1  Christopher B. Ghio (State Bar No. 259094)
   Christopher Celentino (State Bar No. 131688)
2  Jeremy B. Freedman (State Bar No. 308752)
   **DINSMORE & SHOHL LLP**
3  655 West Broadway, Suite 800
   San Diego, CA 92101
4  Telephone: 619.400.0500
   Facsimile: 619.400.0501
5  christopher.ghio@dinsmore.com
   christopher.celentino@dinsmore.com
6  jeremy.freedman@dinsmore.com

7  Proposed Special Counsel to Richard A. Marshack

8

9                **UNITED STATES BANKRUPTCY COURT**

10        **CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION**

11

12  In re:                              Case No.: 8:23-bk-10571-SC

13  THE LITIGATION PRACTICE GROUP P.C.,    Adv. Proc. No.

14        Debtor.                       Chapter 11

15  ──────────────────────────────      **TRUSTEE, RICHARD MARSHACK'S
                                        OMNIBUS** *EMERGENCY* **MOTION FOR:**
16  RICHARD A. MARSHACK,
    Chapter 11 Trustee,
17                                      **1) TURNOVER OF ESTATE PROPERTY
            Plaintiff,                  AND RECORDED INFORMATION
18                                      PURSUANT TO 11 U.S.C. § 542;
            v.                          2) PRELIMINARY INJUNCTION;
19                                      3) LOCK-OUT;
    TONY DIAB, an individual; DANIEL S.  4) RE-DIRECTION OF UNITED STATES
20  MARCH, an individual; ROSA BIANCA LOLI,  PARCEL SERVICES MAIL;
    an individual; LISA COHEN, an individual;  5) ORDER TO SHOW CAUSE RE
21  WILLIAM TAYLOR CARSS, an individual;  COMPLIANCE WITH COURT ORDER;
    ENG TANG, an individual; MARIA EEYA TAN,  AND
22  an individual; JAKE AKERS, an individual; HAN  6) OTHER RELIEF AS NECESSARY TO
    TRINH, an individual; JAYDE TRINH, an  THE EFFICIENT ADMINISTRATION OF
23  individual; WES THOMAS, an individual;  THIS MATTER;
    SCOTT JAMES EADIE, an individual; JIMMY  THE DECLARATION OF RUSS
24  CHHOR, an individual; DONGLIANG JIANG,  SQUIRES; DECLARATION OF DARIUS
    an individual; OAKSTONE LAW GROUP PC;  NEWBOLD;
25  GREYSON LAW CENTER PC; PHOENIX  DECLARATION OF RICHARD
    LAW GROUP, INC.; MAVERICK  MARSHACK; DECLARATION OF
26  MANAGEMENT, LLC; LGS HOLDCO, LLC;  CHRISTOPHER GHIO; AND
    CONSUMER LEGAL GROUP, P.C.; VULCAN  [PROPOSED] ORDER THEREON
27  CONSULTING GROUP LLC; B.A.T. INC. d/b/a
    COAST PROCESSING; PRIME LOGIX, LLC;
28  TERACEL BLOCKCHAIN FUND II LLC;
    EPPS; EQUIPAY; AUTHORIZE.NET; WORLD
    GLOBAL; OPTIMUMBANK HOLDINGS, INC.

1 | d/b/a OPTIMUM BANK; MARICH BEIN, LLC;
BANKUNITED, N.A.; REVOLV3, INC.;
2 | FIDELITY NATIONAL INFORMATION
SERVICES, INC. d/b/a FIS; WORLDPAY, INC.;
3 | WORLDPAY GROUP; MERIT FUND, LLC;
GUARDIAN PROCESSING, LLC; THE
4 | UNITED STATES POSTAL SERVICE; and
DOES 1 through 100, inclusive,

5

6 | Defendants.

Date:   May 26, 2023
Time:   **T.B.D. By Clerk of Court**
Judge:  Hon. Scott C. Clarkson
Place:  Courtroom 5C
        411 W. Fourth Street
        Santa Ana, CA  92701

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................... 2

II.  FACTUAL BACKGROUND .......................................................... 4

    A.   THE DEBT RELIEF INDUSTRY AND LPG'S BUSINESS MODEL ................... 4

        1.   Debt Relief Industry ......................................................... 4

        2.   LPG's Business Model .................................................... 6

    B.   DIAB'S CONTROL OF LPG .................................................... 7

    C.   LPG'S PAYMENT PROCESSING CONTROLLED BY DIAB ..................... 9

    D.   MR. DIAB'S FULFILLED THREAT TO BANKRUPT LPG IN RESPONSE TO
       STATE COURT LAWSUITS ..................................................... 10

    E.   MR. DIAB'S FRAUDULENT TRANSFER OF LPG FILES ..................... 11

    F.   MISDIRECTION OF LPG FUNDS TO DIAB CONTROLLED ENTITIES PRE
       AND POST PETITION ......................................................... 12

    G.   REAL AND PRESENT THREATS TO ESTATE PROPERTY ................... 13

III. THIS COURT IS AUTHORIZED TO ISSUE AN EMERGENCY ORDER TO TURN
    OVER ESTATE PROPERTY AND RECORDED RECORDS PURSUANT TO 11
    U.S.C. §§ 363, 365, 521, 542 AND 548. ...................................... 14

    A.   LPG AND ITS ALTER EGO'S EARNED REVENUE AND ACCOUNTS
       RECEIVABLES ARE PROPERTY OF DEBTOR'S ESTATE. ................ 15

    B.   LPG AND ITS ALTER EGO'S ACH DATA, CLIENT TRANSFER-IN AND
       TRANSFER-OUT DATA SHOULD BE TURNED OVER TO TRUSTEE
       PURSUANT TO SECTION 542(A). ........................................... 16

    C.   SECTION 542(E) AUTHORIZES THIS COURT TO TURNOVER LPG AND
       ITS ALTER EGO'S RECORDED INFORMATION, CLIENT FILES,
       COMMUNICATIONS AND ACCOUNTING DATA. ........................... 18

        1.   LPG and its Alter Ego's DPP, LUNA and Airtable Data Should Be
           Turned Over to Trustee .................................................. 19

        2.   LPG and It's Alter Ego's ACH Data, ACH Transfer Data, Client Transfer-In
           Data, Client Transfer-Out Data And Accounting Data Should Be Turned
           Over To Trustee .......................................................... 20

        3.   LPG and It's Alter Ego's Email  Data Should Be Turned Over To Trustee . 22

    D.   MR. DIAB FRAUDULENTLY TRANSFERRED LPG'S TANGIBLE AND
       INTANGIBLE ASSETS TO ITS ALTER EGO ENTITIES PURSUANT TO 11
       U.S.C. 548(a). .............................................................. 23

i

# TABLE OF CONTENTS

**Page**

IV.  THIS COURT IS AUTHORIZED TO ISSUE A PRELIMINARY INJUNCTION TO PREVENT FURTHER TRANSFER, LOSS, AND DESTRUCTION OF ESTATE PROPERTY ..................................................................................27

    A.  A NO-NOTICE EMERGENCY PRELIMINARY INJUNCTION IS PROPER AND NECESSARY UNDER THE FACTS OF THIS CASE .................................27

    B.  A PRELIMINARY INJUNCTION IS PROPER UNDER THE FACTS OF THIS CASE AS TRUSTEE IS LIKELY TO PREVAIL .....................................................28

V.  CONCLUSION....................................................................................................28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Page**

## CASES

*Adeofolarin Ademosu v. Phoenix Law, PC*
  Case No. 3:23-cv05404-BHS, Docket No. 1 (W. Dist. Wash. May 4, 2023)..................................7

*American Metrocomm Corp. v. Duane Morris & Heckscher LLP* (In re American Metrocomm
  Corp.)
  274 B.R. 641 (Bankr. D. Del. 2002) ..........................................................................18

*Babitt v. Vebeliunas* (In re Vebeliunas)
  252 B.R. 878 (Bankr. S.D.N.Y. 2000), remanded, (S.D.N.Y. Jan. 28, 2002) 2002 U.S. Dist.
  LEXIS 1271 ...................................................................................................14

*Baldi v. Lynch* (In re McCook Metals, L.L.C.)
  319 B.R. 570 (Bankr. N.D. Ill. 2005) ..........................................................23, 24, 25

*Commodity Futures Trading Com v. Weintraub*
  473 U.S. 343 (1985)..........................................................................................22

*Debt Validation Fund II, LLC v. The Litigation Practice Group*
  Case No. 30-2023-01303355-CU-CO-CXC (County of Orange, January 2023). .........................10

*Diamond v. Pillsbury Winthrop Shaw Pittman, LLP* (In re Howrey LLP)
  (N.D. Cal. Bankr. Feb. 7, 2014) 2014 Bankr. LEXIS 527.............................................15

*In re American Express, Inc.*
  132 B.R. 535 (3rd Cir. 1991) ................................................................................15

*In re Anaheim Electric Motor, Inc.*
  138 B.R. 791 (C.D. Cal. 1992) ..............................................................................15

*In re Belize Airways, Ltd.*
  6 B.R. 157 (Bankr. S.D. Fla. 1980)..........................................................................18

*In re Biedermann Mfg. Indus.*
  453 B.R. 802 (4th Cir. 2011) ................................................................................15

*In re Carrozzella & Richardson*
  286 B.R. 480 (Bankr. D. Conn. 2002). ......................................................................24

*In re Crescent Res., LLC*
  457 B.R. 506 (Bankr. W.D. Tex. 2011)..............................................................14, 18

*In re Dawson*
  587 B.R. 327 (Bankr. W.D. Mich. 2018)....................................................................22

*In re Farmer*
  237 B.R. 210 (Bankr. M.D. Fla. 1999) ......................................................................20

# TABLE OF AUTHORITIES

**Page**

*In re Focus Media, Inc.*
    387 F.3d 1077 (9th Cir. 2004) .......................................................................... 27

*In re Heritage Org., LLC*
    350 B.R. 733 (Bankr. N.D. Tex. 2006) ............................................................. 19

*In re McKenzie*
    716 F.3d 404 (6th Cir. 2013) ........................................................................... 18

*In re Nat'l Ctr. For the Empl. Of the Disabled*
    157 B.R. 291 (5th Circ. 1993) .......................................................................... 15

*In re Schneeweiss*
    233 B.R. 28 (Bankr ND NY 1998) .................................................................... 15

*Moore v. Brewer* (In re HMH Motor Servs., Inc.)
    259 B.R. 440 (Bankr. S.D. Ga. 2000) ............................................................... 16

*Plotkin v. Pomona Valley Imports, Inc.* (In re Cohen)
    199 B.R. 709 (9th Cir. BAP 1996); ................................................................... 25

