1  Christopher B. Ghio (State Bar No. 259094)
   Christopher Celentino (State Bar No. 131688)
2  Jeremy B. Freedman (State Bar No. 308752)
   **DINSMORE & SHOHL LLP**
3  655 West Broadway, Suite 800
   San Diego, CA 92101
4  Telephone: 619.400.0500
   Facsimile: 619.400.0501
5  christopher.ghio@dinsmore.com
   christopher.celentino@dinsmore.com
6  jeremy.freedman@dinsmore.com

7  Proposed Special Counsel to Richard A. Marshack

8

9              **UNITED STATES BANKRUPTCY COURT**

10      **CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION**

11

12 | In re:                                    | Case No.: 8:23-bk-10571-SC

13 | THE LITIGATION PRACTICE GROUP P.C.,       | Adv. Proc. No.

14 |      Debtor.                              | Chapter 11

15 |                                           | **DECLARATION OF DARIUS NEWBOLD
   | RICHARD A. MARSHACK,                      | IN SUPPORT OF DARIUS NEWBOLD**
16 | Chapter 11 Trustee,                       | **OMNIBUS *EMERGENCY* MOTION FOR:**

17 |          Plaintiff,                       | **1) TURNOVER OF ESTATE PROPERTY
   |                                           | AND RECORDED INFORMATION**
18 |          v.                               | **PURSUANT TO 11 U.S.C. § 542;**
   |                                           | **2) PRELIMINARY INJUNCTION;**
19 | TONY DIAB, an individual; DANIEL S.       | **3) LOCK-OUT;**
   | MARCH, an individual; ROSA BIANCA LOLI,   | **4) RE-DIRECTION OF UNITED STATES**
20 | an individual; LISA COHEN, an individual; | **PARCEL SERVICES MAIL;**
   | WILLIAM TAYLOR CARSS, an individual;      | **5) ORDER TO SHOW CAUSE RE**
21 | ENG TANG, an individual; MARIA EEYA TAN,  | **COMPLIANCE WITH COURT ORDER;**
   | an individual; JAKE AKERS, an individual; HAN | **AND**
22 | TRINH, an individual; JAYDE TRINH, an     | **6) OTHER RELIEF AS NECESSARY TO**
   | individual; WES THOMAS, an individual;    | **THE EFFICIENT ADMINISTRATION OF**
23 | SCOTT JAMES EADIE, an individual; JIMMY   | **THIS MATTER**
   | CHHOR, an individual; DONGLIANG JIANG,    |
24 | an individual; OAKSTONE LAW GROUP PC;     | Date:  May 26, 2023
   | GREYSON LAW CENTER PC; PHOENIX            | Time:  **T.B.D. By Clerk of Court**
25 | LAW GROUP, INC.; MAVERICK                 | Judge: Hon. Scott C. Clarkson
   | MANAGEMENT, LLC; LGS HOLDCO, LLC;         | Place: Courtroom 5C
26 | CONSUMER LEGAL GROUP, P.C.; VULCAN        |        411 W. Fourth Street
   | CONSULTING GROUP LLC; B.A.T. INC. d/b/a   |        Santa Ana, CA 92701
27 | COAST PROCESSING; PRIME LOGIX, LLC;       |
   | TERACEL BLOCKCHAIN FUND II LLC;           |
28 | EPPS; EQUIPAY; AUTHORIZE.NET; WORLD       |
   | GLOBAL; OPTIMUMBANK HOLDINGS, INC.        |

FILED

MAY 25 2023

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY:                    Deputy Clerk

1  d/b/a OPTIMUM BANK; MARICH BEIN, LLC;
BANKUNITED, N.A.; REVOLV3, INC.;

2  FIDELITY NATIONAL INFORMATION
SERVICES, INC. d/b/a FIS; WORLDPAY, INC.;

3  WORLDPAY GROUP; MERIT FUND, LLC;
GUARDIAN PROCESSING, LLC; THE

4  UNITED STATES POSTAL SERVICE; and
DOES 1 through 100, inclusive,

5

6              Defendants.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  I, Darius Newbold declare as follows:

2       1.     I have personal knowledge of the matters set forth herein. If called as a witness in this

3  matter, I could and would testify competently thereto.

