Post #104

1 Christopher B. Ghio (State Bar No. 259094)
  Christopher Celentino (State Bar No. 131688)
2 Jeremy B. Freedman (State Bar No. 308752)
  **DINSMORE & SHOHL LLP**
3 655 West Broadway, Suite 800
  San Diego, CA 92101
4 Telephone: 619.400.0500
  Facsimile: 619.400.0501
5 christopher.ghio@dinsmore.com
  christopher.celentino@dinsmore.com
6 jeremy.freedman@dinsmore.com

7 Proposed Special Counsel to Richard A. Marshack



**FILED**

MAY 25 2023

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ Deputy Clerk

8

9               **UNITED STATES BANKRUPTCY COURT**

10       **CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION**

11

| | |
|---|---|
| 12 In re: | Case No.: 8:23-bk-10571-SC |
| 13 THE LITIGATION PRACTICE GROUP P.C., | Adv. Proc. No. |
| 14     Debtor. | Chapter 11 |
| 15 | **DECLARATION OF TRUSTEE, RICHARD MARSHACK IN SUPPORT OF TRUSTEE'S OMNIBUS *EMERGENCY* MOTION FOR:** |
| 16 RICHARD A. MARSHACK, Chapter 11 Trustee, | |
| 17     Plaintiff, | |
| 18     v. | **1) TURNOVER OF ESTATE PROPERTY AND RECORDED INFORMATION PURSUANT TO 11 U.S.C. § 542;** |
| 19 TONY DIAB, an individual; DANIEL S. MARCH, an individual; ROSA BIANCA LOLI, | **2) PRELIMINARY INJUNCTION;** |
| 20 an individual; LISA COHEN, an individual; WILLIAM TAYLOR CARSS, an individual; | **3) LOCK-OUT;** **4) RE-DIRECTION OF UNITED STATES PARCEL SERVICES MAIL;** |
| 21 ENG TANG, an individual; MARIA EEYA TAN, an individual; JAKE AKERS, an individual; HAN | **5) ORDER TO SHOW CAUSE RE COMPLIANCE WITH COURT ORDER;** |
| 22 TRINH, an individual; JAYDE TRINH, an individual; WES THOMAS, an individual; | **AND** |
| 23 SCOTT JAMES EADIE, an individual; JIMMY CHHOR, an individual; DONGLIANG JIANG, | **6) OTHER RELIEF AS NECESSARY TO THE EFFICIENT ADMINISTRATION OF** |
| 24 an individual; OAKSTONE LAW GROUP PC; GREYSON LAW CENTER PC; PHOENIX | **THIS MATTER** |
| 25 LAW GROUP, INC.; MAVERICK MANAGEMENT, LLC; LGS HOLDCO, LLC; | Date: May 26, 2023 |
| 26 CONSUMER LEGAL GROUP, P.C.; VULCAN CONSULTING GROUP LLC; B.A.T. INC. d/b/a | Time: **T.B.D. By Clerk of Court** Judge: Hon. Scott C. Clarkson |
| 27 COAST PROCESSING; PRIME LOGIX, LLC; TERACEL BLOCKCHAIN FUND II LLC; | Place: Courtroom 5C 411 W. Fourth Street |
| 28 EPPS; EQUIPAY; AUTHORIZE.NET; WORLD GLOBAL; OPTIMUMBANK HOLDINGS, INC. | Santa Ana, CA 92701 |

1  d/b/a OPTIMUM BANK; MARICH BEIN, LLC;
   BANKUNITED, N.A.; REVOLV3, INC.;
2  FIDELITY NATIONAL INFORMATION
   SERVICES, INC. d/b/a FIS; WORLDPAY, INC.;
3  WORLDPAY GROUP; MERIT FUND, LLC;
   GUARDIAN PROCESSING, LLC; THE
4  UNITED STATES POSTAL SERVICE; and
   DOES 1 through 100, inclusive,
5
                    Defendants.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

I, Richard A. Marshack declare as follows:

1.    I am the duly appointed Chapter 11 Trustee in the above captioned matter. I am an equity partner at Marshack Hays LLP, and duly admitted to practice before all of the Courts in the State of California, United States District Court for the State of California and the United States Bankruptcy Courts for the State of California.

2.    I have personal knowledge of the matters set forth herein. If called as a witness in this matter, I could and would testify competently thereto.

3.    Pursuant to Docket No. 65, I was duly appointed as the Chapter 11 Trustee in this matter on May 8, 2023.

4.    Since that date, I have attempted to obtain compliance in securing a turnover of property of the estate from Debtor The Litigation Practice Group, P.C. ("LPG") and its purported sole shareholder, Daniel March ("March"), and Tony Diab ("Diab"), who LPG designated as the person most knowledgeable concerning LPG's dealings with vendors, and who appeared on behalf of LPG at is initial meeting of creditors held under section 341(a) of the Bankruptcy Code

5.    For example, on March 17, 2023, my general counsel Ed Hays emailed Diab asking a series of questions. No. 7 requested "Any and all ACH or other payment processing agreements, and superadministrative access to all payment processing companies and affiliates utilized by Debtor in the last 5 years." In response to this request, Diab stated "I will assemble and forward all payment processing agreement we currently have access to, **but I am confused about superadministrative access as there are no portals we can access**. I can introduce you to our point of contact at all payment processors and instruct them to give full access to information, please confirm that I may do so using this email address for you and Richard."

6.    This was a lie. A witness, Russ Squires, has provided screen shots taken from LPG's merchant portal on Revolv3. This screenshot, attached hereto as **Exhibit 6**, and incorporated herein by this reference clearly establishes that ACH payment processor Revolv3 has processed a net settlement amount of $6,308,702.72 under LPG's merchant account during the post-petition period from March 28, 2023 through May 19, 2023. In the upper right hand corner of the screen shot, the merchant portal states "Hi, tony.diab" clearly reflecting that the administrative access remains under

1    Diab's name. Moreover, this screen shot confirms that the $6,308,702.72 settled on behalf of the

2    Debtor LPG post-peitition was settled to an account at Bank of America, N.A. (routing no.

3    122400724) ending in 9201. Russ Squires is informed and alleges that this account is in the name of

4    Prime Logix, LLC ("Prime Logix").   Russ Squires is further informed and alleges that the

5    administrative credentials are: **Username: tony.diab; Password: Rosaloli1.**

6        7.    Question No. 3 in Ed Hays' May 17, 2023 email requests "List of all payment

7    processing agreements and superadministrative access to all." Diab's response states "We have no

8    current payment processors other than Equipay/Approvely, which is holding approx. $653k, but they

9    deactivated our login. The point of contact for the login when we still had one was Matt Cooper, 954-

10   234-4995." The information set forth in paragraph 6, above, renders this response untruthful and or

11   evasive at best, as Debtor LPG still has an active merchant account with payment processor Revolv3.

12       8.    Question No. 9 in Ed Hays' May 17, 2023 email requests "Super administrative

13   credentials to the Debtor's Microsoft 365 account(s)."  In response, Diab stated "We are currently at

14   risk of losing our Microsoft access, we are again in need to assistance in collecting money held by

15   Equipay so that essential expenses can be paid.  In the meantime I will obtain and forward admin

16   access, which I believe is through Sharp Business Systems, the vendor through which we obtained

17   our E1, E3 and E5 licenses."

18       9.    Diab has, to date, failed and refused to provide the credentials to the Debtor's

19   Exchange365 account, but continues to send emails from admin@lpglaw.com confirming that he

20   retains access to the Debtor's Exchange365 account but refuses to provide same to myself.  Emails

21   originating from admin@lpglaw.com on May 21, 2023 and May 22, 2023, sent in response to other

22   requests originating from my office, are attached hereto as **Exhibit 7**.

23       10.   Question No. 6 requests "Administrative access to Luna and all client data contained

24   therein". Diab's response states "We (LPG) do not have a Luna account.  We do, however, have a

25   login that Dan uses, I will have him forward his credentials so that you can access." Diab, LPG

26   and March have failed and refused to provide access to Luna, which I understand is where the

27   Debtor's customer relationship management ("CRM") software was migrated following Debt Pay

28   Pro's termination of Debtor's access in March, 2023.

11.     Question No. 10 requests "Payroll and human resource records." Diab responded stating, "We will forward administrative logins to Paychex as well as forward a USB with all HR records." Debtor LPG, Diab and March have failed and refused to provide same.

12.     From my review of the Debtor's 341a transcript ("TR"), Diab represented that LPG began transferring LPG's approximately 67,000 clients in or about February or March of 2023 to three entities, Oakstone Law Group, P.C. ("Oakstone"), Consumer Legal Group, P.C. ("CLG") and Phoenix Law, P.C. ("Phoenix") (TR pg. 47, line 5 – pg. 48, line 24). A true and correct copy of the TR is attached hereto as **Exhibit 8**. As to these alleged transfers, at least as to Phoenix, Diab contends that there is no finalized agreement.

13.     Exigent circumstances exist to grant the requested relief. As set forth in the Declaration of Russ Squires, credible threats have been shared with us by employees of LPG. These threats have been made by Mr. Diab and other associated with him including Han and Jade Trinh, Lisa Cohen and Rosa Loli.

14.     Given the alleged transfers and ongoing control being exercised over Debtor's contractual rights to collect revenue from its clients, property in which Debtor has an interest is in imminent danger of loss, destruction, and further transfers.

15.     Based on representations made to me by Mr. Diab, ACH processing companies, including World Global have threatened to initiate unauthorized electronic transfers. Based on historical ACH transfers at LPG it is anticipated that Mr. Diab by and through Revolv3, Inc.; OakStone; Phoenix; Greyson; Gallant; CLG; and/or any other entity he controls will initiate an ACH transfer of client funds for the bulk of LPG's prior clients on June 1, 2023, which is expected exceed $1 million dollars. Without an order granting the requested injunctive relief, Mr. Diab would again have the ability to transfer such funds to other corporate entities he controls, including Vulcan Consulting, Maverick Management, LLC, Prime Logix, LLC among many others under his control.

16.     As such, property of Debtor's Estate as set forth in the concurrently filed motion and proposed order, is at great risk of further dissipation, loss, destruction, and fraudulent transfer. In fact, by way of Mr. Squires, it has been brought to my attention that Mr. Diab is in the process of creating

1   new corporate entities in furtherance of his attempts to transfer property in which Debtor has an

2   interest as part of his deliberate efforts to hinder, delay, and defraud LPG's creditors.

3         17.    In further support for immediate injunctive relief, LPG's clients were and have alleged

4   their files were assigned or transferred to Oakstone, Greyson, Gallant, Phoenix, or CLG without their

5   previous knowledge or consent. One such client has filed already filed a lawsuit to that effect.

6         18.    Based on information provided by Mr. Squires and as set forth in his declaration, many

7   of the 40,000 plus clients whose files were allegedly transferred are not being serviced due to their

8   files being transferred from DebtPayPro ("DPP"), which automated many of the services provided,

9   to a proprietary system, LUNA, which does not have the same functionality as DPP.

10         19.    Based on complaints made to the Better Business Bureau, on Facebook, and to news

11   outlets including Law360, the potential for substantial claims absent immediate relief to turn over the

12   client files and recorded information is paramount. This information is critical and necessary to

13   evaluate over 40,000 client files and determine whether the Debtor's legal services agreements are

14   executory contracts and, if so, which could reasonably be assumed, cured, and serviced. Similarly,

15   obtaining the contracts will permit me to evaluate and decide if any should be rejected. Lastly, I need

16   this information to determine which non-executory contracts and earned accounts receivables are

17   property of the Debtor's estate.

