Part 2 of 3

51

1          MR. DIAB:  Yeah, approximately.

2          TRUSTEE NG:  So, like, you know, in terms of

3    sending these clients to the three law firms, was it, again,

4    a joint decision between you and Dan?

5          MR. DIAB:  Yeah, it would have been a decision

6    between me, Dan, and then the receiving law firm because

7    they also had criteria for the clients they received.  For

8    instance, CLG wasn't going to take any client that was in

9    the State of North Dakota because of regulatory issues in

10   North Dakota, that type of a conversation.

11         TRUSTEE NG:  Okay.  And all the transfers have

12   been completed?

13         MR. DIAB:  Correct.  All the transfers have been

14   completed.  The terminations that were requested by clients

15   have also been completed.  There are some refunds that are

16   pending.  They haven't been sent out because we're waiting

17   for (indiscernible).  But, otherwise, that process has been

18   completed.

19         TRUSTEE NG:  The refund, is that pertaining to the

20   5,000 clients who -- who, you know, canceled the agreement?

21         MR. DIAB:  Yes, correct.

22         MR. MARCH:  Yes.

23         TRUSTEE NG:  Did LPG receive any consideration in

24   connection with the transfers of the files to these three

25   law firms?

*Briggs Reporting Company, Inc.*

52

1          MR. DIAB:  So, not at the time of transfer, but

2  LPG receives an ongoing residual payment on the clients that

3  continue to perform.  That means that the clients make

4  payments to these three law firms.  These law firms under

5  separate agreements, would make a payment through to LPG

6  (indiscernible) and get a referral fee, but it's essentially

7  the commission that the law firms are paying for the

8  referral, and that's a separate agreement for each of the

9  three.  It's a 20 percent referral agreement with Oakstone,

10  20 percent with Phoenix, and 40 percent with Consumer Legal

11  Group, and that's percent of the revenue stream generated by

12  this client.

13          MR. MARCH:  Actual receipts.

14          TRUSTEE NG:  These are actual receipts that these

15  law firms receive from these clients, and then whatever they

16  receive, the actual amount they transfer -- I guess for

17  Oakstone and Phoenix, they gave -- they transferred 20

18  percent back to the Debtor, is that right?

19          MR. MARCH:  That's correct.  That's the agreement

20  between those -- with those two entities.

21          TRUSTEE NG:  Is there a written agreement with all

22  these law firms regarding the referral fees?

23          MR. DIAB:  There is a written agreement with

24  Consumer Legal Group and with Oakstone Law Group.  There is

25  not yet a written agreement with Phoenix Law.  That

*Briggs Reporting Company, Inc.*

53

1  agreement has not been reduced to writing yet, but it's
2  something that we intend to do.
3          TRUSTEE NG:  Why wasn't there a written agreement
4  when the trials have already been transferred?
5          MR. DIAB:  At the time that LPG was transferring
6  the files, there was a combination of a lack of manpower on
7  the LPG side, and the transition was -- for lack of a better
8  word, it was rushed.  We were trying to push the clients
9  over as soon as possible.  They -- the lawsuits come in
10 daily.  These clients are receiving them and submitting some
11 to us on a daily basis, and we have to properly assign the
12 counsel.  So, we moved fast, received the transaction, but
13 the -- the agreement is in place at the 20 percent referral
14 fee, and -- and also, just to be clear, LPG maintains its
15 contractual right with regard to these clients.  If they
16 were ever nonperforming (indiscernible) retake the
17 representation, it would just have to find counsel licensed
18 in the jurisdiction in which these clients reside.
19         TRUSTEE NG:  Okay.  I think we asked for the
20 written agreements with these three law firms.  And so far I
21 think we only received one with -- maybe it was CLG.  I
22 don't have the one with Phoenix.  I mean, when do you think
23 you'll get into writing?
24         MR. DIAB:  That's something that we -- we
25 anticipate completing probably within the next week, and

54

1 we'll send that to you as soon as that's completed.  The

2 agreement with Oakstone should have been sent through.  I'll

3 make sure to re-send that.

4           TRUSTEE NG:  I think it was just a letter.  I

5 don't have the actual agreement.

6           MR. MARCH:  That's true.

7           MR. DIAB:  Understood.

8           TRUSTEE NG:  So, we would need the agreement as

9 well.

10           I noticed that in the amended schedule

11 (indiscernible) was filed with the Court on May 1st.  It

12 doesn't list any of these contracts.  Were these law firms?

13 Is there a reason why?

14      (Pause.)

15           MR. DIAB:  Sorry.  This is Tony.  I'm not sure,

16 but we'll obviously connect with counsel and submit amended

17 schedules.

18           TRUSTEE NG:  Okay.  So, Oakstone you're expecting

19 20 percent from the actual receipts.  Based on the 15,000

20 clients or so that was transferred, you know, what is the

21 average monthly gross income you think you can get form

22 that?

23           MR. DIAB:  In the future we anticipate receiving

24 roughly $700,000 solely from Oakstone.  Like LPG, Oakstone

25 is using the same payment process as (indiscernible) and

55

1  have the payment processing issue at the time of transition.

2  So, they were behind in collecting payments, meaning they

3  didn't collect the clients' payments that they were

4  attempting to collect because the new processor was holding

5  those funds.  But once that issue is behind us, which it

6  appears to be this month, it should be roughly $700,000.

7          TRUSTEE NG:  And --

8          MR. DIAB:  Again, it's dependent on actual client

9  performance, but that should be the revenue stream from

10 Oakstone.

11         TRUSTEE NG:  Is that based on the historical, you

12 know, receipt that LPG received from these clients you're

13 expecting about 700?  That's the 20 percent, you know,

14 referral fee?

15         MR. DIAB:  Correct.  That's based on -- on what we

16 -- what we have in terms of our data on this client basis

17 performance.  We don't know that the performance is going to

18 be the same post-transfer, but we imagine it would be

19 roughly similar, and that's where we came up with that

20 number.

21         TRUSTEE NG:  And -- and is Oakstone going to pay

22 the referral fee on a monthly basis or how often?

23         MR. DIAB:  Yes.  It was worked out with -- with

24 both Consumer Legal Group and with Oakstone it was a monthly

25 reconciliation and a monthly payment.  So, it would be one

56

1  payment at the conclusion of the month.  With Phoenix, the

2  agreement was more frequent.  It was supposed to be a -- a

3  weekly payment that's sent through.  We worked a few of the

4  reconciliations, but that would be a weekly, for the other

5  two entities, monthly payments.

6         TRUSTEE NG:  And which account is those money

7  going to go into?

8         MR. DIAB:  The general operating account at Wells

9  Fargo.

10        TRUSTEE NG:  Okay.

11        MR. DIAB:  That -- that Dan referenced.

12        TRUSTEE NG:  Did LPG receive any referral fees

13 from any of these entities since the filing of bankruptcy?

14        MR. DIAB:  Not yet, but we anticipate receiving

15 the first payment of $240,000 from Oakstone at the end of

16 this week.  It's scheduled for Friday of this week for that

17 first payment to come through.

18        TRUSTEE NG:  And how are they going to transfer

19 it?  Is it going to be a wire transfer?  Are they going to

20 give you a check?  How does that work?

21        MR. DIAB:  So, we had requested a wire transfer

22 into that operating account.  It's a method that we

23 requested.  They haven't confirmed that that's how they'll

24 send it.  They may send by ACH.

25        TRUSTEE NG:  Okay.  So, other than the $240,000

57

1  that you're expecting this week from Oakstone, do you expect

2  any other fees from the other two law firms this month?

3          MR. DIAB:  We're awaiting reconciliations from

4  CLG.  We anticipate receiving from CLG next week between 150

5  and 250 thousand, but they have to finish their

6  reconciliation.  And, again, it's a payment processing issue

7  that they've had.  For Phoenix, we don't have numbers yet,

8  but those would be payments that were supposed to begin this

9  week.  So, we're more likely to receive that amount tomorrow

10 or Thursday in terms of the number, and then we receive the

11 actual wire on Friday, but we don't yet know the amount for

12 the Phoenix entity.

13         TRUSTEE NG:  Okay.  So, other than the client

14 files that we just discussed, you know, to the three law

15 firms, did the Debtor transfer any other assets to any other

16 third parties within the last year?

17         MR. DIAB:  No, no other transfers.

18         TRUSTEE NG:  Okay.  So, what happens if those

19 three law firms decided to transfer the files to another new

20 law firm?  Like, will the Debtor continue to receive

21 payments at that point?

22         MR. DIAB:  Well, post-transfer, the -- the

23 receiving law firm begin to collect payments.  LPG is no

24 longer collecting payments direct from clients.  LPG may

25 begin onboarding clients again in the future.  At this time

58

1 the focus is on obviously the -- the bankruptcy, the Chapter

2 11 reorganization and these referral fees coming through.

3 LPG at some point in the future may resume enrolling

4 clients. We (indiscernible) only and then may just go

5 through this again, but right now there's been no final

6 decision on that front. For now it's simply just a

7 (indiscernible) model.

8          TRUSTEE NG: So, if these law firms decided to

9 transfer their files out to a different entity, then

10 basically LPG would lose its referral fees completely?

11          MR. DIAB: These entities don't have contracts

12 with the client. They don't have the right contractually to

13 transfer the files. Doesn't mean that they couldn't anyway.

14 But only LPG has the contractual right to transfer the file.

15 So, we could dispute it if one of these law firms were to

16 try to transfer a client, but technically, if these law

17 firms were to do so, we would have a hard time collecting

18 any fees from a third party recipient.

19          TRUSTEE NG: Well, do you anticipate any transfer

20 of client files from these three law firms and another law

21 firm?

22          MR. DIAB: No, we do not, and we have a good

23 relationship with these three. We don't anticipate it, but

24 it's something that could happen. It's certainly a

25 possibility.

*Briggs Reporting Company, Inc.*

59

1          TRUSTEE NG:  So --

2          MR. DIAB:  We do have visibility, and so we would

3 see if the clients were transferred.  I mean, we have

4 visibility over the clients (indiscernible).  We can see

5 them and know.

6          TRUSTEE NG:  Okay.  So, you mentioned Oakstone and

7 Phoenix are both California corporation, right?

8          MR. DIAB:  Correct.

9          MR. MARCH:  Yes.

10          TRUSTEE NG:  Does the Debtor have any interest in

11 these law firms at all?

12          MR. MARCH:  No.

13          MR. DIAB:  No.

14          TRUSTEE NG:  What about you, Mr. March or Mr.

15 Diab?

16          MR. MARCH:  That was a no from Dan.

17          MR. DIAB:  Yeah.  This is Tony.  That's a no for

18 me as well.

19          TRUSTEE NG:  Okay.  And with respect to Oakstone,

20 who is the owner for the shareholder of Oakstone Law Group?

21          MR. MARCH:  Scott Eadie, E-A-D-I-E.

22          TRUSTEE NG:  And is he an attorney?

23          MR. MARCH:  Yes.

24          TRUSTEE NG:  And was he ever an attorney of LPG?

25          MR. MARCH:  Yes.

*Briggs Reporting Company, Inc.*

60

1          TRUSTEE NG:  For what period?

2          MR. MARCH:  I think he said his two-year

3    anniversary was a month ago.

4          TRUSTEE NG:  So, two-year -- two-year anniversary

5    meaning --

6          MR. MARCH:  I believe it's two years.

7          TRUSTEE NG:  -- he's been with the LPG for two

8    years?

9          MR. MARCH:  He's been with LPG for about two

10   years.

11         TRUSTEE NG:  And was that his first job out of law

12   school?

13         MR. MARCH:  Oh, no.  Scott and I go back to junior

14   high school, and I'm 66 years old.

