Part 3 of 3

126

1  was the issue that he had raised as his objection.

2       MR. CUSIO:  Okay.  Mr. Diab, you were talking

3  about the -- some of the entities, your entities that

4  received compensation from LPG.  You mentioned Vulcan

5  Consulting Group and Strategic Consulting Solutions.  Were

6  there any other entities associated with you who received

7  money from LPG?

8       MR. DIAB:  The only other entity would be BAD,

9  Incorporated, which did business in post-processing, and

10 post-processing received money from LPG from February 2019

11 when LPG was formed, until June of 2021 when BAD,

12 Incorporated was essentially dissolved.  It was never

13 dissolved formally because there's outstanding liabilities,

14 but it was essentially nonoperational as of June 2021.  That

15 entity I had an interest in, and it also was receiving

16 payments from LPG.

17      MR. CUSIO:  And who are -- is that an LLC?  What

18 kind of entity is that?

19      MR. DIAB:  BAD was formed as an LLC in I believe

20 it was January 2018.  It was converted to a -- an S

21 Corporation sometime around May of 2019, if memory serves.

22 And, so, it was BAD, Incorporated at the time that it ceased

23 operations.  It was made up, when it was an LLC, of three

24 partners, Brian Really, Arosh Asante (indiscernible) and

25 Tony Diab.  So B for Brian, A for Asante, D for Tony, BAD,

127

1  Inc.

2          MR. CUSIO:  Got it.  And then who were its

3  officers when it was an S Corp. or did it have officers?

4          MR. DIAB:  It did have officers.  Brian Really was

5  the CEO, and Arosh Asante Berudi (phonetic) was the

6  treasurer, CFO.  The secretary was (indiscernible).  I never

7  held an officer position for the entity and didn't receive

8  compensation from the entity, meaning I wasn't on payroll or

9  a 1099 for BAD, Inc.

10          MR. CUSIO:  Strategic Consulting, is that an LLC

11  or was it an LLC at the time?

12          MR. DIAB:  Yes, that was and even remains a

13  limited liability corporation -- company, sorry.

14          MR. CUSIO:  And who are the members of Strategic

15  Consulting?

16          MR. DIAB:  There's one member.  His name is James

17  Hinson.  He's a sole member, and I believe that entity was

18  formed toward the end of 2021, November'ish 2021.

19          MR. CUSIO:  Okay.  And how do you spell Mr.

20  Hinson's last name?

21          MR. DIAB:  James is standard spelling.  Hinson is

22  H-I-N-S-O-N.

23          MR. CUSIO:  And I believe you said that there were

24  never written agreements between LPG and Vulcan and LPG and

25  Strategic Consulting, is that correct?  Did I get that

128

1 correct?

2        MR. DIAB:  Yes, that's correct.

3        MR. CUSIO:   Are there ever times that money went

4 from any of the payment processors directly to an entity

5 that you were associated with or to yourself as an

6 individual?

7        MR. DIAB:  The former, yes.  It went to entities I

8 was associated with, never to me as an individual.  But

9 money would have been directed from payment processors

10 direct to Vulcan Consulting Group.  This would have been now

11 2021 because Vulcan was only used in 2020, 2021, and so

12 payments would have been directed at -- so, on the payment

13 processor to Vulcan without passing through any LPG

14 operating accounts.

15        MR. CUSIO:  And that was in 2021?

16        MR. DIAB:  Correct.

17        MR. CUSIO:   Did it ever happen with -- sorry --

18 Strategic Consulting?

19        MR. DIAB:  With Strategic Consulting no, but there

20 may have been -- there may have been one other entity that

21 had received those directed payments which was called

22 Lineman and Associates, but in reality, that was just a DBA

23 for World Global Fund, and World Global Fund was one of the

24 merchant cash advance companies that had given money to LPG.

25 And they also received directed payments that never passed

129

1   through any LPG account, and I have no interest in that

2   entity, but they were a sizeable financier of LPG during its

3   growth.

4           MR. CUSIO:  There was a dispute between LPG and

5   World global, correct?

6           MR. DIAB:  Correct, a substantial one that arose

7   in April of 2022.

8           MR. CUSIO:  What was the amount at issue in that

9   dispute?

10          MR. DIAB:  So, similar to Merrich Bine, we didn't

11  get firm numbers.  Our understanding is that something in

12  the neighborhood of $10 million was collected from World

13  Global using various DBA's.  Money was collected direct from

14  LPG clients.  It was not authorized.  They called it a

15  payment processing error, but essentially on April 7th and

16  8th of 2022, World Global initiated debits of virtually all

17  LPG clients.  They essentially tried to pull payments from

18  almost all LPG clients on dates that were not authorized.

19  The clients had not had a payment due on those dates, but

20  the money was pulled anyway.  The dispute resulted with

21  World Global issuing a refund to the clients.  At least as

22  far as we know they issued refunds to all the clients that

23  were affected, but we don't have any confirmation that that

24  was the case because some of our clients would not notice a

25  payment and wouldn't necessarily contact us to report the

130

1  additional payment, but it was our understanding that they

2  had refunded all the clients, but this dispute was the month

3  of April 2022, and it was roughly $10 million the amount in

4  controversy.  Out of that, we think the vast majority was

5  returned to clients.  We just don't have confirmation.

6          MR. CUSIO:  Was there ever a dispute with World

7  Global or what LPG claimed that World Global owed LPG money?

8          MR. DIAB:  Could -- could you ask that again?

9          MR. CUSIO:  Sure.  Was there ever a dispute where

10 LPG claimed that World Global owed LPG money?

11         MR. DIAB:  Yes.  So, both prior to and after this

12 payment processing error, LPG believes that World Global has

13 collected money that was due to LPG that wasn't being

14 remitted through.  Whether it was being held as a reserve or

15 simply not being reported, there was money that was supposed

16 to come to LPG that didn't, and that was before the payment

17 processing error.  After the payment processing error, there

18 was money due to LPG for the damage that was caused by World

19 Global's conduct, and that damage included additional

20 employee time and overtime.  It included refunds that had to

21 issue beyond the amount that was taken from clients to make

22 the clients whole.  For instance, somebody misses a car

23 payment, and now they have extra fees, and we have to make

24 them whole for that.  This is not the client's fault that

25 they couldn't make the payment.

131

1          We also lost a tremendous number of clients, and

2 we -- so, we demand compensation for the clients that it

3 canceled.  We also at that time lost our BBB rating, which

4 had been an A plus.  We went to a no rating which impacted

5 our ability to onboard new clients.  So, that was the range

6 of damage caused by the April disaster, and we demanded

7 compensation after April.  We never received it.

8          MR. CUSIO:  LPG filed a lawsuit against World

9 Global, is that correct?

10          MR. DIAB:  Correct.  It was filed under seal in

11 the Eastern District of New York and subsequently dismissed

12 for lack of diversity jurisdiction.  We didn't have the

13 membership of the LLC.  And, so, we couldn't show that there

14 was complete diversity between all of the members of the

15 World Global, LLC and Litigation Practice Group, and for

16 that reason, the court in the Eastern District of New York

17 declined to exercise diversity jurisdiction.  It is our

18 intention to refile in California, but we -- we have not yet

19 refiled.  We still have another 11 months to be able to file

20 that action, but we have not yet filed any action against

21 him.

22          MR. CUSIO:  And do you -- is it LPG's intent still

23 to file that action?  Is that another adversary proceeding?

24          MR. DIAB:  We have discussed resolution with the

25 members of World Global, and that's still a discussion

132

1 that's ongoing.  If we can't resolve things amicably, which
2 seems to be the case, then that would be added to the list
3 of adversaries that we would file.  We had a conversation on
4 that subject as recent as this past Friday with one of the
5 members of World Global.  So, we're still pursuing
6 resolution, but it doesn't appear likely, in which case that
7 would be an additional adversary.
8         MR. CUSIO:  Do you -- do you personally receive
9 compensation from a company called Prime Logix, L-O-G-I-X?
10        MR. DIAB:  No.  So, I don't receive any
11 compensation from Prime Logix, but I believe it's spelled L-
12 O-G-I-X.  Is that what you said?
13        MR. CUSIO:  Yes.
14        MR. DIAB:  Yes.  So, Prime Logix, which is a
15 Wyoming entity I don't have an interest in and I haven't
16 received any payments from that entity.
17        MR. CUSIO:  And what does Prime Logix do?
18        MR. DIAB:  Prime Logix was affiliated with the Law
19 Firm Gallant Law Group, which was the law firm that had
20 Robert Tobia (phonetic) as its principal.  Robert's an
21 attorney licensed in Pennsylvania who works out of an office
22 in Philadelphia, and prime would provide support in the form
23 of customer service, mail processing, payment processing,
24 and -- and other functions to Gallant, and then that ceased
25 when Gallant essentially was folded maybe December of 2022,

133

1 December, January.  Might have been January 2023.

2        MR. CUSIO:  Just -- just to clarify one thing, you

3 said that Prime Logix was affiliated with Gallant.  Does

4 that mean that -- are you using affiliate as there's common

5 ownership or the way you were using it earlier, that they

6 were working together?

7        MR. DIAB:  They were working together.  Prime

8 would have been the contracted party receiving payment from

9 Gallant, which was the party seeking assistance with

10 processing, but affiliation only in that they were working

11 together, and there was a financial arrangement, though,

12 overlapping ownership.

13        MR. CUSIO:  When money would go from the processor

14 to Vulcan without going through LPG, why would the money not

15 go through LPG?

16        MR. DIAB:  Well, it was a few different reasons.

17 One was the logistics of it.  There were delays, and

18 sometimes some payments had to be made on these cash advance

19 positions by Vulcan, and it couldn't delay because threats

20 were being made about filing TRO's, freezing bank accounts,

21 sending direction letters to vendors, et cetera.  And, so,

22 for expedience, we would sometimes send the money direct to

23 Vulcan to release to these cash advance companies.

24 Sometimes it was just a function of the bookkeeping that

25 when the money would go to LPG first, there was bookkeeping

*Briggs Reporting Company, Inc.*

134

1  activity for the incoming revenue and then the outgoing

2  payment, and sometimes that would create delays but then

3  also create difficulties in how we recorded the transactions

4  between LPG and Vulcan after the transfer.  So, to make it

5  easy, we would do the transfer direct.  This wasn't sizable.

6  It wasn't raising millions of dollars.  It was probably a

7  few hundred thousand, but they were at points in time when

8  there was some time sensitivity, some urgency that required

9  the money to move fast, but that would be the -- sort of the

10 two-part reason, the bookkeeping and then the -- the need

11 for speed.

12          MR. CUSIO:  Mr. March, how long have you been the

13 only lawyer employed by LPG?

14          MR. MARCH:  Probably February of this year,

15 possibly even March.

16          MR. CUSIO:  As of the date of filing the

17 bankruptcy, were you the only attorney?

