1   Christopher B. Ghio (State Bar No. 259094)
    Christopher Celentino (State Bar No. 131688)
2   Jeremy B. Freedman (State Bar No. 308752)
    **DINSMORE & SHOHL LLP**
3   655 West Broadway, Suite 800
    San Diego, CA 92101
4   Telephone:  619.400.0500
    Facsimile:  619.400.0501
5   christopher.ghio@dinsmore.com
    christopher.celentino@dinsmore.com
6   jeremy.freedman@dinsmore.com

7   Proposed Special Counsel to Richard A. Marshack

8

9                   **UNITED STATES BANKRUPTCY COURT**

10          **CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION**

11

12   In re:                                   Case No.: 8:23-bk-10571-SC

13   THE LITIGATION PRACTICE GROUP P.C.,      Adv. Proc. No. 8:23-ap-01046-SC

14          Debtor.                           Chapter 11

15   _____      **STATUS CONFERENCE REPORT**

16   RICHARD A. MARSHACK,                     Date:   June 12, 2023
     Chapter 11 Trustee,                      Time:   1:30 p.m.
17                                            Judge:  Hon. Scott C. Clarkson
            Plaintiff,                        Place:  Courtroom 5C
18                                                    411 W. Fourth Street
            v.                                        Santa Ana, CA  92701
19
     TONY DIAB, an individual; DANIEL S.
20   MARCH, an individual; ROSA BIANCA LOLI,
     an individual; LISA COHEN, an individual;
21   WILLIAM TAYLOR CARSS, an individual;
     ENG TANG, an individual; MARIA EEYA TAN,
22   an individual; JAKE AKERS, an individual; HAN
     TRINH, an individual; JAYDE TRINH, an
23   individual; WES THOMAS, an individual;
     SCOTT JAMES EADIE, an individual; JIMMY
24   CHHOR, an individual; DONGLIANG JIANG,
     an individual; OAKSTONE LAW GROUP PC;
25   GREYSON LAW CENTER PC; PHOENIX
     LAW GROUP, INC.; MAVERICK
26   MANAGEMENT, LLC; LGS HOLDCO, LLC;
     CONSUMER LEGAL GROUP, P.C.; VULCAN
27   CONSULTING GROUP LLC; B.A.T. INC. d/b/a
     COAST PROCESSING; PRIME LOGIX, LLC;
28   TERACEL BLOCKCHAIN FUND II LLC;
     EPPS; EQUIPAY; AUTHORIZE.NET; WORLD
     GLOBAL; OPTIMUMBANK HOLDINGS, INC.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

d/b/a OPTIMUM BANK; MARICH BEIN, LLC;
BANKUNITED, N.A.; REVOLV3, INC.;
FIDELITY NATIONAL INFORMATION
SERVICES, INC. d/b/a FIS; WORLDPAY, INC.;
WORLDPAY GROUP; MERIT FUND, LLC;
GUARDIAN PROCESSING, LLC; THE
UNITED STATES POSTAL SERVICE; and
DOES 1 through 100, inclusive,

Defendants.

The duly appointed Chapter 11 Trustee, Richard Marshack ("Trustee") submits the following status report ahead of the June 12, 2023 status conference in the above captioned Court. To date the following has occurred and/or been completed:

## INTRODUCTION

The Trustee has been available and working with Special Counsel on this case each day since 26 May 2023 from 6 a.m. until typically 11:00 p.m.  Special Counsel team members have reviewed tens of thousands of documents, handled thousands of emails and phone calls, reviewed and prepared pleadings, effected process, secured financial information and interviewed witnesses during the same hours as the Trustee made himself available.  This case is complicated but in one important sense, it is very simple: the labyrinth of illegal and unethical operation of LPG and all of its alter ego entities, including but not limited to OakStone Legal Group, P.C. ("OakStone"); Greyson Law, P.C. ("Greyson"); Phoenix Law Group, P.C. (Phoenix"); LGS Holdco., LLC; Maverick Management, LLC ("Maverick"); Guardian Processing, LLC ("Guardian"); Prime Logix, LLC ("Prime Logix"); BAT Inc. d/b/a Coast Processing ("Coast Processing"); Strategic Consulting Solutions, LLC ("SCS"); and Vulcan Consulting Group, LLC ("Vulcan")  over the last six to twelve months have greatly exacerbated the damage to the Consumer Creditors of LPG; yet, the immediate dismantling and shut-down of that business, instead of a reformation to a legally compliant one, virtually assures that LPG's Consumer Creditors and others harmed by these activities will NOT receive significant economic compensation but will have to rely on satisfaction in the form of some non-economic penalty imposed upon the wrong-doers.  It is with the protection of the Consumer Creditor at the forefront of the Trustee's approach that the Trustee submits this Status Report.

## PRIOR HISTORY AND FACTS ESTABLISHED SINCE LAST HEARING

1.      Prior to the Litigation Practice Group, PC ("Debtor") filing for Bankruptcy protection, Tony Diab and is associates, including Dan March, Eng Taing, Rosa Bianca Loli, Han Trinh, Jayde Trinh and a group of other non-lawyer managers started a series of affiliated companies, including but not limited to OakStone; Greyson; Phoenix; LGS Holdco., LLC; Maverick (the entity known as Gallant may have been in prior existence).  These entities were used to facilitate a transfer of revenue and client files in the face of pending litigation by Debtor's creditors and a series of Class Action

lawsuits, and in order to protect and syphon off the ACH pulls (as to which clients had only authorized LPG to withdraw funds from their accounts) to other existing or newly created entities, including but not limited to Vulcan and Prime Logix, among others.

