Daniel H. Reiss
State Bar No. 150573
**LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.**
2818 La Cienega Avenue
Los Angeles, California 90034

Rusty O'Kane
Texas State Bar No. 24088149 (admitted pro hac vice)
*rusty.okane@wickphillips.com*
Alexandra W. Wahl
Texas State Bar No. 241071581 (admitted pro hac vice)
*alex.wahl@wickphillips.com*
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Telephone: (214) 692-6200
Facsimile: (214) 692-6255

## UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF CALIFORNIA
### SANTA ANA DIVISON

| | |
|---|---|
| In re:<br><br>THE LITIGATION PRACTICE GROUP, PC,<br><br>    Debtor. | Case No. 8:23-bk-10571-SC<br><br>Adv. Proc. No. 8:23-ap-01046-SC<br><br>Chapter 11 |
| RICHARD A. MARSHACK,<br>Chapter 11 Trustee,<br><br>    Plaintiff,<br><br>    v.<br><br>TONY DIAB, an individual; DANIEL S. MARCH, an individual; ROSA BIANCA LOLI, an individual; LISA COHEN, an individual; WILLIAM TAYLOR CARSS, an individual; ENG TAING, an individual; HENG TAING, an individual; MARIA EEYA TAN, an individual; JAKE AKERS, an individual; HAN TRINH, an individual; JAYDE TRINH, an individual; WES THOMAS, an individual; SCOTT JAMES EADIE, an individual; JIMMY CHHOR, an | **APPENDIX OF UNPUBLISHED AUTHORITY IN SUPPORT OF MOTION BY DEFENDANTS ENG TAING AND TOUZI CAPITAL, LLC TO DISMISS COMPLAINT UNDER FED. RULE BANK. PROC. 7012 AND FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)**<br><br>Judge:  Hon. Scott C. Clarkson<br><br>**DATE:  SEPTEMBER 13, 2023**<br>**TIME:  1:30 P.M.**<br>**PLACE: ZOOMGOV**<br>        **COURTROOM 5C**<br>        **411 WEST 4TH STREET**<br>        **SANTA ANA, CA 92701-4593** |

individual; DONGLIANG JIANG, an
individual; MAX CHOU, an individual;
OAKSTONE LAW GROUP PC;
GREYSON LAW CENTER PC; PHOENIX
LAW, PC; MAVERICK MANAGEMENT
GROUP, LLC; LGS HOLDCO, LLC;
CONSUMER LEGAL GROUP, P.C.;
VULCAN CONSULTING GROUP LLC; BAT
INC. d/b/a COAST PROCESSING; PRIME
LOGIX, LLC; TERACEL BLOCKCHAIN
FUND II LLC; EPPS; EQUIPAY;
AUTHORIZE.NET; WORLD GLOBAL;
OPTIMUMBANK HOLDINGS, INC. d/b/a
OPTIMUM BANK; MARICH BEIN, LLC;
BANKUNITED, N.A.; REVOLV3, INC.;
FIDELITY NATIONAL INFORMATION
SERVICES, INC. d/b/a FIS; WORLDPAY,
LLC; WORLDPAY GROUP; MERIT FUND,
LLC; GUARDIAN PROCESSING, LLC;
PAYLIANCE, LLC; TOUZI CAPITAL, LLC;
SEAMLESS CHEX INC; DWOLLA, INC.;
STRIPE, INC.; and DOES 1 through 100,
inclusive,

        Defendants.

Defendants, Eng Taing and Touzi Capital, LLC hereby files its appendix of the unpublished authority cited in its concurrently filed *Motion By Defendants Eng Taing and Touzi Capital, LLC to Dismiss Complaint under Fed. Rule Bank. Proc. 7012 and Federal Rule of Civil Procedure 12(b)(6)* as follows:

| NAME OF CASE | EXHIBIT NO. |
|---|---|
| *Bouncing Angels, Inc. v. Burlington Ins. Co., No. EDCV170015JGBSPX, 2017 WL 1294004 (C.D. Cal. Mar. 20, 2017)* | 1 |
| *Clement 1, LLC v. Scottsdale Ins. Co., 2023 WL 4492422 (C.D. Cal. July 11, 2023)* | 2 |
| *In re Crown Vantage, Inc., 2003 WL 25257821 (N.D. Cal. Sept. 25, 2003)* | 3 |
| *McHale v. Silicon Valley Law Group, 2011 WL 6990187 (N.D. Cal. Dec. 14, 2011)* | 4 |
| *Mosier v. Stonefield Josephson, Inc.,2011 WL 5075551 (C.D. Cal. Oct. 25, 2011)* | 5 |
| *Rund v. Lee (In re Amergence Technology, Inc.), 2016 WL 4069550 (Bankr. C.D. Cal. July 27, 2016)* | 6 |

Dated:  July 24, 2023

Respectfully submitted,

*/s/ Daniel H. Reiss*
Daniel H. Reiss
**Levene, Neale, Bender, Yoo & Golubchik, LLP**
2818 La Cienega Avenue
Los Angeles, California 90034

Rusty O'Kane
Alexandra W. Wahl
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Telephone: (214) 692-6200
Facsimile: (214) 692-6255

**ATTORNEYS FOR DEFENDANTS ENG TAING AND TOUZI CAPITAL, LLC**

# EXHIBIT "1"

Case 8:23-ap-01046-SC   Doc 98   Filed 07/24/23   Entered 07/24/23 13:49:39   Desc
Main Document   Page 5 of 52

Bouncing Angels, Inc. v. Burlington Insurance Company, Not Reported in Fed.Supp....

2017 WL 1294004

2017 WL 1294004
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

BOUNCING ANGELS, INC.

v.

The BURLINGTON INSURANCE COMPANY

Case No. EDCV 17–0015 JGB (SPx)
|
Signed 03/20/2017

**Attorneys and Law Firms**

Cheryl Dunn Soto, Joshua D. Franklin, Franklin Soto LLP, San Diego, CA, for Bouncing Angels, Inc.

Aaron C. Agness, Bryan A. Reynolds, Weston and McElvain LLP, El Segundo, CA, for The Burlington Insurance Company.

**Proceedings: Order: GRANTING Defendant's Motion to Dismiss and DISMISSING Plaintiff's claim for punitive damages WITH LEAVE TO AMEND (Dkt. No. 9) (IN CHAMBERS)**

The Honorable JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

**\*1** Before the Court is Defendant The Burlington Insurance Company's Motion to Dismiss. (Dkt. No. 9.) The Court finds this matter appropriate for resolution without a hearing. See Fed. R. Civ. P. 78; L.R. 7–15. After consideration of the papers filed in support of and in opposition to the motion, the Court GRANTS the motion.

## I. BACKGROUND

On January 5, 2017, Bouncing Angels, Inc. ("Plaintiff" or "BAI") filed a Complaint seeking damages against The Burlington Insurance Company ("Defendant" or "Burlington") for the following claims: (1) breach of contract (defense costs), (2) breach of contract (settlement costs), and (3) breach of the implied covenant of good faith and fair dealing. ("Complaint," Dkt. No. 1.) On February 2, 2017, Burlington filed a Motion to Dismiss, attaching a Declaration of Bryan A. Reynolds in support. ("Motion," Dkt. No. 9;

Reynolds Decl., Dkt. No. 9–1.) Plaintiff filed an Opposition to Burlington's Motion on February 17, 2017, and Burlington filed its Reply on February 27, 2017. ("Opposition," Dkt. No. 12; "Reply," Dkt. No. 13.)

The following facts are drawn from Plaintiff's Complaint and taken as true for purposes of this Motion. Burlington issued a commercial general liability insurance policy to BAI (Policy No. 154BW23993) for the policy period of November 29, 2012 to November 29, 2013 (the "Policy"). (Complaint ¶ 8.) According to the Complaint, Burlington is obligated to defend and indemnify BAI against lawsuits seeking damages for a "personal and advertising injury." (Id. at ¶ 9.) The Policy allegedly defines "personal and advertising injury" as "[i]nfringing upon another's copyright, trade dress or slogan in your 'advertisement'." (Id. at ¶ 10.) "Advertisement" is alleged in the Complaint to mean "a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters" and includes "material placed on the Internet." (Id. at ¶ 11.) The Policy limit for liability for "personal and advertising injury," excluding defense costs, is $1 million dollars. (Id. at ¶ 12.)

On October 4, 2013, BAI and another entity, EZ Inflatables, Inc., were sued by a competitor, WhatRU Holding, LLC ("WRUH"), in WhatRU Holding, LLC v. Bouncing Angels Inc., et al. (the "Lawsuit"). (Id. at ¶ 13.) In the Lawsuit, WRUH alleged that BAI offered an infringing product, the "Carousel Jumper," on its website in contravention of WRUH's copyright. (Id. at ¶ 14.) Specifically, WRUH's amended complaint alleged that BAI advertised on its website and other unspecified places "certain products such as that identified as 'Carousel Jumper' and 'such as that identified as 'Fire Engine' which infringed WhatRU's copyrights.' " (Id. at ¶ 15.) WRUH also alleged BAI "infringed WRUH's trade dress by advertising products that used trade dress substantially and confusingly similar to WRUH's non-functional trade dress, identified as 'Carousel Bouncer' and 'Fire Truck Bus.' " (Id.)

**\*2** According to BAI, when it tendered its claim for a defense in the Lawsuit to Burlington, Burlington wrongfully denied coverage, which left BAI to fund its own defense costs. (Id. at ¶17.) BAI claims to have suffered damages as a result of Burlington's denial of coverage, including defense and settlement costs. (Id.) BAI alleges that Burlington knew it breached its duty to defend BAI in the Lawsuit, but "made a calculated decision to wrongfully deny BAI's

2017 WL 1294004

claim for a defense and gamble that its denial would go unchallenged." (Id. at ¶ 30.) As such, BAI also seeks punitive damages under California Civil Code section 3294 on the ground that Burlington's intentional denial of BAI's insurance claim, motivated by its goal of enriching itself, constitutes "oppression, fraud or malice." (Id. at ¶¶ 31, 30.)

## II. DISCUSSION

Burlington moves to dismiss BAI's claim for punitive damages for failure to plead specific facts supporting a reasonable inference that Burlington acted with fraud, malice or oppression, and for failure to adequately allege ratification by a managing agent, director, or officer of Burlington. (Mot. at 3.) In so doing, Burlington argues that the conclusory allegations of bad faith do not constitute despicable conduct under controlling authorities. (Id. at 8.) As to claims premised on entity liability, Burlington maintains that "[u]nder California law, a corporate entity is incapable of engaging in willful and malicious conduct for purposes of punitive damages liability." (Id.) (citing Cal. Civ. Code § 3294(b)).

BAI, on the other hand, argues its allegations of bad faith are sufficient to infer that Burlington engaged in fraud, malice or oppression in light of Twombly's "facial plausibility standard." (Opp. at 5.) As to the requirement of control-person-ratification, BAI maintains that the facts alleged in its Complaint "allow the Court to draw the reasonable, common-sense inference that one or more of Burlington's managing agents authorized or ratified Burlington's bad-faith denial of insurance coverage benefits." (Id. at 7–8.) In support, Plaintiff contends that the case law confirms that where a complaint alleges an insurer continued to maintain its coverage denial after its insured explained why such denial was erroneous, "the Court can reasonably infer that a managing agent of the insurer—namely, a claims adjuster or supervisor with 'substantial discretionary authority' to deny claims—authorized or ratified the coverage denial." (Opp. at 8.)

### A. Legal Standard
Under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), a party may bring a motion to dismiss for failure to state a claim upon which relief can be granted. As a general matter, the Federal Rules require only that a plaintiff provide " 'a short and plain statement of the claim' that will give the

defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Conley v. Gibson, 355 U.S. 41, 47 (1957) (quoting Fed. R. Civ. P. 8(a)(2)); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). When evaluating a Rule 12(b)(6) motion, a court must accept all material allegations in the complaint—as well as any reasonable inferences to be drawn from them—as true and construe them in the light most favorable to the non-moving party. See Doe v. United States, 419 F.3d 1058, 1062 (9th Cir. 2005); ARC Ecology v. U.S. Dep't of Air Force, 411 F.3d 1092, 1096 (9th Cir. 2005); Moyo v. Gomez, 32 F.3d 1382, 1384 (9th Cir. 1994).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (citations omitted). Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level." Id. at 545.

*3  To survive a motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570; Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.' " Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 556). The Ninth Circuit has clarified that (1) a complaint must "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively," and (2) "the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011).

### B. Analysis
California Code of Civil Procedure section 3294 authorizes punitive damages "for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Cal. Code Civ. Proc. § 3294(a). "Malice" is defined as "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 1294004

disregard of the rights or safety of others." Cal. Code Civ. Proc. § 3294(c)(1). "Oppression" is defined as "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." Id. at subd. (2). "Despicable conduct" is that which is "so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by ordinary decent people." In re First All. Mortgage Co., 471 F.3d 977, 998 (9th Cir. 2006) (citing Lackner v. North, 135 Cal. App. 4th 1188, 1210 (2006)).

In support of its punitive damages claim, Plaintiff alleges that "Burlington knowingly and willfully engaged in, among other things, the following misconduct:"

- "Unreasonably adopting narrow and arbitrary interpretations of the exclusions in the Policy, including interpretations that were wholly at odds with California law and inconsistent with the Policy's own provisions" (Complaint at ¶ 28);

- "Disregarding California law in evaluating its defense obligation" (Id.);

- "Wrongfully and unreasonably denying a duty to defend in conscious disregard of California insurance law and BAI's rights" (Id.); and

- "Compelling BAI to file the present lawsuit in order to obtain contractual benefits due under the Policy despite being specifically advised by BAI regarding the reasons why its denial was erroneous." (Id.)

Plaintiff alleges ratification by a managing agent, director or officer of Burlington by inviting the Court to infer that whenever an insured challenges an insurer's denial of coverage, the bases for the denial must have come to the attention of an officer with discretion over corporate policy. (Opp. at 4–5.) The Court disagrees and concludes that these allegations are insufficient to plausibly infer any "despicable conduct" on the part of Burlington as defined by section 3294.

Punitive damages are not available for breach of contract, but may be available for breach of the covenant of good faith and fair dealing, which is essentially a tort claim, "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294(a). In insurance cases, the evidence needed to show "oppression" is the same as the evidence needed to show bad faith. Shade Foods, Inc. v. Innovative Products Sales &

Mktg., Inc., 78 Cal. App. 4th 847, 890 (2000). However, the conduct involved must be of a different "dimension" than that which would be enough to make out a "marginally sufficient" case for bad faith. Klees v. Liberty Life Assur. Co. of Boston, 110 F. Supp. 3d 978, 987–88 (C.D. Cal. 2015).

*4 While courts allow punitive and emotional distress damages for breach of contract claims in the insurance context, courts have also held that mere allegations of willful breach are insufficient to award punitive damages. Cates Constr., Inc. v. Talbot Partners, 21 Cal. 4th 28, 61 (1999) ("[P]unitive or exemplary damages, which are designed to punish and deter statutorily defined types of wrongful conduct, are available only in actions 'for breach of an obligation not arising from contract.' (Civ.Code, § 3294, subd. (a), italics added.) In the absence of an independent tort, punitive damages may not be awarded for breach of contract 'even where the defendant's conduct in breaching the contract was willful, fraudulent, or malicious.' "). Since the allegations on which Plaintiff relies to sustain its claim for punitive damages go no further than what is alleged in support of Plaintiff's breach of contract and breach of the covenant of good faith and fair dealing claims, the Court cannot infer that Burlington's conduct is of a "different dimension" than that which would be enough to make out a case for bad faith.

Moreover, to recover punitive damages against a corporate employer, Plaintiff must plead and prove that a corporate officer, director or managing agent of Burlington (a) had advance knowledge of the unfitness of the employee engaged in the oppressive, fraudulent or malicious conduct or employed that employee with a conscious disregard of the rights or safety of others or (b) authorized, or ratified the wrongful conduct for which the damages are awarded, or (c) was personally guilty of oppression, fraud, or malice. Cal. Code Civ. Proc. § 3294(b). Plaintiff fails to allege any specific conduct on the part of an identifiable individual who could reasonably be inferred to have decision making power over corporate policy. Egan v. Mut. of Omaha Ins. Co., 24 Cal. 3d 809 (1979) (stating that while the determination of whether employees act in a managerial capacity does not necessarily hinge on their level in corporate hierarchy, they must retain a degree of discretion in making decisions that will ultimately determine corporate policy.). In the absence of more particularized allegations of the claim adjuster's role, the Court cannot infer that the claim adjuster has the power to ratify decisions that will ultimately determine Burlington's corporate policy.

2017 WL 1294004

Plaintiff is correct that requiring specific allegations of malice, oppression or fraudulent intent to claim damages under section 3294 can conflict with Federal Rules of Civil Procedure 8 and 9, which only require a "short and plain" prayer for punitive damages. Fed. R. Civ. P. 8, 9. That said, Plaintiff must still satisfy the requirements of Twombly and Iqbal. See Diaz v. Bank of Am. Home Loan Servicing, L.P., No. CV099286PSGMANX, 2011 WL 13046844, at *5 (C.D. Cal. July 8, 2011) (granting the defendants' motion to dismiss the plaintiff's demands for punitive damages for lack of sufficient factual detail); see also GBTI, Inc. v. Ins. Co. of Pennsylvania, No. CV F 09–1173LJODLB, 2009 WL 2365409, at *8 (E.D. Cal. July 29, 2009) (striking punitive damages where the complaint contained only "platitudes and a conclusory paragraph which essentially summarizes section 3294 elements"). Where, as here, the allegations of breach of contract remain undifferentiated from Defendant's allegedly despicable conduct, Burlington does not have sufficient notice of the actions taken by its employees or officers that give rise to Plaintiff's claim for exemplary damages.

Accordingly, the Court finds BAI failed to plead sufficient facts to support a finding of malice, fraud or oppression and GRANTS Burlington's motion to dismiss its punitive damages claim. The Court will grant Plaintiff leave to amend this claim to attempt to correct the deficiencies identified herein.

### III. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's motion to dismiss. Plaintiff's claim for punitive damages is DISMISSED WITH LEAVE TO AMEND. If Plaintiff wishes to amend its Complaint to correct the deficiencies identified in this Order, it shall do so by **April 17, 2017.**

 **\*5  IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 1294004

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT "2"

2023 WL 4492422
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

CLEMENT 1 LLC
v.
SCOTTSDALE INSURANCE COMPANY

Case No. CV 23-3779 PA (JCx)
|
Filed July 11, 2023

**Attorneys and Law Firms**

Craig D. Rackohn, Rackohn and Rackohn APC, Westlake Village, CA, for Clement 1 LLC.

John S. Na, Gordon Rees Scully Mansukhani LLP, Los Angeles, CA, Michelle R. Bernard, Gordon Rees Scully Mansukhani LLP, San Diego, CA, for Scottsdale Insurance Company.

**Proceedings:** IN CHAMBERS - COURT ORDER

PERCY ANDERSON, UNITED STATES DISTRICT JUDGE

**\*1** Before the Court is a Motion to Dismiss Plaintiff's Complaint (Docket No. 17) filed by defendant Scottsdale Insurance Company ("Defendant"). The matter is fully briefed. Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court finds that these matters are appropriate for decision without oral argument. The hearing calendared for July 17, 2023, is vacated, and the matter taken off calendar.

**I. Background**
On December 14, 2022, plaintiff Clement 1 LLC ("Plaintiff") filed a complaint against Defendant in Los Angeles County Superior Court, Case No. 22STCV39008. The Complaint alleges that on February 28, 2022, Defendant issued Plaintiff a commercial general liability policy (the "Policy") that included fire and water damage coverage. On October 8, 2022, Plaintiff had a fire loss at the insured premises. Plaintiff alleges that it timely notified Defendant of the fire loss, but that Defendant refused to provide coverage due to an earlier sent Notice of Cancellation. The Notice of Cancellation, sent May 13, 2022, purportedly cancelled the Policy and

identified a single ground for cancellation, "[d]ue to carrier's request." Plaintiff alleges that the Notice of Cancellation was defective under California Insurance Code 676, which limits an insurer's right to cancel. On November 18, 2022, Plaintiff notified Defendant that the Notice of Cancellation was defective and that the Policy was still in effect at the time of the October 8, 2022 fire loss. On November 28, 2022, Defendant responded that "[o]ur position remains unchanged, we are reiterating our disclaimer at this time." The Complaint asserts two causes of action: (1) breach of contract; and (2) breach of the covenant of good faith and fair dealing.

On January 21, 2023, Defendant removed the action to federal court and on January 27, 2023, this Court remanded for lack of subject matter jurisdiction. On May 17, 2023, Defendant again removed the action to federal court and adequately alleged subject matter jurisdiction. Now, Defendant moves to dismiss Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

**II. Legal Standard**
For purposes of a Motion to Dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6), plaintiffs in federal court are generally required to give only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). While the Federal Rules allow a court to dismiss a cause of action for "failure to state a claim upon which relief can be granted," they also require all pleadings to be "construed so as to do justice." Fed. R. Civ. P. 12(b)(6), 8(e). The purpose of Rule 8(a)(2) is to " 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964, 167 L. Ed. 2d 929 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 103, 2 L. Ed. 2d 80 (1957)). The Ninth Circuit is particularly hostile to motions to dismiss under Rule 12(b)(6). See, e.g., Gilligan v. Jamco Dev. Corp., 108 F.3d 246, 248–49 (9th Cir. 1997) ("The Rule 8 standard contains a powerful presumption against rejecting pleadings for failure to state a claim.") (internal quotation omitted).