*Rumbaugh v. Harley*
    (E.D. Cal. Aug 22, 2018) 2018 U.S. Dist. LEXIS 143033 .............................. 27

*Spyglass Media Grp., LLC v. Bruce Cohen Prods.* (In re Weinstein Co. Holdings, LLC)
    997 F.3d 497, 504 (3d Cir. 2021) ............................................................... 15, 16

*Taylor v. Rupp* (In re Taylor)
    133 F.3d 1336 (10th Cir. 1998). ....................................................................... 25

*U.S. Trust Co. v. Raritan River Steel Co., Inc.* (In re Am. Spring Bed Mfg. Co.)
    153 B.R. 365 (Bankr. D. Mass. 1993) .............................................................. 17

*Ulrich v. Schain Walker, P.L.C.* (In re Boates)
    551 B.R. 428 (9th Cir. BAP 2016) ................................................................... 15

*United States v. Whiting Pools, Inc.*
    462 U.S. 198 (1983) ......................................................................................... 15

*Validation Partners, LLC v. The Litigation Practice Group*
    Case No. 30-2022-01281911-CU-BC-CXC (County of Orange, September 2022). .................... 10

*West v. Hsu* (In re Advanced Modular Power Sys.)
    413 B.R. 643 (Bankr. S.D. Tex. 2009) ....................................................... 16, 17, 24

*Wolkowitz v. Beverly* (In re Beverly)
    374 B.R. 221 (9th Cir. BAP 2007) ................................................................... 25

*Yaquinto v. Greer*
    81 B.R. 870, 878 (N.D. Tex. 1988) .................................................................. 14

## **TABLE OF AUTHORITIES**

**Page**

**STATUTES**

11 U.S.C. § 363 ........................................................................................................... 14

11 U.S.C. § 365 ..................................................................................................... 14, 21

11 U.S.C. § 521 ........................................................................................................... 14

11 U.S.C. § 521(4) ................................................................................................. 20, 21

11 U.S.C. § 541(a)(1) .................................................................................................. 15

11 U.S.C. § 542 ........................................................................................................... 14

11 U.S.C. § 542(a) ................................................................................................. 16, 18

11 U.S.C. § 542(e) ............................................................................. 18, 19, 20, 21, 22

11 U.S.C. § 544(a) ....................................................................................................... 24

11 U.S.C. § 548 ................................................................................................ 11, 14, 23

11 U.S.C. § 548(a) ....................................................................................................... 23

11 U.S.C. § 548(a)(1) .................................................................................................. 25

11 U.S.C. § 548(a)(1)(B)(i) ......................................................................................... 25

11 U.S.C. § 548(a)(1)(B)(ii)(I) .................................................................................... 25

11 U.S.C. § 548(a)(1)(B)(ii)(IV) ................................................................................. 25

11 U.S.C. 548(a) .......................................................................................................... 26

Civil Code § 3439 ....................................................................................................... 24

Civil Code § 3439.04(b) .............................................................................................. 25

Civil Code § 3439.04(b)(1) .......................................................................................... 26

Civil Code § 3439.04(b)(2) .......................................................................................... 26

Civil Code § 3439.04(b)(3) .......................................................................................... 26

Civil Code § 3439.04(b)(4) .......................................................................................... 26

Civil Code § 3439.04(b)(5) .......................................................................................... 26

Civil Code § 3439.04(b)(7) .......................................................................................... 26

Civil Code § 3439.04(b)(8) .......................................................................................... 26

## <u>TABLE OF AUTHORITIES</u>

<u>**Page**</u>

Civil Code § 3439.04(b)(9) ................................................................................................ 26

Federal Rule of Civil Procedure, Rule 65 ...................................................................... 27, 28

United States Bankruptcy Court, Central District of California, Local Rule 65-1 ............................ 28

1   Trustee, Richard Marshack ("Trustee"), in his capacity as the duly appointed and acting

2   Chapter 11 Trustee seeks an emergency order, as more thoroughly discussed herein and as set forth

3   in the concurrently filed [Proposed] order seeking: 1) turnover of property of the Debtor, The

4   Litigation Practice Group, Inc.'s ("LPG") Bankruptcy Estate (hereinafter "Debtor's Estate"),

5   including but not limited to the approximated $6.3 million dollars in automated clearing house

6   ("ACH") electronic funds transfers ("EFT") pulled through LPG's Revolv3, Inc. merchant account

7   between March and May 2023; 2) turnover of any and all funds from LPG clients related to non-

8   executory contracts that have been earned and payments remain under the client's plan, including

9   any amounts transferred to any one or more of LPG's Alter Egos[1]; 3) for LPG's client ACH's to

10  continue as scheduled and held in trust by the ACH processing company to be transferred pursuant to

11  instructions by the Trustee; 3) protect property and critical recorded information related to the

12  Debtor's Estate that has been transferred out of LPG to its Alter Egos; 4) turnover recorded

13  information in order for the Trustee to determine which executory contracts are to be assumed and

14  which are to be rejected; 5) prevent access to LPG and its Alter Ego's real property, stored information

15  and servers pending the Trustee review and determination regarding the Debtor's Estate and

16  executory contracts; 6) enjoin LPG and its Alter Egos from accessing and/or transferring any funds

17  received from clients by way of ACH EFT or check pursuant to LPG's Legal Services Agreement

18  ("LSA") and client payment plan contracts; 7) send Trustee notice to LPG clients whose files were

19  fraudulently transferred to Alter Ego entities of: i) the Bankruptcy; ii) evaluation of the client's file;

20  and ii) and status prior to assuming or rejecting such contracts in substantially similar form as attached

21  to the [Proposed] Order concurrently filed herewith; 8) re-directing all LPG; Oakstone; Phoenix,

22  Greyson; Gallant; CLG; Prime Logix and Vulcan's mail to an address designated by Trustee; 9) an

23  order shortening time to hear Trustee motions required for the efficient and effective administration

24  _____

25  [1] The Alter Egos include, but are not limited to: OakStone Legal Group, P.C. ("OakStone"); Greyson

26  Law, P.C. ("Greyson"); Phoenix Law Group, P.C. (Phoenix); LGS Holdco., LLC; Consumer Legal
    Group, P.C. ("CLG"); Maverick Management, LLC ("Maverick"); Vulcan Consulting Group, LLC

27  ("Vulcan"); Strategic Consulting Solutions, LLC ("SCS"); BAT Inc. d/b/a Coast Processing ("Coast
    Processing"); Prime Logix, LLC ("Prime Logix"); Tony Diab; Rosa Loli aka Rosa Bianca Loli aka

28  Bianca Loli ("Rosa Loli"); Lisa Cohen and/or any other alias', agents or corporate entities affiliated
    with same (collectively referred to herein as "Alter Egos" unless specifically identified).

1  of Debtor's Estate to the large quantity of vendors and clients, to require only four (4) business days'

2  notice absent the existence of exigent circumstances requiring emergency relief and subject to the

3  Court's discretion to require notice per code; and 10) an order to show cause hearing directing Tony

4  Diab, Lisa Cohen, Daniel March and William Taylor "Ty" Carrs to appear in court regarding

5  compliance with the Court's order and to sit for limited examination regarding the $6.3 million dollars

6  in ACH EFTs through LPG's merchant account at Revolv3, Inc. from March 2023 to present, and

7  other ACH EFTs processed post-petition through any other ACH processing company.

8  **I.    INTRODUCTION**

9      "Pay no attention to the man behind the curtain!" (Noel Langley, The Wizard of Oz).

10      Tony Diab and his cohorts have lived behind a web of lies since 2019 after Mr. Diab was

11  disbarred by the California and Nevada State Bar Associations for forging a Judge's signature and

12  stealing client funds. From moving his operations from Nevada to California, requiring his employees

13  to call him "Admin" rather than his real name, to hiring "curtains" including John Thompson, Daniel

14  March and most recently William Taylor "Ty" Carrs of Phoenix to be the face of his debt relief law

15  practices, Mr. Diab has made every effort to deceive and defraud those clients who come to him for

16  help. Without mistake, Mr. Diab has actively been running LPG and its Alter Egos, providing

17  unauthorized legal advice and syphoning off millions of dollars (the full extent of which is unknown

18  at this time) from LPG in order to defraud its creditors. In this regard, as soon as LPG's creditors

19  stopped receiving payment, they filed lawsuits in State Court seeking the appointment of a receiver

20  with similar duties of a Bankruptcy Trustee. In response, Mr. Diab threatened and fulfilled on his

21  threat to bankrupt LPG, but not before transferring his golden egg, LPG's client files and ACH

22  information, to its Alter Egos.

23      To wit, LPG's Bankruptcy is yet another cloaked canard designed by Mr. Diab to hide behind

24  Bankruptcy protection, stave off creditors and maintain control of LPG's clients, information, ACH

25  data, software programs, vendors and most importantly LPG's $12 to $24 million dollar a month

26  revenue from Client ACH driven account receivables. Equally concerning is Mr. Diab's intent to

27  defraud the Trustee and this Court. By way of example, and as more thoroughly detailed in the

28  Declaration of Trustee, Mr. Diab has represented he does not have control over LPG's client files

1  including ACH payments transferred to Phoenix. Yet the evidence reveals the username and password

2  for LPG's ACH merchant account at Revolv3, Inc. is: **Username: tony.diab; Password: Rosaloli1**.

3  Mr. Diab continues to represent he is unable to access LPG funds, yet post-petition has successfully

4  processed $6.3 million dollars on behalf of Phoenix and transferred all or a portion thereof to other

5  entities he controls including but not limited to Prime Logix and Vulcan from which he made LPG's

6  payroll, and refunded selected client accounts, many of whomcomplained to the Better Business

7  Bureau ("BBB") and Law360. The evidence and MR. Diab's threats are clear, without emergency

8  relief, he and his cohorts will continue take measures to hide their golden egg, destroy any goodwill

9  and business reputation LPG had, continuously switching clients to his various alter ego companies.

10  Recently, having contended that the clients had been transferred to Phoenix, it appears he is now

11  trying to switch clients to yet another newly created debt relief company under his control, Maverick

12  Management, LLC. In doing so, Mr. Diab and his cohorts intend to make good on their threats and

13  ensure Debtor's Estate and its creditors suffer substantial harm as he has already attempted to do.

14      LPG has a duty to turn over access and possession of Estate Property to their Chapter 11

15  Trustee in order to allow the Trustee to ascertain and preserve Estate Property, including earned

16  retainer revenue, ACH Data and Accounting, and prevent any further fraudulent transfers of client

17  files, loss of Estate Property as a result of recent threats impacting the value of Estate Property and

18  clients of LPG. LPG and Diab are thwarting the obligation to turn over such information to the

19  Trustee. Trustee and his agents have made multiple requests for access to and the turnover of the

20  Estate Property, including but not limited to the information sought by the Trustee's motion for

21  turnover, to no avail. Instead, Mr. Diab has offered nothing but misrepresentations contrary to

22  information being provided by current employees, clients, and apparently even Law360 reporters.