4       2.     I submit this declaration in support of the Trustee Richard Marshack's Omnibus

5  Emergency Motion for: 1) turnover of estate property and recorded information; 2) preliminary

6  injunction; 3) Lockout; 4) Re-direction of United States Postal Services Mail; and Order to Show

7  Cause re Compliance with Court Order.

8       3.     I incorporate by reference my declaration dated November 14, 2022 made in support

9  of Plaintiff's motion Motion to Appoint Receiver and for Preliminary Injunction in the State Court

10  proceeding, Case No. 30-2022-01281911-CU-BC-CXC pending before the Superior Court for the

11  County of Orange and all exhibits attached thereto. The information contained therein is based on my

12  personal knowledge and I have not learned of any information contrary to the facts stated therein. A

13  true and correct copy of my November 14, 2022 declaration is attached hereto as **Exhibit 1**.

14       I declare under penalty of perjury under the laws of the state of California that the foregoing

15  is true and correct, and that this declaration is executed on this 24th day of May, 2023 at Sunrise,

16  Florida.

17

18                                  _____

19                                  Darius Newbold

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

# DECLARATION OF DARIUS NEWBOLD

I, Darius Newbold, declare and state:

1.    I make this declaration of my own personal knowledge, and if called to testify in Court on these matters, I could do so competently.

2.    I submit this declaration in support of Plaintiff's Motion to Appoint Receiver and for Preliminary Injunction.

3.    On January 10, 2022, I became the controller of Validation Partners LLC and a related sister entity, Morning Financial.  I graduated from SUNY Oneonta with a degree in Accounting.  I worked for twelve years as the Assistant Director of Finance for The Arc of Delaware County, a Medicaid funded non-profit, that has gross revenue of between $12-14 million annually.  Due to the nature of Medicaid funding the accounting process was highly regimented and audited annually by Marks Paneth, a large NYC-based accounting firm.  I also built up an employee leasing company from 30 to 40 clients to a $50,000,000 gross annual revenue operation over the course of two years.

**Matters Learned During My Initial Audit of Litigation Practice Group**

4.    On May 5, 2022, Wes Thomas was fired as Chief Financial Officer of Litigation Practice Group ("LPG").  Shortly thereafter, Tony Diab on behalf of LPG advised Validation Partners that LPG's financial affairs were not in order. Russ Squires, CEO of Validation Partners offered Diab assistance, which he accepted.  Thus, on May 31, 2022, I traveled to LPG's headquarters in Tustin, California and spent two days in their offices auditing their financial information. Thereafter, and continuing through the first week of July, I continued auditing their process remotely as all their software was/is cloud-based.  Diab instructed LPG Controller Alex Tarkoff, the acting leader of the LPG finance team, to provide me with access to all of LPG's financial information, which was stored in the following primary systems:  (1) QuickBooks Desktop for historical records to LPG and Coast Processing; (2) NetSuite for current LPG accounting records and

*McLachlan Law, APC*
2447 Pacific Coast Highway, Suite 100
Hermosa Beach, CA 90254

processes; (3) AirTable, a cloud-based tracking system which manages marketing affiliate to investor file purchases, client refunds, client settlements, and project mapping; (4) Debt Pay Pro, a cloud-based system designed primarily for debt resolution work in which, among other data, LPG maintains details of payments from clients, as well as payments to outside partners such as Validation Partners and marketing affiliates, such as Morning Financial; (5) LPG's Microsoft SharePoint shared folder containing accounting records; (6) LPG e-mail controller@lpglaw.com; (7) LPG's JP Morgan Chase account for both online banking and online credit card review; (8) PayChex (Payroll Software); and (9) direct access to EPPS, Equipay, and Authorize.net payment processor websites.

5.      I continued to analyze and assess LPG's finances and accounting systems through July 11, 2022, when I was abruptly blocked from accessing NetSuite, online access to the Chase bank account, the Chase Credit Card, and LPG's AirTable system.  My access to LPG's Microsoft SharePoint shared drive and the payment processor portals however have remained active to date.  On or about August 22, 2022, my access to Debt Pay Pro was terminated.  At no point was I told I could not continue accessing the SharePoint files or the payment processing websites.  My most recent conversation with Diab was that he no longer wanted my input or interference with his ability to make decisions about cash flow and payment priorities but did still want my assistance with LPG's financial organization and fundamental accounting processes.