18         20.    Further, by way of Mr. Squires' communications with employees of LPG, Mr. Diab

19   and his associates have made threats of physical harm to any person who provides information related

20   to LPG, OakStone, Phoenix, Greyson, and CLG among his other entities to LPG's creditors or with

21   regard to its bankruptcy filing, unless such information comes directly from Mr. Diab himself in order

22   to control and maintain his false narrative in this Bankruptcy matter.

23         I declare under penalty of perjury under the laws of the state of California that the foregoing

24   is true and correct, and that this declaration is executed on this 24 day of May, 2023.

25

26                                         Richard A. Marshack

27

28

# EXHIBIT 6

Reconciliation | Settlement | Activity | Fees | Reserve | Transfers | Direct Debit | Prime

## Reconciliation

Settlement Date ▾ | The Litigation Practice Group, P.C. ▾ | ▾ | 03/26/2023 – 05/19/2023 ▾

Reconciliation Settlement The Litigation Practice Group, P.C. 03/26/2023 – 05/19/2023

**Net Settlement**
$6,308,702.72
29,837 Settled Transactions

Net Settled Sales
$9,331,604.58

Returned Payments
-$2,873,364.56

Settled Deposit
$9,331,604.58

Total Fees
-$149,537.30

Settled Refunds
$0.00

Workout Fees
-$138,719.04

Declined Reversals
$0.00

Passthrough Fees
-$10,818.26

Refund Reversals
$0.00

Reserve Activity
$0.00

How do I use this data?

### Settlement by Funds Transfers
Expand All

| Routing Number | Account Number | Account Description | Transfer Date | Workout Transfer Id | Selected Reporting Group | Full Transfer Amount |
|---|---|---|---|---|---|---|
| 122400724 | XXXXXXX-9201 | The Litigation Practice Group PC Merchant Account | | | $6,308,702.72 | $6,308,702.72 |
| USD Totals | | | | | $6,308,702.72 | $6,308,702.72 |

How do I use this data?

### Settlement Summary

By Settlement Date | By Payment Method | By Preparer | By Purchase Currency

| Settlement Date ▾ | Activity Date | Net Settled Sales | Count | Returned Payments | Total Fees | Reserve Activity | Third Party Payments | Net Settlement |
|---|---|---|---|---|---|---|---|---|

# EXHIBIT 7

**From:** Tony Diab <tony@coastprocessing.com>
**Date:** May 17, 2023 at 12:55:50 AM PDT
**To:** Ed Hays <EHays@marshackhays.com>
**Cc:** Richard Marshack <RMarshack@marshackhays.com>, "joon khanglaw.com" <joon@khanglaw.com>, Pam Kraus <pkraus@marshackhays.com>, "Daniel S. March" <dan@litigationpracticegroup.com>, Laila Masud <LMasud@marshackhays.com>
**Subject: Re: LPG: Urgent Matters**


Hi Ed -

Responses below. Shia's email address is: admin@fundersgateway.com. Not sure how serious the threat was as we have not received word of any unusual payment activity. I will obviously keep you posted.


1. Direct access to the Debtor's accounting software or a copy thereof (i.e. QuickBooks); -LPG used a desktop version of Quickbooks, I will have a USB loaded with the full transaction log. If you are unable to access I believe you can convert from QB desktop to online, but this is well outside of my range of ability.
2. Any and all documentation related to assets owned by the Debtor; -We have no documentation but we can prepare the same, namely an inventory of the items in storage.
3. List of all payment processing agreements and superadministrative access to all; -We have no current payment processors other than Equipay/Approvely, which is holding approx. $653k, but they deactivated our login. The point of contact for the login when we still had one was Matt Cooper, 954-234-4995
4. Any and all client files in whatever form they exist; -All client files were maintained in DebtPayPro. They have restricted our access to the network version of DPP. We have the file in USB format, we will send. The file type is what DPP gives us, if you cannot access I will connect you with our former IT person who may be able to assist.

5. Administrative credentials for Debt Pay Pro; -We no longer have access to DPP, they terminated our access in March. We do, however, have a backup of all client files which we will forward via USB.

6. Administrative access to Luna and all client data contained therein; -We (LPG) do not have a Luna account. We do, however, have a login that Dan uses, I will have him forward his credentials so that you can access it.

7. Any and all ACH or other payment processing agreements, and superadministrative access to all payment processing companies and affiliates utilized by Debtor in the last 5 years; -I will assemble and forward all payment processing agreement we currently have access to, but I am confused about superadministrative access as there are no portals we can access. I can introduce you to our point of contact at all payment processors and instruct them to give full access to information, please confirm that I may do so using this email address for you and Richard.

8. Any and all insurance policies (the ones previously sent have expired); -I will obtain current policies and send, but note that our malpractice policy extension remains unpaid and must be paid by early June. We are hopeful that this payment can be approved once funds are received from Equipay or otherwise.

9. Super administrative credentials to the Debtor's Microsoft 365 account(s); -We are currently at risk of losing our Microsoft access, we are again in need to assistance in collecting money held by Equipay so that essential expenses can be paid. In the meantime I will obtain and forward admin access, which I believe is through Sharp Business Systems, the vendor through which we obtained our E1, E3 and E5 licenses.

10. Payroll and human resource records; -We will forward administrative logins to Paychex as well as forward a USB with all HR records.

11. Super administrative credentials to present, and a historical list of those used in the last 5 years, of all online storage services ever used by the Debtor and administrative credentials for each of those services; -We will create a user with access to our shared drive and forward; this is again subject to revocation for non-payment.

12. Physical access to all of the Debtor's computer equipment (desktops, laptops, iPads, servers, etc.) and hardcopy records wherever they may be located. -These are being held in storage but can be accessed. No harddrive storage was permitted, only cloud storage, but we will add you to the storage unit so that you can access at your convenience. We need one more storage unit so that we can empty the space at 17542 E 17th Street, but need approval to incur the expense and also needs funds. As Dan noted, the small amount held in LPG's DIP account was seized by a creditor who was on notice of LPG's bankruptcy filing. LPG literally does not have a dollar to spend after that account was levied.

13. Any and all tax returns; -I will forward; no return has been filed for 2022 to date.

14. Corporate documents, board resolutions, etc.; -I will locate and forward.

15. Organizational chart for the Debtor and affiliated entities; -No such chart exists, but I can create one provided that is ok (I do not want you to think we kept such a chart, but I am happy to put together with the understanding that it was created for you in response to this request).

16. Organization chart for the Debtor's employees and officers; -I will forward.

17. Bank statements, canceled checks, wire transfer notices and other enclosures for any and all Debtor bank accounts used within the last 5 years, and present; -We only have bank statements and Quickbooks records, both of which will be forwarded. Online logins no longer work for any LPG accounts, but we can request any desired records from the bank branches at Chase, B of A, Union Bank, or Optimum Bank.

18. Any and all corporate credit card statements; -I will forward.

19. Any and all investment or brokerage statements; -None exist.

20. Any and all compiled, reviewed or audited financial statements;  -LPG did not have audited, certified, or reviewed financial statements.  I will forward our internal financial statements but with the admonition that they were never reviewed by a CPA or other accounting professional, only LPG's internal bookkeepers and former acting CFO Kevin Kurka.

21. Monthly general ledgers, income statements, balance sheets, and trial balances, preferably in an electronic format;  -Subject to the statement in response to 20., above, I will forward.

22. Contact information for any and all accounting firms, tax prep firms or bookkeepers utilized by the Debtor.  -The accounting firm that prepared LPG's prior tax filings, but which is no longer working with LPG for lack of payment, is Carpenter and Associates, 949-951-3200

As noted in our call, we have no administrative support.  I will collect documents and materials as fast as possible and will forward on a rolling basis.  For USBs, I will drop them off at your office unless instructed otherwise and will place them in an envelope marked "LPG data"

Thanks,
Tony

On Mon, May 15, 2023 at 3:57 PM Ed Hays <EHays@marshackhays.com> wrote:

Tony and Joon:

Trustee needs the following documents as soon as possible today or tomorrow morning:

1. Direct access to the Debtor's accounting software or a copy thereof (i.e. QuickBooks);
2. Any and all documentation related to assets owned by the Debtor;
3. List of all payment processing agreements and superadministrative access to all;
4. Any and all client files in whatever form they exist;
5. Administrative credentials for Debt Pay Pro;
6. Administrative access to Luna and all client data contained therein;
7. Any and all ACH or other payment processing agreements, and superadministrative access to all payment processing companies and affiliates utilized by Debtor in the last 5 years;
8. Any and all insurance policies (the ones previously sent have expired);
9. Super administrative credentials to the Debtor's Microsoft 365 account(s);
10. Payroll and human resource records;
11. Super administrative credentials to present, and a historical list of those used in the last 5 years, of all online storage services ever used by the Debtor and administrative credentials for each of those services; and
12. Physical access to all of the Debtor's computer equipment (desktops, laptops, iPads, servers, etc.) and hardcopy records wherever they may be located.

Then, as soon as possible and preferably by the close of business on Wednesday or Thursday at the latest, we need the following:

13. Any and all tax returns;
14. Corporate documents, board resolutions, etc.;
15. Organizational chart for the Debtor and affiliated entities;
16. Organization chart for the Debtor's employees and officers;
17. Bank statements, canceled checks, wire transfer notices and other enclosures for any and all Debtor bank accounts used within the last 5 years, and present;
18. Any and all corporate credit card statements;
19. Any and all investment or brokerage statements;
20. Any and all compiled, reviewed or audited financial statements;
21. Monthly general ledgers, income statements, balance sheets, and trial balances, preferably in an electronic format; and
22. Contact information for any and all accounting firms, tax prep firms or bookkeepers utilized by the Debtor.

Please reply all to confirm your receipt of this e-mail and agreement to provide these documents and information.

Also, do you have an e-mail address for Shia Dembitzer?

Thank you.

Ed

cc: Richard, Pam

**From:** Tony Diab <tony@coastprocessing.com>
**Date:** Monday, May 15, 2023 at 10:13 AM
**To:** Richard Marshack <RMarshack@MarshackHays.com>, Ed Hays <EHays@MarshackHays.com>, joon khanglaw.com <joon@khanglaw.com>, Pam Kraus <pkraus@marshackhays.com>
**Cc:** Daniel S. March <dan@litigationpracticegroup.com>
**Subject:** Urgent Matter

All -


We (LPG) received a threat this morning from a creditor that they are going to start drafting payments from LPG clients if they do not receive a payment from us. They do not care about the automatic stay. I would like to discuss with someone before taking action but time is of the essence. Please advise when we can jump on a call to discuss; I do not want to take any steps without approval but obviously this would be devastating to our client base and the relationship we have with the two firms servicing LPG clients. I am generally available at 620-474-031.


The threat is coming from Shia Dembitzer of World Global Fund LLC. This is the same individual and entity that committed a mass erroneous debit of clients in April 2022.