15         TRUSTEE NG:  Is this Tony talking or is it Dan?

16   I'm sorry.

17         MR. MARCH:  That was Dan March.  I'm sorry.

18         TRUSTEE NG:  I'm sorry.  Okay.

19         MR. MARCH:  I've known Mr. Eadie -- yeah, Mr.

20   Eadie I think in 1984 or '85 received his certificate.  He's

21   been practicing since about '84.

22         TRUSTEE NG:  Why did he leave LPG?

23         MR. MARCH:  There were simply no funds to pay him

24   or anyone else.

25         TRUSTEE NG:  And then he started -- when -- so,

61

1  when he left LPG, he went to start Oakstone Law Group?

2          MR. DIAB:  This is Tony.  Just to be clear, he was

3  referred.  We recommended Scott as a head attorney, Dan and

4  I, more than two years.  He's been practicing with LPG for

5  two years.  He practiced in a number of different areas for

6  years before that, and Pec Corporation is managed by

7  somebody named Eng Tang (phonetic), and Eng asked for

8  referrals, who do we think would be a good person to head

9  the law firm that's going to house the files in which Pec

10 Corp. has an interest in the receivable, and Dan and I both

11 pointed to Scott and thought he was the perfect fit for it,

12 and so we had recommended him, but Scott had missed two

13 payrolls, and LPG was not a viable employment at that time,

14 which obviously helped to motivate Scott's decision.

15         TRUSTEE NG:  Okay.  I noticed that the Oakstone

16 Law Group, it was formed in January 2023.  Is that right?

17         MR. DIAB:  That sounds correct, yes.

18         TRUSTEE NG:  Was it a joint decision between you

19 and Dan that -- that there would be a new law firm, Oakstone

20 Law Group?

21         MR. DIAB:  No.  Dan and I didn't have that -- a

22 part in the naming or the formation of Oakstone and have

23 been driving its formation.  He had been in conversation

24 with us about moving the files that he had an interest in,

25 and so we were collaborating but not the driving force

*Briggs Reporting Company, Inc.*

62

1 behind the formation for that entity, but the entity was

2 formed in January, and the agreement was reached in January.

3       TRUSTEE NG:  When you say collaboration, is it

4 collaboration with who?

5       MR. DIAB:  It was just Eng Tang.  So,

6 collaboration between LPG and Eng about the release of these

7 files that have Pec Corporation interest in them.  And it

8 was -- it was then a function of the pressures that I think

9 he had relating to the Validation Partners lawsuits and the

10 fact that we had grown to a client account that was

11 untenable.  It was difficult to represent that number, and

12 Eng had been pushing for these files to be moved to a

13 different entity.  And, so, we essentially agreed in January

14 that we would move them to the destination that we chose,

15 and then in the course of those conversations, we

16 recommended Scott as an attorney to (indiscernible) that

17 entity.

18       TRUSTEE NG:  And -- and Eng Taing, is that last

19 name T-A-I-N-G?

20       MR. DIAB:  That's -- yeah, that sounds correct.

21       TRUSTEE NG:  Was he an attorney with LPG?

22       MR. DIAB:  No.  He was an investor in Validation

23 Partners.  He was one of the many individuals that gave

24 money to Validation Partners, and Validation Partners

25 defaulted.  Pec Corporation then sought recourse against LPG

*Briggs Reporting Company, Inc.*

63

1  directly, and LPG was making payments to Pec Corp. and had

2  essentially paid Pec Corp. for an assignment of Pec Corp.'s

3  claim against Validation Partners.  So Pec Corp. ended up

4  receiving payments from LPG, and LPG received a right to go

5  after Validation Partners for a little less than 30 million.

6  And, so, Eng had been receiving these payments from LPG but

7  became increasingly concerned about the effect that the

8  Validation Partners' litigation was having on LPG and wanted

9  the -- the files in which Pec Corp. had an interest to be

10 transferred.  And, so, we complied with that request.

11          TRUSTEE NG:  Okay.

12          MR. DIAB:  But Eng is not an attorney and not

13 practicing.

14          TRUSTEE NG:  Okay.  And who's Michael Thomas?

15          MR. DIAB:  I'm not familiar with Michael Thomas.

16          TRUSTEE NG:  Okay.  This person --

17          MR. MARCH:  I'm not familiar with Michael Thomas.

18          TRUSTEE NG:  Okay.  For some reason, this person

19 signed the Articles of Incorporation for Oakstone.  So, you

20 don't know this name?

21          MR. DIAB:  No.  I'm not familiar with that name.

22 I would imagine it's somebody that Eng hired or --

23          TRUSTEE NG:  Okay.

24          MR. DIAB:  -- or Scott hired or somebody hired to

25 assist with that formation.

64

1          TRUSTEE NG:  How many attorneys do they have at

2    Oakstone?

3          MR. DIAB:  That I'm not sure.  I do know that they

4    have attorneys licensed in most jurisdictions in the

5    country, but I don't know the exact attorney count.

6          TRUSTEE NG:  How many offices do they have?

7          MR. DIAB:  I'm only aware of one office that

8    appears on the website.  I'm not -- I'm not familiar with

9    whether they have any local attorney offices, although I

10   know that they have enough attorneys to where I'm sure that

11   some of them have offices in these other jurisdictions,

12   these other states, but I'm not aware of any other

13   locations.

14         TRUSTEE NG:  And what's the -- what's the location

15   on the website?  It's in California?

16         MR. DIAB:  Correct.  So, the -- the location on

17   the website is an office that's sort of a -- a receptionist

18   only type of an office, and the processing for Oakstone is

19   done in California, and that's the -- the Irvine office is

20   where Scott is housed and where the work is primarily done.

21         TRUSTEE NG:  Okay.  So, you were going to transfer

22   15,000 -- 15,000 clients to this law firm who just started

23   in January, and you don't know how many attorneys they have?

24   Like, what if they can't handle the 15,000 clients?

25         MR. DIAB:  We confirmed that they had licensed

65

1   counsel in the jurisdictions in which these 15,000 clients

2   reside.  I don't know how many other attorneys they're

3   employing, but they did confirm that they had attorneys

4   licensed in the states where this batch of 15,000 clients

5   resided.

6            TRUSTEE NG:  Okay.  And Phoenix Law Group, who is

7   the owner of Phoenix Law Group?

8            MR. DIAB:  His name is Ty Carss.  So Ty, T-Y,

9   Carss, C-A-R-S-S.

10           TRUSTEE NG:  C-A-R-S-S, is that what you said?

11           MR. DIAB:  Yes.

12           TRUSTEE NG:  Okay.  Is this a female?  I'm sorry.

13           MR. DIAB:  No, male.

14           TRUSTEE NG:  Okay.  And is this person an

15   attorney?

16           MR. DIAB:  Yes, he's a licensed attorney.  He's

17   been practicing for a little over 20 years.

18           TRUSTEE NG:  Licensed where?

19           MR. DIAB:  In the State of California.

20           TRUSTEE NG:  Okay.

21           MR. DIAB:  State and Federal Court.

22           TRUSTEE NG:  And was this person an attorney for

23   LPG?

24           MR. DIAB:  No, never any affiliation with LPG of

25   any kind, employee or contractor.

*Briggs Reporting Company, Inc.*

66

1              TRUSTEE NG:  Okay.  And I think this firm is also

2    formed in January 10, 2023.  So, how did LPG find this Law

3    firm?

4              MR. DIAB:  So, this Law firm was previously -- I'm

5    sorry.  This -- this is now -- law firm's a successor to a

6    prior law firm called Gallant Law Group who LPG had done

7    some work with.  But, essentially, this law firm, Phoenix

8    Law was formed to take over the pipeline that previously was

9    Gallant Law Group.  The head attorney for Gallant Law Group

10   was a gentleman named Robert Tobia (phonetic), in

11   Philadelphia, Pennsylvania, and he essentially moved this

12   docket over to Ty into Phoenix, which is an entity that was

13   formed on the 10th of January.

14             We began discussing transfers in early February

15   and then Phoenix where Ty transfers (indiscernible).

16             TRUSTEE NG:  Okay.  And do you know how many

17   attorneys they have at Phoenix Law Group?

18             MR. DIAB:  I do not know their attorney count, no.

19             TRUSTEE NG:  Do you know if any of your LPG former

20   attorneys are in any of the law firms?

21             MR. DIAB:  I know that there are certain LPG

22   attorneys that are employed by Oakstone Law Group.  They

23   were recruited by Scott and by Eng.  There's no LPG

24   attorneys working for Phoenix Law as far as I know.

25             TRUSTEE NG:  And how many former LPG attorneys at

67

1 | Oakstone right now?

2 |         MR. DIAB:  I believe the number is between 12 and

3 | 15.

4 |         TRUSTEE NG:  And what about --

5 |         MR. DIAB:  I know that it's -- it's a bit fluid

6 | because Oakstone may have also lost attorneys recently.

7 | Sorry.

8 |         TRUSTEE NG:  And what about Consumer Legal Group?

9 |         MR. DIAB:  So, the principal of Consumer Legal

10 | Group is Aryeh Weber, Aryeh, A-R-Y-E-H.  Last name W-E-B-E-

11 | R.  And he's the principal of Consumer Legal Group which I

12 | want to say was formed in June or July of 2022.

13 |         TRUSTEE NG:  Okay.  And was he ever an attorney

14 | with -- with LPG?

15 |         MR. DIAB:  No, zero connection to LPG either as an

16 | employee or contractor.

17 |         TRUSTEE NG:  And, so, how did the Debtor find

18 | Consumer Legal Group then?

19 |         MR. DIAB:  Well, I know the individuals who had

20 | started that group on the processing side.  The individuals

21 | who are managing the processing center for CLG are known to

22 | me.  I've met Aryeh Weber one -- maybe -- I met him once in

23 | the summer of 2022 and again I think in January of this

24 | year, but I don't really know Aryeh, but I do know the

25 | people who are managing the processing center for Mr. Weber

*Briggs Reporting Company, Inc.*

68

1  for CLG.

2  TRUSTEE NG:  Okay.  So, that was a joint decision

3  with you and Dan to transfer the clients to CLG based on

4  your -- I guess your affiliations with the people at that

5  firm?

6  MR. DIAB:  Correct.  And CLG had more restrictions

7  on which jurisdictions they could onboard, but the clients

8  that were selected for CLG were based on jurisdictions where

9  they did have licensed counsel.

10  TRUSTEE NG:  Is there a reason why CLG is given 40

11  percent for referral fee versus the 20 percent that the

12  others are paying?

13  MR. DIAB:  Well, we were able to negotiate, and so

14  the arm's-length negotiations, with Eng it was probably a

15  more -- sorry.  Eng is Oakstone.  With Oakstone, it was

16  probably more of a friendly negotiation by virtue of the

17  fact that (indiscernible) from LPG to Pec Corp., Pec Corp.

18  being the entity to which Eng would be the (indiscernible).

19  And, so, that agreement was more favorable and likely

20  because of the pressure that existed from the amount that

21  was owed.  Phoenix was filed just as a copycat of Oakstone

22  once the Oakstone terms were set.  And, so, we did Phoenix

23  the same way.  CLG was more of an aggressive negotiation.

24  They were in greater need of clients because they had been

25  at it since the summer.  They weren't really growing, and so

*Briggs Reporting Company, Inc.*

69

1  we were able to get a better deal by then.

2          TRUSTEE NG:  Okay.  Did LPG obtain the written

3  consent from its clients, the former clients, to transfer

4  the files to the three law firms at the time of the

5  transfer?