18          MR. MARCH:  Yes, that was actually working, yes.

19 I think there were a few attorneys -- there were still

20 attorneys working for LPG.  I don't know if they received

21 compensation.  As of March 17th, I think that was the last

22 one, amount that was paid to any attorneys at all at LPG,

23 including myself.

24          MR. CUSIO:  You said earlier -- I'm sorry.  I

25 don't remember if this was Mr. March or Mr. Diab -- that LPG

135

1 started losing employees in October and November of 2022.

2 Did I get that right?

3          MR. DIAB:  By -- sorry.  This is Tony, and I made

4 the statement earlier.  By choice, yes, we terminated

5 employees in the Las Vegas, Nevada office over the course of

6 October, November of 2022, and that was part of --

7          MR. CUSIO:  So, that --

8          MR. DIAB:  -- the (indiscernible).

9          MR. CUSIO:  Okay.  I want to make sure I

10 understand this correctly.  I believe you said that at the

11 peak, LPG had 67,000 active clients.  Is that correct?

12          MR. DIAB:  Correct, meaning a combination of

13 paying and completed payment clients, yes.

14          MR. CUSIO:  Payments and completed.  So, some of

15 these were not making payments any longer.  Were you still

16 -- was LPG still doing work on their behalf?

17          MR. DIAB:  Exactly.  So, we have clients that

18 complete the payments, sometimes early or sometimes on

19 track, but they have -- we have a lot that stretch well

20 beyond the completion of the payment stream.  And, so, we

21 may be handling a lawsuit for a year or two years after the

22 payments are finished.  We regard that as active because we

23 are continuing to do work, but there's no more payments

24 being made by the client.

25          MR. CUSIO:  And did I understand correctly that

136

1  the 400 to 600 California clients LPG still has, they have

2  completed their payment obligations, but LPG still has work

3  to close out those files, is that correct?

4         MR. DIAB:  That's correct.

5         MR. CUSIO:  And then the 67,000 active clients,

6  was that the number at the end of 2022?

7         MR. DIAB:  Yeah, that would have been -- so, that

8  -- that peak would have been somewhere around December 2022,

9  January 2023, that highwater mark.

10         MR. CUSIO:  And you said that a number of clients

11 had decided not to -- had decided -- I'm going to use the

12 word drop out.  That's not the right word but are no longer

13 working either with LPG, Oakstone, CLG or Phoenix, correct?

14         MR. DIAB:  That's correct.

15         MR. CUSIO:  And approximately what percentage of

16 th -- the 67,000 are -- decided to not work with any of

17 those entities?

18         MR. DIAB:  It would be that 5,000 figure that

19 we're aware of, meaning that was known to us before any

20 transfers were completed.  There were also subsequent

21 cancellations by clients who didn't want the transfer and

22 voiced that to the new law firm.  I don't have firm

23 statistics on that, but I would imagine it's probably

24 another 5,000.  So, probably 10,000 total clients out of the

25 67 that opted against transfer, either before or after the

137

1   transfer was completed.

2          MR. CUSIO:  Okay.  All right.  Just a second.

3   When -- you said that there were about 15,000 files that

4   were associated with Pec. How were those associated with

5   Pec?

6          MR. DIAB:  Pec had obtained some right to

7   receivable from the files, meaning it was entitled to some

8   percentage of the payment stream of those 15,000 clients,

9   and that was by virtue of a combination of receivable

10  purchases that Pec or a related entity had done.  Pec was

11  related to entities under the names 2Z, Carousel, and G2CC,

12  but it was a combination of receivable purchased by Pec and

13  then voluntary agreement between LPG and Pec to assign

14  receivables as a way of making Pec whole and satisfying the

15  obligations that LPG had under its promissory note to Pec

16  Corp.

17         MR. CUSIO:  Okay.

18         MR. DIAB:  What I would style an in-kind transfer.

19  Instead of money paid to Pec Corp., we gave them a right to

20  receivable, and Pec Corp. accepted that as satisfaction of

21  the obligation.

22         MR. CUSIO:  So, Pec received the right to the

23  receivable to get income stream, and then the files were

24  transferred to Oakstone, correct?

25         MR. DIAB:  Correct.  And, just to be clear, it was

138

1 a percentage, not the entire payment stream, but a

2 percentage of the payment stream on those files, but that is

3 correct.

4        MR. CUSIO:  There was a UCC1 filed in -- on

5 February 2nd of 2023 by First Corporate Solutions, and it

6 identified your Debtor as the Litigation Practice Group, and

7 it identifies a list of about 15,000 accounts.  Is that the

8 -- or is that list the list of accounts that were the

9 receivables for Pec?

10        MR. DIAB:  I'm not -- I'm not certain, but I

11 believe so.  I know that Pec filed a UCC1.  I didn't know

12 whether they filed it direct or used an agent, but if it was

13 15,000 files listed, then in all likelihood, that was the

14 Pec UCC1 filing.

15        MR. CUSIO:  Is LPG doing anything to oversee the

16 work that Oakstone, CLG or Phoenix are doing?

17        MR. DIAB:  Yes, minimal oversight just by virtue

18 of the fact that we have very few hands on deck at LPG, but

19 we do have access to the CRM's for the three entities to be

20 able to see client files and when clients call in to lodge

21 complaints regarding the new servicing, we're able to see

22 what servicing has been completed and send messages to those

23 law firms about the complaint that we're receiving from the

24 clients.  We continue to have -- so, LPG has the office now

25 with Dan, Olga and Carl.  And, so, a lot of these are coming

139

1  in by way of email. And, so, we have some clients that will

2  call in and talk with Dan or Olga but other clients that

3  would email and then the message is relayed to the new firm.

4  If it's by email, usually by me, saying client so and so is

5  saying they can't get a call back on this case. Can you

6  please contact them? So, we have that minimal oversight and

7  the ability to communicate regarding client concerns, and

8  that's sort of the limit of the participation at this point.

9         MR. CUSIO: What is -- you mentioned CRM. What is

10 that?

11        MR. DIAB: CRM is the -- essentially, it's all the

12 client data that's kept in one location. The LPG CRM was

13 called Debt Pay Pro. It was a Centric CRM. It's network

14 based, and it would house all data regarding the clients.

15 So, it would have the case file. It would have all the

16 clients' personal data, including credit reports. It would

17 have their payment information, whatever they were using to

18 make their payments to us. All the correspondence that we

19 received on behalf of the client or from the client would be

20 stored there. And then notes are kept on every client

21 communication. So, every time there's a call, an email or

22 letter, we record the content of the client communication

23 under the note section. It's sort of a one-stop shop for

24 all information related to the client representation, and

25 each of the other firms also have CRM that performs a

140

1   singular function.  For some you've got (indiscernible).

2   For others they use proprietary systems but we have access

3   to the CRM for each of those three entities with regard to

4   LPG clients.

5          MR. CUSIO:  Did Debt Pay Pro track money that was

6   pulled from the clients' accounts?

7          MR. DIAB:  Yes.  Debt Pay Pro had a system for

8   tracking client payment information.  The payment processes

9   were either API'd into Debt Pay Pro so that the payment

10  processor would speak to Debt Pay Pro directly and

11  automatically update client information.  Others who didn't

12  have that direct connection would send information in TSC

13  files, Excel files, and then would take that data and

14  populate it into Debt Pay Pro.  But, either way, the client

15  payment information was updated in Debt Pay Pro using one

16  method or the other.

17         MR. CUSIO:  And does LPG still have Debt Pay Pro?

18         MR. DIAB:  Our access to Debt Pay Pro was cut off

19  at the time that we filed the petition.  DebtProPay

20  terminated our access just before the filing of the

21  petition, if memory serves.  I think they had terminated

22  access on Friday afternoon, and we filed the petition on

23  Monday, but we had not had access to our DebtPayPro since

24  that time, although we did have a backup with all of the

25  DebtPayPro data that we can still access, but we're

141

1 accessing the backup that was pulled (indiscernible)

2 DebtPayPro has as of I think it's March 17th.

3          MR. CUSIO:  What is the CRM that Oakstone uses?

4          MR. DIAB:  Oakstone was using a combination of

5 Freshworks and Freshsales which are CRM's that Eng had

6 found.  Eng is from Pec Corp.  He had found those as

7 platforms that he liked, and then they were also using a

8 proprietary system that -- that is not a public CRM.  It's

9 available for purchase.  So, they had the combination of the

10 proprietary system and then this Freshworks, Freshsales, and

11 then Eng was also building his own CRM, although I think

12 that project has now stopped, and but that's what Oakstone

13 was using.  CLG uses DebtPayPro, and it's a very similar

14 platform to the DebtPayPro version that we were using.  So,

15 DebtPayPro was very convenient.

16          MR. CUSIO:  And then what does Phoenix use as a

17 CRM?

18          MR. DIAB:  They use the same proprietary system.

19 So, the Oakstone system is a combination of Freshworks,

20 Freshsales.  It is a proprietary system.  Phoenix is just

21 using that proprietary CRM system that was written by

22 developers at -- at Phoenix.

23          MR. CUSIO:  And, so, Phoenix is sharing its system

24 with Oakstone?  Is that what I understand, the proprietary

25 system?

142

1          MR. DIAB:  Yeah.  I mean, I believe that Oakstone

2  pays for a license to utilize that CRM right now, but that's

3  correct that it's -- in part, because Oakstone is using

4  other platforms as well, but in part, they're utilizing that

5  system.

6          MR. CUSIO:  Who is Israel Orozco, O-R-O-Z-C-O?

7          MR. DIAB:  He was one of the attorneys at LPG.  He

8  was a California licensed attorney.  And, so, he had worked

9  on the California docket of cases at LPG.  He also had

10  helped with some of the FDCPA cases that another attorney,

11  Richard Meyer (phonetic), was handling at -- at LPG.  But he

12  is a California attorney.

13          MR. CUSIO:  And when did he stop working for LPG?

14          MR. DIAB:  So, formally he stopped in March along

15  with everybody else, but I think even to the present day he

16  continues to consult with Dan regarding matters.  He's

17  finishing out client files even though he's not being paid

18  because he's counsel of record in the cases, and I think he

19  still communicates with Dan about his California docket to

20  make sure each one of those cases is concluded.  I'm not

21  sure how many he was still handling, but my understanding is

22  he was still working on them as recent as last week, but his

23  formal employment ended in -- sometime in March, along with

24  everybody else.

25          MR. CUSIO:  How many lawyers are working for LPG

*Briggs Reporting Company, Inc.*

143

1  in that kind of context?

2          MR. DIAB:  Well, that's a good question.  So, how

3  many of the lawyers are still handling cases even though

4  they're not being compensated?  I think that's -- probably a

5  lot of the attorneys that were employed by LPG are finishing

6  out cases that had been assigned before the termination of

7  their employment or before they quit, and that's obviously

8  because of the Rules of Professional Conduct in every state

9  that limit the circumstances in which an attorney can

10 withdraw from a case.  And if you've got a $2,000 collection

11 case, the judge doesn't want to see a motion to withdraw.