2.    Throughout his short tenure as Trustee, Mr. Marshack's focus has primarily been to protect the consumers, their private data and prevent unauthorized ACH transactions and duplicate transactions that have been complained of after files were transferred to Phoenix and Oakstone, among others. To that end, on March 25, 2023, Trustee sought emergency relief in the form on order seeking a temporary restraining order, turnover of information and data, re-direction of mail and setting an order to show cause ("Emergency Order"). After considering the moving papers and evidence in support thereof and finding good cause and exigent circumstances the Court granted the Emergency Order subject to the court's ruling at the hearing, which was incorporated into the order signed by the Court on May 26, 2023.

3.    Virtually all of the named parties (except as noted below) subject to Trustee's adversary complaint were served with the summons, complaint, order appointing Richard Marshack as the Chapter 11 Trustee in this matter and the emergency Order on the Chapter 11 Trustee, Richard Marshack's Omnibus Motion entered May 26, 2023 ("Emergency Order") on or around June 2, 2023, with the exception of Defendants EPPS, Chris Winslow and Maria Eeya Tan.  A person named Hahn Trinh was initially served, however, Trustee has been contacted and informed the Han Trinh that was initially served is not affiliated with Debtor any of the other named entities; a substitute service was effected on the correct Han Trinh who has been served.  The proofs of service of which were filed on Friday, June 9, 2023, Docket Nos. 31, 34-37, 40-44.  The Trustee has not served the United States Postal Service ("USPS"), and upon reflection, intends to dismiss the USPS without prejudice; and seek to address the authority to change the mail address for the related entities per the USPS guidelines in the modified Preliminary Injunction being sought hereby.

4.    All non-parties subject to the Emergency Order were served on or about June 2, 2023; see Proofs of Service, Docket Nos. 31, 34-36, 41-42.

5.    On Friday, June 2, 2023, with the assistance of the Irvine Police department, a processes server and proposed special counsel for Trustee, and Lori Ensley of Bicher Associates

1  (application for employment by Trustee pending) employees of the Litigation Practice Group, PC

2  operating through Phoenix Law, PC, Prime Logix, LLC and Greyson Law Group were served, locked

3  out of the premises located at 3347 Michelson Drive, Suite 400, 410 & 420, Irvine CA 92612 and

4  informed of the turnover order and the role of the Trustee in the Bankruptcy matter to protect

5  Consumer Creditors, data and funds. Gary Depew of Resolution Processing, a consultant retained by

6  the Trustee to assist in the evaluation of the operations and data, employees of Greyson, Maverick

7  Management and Phoenix were informed of the purpose of their presence, to collect information and

8  make sure data systems and company property are secure for the benefit of LPG clients; as set forth

9  in the report of Mr. Depew maintained as a regular business record of the Trustee, there was no

10 communication that the Trustee was serving as a "Manager" but only that there was to be compliance

11 with the Court's order. See Declaration of Christopher Celentino ("Celentino Decl.") at ¶ 3. Mr.

12 Depew and Lori Ensley have remained exclusively in private offices affording them a view of the

13 employees of the various entities that remain in the premises in order to monitor the coming and going

14 of employees to ensure no loss of information or assets. *Id*. However, dissension among employees

15 who remain working to keep Greyson, Phoenix and Maverick running has been exacerbated by missed

16 payroll prior to June 2, 2023 and non-payment of subsequent payroll in the afternoon on June 2, 2023.

17 *Id*.  It is the Trustee's belief that persons enjoined by the TRO may have tried to shift the blame for

18 the missed payroll on the Trustee, but the details of the shenanigans concerning the payroll are set

19 forth in the Declaration of Jonathan Serrano, submitted herewith. As a result of these efforts the

20 Trustee was able to gain access to, freeze and preserve critical business and financial records, client

21 files, email accounts (including archives), bank accounts and ACH processing accounts, as detailed

22 below.

23      6.      The Trustee has gained access to and secured super administrative permission over

24 LPG and Phoenix's email accounts hosted on Microsoft 365 despite Mr. Diab's representations to the

25 Trustee no such access was available. Microsoft is further working to provide Trustee with super

26 administrative access rights to Oakstone and Guardian Processing's email accounts hosted through

27 the same service.

28 ///

7.      The Trustee has gained access to and secured super administrative permission over Debtor's Revolv3 and WorldPay software and accounts preventing any further unauthorized ACH transactions through these entities. As previously indicated, Mr. Diab had represented that neither he nor Debtor had access to any other ACH processing platforms or accounts other than at Equipay/Approvely who was holding approximately $653,000 which was needed to pay expenses, which apparently did not include payroll which was being paid through Vulcan Consulting and/or Prime Logix's Bank of America Accounts, or the Wells Fargo account in the name of Maverick Consulting, as discussed more fully in the Declaration of Jonathan Serrano submitted in support to Preliminary Injunction.