**\*2** However, in Twombly, the Supreme Court rejected the notion that "a wholly conclusory statement of a claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some set of undisclosed facts to support recovery." Twombly, 550 U.S. at 561, 127 S. Ct. at 1968 (internal quotation omitted). Instead, the Court adopted a "plausibility standard," in which the complaint must "raise a reasonable expectation that discovery

Clement T LLC v. Scottsdale Insurance Company, Slip Copy (2023)
2023 WL 4492422

will reveal evidence of [the alleged infraction]." Id. at 556, 127 S. Ct. at 1965. For a complaint to meet this standard, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." Id. at 555, 127 S. Ct. at 1965 (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-36 (3d ed. 2004) ("[T]he pleading must contain something more ... than ... a statement of facts that merely creates a suspicion [of] a legally cognizable right of action") (alteration in original)); Daniel v. Cnty. of Santa Barbara, 288 F.3d 375, 380 (9th Cir. 2002) (" 'All allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party.' ") (quoting Burgert v. Lokelani Bernice Pauahi Bishop Tr., 200 F.3d 661, 663 (9th Cir. 2000)). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555, 127 S. Ct. at 1964-65 (internal quotations omitted). In construing the Twombly standard, the Supreme Court has advised that "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Ashcroft v. Iqbal, 556 U.S. 662, 679, 129 S. Ct. 1937, 1950, 173 L. Ed. 2d 868 (2009).

### III. Discussion

Defendant contends that the Notice of Cancellation was effective under the Policy's terms and, as a result, Plaintiff's claims fail as a matter of law. Defendant's argument relies in part upon the Court's ability to consider extrinsic evidence, so the Court first addresses that issue before turning to the sufficiency of Plaintiff's claims.

#### A. Extrinsic Evidence

"Generally, district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure." Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 998 (9th Cir. 2018) (citing Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001)). "There are two exceptions to this rule: the incorporation-by-reference doctrine, and judicial notice under Federal Rule of Evidence 201." Id. Defendant relies upon both exceptions in moving to dismiss. Plaintiff asserts a blanket objection "to any consideration

of evidence contrary to the allegations of the Complaint" because "[c]onsideration of such evidence extrinsic to the complaint is entirely inappropriate in the context of a motion to dismiss." (Opp'n at 8, Docket No. 20.)

Defendant contends that Plaintiff's Complaint incorporated by reference the Policy and Notice of Cancellation. "[U]nder the 'incorporation by reference' doctrine, [courts may] take into account documents 'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading.' " Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005) (quoting In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 986 (9th Cir. 1999)); see also Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 322, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007) (noting that courts must consider a complaint in its entirety, along with any documents incorporated by reference or subject to judicial notice, to resolve a motion to dismiss). "The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken– or doom–their claims." Khoja, 899 F.3d at 1002 (citing Parrino v. FHP, Inc., 146 F.3d 699, 706 (9th Cir. 1998)). The Ninth Circuit has "extended the 'incorporation by reference' doctrine to situations in which the plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint." Knievel, 183 F.3d at 986 (citing Parrino v. FHP, Inc., 146 F.3d 699, 706 (9th Cir. 1998)). Here, the Complaint references the contents of the Policy and Notice of Cancellation several times and their authenticity is undisputed. (See Compl. ¶¶ 4, 6, 8, 18-19, 21.) Accordingly, the Court finds it may properly consider the Policy and Notice of Cancellation under the incorporation by reference doctrine in deciding the Motion.

**\*3** Defendant also requests the Court take judicial notice of two documents, a January 5, 2018 Order in Exotic Reef Imports, Inc. v. Scottsdale Ins. Co., 2018 WL 1030342, and a February 27, 2023 Demurrer to Plaintiff's Complaint from the state court action. A court "may judicially notice a fact that is not subject to reasonable dispute because it" either (1) "is generally known within the trial court's territorial jurisdiction," or (2) "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Civ. P. 201(b). "Proper subjects of judicial notice when ruling on a Rule 12 motion include court

Clement 1 LLC v. Scottsdale Insurance Company, Slip Copy (2023)
2023 WL 4492422

documents already in the public record and documents filed in other courts; records of state agencies; and publicly accessible websites." Minor v. FedEx Off. & Print Servs., Inc., 78 F. Supp. 3d 1021, 1027 (N.D. Cal. 2015) (internal citations omitted). Because the documents are already available as documents filed in other courts, the Court finds they are properly subject to judicial notice. However, the Court cannot take judicial notice of any disputed facts therein. See Lee, 250 F.3d at 689.

**B. Breach of Contract**

To prevail on a breach of contract claim, a plaintiff must establish: " '(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff.' " Careau & Co. v. Sec. Pac. Bus. Credit, Inc., 222 Cal. App. 3d 1371, 1388 (1990) (citing Reichert v. Gen. Ins. Co., 68 Cal. 2d 822, 830 (1968)). Defendant argues that Plaintiff cannot establish Defendant breached the Policy, because the Notice of Cancellation was effective under the Policy's terms and the California Insurance Code.

Under the California Insurance Code, " '[c]ancellation' means termination of coverage by an insurer (other than termination at the request of the insured) during a policy period." Cal. Ins. Code § 660(g). Generally, insurance policies may be cancelled only pursuant to their terms, by mutual consent, or where authorized by statute. See Clarendon Nat'l Ins. Co. v. Ins. Co. of the W., 442 F. Supp. 2d 914, 937-38 (E.D. Cal. 2006) (citing Spott Elec. Co. v. Indus. Indem. Co., 30 Cal. App. 3d 797, 806, 106 Cal. Rptr. 710 (1973)). "Subject to legislative restriction, parties may agree on the cause, method, and means of cancellation." Id. at 938 (citing Jensen v. Traders & Gen. Ins. Co., 52 Cal.2d 786, 790, 345 P.2d 1 (1959)). Here, Plaintiff contends that California Insurance Code Section 676 limits Defendant's right to cancel the insurance policy. Under Section 676, "[a]fter a policy specified in Section 675 has been in effect for 60 days, or, if the policy is a renewal, effective immediately, no notice of cancellation shall be effective unless it is based on the occurrence" of one of six enumerated situations. Plaintiff argues that limitation applies, as the Policy had been in effect for 60 days and was a renewal policy, and that Defendant's Notice of Cancellation was deficient for not stating an enumerated ground for cancellation from Section 676.

Defendant counters, and the Court agrees, that Section 676 does not apply to the Policy. By its terms, Section 676

specifically applies to "a policy specified in Section 675." [1/] Section 675, in turn, limits application of the insurance code chapter to those insurance plans, other than automobile and workers' compensation insurance, that insure against loss on residential real property, personal property not used in commercial enterprises, and liability arising outside of commercial liability. See Cal. Ins. Code § 675; see also Gasumyan v. Travelers Cas. Ins. Co. of Am., No. 16-08197-AB (GJSx), 2017 WL 6888703, at *2 (C.D. Cal. Dec. 6, 2017) (finding that California Insurance Code Section 677, which requires mailed notice of cancellation, did not apply to a commercial policy because Section 675 limited the chapter's application to "insurance on residential real property, insurance on personal property except that used in a commercial enterprise, and liability policies except for commercial liability policies"). It is undisputed here that the Policy is a commercial insurance policy, so Sections 675 and 676 do not apply. Instead, the relevant California Insurance Code provision to consider is Section 676.2, which governs the cancellation of commercial insurance policies. See Curtis v. Zurich Am. Ins. Co., No. 1:06-CV-00053 OWW LJO, 2007 WL 963294, at *6 (E.D. Cal. Mar. 29, 2007). In similar fashion to Section 676, Section 676.2 limits the acceptable grounds for cancellation but "applies only to policies of commercial insurance that are subject to Section 675.5." Cal. Ins. Code § 676.2; see also Clarendon, 442 F. Supp. 2d at 938 ("Pursuant to Cal. Ins. Code § 676.2(b), an insurer may cancel commercial insurance for any reason in the first sixty days; the statute limits the form of cancellation notices and the grounds for cancellation or policies that have been in effect for more than sixty days.").

1/      Plaintiff's construction that Section 676 applies to all renewal policies relies upon a severe misreading of the timing requirement. Section 676 is clear that policies falling under Section 675 can be cancelled for any grounds prior to 60 days of taking effect, but must include an enumerated ground after 60 days or where the policy has been renewed.

**\*4** Defendant argues that Section 676.2 also does not apply, because Defendant is a surplus line insurer that is exempt from Section 675.5. Section 675.5 extends the insurance code chapter's application to commercial insurance and delineates what qualifies. See Cal. Ins. Code § 675.5(a)-(c). Section 675.5(d) then provides carve-outs of what "the term commercial insurance does not include." Relevant here, Section 675.5(d)(7) states that commercial insurance does not include "[s]urplus line insurance, which is nonadmitted

2023 WL 4492422

insurance as defined in subdivision (m) of Section 1760.1." Cal. Ins. Code § 675.5(d)(7); see San Pedro Forklift, Inc. v. Capitol Specialty Ins. Corp., No. CV 11-645 DSF (CWx), 2011 WL 13220106, at *3 (C.D. Cal. May 16, 2011) ("Defendant is a surplus line insurer ... and surplus line insurance is not covered by Section 675."); Ausmus v. Lexington Ins. Co., No. 08-CV-2342 L(LSP), 2009 WL 1098627, at *3 (S.D. Cal. Apr. 22, 2009) (noting that Section 675.5 extends application of the insurance code chapter to policies of commercial insurance but "excludes surplus line insurance from its definition of commercial insurance."); Indep. Taxi Owners Ass'n v. Pub. Livery Ins. Servs. Inc., No. CV 08-5199-GHK (AGRx), 2008 WL 11338187, at *1 (C.D. Cal. Sept. 30, 2008) ("§ 675.5 does not apply to the insurance contract between Plaintiff and Defendant because that contract was a 'surplus line insurance contract,' which are specifically excluded under the statute."). Here, Plaintiff does not dispute that Defendant is a surplus line insurer, and the Policy itself warns of Defendant's status as a surplus line insurer. (See Policy at 3, Docket No. 17-3 ("1. The insurance policy that you have purchased is being issued by an insurer that is not licensed by the State of California. These companies are called 'nonadmitted' or 'surplus line' insurers.").) Accordingly, Sections 675.5 and 676.2 do not apply.

Because no legislative restriction limited the parties' right to cancellation, the parties' agreement controls. The Policy contains a page titled "COMMON POLICY CONDITIONS," Form IL 00 17 11 98, that allows Defendant to cancel the policy by mailing or delivering a written notice of cancellation at least thirty days before the effective date of cancellation if Defendant cancels for any reason other than nonpayment of premium. (See Policy at 15, Docket No. 17-3.) Defendant did so here, making the Notice of Cancellation effective and Defendant's refusal to pay benefits under the Policy was not a breach. See Carma Devs. (Cal.), Inc. v. Marathon Dev. Cal., Inc., 2 Cal. 4th 342, 374, 826 P.2d 710, 728 (1992) ("[I]f defendant were given the right to do what they did by the express provisions of the contract there can be no breach."). Plaintiff has therefore failed to state a claim for breach of contract.

Furthermore, Plaintiff is unable to cure this deficiency through amendment. When assessing whether leave to amend is proper, courts consider "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." U.S.

ex rel. Lee v. SmithKline Beecham, Inc., 245 F.3d 1048, 1052 (9th Cir. 2001) (internal citations and quotations omitted). However, "[f]utility of amendment can, by itself, justify the denial of a motion for leave to amend." Id. "Although leave to amend should be liberally granted, the amended complaint may only allege 'other facts consistent with the challenged pleading.'" Reddy v. Litton Indus., Inc., 912 F.2d 291, 296-97 (9th Cir. 1990) (quoting Schreiber Distributing Co. v. Serv-Well Furniture Co., Inc., 806 F.2d 1393, 1401 (9th Cir. 1986)). Because Defendant's Notice of Cancellation was effective, any amendment would be futile. Plaintiff's claim for breach of contract is therefore dismissed without leave to amend.

### 2. Breach of Implied Covenant of Good Faith and Fair Dealing

Defendant next argues that Plaintiff's claim for breach of the implied covenant of good faith and fair dealing fails as a matter of law. "There is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." Comunale v. Traders & Gen. Ins. Co., 50 Cal. 2d 654, 658, 328 P.2d 198, 200 (1958). "Improper or ineffective attempts to cancel coverage may expose the insurer to liability for breach of its implied covenant of good faith and cooperation with the insured. However, a cancellation accomplished in accordance with statutory and contractual requirements normally will not breach the insurer's implied covenant." Clarendon, 442 F. Supp. 2d at 940 (citing Williams v. State Farm Fire & Cas. Co., 216 Cal. App. 3d 1540, 1549, 265 Cal. Rptr. 644 (1990)); see also Brodkin v. State Farm Fire & Cas. Co., 217 Ca. App. 3d 210, 218, 265 Cal. Rptr. 710 (1989) ("[T]here could be no cause of action for breach of the covenant of good faith or of any statutory duty since State Farm correctly denied the claim."). As discussed above, Defendant successfully canceled the Policy without running afoul of statutory or contractual requirements. Accordingly, Plaintiff fails to state a claim for breach of the implied covenant of good faith and fair dealing.

**\*5** Further, any amendment would be futile because Defendant successfully cancelled the Policy. Accordingly, Plaintiff claim for breach of the implied covenant of good faith and fair dealing is dismissed without leave to amend. See U.S. ex rel. Lee, 245 F.3d at 1052 ("Futility of amendment can, by itself, justify the denial of ... leave to amend.").

Clement 1 LLC v. Scottsdale Insurance Company, Slip Copy (2023)
2023 WL 4492422

IT IS SO ORDERED.

### Conclusion

For the reasons discussed above, the Court dismisses Plaintiff's claims without leave to amend. The Court will issue a Judgment consistent with this order.

**All Citations**

Slip Copy, 2023 WL 4492422

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT "3"

2003 WL 25257821
Only the Westlaw citation is currently available.
United States District Court,
N.D. California.

In re: CROWN VANTAGE, INC., Debtor.

No. 02–3836 MMC.
|
Sept. 25, 2003.

## Attorneys and Law Firms

Allan Steyer, Edward Egan Smith, Steyer Lowenthal Boodrookas Alvarez & Smith LLP, San Francisco, CA, Leo Ray Beus, Malcolm Loeb, Robert T. Mills, Scot Stirling, Beus Gilbert, Scottsdale, AZ, David W. Trench, Bilzin Sumberg Baena Price & Axelrod, Miami, FL, for Plaintiff.

Dale L. Bratton, Hilary E. Ware, Laurence Andrew Weiss, Michael L. Rugen, Heller Ehrman White & McAuliffe LLP, Scott A. Fink, Gibson, Dunn & Crutcher, LLP, Blaine I. Green, Bruce A. Ericson, Pillsbury Winthrop Shaw Pittman LLP, Kristin Linsley Myles, Munger Tolles & Olson LLP, Benjamin K. Riley, Howrey LLP, Loren Kieve, Quinn Emanuel Urquhart Oliver & Hedges LLP, David P. Chiappetta, Bingham McCutchen LLP, Stephen D. Hibbard, Shearman & Sterling LLP, James C. Krieg, Stan G. Roman, Krieg Keller Sloan Reilley & Roman LLP, San Francisco, CA, John S. Barr, John V. Cogbill, III, McGuirrewoods LLP, Richmond, VA, George B. Curtis, Gibson, Dunn & Crutcher LLP, Denver, CO, Thomas Dupree, Gibson, Dunn & Crutcher LLP, Washington, DC, Robert Fraley, New York, NY, Scott Solomon, A. William Urquhart, Quinn Emanuel Urquhart Oliver & Hedges, Joseph F. Coyne, Jr., Michelle Sherman, Kenneth Alfred O'Brien, Sheppard Mullin Richter & Hampton LLP, Linda J. Smith, James M. Pearl, Kenyon Woolley, O'Melveny & Meyers LLP, Los Angeles, CA, Philip C. Korologos, David Boies, Boies Schiller & Flexner, Armonk, NY, for Defendants.

Randall J. Newsome, Oakland, CA, pro se.

USBC Manager, Oakland, CA, pro se.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS; DEFERRING RULING ON CERTAIN ISSUES

MAXINE M. CHESNEY, J.

(Docket Nos. 83, 84, 86, 89, 90, 96, 97)

**\*1** The above-titled consolidated proceeding consists of three matters that previously were pending in the United States Bankruptcy Court for the Northern District of California, as part of *In re Crown Vantage, Inc.,* a Chapter 11 proceeding filed by Crown Vantage, Inc. ("Crown Vantage") and Crown Paper Company ("Crown Paper").[1] The three matters are: (1) *Fort James Corporation v. Crown Vantage, Inc., et al.,* C 02–3838 ("the Fort James case"); (2) *Crown Paper Co., et al., v. Fort James Corp., et al.,* C 02–3839 MMC ("the Crown Vantage case"); and (3) *Crown Paper Liquidating Trust v. PricewaterhouseCoopers, et al.,* C 02–3836 MMC ("the Liquidating Trust case").

[1]    By orders filed April 23, 2002 and August 8, 2002, the bankruptcy court certified the three matters to the District Court for withdrawal of the reference pursuant to Bankruptcy Local Rule 9015–2, and on April 16, 2003, the consolidated proceeding was reassigned to the undersigned.

Before the Court is the motion of defendants Fort James Corporation, Fort James Operating Company, Fort James Fiber Company, and Fort James International Holdings, Ltd. (collectively, "Fort James") to dismiss the First Amended Complaint in the Crown Vantage case ("the FJ FAC"). Also before the Court are nine motions to dismiss the First Amended Complaint in the Liquidating Trust case ("the PWC FAC"), filed, respectively, by the following defendants: (1) PricewaterhouseCoopers LLP, f/k/a Coopers & Lybrand ("PWC"); (2) Ernst & Young LLP ("E & Y"); (3) McGuireWoods LLP, as successor to McGuire Woods Battle & Boothe, LLP ("McGuire Woods"); (4) Merrill Lynch & Co., Merrill Lynch Pierce Fenner & Smith, (collectively, "Merrill Lynch") and Salomon Brothers ("Salomon"); (5) Credit Suisse First Boston Corporation, as successor to Donaldson, Lufkin & Jenrette ("DLJ"); (6) Houlihan Lokey Howard & Zukin ("Houlihan Lokey"); (7) Ernest Leopold ("Leopold"); (8) Clifford Cutchins ("Cutchins"), Stephen Hare ("Hare"), and Robert C. Williams ("Williams"); and (9) William Daniel ("Daniel"), Joseph T. Piemont ("Piemont"), and E. Lee Showalter ("Showalter").

On August 15, 2003, the motions came on regularly for hearing, at which time all parties appeared through their

counsel of record. Having considered the papers filed in support and in opposition to the motions, and the arguments of counsel, the Court rules as follows.

## FACTUAL BACKGROUND

Crown's [2] claims arise out of a series of transactions, which Crown refers to as the "Spin," and from the aftermath of those transactions. In the pleadings, Crown defines the "Spin" as "a scheme by Fort James [ ] to unload vastly over-valued but under-performing assets onto Crown, and to cause Crown to borrow well over half a billion dollars, all of which monies were then taken by Fort James, while Crown remained obligated to pay on the loans." (*See* FJ FAC ¶ 627; *see also* PWC FAC ¶¶ 12–17.) [3]

[2]    Plaintiffs refer to Crown Vantage and Crown Paper "interchangeably" and "collectively" as "Crown," except where necessary to differentiate between them. (*See* FJ FAC ¶ 4; PWC FAC ¶ 21.) For the purposes of this order, the Court will refer to plaintiffs as "Crown," except where necessary to differentiate between them.

[3]    At the hearing, Crown expanded on its definition of the "Spin" by explaining that, in its view, the "Spin" consisted of four transactions, occurring when: (1) Fort James predecessor, James River Corporation, transferred assets and liabilities to Crown Paper, in exchange for Crown Paper stock; (2) Crown Paper borrowed money from third parties; (3) James River Corporation obtained from Crown Vantage pay-in-kind notes; and (4) Crown transferred cash to James River Corporation.

The following facts, taken from the FJ FAC and from the PWC FAC, are assumed true solely for the purposes of the motions to dismiss.

In 1994, defendant Fort James' predecessor, James River Corporation ("JRC"), was "on the brink of insolvency." (FJ FAC ¶¶ 5, 101; PWC FAC ¶¶ 2, 106.) In March 1995, defendant McGuire Woods, a law firm whose clients included JRC and Crown, formed Crown Vantage and Crown Paper as Virginia corporations, being aware of JRC's financial situation and intending that Crown would be "the dumping ground of JRC's unwanted assets and liabilities." (FJ FAC ¶¶ 21, 131; PWC FAC ¶¶ 24, 136.) Crown Vantage was a

"publicly traded holding company owning 100% of Crown Paper's outstanding stock" (PWC ¶ 3), and JRC became the "sole shareholder" of Crown Vantage. (FJ FAC ¶¶ 260(a), 630; PWC FAC ¶¶ 265(a).) JRC elected insiders of JRC to the Crown Board of Directors, and those "insider directors" were under control of, and acted for the benefit of, JRC. (FJ FAC ¶ 133; PWC FAC ¶ 138.) Additionally, three "independent" directors were appointed to the Crown Board. (FJ FAC ¶ 167; PWC FAC ¶ 172.) On August 15, 1995, the Crown Board of Directors, including the "independent" directors, voted to enter into transactions "related to the Spin," (FJ FAC ¶¶ 208, 242; PWC FAC ¶¶ 213, 247) and, on August 25, 1995, the "spin-off" of Crown from JRC occurred. (FJ FAC ¶ 696.)