23      Left with no other option, another multi-million dollar ACH pull scheduled to take place on

24  or about June 1, 2023 and credible threats of further transfer and dissipation of LPG assets and

25  physical harm to employees, Trustee requests an emergency order directing LPG, it officers, directors,

26  agents, anyone working in cooperation or in concert with them, and any one or more of its Alter Egos

27  to turnover property of the Debtor's Estate, including LPG revenue and recorded information as set

28  forth herein, refrain from accessing or transferring successfully processed ACH EFT from client

1  accounts to be held in trust by ACH process companies and their affiliated financial institutions.

2  Additionally, the Trustee seeks an order establishing procedures for enforcement of the turnover

3  order, preliminary injunction and safeguards to ensure LPG client funds are not diverted to Mr. Diab

4  and the Alter Egos.

5  **II.    FACTUAL BACKGROUND**

6      **A.    THE DEBT RELIEF INDUSTRY AND LPG'S BUSINESS MODEL**

7          **1.    Debt Relief Industry**

8        LPG operates in the debt relief industry that generally targets "vulnerable, legally

9  unsophisticated debtors" who are unable to pay their debts, receiving collection calls and/or whose

10  credit report is incorrectly reporting consumer credit, typically revolving credit card or similar credit

11  arrangements. *See* Declaration of Chris Ghio ("CG Decl.") at ¶ 3, Exh. 1 at pg. 3; Declaration of Russ

12  Squires ("RS Decl.") at ¶ 4, Exh. 2. Debt relief companies operating in this space market an ability to

13  eliminate the challenged and often delinquent debt, stop harassing collection calls, remove the debt

14  from their credit report and, if necessary, provide legal representation in court should a collection

15  lawsuit be filed. RS Decl. at ¶ 4, Exh. 2. Such companies, however, offer no guarantees and if the

16  legal services are provided offer no or few refunds even if the debt is not eliminated or successfully

17  challenged. *Id.* For these services, clients are generally asked to pay forty (40%) percent of the balance

18  of the challenged debt(s) over a period of 24 to 60 months. *Id.* at 6. By way of example, if a potential

19  new client has two credit cards totaling $5,000 per card they want to challenge ($10,000 in total), the

20  debt relief company will often charge $2,000 per debt paid over 48 months for a monthly fee of $41.66

21  per month per debt ($83.33) in total. In reality, average monthly payment plans in the industry run

22  between $200 and $300 per month. *Id.*

23        As such, determining whether to sign up a new client often revolves around the issuer and

24  amount of the debt, and whether the client is able to afford the proposed monthly payment for the

25  debt relief services to be provided. This often requires pulling their credit report, obtaining their

26  income information, reviewing the type and issuer of the debt because some companies historically

27  have better success rates than others, and evaluating the client for potential payment plan default.

28  Debt relief companies obtain new clients from a number of sources including self-marketing, referrals

1    from other financial related businesses and accountants, and also from companies whose sole focus

2    is to identify and sign up new debt relief clients, these entities are generally referred to as "cappers"

3    or "capping companies". RS Decl. at ¶ 4, Exh. 2. Once a capper signs up enough new clients, it will

4    sell a batch to debt relief companies based on a percentage of the total payment plan receivables for

5    that batch of new clients taking into account a discount for historical non-payment rates associated

6    with that specific capper and/or industry standard. *Id.*

7         Once a new client has signed up, executed the retainer, payment plan contract and provided

8    their bank ACH information or been purchased from a capper, the debt relief company, such as LPG

9    and its Alter Egos, is responsible for servicing the client file. In this regard, debt relief companies,

10   such as LPG used software such as DebtPayPro ("DPP"), to automate the dispute process, client

11   communications and payment information. RS Decl. at ¶ 7. For instance, the correspondence sent on

12   behalf of clients to creditors, collection agencies and/or the credit bureaus related to the challenged

13   debt are automated and generic templates sent via US Mail, facsimile and/or electronically. *Id.* When

14   LPG and its Alter Ego's switched over to proprietary software, "LUNA", Mr. Diab had built to

15   facilitate and conceal the transfer of client files, most, if not all the automation provided by DPP was

16   lost. *Id.* at ¶ 8.

17        Some debt invalidation cases result in the debt in-dispute being corrected on the client's credit

18   report, some as a result of consumer protection laws are successfully challenged and yet others result

19   in settlement of the debt, which the client is responsible to pay in addition to the agreed upon payment

20   plan with the debt relief company. RS Decl. at ¶ 4, Exh. 2. In limited instances, will a debt relief

21   company such as LPG file a lawsuit in an effort to eliminate a debt in dispute. *Id.* Similarly, defending

22   clients against debt collection lawsuits is also a small fraction of their business model. *Id.* Clients that

23   actually require litigation are often less profitable despite the client's agreement to provide additional

24   compensation in the event of any actual litigation.

25        In order to grow quickly or even maintain a healthy pipeline of new clients and revenue, some

26   debt relief companies will borrow money against and sell future streams of client receivables (ACH

27   transfers) to companies known as "factoring companies". RS Decl. at ¶ 4, Exh. 2. Companies such as

28   LPG generally sell such receivables at discount and play an important role in the debt relief income,

1  growth and turnover cycle. In this regard, factoring companies provide necessary capital to purchase

2  new clients from capping companies, hire additional staff to meet client needs, replace completed,

3  cancelled or defaulted client files with income generating clients among other marketing efforts and

4  capital requirements. At which time, the cycle essentially starts over again.

5  **2.    LPG's Business Model**

6  Since approximately March 1, 2019, Debtor, LPG has and continues to run a debt relief law

7  practice servicing over 40,000 client files nationwide (although the exact number is unknown this

8  figure could be as high as 67,000 client files) wherein it receives a regular payment, primarily via

9  ACH ETF from client financial accounts for legal and other non-legal services pursuant to contract

10  in an effort to extinguish, settle or reduce consumer debts on their behalf. LPG's LSA represents it

11  provides the following services: 1) assistance with stopping creditors and any related debt collectors

12  from harassing or contacting clients in connection with any of the debts in dispute; 2) dispute the

13  legal validity of the debts in dispute; 3) assistance with removing erroneous or inaccurate information

14  reported in connection with debts in dispute; 4) defending clients against any collection activity or

15  lawsuit on any invalidated debt; 5) initiating legal action in a court against any creditor that violates

16  state or federal law in connection with the debt in dispute; and 6) qualifying clients for Bankruptcy

17  under Chapter 7 or Chapter 13 of the U.S. Bankruptcy Code and provide counsel regarding whether

18  the client qualifies, the procedures and effect of filing bankruptcy. RS Decl. at ¶ 6, Exh. 3.

19  In the event LPG does not file a lawsuit, reach a settlement regarding the debt in dispute,

20  obtain an acknowledgment of invalidity or the debt is still reporting to one of the three credit bureaus,

21  the client could at their request receive a refund as to the service fee related only to that specific "debt

22  in dispute" at the end of the payment plan and upon termination of LPG's representation of the client.

23  RS Decl. at ¶ 6, Exh. 3. This provision, however, does not apply to other debts in dispute by a client

24  who received one or more of the foregoing outcomes stated in the LSA. *Id.*

25  In order to provide, manage and service client accounts, LPG previously utilized DPP, a cloud

26  based debt collection customer relationship management software program provided by Forth, Inc.

27  DPP collected client information, debts in dispute, client credit reports, client ACH and financial

28  account information, settlements and other activity on a client's file including communications and

efforts taken to invalidate the debt in dispute. RS Del. at ¶ 7. DPP further contains additional information regarding payments to outside factoring companies and creditors, including Validation Partners, LLC and cappers, such as Morning Financial, among other critical information. *Id.*; Declaration of Darius Newbold ("DN Decl.") at ¶ 4.

Surreptitiously, LPG moved its client files from DPP to transfer its client files to a proprietary software program, LUNA, at or around the time LPG filed its Bankruptcy petition. In doing so, Mr. Diab opened an avenue to hide information from the Court, the Trustee, and later preventing same from accessing information concerning LPG's client files and as discussed below to effectuate a fraudulent transfer of thousands of client files (and affiliated revenue) to OakStone, Phoenix and/or CLG. RS decl. at ¶ 8. LUNA is currently hosted on Amazon's Web Service ("AWS"), however, does not have the functionality of DPP causing many files to go unserviced, potentially harming clients. *Id. see also Adeofolarin Ademosu v. Phoenix Law, PC*, Case No. 3:23-cv05404-BHS, Docket No. 1 (W. Dist. Wash. May 4, 2023) [alleging LPG and Phoenix have breached the LSA in failing to provide the services for which LPG was retained and wrongfully transferring the client's file to Phoenix without proper client consent].

As discussed above, LPG often charged forty (40%) percent of total outstanding balance of each debt in dispute to be paid in monthly installments over a twenty-four to sixty month payment plan. RS Del. at ¶ 6, Exh. 3. The amount and duration of the payment plan often depended on the client, amount of debt in dispute and the client's ability to make monthly installment payments. *Id.* On average LPG successfully processes through ACH processing companies and affiliated banks approximately, $280 to $310 per client per month. *Id.* With an estimated 40,000 or more active client files, LPG's monthly revenue, including those files fraudulently transferred to its Alter Egos, should range from approximately $11.2 million to $12.4 million dollars per month. *See* Declaration of Richard Marshack ("RM Decl.") at ¶ 4, Exh. 2 at 51:11-15.

## B.    DIAB'S CONTROL OF LPG

LPG's initial managing shareholder and whose California law license LPG "rented" according to Mr. Diab, was initially that of John Thompson. CG Decl. at ¶ 5, Exh. 3; DN Decl. at ¶ 3, Exh. 1 at ¶ 57. Ms. Rosa Loli was also listed as an officer of LPG at that time. CG Decl. at ¶ 5, Exh. 3. On or

1   around June 15, 2021, Mr. Thompson was replaced by Mr. Diab with Daniel March and Ms. Loli's

2   role at LPG like Mr. Diab's was intentionally hidden. CG Decl. at ¶ 5-6; Exh. 3-4. For the use of Mr.

3   March's law license he received an annual salary of approximately $600,000 per year in additional to

4   discretionary bonuses provided by its true owner, Tony Diab. DN Decl. at ¶ 3, Exh. 1 at ¶ 57.