6.      LPG had, and still maintains, two Interest on Lawyers' Trust Account ("IOLTA") accounts, one at Union Bank (Acct. No. ******4874) and one at Chase (Acct. No. ******3568).  LPG has and still maintains four operating bank accounts, two at Chase (Account Nos. ******3158 and ******3133), one at Union Bank (Acct. No. ******4858), and one at Optimum Bank (Acct. No. ******6738).

7.      Additionally, When I asked Tarkoff if this was indeed all the bank accounts for LPG, he informed me there were actually two more existing bank

McLachlan Law, APC
2447 Pacific Coast Highway, Suite 100
Hermosa Beach, CA 90254

McLachlan Law, APC
2447 Pacific Coast Highway, Suite 100
Hermosa Beach, CA 90254

1  accounts he was aware of but did not have access to. Both of those accounts are at

2  Optimum Bank (Account Nos. ****0029 and *****6712).

3     8.    During my time doing the audit work, it was very apparent that LPG

4  was entirely controlled and managed by Diab. For essentially all my biggest

5  questions about accounting and finance issues, I was advised to consult Diab

6  directly, and did so almost daily. I never interfaced or reported to Daniel March,

7  the managing shareholder of LPG. Indeed, I have never spoken to him. Every

8  single large payment was processed with the approval of Diab, every daily small

9  payment was sent to Diab through admin@LPGlaw.com and was approved by

10  him utilizing a daily rollover sheet. Attached as **Exhibit 1** to Plaintiff's Appendix

11  of Evidence ("Plaintiff's Appendix") is a true and correct copy of ten worksheets

12  from the LPG Excel file titled "Accounts Payable Rollover Sheet – Approved by

13  Admin" for the dates August 11, 15, 16, and 22, 2022; and September 6 and 8,

14  2022; and October 3, 4, 7, 25, 2022.

15     9.    What I learned during my time at LPG was that the practice of law

16  was run by Diab through his assistant Han Trinh (referred to inside of LPG as

17  "General Han") and a young lawyer named Jayde Trinh. In the office, Diab is not

18  called by his given name, but rather by the name "Admin." When corresponding

19  with him via e-mail, he uses the email address admin@LPGlaw.com. Attached to

20  Plaintiff's Appendix as **Exhibit 2** is a true and correct copy of two e-mails: one

21  sent by Tony to me on June 20, 2022 from tony@coastprocessing.com; and one

22  of many Diab sent to me from admin@LPGlaw.com, this one dated June 23,

23  2022, which contains the nearly identical text as the first e-mail (also included

24  are screen shots of both with the email address in full). When speaking to senior

25  employees and using Tony Diab's name I was told they didn't recognize that

26  name and only knew him as Admin. Diab has a placard on his desk that reads "I

27  don't work here." Upon speaking to Han Trinh regarding the cost of legal

28  services per state she credited all her success to the legal mentorship she received

*McLachlan Law, APC*
2447 Pacific Coast Highway, Suite 100
Hermosa Beach, CA 90254

1  from Diab and said she couldn't do her job without his guidance. Additionally,

2  Diab and Han Trinh shared a small office.

3      10.    In my time formally auditing LPG, I learned that many millions of

4  dollars were being diverted to third parties for which no credible explanation

5  could be obtained.  Diab referred to certain categories of monthly expenditures as

6  "legacy costs," which Diab advised were in part costs incurred by Coast

7  Processing in prior years.[1]  I questioned Diab regarding numerous specific six-

8  figure payments, including to Craig Hunter, his company Veritas (paid $180,000

9  between June July and August of 2022), Strategic Consulting Solutions (paid

10  $736,000 from June through September), United Partnerships (paid $723,546

11  from July through October).  Diab advised that when these people demanded

12  money, there was no choice but to pay, or "bad things would happen."  The clear

13  impression was that he and/or LPG were being extorted as to some of these

14  larger payments.  Attached to Plaintiff's Appendix as **Exhibit 3** is a true and

15  correct copy of an e-mail string between Diab, myself, and LPG's internal

16  accounting staff concerning Diab's instruction to write a check for an extortive

17  payment involving threats of Diab's kneecaps being broken.  Diab explained to

18  me that LPG had many people that were extorting the firm for their connection to

19  affiliates and he had no choice but to make payments as soon as funds were

20  available.