Thanks,

Tony


--
Coast Processing
1351 Calle Avanzado
Suite 2
San Clemente, CA 92673
949.229.6262, ext. 1013
tony@coastprocessing.com



**From:** Admin <admin@lpglaw.com>
**Date:** May 21, 2023 at 10:03:28 PM PDT
**To:** Matthew Cooper <matt@approvely.com>, Chelsie Cooper <ccooper@approvely.com>,
Nitin Aggarwal <Nitin.Aggarwal@equipay.co>
**Cc:** Anupam Satyasheel <anupam.satyasheel@occamsadvisory.com>, Richard Marshack
<RMarshack@marshackhays.com>, Ed Hays <EHays@marshackhays.com>, Pam Kraus
<pkraus@marshackhays.com>, "joon khanglaw" <joon@khanglaw.com>,
dan@litigationpracticegroup.com
**Subject: Chapter 11 Trustees**


All -

I am writing to advise you of the appointment of Marshack Hays LLP as Chapter 11 Trustees
for Litigation Practice Group. Richard Marshack and Ed Hays are copied on this
email. Please contact their office immediately to coordinate the turnover of all funds being
held to the bankruptcy estate. Marshack Hays LLP can be reached at 949-333-7777.

In addition, LPG has lost access to the online portal to view the current balance and all fees
collected to date. Please provide current statements or online access to Mssrs. Marshack
and Hays.

Thanks!

The Litigation Practice Group PC
17542 E. 17th St., Ste 100
Tustin, CA 92780
p: 949.715.0644
f: 949.315.4332

www.lpglaw.com



NOTICE: This email message (including any attachments) may contain material that is confidential and/or legally privileged. Unless you are the intended recipient or are authorized to receive information for the intended recipient, you may not use, copy, or disclose any part of this message. If you have received this message in error, please notify us and delete all copies of it. Thank you

**From:** Admin <admin@lpglaw.com>
**Sent:** Monday, May 22, 2023 2:14 PM
**To:** Richard Marshack <RMarshack@MarshackHays.com>; Ed Hays <EHays@MarshackHays.com>
**Cc:** Pam Kraus <pkraus@marshackhays.com>; dan@litigationpracticegroup.com; joon khanglaw.com <joon@khanglaw.com>
**Subject:** Fw: Litigation Practice Group PC -Non-Renewal

All -

Our malpractice policy is set to expire on July 18, we can extend for a year for a premium of $9,750.00. The prior quote that I included in the cash flow statements was based on our old attorney roster. With only Dan left the price came down substantially. Please confirm if we should proceed. If so, I will forward the invoice to you to handle out of the funds we receive (which we should be receiving soon!).

Thanks!


The Litigation Practice Group PC

17542 E. 17th St., Ste 100

Tustin, CA 92780

p: 949.715.0644

f: 949.315.4332

www.lpglaw.com



NOTICE: This email message (including any attachments) may contain material that is confidential and/or legally privileged. Unless you are the intended recipient or are authorized to receive information for the intended recipient, you may not use, copy, or disclose any part of this message. If you have received this message in error, please notify us and delete all copies of it. Thank you

**From:** Andrew McDonald <amcdonald@libertycompany.com>
**Sent:** Monday, May 22, 2023 8:36 AM
**To:** Admin <admin@lpglaw.com>
**Subject:** Litigation Practice Group PC -Non-Renewal

FYI Ascot is set to non-renew LPG's E&O...do you anticipate wanting to purchase tail E&O coverage for a year?

Thanks,
Andrew McDonald, CLCS, 4036936
Vice President, Consultant
The Liberty Company Insurance Brokers, CA License #0D79653

2801 West Coast Hwy., Suite 350, Newport Beach, CA 92663
| Fax 866-835-6983 | Cell 949-525-1808
libertycompany.com ; amcdonald@libertycompany.com

• To send me a secure/encrypted email, please click HERE!



mission          peace of mind

                              core values    integrity, excellence, caring, kindness, fairness, teamwork,
good feelings,    fun

Coverage cannot be bound or changed via e-mail without written confirmation from your Agent.

PRIVILEGED AND CONFIDENTIAL INFORMATION: The information contained in this electronic transmission, and any documents attached hereto, may contain confidential information that is legally privileged and confidential. The information is intended only for the use of the recipient(s) named above. If you have received this electronic message in error, please notify the sender and delete the electronic message. Any disclosure, copying, distribution or the taking of any action in reliance on the contents of the information received in error is strictly prohibited.

# EXHIBIT 8

1                OFFICE OF THE UNITED STATES TRUSTEE

2                       SANTA ANA DIVISION

3

4   In Re:                      )   Case No. 8:23-bk-10571-SC
                                )
5   THE LITIGATION PRACTICE      )   Chapter 11
    GROUP, PC,                   )
6                               )
            Debtor.             )
7   _____)

8                               341(a) MEETING

9                       QUEENIE NG, Presiding

10                          --oOo--

11              Monday, April 24, 2023

12              411 West Fourth Street
                Santa Ana, California 92701
13

14  APPEARANCES:

15  For the Debtor:              JOON M. KHANG, ESQ.
                                 Khang & Khang, LLP
16                               4000 Barranca Parkway
                                 Suite 250
17                               Irvine, California 92604
                                 (949) 419-3834
18

19  For the United States        QUEENIE K. NG, ESQ.
      Trustee:                   MARILYN SORENSEN, ANALYST
20                               CAM MISKINS, ESQ.
                                 Office of the United States
21                                  Trustee
                                 411 West Fourth Street
22                               Suite 7160
                                 Santa Ana, California 92701
23                               (714) 338-3403

24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

*Briggs Reporting Company, Inc.*

ii

1  APPEARANCES:   (cont'd.)

2  For All Service Financial:      ALAN I. NAHMIAS, ESQ.
                                   Mirman, Bubman & Nahmias, LLP
3                                  21860 Burbank Boulevard
                                   Suite 360
4                                  Woodland Hills, California
                                     91367
5                                  (818) 995-2555

6  For SDCO Tustin Executive       RONALD BROWN, ESQ.
     Center:

7

8  For DVF 2, MCDVI 1, MCDVI 2:    DAVID CUSIO, ESQ.
                                   MATTHEW STOCKHOLD, ESQ.
9                                  MICHAEL BRELJE, ESQ.

10 For Maverick Bank Card,         FRANK WHITE, ESQ.
     Inc.:

11

12 For Carolyn Beach:              DANIEL EDELMAN, ESQ.

13 For the Commonwealth of         AMY SCHULMAN, ESQ.
     Pennsylvania:

14

15 For Validation Fund 2:          DAVE ZUCK, ESQ.

16 Transcriber:                    Briggs Reporting Company, Inc.
                                   9711 Cactus Street
17                                 Suite B
                                   Lakeside, California 92040
18                                 (310) 410-4151

19

20

21

22

23

24

25

*Briggs Reporting Company, Inc.*

iii

I N D E X

WITNESSES:                                    EXAMINATION

DANIEL MARCH                                       5

TONY DIAB                                          6

*Briggs Reporting Company, Inc.*

1

<u>SANTA ANA, CALIFORNIA MONDAY, APRIL 24, 2023  11:00 AM</u>

--oOo--

3    TRUSTEE NG:  Good morning, everyone.  My name is
4 Queenie Ng.  I'm the trial attorney for the United States
5 Trustee's Office, and the Assistant U.S. Trustee, Cam
6 Miskins (phonetic), is also attending today.

7    This is the 341(a) meeting of In Re The Litigation
8 Practice Group, PC, Case Number 8:23-bk-10751-SC.  This
9 Chapter 11 case was filed on March 20th, '23, and the
10 initial 341(a) was set for April 24th, '23 and was continued
11 to today, May 2nd, '23, at 9:30 pursuant to the Debtor's
12 request.

13    I note there are a lot of people on the phone
14 right now.  I would like everyone to make an appearance so
15 we have a record who is hear today.  Can we start with the
16 Debtor's counsel and Debtor's representative.

17    MR. KHANG (telephonic):  Good morning.  This is
18 Joon Khang appearing on behalf of the Debtor.

19    MR. MARCH (telephonic):  This is Daniel Steven
20 March for The Litigation Practice Group, shareholder.

21    MR. DIAB (telephonic):  Tony Diab on behalf of
22 Litigation Practice Group.

23    TRUSTEE NG:  Anyone else in the audience?  If so,
24 can you please announce your name?

25    MR. BROWN (telephonic):  Good morning.  Ronald

*Briggs Reporting Company, Inc.*

2

1 Brown, attorney for SDCO Tustin Executive Center, the

2 landlord to the Debtor.

3          TRUSTEE NG:  Thank you.

4          MR. CUSIO (telephonic):  Good morning.  David

5 Cusio (phonetic) on behalf of Debt Validation Fund 2, MCDVI

6 Fund 1, and MCDVI Fund 2.

7          TRUSTEE NG:  Thank you.

8          MR. STOCKHOLD (telephonic):  Good morning.

9 Matthew Stockhold (phonetic), also appearing on behalf of

10 Debt Validation Fund 2, MCDVI Fund 1, and MCDVI Fund 2.

11          MR. LEE (telephonic):  This is Eric Lee, an

12 investor in Validation Partners, a creditor.

13          MR. WHITE (telephonic):  Good morning.  Frank

14 White for (indiscernible).

15          UNIDENTIFIED SPEAKER:  Good morning --

16          MR. WHITE:  Frank White -- go ahead.

17          UNIDENTIFIED SPEAKER:  Ann --

18          MR. ZUCK (telephonic):  (Indiscernible) Debt

19 Validation Fund 2.

20          TRUSTEE NG:  Okay.  I'm sorry.  I didn't hear that

21 name just now.

22          MR. ZUCK:  Dave Zuck (phonetic), Validation Fund

23 2.

24          TRUSTEE NG:  Okay.

25     (Multiple speakers.)

3

1          MR. NAHMIAS (telephonic):  This is Alan Nahmias,

2   Mirman, Bubman and Nahmias, on behalf of All Service

3   Financial.

4          MS. JAY (telephonic):  Ann Jay on behalf of

5   (indiscernible) Enterprise.

6          UNIDENTIFIED SPEAKER:  (Indiscernible.)

7          TRUSTEE NG:  I'm sorry.  I didn't hear that one.

8      (No response.)

9          TRUSTEE NG:  I'm sorry.  Can you repeat that,

10  whoever just spoke?

11         MR. CARR (telephonic):  Chris Carr (phonetic) on

12  behalf of Gloria (indiscernible).

13         TRUSTEE NG:  Okay.  Anyone else?

14         UNIDENTIFIED SPEAKER:  (Audio glitch.)

15         MS. SCHULMAN:  This is Amy Schulman on behalf of

16  the Commonwealth of Pennsylvania Office of Attorney General,

17  Bureau of Consumer Protection.

18         TRUSTEE NG:  Thank you.

19         MR. WHITE:  Frank White for Creditor Maverick Bank

20  Card, Inc.

21         MR. MCKENNA (telephonic):  Ryan McKenna of MCDVI

22  Fund 1 and MCDVI Fund 2.

23         MR. BRELJE (telephonic):  Michael Brelje

24  (phonetic) on behalf of Debt Validation Fund MCDVI 1, MCDVI

25  2.

*Briggs Reporting Company, Inc.*

4

1          TRUSTEE NG:  Okay.  Is that everyone?

2          MR. MCKENNA (telephonic):  Sean McKenna on behalf

3  of MCDVI Funds 1 and 2.

4          MR. DRAGER (telephonic):  Jason Drager (phonetic)

5  on behalf of Ketterline (phonetic) Beach.

6          TRUSTEE NG:  Thank you.

7          MR. BARRY (telephonic):  Jack Barry (phonetic) on

8  behalf of Debt Validation Fund 2.

9          MR. GORDON (telephonic):  Brendan Gordon

10  (phonetic) on behalf of Debt Validation Fund 2.

11          TRUSTEE NG:  Okay.  Is that everyone?

12      (No response.)