6          MR. DIAB:  LPG did not.  LPT notified the clients

7  but did not receive written consent at that time.  At the

8  time that the client executed the legal services agreement,

9  the legal services agreement gave LPG the right to transfer

10  the servicing, and it's our position that they consented at

11  that time, that there was no substantive consent sought or

12  received at the time of the actual transfer.

13          TRUSTEE NG:  Can you point to me where the legal

14  service agreement, where it gave the right to LPG to

15  transfer the clients' files?

16          MR. DIAB:  Yes.  LPG has used different models of

17  the agreement for the licensing provision.

18          TRUSTEE NG:  Okay.

19          MR. DIAB:  I will open the agreement and read

20  that.  Just one second.

21          TRUSTEE NG:  Okay.  Thank you.

22      (Pause.)

23          MR. DIAB:  So, in the legal services agreement

24  itself, the -- the template agreement that was sent to the

25  Trustee's Office, that would be page three of six --

*Briggs Reporting Company, Inc.*

70

1          TRUSTEE NG:  Okay.

2          MR. DIAB:  -- it goes under the -- so, the heading

3  is Applicable Law and Confidentiality, and that's the

4  (indiscernible) that LPG (indiscernible) other attorneys to

5  provide the services, and then LPG retains the right to

6  utilize other attorneys to assist in the representation of

7  these clients.  It also says that the client has a right to

8  know the attorney that's working on their file.

9          TRUSTEE NG:  Okay.  I did read that provision, but

10 the language does not cover attorneys who are not directly

11 employed by LPG, is that right?

12         MR. DIAB:  So, our reading of this provision it

13 doesn't put any restrictions that the attorneys that we'd

14 utilize have to be employed by LPG.

15         TRUSTEE NG:  Okay.  So, it says --

16         MR. DIAB:  We describe affiliation.

17         TRUSTEE NG:  Okay.  So, is it LPG's position that

18 these law firms are affiliated attorney to LPG?

19         MR. DIAB:  Yes.

20         TRUSTEE NG:  Okay.

21         MR. DIAB:  Yes.  And the -- the agreement with

22 Consumer Legal Group states that, that that's the basis.

23         TRUSTEE NG:  What would be the affiliation --

24         MR. DIAB:  And, just to be clear, there were --

25 I'm sorry.  There were different templates used over the

71

1 years, but they all contain a provision similar to this one.

2            TRUSTEE NG:  Okay.

3            MR. DIAB:  I'm sorry.  Go ahead.

4            TRUSTEE NG:  But what would be the affiliation?  I

5 mean, I asked you earlier.  You said you or Tony Diab, the

6 Debtor, does not have any interest in any of these law

7 firms.  So, what would be the affiliation between the Debtor

8 and these three entities or three Law firms?

9            MR. DIAB:  Affiliation is the transfer of the

10 client files out.  So, we affiliate the attorneys to assist

11 in the representation of the clients.  We compensate for

12 that affiliation.  In this case, it's 80 percent of revenue

13 for Oakstone and Phoenix and 60 percent of revenue for CLG,

14 but the affiliation just means that we are working with the

15 law firm in these other jurisdictions to provide the

16 services, and that's how we styled that term, "affiliation".

17 So -- so, in our view, an affiliation doesn't mean that

18 there's a -- an employment relationship, W-2 or 1099.  It

19 means that we've retained these firms to provide this

20 service for this particular client, just a discrete

21 representation.

22            TRUSTEE NG:  Okay.

23            MR. DIAB:  Not an ongoing general one.

24            TRUSTEE NG:  Okay.  And you indicated earlier that

25 LPG had notified all clients?  Was that the case?

72

1          MR. DIAB:  Yes.

2          TRUSTEE NG:  And how did they notify -- how did

3    LPG notify the clients?

4          MR. DIAB:  Notifications were sent from LPG to the

5    clients by email notifying them of the transfer, and then

6    the -- the other law firm then reached out by email and by

7    phone to describe the transfer, and on LPG's side, we send

8    notification to the clients using email, which is one of the

9    methods of notification that the clients agree to receive in

10   their contract, and so we did it by email only.  I believe

11   there was also a text message blast, but it was primarily by

12   email.

13         TRUSTEE NG:  Okay.  And was the email sent -- the

14   notification email sent, you know, concurrent or shortly

15   after the files were transferred to these law firms?

16         MR. DIAB:  It was sent before, but it would have

17   been shortly before.  So, we would send the email from LPG.

18   The receiving firm, for instance, Oakstone, would then send

19   their email and then the transfer was completed after that,

20   and the transfer with the electronic portion of the client

21   file so that Oakstone would then have access at that point

22   to the client's files.

23         TRUSTEE NG:  And that's -- the email provides the

24   -- these former clients like rights if they want to cancel

25   the agreement?

73

1          MR. DIAB:  So, it does indicate that the clients

2  if they -- if they I guess do not want the transfer, do not

3  approve of it, they remain contractually entitled to

4  terminate the contract and receive a refund.  We put that in

5  all of our agreements, that the clients have the ability to

6  terminate at any time.  We never try to collect from our

7  clients or enforce the -- the remaining payment on the

8  agreement.  They always have that right to cancel.

9          TRUSTEE NG:  Okay.  So, the 5,000 clients that you

10  said earlier that they cancel, how much would the refund

11  total amount be?

12          MR. DIAB:  So, that refund total would have been

13  between 300 and 350 thousand.  We also had other clients

14  that weren't canceling but had requested refunds for other

15  reasons.  So, we right now have pending right around

16  $500,000 worth of refund requests, which will be sent from

17  our general Debtor in Possession account once the funding

18  arrives from our payment processes.

19          TRUSTEE NG:  Okay.  And how much of those $500,000

20  have been already paid?

21          MR. DIAB:  Could you ask that again?

22          MR. MARCH:  Yeah, I didn't --

23          TRUSTEE NG:  You mentioned the total amount would

24  be somewhere around $500,000, the refund amount.  Of that

25  $500,000, how much have LPG already paid?  Or is it the

*Briggs Reporting Company, Inc.*

74

1  entire amount paid?

2          MR. DIAB:  So, the $500,000, yeah, that's the

3  remaining balance.  LPG probably paid about $200,000 and had

4  about $500,000 still pending, and that 500 remains owed at

5  this time.

6          TRUSTEE NG:  Okay.  Understood.

7          So, did the terms of the payment in terms of the

8  clients, did they change after the files had been

9  transferred to the -- you know, the three law firms?

10         MR. DIAB:  No.  The -- the payment terms remain

11 the same, and the -- the only operative contract remains

12 with LPG.  And, so, all the payment terms remain exactly the

13 same as they were prior to the transfer.

14         TRUSTEE NG:  Okay.  So, you previously mentioned

15 that, you know, some clients have opted to do like monthly

16 payments.  So, for those clients, how does the new law firm,

17 you know, have access to the monthly -- you know, the auto

18 payment from their bank account?

19         MR. DIAB:  The client file that was transferred

20 the receiving Law firm includes payment records of all the

21 payments that had cleared, all the payments that were still

22 due and owing, and the amount of those payments and the bank

23 account from which the payments were supposed to be drafted.

24 So, all of the payment data was conveyed to the Law clerks

25 for them to process those payments.

75

1              TRUSTEE NG:  Okay.  And then does the Law firm use

2   a new -- some kind of electronic agreement so, therefore,

3   they can, you know, debit or withdraw money from the

4   account, those clients' accounts?

5              MR. DIAB:  If they're simply collecting the

6   amounts that were in LPG's contract, they don't.  The LPG

7   EFT form allows LPG to assign the collection of payments to

8   third parties.  And, so, as long as it's an identical

9   payment to what's set forth in the contract, no EFT is

10  needed.  If the payment changes even by one penny or one

11  day, then they have to collect a new EFT form from the

12  client to -- to continue to collect payment.

13             TRUSTEE NG:  Okay.  Have LPG actually assigned the

14  EFT forms to the new Law firms?

15             MR. DIAB:  Not yet.  That was part of -- of what

16  was sent.  Those EFT forms were given to each of the law

17  firms for each of the clients.

18             TRUSTEE NG:  So, they have -- that has not been

19  done?

20             MR. DIAB:  That has been done.  That was already

21  completed.  The EFT forms were already assigned to each of

22  the law firms.

23             TRUSTEE NG:  Okay.  So, since the transfer of the

24  client files, have there been any situations where, you

25  know, the Debtor would continue to receive monthly, you

*Briggs Reporting Company, Inc.*

76

1 know, autopayment from these clients, former clients now,

2 but the law firm, the new firm also, you know, receiving

3 monthly payments from them?  Therefore, you know, those

4 clients have to pay twice?

5       MR. DIAB:  It's a two-part answer.  Yes, that

6 happens, but it was over our objection.  Merrich Bine, the

7 payment processes that I referenced before continued to

8 collect payments in the months of February and March over

9 our objection.  We had asked them to stop.  The new law

10 firm, Oakstone, Phoenix, CLG asked them to stop, but they

11 continued to collect payments, and they were collecting

12 payments using the batch of files that LPG -- sorry --

13 (indiscernible) files of the file containing the payment

14 information for a batch of clients.  It then would use this

15 payment data from LPG that was outdated payment data and

16 pull the payments from the clients.  And, so, there were

17 some clients who had the payment pulled by Merits Find on

18 behalf of LPG.  But the new law firm was also collecting

19 payment at the same time.  All of those double payments were

20 refunded to the clients or were supposed to have been

21 refunded to the clients, and some of the $500,000 is refunds

22 that LPG is currently trying to send some of that pending

23 $500,000 consisted of these what we call double debits, of

24 payments pulling from Merits Find and pulling from the new

25 law firm.  LPG agreed to give that refund.  And, so, Merrich

77

1  Bine (phonetic) since stopped.  An agreement was reached.

2  They ceased collecting payments on March the 10th, and they

3  haven't collected any payments since.  They've adhered to

4  the agreement that they stop collecting any payments, but

5  there's still an open question about what was collected

6  between January 30th and March 10th.  We don't have that

7  data yet.

8          TRUSTEE NG:  And how is the Debtor going to get

9  that data?

10          MR. DIAB:  Likely through an adversary action.

11  It's -- it's not forthcoming voluntarily.  So, it appears

12  the only way we'll be able to obtain it is by filing an

13  action inside of this proceeding.

14          TRUSTEE NG:  Okay.  What do you think that -- you

15  know, you call it the double debit.  Like, what do you think

16  that refund pertaining to the double credit -- double debit

17  would be?

18          MR. DIAB:  Well, it's probably about $100,000 out

19  of the $500,000 that's pending.  Or out of the $500,000,

20  probably about 350 are clients that are canceling, 100 are

21  the double debits.

22          TRUSTEE NG:  Okay.

23          MR. DIAB:  Fifty are other miscellaneous reasons.

24          TRUSTEE NG:  Okay.  So, you mentioned the Debtor's

25  not actively looking for new clients in California, is that

*Briggs Reporting Company, Inc.*

78

1  right?

2          MR. DIAB:  Not at this time, correct.

3          MR. MARCH:  Correct.

4          TRUSTEE NG:  So, once those 400, 600 files, you

5  know, are completed, then the Debtor will no longer have an

6  income stream from California clients?

7          MR. DIAB:  Well, we do anticipate -- and I've

8  spoken with Dan about this.  This is Tony.  But Dan intends

9  to continue his bankruptcy process.  And, so, he'll continue

10 to take on clients who are filing Chapter 7 petitions in

11 California Bankruptcy Courts across the state, and that will

12 be a continued revenue stream.  But the ultimate question is

13 whether we'll also take on other non-bankruptcy clients, and

14 at this time we just don't have the infrastructure.