12 They want to see a settlement.  So, I think it's probably a

13 fair number, although I don't have statistics on that.

14         MR. CUSIO:  On the 15,000 client files that Pec

15 had an interest in the receivables for, what is the document

16 that shows Pec had that interest in those specific -- those

17 specific client files?

18         MR. DIAB:  I believe it was a receivable purchase

19 agreement that was executed as satisfaction of the

20 promissory note that LPG had given to Pec Corp, but the

21 actual document itself would have been style a receivable

22 purchase agreement.

23         MR. CUSIO:  What is Grayson Law Center?

24         MR. DIAB:  Grayson was one of the platforms that

25 Eng had been throwing around as a potential other platform

144

1  to onboard clients.  My understanding is they're not

2  operational.  In fact, I believe that with all of the

3  accusations that were being made against Oakstone, the

4  thought was that new clients would be onboarded to a

5  different platform and not commingled with the LPG pipeline,

6  but that was a plan that my understanding hadn't gotten off

7  the ground to date, and I don't believe that they're still

8  trying to get that off the ground.  That would -- that would

9  be the function that it was supposed to serve, for new

10 clients that are unrelated to any LPG transfer.

11         MR. CUSIO:  Back in about October, there was a

12 transfer of receivables to StratCap (phonetic).  Why were

13 those receivables transferred to StratCap?

14         MR. DIAB:  There was no receivable transferred to

15 StratCap.  StratCap had sent an agreement to try to document

16 receivable purchases for the files that Validation Partners

17 had purportedly acquired, and I say purported because it was

18 an open question about whether Validation Partners had

19 documented all of the receivables that they had actually

20 purchased.  And, so, Russ put together the list of what he

21 thought were all the Validation Partners' receivables that

22 were purchased.  He wanted to execute a document and file a

23 UCC1 to sort of preserve the position of the Validation

24 Partners Investors, but he immediately upon filing, he

25 received objections from every different direction, and we

145

1 never proceeded with the agreement, meaning he never paid

2 the consideration that was due.  He never received any

3 payments on those files.  The actual transfer never took

4 place, but at least his desire to do a UCC1 filing to

5 perfect the interest in those files, in order to do so, you

6 have to have an underlying security agreement.  His fear was

7 lawsuits on individual investors claiming that Wes and Russ

8 as the co-managers of Validation Partners had failed to

9 fulfill their fiduciary duty because they had taken in

10 almost 70, 80 million dollars worth of money to buy

11 receivables, but they didn't perfect a single receivable

12 purchase.  And in that sense, in a proceeding like this,

13 they're treated as unsecured creditors, and Russ thought

14 that would create substantial liability for him as an

15 individual.  At that point in time, Russ had essentially

16 kicked Wes out of Validation Partners.  So, Wes couldn't do

17 anything to help Validation Partners perfect the interest of

18 the investors.  So, Wes was trying to do that but failed,

19 but he never received any payment pursuant to that

20 agreement.  He never paid the consideration called for by

21 the agreement.  In my understanding, he was withdrawing his

22 UCC1 filing, although I don't know if that's happened to

23 date.

24        MR. CUSIO:  After Mr. Thompson stopped being the

25 member of Litigation Practice Group, did he continue doing

146

1 work for Litigation Practice Group?

2      MR. DIAB:  He was listed as counsel of record on

3 certain cases.  And, in his position as counsel of record, I

4 don't know that he withdrew immediately upon relinquishing

5 his title of managing shareholder.  So, there was probably

6 matters that were active and lingered a few months after his

7 transition out as the head attorney at LPG.  But, again,

8 when you're listed on a docket, you'll stay there until some

9 form of motion is made, but I don't believe he engaged in

10 any actual after (indiscernible) after he transferred his

11 shares to Dan.

12      MR. CUSIO:  Did he continue to have access to an

13 LPG email account?

14      MR. DIAB:  I believe he did, and I believe he

15 still had access to the CRM.  I don't know that he ever

16 utilized it, but I believe he still did have some form of

17 login.  I don't know that John ever actually logged in,

18 though.

19      MR. CUSIO:  I want to make sure I got this

20 correct.  Did you say that Scott Eadie is the owner of

21 Oakstone?

22      MR. DIAB:  Correct.  My understanding is he is

23 sole shareholder and managing attorney for Oakstone.  So,

24 he'd be the sole owner.

25      (Pause.)

147

1          MR. CUSIO:  Did LPG default on its note with Pec?

2          MR. DIAB:  No.  LPG was still in compliance with

3  the terms of the Pec note at the time that it negotiated the

4  satisfaction of the note by virtue of the receivable

5  assignment.

6          MR. CUSIO:  Now, the -- you were asked some

7  questions about this earlier.  There's $120 million that's

8  listed in -- as accounts receivable over the last 90 days.

9  As I understand what you explained, that $120 million was

10 your expectation of the 20 percent -- the 20 to 40 percent,

11 20 percent with Oakstone and Phoenix and 40 percent with

12 CLG, that you expect LPG is going to receive, correct?

13         MR. DIAB:  Correct.

14         MR. CUSIO:  And then you had said that it's now

15 closer to 60?

16         MR. DIAB:  Correct.  Both were estimates.  And, as

17 you said, the strike between the 120 figure and the 60

18 figure is fallout from the transfer.  It resulted in a lot

19 more nonperformance than we anticipated.  Nonperformance

20 meaning a combination of cancellations and then clients that

21 aren't responsive and not making payments, which is

22 potentially going to turn into a cancellation.

23         MR. CUSIO:  So, when you mentioned the

24 approximately 10,000 cancellation, that was just official

25 cancellations?  Is that what I understand?

148

1       MR. DIAB:  Correct.  It doesn't include what I'll

2  call an NSF client, a client who had a bounced payment and

3  hasn't made an election of whether they're terminating the

4  agreement or not.  That number would be much larger,

5  probably another six to eight thousand clients, rough

6  estimate, but probably something like six to eight thousand

7  that are not performing and not responding.

8       MR. CUSIO:  So, if -- but if you had estimated 120

9  and now you're saying it's 60 million, that's about a 50

10  percent drop, right?

11       MR. DIAB:  Roughly 50 percent drop, correct.

12       MR. CUSIO:  But that only represents about 20,000

13  clients?

14       MR. DIAB:  Correct, and there were probably I

15  would say in the neighborhood of the high 40's, low 50's in

16  terms of performing clients at the time that -- that all

17  this began, so probably maybe about 40 percent of the

18  clients that would be in that nonperforming category, 40

19  percent of the formerly performing that are now not

20  performing.

21       In terms of determining receivable, though, some

22  clients are early in their contract and some are late.  And,

23  so, not every cancellation is going to have the same dollar

24  value.  A client that has two payments left versus a client

25  that has 20 payments left, I think would be weighted

149

1 | differently.  But those are rough estimates.  They're not
2 | precise figures.
3 |       MR. CUSIO:  Okay.  I -- sorry.  Hold on just a
4 | second.  Are -- Mr. Diab, are you an owner of Validation
5 | Partners?
6 |       MR. DIAB:  No.  I was -- so, Validation Partners
7 | was owned by a couple of entities.  One of the entities was
8 | StratCap, which is an entity that West Thomas owns, and Wes
9 | sort of cut me into half of his entity, but I'm not myself
10 | or through any entity that I own an owner in StratCap, which
11 | is the indirect owner of Validation Partners, but I was
12 | treated as the same thing, meaning, I was treated as though
13 | I was essentially like one-quarter of Validation Partners.
14 | That was from the beginning of Validation Partners, they
15 | would treat me in that capacity and in that sense, sort of
16 | an informal participant for Validation Partners.
17 |       MR. CUSIO:  What do you mean you were treated as
18 | an owner, a 25 percent owner?
19 |       MR. DIAB:  Meaning I didn't actually -- sorry.
20 | Meaning I didn't actually own anything.  There's nothing I
21 | could sell.  I can't go to the bank and send a wire.  I
22 | can't sign a document.  I can't sell a share, but I was
23 | treated as though I could.  I was treated as though I was
24 | one-fourth of the same, and Russ, to his credit, was always
25 | very gracious in treating me in that same manner, as though

150

1  I were an actual owner, somebody who could actually do

2  something like sell a share, send a transfer.  So, that's

3  what I mean by informal.

4       MR. CUSIO:  Was Pec's promissory note with LPG

5  perfected?

6       MR. DIAB:  My understanding is that he did perfect

7  with the filing of the UCC.  I don't think that he filed it

8  under Pec Corp.  I think he filed it using an agent like a

9  CT Corp., but my understanding is that he did perfect it by

10  filing a UCC1.

11      (Pause.)

12      MR. CUSIO:  Okay.  I do not have additional

13  questions at this point.

14      MR. EDELMAN (telephonic):  This is Daniel Edelman.

15  I represent Carolyn Beach in the Mississippi litigation, and

16  I have some questions.

17      When Validation Partners' counsel was asking

18  questions, he referred to merchant cash advance companies.

19  Can you explain what these companies did and identify them?

20      MR. DIAB:  Yes.  So, merchant cash advance is a

21  receivable purchase.  It's styled a cash advance, but it's

22  actually just a purchase of receivables where the company

23  will buy a receivable at a factor rate.  A common factor

24  rate is a 149.  So, we would sell those dollars in

25  receivables.  We would receive them -- sorry.  We would sell

151

1  (indiscernible) in receivables.  We would only receive a
2  million dollars but have to pay $1.5 million.  So cash
3  advance is an expensive form of financing.  It almost always
4  takes the form of receivable purchase and comes along with
5  UCC1 filings and any enforcement mechanisms that are
6  available under Article 9 of he Uniform Commercial Code.  A
7  merchant cash advance companies -- sorry.  One step back.
8          LPG throughout its history has never been able to
9  qualify for financing from financial institutions, likely
10 because of the conflict of interest because we have
11 litigations for both plaintiff and defendant with every bank
12 in the country and almost every credit union.  And, so, we
13 really don't have the option to do financing through any
14 means other than receivable purchase.  Validation Partners
15 was a receivable purchase entity, but these cash advance
16 companies out of New York are also receivable purchasers,
17 and so the -- the names of receivable purchasers in New York
18 that we interacted with, World Global Fund was a large one,
19 Diverse Capital, Bridge Funding, Highbar Capital, Cobalt --
20         MR. EDELMAN:  I'm sorry.  What's the one you just
21 said?
22         MR. DIAB:  Highbar Capital, and then after that I
23 said Cobalt Funding Solutions, Cobalt, C-O-B-A-L-T.  There
24 was Clear Fund Solutions.  There was Clean Funding.
25         MR. EDELMAN:  Clean Funding?

152

1          MR. DIAB:  -- Capital -- yes, Clean Funding, Park

2  East Capital, EIN Capital.

3          MR. EDELMAN:  Can you spell -- what is this EIN

4  entity?