8.      To date, Trustee has not been given access to Debtor's Equipay/Approvely accounts, nor has the approximately $635,000 charged to Consumer Creditors been turned over to the Trustee. The Trustee, however, has frozen bank accounts at Bank of America held by Vulcan Consulting, Prime Logix and Gallant Law Group, including Vulcan and Prime Logix accounts from which payroll has been issued to employees ending in xxx 9021 and xxx 951. Bank of America has indicated they intend to provide and accounting of accounts and funds held, however, did not anticipate being able to provide such information by the time of the status conference on June 12, 2023. Based upon records secured from WorldPay, Trustee is informed and believes that the amount of such frozen funds in the aforementioned Bank of America accounts is more than $1.2 million dollars to date.  Trustee has also been able to secure monies in the amount of $239,197.01 in the form of a Cashier's Check made payable to the Trustee which came from a bank account in the name of Maverick, controlled by Defendant Rosa Loli, and maintained at Wells Fargo Bank.

9.      The Trustee has recently learned as a result of the Emergency Order that Oakstone's manager, Mr. Eng Taing, has the capability and is processing ACH transactions post-petition against LPG client accounts wrongfully transferred to Oakstone using a newly discovered ACH processing company, Payliance located in Ohio. In order to accomplish this, Mr. Taing created an account under Guardian Processing at Payliance. See Declaration of Jonathan Serrano ("Serrano Decl." at ¶ 7, **Exhibit 1**. In May of 2023, Mr. Taing by and through Guardian Processing and the ACH services of Payliance pulled $551,893.42 in ACH transactions on LPG client accounts that had been wrongfully

transferred to Oakstone Legal Group. *Id.* These funds were then transferred to a separate entity, Touzi Capital, Inc. with which Mr. Taing and his brother, Heng Taing, are involved and operating what has been described in complaints available online as a financial / cryptocurrency ponzi scheme. See Serrano Decl. at ¶ 8, **Exhibit 2**. According to Mr. Diab Mr. Eng "went rogue" after initially receiving transferred LPG files but having had a "falling out" with Mr. Diab and his team, necessitating the transfer of those Oakstone files elsewhere. Trustee believes additional fraudulent transfers of funds and ACH transactions similar to those described above have taken place and been initiated by Mr. Diab, Mr. Taing and/or others through various entities, including Guardian Processing, that have yet to be identified, but strongly support the necessary imposition of a preliminary injunction to attempt to curb such activity.  Also as set forth below, it appears that funds taken from consumer customers of LPG and diverted to Touzi Capital may have been used by Touzi Capital on more than one occasion to make payroll to attorneys and employees of the alter ego company known as Greyson; see Decl. of Jonathan Serrano, below.  All of these entities and individuals have been specifically identified by name in the Adversary Complaint and the Court's Emergency Order with the exception of Payliance. Mr. Eng Taing was properly served with the summons and complaint and Emergency Order.

10.    As detailed above, Oakstone remains the only entity Trustee has not been able to control. Mr. Taing continues to devise new ways to utilize legacy LPG client information, and withdraw funds from the LPG consumer's accounts without providing any known services. Although Mr. Taing has been served with the Court's Emergency Order, his activity has not stopped and he is knowingly acting in contempt of the TRO. Trustee's plan would be to stop that wrongdoing with modified or further court orders as necessary, including making a case and seeking imposition of an order for criminal contempt.

11.    The Trustee has served, secured and/or has access to all known ACH processing companies accounts, including EquiPay, LLC ("EquiPay"); Merit Fund, LLC ("Merit Fund"); Authorize.net a subsidiary of Visa, Inc. ("Authorize.net"); World Global; OptimumBank Holdings, Inc. dba Optimum Bank ("Optimum Bank"); BankUnited, Inc. ("BankUnited"); Marich Bein, LLC ("Marich Bein"); Revolv3, Inc. ("Revolv3"); Fidelity National Information Services, Inc. dba FIS ,

including but not limited to its subsidiaries Worldpay, Inc., Worldpay, LLC, Worldpay Group or any other subsidiaries providing ACH processing services ("FIS"). ACH Processing companies including EPPS and entities affiliated with the ACH identification transaction "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875" or any such substantially similar ACH identification transaction have yet to be identified. Guardian Processing, LLC appears to be under Mr. Taing and/or Mr. Diab's control and while it has been served, it has yet to be determined whether they have or intend to comply with the Emergency Order further necessitating a preliminary injunction. Trustee is in the process of serving Payliance with the Emergency Order and Order Appointing Richard Marshack as Trustee, and as discussed above further supports the necessity for a preliminary injunction.

12.    Despite Mr. Diab's representations to Trustee that Debtor does not have access to the Luna customer relationship management software ("CRM"), Trustee was provided access to the Luna CRM for Phoenix and Greyson, which appears to contain legacy LPG client files, after being served with the Emergency Order in an effort to preserve client files and that software processes currently in place continue to function. This includes daily IT maintenance to the Luna CRM and other related components. Trustee has spoken to and is currently working with Amazon Web Services to gain access to any other domains for Maverick, Gallant, Oakstone, Prime Logix and/or any others in order to ascertain the location of LPG client files and preserve the data. Based on Trustee's preliminary review of the thousands of documents turned over and Declarations obtained concerning the same, CLG and Gallant appear to be operating law firms that have other operations and client accounts that are not affiliated or pertain to LPG or the siphoning of LPG's executory contracts to other entities as noted above -- it does appear, however, that CLG also has "legacy" LPG client files for which it is paying referral fees to LPG or other entities (it appears that such fees may have been diverted to PrimeLogix in the form of an "advance").