**\*2**  In planning and executing the Spin, JRC had "sole and complete decision-making power." (FJ FAC ¶ 134; PWC FAC ¶ 139.) Under the transactions comprising the Spin, JRC transferred to Crown assets that were "depleted" and "extremely overvalued." (FJ FAC ¶¶ 159(a), 400; PWC FAC ¶¶ 164(a), 405.) JRC also caused Crown to transfer to JRC $551,200,000 in cash, [4] (FJ FAC ¶ 252; PWC FAC ¶ 257), caused Crown to issue $100 million in "Senior Pay–in–Kind" ("PIK") Notes to JRC, (*id.*), and caused Crown to enter into an agreement under which Crown became liable for "numerous contractual and other liabilities" of JRC. (FJ FAC ¶ 254; PWC FAC ¶ 259.) [5] Crown alleges these transfers of cash, notes and liability constituted "fraudulent transfers." (*See* FJ FAC ¶ 254; PWC FAC ¶ 259.) The "fraudulent transfers" rendered Crown "insolvent, in that its liabilities, including future probable liabilities, exceeded its assets. (FJ FAC ¶ 260(m); PWC FAC ¶ 265(m).)

[4]    As a result of alleged misrepresentations made by JRC to a group of banks, Crown had obtained a "credit facility," comprising two "terms loans," and a "revolving line of credit." (FJ FAC ¶ 166; PWC FAC ¶ 171.)

[5]    Many of the transferred liabilities were not associated with any of the transferred assets. (FJ FAC ¶ 159(b); PWC FAC ¶ 164(b).)

In order to persuade the "independent" Crown directors to approve the "Spin," JRC hired defendant Houlihan Lokey, an investment banking firm, to render a "solvency opinion" to be presented to Crown. (FJ FAC ¶¶ 25, 169–70; PWC FAC ¶¶ 28, 174–75.) JRC provided Houlihan Lokey with "inflated projections" that had been created by defendant Williams, the President of JRC, who was "directly involved

in each aspect of structuring and planning of the Spin," and by defendant Merrill Lynch, an underwriter serving as Crown's investment adviser and which "was primarily responsible for structuring the Spin." (FJ FAC ¶¶ 22, 33, 173, 205, 278, 286, 446; PWC FAC ¶¶ 25, 36, 178, 210, 283, 291, 451.) In its opinion, Houlihan Lokey "rubber-stamp[ed]" JRC's projections, although Houlihan Lokey knew it could not justifiably rely on the projections, and advised the Crown directors that Crown "would go forward as a solvent business." (FJ FAC ¶¶ 204, 207, 437; PWC FAC ¶¶ 209, 212, 442.)

Williams concealed from Crown the fact that the value of the assets JRC transferred to Crown was "substantially overstated on financial statements," that the transferred liabilities were "severely understated," and that "Crown was insolvent." (FJ FAC ¶ 449; PWC FAC ¶ 454.) Just prior to the Spin, defendant PWC, an accounting firm, prepared an audit report for the Crown directors containing falsehoods by the persons who prepared Crown's financial statements; PWC "turned a blind eye to the material misrepresentations." (FJ FAC ¶¶ 19, 245–47, 455, 463–64; PWC FAC ¶¶ 22, 250–52, 460, 468–69.) Had PWC prepared a proper accounting, "Crown would have been deemed insolvent from the date of the spin." (FJ FAC ¶ 464; PWC FAC ¶ 469.) Defendant McGuire Woods, who provided legal advice to Crown with respect to the Spin, failed to advise Crown that McGuire Woods knew Crown would not have adequate capital to survive if Crown approved the Spin. (FJ FAC ¶ 213; PWC FAC ¶ 218.) Defendant Salomon, an underwriter, prepared a prospectus containing false information provided by JRC concerning the assets to be transferred by JRC to Crown, and failed to advise Crown of the falsehoods. (FJ FAC ¶¶ 23, 309, 318; PWC FAC ¶¶ 26, 314, 323.)

 *3  Defendants Cutchins and Hare were Crown directors just prior to the Spin. (FJ FAC ¶¶ 398, 403; PWC FAC ¶¶ 403, 408.) During such time as Cutchins and Hare served as Crown directors, they worked to "construe all arrangements between JRC and Crown in favor of JRC," and hired Merrill Lynch to work for Crown because they knew Merrill Lynch would "go along with JRC's inflated valuation" of the assets that were to be transferred in the Spin. (FJ FAC ¶¶ 400, 402; PWC FAC ¶¶ 405, 407.) Defendants Daniel and Piemont, two of Crown's directors, both of whom were also directors of JRC, approved the Spin even though they knew at the time that the assets transferred from JRC to Crown were "over-valued," knew that Crown was "insolvent," and knew that "the Spin was structured to only benefit JRC." (FJ FAC ¶¶ 412, 439, 442;

PWC FAC ¶¶ 417, 442, 447.) Defendant Leopold, chosen by Williams to be Chairman of the Crown Board of Directors, knew "at the time of the Spin" that the assets transferred from JRC to Crown were "significantly overvalued and insufficient collateral to the subordinated debt offering." (FJ FAC ¶¶ 419, 421, 423; PWC FAC ¶¶ 424, 426, 428.) Defendant Showalter, a Crown director who had been an employee of JRC, knew the "true condition" of assets transferred from JRC to Crown and worked closely with PWC to "hide the fact that Crown's assets were overvalued." (FJ FAC ¶¶ 434–35; PWC FAC ¶¶ 439–40.)

After the transfers, JRC distributed "all of the outstanding shares of Crown Vantage to the JRC shareholders." (FJ FAC ¶ 257; PWC FAC ¶ 262, 265(o).)[6] JRC continued to "exercise[ ] adverse dominion and control" over the Crown directors, and the "vestiges of JRC's control of Crown continued through and up to the time Crown filed for bankruptcy." (FJ FAC ¶¶ 346, 389; PWC FAC ¶¶ 351, 394.) JRC, assisted by the other defendants, "continued to misrepresent and/or conceal Crown's true financial condition ... long after Crown became insolvent." (FJ FAC ¶ 389; PWC FAC ¶ 394.) The "concealment of Crown's true financial condition artificially prolonged the life of Crown while giving the illusion ... that Crown's business was prosperous when, in fact, it was not." (FJ FAC ¶ 393; PWC FAC ¶ 398.)

[6]     Although the FACs do not state on what date this occurred, Crown reported to the SEC in 1997 in a Form 10–K that "[a] total of 8,446,362 shares of [Crown Vantage]'s common stock were issued and began trading on NASDAQ on August 28, 1995." (*See* Hibbard Decl. Ex. G at 4.) Defendants' request, unopposed by Crown, that the Court take judicial notice of the Form 10–K is hereby GRANTED.

McGuire Woods, who continued to represent Crown, concealed from Crown after the Spin "all documents and information related to the Spin." (FJ FAC ¶ 350; PWC FAC ¶ 355.) Merrill Lynch and Houlihan Lokey, after the transfers, provided "false and misleading opinions" that the Spin had been "fair and equitable and not a fraudulent transfer." (FJ FAC ¶ 351; PWC FAC ¶ 356.) PWC prepared and disseminated "false and misleading financial statements" to assist JRC in "the perpetuation of the illusion of growth and prosperity and artificially prolonging Crown's life." (FJ FAC ¶ 489; PWC FAC ¶ 494.) Salomon, who "conducted due

diligence regarding Crown's post-Spin operations," did not advise Crown of "the true nature of the assets." (FJ FAC ¶¶ 357–58; PWC FAC ¶¶ 362–63.) Defendant Credit Suisse First Boston Corporation's predecessor, DLJ, which beginning in 1997 worked for Crown as a financial advisor pursuant to the terms of an "engagement letter," did not advise Crown of the true value of its assets and should have advised Crown to file for bankruptcy, rather than to continue as a "going concern." (FJ FAC ¶¶ 360, 379–80; PWC FAC ¶¶ 365, 384–85.)

**\*4** Defendant E & Y, an accounting firm that began performing services for Crown after the Spin, prepared audits for Crown that falsely represented Crown's financial position. (FJ FAC ¶¶ 20, 538; PWC FAC ¶¶ 23, 543.) In particular, E & Y "intended to hide the fact" that other defendants had "failed to properly write-down" the value of certain assets. (FJ FAC ¶ 608; PWC FAC ¶ 612.) Showalter worked with E & Y to approve each of E & Y's audits of Crown so as "to conceal Crown's deepening insolvency, to hide the over-valuing of the transferred assets and to conceal his wrongdoing and that of [the other] Defendants." (FJ FAC ¶ 436; PWC FAC ¶ 441.) Williams, Cutchins, Hare, and Leopold also were aware of, but failed to disclose, Crown's insolvency after the Spin. (FJ FAC ¶¶ 341–42; PWC FAC ¶¶ 346–47.) Daniel and Piemont, after the Spin, failed to take any step to "remedy the Spin." (FJ FAC ¶ 443; PWC FAC ¶ 448.)

On March 18, 1998, JRC and Crown entered into a settlement agreement, under which Crown's obligations to JRC under the PIK Notes were modified and Crown released any "potential claims arising out of the Spin" that Crown had against JRC and certain "generically described parties." (FJ FAC ¶¶ 323–24, 333; PWC FAC ¶¶ 328–29, 338.) Crown alleges that the release was a "fraudulent conveyance" because "Crown received nothing in return for the release of claims." (*See* FJ FAC ¶ 335; PWC FAC ¶ 340.)

Showalter, in his capacity as a Crown director but acting in the best interest of JRC, voted to approve the settlement agreement. (FJ FAC ¶ 438; PWC FAC ¶ 443.) Piemont and Daniel voted to approve the settlement agreement even though it provided no benefit to Crown. (FJ FAC ¶ 443; PWC FAC ¶ 448.) Leopold signed the settlement agreement on behalf of Crown, thereby "potentially absolv[ing] JRC of any liability for certain prior wrongful acts done to Crown," even though Leopold had, four months earlier, stated to JRC that one of the Spin transactions had been "a one-sided deal, drafted only in favor of JRC." (FJ FAC ¶¶ 431–

32; PWC FAC ¶¶ 436–37.) E & Y, knowing there was "no economic justification" for the settlement agreement, failed to disclose that the settlement agreement was "absent arms length fairness or proper consideration." (FJ FAC ¶¶ 517–18; PWC FAC ¶¶ 522–23.) DLJ advised Crown to enter into the settlement agreement in order to "protect" JRC and other defendants from liability as a result of the Spin. (FJ FAC ¶¶ 386–87; PWC FAC ¶¶ 391–92.)

On March 15, 2000, Crown, having "become insolvent by well in excess of $1 Billion," filed for bankruptcy protection. (FJ FAC ¶ 13.)

## PROCEDURAL BACKGROUND

As noted, on March 15, 2000, Crown filed for bankruptcy protection. During the course of the bankruptcy proceedings, Fort James filed proofs of claims against the bankruptcy estate. (*See* Coyne Decl., filed November 1, 2002, Exs. C–1.) On April 13, 2001, Fort James filed in the bankruptcy court the Fort James case, by which Fort James seeks, *inter alia,* a declaration that the "Transaction" [7] was not a "fraudulent transfer" and that any claim by Crown against Fort James arising out of the "Transaction" has been "waived, barred and precluded by, among other things, the doctrines of waiver, unclean hands, laches, estoppel, and any and all statutes of limitations." (*See* Compl. For Declaratory J., prayer for relief.)

[7]     The Transaction" to which Fort James refers in the Fort James case is the "Spin." or at least some of the transfers Crown alleges constituted the "Spin."

**\*5** On September 26, 2001, Crown filed in the bankruptcy court the Crown Vantage case, by which Crown asserts against Fort James claims for fraudulent transfer, breach of fiduciary trust, and related causes of action. By order filed November 19, 2001, the bankruptcy court, upon stipulation of the parties, deemed the Fort James case to be a counter-claim to the Crown Vantage case. On April 23, 2002, in light of Crown's jury demand in the Crown Vantage case and Fort James' lack of consent to a jury trial before the bankruptcy court, the bankruptcy court certified the Crown Vantage and Fort James cases for withdrawal of the reference.

Meanwhile, on November 19, 2001, the bankruptcy court confirmed Crown's proposed plan. Under the confirmed plan, Crown Paper Liquidating Trust ("the Liquidating Trust")

became the successor-in-interest to Crown. On March 14, 2002, the Liquidating Trust filed in state court the Liquidating Trust case, alleging therein that 15 defendants participated in Fort James's wrongful conduct, aided and abetted Fort James and each other, or otherwise breached independent duties owed to Crown with respect to the "Spin" and its aftermath. E & Y removed the Liquidating Trust case to bankruptcy court. On August 8, 2002, in light of Crown's jury demand in the Liquidating Trust case and E & Y's lack of consent to a jury trial before the bankruptcy court, the bankruptcy court certified the Liquidating Trust case to the District Court for withdrawal of the reference.

On September 20, 2002, the Honorable William H. Alsup, to whom the matters were then assigned, consolidated the Crown Vantage case, the Fort James case, and the Liquidating Trust case for all pre-trial purposes. On October 31, 2002, plaintiffs filed FACs in both the Crown Vantage and Liquidating Trust cases.

DISCUSSION

Defendants argues that Crown's claims in the FACs should be dismissed on numerous grounds. The Court will first address the arguments made by defendants in the Omnibus Memorandum of Points and Authorities in Support of Motions to Dismiss ("Omnibus Memorandum"), to which all defendants in the Liquidating Trust case and Fort James, the only defendant in the Crown Vantage case, have joined. The Court will then consider additional arguments made in the separately filed motions to dismiss.

A. Omnibus Memorandum Issues

1. Standing

As a threshold issue, defendants argue that Crown lacks standing to assert the claims made against them.[8] Defendants observe that the pleadings contain many allegations that defendants, or some of them, have misled Crown's creditors, (see, e.g., PWC FAC ¶ 159 (alleging Merrill Lynch was aware statements made by certain defendants to "potential creditors" of Crown were false)), and argue that Crown is attempting to seek relief for injuries to the creditors.

[8]    Fort James has joined in this argument to the extent that Crown has asserted claims on behalf of Crown itself, specifically Counts 3 through 13 asserted in

the Crown Vantage case, as opposed to the two claims brought on behalf of Crown's creditors, specifically Counts 1 and 2 asserted in the Crown Vantage case. (See Fort James' Official Response to Court's Question Re Joinder, filed September 9, 2003.)

The claims that Crown asserts against defendants arise from the following allegations: (1) defendants were responsible for the alleged "fraudulent transfers" occurring during the Spin, whereby, inter alia, Crown paid over $550,000,000 to JRC, as well as other consideration, in exchange for worthless assets; (2) defendants were aware at all times prior to Crown's filing for bankruptcy that Crown was insolvent, but failed to advise Crown of that fact and took steps to artificially prolong Crown's existence; and (3) defendants caused Crown to enter into an agreement releasing claims Crown had against JRC and others arising out of the Spin, as well as modifying other obligations Crown had to JRC, but failed to advise Crown that Crown was not receiving any valid consideration in return from JRC. Such allegations adequately allege that defendants caused injury to Crown. Consequently, Crown has standing to allege claims based on such conduct. See *National Organization for Women v. Scheidler*, 510 U.S. 249, 256, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994) (holding to establish standing, plaintiff, at pleading stage, need only allege some injury to itself "fairly traceable to the defendant's allegedly unlawful conduct").

**\*6**  Accordingly, defendants are not entitled to dismissal on the ground that Crown has not alleged the requisite injury to itself for purposes of standing.

2. In Pari Delicto

Defendants argue that Crown is barred from asserting the claims made against them under the doctrine of in pari delicto.[9]  The doctrine of in pari delicto bars a participant in an unlawful act from recovering damages from another participant in the unlawful act. See, e.g., *Terlecky v. Hurd (In re Dublin Sec., Inc.),* 133 F.3d 377, 380 (6th Cir.1998). Where a plaintiff is a corporation, the doctrine applies if, under agency principles, the unlawful actions of an agent of the corporation are imputed to the corporation. See id.

[9]    Fort James has joined in this argument to the extent that Crown has asserted claims on behalf of Crown itself, specifically Counts 3 through 13 asserted in the Crown Vantage case, as opposed to the two

claims brought on behalf of Crown's creditors, specifically Counts 1 and 2 asserted in the Crown Vantage case. (*See* Fort James' Official Response to Court's Question Re Joinder, filed September 9, 2003.)

  a. Invoking In Pari Delicto Against Bankruptcy Trustee
Crown argues that the doctrine of in pari delicto cannot be invoked against a bankruptcy trustee, irrespective of whether it could have been invoked against the debtor corporation. Although the Ninth Circuit has not had occasion to directly address the issue, every Circuit to have considered the question has held that in pari delicto can be asserted against a trustee bringing a claim on behalf of a debtor in bankruptcy. *See Official Committee of Unsecured Creditors v. R.F. Lafferty & Co.,* 267 F.3d 340, 356–58 (3 [rd] Cir.2001); *Terlecky,* 133 F.3d 377, 381 (6 [th] Cir.1998); *Sender v. Buchanan (In re Hedged–Investments Associates, Inc.),* 84 F.3d 1281, 1284–86 (10 [th] Cir.1996); *Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1093 (2 [nd] Cir.1995). As explained in *Sender,* when a trustee asserts a claim on behalf of a debtor, the trustee proceeds under 11 U.S.C. § 541(a)(1), which defines the property of the estate as "all legal or equitable interests of the debtor in property as of the commencement of the case." *See Sender,* 84 F.3d at 1285 (citing 11 U.S.C. § 541(a)(1)). *Sender* concluded that § 541(a)(1) "establishes the estate's rights as no stronger than they were when actually held by the debtor," and thus in pari delicto, or any other defense available as against the debtor, can be asserted against the trustee. *See id.*

The legislative history of § 541 lends support for this conclusion:

> Though this paragraph [§ 541(a)(1) ] will include choses in action and claims by the debtor against others, it is not intended to expand the debtor's rights against others more than they exist at the commencement of the case. For example, if the debtor has a claim that is barred at the time of the commencement of the case by the statute of limitations, then the trustee would not be able to purse that claim, because he too would be barred.

*See* H.R. Rep. 95–595, at 367–68, reprinted in 1978 U.S.C.C.A.N. 5963, 6323.

Relying on *Federal Deposit Ins. Corp. v. O'Melveny & Myers,* 61 F.3d 17 (9 [th] Cir.1995), Crown argues that a different result should pertain in the Ninth Circuit. In *O'Melveny,* the Ninth Circuit, applying California law, held that "defenses based on a party's unclean hands or inequitable conduct do not generally apply against that party's receiver." *See id.* at 19. As the Third Circuit observed in *Lafferty,* however, *O'Melveny* is distinguishable, as that case involved a receiver, a party not subject to the restrictions of § 541(a)(1). *See Lafferty,* 267 F.3d at 358 (distinguishing *O'Melveny* from action brought by bankruptcy trustee; noting "unlike bankruptcy trustees, receivers are not subject to the limits of section 541"). Where, as here, a bankruptcy trustee files claims on behalf of the bankruptcy estate, § 541(a)(1), as discussed above, provides that the trustee's rights are no greater than the rights of the debtor. Indeed, even before the enactment of § 541(a)(1), [10] the Ninth Circuit had observed, "It is elemental that the trustee stands in the shoes of the bankrupt ... and can assert no greater rights against the [defendant] than could have been asserted by the bankrupt in the absence of bankruptcy proceedings." *See Schultz v. England,* 106 F.2d 764, 768 (9 [th] Cir.1939) (holding resolution of trustee's claim to equipment in building leased by landlord to debtor was dependent on whether debtor had right to possess equipment as against landlord); *see also Pellerin v. Stuhley (In re Destro),* 675 F.2d 1037, 1040 (9 [th] Cir.1982) (holding, in context of adversary proceeding against debtor, that bankruptcy trustee "succeeds only to such rights as the bankrupt possessed; and the trustee is subject to all claims and defenses which might have been asserted against the bankrupt but for the filing of the petition").

10    Section 541 was enacted in November 1978.

 **7** Consequently, defendants may assert in pari delicto as a defense.

  b. Application of In Pari Delicto Defense
Because defendants raise the defense of in pari delicto on a motion to dismiss, defendants are entitled to dismissal only if the defense is established on the face of the complaints, specifically, the FJ FAC and the PWC FAC. *See, e.g., Official Committee of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP,* 322 F.2d 147, 163–166 (2 [nd] Cir.2003) (affirming dismissal of claims filed on behalf

2003 WL 25257821

of debtor where applicability of defense of in pari delicto was established in complaint). Because Crown's claims arise under state law, the issue of whether Crown's claims are barred by in pari delicto is governed by state law. *See id.* (holding where Texas law applied to state law claims filed on behalf of debtor, dismissal was appropriate where, under Texas law, defense of in pari delicto was established on face of complaint).

Here, all defendants, with the exception of E & Y and DLJ as discussed below, argue that Virginia law applies to the claims asserted against them. In large part, these defendants rely on the bankruptcy court's ruling in the Crown Vantage case that Virginia law applies to Crown's claims against Fort James. (*See* Order, filed April 23, 2002, in Crown Vantage case). [11] In its opposition, Crown has not requested reconsideration of this ruling, and, indeed, cites Virginia law as supportive of Crown's argument that Crown has stated valid claims. (*See, e.g.,* Pls.' Consolidated Response to Defs.' Mots. To Dismiss at 56:6–9, 68:22–7.) Consequently, the Court will apply Virginia law to Crown's claims against defendants Fort James, PWC, McGuire Woods, Merrill Lynch, Salomon, DLJ, Leopold, Cutchins, Hare, Williams, Daniel, Piemont, Showalter, and, with one exception discussed *infra,* Houlihan Lokey.