5       Despite concerted efforts to deceive LPG clients, consumers, the public at large, the Trustee

6   and this Court, LPG is effectively run and managed by Mr. Diab, a disbarred California and Nevada

7   attorney. RS Decl. at ¶ 3, Exh. 1 at ¶ 14; CG Decl. at ¶¶ 10-11, Exhs. 8-9. To wit, in January 2023,

8   Mr. Diab informed Law360 "the notion that [Daniel March is] just a figurehead or something like

9   that is absurd." CG Decl. at ¶ 3, Exh. 1 at pg. 4. At Debtor's 341(a) creditors hearing, Mr. Diab

10  attempted to down play his role as an outside contractor managing LPG's third party vendors and

11  dispel of any control over LPG and its legal practice. RM Decl. at ¶ 11, Exh. 8. Notably, however,

12  Mr. Diab could not explain why none of the network of attorneys he employed were present for the

13  341(a) hearing and why Mr. March had little input. *Id.*

14      On May 19, 2023, the curtains were pulled back and Mr. Diab admitted that after being

15  disbarred in 2019 by the State of California and Nevada for forging a Judge's signature and stealing

16  from his clients, he created LPG, controlled the firms business operations, mailing centers and

17  "worked to keep his own involvement secret from banks and other institutions" including this Court.

18  CG Decl. at ¶ 3, Exh. 1 at pg. 4.

19      Mr. Diab's involvement in LPG, however, went far beyond LPG's business operations. From

20  LPG's inception, Diab has exercised full control over LPG's legal practice, finances, ACH

21  information and accounting. Mr. Diab requires employees call him "Admin" rather than referring to

22  his first or last name. RS Decl. at ¶ 3, Exh. 1 at ¶15. Mr. Diab maintains an office and active presence

23  at LPG's headquarters overseeing not only the business operations but also the legal operations. *Id.*

24  Mr. Diab has and continues to provide counsel and advice to LPG clients. RS Decl. at ¶ 3, Exh. 1 at

25  ¶ 18. To hide his identity while giving unauthorized legal advice, Mr. Diab has used an LPG email

26  account "Attorney Attorney" to communicate with clients. *Id.* Moreover, Mr. Diab has executed LPG

27  client Legal Services Agreement's utilizing Mr. Marchs' and potentially other attorney's signature

28

1  through LPG's primary DocuSign account, admin@lpglaw.com.[2] RS Decl. at ¶ 3, Exh. 1 at ¶ 22.

2  With little doubt, Mr. Diab has and continues to control and fraudulently transfer LPG client files,

3  ACH processing accounts, LPG revenue, and financial information that are property of Debtor's

4  Estate.

5       **C.    LPG'S PAYMENT PROCESSING CONTROLLED BY DIAB**

6         LPG's monthly revenue from client files is primarily received via ACH payments, with few

7  monthly payments and other income being received via check or mail. In order to process ACH

8  payments LPG is required to enlist the services of ACH payment processing companies who handle

9  high risk transactions. In this regard, Mr. Diab has enlisted an army of ACH processing companies[3]

10 in order to easily switch between different vendors and quickly transfer millions of dollars of LPG

11 funds to entities he controls, including but not limited to Vulcan, Prime Logix, SCS and/or Coast

12 Processing generally in less than three days from the ACH pull, without oversight, detection and to

13 avoid payment disputes and/or complications with the vendor itself. RS Decl. at ¶ 9. Notably, LPG

14 does not have service contracts with EPPS or Marich Bein, WorldGlobal, EPPS and Optimum Bank

15 among others who have processed the majority of LPG's ACH payments giving the appearance Mr.

16 Diab is affiliated with or has significant influence over such entities. RS Decl. at ¶ 9; DN Decl. at ¶ 3,

17 Exh. 1 at ¶¶ 47 and 49.

18 ///

19 ///

20

21  ──────────────────────

22 [2] Notably, the admin@lpglaw.com email account Mr. Diab has used to engage in the unauthorized
   practice of law is the same account Mr. Diab has used to communicate with Trustee in Debtor's

23 bankruptcy matter. See RM Decl. at ¶ 9, Exh.7.

24 [3] The ACH processing companies LPH has and currently and which Mr. Diab has control over,
   include but are not limited to EPPS; EquiPay, LLC ("EquiPay"); Merit Fund, LLC ("Merit Fund");

25 Authorize.net a subsidiary of Visa, Inc. ("Authorize.net"); World Global; OptimumBank Holdings,
   Inc. dba Optimum Bank ("Optimum Bank"); BankUnited, Inc. ("BankUnited"); Marich Bein, LLC

26 ("Marich Bein"); Revolv3, Inc. ("Revolv3"); Fidelity National Information Services, Inc. dba FIS ,
   including but not limited to its subsidiaries Worldpay, Inc., Worldpay Group or any other subsidiaries

27 providing ACH processing services ("FIS"); Guardian Processing, LLC ("Guardian"); and/or any
   entity associated with the ACH identification transaction "LPG 949-226-6262 #5 2363 RT 9 TOMS

28 RIVER NJ 0875" or any such substantially similar ACH identification transaction.

1       By way of example, on April 8, 2022, an issue arose between World Global and LPG wherein

2  World Global processed approximately $10 million dollars in ACH client transfers without

3  authorization and refused to release the funds to LPG or its clients. RS Decl. at ¶3 and 10, Exh. 1 at

4  ¶ 55-70. LPG's investors insisted LPG file suit against World Global and even paid a $50,000 retainer

5  on LPG's behalf to do so. Mr. Diab, however, stepped in and apparently made a side deal worth

6  approximately $7 million dollars he hid from his investors, the true nature of which remains unknown

7  including three million dollars of the funds withheld by World Global. *Id*. Thus, the evidence strongly

8  suggests Mr. Diab has and continues to influence, if not outright control, the companies processing

9  LPG and its Alter Egos ACH EFT's and therefore over property of the Debtors estate in order to

10  fraudulently transfer funds to himself and the Alter Egos. *Id*.; DN Decl. at ¶ 3, Exh. 1 at ¶¶ 20-21.

11       As audited by LPG's investors pre-petition, LPG's monthly gross revenue from receipt of

12  client payments has ranged between $8.4 million to $11.2 million per month for the months, May

13  2022 through September 2022. DN Decl. at ¶¶ 35-38. It is estimated that the current monthly revenue

14  from client accounts that are serviced exceed $15 million dollars per month using a conservative

15  growth model and based on the number of estimated client files whose ACH EFT's are successfully

16  processed. *Id*. Notwithstanding LPG's substantial monthly revenue and relatively low pre-petition

17  monthly expenses (ranging between $2.3 to $3.4 million per month at the end of 2022), LPG was not

18  accumulating any cash on hand and claimed to have only $4,500 in its bank account at the time it

19  filed bankruptcy on March 20, 2023. *Id*.

20  **D.    MR. DIAB'S FULFILLED THREAT TO BANKRUPT LPG IN RESPONSE TO**

21        **STATE COURT LAWSUITS**

22       In September of 2022 one of LPG's largest creditors, Validation Partners, LLC filed a lawsuit

23  against LPG, Tony Diab and others for breach of contract among other causes of action. See

24  *Validation Partners, LLC v. The Litigation Practice Group*, Case No. 30-2022-01281911-CU-BC-

25  CXC (County of Orange, September 2022). In January 2023, Creditor Debt Validation Fund II, LLC

26  filed a similar lawsuit against LPG and Mr. Diab, among others. See *Debt Validation Fund II, LLC*

27  *v. The Litigation Practice Group*, Case No. 30-2023-01303355-CU-CO-CXC (County of Orange,

28  January 2023). Notably, the lawsuits sought the appointment of a receiver to perform many of the

1    same duties of the Trustee and obtain the information, an accounting of LPG funds, assets and

2    accounts receivables and maintain the status quo, among other relief, pending the outcome of said

3    litigation. RS Decl. at ¶ 10. On or about November 18, 2022, in response to LPG's creditor's efforts

4    to seek the appointment of a receiver in the state lawsuits, Mr. Diab made his intentions known. *Id.*

5    at ¶ 10, Exh. 4. <u>Mr. Diab threatened that if LPG's investor's continued to have a receiver take control</u>

6    <u>of LPG and away from him, he would bankrupt the company, transfer files and destroy evidence to</u>

7    <u>which investors were warned to protect themselves, their assets and evidence.</u> *Id.* A threat Mr. Diab

8    was already in the process of following through on to avoid losing control of LPG and more

9    importantly his golden egg, LPG's revenue.

10       In an effort to make LPG appear bankrupt, in February of 2023, Mr. Diab purchased a 20 year

11    old shell corporation and the website domain phoenixlaw.co and registered the business with the

12    Better Business Bureau ("BBB"). CG Decl. at ¶¶ 6-8, Exh. 4-6. Similarly, between November 2022

13    and March 20, 2023, Mr. Diab set up Oakstone, Greyson, Gallant and CLG, set up a new attorney

14    networks, offices and continued running LPG's business through these new entities contrary to Mr.

15    Diab's 341(a) testimony that LPG was not able to afford to service the same clients through LPG.

16    RM Decl. at ¶ 11, Exh. 8 at ¶¶ 11-12.

17      **E.    MR. DIAB'S FRAUDULENT TRANSFER OF LPG FILES**

18       At or around the time LPG filed its petition for protection under Chapter 11 on March 20,

19    2023, Mr. Diab has admitted LPG had already transferred 15,000 client files to OakStone

20    (approximately $4.2 million in revenue), 12,000 files to CLG (approximately $3.3 million in revenue)

21    and the remaining files, approximated by Mr. Diab at slightly less than 40,000 client files to Phoenix

22    (approximately $11.2 million in revenue). RM Decl. at ¶ 11, Exh. 8 at 51:18-24. Neither LPG nor Mr.

23    Diab obtained consent prior to fraudulently transferring the client files to these alter egos. LPG does

24    not have an executed assignment contact for the fraudulently transferred client files, and even if an

25    executed copy existed they would be void pursuant to 11 U.S.C. § 548. RM Decl. at ¶ 12. Mr. Diab

26    has and continues to misrepresent and attempt to hide his control and financial interest in these alter

27    ego entities to the Trustee. *Id.* at ¶ 4-11. As such, the Trustee seeks an emergency order maintaining

28    the status quo, enjoining any further transfer of any LPG Client and/or client obtained using Funds

1  that are property of the Debtor's Estate and turning over necessary information to either assume or

2  reject each of the 40,000 or more potentially outstanding and unearned executory contracts.