21      11.    As another example, LPG, as noted above, was paying Veritas large

22  sums of money that, per Diab and Tarkoff, were settlement/severance/extortion"

23  payments where if Diab refused to pay Craig Hunter would go to Daniel March

24  _____

25      [1] As noted in the Squires Declaration (at ¶ 12), LPG historically had a
26  business partner called BAT Inc. d/b/a Coast Processing ("Coast Processing"),
which was owned by Brian Reale, Arash Asante Bayrooti, and Tony Diab.  Coast
27  Processing was the primary entity through which LPG ran its marketing and
client development operations.  In the summer of 2021, Diab, through LPG,
28  bought out his partners in Coast Processing and merged some of its functions
into LPG.

4
**DECLARATION OF DARIUS NEWBOLD**

and March would then beg Diab to process the payment to Hunter. Attached to Plaintiff's Appendix as **Exhibit 4** is a true and correct copy of an e-mail thread between Diab, myself, and Tarkoff discussing this matter.

12. Many of what Diab referred to as "legacy costs" were paid to affiliates, vendors, and individuals based on debts and liabilities accrued by Coast Processing prior to the merger with LPG. These were debts that were not legally owed by LPG, per Diab's own explanations, but he nevertheless chose to pay them. Attached to Plaintiff's Appendix as **Exhibit 5** is a true and correct copy of a summary I prepared from LPG's bank statements and accounting documents which details these expenditures, setting forth various "legacy costs" and other large and unaccounted for transactions discovered during my audit of LPG. From June to October 2022, LPG paid $1,812,538.46 in expenses which were "legacy costs" per Tony. During the same time period, there was an additional $16,121,957.05 in highly questionable payments that, in my professional opinion, are not properly backed by invoices, contracts, or agreements. The majority of vendors do not have W-9s on file and are paid at Diab's discretion, according to LPG's written accounting documentation.

13. Nearly all larger payments for which I was unable to determine the purpose were authorized directly by Diab (as noted in the Accounts Payable Rollover Sheet). The highlighted items on **Exhibit 5** are either not legitimate operating costs or could not be verified, i.e., were lacking in any back-up in LPG's records.

14. During calendar year 2022 there were 66 checks noted in the LPG checking system as "handwritten by Tony" totaling $1,324,583.67. I was told by both Diab and Tarkoff, that Diab would often handwrite checks to angry vendors for non-business reasons to cover "legacy costs," which, by their own admission, amounted to payoffs for services outside of written agreements and without consistent processes.

5
**DECLARATION OF DARIUS NEWBOLD**

15.    To my knowledge, the only signatory on the LPG accounts was Daniel March as of my time working with LPG.  I was never informed of Daniel March signing any checks himself.  The checks were always written by Diab, although I was told Diab was not a signatory on any of LPG's bank accounts.

### Tony Diab's Continued Involvement in LPG

16.    During my review of LPG's payroll, I discovered that Diab is not an employee of LPG.  To the best of my knowledge based upon reviewing financial and payroll records dating back several years, Diab has never been an employee of LPG.

17.    From my review of the data in LPG's SharePoint shared accounting files over the past two weeks, I continue to find numerous entries with notations like "approved by Admin."  In my experience during my audit, all such notations to "Admin" refer directly to Diab.  I know this because of numerous inquiries I made of LPG's accounting staff and information directly provided to me. Attached to Plaintiff's Appendix as **Exhibit 6** is a true and correct copy of some of those entries.  For example, there was a reversal of multiple fees for Equity Finance deals that LPG stopped making in early September totaling $89,739.47, the associated note on the LPG SharePoint checking document references "per Admin."

18.    As of October, there are still multiple references in the current accounts payable rollover sheet referring to "approved by admin" or "pay per admin". The accounts payable rollover sheet is how LPG logs their outstanding accounts payable items outside their core accounting software. During my audit, I learned that this sheet is sent to and approved by Diab on a daily basis.  The rollover sheet as of November 1, 2022 is attached to Plaintiff's Appendix as **Exhibit 1** (references to Admin, aka Diab, approvals are highlighted).

*McLachlan Law, APC*
2447 Pacific Coast Highway, Suite 100
Hermosa Beach, CA 90254

6
**DECLARATION OF DARIUS NEWBOLD**

### Continuing Misdirection of Funds to Date

19.    I have continued to periodically review LPGs finances through its SharePoint shared folder and have downloaded bank statements as they have become available.  In this section, I summarize some of the more concerning financial developments in recent months: (1) the blatant misappropriation of monies that should be paid to LPG's creditors; (2) the continued purchase of new files from affiliates who previously sold their accounts receivable to Validation Partners; (3) the sale of files to new third parties without corresponding income being shown on any of LPG's bank statements; and (4) the sizeable drop in receivables during October 2022.