13          TRUSTEE NG:  All right.  I hear no response, so

14  we're going to go ahead.

15          There are a lot of people here today.  For some

16  this might be your first time.  I'm just going to explain

17  what's going to happen today.

18          So, I'm going to ask everyone who's not going to

19  speak for now to mute because this meeting is being

20  recorded, and once I've finished all the questions, we'll

21  open up the forum to -- for any creditors who would like to

22  ask questions at the end.  At that point, you know, you can

23  unmute yourself and announce your name and if you're

24  representing someone, please, you know, announce the party

25  that you're representing.

5

1        Mr. Khang, who's going to appear on behalf of the

2 Debtor today?

3        MR. KHANG:  Appearing for the Debtor are Daniel

4 March, who is the President and sole shareholder of the

5 Debtor, as well as Tony Diab, who is the person most

6 knowledgeable with dealings with vendors of the Debtor.

7        TRUSTEE NG:  Okay.  So, we're going to swear in

8 both parties.

9        Mr. March, I know I can't see you, but can you

10 please raise your right hand and let me know when you're

11 done?

12        MR. MARCH:  I have done it.

13             DANIEL MARCH - WITNESS - SWORN

14        TRUSTEE NG:  And can you state your full name and

15 address for the record, please?

16        MR. MARCH:  Daniel Steven March, M-A-R-C-H.

17        TRUSTEE NG:  And your address for the record,

18 please?

19        MR. MARCH:  17291 Irvine Boulevard, Suite 101,

20 Tustin, California 92780.

21        TRUSTEE NG:  Is this your personal residence or is

22 this the Debtor's location?

23        MR. MARCH:  This is the Debtor's location.

24        TRUSTEE NG:  Okay.  I'm sorry.  Can you state that

25 address again?

6

1          MR. MARCH:  17291 Irvine Boulevard, Suite 101,

2    Tustin, California 92780.

3          TRUSTEE NG:  Thank you.

4          Is there any reason why you would not be able to

5    answer my question accurately and truthfully today?

6          MR. MARCH:  I don't believe so, no.

7          TRUSTEE NG:  Thank you so much.

8          Mr. Diab, could you please raise your right hand

9    and let me know when you're done.

10          MR. DIAB:  Yes.  I've raised my right hand.

11                TONY DIAB - WITNESS - SWORN

12          TRUSTEE NG:  Can you please state your full name

13    and the address for the record, please?

14          MR. DIAB:  Tony Diab.  Address is 20101 Southwest

15    Cyprus Street, Newport Beach, California 92660.

16          TRUSTEE NG:  And is this your personal residence?

17          MR. DIAB:  Yes.

18          TRUSTEE NG:  Thank you.  And is there any reason

19    why you would not be able to answer my question truthfully

20    and accurately today?

21          MR. DIAB:  None.

22          TRUSTEE NG:  Okay.  Mr. Khang, I'm going to ask

23    you to confirm whether or not the voice we just heard is, in

24    fact, the Debtor representative Mr. March and Mr. Diab?

25          MR. KHANG:  Yes.  I confirm that that -- the

*Briggs Reporting Company, Inc.*

7

1    voices are of Daniel March and Tony Diab.

2            TRUSTEE NG:  Thank you.

3            One of you can answer the question, Mr. March or

4    Mr. Diab.  If your answers are different, than I want to

5    hear from both of you, but if the answer is the same, only

6    one person needs to answer the question.

7            TRUSTEE NG:  Can you please provide the -- you

8    provided me the address for the Debtor just now, and you

9    mentioned that's the physical office at the Debtor, right?

10           MR. MARCH:  Yes.

11           TRUSTEE NG:  The petition lists a different

12   address at 17542 17th Street, Suite 100.  Is that a

13   different location?

14           MR. MARCH:  Yes.  That was the former address.

15   It's the one that's executory leases.  So, that is at

16   another building that we occupied only about three weeks

17   ago.

18           TRUSTEE NG:  Okay.  So, the Debtor moved out three

19   weeks ago?

20           MR. MARCH:  Yes.

21           TRUSTEE NG:  Did the Debtor terminate the lease?

22           MR. MARCH:  Can you repeat that, please?

23           TRUSTEE NG:  Was the lease terminated or what was

24   the reason for moving out?

25           MR. MARCH:  We moved out.  We gave notice, and we

8

1  moved out, vacated the premises.

2          TRUSTEE NG:  Okay.

3          MR. MARCH:  The lease is still pending.  There's

4  -- yeah, there's still a lease on the location.

5          TRUSTEE NG:  So, the Debtor still has to pay the

6  monthly rent for this location?

7          MR. MARCH:  We are not paying the monthly rent.

8  We intend to abandon that and --

9          TRUSTEE NG:  Okay.

10         MR. MARCH:  -- (indiscernible) the lease.

11         TRUSTEE NG:  For the new location on Irvine

12 Boulevard, is that a lease as well?

13         MR. MARCH:  What is that?  I'm sorry.  Can you

14 repeat that?

15         TRUSTEE NG:  Is that a lease as well?

16         MR. MARCH:  Yes.  That's a lease.

17         TRUSTEE NG:  And when did the Debtor enter into

18 that lease?

19         MR. MARCH:  Oh, let's see.  It was a personal

20 lease, and it's also myself litigation and The Litigation

21 Practice Group.  I think that lease -- I know it expires I

22 believe next year.  I think the Litigation Practice Group

23 began paying on that about two years ago.

24         TRUSTEE NG:  So, this lease was entered two years

25 ago?

*Briggs Reporting Company, Inc.*

9

1          MR. MARCH:  It's -- it's probably been about three

2  years, ago, and it was on my own personal behalf.  It was my

3  own personal office, and The Litigation Practice Group is

4  now paying for that lease.

5          TRUSTEE NG:  Is LPG on the lease as well?

6          MR. MARCH:  Can you repeat that?  You're breaking

7  in and out.  I --

8          TRUSTEE NG:  I know I'm --

9          MR. MARCH:  -- I'm on a land line.  So --

10         TRUSTEE NG:  Yeah.  I know.  I'm having some

11 difficulty.  I think it's kind of -- if you guys can't hear

12 me, just let me know.  I'll try to do my best to repeat it.

13    You mentioned this is a personal lease.  Because I

14 can't recognize the voice, is it -- this is Daniel March,

15 right?

16         MR. MARCH:  Well, it was a personal lease when I

17 originally signed it, and then Litigation Practice Group, we

18 agreed to pay that lease, and they're also the insurer and

19 making payments on the insurance on the lease itself.

20         TRUSTEE NG:  Okay.  I'm going to ask for a copy of

21 the lease agreement.

22         MR. MARCH:  I can do that.  I know I provided the

23 insurance agreement.  I can provide the lease agreement as

24 well.

25         TRUSTEE NG:  And how much is the monthly rent for

10

1  this lease?

2         MR. MARCH:  You know, I don't -- I don't recall.

3  It's about $2100.

4         TRUSTEE NG:  The -- the Debtor's cash flow

5  projection lists rent for $1450.  Is that for the current

6  lease or the one that you were going to abandon?

7         MR. MARCH:  I'm sorry.  That entire conversation

8  broke up.

9         TRUSTEE NG:  Okay.  The Debtor's projection lists

10 a rent for $1450.  Is that for the current lease or the one

11 that you were going to abandon?

12        MR. MARCH:  The one we are going to abandon.

13        TRUSTEE NG:  Okay.  So, do you know what amount is

14 for the current lease?

15        MR. MARCH:  I actually don't.

16        TRUSTEE NG:  Do you think --

17        MR. MARCH:  I will get that lease.

18        TRUSTEE NG:  Okay.  Do you think it's more than

19 the $1450?

20        MR. MARCH:  Yeah.

21        TRUSTEE NG:  Excuse me.

22        UNIDENTIFIED SPEAKER:  It's really hard to hear.

23        MR. MARCH:  Tony may be able to --

24        TRUSTEE NG:  Do you think we should --

25        UNIDENTIFIED SPEAKER:  Call in --

*Briggs Reporting Company, Inc.*

                                                                    11

1          TRUSTEE NG:  -- call in from here and do a --

2          MR. MARCH:  -- on the amount of the lease.  I

3  don't have --

4          UNIDENTIFIED SPEAKER:  You have to dial the

5  number, 91, then the number, and then --

6          TRUSTEE NG:  I'm sorry.  I couldn't hear what you

7  said.  I'm going to call in a different number, so hopefully

8  it's better.  So, can everyone hold on for a second?

9          MR. MARCH:  I can call -- I can call in on my cell

10 phone, and that might be clearer.

11         TRUSTEE NG:  I think it might be me actually.  So,

12 I'm going to try to call in a different number with my land

13 line.  So, maybe that would be better.

14         MR. MARCH:  Okay.

15     (Pause.)

16         TRUSTEE NG:  Can everybody hear me?  Can everybody

17 hear me better now?

18         UNIDENTIFIED SPEAKER:  Yes.

19         UNIDENTIFIED SPEAKER:  Yes.

20         TRUSTEE NG:  Okay.  Thank you.  Appreciate that.

21         UNIDENTIFIED SPEAKER:  That's better.

22         UNIDENTIFIED SPEAKER:  Yes.

23         TRUSTEE NG:  Okay.  So, let's go back -- you were

24 going to provide me with a lease -- a copy of the lease

25 agreement, and is the Debtor current with the lease?

*Briggs Reporting Company, Inc.*

12

1         MR. MARCH:  Oh, yes.

2         TRUSTEE NG:  I'm sorry?

3         MR. MARCH:  Yes.

4         TRUSTEE NG:  And when was the Debtor -- lease

5 payment -- when was the last time?

6         MR. MARCH:  It would have been for the month of

7 April.

8         TRUSTEE NG:  And you don't recall the amount?

9         MR. MARCH:  I don't.

10         TRUSTEE NG:  Okay.

11         MR. MARCH:  I think it's about $2100.

12         TRUSTEE NG:  Okay.  And does the Debtor also have

13 a lease in Las Vegas?

14         MR. DIAB:  This is Tony Diab --

15         TRUSTEE NG:  Yes.

16         MR. DIAB:  I can answer the question with regard

17 to the Las Vegas place.  There was a lease in Las Vegas.

18 That lease was abandoned in November of 2022, and it's my

19 understanding that the -- that the space has not been

20 occupied since November of 2022.  But the lease itself has

21 not been terminated.  It will be one of the executory

22 contracts terminated by this proceeding.

23         TRUSTEE NG:  Okay.  So, we have not received the

24 real property questionnaire, and then we certainly need one

25 for the new lease.  So, you can send it to your attorney,

13

1  and -- and he can send it to us.  Okay.

2          MR. MARCH:  Understood.

3          TRUSTEE NG:  And it looks like this Debtor was

4  formed in February of 2009.  Does that sound right?

5          MR. DIAB:  Yes, it would have been February 22nd,

6  2019 that LPG was filed with the Secretary of State in

7  California.

8          TRUSTEE NG:  Is it 2019?  I'm sorry.

9          MR. DIAB:  Yeah.  I heard you say 2009.  So, I

10  was --

11          TRUSTEE NG:  I apologize.  I meant 2019.

12          Who were the original members -- Roughly 2019.

13          MR. DIAB:  The original shareholder Litigation

14  Practice Group was John Thompson, and that would have been

15  in February of 2019.

16          TRUSTEE NG:  When did he not become the -- the

17  member of the LPG?

18          MR. DIAB:  He conveyed his interest in November of

19  2019 to Dan March, who has been the sole shareholder since.