15         If the referral fees are processing the way that

16 they're supposed to and the reorganization fell into place,

17 then we do anticipate taking on what we'll call normal

18 clients, so, the non-bankruptcy clients in the State of

19 California, but the decision has not been made.

20         TRUSTEE NG:  Okay.  If LPG is going to take on new

21 clients in California, does LPG have any plans to retain new

22 counsel?  I mean, it's only one attorney right now, and

23 there's only so much work he can do.

24         MR. DIAB:  If we were to onboard new California

25 clients, we would add customer service reps, and we would

*Briggs Reporting Company, Inc.*

79

1  likely add another attorney licensed in the state.  And, so,

2  the first step is whether we have the budget available to do

3  so.

4            TRUSTEE NG:  Okay.

5            MR. DIAB:  If we do, then we'll likely add

6  California clients.

7            TRUSTEE NG:  Okay.  So, other than the referral

8  fees as we talked about and then the -- the existing income

9  from the clients in California or potentially maybe start

10 getting new clients, does the Debtor have any other source

11 of income?

12           MR. DIAB:  So, the bankruptcy docket and the

13 referral fees are the only source of income at this time.

14           TRUSTEE NG:  Okay.

15           MR. DIAB:  And we don't anticipate any other

16 source of income except the potential for California clients

17 on -- on the old model.

18           TRUSTEE NG:  Okay.  According to the Debtor's

19 amended statement of financial affairs that was filed with

20 the Court on May 1st, 2023 -- that's Docket Number 54 -- the

21 Debtor gross annual income for 2022 was $155 million.  So,

22 that's about $13 million or so, you know, gross per month.

23 Does that sound right to you?

24           MR. DIAB:  Yes, that sounds accurate for 2022.

25           TRUSTEE NG:  So, for 2022, when the Debtor was

80

1  making $13 million gross per month, what was the gross

2  monthly expenses, the average?

3          MR. DIAB:  So, for -- for the calendar year 2022,

4  it would have probably been about 13 and a half million.  We

5  probably suffered a loss just under $6 million for the year.

6  That's according to the financials that we have.  As I said,

7  the tax return hasn't been filed, but that's what we have in

8  terms of the -- the bookkeeping.

9          TRUSTEE NG:  Okay.  So, according to the same

10 amended SOFA, the gross income for this year from January

11 1st, 2023 to the petition date, that was about $30 million.

12 So, that's about for the three-month period or so, so give

13 or take, maybe about $10 million a month.  Does that sound

14 right?

15         MR. DIAB:  Yes, but that depends on the exact

16 amount that Merrich Bine was collecting.  So, we don't have

17 the exact data.  So, we're estimating, and the estimate is

18 based on a batch of files that we believe that they were

19 running.  And when I say believed, we looked at the clients

20 that were complaining of double debits and things, and we

21 isolated the batch of files that would be the rerun, but we

22 have no confirmation of that.  So, the $30 million is based

23 on an estimate of what Merrich Bine, the payment processor,

24 collected.

25         TRUSTEE NG:  Okay.

81

1          MR. DIAB:  Once we have the actual data, we can

2    give a firm number.

3          TRUSTEE NG:  I was under the impression that you

4    mentioned -- I mean, and I understand that you said you

5    don't know the exact amount, but it was somewhere around

6    like 12 to 14 million dollars I mean or do you think now

7    it's actually closer to 30?

8          MR. DIAB:  No.  Sorry.  So, LPG did collect

9    payments throughout the month of January.  It also collected

10   payments from March 10th to about March 20th, and then

11   Merrich Bine was collecting payments from about January 31st

12   -- 30th or 31st until March 10th.  It's that six-week period

13   that represented the 12 to 14 million that is the mystery.

14   We know that we collected -- we being, sorry, LPG collected

15   about $12 million in the month of January.  We think there's

16   between 12 and 14 million from Merrich Bine, and then

17   there's three to four million that we collected in March

18   before the petition and we stopped collecting the payments.

19         TRUSTEE NG:  Okay.  So, that $30 million estimate

20   for the three months or so, does that include any referral

21   fees?

22         MR. DIAB:  No.  So, there were no referral fees

23   paid that were part of that, that figure.  And today, as we

24   sit here today, we have yet to receive any referral fees

25   that were supposed to be paid for the first time at the end

82

1 of this week.

2         TRUSTEE NG:  So, the --

3         MR. DIAB:  By Friday, the 5th.

4         TRUSTEE NG:  Okay.  So, the amount that LPG

5 collected, you said, you know, not from the other -- is it

6 from the Apple Pay or who -- who collected it on behalf of

7 LPG?

8         MR. DIAB:  So, the LPG payments that were

9 collected in January were from EquiPay and from Merrich

10 Bine.  Merrich Bine was submitting payments in January,

11 collecting it from the clients and sending the money to us.

12 So, we collected from those two processors in the month of

13 January and from EquiPay alone in the month of March.

14         TRUSTEE NG:  Okay.  So, for 2023, year to date,

15 did the Debtor post a profit or loss?

16         MR. DIAB:  So, it's a -- it's a loss, but that's

17 because the money held by Merrich Bine is not accessible.

18 We would be if that 12 to 14 million were conveyed, but it's

19 not.  It's being held by them, and so we've operated at a

20 substantial loss.

21         TRUSTEE NG:  Okay.  So, your office submitted a

22 cash flow projection late Friday, last Friday evening, and

23 that projection shows gross revenue.  Like for April the

24 projection was $240,000.  It doesn't say whether it's gross

25 or net.  I mean, is it -- do you know if it's gross or net?

83

1          MR. DIAB:  That was that gross figure for April.

2          TRUSTEE NG:  Okay.  So, and then May the

3   projection is $740,000, and for June it's $1.2 million

4   gross.  So, you know --

5          MR. DIAB:  Correct.

6          TRUSTEE NG:  -- we talked about the first three

7   months I mean earlier.  It's about, you know, $10 million

8   including the money held by Merrich Bine, I think the $12

9   million.  But, so, how do you go from 10 million for the

10  first three months to $240,000 in April?

11         MR. DIAB:  Well, in -- in April it was two

12  different factors.  The first, we were only collecting 20

13  percent of the revenue stream from two of the firms and 40

14  percent from the other.  But also a lot of the clients who

15  were we'll just say victimized by the -- by the payment

16  processing in February and March were unwilling to make

17  payments in April or received accommodations to wipe out the

18  payment in April, either because they had two payments

19  drafts or because they had a payment draft on the wrong date

20  or in the wrong amount.  And, so, the revenue for these

21  other firms was lower by virtue of the fact that Merrick

22  Fund continued to collect payments in the month of February

23  and March.  And, so, the revenue was lower in April than it

24  otherwise would have been.  The June figure is when we think

25  that everything is back to normal, meaning that the payments

84

1  are processing, the clients are performing in a normal way,

2  and that's when we come closer to the -- the 1.2 figure.  We

3  think eventually we'll peak out somewhere around $2 million

4  per month once everything's processing normal.  But the

5  impact was substantial.  A lot of clients had payments

6  paused.  A lot of clients canceled, and a lot of clients are

7  refusing to make payments.  They want accommodations.  So,

8  the other law firms are working through that right now.

9          TRUSTEE NG:  Okay.  But the 1.2 in June, that's

10  still substantially less than the 10 million, you know, per

11  month that they were receiving for the first three months

12  prior to the bankruptcy.

13          MR. DIAB:  Agreed.  So, I think that the 2 million

14  figure that should be after June, that's more the realistic

15  figure (indiscernible), but there were a lot of clients --

16  there were clients that cancelled before billing transfers,

17  and there were clients that cancelled as a result of the

18  payment processing issues.  So, just estimated based on the

19  clients, yes, it was (indiscernible) based on the clients

20  but still appeared to be performing at these three other law

21  firms based on this cancellation rate that spiked during the

22  payment processing dispute.

23          TRUSTEE NG:  Okay.

24          MR. MARCH:  And I -- I think the -- the idea is

25  that we won't have any -- I mean, we're only going to have

85

1  three -- three employees on payroll as opposed to 350 people

2  on payroll.

3          TRUSTEE NG:  Okay.  The projection shows the

4  $675,000 revenue in March -- that's gross -- being held by

5  EquiPay.  Is that --

6      (Pause for outside noise.)

7          TRUSTEE NG:  Is EquiPay not -- the projections

8  show $675,000 being held in March revenue, gross revenue,

9  being held by EquiPay.  Is EquiPay not paying the Debtor as

10 well?

11         MR. DIAB:  Correct.  So, EquiPay is refusing to

12 send that amount through.  That's money that was collected

13 in March.  So, we're looking at it as -- as March revenue,

14 that EquiPay is holding that amount and refusing to send

15 that through to LPG.  That's likely to be another adversary

16 action, although our counsel is trying to get cooperation,

17 but right now it looks like they'll have to file to get that

18 money released.

19         TRUSTEE NG:  What is the reason for holding the

20 Debtor's revenue?  Did they provide you a reason?

21         MR. MARCH:  So, it was a combination of two

22 factors.  One reason, which was true for both EquiPay and

23 Merrich Bine was the litigation with Validation Partners.

24 They believed that the litigation was going to result in the

25 closure of LPG, the appointment of a receive and LPG

*Briggs Reporting Company, Inc.*

86

1  shutting down, in which case, both of those payment
2  processors would be on the hook for charge backs and
3  unauthorized transaction, and they didn't want to be left
4  holding the bag.  So, they used that as an excuse.  Whether
5  it's good faith or bad faith, I don't know, but that was the
6  explanation given, that the litigation with Validation
7  Partners put LPG in a -- a risk of being shut down.
8          The other factor that's cited by EquiPay is the
9  high bounce rate in the month of February.  We explained
10 that the bounce rate was high but that we were attempting to
11 collect payments at the same time as Merrich Bine, and then
12 we stopped.  But during that period where both LPG and
13 Merrich Bine were trying to collect payments, LPG through
14 EquiPay, Merrich Bine on its own, the client bounce rate
15 spiked because the clients can't afford to make two payments
16 at the same time.  And, so, we explained that that higher
17 NSF rate was a function of the payment processing dispute,
18 but EquiPay still felt that the high NSF rate warranted
19 holding funds at least for a short period of time.  We've
20 never been given a date certain when they'll release the
21 funds.
22          TRUSTEE NG:  Okay.  And is the Debtor still using
23 EquiPay or Merrich Bine?
24          MR. DIAB:  No, we're not currently using either to
25 process anything.

87

1          TRUSTEE NG:  So --

2          MR. DIAB:  And our understanding is that none of

3    the three Law firms are using either to process payments

4    themselves.

5          TRUSTEE NG:  So, who does the Debtor use for the

6    existing, you know, 400, 600 clients in California for

7    payment processing?

8          MR. DIAB:  Those clients are -- are no longer

9    making payments.

10          TRUSTEE NG:  Okay.

11          MR. DIAB:  Dan is continuing to handle the

12   litigation for those clients until the end, but they're not

13   making payments at this time, and no other service is being

14   provided to other banks, including those lawsuits.

15          TRUSTEE NG:  Okay.  So, according to the

16   projection that we received, the monthly expenses for April,

17   May and June -- well, I guess for May and June is about

18   $260,000.  For April it's a little bit more.  It's $358,000

19   because of the one-time liability, professional liability

20   expense.  So, I mean, without that expense, would you say

21   the expenses average per month is about $263,000 or so?

22          MR. DIAB:  Yes, and that should remain the case

23   moving forward, that (indiscernible) normal month over month

24   over month.