5          MR. DIAB:  EIN Capital, like an EIN number, is for

6  identification, but it was called EIN and then second word

7  Capital.

8          MR. EDELMAN:  Okay.

9          MR. DIAB:  There was Fundura, F-U-N-D-U-R-A.

10  There was MNS Funding, just the letters MNS and the second

11  word Funding.  There was Vertex, V-E-R-T-E-X.  And then I'm

12  trying to think of additional ones.  Green Fund was an

13  additional one.  And then MCA Cap, just the letters MCA and

14  then second word CAP.  I believe that's all of them -- I'm

15  sorry.  One more with a litigation in Florida, .69, LLC.

16          MR. EDELMAN:  .69, LLC.  Is there a list of the

17  names and addresses of these entities some place?

18          MR. DIAB:  Yeah.  The UCC1 filing in California,

19  the California Secretary of State maintains a listing of all

20  the UCC1's that were filed.  Each one of these cash advance

21  companies had filed a UCC.  Some are active.  Some are

22  terminated, but you'll see the exhaustive list there, and I

23  may have left some off.

24          MR. EDELMAN:  Okay.  You also mentioned some

25  receivable purchases.  Other than the merchant cash advance

153

1  companies, to whom did LPG sell receivables?

2          MR. DIAB:  So, LPG had I believe two different

3  receivable purchase agreements with Validation Partners,

4  LLC.  Validation Partners only attached one such agreement

5  to their complaint, but I believe that there is a second.

6  We're reviewing our records.  So, we had twice sold

7  receivables ourselves, meaning LPG sold receivables to

8  Validation Partners.  There was also a receivable assignment

9  to Pec Corporation.  It wasn't in exchange for money.  It

10 was in exchange for satisfaction of a promissory note, but

11 there was a conveyance of receivables to Pec Corporation.

12 And then that would be it in terms of the actual receivables

13 that LPG sold.

14          There were also receivables that parties that LPG

15 interacted with, they would also sell their receivables, but

16 that wasn't a contract with LPG.  That's a contract with a

17 third party, usually third party marketing companies, but

18 that's not -- not us.

19          MR. EDELMAN:  Okay.  What are these marketing

20 companies to which you refer?

21          MR. DIAB:  These are companies that locate and

22 onboard clients for LPG.  So, somebody opts in to receive,

23 you know, assistance with their debt, they get on the phone

24 with somebody.  They start talking through options, and the

25 person will say that LPG is a good fit based on your

154

1  circumstances, and then there's compensation for the cost of

2  the lead, for the time spent on the phones, for the customer

3  service function that's provided after the sale.  These

4  companies would follow up and communicate with clients,

5  quality assurance and quality control measures.  So, they're

6  compensated for all these things.  We refer to them as

7  marketing affiliates, but they're essentially sales floors

8  that -- that do marketing for LPG.

9        MR. EDELMAN:  How many of these marketing

10 companies or affiliates are there?

11       MR. DIAB:  Over the years, we've had probably more

12 than 100 that we've worked with.  Some of them have sent

13 just one client.  Some have sent 10,000.  But there's a lot

14 of different companies we've worked with.  A lot of times

15 the companies will approach us and say essentially we'd like

16 to do work.  We'd strike an agreement.  It lasts for a

17 certain period of time.  There's a lot of turnover.  So,

18 these marketing companies usually will run campaigns for a

19 period of time and then move on to something else, but well

20 over 100 that we've worked with over the course of our years

21 of existence.

22       MR. EDELMAN:  Is there a list of these marketing

23 companies somewhere?

24       MR. DIAB:  Yeah.  LPG -- we -- we maintain a list,

25 and that's something we could provide if we needed to.

155

1          MR. EDELMAN:  Okay.  What is the general

2 compensation arrangement between LPG and the marketing

3 companies?

4          MR. DIAB:  It's changed over the years.  We record

5 different models.  But typically we're paying for the work

6 that's done in onboarding clients, and that -- that

7 onboarding function sometimes there will be additional

8 follow up after the contract is signed and the client is

9 enrolled.  But, essentially for -- it's payment for all the

10 different services that are rendered.  It starts with the

11 lead itself.  Then there's the sales function, which is

12 hourly time on the phone that he sells that to the clients,

13 and then there's the function after the sale, which is the

14 QA function, the QC function, ensuring that the client

15 understood what they signed up for, doing follow-up calls

16 several days later to reiterate what it is that they've

17 signed up for, how it works.  It's compensation for all

18 these different functions that it performed.

19          MR. EDELMAN:  Do the marketing companies transmit

20 the LPG client agreement to the client?

21          MR. DIAB:  The LPG CRM's that would transmit the

22 agreement.  So, there were employees, and there were

23 contractors that were inside of the CRM generating and

24 sending these e-signature documents to clients, and some of

25 them -- some of these contractors may have been marketing

156

1  companies.  That's correct.

2         MR. EDELMAN:  Okay.  Did the marketing companies

3  receive a percentage of the revenue stream from the client

4  or a fixed amount of money for a lead or how did that work?

5         MR. DIAB:  So, over the course of the five years

6  or so that we ran this, whether it was through LPG or

7  through predecessor law firms, essentially we would employ

8  different models.  Some of them are flat fees.  Some of them

9  are a percentage of the debt that's enrolled, and some of

10 them were a percentage of the revenue stream, which we're

11 not doing at this time.  We're not doing any onboarding at

12 this time, but we have tried to get away from that model,

13 but over the years of doing business, we've pegged it to

14 every different variable there is.

15         To your point, to be direct, there were times when

16 we were paying a percentage of the receivable.

17         MR. EDELMAN:  Do you recall who the largest

18 marketing companies were?

19         MR. DIAB:  I believe the largest was All Service

20 Financial, who I think is also on the phone through counsel,

21 has a dispute with us.  And I think in the end, All Service

22 is the biggest (indiscernible) that was a really sizable

23 litigating, GoFi, GoFi, G-O-F-I, and they are multiple

24 companies.  And they were also sizable kind of enrollments.

25         MR. EDELMAN:  And who were the one or two that you

157

1 mentioned previously?

2          MR. DIAB:  I'm sorry.  Could you say that again?

3          MR. EDELMAN:  Before GoFi, you mentioned one or

4 two large marketing companies.

5          MR. DIAB:  Yes, all --

6          MR. EDELMAN:  Can you repeat that?

7          MR. DIAB:  -- Service Financial.  Yeah.  So, it

8 was three words, All Service Financial.  They were the first

9 really large marketing company we worked with, and I think

10 they're still the largest today out of everybody.

11          MR. EDELMAN:  And that's the letter L Service

12 Financial?

13          MR. DIAB:  No.  All, so A-L-L, All Service

14 Financial.

15          MR. EDELMAN:  Oh, All.  Okay.  And what's your

16 third one?

17          MR. DIAB:  Those would be the two largest.  I

18 would say the next largest was a company called Paragon

19 Financial.  Paragon spelled P-A-R-A-G-O-N, and Paragon also

20 was -- was very sizable in terms of the onboarding that they

21 did, probably be the third largest.

22          MR. EDELMAN:  Do you know -- do you recall how

23 GoFi was compensated?

24          MR. DIAB:  GoFi never had a contract with LPG.  We

25 never formalized the terms, but they would receive a one-

158

1 time payment for the service of onboarding a client, the

2 payment range on the low end maybe $1100, on the high end

3 maybe $1640, $1700, or something in that range for the

4 service of getting a client from the point of lead to sale

5 to onboarding.  But we never had a formal agreement.

6          MR. EDELMAN:  Okay.  How was All Service Financial

7 compensated?

8          MR. DIAB:  At the time that All Service did its

9 agreement, a gentleman who's now passed away, named Brian

10 Really managed that relationship, and I don't know the terms

11 that were worked out with All Service, but that was back in

12 the Coast Processing days, so when BAD was still actively

13 managing a lot of these marketing relationships, and I

14 believe that Brian had worked out a share between Coast

15 Processing and All Service, but that's all conjecture on my

16 part.

17          MR. EDELMAN:  And Paragon Financial, how were they

18 compensated?

19          MR. DIAB:  GoFi and the same sort of arrangement

20 where LPG never had a contract with them, but we would work

21 through month by month in terms of compensation for the

22 service that they were actually performing, and the Paragon

23 relationship probably started in November of 2021 and

24 probably ended November of 2022.  I don't think we've

25 received anything from them since.

159

1          MR. EDELMAN:  Does the name Integrity Docs, LLC

2 mean anything in terms of relationship with LPG?

3          MR. DIAB:  Yeah.  Integrity Docs is a marketing

4 company that we've worked with at certain points in time.  I

5 believe I know the principal of Integrity, but I know that

6 Integrity was a marketing company, yes.

7          MR. EDELMAN:  Do you know how they were

8 compensated?

9          MR. DIAB:  That I don't know.  I know that they

10 were small, meaning they didn't do a lot of volume.  They

11 didn't have a ton of -- of clients, but they did onboard

12 clients, and I don't know the terms that they had.

13          MR. EDELMAN:  Does the name Vercy, V-E-R-C-Y, LLC

14 mean anything to you?

15          MR. DIAB:  Yes.  Vercy like Integrity, was an

16 affiliate that onboarded.  They onboarded around the same

17 time that Integrity was doing so, and generally they had a

18 -- essentially, it was an arrangement where they were paid

19 up front for the work that they did, but I don't know the

20 exact terms for Vercy's contract.

21          MR. EDELMAN:  Okay.  Does the name Debt Validation

22 Fund 2, LLC mean anything to you?

23          MR. DIAB:  Yeah.  I believe that that's the fund

24 that Dave Zuck managed.  They raised money and gave money to

25 Validation Partners to purchase receivables.  I believe

160

1 that's the entity.

2       MR. EDELMAN:  Okay.  Is there a Debt Validation

3 Fund 1?

4       MR. DIAB:  Yes.  Debt -- again, if I remember

5 correct, Debt Validation Fund 1 would have been a direct

6 purchase of receivables that Dave Zuck did with Coast

7 Processing at the time where they would purchase I believe

8 it was All Service Financial clients and receive the

9 receivable from those clients in exchange for a payment that

10 was made, but that was not through Validation Partners.

11 That was something Direct that Dave did or his fund did with

12 the Coast Processing entity, if memory serves.

13       MR. EDELMAN:  Does the name MCDVI Fund 1 and 2,

14 LLC mean anything to you?

15       MR. DIAB:  Yes.  That would be the entities

16 managed by Ryan and Sean McKenna.  They had made investments

17 into Validation Partners, same purpose.

18     (Pause.)

19       MR. EDELMAN:  Does the name Flight Form, LLC mean

20 anything to you?

21       MR. DIAB:  Yes.  That was an entity that Eng Taing

22 had formed for the purpose of developing technologies that

23 would service clients in this industry.  It never got off

24 the ground.  My understanding is it never had any

25 transactions, never did any development.  It was identified

161

1 in a deposition that was taken in late January. And, as a

2 result, Eng I think decided not to proceed with that

3 project, but that was a -- a company that he had formed for

4 the purpose of developing tech related to this industry,

5 this industry being unsecured debt.