13.    Trustee and his proposed special counsel have further become aware after serving the Emergency Order, LPG continued to enter into further executory contract(s) for the purchase of client files / receivables as early as a few days post-petition. See Declaration of Jeremy Freedman ("Freedman Decl.") at ¶ 3, **Exhibits 3** and **4**.

6

14.    Notwithstanding the questionable acts of those individuals named in the Adversary complaint and others they have enlisted to aid them, Trustee's investigation shows that under proper management the practice appears viable within the confines of the law as many other consumer litigation firms operate, whether entirely or as part of a larger suite of legal services offered. See the Declaration of Robert Schneider, submitted herewith; Trustee continues to seek additional opinions on this matter, and will supplement the record when available.

15.    Trustee has communicated with a number of actual lawyers providing legal services to the various clients in the various locations of operations. Celentino Decl. at ¶ 4.  Those lawyers, for the most part appear to be diligent in discharging their duties to represent Consumer Creditors. *Id.* To that end, Trustee was informed that court appearances continue to be made, cases are being settled and have not received any complaints concerning matters handled in the last 72 hours after the Emergency Order was served and Trustee secured the client information and funds as detailed above -- except for complaints about the continuous "pulling" of ACH funds by Mr. Eng and Oakstone, noted above. *Id*. A review of the client accounts indicate other attorneys have secured victories for such clients, including legal challenge to creditors, including Goldman Sachs, where a judgment in favor of the client was obtain covering the cost of the fees paid to Debtor and providing compensation to the client. See Serrano Decl. at ¶ 16.

16.    In furtherance of protecting consumers, Trustee envisioned the creation of an ad hoc committee of Consumer Creditors being formed (the "Ad Hoc Committee"), and reached out to the firm of Pachulski Stang to consider taking such representation with the understanding that the Trustee would support a reimbursement agreement so the estate would pay the legal expenses at no cost to the Consumer Creditors. See Declaration of Richard Marshack ("Marshack Decl.") at ¶ 4.  The Trustee envisions that, with the input of the Ad Hoc Committee, Trustee, the committee and the Court could ensure that the consumer customers of the Estate could be properly serviced by an ethical and honorable consumer law firm where the transfer by the estate could require implementation of safeguards to the Consumer Creditors built-in to any post transfer operations, with audit and other document inspection rights could ensure ethical practices are employed.

///

17.    The Trustee discussed the same with the Office of the United States Trustee, and they are not in favor of the idea; alternatively, the Trustee asked for the Office of the United States Trustee to appoint a formal committee of consumer creditors under 11 U.S.C. section 1102, and has received no response.  Trustee understands that proposed counsel to the Ad Hoc Committee from Pachulski Stang will be present to discuss these ideas -- and their ideas for protecting the consumers -- with the Court.

18.    It is the Trustee's belief that an immediate shut down of the businesses, and a dissolution of the TRO, will lead to worsening conditions for the Consumer Creditors of the Estate. While it appears the Ad Hoc Committee and its counsel harbor the same belief, it is unclear that the Office of United States Trustee agrees. It appears that many of the current clients have active litigation cases, and an immediate shut-down of the business may negatively impact that representation; it also appears that many of the Consumer Creditors are having success invalidating the debts being enforced against them  In the Trustee's view, it appears consumers stand to be harmed absent immediate operation of the business pending a transfer of the assets/business to a good faith buyer, or, in the alternative a winding down the business altogether. The invoices and monthly accounts payable necessary for proper operations and meeting payroll of Phoenix, Greyson and Maverick among others are mounting. While the total amount owed outstanding is still be gathered by accountants, Trustee is aware of over $200,000 in expenses outstanding, including but not limited to, office leases, re-instating DebtPayPro, staffing for affiliated customer service and digital mail rooms, and many claims for employees from the entities that are utilizing LPG client contracts and the revenue therefrom to support their expenses;

19.    To date, in the last week, Trustee has secured more than $1.4 million from the alter ego entities and financial institutions listed in the Emergency Order that have provided an accounting of held funds and/or turned over said funds. This does not include money held by Bank of America in the two accounts identified in the Emergency Order held by Vulcan Consulting and Prime Logix. These accounts may include some of the approximated $6 million dollars in ACH transfers processed through Revolv3 and Worldpay between March and May 2023 as indicated in the Emergency Order pending receipt of the accounting from Bank of America.

20.     Greyson is an entity that currently operates within the same physical space as the Phoenix Law Group.  There appears to be no lease, no sub-lease and no legal right for this entity to be present in this space.  The Manger of the entity is Han Trinh, who is not a lawyer, and appears to have herself slated for a $300,000 salary.  The reputed lawyers in charge are Phuong "Jayde" Trinh (CA Lic. No. 340042) (who the CA state bar lists as having been licensed on November 24, 2021 and is slated for a $500,000 annual salary) and Scott Eadie (CA Bar No. 108345) (who the CA state bar lists as having been licensed on June 3, 1983, and is slated for a $360,000 annual salary).  There appears to be no active supervision of non-lawyer staff by the attorneys built-into the workflow operation of this entity.  It appears to have been incorporated on May 12, 2023, and the Principal is listed as Scott Eadie.  In conversations with Mr. Celentino, Ms. Han Trinh contends that "hates Tony Diab, that she and her sister Jayde started this company to separate itself from Tony Diab and the terrible persons running LPG and Phoenix and that Greyson, Han and her sister have no affiliation or contact with Mr. Diab."  Ironically, Mr. Celentino was introduced to Ms. Han Trinh in a call that included Trustee Marshack on the morning of June 2, 2023, when Mr. Diab told Ms. Trinh to comply with requests and turnover to the Trustee all the information pertaining to Greyson.