[11]    The bankruptcy court reached this result after applying the tests set forth in the Restatement (Second) of Conflict of Laws. (*See id.* at 4–7.)

As discussed in more detail below, E & Y argues that the claims against it are governed by California law and DLJ argues that the claims against it are governed by New York law. For the purposes of the doctrine of in pari delicto, however, no party argues that the law of the three potentially relevant states, namely Virginia, California, and New York, differs in any respect with regard to the doctrine of in pari delicto. Rather, the parties agree that the analysis of the applicability of that doctrine proceeds in three specific steps. [12] First, for the doctrine to apply, agents of the plaintiff corporation must have participated in the wrongdoing for which the corporation seeks to recover. *See Mediators. Inc. v. Manney (In re Mediators),* 105 F.3d 822, 826–27 (2ⁿᵈ Cir.1997) (holding where agents of corporation participated in fraudulent scheme with defendant, corporation was barred from asserting claim against defendant, unless exception to doctrine of in pari delicto applied). [13] Second, if such agents, at the time of such participation, were acting in a manner adverse to the interests of the corporation, the so-called

"adverse interest exception" applies, with the result that the actions of the agents are not imputed to the corporation. *See, e.g., Bankruptcy Services, Inc. v. Ernst & Young (In re CBI Holding Co.),* 247 B.R. 341, 365 (Bankr.S.D.N.Y.2000) (holding where "segment of management involved in the fraud was acting for its own interest and not that of [the corporation]," their participation in accounting fraud was not imputed to corporation, and corporation's claim against defendant accounting firm was not barred). Third, even if the agents of the corporation were acting in a manner adverse to the interests of the corporation, where the agents and the corporation are "one and the same," the "sole actor exception" applies to the "adverse interest exception," with the result that in pari delicto will bar the claim. *See, e.g., Lafferty,* 267 F.3d at 359 (holding "sole actor exception" applied to bar corporation from suing its underwriters for participating with agents of corporation in fraudulent scheme, where such agents "clearly dominated" corporation and one of the agents was the "sole shareholder" of corporation).

[12]    No party cites any case applying either Virginia or California law in which the doctrine of in pari delicto was applied in a case similar to the instant action. No party, however, argues that Virginia or California would apply the doctrine in a manner different from that set forth in the decisions from other jurisdictions on which all parties have relied.

[13]    Although the Second Circuit in *Mediators* did not specifically identify the applicable doctrine, a later decision of the Second Circuit clarified that the doctrine in question was in pari delicto. *See Coopers & Lybrand,* 322 F.3d at 164 (describing *Mediators* as case where Second Circuit affirmed dismissal "upon findings that in pan delicto had been established in the complaints").

**\*8**  Here, according to the FACs, the majority of Crown's directors, along with JRC, participated in all of the allegedly wrongful acts. As discussed above, those acts are alleged to have caused injury to Crown, thus bringing into play the "adverse interest exception." [14] As a consequence, unless the applicability of the "sole actor exception" is apparent from the face of the complaints, defendants are not entitled to dismissal based on the doctrine of in pari delicto.

[14]    Defendants, relying on Crown's allegation that some defendants defrauded banks into loaning Crown large sums of money, argue that JRC and

certain of the other defendants in fact provided benefits to Crown. (*See* Defs.' Omnibus Reply at 13.) As noted above, however, Crown also alleges that after Crown received those funds, the Crown directors voted to transfer the funds to JRC in exchange for JRC's worthless assets. When viewed in the light most favorable to Crown, these allegations cannot be read as a concession that JRC or any other defendant acted for the benefit of Crown.

Defendants argue that the sole actor exception applies in light of Crown's allegation that "JRC, as the sole shareholder of Crown Vantage, exercised dominion and control over Crown as to the Spin," (*see* FJ FAC ¶ 260(a); PWC FAC ¶ 265(a)), and that JRC had "sole and complete decision-making" during those transactions. (*See* FJ FAC ¶ 134; PWC FAC ¶ 139.) In support of this argument, defendants rely on cases applying the sole actor exception where the sole shareholder of the plaintiff corporation participated in the alleged wrongdoing. *See, e.g., Mediators,* 105 F.3d at 827 (holding where sole shareholder "is alleged to have stripped the corporation of assets, the adverse interest exception to the presumption of knowledge cannot apply"; barring corporation's claim against bank and law firm for allegedly assisting shareholder in stripping corporation of its assets). In explaining the basis for this result, the Second Circuit has stated: "This rule imputes the agent's knowledge to the principal notwithstanding the agent's self-dealing because the party that should have been informed was the agent itself albeit in its capacity as principal. Where, as here, a sole shareholder is alleged to have stripped the corporation of assets, the adverse interest exception to the presumption of knowledge cannot apply." *See id.*

In response, Crown relies on its allegations that Crown had "independent" directors who did not participate in, and were unaware of, the wrongdoing, (*see, e.g.,* FJ FAC ¶¶ 167–69; PWC FAC ¶¶ 172–74), as well as its allegations that the independent directors "could have taken steps to prevent the damages and losses [Crown] incurred as a result of the wrongful conduct" had they known of the conduct. (*See* FJ FAC ¶ 346; PWC FAC ¶ 351.) Crown cites several cases holding that the doctrine of in pari delicto does not apply where independent directors could have prevented or stopped the wrongful conduct had they been made aware of it. *See, e.g., Sharp Int'l Corp. v. KPMG LLP (In re Sharp Int'l Corp.),* 278 B.R. 28, 37–39 (Bankr.E.D.N.Y.2002) (holding plaintiff's allegation that "innocent" director would have had ability to "bring an end to the fraudulent activity" was sufficient

to withstand motion to dismiss based on in pari delicto); *Smith v. Arthur Andersen L.L.P.,* 175 F.Supp.2d 1180, 1198–1200 (D.Ariz.2001) (holding plaintiff's allegation that there were "innocent members on [plaintiff's] Board and Audit Committee who were unaware of the wrongdoing" was sufficient to withstand motion to dismiss based on in pari delicto); *CBI Holding,* 247 B.R. at 365 (holding evidence that one of plaintiff's directors "had he known of the fraud, would have taken steps to stop it" was sufficient to defeat defendant's argument that fraud committed by certain of plaintiff's officers and managers was imputed to plaintiff); *Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld, L.L.P.,* 212 B.R. 34,45–46 (S.D.N.Y.1997) (dismissing complaint with leave to amend to allege "innocent member" of plaintiff's management would have had ability to stop CEO's fraudulent activity had such person known of it). In none of the cases on which Crown relies, however, was the plaintiff a corporation owned by a sole shareholder who participated in the wrongdoing for which the plaintiff sought relief. *See, e.g., Sharp,* 278 B.R. at 37–39 (observing corporation had "innocent 13% shareholder" at all times); *Smith,* 175 F.Supp.2d at 1187, 1199 (noting plaintiff corporation argued that sole actor exception did not apply because case did not involve allegation that sole shareholder engaged in wrongdoing; observing corporation had alleged defendants, former officers and directors, had concealed material information from corporation's shareholders); *CBI Holding,* 247 B.R. at 365 (observing plaintiff's 48% shareholder "was innocent of the fraud"); *Wechsler,* 212 B.R. at 35 (observing alleged wrongdoers were not sole shareholders of plaintiff).

**\*9** Although Crown argues that the sole actor exception is inapplicable unless all shareholders and directors participate in the fraud, Crown cites no case in which the sole actor exception was held inapplicable where a sole shareholder participated in the fraud. Rather, irrespective of whether all or some of the directors also participated, the courts have held that where a sole shareholder is a participant in the wrongdoing, an allegation that independent or innocent directors could have taken steps to stop the wrongful conduct is insufficient to avoid the bar of in pari delicto. *See, e.g., Lafferty,* 267 F.3d at 360 (affirming dismissal based on in pari delicto where sole shareholder participated in alleged wrongful conduct for which plaintiff sought relief; holding plaintiff's allegation that some directors did not perpetrate fraud insufficient to avoid application of in pari delicto); *FDIC v. Ernst & Young,* 967 F.2d 166, 171–72 and n. 2 (5 [th] Cir.1992) (affirming grant of summary judgment against plaintiff corporation where "sole owner" of corporation

2003 WL 25257821

engaged in accounting fraud and "dominated the board of directors"; holding evidence that "three outside directors" would have acted differently had they known of fraud insufficient to create triable issue of fact). Under the law of Virginia, the state in which Crown was incorporated, such a result follows from the fact that a sole shareholder has the right to remove directors. *See* Va.Code Ann. § 13.1–680 (affording shareholders right to remove directors). Consequently, to the extent Crown's claims are based on conduct occurring while JRC was Crown's sole shareholder, Crown's "independent" director allegations do not assist Crown in avoiding dismissal based on in pari delicto.

Relying on principles of comparative fault as recognized in California and New York, Crown argues that even if the bar of in pari delicto is apparent from the face of the complaints, the Court, at the pleading stage, should not determine that the bar is complete as to any claims governed by the law of those states, because a jury might conclude that defendants' wrongdoing exceeded that of Crown. None of the claims as to which in pari delicto is applicable, however, is governed by the law of any state other than Virginia. [15] Under Virginia law, negligence on the part of a plaintiff, if concurrent with that of a defendant, is a complete bar to any recovery on a negligence claim. *See Ponirakis v. Choi,* 262 Va. 119, 546 S.E.2d 707, 711 (Va.2001). Although, "[g]enerally, an issue whether a plaintiff is guilty of contributory negligence is a question of fact to be decided by the trier of fact," *see id.,* here, as discussed above, the alleged wrongful acts of JRC, when it was Crown's sole shareholder, are imputed as a matter of law to Crown as a result of the applicability of the doctrine of in part delicto. In other words, there is no triable issue of material fact with respect to contributory negligence.

[15]    The parties agree that the claims based on conduct occurring while JRC was Crown's sole shareholder are subject to Virginia law. The agreement on which DLJ relies in support of its argument that New York law applies was not executed until 1997, well after Crown's stock became available to the public. All of the claims against E & Y, who argues California law governs the claims against it, arise from conduct occurring after Crown's stock became available to the public.

 **\*10**  Accordingly, defendants are entitled to dismissal of Crown's claims to the extent the claims are based on conduct occurring while JRC was Crown's sole shareholder. Because Crown has alleged that all of the transactions comprising the

Spin occurred while JRC was Crown's sole shareholder, (*see, e.g.,* PWC FAC ¶ 265(a)), Crown's claims based on such transactions are barred by the doctrine of in pari delicto. [16] In light of Crown's allegations that JRC was not Crown's sole shareholder after the completion of the transactions that comprised the Spin, however, and the allegations that the independent board members could have taken steps to remedy the alleged wrongdoing by defendants, defendants are not entitled to dismissal of Crown's claims to the extent the claims are based on conduct occurring after JRC was no longer Crown's sole shareholder.

[16]    In the Omnibus Memorandum, defendants also argue that Crown's claims based on the transactions comprising the Spin are subject to dismissal on the grounds that Crown has failed to adequately allege the element of causation, has failed to adequately allege a basis for finding defendants owed Crown fiduciary duties with respect to such transactions, and has pleaded facts establishing the bar of the statute of limitations. In light of the Court's finding with respect to the doctrine of in pari delicto, the Court need not decide these issues.

 3. Aiding and Abetting Fraudulent Transfers
Crown alleges that defendants in the Liquidating Trust case, with the exception of E & Y, are liable for aiding and abetting fraudulent transfers of assets from Crown to Fort James. [17] (*See* PWC FAC ¶¶ 329, 333–340 (alleging Fort James was sole transferee of certain property of Crown); PWC FAC Counts 2, 12, 23, 40, 45, 50, 58, 63, 68, 73, 78, 83.) Defendants argue that such claims are subject to dismissal because no such claim is cognizable under bankruptcy law, Virginia law, or New York law.

[17]    As a result of the Court's dismissal of certain claims based on in pari delicto, the Court has dismissed any claim based on the theory that defendants in the Liquidating Trust case aided and abetted JRC in effectuating the transactions comprising the Spin. Consequently, the Court will address the propriety of Crown's aiding and abetting fraudulent transfer claims only to the extent such claims are based on Crown's 1998 settlement agreement with Fort James, which agreement Crown also alleges to be a fraudulent conveyance.

Under bankruptcy law pertaining to recovery for a fraudulent conveyance, "recovery may be had only against persons

who have received the property in question." *See Elliott v. Glushon,* 390 F.2d 514, 514, 517 (9 th Cir.1967) (holding trustee seeking relief from fraudulent conveyance may only recover from transferee; affirming dismissal of claim for damages against attorney who allegedly conspired with debtor to fraudulently convey estate's property to third party). Likewise, under Virginia law, a plaintiff seeking recovery for a fraudulent conveyance may only seek recovery of the property, or under limited circumstances the value of the property, from the transferee. *See Efessiou v. Efessiou,* 41 Va. Cir. 142, 1996 WL 1065637, *4 (1996) (citing Supreme Court of Virginia decisions so holding). Similarly, under New York law, a plaintiff who seeks recovery for a fraudulent conveyance may "obtain a nullification of the conveyance" and/or "secure the assets in satisfaction of the debt," remedies which by definition are available only from the transferee. *See FDIC v. Porco,* 75 N.Y.2d 840, 552 N.Y.S.2d 910, 552 N.E.2d 158, 159 (N.Y.1990) (holding trial court erred by not dismissing claim for damages based on allegation defendants "assisted" debtor in transferring debtor's assets outside of country; reaffirming "traditional rule in this State reject[ing] any cause of action for mere participation in the transfer of a debtor's property prior to the creditor's obtaining a judgment"). Consequently, Crown cannot state a claim for relief under either bankruptcy law, Virginia law, or New York law for aiding and abetting fraudulent transfers.

**\*11** Crown argues that, in the event its claims for aiding and abetting a fraudulent transfer are not cognizable, such claims should be construed as claims for aiding and abetting a breach of fiduciary duty or for common law conspiracy to commit a fraudulent act. Crown, however, has alleged claims for aiding and abetting breach of fiduciary duty against each defendant against whom it has alleged a claim for aiding and abetting fraudulent transfers. Further, neither Virginia nor New York recognizes any cause of action to effect a fraudulent conveyance. *See Efessiou,* 41 Va. Cir. 142, 1996 WL 1065637, *4–5 (dismissing claim for conspiracy to effect fraudulent conveyance because, under Virginia law, "there can be no civil action for conspiracy where the unlawful act underlying the conspiracy claim does not allow for a damage award," and Virginia does not permit damage award as remedy for fraudulent conveyance); *Porco,* 552 N.Y.S.2d 910, 552 N.E.2d at 159 ("Nor is there merit to plaintiff's argument that [a New York statute] creates a creditor's cause of action in conspiracy, assertable against nontransferees or nonbeneficiaries solely for assisting in the conveyance of a debtor's assets.")

Accordingly, Crown's claims for aiding and abetting fraudulent transfers, specifically Counts 2, 12, 23, 40, 45, 50, 58, 63, 68, 73, 78, 83 in the Liquidating Trust case, are subject to dismissal, without leave to amend.

### 4. Negligent Misrepresentation Claims

Crown alleges claims for negligent misrepresentation against some of the defendants. Fort James, Houlihan Lokey, McGuire Woods, PWC, Merrill Lynch, and Salomon argue that the claims for negligent misrepresentation asserted against them are governed by Virginia law, [18] and that such claims are not cognizable because Virginia law does not recognize a tort of negligent misrepresentation. *See Bentley v. Legent Corp.,* 849 F.Supp. 429, 434 (E.D.Va.1994) ("Virginia does not recognize any tort of negligent misrepresentation.") In response, Crown does not offer any contrary authority recognizing such claims under Virginia law. Consequently, the negligent misrepresentation claims asserted under Virginia law are subject to dismissal.

[18]     Crown also alleges claims for negligent misrepresentation against E & Y and DLJ. These claims arise from conduct allegedly occurring after JRC was no longer Crown's sole shareholder. The parties to such claims agree that the law of states other than Virginia governs such claims.

Houlihan Lokey, however, has not shown that Crown's claim for negligent misrepresentation against it is subject to Virginia law. To the extent that claim is not subject to dismissal pursuant to the doctrine of in pari delicto, the claim for negligent misrepresentation against Houlihan Lokey appears to be based solely on alleged statements made by Houlihan Lokey in an opinion letter to Crown dated July 8, 1999. (*See* PWC FAC ¶ 360.) Crown alleges that such opinion letter was issued as a result of a June 1, 1999 agreement, which, Crown states, the parties agreed would be governed by California law. (*See* PWC FAC ¶¶ 360–61.) [19] Under California law, a claim for negligent misrepresentation is cognizable. *See Bily v. Arthur Young & Co.,* 3 Cal.4th 370, 408, 11 Cal.Rptr.2d 51, 834 P.2d 745 (1992) ("Where the defendant makes false statements, honestly believing that they are true, but without reasonable ground for such belief, he may be liable for negligent misrepresentation, a form of deceit.") Consequently, given the potential for application of California law to Crown's claim for negligent misrepresentation as based on the opinion letter, Houlihan Lokey has not shown that such claim is subject to dismissal.

19        Both Houlihan Lokey and Crown only address Crown's allegation that Houlihan Lokey made misrepresentations during the time JRC was Crown's sole shareholder. Consequently, neither party has addressed the effect of the choice of law provision allegedly included in the parties' June 1999 agreement.

**\*12**  Crown argues that, as to those defendants subject to Virginia law, its claims for negligent misrepresentation should be construed as claims for constructive fraud. In support thereof, Crown cites *Hitachi Credit America Corp. v. Signet Bank,* 166 F.3d 614 (4 th Cir.1999), in which the Fourth Circuit observed that a claim for constructive fraud under Virginia law can be based on a false statement that is made negligently: "Constructive fraud differs [from actual fraud] only in that the misrepresentation of fact is not made with the intent to mislead, but is made innocently or negligently; the plaintiff must still prove the other elements of actual fraud—reliance and detriment—by clear and convincing evidence." *See id.* at 628. Crown, however, has separately alleged constructive fraud claims against McGuire Woods and PWC and, consequently, leave to amend to allege constructive fraud against those defendants is unnecessary.

Accordingly, Crown's claims titled "negligent misrepresentation" against Fort James (Count 7 in the Crown Vantage case), McGuire Woods (Count 7 in the Liquidating Trust case), PWC (Count 18 in the Liquidating Trust case), Merrill Lynch (Count 39 in the Liquidating Trust case), and Salomon (Count 44 in the Liquidating Trust case), are subject to dismissal for failure to state a claim under Virginia law. Crown will, however, be afforded leave to amend to allege claims for constructive fraud against Fort James, Merrill Lynch and Salomon, to the extent Crown bases such claims on conduct occurring after Fort James no longer was Crown's sole shareholder.

    5. Breach of the Duty of Good Faith and Fair Dealing Claims

Crown alleges claims for tortious breach of the duty of good faith and fair dealing against defendants Fort James, McGuire Woods, PWC, E & Y, and DLJ. Defendants argue that such claims are not cognizable.

Virginia law governs the claims against Fort James, McGuire Woods and PWC. Virginia does not recognize a cause of action for tortious breach of the duty of good faith and fair

dealing. *See Charles E. Brauer Co. v. Nationsbank,* 251 Va. 28, 466 S.E.2d 382, 385 (Va.1996) (holding breach of implied covenant of good faith and fair dealing does not constitute a tort, but gives rise only to a claim for breach of contract.) New York law governs the claim against DLJ. [20]  New York does not recognize a cause of action for tortious breach of the duty of good faith and fair dealing. *See Harris v. Provident Life Accident Ins. Co.,* 310 F.3d 73, 80 (2 nd Cir.2002) ("Under New York law, parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying agreement.") California law governs the claim against E & Y. [21] California, with limited exceptions not applicable to the instant action, does not recognize a cause of action for tortious breach of the duty of good faith and fair dealing. *See Kransco v. American Empire Surplus Lines Ins. Co.,* 23 Cal. 4 th 390, 400 (2000) (holding plaintiff alleging breach of covenant of good faith and fair dealing is, outside of context of insurance contracts, "limited to contract rather than tort remedies").

20        DLJ argues that all of the claims asserted against it are governed by New York law. At the hearing conducted August 15, 2003, Crown stated that it does not dispute DLJ's argument, to the extent Crown's claims are based on conduct arising out of the performance of DLJ's contractual duties.

21        E & Y argues that all of the claims asserted against it are governed by California law. At the hearing conducted August 15, 2003, Crown stated that it does not dispute E & Y's argument, to the extent Crown's claims are based on conduct arising out of the performance of E & Y's contractual duties.

**\*13**  Crown argues that its claims for tortious breach of the covenant should be allowed to proceed as claims for breach of fiduciary duty. Crown, however, has alleged claims for breach of fiduciary duty against Fort James, McGuire Woods, PWC, E & Y, and DLJ.

Accordingly, Crown's claims for tortious breach of the duty of good faith and fair dealing, specifically, Count 13 in the Crown Vantage case and Counts 16, 27, 37, and 54 in the Liquidating Trust case are subject to dismissal, without leave to amend.