3  **F.    MISDIRECTION OF LPG FUNDS TO DIAB CONTROLLED ENTITIES PRE**

4  **AND POST PETITION**

5      A review of LPG's financial accounting conducted at Mr. Diab's request by Mr. Newbold,

6  evidence a history of Mr. Diab re-directing significant sums of money to entities he owns and/or

7  controls impacting LPG's ability to pay its creditors and ultimately filing for protection under Chapter

8  11 of the Bankruptcy Code. DN Decl. at ¶ 3, Exh. 1 at ¶¶ 10-16, 50-59. By way of example, LPG's

9  financial records indicated monthly expenditures for "legacy costs" which Mr. Diab explained were

10  in part costs incurred by Coast Processing, one of Mr. Diab's debt relief marketing companies. DN

11  Decl. at ¶ 3, Exh. 1 at ¶ 10. Moreover, between June through October 2022 alone, LPG had made

12  over $1.6 million in "legacy cost" payments to companies he owned or controlled, including Veritas,

13  Strategic Consulting and United Partnerships. *Id.* Mr. Diab explained to Mr. Newbold that LPG was

14  being extorted by many other people who had threatened physical harm and thus he had no choice

15  but to make payments as soon as funds were available. *Id.* Thus, permitting LPG and Mr. Diab to

16  maintain control over client ACH processing and accounts without turning them over, provide LPG

17  and Mr. Diab with the means to wrongfully continue to divert, squander and fraudulently transfer

18  Estate Property to himself and others, including the Alter Egos.

19      To wit, such fraudulent transfers in violation of the Bankruptcy code are currently taking

20  place, post-petition, and will continue absent immediate Court intervention. The evidence shows Mr.

21  Diab, Ms. Cohen, Ms. Loli and the same group of affiliated individuals running LPG are now, post-

22  petition syphoning off money through the newly created Alter Ego entities, using LPG's ACH

23  processing accounts at Revolv3, among others, that identify "Tony Diab" as the user of the account

24  and LPG as the merchant account holder. RS Decl. at ¶ 16, Exh. 5. Along these lines, LPG's Revolv3

25  account indicates from March 28, 2023 through May 19, 2023, Mr. Diab has netted approximately

26  $6.3 million dollars and fraudulently transferred such funds to LPG's Alter Ego entities, including

27  but not limited to Prime Logix and Vulcan. *Id.* Mr. Diab, Ms. Cohen and/or Ms. Loli appear to have

28  then used such funds to make LPG's payroll from Vulcan's accounts held at Bank of America. RM

1   Decl at ¶ 6, 18. Clients who have requested a refund after their file was transferred to Phoenix were

2   refunded by a Bank of America account held by Prime Logix. CG Decl. at ¶ 3, Exh. 1. This, however,

3   only unveils the curtain on a limited number of transactions we have been able to uncover in the last

4   7 business days. The evidence shows Mr. Diab has also used other ACH processing companies

5   including Guardian Processing among others to fraudulently process and transfer property of Debtor's

6   Estate through Mr. Diab's army of Alter Egos and ACH processing companies which have

7   mysteriously disappeared.

8       **G.**    **REAL AND PRESENT THREATS TO ESTATE PROPERTY**

9          Competing debt relief law firms and/or marketing companies, including those who have even

10  sold files to LPG (capping companies) including Point Break Debt Relief have started to market to

11  LPG clients advising of the bankruptcy in an effort to solicit them to switch services, depriving LPG

12  of monthly revenue. CG Decl. at ¶ 9, Exh. 7. Such efforts present a real and immediate threat to Estate

13  Property and revenue. This is especially true given a recent issue with World Global who illegally

14  withdrew $10 million dollars in payments from LPG clients causing over 2,000 LPG clients to

15  terminate their files. RS Decl. at ¶ 3, Exh. 1 at ¶¶ 55-59. According to Mr. Diab, World Global has

16  again recently threatened to initiate wrongful ACH withdraws from LPG client financial accounts

17  totaling approximately $10 million dollars suggesting Mr. Diab is controlling World Global and/or

18  constructing falsified disputes with World Global in order to transfer millions of dollars to himself

19  and the Alter Egos. *Id.* at ¶ 10; RM Decl. at ¶ 13. As such, a real and immediate threat to property of

20  the Estate exists warranting immediate intervention of the Court as requested by the Trustee.

21         Moreover, LPG, OakStone and Phoenix have failed to perform work on many of LPG's client

22  files which may constitute a material breach of the Legal Services Contract making the performance

23  under the retainer uncertain. As noted in many complaints to the BBB, Law 360 and other channels,

24  clients have voiced concern that their files are not being serviced, that they cannot reach anyone at

25  LPG, Phoenix, among the other Alter Ego entities. CG Decl. at ¶ 7, Exh. 5. The court is without

26  authority to order LPG or the Alter Ego entities to perform work on such files. As such, the only

27  viable method to service the files the Trustee intends to assume, protect LPG clients, property of the

28

1  Debtor's Estate and prevent a material breach of LPG's LSA is to grant Trustee's requested relief

2  herein.

3    Along these lines, absent an immediate order requiring LPG to turnover the Property, the

4  Trustee is not able to evaluate the nature, scope and extent of LPG's breaches that may exist and

5  determine whether to assume or reject the remaining 40,000 or more executory contracts that have

6  not been fully performed. 11 U.S.C. § 365. The longer the delay in obtaining such information while

7  LPG clients continue to make payments, the more likely a breach has or will occur causing the client

8  to demand a refund, switch attorneys, or both, significantly diminishing the value of LPG's

9  Bankruptcy Estate and potentially creating a substantial pool of unsecured creditor claims and/or class

10 action lawsuit.

11   Moreover, threats of physical violence have been made by Mr. Diab and his cohorts against

12 any employee who has provided LPG's creditors or the Trustee with insider information. RS Decl. at

13 ¶ 20. RM Decl. at ¶¶ 11-13. Given Mr. Diab's intent to follow through with his prior threats, discussed

14 above, a real and present threat of harm to LPG employees exist absent an order granting the requested

15 relief. With little doubt, a real and imminent threat to Debtor's estate and LPG employees exists such

16 that the emergency relief requested is the only reasonable method of protecting Debtor's Estate,

17 employees, and clients and the effective administration of Debtor's Bankruptcy matter.

18 **III. THIS COURT IS AUTHORIZED TO ISSUE AN EMERGENCY ORDER TO TURN**

19    **OVER ESTATE PROPERTY AND RECORDED RECORDS PURSUANT TO 11**

20    **U.S.C. §§ 363, 365, 521, 542 AND 548.**

21   In a turnover action under 11 U.S.C. § 542, the Trustee bears the initial burden to prove that

22 property at issue is property of estate and in the possession or control of the Debtor at the time the

23 turnover proceeding is commenced. *Yaquinto v. Greer*, 81 B.R. 870, 878 (N.D. Tex. 1988). For

24 purposes of turnover, including attorney-client files, under 11 U.S.C. § 542, the Trustee need only

25 show property is property of the estate by a preponderance of the evidence as opposed to clear and

26 convincing evidence. *In re Crescent Res., LLC*, 457 B.R. 506 (Bankr. W.D. Tex. 2011); *Babitt v.*

27 *Vebeliunas* (In re Vebeliunas), 252 B.R. 878 (Bankr. S.D.N.Y. 2000), remanded, (S.D.N.Y. Jan. 28,

28 2002) 2002 U.S. Dist. LEXIS 1271.

1
2

A.    **LPG AND ITS ALTER EGO'S EARNED REVENUE AND ACCOUNTS RECEIVABLES ARE PROPERTY OF DEBTOR'S ESTATE.**

3    Section 541 enumerates property of debtor's bankruptcy to consist of all legal or equitable

4 interests of the debtor in property at the time the case is commenced. 11 U.S.C. § 541(a)(1). This has

5 been interpreted in the Ninth Circuit broadly to include all types of property, including tangible and

6 intangible. *In re Anaheim Electric Motor, Inc.*, 138 B.R. 791, 792-93 (C.D. Cal. 1992) citing *United*

7 *States v. Whiting Pools, Inc.,* 462 U.S. 198, 205 (1983).

8    It has long been recognized in the Ninth Circuit, among other jurisdictions, that accounts

9 receivable are property of the Bankruptcy estate. *See In re Anaheim Electric Motor, Inc.*, 138 B.R.

10 791, 792-93 (C.D. Cal. 1992) citing *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 205 (1983);

11 see also *In re Biedermann Mfg. Indus.*, 453 B.R. 802, 807 (4th Cir. 2011); *In re American Express,*

12 *Inc.*, 132 B.R. 535, 539 (3rd Cir. 1991); *In re Nat'l Ctr. For the Empl. Of the Disabled*, 157 B.R. 291,

13 296 (5th Circ. 1993).

14    In the context of pre-petition retainer agreements, such as LPG's Legal Services Contract,

15 where Debtor has performed those services and has therefore earned and is entitled to future

16 receivables from the client, the contract is no longer executory and therefore property of the estate.

17 *Ulrich v. Schain Walker, P.L.C.* (In re Boates), 551 B.R. 428, 436 (9th Cir. BAP 2016) [holding a

18 retainer for legal services was an executory contract where both parties had contractual duties yet to

19 be performed that the failure to perform would constitute a material breach and therefore not property

20 of the estate] *In re Schneeweiss*, 233 B.R. 28 (Bankr ND NY 1998) [all payments under the terms of

21 a non-executory contract post-petition are property of the estate and must be turned over to the

22 Trustee]; *Diamond v. Pillsbury Winthrop Shaw Pittman, LLP* (In re Howrey LLP), (N.D. Cal. Bankr.

23 Feb. 7, 2014) 2014 Bankr. LEXIS 527 [Chapter 11 trustee could not recover profits on law firm's

24 unfinished business.].

25    LPG having duly performed and incapable of a breach of the retainer, the future accounts

26 receivables, Retainer Revenue and ACH payments, post-petition are property of the debtor's estate.

27 *Spyglass Media Grp., LLC v. Bruce Cohen Prods.* (In re Weinstein Co. Holdings, LLC), 997 F.3d

28 497, 504 (3d Cir. 2021). As the third Circuit explained, "a helpful perspective is to view executory

1  contracts as a combination of assets and liability to the bankruptcy estate; the performance the

2  nonbankrupt owes the debtor constitutes an asset, and the performance the debtor owes the

3  nonbankrupt is a liability. Under this framework, a contract where the debtor fully performed all

4  material obligations, but the nonbankrupt counterparty has not, cannot be executory; that contract can

5  be viewed as just an asset of the estate with no liability." *Id.* citing 3 Collier on Bankruptcy ¶

6  365.02[2](a) (16th ed. 2020).

7         Based on the foregoing, all of LPG's revenue and accounts receivables for clients who had

8  received the services set forth in the LSA, not entitled to a refund and required to complete making

9  payments under the contract post-petition, is property of the Debtor Estate and properly turned over

10 to the Trustee for the benefit of all creditors. Similarly, all fraudulent transfers related to rental

11 payments for extravagant multi-million dollar properties leased by Vulcan, Mr. Diab and Ms. Cohen,

12 including but not limited to 20101 S.W. Cypress Street, Newport Beach 92660 ("Newport Beach

13 Property") and 8 Almanzora, Newport Coast, California 92657 ("Newport Coast Property") using

14 earned revenue and accounts receivables diverted from LPG and/or fraudulently transferred to the

15 landlords of the Newport Beach and Newport Coast Properties are property of the Debtor's Estate as

16 discussed more thoroughly below, and should be turned over to the Trustee.