20.    On September 2, 2022, LPG received a wire transfer from Sunflower Bank in the amount of $6,244,811.78.  From prior banking transactions, this money is believed to be associated with the World Global processing dispute, as discussed in more detail within Russ Squires' declaration.  On September 8, 2022, check number 216 in the amount of $5,814,146.45 cleared this trust account.  LPG's Microsoft SharePoint Excel spreadsheet entry for this check states it was made payable to "Arash Asante Bayrooti."  There is no record of the purpose of this payment in LPG's accounting system.  Attached to Plaintiff's Appendix as **Exhibit 7** and **Exhibit 8** are true and correct copies of the LPG's Union Bank IOLTA account statement for July, August, and September of 2022 (partially redacted) as well as the Microsoft SharePoint LPG checking entry for check no. 216.  To date, I find no evidence that any of this money has returned to any of the known LPG owned bank accounts.

21.    On July 18, 2022, LPG received two separate wire transfers for $1,000,000 each into their IOLTA account.  One was from MUFG Bank, LTD and the second from Optimum Bank.  The LPG checking sheet clearly notes one of the transactions as "Optimum Bank Disputes – Client Payments."  This means it is

McLachlan Law, APC
2447 Pacific Coast Highway, Suite 100
Hermosa Beach, CA 90254

almost certainly money relating to the World Global dispute. The other transaction is noted as "Pastor Delphine Esther Valentine."

22. One of my larger concerns discovered during my audit was that LPG was spending large sums of money buying assets for LPG, rather than paying monies owed to Validation Partners. Specifically, LPG was purchasing new client files from marketing affiliates such as GoFi, who had previously sold their accounts receivables to Validation Partners. Those expenditures have grown over time; they totaled a combined $3,589,427.55 during September and October 2022. Attached to Plaintiff's Appendix as **Exhibit 9** is a true and correct copy showing a summary of payments made from LPG's Chase Accounts 3158 and 3133 for file purchases.

23. In the months of July through October 2022, LPG spent no less than $6,195,101.84 purchasing new client accounts from marketing affiliates. Attached to Plaintiff's Appendix as **Exhibit 10** is a true and correct copy showing a summary of those purchases which I prepared from data obtained from LPG's daily cash tracking sheet which LPG continues to use to track and reconcile all their payments. I have periodically checked these amounts against the bank statements for each account and have found a high level of accuracy pending their full bank reconciliation which is completed at the end of each month.

24. In September and October 2022, I find other substantial departures from LPG's standard practices. For example, LPG received $752,200 in deposits labeled "cash in/cash received" and an additional $232,212.68 in deposits labeled "Remote Deposit – Client Check Payment." LPG historically processes electronic check payments through the third-party processor, Seamless Checks. Typically processing in the range of between $50,000 to $60,000 per month. These cash payments appear to be Diab pulling money from non-LPG bank accounts to cover payments through LPG that he believes are important. This activity is highly unusual and not consistent with LPG's historic financial practices.

McLachlan Law, APC
2447 Pacific Coast Highway, Suite 100
Hermosa Beach, CA 90254

8

**DECLARATION OF DARIUS NEWBOLD**

*McLachlan Law, APC*
2447 Pacific Coast Highway, Suite 100
Hermosa Beach, CA 90254

25.    As recently as last week, on November 1, 2022, a single large cash deposit was made of $700,000. This money was immediately paid out as part of a wire transfer the following day of $1,000,000 to Pastor Delphine. Attached to Plaintiff's Appendix as **Exhibit 11** is a true and correct copy of a LPG's accounting entries for these two transactions.

26.    During September and October 2022, LPG sold client account receivables to third parties totaling upwards of $3,402,088. This is derived from bank deposits that are not from payment processors and in most cases noted as file (new client account) purchases. I am unable to find any corresponding income growth to LPG from these file purchases. Attached to Plaintiff's Appendix as **Exhibit 12** is a true and correct copy of a summary of account sales which I prepared with data obtained from the LPG Checking report within the LPG accounting SharePoint shared folder.