20          TRUSTEE NG:  And did you, Dan, have to pay

21  anything for that interest for the law firm?

22          MR. MARCH:  No.

23          MR. DIAB:  No.  John transferred the interest in

24  exchange for a release of liability, because he had concerns

25  on the liability front and asked to be swapped out as a

14

1 shareholder of LPG. We obviously located Dan March who took

2 over, and it was in exchange of a release of liability only,

3 no compensation to John for the shares.

4       TRUSTEE NG: Okay. I'm sorry. Was it Tony? Was

5 it Mr. Diab? Were you the one talking just now?

6       MR. DIAB: Yes.

7       TRUSTEE NG: Okay. It might be helpful if -- you

8 know, because I can't recognize the voice, it might be

9 helpful if, you know, you guys speak, then you would first

10 announce your name first so I know who's speaking.

11       When you said you located Dan March, was it you

12 who made the decision to locate Mr. March and convey the

13 interest to him?

14       MR. DIAB: Actually, there were a group of us that

15 were managing two entities at the time. And, so, the entity

16 called CAT, Incorporated, which would be (indiscernible),

17 and I had two partners. So, this is (indiscernible). I had

18 two partners, Brian Really (phonetic) and Santo De Rudi

19 (phonetic), and the three of us and Dan were comfortable

20 with his competence in this space. We met with him several

21 times, and we decided to pursue him for the position of

22 managing shareholder for LPG, but it was a joint decision

23 between the three of us, and we obviously offered it to Dan,

24 and he accepted.

25       TRUSTEE NG: Okay. So, you said you were managing

15

1 the Debtor at the time.  So, that would be around October

2 2009?

3        MR. DIAB:  This would have been October, November

4 of 2019, managing a related entity called Post Processing.

5        TRUSTEE NG:  Okay.

6        MR. DIAB:  And John was still the shareholder

7 managing LPG at the time, but his management was really

8 hands off.  So, it was important to us that he was also

9 managing LPG.

10        TRUSTEE NG:  So, are you still a managing member

11 of LPG?

12        MR. DIAB:  No.  Well, there was never a time where

13 I was a managing member.  I had a formal role in the

14 shareholder member (indiscernible), but I continue to this

15 day to manage the vendors, which includes the marketing

16 companies that (indiscernible) who now has the credit vendor

17 for credit reporting services, the payment processors, the

18 call centers that we hire to assist the clients, et cetera,

19 so all these things and then the (indiscernible) formed in

20 October, November 2019, it remains the case now.

21        TRUSTEE NG:  Okay.  So, do you have an official

22 title?

23        MR. MARCH:  And this is Dan March.  That's --

24 that's all correct.

25        TRUSTEE NG:  Okay.  Do you have official title

16

1 with the Debtor, Mr. Diab?

2          MR. DIAB:  We've -- no.  We've never worked out an

3 official title.  Vendor manager seems like the most accurate

4 description, but also we've never fixed that description to

5 my position.  So, no formal title.

6          TRUSTEE NG:  Were you ever an employee of the

7 Debtor?

8          MR. DIAB:  No.  I was -- at one point in time I

9 was myself an independent contractor of the Debtor, and then

10 subsequent, I had entities that were independent contractors

11 of the Debtor, but I was never employed on a W-2 basis.

12          TRUSTEE NG:  Okay.  So, are you a 1099 employee

13 then?

14          MR. DIAB:  So, I was.  I haven't received any

15 compensation in this calendar year, but I did as recent as

16 2022 through the entity as a 1099 contractor.

17          TRUSTEE NG:  So, you said the last time you

18 received compensation was in 2022?

19          MR. DIAB:  Correct.  And -- and that's mostly a

20 function of 2023 of the financial issues that we've had, not

21 any other reason.  It's just a function of the issues we've

22 dealt with for the first five months of this year.

23          TRUSTEE NG:  Do you recall when was -- what month

24 did you receive compensation?

25          MR. DIAB:  I think the last time I would have

17

1  received something would have been the beginning of December

2  of 2022.

3          TRUSTEE NG:  And do you recall your compensation?

4          MR. DIAB:  The amount that we received that month,

5  I don't.  I would have to look at records, but it would have

6  been probably around $20,000.

7          TRUSTEE NG:  And did --

8          MR. DIAB:  Give or take.

9          TRUSTEE NG:  Okay.  And did you receive -- say for

10 2022, did you receive compensation every month?

11         MR. DIAB:  No.  There were some months where I did

12 not receive compensation.  It was inconsistent and based on

13 available funds (indiscernible).

14         TRUSTEE NG:  Was there a written agreement between

15 you and LPG regarding your -- your employment terms?

16         MR. DIAB:  So, there was no written agreement

17 between the entities and I.  There was a written agreement

18 between me as an individual and LPG when I was compensated

19 as an individual but not between the entities and LPG.  I

20 was compensated through the entity.

21         TRUSTEE NG:  I'm sorry.  What entity was it you

22 were compensated through?

23         MR. DIAB:  So, in 2021, the entity was called

24 Vulcan Consulting Group, ALC.

25         TRUSTEE NG:  Can you spell the name?

18

1          MR. DIAB:  And in 2022 -- yes.  Vulcan Consulting

2    Group is V-U-L-C-A-N, second word Consulting, standard

3    spelling, and then the third word Group, and that was an

4    LLC.

5          TRUSTEE NG:  And does the Debtor have any interest

6    in this LLC?

7          MR. DIAB:  No.

8          TRUSTEE NG:  Does Mr. March have any interest in

9    this LLC?

10          MR. DIAB:  No.

11          TRUSTEE NG:  Who is the owner of this LLC?

12          MR. DIAB:  The -- the member of the LLC is Lisa

13    Cohen (phonetic).

14          TRUSTEE NG:  Lisa Cohen?

15          MR. DIAB:  Yes.

16          TRUSTEE NG:  And is this person an attorney?

17          MR. DIAB:  No.  Vulcan Consulting Group is not a

18    law firm, and she's not an attorney.

19          TRUSTEE NG:  Okay.  And what kind of arrangement

20    does the Debtor have with this consult -- Vulcan Consulting

21    Group?

22          MR. DIAB:  There were two reasons why the Debtor

23    would transfer money to this group.  One was this group was,

24    one, a consulting group which we'll call VCG.  VCG was

25    paying the merchant cash advances that LPG had taken in

19

1  December of 2021.  So, LPG would send money to Vulcan

2  Consulting Group which would then send money to the lender

3  in New York who had made cash advances to LPG and Vulcan.

4  Vulcan is one of the (indiscernible) cash advance

5  agreements, and LPG is the other.  The other reason LPG

6  would transfer money to Vulcan was to provide compensation.

7  So, those two transfers would have occurred in 2021.  No

8  transfers have happened since about August of 2021.

9          TRUSTEE NG:  So, for 2021, how much did you

10  receive total compensation?

11          MR. DIAB:  So, me as an individual from Vulcan?

12          TRUSTEE NG:  Yes.

13          MR. DIAB:  It would have been between 200 to 250

14  thousand.

15          TRUSTEE NG:  Did you receive compensation in any

16  other capacity from any other entity for your work done in

17  connection with LPG?

18          MR. DIAB:  In early 2021, early January and

19  February, I still received compensation directly from LPG,

20  and the compensation in those two months was just sent

21  directly from LPG to Tony Diab as an individual, would have

22  been roughly 60 to 80 thousand dollars.

23          TRUSTEE NG:  Why didn't the Debtor, LPG, just send

24  you compensation, you know, since you're the 1099 employee?

25  Why did they have to go through this, you know, third party

20

1  to do it?

2        MR. DIAB:  There were two concerns that we had.

3  One is because of my background, we tried to limit

4  visibility of things because of the way it -- the way that

5  it would make various vendors and attorneys feel because of

6  my background.  I actually tried to limit the number of

7  times that LPG interacted with Tony as an individual, and

8  that was just the optics of it in terms of managing

9  relationships with those who were concerned about my

10  background, and we made that switch in early 2021 based on

11  feedback that we were receiving.  And, so, that was the

12  primary reason why we started to do the compensation in an

13  indirect manner.  So, I would say that was the primary

14  reason.

15        The secondary reason is that the compensation was

16  always -- it was inconsistent, inconsistent meaning we

17  didn't know how much money would be available, the fact that

18  we didn't want to harm the business.  So, it would be a

19  function how much was available in terms of free cash flow.

20  That's what we would choose as pay through to me.  And, so,

21  the money would go to Vulcan into their -- Vulcan would

22  cover it for expenses like these cash advances, and then as

23  soon as money was made, it would be passed through.  And,

24  so, that was easier in terms of managing the cash flow than

25  having me on a set pay schedule.

*Briggs Reporting Company, Inc.*

21

1           TRUSTEE NG:   Okay.   And what about in 2022?   How
2   much did you receive total in 2022?
3           MR. DIAB:   In 2022, for the year, it probably
4   would have been -- so, it's complicated by -- by a factor.
5   So, it probably would have been a total of about $480,000
6   that went through Strategic Consulting Solutions.   When LPG
7   had its financial difficulties in 2022, most of that money
8   was given back, and Strategic ended up net zero at the end
9   of 2022, but that was only because the business needed the
10  money.   So, we essentially put it back in through Strategic.
11  So, Strategic would have received about 480 and would have
12  put back in about 480.   So, it was net zero, but that money
13  was paid throughout the course of the year.
14          TRUSTEE NG:   Okay.   So, at some point you decided
15  that you're not going to get paid through VCG, and then the
16  Debtor decided to pay you through Strategic Consulting, is
17  that right?
18          MR. DIAB:   Correct.   And the reason for that, just
19  to clarify, there was a dispute with the cash advance
20  companies in the State of New York.   There were several
21  lawsuits that were filed between these cash advance
22  companies, Vulcan Consulting Group and LPG.   And, for that
23  reason, we ceased using Vulcan Consulting Group and started
24  to use Strategic Consulting Solutions in place of it
25  starting in 2022.

*Briggs Reporting Company, Inc.*

22

1          TRUSTEE NG:  And what is the Debtor's

2 relationship, you know, to Strategic Consulting Solutions?

3          MR. DIAB:  It's identical to VCG's.  So, Strategic

4 would make cash advance payments, would make payments to me,

5 and those were the two functions that it served, and it had

6 a -- essentially, it was just based on the -- the negative

7 publicity that Vulcan received by virtue of I think it was

8 about a dozen lawsuits that were filed back and forth

9 between certain cash advance companies that include us, and

10 for that reason, we offered not to continue to use them as a

11 vehicle, and we locked in Strategic Consulting in its place.

12          TRUSTEE NG:  Okay.  And did you receive any

13 compensation for 2023?

14          MR. DIAB:  For 2023, this calendar year, there's

15 not been compensation to date.  There has been one transfer

16 of about $11,000 for Strategic Consulting Solutions.  That's

17 the only transfer that I can think of, but that didn't come

18 through to me, but Strategic would have received about

19 $11,000 this calendar year.

20          TRUSTEE NG:  Okay.  Do you expect to receive some

21 kind of compensation, you know, in this bankruptcy case from

22 the Debtor?

23          MR. DIAB:  I'm sorry.  Could you repeat that

24 question?

25          TRUSTEE NG:  Do you intend to -- you know, expect

*Briggs Reporting Company, Inc.*

23

1   to, you know, get some kind of compensation from the Debtor

2   in this case?