25          TRUSTEE NG:  Okay.  I mean, they --

88

1          MR. DIAB:  On the cost side.

2          TRUSTEE NG:  Okay.  There is an entry for refunds,

3   $50,000 per month.  Is that the expected payment the

4   Debtor's going to make, $50,000 a month on those refunds?

5          MR. DIAB:  No.  So, those are for additional

6   refunds, meaning the refunds that we anticipate clients

7   requesting from LPG.  If LPG collected money from a client

8   and the client chooses to cancel and request a refund, even

9   if they're currently being serviced by another law firm, the

10  money that They paid the LPG would be refunded by LPG.  So,

11  we're estimating $50,000 a month in new refunds that we'll

12  have to address month over month --

13         TRUSTEE NG:  Okay.

14         MR. DIAB:  -- moving forward.

15         TRUSTEE NG:  And the pay -- I mean, the rent has

16  to be amended because it lists only the 1450, and you

17  mentioned earlier the Debtor moved to a new location.   So,

18  we would need amended cash flow projection.

19         I notice that a lot of the expenses that was

20  previously listed, you know, in -- in the balance sheet that

21  you submitted to us was not there any more.  Like, I don't

22  see any expenses for office supplies or the malpractice

23  insurance that we talked about or software or Lexis, you

24  know, any of those equipments or, you know, I don't see that

25  anymore.  So, I don't know if we were just omitted or the

89

1  Debtor does not have those expenses anymore.

2          MR. DIAB:  We -- based on the -- essentially the

3  operation that we envision moving forward, those vendors and

4  those contracts were not needed.  And, so, that's why

5  they're not listed on our new operating budget.  The current

6  operating budget just consists of the salaries for Dan, Olga

7  and Carl and then the base expenses that they have for the

8  office out of which they're operating.  We will revise the

9  1450 figure if it was short of -- of -- I think Dan

10  referenced 2100 might be a more accurate number.  So, we'll

11  revise that for --

12          MR. MARCH:  It's actually --

13          MR. DIAB:  -- the malpractice.

14          MR. MARCH:  It's actually $1,491 a month in rent.

15          TRUSTEE NG:  Okay.

16          MR. DIAB:  Okay.  So, we'll still revise that

17  number.  And the malpractice also is a one-time payment of

18  94 or 96 thousand, which covers us all the way until March

19  2024.

20          TRUSTEE NG:  Did the Debtor make the one-time

21  payment?

22          MR. DIAB:  The one-time payment is outstanding.

23  It's part of that March budget that we intend to fund

24  through the -- the funds that we receive from EquiPay.

25          TRUSTEE NG:  So, has that been paid, the $96,000?

90

1           MR. DIAB:  It has not been paid.  The -- the

2   carrier understands that we're waiting on the funds from our

3   payment process and we'll make the payment at that time, and

4   they're cooperating.

5           TRUSTEE NG:  So, is --

6           MR. DIAB:  At least for now.

7           TRUSTEE NG:  Is the malpractice insurance active

8   then if the Debtor did not pay the $96,000?

9           MR. DIAB:  Yes.  It remains active provided that

10  we make the payment forthwith, although we haven't defined

11  that period of time.  But the policy has remained active.

12  The policy's initial termination date was actually June of

13  this year, but we did the one-year extension in March, and

14  it was negotiated at that price based on a March to March

15  period for the malpractice policy.

16          TRUSTEE NG:  Is there a deadline the Debtor had to

17  have made that $96,000?

18          MR. DIAB:  We have not been given a deadline.

19  It's expected to happen soon, but they understand that it's

20  a function of when we receive the money for the payment

21  processor.

22          TRUSTEE NG:  Okay.

23          MR. DIAB:  They have not given us a hard deadline.

24          TRUSTEE NG:  Okay.

25          MR. DIAB:  But they inquire.

91

1          TRUSTEE NG:  I don't see that expense in your

2  projection.  So, you need to revise the projection to

3  include the expense.

4          MR. DIAB:  Okay.  Understood.

5          TRUSTEE NG:  It looks like the largest payroll --

6  largest expense in the projection is the payroll for

7  $209,000.  I assume that includes the $100,000 per month

8  monthly payment that the Debtor intends to pay Mr. March, is

9  that right?

10          MR. DIAB:  That's correct.

11          MR. MARCH:  Yes.

12          TRUSTEE NG:  Okay.  And, previously, I think,

13  Tony, you mentioned that you don't expect to receive

14  anything from the Debtor in this bankruptcy, is that right?

15          MR. DIAB:  That's correct.

16          TRUSTEE NG:  Okay.  Mr. March, have you received

17  any compensation since the filing of the bankruptcy?

18          MR. MARCH:  No.  Well, the last -- no.  The last

19  payment I think I received compensation was March 17th.  I

20  think all the employees are owed from March 17th.

21          TRUSTEE NG:  And how much was that payment?

22          MR. MARCH:  Oh, for everybody or for --

23          TRUSTEE NG:  Just --

24          MR. MARCH:  For me it would have been the $100,000

25  a month.

*Briggs Reporting Company, Inc.*

92

1           TRUSTEE NG:  Okay.

2           MR. MARCH:  Yeah.  I'm not sure about Carl.  But

3    there's -- that's just with my office right now.

4           TRUSTEE NG:  Okay.

5           MR. MARCH:  That's with the three staff members.

6           TRUSTEE NG:  So, for 2023, other than that March

7    17 payment, $100,000, did you receive any other payments?

8           MR. MARCH:  Since then?  No.

9           TRUSTEE NG:  No, no, not since then.  Like prior

10   to -- other than the March 17, '23, did you receive a

11   payment in February or January of this year?

12          MR. MARCH:  Yes.  I believe I was current through

13   March 17th.

14          TRUSTEE NG:  Okay.

15          MR. MARCH:  I think that was the last payment

16   anyone received.

17          TRUSTEE NG:  Was it like a monthly payment that

18   they paid you the $100,000?

19          MR. MARCH:  No.  It was every two weeks on a

20   regular basis.

21          TRUSTEE NG:  And how much was every two weeks?

22          MR. MARCH:  Well, the net was about $23,000.  The

23   gross would have been close to $50,000, so about $48,000

24   payable every two weeks gross.

25          TRUSTEE NG:  Okay.  And how long --

*Briggs Reporting Company, Inc.*

93

1          MR. MARCH:  The net was 23.

2          TRUSTEE NG:  And how long have you been receiving

3    that?

4          MR. MARCH:  Let's see.  It's been about since I

5    think January of 2022.

6          TRUSTEE NG:  What about prior to --

7          MR. MARCH:  I didn't receive -- there was -- there

8    was 200 -- it was not that.  It would have been about --

9    let's see.  I was $200,000 short in 2022 of $100,000 a

10   month.

11         TRUSTEE NG:  So, like in --

12         MR. MARCH:  For the year.

13         TRUSTEE NG:  -- 2022, you did not receive the $1.1

14   million?  You only received $900,000?  Is that what you're

15   saying?

16         MR. MARCH:  About $900,000 or I think the -- it's

17   $850,000 I believe is what it was.

18         TRUSTEE NG:  Okay.  And what was the source of the

19   funds for your compensation?

20         MR. MARCH:  It just came out of general and from

21   general into payroll and payroll to the employees --

22         TRUSTEE NG:  Which general is --

23         MR. MARCH:  -- who received them at the same time,

24   all the employees did.

25         TRUSTEE NG:  Is it the --

*Briggs Reporting Company, Inc.*

94

1          MR. MARCH:  That would have been the --

2          TRUSTEE NG:  -- the 4858?

3          MR. MARCH:  From Union Bank for this year.  It

4 might have been Bank of America for one payment.  I think

5 that's all we had it for, and -- and from Chase.

6          TRUSTEE NG:  Which -- which Chase account?

7          MR. MARCH:  I don't know if I ever -- let's see.

8 I received it from the payroll.  I received paychecks.

9          So, Tony, which account is the -- I think we're

10 looking at the Chase one.

11          MR. DIAB:  The paychecks -- paychecks would drop

12 payroll from the general operating account, the account

13 ending 3158.  Bank of America had a separate payroll account

14 that just held the payroll money when we were using Bank of

15 America for that month and a half.

16          For Union Bank, again, it was the general

17 operating account for payroll, which is the 4854 account.

18          TRUSTEE NG:  Okay.  So, I'm going to ask for proof

19 of payment from January 2022 to March 17, 2023.

20          What about 2021?  What was your compensation in

21 2021?

22          MR. MARCH:  You know, I don't recall that.

23          TRUSTEE NG:  Is it close to what you were

24 receiving in 2022?

25          MR. MARCH:  No.  I think it was about -- I think

95

1  it was $50,000 a month.

2          TRUSTEE NG:  I'm sorry.  I can't hear you.

3          MR. MARCH:  I think it might have been about

4  $50,000 a month.

5          TRUSTEE NG:  Fifty thousand a month?

6          MR. DIAB:  As I recall, it was -- it was in 2021

7  that Dan's compensation went from the 50 to 100 figure, but

8  I'm not sure what month of 2021 that switch was made.  I

9  think it was maybe August of 2021.

10          TRUSTEE NG:  Okay.  And prior to that, in 2020?

11          MR. MARCH:  Oh, that I don't remember at all.  It

12  was --

13          TRUSTEE NG:  Do you think it was about --

14          MR. MARCH:  Might have been --

15          TRUSTEE NG:  Do you think it's about the $50,000?

16          MR. MARCH:  No.  I think it was about $ 11,000 a

17  month.

18          TRUSTEE NG:  Okay.  So, why was the income, you

19  know, increased from $50,000 to $100,000 in 2022 when -- you

20  know, when the Debtor's facing all these financial

21  difficulties?

22          MR. DIAB:  Sorry, this is Tony.  As I recall, the

23  change was made in August of 2021 --

24          TRUSTEE NG:  Okay.

25          MR. DIAB:  -- when LPG was doing much better.

*Briggs Reporting Company, Inc.*

96

1          TRUSTEE NG:  Okay.

2          MR. DIAB:  It didn't have any -- any of these

3    issues, and Dan had taken on a much more active role when we

4    decided to ramp up the growth and -- and based on the size

5    of the docket and the number of attorneys he was managing,

6    it was right around August of '21 that we decided to -- to

7    increase that compensation.  And then in -- as you noted, in

8    2022, when we had the financial difficulty, he ended up

9    taking a haircut of between two and three hundred thousand,

10   which he obviously voluntarily did because of the issues

11   that we faced.

12         TRUSTEE NG:  According to the bank statements that

13   was attached to the Debtor's monthly operating report filed

14   with the Court on May 1st, 2013 (sic), docket number 55, it

15   looks like the Debtor only has about $6300 in the bank

16   account as of March 31st, 2023.  How is the Debtor going to

17   be able to pay for the $100,000 a month?

18         MR. DIAB:  The -- this is Tony again.  We

19   anticipated revenue from referral fees in addition to the

20   money that's being held by the payment processor.  We have

21   no problem clearing that -- the current operating budget of

22   $253,000, which includes the $100,000 salary to Dan, but

23   that does -- the revenue source moving forward, the payment

24   process, there's a one-time payment that we would receive.

25   But the referral fees moving forward should be more than

97

1  enough to cover that amount that's due.

2          TRUSTEE NG:  The employment app --

3          MR. MARCH:  And I think that starts this Friday.

4          TRUSTEE NG:  Okay.  The employment application

5  filed with the Court by your attorney also asks for a

6  $20,000 post-petition retainer.  Has that been paid?

7          MR. DIAB:  It has not at this time, no.

8          TRUSTEE NG:  And is this -- is this going to be

9  the same source of funds going to pay that retainer or what

10 other source of funds?