6        MR. EDELMAN: Does the name City Capital New York

7 mean anything?

8        MR. DIAB: Yeah. So, City Capital was a multi

9 cash advance company that issued I believe the -- the last

10 of all the cash advances. That cash advance would have been

11 in February of this year, 2023, and they were a creditor,

12 received one payment, and then the filing took place, and

13 they're -- they're currently a creditor of LPG.

14        MR. EDELMAN: Are there documents or files which

15 show the terms of LPG's dealings with these various merchant

16 cash advance companies?

17        MR. DIAB: Yes. For each one we have a receivable

18 purchase agreement that was executed. Those receivable

19 purchase agreements have a security instrument underlying

20 the UCC1 filings for these entities, and we have those for

21 each one of the entities that I've referenced.

22        MR. EDELMAN: Those are all the questions that I

23 have.

24        MR. KHANG: Queenie, this is Joon Khang --

25        MS. SCHULMAN: This is Amy Schulman from

*Briggs Reporting Company, Inc.*

162

1  Pennsylvania --

2          MR. KHANG:  We've been going for

3  about --

4          MS. SCHULMAN:  -- the Attorney General --

5          MR. KHANG:  Hold on.  Hold on.

6          TRUSTEE NG:  Mr. Kahn, go ahead.

7          MR. KHANG:  I have a question real quick.  This is

8  Joon Khang.  Yeah, we've been going for about three and a

9  half hours.  I don't know how many more creditors are on the

10 line who are going to ask more questions.  But I didn't

11 anticipate we were going to be on this call all day.

12          Is there any point that we can either cut this off

13 or continue this meeting, because, you know, unfortunately,

14 there are other matters that need to be tended to today as

15 well.  So, Queenie, is there something we can do about that?

16          TRUSTEE NG:  Well, I would like to give, you know,

17 other creditors a chance to ask questions today because

18 they --

19          MR. KHANG:  Right.

20          TRUSTEE NG:  -- waited for a long time, and I

21 think it's only, you know, the fair thing to do.  Can I just

22 get an idea of how many creditors are planning to ask

23 questions?  I know the Attorney General just --

24          MS. SCHULMAN:  Amy Schulman from the Attorney

25 General's Office in Pennsylvania.  I have just a few quick

163

1 questions.

2          TRUSTEE NG:   Okay.  And anyone else intends to ask

3 questions?

4          MR. STOCKHOLD:   Yeah.  This is Matthew Stockhold

5 on behalf of Debt Validation Fund 2, MCDVI Fund 1 and MCDVI

6 Fund 2.  I have a few follow-up questions on the schedules.

7          TRUSTEE NG:   Okay.  Anyone else?

8          MR. WHITE:   And then this is Frank White.  I

9 represent Maverick Bank Card.  I have just a small handful

10 of questions for Mr. Diab.

11          TRUSTEE NG:   Okay.  All right.  Anyone else?

12      (No response.)

13          TRUSTEE NG:   So, I think, Joon, there are only

14 three more creditors who would like to ask questions.  If

15 your client needs a break, a short break, I'll be happy to

16 do that.  Do you -- is that what you need or, otherwise, we

17 can just go ahead and, you know, ask -- let those three

18 creditors ask questions since they waited a long time as

19 well.

20          MR. DIAB:   I would prefer to just finish the

21 questions.  I don't need a break at this time.

22          TRUSTEE NG:   Okay.  Why don't we go from the order

23 of --

24          MR. MARCH:   Okay.  All right.  Let's go forward,

25 yeah.

164

1          TRUSTEE NG:  Okay.  Thank you so much.

2          MR. WHITE:  This is Frank White.  I have a small

3   handful of questions, and also I have to drop off in about

4   15 minutes.  I'm wondering if everyone can indulge and let

5   me go first.  It won't take more than a couple of minutes.

6          TRUSTEE NG:  That's fine with me.  I hope that's

7   fine with the Debtor as well.

8          MR. KHANG:  That's fine.

9          TRUSTEE NG:  Thank you so much, Counsel.

10          MR. WHITE:  Thank you.

11          Mr. Diab, again, my name is Frank White.  I

12   represent a company called Maverick Bank Card, which at

13   least until the petition date was doing some volume of

14   credit card processing for the Debtor.  I'm just wondering

15   if you're familiar with that relationship?

16          MR. DIAB:  Yes.  My understanding is that Maverick

17   would do the actual processing that approved the EquiPay and

18   was just a broker sitting in between, but I'm familiar with

19   Maverick, yes.

20          MR. WHITE:  Okay.  And are you aware whether the

21   Debtor is currently doing any processing through Maverick at

22   all?

23          MR. DIAB:  Zero processing as of March the 20th.

24   Should be zero processing.

25          MR. WHITE:  Okay.  Is there any reason why that --

*Briggs Reporting Company, Inc.*

165

1 the processing agreement between the Debtor and Maverick

2 can't be consensually rejected?

3          MR. DIAB:  I don't see any reason, no.

4          MR. WHITE:  Okay.  Then I'll just -- I'll reach

5 out to Mr. Khang later this week to see if we can't just

6 consensually arrange for that.  That's all I needed to know.

7 Thank you.

8          MR. DIAB:  Thank you.

9          MS. SCHULMAN:  If anyone wouldn't mind, this is

10 Amy Schulman from the Attorney General's Office.  I just

11 have some very quick questions, and I also have to jump off

12 the -- as well.

13          TRUSTEE NG:  Go ahead, Ms. Schulman.

14          MS. SCHULMAN:  Okay.  So, again, I'm calling from

15 the Pennsylvania Attorney General's Office here in

16 Pennsylvania, and we have received several complaints from

17 consumers who allege they paid LPG for debt settlement

18 services that were not provided.  So, I have a few questions

19 stemming from this.  Number one, where should we be sending

20 the complaints?  We had previously sent them to LPG for

21 purposes of mediation, and those complaints were not

22 responded to, and I would like to get a response to those

23 complaints.

24          MR. DIAB:  The best is if you could send it by

25 email.  Is that possible if I give you an email address?

*Briggs Reporting Company, Inc.*

166

1          MS. SCHULMAN:  Okay.  Should I send them to --

2    yes, you or your counsel, just --

3          MR. DIAB:  If it's okay, it would be direct to us,

4    and it would be attention to Dan March and Tony Diab, and it

5    would be the email address, admin, A-D-M-I-N, @lpglaw.com.

6          MS. SCHULMAN:  Okay.  Next question, given the

7    fact that these accounts have largely been -- have been

8    transferred, can you identify the affiliated law firms here

9    in Pennsylvania that have received transfer of Pennsylvania

10   accounts?

11         MR. DIAB:  The -- the attorneys that are licensed

12   in the State of Pennsylvania that would be handling the

13   accounts from this universe of cases would be Jordan Kurth

14   (phonetic), Kelly Adams --

15         MS. SCHULMAN:  Can you -- I'm sorry.  Can you

16   spell these?

17         MR. DIAB:  Yes.  So, Jordan, J-O-R-D-A-N, Kurth,

18   K-U-R-T-H.  He's the first.  Kelly Adams is the second, K-E-

19   L-L-Y and then Adams, A-D-A-M-S.  The third would be Robert

20   Tobia.  Last name is spelled T-O-B-I-A.  And then the fourth

21   would be -- give me one second.

22       (Pause.)

23         MS. SCHULMAN:  And if you don't have the names, I

24   can follow up by way of email.  I don't want to hold

25   everyone up.

167

1          MR. DIAB:  So, for the fourth one, I'll follow up
2  by email in response, yes.
3          MS. SCHULMAN:  Okay.
4          MR. DIAB:  Thank you.
5          MS. SCHULMAN:  Next quick question.  Did anyone
6  from LPG ever meet in person or face to face with
7  Pennsylvania consumers in connection with these debt
8  settlement services?
9          MR. DIAB:  Yes.  Employee Jordan Kurth, our
10  attorney in the State of Pennsylvania, would have had a lot
11  of face-to-face meetings.  It would not have been with every
12  Pennsylvania client but with a certain portion of that
13  population.  So, Jordan would be the only LPG employee to
14  have met face to face.  There was a contractor, the fourth
15  law firm, that I can't recall at the moment.  They would
16  also have had meetings, but they were contractors of LPG,
17  not employees.
18          MS. SCHULMAN:  Okay.  Do you have any sense of how
19  many of the accounts entered into with LPG were with
20  Pennsylvania consumers?
21          MR. DIAB:  I would say the Pennsylvania pipeline,
22  again, at its peak was probably -- probably 2,000 to 2500
23  clients I would imagine, no more than that.
24          MS. SCHULMAN:  And I just want to confirm that LPG
25  is no longer soliciting business in Pennsylvania, is that

168

1 correct?

2           MR. DIAB:  That's correct.

3           MS. SCHULMAN:  Okay.  And those are all my

4 questions today.  If for some reason additional questions

5 come to mind I'll reach out to that address at

6 admin@lpq.com.  Thank you everyone.  I really appreciate it.

7           TRUSTEE NG:  Thank you.  Thank you, Ms. Schulman.

8           MR. STOCKHOLD:  Hi.  This is Matt Stockhold

9 appearing on behalf of Debt Validation Fund 2, MCDVI Fund 1,

10 and MCDVI Fund 2.  I have a few follow-up questions.

11           On Schedule B, going back to the receivables for

12 $120 million, was any portion of that included in the $155

13 million dollar amount of revenue reported for 2022?

14           MR. DIAB:  No.  It should not have been.  It

15 should have been separate from that.

16           MR. STOCKHOLD:  And, along the same lines, is any

17 of that amount reported as part of the $30 million for the

18 first three months of 2023?

19           MR. DIAB:  Yes.  So, part of what was collected in

20 -- in 2023 may have overlapped with the $120 million figure.

21 The exact dollar amount of overlap I'm not sure, but there

22 would have been some overlap, yes.

23           MR. STOCKHOLD:  On the statement of financial

24 affairs, it says the gross income for the first three months

25 was $30 million.  Is that accurate?

169

1        MR. DIAB:  Correct.  But included in that figure

2   is payments processed by Merrich Bine and retained by

3   Merrich Bine and not sent to LPG.

4        MR. STOCKHOLD:  And of those amounts, are those

5   included in the receivables?

6        MR. DIAB:  There would have been some overlap

7   between the receivable quote of $120 million and payments

8   that would have been collected in March, but the amount of

9   overlap I'm not sure, but they would have been sent.

10        MR. STOCKHOLD:  Also on Schedule B you listed

11   $120,000 for a customer list.  What's the basis for that?