21.     Interestingly, business records turned over to the Trustee and Mr. Celentino by Ms. Trinh establish that Greyson has exactly 48 clients, all 48 of whom were once clients of LPG, and all 48 of whom were also recently or remain current clients of Phoenix in the database. Also interestingly, Greyson now employs -- as salaried attorneys -- almost all of the attorneys who once served as LPG attorneys, and prior to that, all served as attorneys for Phoenix.  Interestingly, despite contending no relationship to Greyson, it was Mr. Diab who reached out to Mr. Marshack, and Mr. Celentino, when he learned from a Greyson Manager (who we are informed and believe was Ms. Han) was informed by a Greyson attorney that Mr. Celentino had called to ensure a clients' court hearing was being handled.  See Marshack Decl. at ¶ 5, **Exhibit 5**.

22.     Without any evident contractual right or obligation to pay for access to the LPG/Phoenix CRM system, all of the records of these 48 clients are made available to Greyson employees and attorneys.  It appears that the anticipated revenue from the 48 former LPG client contracts is under about $15,000 per month.  Until the first Greyson client was on-boarded on March

9

20, 2023 (the date of the bankruptcy filing), Mr. Carss of Phoenix indicates that the LPG attorneys were on 1099 set fee for Phoenix at a set rate per case; subsequently, those attorneys appear to have walked from Phoenix to work for Greyson, and Ms. Han Trinh charges Phoenix a set fee that is 167% higher than the prior charge to Phoenix; for reasons unknown, Phoenix is unable to secure attorneys other than those former LPG and Phoenix attorneys now at Greyson to assist LPG legacy clients formerly parked at Phoenix. Mr. Carss believes that the plan of action at Greyson is to eventually poach all of the former LPG clients once transferred to Phoenix to Greyson, and to overcharge Phoenix for legal services to both make a "spread" for Greyson and to destroy the economics of the former assignments to Phoenix. In a surprise move, the human resources payroll for Phoenix -- assuming the hourly employees only work 1 hour per year -- is a staggering contractual amount of over $6.79 million per year, or approximately $565,900 per month; which of course cannot be sustained on a projected gross revenue from current clients at approximately $15,000 per month. The Greyson payroll appears to have been paid in March, April and May from various entities from which LPG client pulls were made: Touzi (Mr. Eng's company), Vulcan (Ms. Cohen), Prime (Ms. Loli) and Maverick (Ms. Loli). That Greyson in and of itself is some form of a Ponzi scheme is self-evident -- the Trustee believes that the customers and attorneys of Greyson should be contacted, the customers referred to a safe, legal operation with their consent, and the attorneys can assume with customer consent the direct relationship with the clients under new contracts for services that comply with the law; alternatively, Phoenix and Mr. Carss will reach out to provide the support and care to such customers, lawfully and under the supervision of the Trustee, until an alternative representation can be arranged. Unfortunately, the many hourly employees who "drank the koolaid" and wrongfully believed that Greyson had a legitimate purpose are hurt. The Trustee will seek to amend the Complaint to provide that Greyson is not an alter ego of the Debtor, but is a party that received fraudulent conveyances of Debtor's property with direct and indirect intent to defraud the Debtor, the Court, the Trustee and the creditors thereof. Greyson and its principals should be held accountable to the employees whose lives they negatively impacted with this selfish Ponzi charade.

///

///

## TRUSTEE'S PROPOSED RECOMMENDATIONS FOR COURSE OF ACTION.

Based on the foregoing, and ongoing review of client files and business operations, the Trustee raises the following issues and proposes the Court, subject to Trustee's motion, grant authority for a third party to operate Debtor for a short, two to three week period of time pending a motion for sale of Debtor's assets, or, in the alternative have the Trustee use funds on hand to effect an orderly winding down of Debtor's Business, and for certain at any time in the event the Debtor's Business cannot be operated legally, as follows:

23.    Trustee is most concerned about the Consumer Creditors who through ignorance or other means are potentially harmed by the status quo if something isn't done to improve it, and who could be further harmed if there is no orderly transition to legitimate counsel.

24.    The Trustee has received an offer from one, and believes at least two other reputable firms who have indicated they will make offers, and in the Trustee's current judgment, there are likely several additional firms, who would make offers on overbid to be able to secure the assumption and assignment of the consumer contracts.

25.    Any motion seeking to assume and assign (or sell) the law business and its key client contract, would seek findings from the court that such sale and further provision of services was legal, and would only be sold if the Purchaser affirms acceptance of appropriate safeguards for the Consumer Creditors;

26.    It is the Trustee's belief that any sale would be subject to and consistent with Rule 1.17 of the ABA Model Rules of Professional Responsibility allowing clients of the Law Firm a full 90-day period to Opt Out of the sale and seek their own counsel; the Trustee would welcome the maintenance of a Preliminary Injunction to prevent continued prey upon these clients by the named principals of the Debtor and its alter egos, affiliates and fraudulent conveyance partners

27.    With consumer input (as noted, an Ad Hoc Committee of Consumer Creditors has been formed), the Trustee could effectuate a system where there are safeguards to the Consumer Creditors built-in to the post-sale operations, with audit and other document inspection rights that could be made available to ensure ethical treatment of the customers;

28. Trustee has procured one offer from a reputable businesses to pay more than $35 million to purchase the assets and provide the services for which the consumers contracted;

29. Additionally, there are a series of "call centers" that work the industry, and they are accustomed to robocalls of the consumers and assigning those clients to firms, like Debtor, to service. A continuation of the case offers a chance to expose and correct some of that activity with appropriate court orders.