    6. Deepening Insolvency Claims

2003 WL 25257821

In the Omnibus Memorandum, defendants do not specifically address Crown's claims for damages based on a "deepening insolvency" theory. (*See* PWC FAC Prayer for Relief ¶ A.) Crown bases such claims on conduct occurring after JRC was no longer Crown's sole shareholder. (*See, e.g.,* PWC FAC ¶¶ 494 (alleging PWC prepared and disseminated "false and misleading financial statements" after transactions comprising Spin had occurred in order to assist JRC in "the perpetuation of the illusion of growth and prosperity and artificially prolonging Crown's life").) In their reply offered in support of the Omnibus Memorandum, defendants address the "deepening insolvency" claims, arguing therein that such claims are not cognizable because Crown alleges it was insolvent at the time the transactions comprising the Spin were effectuated. (*See, e.g.,* PWC FAC ¶ 236 (alleging "[a]t the time of the Spin and thereafter, Crown was insolvent").) Although not clearly expressed, it appears defendants are arguing that a "deepening insolvency" claim is cognizable only where the plaintiff corporation was initially solvent and later became insolvent, after which time a defendant took action to cause the corporation's insolvency to deepen. Defendants cite no authority in support of this proposition, either as a matter of Virginia law or otherwise. For this reason, and because defendants have raised this argument for the first time in their reply, the Court will not further address the argument at this time. As the Court indicated at the hearing conducted August 15, 2003, however, the Court will not preclude defendants from filing a second motion to dismiss to specifically address Crown's claims based on conduct occurring after JRC was no longer Crown's sole shareholder.

**B. Motion to Dismiss Claims in Crown Vantage Case**
Fort James, in addition to relying on the arguments made in the Omnibus Memorandum, makes additional arguments in support of dismissal. With respect to the claims brought by Crown on its own behalf, Fort James has specifically addressed only Crown's claims based on conduct occurring during such time as JRC was Crown's sole shareholder. In light of the Court's ruling as to in pari delicto, the Court finds it unnecessary to address the separate arguments made by Fort James in support of dismissal of such claims.

The Court will, however, address Fort James's arguments in support of dismissal of Crown's claims brought on behalf of creditors. [22]

22    These claims are not addressed in the Omnibus Memorandum.

**1. Count One**
**\*14** Count One, brought by Crown on behalf of its creditors, alleges that the transfers of property from Crown to JRC under the "Spin" constituted fraudulent conveyances under 11 U.S.C. § 544(b).

"[T]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor." 11 U.S.C. § 544(b). "Applicable law" within the meaning of § 544(b) includes state law. *See Wyle v. C.H. Rider & Family (In re United Energy Corp.),* 944 F.2d 589, 593 (9 th Cir.1991). Crown and Fort James agree that the "applicable law" as to Count 1 is the law of Virginia. Fort James does not argue that Crown fails to state a claim for fraudulent conveyance under Virginia law; [23] rather, Fort James argues that the claim, which it asserts accrued in August 1995 when the subject transfers occurred, is barred by a four-year statute of limitations applicable under California law. Crown, in opposition, argues that Virginia law as to the statute of limitations should apply.

23    Under Virginia law, a transfer "given with intent to delay, hinder or defraud creditors, purchasers or other persons of or from what they are or may be lawfully entitled to shall, as to such creditors, purchasers or other persons, their representatives or assigns, be void," *see* Va.Code Ann. § 55–80, and a transfer "which is not upon consideration deemed valuable in law ... by a transferor who is thereby rendered insolvent, shall be void as to creditors whose debts shall have been contracted at the time it was made...." *See* Va.Code Ann. § 55–81.

Fort James cites no case in which a bankruptcy court applying the law of one state for purposes of assessing the merits of a fraudulent conveyance claim has applied the law of a different state for purposes of the statute of limitations. By contrast, numerous cases, when applying a given state's law as to a claim for fraudulent conveyance under § 544(b), have applied that same state's statute of limitations. *See, e.g., Dietz v. St. Edward's Catholic Church (In re Bargfrede),* 117 F.3d 1078, 1080 (8 th Cir.1997) (holding trustee's claim under § 544(b) subject to Iowa law, both as to elements of claim and statute of limitations); *Womack v. Eggebrecht (In re Demis),* 191

In re Crown Vantage, Inc., Not Reported in F.Supp.2d (2003)
2003 WL 25257821

B.R. 851, 856 (Bankr.D.Mont.1996) (holding where trustee sought to set aside transfer under Montana law pursuant to § 544(b), "Montana law determines the limitations period"); *Mahoney, Trocki & Assocs. v. Kunzman (In re Mahoney, Trocki & Assocs.),* 111 B.R. 914, 917 (Bankr.S.D.Cal.1990) (holding, as to claim under § 544(b), where "California law on fraudulent conveyances is being utilized, California statute of limitations must be applied as well"; citing cases in support thereof).

Consequently, the Court will apply Virginia law to determine the applicable statute of limitations. In that respect, as Fort James acknowledges, the Supreme Court of Virginia has held that an action to set aside a conveyance of the ground of actual fraud is not subject to any statute of limitations. *See Flook v. Armentrout's Adm'r,* 100 Va. 638, 42 S.E. 686, 687 (Va.1902) (holding no statute of limitations barred claim to set aside fraudulent conveyance "upon the ground of actual fraud"; considering merits of claim brought ten years after subject conveyance occurred). [24] Here, Crown alleges that the conveyances "were made with the actual intent to hinder, delay and defraud Crown's creditors." (*See* FJ FAC ¶ 723.)

[24]   At least one bankruptcy court, sitting in Virginia, has held that such a claim is subject to the equitable doctrine of laches. *See In re Massey,* 225 B.R. 887, 891 (Bankr.E.D.Va.1998). Because Fort James does not argue that Count 1 is barred by laches, the Court need not decide whether laches is a cognizable defense to a claim for fraudulent conveyance under Virginia law.

**\*15**   Accordingly, Fort James is not entitled to dismissal of Count 1 based on the statute of limitations. [25]

[25]   Crown alternatively argues that because it has alleged that one of the creditors is the United States, the trustee, standing in the shoes of the United States, is not bound by any state statute of limitations. In light of the Court's finding with respect to the applicability of Virginia law as to the statute of limitations, the Court need not address Crown's alternative argument.

2. Count Two

In Count Two, also brought by Crown on behalf of its creditors, Crown alleges that the settlement agreement Crown entered into with Fort James in 1998 was a fraudulent conveyance that should be set aside under § 544(b).

Crown alleges that because the settlement agreement was a fraudulent conveyance, the release therein is "ineffective to release the claims held by any creditors of Crown." (*See* FJ FAC ¶ 753.)

Fort James argues that if Count One is dismissed, Count Two is moot. Assuming, *arguendo,* Fort James' assertion is correct, Fort James is not entitled to dismissal of Count Two as Count One is not subject to dismissal.

C. Motion to Dismiss Claims in Liquidating Trust Case

All defendants in the Liquidating Trust case, in addition to seeking dismissal for the reasons stated in the Omnibus Memorandum, seek dismissal of the claims asserted against them for reasons set forth in their separate motions to dismiss.

The separate motions filed on behalf of defendants Houlihan Lokey, McGuire Woods, Merrill Lynch, Salomon, Leopold, Cutchins, Hare, Williams, Daniel, Piemont, and Showalter specifically address only Crown's claims based on conduct occurring during such time as JRC was Crown's sole shareholder. [26] In light of the Court's ruling as to in pari delicto, it is unnecessary to address the separate arguments made by these defendants.

[26]   Each defendant in the Liquidating Trust case is alleged to have participated in some type of wrongful conduct after the time JRC ceased to be Crown's sole shareholder, as well as to have aided and abetted wrongful conduct of other defendants and to have participated in a conspiracy during such time.

The motions filed by PWC, E & Y and DLJ do specifically address Crown's claims based on conduct occurring after JRC was no longer Crown's sole shareholder. In the interests of judicial economy, however, the Court will defer ruling on those portions of the motions filed by PWC, E & Y, and DLJ until such time as all defendants have had the opportunity to specifically address such claims.

CONCLUSION

For the reasons discussed, defendants' motions to dismiss are GRANTED in part and DENIED in part, as follows:

1. In the Crown Vantage case,

a. Counts 3 to 12 are hereby DISMISSED without leave to amend, to the extent the claims are based on conduct occurring while JRC was Crown's sole shareholder;

b. Count 7 is hereby DISMISSED with leave to amend;[27]

[27] The Court, after addressing any motions seeking dismissal of claims based on conduct occurring after JRC was no longer Crown's sole shareholder, will provide a deadline by which Crown may amend.

c. Count 13 is hereby DISMISSED without leave to amend; and

d. in all other respects, the motion filed by Fort James is hereby DENIED.

2. In the Liquidating Trust case,

a. all claims are hereby DISMISSED without leave to amend, to the extent the claims are based on conduct occurring while JRC was Crown's sole shareholder;

b. Counts 2, 7, 12, 16, 18, 23, 27, 37, 40, 45, 50, 54, 58, 63, 68, 73, 78, 83 are hereby DISMISSED without leave to amend;

c. Counts 39 and 44 are hereby DISMISSED with leave to amend;

d. in all other respects, the motions filed by Houlihan Lokey, McGuire Woods, Merrill Lynch, Salomon, Cutchins, Hare, Leopold, Showalter, Daniel, Piemont, and Williams are hereby DENIED; and

 *16 e. ruling on the motions to dismiss filed by PWC, E & Y, and DLJ, to the extent such motions address conduct occurring after JRC was no longer Crown's sole shareholder, is hereby DEFERRED.

3. Fort James, Houlihan Lokey, McGuire Woods, Merrill Lynch, Salomon, Cutchins, Hare, Leopold, Showalter, Daniel, Piemont, and Williams may, no later than 30 days from the date of this order, file motions to dismiss, addressing claims based on conduct occurring after JRC was no longer Crown's sole shareholder. At the hearing on any such motions, the Court will also address the remaining arguments in the motions filed by PWC, E & Y, and DLJ.

This order closes Docket Numbers 83, 84, 86, 89, 90, 96, and 97.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2003 WL 25257821

---

**End of Document**                © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT "4"

2011 WL 6990187
Only the Westlaw citation is currently available.
United States District Court, N.D. California,
San Francisco Division.

Gerard A. McHALE, Plaintiff,

v.

SILICON VALLEY LAW GROUP, Defendant.

No. C 10–04864 JW.
|
Dec. 14, 2011.

**Attorneys and Law Firms**

Allyson G. Albert, Jacqueline G. Veit, Michael S. Devorkin, Golenbock Eiseman Assor Bell and Peskoe LLP, New York, NY, Nils Rosenquest, Rosenquest & Associates, San Francisco, CA, for Plaintiff.

Debra Steel Sturmer, Brett Alan Broge, Jerome Nathan Lerch, Lerch Sturmer LLP, San Francisco, CA, Christopher Ashworth, Silicon Valley Law Group, San Jose, CA, for Defendant.

**ORDER DENYING PLAINTIFF'S MOTION TO AMEND COMPLAINT; DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DENYING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT WITHOUT PREJUDICE**

JAMES WARE, Chief Judge.

## I. INTRODUCTION

*1 Gerard A. McHale, as Liquidation Trustee for the 1031 Debtors Liquidation Trust ("Plaintiff"), brings this diversity action against Silicon Valley Law Group ("Defendant") alleging legal malpractice. Plaintiff alleges that Defendant failed to conduct proper due diligence and provided negligent legal advice in facilitating the sale of 1031 Advance to 1031 Tax Group. Plaintiff alleges that as a result of Defendant's negligence in facilitating this sale, Plaintiff was driven into bankruptcy by the criminal conduct of its new owner, who utilized Plaintiff's funds in furtherance of his ongoing criminal enterprise.

Presently before the Court are Plaintiff's Motion to Amend Complaint [1] and Defendant's Motion for Summary Judgment or Partial Summary Judgment. [2] The Court finds it appropriate to take the Motions under submission without oral argument. *See* Civ. L.R. 7–1(b). Based on the papers submitted to date, the Court DENIES Plaintiff's Motion to Amend Complaint, DENIES Defendant's Motion for Summary Judgment and DENIES Defendant's Motion for Partial Summary Judgment without prejudice.

[1]    (Notice of Motion for Plaintiff Trustee to File a First Amended Complaint; Trustee's Memorandum of Points and Authorities in Support of Motion, hereafter, "Motion to Amend," Docket Item No. 60.)

[2]    (Defendant Silicon Valley Law Group's Memorandum of Points and Authorities in Support of Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment, hereafter, "MSJ," Docket Item No. 52–1.)

## II. BACKGROUND

### A. *Undisputed Facts*

On or about October 23, 2006, Defendant agreed to represent 1031 Advance, [3] Janet Dashiell ("Dashiell") and Steven Allred ("Allred") in connection with 1031 Advance's general legal matters . [4] Dashiell and Allred were the principal officers of 1031 Advance. [5] Defendant assisted 1031 Advance, Dashiell and Allred with their sale of 1031 Advance to companies owned by Ed Okun ("Okun"). [6]

[3]    Section 1031 of the Internal Revenue Code allows owners of investment property to defer capital gains taxes that would otherwise be due upon the sale of a property if they timely identify and purchase a replacement property. These "1031 Exchanges" are often done with the use of a "qualified intermediary," with whom the sale proceeds are deposited until a replacement property is found. Use of a qualified intermediary, or "QI," allows the taxpayer to avoid constructive receipt of the sale proceeds, as is necessary to preserve the tax benefit. 1031 Advance was such a QI until it filed for bankruptcy.

[4]
> (Complaint ¶ 29, hereafter, "Complaint," Docket Item No. 1; Defendant Silicon Valley Law Group's Answer to Plaintiff's Complaint ¶ 29, hereafter, "Answer," Docket Item No. 16.)

[5]
> (Complaint ¶ 29; Answer ¶ 29.)

[6]
> (*See* MSJ at 2 (citing Complaint ¶ 29).)

On December 18, 2006, Okun's company, 1031 Tax Group, purchased the capital stock of 1031 Advance. (Complaint ¶ 80; Answer ¶ 80 .) As of December 19, 2006, Okun was the sole member of 1031 Tax Group. [7] Shortly after the sale of 1031 Advance to 1031 Tax Group, Dashiell became the president and CEO of 1031 Tax Group. [8] Between August 2005 and December 2006, Okun purchased six different QIs, each of which became a wholly owned or indirect subsidiary of the 1031 Tax Group. [9]

[7]
> (Declaration of Debra Steel Sturmer in Support of Silicon Valley Law Group's Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment, hereafter, "Sturmer Decl.," Ex. A, Plaintiff's Responses and Objections to Silicon Valley Law Group's Request for Admissions at 3, hereafter, "Plaintiff's Responses," Docket Item No. 52–5.)

[8]
> (Complaint ¶ 97; MSJ at 4.)

[9]
> (Complaint ¶¶ 22–23; MSJ at 14.)

Upon the closing of the sale of 1031 Advance to 1031 Tax Group, Dashiell communicated directly with Lara Coleman ("Coleman"), Chief Operating Officer of another Okun entity, about wiring the funds of 1031 Advance to 1031 Tax Group's account at Wachovia Bank. [10] Coleman initiated the wire transfer instructions by which 1031 Advance funds were wired to 1031 Tax Group on December 19, 2006. [11]

[10]
> (Sturmer Decl., Ex. G and Ex. H, E-mails Between Janet Dashiell and Lara Coleman, Docket Item No. 52–6.)

[11]
> (Plaintiff's Responses at 7–8.)

From at least August 2005 through April of 2007, Okun misappropriated money from the Exchanges he owned and used the money to support a lavish lifestyle and to acquire personal assets. [12] On March 19, 2009, Okun was convicted

of 23 counts of mail fraud and related crimes, after which Okun was sentenced to 100 years in prison. [13] Coleman also pleaded guilty for her participation in Okun's crimes. (*Id.*)

[12]
> (MSJ at 2 (citing Complaint ¶¶ 24–26).)

[13]
> (Complaint ¶ 27; Answer ¶ 27.)

In May of 2007, 1031 Advance declared bankruptcy. (Plaintiff's Responses at 5.)

**B.** *Procedural History*
 **\*2** On October 27, 2010, Plaintiff filed his Complaint alleging a single cause of action for legal malpractice. (*See* Complaint ¶¶ 113–24.) Plaintiff filed the Complaint as Chapter 11 Trustee of the Trust for 1031 Advance and the other 1031 Debtors, which owns their respective claims and causes of action. (*See id.* ¶¶ 5, 12.)

On November 19, 2010, the Court granted Plaintiff's Motion to relate cases, and related this case with *Hunter, et al. v. Citibank, et al.,* Case No. 09–2079 JW (*"Hunter"* ). (*See* Docket Item No. 18.) The *Hunter* action involves Exchange clients who had invested with QIs owned by Okun and whose funds were lost due to his criminal enterprise. [14]

[14]
> (*See* Order Granting in part and Denying in part Defendants' Various Motions to Dismiss at 2 (describing factual allegations), hereafter, "*Hunter* Dismissal Order," *Hunter* Docket Item No. 264.)

Presently before the Court are Plaintiff's Motion to Amend Complaint and Defendant's Motion for Summary Judgment or Partial Summary Judgment.

### *III. STANDARDS*

**A.** *Motion to Amend*
When a party can no longer amend a pleading as a matter of right under Federal Rule of Civil Procedure Rule 15(a), the party must either petition the court for leave to amend or obtain consent from the adverse parties. Fed.R.Civ.P. 15(a); *Keniston v. Roberts,* 717 F.2d 1295, 1300 (9th Cir.1983). Leave to amend under Fed.R.Civ.P. 15(a) "shall be freely given when justice so requires." *Keniston,* 717 F.2d at 1300. "This policy is to be applied with extreme liberality." *Eminence Capital, LLC v. Aspeon, Inc.,* 316 F.3d 1048, 1051

McHale v. Silicon Valley Law Group, Not Reported in F.Supp.2d (2011)
2011 WL 6990187

(9th Cir.2003); *Owens v. Kaiser Found. Health Plan, Inc.,* 244
F.3d 708, 712 (9th Cir.2001).

However, leave to amend need not be granted where the
amendment: (1) prejudices the opposing party; (2) is sought
in bad faith; (3) produces an undue delay in litigation; or
(4) is futile. *Amerisource Bergen Corp. v. Dialysist West,
Inc.,* 465 F.3d 946, 951 (9th Cir.2006); *Bowles v. Reade,* 198
F.3d 752, 757 (9th Cir.1999). Prejudice to the defendant is
the most important factor, but amendment may be denied
upon a sufficiently strong showing of the other factors. *See
Eminence Capital,* 316 F.3d at 1052; *Keniston,* 717 F.2d at
1300. The burden of showing prejudice rests on the party
opposing amendment. *DCD Programs, Ltd. v. Leighton,* 833
F.2d 183, 186 (9th Cir.1987).

**B. *Summary Judgment***

Summary judgment is proper when the moving party shows
that there is no genuine dispute as to any material fact.
Fed.R.Civ.P. 56(a). The purpose of summary judgment "is
to isolate and dispose of factually unsupported claims or
defenses." *Celotex v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct.
2548, 91 L.Ed.2d 265 (1986). The moving party "always
bears the initial responsibility of informing the district court
of the basis for its motion, and identifying those portion which
it believes demonstrates the absence of a genuine issue of
material fact." *Id.* at 323. If the moving party meets its initial
burden, the "burden then shifts to the nonmoving party to
establish, beyond the pleadings, that there is a genuine issue
for trial." *Miller v. Glenn Miller Prods., Inc.,* 454 F.3d 975,
987 (9th Cir.2006) (citing *Celotex,* 477 U.S. at 324).

**\*3** When evaluating a motion for summary judgment,
the court views the evidence through the prism of the
evidentiary standard of proof that would pertain at trial.
*Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 255, 106
S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court draws all
reasonable inferences in favor of the nonmoving party,
including questions of credibility and of the weight that
particular evidence is accorded. *See, e.g., Masson v. New
Yorker Magazine, Inc.,* 501 U.S. 496, 520, 111 S.Ct. 2419,
115 L.Ed.2d 447 (1992). The court determines whether the
non-moving party's "specific facts," coupled with disputed
background or contextual facts, are such that a reasonable
jury might return a verdict for the non-moving party. *T.W.
Elec. Serv. v. Pac. Elec. Contractors,* 809 F.2d 626, 631 (9th
Cir.1987). In such a case, summary judgment is inappropriate.
*Anderson,* 477 U.S. at 248. However, where a rational trier
of fact could not find for the non-moving party based on

the record as a whole, there is no "genuine issue for trial."
*Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574,
587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### *IV. DISCUSSION*

**A. *Motion to Amend***
Plaintiff moves to amend his Complaint to assert four new
causes of action: Partial Equitable Indemnity for Malpractice,
Equitable Subrogation for Malpractice, Trust Claim for
Malpractice, and Bailment for Malpractice. (Motion to
Amend at 8.) Defendant contends that Plaintiff should not be
granted leave to amend because amendment at this stage in
the litigation would cause undue prejudice to Defendant and
be futile. [15]

> [15]    (Defendant Silicon Valley Law Group's
> Memorandum of Points & Authorities in
> Opposition to Plaintiff's Motion to File a First
> Amended Complaint at 1, hereafter, "Amendment
> Opp'n," Docket Item No. 67.)