17 **B.    LPG AND ITS ALTER EGO'S ACH DATA[4], CLIENT TRANSFER-IN AND**

18 **TRANSFER-OUT DATA SHOULD BE TURNED OVER TO TRUSTEE**

19 **PURSUANT TO SECTION 542(A).**

20        LPG and its Alter Ego's client lists, including but not limited to vendor lists, client files

21 purchased from capping companies, sold to factoring companies, transferred in, out or improperly to

22 its Alter Egos including client ACH information has routinely been held to be an intangible asset of

23 the Debtor's Estate and therefore subject to turnover pursuant to Section 542(a). *West v. Hsu* (In re

24 Advanced Modular Power Sys.), 413 B.R. 643 (Bankr. S.D. Tex. 2009); *Moore v. Brewer* (In re HMH

25 Motor Servs., Inc.), 259 B.R. 440, 451-52 (Bankr. S.D. Ga. 2000) (holding that intangibles include

26

27

28

---

[4] The terms "ACH Data," "DPP Data," "Luna Data," "ACH Data," "ACH Transfer Data," "Client Transfer-In Data," "Client Transfer-Out Data," "Airtable Data," "Accounting Data" and "Email Data" are more specifically defined in the concurrently filed [Proposed] Order.

1   name, relationships with customers and parties dealing with the debtor, goodwill, and telephone

2   numbers); *In re Schultz*, 250 B.R. at 35 (stating the value of a professional practice owned by a debtor

3   is attributable to many different assets including human capital, goodwill, name, recognition,

4   consumer brand loyalty, or special relationships with suppliers or clients); *U.S. Trust Co. v. Raritan*

5   *River Steel Co., Inc.* (In re Am. Spring Bed Mfg.  Co.), 153 B.R. 365, 369 (Bankr. D. Mass. 1993)

6   (finding, in order to satisfy a debt with a creditor, a debtor sold goodwill including, but not limited

7   to, trade names, trademarks, brand names, and customer lists because all of those assets had

8   significant value). This is especially true where, as here, the principal of the Debtor engaged in

9   fraudulent transfers and began operating the debtor's business of servicing debtor's clients through

10  newly formed corporations, using debtor's client and vendor lists, addresses, ACH information and

11  specialized knowledge obtained while operating the debtor's business. *In re Advanced Modular*

12  *Power Sys., supra*, 413 B.R. at 673-74.

13      The facts in this case are parallel to those in *In re Advanced Modular Power Sys.* Indeed, Mr.

14  Diab fraudulently transferred LPG's clients, names, addresses, ACH information, files, vendors,

15  attorney network, ACH processing companies and other intangible assets of Debtor to newly formed

16  corporations, including but not limited to, OakStone, Greyson, Gallant, Phoenix, Maverick and CLG.

17  *See In re Advanced Modular Power Sys., supra*, 413 B.R. at 673-74. As discussed below, Mr. Diab's

18  fraudulent transfer of LPG assets, tangible and intangible occurred approximately within a month or

19  two of LPG's petition date to its Alter Egos. *Id.* Almost immediately after LPG filed its petition,

20  business operations at LPG ceased and commenced at its Alter Ego entities. *Id.* Moreover, Mr. Diab's

21  fraudulent transfer was made with intent to hinder, delay and defraud the Debtor, LPG's clients and

22  creditors, the Trustee and this Court as Mr. Diab had threatened to do pre-petition. Given such vile

23  intent performed with calculated precision, LPG's tangible and intangible assets are at risk of total

24  loss, further transfer and destruction as Mr. Diab previously threatened its creditors. RS Decl. at ¶ 10,

25  Exh. 4. As such, this Court should issue an immediate order requiring LPG and its Alter Ego entities

26  to turnover LPG's ACH Data, Client Transfer-In and Transfer-Out Data fraudulently transferred the

27  Alter Egos.

28  ///

17

1   ///

2   ///

3       **C.**     **SECTION 542(E) AUTHORIZES THIS COURT TO TURNOVER LPG AND**

4              **ITS ALTER EGO'S RECORDED INFORMATION, CLIENT FILES,**

5              **COMMUNICATIONS AND ACCOUNTING DATA.**

6         Pursuant to Section 542(e), "[s]ubject to any applicable privilege. . .the court may order an

7   attorney, accountant, or other person that holds recorded information, including books, documents,

8   records, and papers, relating to the debtor's property or financial affairs, to turn over or disclose such

9   recorded information to the trustee." To which Courts routinely hold "person with knowledge of

10  commencement of bankruptcy proceedings has [a] duty to turn over to trustee property of estate,

11  which trustee can use, sell or lease under 11 USCS § 363, of which he has possession, custody or

12  control and to account for property or its value. . ." *In re Belize Airways, Ltd.*, 6 B.R. 157, 158 (Bankr.

13  S.D. Fla. 1980).

14        Here, the Trustee seeks nine categories of information from Debtor related to LPG, its client

15  files, performance under the LSA and information related to property of the Debtor's Estate,

16  fraudulent transfers and the Trustees ability to assume the large quantity of current client executory

17  contracts, including those fraudulently transferred to its Alter Ego entities which Mr. Diab, Rosa Loli

18  and other LPG employees maintain control over, including: 1) the DPP Data; 2) the LUNA Data; 3)

19  ACH Data; 4) ACH Transfer Data; 5) Accounting Data; 6) Client Transfer-Out Data; 7) Client

20  Transfer-In Data; 8) Airtable Data; and 9) Email Data.

21        Turnover of client files and recorded information kept by a law firm is proper where, as here,

22  the documents relate to the Debtor's property or financial affairs. *In re Crescent Res., LLC*, 457 B.R.

23  506, 515 (Bankr. W.D. Tex. 2011). The recorded information subject to turnover under Section 542(e)

24  need not itself constitute property of the bankruptcy estate. *See In re McKenzie*, 716 F.3d 404, 419

25  (6th Cir. 2013)("[A]n action for turnover under § 542(e) does not require that the information be

26  property of the estate.")(citations omitted); *American Metrocomm Corp. v. Duane Morris &*

27  *Heckscher LLP* (In re American Metrocomm Corp.), 274 B.R. 641, 652 (Bankr. D. Del.

28  2002)("Although an action for turnover under Section 542(a) requires that the information requested

1   be property of the estate, there is no such requirement in Section 542(e)."). However, the recorded

2   information must either 1) relate to property of the estate; or 2) relate to the debtor's financial affairs.

3   11 U.S.C. § 542(e). Trustee bears the burden of demonstrating the connection of the recorded

4   information to the debtor's financial affairs. *See In re Heritage Org., LLC*, 350 B.R. 733, 740 (Bankr.

5   N.D. Tex. 2006) ("[T]he language of Section 542(e) suggests that Trustee must carry an initial burden

6   to establish that the Documents 'relat[e] . . . to the debtor's property or financial affairs.'"). Once this

7   burden has been met, the Trustee is entitled to turnover of LPG's client files stored on its prior DPP

8   account and current LUNA software located on Amazon Web Services, that as a result of the

9   fraudulent transfer of client files is now being utilized by its Alter Egos, including but not limited to

10  OakStone; Greyson; Gallant; Phoenix; Maverick and/or CLG. *Id.*

11      **1.**    **LPG and its Alter Ego's DPP, LUNA and Airtable Data Should Be Turned**

12      **Over to Trustee**

13         LPG's DPP Data and LUNA Data contain critical information related to and including the

14  client's executed LSA, executed payment plan, ACH information, credit reports, debt's in dispute and

15  management of the client file with regards to the services the client contracted for, among other

16  information necessary to manage the debt relief services LPG purported to provide. RS Decl. at ¶¶ 7-

17  8. In this way, the DPP Data and LUNA Data provide and store critical information necessary to

18  determine whether the client's LSA is executory or non-executory, earned, breached, the status of the

19  client's payment plan, actions taken by LPG or its Alter Egos' to invalidate the client's debt in dispute

20  among other information that necessarily relate to LPG and its Alter Ego's property and more

21  specifically financial affairs, which greatly impact LPG Chapter 11 bankruptcy matter given the

22  fraudulent transfers of client files and ACH funds, misrepresentations made by Mr. Diab regarding

23  Debtor's assets at the time it filed its Bankruptcy petition on March 20, 2023.

24         Further, the debt invalidation services provided by LPG and its Alter Ego entities are based

25  on fairly consistent debt invalidation strategies such as sending communications and letters to client

26  creditors, demanding debt validation pursuant to Fair Debt Practices Collection Act (FDCPA) and

27  similar State statutes. Through DPP this process was fairly automated. RS Decl. at ¶ 7. However,

28  when LPG commissioned LUNA pre-petition in order to maintain control of client files and ACH

1  information pending LPG's pre-planned Bankruptcy petition and fraudulent transfer to its Alter Ego

2  entities, many and/or all of the automated processes provided through DPP were not carried over. RS

3  Decl. at ¶ 8; RM Decl. at ¶ 11, Exh. 8 at 143:17-25. As such, in order to determine what debt

4  invalidation and/or legal tasks had been performed on any one of the 40,000 plus client files it is

5  necessary to obtain the information store in LUNA that is hosted on AWS.

6      Similarly, Airtable provides data management software offering LPG and its Alter Ego

7  entities, cloud-based tracking system which manages marketing affiliate to investor file purchases,

8  client refunds, client settlements, and project mapping. DN Decl. at ¶ 4. Airtable thus provides critical

9  tracking of debt invalidation services performed, accounting and financial information that relates to

10  LPG and its Alter Ego's accounts receivables, executory contracts and therefore Debtor's estate. Since

11  LPG client files were fraudulently transferred to its Alter Egos, complaints in droves have surfaced

12  alleging entities such as OakStone and/or Phoenix have not provided the services for which LPG was

13  retained. CG Decl. at ¶ 7, Exh. 5. Obtaining the client tracking information and reports stored on

14  Airtable is critical to evaluate how many similarly situated client files need attention, activity or to be

15  rejected by the Trustee pursuant to Section 365 along with a full refund for post-petition payments, a

16  claim for pre-petition payments and the amount to be refunded or subject to claims.

17      Because the foregoing information is inseparably intertwined with property of Debtor's Estate

18  and its most valuable asset, multi-million dollar monthly accounts receivable revenue, Trustee has

19  met its burden establishing it is entitled to an order requiring LPG and its Alter Egos to turn over all

20  DPP and LUNA Data, including any all usernames and passwords to access the servers and/or

21  accounts on which they are or have been stored.