### Teracel

27.    Regarding the alleged accounts receivable purchases made by Teracel, as referred to in the Squires Declaration at paragraph 34, I have found no records of Teracel sending any monies to LPG to purchase accounts. However, Teracel was paid affiliate distributions of $90,993.19 during the month of October 2022. Attached to Plaintiff's Appendix as **Exhibit 13** is a true and correct copy of the relevant portions of the LPG Excel accounting file "Sharepoint LPG Checking" for the LPG operating account at Chase Account (******3133). According to LPG's accounting systems, Teracel is not a marketing affiliate producing debt validation accounts.

28.    According to the report LPG produced dated October 26, 2022, Teracel is being paid 100% of gross revenues received. Affiliates have historically received a percentage of the net LPG processing fee (otherwise LPG can make no money for its services to clients).

**Payment processing Issues**

29.     Nearly all of LPG's income from clients comes by way of several payment processors.  Payments are collected from the clients on a monthly basis via ACH, credit card or check, and these payment processing companies are used to collect the money.

30.     LPG has used multiple payment processors in 2022. The primary payment processor in early 2022 was World Global.  Due to an enormous crisis outlined in Squires declaration, World Global was transitioned out in April/May 2022.

31.     Immediately upon beginning my audit I identified three major issues with World Global:

    a.  LPG had no contract with World Global. The entire relationship was based on a "handshake agreement."

    b.  I could not find any documentation about World Global.  They did not have a website nor did LPG have any documentation that suggested World Global followed best practices for the industry, moreover actual payment processing regulations.

    c.  Finally, World Global did not provide any regular reporting that could be validated in any way, nor did they provide access to any billing system, as normal payment processors do, which would allow the ability to see records of payments collected in real-time.

32.     After the massive overbilling incident, World Global's payment volume was primarily replaced by the processor known as EPPS. While EPPS is a company I could identify, has a website which clearly references best practices and regulations, and provided regular reporting, again I learned there was no formal contract between LPG and EPPS.  This was yet another example of a business relationship with a "handshake agreement", in this instance between Lance Witt, CEO of EPPS, and Diab.

McLachlan Law, APC
2447 Pacific Coast Highway, Suite 100
Hermosa Beach, CA 90254

10

**DECLARATION OF DARIUS NEWBOLD**

33.   EPPS began withholding larger volumes of funds and for longer periods of time beginning in June 2022.  Since there was no contract in place and all negotiations regarding the release of funds were handled between Diab and Lance Witt from EPPS, I strongly recommended to Tarkoff that they shift the volume to Equipay/Maverick, another payment processor.

34.   Equipay has a signed contract in place with LPG, a website and documentation available clearly stating best practices and regulations being followed, and they provide a robust reporting system where all payments collected can be reconciled monthly. Thus, starting in July, the largest volume of payment processing was shifted to Equipay.

35.   From their bank statements, the following summarizes LPG's revenue stream from existing payment processors for the months of May through October:

   a.   May 2022 $8,471,673.39

   b.   June 2022 $8,71,673.39

   c.   July 2022 $8,774,982.62

   d.   August 2022 $11,204,694.07

   e.   September 2022 $10,298,578.66

   f.   October 2022 $6,182,763.99[2]

36.   In 2022, LPG operating expenses have remained fairly consistent month to month.  For example, the following summarizes LPG's largest expense, payroll during the same timeframe:

   a.   May 2022 $2,385,971.30

   b.   June 2022 $2,230,491.98

   c.   July 2022 $2,174,779.22

   d.   August 2022 $2,332,314.03

---

[2] As noted in paragraph 40 below, if Marich Bein is in fact a payment processor, then this number is higher.

**DECLARATION OF DARIUS NEWBOLD**

McLachlan Law, APC
2447 Pacific Coast Highway, Suite 100
Hermosa Beach, CA 90254

McLachlan Law, APC
2447 Pacific Coast Highway, Suite 100
Hermosa Beach, CA 90254

e.  September 2022 $3,425,487.08 (3 Payrolls)

f.  October 2022 $2,416,952.98

37.  Based upon LPG's historical affiliate production and conversations with Diab when creating LPG's budget framework, the expectation was a conservative growth path of $500,000 gross revenue each month, as further explained in the Squires Declaration.  Based upon July's $11,204,694.07 gross income and historic revenue growth during 2022, the estimated gross revenue in October should have been $13,000,000 using a conservative growth figure.