3             MR. DIAB:  No.  So, we've -- obviously, if there's

4   any compensation in my work for LPG, it will be done when

5   the Chapter 11 proceeding is done.  The vendors that I used

6   to manage are pretty much all gone.  Dan has a -- a limited

7   staff at the other office that he referenced.  And, so, once

8   this case is concluded, there won't be any further role for

9   me at LPG.  And, so, no compensation is contemplated.

10            TRUSTEE NG:  Okay.  Going back to --

11            MR. MARCH:  And I agree.  This is Dan.

12            TRUSTEE NG:  Thank you, Mr. March.

13            Going back to Mr. March, so, you joined the law

14  firm sometime in October or November of 2019.  And, prior to

15  that, did you have any relationship with the Debtor?

16            MR. MARCH:  No, I did not.

17            TRUSTEE NG:  Okay.  And, so, since you joined the

18  law firm, has there been any change in stock ownership?

19            MR. MARCH:  No, there has not.

20            TRUSTEE NG:  And who are the current officers?

21            MR. MARCH:  It is just myself.

22            TRUSTEE NG:  Okay.  And -- and your title is CEO

23  and President, is that right?

24            MR. MARCH:  Yes.

25            TRUSTEE NG:  When was the last time the Debtor had

*Briggs Reporting Company, Inc.*

24

1 other officers?

2       MR. MARCH: It wouldn't have been with me. So, I

3 don't know if it was with John Thompson or not. I don't

4 know if John had other officers. I don't believe so.

5       TRUSTEE NG: Okay. But since you joined the firm,

6 you -- you're the only officer, is that right?

7       MR. MARCH: That's correct.

8       TRUSTEE NG: So, the current Tustin location, how

9 many people work out from this office?

10       MR. MARCH: There are currently two --

11       TRUSTEE NG: And who are these people?

12       MR. MARCH: -- others. Olga Esquivel, E-S-Q-U-I-

13 V-E-L, and Carl -- the last name is difficult for me. Tony,

14 do you know his last name (indiscernible)?

15       MR. DIAB: That's Carl Wekashu (phonetic).

16       MR. MARCH: Yeah. It's so hard I can't even spell

17 it.

18       TRUSTEE NG: And what is their title?

19       MR. MARCH: They are just staff members. I don't

20 say just staff members, but they are -- they are handling

21 litigation that is currently going on in the State of

22 California.

23       TRUSTEE NG: Okay.

24       MR. MARCH: So, we have approximately 400 to 600

25 pending lawsuits that we are defending and litigating in the

25

1  State of California.  They're also handling previous

2  bankruptcy filings that we have pending from former LPG

3  clients.

4          TRUSTEE NG:  So, the 400 to 600 lawsuits that you

5  -- you know, you're referencing, are they -- is the Debtor

6  the Defendant in any of those lawsuits?

7          MR. MARCH:  The Defender --

8          TRUSTEE NG:  The Defendant --

9          MR. MARCH:  -- is the --

10         TRUSTEE NG:  The Debtor.

11         MR. MARCH:  We are defending -- we are -- yeah, we

12 are -- Litigation Practice Group, the Debtor, is the

13 attorney of record for these clients in California.

14         TRUSTEE NG:  Okay.  Oh, so, these are lawsuits

15 where the -- the -- LPG is representing clients to defend

16 those cases?

17         MR. MARCH:  Yes.

18         TRUSTEE NG:  Okay.  Understood.  And, is -- is

19 there a paralegal in -- in the office or anything like that?

20         MR. MARCH:  Olga Esquivel would be characterized

21 -- she's a certified paralegal.

22         TRUSTEE NG:  Okay.  And how many attorneys work

23 from the Tustin office?

24         MR. MARCH:  Just myself --

25         TRUSTEE NG:  Okay.

*Briggs Reporting Company, Inc.*

26

1          MR. MARCH:   -- at this point.  I think we only

2  have three active employees, including myself.

3          TRUSTEE NG:  Okay.  Are you in the office every

4  day or how often are you in the office?

5          MR. MARCH:  I'm in the office every single day,

6  including Saturdays.

7          TRUSTEE NG:  And what about the staff, the two

8  staff that you mention?

9          MR. MARCH:  They are in every single day.  Olga

10  will not come in on Fridays in the office, but she works

11  from home.  She's able to contact and give information to

12  the attorneys that are working on the cases.

13          TRUSTEE NG:  And what about Mr. Diab, is he in the

14  office every day?

15          MR. MARCH:  No, Mr. Diab doesn't go to the office.

16          TRUSTEE NG:  And how often does he go to the

17  office?

18          MR. MARCH:  No, Mr. Diab never comes in.

19          TRUSTEE NG:  Oh, he does not come in the office.

20  Okay.

21          MR. MARCH:  Correct.

22          TRUSTEE NG:  And you previously mentioned the

23  Debtor does not have any other location, is that right,

24  other than the Tustin location?

25          MR. MARCH:  Correct, correct.

*Briggs Reporting Company, Inc.*

27

1          TRUSTEE NG:  And was that the case in 2022 as

2  well?

3          MR. MARCH:  No.  I think we vacated the offices at

4  17542 17th Street probably -- I'm going to say it's about

5  February.  March is probably the last time anyone was in the

6  office (indiscernible).

7          TRUSTEE NG:  Okay.  I --

8          MR. DIAB:  This is Tony Diab.  That's correct.

9          TRUSTEE NG:  Other than the prior Tustin location,

10 did the Debtor ever have any offices like anywhere else in

11 the country?

12         MR. DIAB:  This is Tony.  I can answer that

13 question for other locations that we had.  We also had an

14 office in Las Vegas, Nevada that we vacated in November of

15 2022 and it has not been occupied since.  In addition, we

16 have an office in -- we had an office in Asheville, North

17 Carolina, a lease that we've abandoned.  We had an office in

18 Fort Lauderdale, Florida, which is, again, a lease that is

19 being abandoned.  It was abandoned before we filed the

20 petition.  The attorneys closed that space in North Carolina

21 and Florida in March, and we no longer have need for the

22 office space in those two jurisdictions.

23         There was an office in Atlanta, Georgia, and the

24 situation there, the attorneys offered to go remote, and the

25 lease was let go in February of 2023, this year.  There was

28

1  also compensation to attorneys who had their own offices,

2  but those were not leases for LPG.  They were reimbursements

3  paid to the attorneys who were LPG employees in states like

4  Minnesota, Indiana, South Dakota, Oklahoma, and Nevada.

5  There's a second Nevada location.  This was a reimbursement

6  for an attorney who had her own office there and employed by

7  LPG.  But, again, those were not LPG leases.

8        There was also a lease in Belview, Washington

9  which was taken over I think by the attorney who was

10 occupying that space.  He was a former LPG employee who also

11 left the firm and asked to take the lease with him, and he

12 did.  And, so, that was assigned to him.  This would have

13 been in, again, February of this year.  And then Peter

14 Snyder out of Washington, this was in LPG's name but was

15 assigned to Peter, and he just took over that lease.  And

16 that should be the total of -- of all the locations.

17        TRUSTEE NG:  Okay.  So, the Belview, Washington

18 location that the former attorney took over, what's the name

19 of that law firm now?

20        MR. DIAB:  It's now Law Offices of Peter Snyder.

21        TRUSTEE NG:  I can't hear you.

22        MR. DIAB:  He's a sole -- sole practitioner.

23        TRUSTEE NG:  Okay.

24        MR. DIAB:  It's Peter Snyder is the sole

25 practitioner for Law Offices of Peter Snyder.

29

1          TRUSTEE NG:  I see.  Okay.  So, those -- all the

2   leases were either abandoned or let go sometime prior to

3   them filing bankruptcy this year, is that right?

4          MR. DIAB:  Correct.

5          TRUSTEE NG:  Okay.  So, for 2022, how many

6   employees did the Debtor have?

7          MR. DIAB:  This is Tony.  We would have employed

8   between 350 and 420, depending on the point in that year.

9   The high mark would have been about 420 full-time employees

10  for LPG in 2022.

11         TRUSTEE NG:  And when did LPG start losing these

12  employees?

13         MR. DIAB:  The real terminations began in November

14  when we let go of the -- the Nevada office.  So, the Nevada

15  office had at its peak about 88 employees, and they were all

16  let go in October and November of 2022.  So, that would have

17  been the first large reduction in the workforce.  And then

18  in January we resumed -- we probably cut between 30 and 40

19  employees in January, and then in February, when we were

20  unable to make payroll, we lost virtually everyone.

21         TRUSTEE NG:  So, by February this year, LPG

22  basically lost all its employees?

23         MR. DIAB:  Yeah.  So, as of March of this year,

24  the month we filed the petition, there were maybe 15

25  employees left.  And after the filing of the petition, we're

30

1  now at -- at three employees, Dan, Olga and Carl, as

2  referenced before.

3          TRUSTEE NG:  Okay.  Of those 300 or, you know, 350

4  employees that you mentioned that was hired in 2022, how

5  many of them were attorneys?

6          MR. DIAB:  At one -- at one point there were about

7  40 W-2 attorneys, meaning they were full employees of LPG,

8  and about 22 contractors, 1099.  And, so, we were at about

9  62 attorneys at the high mark in 2022.

10         TRUSTEE NG:  Okay.  And do you know where these

11 attorneys went?

12         MR. DIAB:  Some of the attorneys started their own

13 practice.  Some of the attorneys went to other firms that do

14 similar work as LPG and they represent individual debtors in

15 collection actions in cases, and some of them we don't know

16 because they just left, and they didn't tell us what they

17 were doing.  But several of them now have their own practice

18 doing similar work as solo practitioners.

19         TRUSTEE NG:  Okay.  The projection shows the

20 Debtor has Worker's Comp, is that right?

21         MR. DIAB:  That's correct.

22         TRUSTEE NG:  We don't have proof of that

23 insurance.  So, you will need to send us a copy of the

24 insurance proof of coverage.

25         UNIDENTIFIED SPEAKER:  And that was Worker's Comp,

*Briggs Reporting Company, Inc.*

31

1 correct?

2          TRUSTEE NG:  Correct.  That hasn't expired, right?

3 Is the Worker's Comp --

4          UNIDENTIFIED SPEAKER:  (Indiscernible).  Yeah,

5 we'll send a copy of that policy.  It remains active.

6          TRUSTEE NG:  Okay.  So, other than Mr. Diab, does

7 the Debtor have any other independent contractor?

8          MR. DIAB:  Not at this time.

9          TRUSTEE NG:  Okay.  Can you just give me a brief

10 summary of the reason for filing for bankruptcy?

11          MR. DIAB:  We -- the -- the -- I guess there are

12 two parts that sort of combined to force us to be in this

13 position.  The most important factor was the payment process

14 of Merits Fund, LLC began holding money at the very end of

15 January, then processed payments of LPG clients and then

16 remit those payments through the LPG (indiscernible).  They

17 stopped sending that revenue through to LPG at the very end

18 of January, beginning of February.  And, as a result, LPG

19 failed to make two consecutive payrolls.  At that point, we

20 lost so many of our attorneys that we couldn't continue to

21 represent clients' states for lack of a -- a valid license

22 to practice law in those states.  And, so we were forced to

23 essentially go the direction of reorganization because we

24 didn't have attorneys to represent clients, and we couldn't

25 maintain those attorney-client relationships in those

32

1  states.