11         MR. DIAB:  Correct.  It would be either the -- the

12 funds released by EquiPay if they release funds first or the

13 revenue received from the referral fees if that's received

14 first would go to pay the $20,000 post-petition retainer.

15         TRUSTEE NG:  Okay.  But the EquiPay, you

16 anticipate you will probably have to file some kind of

17 adversary action in order to get the funds back, right?

18         MR. DIAB:  Correct, unless they break -- their

19 conversation's not going well -- we don't think that they're

20 going to do it voluntarily.

21         TRUSTEE NG:  What about --

22         MR. DIAB:  That's correct.

23         TRUSTEE NG:  What about Merrich Bine, do you think

24 they're going to voluntarily give back the money or do you

25 think the Debtor needs to file some kind of adversary

98

1 proceeding?

2          MR. DIAB:  Yeah, that -- that one I can confirm

3 there's no chance that they voluntarily return anything.

4          TRUSTEE NG:  Okay.

5          MR. DIAB:  And, so, that, again, would have to be

6 some formal proceeding.

7          TRUSTEE NG:  Okay.  I note that the Debtor filed

8 the March monthly operating report using the wrong form.

9 The Debtor actually used the small business debtor form, and

10 this is not a small business debtor case.  So, we cannot

11 accept that monthly operating report for that reason.  And,

12 also, pursuant to the IDI letter that we sent to your

13 counsel on March 22nd, we specifically indicated that

14 certain supporting documentation must be filed along with

15 the monthly operating report, and that includes the balance

16 sheets, the P and L statement, the general ledger and things

17 like that, and none of those were attached to the monthly

18 operating report.  So, the Debtor needs to refile the

19 monthly operating report using the correct form and provide

20 the supporting documentation.  I mean, if you don't have a

21 copy of the IDI letter, you can certainly contact our

22 office, and we'll be happy to send you a new one.

23          Does that work for you?

24          MR. DIAB:  Yes, understood.

25          TRUSTEE NG:  Thank you so much.

99

1          I note that there are three secured creditors

2    listed in the Debtor's amended Schedule D that was filed

3    yesterday, Docket Number 52.  Does the Debtor need the

4    consent of these secured creditors to use the cash

5    collateral to pay any business expenses, including the

6    insider compensation?

7          MR. DIAB:  This is Tony.  I don't have an answer

8    to that question.

9          TRUSTEE NG:  Okay.  And I note that the amended

10   Schedule D still does not list the dates upon which the debt

11   was incurred or the last four digits of the account number.

12   So, that has to be -- that has to be amended.

13         Since the Debtor filed for bankruptcy, has the

14   Debtor made any expenses payment?

15      (Pause.)

16         MR. DIAB:  No.

17         MR. MARCH:  No.  I don't think so.

18         TRUSTEE NG:  So, the Debtor didn't pay for rent or

19   payroll or electricity for the -- you know, no payments were

20   ever made?

21         MR. DIAB:  Post-petition, no payments have been

22   made.  We've been waiting on funds from the payment

23   processor or, in the alternative, for these referral fees to

24   kick in.  At this time, no payments have been made post-

25   petition.  No funds have been available.

100

1          TRUSTEE NG:  So, no payments to the two staff were

2  made post-petition?

3          MR. DIAB:  Correct.  That's two payrolls that have

4  been missed.

5          TRUSTEE NG:  What about the lease of the new

6  place?

7          MR. DIAB:  So, the -- the April payment was made

8  at the end of March, but the -- the May payment has not been

9  made.  Today is the 2nd.  We have I believe until Friday to

10  make that payment without penalty, but that has not been

11  paid for the month of May.

12          TRUSTEE NG:  So, the April payment --

13          MR. DIAB:  The 1491 figure that was given.

14          TRUSTEE NG:  Okay.  So, the April figure, the

15  April rent payment, was that -- what was the source of the

16  funds to pay that payment?

17          MR. DIAB:  So, that was paid out of the Union Bank

18  operating account.  It was paid.  In the middle of March we

19  made the payment for the month of April, but I don't know

20  the exact date.  I do know it would have gone from the Union

21  Bank account ending 4854.

22          TRUSTEE NG:  Okay.  What kind of account --

23          MR. DIAB:  I'm just trying to source of funds --

24          TRUSTEE NG:  I'm sorry.  Go ahead.

25          MR. DIAB:  I'm sorry.  Just to answer your

101

1  question, the source of funds, that would have been client

2  payments that we could receive in March because we did

3  receive some client payments.  The 675 was held, but

4  clients' payments -- I'm sorry.  Client payments would have

5  been the source of the rent payment that was made in March

6  for the month of April.

7          TRUSTEE NG:  Okay.  What kind of accounting

8  systems and software did the Debtor -- does the Debtor use

9  to track financial activity?

10         MR. DIAB:  LPG currently uses Quickbooks.  In

11 2022, we had switched to NetSuite and then switched back

12 from NetSuite to Quickbooks.  In 2023, it's exclusively been

13 Quickbooks as the bookkeeping software.

14         TRUSTEE NG:  Okay.  And who has access to the

15 Quickbooks?

16         MR. DIAB:  So, there was a -- a former accountant

17 who was in the accounting department named Breanne

18 (phonetic).  Dan has access to the Quickbooks.  And,

19 although I don't have access, I could give access.

20 Carpenter and Associates, the accountants who handle the tax

21 filings, also have access to the Quickbooks account.

22         TRUSTEE NG:  Okay.  We received a balance sheet

23 for end of fiscal year 2022 late last Friday evening and an

24 income statement for fiscal year 2022.  When were these

25 documents prepared?

102

1          MR. DIAB:  They would have been finalized in

2   January of 2023.  They were prepared throughout the course

3   of the year in 2022 with bookkeeping entries, but those

4   financials were formalized in January.  No financials for

5   the year 2023 have been prepared.  The accounting

6   department, along with others, left in February, and they

7   have not replaced them.  The accountants themselves, they're

8   working on the tax filings but have not completed financials

9   for this calendar year, for 2023.  Their tax focus was 2022

10  tax year.

11          TRUSTEE NG:  And who prepared them, your

12  accountant?

13          MR. DIAB:  It was our accounting department.  Our

14  accounting department as of January consisted of three

15  individual bookkeepers and then an acting CFO, not a

16  technical officer or director of the company but somebody

17  who was fulfilling the role of CFO named Kevin Kirkler

18  (phonetic).

19          TRUSTEE NG:  And when was he the CFO of the

20  Debtor?

21          MR. DIAB:  He was hired in August to fill that

22  role.  He was terminated at the very beginning of February.

23  And, so, he was employed during that period of time.  The

24  termination in -- in early February was the result of -- of

25  certain discoveries that came to light for me and Dan, and

103

1  then the decision was made to part ways with Kevin.

2          TRUSTEE NG:  Okay.  And you mentioned that -- is

3  it two bookkeepers in the accounting department?

4          MR. DIAB:  Well, there were -- there were three

5  people working underneath Kevin during the time when Kevin

6  was employed.  The three people were Gabriel Monroy

7  (phonetic), Breanne Pierwich (phonetic) from

8  (indiscernible), and then the third individual was Eddie,

9  Eddie Ball (phonetic), and those three individuals were the

10  bookkeepers essentially working under Cameron during that

11  period of time.

12          TRUSTEE NG:  And are they still with LPG?

13          MR. DIAB:  No.  They left along with others in

14  February and March.

15          TRUSTEE NG:  Okay.

16          MR. DIAB:  And are no longer employed by LPG,

17  although Breanne does answer questions for us often when we

18  -- when we ask where to find a piece of information, but

19  she's not employed.

20          TRUSTEE NG:  So, was the balance sheet and the

21  income statement submitted to us prepared by this department

22  prior to their departure?

23          MR. DIAB:  It was prepared prior to her departure,

24  but it was pulled by me last week to be able to send

25  through, which is another way of saying it was not verified

104

1 by anybody in the accounting department that that's the

2 correct version, but it's the last version that I had

3 received from the accounting department.  It's the only

4 version I had access to.

5          TRUSTEE NG:  Okay.  Because the initial seven-day

6 package that was submitted to our office on April 17th, '23,

7 the Debtor at that time indicated that it has not prepared

8 an financial statements in 2022 or in the past year.  So,

9 but you're saying these were actually prepared by the -- you

10 know, by the department, the accounting department prior to

11 their departure, and you pulled it last week or so, is that

12 right?

13          MR. DIAB:  That's correct.  And, to be clear, the

14 -- the documents that were sent were never reviewed by a CPA

15 nor certified by a CPA.  It was our internal accounting

16 department only.

17          TRUSTEE NG:  I don't think we ever received a

18 profit and loss statement even though we asked for it.  Is

19 there a profit and loss statement?

20          MR. DIAB:  For 2022 there is.  None has been

21 prepared -- yeah, for 2023, none have been prepared for the

22 first four months of the year.

23          TRUSTEE NG:  The Debtor was making $155 million

24 gross in 2022, and you don't have a P and L statement?

25          MR. DIAB:  We have the P and L for 2022.  We don't

105

1 have it for 2023.

2           TRUSTEE NG:  Okay.

3           MR. DIAB:  It was submitted for 2022, along with

4 the balance sheet.

5           TRUSTEE NG:  So, we don't -- no, we did not

6 receive the P and L statement for 2022.  So, can you please

7 go ahead and send it to your attorney, and he can send it to

8 us?

9           UNIDENTIFIED SPEAKER:  (Indiscernible) we have

10 your income statement for --

11          TRUSTEE NG:  Oh, we have the income statement.

12          UNIDENTIFIED SPEAKER:  It's the same thing as the

13 P and L.

14          TRUSTEE NG:  Okay.

15          UNIDENTIFIED SPEAKER:  Sorry.

16          TRUSTEE NG:  And the accounts receivable,

17 according to the balance sheet for end of fiscal year 2022

18 that we received last Friday evening, the title of that

19 document, it says "Litigation Practice Group, PC, Parent

20 Consolidated."  So, what entities are consolidated with the

21 Debtor?

22          MR. DIAB:  I'm not aware of any being consolidated

23 with the Debtor.  So, I don't -- yeah, I don't know why that

24 notation was made, but I would have to inquire of Kevin if

25 there was anybody else included in that, but there should

106

1  not be any other entities.

2           TRUSTEE NG:  Are you still in good terms with

3  Kevin?  I thought he was let go.

4           MR. DIAB:  We -- so, we have a -- we have an open

5  line of communication.  It's not the best relationship, but

6  I am able to reach out to him, and he reaches out to me.

7           TRUSTEE NG:  Okay.

8           MR. DIAB:  And answers questions from time to

9  time.

10           TRUSTEE NG:  Okay.  Yeah, I will need explanation

11  why it says, you know, there's consolidation.  If there is,

12  in, fact, a consolidation, we need to know the reason for

13  that.

14           The balance sheets it says for end of fiscal year

15  2022.  Does that mean those figures listed in that balance

16  sheet is as of December 31st, 2022?

17           MR. DIAB:  Correct.

18           MR. MARCH:  That's my understanding, yes.

19           TRUSTEE NG:  Okay.  Thank you.  So, the balance

20  sheet shows that the total accounts receivables as of

21  December 31st, 2022 to be $6.6 million.  Does that sound

22  right to you?

23           MR. DIAB:  Yes.  So, my understanding of how they

24  calculate the accounts receivable on the balance sheet, they

25  don't book all future payments due on all contracts.  What

107

1  they're looking at is NSF's that were unresolved because

2  those amounts are owed to the company, and the company is

3  supposed to collect until they have a clearing entry to

4  remove the -- the NFS's that are owed.  But that figure does

5  not include future payments pursuant to contracts, and that

6  was a decision that the accountants made based on

7  (indiscernible) system that we book all the future contract

8  payments.  We just got hit with a huge tax liability in the

9  current year, and so they opt not to include AR beyond the

10 payments that we sought from clients but didn't collect.