12        MR. DIAB:  So, in terms of viewing what LPG has as

13   a -- as an asset, something potentially of value, when you

14   review the matter, one thing that LPG possesses are client

15   data for clients that did not sign up for LPG services,

16   people that were in one way or another sold but didn't sign

17   up.  And, so, if we were to take that data, pool it and sell

18   it, we think that the estimated value would be $120,000.  We

19   don't think the State Bar would let us do it, but we

20   reported that as a potential asset since we didn't have time

21   to resolve the question of whether that type of sale of opt-

22   in data was permissible, but that's what we're referring to

23   would be a sale of leads of people that did not sign up for

24   client -- for LPG services, but we have their opt-in to

25   receive solicitation regarding debt resolution.

170

1        MR. STOCKHOLD:  Did you obtain an appraisal of the

2 value of that list or is that something that you determined

3 internally?

4        MR. DIAB:  That's based on what marketing

5 companies tell us they would pay for records for opt-in

6 methods, meaning a client that is saying they want help with

7 unsecured debt.  This is what you would do, for instance,

8 pay for records, but it was determined by us anecdotally.

9 It was not appraised.

10        MR. STOCKHOLD:  On Schedule D, which lists

11 creditors who have secured claims, the first creditor on the

12 list is Diverse Capital, LLC in the amount of approximately

13 $1.2 million.  What's the basis for this claim?

14        MR. DIAB:  We -- we dispute the claim, but Diverse

15 Capital has entered into a settlement agreement with LPG.

16 LPG believes that it performed under the settlement

17 agreement.  Diverse believes that we did not perform.  And

18 on the basis of nonperformance, the original obligations

19 spring back into existence.  And, so, they're saying the

20 balance due after applying all payments on the

21 (indiscernible) is that $1.1, $1.2 million figure, but that

22 is predicated on a breach of the settlement agreement, and

23 we deny that there was any breach of that agreement, but

24 that's where they calculate the figure.  That's what would

25 be left over after applying all payments, including

171

1  settlement payments, to the original contractual obligation.

2  The balance owed would be that number that they quoted.

3          MR. WHITE:  Did they file a UCC1 financing

4  statement?

5          MR. DIAB:  Diverse did.  They filed it I believe

6  in December of 2021, but they filed it long ago.

7          MR. WHITE:  Do you know what they listed as

8  collateral in that statement?

9          MR. DIAB:  All accounts receivable of LPG was --

10  that's the standard language that was used in those UCC1's.

11          MR. WHITE:  Moving on to the next creditor, City

12  Capital New York, the amount of the claim is approximately

13  $2.9 million.  Is that a similar arrangement?

14          MR. DIAB:  No.  So, in the case of City Capital,

15  that was an advance that was taken in February while we were

16  trying to get through the period of time where payments were

17  being collected by Merrich Bine and not remitted to LPG.

18  So, we took a cash advance from Star Capital in February.

19  Despite that cash advance, we weren't able to stay afloat,

20  and so we defaulted on that position, but that was a new

21  agreement in February with Star, and it was an agreement

22  that we admittedly defaulted on.  We made one payment of

23  $50,000, and no other payments were made.

24          MR. WHITE:  And that was February of 2023?

25          MR. DIAB:  Correct.  That's when that position was

172

1 taken and the loan payment was made.

2          MR. WHITE:  Do you know if City Capital recorded

3 UCC1?

4          MR. DIAB:  They -- I do not believe that they did,

5 but I believe that they're related to an entity called BMS

6 Advance, LLC that did have a UCC1 previously recorded.  My

7 belief is that they're utilizing the BMF UCC1 that an

8 assignment took place, but I don't have verification of

9 that.  That's simply my belief in terms of how this industry

10 operates.

11          MR. WHITE:  Does the Debtor dispute this claim?

12          MR. DIAB:  No.  I don't believe that we have a

13 dispute as to the balance or the -- the claim.  There may be

14 a dispute as to whether it's cured because we don't know

15 whether it was perfected, but that would be the only open

16 question, not the balance or not the fact that it was a

17 default.

18          MR. WHITE:  To the extent that the Debtor plans to

19 challenge the validity or perfection of the lien, did you

20 amend the schedule to list it as disputed?

21          MR. DIAB:  Yes, we did.

22          MR. WHITE:  The next creditor on this is Fundura

23 Capital Group, listed as disputed, amount of $2.1 million.

24 Do you know if Fundura recorded a UCC1?

25          MR. DIAB:  Fundura recorded a UCC1 after the

*Briggs Reporting Company, Inc.*

173

1  initiation of litigation.  They filed suit in August of

2  2021, and we filed a counterclaim.  It didn't have a UCC1

3  filing.  They attempted to utilize the UCC1 of a related

4  company called Bridge Funding, but Bridge Funding's UCC had

5  been satisfied by a settlement.  The settlement was

6  consummated, paid in full, and the UCC1 of Bridge was

7  withdrawn.  When Fundura realized that -- that Fundura --

8  I'm sorry.  When Fundura realized that Bridge didn't have a

9  valid UCC1 on file, they attempted to file late.  They filed

10  in October I believe of 2021, but we're disputing that UCC1

11  as invalid.  It came after the filing of the lawsuit and

12  after we had successfully disputed the Bridge UCC1.  So, our

13  position is that it's an unsecured -- it's an unsecured

14  position that Fundura has, but also Fundura is an actual

15  loan.  Their receivable purchase agreement was paid in full,

16  and they attempted to do a no net renewal.  They attempted

17  to do a refinance where they simply increased the balance

18  that was owed.  That's not valid under New York law in our

19  position.  And, so, we're actually anticipating getting

20  money back from them.  We believe we overpaid them.  But on

21  the UCC issue, we don't believe they have a valid UCC1

22  filing of their usual filing, the filings they made in

23  October of -- of '21.

24          MR. WHITE:  Do you know what they listed as the

25  collateral securing the lien?

174

1          MR. DIAB:   It would have also said all accounts

2  receivable current and future.

3          MR. WHITE:   Does the Debtor anticipate filing an

4  adversary proceeding to challenge this claim?

5          MR. DIAB:   We already have -- so, we have the

6  active (indiscernible) claim.   We intend on removing the

7  action from New York State Court to this court, and so that

8  removal would likely be filed in the coming weeks.

9          MR. WHITE:   There are a number of creditors that

10 filed UCC1 financing statements that are not listed on

11 Schedule D.   So, I'll go through those just to see if the

12 Debtor's aware of them or what the relationship is.

13          Are you aware of an entity called Liberty Fund

14 Group?

15          MR. DIAB:   Yes.   Liberty had a position that was

16 satisfied in full.   THAT UCC1 should have been withdrawn.

17          MR. WHITE:   And you mentioned earlier StratCap

18 Management, LLC also appears to have filed a UCC1.   Do you

19 know what the status of that is?

20          MR. DIAB:   I believe they're withdrawing the UCC1,

21 but the underlying security agreement was never consummated.

22 So, it wouldn't be a valid UCC1 in any event, but I believe

23 they're withdrawing that.

24          MR. WHITE:   How about Franklin Capital Management,

25 LLC?

*Briggs Reporting Company, Inc.*

175

1          MR. DIAB:  Franklin Capital was a company that we

2 discussed a loan with.  They filed a UCC1 before any

3 documents were executed.  They asked us not to proceed with

4 it, but they never withdrew their UCC1 filing.  So, again, I

5 think it's an invalid UCC1 for lack of underlying security

6 agreement.

7          MR. WHITE:  Everyday Funding Group?

8          MR. DIAB:  Everyday Funding would have been an

9 entity related to Park East Capital and MCA Cap.  They did

10 have a position.  It was satisfied in full.  The UCC1 was

11 supposed to be removed as a result of that settlement.

12          MR. WHITE:  Are you familiar with Green Fund New

13 York?

14          MR. DIAB:  Yes.  Again, that was an entity with

15 which we settled.  We settled in full.  They were supposed

16 to terminate the UCC.  They never did.

17          MR. WHITE:  And you mentioned earlier World Global

18 Fund, LLC.  Are you aware of their UCC1 statement?

19          MR. DIAB:  Yes.  World Global had a UCC1 that was

20 filed, and a related entity, MNS Funding, had a UCC1 that

21 was filed.  Both have been satisfied.  I take that back.

22 World Global has been satisfied in full.  That one should

23 have been terminated.  MNS has a dispute as to whether

24 there's a balance still owed.  They haven't taken any action

25 on that, but they allege that there's a balance owed, and

176

1  that's why they're refusing to withdraw the UCC1 that

2  (indiscernible) between us and MNS.

3        MR. WHITE:  Is there a reason the Debtor did not

4  include MNS Fund in its Schedule D?

5        MR. DIAB:  No.  That's just an oversight.  We'll

6  have to add them based on what they're claiming is still

7  owed.  So, that's one that would have to be added.  We do

8  believe we satisfied it, but they -- I mean (indiscernible)

9  that's included in the amended schedule.

10        MR. WHITE:  What about MCA Capital Holdings, LLC?

11        MR. DIAB:  That is another entity that we had a

12  resolution.  We paid them in full.  They were supposed to

13  terminate their UCC1.

14        MR. WHITE:  BMF Advance?

15        MR. DIAB:  Similarly satisfied in full.  They had

16  filed a dismissal of the action in New York State Court

17  (indiscernible), but they still have their UCC1.  We believe

18  that City Capital is going to borrow that UCC1 and that's

19  why they haven't terminated, but they haven't formally

20  stated that to us.

21        MR. WHITE:  Would you amend the Schedule D to add

22  them then?

23        MR. DIAB:  BMF is not the one with the position.

24  Star Capital is, and so Star Capital -- not Star Capital,

25  sorry -- City Capital.  City Capital is listed as a -- as a

177

1 creditor, and City Capital is the one that would be using

2 the UCC1 to enforce the City Capital loan or advance I

3 should say.

4          MR. WHITE:  (Indiscernible) Franklin Capital

5 Management, LLC.  What about Franklin Capital Group, LLC?

6          MR. DIAB:  It's the same entity.  They filed two

7 different UCC's, but we didn't proceed with either entity as

8 a -- as a creditor.  So, they don't have any underlying

9 security agreement.

10          MR. WHITE:  And the next one is OHP LPG, LP.  Are

11 you familiar with that entity?

12          MR. DIAB:  Yes, but OHP had purchased receivables

13 of marketing companies, third parties, not of -- of LPG.

14 So, they shouldn't be filing a UCC1 on LPG.  They should

15 file it on the -- the marketing companies themselves, but --

16 but I'm aware of who they are and the fact that they filed a

17 UCC1.

18          MR. WHITE:  What about Proof Positive, LLC?

19          MR. DIAB:  That's similar.  Proof Positive has

20 purchased affiliate receivables but filed a UCC1 on LPG even

21 though LPG is not a party to the Proof Positive security

22 agreements.  So, I think it was just an erroneous filing,

23 but we're aware of who they are and the fact that they've

24 filed a UCC1.

25          MR. WHITE:  Are you aware of the fact that Debt

178

1 Validation Fund 2, LLC, MCDVI Fund 1, LLC, and MCDVI Fund 2,

2 LLC filed UCC1 statements?

3          MR. DIAB:  Yes, I'm aware of those filings.  I

4 believe they took place in January.