30. Alternatively, should the Court find that the Debtor's business may not appropriately be continued under management of a reputable firm with consumer safeguards in place with the input of the consumer committee, then Trustee believes in his best judgment, that Debtor's business operations, and those of its affiliates, alter egos, and fraudulent conveyance partners, should in all likelihood be wound down over a short but reasonable period of time to protect the consumers and provide time to allow Consumer Creditors of Debtor to seek similar services and potentially make claims for reimbursement based on any contracts that remain executory, with the protection of an enforced Preliminary Injunction prohibiting the continued wrongful conduct, especially that of Greyson.

31. The alternative -- shutting down LPG and dissolving the TRO as to the other entities – raises other concerns. Doing so will leave these consumers in a state of disrepair, and exacerbating despair. Those getting proper services will find difficulty in retaining new lawyers. These clients could be better serviced by a quality law firm. If Trustee doesn't assist in transitioning these clients to a reputable firm, they will continue to be preyed upon by Debtor's former principal, his cohorts, his new affiliates and their fraudulent conveyance partners. Moreover, rejecting all the contracts will damage the customers who won't receive what they bargained for (relief from their debts) and the estate won't have any funds from which it can pay damages arising from their potentially wasted years of payments.

32. There is no ideal solution, but Trustee is concerned that the best course of action is to develop a plan that ensures some degree of protection for the consumers so they do not again find themselves as prey. Trustee believes a short-lived (i.e. 2-3 weeks) temporary operation of the affiliated entities pending a properly- noticed sale of the business with consumer-protections can be

consummated.  In any event, Trustee intends to pursue litigation against all persons who worked with and for Mr. Diab in this enterprise, and to recover all ill-gotten gains, or the value thereof, in civil judgments.

33.    Mr. Diab's recent communication to the call centers and the aligned staff predicts that he "will be in charge of the entire operation in two weeks."  There is no protection for the consumers, the Estate, and Trustee if that prediction comes to fruition.

34.    Trustee is focused on preventing further damage to the consumers and will only proceed with administration of assets if that can be done lawfully and pursuant to court orders. If that cannot be done, Trustee will of course work diligently to terminate all alter ego and related businesses and fraudulent conveyance partners and to prevent further damage to consumers.

## **AUTHORITY AND SUPPORT FOR TRUSTEE'S PROPOSED ACTION**

### *LPG's Business Model Rehabilitation Process*

While the execution of its business was clearly mismanaged, LPG's business model is not atypical for the Debt Resolution industry – making it a prime contender to be sold in bankruptcy now that said mismanagement has been removed from the equation. *See Richard Marshack's Omnibus Emergency Motion* [Doc. No. 4] (the "Turnover Motion"), Section II(A)(2), incorporated herein.

As further described in the Turnover Motion, LPG operated a nationwide debt relief law practice, servicing over 40,000 clients for legal and non-legal services as outlined in an agreement with the consumer in an effort to extinguish, settle or reduce consumer debts on their behalf. LPG would: (1) assist with ensuring creditors ceased harassing communications with respect to any of the debts in dispute; (2) dispute legal validity of the debts in dispute; (3)  defend clients against any collection activity or lawsuit on any invalidated debt; (4) initiate legal action against any creditor that violates state or federal law in connection with the debt in dispute; and (5) qualifying clients for Bankruptcy under Chapter 7 or Chapter 13 or the U.S. Bankruptcy Code and provide counsel regarding whether the client qualifies, the procedures and effect of filing bankruptcy. *Id.* at RS Decl. at ¶ 6, Exh. 3 [Dkt. No. 5].

LPG would charge forty percent (40%) of the debt in dispute, to be paid over sixty (60) monthly payments. However, to the extent the client agrees to any settlement, the monthly payment

1   would be reduced to cover all or a portion of the settlement payment. Further, no additional charges

2   were incurred in order to file a lawsuit. Finally, if no outcome is achieved, the consumer could request

3   a full refund for all amounts paid to LPG. Thus, client protections were incorporated into the model

4   despite the failure in LPG's actual implementation.  In other words, LPG's model is sound and legally

5   compliant if executed appropriately. The only necessary and substantial model-based adjustment is

6   the result of the adoption in California of the Fair Debt Settlement Practices Act ("FDSPA"), effective

7   as of January 1, 2022; this statute applies prospectively only.[1] Thus, only a portion of the customers

8   will require updates to structure, communication, and execution. The FDSPA offers clear parameters

9   for the necessary reformation of LPG's business model transformation In fact, much of the FDSPA

10  relates to how various processes are carried out, and thus will automatically be remediated by an

11  appropriate purchaser. *See e.g.,* Cal. Civ. Code 1788.302 (prohibiting any debt settlement provider

12  from engaging in false, deceptive or misleading acts). Other requirements, however, require specific

13  disclosures no less than three (3) calendar days before you sign a contract with them, including

14  provisions that currently exist in LPG's agreements, such as: the consumer's right to cancel the

15  contract at any time and the possibility of a negative credit score rating from failing to pay debts on

16  time. *Id.*; *see also* Turnover Motion, RS Decl. at ¶ 6, Exh. 3 [Dkt. No. 5].