Prejudice to a party opposing amendment may result from
any number of factors leading to "[e]xpense, delay, and wear
and tear on individuals and companies." *Kaplan v. Rose,* 49
F.3d 1363, 1370 (9th Cir.1994) (citation omitted). Prejudice
may arise if the amendment to the complaint would greatly
alter the basis of the lawsuit by adding new claims based on
different legal theories late in the litigation, thus requiring
"an entirely new course of defense." *See Morongo Band of
Mission Indians v. Rose,* 893 F.2d 1074, 1079 (9th Cir.1990).
The necessity of additional discovery, as well as the fact that
a motion for summary judgment has already been filed, may
be considered as factors causing prejudice. *See, e.g., M/V Am.
Queen v. San Diego Marine Const. Corp.,* 708 F.2d 1483,
1492 (9th Cir.1983). The likelihood of prejudice is greater
where discovery has already closed and trial is relatively
near. *See, e.g., Texaco, Inc. v. Ponsoldt,* 939 F.2d 794, 799
(9th Cir.1991). In addition, "late amendments to assert new
theories are not reviewed favorably when the facts and the
theory have been known to the party seeking amendment
since the inception of the cause of action." *Acri v. Int'l Ass'n of
Machinists & Aerospace Workers,* 781 F.2d 1393, 1398 (9th
Cir.1986) (citations omitted).

Here, the Court finds that Defendant has met its burden
of establishing undue prejudice from Plaintiff's proposed
amendment. Discovery in this matter closed on October

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

McHale v. Silicon Valley Law Group, Not Reported in F.Supp.2d (2011)
2011 WL 6990187

5, 2011. (*See* Docket Item No. 54.) Contrary to Plaintiff's assertions, Defendant has listed specific questions that it would have asked nearly forty deposition witnesses had it been aware of Plaintiff's amended claims .[16] Further, Defendant has already submitted a Motion for Summary Judgment that Plaintiff concedes would be rendered moot (at least in part) by his proposed amendments. [17] Thus, Plaintiff's amendments require a "new course of defense" after the close of discovery, giving rise to undue prejudice. *See Morango Band of Mission Indians,* 893 F.2d at 1079.

16      (*See* Amendment Opp'n at 6–7.)

17      (*See* Motion to Amend at 9.)

 **\*4**  Further, Plaintiff has been on notice since at least November of 2010 that Defendant would take the position that Plaintiff lacked standing to recover for damages sustained by exchanger clients.[18] As early as 2009, one year before Plaintiff filed his initial complaint in this matter, a bankruptcy court in a related matter concluded that the bankruptcy trustee lacked standing to assert claims on behalf of exchanger clients.[19] Defendant also asserted that the Qualified Intermediaries did not constitute trusts in a Motion for Summary Judgment in *Hunter,* of which Plaintiff received notice in January of 2011.[20] Thus, although Plaintiff contends that his Motion to Amend "respond[s] to arguments raised by [Defendant] in its [Motion for Summary Judgment] and in its recent expert reports,"[21] Plaintiff has been on notice for nearly a year that Defendant would raise these arguments. Plaintiff's decision not to seek leave to amend until after discovery has closed and a Motion for Summary Judgment has been filed constitute undue delay that, when considered alongside the prejudice discussed above, weighs against granting leave to amend.

18      (*See* Answer at 17.)

19      *See In re 1031 Tax Group, LLC,* 420 B.R. 178, 194 (Bankr.S.D.N.Y.2009) ("[T]he trustee does not have constitutional standing to recover from Citibank money lost by the 1031 Debtors' exchange participants who were waiting to complete their 1031 exchange transactions when Okun looted funds from the Citibank bank accounts").

20      (*See Hunter* Docket Item No. 447.)

21      (*See* Motion to Amend at 9.)

Plaintiff contends that late amendment will not prejudice Defendant because the topic on which Defendant asserts that additional discovery would be necessary is already an issue in the related *Hunter* litigation and thus has been the subject of ample discovery.[22] The Court finds, however, that while the taking of discovery on these issues in a related matter does somewhat mitigate the prejudice to Defendant, it is insufficient to eliminate the prejudice that arises from responding to claims involving new facts after the discovery deadline. Even though the existence of a trust relationship is at issue in the *Hunter* litigation, the *Hunter* plaintiffs are proceeding under a different theory of liability, and disputing the actual existence of a trust is only one of the many possible defenses that Defendant can pursue in that case .[23] Accordingly, although Defendant did take the position in *Hunter* that no trust was created between 1031 Advance and its clients, its primary argument to date in that action has been that the *Hunter* plaintiffs cannot meet their burden of proving that Defendant had actual knowledge of Okun's misdeeds, as is necessary to support their Aiding and Abetting claim.[24] Thus, though Plaintiff contends his proposed amendments require no additional discovery, the Court cannot simply discount Defendant's contention that it would have asked additional questions of exchanger clients had Plaintiff's Complaint been amended sooner.[25] In light of Plaintiff's failure to provide any reason for not seeking amendment earlier, this prejudice is sufficient to deny amendment.

22      (*See* Reply Memorandum of Points and Authorities of Plaintiff Trustee in Support of Motion to File a First Amended Complaint at 2–3, Docket Item No. 73.)

23      (*See Hunter* Dismissal Order at 26–27 (explaining elements of the plaintiffs' claims in *Hunter* ).)

24      (*See, e.g.,* Defendant Silicon Valley Law Group's Motion for Summary Judgment in *Hunter* (arguing that Defendant should be granted summary judgment due to Plaintiff's lack of evidence that Defendants had actual knowledge of Okun's criminal activity), *Hunter* Docket Item No. 402.)

25      (*See* Amendment Opp'n at 6–7.)

Accordingly, the Court DENIES Plaintiff's Motion to Amend.

**B.** *Motion for Summary Judgment*

Defendant moves for summary judgment on the ground that the undisputed facts establish that Plaintiff is barred from recovery on the basis of unclean hands on the part of 1031 Advance. (MSJ at 1.) Defendant contends that because 1031 Advance was owned entirely by Okun, it cannot seek to recover funds that Okun himself wrongly misappropriated. (*Id.*) Plaintiff responds that the unclean hands doctrine does not bar recovery because the wrongful conduct of Okun cannot be imputed to 1031 Advance or the bankruptcy trustee.[26]

[26]     (Trustee's Memorandum of Points and Authorities in Opposition to SVLG's Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment at 16–31, hereafter, "MSJ Opp'n," Docket Item No. 68.)

**\*5** The unclean hands doctrine "demands that a plaintiff act fairly in the matter for which he seeks a remedy. He must come into court with clean hands, and keep them clean, or he will be denied relief, regardless of the merits of his claim." *Kendall–Jackson Winery, Ltd. v. Superior Court of Stanislaus Cnty.,* 76 Cal.App.4th 970, 978, 90 Cal.Rptr.2d 743 (Cal.Ct.App.1999) (citations omitted). To be applicable, "[t]he misconduct which brings the clean hands doctrine into operation must relate directly to the transaction concerning which the complaint is made, i.e., it must pertain to the very subject matter involved and affect the equitable relations between the litigants." *Vacco Indus., Inc. v. Van Den Berg,* 5 Cal.App.4th 34, 52, 6 Cal.Rptr.2d 602 (Cal.Ct.App.1992) (citation omitted). The critical issues are (1) "the nature of the conduct, not the party at whom it is directed," and (2) "the impact that such conduct has on the *equitable relations* between the parties." *Id.* (emphasis in original). In the context of legal malpractice claims, the unclean hands doctrine applies to prevent wrongdoers who intentionally violate the law from seeking recovery from attorneys who were merely negligent in allowing them to do so. *See Chapman v. Superior Court,* 130 Cal.App.4th 261, 276–77, 29 Cal.Rptr.3d 852 (Cal.Ct.App.2005).

Here, Plaintiff does not dispute that Okun misappropriated 1031 Advance exchange funds, and that such conduct was wrongful and adverse to the interest of the company. (Complaint ¶¶ 24–28.) Thus, it follows that if Okun himself were seeking to recover such funds from Defendant, the unclean hands doctrine would prevent him, as an intentional wrongdoer, from pursuing a legal malpractice claim against

his attorneys, insofar as they were merely negligent. *See Chapman,* 130 Cal.App.4th at 276–77, 29 Cal.Rptr.3d 852. Thus, the question before the Court is whether, on the basis of the undisputed facts, Okun's conduct can be imputed to 1031 Advance such that his unclean hands bar the corporation (or, in this case, its bankruptcy trustee) from seeking recovery.

A corporation is a distinct legal entity, separate from either its shareholders or its corporate officers. *See F.D.I.C. v. O'Melveny & Myers,* 969 F.2d 744, 750 (9th Cir.1992) (*"O'Melveny I"* ) (citation omitted), rev'd on other grounds, *O'Melveny & Meyers v. F.D.I.C.,* 512 U.S. 79, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994), reaff'd on remand, *F.D.I.C. v. O'Melveny & Meyers,* 61 F.2d 19 (9th Cir.1995). Nonetheless, knowledge of a corporate officer acting within the scope of his duties is generally imputed to a corporation. *See Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP,* 133 Cal.App.4th 658, 679, 35 Cal.Rptr.3d 31 (Cal.Ct.App.2005). A corporate officer's knowledge will not be imputed to a corporation, however, when he has "no authority to bind the corporation relative to the fact or matter within his knowledge." *Id.* (citations omitted). Nor will a corporate officer's knowledge or conduct be imputed to a corporation if the officer is engaged in activity that is adverse to the interest of the corporation. *See O'Melveny I,* 969 F.2d at 750 (applying California law to analyze when conduct of officer or shareholder is imputed to corporation). Thus, when a corporate officer collaborates with outsiders to defraud a corporation, knowledge of the fraud is not attributable to the corporation. *See Peregrine,* 133 Cal.App.4th at 679, 35 Cal.Rptr.3d 31.

**\*6** California courts have recognized a limited exception to the rule that the acts of an officer acting adversely to a company will not be attributed to it. In *Peregrine,* the court imputed the fraudulent conduct of an officer and sole-shareholder to the corporation in spite of the fact that his actions were adverse to it. 133 Cal.App.4th at 679, 35 Cal.Rptr.3d 31. The court reasoned that because the perpetrator of the fraud "was also the owner and sole person in control of [the corporation], his fraud is properly imputed to [the corporation]." *Id.* Courts have declined to impute this exception, however, where it has not been established that all relevant decision makers for the corporation were engaged in the fraud. *See Casey v. U.S. Bank Nat'l Ass'n,* 127 Cal.App.4th 1138, 1143, 26 Cal.Rptr.3d 401 (Cal.Ct.App.2005). Thus, finding that a corporation is barred from recovery on the basis of unclean hands is appropriate at the summary judgment stage only if the undisputed evidence meets the standard set

forth in *Peregrine,* namely, that those who perpetrated the fraud solely control the corporation.

In support of its contention that Okun's fraudulent conduct should be imputed to 1031 Advance, Defendant relies on the following evidence:

1. Plaintiff's Complaint alleges that, "[E]ntities owned in whole or in part by Okun purchased *control* of the 1031 Debtors." (Complaint ¶ 22 (emphasis added).)

2. As of December 19, 2006, 1031 Tax Group was the sole owner of 100% of the shares of the 1031 Advance. Okun was the sole member of 1031 Tax Group. (Plaintiff's Responses at 3.)

3. On March 5, 2007, Okun sent all employees an e-mail stating that in spite of whatever corporate restructuring was taking place, he made all final decisions as to how the business was run. (Sturmer Decl., Ex. K, Docket Item No. 52–6.)

4. Dashiell, as President of 1031 Advance, learned in February of 2007 that $8 million had been taken by Okun without her knowledge .[27] Upon learning that Okun had taken funds in violation of the investment guidelines, Dashiell could have demanded immediate control over all funds and placed the funds where they would be inaccessible to Okun, but did not do so.[28]

[27]  (Sturmer Decl., Ex. D, Deposition of Janet Dashiell Vol. 1 at 122:6–122:15, hereafter, "Dashiell Depo. 1," Docket Item No. 52–5.)

[28]  (Sturmer Decl., Ex. C, Deposition of Lara Coleman at 439:17–441:12, hereafter, "Coleman Depo. 1," Docket Item No. 52–5.)

5. Even after learning of these loans and developing serious concerns about the ability of 1031 Advance to close its accounts, Dashiell continued trying to bring in new clients.[29] Dashiell did not instruct employees to stop accepting new accounts until the end of April, 2007.[30]

[29]  (*See* Sturmer Decl., Ex. Y, E-mail from Dashiell at 1 (stating that she is trying to generate new business), Docket Item No. 52–7; Sturmer Decl., Ex. X, Deposition of Anita Hunter at 135:7–137:14 (explaining that Dashiell was trying to close a deal with her in February and March of 2007 and did

not disclose that Okun had been using funds for his own use), Docket Item No. 52–7.)

[30]  (Sturmer Decl., Ex. Z, E-mail from Dashiell, Docket Item No. 52–7.)

6. Many members of Okuns' senior management and in-house lawyers knew that Okun was stealing funds, including David Field, Richard Simring and Lara Coleman, the Chief Operating Officer of 1031 Tax Group.[31]

[31]  (Coleman Depo. 1 at 378:1–379:7.)

Plaintiff responds that Okun's fraudulent conduct should not be imputed to 1031 Advance because Dashiell, as the President of 1031 Advance, maintained day-to-day control of the corporation and was not a part of Okun's fraud. Plaintiff contends that Dashiell would have stopped the fraud had she been aware of it, and thus Okun must be viewed an officer collaborating with outsiders to defraud a corporation whose management was not complacent in perpetrating the fraud.[32] In support of this contention, Plaintiff relies on the following evidence:

[32]  (MSJ Opp'n at 24–26.)

**\*7**  1. In February of 2007, Dashiell was in the process of setting up segregated accounts at Citibank for subsidiaries of 1031 Tax Group.[33] She had the authority to do this, and was poised to start moving all of the funds into those accounts. (*Id.*) The signatories for these accounts were going to be herself, David Field and Nicole Elder. (*Id.*) Okun would not be a signatory. (*Id.*)

[33]  (Declaration of Michael S. Devorkin in Opposition to SVLG's Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment, hereafter, "Devorkin Decl.," Ex. 8, Deposition of Janet Dashiell at 332:20–334:15, hereafter, "Dashiell Depo. 2," Docket Item No. 69–5.)

2. The Declaration of James Lukenda, Chief Restructuring Officer of 1031 Tax Group, that Okun is the sole member of 1031 Tax Group, but that Okun was not involved in the day-to-day operations of the QI businesses.[34]

[34]  (*See* Defendant Silicon Valley Law Group's Request for Judicial Notice in Support of Motion for Summary Judgment or, in the Alternative,

McHale v. Silicon Valley Law Group, Not Reported in F.Supp.2d (2011)
2011 WL 6990187

Partial Summary Judgment, Ex. B, Declaration of
James Lukenda ¶¶ 10–11, Docket Item No. 52–9.)

3. When Dashiell learned that $8 million had been
borrowed by Okun without her prior knowledge, she
was "livid" toward Coleman and said that she could not
transfer money whenever she felt like it .[35] Okun said
he would handle the situation, and told Dashiell that the
money would come back immediately. (*Id.*) Okun told
Coleman that they needed to close the loan immediately
to keep Dashiell confident that he would close every
loan he borrowed. (*Id.*) The money was replaced within
about seven days. (*Id.*) Replacing money this quickly was
atypical. A week's worth of interest was paid on this loan,
which was also completely atypical. (*Id.*) Dashiell was
informed that the money had been replaced. (*Id.*)

[35]    (Devorkin Decl., Ex. 7, Deposition of Lara
Coleman at 228:4–231:23, hereafter, "Coleman
Depo. 2," Docket Item No. 69–3.)

4. March 23, 2007, was the first time that Dashiell began
to suspect that the money being taken from accounts was
not being used for down payments on real estate [i.e., for
legitimate business purposes]. (Dashiell Depo 1. at 116:10–
17.) Dashiell began to suspect that this was taking place
when she learned that Okun had borrowed $700,000 to
pay the expenses of another of his companies, and not to
buy real estate. (*Id.* at 117:1–117:10, 35 Cal.Rptr.3d 31.)
She then opened an account at Countrywide Bank and
transferred funds from Wachovia to Countrywide, where
she would be the only authorized signatory. (*Id.* at 128:15–
24, 35 Cal.Rptr.3d 31.)

Upon review, the Court finds that the undisputed facts do not
establish that Okun's fraudulent conduct should be imputed
to 1031 Advance as a matter of law. Although it is clear
with the benefit of hindsight that Dashiell was ineffective at
stopping Okun's fraud, the undisputed facts do not establish
that those perpetrating the fraud were solely responsible for
running 1031 Advance. Defendant's own evidence indicates
that Dashiell had the authority to move Exchanger funds
to accounts where Okun could not access them when
she realized he was taking loans without her knowledge.
(Coleman Depo. 1 at 439:17–441:12.) Defendant's evidence
also establishes that Okun took active steps to conceal the
fraudulent conduct from Dashiell, believing it was important
that she remain unaware of the fraud. (Coleman Depo. 2 at
228:4–231:23.) Further, while it is undisputed that Coleman
withdrew exchange funds at Okun's request when he told her

to, the evidence does not establish whether removal of such
funds was actually within Okun's authority with regard to the
corporation, or whether the removal was merely allowed to
take place because Okun successfully hid his fraud from the
corporation's management.[36] Thus, a triable issue exists as
to Dashiell's role in the corporation as well as in the alleged
fraud by Okun.

[36]    (*See* Coleman Depo. 1 at 438:15–438:20.)

 **\*8**  Accordingly, the Court DENIES Defendant's Motion for
Summary Judgment on the basis of Plaintiff's unclean hands.

## C. *Motion for Partial Summary Judgment*

Defendant moves for partial summary judgment on the issue
of whether Plaintiff has standing to seek damages for the
funds deposited by 1031 clients which were misappropriated
by Okun. Defendant contends that although such funds
were in the possession of 1031 Advance at the time of its
bankruptcy petition, they represent injuries to the individual
investors, and not to 1031 Advance itself, giving the trustee
no standing to seek damages which would include the funds.
(MSJ at 18.) Plaintiff responds that the proper measure of
damages is the amount necessary to restore 1031 Advance
to the position it was in before Okun misappropriated the
funds, and is thus equal to the total amount of funds
misappropriated.[37]

[37]    (MSJ Opp'n at 4.)

Upon review, the Court finds that this subject is inadequately
briefed, and DENIES the Motion without prejudice to
Defendant to refile. Although Defendant's Motion is framed
in terms of the trustee's standing, the Court finds that the
question before it is not one of standing, but rather of the
proper measure of damages to 1031 Advance once standing
is established. The cases relied upon by Defendant address
instances of a bankruptcy trustee seeking to assert a claim that
is the legal property of another. *See, e.g., Caplin v. Marine
Midland Grace Trust,* 406 U.S. 416, 420, 92 S.Ct. 1678,
32 L.Ed.2d 195 (1988); *Williams v. Cal. 1st Bank,* 859 F.2d
664, 665–67 (9th Cir.1988). Here, there is no question that
a claim for legal malpractice is the property of the debtor
corporation.[38] Thus, *Caplin* and *Williams* are inapposite to
the trustee's standing to assert a legal malpractice claim.
The cases relied upon by the trustee, by contrast, establish
that the dissipation of a corporation's assets confers standing
upon a corporation, but do not address the proper measure

of damages based on the loss of assets. *See, e.g., Smith v. Arthur Andersen LLP,* 421 F.3d 989, 1005 (9th Cir.2005) ("We need not and do not express any opinion on the appropriate measure of damages in this case. The only question before us is whether the trustee has sufficiently alleged an injury to [the corporation]."). Thus, the Court finds that these cases are also inapposite to the question of the proper measurement of damages to a corporation when funds deposited by clients are misappropriated.

38    *See Office of Statewide Health Planning and Dev. v. Musick, Peeler & Garrett,* 76 Cal.App.4th 830, 833–34, 90 Cal.Rptr.2d 705 (Cal.Ct.App.1999); *see also Baum v. Duckor, Spradling & Metzger,* 72 Cal.App.4th 54, 66, 84 Cal.Rptr.2d 703 (Cal.Ct.App.1999) (explaining that claim for malpractice belongs to client to whom attorney owed duty).

Accordingly, the Court DENIES Defendant's Motion for Partial Summary Judgment without prejudice to refile a dispositive motion on the issue of the appropriate measure of damages to 1031 Advance.

## V. CONCLUSION

The Court DENIES Plaintiff's Motion to Amended, DENIES Defendant's Motion for Summary Judgment and DENIES Defendant's Motion for Partial Summary Judgment without prejudice.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 6990187

---

End of Document                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT "5"

2011 WL 5075551
Only the Westlaw citation is currently available.
United States District Court,
C.D. California.

Robert P. MOSIER et al.

v.

STONEFIELD JOSEPHSON, INC., CPAs.

No. CV 11–2666 PSG (Ex).
|
Oct. 25, 2011.

**Attorneys and Law Firms**

Ana Tagvoryan, Joshua M. Briones, Nicolas Morgan, DLA Piper LLP, Los Angeles, CA, for Plaintiff.

Efren Anthony Compean, Garrett & Tully, Pasadena, CA, for Defendant.

**Proceedings: (In Chambers) Order DENYING motion to dismiss**

The Honorable PHILIP S. GUTIERREZ, District Judge.

**\*1** Wendy K. Hernandez, Deputy Clerk.

Pending before the Court is Defendant Stonefield Josephson, Inc's motion to dismiss the First Amended Complaint. The Court finds the matter appropriate for decision without oral argument. See Fed.R.Civ.P. 78; L.R. 7–15. After considering the moving and opposing papers, the Court DENIES the motion.