22      **2.    LPG and It's Alter Ego's ACH Data, ACH Transfer Data, Client**

23          **Transfer-In Data, Client Transfer-Out Data And Accounting Data Should**

24          **Be Turned Over To Trustee**

25      With little doubt, Sections 521(4) and 542(e) imposes a duty on LPG and its Alter Egos as a

26  result of the fraudulent transfers, discussed below, to turn over and surrender to Trustee all financial

27  records, whether immunity is granted or not. 11 U.S.C. § 542(e); *See also, In re Farmer*, 237 B.R.

28  210, 212 (Bankr. M.D. Fla. 1999). Here, LPG's ACH Data, ACH Transfer Data, Client Transfer-In

1 | Data, Client Transfer-Out Data and Account Data, is just exactly what the legislature intended to be

2 | turned over, financial records directly related to property of Debtor's estate, in this case LPG's

3 | substantial accounts receivable revenue.

4 | Indeed, the ACH Data provides financial information related to LPG's client ACH EFT's that

5 | LPG and Mr. Diab have and by and through its ACH processing companies, including but not limited

6 | to Revolv3 and totaling more than $6 million dollars received post-petition (that is known at this

7 | time), and which LPG and its cohorts continue to successfully initiate on a monthly basis, drawing

8 | millions of dollars in revenue from client accounts. RS Decl. at ¶ 16, Exh. 5. The ACH Transfer Data

9 | seeks financial records related to any transfer of funds received as a result of LPG and/or its alter Ego

10 | entities ACH EFTs in order determine the property or lack thereof of any transfer of property of

11 | Debtor's Estate pulled and held at any one or more of LPG or its Alter Ego's ACH processing

12 | company accounts. Moreover, both the ACH Data and ACH Transfer Data is required to evaluate

13 | which client LSA's are no longer executory and have remaining receivables under their specific

14 | payment plan, which client accounts should be rejected pursuant to Section 365, refunds issued and

15 | to which client accounts they should be issued. As such, Sections 521(4) and 542(e) authorize this

16 | Court to issue an order requiring LPG and its Alter Egos to turn over such information.

17 | LPG's Client Transfer-In and Transfer-Out Data also relate to LPG's financial records. As

18 | discussed above, LPG purchased client files from capping companies including those owned and

19 | controlled by Mr. Diab, including but not limited to Coast Processing among other outside vendors

20 | and thereby gaining an asset at a cost of approximately 50% of the client's account receivable. DN

21 | Decl. at ¶ 3, Exh. 1 at ¶¶ 10, 12-15. Similarly, LPG sold client account receivables to factoring

22 | companies, including creditors such as Validation Partners, LLC, thereby incurring substantial

23 | liabilities related to property of the Debtor's Estate. Similarly, the Trustee is entitled to all other

24 | financial information, including but not limited to employee payroll, attorney payroll, client litigation

25 | costs, assets, liabilities, overhead and other financial information impacting Debtor's Estate, its

26 | solvency, viability and any potential plan of reorganization under the Code. 11 U.S.C. §§ 521(4) and

27 | 542(e).

28 | ///

21

1    ///

2    **3.    LPG and It's Alter Ego's Email Data Should Be Turned Over To Trustee**

3    Communications that relate to Debtor's property, assets, client files, accounts receivables,

4    liabilities and indebtedness have all been held to "clearly qualify as recorded information relating to

5    their property and financial condition" pursuant to Section 542(e) and subject to a turnover order. *In*

6    *re Dawson*, 587 B.R. 327, 329 (Bankr. W.D. Mich. 2018). Pursuant to the Supreme Court of the

7    United states,  the "[s]ubject to any applicable privilege" language of 11 U.S.C. § 542(e). . . poses no

8    bar to power of bankruptcy trustee to waive corporate debtor's attorney-client privilege with respect

9    to communications that occurred before filing of bankruptcy petition. *Commodity Futures Trading*

10    *Com v. Weintraub*, 473 U.S. 343, 350 (1985).

11    Here, Trustee seeks LPG and its Alter Ego entities to turn over all email communications. As

12    indicated by a number of BBB complaints, clients of LPG and its Alter Ego's including Phoenix

13    received critical communications from clients via email, including requests to cancel their plan and

14    corresponding demand for a full refund. CG Decl. at ¶¶ 3, 7, Exh. 1, 5. The only reliable recorded

15    information related to these clients and potential executory contracts that need to be worked, and are

16    either properly assumed or rejected and issued a refund are email communications. Moreover, email

17    communications by and between LPG employees and client creditors demanding debt validation

18    pursuant to the FDCPA, resolution of debts in dispute, and status of litigation all relate to Debtor's

19    Estate and Trustees duty to determine which accounts are non-executory and accounts receivables are

20    property of Debtor's Estate.

21    Moreover, communications between capping and factoring companies relate to Debtor's

22    potential assets and liabilities directly impacting Debtor's Estate and the administration thereof. *In re*

23    *Dawson, supra*, 587 B.R. at 329. Similarly, communications between LPG and any of its vendors

24    including but not limited to the plethora of ACH processing companies directly relate to property of

25    Debtor's estate and its monthly revenue, instructions to initiate ACH EFTs, transfers of funds from

26    such accounts, disputes over disbursement of funds between LPG and such processing, capping and

27    factoring companies is also relevant to Debtor's Estate, creditor claims and the administration thereof.

28    According to Mr. Diab, World Global and EquiPay are withholding more than $675,000 and

22

1  potentially $3 to $10 million dollars in processed ACH payments that directly relate to Debtor's

2  Estate. RM Decl. at ¶ 7; RS Decl. at ¶ 3, Exh. 1 at ¶¶ 69-70. LPG Bankruptcy schedules further

3  indicate Marich Bein is holding approximately $12 million in LPG funds. See Docket No. 54 at pg.

4  2. In fact, Mr. Diab has requested the assistance of Trustee to motivate "them to send the funds to you

5  [Trustee]". RM Decl. at ¶ 7.

6      Along the same lines, the evidence shows Mr. Diab has initiated ACH EFTs utilizing LPG's

7  Revolv3 account post-petition totaling $6.3 million dollars. RS Decl. at ¶ 16. This, however, does not

8  account for the other ACH companies LPG has and continues to use. To that end, many financial

9  companies provide email confirmation of financial transactions, including but not limited to transfer

10 of funds, wires, deposits and other similar transactions. All email communications related these types

11 of transactions are critical to evaluating property of Debtor's Estate, fraudulent transfers the evidence

12 shows has already occurred and identifying when and where such funds were transferred to.

13     Based on the foregoing, the Court is authorized and should grant Trustee's request to turn over

14 all of LPG and its Alter Ego email communications, stored on Office 365 and G-suite's cloud based

15 servers, something Diab maintains control over but refuses to provide to Trustee as of this date.

16 **D.     MR. DIAB FRAUDULENTLY TRANSFERRED LPG'S TANGIBLE AND**

17 **INTANGIBLE ASSETS TO ITS ALTER EGO ENTITIES PURSUANT TO 11**

18 **U.S.C. § 548(a).**

19     Section 548 of the Bankruptcy Code sets out the Code's formulation of the ancient principal

20 that creditors may recover property that the debtor transferred in an improper manner. *Baldi v. Lynch*

21 (In re McCook Metals, L.L.C.), 319 B.R. 570, 587 (Bankr. N.D. Ill. 2005). Pursuant to 11 U.S.C.

22 548(a)(1) "[t]he trustee may avoid any transfer (including any transfer to or for the benefit of an

23 insider under an employment contract) of an interest of the debtor in property, or any obligation

24 (including any obligation to or for the benefit of an insider under an employment contract) incurred

25 by the debtor, that was made or incurred on or within 2 years before the date of the filing of the

26 petition, if the debtor voluntarily or involuntarily—

27     (A)     made such transfer or incurred such obligation with actual intent to hinder,
       delay, or defraud any entity to which the debtor was or became, on or after the date
28     that such transfer was made or such obligation was incurred, indebted; or

23

(B)(i)  received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I)  was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; . . .

(IV)  made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

Essentially similar provisions are contained in California's Uniform Fraudulent Transfer Act ("UFTA"), Civil Code Section 3439, *et seq.* and also available to Trustee pursuant to 11 U.S.C. section 544(a). *See In re Carrozzella & Richardson*, 286 B.R. 480, 483 n.3 (Bankr. D. Conn. 2002). Trustee bears the burden of proof by a preponderance of the evidence on all the elements of a fraudulent transfer and of the grounds for avoidance of the transfer. *In re McCook Metals, L.L.C., supra*, 319 B.R. at 587. In this regard, Courts have long held transfers by a controlling agent of debtor who transferred debtor's assets, tangible and intangible, to another newly created entity, which they also control and have a financial interest in and used such entities to insulate those assets from claims of creditors and debtor became insolvent as a result of the transfer to be voidable pursuant to Section 548. *In re Advanced Modular Power Sys., supra*, 413 B.R. at 673.

Here, Mr. Diab admits and the evidence confirms he has and continues to control Debtor, LPG and its newly formed Alter Egos. CG Decl. at ¶ 3, Exh. 1; DN Decl. at ¶ 3, Exh. 1 at ¶¶ 16-18; RS Decl. at ¶ 3, Exh. 1 at ¶¶ 14-22. In 2022, prior to several creditor lawsuits brought against LPG alleging Mr. Diab's control over LPG, misappropriation of LPG funds and seeking the appointment of a receiver, it was a viable debt relief law practice. DN Decl. at ¶ 3, Exh. 1 at ¶¶ 35-36; *In re Advanced Modular Power Sys.*, 413 B.R. at 670. Facing the appointment of a receiver and losing control over millions of dollars of monthly revenue, on or around November 18, 2022, Mr. Diab threatened LPG's investors suing LPG that he would bankrupt LPG and as such they were take all reasonable precautions to prevent misappropriation of funds, the destruction of evidence and other misconduct. RS Decl. at ¶ 10, Exh. 4.

///

///

1    Following through on his threat, Mr. Diab got to work, creating new entities to transfer LPG's

2   client files and ultimately LPG's significant monthly accounts receivables to. CG Decl. at ¶¶ 6-8,

3   Exh. 4-6; RS Decl. at ¶ 11-12. Within a few months prior to LPG filing its petition on March 20,

4   2023, it began notifying clients their file had been transferred to OakStone, Phoneix, Greyson,

5   Gallant, CLG and/or maverick to which Mr. Diab has admitted. RM Decl. at ¶ 11, Exh. 8. In doing

6   so, all or substantially all of LPG's revenue was effectively diverted from LPG to other entities Mr.

7   Diab controlled causing LPG to become insolvent. 11 U.S.C. § 548 subd. (a)(1),  (a)(1)(B)(ii)(I) and

8   (a)(1)(B)(ii)(IV).