38.  Although LPG's revenue has continued to grow during 2022 and its operating expenses remain steady, there is little to no cash accumulating in LPG even though it is not paying Validation Partners anything.  The compensation for both the in-house and outsourced overseas call center teams along with employee compensation has remained rather consistent at about $1,100,000 per bi-weekly payroll.  Based on the amount of accounts LPG and other investors are purchasing through LPG the revenue should be increasing each month.

**Marich Bein:  New Non-Contracted Payment Processor**

39.  As stated above, Equipay was the primary payment processor for July, August, and September 2022 averaging over $7,500,000 per month.  In October 2022 that amount was drastically reduced to $3,330,507.74.  A true and correct copy showing a summary of cash received by LPG is attached to Plaintiff's Appendix as **Exhibit 14**.

40.  Concerned with the massive reduction in revenue, I searched LPG's shared accounting files for any record of new payments that appear to be from a processor or for contracts that would have been signed with a new company.  I did not find any contracts for anew payment processor in the locations where they are typically found, or anywhere else.

41.  Russ Squires informed me he had documentation referencing a new payment processing company labelled as "other," but I could not find any

references to "other" on the bank statements. Rather, I found what are very unusual new deposits into LPG's bank accounts, deposits which would seemingly coincide with a new payment processor, but the payments quite literally appeared to come from itself, "LPG."

42.     After a deep review of recent bank statements and other LPG financial documents, I believe a new company Marich Bein, LLC is likely processing payments for LPG.

43.     Early in October of 2022, LPG received deposits as large as $2,500,000 were received from Marich Bein.  In October of 2022, LPG received combined deposits totaling $5,011,824.17 from Marich Bein and from a company known as "LPG 949-226-6262." After review, these deposits all came from the same bank account, which means they are the same company.

44.     On October 21, 2022, daily deposits commenced from an account known as "9855785489 LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875".

45.     Based upon the existing accounting processes in place during my audit, if the LPG accounting team does not recognize a vendor they take the information from the online banking detail and include it in the LPG checking register, and as seen in Attached to Plaintiff's Appendix as **Exhibit 15** is a true and correct copy of a summary of LPG accounting entries showing how the accounting team logged the transactions.

46.     Based upon my review of the LPG checking register, I believe the LPG Accounting team does not recognize Marich Bein as a payment processor with an official contract.

47.     This means LPG is now processing the vast majority of its client funds through two payment processors that do not have contracts:  Marich Bein and EPPS.  Based upon adverse events with processing earlier this year, if Marich Bein is another poorly regulated payment processor, possibly with a direct

McLachlan Law, APC
2447 Pacific Coast Highway, Suite 100
Hermosa Beach, CA 90254

connection to Diab, there is an increased likelihood of similar issues of erroneous and improper client charges as happened with World Global, outlined in the Squires Declaration. As the past has proven, this high-risk processing arrangement is not in the best interest of the clients, nor of LPG as a functional business. It exposes undue risks to clients for erroneous and improper charges, as well as risk to LPG for inconsistent cash flows due to excessive cash retention by these processors, the exodus of angry customers, potential lawsuits, and negative reviews.

48. Because World Global did not provide proper payment processing reports, the LPG accounting team would need to determine if certain clients paid using a combination of a process of elimination and "educated guesses." Upon audit and review of the process the LPG accounting team lead by LPG Controller Alex Tarkoff, he could not assure me that client billing processes were accurate when billed through World Global. All other payment processors provided client by client documentation. I do not find anything in LPG's SharePoint accounting shared folders with reporting from Marich Bein which outlines client billing. Again, this strongly implies clients could be billed incorrectly without LPG's knowledge due to a poorly regulated payment processor.

49. Thus, in conclusion, from my detailed review of LPG's recent accounting documentation and bank statements along with the significant details outlined in the Squires declaration, it appears that Diab has created another deal with a high-risk payment processor without any contract, as was the case with EPPS and World Global. When coupled with very limited reporting for the LPG accounting team and limited visibility for financial auditing from any outside agency, it is very likely they have an outside relationship with Diab.