2          The other factor was the litigation

3  (indiscernible) which essentially involved a lot of

4  (indiscernible) and essentially driving employees to turn on

5  us.  So, we had a group of employees that were providing

6  information (indiscernible) and providing information to

7  adverse parties in litigation, and that group was -- was

8  sizable, and those employees, one of them discovered that

9  they had provided that information and (indiscernible), and

10 that was January, and since left us in a position where we

11 were missing a lot of key positions, and we had enough

12 information public that our marketing companies didn't want

13 to continue to work with us, and so we didn't want to

14 onboard clients.  So, that created pressure.  We simply were

15 not seeing the volume business.  We had a lot of clients

16 leaving (indiscernible) clients possibly coming in.  Then

17 the marketing companies (indiscernible) to the information

18 disclosed in that litigation, although they wanted to work

19 with us, but they (indiscernible) future.  And then right

20 after that, the money was held by the payment processor and

21 essentially caused the -- the forced reorganization.

22          TRUSTEE NG:  Okay.  Let's talk about the pre-

23 petition bank account.  The Union Bank 4858, what was this

24 account used for pre-petition?

25          MR. DIAB:  That was an operating account.  It was

33

1  an operating account that was essentially started all the

2  way back in 2020.  At one point we had stopped using Union

3  Bank and instead was using other banks, but that operating

4  account remained open.  And in 2022, we started to use it

5  again as a primary bank account.  We had switched from Union

6  Bank to Chase as a primary account and then from Chase to

7  Bank of America and then from Bank of America back to Union

8  Bank.  That last switch took place in January of this year.

9  So, that was (indiscernible).

10          TRUSTEE NG:  Okay.  So, we actually --

11          MR. MARCH:  And that's all correct.

12          TRUSTEE NG:  I'm sorry.  Okay.

13          We actually do not have the final closing

14  statement for this account.  We only have a closing receipt.

15  So, we would need that final closing statement.  And our

16  office previously requested bank statements for 2023, and we

17  did not receive the bank statements.  So, we will need that

18  as well.

19          MR. MARCH:  Union Bank?

20          TRUSTEE NG:  Union Bank 45 -- 4858.

21          MR. MARCH:  And that's for 2022 and '23?

22          TRUSTEE NG:  No, just 2023.  We did receive the

23  2022 statements.  And we also -- that would include the

24  closing bank statement that we need.

25          MR. MARCH:  Okay.

34

1          TRUSTEE NG:  So, at the time of the filing, how

2   much was in that bank account?

3          MR. MARCH:  And that was the amount that was

4   transferred into the Debtor in Possession's account.

5          TRUSTEE NG:  So, that's like $4500 or so?

6          MR. MARCH:  Yes, ma'am.

7          TRUSTEE NG:  Okay.  And do you know the balance as

8   of end of January of this year?

9          MR. MARCH:  I don't.

10          TRUSTEE NG:  Would it be around the $4500 or would

11   it be substantially, you know, more?

12          MR. DIAB:  This is Tony.  It should have been

13   substantially more than the $4500.  I (indiscernible), but

14   we would have to pull the -- the records to see the exact

15   balance.

16          TRUSTEE NG:  Okay.  So, I -- I think I -- I don't

17   have the 2023 bank statements, but I have the bank

18   statements 1/22.  It shows that as of December 31, there was

19   only like $2100 or so in the bank account.  So, for the

20   following two months, you know, January and February 2023,

21   do you think it would be somewhere around that amount?

22          MR. DIAB:  No, it should have been substantially

23   more in December of 2022.  LPG was still using the Chase

24   account and transitioning to the Bank of America.  So, the

25   Chase and Bank of America accounts would have had the

*Briggs Reporting Company, Inc.*

35

1  activity for LPG in December.  In January the Chase account

2  was -- was terminated.  The Bank of America account was the

3  primary account until the end of the month, and then at the

4  end of January is when the switch was taken to the -- back

5  to Union Bank.  And that switch from Bank of America to

6  Union Bank was in connection with Kevin Suerta (phonetic),

7  the head of our accounting department potentially being

8  removed from LPG.  He had the relationship with Bank of

9  America, and when he left, Bank of America terminated LPG's

10 relationship, and that's what caused the switch back to

11 Union Bank right around February 1st or so.

12         TRUSTEE NG:  When was the Bank of America account

13 terminated?

14         MR. DIAB:  The Bank of America account was closed

15 the first week of February.  I don't have the exact date,

16 but it would have been somewhere between February 5th but

17 maybe as late as February 10th.

18         TRUSTEE NG:  Okay.

19         MR. DIAB:  And it was closed by Bank of America

20 account notice.

21         TRUSTEE NG:  Okay.  So, we did ask for bank

22 statements for all 2023.  So, we will -- you know, for the

23 -- for the two months in 2023, we will need that bank

24 statements.

25         MR. MARCH:  Okay.

*Briggs Reporting Company, Inc.*

36

1       TRUSTEE NG:  And the case, 3158, that account is

2 not listed in the compliance declaration or the schedules.

3 What account is this?

4       MR. DIAB:  That was the same operating account or

5 main operating account for Chase that was used from about

6 March or April of 2021 all the way until December of 2022

7 when we decided to make the switch to Bank of America --

8       TRUSTEE NG:  Okay.

9       MR. DIAB:  -- since we still had some transactions

10 into January 2023, and that would have been it.

11       TRUSTEE NG:  So, is that account closed?

12       MR. DIAB:  Yes, that account was closed.  Again,

13 it was closed by Chase after we stopped utilizing the

14 account.  That closure would have happened in I believe

15 February formally.

16       TRUSTEE NG:  Of this year?

17       MR. DIAB:  I know we stopped using it in January.

18       TRUSTEE NG:  Okay.

19       MR. DIAB:  Of this year, correct.

20       TRUSTEE NG:  What was the balance at the time

21 Chase closed the account?

22       MR. MARCH:  I believe the balance at the time

23 would have been very close to zero as --

24       TRUSTEE NG:  Okay.

25       MR. MARCH:  -- (indiscernible).

37

1          TRUSTEE NG:   Okay.   And what about the Chase 3133,

2   what was this account for?

3          MR. DIAB:   That account was only used to make

4   payments to our marketing affiliates.   So, it was

5   exclusively used for marketing affiliates, and it was always

6   kept at a zero balance until payment needs to be made, and

7   then the exact amount of the payment would transfer from the

8   315 account to the 3133 account, and then it would go out

9   the same day, and that was always kept to a zero balance at

10  the close of business.

11         TRUSTEE NG:   And is this account closed?

12         MR. DIAB:   Yes, that account was closed by Chase

13  also.   It was -- it was no longer used as of January and

14  formally closed sometime in February by Chase.

15         TRUSTEE NG:   Okay.   And the Union Bank 4874, what

16  kind of account was that?

17         MR. DIAB:   That -- that was the local account for

18  Litigation Practice Group.   And, so, that -- that attorney-

19  client trust account remains open at this point in time.

20  Those client checks that's outstanding in the sense of the

21  clients that haven't deposited it.   So, that account

22  actually remains open.   It is an attorney-client trust

23  account with a balance about $3300, which I believe is the

24  amount of the check that's outstanding.

25         TRUSTEE NG:   I'm sorry.   Did you say $3300?

*Briggs Reporting Company, Inc.*

38

1        MR. DIAB:  That sounds correct, yes.

2        TRUSTEE NG:  Okay.  And is it the Debtor's

3 intention to keep this account open?

4        MR. DIAB:  No.  As soon as that last check is

5 negotiated, the account will be closed.

6        MR. MARCH:  And this is Dan, and that's because I

7 don't believe we have any more affirmative cases pending.

8        TRUSTEE NG:  Okay.  And when do you expect the

9 account to be closed?

10       MR. DIAB:  We've attempted to contact this

11 individual client to find out why they haven't deposited the

12 check.  (Indiscernible) and it looks -- if it takes longer

13 than this month (indiscernible).

14       TRUSTEE NG:  Okay.  So, once it's closed, please

15 go ahead and send to us the proof of closure.  What about

16 the Chase 3568?

17       MR. DIAB:  That was the Iolta (phonetic) account

18 at Chase, and that account was emptied.  The money was moved

19 to the Iolta account at Union Bank in January of 2023, and

20 that account was also closed by Chase at the same time as

21 the Iolta.

22       TRUSTEE NG:  Okay.  So, sometime in February or

23 something in 2023?

24       MR. DIAB:  Correct.

25       TRUSTEE NG:  Okay.  And I noticed that the Debtor

*Briggs Reporting Company, Inc.*

39

1 opened three post-petition bank accounts at Wells Fargo.

2 What is the -- the balance right now in the -- in the

3 general account?

4          MR. MARCH:  That should be that $4500 that was

5 transferred from Union when we closed the account.

6          TRUSTEE NG:  Okay.  What about the payroll and tax

7 account, any money in there?

8          MR. MARCH:  There might be the -- they require $50

9 each to open both of those accounts as well.

10          TRUSTEE NG:  Okay.  So, do you have voided checks

11 for those accounts?

12          MR. MARCH:  I have a voided check for the

13 (indiscernible) account.  I don't know that we have checks

14 -- I don't think we received checks yet --

15          TRUSTEE NG:  Okay.

16          MR. MARCH:  -- a checkbook for the payroll

17 account.  But I don't know that we have one for the

18 (indiscernible).

19          TRUSTEE NG:  Okay.  Yeah, you can go ahead and

20 send the voided check for the general account to your

21 counsel, and you can send it to us.  That would be great.

22 Thank you.

23          MR. MARCH:  Okay.  And we did that yesterday.

24          TRUSTEE NG:  Okay.  Does the Debtor have

25 malpractice insurance?

40

1          MR. DIAB:  Yes.  The malpractice policy remains

2   active.  We purchase a one-year account on the policy in

3   March of 2023, and that would extend to March 31st, 2024 for

4   the malpractice policy which is a $1,000,000 policy.

5          TRUSTEE NG:  Okay.

6          MR. DIAB:  Two thousand dollar deductible.

7          TRUSTEE NG:  So, we would need the proof of the

8   insurance coverage for that as well.  What about tax return

9   2022, was it filed?

10         MR. DIAB:  No, we have not yet filed the 2022 tax

11  return.

12         TRUSTEE NG:  Has there been an extension filed?

13         MR. DIAB:  I believe -- I think so.  The

14  (indiscernible) and Associates was the accounting firm

15  handling the tax funds for LPG.  My understanding it filed

16  the extension for LPG which suffered a loss in 2022.  We

17  don't anticipate tax liability.

18         TRUSTEE NG:  Okay.  And, so, the insurance

19  coverage for the general liability, I noticed that the

20  Debtor is not listed as the insured.  Has the Debtor

21  contacted the insurance company to make that change?

22         MR. DIAB:  We were not under the impression that

23  LPG was not listed as the insured.  So, we'll contact them

24  and correct that.

25         TRUSTEE NG:  And, also, the U.S. Trustee has to be

41

1  listed as an additional interested party for notification

2  purpose.

3       MR. DIAB:  Understood.

4       TRUSTEE NG:  Can you just give me a brief summary

5  of the nature of the Debtor's business?

6       MR. DIAB:  So, this is Tony again.  I'll give a

7  summary before and after the reorganization.  LPG when it

8  started and up until February 2023, the business model was

9  an entity to represent individuals in connection with their

10 disputes against their creditors.  That took three forms.

11 One was defending collection actions in court filed by

12 creditors.  Another was prosecuting bankruptcy petitions

13 under Chapter 7 and Chapter 13 of the U.S. Bankruptcy laws.