11       TRUSTEE NG:  If the Debtor were to include the

12 future AR, what would the figure look like?

13       MR. DIAB:  As of right now or as of December --

14       TRUSTEE NG:  As of December -- I mean, is there a

15 difference?  I mean, is there a huge difference?  Well, what

16 about as of right -- as of right now?

17       MR. DIAB:  As of right now, I think that we were

18 putting the figure at roughly 60 million based on the

19 referral fees model that we're now adopting.  As of December

20 of 2022, when we still had all of the direct client payments

21 to account for, it probably would have been closer to $300

22 million in terms of all future contracts and payments due

23 thereunder.

24       TRUSTEE NG:  So, how did it go from 300 to 60

25 million dollars?

108

1          MR. DIAB:  That's a function of the percentage

2  split for the companies that are now servicing the clients,

3  so the 40 percent from CLG and 20 percent each from Phoenix

4  and Oakstone.  That's how the number is now 60 million,

5  because the remaining AR is going to belong to the firm

6  that's doing the servicing for the clients.

7          TRUSTEE NG:  Okay.  So, the Debtor's Schedule B

8  filed with the Court on April 4th -- and that's Docket

9  Number 33 -- shows the AR in the amount of $120 million.

10  So, how do you reconcile the numbers you just told me and

11  the $120 million?

12          MR. DIAB:  So, the $120 million would have to be

13  revised based upon the cancellations that we actually saw

14  happen as a result of these transitions and everything else

15  that was happening.  So, the 123 would have been a figure

16  that we would have determined in March at the time that we

17  were filing the petitions based on all of the clients

18  remaining onboard.  And in reality, clients cancelled with

19  LPG before the transfer and cancelled with the receiving law

20  firms post-transfer, in part because of the payment issue

21  with Merrich Bine, in part because they objected to the

22  transition.  And, so, the client base shrunk as a result of

23  -- of the movement from us, and that's why the future AR

24  also shrunk.

25          The 120 was a very rough figure.  The 60 million

109

1 itself is a rough figure.  This client base is inconsistent

2 in terms of payment streams.  Sometimes they perform really

3 well.  Sometimes they perform poorly.  So, it's a -- a best

4 guess.

5        TRUSTEE NG:  Okay.  And have the Debtors taken any

6 steps to try to recover the AR?

7        MR. DIAB:  I would say no.  The -- the policy

8 we've had from the inception of LPG is that we won't seek to

9 collect from clients that don't make payments.  We'll

10 encourage them to make payments.  We'll try to retain them

11 so that they remain clients, but if they want to leave, we

12 don't collect any payments that were owed at the time that

13 they leave.  We don't even make demands out of them, engage

14 in collection action.

15        TRUSTEE NG:  Okay.  So, and that's to both

16 existing clients or clients who decided to leave LPG that

17 the policy is they don't -- that LPG does not try to make

18 any demands or collect on the AR?

19        MR. DIAB:  Correct, and that's a function of the

20 positions the clients are in as individual discovering of

21 that and also concerns about how the State Bar would view

22 that practice, how seeking to collect from these individual

23 clients, that policy decision was made early on, and we

24 haven't changed it since.

25        TRUSTEE NG:  Okay.  So, the combined bank accounts

110

1  on that balance sheet shows that, you know, the balance as

2  of December 31st, 2022 was $2.5 million, but the Debtor only

3  listed $4500 in the Union Bank account as of the petition

4  date.

5          So, what happened to all that money?

6          MR. DIAB:  So, the operating costs in January but

7  then also when February -- in the month of February, when

8  the payment processing was no longer paying anything through

9  because the process was (indiscernible), all the existing

10 money that we had sort of in the bank from all these various

11 accounts we used to keep LPG operating as long as possible.

12 And then, when that money was gone, that's when we

13 essentially made a payroll and saw the mass exodus of

14 employees.  But any money that would have been in the

15 account at the end of December or the beginning of January

16 was used to cover all the expenses in January and February

17 of this year.

18         TRUSTEE NG:  Okay.  The balance sheet shows the

19 total liability as of December 31st to be $9.9 million.

20 Does that sound right?

21         MR. DIAB:  That sounds accurate, yes.

22         TRUSTEE NG:  And then the Debtor's schedule shows

23 liabilities about $140 million or so.  So, how do you go

24 from 9.9 as of December 31st of last year to $140 million

25 within the three months?

111

1          MR. DIAB:  We dispute the vast majority of the 140

2 million.  We were obviously advised by counsel that if

3 somebody is claiming a balance is owed, we have to report

4 that to the Court, but we do not believe that the vast

5 majority of purported creditors are actually creditors.

6 They either are seeking moneys that are not owed or they're

7 seeking to enforce contracts that they had already breached

8 and they're not permitted to enforce.  So, we think that the

9 actual amount owed to creditors is much closer to about $10

10 million, maybe a little bit less, in terms of actual

11 creditors.  These disputes obviously are going to have to be

12 adjudicated, but -- but we've marked the debts as disputed

13 on our schedules.

14          TRUSTEE NG:  Okay.  And --

15          MR. DIAB:  The balance sheet shows our -- our

16 position.

17          TRUSTEE NG:  I'm sorry.  I couldn't hear you.

18          MR. DIAB:  The balance sheet shows our position

19 with regard to who's actually a creditor and who's not.

20          TRUSTEE NG:  Okay.

21          MR. DIAB:  As of this time.

22          TRUSTEE NG:  Okay.  We -- we -- our office

23 requested a list of receivables with an aging, and we did

24 receive some kind of report from your office, but it does

25 not identify any account holders, and there's no aging is

112

1  listed, just amount each month.  So, we would need a revised

2  aging report with those information in order for us to have

3  a meaningful understanding of what's going on.  You can send

4  it to your attorney.

5        MR. DIAB:  Just to clarify -- I apologize for

6  interrupting, but to clarify, you would prefer to see each

7  one of the clients and their payment streams?

8        TRUSTEE NG:  Right.

9        MR. DIAB:  And then multiplying out our 20 percent

10 or 40 percent?  Got it.

11       TRUSTEE NG:  Right.  I think if you have any

12 question, you can also contact our office after the meeting,

13 and we can explain to you what we need, but I think that

14 would be the information that we need so we can have an

15 understanding of what's going on.

16       On January 6th, '23, of this year, the Superior

17 Court for the State of California Orange County, Judge

18 Sherman, issued an order enjoining LPG from spending any

19 money that would result in less than $4.48 million cash in

20 hand.  And, similarly, on March 10th, '23, the State Court

21 issued a minute order enjoining the Debtor to spend any

22 money that would result in less than $4.48 million cash on

23 hand.

24       Are you aware of those two orders?

25       MR. DIAB:  Yes, we're aware of the orders.

*Briggs Reporting Company, Inc.*

113

1          TRUSTEE NG:  And can you explain why the Debtor

2  only has $4500 in the bank account as of the petition date?

3          MR. DIAB:  There's money held by the payment

4  processor which collects payments from clients.  Those

5  payments are held by the payment processor in an account for

6  benefit of LPG.  We believe that those funds belong to LPG

7  and would satisfy the minimum balance that the Superior

8  Court wanted us to hold.  And, so, our position is if the

9  payment processor's holding the $4.5 million, then we're

10 satisfying the Court's order.

11          In our operating account, we have never for one

12 minute in our history had four and a half million in the

13 operating account.  So, to the extent that -- that we're

14 enjoined from spending money to bring the -- the account

15 balance below four and a half million, we've never been

16 above it.  So, we couldn't bring it below.  But we don't

17 think that the Court was -- was using that hyper technical

18 interpretation.  We believe that they meant the total

19 account balances across all accounts adds up to the four and

20 a half million, which is easily the case when you look at

21 the payment processor's account and the amount of money

22 that's being held there.

23          TRUSTEE NG:  Well, actually --

24          MR. DIAB:  But that's the interpretation we've

25 taken.  It's never --

*Briggs Reporting Company, Inc.*

1          TRUSTEE NG:  Okay.  Understood.

2          MR. DIAB:  Go ahead.

3          TRUSTEE NG:  We have reviewed the bank statements

4 that you sent to our office like yesterday.  There were a

5 lot of them, and those bank statements, the Chase 3158, the

6 Chase 3133, I mean, they did have substantial deposits.  I

7 mean, even as of December the deposits were $8 million.  I

8 mean, the withdrawal was -- was a lot, was $8 million as

9 well, same as Chase 3133.  As of December, the deposit was

10 $4.38 million, and the withdrawals were $4.31 million.

11          So, it appears that the Debtor did have

12 substantial deposits in excess of the $4.5 million that the

13 Court ordered in expense account at one point.

14          MR. DIAB:  But the way that the deposits work, the

15 payment processors will send money through on a -- on a

16 daily basis any time it's (indiscernible) day.  And, so,

17 we'll receive the $4 million, $8 million, whatever the

18 number is.  We'll receive it as daily deposits of anywhere

19 from $100,000 to $1.5 million, but it never comes in as a

20 batch of four or five million or more than that amount.  The

21 largest it would ever come in as is $1.5, $1.6 million at

22 any one point in time, and when the money comes in, it's

23 obviously then spent on all the operating expenses that we

24 had operating a law firm that's -- that at the time was

25 active in 48 different states.  But the -- so, the payment

115

1 processing trickles in in small batches, and it's spent at

2 the time that it trickles in.  It never pools.  It never

3 has, and it never would if this business model is to

4 succeed.

5         TRUSTEE NG:  Okay.  So, the Debtor listed a

6 transfer of $50,000 to City Capital within the 90 days prior

7 to the filing.  Do you know when the transfer took place?

8         MR. DIAB:  The transfer would have been in

9 February of 2023.  I don't know the exact date, but probably

10 somewhere around February 20th to 25th.

11        TRUSTEE NG:  And what was the reason?

12        MR. DIAB:  But that was the one transfer that was

13 made to City Capital.

14        TRUSTEE NG:  And what was the reason for that

15 transfer?

16        MR. DIAB:  City Capital had issued a loan.  It was

17 a -- another merchant cash advance.  So, that cash advance

18 called for payments of $50,000.  We made one such payment,

19 and then we defaulted on that obligation, and that's one of

20 the obligations that we reported as a secured obligation.

21        TRUSTEE NG:  Okay.  And the Debtor also lists a

22 transfer $12 million to Merrick Bank, and when was that

23 transfer?

24        MR. DIAB:  So, Merrick Bank collected the money

25 from LPG's clients.  The money was never sent to LPG.

*Briggs Reporting Company, Inc.*

116

1  Merrich Bine is holding that amount we believe, but, again,

2  that's an estimate.  We don't know the exact amount that

3  they're holding, but that amount that was being held and is

4  being held by Merrich Bine we're regarding as LPG funds, and

5  that's the reason for that notation.  But no amount was ever

6  sent from LPG to Merrich Bine.  That was collected from LPG

7  clients and held by Merrich Bine.

8          TRUSTEE NG:  Okay.  So, how long did the Debtor

9  actually use Merrich Bine services?

10         MR. DIAB:  So, Merrich Bine began processing

11 payments in September of 2022, and the last payment process

12 is March 10th of 2023, so, from September '22 to March of

13 '23.

14         TRUSTEE NG:  And they have been officially

15 terminated by the Debtor?

16         MR. DIAB:  Correct, and it was -- it was by mutual

17 consent because they had a contract to process payments, and

18 they agreed to stop.  They essentially agreed at least

19 temporarily to give up their contractual right at our

20 request that they stop collecting payments, and so that took

21 place in March.  The agreement was reached March 10th, and

22 they have not collected the payments since.