5          MR. WHITE:  Is there a reason they were not -- is

6 there a reason they were not listed on Schedule D?

7          MR. DIAB:  So, those -- so, for two reasons.  The

8 underlying agreement had been breached before the filing of

9 the UCC1.  So, we don't believe that there's an underlying

10 security agreement that would rise to a valid UCC1 filing,

11 and at the second (indiscernible), we believe that that

12 filing was in the preference period, and we're going to

13 avoid it, but we consider them to be at most an unsecured

14 creditor and at least a debtor that owes us money for what

15 they took pursuant to those agreements that they breached.

16 That's our position on that subject.

17          MR. WHITE:  So, that was on Schedule F?

18          MR. DIAB:  I'm sorry.  Could you say that again?

19          MR. WHITE:  Did you list them on Schedule F?

20          MR. DIAB:  I know that they were listed on one of

21 the schedules, but I believe they were listed as an

22 unsecured creditor.

23          MR. WHITE:  You mentioned in your earlier

24 testimony a number of other entities such as .69, LLC, Green

25 Fund, Vertex, Highbar, Cobalt Funding.  Do any of those

179

1 entities have UCC1 financing statements on file?

2      MR. DIAB:  Yeah.  I think almost all of them have

3 UCC1 financing statements.  Some have terminated.  Some have

4 chosen not to terminate even though they should terminate

5 them, but I believe each one of those having a UCC1 at some

6 point.  A lot of the times they would file the UCC's under

7 CT Corporation, CFC or -- or some other agent for service of

8 process, but they -- so, they would file anonymously, but

9 they had UCC1's that are filed.

10      MR. WHITE:  But the Debtor took the position not

11 to list those on Schedule D?

12      MR. DIAB:  Yeah.  So, the -- the actual agreements

13 were satisfied.  There's no balance owed, and the UCC1's

14 that remain active are erroneous, should be terminated.

15      MR. WHITE:  Is there an employment agreement with

16 Mr. March?

17      MR. MARCH:  Yes.

18      MR. DIAB:  Mr. March -- and, yeah, his employment

19 with LPG, yes, he's got an employment agreement.

20      MR. MARCH:  Yes.

21      MR. WHITE:  Was there any amount owed to Mr. March

22 as of the petition date?

23      MR. DIAB:  Under -- as I said earlier, he was

24 shorted in the year 2022, but he voluntarily agreed not to

25 receive that additional compensation and in that sense is

180

1  not a creditor.  But he -- he was short in his -- his

2  contractual compensation for the year 2022.

3          MR. WHITE:  Does he intend to file a claim against

4  the Debtor?

5          MR. DIAB:  No.

6          MR. WHITE:  Is there any money owed to any

7  employees as of the petition date?

8          MR. DIAB:  Yes.  There are, I believe, two pre-

9  petition payrolls that were missed and one post-petition

10  payroll that was missed.  No, I take that back, now two.

11  So, two pre-petition and two post-petition payrolls that are

12  outstanding.

13          MR. WHITE:  And, Mr. Diab, the testimony earlier

14  was that somewhere around early 2021, you no longer received

15  compensation directly from the Debtor but it went through

16  the LLC's, and the reason for that was mentioned that it was

17  because it was Mr. Diab's background or to limit it.  Can

18  you provide more insight on that?

19          MR. DIAB:  Yeah.  One of the reasons was

20  background because of my disbarred status.  It raises

21  questions when my name appears on payroll records or any

22  other record.  So, we tried to eliminate that potential

23  source of prejudice against LPG by eliminating the use of my

24  name on -- on anything.  And, so, for that reason, the

25  payment would go to one of these LLC's, and then the LLC in

181

1  turn would pay me some portion.  But that decision was made

2  mostly because of the reaction that we would get when --

3  when that name was found on -- on a record.

4         MR. WHITE:  Before the disbarment, did you

5  practice law in California?

6         MR. DIAB:  Yes.  I was practicing law in

7  California and Nevada.  I had done so since 2010 in

8  California and 2012 in Nevada.

9         MR. WHITE:  And when -- when were you disbarred?

10         MR. DIAB:  Would have been -- it took effect in

11 January 2019.  I believe for both right about the same time

12 or right around --

13         MR. WHITE:  So, was that in California or Nevada?

14         MR. DIAB:  I believe they both entered orders --

15 sorry.  Nevada went first, but Nevada would have entered an

16 order right around January of 2019, and I think it was

17 actually February the 11th, 2019 that the -- that the

18 California Bar entered their involuntary inactive status,

19 and that's when LPG wanted to take over matters that I had

20 previously been handling.  This is now February 2019.

21         MR. WHITE:  So, what were the grounds for the --

22 what were the grounds for the disbarment?

23         MR. DIAB:  Both disbarments were related to the

24 same underlying representation.  It was the representation

25 of a (indiscernible) named Bashal Shamaria (phonetic) that I

*Briggs Reporting Company, Inc.*

182

1  was undertaken.  He was a Las Vegas resident, and the

2  representation was in Nevada under the Nevada rules.  There

3  was also one small civil matter in the State of California

4  that I was handling for Bashal, and I was doing those

5  representations moonlighting while I was at a firm.  So, I

6  was employed at Shakardi and Fagan as an attorney and then

7  handling this -- these group of matters for Bashal on the

8  side essentially, and it was going through that

9  representation that the Nevada Bar made their -- you know,

10  their findings and decided to charge.  And when they issued

11  their charging document, I took a default and choose to

12  allow the disbarment to take place in Nevada.  California

13  then came in with a reciprocal action.  After the disbarment

14  started in Nevada, California essentially said the same, and

15  I did the same thing where I took a default in the

16  California proceeding, chose not to participate, and the

17  default was entered right around February 11, 2019, and I

18  remember the date because we had a deposition that same day,

19  and it was the last deposition that I did, and then right

20  after that, the involuntary inactive set in.  And then about

21  a week later, LPG was formed.

22          MR. WHITE:  And LPG was formed to take over your

23  client files?

24          MR. DIAB:  Yeah.  So, essentially all the files

25  that were being handled by the entity as a sole

183

1  proprietorship called Diab Law, all those entities had to be

2  moved to another law firm.  And, so, John had agreed to

3  launch LPG primarily to handle the Debtor cases that are

4  still the LPG, you know, pipeline to this day.  In addition,

5  there were, I don't know, 40 or 50 other cases that LPG took

6  on, everything from wrongful death to intellectual property

7  to employment law.  And all those matters were taken over by

8  LPG, and it's something that the State Bar was informed of

9  at the time.  When the involuntary inactive status set in,

10 we had to find counsel in short order because no appearances

11 were permissible.  And, so, the cases were all moved from

12 Diab Law to LPG in February 2019.

13       There's another attorney in addition to John

14 Thompson named Clara Young that was handling a lot of the

15 cases for Diab Law, and she continues to handle them as an

16 employee of LPG.  And, so, those cases were continued.  The

17 same attorney was handling them, the -- the associate,

18 Clara.  And, so, she just moved from one firm to the other

19 and continued to handle those same batch of cases.

20       MR. WHITE:  Do you know if LPG has any liability

21 stemming from the disbarment?

22       MR. DIAB:  No.  There was no overlap on the

23 disbarment aspect, but there was some liability related to

24 some of the cases that were transitioned, which LPG resolved

25 years ago.  There's some clients at the point of transition

184

1  that didn't -- essentially they were complaining about the

2  representation that Diab Law had rendered.  But now that

3  they were represented by LPG, LPG satisfied the dispute and

4  essentially settled with the clients.  There was a handful

5  of them.  This happened back in 2019 when the files were

6  transferred, but nothing stretched beyond that in 2019, at

7  least not that I'm aware of.

8          MR. WHITE:  Was there ever a criminal referral

9  relating to this disbarment?

10         MR. DIAB:  No, none, in Nevada or California.

11         MR. WHITE:  Turning to the list of the creditors

12  that have the 20 largest unsecured claims, there are a

13  number there that are listed as disputed.  I know you listed

14  my clients' claims as disputed and gave the reasons why

15  regrettably they're disputed.  What about Merrich Banes?

16  There was a claim for $8 million.  What's the basis for that

17  dispute?

18         MR. DIAB:  So, Merrich Bine was owed money on

19  receivable purchase agreements (indiscernible), but based on

20  what (indiscernible) like the damage caused by the payment

21  processing dispute in February and March, we don't believe

22  that we continue to owe them.  We think, if anything, we're

23  a net creditor because the damage was substantial, but

24  that's a difficult matter to have to be litigated, but on

25  paper they would still be owed but for the fact that they

185

1 collected payments and refused to send that, those amounts

2 to LPG and, thereby, caused damage.  If you take that away,

3 they would still be owed an additional I think roughly $8

4 million.  I believe that they believe the number to be

5 larger.  So, that $8 million figure is disputed, but whether

6 anything is owed is also disputed on account of the conduct.

7 That will require an adversary proceeding to resolve.

8        MR. WHITE:  Validation Partners, LLC is listed as

9 having a $25 million claim that is disputed.  What's the

10 basis for that dispute?

11        MR. DIAB:  The $25 million figure came from the

12 complaint that Validation Partners filed, and the dispute is

13 twofold.  One is that we also have a credit against

14 Validation Partners for the assignment from Pec Corp. for

15 about $28 million, which would make Validation Partners a

16 net debtor, not a net creditor.  But separate from that, we

17 don't believe there's any support for -- we don't believe

18 there's any support for the $25 million figure.  We think at

19 most the amount that would be owed, forget about our

20 assignment and our claims, the amount that would be owed

21 would be around $14 million, maybe $15 million, not $25

22 million to Validation Partners.  That's based on their

23 actual contract.  So, it's a two-part dispute.  One is we

24 don't think the $25 million is correct.  We think that

25 they're a net debtor and owe money to LPG and to the

186

1  bankruptcy estate.

2      MR. WHITE:  Business Centers of America is listed

3  as disputed in the amount of $2.4 million.  What's the basis

4  for that dispute?

5      MR. DIAB:  Business Centers of America had an

6  agreement with Coast Processing, the entity that I

7  referenced earlier.  They never had an agreement with LPG,

8  but we believe that they were claiming that LPG owed them

9  money.  They subsequently filed a lawsuit and did not name

10 LPG.  So, they may also join in stating that LPG does not

11 owe them any money, but -- but the claim had been made by

12 Business Centers of America that they are owed $2.4 million

13 and that LPG has to pay it as the company servicing the

14 clients that were relevant to the receivable purchase that

15 Business Centers of America made.  So, we reported it as

16 disputed, but the nature of that dispute is that LPG never

17 undertook an obligation to Business Centers of America.

18 Another entity did, and we think that they agree by virtue

19 of the fact that they filed suit and did not bring LPG, but

20 they haven't stated it a release of LPG in any way.  So,

21 they still have a question about whether LPG is liable.