17        To be sure, not all of the FDSPA's requirements were incorporated into LPG's agreement and

18  processes, and additional laws would require incorporation in order to ensure proper compliance (i.e.,

19  Consumer Legal Remedies Act and Credit Repair Organization Act). However, the FDSPA enables

20  a swift remediation to these deficiencies. For example, a list of what each contract is required to

21  contain is spelled out in Cal. Civil Code 1788.302.

22        One important update to the business model will be how LPG receives fees. The FDSPA

23  instilled an explicit ban against advanced fees until a settlement agreement has been reached, agreed

24  _____

25  [1] There is no indication of retroactive intent in the bill as drafted, nor is there any indication of the

26  same in the enacted law, or subsequent case published case law.  In California, as in most states, a
    statute is presumed to operate prospectively. Quarry v. Doe I (2012) 53 Cal.4th 945, 955. In

27  construing statutes, there is a presumption against retroactive application unless the Legislature
    plainly has directed otherwise by means of express language of retroactivity or other sources that

28  provide a clear and unavoidable implication that the Legislature intended retroactive application of
    the statute. Id.

1    to, and at least one payment to the creditor has been made as a result of the agreement. *Id.* Prior to

2    the FDSPA, a restriction against the advanced-fee model only applied to credit repair agencies, which,

3    upon information and belief, LPG is not. Turnover Motion, RS Decl. Exh. 3; *see also* 15 U.S.C.

4    1679(a)(3) (the Credit Repair Organization Act (the "CROA").

5          In support of the exclusion of LPG from the purview of CROA, the Trustee has reviewed the

6    business model of LPG and its relevant documents to execute the same. The core documents include,

7    but certainly are not limited to: the Legal Services Agreement (the "LSA"); the LPG "QC Script"; the

8    LPG "Sales Script"; and, the "Educational Outreach Script" (together, the "Core Documents"). The

9    Core Documents contain the description of services and actions to include debt disputes and debt

10    relief. The Core Documents are completely devoid of any language indicating that LPG: (1) is a credit

11    repair agency; (2) can "repair" bad credit after the fact, or (3) act with the purpose of repairing credit.

12    Instead, the implication of a credit repair is an indirect, unstated, and un-marketed benefit of the

13    services LPG offers. In fact, LPG discloses the potential *negative* impact the program could have on

14    the applicant's credit. *See* QC Script, Page 11 of 14. A true and correct copy of the QC Script is

15    attached to the Serrano Decl. at ¶ 15, **Exhibit 6** and incorporated herein. Only in response to an

16    applicant's confusion to this disclosure does LPG respond,

17
      "…your credit report is used by creditors to determine whether to extend new credit
18          to you or not, but your main concern while in our program should be getting out of
      debt. Once your accounts are invalidated and removed from your credit report, your
19          credit should begin to repair itself as long as the rest of your credit stays positive…".

20    *Id.* If credit repair was incorporated into the business model of LPG, one would certainly expect to

21    find that information contained in the customer pitch. However, the Sales Script is devoid of any

22    flavor of credit repair. *See generally* Sales Script. A true and correct copy of the Sales Script is

23    attached to the Serrano Decl. at ¶ 15, **Exhibit 6** and incorporated herein.

24          Thus, the positive impact to credit is a mere collateral consequence, mentioned only in

25    response to an applicant's uncertainty on the negative impact the program can have in the initial

26    stages. The same mention is absent from any marketing or contract. Similar to filing bankruptcy,

27    one's credit is negatively impacted before it improves. Therefore, it is clear LPG's primary focus is

28    not on the improvement or repair of a consumer's creditor record, but instead on the development of

creditworthy behavior and resolution of debts. This thereby excludes LPG from CROA's purview. *Plattner v. Edge Solutions, Inc.,* 422 F. Supp. 2d 969 (ND Ill. 2006) (finding a "Post Closing Credit Restoration Program" did not render the company a "credit repair organization" when viewed in context with the company's primary debt management services since the primary service was to assist in managing a consumer's debt); *Walston v. Nationwide Credit, Inc.,* 2019 U.S. Dist. LEXIS 147865 (ND Ill. August 30, 2019) (stating that "the definition of credit repair organization encompasses 'entities whose focus is on the improvement or repair of a consumer's credit record, credit history or credit rating, explicitly or implicitly, not entities whose activities are aimed at assisting consumers in developing "creditworthy behavior" and paying their debts, which may result in improved actual credit as a collateral consequence, rather than as a program objective."); *White v. Fin. Credit Corp.,* 2001 U.S. Dist. LEXIS 21486 (ND Ill. December 20, 2001)(finding a company that represented paying debts would improve credit history was not a credit repair organization because its primary business focus was debt collection); s*ee e.g., Jackson v. Tel. Chrysler Jeep, Inc.*, No. 07-10489, 2009 U.S. Dist. LEXIS 30550 *20 (E.D. Mich. Mar. 31, 2009) (Finding a reasonable juror could not find that the Defendants met the definition of "credit repair organization" under the CROA where Plaintiffs had not offered any evidence which suggest that the Defendants (1) held themselves out as a credit repair agency, (2) offered to "repair" bad credit after the fact, or (3) "crossed the boundary from credit counseling to credit repair" in their dealings with the Plaintiffs.)