*I. Background*

On April 24, 2009, the Securities and Exchange Commission initiated an action against Private Equity Management Group, Inc., Private Equity Management Group LLC (collectively, "PEM Group") and PEM Group's chairman, Danny Pang, alleging that PEM Group engaged in a range of fraudulent conduct and securities violations, including making material misrepresentations regarding the use of investors' funds and diverting the funds for improper purposes. [1] *See S.E.C. v. Private Equity Management Group, Inc. Case No.* CV 09–2901–PSG (Ex). On July 2, 2009, the Court issued a Preliminary Injunction and Order that, among other things,

appointed Robert P. Mosier (the "Receiver") as permanent receiver of PEM Group and its subsidiaries and affiliates. *See id.* (Dkt # 246).

[1]    The Court refers to Pang and the PEM Group officers and directors who engaged in such misconduct collectively as "PEM Group Principals."

This action is brought by the Receiver against Defendant Stonefield Josephson, Inc. ("Defendant" or "Stonefield"), an accounting and business consulting firm that served as auditor for one of PEM Group's affiliates, GVEC. *FAC* ¶ 14. PEM Group, purportedly a financial management and advisory service company, offered and sold securities through "special purpose vehicle" ("SPV") entities that it established in the British Virgin Islands (the "GVEC entities"). *FAC* ¶ 1. From late 2003 through mid–2006, the PEM Group-controlled GVEC entities conducted a series of securities offerings, typically in the form of notes, debentures, and collateralized debt obligations. [2] *FAC* ¶ 17. PEM Group's purported business purpose was to invest in life insurance policies and time-share related assets. *FAC* ¶¶ 2, 19, 21. However, as was later discovered, the GVEC offerings were part of a massive Ponzi scheme in which PEM Group sold life insurance policies owned by earlier investors to later investors at an inflated value, and divested the funds purportedly used to purchase the policies for a variety of improper purposes. *FAC* ¶¶ 2–6.

[2]    Such offerings were referred generally as "funds" or "Tranches." *FAC* ¶ 1.

According to the Receiver, Stonefield was retained in 2003 to audit the financial statements, statements of assets, liabilities and net assets, and related statements of operations and changes in net assets of the GVEC entities. *FAC* ¶ 26. It was allegedly required to conduct such audits in accordance with Generally Accepted Auditing Standards ("GAAS"). *FAC* ¶¶ 26, 27. In bringing this action, the Receiver essentially alleges that Stonefield assisted the PEM Group Principals' misappropriation of funds by failing to conduct audits in accordance with GAAS, and by preparing and distributing false and misleading audit reports. *FAC* ¶ 6. More specifically, the pleading asserts that Stonefield knew or should have known that certain interTranche transfers were improper and the insurance policies that were subject of the sales were inaccurately valued. *FAC* ¶ 30. It asserts that "despite knowing that GVEC had engaged in inter-Tranche transfers and failing to investigate these transfers, Stonefield represented that its

2011 WL 5075551

audit reports fairly presented the financial position of GVEC Tranches." *FAC* ¶ 32. Further, according to the pleading, these allegedly false audit reports induced investors to make and maintain investments in debt offered by PEM Group and the GVEC entities, and "harmed PEM Group and its Tranches by, among other things, causing Tranches to purchase life insurance policies at inflated prices." *FAC* ¶¶ 34, 35.

**\*2**  Based on these, and other, allegations, on July 1, 2011, the Receiver filed a First Amended Complaint against Stonefield, asserting claims for (1) professional negligence; (2) aiding and abetting conversion; and (3) unjust enrichment. *See* Dkt. # 12 (July 1, 2011). Stonefield now seeks to dismiss the FAC under Federal Rule of Civil Procedure 12(b)(6). *See* Dkt. # 14 (July 25, 2011).

## II. *Legal Standard*

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a defendant may move to dismiss a cause of action if the plaintiff fails to state a claim upon which relief can be granted. *See* Fed.R.Civ.P. 12(b)(6). In evaluating the sufficiency of a complaint under Rule 12(b)(6), courts should be mindful that the Federal Rules of Civil Procedure generally require only that the complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *See* Fed.R.Civ.P. 8(a)(2). Although detailed factual allegations are not required to survive a Rule 12(b)(6) motion to dismiss, a complaint that "offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007)). Rather, the complaint must allege sufficient facts to support a plausible claim to relief. *See id.*

In evaluating a Rule 12(b)(6) motion, the court must engage in a two-step analysis. *See id.* at 1950. First, the court must accept as true all non-conclusory, factual allegations made in the complaint. *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 164, 113 S.Ct. 1160, 1161, 122 L.Ed.2d 517 (1993). Based upon these allegations, the court must draw all reasonable inferences in favor of the plaintiff. *See Mohamed v. Jeppesen Dataplan, Inc.,* 579 F.3d 943, 949 (9th Cir.2009). Second, after accepting as true all non-conclusory allegations and drawing all reasonable inferences in favor of the plaintiff, the court must determine whether the complaint alleges a plausible claim for relief. *See Iqbal,* 129 S.Ct. at 1950.

Despite the liberal pleadings standards of Rule 8, conclusory allegations will not save a complaint from dismissal. *See id.*

## III. *Discussion*

In moving to dismiss the Receiver's First Amended Complaint, Stonefield presents essentially three discrete arguments. First, it argues that because the allegations show that PEM Group's investors—as opposed to PEM Group or its affiliates—were harmed by the alleged misconduct, the Receiver lacks standing to pursue his claims for relief. Second, it contends that the Receiver's claims are barred by the equitable defense of *in pari delicto.* Third, Stonefield asserts that the Receiver fails to adequately plead requisite elements of its first and second causes of action. To this end, it argues that the Receiver's first claim for professional negligence claim fails because Plaintiff cannot establish the element of causation, and that the Receiver's second claim for aiding and abetting conversion fails because the pleading fails to set forth facts establishing that Stonefield had actual knowledge of PEM Group's alleged conversion. In proceeding, the Court will address each argument in turn.

### A. *Standing*

**\*3**  As noted above, Stonefield first contends that the Receiver lacks standing to pursue the claims asserted in the FAC because those claims allegedly belong to investors. The Court, however, disagrees.

In general, a receiver has capacity to bring only such actions as could have been brought by the entity or individual whose property is in a receivership, and thus may sue only to redress injuries to the entity in receivership. *Grant v. A.B. Leach & Co.,* 280 U.S. 351, 50 S.Ct. 107, 74 L.Ed. 470 (1930); *see also Scholes v. Lehmann,* 56 F.3d 750, 753 (7th Cir.1995). In contrast, an equity receiver or trustee of an entity cannot pursue claims where the alleged harm was suffered only by third-party investors in that entity. *See Williams v. California 1st Bank,* 859 F.2d 664, 666 (9th Cir.1988); *cf. Hays v. Adam,* 512 F.Supp.2d 1330, 1341 (N.D.Ga.2007) (noting that third party investors may nonetheless indirectly benefit from the receiver's action as creditors of the receivership). As the Ninth Circuit has noted, "[a]lthough the line between 'claims of the debtor,' which a trustee [or equity receiver] has statutory authority to assert, and 'claims of creditors,' which [*Caplin v. Marine Midland Grace Trust Co.,* 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972) ] bars the trustee from pursuing, is not always clear, the focus of the inquiry is on whether the Trustee is seeking to redress injuries to the debtor itself caused

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

by the defendants' alleged conduct." *Smith v. Arthur Andersen LLP,* 421 F.3d 989, 1002 (9th Cir.2005).

Here, upon reviewing the FAC, the Court finds that the allegations show that, in bringing this action, the Receiver seeks to redress injuries caused to PEM Group and its affiliate entities by Stonefield's alleged misconduct. The Receiver, for example, has alleged that Stonefield owed, and breached, a contractual duty of care to PEM Group and GVEC to conduct and audit of the company's financial statements using the appropriate industry standards. *FAC* ¶¶ 30–32, 43–47. He goes on to assert that Stonefield's breach of this duty allowed the PEM Group Principals to dissipate GVEC's assets through transfers to other Tranches when GVEC was unable to pay its operating expenses, which ultimately led to the "retirement" of GVEC portfolios once those portfolios had been looted of their assets. *FAC* ¶¶ 25–26, 35. Further, according to the pleading, "[h]ad the misuse of funds been revealed earlier, Pang and the PEM Group Management Team would have been stopped and investigated, preventing millions of dollars of additional losses." *FAC* ¶ 35.

While certain allegations in the FAC could conceivably be said to allege injury to investors as well, this does not necessarily vitiate the Receiver's standing to pursue claims on behalf of the receivership entities. Rather, as the Ninth Circuit has acknowledged, so long as an entity in receivership has suffered harm, an equity receiver has standing to pursue a claim for such injuries—even if the creditors of the receivership entity may also have a claim arising from the same underlying misconduct. *Smith v. Arthur Andersen LLP,* 421 F.3d 989, 1002–04 (9th Cir.2005) (noting that the "dissipation of assets limited the firm's ability to repay its debts ... is not, however, a concession that only the creditors, and not [the corporate entity] itself, have sustained any injury. [I]t is a recognition of the economic reality that any injury to an insolvent firm is necessarily felt by its creditors."). In *Smith,* for example, the plaintiff trustee alleged that the defendants breached duties owed to Boston Chicken, claiming that "if they had not concealed Boston Chicken's financial condition from its outside directors and the investing public, the firm might have filed for bankruptcy more promptly." *Id.* at 1003. Reasoning that "in that situation, additional assets might not have been spent on a failing business[,]" the Ninth Circuit concluded that the "allegedly wrongful expenditure of corporate assets qualifies as an injury to the firm which was sufficient to confer standing upon the Trustee." *Id.*

**\*4** Here, similarly, the Receiver has alleged that Stonefield's failures to (1) conduct rigorous audits in accordance with GAAS standards, *FAC* ¶ 35; (2) to make disclosures regarding, *inter alia,* allegedly improper inter-Tranche transfers, *FAC* ¶¶ 32, 46; and (3) Stonefield's allegedly false and misleading audit reports were all significant factors in concealing Pang and PEM Group Principals' misuse of investor funds. *FAC.* ¶ 35. According to the pleading, had the misuse of funds been revealed earlier, additional losses would have not been incurred. *Id.* The Court finds that, as in *Smith,* these allegations qualify as a corporate injury traceable to Stonefield's conduct for which the Receiver is authorized to seek recovery. Additionally, while Stonefield contends that PEM Group's use of funds from later Tranches to purchase life insurance policies from earlier GVEC Tranches at inflated prices actually *benefitted* GVEC in that it "served to maintain the illusion of the financial and operational strength of PEM Group," *Reply* 1:13–16, evaluation of this assertion requires the Court to look beyond the pleadings. At this stage in the proceedings, however, the Court must take as true the Receiver's allegations that the PEM Group and GVEC entities were harmed by, *inter alia,* their inability to repay various note and debenture holders as a result of Stonefield's alleged misconduct. *See Cousins v. Lockyer,* 568 F.3d 1063, 1067 (9th Cir.2009).

Thus, based on the foregoing, the Court concludes that the Receiver has standing to pursue his claims against Stonefield.

### B. *In Pari Delicto Defense*

Next, Stonefield argues that because PEM Group, acting through its management and directors, engaged in and/or condoned the same transactions that the Receiver alleges Stonefield should have disclosed, his claims are therefore barred by the doctrine of *in pari delicto.* The *in pari delicto* defense bars one participant in an unlawful act from recovering damages from another participant in the unlawful act. *See In re Crown Vantage, Inc.,* No. 02–3836 MMC, 2003 WL 25257821, at *6 (N.D.Cal. Sept.25, 2003); *see also Casey v. U.S. Bank National Ass'n,* 127 Cal.App.4th 1138, 1143, 26 Cal.Rptr.3d 401, 404 (2005) ( "The doctrine of *in pari delicto* dictates that when a participant in illegal, fraudulent, or inequitable conduct seeks to recover from another participant in that conduct, the parties are deemed *in pari delicto,* and the law will aid neither, but rather, will leave them where it finds them."). In essence, the doctrine can be understood as asking whether the plaintiff or the defendant is more morally blameworthy for the unlawful conduct that has occurred. *See Chen v. Golden Eagle Group, Inc.,* No. C–07–4433 CRB

2011 WL 5075551

(EMC), 2008 WL 4679864, at * 1 (N.D.Cal. Oct.21, 2008) (internal citations omitted).

Stonefield argues that the FAC should be dismissed because, based on principles of California agency law, PEM Group and its directors and officers were "completely responsible for the fraudulent scheme[,]" and therefore *in pari delicto* with the alleged conduct of Stonefield.[3] *Mot.* 9:20–22. In response, the Receiver asserts that application of the *in pari delicto* defense is barred by the Ninth Circuit's decision in *FDIC v. O'Melveny & Myers,* 61 F.3d 17 (9th Cir.1995). Accordingly, the Court turns its attention to the threshold question of whether Stonefield is entitled to invoke the defense against the Receiver.

3    In general, where the plaintiff is a corporation, the doctrine of *in pari delicto* applies if, under agency principles, the unlawful actions of an agent of the corporation are imputed to the corporation. *In re Crown Vantage, Inc.,* 2003 WL 25257821 at *6.

*5 In *O'Melveny & Myers,* the Federal Deposit Insurance Corporation ("FDIC") took over as receiver for an insolvent bank whose principals had been involved in fraud. *F.D.I.C. v. O'Melveny & Myers,* 969 F.2d 744, 746–47 (9th Cir.1992). In its capacity as receiver, the FDIC filed suit against the bank's outside attorneys for professional negligence, negligent misrepresentation, and breach of fiduciary duty based on allegations that the law firm participated in preparing misleading documents designed to induce investment in real estate deals. *Id.* The law firm argued that because the FDIC stood in the bank's shoes as receiver, and the wrongdoing of the bank's officers should be imputed to the bank, equitable defenses therefore precluded the FDIC from recovering against the law firm. *Id.* at 747. The Ninth Circuit, however, disagreed. Concluding that federal law governed the application of defenses against the FDIC, *id.* at 751, the court went on to hold that that the bank's inequitable conduct was not imputed to FDIC for the purpose of barring the FDIC's claims.[4] *Id.* at 752.

4    The court expressly cautioned, however, that "it does not necessarily follow that equitable defenses can never be asserted against FDIC acting as a receiver." *Id.* at 752.

The United States Supreme Court subsequently reversed, holding that state law, not federal law, governs whether corporate officers' knowledge of fraud can be imputed to the

FDIC suing as a receiver. *O'Melveny & Myers v. F.D.I.C.,* 512 U.S. 79, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994). The Court thus remanded to the Ninth Circuit with instructions to analyze the applicability of O'Melveny's equitable defense against the FDIC under state law. *Id.* at 89. On remand, the Ninth Circuit reached "the same conclusion as ... last time[,]" holding that California law likewise did not permit equitable defenses to be applied against a bank's receiver where it would be inequitable to do so. *F.D.I. C. v. O'Melveny & Myers,* 61 F.3d 17, 19 (9th Cir.1995). While recognizing that, "in general, '[a] receiver occupies no better position than that which was occupied by the person or party for whom he acts ... and any defense good against the original party is good against the receiver[,]' " *id.* at 19 (internal citations omitted), the court went on to acknowledge that "this rule is subject to exceptions; defenses based on a party's unclean hands or inequitable conduct do not generally apply against that party's receiver." *Id.* (citing *Camerer v. California Sav. & Commercial Bank,* 4 Cal.2d 159, 170–71, 48 P.2d 39 (1935)). Balancing the equities in the case, the Ninth Circuit noted that the receiver was not a party to the original inequitable conduct and that application of the *in pari delicto* defense would place losses on innocent creditors rather than the allegedly culpable defendant. *Id.* ("While a party may itself be denied a right or defense on account of its misdeeds, there is little reason to impose the same punishment on a trustee, receiver or similar innocent entity that steps into the party's shoes pursuant to court order or operation of law."). It further reasoned that because "[a] receiver, like a bankruptcy trustee and unlike a normal successor in interest, does not voluntarily step into the shoes of the bank[,]" application of equitable defenses against the receiver would frustrate the intricate regulatory scheme designed to protect innocent third parties by imputing the bank's inequitable conduct to the receiver. *Id.* Accordingly, the court reaffirmed its previous holding that the bank's inequitable conduct could not be imputed to FDIC. *Id.*

*6 While the Court recognizes that *O'Melveny & Myers* does not necessarily stand for the broad proposition that equitable defenses may never be asserted against federal receivers, *see O'Melveny & Myers,* 61 F.3d at 19, it nonetheless agrees with the Receiver that the same equitable considerations that guided the Ninth Circuit in *O'Melveny & Myers* compel the same conclusion in this case. Like the receiver in *O'Melveny & Myers,* the Receiver in this case was not a party to any of the alleged misconduct conduct in which the PEM Group Principals engaged. Rather, he was appointed by the Court "to take such action as is necessary and appropriate to preserve and take control of and to prevent the dissipation,

concealment, or disposition of any assets ....” *SEC v. Private Equity Management Group, LLC,* No. CV–09–2901 PSG (Ex), Dkt. # 246. The Court finds persuasive the Receiver's assertion that allowing Stonefield to invoke the defense of *in pari delicto* would frustrate the Court's plan by “diminishing the value of the asset pool held,” thereby hurting innocent third-party creditors, while benefitting alleged an alleged wrongdoer. *See O'Melveny & Myers,* 61 F.3d at 19; *see also Hays v. Paul, Hastings, Janofsky & Walker LLP,* No. CIV.A.106CV754–CAP, 2006 WL 4448809, at *10 (N.D.Ga. Sept.14, 2006)* (barring application of *in pari delicto* defense because “the result would be the protection [of] wrongdoers and the punishment of the innocent victims”).

Thus, upon balancing the equities, the Court concludes that the doctrine of *in pari delicto* does not preclude the Receiver from pursuing his claims against Stonefield. Accordingly, the Court rejects Stonefield's position that the *in pari delicto* defense justifies dismissing the FAC.

### C. *Sufficiency of Allegations*

Stonefield also argues that the Receiver failed to adequately plead his causes of action for professional negligence and aiding and abetting conversion. The Court addresses each in turn below.

### 1. *Professional Negligence Claim (First Cause of Action)*

To state a cause of action for professional negligence under California law, a plaintiff must allege that the defendant failed to use the skill and care that a reasonably careful professional operating in the field would have used in similar circumstances, and that the defendant's failure proximately causes damage to plaintiff. *Thomson v. Canyon,* 198 Cal.App.4th 594, 604, 129 Cal.Rptr.3d 525, 532–33 (2011); *Carlton v. Quint,* 77 Cal.App.4th 690, 698–699, 91 Cal.Rptr.2d 844 (2000). Stonefield asserts that the Receiver fails to plead the element of causation because the FAC alleges that PEM Group's management was aware of the transactions Stonefield allegedly should have disclosed. Because, according to Stonefield, the acts and knowledge of PEM Group's management are imputed to PEMGroup (and, by extension, to the Receiver), such acts and knowledge therefore “eliminate the possibility that PEM Group actually relied upon the allegedly inaccurate audit reports issued by Stonefield.” *Mot.* 21:26–22:5. This position, however, is misguided. Reasonable reliance is not an element of a professional negligence claim under California law. *Thomson,* 198 Cal.App.4th at 604, 129 Cal.Rptr.3d 525. Accordingly,

Stonefield's argument—which appears to presuppose that the Receiver asserted a cause of action for a different tort of *negligent misrepresentation*—is inapposite.[5] Thus, given that reasonable reliance is not an element that the Receiver needs to establish to succeed on his claim for professional negligence, the Court need not be detained by Stonefield's discussion of the imputation rule (and/or its “adverse interest” and “sole actor” exceptions) at this stage in the proceedings.

[5]    The elements of a negligent misrepresentation claim are (1) the misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage. *Wells Fargo Bank, N.A. v. FSI, Financial Solutions, Inc.,* 196 Cal.App.4th 1559, 127 Cal.Rptr.3d 589 (2011). As noted above, the Receiver asserts no such claim.

**\*7** Here, the FAC alleges with sufficient factual specificity that Stonefield's sub-standard auditing work injured GVEC and PEM Group because it concealed the PEM Group Principals' looting and misappropriation of funds. *See FAC* ¶¶ 33–35, 48. Moreover, as the Receiver correctly points out, because questions of causation raise issues of fact, dismissal on the basis of causation is premature at this stage in the proceedings. Accordingly, the Court concludes that the Receiver has adequately alleged the element of causation, and therefore can maintain his first cause of action for professional negligence.

### 2. *Aiding and Abetting Conversion Claim (Second Cause of Action)*

Lastly, Stonefield challenges the Receiver's second cause of action for aiding and abetting conversion. Under California law, a defendant may be liable for aiding and abetting the commission of an intentional tort if the plaintiff can establish that the defendant “(a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person.” *Casey v. U.S. Bank National Ass'n,* 127 Cal.App.4th 1138, 1144, 26 Cal.Rptr.3d 401, 405 (2005); *see also In re First Alliance Mortgage Co.,* 471 F.3d 977, 993 (9th Cir.2006) ( “[a]lthough the California decisions on this subject may not be entirely consistent, we agree ... that aiding and abetting liability under California

Mosier v. Stonefield Josephson, Inc., Not Reported in F.Supp.2d (2011)
2011 WL 5075551

law, as applied by the California state courts, requires a finding of actual knowledge, [but] not specific intent."). As both California and federal courts have noted, even "ordinary business transactions" can constitute substantial assistance for purposes of aiding and abetting liability, if the defendant actually knew the transactions were assisting the tortfeasor in committing a specific tort. *Casey,* 127 Cal.App.4th at 1445, 26 Cal.Rptr.3d 527; *In re First Alliance Mortg. Co.,* 471 F.3d at 994–95 (9th Cir.2006); *see also Benson v. JPMorgan Chase Bank, N.A.,* No. C–09–5272–EMC, 2010 WL 1526394, *4 (N.D.Cal. Apr.25, 2010).