9    To date neither LPG nor any of its Alter Ego entities have executed any agreement related to

10   the fraudulent transfer of LPG's clients, nor has LPG received any value in exchange for the transfer

11   of potentially $12 million to $24 million dollars in monthly revenue. 11 U.S.C. § 548(a)(1)(B)(i); RM

12   Decl. at ¶¶ 9, 12, Exh. 7.

13    As the evidence shows, Mr. Diab transferred LPG's client files to its Alter Egos with actual

14   intent after making a threat to do just that –hinder, delay and defraud LPG's creditors, LPG's clients,

15   Trustee and this Court. RS Decl. at ¶¶ 10-11; RM Decl. at ¶¶ 12. As has been held in the Ninth Circuit,

16   the debtor's state of mind "is the focus in the inquiry into actual intent." *Plotkin v. Pomona Valley*

17   *Imports, Inc.* (In re Cohen), 199 B.R. 709, 716 (9th Cir. BAP 1996); *see also Wolkowitz v. Beverly*

18   (In re Beverly), 374 B.R. 221, 235 (9th Cir. BAP 2007). Here, Mr. Diab's state of mind was made

19   clear by his vocalized threat to his creditors who were suing and seeking to have a receiver take over

20   LPG- back down or I will bankrupt LPG. This was followed by concerted efforts to achieve that result

21   while maintaining control over LPG's client files and substantial revenue to the detriment of LPG's

22   creditors.

23    Notwithstanding the direct evidence of Mr. Diab's intent to harm and defraud its creditors,

24   circumstantial evidence, often referred to as 'badges of fraud'. . ., strongly supports a finding Mr.

25   Diab acted with intent to defraud LPG's creditors. *In re McCook Metals, L.L.C.*, 319 B.R. at 588.

26   citing *Taylor v. Rupp* (In re Taylor), 133 F.3d 1336, 1339 (10th Cir. 1998). California's UFTA section

27   3439.04(b) provides a non-exhaustive list of factors "intended to provide guidance to the trial Court"

28   as to whether the transfer was committed with intent. In relevant part, eight out of the eleven badges

1    of fraud support a finding Mr. Diab and LPG intended to hinder delay and defraud LPG's creditors,

2    including: 1) LPG's client files and revenue where transferred to Alter Ego's Mr. Diab, an insider,

3    controlled (Civ. Code § 3439.04(b)(1)); 2) Mr. Diab retained control and possession over the client

4    files and associated revenue fraudulently transferred to LPG's Alter Egos and in order to pay for

5    properties leased to Vulcan and Mr. Diab himself who, according to Mr. Diab, were unaffiliated with

6    LPG (Civ. Code § 3439.04(b)(2)); 3) Mr. Diab attempted to conceal fulfilling his threat and control

7    over LPG's Alter Egos and its funds which paid for the properties leased to Vulcan, Ms. Cohen and

8    Mr. Diab (Civ. Code § 3439.04(b)(3)); 4) prior to the fraudulent transfer of LPG client files and

9    revenue, LPG had been sued by its creditors and was facing a court ordered receivership absent filing

10   bankruptcy to stay the proceedings related and misappropriate funds including, diversion of millions

11   of dollars to himself, Vulcan and Ms. Cohen which also paid for the properties leased to Vulcan, Ms.

12   Cohen and Mr. Diab (Civ. Code § 3439.04(b)(4)); 5) the fraudulent transfer consisted of substantially,

13   if not all of LPG's assets that had any value (Civ. Code § 3439.04(b)(5)); 6) Mr. Diab and his cohorts,

14   including but not limited to Mr. March, Mr. Carrs, Ms. Cohen and Rosa Loli by and through Vulcan,

15   Prime Logix, SCS, Coast Processing among other entities under Diab's control removed, diverted

16   and concealed numerous transactions worth millions of dollars from LPG including but not limited

17   to lease payments for properties leased to Vulcan, Mr. Diab and Ms. Cohen using LPG Funds; (Civ.

18   Code § 3439.04(b)(7)); 7) LPG received no consideration for transferring $12 million to potentially

19   $24 million dollars of revenue per month to its Alter Ego entities Mr. Diab controlled (Civ. Code §

20   3439.04(b)(8)); and, 8) LPG became immediately insolvent after Mr. Diab fraudulently transferred

21   LPG's client files and revenue to its Alter Ego entities (Civ. Code § 3439.04(b)(9)).

22       Based on the foregoing, there can be little doubt that Mr. Diab's transfer of LPG's client files

23   and revenue to its Alter Egos and payment for properties unaffiliated with LPG, or any of its listed

24   directors, officers, shareholders were fraudulent transfers within the meaning of 11 U.S.C. 548(a) and

25   California's UFTA. As such, the fraudulent transfer of LPG's client files and accounts receivables

26   may avoided by Trustee to the benefit of Debtor's Estate and all creditors.

27   ///

28   ///

26

## IV.    THIS COURT IS AUTHORIZED TO ISSUE A PRELIMINARY INJUNCTION TO PREVENT FURTHER TRANSFER, LOSS, AND DESTRUCTION OF ESTATE PROPERTY

Where, as here, Trustee seeks equitable relief, including the avoidance of fraudulent transfers and assets to be frozen and held in trust, a court may grant injunctive relief if the requirements for a preliminary injunction are otherwise satisfied. *In re Focus Media, Inc.*, 387 F.3d 1077, 1084 (9th Cir. 2004) (citations omitted). The Ninth Circuit has specifically recognized that the rule against injunctive relief does not apply to underlying claims for fraudulent transfers and constructive trusts. (*Id.* at 1085.) Judges of this district court have also ordered injunctive relief to secure assets subject to a claim for the imposition of a constructive trust, which Trustee effectively seeks in the concurrently filed adversary complaint over all funds held in an LPG or Alter Ego ACH Processing company account. *See Rumbaugh v. Harley*, (E.D. Cal. Aug 22, 2018) 2018 U.S. Dist. LEXIS 143033.

### A.    A NO-NOTICE EMERGENCY PRELIMINARY INJUNCTION IS PROPER AND NECESSARY UNDER THE FACTS OF THIS CASE

Federal Rule of Civil Procedure, Rule 65 requires "the movant's attorney [to] certif[y] in writing the reasons why [notice] should not be required." As discussed herein and the declaration of Trustee, notice should not be required because doing so would likely enrage an already active dragon in Mr. Diab who has already proven to follow through on his threats to cause financial harm to creditors, hide, transfer, conceal and destroy LPG assets, goodwill, and income in order to ensure he remains in control and his stream of income uninterrupted. RS Decl. at ¶ 10, Exh. 4; RM Decl. at ¶¶ 13-15. Moreover, Mr. Diab has made threats to "sink the ship" and advise all clients of LPG and therefore its Alter Ego entities to cancel and request a full refund should threatening property and substantial assets of the Debtor's Estate. RS Decl. at ¶ 10, Exh. 4; RM Decl. at ¶¶ 13-15. In fact, this has already begun as a result of Mr. Diab's bankrupting LPG, transferring files to LPG's Alter Egos without client consent resulting in a recent lawsuit being filed, and competitors soliciting LPG clients. CG Decl. at ¶ 3, 7, Exh. 1, 5; RS Decl. at ¶ 10, Exh. 4; RM Decl. at ¶¶ 13-15. Given the lack of attention LPG's Alter Egos have given LPG's client files, a potential risk for a class lawsuit for breach of LSA and professional negligence remains high. RS Decl. at ¶ 10, Exh. 4; RM Decl. at ¶¶ 13-15.

1    As such, LPG's non-executory contracts and associated accounts receivables are at a heightened risk

2    of dissipation such that a non-noticed preliminary injunction is prudent and proper. RS Decl. at ¶ 10,

3    Exh. 4; RM Decl. at ¶¶ 13-15.

4        Mr. Diab and his cohorts have also made threats of physical harm to those that cross him, have

5    provided information to LPG's creditors and/or the Trustee regarding his nefarious and fraudulent

6    conduct consistent with his disbarment from the State of California and Nevada for forgery and theft

7    of client funds. CG Decl. at ¶ 10-11, Exhs. 8-9; RS Decl. at ¶ 20, Exh. 4; RM Decl. at ¶¶ 13-15. Entry

8    of and order on a non-noticed request for preliminary injunction is therefore necessary to protect

9    innocent employees of LPG and its Alter Egos, client funds and property of Debtor's Estate. Exh. 4;

10   RS Decl. at ¶ 20; RM Decl. at ¶¶ 13-15.

11       In the event this Court finds, Trustee has not made a sufficient showing for a no-notice

12   preliminary injunction regarding all or any portions of the relief sought in the concurrently filed

13   [Proposed] Order, Trustee respectfully requests the Court issue a no-notice Temporary Restraining

14   Order pursuant to Fed. R. Civ. P. Rule 65 and Local Rule 65-1 with an order to show cause hearing

15   scheduled on a shortened time frame.

16   **B.    A PRELIMINARY INJUNCTION IS PROPER UNDER THE FACTS OF THIS**

17   **CASE AS TRUSTEE IS LIKELY TO PREVAIL**

18       As more thoroughly discussed above, the direct evidence shows Mr. Diab acted with actual

19   intent to harm LPG's creditors when he fraudulently transferred all, or substantially all of LPG's

20   assets pre-petition to newly incorporated Alter Ego entities under his direct control. The

21   circumstantial evidence establishing fraudulent intent, confirms Mr. Diab acted with actual intent to

22   transfer LPG's primary to the detriment of all creditors. LPG has not received any consideration for

23   the transfer of significant streams of revenue from its Alter Ego entities. Further, the fraudulent

24   transfers occurred within several months and in preparation of LPG's filing its petition.

25   **V.   CONCLUSION**

26       This case is not any ordinary Chapter 11 Bankruptcy matter as discussed herein. As a result

27   of Mr. Diab and his cohort's concerted efforts to protect fraudulently transferred client filesand

28   substantial revenue, Debtor's Estate is at substantial risk of dissipation, harm and loss absent this

1 | Court granting Trustee's requested relief. Based on the foregoing, the concurrently filed declarations

2 | of Trustee, Richard Marshack, Russ Squire, Darius Newbold, Christopher Ghio and the [Proposed]

3 | Order seeking relief in order to protect Debtor's Estate and effectively and efficiently administer

4 | Debtor's Estate Trustee respectfully requests the grant such emergency relief.

6 | Dated: May 25, 2023                              Respectfully submitted,

7 |                                                  DINSMORE & SHOHL LLP

9 |                                                  By: /s/ Christopher B. Ghio
                                                       Christopher B. Ghio
10|                                                     Christopher Celentino
                                                       Proposed Special Counsel to
11|                                                     Richard A. Marshack