**Misdirection of Funds Directly to Diab**

50. Based upon LPG's QuickBooks records, Vulcan Consulting, a company owned by Diab, was paid $2,600,000 in 2021. These payments

14
**DECLARATION OF DARIUS NEWBOLD**

included the memo "legal service" or "client attorney fees." Attached to Plaintiff's Appendix as **Exhibit 16** is a true and correct copy of a summary of payment data to Diab and Vulcan, as well as two checks from LPG's QuickBooks file showing the memo lines.

51.    Additionally, during my time auditing LPG, it was brought to my attention directly by Diab that LPG paid many vendors for non-business functions. For example, Spot On Consulting was paid $520,600 between August and October of 2022 for "consulting." Based on my history with LPG this strongly implies there was no standard business function.

52.    Strategic Consulting Services was paid $736,000 between June and September of 2022. There are often notes in the LPG checking register as "paid per Admin," aka Diab.

53.    United Partnerships was paid $723,546.69 between July and October of 2022. This is a marketing company that I have been told Tony Diab has an ownership interest in. Through direct conversations with Tony Diab, LPG's marketing costs are minimal since the affiliates are responsible for client acquisition costs. Again, many of these line items are noted as "paid per Admin", aka Diab, on the LPG checking sheet.

54.    CFS Lead Generation was paid $369,500 between September and October of 2022. Again, LPG does not as a typical course of business pay for large scale marketing costs.

55.    Very recently, LPG started offering special equity financing deals for clients that met certain credit score criteria. This was processed through an affiliate of GoFi, another company Diab has an outside financial relationship with. (*See* Squires Decl., ¶ 88.) LPG would provide legal services for these accounts. When the payments were received by LPG the gross revenue was to be split 50/50 between LPG and GoFi. From January 2022 through August 2022 this produced $5,193,441.22 in gross revenue for LPG or an average of

McLachlan Law, APC
2447 Pacific Coast Highway, Suite 100
Hermosa Beach, CA 90254

McLachlan Law, APC
2447 Pacific Coast Highway, Suite 100
Hermosa Beach, CA 90254

1  $324,590.08 per month through August.[3] (*See* **Exhibit 14** (Columns E & F.)

2  This revenue stream was replaced per an e-mail dated September 16, 2022 from

3  LPG's affiliate coordinator, Dima Rafoul, to all affiliates stating all qualifying

4  accounts will be transferred to "LPG Finance." No corresponding revenue can be

5  found on LPG's bank statements since August 2022 through November 15, 2022.

6  In sum, it is unclear where this money has gone, but it is not going to the known

7  universe of LPG bank accounts.

8       56.   In my professional opinion, based on my review of the data available,

9  all money paid to companies that Diab is said to have an outside financial interest

10  in, should have been paid to Validation Partners and the corresponding investor

11  groups.

12           **Misdirection of Funds to Daniel March and Wes Thomas**

13       57.   During my audit, I also learned that Daniel March receives an annual

14  salary of $600,000, paid $23,076.92 bi-weekly, through their PayChex payroll

15  system. March was promised an additional $50,000 per month paid on invoice

16  at Diab's discretion as cash flow allowed. This, as explained to me by Diab, was

17  for "renting" March's law license.

18       58.   Daniel March received additional income totaling $131,500 from

19  LPG between August 31, 2022 and October 7, 2022. The first payment was made

20  the day after March was served by our counsel with the initial demand letter in

21  this matter. Attached to Plaintiff's Appendix as **Exhibit 18** is a true and correct

22  copy of the relevant portions of the LPG Excel accounting file "Sharepoint LPG

23  Checking" for the LPG operating account at Chase Account (******3158), with the

24  pertinent entries highlighted.

25

26  _____

27       3 Diab discussed this increasing revenue stream in a July 7, 2022 e-mail he
   sent to me, in the seventh paragraph ("as you know, GoFi is driving finance deals

28  that *net* LPG $400,000 in monthly revenue.") Attached to Plaintiff's Appendix as
   **Exhibit 17** is a true and correct copy of this e-mail.

16

**DECLARATION OF DARIUS NEWBOLD**

59. LPG also processed payments of $15,000 in September and $20,000 in October to Fintelyx, LLC, a company we know to be owned by Wes Thomas former Chief Financial Officer of LPG. (See **Exhibit 18**, pp. 4-5.) These payments purport to be for consulting fees. Thomas was fired by LPG in May of 2022.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 14th day of November 2022, at Sunrise, Florida.

Darius Newbold

**DECLARATION OF DARIUS NEWBOLD**