14 And then the third avenue was initiating action either as

15 freestanding complaints or as counterclaims or cross-

16 complaints under the Fair Debt Collection Practices Act and

17 Fair Credit Reporting Act.  So, we would sue the creditors

18 for their violations of those federal laws.  And, so, those

19 were the three avenues through which LPG represented

20 individual consumers.

21      In February, when we lost employees who didn't

22 return and we could no longer perform that function, the

23 clients were referred to other law firms for those law firms

24 to handle those cases, and LPG became essentially a residual

25 on the side if it was sent to other law firms as a referral

42

1 fee for sending those clients out to other law firms.

2        And, so, the business as it exists now is a

3 combination of completing those four to six hundred

4 California cases (indiscernible) and then receiving

5 compensation for these referrals that were sent to other law

6 firms, and that was the revenue stream that was funding the

7 Chapter 11 plan, and it's the revenue stream that LPG has at

8 this point in time.

9        TRUSTEE NG:  So, the other law firms that you

10 mentioned, what are the names of those law firms?

11        MR. DIAB:  The parties I think -- the law firms

12 that currently are represented -- LPG clients are Oakstone

13 Law Group, PC, Consumer Legal Group, which is out of New

14 York, also a PC, and then Phoenix Law, PC.  Phoenix Law and

15 Oakstone Law are both California entities.  Consumer Legal

16 Group is a New York entity.

17        TRUSTEE NG:  Okay.  So, prior to this change in

18 your business model that you just mentioned, how many

19 clients did the Debtor have, like, say, in 2022 before the

20 change?

21        MR. DIAB:  At its peak, LPG was representing a

22 total of about 67,000 clients, some of whom have completed

23 their payments, some of whom (indiscernible) payment to LPG.

24 But at its peak, it would have been 67,000 active clients

25 being represented by LPG.

43

1          TRUSTEE NG:  Okay.  Of these 67,000 clients, did

2  they enter into like some kind of retainer agreement or a

3  legal services agreement with LPG?

4          MR. DIAB:  Yes, and that -- the terminology would

5  vary based on the state, but it was a legal services

6  agreement that the client would execute with LPG.  It was a

7  flat fee representation.  In exchange for the flat fee, LPG

8  agreed to provide the services I referenced before on any

9  one of those three, depending on the client's needs, and the

10  client's payment would be broken up anywhere from one

11  payment to as many as 72 payments, depending on the client's

12  budget.  So, some clients would make one payment.  Some

13  would make semimonthly payments for two years.  Some would

14  pay for 20 months.  It varied depending on the client's

15  budget, but it was always a written agreement between the

16  client and LPG for those services that were referenced

17  before.

18          TRUSTEE NG:  Would the written agreements specify

19  the terms like whether they pay a one-time flat fee or

20  whether they're going to, you know, pay monthly payments?

21  Would that be specified in the agreement?

22          MR. DIAB:  Yes.  The agreement would give specific

23  dates and amounts for all payments.  And, so, if it was

24  broken up into 30 payments, all 30 payments would be

25  identified by date and amount.

44

1          TRUSTEE NG:  Okay.  So, if they chose to make

2 monthly payments, and how did they pay the Debtor per month?

3          MR. DIAB:  Well, the clients would be set up with

4 automatic electronic withdrawals from the bank account.  The

5 contract with LPG includes an electronic funds transfer

6 authorization form.  And, so, the client would execute the

7 agreement and the EFT form, and then each month on the

8 payment date, LPG would withdraw the client's payment

9 automatically from their deposit account.  Some clients who

10 didn't have a deposit account would make the payments by

11 debit card.  The process was the same.  Each month on the

12 payment date, the amount of payment would be withdrawn from

13 the client's debit card, and -- and that would happen each

14 month on the specified date.  LPG never accepted credit card

15 payment for the obvious reasons.

16          TRUSTEE NG:  Okay.  So, for these electronic

17 payments, did LPG contract with a vendor to collect these

18 fees or how did it work?

19          MR. DIAB:  Yes.  So, LPG, over the course of its

20 history from February 2019 to present has used no less than

21 a dozen different payment processes.  These processes

22 collect the payment for a fee and then remit the payment to

23 LPG.  So, we use different payment processes.  They have

24 different policies.  Some processes hold reserves to cover

25 charge backs or unauthorized transaction reports.  Some

*Briggs Reporting Company, Inc.*

45

1  don't hold reserves but charge higher fees.  But we've used

2  different processes over the years.  As of 2023, this

3  calendar year, the two processes we were using were EquiPay,

4  which is currently holding the last $700,000 in LPG client

5  payments.  The other was Merits Fund, which is holding an

6  undisclosed amount.  They haven't told us how much they're

7  holding.  We think it's in the range of 12 to 14 million,

8  but we don't know because they won't provide that

9  information.  So, it's still a mystery.

10        TRUSTEE NG:  Okay.  So, what about 2022?  Did LPG

11  use these two processors as well?

12        MR. DIAB:  Correct.  So, in -- in 2022, in

13  addition to the two processors I just referenced, LPG also

14  utilized a company called World Global, which was processing

15  payments through Optimum Bank in Fort Lauderdale, Florida,

16  and we were also using a company called EPPS.  EPPS is a

17  payment processor that's based out of Sacramento I believe,

18  but they were also processing payments for about three

19  months in 2022.

20        TRUSTEE NG:  And once they -- you know, these

21  processors collected the fees typically, how soon would they

22  remit the payments to LPG?

23        MR. DIAB:  Each processor has slightly different

24  policies, but the range would be anywhere from a one-day

25  hold to a six-day hold, meaning that they would collect the

46

1  payment on a Monday, fund it to LPG as soon as Wednesday or

2  as late as the following Monday.  It depends on the payment

3  processor, but that funding timeline, the number of days

4  that they hold the payments was so that the payment

5  processor could confirm that the payment actually went

6  through.  Different banks will report balances on different

7  time lines.  So, the paying processor would hold the funds

8  to ensure that the payment cleared.  But the worst case

9  scenario, we would get it one week after the client's

10 payment was initiated.

11         TRUSTEE NG:  And what was the reason for that

12 business model change that you mentioned?

13         MR. DIAB:  The change in 2023 was caused by the

14 payment processor refusing to remit funds to LPG, refusing

15 to hand over the proper payroll.  The -- the first payroll

16 of February, LPG was unable to cover.  A lot of employees

17 walked out at that time.  The second payroll, again, LPG was

18 unable to fund the payroll, and almost all remaining

19 employees left at that time.  So, when we lost those

20 employees, those happened to be the attorneys who were the

21 licenses under which we operate jurisdictions under in

22 California.  We could no longer continue the existing

23 business model.  We didn't have the money to fund our

24 existing payroll.  We certainly couldn't go out and hire new

25 attorneys licensed in those jurisdictions.  So, we opted to

47

1 make this switch and still retain some sort of revenue for

2 LPG.  But it was precipitated by the payment processor

3 holding funds and our inability to cover essential costs

4 like payroll.

5         TRUSTEE NG:  Did you make the decision to the

6 business to change its business model?

7         MR. DIAB:  Both Dan and I discussed this in

8 February, that the payroll was being missed, and we jointly

9 made the decision that this was sort of the only option.  It

10 was either that or close the doors.  And, so, we opted for

11 this -- this reorganization.

12        TRUSTEE NG:  Okay.  So, since 20 -- like '23,

13 2023, this year, the Debtor is only actively representing

14 clients in California, is that right?

15        MR. DIAB:  So, at this time, we're not looking for

16 any new clients.

17        TRUSTEE NG:  Okay.

18        MR. DIAB:  At this point in time, LPG is not

19 onboarding anybody.

20        TRUSTEE NG:  Okay.  But do you have existing

21 clients in California that you kept?  You meaning the

22 Debtor.

23        MR. DIAB:  Correct.  And --

24        MR. MARCH:  We do.

25        MR. DIAB:  Yes, that's correct.

48

1           TRUSTEE NG:  And then that's the 400 to 600, you

2   know, files that you talked about earlier?

3           MR. MARCH:  Yes.

4           MR. DIAB:  Correct.

5           TRUSTEE NG:  So, does that mean the remaining --

6   because you said that at its peak in 2022, the Debtor had

7   about 67,000 clients.  So, does that mean the remaining, you

8   know, minus the 400, 600 files in California, the remaining

9   were transferred to the three law firms that you just talked

10  about?

11          MR. DIAB:  Either transferred or terminated.  Some

12  clients opted to terminate the relationship rather than be

13  serviced by another firm, but all the 67,000 or so clients

14  were either transferred or they terminated their

15  relationship with LPG.

16          TRUSTEE NG:  Can you give me a breakdown how many

17  were transferred to each law firm?

18          MR. DIAB:  So, approximately 15,000 were

19  transferred to Oakstone Law Group.  About 12,000 were

20  transferred to Consumer Legal Group, and the remainder were

21  transferred to Phoenix Law.

22          TRUSTEE NG:  So, that's about 40,000 or so?

23          MR. DIAB:  Yeah, it would have been roughly, a

24  little bit less than 40.

25          TRUSTEE NG:  Okay.  So -- and when did these

*Briggs Reporting Company, Inc.*

49

1   transfers actually take place?

2          MR. DIAB:  So, the -- the transfers took place in

3   February and March.  The first transfer to Oakstone took

4   place in early February of 2023.  In early February, a small

5   group was transferred to Consumer Legal Group, and then in

6   early March, a larger group was transferred to Consumer

7   Legal Group.  In mid March, the remaining clients were

8   transferred to Phoenix Law.

9          TRUSTEE NG:  How were these clients selected?  You

10  know, say, for the Oakstone, the 15,000, you know, clients,

11  how were they selected to be transferred to oakstone?

12         MR. DIAB:  So, in Oakstone's case, it was slightly

13  different because there's as -- a company called Pec

14  Corporation which had done a receivable purchase agreement

15  and had an interest in the receivable of the 15,000 clients

16  that were transferred to Oakstone.  Pec Corp. wanted those

17  clients all to be kept together because it had an interest

18  in the revenue stream from those clients.  And, so, it

19  insisted that the clients be kept together and be

20  transferred to one law firm as a group, and that was the

21  impetus for the Oakstone transfer.

22         For the other transfers, it was a function of the

23  initial -- the initial transfer of client facility was based

24  on the initial attorneys withdrawing from their cases and

25  the need to shift chose clients to another law firm.

50

1          And then with Phoenix, it was simply the

2 remainder.  Everything that was left got pushed to Phoenix

3 in March.  And, so, it was so that the decision was Oakstone

4 would be driven by Pec Corp.  Consumer Legal Group was

5 driven by necessity in terms of jurisdiction, and then

6 Phoenix received the remainder.

7          TRUSTEE NG:  Well, did Pec Corp. specifically

8 mention I want the files to transfer to Oakstone or who made

9 the decision to go to Oakstone?

10          MR. DIAB:  The decision to refer the clients to

11 Oakstone was made by Litigation Practice Group.  In LPG's

12 contract with the clients, LPG reserves the right to utilize

13 other law firms to service client files.  That's based on

14 the volume of work that we do.  We sometimes become

15 overloaded in a state, and also sometimes we lose counsel in

16 a state.  And, so, we reserve to ourselves the right to

17 transfer the servicing of the client to another law firm.

18 And, so, that was exercised with regard to all these

19 transfers.  LPG made the decision.

20          TRUSTEE NG:  Okay.

21          MR. DIAB:  But any client that objected had the

22 opportunity to terminate the representation and receive a

23 full refund of fees, and there were probably five or so

24 thousand clients that opted for the termination and refund.

25          TRUSTEE NG:  Five thousand you said?