23         TRUSTEE NG:  Okay.  And the Debtor listed Merrich

24 Bank in its Schedule F as a creditor with a claim of $8

25 million.  What is the basis of that claim?

117

1          MR. DIAB:  In addition to being a payment

2   processor, Merrich Bine had purchased receivables from LPG.

3   They entered into receivable purchase agreements on three or

4   four different occasions, and those purchase agreements

5   called for payments out of LPG's receivable to Merrich Bine,

6   and so Merrich Bine was both a payment processor and also a

7   financier in the form of receivable purchaser.

8          TRUSTEE NG:  Okay.  I think previously you

9   mentioned that the Debtor may, you know, take -- may -- may

10  initiate, you know, adversary proceedings against either

11  Merrich Bine or Apocay (phonetic) in this bankruptcy case.

12  Does the Debtor contemplate any other litigation against any

13  other party in this bankruptcy?

14         MR. DIAB:  Yes, a number of other adversary

15  actions are contemplated.  As I mentioned earlier, there's a

16  dispute with Kevin Kirkler, the former acting CFO, and that

17  dispute involves money that LPG believes was taking

18  wrongfully, that LPG is going to seek to have returned.

19  Also, LPG believes there was a misappropriation of trade

20  secrets by Kevin Kirkler and another individual who is a

21  creditor named Mario Acevedo.  We believe that they shared

22  information with a competitor, and that competitor is

23  actively stealing clients from LPG.  They're LPG clients

24  that are located at other Law firms now, but they still have

25  a contract with LPG, and this Law firm is reselling them on

118

1  this other platform that this Law firm runs.  And, so, we

2  anticipate an adversary complaint for the misappropriation

3  of LPG's trade secrets, including client lists.

4          And then there's a related action against a

5  company called Point Break Holdings, which is partnered with

6  Mario and Kevin in this new Law firm venture, and they're

7  also actively stealing clients from -- from the Law firms

8  that are LPG clients.  So, there's going to be an adversary

9  action against them for that interference with contractual

10 relations as well as violation of a contract that Point

11 Break had with LPG that restricted such conduct.  And, so,

12 those adversary actions are contemplated.

13         There was an -- one additional adversary action

14 would be against Debt Validation Fund and DVI Fund related

15 to money that was paid to them pursuant to agreements that

16 they both breached.  And, so, we would seek to return the

17 funds from those two individual purported creditors and seek

18 to -- to have those funds returned as a result of the breach

19 or the agreement by those two parties.

20         Dan, can you think of any other adversaries that

21 we discussed?

22         MR. MARCH:  No.  I was going to say that --

23 against Validation Partners, that's about $30 million.

24         MR. DIAB:  Yeah.  So, Validation Partners, which

25 is also listed as a creditor, we received an assignment from

119

1 Pec Corporation of a roughly $30 million claim that Pec

2 Corporation had against Validation Partners, meaning

3 Validation Partners owed Pec Corporation $30 million that

4 was assigned to LPG.  So, that's an asset of LPG that we're

5 going to seek.  It's that $30 million assignment that we'll

6 file as an adversary action against Validation Partners.

7 And, so, that's I guess the last of the adversaries.

8           TRUSTEE NG:  Okay.  And what about the -- the

9 potential lawsuit against Kevin?  How much was taken

10 wrongfully allegedly by him or his -- Mario?

11           MR. DIAB:  So, for Kevin, the amount in

12 controversy is $205,000, and that relates to transactions in

13 a bank account that -- that do not appear to have been

14 authorized by Dan or by myself, and that's one that is --

15 there's an ongoing conversation with Kevin and a desire to

16 resolve it amicably, but we don't know that that's going to

17 be the case, but that would be the amount in controversy.

18           TRUSTEE NG:  Okay.  And does the Debtor expect

19 anyone to sue the Debtor in this bankruptcy case?

20           MR. DIAB:  I'm sorry.  Could you repeat that

21 question?

22           TRUSTEE NG:  Do you expect anybody to sue the

23 Debtor in this bankruptcy case?

24           MR. DIAB:  So, the active lawsuits that were

25 already pending at the time of the filing of the petition

120

1 are the only lawsuits we envision.  We don't envision there

2 being any other lawsuits filed.

3          TRUSTEE NG:  Okay.  What is the plan for

4 reorganization here?

5          MR. DIAB:  So, our goal is to make all secured

6 creditors whole using the revenue stream from referral fees,

7 and then the balance of those referral fees would be made

8 available to the unsecured creditors pro rata.  The

9 complicating factor is the uncertain payment stream from the

10 client base.  And, so, over the next couple of months, we'll

11 have a good sense of exactly how this client base is going

12 to perform, that is of each service by three law firms that

13 are not LPG.  And then that would be the amount that's

14 available, but we think it would be easy to make secured

15 creditors whole, and there would be a sizeable amount left

16 for unsecured creditors.

17          TRUSTEE NG:  Okay.  At this point, I'm going to

18 turn to my colleagues, Marilyn Sorensen or the AUST, Cam

19 Miskins, to see if they have any follow-up questions.

20          MS. SORENSEN:  I do not, Queenie.

21          TRUSTEE NG:  Thank you.  I hear no response.

22 So --

23          MR. MISKINS:  I do not.

24          TRUSTEE NG:  Okay.  I'm sorry.  Cam, do you have

25 any questions?

121

1           MR. MISKINS:  No, I don't.

2           TRUSTEE NG:  Thank you.

3           So, at this point, I'm going to open the forum to

4    all creditors who would like to question the Debtor.  If so,

5    please announce yourself and state your name and if you're

6    an attorney and the party that you represent on the record,

7    please.

8           MR. BROWN (telephonic):  Hello.  Bob Brown.  I'm

9    an attorney.  I represent SDCO Tustin Executive Center.

10   It's the owner of the property located at 17542 East 7th

11   Street, Tustin, California, Suites 100, 105, 250 and 330.

12          Earlier in the examination, I heard the Debtors

13   representatives indicate they vacated that property in

14   February or March of 2023.  We have filed a motion for

15   relief from stay to recover possession of the property.

16          Has, in fact, the Debtor vacated those -- or

17   abandoned those premises?

18          MR. DIAB:  So, there -- there are no longer any

19   employees operating out of that space.  There's office

20   furniture that still has to be moved into storage, which we

21   anticipate completing by the end of this week, by Friday the

22   5th or Saturday the 6th, at which point we would be ready to

23   turn over possession.

24          MR. BROWN:  Okay.  Earlier I heard somebody say

25   that they vacated and gave the landlord notice that they'd

122

1  given up possession of the property, yet my client never

2  received that.  So, you anticipate vacating the property by

3  the end of next week?

4          MR. DIAB:  By the end of this week, correct, and

5  we'll have -- we'll make sure that notice is given to

6  (indiscernible) at the moment that everything has been

7  removed.

8          MR. BROWN:  Okay.  Very good.  I've got a motion

9  pending for relief from stay.  As I indicated, it's Docket

10  Number 19.  So, if Debtor's counsel would agree to give me

11  notice once the Debtor has vacated so we can take possession

12  of the property, I would appreciate that.  Obviously, we'll

13  dispose of any remaining items in the unit in accordance

14  with the Civil Code.  We will proceed with our motion for

15  relief from stay tomorrow just to make sure that this is

16  moving forward to conclusion.  But you anticipate being out

17  by the end of this week, correct?

18          MR. DIAB:  Correct.  And we don't have any

19  opposition to the motion as I understand it.

20          MR. BROWN:  Okay.  Very good.  Those are all the

21  questions that I have on behalf of my client.  Thank you.

22          TRUSTEE NG:  Thank you, Mr. Brown.

23      (Simultaneous speaking.)

24          MR. STOCKHOLD:  Go ahead, Dave.  This is Matt

25  Stockhold.

123

1          MR. CUSIO:  Okay.  This is David Cusio on behalf

2    of Debt Validation Fund 2, MCDVI Fund 1, and MCDVI Fund 2.

3          I want to follow up on a few things.  Mr. Diab,

4    you mentioned that the notes you had -- or, sorry -- the

5    notes that LPG had with my clients were breached by my

6    clients.  How do you believe those were breached?

7          MR. DIAB:  Well, we believe that for three

8    reasons.  The confidentiality term was breached when your

9    clients, both of them, shared confidential information to

10   Validation Partners, an adverse party in active litigation,

11   in November of 2023 -- of 2022, and they also violated the

12   non-disparagement clause by disparaging LPG and Dan March

13   and Tony Diab as individuals.  And then more important than

14   all of that, they continued to seek to support Validation

15   Partners in the collection of amounts that were allegedly

16   assigned.  So, the exchange was a promissory note for

17   assignment by the DVF and DVI Fund receivables from

18   Validation Partners.  But after that purported assignment,

19   the two entities continued to seek to collect and supported

20   Validation Partners in efforts to collect, which we think

21   violated both the covenant of good faith and fair dealing

22   and also, more directly, eviscerated the (indiscernible)

23   consideration to LPG for those two promissory notes.  And,

24   so, that's the position that would be outlined in the

25   adversary that we intend to file.

124

1          MR. CUSIO:  And what was the confidentiality?

2    What was the confidential information that was disclosed

3    improperly?

4          MR. DIAB:  It was financial information as well as

5    the content of various meetings.  I would have weekly

6    meetings with Dave Zuck, McKenna, Eng Taing,

7    (indiscernible), Kevin Kirkler, and we would provide

8    confidential information regarding LPG's operations,

9    including its financial status and financial transactions,

10   and that information was given to Mike McLaughlin

11   (phonetic), counsel for Validation Partners, at meetings

12   that were witnessed by Eng Taing.  And, so, that information

13   that was conveyed was used by Validation Partners in

14   connection with their active litigation.  But, specifically,

15   it was financial information and operational information

16   shared with -- with Ross and his attorney, Mike.

17         MR. CUSIO:  Okay.  I want to -- I'm going back to

18   what we were talking about much earlier this morning.

19         Mr. March, aside from work with LPG, do you have

20   personal cases that you handle personally?

21         MR. MARCH:  I have a few.  I -- I handle

22   bankruptcies, yes.

23         MR. CUSIO:  Okay.  And how long had LPG been

24   making the lease payment for your office?

25         MR. MARCH:  I would say it's been about two years.

125

1          MR. CUSIO:  Okay.  And do they cover -- does LPG

2   cover the entire rent?

3          MR. MARCH:  Yes.

4          MR. CUSIO:  So, you don't pay any of the rents due

5   on your office space?

6          MR. MARCH:  No.

7          MR. CUSIO:  What were Mr. -- sorry.  The original

8   member of LPG was John, and I didn't catch his last name.

9          MR. MARCH:  Thompson.

10         MR. DIAB:  The last name is -- yes.  I'm sorry.

11         MR. CUSIO:  Johnson?

12         MR. DIAB:  It was Thompson.

13         MR. MARCH:  Oh, Thompson.  I'm sorry.  You said he

14  had concerns about liability.  What were those concerns?

15         MR. DIAB:  This is Tony.  I can address that

16  because he had raised those concerns direct to me.

17  Specifically, his concern related to the marketing companies

18  and their compensation method.  He had concerns that the way

19  that the marketing companies that would onboard files to

20  LPG, he felt that that compensation method may violate the

21  fee sharing ban between lawyers and non-lawyers.  And, so,

22  he raised that styled as an objection, and he said, after we

23  discussed the issue, he would prefer not to be counsel of

24  record for LPG and a shareholder of LPG, and that's when we

25  essentially began a search for his replacement.  But that