22      MR. WHITE:  The Debtor is also disputing a $1.4

23 million claim by J.P. Morgan Chase for a corporate credit

24 card.  What's the reason for that dispute?

25      MR. DIAB:  So, there's a dispute about what amount

*Briggs Reporting Company, Inc.*

187

1  was owed on the corporate credit card account that LPG has

2  to J.P. Morgan Chase.  We think that they're adding interest

3  and fees that they're not allowed to add to the balance that

4  was owed, and so we're disputing the amount.  We're not

5  disputing whether there's something owed, just how much is

6  owed as of today.

7      MR. WHITE:  The Debtor's also disputing a

8  approximately $250,000 claim for Outsource Accelerated,

9  Limited, an offshore call center.  What's the basis for

10  that?

11      MR. DIAB:  Yes.  Outsource Accelerated would bill

12  in advance before the services were rendered, sort of like a

13  retainer, and then they would pull from the amount as they

14  would render services.  We terminated their agreement, and

15  they still wanted us to prepay for a month of service even

16  though we weren't going to utilize them.  So, we disputed

17  the amount of the claim.  We think that they provided may 10

18  or 20 thousand dollars worth of service but not $250,000,

19  and they still wanted us to prepay the entire month, and we

20  believe it's because they were going to take that money and

21  keep it, but we didn't see any contractual right for them to

22  demand that amount.  So, that's the dispute there is that

23  they wanted to prepay even though we'd agreed they weren't

24  going to provide the services.  So, we weren't going to

25  prepay that amount.

188

1          MR. WHITE:  Net Suite Oracle is listed as being

2 owed $100,000 for bookkeeping software.  Why is that

3 disputed?

4          MR. DIAB:  Well, we attempted to switch from

5 Quickbooks to Net Suite in 2022.  The transition didn't

6 work, and Net Suite, who had assured us that it would,

7 continued to work with us for about six months and could not

8 get the data imported over.  It made our books a mess for

9 the year 2022, but because their platform didn't work, we

10 instructed them that we're not going to pay them, and we

11 switched back to Quickbooks.  I think -- obviously I think

12 that they're disputing that and they're still pursuing

13 collection, and that fee would have been their licensing

14 fee, but the licensing fee in our opinion (indiscernible)

15 because we didn't end up using Net Suite and because Net

16 Suite failed to import the information over to Quickbooks,

17 which caused substantial damage on the accounting side.

18          MR. WHITE:  Moving on to Schedule G, Executory

19 Contracts, besides the office leases and the lease with

20 Sharp Electronics, the Debtor listed some contracts with

21 California clients, but there are no other contracts listed

22 on Schedule G, for example, for the -- with the law firms

23 that the client files were transferred to or any other.

24          Is the Debtor going to amend Schedule G to include

25 all of its contracts?

189

1          MR. DIAB:   Yeah.   I believe the Schedule G is one

2    of the -- the schedules that would have to be amended.   So,

3    I do believe that an amended schedule will be filed.

4          MR. WHITE:   I have a few questions to finish up.

5    Does Mr. March, is he still working on the approximately 400

6    to 600 California cases that remain?

7          MR. DIAB:   Yes, he is.   He's handling those, and I

8    can allow him to speak obviously to that issue.

9          MR. MARCH:   Yes.   Yes, we are.

10          MR. WHITE:   And, as I understand from your prior

11    testimony, there's no current revenue stream for those

12    cases?

13          MR. MARCH:   That's correct.

14          MR. WHITE:   So, is the only monthly revenue from

15    the law firms that are paying 20 or 40 percent, is that

16    correct?

17          MR. MARCH:   Yes.

18          MR. WHITE:   And approximately how much each month

19    do you anticipate receiving from those firms?

20          MR. DIAB:   When the payments are processed, per

21    the usual, meaning they're out of the range of damage caused

22    by the payment processing dispute with Merrich Bane.   We

23    anticipate it will be roughly $2 million a month that would

24    come through from its resources.

25          MR. WHITE:   And of those $2 million, is the Debtor

190

1  entitled to all of those as earned fees or does a certain

2  amount of that pass through to other entities or, for

3  example, as part of -- you described three buckets of

4  services.  One was, you know, resolving debts on behalf of

5  individuals.  Does the Debtor provide services such as

6  collecting installment payments and then negotiating with

7  those clients' creditors to pay them off or does the Debtor

8  retain all those funds?

9        MR. DIAB:  All of those funds would be retained.

10 Those funds are earned services fees paid to these other

11 three law firms that would be passed through on this

12 referral agreement.  So, all of that money would be retained

13 by LPG and obviously available to fund a plan.

14       MR. WHITE:  So, based on the $2 million in

15 revenue, what's the net income per month do you estimate?

16       MR. DIAB:  Roughly $1.75 million, with the cost,

17 roughly $250,000.

18       MR. WHITE:  And the 90 days leading up to the

19 bankruptcy case, the Debtor generated approximately $30

20 million in income but only paid City Capital.  Is there a

21 reason no other creditors were paid during that period?

22       MR. DIAB:  About 12 to 14 million out of that 30

23 was being held.  And, so, that money wasn't available to us.

24 It's still essentially being held by Merrich Bine.  So, the

25 amount that was actually available to us was much less and

191

1 went towards operating expenses mostly in January, but the

2 reason that more wasn't paid to either City Capital or any

3 other creditor is that the money was used for operating

4 expenses, and roughly half of it is not in our possession.

5 It's being held by the processor.

6       MR. WHITE: And what was the basis for saying this

7 was an improper holding by Merrich Bine?

8       MR. DIAB: Merrich Bine is a creditor and a

9 payment processor. Under the agreement, they're permitted

10 to hold the money that was currently due and owing under

11 their creditor status as a receivable buyer, and the

12 remaining amount was supposed to be remitted to LPG. The

13 remaining amount wasn't remitted to LPG, and that's the

14 amount that we believe rightfully belongs to us and is being

15 withheld, in violation of the contract between the parties

16 and also violation of law. They don't have the right to

17 hold. And if you're going to hold in the payment process,

18 you're have to give notice to the individual clients that --

19 that the third party is holding the funds, and no such

20 rights were given to our clients that Merrich Bine was

21 holding funds of the clients. So, that's -- that's our

22 position on Merrich.

23       MR. WHITE: And in the year leading up to the

24 filing, Mr. March testified that he received approximately

25 $100,000 per month. Were there any other payments made to

192

1  officers or directors of the Debtor during that one-year

2  period?

3           MR. DIAB:  No.

4           MR. WHITE:  Did Mr. Diab receive any payments

5  during that period?

6           MR. DIAB:  During the year 2022?  No.  There were

7  -- (indiscernible) there were indirect payments made to

8  Strategic Consulting Solutions that were made back to LPG so

9  that it was a net zero at the end of the year.  So, for the

10 year as a whole, it was a net zero, but there was roughly

11 $480,000 sent to Strategic Consulting before it was sent

12 back to LPG.

13          MR. WHITE:  During that one-year were there any

14 payments made by the Debtor to any relatives of Mr. March?

15          MR. MARCH:  No.

16          MR. DIAB:  No.  I'm sorry.

17          MR. WHITE:  And same question for you, Mr. Diab,

18 any payments made to any of your relatives by the Debtor

19 during that one-year period?

20          MR. DIAB:  No.

21          MR. WHITE:  And were there any payments made to

22 any other insiders during the year leading up to the

23 bankruptcy filing?

24          MR. DIAB:  Did you say any other insider payments?

25 No.

193

1          MR. WHITE:  Those are all my questions for now.
2    Thank you.
3          TRUSTEE NG:  Thank you.
4          Are there any other creditors who would like to
5    ask questions?
6       (No response.)
7          TRUSTEE NG:  I just have a couple of follow-up
8    questions.  The Debtor indicated that they're moving to a
9    new address.  So, the Debtor needs to file a notice of
10   change of address with the Court with the new address.
11         The Debtor mentioned earlier that it missed two
12   pre-petition payroll.  I think that's what they said, and
13   then I don't recall seeing any employees listed in Schedule
14   E or F.  So, that looks like it has to be amended.
15         And, finally, I think the Debtor indicated that
16   Mr. March has an employment agreement with LPG.  I don't
17   think that's listed in Schedule G, and I'd also like a copy
18   of the employment agreement.  So, that's all the --
19         MR. MARCH:  Okay.
20         TRUSTEE NG:  -- information I have.  And I hear no
21   further response from anyone wanting to question the Debtor.
22   So, the matter is being concluded, and I want to thank
23   everyone for coming today.  I appreciate your help, Mr.
24   Khang and Mr. Diab and Mr. March.  Thank you so much.
25         UNIDENTIFIED SPEAKER:  Thank you.

194

1        MR. SHANKMAN (telephonic):  This is Paul Shankman.

2  I have a few questions.

3        TRUSTEE NG:  Okay.  Can you please go ahead.

4  Thank you.

5        MR. SHANKMAN:  Yes.  This is Paul Shankman of

6  Fordis, LLP, and I represent Creditor Outsource, which is a

7  provider of employee services to the Debtor.  We have filed

8  a claim, Number 13, for over $300,000.  I have just a few

9  questions.

10        The Debtor had mentioned that the payment

11  processors were holding I believe several million dollars

12  which the estate contends should be property of the estate

13  and contemplates acting towards recovering those moneys.  Is

14  that correct?

15        MR. DIAB:  Correct.

16        MR. SHANKMAN:  And is there any reason why over a

17  month has passed since the filing of the case and no action

18  has been taken before the Court to do so since that seems to

19  be part of the lifeblood of the restructuring of this

20  estate?

21        MR. DIAB:  We have two issues.  One was an attempt

22  to voluntarily (indiscernible) with Merrich Bine, and that

23  conversation has been ongoing.  The other is that LPG

24  doesn't have resources.  We don't have manpower.  We don't

25  have money.  And, so, it's difficult for us to do much of

195

1  anything right now, but it's a high priority for us to

2  proceed with these adversaries, but we are also in direct

3  discussions with (indiscernible) trying to resolve the

4  dispute.  We just haven't been able to do so.

5          MR. SHANKMAN:  How much is in the DIP account

6  presently?

7          MR. DIAB:  I believe the balance is $6,000 and

8  change if I remember correctly.

9          MR. SHANKMAN:  Okay.  Madam Trustee, I have no

10 further questions.

11         TRUSTEE NG:  Thank you so much?  Are there any

12 other creditors who would like to ask questions?

13     (No response.)

14         TRUSTEE NG:  Okay.  I hear no response, and so

15 this matter is being concluded.  Thank you again everyone

16 for coming today.

17         ALL:  Thank you.

18     (Proceedings concluded.)

19

20         I certify that the foregoing is a correct

21 transcript from the electronic sound recording of the

22 proceedings in the above-entitled matter.

23

24 /s/ Holly Steinhauer          5-17-23
   Transcriber                   Date

25