In the Trustee's judgment, and in conjunction with its review of the relevant documents and business model, and this appearing to be the closest mention to anything related to a credit repair, and applicable case law, LPG's model does not implicate the CROA.

### ***The Sale of LPG***

Based on the flexible model of LPG and the streamlined ability to true-up the company with the assistance of the FDSPA, the Trustee believes substantially all assets of this Debtor can and should be sold pursuant to Section 363 of the Bankruptcy Code or, in the alternative, a liquidating plan. Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may ... sell ..., other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Also, a trustee may sell property "free and clear of any interest" in the estate property. 11

U.S.C. § 363(f). The sale of estate property under the Bankruptcy Code is conducted by a trustee, who has ample discretion to administer the estate, including authority to conduct public or private sales of estate property. *In re Canyon Partnership*, 55 B.R. 520, 524 (Bankr. S. D. Cal. 1985).

In deciding whether to approve a proposed sale under section 363, courts generally apply standards that, although stated various ways, represent essentially a business judgment test. Recent cases typically inquire "whether a sale is supported by a sound business reason and is based on a sound exercise of business judgment." 3 Collier on Bankruptcy § 363.02 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2013). The court should determine only whether the trustee's judgment was reasonable and whether a sound business justification exists supporting the sale and its terms. 3 Collier on Bankruptcy P 363.02 (16th 2023). "Although a trustee normally would be expected to sell to the highest bidder at an auction, there may be sound business reasons to accept a lower bid, particularly in a negotiated sale" and the trustee enjoys a certain amount of judicial deference in its business judgment *Id.*

Further, an asset sale offers some prospect of recovery of value of the estates to pay creditors and prevents returning the creditors to the prepetition status quo where they have to fend for themselves. *In re Corona Care Convalescent Corp.*, 527 B.R. 379, 387 (Bankr. C.D. Cal. 2015). Indeed, in this case, absent some form of advancement of the consumer representation to a legitimate law firm to provide compliant services and some form of compensation to the estate for the transfer, there is a substantially reduced chance that consumer creditors will be able to recover any claim to funds from the estate for any violations of the FDCPA or any other applicable law. The Trustee is informed and believes that the Ad Hoc Committee supports this approach.

Most cases where a trustee is appointed involve similar factual situations of wrongdoing and do not prevent the sale of debtor assets. *See In re Ford,* 36 Bankr. 501 (Bankr. W.D. Ky. 1983) (debtor made intercorporate loans and transfers without court permission and without disclosure in its monthly financial reports); *In re Brown,* 31 Bankr. 583 (D. D.C. 1983) (debtor's principal mismanaged parking garage by refusing to sell or lease that property to maximize distribution to creditors in order to retain that property for his individual control and operation); *In re ///*

1  *Philadelphia Athletic Club, Inc.,* 15 Bankr. 60 (Bankr. E.D. Penn. 1981) (principal self-dealing and

2  commingling of funds with principal's other corporation).

3         Similarly, in this instance, the mismanagement should not result in conversion or dismissal

4  when the appointed Trustee believes there to be greater recovery and protection for the creditors and

5  the estate if allowed to proceed with a sale of the business in a manner that both ensures future

6  compliance with all laws (and the FDCPA, to the extent applicable to CA customers) and will provide

7  notice to the consumer to be able to opt out of a law firm sale within 90 days as applicable under

8  ABA Model Rule of Professional Conduct 1.17.

9

10  Dated:  June 12, 2023                    Respectfully submitted,

11                                           DINSMORE & SHOHL LLP

12

                                             By: */s/ Christopher Celentino*_____
13                                               Christopher B. Ghio
                                                 Christopher Celentino
14                                               Proposed Special Counsel to
                                                 Richard A. Marsha

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 655 W. Broadway, Suite 800, San Diego, California  92101

A true and correct copy of the foregoing document entitled (*specify*): **STATUS CONFERENCE REPORT**

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On June 12, 2023, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒    Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:  On June 12, 2023, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐    Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on June 12, 2023, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

        **JUDGE'S COPY**
        The Honorable Scott C. Clarkson
        United States Bankruptcy Court
        Central District of California
        Ronald Reagan Federal Building and Courthouse
        411 West Fourth Street, Suite 5130 / Courtroom 5C
        Santa Ana, CA 92701-4593

☐    Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| June 12, 2023 | Caron Burke | |
| *Date* | *Printed Name* | *Signature* |

**1.**     <u>**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**</u>:

Christopher Celentino on behalf of Plaintiff Richard A. Marshack
christopher.celentino@dinsmore.com, caron.burke@dinsmore.com

Christopher Celentino on behalf of Trustee Richard A Marshack (TR)
christopher.celentino@dinsmore.com, caron.burke@dinsmore.com

Christopher Ghio on behalf of Plaintiff Richard A. Marshack
christopher.ghio@dinsmore.com

Richard A Marshack (TR)
pkraus@marshackhays.com, rmarshack@iq7technology.com;ecf.alert+Marshack@titlexi.com

Kenneth Misken on behalf of U.S. Trustee United States Trustee (SA)
Kenneth.M.Misken@usdoj.gov

United States Trustee (SA)
ustpregion16.sa.ecf@usdoj.gov