Stonefield contends that the Receiver's aiding and abetting conversion claim should be dismissed because the allegations do not establish that Stonefield had actual knowledge that the PEM Group Principals committed conversion, or that Stonefield "acted with the intent of facilitating the commission of that tort." *Mot.* 25:16–19. The Court, however, disagrees. To the contrary, it finds that the Receiver has sufficiently alleged that Stonefield actually knew of the underlying conversion of PEM Group and GVEC assets.

A plaintiff can plead actual knowledge of an intentional tort by alleging facts that demonstrate the defendant was aware of the commission of the tort. *See Neilson v. Union Bank of California,* 290 F.Supp.2d 1101, 1120 (C.D.Cal.2003); *see also Marcelos v. Dominguez,* No.C–08–00056, 2008 WL 2788173, *8 (N.D.Cal. July 18, 2008) (finding actual knowledge despite plaintiff having included the phrase "knew or should have known" because plaintiff pled facts demonstrating actual knowledge). For instance, in *Neilson,* the court concluded that the complaint adequately pled that the defendant banks had actual knowledge of the fraudulent Ponzi scheme conducted by a third party, Mr. Slatkin. *See Neilson,* 290 F.Supp.2d at 1120. The court noted that the complaint detailed the manner in which the Ponzi scheme operated, describes Slatkin's fraudulent transactions, and outlines the banks' involvement in these activities. *Id.* at 1120. Further, it reasoned that by alleging that the banks utilized atypical banking procedures to service Slatkin's accounts, the plaintiff raised an inference that the banks knew of the Ponzi scheme and sought to accommodate it by altering their normal way of doing business. *Id* . Accordingly, it concluded that the plaintiff had sufficiently pled general allegations of knowledge. *Id.*

**\*8** In arguing that the FAC fails to adequately plead actual knowledge, Stonefield relies primarily on a California appellate decision, *Casey v. U.S. Bank National Ass'n,* 127 Cal.App.4th 1138, 1144, 26 Cal.Rptr.3d 401, 405 (2005). Such reliance, however, is misplaced. *Casey* involved a trustee who sued three banks for aiding and abetting a breach of fiduciary duty and aiding and abetting fraud. *Casey,* 127 Cal.App.4th at 1141, 26 Cal.Rptr.3d 401. The court reasoned that because the breach of fiduciary duty claim stemmed from the alleged misappropriation of corporate funds from the debtor corporation, the trustee was required to allege that the defendant banks knew of the source of the funds deposited into the alter-ego accounts. *See id.* at 1149, 1152, 26 Cal.Rptr.3d 401. The complaint at issue, however, contained no allegation that the banks knew the alleged tortfeasors were misappropriating funds from the trust or that the money they were depositing belonged to the trust. *Id.* at 1152, 26 Cal.Rptr.3d 401. Because the trustee had failed to allege that the banks knew of the source of the funds deposited into the alter-ego accounts, the court reasoned that the banks could not have known that allowing the directors and officers to withdraw funds from the accounts was assisting a diversion of corporate funds. *Id.* Accordingly, it held that the trustee failed to allege that the bank possessed the requisite knowledge to state a claim on an aiding and abetting theory of liability. *Id.*

Here, unlike in *Casey,* where the allegations failed to demonstrate that the banks were privy to enough facts to reveal the fraudulent scheme, the Receiver's FAC sets forth specific facts showing that Stonefield had actual knowledge of the PEM Group Principals' conversion of offering proceeds and misuse of investor funds. To wit, the FAC asserts that during audits of GVEC and its Tranches, Stonefield became aware of the improper inter-Tranche transfers "because, among other things, Stonefield reviewed the insurance policies (assets) that were the subjects of the sales and reviewed the sale and purchase agreements between the Tranches." *FAC* ¶¶ 26, 30. It goes on to allege that Stonefield knew the valuations of the insurance "policies were inaccurate because:

> (1) a conflict existed in that the same managers and advisors represented both the buying Tranche and the selling Tranche, (2) the valuations of the assets were prepared by PEMGroup, and not by a third party, (3) the returns on investments of insurance policies sold to affiliated Tranches were significantly higher than the industry average ... and (4)

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    6

some of the insurance policies were
sold for an amount close to the face
value of the policies.

*FAC* ¶ 31. Further, according to the FAC, Stonefield knew
of the underlying conversion because GVEC portfolios were
being "retired" through the sale of their assets to other entities
in order to cover the GVEC portfolios' expenses. *FAC* ¶¶ 23–
25. At this stage in the proceedings, the Court must take all
well-pleaded allegations in the complaint as true and construe
them in the light most favorable to the nonmoving party.
*See Cousins v. Lockyer,* 568 F.3d 1063, 1067 (9th Cir.2009).
Moreover, as in *Neilson* where the court drew an inference
of knowledge because "the Banks utilized atypical banking
procedures," *Neilson,* 290 F.Supp.2d at 1121, the Court can
also infer knowledge based on allegations that Stonefield's

audits and audit reports did not comply with GAAS standards.
*See FAC* ¶¶ 30–31.

**\*9** Thus, taking together the sum of the allegations, along
with reasonable inferences that can be drawn from them,
the Court holds that the Receiver has sufficiently alleged a
plausible claim of aiding and abetting conversion.

IV. *Conclusion*
Therefore, for the foregoing reasons, Stonefield's motion to
dismiss the First Amended Complaint is DENIED.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 5075551

---

**End of Document**                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT "6"

2016 WL 4069550
Only the Westlaw citation is currently available.
***NOT FOR PUBLICATION***
United States Bankruptcy Court, C.D. California,
Los Angeles Division.

IN RE: AMERGENCE TECHNOLOGY, INC., Debtor.
Jason M. Rund, Chapter 7 Trustee, Plaintiff,

v.

Albert Lee, an individual; Business Legal Partners
Attorneys at Law, Law Corp., a California
corporation; Levene, Neale, Bender, Yoo &
Brill L.L.P., and Does 1 through 10, Defendants.

Case No. 2:12–bk–35473–RK
|
Adversary No. 2:15–ap–01563–RK
|
Date: July 26, 2016, Time: 3:00 p.m., Place: Courtroom
1675, 255 East Temple Street, Los Angeles, CA 90012
|
Signed July 27, 2016

**Attorneys and Law Firms**

Michael W. Davis, Corey R. Weber, Brutzkus Gubner
Rozansky Seror Weber LLP, Woodland Hills, CA, for
Plaintiff.

Russell W. Clampitt, Bradley W. Jacks, Jacks & Maybaum
LLP, William K. Mills, Parker Mills LLP, Los Angeles, CA,
for Defendant.

Does 1 through 10, pro se.

**MEMORANDUM DECISION ON
DEFENDANTS' MOTIONS TO DISMISS
FIRST AMENDED COMPLAINT OR
FOR MORE DEFINITE STATEMENT**

Robert Kwan, United States Bankruptcy Judge

**\*1** This adversary proceeding came on for hearing on July
26, 2016 before the undersigned United States Bankruptcy
Judge on the motions of defendants Albert Lee, Business
Legal Partners Attorneys at Law, Law Corp (collectively
referred to as "Lee Defendants"), and Levene, Neale, Bender,
Yoo & Brill L.L.P. ("Defendant Levene Neale"), to dismiss

the first amended complaint of Jason M. Rund, the Chapter
7 trustee appointed in the underlying bankruptcy case
("Trustee"), asserting claims for malpractice and breach of
fiduciary duty for their alleged prepetition and postpetition
acts in representing the debtor in this bankruptcy case,
Amergence Technology, Inc., seeking damages in excess of
$2.1 million, for failure to state a claim upon which relief can
be granted or for more definite statement pursuant to Rules
12(b)(6) and 12(e) of the Federal Rules of Civil Procedure as
incorporated by reference in Rule 7012 of the Federal Rules
of Bankruptcy Procedure. Corey R. Weber, of the law firm
of Brutzkus Gubner, appeared for Trustee. Bradley W. Jacks,
of the law firm of David B. Parker, of the law firm of Parker
Mills LLP, appeared for Defendant Levene Neale.

Because the court must accept the material factual allegations
of Trustee's first amended complaint as true and draw
inferences from those allegations in the most favorable light
to Trustee for purposes of defendants' Rule 12(b)(6) motion,
it is not inclined to dismiss the amended complaint because
the claims in the amended complaint state a claim upon
which relief can be granted. *Loyd v. Paine Webber, Inc.,* 208
F.3d 755, 759 (9th Cir. 2000) (citations omitted); *see also,*
1 Wagstaffe, *Rutter Group Federal Civil Procedure Before
Trial,* ¶¶ 9:213 and 9:215 at 9–81 and 9–83 (2016), *citing inter
alia, Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007); *In
re Estate Financial Mortgage Fund, LLC,* 565 Fed. Appx. 628
(9th Cir. 2014)(construing complaint in most favorable light,
holding complaint should not have been dismissed). Trustee's
malpractice and fiduciary duty breach claims in his first
amended complaint appear to this court to be claims asserted
on behalf of the debtor rather than on behalf of its creditors.
*See, Peregrine Funding, Inc. v. Sheppard Mullin Richter &
Hampton LLP,* 133 Cal.App.4th 658, 676–678 (2005). Thus,
there is no standing problem for Trustee to assert such claims.
*Id.*

Trustee's claims in the first amended complaint that defendant
attorneys and law firms committed malpractice and breached
their fiduciary duty to the debtor, Amergence Technology,
Inc., in allegedly advising debtor and its affiliated entity
controlled by debtor's insiders to transfer debtor's assets to
the affiliated entity to hinder debtor's creditors state plausible
claims for purposes of *Bell Atlantic Corp. v. Twombly, supra,*
and do not require a more definite statement.

The question of whether a bankruptcy trustee is or is not
subject to an *in pari delicto* defense under California law
was very recently addressed by a California Court of Appeal

**WESTLAW**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    1

in *Uecker v. Zentil,* 244 Cal.App.4th 789 (2016), which held that the doctrine of *in pari delicto* applies to bar a bankruptcy trustee suing on behalf of the bankruptcy estate of a company if the doctrine would bar the company from asserting such claims. *Id.* at 794–797, *citing,* 11 U.S.C. § 541(a)(1) and *Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP,* 133 Cal.App.4th at 676–678. Quoting the opinion in *Peregrine Funding,* the court in *Uecker v. Zentil* stated that:

> **\*2** A bankruptcy trustee succeeds to claims held by the debtor 'as of the commencement' of bankruptcy. (11 U.S.C. § 541(a)(1).) Section 541 of the Bankruptcy Code thus requires that courts analyze defenses to claims asserted by a trustee as they existed at the commencement of bankruptcy, and later events (such as the ouster of a wrongdoer) may not be taken into account. [Citations.] In the context of an unclean hands defense, this means a bankruptcy trustee stands in the shoes of the debtor and may not use his status as an innocent successor to insulate the debtor from the consequences of its wrongdoing. [Citations.] [The debtor's] unclean conduct—i.e., its participation in the scheme that defrauded investors of millions—must therefore be considered without regard to the trustee's succession.

*Uecker v. Zentil,* 244 Cal.App.4th at 794, quoting, *Peregrine Funds, Inc. v. Sheppard Mullin Richter & Hampton LLP,* 133 Cal.App.4th at 680. However, the issue has not been definitively addressed by the California Supreme Court. *See, Uecker v. Zentil,* 244 Cal.App.4th at 797; *Gottlieb v. Fulcrum 5 Inc. (In re KSL Media, Inc.),* 2016 WL 3549166, slip op. at \*10 (Bankr.C.D.Cal.2016) (Mund, J.); *cf., Camerer v. Savings and Commercial Bank of San Diego,* 4 Cal.2d 159 (1935)(*in pari delicto* not applicable to a state court receiver); *accord, FDIC v. O'Melveny & Myers,* 61 F.3d 17, 18–19 (9th Cir.1995) (holding under California law that *in pari delicto* does not apply to a state court receiver, noting in dicta that "[a] receiver, like a bankruptcy trustee and unlike a normal

successor in interest). Judge Mund of this court stated in *In re KSL Media, Inc.* that:

> The real emphasis here is that Section 541(a)(1) applies to bankruptcy trustees and not to receivers. Thus, the cases that are limited to receivers are not on point. If Congress wishes to protect the estate from claims of in pari delicto, it need only amend Section 541(a)(1).)".

2016 WL 3549166, slip op. at \*10.

This issue of California law is apparently an open one in the Ninth Circuit since there is no published opinion on the issue. *See Uecker v. Wells Fargo Capital Finance, LLC (In re Mortgage Fund '08 LLC),* 527 B.R. 351, 366–370 (N.D.Cal.2015) (noting that the Ninth Circuit has not addressed in a published opinion the applicability of the *in pari delicto* defense in a published opinion, but had affirmed its application in an unpublished decision), *citing, In re Crown Vantage, Inc.,* No. 023836 MMC, 2003 WL 25257821, at \*6 (N.D.Cal.2003), *aff'd, Crown Paper Liquidating Trust v. Pricewaterhousecoopers LLP,* 198 Fed. Appx. 597 (9th Cir. 2006); *accord, In re KSL Media, Inc.,* 2016 WL 3549166, slip op. at \*8–10; *see also, In re Estate Financial Mortgage Fund, LLC, supra* (reversing trial court's dismissal of complaints and commenting that "[g]iven our disposition, we need not resolve trustees' arguments that the *in pari delicto* and unclean hands defense may never apply to bankruptcy trustees or claims brought by trustees that arise postpetition.").

As also noted in *In re Mortgage Fund '08 LLC,* "[a]lthough the Ninth Circuit has not directly addressed the issue, every circuit to have considered the question has held that a defendant 'sued by a trustee in bankruptcy may assert the defense of *in pari delicto,* if the jurisdiction whose law creates the claim permits such a defense outside of bankruptcy.' " *In re Mortgage Fund '08 LLC.,* 527 B.R. at 366–367, *citing, Peterson v. McGladrey & Pulley, LLP.,* 676 F.3d 594, 598–599 (7th Cir. 2012); *Picard v. JPMorgan Chase Bank & Co. (In re Bernard L. Madoff Investment Securities LLC,* 721 F.3d 54, 63–65 (2nd Cir. 2013); *Baena v. KPMG LLP,* 453 F.3d 1, 6–10 (1st Cir. 2006); *Official Committee of Unsecured Creditors v. R.F. Lafferty & Co.,* 267 F.3d 340, 354–360 (3rd Cir. 2001); *In re Derivium Capital LLC,* 716 F.3d 355, 366–369 (4th Cir. 2013); *Terlecky v. Hurd (In re Dublin Securities, Inc.),* 133 F.3d 377, 380 (6th Cir.1997); *Grassmueck v. American Shorthorn Association,* 402 F.3d 833, 836–842 (8th Cir. 2005); ); *Sender v. Buchanan (In re Hedged–Investments Associates, Inc.),* 84 F.3d 1281, 1285 (10th Cir.1996); *Official Committee of Unsecured Creditors*

Case 8:23-ap-01046-SC    Doc 98    Filed 07/24/23    Entered 07/24/23 13:49:39    Desc
Main Document    Page 50 of 52

In re Amergence Technology, Inc., Not Reported in B.R. Rptr. (2016)
2016 WL 4069550

*of PSA, Inc. v. Edwards,* 437 F.3d 1145, 1152 (11th Cir. 2006); *accord, In re KSM Media Inc.,* 2016 WL 3549166, slip op. at *8–9.

**\*3** The court determines that even if defendants have raised the *in pari delicto* defense as it is inclined to recognize at this preliminary stage of the litigation, applying *Uecker v. Zentil, supra,* there are genuine issues of material fact regarding the applicability of any such defense of *in pari delicto* raised by defendants regarding the so-called adverse interest exception asserted by Trustee, which exception is fact-intensive and should not be generally resolved at the pleading stage. *See, Floyd v. CIBC World Markets, Inc.,* 426 B.R. 622, 642–643 (S.D.Tex.2009). "The 'adverse interest exception' provides that where corporate agents act in a manner adverse to the interests of the corporation, the actions of the agents are not imputed to the corporation." *In re Mortgage Fund '08 LLC,* 527 B.R. at 368 (citation omitted). The court should not resolve the factual disputes relating to the adverse interest exception at the pleading stage, even though such disputes are based on seemingly inconsistent allegations in the various pleadings of trustee. *Peterson v. McCaffrey & Pullen, LLP,* 676 F.3d at 596–597; *see also,* 1 Wagstaffe, *Rutter Group Federal Civil Procedure Before Trial,* ¶ 9:216 at 9–83 ("no matter how improbable the facts alleged are, they must be accepted as true for purposes of the motion"), *citing inter alia, Bell Atlantic Corp. v. Twombly,* 550 U.S. at 556. Thus, the court does not reach the merits of the *in pari delicto* defense asserted by defendants at the pleading stage.

In this regard, this court diverges from Judge Mund, who in the *KSM Media* matter had granted defendants' motion to strike the bankruptcy trustee's claims based on *in pari delicto* raised as an affirmative defense and denied the trustee's motion for reconsideration despite this court sharing the concern of Judge Mund about possible prejudice to defendants as they "will be forced to incur additional and significant expense and time with respect to the discovery that will certainly be propounded by Trustee." *In re KSM Media Inc.,* 2016 WL 3549166, slip op. at *8–9. Nevertheless, the court determines that defendants' motions to dismiss should be denied mainly because in this case, Trustee has asserted the *in pari delicto* defense should not be sustained here under the "adverse interest" exception in that the bad acts involved here should not be attributable to the debtor, which are allegedly due to the acts of an officer of the company acting adversely to it, Yian Chen aka David Chen, a minority shareholder of debtor, and the assertion of the adverse interest exception is fact-intensive and should not be determined at the pleading stage. *See, In re California TD Investments LLC,* 489 B.R. 124, 129–130 (Bankr.C.D.Cal.2013)(Mund, J.); *but see, In re Mortgage Fund '08 LLC,* 527 B.R. at 369 ("Although the imputation analysis 'generally rests on questions of fact,' '[w]here, as here, a plaintiff's own pleadings contain admissions that establish the basis of an unclean hands defense, the defense may be applied without further' proceedings.").

The court also agrees with Trustee that California Civil Code § 1714 is not a barrier to suit since formally speaking, the first amended complaint does not allege civil conspiracy claims against the attorney and law firm defendants.

Defendants' motions to dismiss and/or for more definite statement should be denied, and defendants should be ordered to serve and file answers to the first amended complaint. Counsel for Trustee is to submit proposed orders for denial of the motions as orally ordered at the hearing.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in B.R. Rptr., 2016 WL 4069550

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 2818 La Cienega Avenue, Los Angeles, CA 90034

A true and correct copy of the foregoing document entitled **APPENDIX OF UNPUBLISHED AUTHORITY IN SUPPORT OF MOTION BY DEFENDANTS ENG TAING AND TOUZI CAPITAL, LLC TO DISMISS COMPLAINT UNDER FED. RULE BANK. PROC. 7012 AND FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **July 24, 2023**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Eric Bensamochan    eric@eblawfirm.us, G63723@notify.cincompass.com
- Christopher Celentino    christopher.celentino@dinsmore.com, caron.burke@dinsmore.com
- Leslie A Cohen    leslie@lesliecohenlaw.com, jaime@lesliecohenlaw.com;clare@lesliecohenlaw.com
- Christopher Ghio    christopher.ghio@dinsmore.com, Kristina.Heller@Dinsmore.com
- Richard H Golubow    rgolubow@wghlawyers.com, jmartinez@wghlawyers.com;svillegas@wghlawyers.com
- Meredith King    mking@fsl.law, ssanchez@fsl.law;jwilson@fsl.law
- David S Kupetz    David.Kupetz@lockelord.com, mylene.ruiz@lockelord.com
- Daniel A Lev    daniel.lev@gmlaw.com, cheryl.caldwell@gmlaw.com;dlev@ecf.courtdrive.com
- Richard A Marshack (TR)    pkraus@marshackhays.com, rmarshack@iq7technology.com;ecf.alert+Marshack@titlexi.com
- Kenneth Misken    Kenneth.M.Misken@usdoj.gov
- Queenie K Ng    queenie.k.ng@usdoj.gov
- Douglas A Plazak    dplazak@rhlaw.com
- Ronald N Richards    ron@ronaldrichards.com, 7206828420@filings.docketbird.com
- Jonathan Serrano    jonathan.serrano@dinsmore.com
- Howard Steinberg    steinbergh@gtlaw.com, pearsallt@gtlaw.com;howard-steinberg-6096@ecf.pacerpro.com
- Andrew Still    astill@swlaw.com, kcollins@swlaw.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
- Johnny White    JWhite@wrslawyers.com, jlee@wrslawyers.com

**2. SERVED BY UNITED STATES MAIL**: On **July 24, 2023**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

Honorable Scott C. Clarkson
Ronald Reagan Federal Building and Courthouse
411 West Fourth Street, Suite 5130 / Courtroom 5C
Santa Ana, CA 92701-4593

☐ Service information continued on attached page

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**

1

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **July 24, 2023**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

2

3

4

None.

5

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

6

7

| July 24, 2023 | D. Woo | /s/ D. Woo |
| Date | Type Name | Signature |

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

**F 9013-3.1.PROOF.SERVICE**