# Exhibit "1"

Fill in this information to identify the case:

United States Bankruptcy Court for the:

Central District of California
_____
(State)

Case number (if known): _____ Chapter _____

☐ Check if this is an
amended filing

Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy

06/22

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case
number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals*, is available.

| | |
|---|---|
| **1. Debtor's name** | The Litigation Practice Group P.C. |
| **2. All other names debtor used in the last 8 years**<br><br>Include any assumed names, trade names, and *doing business as* names | |
| **3. Debtor's federal Employer Identification Number (EIN)** | 83 - 3885343 |

**4. Debtor's address**

| Principal place of business | Mailing address, if different from principal place of business |
|---|---|
| 17542 17th St., Ste 100 | |
| Number    Street | Number    Street |
| | P.O. Box |
| Tustin            CA        92780 | Tustin |
| City          State    ZIP Code | City          State    ZIP Code |
| | **Location of principal assets, if different from principal place of business** |
| Orange | |
| County | Number    Street |
| | |
| | City          State    ZIP Code |

**5. Debtor's website (URL)** _____

Official Form 201 Voluntary Petition for Non-individuals Filing for Bankruptcy page 1

**Exhibit "1"** 0001

| Debtor | The Litigation Practice Group P.C. | Case number (if known) |
|---|---|---|
| | Name | |

---

**6. Type of debtor**

☑ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))

☐ Partnership (excluding LLP)

☐ Other. Specify: _____

---

**7. Describe debtor's business**

A. *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

☑ None of the above

B. *Check all that apply:*

☐ Tax-exempt entity (as described in 26 U.S.C. § 501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)

☐ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.uscourts.gov/four-digit-national-association-naics-codes .

---

**8. Under which chapter of the Bankruptcy Code is the debtor filing?**

*Check one:*

☐ Chapter 7

☐ Chapter 9

☑ Chapter 11. *Check all that apply:*

A debtor who is a "small business debtor" must check the first sub-box. A debtor as defined in § 1182(1) who elects to proceed under subchapter V of chapter 11 (whether or not the debtor is a "small business debtor") must check the second sub-box.

    ☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,024,725. If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

    ☐ The debtor is a debtor as defined in 11 U.S.C. § 1182(1), its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $7,500,000, and it chooses to proceed under Subchapter V of Chapter 11. If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return, or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

    ☐ A plan is being filed with this petition.

    ☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

    ☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

    ☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

---

Exhibit "1"    0002

| Debtor | The Litigation Practice Group P.C. | | Case number (if known) | |
| | Name | | | |

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

☑ No

☐ Yes. District _____ When _____ Case number _____
　　　　　　　　　　　　　　　MM / DD / YYYY

District _____ When _____ Case number _____
　　　　　　　　　　　　MM / DD / YYYY

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

List all cases. If more than 1, attach a separate list.

☑ No

☐ Yes. Debtor _____ Relationship _____

District _____ When _____
　　　　　　　　　　　　　　　MM / DD / YYYY

Case number, if known _____

**11. Why is the case filed in this district?**

Check all that apply:

☑ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☑ No

☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

Why does the property need immediate attention? (Check all that apply.)

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard? _____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other _____

Where is the property? _____
　　　　　　　　　　　Number　　Street

_____

_____
City　　　　　　　　　　　　State ZIP Code

Is the property insured?

☐ No

☐ Yes. Insurance agency _____

Contact name _____

Phone _____

---

**Statistical and administrative information**

---

Official Form 201　　　Voluntary Petition for Non-Individuals Filing for Bankruptcy　　　page 3

**Exhibit "1"**　　　　　　　　　0003

| Debtor | The Litigation Practice Group P.C. | Case number (if known) | |
|---|---|---|---|
| | Name | | |

| | | |
|---|---|---|
| **13. Debtor's estimation of available funds** | Check one:<br>☑ Funds will be available for distribution to unsecured creditors.<br>☐ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors. | |

| | | | |
|---|---|---|---|
| **14. Estimated number of creditors** | ☐ 1-49<br>☐ 50-99<br>☐ 100-199<br>☐ 200-999 | ☐ 1,000-5,000<br>☐ 5,001-10,000<br>☐ 10,001-25,000 | ☑ 25,001-50,000<br>☐ 50,001-100,000<br>☐ More than 100,000 |
| **15. Estimated assets** | ☐ $0-$50,000<br>☐ $50,001-$100,000<br>☐ $100,001-$500,000<br>☐ $500,001-$1 million | ☐ $1,000,001-$10 million<br>☐ $10,000,001-$50 million<br>☐ $50,000,001-$100 million<br>☐ $100,000,001-$500 million | ☐ $500,000,001-$1 billion<br>☐ $1,000,000,001-$10 billion<br>☐ $10,000,000,001-$50 billion<br>☐ More than $50 billion |
| **16. Estimated liabilities** | ☐ $0-$50,000<br>☐ $50,001-$100,000<br>☐ $100,001-$500,000<br>☐ $500,001-$1 million | ☐ $1,000,001-$10 million<br>☐ $10,000,001-$50 million<br>☐ $50,000,001-$100 million<br>☐ $100,000,001-$500 million | ☐ $500,000,001-$1 billion<br>☐ $1,000,000,001-$10 billion<br>☐ $10,000,000,001-$50 billion<br>☐ More than $50 billion |

## Request for Relief, Declaration, and Signatures

**WARNING** – Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

| | |
|---|---|
| **17. Declaration and signature of authorized representative of debtor** | The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.<br><br>I have been authorized to file this petition on behalf of the debtor.<br><br>I have examined the information in this petition and have a reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct.<br><br>Executed on  03/20/2023<br>MM / DD / YYYY<br><br>✗ _____    Daniel S. March<br>Signature of authorized representative of debtor    Printed name<br><br>Title  Managing Shareholder |

**Exhibit "1"**                                                      **0004**

| Debtor | The Litigation Practice Group P.C. | | Case number (if known) | |
| --- | --- | --- | --- | --- |
| | Name | | | |

| 18. Signature of attorney | ✗ [signature] | Date | 03/23/2023 |
| --- | --- | --- | --- |
| | Signature of attorney for debtor | | MM / DD / YYYY |

Joon M. Khang
Printed name

KHANG & KHANG LLP
Firm name

4000 Barranca Parkway, Suite 250
Number        Street

Irvine                                                    CA          92604
City                                                      State        ZIP Code

(949) 419-3834                                            joon@khanglaw.com
Contact phone                                             Email address

188722                                                    CA
Bar number                                                State

**Exhibit "1"**                                                0005

**Fill in this information to identify your case:**

Debtor Name    **The Litigation Practice Group P.C.**

United States Bankruptcy Court for the: **Central District of California**

Case number (*if known*): _____

☑ Check if this is an
amended filing

## Official Form 206A/B

# Schedule A/B: Assets — Real and Personal Property                12/15

Disclose all property, real and personal, which the debtor owns or in which the debtor has any other legal, equitable, or future interest. Include all property in which the debtor holds rights and powers exercisable for the debtor's own benefit. Also include assets and properties which have no book value, such as fully depreciated assets or assets that were not capitalized. In Schedule A/B, list any executory contracts or unexpired leases. Also list them on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G).

Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form. At the top of any pages added, write the debtor's name and case number (if known). Also identify the form and line number to which the additional information applies. If an additional sheet is attached, include the amounts from the attachment in the total for the pertinent part.

For Part 1 through Part 11, list each asset under the appropriate category or attach separate supporting schedules, such as a fixed asset schedule or depreciation schedule, that gives the details for each asset in a particular category. List each asset only once. In valuing the debtor's interest, do not deduct the value of secured claims. See the instructions to understand the terms used in this form.

| Part 1: | Cash and cash equivalents |
|---------|---------------------------|

1. **Does the debtor have any cash or cash equivalents?**
   ☑ No. Go to Part 2.
   ☐ Yes. Fill in the information below.

| All cash or cash equivalents owned or controlled by the debtor | Current value of debtor's interest |
|---|---|

2. **Cash on hand**                                                      $ _____ 0.00

3. **Checking, savings, money market, or financial brokerage accounts** (*Identify all*)

| Name of institution (bank or brokerage firm) | Type of account | Last 4 digits of account number | |
|---|---|---|---|
| **3.1**   **Union Bank** | **Checking Account** | | $   4,500.00 |

4. **Other cash equivalents** (*Identify all*)

   **4.1**   **Funds held by payment processor - Marich Bein**      $   12,000,000.00

5. **Total of Part 1**
   Add lines 2 through 4 (including amounts on any additional sheets). Copy the total to line 80.      $   12,004,500.00

---

Official Form 206A/B                     Schedule A/B: Property                     page 1 of 10

Copyright © Financial Software Solutions, LLC
BlueStylus

Exhibit "1"

0006

Debtor   **The Litigation Practice Group P.C.**                    Case number *(if known)* _____
       Name

---

| **Part 2:** | **Deposits and prepayments** |
| --- | --- |

6. **Does the debtor have any deposits or prepayments?**
   - ☑ No. Go to Part 3.
   - ■ Yes. Fill in the information below.

   Current value of debtor's interest

7. **Deposits, including security deposits and utility deposits**
   Description, including name of holder of deposit

8. **Prepayments, including prepayments on executory contracts, leases, insurance, taxes, and rent**
   Description, including name of holder of prepayment

9. **Total of Part 2**
   Add lines 7 through 8. Copy the total to line 81.          $_____62,000.00

---

| **Part 3:** | **Accounts receivable** |
| --- | --- |

10. **Does the debtor have any accounts receivable?**
    - ☑ No. Go to Part 4.
    - ■ Yes. Fill in the information below.

    Current value of debtor's interest

11. **Accounts receivable**

    **11a. 90 days old or less:**   _____120,000,000.00  –  _____0.00  =  $ _____120,000,000.00
                                   face amount                      doubtful or uncollectible accounts

    **11b. Over 90 days old:**   _____0.00  –  _____0.00  =  $ _____0.00
                                   face amount                      doubtful or uncollectible accounts

12. **Total of Part 3**
    Current value on lines 11a + 11b = line 12. Copy the total to line 82.      $_____120,000,000.00

---

Copyright © Financial Software Solutions, LLC                                                                BlueStylus

Exhibit "1"                                                                                              0007

| Debtor | **The Litigation Practice Group P.C.** | Case number *(if known)* | |
| | Name | | |

---

<table>
<tr><td colspan="3" style="background:black;color:white">**Part 4:**   **Investments**</td></tr>
</table>

13. **Does the debtor own any investments?**
    - ◼ No. Go to Part 5.
    - ☑ Yes. Fill in the information below.

| | | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|

14. **Mutual funds or publicly traded stocks not included in Part 1**

    Name of fund or stock:

15. **Non-publicly traded stock and interests in incorporated and unincorporated businesses, including any interest in an LLC, partnership, or joint venture**

    Name of entity:                                    % of ownership:

16. **Government bonds, corporate bonds, and other negotiable and non-negotiable instruments not included in Part 1**

    Describe:

17. **Total of Part 4**

    Add lines 14 through 16. Copy the total to line 83.

    $ _____ **0.00**

---

<table>
<tr><td colspan="5" style="background:black;color:white">**Part 5:**   **Inventory, excluding agriculture assets**</td></tr>
</table>

18. **Does the debtor own any inventory (excluding agriculture assets)?**
    - ◼ No. Go to Part 6.
    - ☑ Yes. Fill in the information below.

| General description | Date of the last physical inventory | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|

19. **Raw materials**

20. **Work in progress**

21. **Finished goods, including goods held for resale**

22. **Other inventory or supplies**

---

Copyright © Financial Software Solutions, LLC                                        BlueStylus

Exhibit "1"                                                                     0008

Debtor   **The Litigation Practice Group P.C.**                          Case number *(if known)* _____
           Name

23. **Total of Part 5**

    Add lines 19 through 22. Copy the total to line 84.

    <div style="border:1px solid">$ _____ 0.00</div>

24. **Is any of the property listed in Part 5 perishable?**

    ■ No

    □ Yes

25. **Has any of the property listed in Part 5 been purchased within 20 days before the bankruptcy was filed?**

    ■ No

    □ Yes.

    Book value   $ _____ 0.00   Valuation method _____   Current Value   $ _____ 0.00

26 **Has any of the property listed in Part 5 been appraised by a professional within the last year?**

    ■ No

    □ Yes

---

| Part 6: | Farming and fishing-related assets (other than titled motor vehicles and land) |
|---|---|

27. **Does the debtor own or lease any farming and fishing-related assets (other than titled motor vehicles and land)?**

    ■ No. Go to Part 7.

    □ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| 28. **Crops—either planted or harvested** | | | |
| _____ | $ _____ 0.00 | _____ | $ _____ 0.00 |
| 29. **Farm animals** *Examples:* Livestock, poultry, farm-raised fish | | | |
| _____ | $ _____ 0.00 | _____ | $ _____ 0.00 |
| 30. **Farm machinery and equipment (Other than titled motor vehicles)** | | | |
| _____ | $ _____ 0.00 | _____ | $ _____ 0.00 |
| 31. **Farm and fishing supplies, chemicals, and feed** | | | |
| _____ | $ _____ 0.00 | _____ | $ _____ 0.00 |

---

Copyright © Financial Software Solutions, LLC
                                                                                                                     BlueStylus

                                          **Exhibit "1"**

                                                                                                                     **0009**

| Debtor | The Litigation Practice Group P.C. | Case number *(if known)* |
|---|---|---|
| | Name | |

32. **Other farming and fishing-related property not already listed in Part 6**

_____  $_____0.00  _____  $_____0.00

33. **Total of Part 6.**
Add lines 28 through 32. Copy the total to line 85.

$_____0.00

34. **Is the debtor a member of an agricultural cooperative?**
■ No
☐ Yes. Is any of the debtor's property stored at the cooperative?
   ■ No
   ☐ Yes

35. **Has any of the property listed in Part 6 been purchased within 20 days before the bankruptcy was filed?**
■ No
☐ Yes

   Book value  $_____0.00  Valuation method _____  Current Value  $_____0.00

36. **Is a depreciation schedule available for any of the property listed in Part 6?**
■ No
☐ Yes

37. **Has any of the property listed in Part 6 been appraised by a professional within the last year?**
■ No
☐ Yes

---

**Part 7:**  **Office furniture, fixtures, and equipment; and collectibles**

38. **Does the debtor own or lease any office furniture, fixtures, equipment, or collectibles?**
■ No. Go to Part 8.
■ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| **39. Office furniture** | | | |
| Office furniture | $_____0.00 | | $_____Unknown |
| **40. Office fixtures** | | | |
| | $_____0.00 | | $_____0.00 |

---

Copyright © Financial Software Solutions, LLC          BlueStylus

Exhibit "1"                                    0010

| Debtor | **The Litigation Practice Group P.C.** | Case number *(if known)* | |
|---|---|---|---|
| | Name | | |

41. **Office equipment, including all computer equipment and communication systems equipment and software**

  **Misc. computers, monitors, cubicles, TV's, office supplies**        $ _____ 0.00 _____        $ _____ Unknown

42. **Collectibles** *Examples:* Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; china and crystal; stamp, coin, or baseball card collections; other collections, memorabilia, or collectibles

  _____        $ _____ 0.00 _____        $ _____ 0.00

43. **Total of Part 7.**

  Add lines 38 through 42. Copy the total to line 86.        $ _____ 0.00

44. **Is a depreciation schedule available for any of the property listed in Part 7?**
  ■ No
  ☐ Yes

45 **Has any of the property listed in Part 7 been appraised by a professional within the last year?**
  ■ No
  ☐ Yes

---

| Part 8: | **Machinery, equipment, and vehicles** |
|---|---|

46. **Does the debtor own or lease any machinery, equipment, or vehicles?**
  ☐ No. Go to Part 9.
  ☐ Yes. Fill in the information below.

| General description<br>Include year, make, model, and identification numbers (i.e., VIN, HIN, or N-number) | Net book value of debtor's interest<br>(Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| 47. **Automobiles, vans, trucks, motorcycles, trailers, and titled farm vehicles** | | | |
| _____ | $ _____ 0.00 | _____ | $ _____ 0.00 |
| 48. **Watercraft, trailers, motors, and related accessories** Examples: Boats, trailers, motors, floating homes, personal watercraft, and fishing vessels | | | |
| _____ | $ _____ 0.00 | _____ | $ _____ 0.00 |
| 49. **Aircraft and accessories** | | | |
| _____ | $ _____ 0.00 | _____ | $ _____ 0.00 |

---

Copyright © Financial Software Solutions, LLC          BlueStylus

Exhibit "1"          **0011**

Debtor    **The Litigation Practice Group P.C.**                    Case number *(if known)* _____
          Name

---

50.  **Other machinery, fixtures, and equipment (excluding farm machinery and equipment)**

_____   $ _____ 0.00   _____   $ _____ 0.00

---

51.  **Total of Part 8.**

Add lines 47 through 50. Copy the total to line 87.                                    $ _____ 0.00

52.  **Is a depreciation schedule available for any of the property listed in Part 8?**
- ■ No
- ☐ Yes

53.  **Has any of the property listed in Part 8 been appraised by a professional within the last year?**
- ■ No
- ☐ Yes

---

| Part 9: | Real property |
|---|---|

54.  **Does the debtor own or lease any real property?**
- ■ No. Go to Part 10.
- ☐ Yes. Fill in the information below.

55.  **Any building, other improved real estate, or land which the debtor owns or in which the debtor has an interest**

| Description and location of property | Nature and extent of debtor's interest in property | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|
| Include street address or other description such as Assessor Parcel Number (APN), and type of property (for example, acreage, factory, warehouse, apartment or office building), if available. | | | | |

---

56.  **Total of Part 9.**

Add the current value on lines 55.1 through 55.6 and entries from any additional sheets. Copy the total to line 88.    $ _____ 0.00

57.  **Is a depreciation schedule available for any of the property listed in Part 9?**
- ■ No
- ☐ Yes

58.  **Has any of the property listed in Part 9 been appraised by a professional within the last year?**
- ■ No
- ☐ Yes

---

Copyright © Financial Software Solutions, LLC                                                          BlueStylus

Exhibit "1"                                                                                           0012

| Debtor | The Litigation Practice Group P.C. | Case number *(if known)* _____ |
|---|---|---|
| | Name | |

---

**Part 10:    Intangibles and intellectual property**

---

59. **Does the debtor have any interests in intangibles or intellectual property?**
    - ☑ No. Go to Part 11.
    - ■ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| 60. **Patents, copyrights, trademarks, and trade secrets** <br> _____ | $ _____ 0.00 | _____ | $ _____ 0.00 |
| 61. **Internet domain names and websites** <br> _____ | $ _____ 0.00 | _____ | $ _____ 0.00 |
| 62. **Licenses, franchises, and royalties** <br> _____ | $ _____ 0.00 | _____ | $ _____ 0.00 |
| 63. **Customer lists, mailing lists, or other compilations** <br> **Customer leads** | $ _____ 0.00 | _____ | $ ____ 120,000.00 |
| 64. **Other intangibles, or intellectual property** <br> _____ | $ _____ 0.00 | _____ | $ _____ 0.00 |
| 65. **Goodwill** <br> _____ | $ _____ 0.00 | _____ | $ _____ 0.00 |

66. **Total of Part 10.**
    Add lines 60 through 65. Copy the total to line 89.

    $ ____ 120,000.00

67. **Do your lists or records include personally identifiable information of customers** (as defined in 11 U.S.C. §§ 101(41A) and 107)?
    - ■ No
    - ☑ Yes

68. **Is there an amortization or other similar schedule available for any of the property listed in Part 10?**
    - ■ No
    - ☑ Yes

69. **Has any of the property listed in Part 10 been appraised by a professional within the last year?**
    - ■ No
    - ☑ Yes

---

Copyright © Financial Software Solutions, LLC    BlueStylus

Exhibit "1"    0013

| Debtor | **The Litigation Practice Group P.C.** | Case number *(if known)* |
|---|---|---|
| | Name | |

| Part 11: | **All other assets** |
|---|---|

70. **Does the debtor own any other assets that have not yet been reported on this form?**

Include all interests in executory contracts and unexpired leases not previously reported on this form.

■ No. Go to Part 12.

☐ Yes. Fill in the information below.

| | Current value of debtor's interest |
|---|---|

71. **Notes receivable**

Description (include name of obligor)

_____    **0.00** – _____ **0.00** =    $ _____ **0.00**
                     Total face amount        doubtful or uncollectible accounts

72. **Tax refunds and unused net operating losses (NOLs)**

Description (for example, federal, state, local)

_____    Tax Year _____    $ _____ **0.00**

73. **Interests in insurance policies or annuities**

_____    $ _____ **0.00**

74. **Causes of action against third parties (whether or not a lawsuit has been filed)**

_____    $ _____ **0.00**

Nature of claim    _____

Amount requested    $ _____ **0.00**

75. **Other contingent and unliquidated claims or causes of action of every nature, including counterclaims of the debtor and rights to set off claims**

_____    $ _____ **0.00**

Nature of claim    _____

Amount requested    $ _____ **0.00**

76. **Trusts, equitable or future interests in property**

_____    $ _____ **0.00**

77. **Other property of any kind not already listed** *Examples:* Season tickets, country club membership

_____    $ _____ **0.00**

Copyright © Financial Software Solutions, LLC    BlueStylus

Exhibit "1"

0014

Debtor    **The Litigation Practice Group P.C.**                    Case number *(if known)* _____
          Name

78. **Total of Part 11.**
    Add lines 71 through 77. Copy the total to line 90.

    $ _____ 0.00

79  **Has any of the property listed in Part 11 been appraised by a professional within the last year?**
    ■ No
    ☐ Yes

---

| **Part 12:** | Summary |
|---|---|

**In Part 12 copy all of the totals from the earlier parts of the form.**

| Type of property | Current value of personal property | Current value of real property |
|---|---|---|
| 80. **Cash, cash equivalents, and financial assets.** *Copy line 5, Part 1.* | $ **12,004,500.00** | |
| 81. **Deposits and prepayments.** *Copy line 9, Part 2.* | $ **62,000.00** | |
| 82. **Accounts receivable.** *Copy line 12, Part 3.* | $ **120,000,000.00** | |
| 83. **Investments.** *Copy line 17, Part 4.* | $ **0.00** | |
| 84 **Inventory.** *Copy line 23, Part 5.* | $ **0.00** | |
| 85. **Farming and fishing-related assets.** *Copy line 33, Part 6.* | $ **0.00** | |
| 86. **Office furniture, fixtures, and equipment; and collectibles.** *Copy line 43, Part 7.* | $ **0.00** | |
| 87. **Machinery, equipment, and vehicles.** *Copy line 51, Part 8.* | $ **0.00** | |
| 88. **Real property.** *Copy line 56, Part 9.* ...............................➔ | | $ **0.00** |
| 89. **Intangibles and intellectual property.** *Copy line 66, Part 10.* | $ **120,000.00** | |
| 90. **All other assets.** *Copy line 78, Part 11.* | $ **0.00** | |
| 91. **Total.** Add lines 80 through 90 for each column................ 91a. | $ **132,186,500.00** | ➕ 91b. $ **0.00** |

92. **Total of all property on Schedule A/B.** Lines 91a + 91b = 92. .................................................

    $ **132,186,500.00**

---

Copyright © Financial Software Solutions, LLC                                                                    BlueStylus

Exhibit "1"                                                                    0015

**Fill in this information to identify your case:**

Debtor Name    __The Litigation Practice Group P.C.__

United States Bankruptcy Court for the: __Central District of California__

Case number (*If known*): _____

☑ Check if this is an amended filing

## Official Form 206D

# Schedule D: Creditors Who Have Claims Secured by Property    12/15

**Be as complete and accurate as possible**

1. **Do any creditors have claims secured by your property?**
   ☑ No. Check this box and submit this form to the court with your other schedules. You have nothing else to report on this form.
   ■ Yes. Fill in all of the information below.

| Part 1: | List Creditors Who Have Secured Claims |
|---|---|

2. **List in alphabetical order all creditors who have secured claims.** If a creditor has more than one secured claim, list the creditor separately for each claim.

|  | Column A **Amount of claim** Do not deduct the value of collateral. | Column B **Value of collateral that supports this claim** |
|---|---|---|

**2.1**

**Creditor's Name**

__Diverse Capital LLC__

**Creditor's mailing address**
__323 Sunny Isles Blvd, Ste 503__
__Sunny Isles, FL 33154__

**Creditor's email address, if known**
_____

**Date debt was incurred** _____

**Last 4 digits of account number** _____

**Do multiple creditors have an interest in the same property?**
■ No
☑ Yes. Have you already specified the relative priority?
   ☑ No. Specify each creditor, including this creditor, and its relative priority.
     _____
   ☑ Yes. The relative priority of creditors is specified on lines

**Describe debtor's property that is subject to a lien**
_____

**Describe the lien**
_____

**Is the creditor an insider or related party?**
■ No
☑ Yes

**Is anyone else liable on this claim?**
■ No
☑ Yes. Fill out Schedule H: Codebtors (Official Form 206H).

**As of the petition filing date, the claim is:**
Check all that apply.
☑ Contingent
☑ Unliquidated
☑ Disputed

$    __1,224,810.00__    $    __0.00__

**Description**
Breach of Settlement Agreement

Copyright © Financial Software Solutions, LLC
BlueStylus

Exhibit "1"

0016

| Debtor | The Litigation Practice Group P.C. | Case number *(if known)* |
|--------|-----------|------------|
| | Name | |

---

**2.2**  | Creditor's Name

**City Capital NY**

**Creditor's mailing address**
**1135 Kane Concourse**
**Bay Harbour Islands, FL 33154**

**Describe debtor's property that is subject to a lien**

$    2,950,000.00    $    1.00

**Creditor's email address, if known**

**Describe the lien**

**Description**
**Breach of Contract**

**Date debt was incurred**

**Is the creditor an insider or related party?**
■ No
☐ Yes

**Last 4 digits of account number**

**Do multiple creditors have an interest in the same property?**
■ No
☐ Yes. Have you already specified the relative priority?
   ☐ No. Specify each creditor, including this creditor, and its relative priority.

   ☐ Yes. The relative priority of creditors is specified on lines

**Is anyone else liable on this claim?**
☐ No
☐ Yes. Fill out Schedule H: Codebtors (Official Form 206H).

**As of the petition filing date, the claim is:**
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

---

**2.3**  | Creditor's Name

**Fundura Capital Group**

**Creditor's mailing address**
**80 Broad Street, Ste 3303**
**New York, NY 10004**

**Describe debtor's property that is subject to a lien**

$    2,100,000.00    $    1.00

**Creditor's email address, if known**

**Describe the lien**

**Description**
**Breach of Contract claim**

**Date debt was incurred**

**Is the creditor an insider or related party?**
■ No
☐ Yes

**Last 4 digits of account number**

**Do multiple creditors have an interest in the same property?**
■ No
☐ Yes. Have you already specified the relative priority?
   ☐ No. Specify each creditor, including this creditor, and its relative priority.

   ☐ Yes. The relative priority of creditors is specified on lines

**Is anyone else liable on this claim?**
☐ No
☐ Yes. Fill out Schedule H: Codebtors (Official Form 206H).

**As of the petition filing date, the claim is:**
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

---

**3.**  Total of the dollar amounts from Part 1, Column A, including the amounts from the Additional Page, if any

$    6,274,810.00

---

Copyright © Financial Software Solutions, LLC                                                                BlueStylus

**Exhibit "1"**                                    **0017**

| Debtor | **The Litigation Practice Group P.C.** | | Case number *(if known)* |
|---|---|---|---|
| | Name | | |

| **Part 2:** | **List Others to Be Notified for a Debt That You Already Listed in Part 1** |
|---|---|

List in alphabetical order any others who must be notified for a debt already listed in Part 1. Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for secured creditors.

If no others need to be notified for the debts listed in Part 1, do not fill out or submit this page. If additional pages are needed, copy this page.

| Name and Address | On which line in Part 1 did you enter the related creditor? | Last 4 digits of account number for this entity |
|---|---|---|

Copyright © Financial Software Solutions, LLC                                                                                                    BlueStylus

**Exhibit "1"**                                        **0018**

**Fill in this information to identify your case:**

Debtor     **The Litigation Practice Group P.C.**

United States Bankruptcy Court for the: **Central District of California**

Case number (*If known*):

☑ Check if this is an
amended filing

## Official Form 206E/F

# Schedule E/F: Creditors Who Have Unsecured Claims     12/15

Be as complete and accurate as possible. Use Part 1 for creditors with PRIORITY unsecured claims and Part 2 for creditors with NONPRIORITY unsecured claims. List the other party to any executory contracts or unexpired leases that could result in a claim. Also list executory contracts on *Schedule A/B: Assets - Real and Personal Property* (Official Form 206A/B) and on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G). Number the entries in Parts 1 and 2 in the boxes on the left. If more space is needed for Part 1 or Part 2, fill out and attach the Additional Page of that Part included in this form.

| Part 1: | List All Creditors with PRIORITY Unsecured Claims |
| --- | --- |

1.    **Do any creditors have priority unsecured claims?** (See 11 U.S.C. § 507).
   - ☑ No. Go to Part 2.
   - ■ Yes. Go to line 2.

2.    **List in alphabetical order all creditors who have unsecured claims that are entitled to priority in whole or in part.** If the debtor has more than 3 creditors with priority unsecured claims, fill out and attach the Additional Page of Part 1

|  |  | Total Claim | Priority Amount |
| --- | --- | --- | --- |

**2.1**   **Priority creditor's name and mailing address**

**Indiana Dept of Revenue**

 **PO Box 1028**

**INDIANAPOLIS, IN 46206**

**Date or dates debt was incurred**

**Last 4 digits of account number** _____

**Specify Code subsection of PRIORITY unsecured claim:** 11 U.S.C. § 507(a) ( _____ )

**As of the petition filing date, the claim is:**
*Check all that apply.*
- ☑ Contingent
- ☑ Unliquidated
- ☑ Disputed

**Basis for the claim:**

**Is the claim subject to offset?**
- ■ No
- ☑ Yes

$ _____ **5,639.24**   $ _____ **5,639.24**

**Description**

| **Withholding Tax** |
| --- |

| Debtor | **The Litigation Practice Group P.C.** | Case number *(if known)* |
|---|---|---|
| | Name | |

---

**2.2**  **Priority creditor's name and mailing address**

**Dept of Labor and Industries**

**PO Box 34022**

**Seattle, WA 98124**

**Date or dates debt was incurred**

**Last 4 digits of account number  4900**

**Specify Code subsection of PRIORITY
unsecured claim:** 11 U.S.C. § 507(a) ( _____ )

As of the petition filing date, the claim is:
*Check all that apply.*

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

**Is the claim subject to offset?**
☑ No
☐ Yes

$ _____ 190.05   $ _____ 190.05

**Description**

Ins tax

---

**2.3**  **Priority creditor's name and mailing address**

**Arizona Dept of Economic Security**

**PO Box 6028**

**Phoenix, AZ 85005**

**Date or dates debt was incurred**

**Last 4 digits of account number  _____**

**Specify Code subsection of PRIORITY
unsecured claim:** 11 U.S.C. § 507(a) ( _____ )

As of the petition filing date, the claim is:
*Check all that apply.*

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

**Is the claim subject to offset?**
☑ No
☐ Yes

$ _____ 35.00   $ _____ 35.00

**Description**

Tax

---

**2.4**  **Priority creditor's name and mailing address**

**Arkansas Dept of Finance & Admin**

**PO Box 9941, Little Rock, AR 72203-
9941**

**Little Rock, AR 72203**

**Date or dates debt was incurred**

**Last 4 digits of account number  _____**

**Specify Code subsection of PRIORITY
unsecured claim:** 11 U.S.C. § 507(a) ( _____ )

As of the petition filing date, the claim is:
*Check all that apply.*

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

**Is the claim subject to offset?**
☑ No
☐ Yes

$ _____ 6,357.40   $ _____ 6,357.40

**Description**

Tax

---

Copyright © Financial Software Solutions, LLC                                                                                                 BlueStylus

**Exhibit "1"**

**0020**

| Debtor | **The Litigation Practice Group P.C.** | Case number *(if known)* |
|---|---|---|
| | Name | |

---

**2.5** | Priority creditor's name and mailing address

**California Franchise Tax Board**

**PO Box 942857**

**Sacramento, CA 94257**

As of the petition filing date, the claim is:
*Check all that apply.*

☐ Contingent
☐ Unliquidated
☐ Disputed

$ _____346,480.39_   $ _____346,480.39_

Date or dates debt was incurred

Basis for the claim:

Last 4 digits of account number _____

Is the claim subject to offset?

■ No
☐ Yes

Description

**Tax**

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) ( _____ )

---

**2.6** | Priority creditor's name and mailing address

**Georgia Dept of Labor**

**148 Andrew Young International Blvd, NE, Suite 752**

**Atlanta, GA 30303**

As of the petition filing date, the claim is:
*Check all that apply.*

☐ Contingent
☐ Unliquidated
☐ Disputed

$ _____2,350.85_   $ _____2,350.85_

Date or dates debt was incurred

Basis for the claim:

Last 4 digits of account number _____

Is the claim subject to offset?

■ No
☐ Yes

Description

**Tax**

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) ( _____ )

---

**2.7** | Priority creditor's name and mailing address

**Internal Revenue Service (IRS)**

 **Internal Revenue Service**

**Ogden, UT 84201**

As of the petition filing date, the claim is:
*Check all that apply.*

☐ Contingent
☐ Unliquidated
☐ Disputed

$ _____9,025.99_   $ _____9,025.99_

Date or dates debt was incurred

Basis for the claim:

Last 4 digits of account number _____

Is the claim subject to offset?

■ No
☐ Yes

Description

**Tax**

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) ( _____ )

---

Exhibit "1"

0021

| Debtor | The Litigation Practice Group P.C. | Case number *(if known)* |
|---|---|---|
| | Name | |

---

**2.8** | Priority creditor's name and mailing address

**Mississippi Dept of Revenue**

**PO Box 23075**

**Jackson, MS 39225**

As of the petition filing date, the claim is:
*Check all that apply.*

$ 393.69    $ 393.69

☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:

Last 4 digits of account number _____

Is the claim subject to offset?

■ No
☐ Yes

Description

Tax

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) ( _____ )

---

**2.9** | Priority creditor's name and mailing address

**Nevada Dept of Taxation**

**1550 College Parkway, Suite 115**

**Carson City, NV 89706**

As of the petition filing date, the claim is:
*Check all that apply.*

$ 3,262.49    $ 3,262.49

☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:

Last 4 digits of account number _____

Is the claim subject to offset?

■ No
☐ Yes

Description

Tax

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) ( _____ )

---

**2.10** | Priority creditor's name and mailing address

**Utah State Tax Commission**

**210 N 1950 W**

**Salt Lake City, UT 84134**

As of the petition filing date, the claim is:
*Check all that apply.*

$ 212.82    $ 212.82

☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:

Last 4 digits of account number _____

Is the claim subject to offset?

■ No
☐ Yes

Description

Tax

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) ( _____ )

---

Copyright © Financial Software Solutions, LLC
BlueStylus

**Exhibit "1"**

0022

| Debtor | **The Litigation Practice Group P.C.** | Case number *(if known)* | |
|---|---|---|---|
| | Name | | |

| 2.11 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $ 112.12 | $ 112.12 |

**Wisconsin Dept of Revenue**

**PO Box 8901**

**Madison, WI 53708**

- ☒ Contingent
- ☒ Unliquidated
- ☒ Disputed

Date or dates debt was incurred

Basis for the claim:

Last 4 digits of account number

Is the claim subject to offset?
- ☒ No
- ☒ Yes

Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a) ( _____ )

Description

**Tax**

---

| **Part 2:** | **List All Creditors with NONPRIORITY Unsecured Claims** |

3.  List in alphabetical order all of the creditors with nonpriority unsecured claims. If the debtor has more than 6 creditors with nonpriority unsecured claims, fill out and attach the Additional Page of Part 2.

**Amount of claim**

| 3.1 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $ 14,472.33 |

**Ajilon**

**Lockbox: Dept CH 14031**

**Palatine, IL 60055**

- ☒ Contingent
- ☒ Unliquidated
- ☒ Disputed

Date or dates debt was incurred

Basis for the claim:

Last 4 digits of account number

Is the claim subject to offset?
- ☒ No
- ☒ Yes

Description

**Staffing Services**

---

Copyright © Financial Software Solutions, LLC                                   BlueStylus

**Exhibit "1"**

**0023**

Debtor    __The Litigation Practice Group P.C.__    Case number *(if known)* _____
     Name

---

| 3.2 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $ 201,869.92 |
|---|---|---|---|

**Anthem Blue Cross**

**PO Box 511300**

**Los Angeles, CA 90051**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Date or dates debt was incurred**
_____

**Basis for the claim:**
_____

**Description**
Insurance

**Last 4 digits of account number** _____

**Is the claim subject to offset?**
☐ No
☐ Yes

---

| 3.3 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $ 187,956.90 |
|---|---|---|---|

**Azevedo Solutions Groups, Inc**

**420 Adobe Canyon Rd**

**Kenwood, CA 95452**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Date or dates debt was incurred**
_____

**Basis for the claim:**
_____

**Description**
IT Vendor

**Last 4 digits of account number** _____

**Is the claim subject to offset?**
■ No
☐ Yes

---

| 3.4 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $ 6,174.87 |
|---|---|---|---|

**Carolina Technologies & Consulting Invoice**

**1854 Hendersonville Road, Suite A PMB #178**

**Asheville, NC 28803**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Date or dates debt was incurred**
_____

**Basis for the claim:**
_____

**Description**
IT Vendor

**Last 4 digits of account number** _____

**Is the claim subject to offset?**
■ No
☐ Yes

---

Copyright © Financial Software Solutions, LLC
BlueStylus

Exhibit "1"

0024

Debtor    __The Litigation Practice Group P.C.__                    Case number *(if known)* _____
         Name

---

| 3.5 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is:<br>Check all that apply. | $ 219,533.80 |

**Collaboration Advisors**

**400 Dorla Court**

**Zephyr Cove, NV 89448**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:

**Description**

Broker - marketing affiliates

Last 4 digits of account number _____

Is the claim subject to offset?

☐ No
☐ Yes

---

| 3.6 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is:<br>Check all that apply. | $ 98,502.00 |

**Credit Reporting Service Inc**

**548 Market St, Suite 72907**

**San Francisco, CA 94104**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:

**Description**

Credit reporting platform

Last 4 digits of account number _____

Is the claim subject to offset?

☑ No
☐ Yes

---

| 3.7 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is:<br>Check all that apply. | $ 374.00 |

**CT Corporation - Inv**

**PO Box 4349**

**Carol Stream, IL 80107**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred

Basis for the claim:

**Description**

Agent for service of process

Last 4 digits of account number _____

Is the claim subject to offset?

☑ No
☐ Yes

---

Exhibit "1"

0025

| Debtor | The Litigation Practice Group P.C. | Case number *(if known)* |
|---|---|---|
| | Name | |

**3.8**

Nonpriority creditor's name and mailing address

Debt Pay Pro

1900 E Golf Road, Suite 550

Schaumburg, IL 60173

Date or dates debt was incurred

Last 4 digits of account number

As of the petition filing date, the claim is:
*Check all that apply.*

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:

Is the claim subject to offset?

☐ No
☐ Yes

$ 162,500.00

Description

CRM

**3.9**

Nonpriority creditor's name and mailing address

Document Fulfillment Services

2930 Ramona Ave #100

Sacramento, CA 95826

Date or dates debt was incurred

Last 4 digits of account number

As of the petition filing date, the claim is:
*Check all that apply.*

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:

Is the claim subject to offset?

■ No
☐ Yes

$ 90,570.08

Description

Mail vendor

**3.10**

Nonpriority creditor's name and mailing address

EnergyCare, LLC

2925 N. Green Valley Parkway
Suite C

Henderson, NV 89014

Date or dates debt was incurred

Last 4 digits of account number

As of the petition filing date, the claim is:
*Check all that apply.*

☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:

Is the claim subject to offset?

■ No
☐ Yes

$ 7,842.00

Description

Offshore call center

Exhibit "1"         0026

Debtor  __**The Litigation Practice Group P.C.**__            Case number *(if known)* _____
        Name

| 3.11 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $                    130,773.51 |

**3.11** Nonpriority creditor's name and mailing address

__**Exela Enterprise Solutions**__

__**2701 E. Grauwyler Road**__

__**Irving, TX 75061**__

As of the petition filing date, the claim is:
*Check all that apply.*

☐ Contingent
☐ Unliquidated
☐ Disputed

$                    130,773.51

Date or dates debt was incurred
_____

Last 4 digits of account number  _____

Basis for the claim:
_____

Is the claim subject to offset?
☑ No
☐ Yes

Description
Mail vendor

---

**3.12** Nonpriority creditor's name and mailing address

__**First Legal Network, LLC**__

__**PO Box 743451**__

__**Los Angeles, CA 90074**__

As of the petition filing date, the claim is:
*Check all that apply.*

☐ Contingent
☐ Unliquidated
☐ Disputed

$                    21,557.13

Date or dates debt was incurred
_____

Last 4 digits of account number  _____

Basis for the claim:
_____

Is the claim subject to offset?
☑ No
☐ Yes

Description
Online filing platform

---

**3.13** Nonpriority creditor's name and mailing address

__**GHA Technologies Inc**__

Dept #2090
PO Box 29661

__**Phoenix, AZ 85038**__

As of the petition filing date, the claim is:
*Check all that apply.*

☐ Contingent
☐ Unliquidated
☐ Disputed

$                    7,861.98

Date or dates debt was incurred
_____

Last 4 digits of account number  _____

Basis for the claim:
_____

Is the claim subject to offset?
☑ No
☐ Yes

Description
Computer sales

---

Copyright © Financial Software Solutions, LLC                                                                    BlueStylus

Exhibit "1"                    0027

| Debtor | **The Litigation Practice Group P.C.** | Case number *(if known)* |
|---|---|---|
| | Name | |

---

**3.14** | Nonpriority creditor's name and mailing address

**Harrington Electric Inc**

**PO Box 886**

**Skyland, NC 28776**

As of the petition filing date, the claim is:
*Check all that apply.*

☐ Contingent
☐ Unliquidated
☐ Disputed

$                                    455.00

Date or dates debt was incurred

Basis for the claim:

**Description**

Utility repair company

Last 4 digits of account number

Is the claim subject to offset?

☐ No
☐ Yes

---

**3.15** | Nonpriority creditor's name and mailing address

**Imagine Reporting**

**1350 Columbia Street
Suite 703**

**San Diego, CA 92103**

As of the petition filing date, the claim is:
*Check all that apply.*

☐ Contingent
☐ Unliquidated
☐ Disputed

$                                  1,010.00

Date or dates debt was incurred

Basis for the claim:

**Description**

Document copying
vendor

Last 4 digits of account number

Is the claim subject to offset?

☑ No
☐ Yes

---

**3.16** | Nonpriority creditor's name and mailing address

**Juize, Inc**

**PO Box 505**

**Murrieta, CA 92562**

As of the petition filing date, the claim is:
*Check all that apply.*

☐ Contingent
☐ Unliquidated
☐ Disputed

$                                  8,107.11

Date or dates debt was incurred

Basis for the claim:

**Description**

Appliance lease

Last 4 digits of account number

Is the claim subject to offset?

☑ No
☐ Yes

---

Copyright © Financial Software Solutions, LLC                                                                                    BlueStylus

**Exhibit "1"**                    **0028**

Debtor    __The Litigation Practice Group P.C.__                          Case number _(if known)_ _____
           Name

---

| 3.17 | **Nonpriority creditor's name and mailing address** | **As of the petition filing date, the claim is:** | $                    1,939.09 |
|---|---|---|---|

**As of the petition filing date, the claim is:**
_Check all that apply._

__Krisp Technologies, Inc__

- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

__2150 Shattuck Ave__
__Penthouse 1300__

__Berkeley, CA 94704__

**Date or dates debt was incurred**        **Basis for the claim:**        **Description**
_____                   _____        Software vendor

**Last 4 digits of account number** _____    **Is the claim subject to offset?**
- ☑ No
- ☐ Yes

---

| 3.18 | **Nonpriority creditor's name and mailing address** | **As of the petition filing date, the claim is:** | $                   13,325.68 |

**As of the petition filing date, the claim is:**
_Check all that apply._

__Liberty Mutual__

- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

__PO Box 91013__

__Chicago, IL 60680__

**Date or dates debt was incurred**        **Basis for the claim:**        **Description**
_____                   _____        Insurance

**Last 4 digits of account number** _____    **Is the claim subject to offset?**
- ☑ No
- ☐ Yes

---

| 3.19 | **Nonpriority creditor's name and mailing address** | **As of the petition filing date, the claim is:** | $                    3,225.83 |

**As of the petition filing date, the claim is:**
_Check all that apply._

__Marc Lemauviel - Allegra__

- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

__326 MacNeil Way__

__Weaverville, NC 28787__

**Date or dates debt was incurred**        **Basis for the claim:**        **Description**
_____                   _____        Interior designer

**Last 4 digits of account number** _____    **Is the claim subject to offset?**
- ☑ No
- ☐ Yes

---

Copyright © Financial Software Solutions, LLC                                                                                      BlueStylus

Exhibit "1"

0029

| Debtor | **The Litigation Practice Group P.C.** | | Case number *(if known)* | |
|---|---|---|---|---|
| | Name | | | |

---

| 3.20 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is:<br>*Check all that apply.* | $ | **4,980.65** |

**MarkSYS Holdings, LLC**

**3725 Cincinnati Ave**
**Suite 200**

**Rocklin, CA 95765**

- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

| Date or dates debt was incurred | Basis for the claim: | Description |
|---|---|---|
| | | **Mail vendor** |

| Last 4 digits of account number | Is the claim subject to offset? |
|---|---|
| | ☑ No<br>☐ Yes |

---

| 3.21 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is:<br>*Check all that apply.* | $ | **101,320.10** |

**Netsuite-Oracle**

**2300 Oracle Way**

**Austin, TX 78741**

- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

| Date or dates debt was incurred | Basis for the claim: | Description |
|---|---|---|
| | | **Bookkeeping software** |

| Last 4 digits of account number | Is the claim subject to offset? |
|---|---|
| | ☑ No<br>☐ Yes |

---

| 3.22 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is:<br>*Check all that apply.* | $ | **1,091.89** |

**Pitney Bowes**

**PO Box 981026**

**Boston, MA 02298**

- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

| Date or dates debt was incurred | Basis for the claim: | Description |
|---|---|---|
| | | **Mail meter vendor** |

| Last 4 digits of account number | Is the claim subject to offset? |
|---|---|
| | ☑ No<br>☐ Yes |

---

Copyright © Financial Software Solutions, LLC        BlueStylus

Exhibit "1"

0030

Debtor    **The Litigation Practice Group P.C.**    Case number *(if known)* _____
     Name

| 3.23 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $ 2,495.00 |

**Rapid Credit Inc**

**3558 Round Barn Blvd
Suite 200**

**Santa Rosa, CA 95403**

As of the petition filing date, the claim is:
*Check all that apply.*

- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

$     **2,495.00**

Date or dates debt was incurred
_____

Basis for the claim:
_____

Description

Credit repair company

Last 4 digits of account number   _____

Is the claim subject to offset?

- ☒ No
- ☐ Yes

---

| 3.24 | Nonpriority creditor's name and mailing address |

**SBS Leasing A Program of De Lage Landen**

**PO Box 41602**

**Philadelphi, PA 19101**

As of the petition filing date, the claim is:
*Check all that apply.*

- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

$     **3,683.54**

Date or dates debt was incurred
_____

Basis for the claim:
_____

Description

Equipment leasing -
copier-printer

Last 4 digits of account number   _____

Is the claim subject to offset?

- ☒ No
- ☐ Yes

---

| 3.25 | Nonpriority creditor's name and mailing address |

**Security Solutions**

**10911 Bloomfield St**

**Los Alamitos, CA 90720**

As of the petition filing date, the claim is:
*Check all that apply.*

- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

$     **552.01**

Date or dates debt was incurred
_____

Basis for the claim:
_____

Description

Door repair company

Last 4 digits of account number   _____

Is the claim subject to offset?

- ☒ No
- ☐ Yes

---

Copyright © Financial Software Solutions, LLC
     BlueStylus

Exhibit "1"

0031

| Debtor | The Litigation Practice Group P.C. | Case number (if known) |
|---|---|---|
| | Name | |

---

**3.26** | **Nonpriority creditor's name and mailing address**

**Sharp Business Systems**

8670 Argent St

**Santee, CA 92071**

**Date or dates debt was incurred**

**Last 4 digits of account number** _____

**As of the petition filing date, the claim is:**
*Check all that apply.*

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

**Is the claim subject to offset?**

■ No
☐ Yes

$ 158,207.87

**Description**

IT support services and phone system

---

**3.27** | **Nonpriority creditor's name and mailing address**

**Streamline Performance Inc**

1551 N Tustin, #555

**Santa Ana, CA 92705**

**Date or dates debt was incurred**

**Last 4 digits of account number** _____

**As of the petition filing date, the claim is:**
*Check all that apply.*

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

**Is the claim subject to offset?**

■ No
☐ Yes

$ 14,091.02

**Description**

Consultant

---

**3.28** | **Nonpriority creditor's name and mailing address**

**Thomson Reuters**

610 Opperman Drive

**Eagen, MN 55123**

**Date or dates debt was incurred**

**Last 4 digits of account number** _____

**As of the petition filing date, the claim is:**
*Check all that apply.*

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

**Is the claim subject to offset?**

■ No
☐ Yes

$ 1,987.20

**Description**

Online search engine platform

---

Exhibit "1"

0032

| Debtor | **The Litigation Practice Group P.C.** | | Case number *(if known)* | |
| --- | --- | --- | --- | --- |
| | Name | | | |

---

**3.29** | Nonpriority creditor's name and mailing address

As of the petition filing date, the claim is:
*Check all that apply.*

$ _____ **18,343.43**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Twilio, Inc**

**101 Spear Street**
**Suite 500**

**San Francisco, CA 94105**

Date or dates debt was incurred

Basis for the claim:

**Description**

**SMS vendor for CRM**

Last 4 digits of account number _____

Is the claim subject to offset?

■ No
☐ Yes

---

**3.30** | Nonpriority creditor's name and mailing address

As of the petition filing date, the claim is:
*Check all that apply.*

$ _____ **9,125.00**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Nationwide Appearance Attorneys**

**5737 Kanan Rd #628**

**Agoura Hills, CA 91301**

Date or dates debt was incurred

Basis for the claim:

**Description**

**Appearance counsel -
1099 basis**

Last 4 digits of account number _____

Is the claim subject to offset?

■ No
☐ Yes

---

**3.31** | Nonpriority creditor's name and mailing address

As of the petition filing date, the claim is:
*Check all that apply.*

$ _____ **52,095.81**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Executive Center LLC**

**5960 South Jones Blvd**

**Las Vegas, NV 89118**

Date or dates debt was incurred

Basis for the claim:

**Description**

**Lease (abandoned) - Las
Vegas, NV**

Last 4 digits of account number _____

Is the claim subject to offset?

■ No
☐ Yes

---

Exhibit "1"

0033

Debtor    **The Litigation Practice Group P.C.**                                            Case number *(if known)*  _____
          Name

---

| 3.32 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $ 247,591.48 |
|---|---|---|---|

**Outsource Accelerator Ltd**

**City Marque Limited, Unit 8801-2
Bldg 244-248 Des Voeux Rd
Central Hong Kong**

- ☐ Contingent
- ☐ Unliquidated
- ☑ Disputed

**Date or dates debt was incurred**

**Basis for the claim:**

**Description**

Offshore call center

**Last 4 digits of account number** _____

**Is the claim subject to offset?**
- ☐ No
- ☐ Yes

---

| 3.33 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $ 481,609.52 |
|---|---|---|---|

**TaskUs Holdings, Inc.**

**1650 Independence Dr**

**New Braunfels, TX 78132**

- ☑ Contingent
- ☑ Unliquidated
- ☑ Disputed

**Date or dates debt was incurred**

**Basis for the claim:**

**Description**

Offshore call center

**Last 4 digits of account number** _____

**Is the claim subject to offset?**
- ☑ No
- ☐ Yes

---

| 3.34 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $ 8,000,000.00 |
|---|---|---|---|

**Marich Bein LLC**

**99 Wall Street
Ste 2669**

**New York, NY 10005**

- ☑ Contingent
- ☑ Unliquidated
- ☑ Disputed

**Date or dates debt was incurred**

**Basis for the claim:**

**Description**

Breach of Contract

**Last 4 digits of account number** _____

**Is the claim subject to offset?**
- ☑ No
- ☐ Yes

---

Official Form 206E/F                    **Schedule E/F: Creditors Who Have Unsecured Claims**                    page 16 of 25

Copyright © Financial Software Solutions, LLC                                                                  BlueStylus

Exhibit "1"                                                                                                      0034

Debtor    **The Litigation Practice Group P.C.**                                     Case number *(if known)* _____
          Name

---

| 3.35 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: | $ 25,000,000.00 |
|---|---|---|---|

**Validation Partners LLC**

**1300 Sawgrass Pkwy**
**Ste 110**

**Sunrise, FL 33323**

As of the petition filing date, the claim is:
*Check all that apply.*

☐ Contingent
☐ Unliquidated
■ Disputed

Date or dates debt was incurred _____

Basis for the claim: _____

Description
**Breach of Contract**

Last 4 digits of account number _____

Is the claim subject to offset?
■ No
☐ Yes

---

| 3.36 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: | $ 36,810,655.64 |
|---|---|---|---|

**MC DVI Fund 1, LLC; MC DVI Fund 2, LLC**

**1598 Cottonwood Dr**

**Glenview, IL 60026**

As of the petition filing date, the claim is:
*Check all that apply.*

☐ Contingent
☐ Unliquidated
■ Disputed

Date or dates debt was incurred _____

Basis for the claim: _____

Description
**Breach of Contract**

Last 4 digits of account number _____

Is the claim subject to offset?
■ No
☐ Yes

---

| 3.37 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: | $ 65,385,489.44 |
|---|---|---|---|

**Debt Validation Fund II, LLC**

**5075 Lower Valley Road**

**Atglen, PA 19310**

As of the petition filing date, the claim is:
*Check all that apply.*

☐ Contingent
☐ Unliquidated
■ Disputed

Date or dates debt was incurred _____

Basis for the claim: _____

Description
**Breach of Contract**

Last 4 digits of account number _____

Is the claim subject to offset?
■ No
☐ Yes

---

**Exhibit "1"**

**0035**

Debtor    **The Litigation Practice Group P.C.**    Case number (if known)
      Name

---

| 3.38 | **Nonpriority creditor's name and mailing address** | **As of the petition filing date, the claim is:** | $ | **139,787.22** |

Check all that apply.

**Tustin Executive Center**

    ☐ Contingent

**1630 S Sunkist Street**
**Ste A**

    ☐ Unliquidated
    ☐ Disputed

**Anaheim, CA 92806**

**Date or dates debt was incurred**      **Basis for the claim:**      **Description**

    **Lease Dispute**

**Last 4 digits of account number**      **Is the claim subject to offset?**

    ■ No
    ☐ Yes

---

| 3.39 | **Nonpriority creditor's name and mailing address** | **As of the petition filing date, the claim is:** | $ | **28,000.00** |

Check all that apply.

**LexisNexus**

    ☐ Contingent

**15500 B Rockfield Blvd**

    ☐ Unliquidated

**Irvine, CA 92618**

    ☐ Disputed

**Date or dates debt was incurred**      **Basis for the claim:**      **Description**

    **Breach of contract -**
    **Online Research Platform**

**Last 4 digits of account number**   7028      **Is the claim subject to offset?**

    ■ No
    ☐ Yes

---

| 3.40 | **Nonpriority creditor's name and mailing address** | **As of the petition filing date, the claim is:** | $ | **1,400,000.00** |

Check all that apply.

**JP Morgan Chase**

    ☐ Contingent

**3 Park Plaza, Ste 900**

    ☐ Unliquidated

**Irvine, CA 92614**

    ■ Disputed

**Date or dates debt was incurred**      **Basis for the claim:**      **Description**

    **Commercial orporate**
    **credit card**

**Last 4 digits of account number**      **Is the claim subject to offset?**

    ■ No
    ☐ Yes

---

Exhibit "1"

0036

Debtor    **The Litigation Practice Group P.C.**          Case number *(if known)*
Name

---

**3.41** | Nonpriority creditor's name and mailing address

**Business Centers of America**

**1100 Sir Francis Drake Blvd
Ste 1**

**Kentfield, CA 94904**

As of the petition filing date, the claim is:
*Check all that apply.*
☑ Contingent
☑ Unliquidated
■ Disputed

$ 2,400,000.00

Date or dates debt was incurred

Last 4 digits of account number

Basis for the claim:

Is the claim subject to offset?
■ No
☑ Yes

Description
Receivable purchase -
unperfected

---

**3.42** | Nonpriority creditor's name and mailing address

**Michael Schwartz**

**3968 Lowry Avenue**

**Cincinnati, OH 45229**

As of the petition filing date, the claim is:
*Check all that apply.*
☑ Contingent
☑ Unliquidated
■ Disputed

$ Unknown

Basis for the claim:

Is the claim subject to offset?
■ No
☑ Yes

Description
Pending litigation - See
SOFA #9

---

**3.43** | Nonpriority creditor's name and mailing address

**Anibal Colon Jr**

**c/o Alexander Taylor, Esq.
Sulaiman Law Group Ltd
2500 S. Highland Ave, Ste 200**

**Lombard, IL 60148**

As of the petition filing date, the claim is:
*Check all that apply.*
☑ Contingent
☑ Unliquidated
■ Disputed

$ Unknown

Basis for the claim:

Is the claim subject to offset?
■ No
☑ Yes

Description
Pending litigation - SOFA
#7

---

Exhibit "1"          0037

Debtor    **The Litigation Practice Group P.C.**                           Case number *(if known)*
          Name

| | |
|---|---|
| **3.44** | **Nonpriority creditor's name and mailing address** |

**Kathleen Lacey**

**c/o David Chami, Esq.**
**Price Law Group**
**8245 N. 85th Way**

**Scottsdale, AZ 85258**

**As of the petition filing date, the claim is:**
*Check all that apply.*

☐ Contingent
☐ Unliquidated
☑ Disputed

$ _____ **Unknown**

**Date or dates debt was incurred**

**Basis for the claim:**

**Description**

**Pending litigation - SOFA #7**

**Last 4 digits of account number** _____

**Is the claim subject to offset?**

☐ No
☑ Yes

---

| | |
|---|---|
| **3.45** | **Nonpriority creditor's name and mailing address** |

**David Ulery**

**c/o Joshua Eggnatz, Esq,**
**EGGNATZ | PASCUCCI**
**7450 Griffin Road, Suite 230**

**Davie, FL 33314**

**As of the petition filing date, the claim is:**
*Check all that apply.*

☑ Contingent
☑ Unliquidated
☑ Disputed

$ _____ **Unknown**

**Date or dates debt was incurred**

**Basis for the claim:**

**Description**

**Pending litigation - SOFA #7**

**Last 4 digits of account number** _____

**Is the claim subject to offset?**

☑ No
☐ Yes

---

| | |
|---|---|
| **3.46** | **Nonpriority creditor's name and mailing address** |

**Kimberly Birdsong**

**c/o Alexander J. Taylor, Esq.**
**SULAIMANLAW GROUP**
**2500 South Highland Ave**
**Suite 200**

**Lombard, IL 60148**

**As of the petition filing date, the claim is:**
*Check all that apply.*

☑ Contingent
☑ Unliquidated
☑ Disputed

$ _____ **Unknown**

**Date or dates debt was incurred**

**Basis for the claim:**

**Description**

**Pending litigation - see SOFA #7**

**Last 4 digits of account number** _____

**Is the claim subject to offset?**

☑ No
☐ Yes

---

Copyright © Financial Software Solutions, LLC                                                                BlueStylus

**Exhibit "1"**

**0038**

| Debtor | The Litigation Practice Group P.C. | Case number *(if known)* |
|---|---|---|
| | Name | |

---

**3.47** | **Nonpriority creditor's name and mailing address**

**Kevin Carpenter**

c/o Alexander Taylor, Esq,
Sulaiman Law Group Ltd
2500 S. Highland Ave, Ste 200

Lombard, IL 60148

**As of the petition filing date, the claim is:**
*Check all that apply.*

☐ Contingent
☐ Unliquidated
☒ Disputed

$_____ Unknown

| **Date or dates debt was incurred** | **Basis for the claim:** | **Description** |
|---|---|---|
| | | Pending litigation - see SOFA #7 |
| **Last 4 digits of account number** _____ | **Is the claim subject to offset?** ☐ No ☒ Yes | |

---

**3.48** | **Nonpriority creditor's name and mailing address**

**Karen Suell**

c/o Nathan C. Volheim, Esq
Sulaiman Law Group
2500 S. Highland Ave, Ste 200

Lombard, IL 60148

**As of the petition filing date, the claim is:**
*Check all that apply.*

☒ Contingent
☒ Unliquidated
☐ Disputed

$_____ Unknown

| **Date or dates debt was incurred** | **Basis for the claim:** | **Description** |
|---|---|---|
| | | Pending litigation - see SOFA #7 |
| **Last 4 digits of account number** _____ | **Is the claim subject to offset?** ☒ No ☐ Yes | |

---

**3.49** | **Nonpriority creditor's name and mailing address**

**Gloria Eaton**

c/o Kris Skaar, Esq.
133 Mirramont Lake Dr.

Woodstock, GA 30189

**As of the petition filing date, the claim is:**
*Check all that apply.*

☒ Contingent
☒ Unliquidated
☐ Disputed

$_____ Unknown

| **Date or dates debt was incurred** | **Basis for the claim:** | **Description** |
|---|---|---|
| | | Pending litigation - see SOFA #7 |
| **Last 4 digits of account number** _____ | **Is the claim subject to offset?** ☒ No ☐ Yes | |

---

Official Form 206E/F

Copyright © Financial Software Solutions, LLC

**Schedule E/F: Creditors Who Have Unsecured Claims**

BlueStylus

Exhibit "1"

0039

Debtor    __**The Litigation Practice Group P.C.**__                    Case number *(if known)* _____
          Name

| 3.50 | **Nonpriority creditor's name and mailing address** | **As of the petition filing date, the claim is:** | |
|---|---|---|---|

**Nonpriority creditor's name and mailing address**

__**Carolyn Beech**__

__**c/o Daniel Edelman, Esq.**__
__**20 South Clark St., Ste1500**__

__**Chicago, IL 60603**__

**As of the petition filing date, the claim is:**
*Check all that apply.*

☐ Contingent
☐ Unliquidated
☑ Disputed

$ _____ **Unknown**

**Date or dates debt was incurred**

_____

**Last 4 digits of account number** _____

**Basis for the claim:**

_____

**Is the claim subject to offset?**

☑ No
☐ Yes

**Description**

**Pending litigation - see SOFA #7**

---

| 3.51 | **Nonpriority creditor's name and mailing address** |
|---|---|

__**Debra Price**__

__**c/o Robert Cocco**__
__**1500 Walnut St, Ste 900**__

__**Philadelphia, PA 19102**__

**As of the petition filing date, the claim is:**
*Check all that apply.*

☐ Contingent
☐ Unliquidated
☑ Disputed

$ _____ **Unknown**

**Date or dates debt was incurred**

_____

**Last 4 digits of account number** _____

**Basis for the claim:**

_____

**Is the claim subject to offset?**

☑ No
☐ Yes

**Description**

**Pending litigation - see SOFA #7**

---

| 3.52 | **Nonpriority creditor's name and mailing address** |
|---|---|

__**Kenneth Topp**__

__**c/o Nathan Volheim, Esq**__
__**Sulaiman Law Group Ltd**__
__**2500 S Highland Ave, Ste 200**__

__**Lombard, IL 60148**__

**As of the petition filing date, the claim is:**
*Check all that apply.*

☐ Contingent
☐ Unliquidated
☑ Disputed

$ _____ **Unknown**

**Date or dates debt was incurred**

_____

**Last 4 digits of account number** _____

**Basis for the claim:**

_____

**Is the claim subject to offset?**

☑ No
☐ Yes

**Description**

**Pending litigation - see SOFA #7**

---

Copyright © Financial Software Solutions, LLC                                                                    BlueStylus

**Exhibit "1"**

**0040**

Debtor     **The Litigation Practice Group P.C.**                                    Case number *(if known)* _____
           Name

---

| 3.53 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: | | $ _____ **Unknown** |

*Check all that apply.*

**Darcy Williamson, Trustee**

**510 SW 10th**

**Topeka, KS 66612**

☐ Contingent
☐ Unliquidated
■ Disputed

Date or dates debt was incurred

Basis for the claim:

**Description**

**Pending litigation - see SOFA #7**

Last 4 digits of account number _____

Is the claim subject to offset?

☐ No
☐ Yes

---

| 3.54 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: | | $ _____ **Unknown** |

*Check all that apply.*

**James Hammett**

**c/o Jenna Dakraub
Price Law Group
8245 N. 85th Way**

**Scottsdale, AZ 85258**

☐ Contingent
☐ Unliquidated
■ Disputed

Date or dates debt was incurred

Basis for the claim:

**Description**

**Pending litigation - see SOFA #7**

Last 4 digits of account number _____

Is the claim subject to offset?

■ No
☐ Yes

---

| 3.55 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: | | $ _____ **Unknown** |

*Check all that apply.*

**Johnny Rlzo**

**c/o Bobby Walker, Esq.
Sulaiman Law Group
2500 S. Highland Ave, Ste 200**

**Lombard, IL 60148**

☐ Contingent
☐ Unliquidated
■ Disputed

Date or dates debt was incurred

Basis for the claim:

**Description**

**Pending litigation - see SOFA #7**

Last 4 digits of account number _____

Is the claim subject to offset?

■ No
☐ Yes

---

Official Form 206E/F                    **Schedule E/F: Creditors Who Have Unsecured Claims**                    page 23 of 25

Copyright © Financial Software Solutions, LLC                                                                  BlueStylus

**Exhibit "1"**

**0041**

Debtor    __The Litigation Practice Group P.C._____    Case number _(if known)_ _____
            Name

---

| 3.56 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: | | $_____ Unknown |
|------|--------|--------|--|--|
| | | _Check all that apply._ | | |

__Beverly Graham_____

c/o Bobby Walker, Esq.
Sulaiman Law Group
__2500 S. Highland Ave, Ste 200_____

__Lombard, IL 60148_____

As of the petition filing date, the claim is:
_Check all that apply._

☐ Contingent
☐ Unliquidated
☑ Disputed

$_____ Unknown

| Date or dates debt was incurred | Basis for the claim: | Description |
|--------|--------|--------|
| _____ | _____ | Pending litigation - see SOFA #7 |
| Last 4 digits of account number _____ | Is the claim subject to offset? | |
| | ☐ No ☑ Yes | |

---

| 3.57 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: |
|------|--------|--------|

__Kathleen Scarlett_____

c/o Jeremiah Heck, Esq.
Luftman Heck & Assoc
__6253 Riverside Dr, Ste 200_____

__Dublin, OH 43017_____

As of the petition filing date, the claim is:
_Check all that apply._

☐ Contingent
☐ Unliquidated
☐ Disputed

$_____ Unknown

| Date or dates debt was incurred | Basis for the claim: | Description |
|--------|--------|--------|
| _____ | _____ | Pending litigation - see SOFA #7 |
| Last 4 digits of account number _____ | Is the claim subject to offset? | |
| | ☑ No ☐ Yes | |

---

| 3.58 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: |
|------|--------|--------|

__Geneve and Myranda Sheffield_____

c/o Jeremiah Heck, Esq
Luftman Heck & Assoc
__6253 Riverside Dr, Ste 200_____

__Dublin, OH 43017_____

As of the petition filing date, the claim is:
_Check all that apply._

☐ Contingent
☐ Unliquidated
☐ Disputed

$_____ Unknown

| Date or dates debt was incurred | Basis for the claim: | Description |
|--------|--------|--------|
| _____ | _____ | Pending litigation - see SOFA #7 |
| Last 4 digits of account number _____ | Is the claim subject to offset? | |
| | ☑ No ☐ Yes | |

---

Exhibit "1"

0042

| Debtor | The Litigation Practice Group P.C. | Case number *(if known)* | |
|--------|-----------------------------------|---------------------------|---|
| | Name | | |

---

**Part 3:    List Others to Be Notified About Unsecured Claims**

**4.    List in alphabetical order any others who must be notified for claims listed in Parts 1 and 2.** Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for unsecured creditors.

If no others need to be notified for the debts listed in Parts 1 and 2, do not fill out or submit this page. If additional pages are needed, copy the next page.

| Name and mailing address | On which line in Part 1 or Part 2 is the related creditor (if any) listed? | Last 4 digits of account number |
|--------------------------|---------------------------------------------------------------------------|---------------------------------|

---

**Part 4:    Total Amounts of the Priority and Nonpriority Unsecured Claims**

**5.    Add the amounts of priority and nonpriority unsecured claims.**

Total of claim amounts

| | | | |
|---|---|---|---|
| 5a. | Total claims from Part 1 | 5a. | $    374,060.04 |
| 5b. | Total claims from Part 2 | 5b. + | $    141,439,158.05 |
| 5c. | Total of Parts 1 and 2<br>Lines 5a + 5b = 5c. | 5c. | $    141,813,218.09 |

---

Exhibit "1"

0043

**Fill in this information to identify your case:**

Debtor Name    __The Litigation Practice Group P.C.__

United States Bankruptcy Court for the: __Central District of California__

Case number (*If known*): _____    Chapter    **7**

☒ Check if this is an
amended filing

## Official Form 206G

# Schedule G: Executory Contracts and Unexpired Leases                    12/15

**Be as complete and accurate as possible. If more space is needed, copy and attach the additional page, numbering the entries consecutively.**

1.    **Does the debtor have any executory contracts or unexpired leases?**

☐ No. Check this box and file this form with the court with the debtor's other schedules. There is nothing else to report on this form.

☒ Yes. Fill in all of the information below even if the contracts or leases are listed on *Schedule A/B: Assets - Real and Personal Property (Official Form 206A/B).*

| 2. | List all contracts and unexpired leases | State the name and mailing address for all other parties with whom the debtor has an executory contract or unexpired lease |
|---|---|---|
| **2.1** | State what the contract or lease is for and the nature of the debtor's interest | **Debtor's office - this lease will be rejected** | **Tustin Executive Center**<br>**1630 S. Sunkist St., Ste A**<br>**Anaheim, CA 92806** |
| | State the term remaining | | |
| | List the contract number of any government contract | | |
| **2.2** | State what the contract or lease is for and the nature of the debtor's interest | **Former office in Las Vegas - lease will be rejected.** | **Executive Center LLC**<br>**5960 S. JOnes Blvd.**<br>**Las Vegas, NV 89118** |
| | State the term remaining | | |
| | List the contract number of any government contract | | |
| **2.3** | State what the contract or lease is for and the nature of the debtor's interest | **See list of additional executory contracts** | **See attached list** |
| | State the term remaining | | |
| | List the contract number of any government contract | | |

Copyright © Financial Software Solutions, LLC                                                                    BlueStylus

**Exhibit "1"**

**0044**

**Fill in this information to identify your case:**

Debtor Name    **The Litigation Practice Group P.C.**

United States Bankruptcy Court for the:  **Central District of California**

Case number (*If known*):

☒ Check if this is an
amended filing

## Official Form 206H

# Schedule H: Your Codebtors

12/15

**Be as complete and accurate as possible. If more space is needed, copy the Additional Page, numbering the entries consecutively. Attach the Additional Page to this page.**

1.   **Does the debtor have any codebtors?**

☒ No. Check this box and submit this form to the court with the debtor's other schedules. Nothing else needs to be reported on this form.

☐ Yes

2.   **In Column 1, list as codebtors all of the people or entities who are also liable for any debts listed by the debtor in the schedules of creditors, *Schedules D-G.*** Include all guarantors and co-obligors. In Column 2, identify the creditor to whom the debt is owed and each schedule on which the creditor is listed. If the codebtor is liable on a debt to more than one creditor, list each creditor separately in Column 2.

| Column 1: **Codebtor** | | Column 2: **Creditor** | |
|---|---|---|---|
| **Name and description** | **Mailing address** | **Name** | *Check all schedules that apply:* |

Exhibit "1"                    0045

---

**Fill in this information to identify your case:**

Debtor name    **The Litigation Practice Group P.C.**

United States Bankruptcy Court for the: **Central District of California**

Case number *(if known)*: _____

☑ Check if this is an
amended filing

---

## Official Form 207

# Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy    04/22

The debtor must answer every question. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and case number (if known).

---

| Part 1: | Income |
|---|---|

**1. Gross revenue from business**

☑ None

| Identify the beginning and ending dates of the debtor's fiscal year, which may be a calendar year | | | Sources of income<br>Check all that apply. | Gross income<br>(before deductions and exclusions) |
|---|---|---|---|---|
| From the beginning of the fiscal year to filing date: | From **1/1/2023**<br>MM/DD/YYYY | to   Filing date | ☑ Operating a business<br>☑ Other _____ | $ **30,000,000.00** |
| For prior year: | From **1/1/2022**<br>MM/DD/YYYY | to **12/31/2022**<br>MM/DD/YYYY | ☑ Operating a business<br>☑ Other _____ | $ **155,000,000.00** |
| For the year before that: | From **1/1/2021**<br>MM/DD/YYYY | to **12/31/2021**<br>MM/DD/YYYY | ☑ Operating a business<br>☑ Other _____ | $ **97,000,000.00** |

**2. Non-business revenue**

Include revenue regardless of whether that revenue is taxable. *Non-business income* may include interest, dividends, money collected from lawsuits, and royalties. List each source and the gross revenue for each separately. Do not include revenue listed in line 1.

☑ None

| | | | Description of sources of revenue | Gross revenue from each source<br>(before deductions and exclusions) |
|---|---|---|---|---|
| From the beginning of the fiscal year to filing date: | From _____<br>MM/DD/YYYY | to   Filing date | _____ | $ _____ |
| For prior year: | From _____<br>MM/DD/YYYY | to _____<br>MM/DD/YYYY | _____ | $ _____ |
| For the year before that: | From _____<br>MM/DD/YYYY | to _____<br>MM/DD/YYYY | _____ | $ _____ |

---

Copyright © Financial Software Solutions, LLC

**Exhibit "1"**      **0046**

| Debtor | **The Litigation Practice Group P.C.** | | Case number *(if known)* | |
|---|---|---|---|---|
| | Name | | | |

| **Part 2:** | **List Certain Transfers Made Before Filing for Bankruptcy** |
|---|---|

3. **Certain payments or transfers to creditors within 90 days before filing this case**

List payments or transfers–including expense reimbursements–to any creditor, other than regular employee compensation, within 90 days before filing this case unless the aggregate value of all property transferred to that creditor is less than $7,575. (This amount may be adjusted on 4/01/25 and every 3 years after that with respect to cases filed on or after the date of adjustment.)

☒ None

| Creditor's name and address | Dates | Total amount or value | Reasons for payment or transfer *Check all that apply* |
|---|---|---|---|
| **3.1 City Capital** <br> Creditor's Name <br><br> Number    Street <br><br> City              State  ZIP Code | | $          50,000.00 | ☒ Secured debt <br> ■ Unsecured loan repayments <br> ☒ Suppliers or vendors <br> ☒ Services <br> ☒ Other _____ |

| Creditor's name and address | Dates | Total amount or value | Reasons for payment or transfer *Check all that apply* |
|---|---|---|---|
| **3.2 Marich Bein** <br> Creditor's Name <br><br> Number    Street <br><br> City              State  ZIP Code | | $       12,000,000.00 | ☒ Secured debt <br> ☒ Unsecured loan repayments <br> ☒ Suppliers or vendors <br> ☒ Services <br> ■ Other **Funds improperly held by payment processor** |

4. **Payments or other transfers of property made within 1 year before filing this case that benefited any insider**

List payments or transfers, including expense reimbursements, made within 1 year before filing this case on debts owed to an insider or guaranteed or cosigned by an insider unless the aggregate value of all property transferred to or for the benefit of the insider is less than $7,575. (This amount may be adjusted on 4/01/25 and every 3 years after that with respect to cases filed on or after the date of adjustment.) Do not include any payments listed in line 3. *Insiders* include officers, directors, and anyone in control of a corporate debtor and their relatives; general partners of a partnership debtor and their relatives; affiliates of the debtor and insiders of such affiliates; and any managing agent of the debtor. 11 U.S.C. § 101(31).

■ None

| Insider's name and address | Dates | Total amount or value | Reasons for payment or transfer |
|---|---|---|---|
| **4.1** <br> Insider's Name <br><br> Number    Street <br><br> City              State  ZIP Code <br><br> Relationship to debtor | | $ _____ | |

Copyright © Financial Software Solutions, LLC          BlueStylus

**Exhibit "1"**                    **0047**

| Debtor | **The Litigation Practice Group P.C.** | Case number *(if known)* |
| | Name | |

5. **Repossessions, foreclosures, and returns**

List all property of the debtor that was obtained by a creditor within 1 year before filing this case, including property repossessed by a creditor, sold at a foreclosure sale, transferred by a deed in lieu of foreclosure, or returned to the seller. Do not include property listed in line 6.

☑ None

| | Creditor's name and address | Description of the property | Date | Value of property |
| --- | --- | --- | --- | --- |
| 5.1 | _____ Creditor's Name | | | $ _____ |
| | _____ Number        Street | | | |
| | _____ City            State   ZIP Code | | | |

6. **Setoffs**

List any creditor, including a bank or financial institution, that within 90 days before filing this case set off or otherwise took anything from an account of the debtor without permission or refused to make a payment at the debtor's direction from an account of the debtor because the debtor owed a debt.

☑ None

| | Creditor's name and address | Description of the action creditor took | Date action was taken | Amount |
| --- | --- | --- | --- | --- |
| 6.1 | _____ Creditor's Name | | | $ _____ |
| | _____ Number        Street | | | |
| | _____ City            State   ZIP Code | Last 4 digits of account number: XXXX– _____ | | |

| **Part 3:** | **Legal Actions or Assignments** |

7. **Legal actions, administrative proceedings, court actions, executions, attachments, or governmental audits**

List the legal actions, proceedings, investigations, arbitrations, mediations, and audits by federal or state agencies in which the debtor was involved in any capacity—within 1 year before filing this case.

☑ None

| | Case title | Nature of case | Court or agency's name and address | Status of case |
| --- | --- | --- | --- | --- |
| 7.1 | _____ | _____ | **See attached list** Creditor's Name | ☐ Pending |
| | **Case Number** | | | ☐ On appeal |
| | _____ | | _____ Number        Street | ☐ Concluded |
| | | | _____ City            State   ZIP Code | |

Exhibit "1"

0048

| Debtor | The Litigation Practice Group P.C. | Case number *(if known)* | |
|---|---|---|---|
| | Name | | |

**8. Assignments and receivership**

List any property in the hands of an assignee for the benefit of creditors during the 120 days before filing this case and any property in the hands of a receiver, custodian, or other court-appointed officer within 1 year before filing this case.

■ None

| Custodian's name and address | Description of the property | Value |
|---|---|---|
| **8.1** _____ | _____ | $ _____ |
| Custodian's name | **Case title** | **Court name and address** |
| _____ | _____ | _____ |
| Number    Street | **Case number** | Court's Name |
| _____ | _____ | _____ |
| City          State  ZIP Code | **Date of order or assignment** | Number      Street |
| | _____ | _____ |
| | | City          State  ZIP Code |

| Part 4: | Certain Gifts and Charitable Contributions |
|---|---|

**9.** List all gifts or charitable contributions the debtor gave to a recipient within 2 years before filing this case unless the aggregate value of the gifts to that recipient is less than $1,000

■ None

| Recipient's name and address | Description of the gifts or contributions | Dates given | Value |
|---|---|---|---|
| **9.1** _____ | | _____ | $ _____ |
| Recipient's Name | | | |
| _____ | | | |
| Number      Street | | | |
| _____ | | | |
| City          State  ZIP Code | | | |
| **Recipient's relationship to debtor** | | | |
| _____ | | | |

Exhibit "1"    0049

| Debtor | **The Litigation Practice Group P.C.** | Case number *(if known)* |
|---|---|---|
| | Name | |

---

| Part 5: | Certain Losses |
|---|---|

10. **All losses from fire, theft, or other casualty within 1 year before filing this case.**

■ None

| | Description of the property lost and how the loss occurred | Amount of payments received for the loss<br><br>If you have received payments to cover the loss, for example, from insurance, government compensation, or tort liability, list the total received.<br><br>List unpaid claims on Official Form 106A/B (Schedule A/B: Assets – Real and Personal Property). | Date of loss | Value of property lost |
|---|---|---|---|---|
| **10.1** | | | | $ |

---

| Part 6: | Certain Payments or Transfers |
|---|---|

11. **Payments related to bankruptcy**

List any payments of money or other transfers of property made by the debtor or person acting on behalf of the debtor within 1 year before the filing of this case to another person or entity, including attorneys, that the debtor consulted about debt consolidation or restructuring, seeking bankruptcy relief, or filing a bankruptcy case.

■ None

| | Who was paid or received the transfer? | If not money, describe any property transferred | Dates | Total amount or value |
|---|---|---|---|---|
| **11.1** | | | | $ |
| | Recipient's Name | | | |
| | Number        Street | | | |
| | City                    State   ZIP Code | | | |
| | **Email or website address** | | | |
| | **Who made the payment, if not debtor?** | | | |

12. **Self-settled trusts of which the debtor is a beneficiary**

List any payments or transfers of property made by the debtor or a person acting on behalf of the debtor within 10 years before the filing of this case to a self-settled trust or similar device.

Do not include transfers already listed on this statement.

■ None

---

<div align="center">**Exhibit "1"**</div>

<div align="right">**0050**</div>

| Debtor | **The Litigation Practice Group P.C.** | Case number *(if known)* | |
|---|---|---|---|
| | Name | | |

|  | Name of trust or device | Describe any property transferred | Dates transfers were made | Total amount or value |
|---|---|---|---|---|
| **12.1** | _____ | | _____ | $ _____ |
| | Trustee | | | |
| | _____ | | | |

**13. Transfers not already listed on this statement**

List any transfers of money or other property–by sale, trade, or any other means–made by the debtor or a person acting on behalf of the debtor within 2 years before the filing of this case to another person, other than property transferred in the ordinary course of business or financial affairs. Include both outright transfers and transfers made as security. Do not include gifts or transfers previously listed on this statement.

■ None

|  | Who received transfer? | Description of property transferred or payments received or debts paid in exchange | Date transfer was made | Total amount or value |
|---|---|---|---|---|
| **13.1** | _____ | | _____ | $ _____ |
| | Recipient's Name | | | |
| | _____ | | | |
| | Number        Street | | | |
| | _____ | | | |
| | City                  State   ZIP Code | | | |
| | Relationship to debtor | | | |
| | _____ | | | |

---

| **Part 7:** | **Previous Locations** |
|---|---|

**14. Previous addresses**

List all previous addresses used by the debtor within 3 years before filing this case and the dates the addresses were used.

■ Does not apply

---

| **Part 8:** | **Health Care Bankruptcies** |
|---|---|

**15. Health Care bankruptcies**

Is the debtor primarily engaged in offering services and facilities for:
— diagnosing or treating injury, deformity, or disease, or
— providing any surgical, psychiatric, drug treatment, or obstetric care?
■ No. Go to Part 9.
☐ Yes. Fill in the information below.

---

Official Form 207            **Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy**            page 6 of 14
Copyright © Financial Software Solutions, LLC            BlueStylus

| Debtor | **The Litigation Practice Group P.C.** | Case number *(if known)* | |
| | Name | | |

| Facility name and address | Nature of the business operation, including type of services the debtor provides | If debtor provides meals and housing, number of patients in debtor's care |
|---|---|---|
| **15.1** _____ Facility Name | | |
| | **Location where patient records are maintained** (if different from facility address). If electronic, identify any service provider. | **How are records kept?** |
| _____ Number     Street | | *Check all that apply:*<br>■ Electronically<br>■ Paper |
| _____ City        State   ZIP Code | | |

---

<div style="background:black;color:white">**Part 9:**</div> **Personally Identifiable Information**

16. **Does the debtor collect and retain personally identifiable information of customers?**
    - ■ No.
    - ■ Yes.  State the nature of the information collected and retained. _____

        Does the debtor have a privacy policy about that information?
        - ■ No
        - ■ Yes

17. **Within 6 years before filing this case, have any employees of the debtor been participants in any ERISA, 401(k), 403(b), or other pension or profit-sharing plan made available by the debtor as an employee benefit?**
    - ■ No. Go to Part 10.
    - ■ Yes.  Does the debtor serve as plan administrator?
        - ■ No. Go to Part 10.
        - ■ Yes. Fill in below:

| Name of plan | Employer identification number of the plan |
|---|---|
| _____ | |

        Has the plan been terminated?
        - ■ No
        - ■ Yes

---

<div style="background:black;color:white">**Part 10:**</div> **Certain Financial Accounts, Safe Deposit Boxes, and Storage Units**

18. **Closed financial accounts**

    Within 1 year before filing this case, were any financial accounts or instruments held in the debtor's name, or for the debtor's benefit, closed, sold, moved, or transferred?

    Include checking, savings, money market, or other financial accounts; certificates of deposit; and shares in banks, credit unions, brokerage houses, cooperatives, associations, and other financial institutions.

    - ■ None

---

Copyright © Financial Software Solutions, LLC          BlueStylus

**Exhibit "1"**                                                          **0052**

Debtor   **The Litigation Practice Group P.C.**                          Case number *(if known)* _____
        Name

|      | **Financial institution name and address** | **Last 4 digits of account number** | **Type of account** | **Date account was closed, sold, moved, or transferred** | **Last balance before closing or transfer** |
|------|---|---|---|---|---|
| **18.1** | _____<br>Name<br><br>_____<br>Number     Street<br><br>_____<br>City          State   ZIP Code | XXXX–_____ | ☑ Checking<br>☑ Savings<br>☑ Money market<br>☑ Brokerage<br>☑ Other _____ | _____ | $ _____ |

19. **Safe deposit boxes**

List any safe deposit box or other depository for securities, cash, or other valuables the debtor now has or did have within 1 year before filing this case.

■ None

|      | **Depository institution name and address** | **Names of anyone with access to it** | **Description of the contents** | **Does debtor still have it?** |
|------|---|---|---|---|
| **19.1** | _____<br>Name<br><br>_____<br>Number     Street<br><br>_____<br>City          State   ZIP Code | **Address** | | ■ No<br>☑ Yes |

20. **Off-premises storage**

List any property kept in storage units or warehouses within 1 year before filing this case. Do not include facilities that are in a part of a building in which the debtor does business.

■ None

|      | **Facility name and address** | **Names of anyone with access to it** | **Description of the contents** | **Does debtor still have it?** |
|------|---|---|---|---|
| **20.1** | _____<br>Name<br><br>_____<br>Number     Street<br><br>_____<br>City          State   ZIP Code | **Address** | | ☑ No<br>■ Yes |

**Exhibit "1"**                                                                                                  0053

| Debtor | **The Litigation Practice Group P.C.** | | Case number *(if known)* | |
|---|---|---|---|---|
| | Name | | | |

---

| **Part 11:** | **Property the Debtor Holds or Controls That the Debtor Does Not Own** |
|---|---|

21. **Property held for another**

List any property that the debtor holds or controls that another entity owns. Include any property borrowed from, being stored for, or held in trust. Do not list leased or rented property.

■ None

| | Owner's name and address | Location of the property | Description of the property | Value |
|---|---|---|---|---|
| **21.1** | _____<br>Owner's Name<br><br>_____<br>Number       Street<br><br>_____<br>City          State   ZIP Code | | | $ _____ |

---

| **Part 12:** | **Details About Environmental Information** |
|---|---|

For the purpose of Part 12, the following definitions apply:

■ *Environmental law* means any statute or governmental regulation that concerns pollution, contamination, or hazardous material, regardless of the medium affected (air, land, water, or any other medium).

■ *Site* means any location, facility, or property, including disposal sites, that the debtor now owns, operates, or utilizes or that the debtor formerly owned, operated, or utilized.

■ *Hazardous material* means anything that an environmental law defines as hazardous or toxic, or describes as a pollutant, contaminant, or a similarly harmful substance.

**Report all notices, releases, and proceedings known, regardless of when they occurred.**

22. **Has the debtor been a party in any judicial or administrative proceeding under any environmental law?** Include settlements and orders.

■ No

☑ Yes. Provide details below.

| | Case title | Court or agency name and address | Nature of case | Status of case |
|---|---|---|---|---|
| **22.1** | _____<br><br>**Case Number**<br><br>_____ | _____<br>Name<br><br>_____<br>Number       Street<br><br>_____<br>City              State   ZIP Code | _____ | ☑ Pending<br>☑ On appeal<br>☑ Concluded |

23. **Has any governmental unit otherwise notified the debtor that the debtor may be liable or potentially liable under or in violation of an environmental law?**

■ No

☑ Yes. Provide details below.

---

Copyright © Financial Software Solutions, LLC                                                                                        BlueStylus

**Exhibit "1"**

0054

| Debtor | **The Litigation Practice Group P.C.** | Case number *(if known)* | |
|---|---|---|---|
| | Name | | |

|  | Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |
|---|---|---|---|---|
| **23.1** | | | | |
| | Name | Name | | |
| | Number    Street | Number    Street | | |
| | City          State   ZIP Code | City          State   ZIP Code | | |

24.   **Has the debtor notified any governmental unit of any release of hazardous material?**

■ No
☒ Yes. Provide details below.

|  | Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |
|---|---|---|---|---|
| **24.1** | | | | |
| | Name | Name | | |
| | Number    Street | Number    Street | | |
| | City          State   ZIP Code | City          State   ZIP Code | | |

| **Part 13:** | **Details About the Debtor's Business or Connections to Any Business** |
|---|---|

25.   **Other businesses in which the debtor has or has had an interest**

List any business for which the debtor was an owner, partner, member, or otherwise a person in control within 6 years before filing this case. Include this information even if already listed in the Schedules.

■ None

|  | Business name and address | Describe the nature of the business | Employer Identification number<br>Do not include Social Security number or ITIN. |
|---|---|---|---|
| **25.1** | | | EIN: _____ |
| | Name | | **Dates business existed** |
| | Number    Street | | From _____  To  **Present** |
| | City          State   ZIP Code | | |

**Exhibit "1"**

**0055**

| Debtor | **The Litigation Practice Group P.C.** | Case number *(if known)* | |
|---|---|---|---|
| | Name | | |

26.    **Books, records, and financial statements**

26a.    List all accountants and bookkeepers who maintained the debtor's books and records within 2 years before filing this case.

☐ None

| Name and address | | Dates of service |
|---|---|---|
| **26a.1** | **Carpenter & Assoc** | From **11/1/2020** To **3/1/2023** |
| | Name | |
| | **26020 Towne Centre Dr, N.** | |
| | Number        Street | |
| | **Foothill Ranch**                    **CA**    **92610** | |
| | City                                              State    ZIP Code | |

26b.    List all firms or individuals who have audited, compiled, or reviewed debtor's books of account and records or prepared a financial statement within 2 years before filing this case.

■ None

| Name and address | | Dates of service |
|---|---|---|
| **26b.1** | | From _____ To **Present** |
| | Name | |
| | | |
| | Number        Street | |
| | | |
| | City                                              State    ZIP Code | |

26c.    List all firms or individuals who were in possession of the debtor's books of account and records when this case is filed.

■ None

| Name and address | | If any books of account and records are unavailable, explain why |
|---|---|---|
| **26c.1** | | |
| | Name | |
| | | |
| | Number        Street | |
| | | |
| | City                                              State    ZIP Code | |

26d.    List all financial institutions, creditors, and other parties, including mercantile and trade agencies, to whom the debtor issued a financial statement within 2 years before filing this case.

■ None

**Exhibit "1"**                                                                        **0056**

Debtor   **The Litigation Practice Group P.C.** _____   Case number _(if known)_ _____
          Name

| Name and address |
| --- |
| **26d.1** Name _____ |
| Number   Street _____ |
| City                          State   ZIP Code |

27. **Inventories**

Have any inventories of the debtor's property been taken within 2 years before filing this case?

■ No

☐ Yes. Give the details about the two most recent inventories.

| Name of the person who supervised the taking of the inventory | Date of inventory | The dollar amount and basis (cost, market, or other basis) of each inventory |
| --- | --- | --- |
| _____ | _____ | $ _____ |

| Name and address of the person who has possession of inventory records |
| --- |
| **27.1** Name _____ |
| Number   Street _____ |
| City                          State   ZIP Code |

28. **List the debtor's officers, directors, managing members, general partners, members in control, controlling shareholders, or other people in control of the debtor at the time of the filing of this case.**

| Name | Address | Position and nature of any interest | % of interest, if any |
| --- | --- | --- | --- |
| **28.1**  Daniel March | **20160 Nob Hill Dr. Yorba Linda, CA 92886** | **President and sole shareholder of debtor** | 0.00 |

29. **Within 1 year before the filing of this case, did the debtor have officers, directors, managing members, general partners, members in control of the debtor, or shareholders in control of the debtor who no longer hold these positions?**

■ No

☐ Yes. Identify below.

| Name | Address | Position and nature of any interest | Period during which position or interest was held |
| --- | --- | --- | --- |
| **29.1** _____ | _____ | _____ | From _____ To **Present** |

**Exhibit "1"**

**0057**

| Debtor | **The Litigation Practice Group P.C.** | Case number *(if known)* | |
|---|---|---|---|
| | Name | | |

**30.** **Payments, distributions, or withdrawals credited or given to insiders**

Within 1 year before filing this case, did the debtor provide an insider with value in any form, including salary, other compensation, draws, bonuses, loans, credits on loans, stock redemptions, and options exercised?

■ No
☐ Yes. Identify below.

| | Name and address of recipient | Amount of money or description and value of property | Dates | Reason for providing the value |
|---|---|---|---|---|
| **30.1** | | | | |
| | Recipient's Name | | | |
| | Number      Street | | | |
| | City                State   ZIP Code | | | |
| | **Relationship to debtor** | | | |

**31.** **Within 6 years before filing this case, has the debtor been a member of any consolidated group for tax purposes?**

■ No
☐ Yes. Identify below.

| Name of the parent corporation | Employer Identification number of the parent corporation |
|---|---|
| | EIN: |

**32.** **Within 6 years before filing this case, has the debtor as an employer been responsible for contributing to a pension fund?**

■ No
☐ Yes. Identify below.

| Name of the pension fund | Employer Identification number of the pension fund |
|---|---|
| | EIN: |

**Exhibit "1"**                                      **0058**

Debtor   **The Litigation Practice Group P.C.**                          Case number *(if known)* _____

       Name

---

| Part 14: | Signature and Declaration |
|---|---|

**WARNING --** Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.
18 U.S.C. §§ 152, 1341, 1519, and 3571.

I have examined the information in this *Statement of Financial Affairs* and any attachments and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   04/03/2023
         MM/DD/YYYY

**X** _____        Printed name   Daniel S. March
   Signature of individual signing on behalf of the debtor

   Position or relationship to debtor   Managing Shareholder

**Are additional pages to *Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy* (Official Form 207) attached?**

☒ No
☐ Yes

Exhibit "1"                                                                      0059

## SOFA #4: PENDING ACTIONS

| Case Captions | Court | Civil Action No. | Judge | Case Status |
|---|---|---|---|---|
| **Plaintiff:** Gloria Eaton (Putative Class Action)<br><br>**Defendant:** The Litigation Practice Group, PC | N.D. Georgia, Atlanta Division | 1:22-cv-00917-VMC | Victoria M. Calvert | Pending class certification, which is contested. Claims involve Telephone Consumer Protection Act and Credit Repair Organization Act |
| **Plaintiff:** Carolyn Beech (Putative Class Action)<br><br>**Defendant:** Litigation Practice Group, PC | S.D. Mississippi, Southern Division | 1:22-cv-00057-HSO-BWR | Halis S. Ozerden | Pending class certification, which is contested. Claims involve Telephone Consumer Protection Act ("TCPA") and Credit Repair Organization Act ("CROA") |
| **Plaintiff:** Debra Price<br><br>**Defendants:** Litigation Practice Group, PC Daniel March, Esq., Marque Carey, Esq., Randall Clark, Esq., Michael Robinson, Esq., Jayde Trinh, Esq., and Howard Gutman, Esq. | M.D. Pennsylvania, Scranton Division | 3:22-cv-00707-MEM | Malachy E. Mannion<br><br><br><br><br><br><br><br><br><br>**Judge** | LPG has a pending motion to dismiss.<br><br>Claims involve TCPA and CROA |

| Case Captions | Court | Civil Action No. | | |
|---|---|---|---|---|
| **Plaintiff:** Kenneth Topp<br><br>**Defendant:** The Litigation Practice Group, PC | W.D. Texas, Waco Division | 6:22-cv-00814-ADA-JCM | Alan D. Albright | Pending motion to dismiss. Claim is under the TCPA. |
| **Debtor:** Daniel Verne Rowe<br><br>**Joint Debtor:** Michelle Lee Rowe<br><br>**Trustee:** Darcy D. Williamson<br><br>**Plaintiff:** Darcy D. Williamson (Trustee)<br><br>**Defendant:** Litigation Practice Group, PC | Bankruptcy Court D. Kansas Topeka Division | 22-40216 (Chapter 7)<br><br><br><br><br>Adversary No. 22-07015 | Dale L. Somers | Settlement reached in principal, awaiting consummation. Preference action brought against LPG to set aside fees paid to LPG by debtor. |
| **Plaintiff:** James Hammett<br><br>**Defendant:** Debt Resolution Direct, LLC, d/b/a Debt Advisors of America Company | N.D. Georgia, Atlanta Division | 1:22-cv-04249-SDG | Steven D. Grimberg | Settlement discussions are ongoing; TCPA claim. |
| **Plaintiff:** Johnny W. Rizo<br>**Defendant:** | E.D. California, Sacramento Division | 2:22-cv-01959-DAD-DB | Dale A. Drozd | Settlement discussions are near completion, |

**Exhibit "1"**          0061

| Case Captions | Court | Civil Action No. | Judge | |
|---|---|---|---|---|
| The Litigation Practice Group, PC | | | | amount for settlement is set but not yet paid; TCPA claim. |
| **Plaintiff:** Beverly A. Graham **Defendant:** The Litigation Practice Group, PC | C.D. California, Los Angeles Division | 2:22-cv-07915-MAR | (Magistrate) Margo A. Rocconi | Settlement discussions are ongoing; TCPA claim. |
| **Plaintiff:** Teresa Klaus **Defendant:** The Litigation Practice Group, PC | N.D. Ohio Toledo Division | 3:22-cv-02094-JGC | James G. Carr | Settlement discussions are ongoing; TCPA claim. |
| **Plaintiff:** Kathlene Scarlett **Defendant:** The Litigation Practice Group, PC | S.D. Ohio Dayton Division | 3:22-cv-00342-WHR-PBS | Walter H. Rice | Settlement discussions are ongoing; TCPA claim. |
| **Plaintiffs:** Geneva Sheffield Myranda Sheffield **Defendant:** The Litigation Practice Group, PC | N.D. Ohio Toledo Division | 3:22-cv-02093-JZ | Jack Zouhary | Settlement discussions are near completion, but settlement amount not yet paid; TCPA claim. |
| **Plaintiffs:** Marich Bein LLC **Defendant:** The Litigation Practice Group, | C.D. Cal. | 8:23-cv-00339-JWH | John Holcomb | Contract dispute between creditor and payment processor Marich Bein |

3

**Exhibit "1"** 0062

| | | | | |
|---|---|---|---|---|
| PC; Oakstone Law Group PC | | | | and LPG.  No counterclaim or responsive pleading were filed as case was stayed prior to deadline. |
| **Plaintiffs:** Validation Partners LLC; Debt Validation Fund II, LLC; MC DVI FUND 1, LLC; MC DVI FUND 2, LLC<br><br>**Defendant:** The Litigation Practice Group, PC; Daniel March; Tony Diab; Wes Thomas; Stratcap Mgmt, LLC; Vercy LLC; GoFi LLC; Integrity Docs, LLC | Orange County Superior Court | Case No. 30-2022-01281911 | Gary Sherman | Contract dispute between receivable purchase company and its investors, on the one hand, and LPG and its managers and marketing affiliates, on the other. Settlement discussions are ongoing, but not likely to resolve. |
| **Plaintiffs:** Fundura Capital Group<br><br>**Defendant:** The Litigation Practice Group, PC; Daniel March; Tony Diab; BAT Inc. dba Coast Processing; Vulcan Consulting Group LLC | Supreme Court of New York – County of Nassau | Index No. 613192/2021 | Eileen Daly-Sapraicone | Receivable purchase company is seeking additional money under receivable purchase agreement; LPG is seeking to recover for overpayment on agreement and for fraud. Counterclaim is being litigated, |

4

**Exhibit "1"**

| | | | | |
|---|---|---|---|---|
| | | | | complaint has been mostly abandoned. |
| **Plaintiffs:** Diverse Capital LLC<br><br>**Defendant:** The Litigation Practice Group, PC; Daniel March; LLC | Supreme Court of New York – County of Ontario | Index No. 135614-2023 | Not assigned | Plaintiff claims breach of settlement agreement; LPG alleges settlement was paid in full. |

5

**Exhibit "1"**                                                                 0064

# Exhibit "2"

1            OFFICE OF THE UNITED STATES TRUSTEE

2                      SANTA ANA DIVISION

3

4   In Re:                    )  Case No. 8:23-bk-10571-SC
                              )
5   THE LITIGATION PRACTICE   )  Chapter 11
    GROUP, PC,                )
6                             )
          Debtor.            )
7   _____ )

8                                341(a) MEETING

9                      QUEENIE NG, Presiding

10                          --oOo--

11                  Monday, April 24, 2023

12                  411 West Fourth Street
                Santa Ana, California 92701
13

14  APPEARANCES:

15  For the Debtor:           JOON M. KHANG, ESQ.
                              Khang & Khang, LLP
16                            4000 Barranca Parkway
                              Suite 250
17                            Irvine, California 92604
                              (949) 419-3834
18

19  For the United States     QUEENIE K. NG, ESQ.
      Trustee:                MARILYN SORENSEN, ANALYST
20                            CAM MISKINS, ESQ.
                              Office of the United States
21                               Trustee
                              411 West Fourth Street
22                            Suite 7160
                              Santa Ana, California 92701
23                            (714) 338-3403

24

    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                                            0065

ii

```
 1  APPEARANCES:  (cont'd.)

 2  For All Service Financial:      ALAN I. NAHMIAS, ESQ.
                                    Mirman, Bubman & Nahmias, LLP
 3                                  21860 Burbank Boulevard
                                    Suite 360
 4                                  Woodland Hills, California
                                      91367
 5                                  (818) 995-2555

 6  For SDCO Tustin Executive       RONALD BROWN, ESQ.
      Center:
 7

 8  For DVF 2, MCDVI 1, MCDVI 2:    DAVID CUSIO, ESQ.
                                    MATTHEW STOCKHOLD, ESQ.
 9                                  MICHAEL BRELJE, ESQ.

10  For Maverick Bank Card,         FRANK WHITE, ESQ.
      Inc.:
11

12  For Carolyn Beach:              DANIEL EDELMAN, ESQ.

13  For the Commonwealth of         AMY SCHULMAN, ESQ.
      Pennsylvania:
14

15  For Validation Fund 2:          DAVE ZUCK, ESQ.

16  Transcriber:                    Briggs Reporting Company, Inc.
                                    9711 Cactus Street
17                                  Suite B
                                    Lakeside, California 92040
18                                  (310) 410-4151

19

20

21

22

23

24

25
```

*Briggs Reporting Company, Inc.*

iii

## I N D E X

WITNESSES:                                          EXAMINATION

1  DANIEL MARCH                                           5

2  TONY DIAB                                              6

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                                        **0067**

1

1   SANTA ANA, CALIFORNIA MONDAY, APRIL 24, 2023  11:00 AM

2                          --oOo--

3           TRUSTEE NG:  Good morning, everyone.  My name is

4   Queenie Ng.  I'm the trial attorney for the United States

5   Trustee's Office, and the Assistant U.S. Trustee, Cam

6   Miskins (phonetic), is also attending today.

7           This is the 341(a) meeting of In Re The Litigation

8   Practice Group, PC, Case Number 8:23-bk-10751-SC.  This

9   Chapter 11 case was filed on March 20th, '23, and the

10  initial 341(a) was set for April 24th, '23 and was continued

11  to today, May 2nd, '23, at 9:30 pursuant to the Debtor's

12  request.

13          I note there are a lot of people on the phone

14  right now.  I would like everyone to make an appearance so

15  we have a record who is hear today.  Can we start with the

16  Debtor's counsel and Debtor's representative.

17          MR. KHANG (telephonic):  Good morning.  This is

18  Joon Khang appearing on behalf of the Debtor.

19          MR. MARCH (telephonic):  This is Daniel Steven

20  March for The Litigation Practice Group, shareholder.

21          MR. DIAB (telephonic):  Tony Diab on behalf of

22  Litigation Practice Group.

23          TRUSTEE NG:  Anyone else in the audience?  If so,

24  can you please announce your name?

25          MR. BROWN (telephonic):  Good morning.  Ronald

Brown, attorney for SDCO Tustin Executive Center, the landlord to the Debtor.

TRUSTEE NG: Thank you.

MR. CUSIO (telephonic): Good morning. David Cusio (phonetic) on behalf of Debt Validation Fund 2, MCDVI Fund 1, and MCDVI Fund 2.

TRUSTEE NG: Thank you.

MR. STOCKHOLD (telephonic): Good morning. Matthew Stockhold (phonetic), also appearing on behalf of Debt Validation Fund 2, MCDVI Fund 1, and MCDVI Fund 2.

MR. LEE (telephonic): This is Eric Lee, an investor in Validation Partners, a creditor.

MR. WHITE (telephonic): Good morning. Frank White for (indiscernible).

UNIDENTIFIED SPEAKER: Good morning --

MR. WHITE: Frank White -- go ahead.

UNIDENTIFIED SPEAKER: Ann --

MR. ZUCK (telephonic): (Indiscernible) Debt Validation Fund 2.

TRUSTEE NG: Okay. I'm sorry. I didn't hear that name just now.

MR. ZUCK: Dave Zuck (phonetic), Validation Fund 2.

TRUSTEE NG: Okay.

(Multiple speakers.)

3

1        MR. NAHMIAS (telephonic):  This is Alan Nahmias,

2  Mirman, Bubman and Nahmias, on behalf of All Service

3  Financial.

4        MS. JAY (telephonic):  Ann Jay on behalf of

5  (indiscernible) Enterprise.

6        UNIDENTIFIED SPEAKER:  (Indiscernible.)

7        TRUSTEE NG:  I'm sorry.  I didn't hear that one.

8     (No response.)

9        TRUSTEE NG:  I'm sorry.  Can you repeat that,

10 whoever just spoke?

11       MR. CARR (telephonic):  Chris Carr (phonetic) on

12 behalf of Gloria (indiscernible).

13       TRUSTEE NG:  Okay.  Anyone else?

14       UNIDENTIFIED SPEAKER:  (Audio glitch.)

15       MS. SCHULMAN:  This is Amy Schulman on behalf of

16 the Commonwealth of Pennsylvania Office of Attorney General,

17 Bureau of Consumer Protection.

18       TRUSTEE NG:  Thank you.

19       MR. WHITE:  Frank White for Creditor Maverick Bank

20 Card, Inc.

21       MR. MCKENNA (telephonic):  Ryan McKenna of MCDVI

22 Fund 1 and MCDVI Fund 2.

23       MR. BRELJE (telephonic):  Michael Brelje

24 (phonetic) on behalf of Debt Validation Fund MCDVI 1, MCDVI

25 2.

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                                      0070

4

1          TRUSTEE NG:  Okay.  Is that everyone?

2          MR. MCKENNA (telephonic):  Sean McKenna on behalf

3   of MCDVI Funds 1 and 2.

4          MR. DRAGER (telephonic):  Jason Drager (phonetic)

5   on behalf of Ketterline (phonetic) Beach.

6          TRUSTEE NG:  Thank you.

7          MR. BARRY (telephonic):  Jack Barry (phonetic) on

8   behalf of Debt Validation Fund 2.

9          MR. GORDON (telephonic):  Brendan Gordon

10  (phonetic) on behalf of Debt Validation Fund 2.

11         TRUSTEE NG:  Okay.  Is that everyone?

12      (No response.)

13         TRUSTEE NG:  All right.  I hear no response, so

14  we're going to go ahead.

15         There are a lot of people here today.  For some

16  this might be your first time.  I'm just going to explain

17  what's going to happen today.

18         So, I'm going to ask everyone who's not going to

19  speak for now to mute because this meeting is being

20  recorded, and once I've finished all the questions, we'll

21  open up the forum to -- for any creditors who would like to

22  ask questions at the end.  At that point, you know, you can

23  unmute yourself and announce your name and if you're

24  representing someone, please, you know, announce the party

25  that you're representing.

5

1          Mr. Khang, who's going to appear on behalf of the

2   Debtor today?

3          MR. KHANG:  Appearing for the Debtor are Daniel

4   March, who is the President and sole shareholder of the

5   Debtor, as well as Tony Diab, who is the person most

6   knowledgeable with dealings with vendors of the Debtor.

7          TRUSTEE NG:  Okay.  So, we're going to swear in

8   both parties.

9          Mr. March, I know I can't see you, but can you

10  please raise your right hand and let me know when you're

11  done?

12         MR. MARCH:  I have done it.

13             DANIEL MARCH - WITNESS - SWORN

14         TRUSTEE NG:  And can you state your full name and

15  address for the record, please?

16         MR. MARCH:  Daniel Steven March, M-A-R-C-H.

17         TRUSTEE NG:  And your address for the record,

18  please?

19         MR. MARCH:  17291 Irvine Boulevard, Suite 101,

20  Tustin, California 92780.

21         TRUSTEE NG:  Is this your personal residence or is

22  this the Debtor's location?

23         MR. MARCH:  This is the Debtor's location.

24         TRUSTEE NG:  Okay.  I'm sorry.  Can you state that

25  address again?

6

1          MR. MARCH:  17291 Irvine Boulevard, Suite 101,

2   Tustin, California 92780.

3          TRUSTEE NG:  Thank you.

4          Is there any reason why you would not be able to

5   answer my question accurately and truthfully today?

6          MR. MARCH:  I don't believe so, no.

7          TRUSTEE NG:  Thank you so much.

8          Mr. Diab, could you please raise your right hand

9   and let me know when you're done.

10          MR. DIAB:  Yes.  I've raised my right hand.

11               TONY DIAB - WITNESS - SWORN

12          TRUSTEE NG:  Can you please state your full name

13   and the address for the record, please?

14          MR. DIAB:  Tony Diab.  Address is 20101 Southwest

15   Cyprus Street, Newport Beach, California 92660.

16          TRUSTEE NG:  And is this your personal residence?

17          MR. DIAB:  Yes.

18          TRUSTEE NG:  Thank you.  And is there any reason

19   why you would not be able to answer my question truthfully

20   and accurately today?

21          MR. DIAB:  None.

22          TRUSTEE NG:  Okay.  Mr. Khang, I'm going to ask

23   you to confirm whether or not the voice we just heard is, in

24   fact, the Debtor representative Mr. March and Mr. Diab?

25          MR. KHANG:  Yes.  I confirm that that -- the

**Exhibit "2"**                                                0073

7

1 voices are of Daniel March and Tony Diab.

2          TRUSTEE NG:  Thank you.

3          One of you can answer the question, Mr. March or

4 Mr. Diab.  If your answers are different, than I want to

5 hear from both of you, but if the answer is the same, only

6 one person needs to answer the question.

7          TRUSTEE NG:  Can you please provide the -- you

8 provided me the address for the Debtor just now, and you

9 mentioned that's the physical office at the Debtor, right?

10          MR. MARCH:  Yes.

11          TRUSTEE NG:  The petition lists a different

12 address at 17542 17th Street, Suite 100.  Is that a

13 different location?

14          MR. MARCH:  Yes.  That was the former address.

15 It's the one that's executory leases.  So, that is at

16 another building that we occupied only about three weeks

17 ago.

18          TRUSTEE NG:  Okay.  So, the Debtor moved out three

19 weeks ago?

20          MR. MARCH:  Yes.

21          TRUSTEE NG:  Did the Debtor terminate the lease?

22          MR. MARCH:  Can you repeat that, please?

23          TRUSTEE NG:  Was the lease terminated or what was

24 the reason for moving out?

25          MR. MARCH:  We moved out.  We gave notice, and we

8

1  moved out, vacated the premises.

2          TRUSTEE NG:  Okay.

3          MR. MARCH:  The lease is still pending.  There's

4  -- yeah, there's still a lease on the location.

5          TRUSTEE NG:  So, the Debtor still has to pay the

6  monthly rent for this location?

7          MR. MARCH:  We are not paying the monthly rent.

8  We intend to abandon that and --

9          TRUSTEE NG:  Okay.

10          MR. MARCH:  -- (indiscernible) the lease.

11          TRUSTEE NG:  For the new location on Irvine

12  Boulevard, is that a lease as well?

13          MR. MARCH:  What is that?  I'm sorry.  Can you

14  repeat that?

15          TRUSTEE NG:  Is that a lease as well?

16          MR. MARCH:  Yes.  That's a lease.

17          TRUSTEE NG:  And when did the Debtor enter into

18  that lease?

19          MR. MARCH:  Oh, let's see.  It was a personal

20  lease, and it's also myself litigation and The Litigation

21  Practice Group.  I think that lease -- I know it expires I

22  believe next year.  I think the Litigation Practice Group

23  began paying on that about two years ago.

24          TRUSTEE NG:  So, this lease was entered two years

25  ago?

**Exhibit "2"**                                                    0075

9

1       MR. MARCH:  It's -- it's probably been about three

2 years, ago, and it was on my own personal behalf.  It was my

3 own personal office, and The Litigation Practice Group is

4 now paying for that lease.

5       TRUSTEE NG:  Is LPG on the lease as well?

6       MR. MARCH:  Can you repeat that?  You're breaking

7 in and out.  I --

8       TRUSTEE NG:  I know I'm --

9       MR. MARCH:  -- I'm on a land line.  So --

10       TRUSTEE NG:  Yeah.  I know.  I'm having some

11 difficulty.  I think it's kind of -- if you guys can't hear

12 me, just let me know.  I'll try to do my best to repeat it.

13   You mentioned this is a personal lease.  Because I

14 can't recognize the voice, is it -- this is Daniel March,

15 right?

16       MR. MARCH:  Well, it was a personal lease when I

17 originally signed it, and then Litigation Practice Group, we

18 agreed to pay that lease, and they're also the insurer and

19 making payments on the insurance on the lease itself.

20       TRUSTEE NG:  Okay.  I'm going to ask for a copy of

21 the lease agreement.

22       MR. MARCH:  I can do that.  I know I provided the

23 insurance agreement.  I can provide the lease agreement as

24 well.

25       TRUSTEE NG:  And how much is the monthly rent for

10

1 this lease?

2        MR. MARCH:  You know, I don't -- I don't recall.

3 It's about $2100.

4        TRUSTEE NG:  The -- the Debtor's cash flow

5 projection lists rent for $1450.  Is that for the current

6 lease or the one that you were going to abandon?

7        MR. MARCH:  I'm sorry.  That entire conversation

8 broke up.

9        TRUSTEE NG:  Okay.  The Debtor's projection lists

10 a rent for $1450.  Is that for the current lease or the one

11 that you were going to abandon?

12        MR. MARCH:  The one we are going to abandon.

13        TRUSTEE NG:  Okay.  So, do you know what amount is

14 for the current lease?

15        MR. MARCH:  I actually don't.

16        TRUSTEE NG:  Do you think --

17        MR. MARCH:  I will get that lease.

18        TRUSTEE NG:  Okay.  Do you think it's more than

19 the $1450?

20        MR. MARCH:  Yeah.

21        TRUSTEE NG:  Excuse me.

22        UNIDENTIFIED SPEAKER:  It's really hard to hear.

23        MR. MARCH:  Tony may be able to --

24        TRUSTEE NG:  Do you think we should --

25        UNIDENTIFIED SPEAKER:  Call in --

11

1          TRUSTEE NG:  -- call in from here and do a --

2          MR. MARCH:  -- on the amount of the lease.  I

3 don't have --

4          UNIDENTIFIED SPEAKER:  You have to dial the

5 number, 91, then the number, and then --

6          TRUSTEE NG:  I'm sorry.  I couldn't hear what you

7 said.  I'm going to call in a different number, so hopefully

8 it's better.  So, can everyone hold on for a second?

9          MR. MARCH:  I can call -- I can call in on my cell

10 phone, and that might be clearer.

11          TRUSTEE NG:  I think it might be me actually.  So,

12 I'm going to try to call in a different number with my land

13 line.  So, maybe that would be better.

14          MR. MARCH:  Okay.

15      (Pause.)

16          TRUSTEE NG:  Can everybody hear me?  Can everybody

17 hear me better now?

18          UNIDENTIFIED SPEAKER:  Yes.

19          UNIDENTIFIED SPEAKER:  Yes.

20          TRUSTEE NG:  Okay.  Thank you.  Appreciate that.

21          UNIDENTIFIED SPEAKER:  That's better.

22          UNIDENTIFIED SPEAKER:  Yes.

23          TRUSTEE NG:  Okay.  So, let's go back -- you were

24 going to provide me with a lease -- a copy of the lease

25 agreement, and is the Debtor current with the lease?

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                                          0078

12

1        MR. MARCH:  Oh, yes.

2        TRUSTEE NG:  I'm sorry?

3        MR. MARCH:  Yes.

4        TRUSTEE NG:  And when was the Debtor -- lease

5  payment -- when was the last time?

6        MR. MARCH:  It would have been for the month of

7  April.

8        TRUSTEE NG:  And you don't recall the amount?

9        MR. MARCH:  I don't.

10       TRUSTEE NG:   Okay.

11       MR. MARCH:  I think it's about $2100.

12       TRUSTEE NG:  Okay.  And does the Debtor also have

13 a lease in Las Vegas?

14       MR. DIAB:  This is Tony Diab --

15       TRUSTEE NG:  Yes.

16       MR. DIAB:  I can answer the question with regard

17 to the Las Vegas place.  There was a lease in Las Vegas.

18 That lease was abandoned in November of 2022, and it's my

19 understanding that the -- that the space has not been

20 occupied since November of 2022.  But the lease itself has

21 not been terminated.  It will be one of the executory

22 contracts terminated by this proceeding.

23       TRUSTEE NG:  Okay.  So, we have not received the

24 real property questionnaire, and then we certainly need one

25 for the new lease.  So, you can send it to your attorney,

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                                           0079

13

1   and -- and he can send it to us.  Okay.

2          MR. MARCH:  Understood.

3          TRUSTEE NG:  And it looks like this Debtor was

4   formed in February of 2009.  Does that sound right?

5          MR. DIAB:  Yes, it would have been February 22nd,

6   2019 that LPG was filed with the Secretary of State in

7   California.

8          TRUSTEE NG:  Is it 2019?  I'm sorry.

9          MR. DIAB:  Yeah.  I heard you say 2009.  So, I

10  was --

11         TRUSTEE NG:  I apologize.  I meant 2019.

12         Who were the original members -- Roughly 2019.

13         MR. DIAB:  The original shareholder Litigation

14  Practice Group was John Thompson, and that would have been

15  in February of 2019.

16         TRUSTEE NG:  When did he not become the -- the

17  member of the LPG?

18         MR. DIAB:  He conveyed his interest in November of

19  2019 to Dan March, who has been the sole shareholder since.

20         TRUSTEE NG:  And did you, Dan, have to pay

21  anything for that interest for the law firm?

22         MR. MARCH:  No.

23         MR. DIAB:  No.  John transferred the interest in

24  exchange for a release of liability, because he had concerns

25  on the liability front and asked to be swapped out as a

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                                    **0080**

14

1 shareholder of LPG. We obviously located Dan March who took

2 over, and it was in exchange of a release of liability only,

3 no compensation to John for the shares.

4      TRUSTEE NG: Okay. I'm sorry. Was it Tony? Was

5 it Mr. Diab? Were you the one talking just now?

6      MR. DIAB: Yes.

7      TRUSTEE NG: Okay. It might be helpful if -- you

8 know, because I can't recognize the voice, it might be

9 helpful if, you know, you guys speak, then you would first

10 announce your name first so I know who's speaking.

11      When you said you located Dan March, was it you

12 who made the decision to locate Mr. March and convey the

13 interest to him?

14      MR. DIAB: Actually, there were a group of us that

15 were managing two entities at the time. And, so, the entity

16 called CAT, Incorporated, which would be (indiscernible),

17 and I had two partners. So, this is (indiscernible). I had

18 two partners, Brian Really (phonetic) and Santo De Rudi

19 (phonetic), and the three of us and Dan were comfortable

20 with his competence in this space. We met with him several

21 times, and we decided to pursue him for the position of

22 managing shareholder for LPG, but it was a joint decision

23 between the three of us, and we obviously offered it to Dan,

24 and he accepted.

25      TRUSTEE NG: Okay. So, you said you were managing

**Exhibit "2"**          **0081**

15

1  the Debtor at the time.  So, that would be around October

2  2009?

3          MR. DIAB:  This would have been October, November

4  of 2019, managing a related entity called Post Processing.

5          TRUSTEE NG:  Okay.

6          MR. DIAB:  And John was still the shareholder

7  managing LPG at the time, but his management was really

8  hands off.  So, it was important to us that he was also

9  managing LPG.

10         TRUSTEE NG:  So, are you still a managing member

11 of LPG?

12         MR. DIAB:  No.  Well, there was never a time where

13 I was a managing member.  I had a formal role in the

14 shareholder member (indiscernible), but I continue to this

15 day to manage the vendors, which includes the marketing

16 companies that (indiscernible) who now has the credit vendor

17 for credit reporting services, the payment processors, the

18 call centers that we hire to assist the clients, et cetera,

19 so all these things and then the (indiscernible) formed in

20 October, November 2019, it remains the case now.

21         TRUSTEE NG:  Okay.  So, do you have an official

22 title?

23         MR. MARCH:  And this is Dan March.  That's --

24 that's all correct.

25         TRUSTEE NG:  Okay.  Do you have official title

16

1 with the Debtor, Mr. Diab?

2          MR. DIAB:  We've -- no.  We've never worked out an

3 official title.  Vendor manager seems like the most accurate

4 description, but also we've never fixed that description to

5 my position.  So, no formal title.

6          TRUSTEE NG:  Were you ever an employee of the

7 Debtor?

8          MR. DIAB:  No.  I was -- at one point in time I

9 was myself an independent contractor of the Debtor, and then

10 subsequent, I had entities that were independent contractors

11 of the Debtor, but I was never employed on a W-2 basis.

12          TRUSTEE NG:  Okay.  So, are you a 1099 employee

13 then?

14          MR. DIAB:  So, I was.  I haven't received any

15 compensation in this calendar year, but I did as recent as

16 2022 through the entity as a 1099 contractor.

17          TRUSTEE NG:  So, you said the last time you

18 received compensation was in 2022?

19          MR. DIAB:  Correct.  And -- and that's mostly a

20 function of 2023 of the financial issues that we've had, not

21 any other reason.  It's just a function of the issues we've

22 dealt with for the first five months of this year.

23          TRUSTEE NG:  Do you recall when was -- what month

24 did you receive compensation?

25          MR. DIAB:  I think the last time I would have

17

1  received something would have been the beginning of December

2  of 2022.

3        TRUSTEE NG:  And do you recall your compensation?

4        MR. DIAB:  The amount that we received that month,

5  I don't.  I would have to look at records, but it would have

6  been probably around $20,000.

7        TRUSTEE NG:  And did --

8        MR. DIAB:  Give or take.

9        TRUSTEE NG:  Okay.  And did you receive -- say for

10 2022, did you receive compensation every month?

11       MR. DIAB:  No.  There were some months where I did

12 not receive compensation.  It was inconsistent and based on

13 available funds (indiscernible).

14       TRUSTEE NG:  Was there a written agreement between

15 you and LPG regarding your -- your employment terms?

16       MR. DIAB:  So, there was no written agreement

17 between the entities and I.  There was a written agreement

18 between me as an individual and LPG when I was compensated

19 as an individual but not between the entities and LPG.  I

20 was compensated through the entity.

21       TRUSTEE NG:  I'm sorry.  What entity was it you

22 were compensated through?

23       MR. DIAB:  So, in 2021, the entity was called

24 Vulcan Consulting Group, ALC.

25       TRUSTEE NG:  Can you spell the name?

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                                            0084

18

1        MR. DIAB:  And in 2022 -- yes.  Vulcan Consulting

2  Group is V-U-L-C-A-N, second word Consulting, standard

3  spelling, and then the third word Group, and that was an

4  LLC.

5        TRUSTEE NG:  And does the Debtor have any interest

6  in this LLC?

7        MR. DIAB:  No.

8        TRUSTEE NG:  Does Mr. March have any interest in

9  this LLC?

10        MR. DIAB:  No.

11        TRUSTEE NG:  Who is the owner of this LLC?

12        MR. DIAB:  The -- the member of the LLC is Lisa

13  Cohen (phonetic).

14        TRUSTEE NG:  Lisa Cohen?

15        MR. DIAB:  Yes.

16        TRUSTEE NG:  And is this person an attorney?

17        MR. DIAB:  No.  Vulcan Consulting Group is not a

18  law firm, and she's not an attorney.

19        TRUSTEE NG:  Okay.  And what kind of arrangement

20  does the Debtor have with this consult -- Vulcan Consulting

21  Group?

22        MR. DIAB:  There were two reasons why the Debtor

23  would transfer money to this group.  One was this group was,

24  one, a consulting group which we'll call VCG.  VCG was

25  paying the merchant cash advances that LPG had taken in

19

1   December of 2021.  So, LPG would send money to Vulcan

2   Consulting Group which would then send money to the lender

3   in New York who had made cash advances to LPG and Vulcan.

4   Vulcan is one of the (indiscernible) cash advance

5   agreements, and LPG is the other.  The other reason LPG

6   would transfer money to Vulcan was to provide compensation.

7   So, those two transfers would have occurred in 2021.  No

8   transfers have happened since about August of 2021.

9           TRUSTEE NG:  So, for 2021, how much did you

10  receive total compensation?

11          MR. DIAB:  So, me as an individual from Vulcan?

12          TRUSTEE NG:  Yes.

13          MR. DIAB:  It would have been between 200 to 250

14  thousand.

15          TRUSTEE NG:  Did you receive compensation in any

16  other capacity from any other entity for your work done in

17  connection with LPG?

18          MR. DIAB:  In early 2021, early January and

19  February, I still received compensation directly from LPG,

20  and the compensation in those two months was just sent

21  directly from LPG to Tony Diab as an individual, would have

22  been roughly 60 to 80 thousand dollars.

23          TRUSTEE NG:  Why didn't the Debtor, LPG, just send

24  you compensation, you know, since you're the 1099 employee?

25  Why did they have to go through this, you know, third party

20

1   to do it?

2        MR. DIAB:  There were two concerns that we had.

3   One is because of my background, we tried to limit

4   visibility of things because of the way it -- the way that

5   it would make various vendors and attorneys feel because of

6   my background.  I actually tried to limit the number of

7   times that LPG interacted with Tony as an individual, and

8   that was just the optics of it in terms of managing

9   relationships with those who were concerned about my

10  background, and we made that switch in early 2021 based on

11  feedback that we were receiving.  And, so, that was the

12  primary reason why we started to do the compensation in an

13  indirect manner.  So, I would say that was the primary

14  reason.

15        The secondary reason is that the compensation was

16  always -- it was inconsistent, inconsistent meaning we

17  didn't know how much money would be available, the fact that

18  we didn't want to harm the business.  So, it would be a

19  function how much was available in terms of free cash flow.

20  That's what we would choose as pay through to me.  And, so,

21  the money would go to Vulcan into their -- Vulcan would

22  cover it for expenses like these cash advances, and then as

23  soon as money was made, it would be passed through.  And,

24  so, that was easier in terms of managing the cash flow than

25  having me on a set pay schedule.

21

1        TRUSTEE NG:  Okay.  And what about in 2022?  How
2  much did you receive total in 2022?
3        MR. DIAB:  In 2022, for the year, it probably
4  would have been -- so, it's complicated by -- by a factor.
5  So, it probably would have been a total of about $480,000
6  that went through Strategic Consulting Solutions.  When LPG
7  had its financial difficulties in 2022, most of that money
8  was given back, and Strategic ended up net zero at the end
9  of 2022, but that was only because the business needed the
10 money.  So, we essentially put it back in through Strategic.
11 So, Strategic would have received about 480 and would have
12 put back in about 480.  So, it was net zero, but that money
13 was paid throughout the course of the year.
14        TRUSTEE NG:  Okay.  So, at some point you decided
15 that you're not going to get paid through VCG, and then the
16 Debtor decided to pay you through Strategic Consulting, is
17 that right?
18        MR. DIAB:  Correct.  And the reason for that, just
19 to clarify, there was a dispute with the cash advance
20 companies in the State of New York.  There were several
21 lawsuits that were filed between these cash advance
22 companies, Vulcan Consulting Group and LPG.  And, for that
23 reason, we ceased using Vulcan Consulting Group and started
24 to use Strategic Consulting Solutions in place of it
25 starting in 2022.

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                                        **0088**

22

1              TRUSTEE NG:  And what is the Debtor's

2 relationship, you know, to Strategic Consulting Solutions?

3              MR. DIAB:  It's identical to VCG's.  So, Strategic

4 would make cash advance payments, would make payments to me,

5 and those were the two functions that it served, and it had

6 a -- essentially, it was just based on the -- the negative

7 publicity that Vulcan received by virtue of I think it was

8 about a dozen lawsuits that were filed back and forth

9 between certain cash advance companies that include us, and

10 for that reason, we offered not to continue to use them as a

11 vehicle, and we locked in Strategic Consulting in its place.

12             TRUSTEE NG:  Okay.  And did you receive any

13 compensation for 2023?

14             MR. DIAB:  For 2023, this calendar year, there's

15 not been compensation to date.  There has been one transfer

16 of about $11,000 for Strategic Consulting Solutions.  That's

17 the only transfer that I can think of, but that didn't come

18 through to me, but Strategic would have received about

19 $11,000 this calendar year.

20             TRUSTEE NG:  Okay.  Do you expect to receive some

21 kind of compensation, you know, in this bankruptcy case from

22 the Debtor?

23             MR. DIAB:  I'm sorry.  Could you repeat that

24 question?

25             TRUSTEE NG:  Do you intend to -- you know, expect

**Exhibit "2"**                                                      **0089**

23

1  to, you know, get some kind of compensation from the Debtor

2  in this case?

3           MR. DIAB:  No.  So, we've -- obviously, if there's

4  any compensation in my work for LPG, it will be done when

5  the Chapter 11 proceeding is done.  The vendors that I used

6  to manage are pretty much all gone.  Dan has a -- a limited

7  staff at the other office that he referenced.  And, so, once

8  this case is concluded, there won't be any further role for

9  me at LPG.  And, so, no compensation is contemplated.

10          TRUSTEE NG:  Okay.  Going back to --

11          MR. MARCH:  And I agree.  This is Dan.

12          TRUSTEE NG:  Thank you, Mr. March.

13          Going back to Mr. March, so, you joined the law

14 firm sometime in October or November of 2019.  And, prior to

15 that, did you have any relationship with the Debtor?

16          MR. MARCH:  No, I did not.

17          TRUSTEE NG:  Okay.  And, so, since you joined the

18 law firm, has there been any change in stock ownership?

19          MR. MARCH:  No, there has not.

20          TRUSTEE NG:  And who are the current officers?

21          MR. MARCH:  It is just myself.

22          TRUSTEE NG:  Okay.  And -- and your title is CEO

23 and President, is that right?

24          MR. MARCH:  Yes.

25          TRUSTEE NG:  When was the last time the Debtor had

24

1   other officers?

2           MR. MARCH:  It wouldn't have been with me.  So, I

3   don't know if it was with John Thompson or not.  I don't

4   know if John had other officers.  I don't believe so.

5           TRUSTEE NG:  Okay.  But since you joined the firm,

6   you -- you're the only officer, is that right?

7           MR. MARCH:  That's correct.

8           TRUSTEE NG:  So, the current Tustin location, how

9   many people work out from this office?

10          MR. MARCH:  There are currently two --

11          TRUSTEE NG:  And who are these people?

12          MR. MARCH:  -- others.  Olga Esquivel, E-S-Q-U-I-

13  V-E-L, and Carl -- the last name is difficult for me.  Tony,

14  do you know his last name (indiscernible)?

15          MR. DIAB:  That's Carl Wekashu (phonetic).

16          MR. MARCH:  Yeah.  It's so hard I can't even spell

17  it.

18          TRUSTEE NG:  And what is their title?

19          MR. MARCH:  They are just staff members.  I don't

20  say just staff members, but they are -- they are handling

21  litigation that is currently going on in the State of

22  California.

23          TRUSTEE NG:  Okay.

24          MR. MARCH:  So, we have approximately 400 to 600

25  pending lawsuits that we are defending and litigating in the

25

1 State of California.  They're also handling previous

2 bankruptcy filings that we have pending from former LPG

3 clients.

4        TRUSTEE NG:  So, the 400 to 600 lawsuits that you

5 -- you know, you're referencing, are they -- is the Debtor

6 the Defendant in any of those lawsuits?

7        MR. MARCH:  The Defender --

8        TRUSTEE NG:  The Defendant --

9        MR. MARCH:  -- is the --

10        TRUSTEE NG:  The Debtor.

11        MR. MARCH:  We are defending -- we are -- yeah, we

12 are -- Litigation Practice Group, the Debtor, is the

13 attorney of record for these clients in California.

14        TRUSTEE NG:  Okay.  Oh, so, these are lawsuits

15 where the -- the -- LPG is representing clients to defend

16 those cases?

17        MR. MARCH:  Yes.

18        TRUSTEE NG:  Okay.  Understood.  And, is -- is

19 there a paralegal in -- in the office or anything like that?

20        MR. MARCH:  Olga Esquivel would be characterized

21 -- she's a certified paralegal.

22        TRUSTEE NG:  Okay.  And how many attorneys work

23 from the Tustin office?

24        MR. MARCH:  Just myself --

25        TRUSTEE NG:  Okay.

**Exhibit "2"**                                    0092

26

1          MR. MARCH:  -- at this point.  I think we only

2  have three active employees, including myself.

3          TRUSTEE NG:  Okay.  Are you in the office every

4  day or how often are you in the office?

5          MR. MARCH:  I'm in the office every single day,

6  including Saturdays.

7          TRUSTEE NG:  And what about the staff, the two

8  staff that you mention?

9          MR. MARCH:  They are in every single day.  Olga

10  will not come in on Fridays in the office, but she works

11  from home.  She's able to contact and give information to

12  the attorneys that are working on the cases.

13          TRUSTEE NG:  And what about Mr. Diab, is he in the

14  office every day?

15          MR. MARCH:  No, Mr. Diab doesn't go to the office.

16          TRUSTEE NG:  And how often does he go to the

17  office?

18          MR. MARCH:  No, Mr. Diab never comes in.

19          TRUSTEE NG:  Oh, he does not come in the office.

20  Okay.

21          MR. MARCH:  Correct.

22          TRUSTEE NG:  And you previously mentioned the

23  Debtor does not have any other location, is that right,

24  other than the Tustin location?

25          MR. MARCH:  Correct, correct.

**Exhibit "2"**                                                 **0093**

27

1        TRUSTEE NG:   And was that the case in 2022 as

2   well?

3        MR. MARCH:   No.   I think we vacated the offices at

4   17542 17th Street probably -- I'm going to say it's about

5   February.   March is probably the last time anyone was in the

6   office (indiscernible).

7        TRUSTEE NG:   Okay.   I --

8        MR. DIAB:   This is Tony Diab.   That's correct.

9        TRUSTEE NG:   Other than the prior Tustin location,

10  did the Debtor ever have any offices like anywhere else in

11  the country?

12       MR. DIAB:   This is Tony.   I can answer that

13  question for other locations that we had.   We also had an

14  office in Las Vegas, Nevada that we vacated in November of

15  2022 and it has not been occupied since.   In addition, we

16  have an office in -- we had an office in Asheville, North

17  Carolina, a lease that we've abandoned.   We had an office in

18  Fort Lauderdale, Florida, which is, again, a lease that is

19  being abandoned.   It was abandoned before we filed the

20  petition.   The attorneys closed that space in North Carolina

21  and Florida in March, and we no longer have need for the

22  office space in those two jurisdictions.

23       There was an office in Atlanta, Georgia, and the

24  situation there, the attorneys offered to go remote, and the

25  lease was let go in February of 2023, this year.   There was

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                                      0094

28

1  also compensation to attorneys who had their own offices,

2  but those were not leases for LPG.  They were reimbursements

3  paid to the attorneys who were LPG employees in states like

4  Minnesota, Indiana, South Dakota, Oklahoma, and Nevada.

5  There's a second Nevada location.  This was a reimbursement

6  for an attorney who had her own office there and employed by

7  LPG.  But, again, those were not LPG leases.

8          There was also a lease in Belview, Washington

9  which was taken over I think by the attorney who was

10 occupying that space.  He was a former LPG employee who also

11 left the firm and asked to take the lease with him, and he

12 did.  And, so, that was assigned to him.  This would have

13 been in, again, February of this year.  And then Peter

14 Snyder out of Washington, this was in LPG's name but was

15 assigned to Peter, and he just took over that lease.  And

16 that should be the total of -- of all the locations.

17          TRUSTEE NG:  Okay.  So, the Belview, Washington

18 location that the former attorney took over, what's the name

19 of that law firm now?

20          MR. DIAB:  It's now Law Offices of Peter Snyder.

21          TRUSTEE NG:  I can't hear you.

22          MR. DIAB:  He's a sole -- sole practitioner.

23          TRUSTEE NG:  Okay.

24          MR. DIAB:  It's Peter Snyder is the sole

25 practitioner for Law Offices of Peter Snyder.

**Exhibit "2"**                                                0095

29

1          TRUSTEE NG:  I see.  Okay.  So, those -- all the

2  leases were either abandoned or let go sometime prior to

3  them filing bankruptcy this year, is that right?

4          MR. DIAB:  Correct.

5          TRUSTEE NG:  Okay.  So, for 2022, how many

6  employees did the Debtor have?

7          MR. DIAB:  This is Tony.  We would have employed

8  between 350 and 420, depending on the point in that year.

9  The high mark would have been about 420 full-time employees

10 for LPG in 2022.

11         TRUSTEE NG:  And when did LPG start losing these

12 employees?

13         MR. DIAB:  The real terminations began in November

14 when we let go of the -- the Nevada office.  So, the Nevada

15 office had at its peak about 88 employees, and they were all

16 let go in October and November of 2022.  So, that would have

17 been the first large reduction in the workforce.  And then

18 in January we resumed -- we probably cut between 30 and 40

19 employees in January, and then in February, when we were

20 unable to make payroll, we lost virtually everyone.

21         TRUSTEE NG:  So, by February this year, LPG

22 basically lost all its employees?

23         MR. DIAB:  Yeah.  So, as of March of this year,

24 the month we filed the petition, there were maybe 15

25 employees left.  And after the filing of the petition, we're

30

1  now at -- at three employees, Dan, Olga and Carl, as

2  referenced before.

3            TRUSTEE NG:  Okay.  Of those 300 or, you know, 350

4  employees that you mentioned that was hired in 2022, how

5  many of them were attorneys?

6            MR. DIAB:  At one -- at one point there were about

7  40 W-2 attorneys, meaning they were full employees of LPG,

8  and about 22 contractors, 1099.  And, so, we were at about

9  62 attorneys at the high mark in 2022.

10           TRUSTEE NG:  Okay.  And do you know where these

11 attorneys went?

12           MR. DIAB:  Some of the attorneys started their own

13 practice.  Some of the attorneys went to other firms that do

14 similar work as LPG and they represent individual debtors in

15 collection actions in cases, and some of them we don't know

16 because they just left, and they didn't tell us what they

17 were doing.  But several of them now have their own practice

18 doing similar work as solo practitioners.

19           TRUSTEE NG:  Okay.  The projection shows the

20 Debtor has Worker's Comp, is that right?

21           MR. DIAB:  That's correct.

22           TRUSTEE NG:  We don't have proof of that

23 insurance.  So, you will need to send us a copy of the

24 insurance proof of coverage.

25           UNIDENTIFIED SPEAKER:  And that was Worker's Comp,

31

1  correct?

2          TRUSTEE NG:  Correct.  That hasn't expired, right?

3  Is the Worker's Comp --

4          UNIDENTIFIED SPEAKER:  (Indiscernible).  Yeah,

5  we'll send a copy of that policy.  It remains active.

6          TRUSTEE NG:  Okay.  So, other than Mr. Diab, does

7  the Debtor have any other independent contractor?

8          MR. DIAB:  Not at this time.

9          TRUSTEE NG:  Okay.  Can you just give me a brief

10  summary of the reason for filing for bankruptcy?

11          MR. DIAB:  We -- the -- the -- I guess there are

12  two parts that sort of combined to force us to be in this

13  position.  The most important factor was the payment process

14  of Merits Fund, LLC began holding money at the very end of

15  January, then processed payments of LPG clients and then

16  remit those payments through the LPG (indiscernible).  They

17  stopped sending that revenue through to LPG at the very end

18  of January, beginning of February.  And, as a result, LPG

19  failed to make two consecutive payrolls.  At that point, we

20  lost so many of our attorneys that we couldn't continue to

21  represent clients' states for lack of a -- a valid license

22  to practice law in those states.  And, so we were forced to

23  essentially go the direction of reorganization because we

24  didn't have attorneys to represent clients, and we couldn't

25  maintain those attorney-client relationships in those

**Exhibit "2"**                                                                 0098

32

1  states.

2          The other factor was the litigation

3  (indiscernible) which essentially involved a lot of

4  (indiscernible) and essentially driving employees to turn on

5  us.  So, we had a group of employees that were providing

6  information (indiscernible) and providing information to

7  adverse parties in litigation, and that group was -- was

8  sizable, and those employees, one of them discovered that

9  they had provided that information and (indiscernible), and

10 that was January, and since left us in a position where we

11 were missing a lot of key positions, and we had enough

12 information public that our marketing companies didn't want

13 to continue to work with us, and so we didn't want to

14 onboard clients.  So, that created pressure.  We simply were

15 not seeing the volume business.  We had a lot of clients

16 leaving (indiscernible) clients possibly coming in.  Then

17 the marketing companies (indiscernible) to the information

18 disclosed in that litigation, although they wanted to work

19 with us, but they (indiscernible) future.  And then right

20 after that, the money was held by the payment processor and

21 essentially caused the -- the forced reorganization.

22          TRUSTEE NG:  Okay.  Let's talk about the pre-

23 petition bank account.  The Union Bank 4858, what was this

24 account used for pre-petition?

25          MR. DIAB:  That was an operating account.  It was

**Exhibit "2"**                                                    0099

33

1  an operating account that was essentially started all the

2  way back in 2020.  At one point we had stopped using Union

3  Bank and instead was using other banks, but that operating

4  account remained open.  And in 2022, we started to use it

5  again as a primary bank account.  We had switched from Union

6  Bank to Chase as a primary account and then from Chase to

7  Bank of America and then from Bank of America back to Union

8  Bank.  That last switch took place in January of this year.

9  So, that was (indiscernible).

10          TRUSTEE NG:  Okay.  So, we actually --

11          MR. MARCH:  And that's all correct.

12          TRUSTEE NG:  I'm sorry.  Okay.

13          We actually do not have the final closing

14 statement for this account.  We only have a closing receipt.

15 So, we would need that final closing statement.  And our

16 office previously requested bank statements for 2023, and we

17 did not receive the bank statements.  So, we will need that

18 as well.

19          MR. MARCH:  Union Bank?

20          TRUSTEE NG:  Union Bank 45 -- 4858.

21          MR. MARCH:  And that's for 2022 and '23?

22          TRUSTEE NG:  No, just 2023.  We did receive the

23 2022 statements.  And we also -- that would include the

24 closing bank statement that we need.

25          MR. MARCH:  Okay.

**Exhibit "2"**                                      0100

34

1          TRUSTEE NG:  So, at the time of the filing, how

2   much was in that bank account?

3          MR. MARCH:  And that was the amount that was

4   transferred into the Debtor in Possession's account.

5          TRUSTEE NG:  So, that's like $4500 or so?

6          MR. MARCH:  Yes, ma'am.

7          TRUSTEE NG:  Okay.  And do you know the balance as

8   of end of January of this year?

9          MR. MARCH:  I don't.

10          TRUSTEE NG:  Would it be around the $4500 or would

11   it be substantially, you know, more?

12          MR. DIAB:  This is Tony.  It should have been

13   substantially more than the $4500.  I (indiscernible), but

14   we would have to pull the -- the records to see the exact

15   balance.

16          TRUSTEE NG:  Okay.  So, I -- I think I -- I don't

17   have the 2023 bank statements, but I have the bank

18   statements 1/22.  It shows that as of December 31, there was

19   only like $2100 or so in the bank account.  So, for the

20   following two months, you know, January and February 2023,

21   do you think it would be somewhere around that amount?

22          MR. DIAB:  No, it should have been substantially

23   more in December of 2022.  LPG was still using the Chase

24   account and transitioning to the Bank of America.  So, the

25   Chase and Bank of America accounts would have had the

35

1  activity for LPG in December.  In January the Chase account

2  was -- was terminated.  The Bank of America account was the

3  primary account until the end of the month, and then at the

4  end of January is when the switch was taken to the -- back

5  to Union Bank.  And that switch from Bank of America to

6  Union Bank was in connection with Kevin Suerta (phonetic),

7  the head of our accounting department potentially being

8  removed from LPG.  He had the relationship with Bank of

9  America, and when he left, Bank of America terminated LPG's

10 relationship, and that's what caused the switch back to

11 Union Bank right around February 1st or so.

12        TRUSTEE NG:  When was the Bank of America account

13 terminated?

14        MR. DIAB:  The Bank of America account was closed

15 the first week of February.  I don't have the exact date,

16 but it would have been somewhere between February 5th but

17 maybe as late as February 10th.

18        TRUSTEE NG:  Okay.

19        MR. DIAB:  And it was closed by Bank of America

20 account notice.

21        TRUSTEE NG:  Okay.  So, we did ask for bank

22 statements for all 2023.  So, we will -- you know, for the

23 -- for the two months in 2023, we will need that bank

24 statements.

25        MR. MARCH:  Okay.

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                                                    0102

36

1          TRUSTEE NG:  And the case, 3158, that account is

2  not listed in the compliance declaration or the schedules.

3  What account is this?

4          MR. DIAB:  That was the same operating account or

5  main operating account for Chase that was used from about

6  March or April of 2021 all the way until December of 2022

7  when we decided to make the switch to Bank of America --

8          TRUSTEE NG:  Okay.

9          MR. DIAB:  -- since we still had some transactions

10 into January 2023, and that would have been it.

11         TRUSTEE NG:  So, is that account closed?

12         MR. DIAB:  Yes, that account was closed.  Again,

13 it was closed by Chase after we stopped utilizing the

14 account.  That closure would have happened in I believe

15 February formally.

16         TRUSTEE NG:  Of this year?

17         MR. DIAB:  I know we stopped using it in January.

18         TRUSTEE NG:  Okay.

19         MR. DIAB:  Of this year, correct.

20         TRUSTEE NG:  What was the balance at the time

21 Chase closed the account?

22         MR. MARCH:  I believe the balance at the time

23 would have been very close to zero as --

24         TRUSTEE NG:  Okay.

25         MR. MARCH:  -- (indiscernible).

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                                    **0103**

37

1      TRUSTEE NG:  Okay.  And what about the Chase 3133,
2  what was this account for?
3      MR. DIAB:  That account was only used to make
4  payments to our marketing affiliates.  So, it was
5  exclusively used for marketing affiliates, and it was always
6  kept at a zero balance until payment needs to be made, and
7  then the exact amount of the payment would transfer from the
8  315 account to the 3133 account, and then it would go out
9  the same day, and that was always kept to a zero balance at
10 the close of business.
11     TRUSTEE NG:  And is this account closed?
12     MR. DIAB:  Yes, that account was closed by Chase
13 also.  It was -- it was no longer used as of January and
14 formally closed sometime in February by Chase.
15     TRUSTEE NG:  Okay.  And the Union Bank 4874, what
16 kind of account was that?
17     MR. DIAB:  That -- that was the local account for
18 Litigation Practice Group.  And, so, that -- that attorney-
19 client trust account remains open at this point in time.
20 Those client checks that's outstanding in the sense of the
21 clients that haven't deposited it.  So, that account
22 actually remains open.  It is an attorney-client trust
23 account with a balance about $3300, which I believe is the
24 amount of the check that's outstanding.
25     TRUSTEE NG:  I'm sorry.  Did you say $3300?

38

1          MR. DIAB:  That sounds correct, yes.

2          TRUSTEE NG:  Okay.  And is it the Debtor's

3  intention to keep this account open?

4          MR. DIAB:  No.  As soon as that last check is

5  negotiated, the account will be closed.

6          MR. MARCH:  And this is Dan, and that's because I

7  don't believe we have any more affirmative cases pending.

8          TRUSTEE NG:  Okay.  And when do you expect the

9  account to be closed?

10          MR. DIAB:  We've attempted to contact this

11  individual client to find out why they haven't deposited the

12  check.  (Indiscernible) and it looks -- if it takes longer

13  than this month (indiscernible).

14          TRUSTEE NG:  Okay.  So, once it's closed, please

15  go ahead and send to us the proof of closure.  What about

16  the Chase 3568?

17          MR. DIAB:  That was the Iolta (phonetic) account

18  at Chase, and that account was emptied.  The money was moved

19  to the Iolta account at Union Bank in January of 2023, and

20  that account was also closed by Chase at the same time as

21  the Iolta.

22          TRUSTEE NG:  Okay.  So, sometime in February or

23  something in 2023?

24          MR. DIAB:  Correct.

25          TRUSTEE NG:  Okay.  And I noticed that the Debtor

**Exhibit "2"**                                                        **0105**

39

1  opened three post-petition bank accounts at Wells Fargo.

2  What is the -- the balance right now in the -- in the

3  general account?

4         MR. MARCH:  That should be that $4500 that was

5  transferred from Union when we closed the account.

6         TRUSTEE NG:  Okay.  What about the payroll and tax

7  account, any money in there?

8         MR. MARCH:  There might be the -- they require $50

9  each to open both of those accounts as well.

10         TRUSTEE NG:  Okay.  So, do you have voided checks

11  for those accounts?

12         MR. MARCH:  I have a voided check for the

13  (indiscernible) account.  I don't know that we have checks

14  -- I don't think we received checks yet --

15         TRUSTEE NG:  Okay.

16         MR. MARCH:  -- a checkbook for the payroll

17  account.  But I don't know that we have one for the

18  (indiscernible).

19         TRUSTEE NG:  Okay.  Yeah, you can go ahead and

20  send the voided check for the general account to your

21  counsel, and you can send it to us.  That would be great.

22  Thank you.

23         MR. MARCH:  Okay.  And we did that yesterday.

24         TRUSTEE NG:  Okay.  Does the Debtor have

25  malpractice insurance?

*Briggs Reporting Company, Inc.*

40

1          MR. DIAB:  Yes.  The malpractice policy remains

2   active.  We purchase a one-year account on the policy in

3   March of 2023, and that would extend to March 31st, 2024 for

4   the malpractice policy which is a $1,000,000 policy.

5          TRUSTEE NG:  Okay.

6          MR. DIAB:  Two thousand dollar deductible.

7          TRUSTEE NG:  So, we would need the proof of the

8   insurance coverage for that as well.  What about tax return

9   2022, was it filed?

10          MR. DIAB:  No, we have not yet filed the 2022 tax

11   return.

12          TRUSTEE NG:  Has there been an extension filed?

13          MR. DIAB:  I believe -- I think so.  The

14   (indiscernible) and Associates was the accounting firm

15   handling the tax funds for LPG.  My understanding it filed

16   the extension for LPG which suffered a loss in 2022.  We

17   don't anticipate tax liability.

18          TRUSTEE NG:  Okay.  And, so, the insurance

19   coverage for the general liability, I noticed that the

20   Debtor is not listed as the insured.  Has the Debtor

21   contacted the insurance company to make that change?

22          MR. DIAB:  We were not under the impression that

23   LPG was not listed as the insured.  So, we'll contact them

24   and correct that.

25          TRUSTEE NG:  And, also, the U.S. Trustee has to be

**Exhibit "2"**                                    0107

41

1   listed as an additional interested party for notification

2   purpose.

3           MR. DIAB:  Understood.

4           TRUSTEE NG:  Can you just give me a brief summary

5   of the nature of the Debtor's business?

6           MR. DIAB:  So, this is Tony again.  I'll give a

7   summary before and after the reorganization.  LPG when it

8   started and up until February 2023, the business model was

9   an entity to represent individuals in connection with their

10  disputes against their creditors.  That took three forms.

11  One was defending collection actions in court filed by

12  creditors.  Another was prosecuting bankruptcy petitions

13  under Chapter 7 and Chapter 13 of the U.S. Bankruptcy laws.

14  And then the third avenue was initiating action either as

15  freestanding complaints or as counterclaims or cross-

16  complaints under the Fair Debt Collection Practices Act and

17  Fair Credit Reporting Act.  So, we would sue the creditors

18  for their violations of those federal laws.  And, so, those

19  were the three avenues through which LPG represented

20  individual consumers.

21          In February, when we lost employees who didn't

22  return and we could no longer perform that function, the

23  clients were referred to other law firms for those law firms

24  to handle those cases, and LPG became essentially a residual

25  on the side if it was sent to other law firms as a referral

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                                              **0108**

42

1   fee for sending those clients out to other law firms.

2          And, so, the business as it exists now is a

3   combination of completing those four to six hundred

4   California cases (indiscernible) and then receiving

5   compensation for these referrals that were sent to other law

6   firms, and that was the revenue stream that was funding the

7   Chapter 11 plan, and it's the revenue stream that LPG has at

8   this point in time.

9          TRUSTEE NG:  So, the other law firms that you

10  mentioned, what are the names of those law firms?

11         MR. DIAB:  The parties I think -- the law firms

12  that currently are represented -- LPG clients are Oakstone

13  Law Group, PC, Consumer Legal Group, which is out of New

14  York, also a PC, and then Phoenix Law, PC.  Phoenix Law and

15  Oakstone Law are both California entities.  Consumer Legal

16  Group is a New York entity.

17         TRUSTEE NG:  Okay.  So, prior to this change in

18  your business model that you just mentioned, how many

19  clients did the Debtor have, like, say, in 2022 before the

20  change?

21         MR. DIAB:  At its peak, LPG was representing a

22  total of about 67,000 clients, some of whom have completed

23  their payments, some of whom (indiscernible) payment to LPG.

24  But at its peak, it would have been 67,000 active clients

25  being represented by LPG.

43

1          TRUSTEE NG:  Okay.  Of these 67,000 clients, did

2  they enter into like some kind of retainer agreement or a

3  legal services agreement with LPG?

4          MR. DIAB:  Yes, and that -- the terminology would

5  vary based on the state, but it was a legal services

6  agreement that the client would execute with LPG.  It was a

7  flat fee representation.  In exchange for the flat fee, LPG

8  agreed to provide the services I referenced before on any

9  one of those three, depending on the client's needs, and the

10  client's payment would be broken up anywhere from one

11  payment to as many as 72 payments, depending on the client's

12  budget.  So, some clients would make one payment.  Some

13  would make semimonthly payments for two years.  Some would

14  pay for 20 months.  It varied depending on the client's

15  budget, but it was always a written agreement between the

16  client and LPG for those services that were referenced

17  before.

18          TRUSTEE NG:  Would the written agreements specify

19  the terms like whether they pay a one-time flat fee or

20  whether they're going to, you know, pay monthly payments?

21  Would that be specified in the agreement?

22          MR. DIAB:  Yes.  The agreement would give specific

23  dates and amounts for all payments.  And, so, if it was

24  broken up into 30 payments, all 30 payments would be

25  identified by date and amount.

*Briggs Reporting Company, Inc.*

44

1        TRUSTEE NG:  Okay.  So, if they chose to make

2   monthly payments, and how did they pay the Debtor per month?

3        MR. DIAB:  Well, the clients would be set up with

4   automatic electronic withdrawals from the bank account.  The

5   contract with LPG includes an electronic funds transfer

6   authorization form.  And, so, the client would execute the

7   agreement and the EFT form, and then each month on the

8   payment date, LPG would withdraw the client's payment

9   automatically from their deposit account.  Some clients who

10  didn't have a deposit account would make the payments by

11  debit card.  The process was the same.  Each month on the

12  payment date, the amount of payment would be withdrawn from

13  the client's debit card, and -- and that would happen each

14  month on the specified date.  LPG never accepted credit card

15  payment for the obvious reasons.

16       TRUSTEE NG:  Okay.  So, for these electronic

17  payments, did LPG contract with a vendor to collect these

18  fees or how did it work?

19       MR. DIAB:  Yes.  So, LPG, over the course of its

20  history from February 2019 to present has used no less than

21  a dozen different payment processes.  These processes

22  collect the payment for a fee and then remit the payment to

23  LPG.  So, we use different payment processes.  They have

24  different policies.  Some processes hold reserves to cover

25  charge backs or unauthorized transaction reports.  Some

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                    **0111**

45

1  don't hold reserves but charge higher fees.  But we've used

2  different processes over the years.  As of 2023, this

3  calendar year, the two processes we were using were EquiPay,

4  which is currently holding the last $700,000 in LPG client

5  payments.  The other was Merits Fund, which is holding an

6  undisclosed amount.  They haven't told us how much they're

7  holding.  We think it's in the range of 12 to 14 million,

8  but we don't know because they won't provide that

9  information.  So, it's still a mystery.

10        TRUSTEE NG:  Okay.  So, what about 2022?  Did LPG

11 use these two processors as well?

12        MR. DIAB:  Correct.  So, in -- in 2022, in

13 addition to the two processors I just referenced, LPG also

14 utilized a company called World Global, which was processing

15 payments through Optimum Bank in Fort Lauderdale, Florida,

16 and we were also using a company called EPPS.  EPPS is a

17 payment processor that's based out of Sacramento I believe,

18 but they were also processing payments for about three

19 months in 2022.

20        TRUSTEE NG:  And once they -- you know, these

21 processors collected the fees typically, how soon would they

22 remit the payments to LPG?

23        MR. DIAB:  Each processor has slightly different

24 policies, but the range would be anywhere from a one-day

25 hold to a six-day hold, meaning that they would collect the

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                                    0112

46

1 payment on a Monday, fund it to LPG as soon as Wednesday or

2 as late as the following Monday.  It depends on the payment

3 processor, but that funding timeline, the number of days

4 that they hold the payments was so that the payment

5 processor could confirm that the payment actually went

6 through.  Different banks will report balances on different

7 time lines.  So, the paying processor would hold the funds

8 to ensure that the payment cleared.  But the worst case

9 scenario, we would get it one week after the client's

10 payment was initiated.

11         TRUSTEE NG:  And what was the reason for that

12 business model change that you mentioned?

13         MR. DIAB:  The change in 2023 was caused by the

14 payment processor refusing to remit funds to LPG, refusing

15 to hand over the proper payroll.  The -- the first payroll

16 of February, LPG was unable to cover.  A lot of employees

17 walked out at that time.  The second payroll, again, LPG was

18 unable to fund the payroll, and almost all remaining

19 employees left at that time.  So, when we lost those

20 employees, those happened to be the attorneys who were the

21 licenses under which we operate jurisdictions under in

22 California.  We could no longer continue the existing

23 business model.  We didn't have the money to fund our

24 existing payroll.  We certainly couldn't go out and hire new

25 attorneys licensed in those jurisdictions.  So, we opted to

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                                    0113

47

1 make this switch and still retain some sort of revenue for

2 LPG.  But it was precipitated by the payment processor

3 holding funds and our inability to cover essential costs

4 like payroll.

5          TRUSTEE NG:  Did you make the decision to the

6 business to change its business model?

7          MR. DIAB:  Both Dan and I discussed this in

8 February, that the payroll was being missed, and we jointly

9 made the decision that this was sort of the only option.  It

10 was either that or close the doors.  And, so, we opted for

11 this -- this reorganization.

12          TRUSTEE NG:  Okay.  So, since 20 -- like '23,

13 2023, this year, the Debtor is only actively representing

14 clients in California, is that right?

15          MR. DIAB:  So, at this time, we're not looking for

16 any new clients.

17          TRUSTEE NG:  Okay.

18          MR. DIAB:  At this point in time, LPG is not

19 onboarding anybody.

20          TRUSTEE NG:  Okay.  But do you have existing

21 clients in California that you kept?  You meaning the

22 Debtor.

23          MR. DIAB:  Correct.  And --

24          MR. MARCH:  We do.

25          MR. DIAB:  Yes, that's correct.

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                                           0114

48

1          TRUSTEE NG:  And then that's the 400 to 600, you

2 know, files that you talked about earlier?

3          MR. MARCH:  Yes.

4          MR. DIAB:  Correct.

5          TRUSTEE NG:  So, does that mean the remaining --

6 because you said that at its peak in 2022, the Debtor had

7 about 67,000 clients.  So, does that mean the remaining, you

8 know, minus the 400, 600 files in California, the remaining

9 were transferred to the three law firms that you just talked

10 about?

11          MR. DIAB:  Either transferred or terminated.  Some

12 clients opted to terminate the relationship rather than be

13 serviced by another firm, but all the 67,000 or so clients

14 were either transferred or they terminated their

15 relationship with LPG.

16          TRUSTEE NG:  Can you give me a breakdown how many

17 were transferred to each law firm?

18          MR. DIAB:  So, approximately 15,000 were

19 transferred to Oakstone Law Group.  About 12,000 were

20 transferred to Consumer Legal Group, and the remainder were

21 transferred to Phoenix Law.

22          TRUSTEE NG:  So, that's about 40,000 or so?

23          MR. DIAB:  Yeah, it would have been roughly, a

24 little bit less than 40.

25          TRUSTEE NG:  Okay.  So -- and when did these

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                                                    **0115**

49

1  transfers actually take place?

2           MR. DIAB:  So, the -- the transfers took place in

3  February and March.  The first transfer to Oakstone took

4  place in early February of 2023.  In early February, a small

5  group was transferred to Consumer Legal Group, and then in

6  early March, a larger group was transferred to Consumer

7  Legal Group.  In mid March, the remaining clients were

8  transferred to Phoenix Law.

9           TRUSTEE NG:  How were these clients selected?  You

10 know, say, for the Oakstone, the 15,000, you know, clients,

11 how were they selected to be transferred to oakstone?

12          MR. DIAB:  So, in Oakstone's case, it was slightly

13 different because there's as -- a company called Pec

14 Corporation which had done a receivable purchase agreement

15 and had an interest in the receivable of the 15,000 clients

16 that were transferred to Oakstone.  Pec Corp. wanted those

17 clients all to be kept together because it had an interest

18 in the revenue stream from those clients.  And, so, it

19 insisted that the clients be kept together and be

20 transferred to one law firm as a group, and that was the

21 impetus for the Oakstone transfer.

22          For the other transfers, it was a function of the

23 initial -- the initial transfer of client facility was based

24 on the initial attorneys withdrawing from their cases and

25 the need to shift chose clients to another law firm.

50

1      And then with Phoenix, it was simply the
2  remainder.  Everything that was left got pushed to Phoenix
3  in March.  And, so, it was so that the decision was Oakstone
4  would be driven by Pec Corp.  Consumer Legal Group was
5  driven by necessity in terms of jurisdiction, and then
6  Phoenix received the remainder.

7      TRUSTEE NG:  Well, did Pec Corp. specifically
8  mention I want the files to transfer to Oakstone or who made
9  the decision to go to Oakstone?

10      MR. DIAB:  The decision to refer the clients to
11  Oakstone was made by Litigation Practice Group.  In LPG's
12  contract with the clients, LPG reserves the right to utilize
13  other law firms to service client files.  That's based on
14  the volume of work that we do.  We sometimes become
15  overloaded in a state, and also sometimes we lose counsel in
16  a state.  And, so, we reserve to ourselves the right to
17  transfer the servicing of the client to another law firm.
18  And, so, that was exercised with regard to all these
19  transfers.  LPG made the decision.

20      TRUSTEE NG:  Okay.

21      MR. DIAB:  But any client that objected had the
22  opportunity to terminate the representation and receive a
23  full refund of fees, and there were probably five or so
24  thousand clients that opted for the termination and refund.

25      TRUSTEE NG:  Five thousand you said?

**Exhibit "2"**                                    **0117**

51

1          MR. DIAB:  Yeah, approximately.

2          TRUSTEE NG:  So, like, you know, in terms of

3   sending these clients to the three law firms, was it, again,

4   a joint decision between you and Dan?

5          MR. DIAB:  Yeah, it would have been a decision

6   between me, Dan, and then the receiving law firm because

7   they also had criteria for the clients they received.  For

8   instance, CLG wasn't going to take any client that was in

9   the State of North Dakota because of regulatory issues in

10  North Dakota, that type of a conversation.

11         TRUSTEE NG:  Okay.  And all the transfers have

12  been completed?

13         MR. DIAB:  Correct.  All the transfers have been

14  completed.  The terminations that were requested by clients

15  have also been completed.  There are some refunds that are

16  pending.  They haven't been sent out because we're waiting

17  for (indiscernible).  But, otherwise, that process has been

18  completed.

19         TRUSTEE NG:  The refund, is that pertaining to the

20  5,000 clients who -- who, you know, canceled the agreement?

21         MR. DIAB:  Yes, correct.

22         MR. MARCH:  Yes.

23         TRUSTEE NG:  Did LPG receive any consideration in

24  connection with the transfers of the files to these three

25  law firms?

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                                          **0118**

52

1          MR. DIAB:  So, not at the time of transfer, but

2  LPG receives an ongoing residual payment on the clients that

3  continue to perform.  That means that the clients make

4  payments to these three law firms.  These law firms under

5  separate agreements, would make a payment through to LPG

6  (indiscernible) and get a referral fee, but it's essentially

7  the commission that the law firms are paying for the

8  referral, and that's a separate agreement for each of the

9  three.  It's a 20 percent referral agreement with Oakstone,

10 20 percent with Phoenix, and 40 percent with Consumer Legal

11 Group, and that's percent of the revenue stream generated by

12 this client.

13         MR. MARCH:  Actual receipts.

14         TRUSTEE NG:  These are actual receipts that these

15 law firms receive from these clients, and then whatever they

16 receive, the actual amount they transfer -- I guess for

17 Oakstone and Phoenix, they gave -- they transferred 20

18 percent back to the Debtor, is that right?

19         MR. MARCH:  That's correct.  That's the agreement

20 between those -- with those two entities.

21         TRUSTEE NG:  Is there a written agreement with all

22 these law firms regarding the referral fees?

23         MR. DIAB:  There is a written agreement with

24 Consumer Legal Group and with Oakstone Law Group.  There is

25 not yet a written agreement with Phoenix Law.  That

53

1  agreement has not been reduced to writing yet, but it's

2  something that we intend to do.

3          TRUSTEE NG:  Why wasn't there a written agreement

4  when the trials have already been transferred?

5          MR. DIAB:  At the time that LPG was transferring

6  the files, there was a combination of a lack of manpower on

7  the LPG side, and the transition was -- for lack of a better

8  word, it was rushed.  We were trying to push the clients

9  over as soon as possible.  They -- the lawsuits come in

10 daily.  These clients are receiving them and submitting some

11 to us on a daily basis, and we have to properly assign the

12 counsel.  So, we moved fast, received the transaction, but

13 the -- the agreement is in place at the 20 percent referral

14 fee, and -- and also, just to be clear, LPG maintains its

15 contractual right with regard to these clients.  If they

16 were ever nonperforming (indiscernible) retake the

17 representation, it would just have to find counsel licensed

18 in the jurisdiction in which these clients reside.

19         TRUSTEE NG:  Okay.  I think we asked for the

20 written agreements with these three law firms.  And so far I

21 think we only received one with -- maybe it was CLG.  I

22 don't have the one with Phoenix.  I mean, when do you think

23 you'll get into writing?

24         MR. DIAB:  That's something that we -- we

25 anticipate completing probably within the next week, and

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                                          0120

54

1  we'll send that to you as soon as that's completed.  The

2  agreement with Oakstone should have been sent through.  I'll

3  make sure to re-send that.

4         TRUSTEE NG:  I think it was just a letter.  I

5  don't have the actual agreement.

6         MR. MARCH:  That's true.

7         MR. DIAB:  Understood.

8         TRUSTEE NG:  So, we would need the agreement as

9  well.

10        I noticed that in the amended schedule

11  (indiscernible) was filed with the Court on May 1st.  It

12  doesn't list any of these contracts.  Were these law firms?

13  Is there a reason why?

14     (Pause.)

15        MR. DIAB:  Sorry.  This is Tony.  I'm not sure,

16  but we'll obviously connect with counsel and submit amended

17  schedules.

18        TRUSTEE NG:  Okay.  So, Oakstone you're expecting

19  20 percent from the actual receipts.  Based on the 15,000

20  clients or so that was transferred, you know, what is the

21  average monthly gross income you think you can get form

22  that?

23        MR. DIAB:  In the future we anticipate receiving

24  roughly $700,000 solely from Oakstone.  Like LPG, Oakstone

25  is using the same payment process as (indiscernible) and

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                                          0121

55

1  have the payment processing issue at the time of transition.

2  So, they were behind in collecting payments, meaning they

3  didn't collect the clients' payments that they were

4  attempting to collect because the new processor was holding

5  those funds.  But once that issue is behind us, which it

6  appears to be this month, it should be roughly $700,000.

7          TRUSTEE NG:  And --

8          MR. DIAB:  Again, it's dependent on actual client

9  performance, but that should be the revenue stream from

10  Oakstone.

11          TRUSTEE NG:  Is that based on the historical, you

12  know, receipt that LPG received from these clients you're

13  expecting about 700?  That's the 20 percent, you know,

14  referral fee?

15          MR. DIAB:  Correct.  That's based on -- on what we

16  -- what we have in terms of our data on this client basis

17  performance.  We don't know that the performance is going to

18  be the same post-transfer, but we imagine it would be

19  roughly similar, and that's where we came up with that

20  number.

21          TRUSTEE NG:  And -- and is Oakstone going to pay

22  the referral fee on a monthly basis or how often?

23          MR. DIAB:  Yes.  It was worked out with -- with

24  both Consumer Legal Group and with Oakstone it was a monthly

25  reconciliation and a monthly payment.  So, it would be one

*Briggs Reporting Company, Inc.*

56

1  payment at the conclusion of the month.  With Phoenix, the

2  agreement was more frequent.  It was supposed to be a -- a

3  weekly payment that's sent through.  We worked a few of the

4  reconciliations, but that would be a weekly, for the other

5  two entities, monthly payments.

6            TRUSTEE NG:  And which account is those money

7  going to go into?

8            MR. DIAB:  The general operating account at Wells

9  Fargo.

10           TRUSTEE NG:  Okay.

11           MR. DIAB:  That -- that Dan referenced.

12           TRUSTEE NG:  Did LPG receive any referral fees

13 from any of these entities since the filing of bankruptcy?

14           MR. DIAB:  Not yet, but we anticipate receiving

15 the first payment of $240,000 from Oakstone at the end of

16 this week.  It's scheduled for Friday of this week for that

17 first payment to come through.

18           TRUSTEE NG:  And how are they going to transfer

19 it?  Is it going to be a wire transfer?  Are they going to

20 give you a check?  How does that work?

21           MR. DIAB:  So, we had requested a wire transfer

22 into that operating account.  It's a method that we

23 requested.  They haven't confirmed that that's how they'll

24 send it.  They may send by ACH.

25           TRUSTEE NG:  Okay.  So, other than the $240,000

57

1  that you're expecting this week from Oakstone, do you expect

2  any other fees from the other two law firms this month?

3          MR. DIAB:  We're awaiting reconciliations from

4  CLG.  We anticipate receiving from CLG next week between 150

5  and 250 thousand, but they have to finish their

6  reconciliation.  And, again, it's a payment processing issue

7  that they've had.  For Phoenix, we don't have numbers yet,

8  but those would be payments that were supposed to begin this

9  week.  So, we're more likely to receive that amount tomorrow

10 or Thursday in terms of the number, and then we receive the

11 actual wire on Friday, but we don't yet know the amount for

12 the Phoenix entity.

13         TRUSTEE NG:  Okay.  So, other than the client

14 files that we just discussed, you know, to the three law

15 firms, did the Debtor transfer any other assets to any other

16 third parties within the last year?

17         MR. DIAB:  No, no other transfers.

18         TRUSTEE NG:  Okay.  So, what happens if those

19 three law firms decided to transfer the files to another new

20 law firm?  Like, will the Debtor continue to receive

21 payments at that point?

22         MR. DIAB:  Well, post-transfer, the -- the

23 receiving law firm begin to collect payments.  LPG is no

24 longer collecting payments direct from clients.  LPG may

25 begin onboarding clients again in the future.  At this time

58

1 the focus is on obviously the -- the bankruptcy, the Chapter

2 11 reorganization and these referral fees coming through.

3 LPG at some point in the future may resume enrolling

4 clients. We (indiscernible) only and then may just go

5 through this again, but right now there's been no final

6 decision on that front. For now it's simply just a

7 (indiscernible) model.

8        TRUSTEE NG: So, if these law firms decided to

9 transfer their files out to a different entity, then

10 basically LPG would lose its referral fees completely?

11        MR. DIAB: These entities don't have contracts

12 with the client. They don't have the right contractually to

13 transfer the files. Doesn't mean that they couldn't anyway.

14 But only LPG has the contractual right to transfer the file.

15 So, we could dispute it if one of these law firms were to

16 try to transfer a client, but technically, if these law

17 firms were to do so, we would have a hard time collecting

18 any fees from a third party recipient.

19        TRUSTEE NG: Well, do you anticipate any transfer

20 of client files from these three law firms and another law

21 firm?

22        MR. DIAB: No, we do not, and we have a good

23 relationship with these three. We don't anticipate it, but

24 it's something that could happen. It's certainly a

25 possibility.

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                    0125

59

1           TRUSTEE NG:  So --

2           MR. DIAB:  We do have visibility, and so we would

3  see if the clients were transferred.  I mean, we have

4  visibility over the clients (indiscernible).  We can see

5  them and know.

6           TRUSTEE NG:  Okay.  So, you mentioned Oakstone and

7  Phoenix are both California corporation, right?

8           MR. DIAB:  Correct.

9           MR. MARCH:  Yes.

10          TRUSTEE NG:  Does the Debtor have any interest in

11 these law firms at all?

12          MR. MARCH:  No.

13          MR. DIAB:  No.

14          TRUSTEE NG:  What about you, Mr. March or Mr.

15 Diab?

16          MR. MARCH:  That was a no from Dan.

17          MR. DIAB:  Yeah.  This is Tony.  That's a no for

18 me as well.

19          TRUSTEE NG:  Okay.  And with respect to Oakstone,

20 who is the owner for the shareholder of Oakstone Law Group?

21          MR. MARCH:  Scott Eadie, E-A-D-I-E.

22          TRUSTEE NG:  And is he an attorney?

23          MR. MARCH:  Yes.

24          TRUSTEE NG:  And was he ever an attorney of LPG?

25          MR. MARCH:  Yes.

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                                              0126

60

1          TRUSTEE NG:  For what period?

2          MR. MARCH:  I think he said his two-year

3 anniversary was a month ago.

4          TRUSTEE NG:  So, two-year -- two-year anniversary

5 meaning --

6          MR. MARCH:  I believe it's two years.

7          TRUSTEE NG:  -- he's been with the LPG for two

8 years?

9          MR. MARCH:  He's been with LPG for about two

10 years.

11          TRUSTEE NG:  And was that his first job out of law

12 school?

13          MR. MARCH:  Oh, no.  Scott and I go back to junior

14 high school, and I'm 66 years old.

15          TRUSTEE NG:  Is this Tony talking or is it Dan?

16 I'm sorry.

17          MR. MARCH:  That was Dan March.  I'm sorry.

18          TRUSTEE NG:  I'm sorry.  Okay.

19          MR. MARCH:  I've known Mr. Eadie -- yeah, Mr.

20 Eadie I think in 1984 or '85 received his certificate.  He's

21 been practicing since about '84.

22          TRUSTEE NG:  Why did he leave LPG?

23          MR. MARCH:  There were simply no funds to pay him

24 or anyone else.

25          TRUSTEE NG:  And then he started -- when -- so,

61

1  when he left LPG, he went to start Oakstone Law Group?

2          MR. DIAB:   This is Tony.   Just to be clear, he was

3  referred.   We recommended Scott as a head attorney, Dan and

4  I, more than two years.   He's been practicing with LPG for

5  two years.   He practiced in a number of different areas for

6  years before that, and Pec Corporation is managed by

7  somebody named Eng Tang (phonetic), and Eng asked for

8  referrals, who do we think would be a good person to head

9  the law firm that's going to house the files in which Pec

10  Corp. has an interest in the receivable, and Dan and I both

11  pointed to Scott and thought he was the perfect fit for it,

12  and so we had recommended him, but Scott had missed two

13  payrolls, and LPG was not a viable employment at that time,

14  which obviously helped to motivate Scott's decision.

15          TRUSTEE NG:   Okay.   I noticed that the Oakstone

16  Law Group, it was formed in January 2023.   Is that right?

17          MR. DIAB:   That sounds correct, yes.

18          TRUSTEE NG:   Was it a joint decision between you

19  and Dan that -- that there would be a new law firm, Oakstone

20  Law Group?

21          MR. DIAB:   No.   Dan and I didn't have that -- a

22  part in the naming or the formation of Oakstone and have

23  been driving its formation.   He had been in conversation

24  with us about moving the files that he had an interest in,

25  and so we were collaborating but not the driving force

62

1  behind the formation for that entity, but the entity was

2  formed in January, and the agreement was reached in January.

3          TRUSTEE NG:  When you say collaboration, is it

4  collaboration with who?

5          MR. DIAB:  It was just Eng Tang.  So,

6  collaboration between LPG and Eng about the release of these

7  files that have Pec Corporation interest in them.  And it

8  was -- it was then a function of the pressures that I think

9  he had relating to the Validation Partners lawsuits and the

10 fact that we had grown to a client account that was

11 untenable.  It was difficult to represent that number, and

12 Eng had been pushing for these files to be moved to a

13 different entity.  And, so, we essentially agreed in January

14 that we would move them to the destination that we chose,

15 and then in the course of those conversations, we

16 recommended Scott as an attorney to (indiscernible) that

17 entity.

18         TRUSTEE NG:  And -- and Eng Taing, is that last

19 name T-A-I-N-G?

20         MR. DIAB:  That's -- yeah, that sounds correct.

21         TRUSTEE NG:  Was he an attorney with LPG?

22         MR. DIAB:  No.  He was an investor in Validation

23 Partners.  He was one of the many individuals that gave

24 money to Validation Partners, and Validation Partners

25 defaulted.  Pec Corporation then sought recourse against LPG

*Briggs Reporting Company, Inc.*

63

1  directly, and LPG was making payments to Pec Corp. and had

2  essentially paid Pec Corp. for an assignment of Pec Corp.'s

3  claim against Validation Partners.  So Pec Corp. ended up

4  receiving payments from LPG, and LPG received a right to go

5  after Validation Partners for a little less than 30 million.

6  And, so, Eng had been receiving these payments from LPG but

7  became increasingly concerned about the effect that the

8  Validation Partners' litigation was having on LPG and wanted

9  the -- the files in which Pec Corp. had an interest to be

10 transferred.  And, so, we complied with that request.

11          TRUSTEE NG:  Okay.

12          MR. DIAB:  But Eng is not an attorney and not

13 practicing.

14          TRUSTEE NG:  Okay.  And who's Michael Thomas?

15          MR. DIAB:  I'm not familiar with Michael Thomas.

16          TRUSTEE NG:  Okay.  This person --

17          MR. MARCH:  I'm not familiar with Michael Thomas.

18          TRUSTEE NG:  Okay.  For some reason, this person

19 signed the Articles of Incorporation for Oakstone.  So, you

20 don't know this name?

21          MR. DIAB:  No.  I'm not familiar with that name.

22 I would imagine it's somebody that Eng hired or --

23          TRUSTEE NG:  Okay.

24          MR. DIAB:  -- or Scott hired or somebody hired to

25 assist with that formation.

64

1       TRUSTEE NG:  How many attorneys do they have at

2  Oakstone?

3       MR. DIAB:  That I'm not sure.  I do know that they

4  have attorneys licensed in most jurisdictions in the

5  country, but I don't know the exact attorney count.

6       TRUSTEE NG:  How many offices do they have?

7       MR. DIAB:  I'm only aware of one office that

8  appears on the website.  I'm not -- I'm not familiar with

9  whether they have any local attorney offices, although I

10  know that they have enough attorneys to where I'm sure that

11  some of them have offices in these other jurisdictions,

12  these other states, but I'm not aware of any other

13  locations.

14       TRUSTEE NG:  And what's the -- what's the location

15  on the website?  It's in California?

16       MR. DIAB:  Correct.  So, the -- the location on

17  the website is an office that's sort of a -- a receptionist

18  only type of an office, and the processing for Oakstone is

19  done in California, and that's the -- the Irvine office is

20  where Scott is housed and where the work is primarily done.

21       TRUSTEE NG:  Okay.  So, you were going to transfer

22  15,000 -- 15,000 clients to this law firm who just started

23  in January, and you don't know how many attorneys they have?

24  Like, what if they can't handle the 15,000 clients?

25       MR. DIAB:  We confirmed that they had licensed

65

1  counsel in the jurisdictions in which these 15,000 clients

2  reside.  I don't know how many other attorneys they're

3  employing, but they did confirm that they had attorneys

4  licensed in the states where this batch of 15,000 clients

5  resided.

6              TRUSTEE NG:  Okay.  And Phoenix Law Group, who is

7  the owner of Phoenix Law Group?

8              MR. DIAB:  His name is Ty Carss.  So Ty, T-Y,

9  Carss, C-A-R-S-S.

10             TRUSTEE NG:  C-A-R-S-S, is that what you said?

11             MR. DIAB:  Yes.

12             TRUSTEE NG:  Okay.  Is this a female?  I'm sorry.

13             MR. DIAB:  No, male.

14             TRUSTEE NG:  Okay.  And is this person an

15 attorney?

16             MR. DIAB:  Yes, he's a licensed attorney.  He's

17 been practicing for a little over 20 years.

18             TRUSTEE NG:  Licensed where?

19             MR. DIAB:  In the State of California.

20             TRUSTEE NG:  Okay.

21             MR. DIAB:  State and Federal Court.

22             TRUSTEE NG:  And was this person an attorney for

23 LPG?

24             MR. DIAB:  No, never any affiliation with LPG of

25 any kind, employee or contractor.

66

1          TRUSTEE NG:   Okay.  And I think this firm is also

2    formed in January 10, 2023.  So, how did LPG find this Law

3    firm?

4          MR. DIAB:  So, this Law firm was previously -- I'm

5    sorry.  This -- this is now -- law firm's a successor to a

6    prior law firm called Gallant Law Group who LPG had done

7    some work with.  But, essentially, this law firm, Phoenix

8    Law was formed to take over the pipeline that previously was

9    Gallant Law Group.  The head attorney for Gallant Law Group

10   was a gentleman named Robert Tobia (phonetic), in

11   Philadelphia, Pennsylvania, and he essentially moved this

12   docket over to Ty into Phoenix, which is an entity that was

13   formed on the 10th of January.

14         We began discussing transfers in early February

15   and then Phoenix where Ty transfers (indiscernible).

16         TRUSTEE NG:   Okay.  And do you know how many

17   attorneys they have at Phoenix Law Group?

18         MR. DIAB:  I do not know their attorney count, no.

19         TRUSTEE NG:   Do you know if any of your LPG former

20   attorneys are in any of the law firms?

21         MR. DIAB:  I know that there are certain LPG

22   attorneys that are employed by Oakstone Law Group.  They

23   were recruited by Scott and by Eng.  There's no LPG

24   attorneys working for Phoenix Law as far as I know.

25         TRUSTEE NG:   And how many former LPG attorneys at

*Briggs Reporting Company, Inc.*

Exhibit "2"                                              0133

67

1  Oakstone right now?

2          MR. DIAB:  I believe the number is between 12 and

3  15.

4          TRUSTEE NG:  And what about --

5          MR. DIAB:  I know that it's -- it's a bit fluid

6  because Oakstone may have also lost attorneys recently.

7  Sorry.

8          TRUSTEE NG:  And what about Consumer Legal Group?

9          MR. DIAB:  So, the principal of Consumer Legal

10 Group is Aryeh Weber, Aryeh, A-R-Y-E-H.  Last name W-E-B-E-

11 R.  And he's the principal of Consumer Legal Group which I

12 want to say was formed in June or July of 2022.

13         TRUSTEE NG:  Okay.  And was he ever an attorney

14 with -- with LPG?

15         MR. DIAB:  No, zero connection to LPG either as an

16 employee or contractor.

17         TRUSTEE NG:  And, so, how did the Debtor find

18 Consumer Legal Group then?

19         MR. DIAB:  Well, I know the individuals who had

20 started that group on the processing side.  The individuals

21 who are managing the processing center for CLG are known to

22 me.  I've met Aryeh Weber one -- maybe -- I met him once in

23 the summer of 2022 and again I think in January of this

24 year, but I don't really know Aryeh, but I do know the

25 people who are managing the processing center for Mr. Weber

68

1 for CLG.

2         TRUSTEE NG:  Okay.  So, that was a joint decision

3 with you and Dan to transfer the clients to CLG based on

4 your -- I guess your affiliations with the people at that

5 firm?

6         MR. DIAB:  Correct.  And CLG had more restrictions

7 on which jurisdictions they could onboard, but the clients

8 that were selected for CLG were based on jurisdictions where

9 they did have licensed counsel.

10         TRUSTEE NG:  Is there a reason why CLG is given 40

11 percent for referral fee versus the 20 percent that the

12 others are paying?

13         MR. DIAB:  Well, we were able to negotiate, and so

14 the arm's-length negotiations, with Eng it was probably a

15 more -- sorry.  Eng is Oakstone.  With Oakstone, it was

16 probably more of a friendly negotiation by virtue of the

17 fact that (indiscernible) from LPG to Pec Corp., Pec Corp.

18 being the entity to which Eng would be the (indiscernible).

19 And, so, that agreement was more favorable and likely

20 because of the pressure that existed from the amount that

21 was owed.  Phoenix was filed just as a copycat of Oakstone

22 once the Oakstone terms were set.  And, so, we did Phoenix

23 the same way.  CLG was more of an aggressive negotiation.

24 They were in greater need of clients because they had been

25 at it since the summer.  They weren't really growing, and so

*Briggs Reporting Company, Inc.*

69

1  we were able to get a better deal by then.

2          TRUSTEE NG:  Okay.  Did LPG obtain the written

3  consent from its clients, the former clients, to transfer

4  the files to the three law firms at the time of the

5  transfer?

6          MR. DIAB:  LPG did not.  LPT notified the clients

7  but did not receive written consent at that time.  At the

8  time that the client executed the legal services agreement,

9  the legal services agreement gave LPG the right to transfer

10 the servicing, and it's our position that they consented at

11 that time, that there was no substantive consent sought or

12 received at the time of the actual transfer.

13         TRUSTEE NG:  Can you point to me where the legal

14 service agreement, where it gave the right to LPG to

15 transfer the clients' files?

16         MR. DIAB:  Yes.  LPG has used different models of

17 the agreement for the licensing provision.

18         TRUSTEE NG:  Okay.

19         MR. DIAB:  I will open the agreement and read

20 that.  Just one second.

21         TRUSTEE NG:  Okay.  Thank you.

22    (Pause.)

23         MR. DIAB:  So, in the legal services agreement

24 itself, the -- the template agreement that was sent to the

25 Trustee's Office, that would be page three of six --

70

1          TRUSTEE NG:  Okay.

2          MR. DIAB:  -- it goes under the -- so, the heading

3 is Applicable Law and Confidentiality, and that's the

4 (indiscernible) that LPG (indiscernible) other attorneys to

5 provide the services, and then LPG retains the right to

6 utilize other attorneys to assist in the representation of

7 these clients.  It also says that the client has a right to

8 know the attorney that's working on their file.

9          TRUSTEE NG:  Okay.  I did read that provision, but

10 the language does not cover attorneys who are not directly

11 employed by LPG, is that right?

12          MR. DIAB:  So, our reading of this provision it

13 doesn't put any restrictions that the attorneys that we'd

14 utilize have to be employed by LPG.

15          TRUSTEE NG:  Okay.  So, it says --

16          MR. DIAB:  We describe affiliation.

17          TRUSTEE NG:  Okay.  So, is it LPG's position that

18 these law firms are affiliated attorney to LPG?

19          MR. DIAB:  Yes.

20          TRUSTEE NG:  Okay.

21          MR. DIAB:  Yes.  And the -- the agreement with

22 Consumer Legal Group states that, that that's the basis.

23          TRUSTEE NG:  What would be the affiliation --

24          MR. DIAB:  And, just to be clear, there were --

25 I'm sorry.  There were different templates used over the

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                    0137

71

1  years, but they all contain a provision similar to this one.

2          TRUSTEE NG:  Okay.

3          MR. DIAB:  I'm sorry.  Go ahead.

4          TRUSTEE NG:  But what would be the affiliation?  I

5  mean, I asked you earlier.  You said you or Tony Diab, the

6  Debtor, does not have any interest in any of these law

7  firms.  So, what would be the affiliation between the Debtor

8  and these three entities or three Law firms?

9          MR. DIAB:  Affiliation is the transfer of the

10 client files out.  So, we affiliate the attorneys to assist

11 in the representation of the clients.  We compensate for

12 that affiliation.  In this case, it's 80 percent of revenue

13 for Oakstone and Phoenix and 60 percent of revenue for CLG,

14 but the affiliation just means that we are working with the

15 law firm in these other jurisdictions to provide the

16 services, and that's how we styled that term, "affiliation".

17 So -- so, in our view, an affiliation doesn't mean that

18 there's a -- an employment relationship, W-2 or 1099.  It

19 means that we've retained these firms to provide this

20 service for this particular client, just a discrete

21 representation.

22         TRUSTEE NG:  Okay.

23         MR. DIAB:  Not an ongoing general one.

24         TRUSTEE NG:  Okay.  And you indicated earlier that

25 LPG had notified all clients?  Was that the case?

72

1          MR. DIAB:  Yes.

2          TRUSTEE NG:  And how did they notify -- how did

3 LPG notify the clients?

4          MR. DIAB:  Notifications were sent from LPG to the

5 clients by email notifying them of the transfer, and then

6 the -- the other law firm then reached out by email and by

7 phone to describe the transfer, and on LPG's side, we send

8 notification to the clients using email, which is one of the

9 methods of notification that the clients agree to receive in

10 their contract, and so we did it by email only.  I believe

11 there was also a text message blast, but it was primarily by

12 email.

13          TRUSTEE NG:  Okay.  And was the email sent -- the

14 notification email sent, you know, concurrent or shortly

15 after the files were transferred to these law firms?

16          MR. DIAB:  It was sent before, but it would have

17 been shortly before.  So, we would send the email from LPG.

18 The receiving firm, for instance, Oakstone, would then send

19 their email and then the transfer was completed after that,

20 and the transfer with the electronic portion of the client

21 file so that Oakstone would then have access at that point

22 to the client's files.

23          TRUSTEE NG:  And that's -- the email provides the

24 -- these former clients like rights if they want to cancel

25 the agreement?

**Exhibit "2"**                                        **0139**

73

1          MR. DIAB:  So, it does indicate that the clients

2 if they -- if they I guess do not want the transfer, do not

3 approve of it, they remain contractually entitled to

4 terminate the contract and receive a refund.  We put that in

5 all of our agreements, that the clients have the ability to

6 terminate at any time.  We never try to collect from our

7 clients or enforce the -- the remaining payment on the

8 agreement.  They always have that right to cancel.

9          TRUSTEE NG:  Okay.  So, the 5,000 clients that you

10 said earlier that they cancel, how much would the refund

11 total amount be?

12          MR. DIAB:  So, that refund total would have been

13 between 300 and 350 thousand.  We also had other clients

14 that weren't canceling but had requested refunds for other

15 reasons.  So, we right now have pending right around

16 $500,000 worth of refund requests, which will be sent from

17 our general Debtor in Possession account once the funding

18 arrives from our payment processes.

19          TRUSTEE NG:  Okay.  And how much of those $500,000

20 have been already paid?

21          MR. DIAB:  Could you ask that again?

22          MR. MARCH:  Yeah, I didn't --

23          TRUSTEE NG:  You mentioned the total amount would

24 be somewhere around $500,000, the refund amount.  Of that

25 $500,000, how much have LPG already paid?  Or is it the

**Exhibit "2"**                                                    0140

74

1  entire amount paid?

2       MR. DIAB:  So, the $500,000, yeah, that's the

3  remaining balance.  LPG probably paid about $200,000 and had

4  about $500,000 still pending, and that 500 remains owed at

5  this time.

6       TRUSTEE NG:  Okay.  Understood.

7       So, did the terms of the payment in terms of the

8  clients, did they change after the files had been

9  transferred to the -- you know, the three law firms?

10      MR. DIAB:  No.  The -- the payment terms remain

11 the same, and the -- the only operative contract remains

12 with LPG.  And, so, all the payment terms remain exactly the

13 same as they were prior to the transfer.

14      TRUSTEE NG:  Okay.  So, you previously mentioned

15 that, you know, some clients have opted to do like monthly

16 payments.  So, for those clients, how does the new law firm,

17 you know, have access to the monthly -- you know, the auto

18 payment from their bank account?

19      MR. DIAB:  The client file that was transferred

20 the receiving Law firm includes payment records of all the

21 payments that had cleared, all the payments that were still

22 due and owing, and the amount of those payments and the bank

23 account from which the payments were supposed to be drafted.

24 So, all of the payment data was conveyed to the Law clerks

25 for them to process those payments.

75

1          TRUSTEE NG:  Okay.  And then does the Law firm use

2   a new -- some kind of electronic agreement so, therefore,

3   they can, you know, debit or withdraw money from the

4   account, those clients' accounts?

5          MR. DIAB:  If they're simply collecting the

6   amounts that were in LPG's contract, they don't.  The LPG

7   EFT form allows LPG to assign the collection of payments to

8   third parties.  And, so, as long as it's an identical

9   payment to what's set forth in the contract, no EFT is

10  needed.  If the payment changes even by one penny or one

11  day, then they have to collect a new EFT form from the

12  client to -- to continue to collect payment.

13         TRUSTEE NG:  Okay.  Have LPG actually assigned the

14  EFT forms to the new Law firms?

15         MR. DIAB:  Not yet.  That was part of -- of what

16  was sent.  Those EFT forms were given to each of the law

17  firms for each of the clients.

18         TRUSTEE NG:  So, they have -- that has not been

19  done?

20         MR. DIAB:  That has been done.  That was already

21  completed.  The EFT forms were already assigned to each of

22  the law firms.

23         TRUSTEE NG:  Okay.  So, since the transfer of the

24  client files, have there been any situations where, you

25  know, the Debtor would continue to receive monthly, you

76

1 know, autopayment from these clients, former clients now,

2 but the law firm, the new firm also, you know, receiving

3 monthly payments from them?  Therefore, you know, those

4 clients have to pay twice?

5        MR. DIAB:  It's a two-part answer.  Yes, that

6 happens, but it was over our objection.  Merrich Bine, the

7 payment processes that I referenced before continued to

8 collect payments in the months of February and March over

9 our objection.  We had asked them to stop.  The new law

10 firm, Oakstone, Phoenix, CLG asked them to stop, but they

11 continued to collect payments, and they were collecting

12 payments using the batch of files that LPG -- sorry --

13 (indiscernible) files of the file containing the payment

14 information for a batch of clients.  It then would use this

15 payment data from LPG that was outdated payment data and

16 pull the payments from the clients.  And, so, there were

17 some clients who had the payment pulled by Merits Find on

18 behalf of LPG.  But the new law firm was also collecting

19 payment at the same time.  All of those double payments were

20 refunded to the clients or were supposed to have been

21 refunded to the clients, and some of the $500,000 is refunds

22 that LPG is currently trying to send some of that pending

23 $500,000 consisted of these what we call double debits, of

24 payments pulling from Merits Find and pulling from the new

25 law firm.  LPG agreed to give that refund.  And, so, Merrich

77

1   Bine (phonetic) since stopped.  An agreement was reached.

2   They ceased collecting payments on March the 10th, and they

3   haven't collected any payments since.  They've adhered to

4   the agreement that they stop collecting any payments, but

5   there's still an open question about what was collected

6   between January 30th and March 10th.  We don't have that

7   data yet.

8        TRUSTEE NG:  And how is the Debtor going to get

9   that data?

10       MR. DIAB:  Likely through an adversary action.

11  It's -- it's not forthcoming voluntarily.  So, it appears

12  the only way we'll be able to obtain it is by filing an

13  action inside of this proceeding.

14       TRUSTEE NG:  Okay.  What do you think that -- you

15  know, you call it the double debit.  Like, what do you think

16  that refund pertaining to the double credit -- double debit

17  would be?

18       MR. DIAB:  Well, it's probably about $100,000 out

19  of the $500,000 that's pending.  Or out of the $500,000,

20  probably about 350 are clients that are canceling, 100 are

21  the double debits.

22       TRUSTEE NG:  Okay.

23       MR. DIAB:  Fifty are other miscellaneous reasons.

24       TRUSTEE NG:  Okay.  So, you mentioned the Debtor's

25  not actively looking for new clients in California, is that

**Exhibit "2"**                                                    0144

78

1  right?

2          MR. DIAB:  Not at this time, correct.

3          MR. MARCH:  Correct.

4          TRUSTEE NG:  So, once those 400, 600 files, you

5  know, are completed, then the Debtor will no longer have an

6  income stream from California clients?

7          MR. DIAB:  Well, we do anticipate -- and I've

8  spoken with Dan about this.  This is Tony.  But Dan intends

9  to continue his bankruptcy process.  And, so, he'll continue

10 to take on clients who are filing Chapter 7 petitions in

11 California Bankruptcy Courts across the state, and that will

12 be a continued revenue stream.  But the ultimate question is

13 whether we'll also take on other non-bankruptcy clients, and

14 at this time we just don't have the infrastructure.

15         If the referral fees are processing the way that

16 they're supposed to and the reorganization fell into place,

17 then we do anticipate taking on what we'll call normal

18 clients, so, the non-bankruptcy clients in the State of

19 California, but the decision has not been made.

20         TRUSTEE NG:  Okay.  If LPG is going to take on new

21 clients in California, does LPG have any plans to retain new

22 counsel?  I mean, it's only one attorney right now, and

23 there's only so much work he can do.

24         MR. DIAB:  If we were to onboard new California

25 clients, we would add customer service reps, and we would

79

1  likely add another attorney licensed in the state.  And, so,

2  the first step is whether we have the budget available to do

3  so.

4          TRUSTEE NG:  Okay.

5          MR. DIAB:  If we do, then we'll likely add

6  California clients.

7          TRUSTEE NG:  Okay.  So, other than the referral

8  fees as we talked about and then the -- the existing income

9  from the clients in California or potentially maybe start

10 getting new clients, does the Debtor have any other source

11 of income?

12         MR. DIAB:  So, the bankruptcy docket and the

13 referral fees are the only source of income at this time.

14         TRUSTEE NG:  Okay.

15         MR. DIAB:  And we don't anticipate any other

16 source of income except the potential for California clients

17 on -- on the old model.

18         TRUSTEE NG:  Okay.  According to the Debtor's

19 amended statement of financial affairs that was filed with

20 the Court on May 1st, 2023 -- that's Docket Number 54 -- the

21 Debtor gross annual income for 2022 was $155 million.  So,

22 that's about $13 million or so, you know, gross per month.

23 Does that sound right to you?

24         MR. DIAB:  Yes, that sounds accurate for 2022.

25         TRUSTEE NG:  So, for 2022, when the Debtor was

80

1  making $13 million gross per month, what was the gross

2  monthly expenses, the average?

3          MR. DIAB:  So, for -- for the calendar year 2022,

4  it would have probably been about 13 and a half million.  We

5  probably suffered a loss just under $6 million for the year.

6  That's according to the financials that we have.  As I said,

7  the tax return hasn't been filed, but that's what we have in

8  terms of the -- the bookkeeping.

9          TRUSTEE NG:  Okay.  So, according to the same

10  amended SOFA, the gross income for this year from January

11  1st, 2023 to the petition date, that was about $30 million.

12  So, that's about for the three-month period or so, so give

13  or take, maybe about $10 million a month.  Does that sound

14  right?

15          MR. DIAB:  Yes, but that depends on the exact

16  amount that Merrich Bine was collecting.  So, we don't have

17  the exact data.  So, we're estimating, and the estimate is

18  based on a batch of files that we believe that they were

19  running.  And when I say believed, we looked at the clients

20  that were complaining of double debits and things, and we

21  isolated the batch of files that would be the rerun, but we

22  have no confirmation of that.  So, the $30 million is based

23  on an estimate of what Merrich Bine, the payment processor,

24  collected.

25          TRUSTEE NG:  Okay.

81

1          MR. DIAB:  Once we have the actual data, we can

2 give a firm number.

3          TRUSTEE NG:  I was under the impression that you

4 mentioned -- I mean, and I understand that you said you

5 don't know the exact amount, but it was somewhere around

6 like 12 to 14 million dollars I mean or do you think now

7 it's actually closer to 30?

8          MR. DIAB:  No.  Sorry.  So, LPG did collect

9 payments throughout the month of January.  It also collected

10 payments from March 10th to about March 20th, and then

11 Merrich Bine was collecting payments from about January 31st

12 -- 30th or 31st until March 10th.  It's that six-week period

13 that represented the 12 to 14 million that is the mystery.

14 We know that we collected -- we being, sorry, LPG collected

15 about $12 million in the month of January.  We think there's

16 between 12 and 14 million from Merrich Bine, and then

17 there's three to four million that we collected in March

18 before the petition and we stopped collecting the payments.

19          TRUSTEE NG:  Okay.  So, that $30 million estimate

20 for the three months or so, does that include any referral

21 fees?

22          MR. DIAB:  No.  So, there were no referral fees

23 paid that were part of that, that figure.  And today, as we

24 sit here today, we have yet to receive any referral fees

25 that were supposed to be paid for the first time at the end

82

1 of this week.

2          TRUSTEE NG:  So, the --

3          MR. DIAB:  By Friday, the 5th.

4          TRUSTEE NG:  Okay.  So, the amount that LPG

5 collected, you said, you know, not from the other -- is it

6 from the Apple Pay or who -- who collected it on behalf of

7 LPG?

8          MR. DIAB:  So, the LPG payments that were

9 collected in January were from EquiPay and from Merrich

10 Bine.  Merrich Bine was submitting payments in January,

11 collecting it from the clients and sending the money to us.

12 So, we collected from those two processors in the month of

13 January and from EquiPay alone in the month of March.

14          TRUSTEE NG:  Okay.  So, for 2023, year to date,

15 did the Debtor post a profit or loss?

16          MR. DIAB:  So, it's a -- it's a loss, but that's

17 because the money held by Merrich Bine is not accessible.

18 We would be if that 12 to 14 million were conveyed, but it's

19 not.  It's being held by them, and so we've operated at a

20 substantial loss.

21          TRUSTEE NG:  Okay.  So, your office submitted a

22 cash flow projection late Friday, last Friday evening, and

23 that projection shows gross revenue.  Like for April the

24 projection was $240,000.  It doesn't say whether it's gross

25 or net.  I mean, is it -- do you know if it's gross or net?

*Briggs Reporting Company, Inc.*

Exhibit "2"                                    0149

83

1          MR. DIAB:  That was that gross figure for April.

2          TRUSTEE NG:  Okay.  So, and then May the

3    projection is $740,000, and for June it's $1.2 million

4    gross.  So, you know --

5          MR. DIAB:  Correct.

6          TRUSTEE NG:  -- we talked about the first three

7    months I mean earlier.  It's about, you know, $10 million

8    including the money held by Merrich Bine, I think the $12

9    million.  But, so, how do you go from 10 million for the

10   first three months to $240,000 in April?

11         MR. DIAB:  Well, in -- in April it was two

12   different factors.  The first, we were only collecting 20

13   percent of the revenue stream from two of the firms and 40

14   percent from the other.  But also a lot of the clients who

15   were we'll just say victimized by the -- by the payment

16   processing in February and March were unwilling to make

17   payments in April or received accommodations to wipe out the

18   payment in April, either because they had two payments

19   drafts or because they had a payment draft on the wrong date

20   or in the wrong amount.  And, so, the revenue for these

21   other firms was lower by virtue of the fact that Merrick

22   Fund continued to collect payments in the month of February

23   and March.  And, so, the revenue was lower in April than it

24   otherwise would have been.  The June figure is when we think

25   that everything is back to normal, meaning that the payments

84

1  are processing, the clients are performing in a normal way,

2  and that's when we come closer to the -- the 1.2 figure.  We

3  think eventually we'll peak out somewhere around $2 million

4  per month once everything's processing normal.  But the

5  impact was substantial.  A lot of clients had payments

6  paused.  A lot of clients canceled, and a lot of clients are

7  refusing to make payments.  They want accommodations.  So,

8  the other law firms are working through that right now.

9        TRUSTEE NG:  Okay.  But the 1.2 in June, that's

10  still substantially less than the 10 million, you know, per

11  month that they were receiving for the first three months

12  prior to the bankruptcy.

13        MR. DIAB:  Agreed.  So, I think that the 2 million

14  figure that should be after June, that's more the realistic

15  figure (indiscernible), but there were a lot of clients --

16  there were clients that cancelled before billing transfers,

17  and there were clients that cancelled as a result of the

18  payment processing issues.  So, just estimated based on the

19  clients, yes, it was (indiscernible) based on the clients

20  but still appeared to be performing at these three other law

21  firms based on this cancellation rate that spiked during the

22  payment processing dispute.

23        TRUSTEE NG:  Okay.

24        MR. MARCH:  And I -- I think the -- the idea is

25  that we won't have any -- I mean, we're only going to have

85

1  three -- three employees on payroll as opposed to 350 people

2  on payroll.

3         TRUSTEE NG:  Okay.  The projection shows the

4  $675,000 revenue in March -- that's gross -- being held by

5  EquiPay.  Is that --

6     (Pause for outside noise.)

7         TRUSTEE NG:  Is EquiPay not -- the projections

8  show $675,000 being held in March revenue, gross revenue,

9  being held by EquiPay.  Is EquiPay not paying the Debtor as

10  well?

11         MR. DIAB:  Correct.  So, EquiPay is refusing to

12  send that amount through.  That's money that was collected

13  in March.  So, we're looking at it as -- as March revenue,

14  that EquiPay is holding that amount and refusing to send

15  that through to LPG.  That's likely to be another adversary

16  action, although our counsel is trying to get cooperation,

17  but right now it looks like they'll have to file to get that

18  money released.

19         TRUSTEE NG:  What is the reason for holding the

20  Debtor's revenue?  Did they provide you a reason?

21         MR. MARCH:  So, it was a combination of two

22  factors.  One reason, which was true for both EquiPay and

23  Merrich Bine was the litigation with Validation Partners.

24  They believed that the litigation was going to result in the

25  closure of LPG, the appointment of a receive and LPG

86

1  shutting down, in which case, both of those payment

2  processors would be on the hook for charge backs and

3  unauthorized transaction, and they didn't want to be left

4  holding the bag.  So, they used that as an excuse.  Whether

5  it's good faith or bad faith, I don't know, but that was the

6  explanation given, that the litigation with Validation

7  Partners put LPG in a -- a risk of being shut down.

8          The other factor that's cited by EquiPay is the

9  high bounce rate in the month of February.  We explained

10 that the bounce rate was high but that we were attempting to

11 collect payments at the same time as Merrich Bine, and then

12 we stopped.  But during that period where both LPG and

13 Merrich Bine were trying to collect payments, LPG through

14 EquiPay, Merrich Bine on its own, the client bounce rate

15 spiked because the clients can't afford to make two payments

16 at the same time.  And, so, we explained that that higher

17 NSF rate was a function of the payment processing dispute,

18 but EquiPay still felt that the high NSF rate warranted

19 holding funds at least for a short period of time.  We've

20 never been given a date certain when they'll release the

21 funds.

22          TRUSTEE NG:  Okay.  And is the Debtor still using

23 EquiPay or Merrich Bine?

24          MR. DIAB:  No, we're not currently using either to

25 process anything.

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                    0153

87

1          TRUSTEE NG:  So --

2          MR. DIAB:  And our understanding is that none of

3   the three Law firms are using either to process payments

4   themselves.

5          TRUSTEE NG:  So, who does the Debtor use for the

6   existing, you know, 400, 600 clients in California for

7   payment processing?

8          MR. DIAB:  Those clients are -- are no longer

9   making payments.

10         TRUSTEE NG:  Okay.

11         MR. DIAB:  Dan is continuing to handle the

12  litigation for those clients until the end, but they're not

13  making payments at this time, and no other service is being

14  provided to other banks, including those lawsuits.

15         TRUSTEE NG:  Okay.  So, according to the

16  projection that we received, the monthly expenses for April,

17  May and June -- well, I guess for May and June is about

18  $260,000.  For April it's a little bit more.  It's $358,000

19  because of the one-time liability, professional liability

20  expense.  So, I mean, without that expense, would you say

21  the expenses average per month is about $263,000 or so?

22         MR. DIAB:  Yes, and that should remain the case

23  moving forward, that (indiscernible) normal month over month

24  over month.

25         TRUSTEE NG:  Okay.  I mean, they --

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                                        0154

88

1          MR. DIAB:  On the cost side.

2          TRUSTEE NG:  Okay.  There is an entry for refunds,

3  $50,000 per month.  Is that the expected payment the

4  Debtor's going to make, $50,000 a month on those refunds?

5          MR. DIAB:  No.  So, those are for additional

6  refunds, meaning the refunds that we anticipate clients

7  requesting from LPG.  If LPG collected money from a client

8  and the client chooses to cancel and request a refund, even

9  if they're currently being serviced by another law firm, the

10  money that They paid the LPG would be refunded by LPG.  So,

11  we're estimating $50,000 a month in new refunds that we'll

12  have to address month over month --

13          TRUSTEE NG:  Okay.

14          MR. DIAB:  -- moving forward.

15          TRUSTEE NG:  And the pay -- I mean, the rent has

16  to be amended because it lists only the 1450, and you

17  mentioned earlier the Debtor moved to a new location.  So,

18  we would need amended cash flow projection.

19          I notice that a lot of the expenses that was

20  previously listed, you know, in -- in the balance sheet that

21  you submitted to us was not there any more.  Like, I don't

22  see any expenses for office supplies or the malpractice

23  insurance that we talked about or software or Lexis, you

24  know, any of those equipments or, you know, I don't see that

25  anymore.  So, I don't know if we were just omitted or the

89

1  Debtor does not have those expenses anymore.

2          MR. DIAB:  We -- based on the -- essentially the

3  operation that we envision moving forward, those vendors and

4  those contracts were not needed.  And, so, that's why

5  they're not listed on our new operating budget.  The current

6  operating budget just consists of the salaries for Dan, Olga

7  and Carl and then the base expenses that they have for the

8  office out of which they're operating.  We will revise the

9  1450 figure if it was short of -- of -- I think Dan

10 referenced 2100 might be a more accurate number.  So, we'll

11 revise that for --

12         MR. MARCH:  It's actually --

13         MR. DIAB:  -- the malpractice.

14         MR. MARCH:  It's actually $1,491 a month in rent.

15         TRUSTEE NG:  Okay.

16         MR. DIAB:  Okay.  So, we'll still revise that

17 number.  And the malpractice also is a one-time payment of

18 94 or 96 thousand, which covers us all the way until March

19 2024.

20         TRUSTEE NG:  Did the Debtor make the one-time

21 payment?

22         MR. DIAB:  The one-time payment is outstanding.

23 It's part of that March budget that we intend to fund

24 through the -- the funds that we receive from EquiPay.

25         TRUSTEE NG:  So, has that been paid, the $96,000?

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                                           0156

90

1          MR. DIAB:  It has not been paid.  The -- the

2    carrier understands that we're waiting on the funds from our

3    payment process and we'll make the payment at that time, and

4    they're cooperating.

5          TRUSTEE NG:  So, is --

6          MR. DIAB:  At least for now.

7          TRUSTEE NG:  Is the malpractice insurance active

8    then if the Debtor did not pay the $96,000?

9          MR. DIAB:  Yes.  It remains active provided that

10   we make the payment forthwith, although we haven't defined

11   that period of time.  But the policy has remained active.

12   The policy's initial termination date was actually June of

13   this year, but we did the one-year extension in March, and

14   it was negotiated at that price based on a March to March

15   period for the malpractice policy.

16         TRUSTEE NG:  Is there a deadline the Debtor had to

17   have made that $96,000?

18         MR. DIAB:  We have not been given a deadline.

19   It's expected to happen soon, but they understand that it's

20   a function of when we receive the money for the payment

21   processor.

22         TRUSTEE NG:  Okay.

23         MR. DIAB:  They have not given us a hard deadline.

24         TRUSTEE NG:  Okay.

25         MR. DIAB:  But they inquire.

91

1          TRUSTEE NG:  I don't see that expense in your
2    projection.  So, you need to revise the projection to
3    include the expense.
4          MR. DIAB:  Okay.  Understood.
5          TRUSTEE NG:  It looks like the largest payroll --
6    largest expense in the projection is the payroll for
7    $209,000.  I assume that includes the $100,000 per month
8    monthly payment that the Debtor intends to pay Mr. March, is
9    that right?
10          MR. DIAB:  That's correct.
11          MR. MARCH:  Yes.
12          TRUSTEE NG:  Okay.  And, previously, I think,
13   Tony, you mentioned that you don't expect to receive
14   anything from the Debtor in this bankruptcy, is that right?
15          MR. DIAB:  That's correct.
16          TRUSTEE NG:  Okay.  Mr. March, have you received
17   any compensation since the filing of the bankruptcy?
18          MR. MARCH:  No.  Well, the last -- no.  The last
19   payment I think I received compensation was March 17th.  I
20   think all the employees are owed from March 17th.
21          TRUSTEE NG:  And how much was that payment?
22          MR. MARCH:  Oh, for everybody or for --
23          TRUSTEE NG:  Just --
24          MR. MARCH:  For me it would have been the $100,000
25   a month.

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                                          0158

92

1          TRUSTEE NG:  Okay.

2          MR. MARCH:  Yeah.  I'm not sure about Carl.  But

3 there's -- that's just with my office right now.

4          TRUSTEE NG:  Okay.

5          MR. MARCH:  That's with the three staff members.

6          TRUSTEE NG:  So, for 2023, other than that March

7 17 payment, $100,000, did you receive any other payments?

8          MR. MARCH:  Since then?  No.

9          TRUSTEE NG:  No, no, not since then.  Like prior

10 to -- other than the March 17, '23, did you receive a

11 payment in February or January of this year?

12          MR. MARCH:  Yes.  I believe I was current through

13 March 17th.

14          TRUSTEE NG:  Okay.

15          MR. MARCH:  I think that was the last payment

16 anyone received.

17          TRUSTEE NG:  Was it like a monthly payment that

18 they paid you the $100,000?

19          MR. MARCH:  No.  It was every two weeks on a

20 regular basis.

21          TRUSTEE NG:  And how much was every two weeks?

22          MR. MARCH:  Well, the net was about $23,000.  The

23 gross would have been close to $50,000, so about $48,000

24 payable every two weeks gross.

25          TRUSTEE NG:  Okay.  And how long --

*Briggs Reporting Company, Inc.*

93

```
 1          MR. MARCH:  The net was 23.

 2          TRUSTEE NG:  And how long have you been receiving

 3 that?

 4          MR. MARCH:  Let's see.  It's been about since I

 5 think January of 2022.

 6          TRUSTEE NG:  What about prior to --

 7          MR. MARCH:  I didn't receive -- there was -- there

 8 was 200 -- it was not that.  It would have been about --

 9 let's see.  I was $200,000 short in 2022 of $100,000 a

10 month.

11          TRUSTEE NG:  So, like in --

12          MR. MARCH:  For the year.

13          TRUSTEE NG:  -- 2022, you did not receive the $1.1

14 million?  You only received $900,000?  Is that what you're

15 saying?

16          MR. MARCH:  About $900,000 or I think the -- it's

17 $850,000 I believe is what it was.

18          TRUSTEE NG:  Okay.  And what was the source of the

19 funds for your compensation?

20          MR. MARCH:  It just came out of general and from

21 general into payroll and payroll to the employees --

22          TRUSTEE NG:  Which general is --

23          MR. MARCH:  -- who received them at the same time,

24 all the employees did.

25          TRUSTEE NG:  Is it the --
```

**Exhibit "2"**                                                    0160

94

1          MR. MARCH:  That would have been the --

2          TRUSTEE NG:  -- the 4858?

3          MR. MARCH:  From Union Bank for this year.  It

4    might have been Bank of America for one payment.  I think

5    that's all we had it for, and -- and from Chase.

6          TRUSTEE NG:  Which -- which Chase account?

7          MR. MARCH:  I don't know if I ever -- let's see.

8    I received it from the payroll.  I received paychecks.

9          So, Tony, which account is the -- I think we're

10   looking at the Chase one.

11         MR. DIAB:  The paychecks -- paychecks would drop

12   payroll from the general operating account, the account

13   ending 3158.  Bank of America had a separate payroll account

14   that just held the payroll money when we were using Bank of

15   America for that month and a half.

16         For Union Bank, again, it was the general

17   operating account for payroll, which is the 4854 account.

18         TRUSTEE NG:  Okay.  So, I'm going to ask for proof

19   of payment from January 2022 to March 17, 2023.

20         What about 2021?  What was your compensation in

21   2021?

22         MR. MARCH:  You know, I don't recall that.

23         TRUSTEE NG:  Is it close to what you were

24   receiving in 2022?

25         MR. MARCH:  No.  I think it was about -- I think

*Briggs Reporting Company, Inc.*

95

1   it was $50,000 a month.

2          TRUSTEE NG:  I'm sorry.  I can't hear you.

3          MR. MARCH:  I think it might have been about

4   $50,000 a month.

5          TRUSTEE NG:  Fifty thousand a month?

6          MR. DIAB:  As I recall, it was -- it was in 2021

7   that Dan's compensation went from the 50 to 100 figure, but

8   I'm not sure what month of 2021 that switch was made.  I

9   think it was maybe August of 2021.

10         TRUSTEE NG:  Okay.  And prior to that, in 2020?

11         MR. MARCH:  Oh, that I don't remember at all.  It

12  was --

13         TRUSTEE NG:  Do you think it was about --

14         MR. MARCH:  Might have been --

15         TRUSTEE NG:  Do you think it's about the $50,000?

16         MR. MARCH:  No.  I think it was about $ 11,000 a

17  month.

18         TRUSTEE NG:  Okay.  So, why was the income, you

19  know, increased from $50,000 to $100,000 in 2022 when -- you

20  know, when the Debtor's facing all these financial

21  difficulties?

22         MR. DIAB:  Sorry, this is Tony.  As I recall, the

23  change was made in August of 2021 --

24         TRUSTEE NG:  Okay.

25         MR. DIAB:  -- when LPG was doing much better.

**Exhibit "2"**                                    0162

96

1            TRUSTEE NG:  Okay.

2            MR. DIAB:  It didn't have any -- any of these

3   issues, and Dan had taken on a much more active role when we

4   decided to ramp up the growth and -- and based on the size

5   of the docket and the number of attorneys he was managing,

6   it was right around August of '21 that we decided to -- to

7   increase that compensation.  And then in -- as you noted, in

8   2022, when we had the financial difficulty, he ended up

9   taking a haircut of between two and three hundred thousand,

10  which he obviously voluntarily did because of the issues

11  that we faced.

12           TRUSTEE NG:  According to the bank statements that

13  was attached to the Debtor's monthly operating report filed

14  with the Court on May 1st, 2013 (sic), docket number 55, it

15  looks like the Debtor only has about $6300 in the bank

16  account as of March 31st, 2023.  How is the Debtor going to

17  be able to pay for the $100,000 a month?

18           MR. DIAB:  The -- this is Tony again.  We

19  anticipated revenue from referral fees in addition to the

20  money that's being held by the payment processor.  We have

21  no problem clearing that -- the current operating budget of

22  $253,000, which includes the $100,000 salary to Dan, but

23  that does -- the revenue source moving forward, the payment

24  process, there's a one-time payment that we would receive.

25  But the referral fees moving forward should be more than

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                                         0163

97

1  enough to cover that amount that's due.

2            TRUSTEE NG:  The employment app --

3            MR. MARCH:  And I think that starts this Friday.

4            TRUSTEE NG:  Okay.  The employment application

5  filed with the Court by your attorney also asks for a

6  $20,000 post-petition retainer.  Has that been paid?

7            MR. DIAB:  It has not at this time, no.

8            TRUSTEE NG:  And is this -- is this going to be

9  the same source of funds going to pay that retainer or what

10 other source of funds?

11           MR. DIAB:  Correct.  It would be either the -- the

12 funds released by EquiPay if they release funds first or the

13 revenue received from the referral fees if that's received

14 first would go to pay the $20,000 post-petition retainer.

15           TRUSTEE NG:  Okay.  But the EquiPay, you

16 anticipate you will probably have to file some kind of

17 adversary action in order to get the funds back, right?

18           MR. DIAB:  Correct, unless they break -- their

19 conversation's not going well -- we don't think that they're

20 going to do it voluntarily.

21           TRUSTEE NG:  What about --

22           MR. DIAB:  That's correct.

23           TRUSTEE NG:  What about Merrich Bine, do you think

24 they're going to voluntarily give back the money or do you

25 think the Debtor needs to file some kind of adversary

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                                                    0164

98

1 proceeding?

2      MR. DIAB:  Yeah, that -- that one I can confirm

3 there's no chance that they voluntarily return anything.

4      TRUSTEE NG:  Okay.

5      MR. DIAB:  And, so, that, again, would have to be

6 some formal proceeding.

7      TRUSTEE NG:  Okay.  I note that the Debtor filed

8 the March monthly operating report using the wrong form.

9 The Debtor actually used the small business debtor form, and

10 this is not a small business debtor case.  So, we cannot

11 accept that monthly operating report for that reason.  And,

12 also, pursuant to the IDI letter that we sent to your

13 counsel on March 22nd, we specifically indicated that

14 certain supporting documentation must be filed along with

15 the monthly operating report, and that includes the balance

16 sheets, the P and L statement, the general ledger and things

17 like that, and none of those were attached to the monthly

18 operating report.  So, the Debtor needs to refile the

19 monthly operating report using the correct form and provide

20 the supporting documentation.  I mean, if you don't have a

21 copy of the IDI letter, you can certainly contact our

22 office, and we'll be happy to send you a new one.

23      Does that work for you?

24      MR. DIAB:  Yes, understood.

25      TRUSTEE NG:  Thank you so much.

99

1      I note that there are three secured creditors

2 listed in the Debtor's amended Schedule D that was filed

3 yesterday, Docket Number 52.  Does the Debtor need the

4 consent of these secured creditors to use the cash

5 collateral to pay any business expenses, including the

6 insider compensation?

7      MR. DIAB:  This is Tony.  I don't have an answer

8 to that question.

9      TRUSTEE NG:  Okay.  And I note that the amended

10 Schedule D still does not list the dates upon which the debt

11 was incurred or the last four digits of the account number.

12 So, that has to be -- that has to be amended.

13      Since the Debtor filed for bankruptcy, has the

14 Debtor made any expenses payment?

15   (Pause.)

16      MR. DIAB:  No.

17      MR. MARCH:  No.  I don't think so.

18      TRUSTEE NG:  So, the Debtor didn't pay for rent or

19 payroll or electricity for the -- you know, no payments were

20 ever made?

21      MR. DIAB:  Post-petition, no payments have been

22 made.  We've been waiting on funds from the payment

23 processor or, in the alternative, for these referral fees to

24 kick in.  At this time, no payments have been made post-

25 petition.  No funds have been available.

100

1          TRUSTEE NG:  So, no payments to the two staff were
2 made post-petition?
3          MR. DIAB:  Correct.  That's two payrolls that have
4 been missed.
5          TRUSTEE NG:  What about the lease of the new
6 place?
7          MR. DIAB:  So, the -- the April payment was made
8 at the end of March, but the -- the May payment has not been
9 made.  Today is the 2nd.  We have I believe until Friday to
10 make that payment without penalty, but that has not been
11 paid for the month of May.
12          TRUSTEE NG:  So, the April payment --
13          MR. DIAB:  The 1491 figure that was given.
14          TRUSTEE NG:  Okay.  So, the April figure, the
15 April rent payment, was that -- what was the source of the
16 funds to pay that payment?
17          MR. DIAB:  So, that was paid out of the Union Bank
18 operating account.  It was paid.  In the middle of March we
19 made the payment for the month of April, but I don't know
20 the exact date.  I do know it would have gone from the Union
21 Bank account ending 4854.
22          TRUSTEE NG:  Okay.  What kind of account --
23          MR. DIAB:  I'm just trying to source of funds --
24          TRUSTEE NG:  I'm sorry.  Go ahead.
25          MR. DIAB:  I'm sorry.  Just to answer your

101

1 question, the source of funds, that would have been client

2 payments that we could receive in March because we did

3 receive some client payments.  The 675 was held, but

4 clients' payments -- I'm sorry.  Client payments would have

5 been the source of the rent payment that was made in March

6 for the month of April.

7        TRUSTEE NG:  Okay.  What kind of accounting

8 systems and software did the Debtor -- does the Debtor use

9 to track financial activity?

10        MR. DIAB:  LPG currently uses Quickbooks.  In

11 2022, we had switched to NetSuite and then switched back

12 from NetSuite to Quickbooks.  In 2023, it's exclusively been

13 Quickbooks as the bookkeeping software.

14        TRUSTEE NG:  Okay.  And who has access to the

15 Quickbooks?

16        MR. DIAB:  So, there was a -- a former accountant

17 who was in the accounting department named Breanne

18 (phonetic).  Dan has access to the Quickbooks.  And,

19 although I don't have access, I could give access.

20 Carpenter and Associates, the accountants who handle the tax

21 filings, also have access to the Quickbooks account.

22        TRUSTEE NG:  Okay.  We received a balance sheet

23 for end of fiscal year 2022 late last Friday evening and an

24 income statement for fiscal year 2022.  When were these

25 documents prepared?

*Briggs Reporting Company, Inc.*

102

1        MR. DIAB:  They would have been finalized in

2  January of 2023.  They were prepared throughout the course

3  of the year in 2022 with bookkeeping entries, but those

4  financials were formalized in January.  No financials for

5  the year 2023 have been prepared.  The accounting

6  department, along with others, left in February, and they

7  have not replaced them.  The accountants themselves, they're

8  working on the tax filings but have not completed financials

9  for this calendar year, for 2023.  Their tax focus was 2022

10  tax year.

11        TRUSTEE NG:  And who prepared them, your

12  accountant?

13        MR. DIAB:  It was our accounting department.  Our

14  accounting department as of January consisted of three

15  individual bookkeepers and then an acting CFO, not a

16  technical officer or director of the company but somebody

17  who was fulfilling the role of CFO named Kevin Kirkler

18  (phonetic).

19        TRUSTEE NG:  And when was he the CFO of the

20  Debtor?

21        MR. DIAB:  He was hired in August to fill that

22  role.  He was terminated at the very beginning of February.

23  And, so, he was employed during that period of time.  The

24  termination in -- in early February was the result of -- of

25  certain discoveries that came to light for me and Dan, and

103

1  then the decision was made to part ways with Kevin.

2          TRUSTEE NG:  Okay.  And you mentioned that -- is

3  it two bookkeepers in the accounting department?

4          MR. DIAB:  Well, there were -- there were three

5  people working underneath Kevin during the time when Kevin

6  was employed.  The three people were Gabriel Monroy

7  (phonetic), Breanne Pierwich (phonetic) from

8  (indiscernible), and then the third individual was Eddie,

9  Eddie Ball (phonetic), and those three individuals were the

10 bookkeepers essentially working under Cameron during that

11 period of time.

12         TRUSTEE NG:  And are they still with LPG?

13         MR. DIAB:  No.  They left along with others in

14 February and March.

15         TRUSTEE NG:  Okay.

16         MR. DIAB:  And are no longer employed by LPG,

17 although Breanne does answer questions for us often when we

18 -- when we ask where to find a piece of information, but

19 she's not employed.

20         TRUSTEE NG:  So, was the balance sheet and the

21 income statement submitted to us prepared by this department

22 prior to their departure?

23         MR. DIAB:  It was prepared prior to her departure,

24 but it was pulled by me last week to be able to send

25 through, which is another way of saying it was not verified

*Briggs Reporting Company, Inc.*

104

1 by anybody in the accounting department that that's the

2 correct version, but it's the last version that I had

3 received from the accounting department.  It's the only

4 version I had access to.

5           TRUSTEE NG:  Okay.  Because the initial seven-day

6 package that was submitted to our office on April 17th, '23,

7 the Debtor at that time indicated that it has not prepared

8 an financial statements in 2022 or in the past year.  So,

9 but you're saying these were actually prepared by the -- you

10 know, by the department, the accounting department prior to

11 their departure, and you pulled it last week or so, is that

12 right?

13           MR. DIAB:  That's correct.  And, to be clear, the

14 -- the documents that were sent were never reviewed by a CPA

15 nor certified by a CPA.  It was our internal accounting

16 department only.

17           TRUSTEE NG:  I don't think we ever received a

18 profit and loss statement even though we asked for it.  Is

19 there a profit and loss statement?

20           MR. DIAB:  For 2022 there is.  None has been

21 prepared -- yeah, for 2023, none have been prepared for the

22 first four months of the year.

23           TRUSTEE NG:  The Debtor was making $155 million

24 gross in 2022, and you don't have a P and L statement?

25           MR. DIAB:  We have the P and L for 2022.  We don't

105

1  have it for 2023.

2          TRUSTEE NG:  Okay.

3          MR. DIAB:  It was submitted for 2022, along with

4  the balance sheet.

5          TRUSTEE NG:  So, we don't -- no, we did not

6  receive the P and L statement for 2022.  So, can you please

7  go ahead and send it to your attorney, and he can send it to

8  us?

9          UNIDENTIFIED SPEAKER:  (Indiscernible) we have

10  your income statement for --

11          TRUSTEE NG:  Oh, we have the income statement.

12          UNIDENTIFIED SPEAKER:  It's the same thing as the

13  P and L.

14          TRUSTEE NG:  Okay.

15          UNIDENTIFIED SPEAKER:  Sorry.

16          TRUSTEE NG:  And the accounts receivable,

17  according to the balance sheet for end of fiscal year 2022

18  that we received last Friday evening, the title of that

19  document, it says "Litigation Practice Group, PC, Parent

20  Consolidated."  So, what entities are consolidated with the

21  Debtor?

22          MR. DIAB:  I'm not aware of any being consolidated

23  with the Debtor.  So, I don't -- yeah, I don't know why that

24  notation was made, but I would have to inquire of Kevin if

25  there was anybody else included in that, but there should

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                                                    0172

106

1  not be any other entities.

2          TRUSTEE NG:  Are you still in good terms with

3  Kevin?  I thought he was let go.

4          MR. DIAB:  We -- so, we have a -- we have an open

5  line of communication.  It's not the best relationship, but

6  I am able to reach out to him, and he reaches out to me.

7          TRUSTEE NG:  Okay.

8          MR. DIAB:  And answers questions from time to

9  time.

10          TRUSTEE NG:  Okay.  Yeah, I will need explanation

11  why it says, you know, there's consolidation.  If there is,

12  in, fact, a consolidation, we need to know the reason for

13  that.

14          The balance sheets it says for end of fiscal year

15  2022.  Does that mean those figures listed in that balance

16  sheet is as of December 31st, 2022?

17          MR. DIAB:  Correct.

18          MR. MARCH:  That's my understanding, yes.

19          TRUSTEE NG:  Okay.  Thank you.  So, the balance

20  sheet shows that the total accounts receivables as of

21  December 31st, 2022 to be $6.6 million.  Does that sound

22  right to you?

23          MR. DIAB:  Yes.  So, my understanding of how they

24  calculate the accounts receivable on the balance sheet, they

25  don't book all future payments due on all contracts.  What

107

1  they're looking at is NSF's that were unresolved because

2  those amounts are owed to the company, and the company is

3  supposed to collect until they have a clearing entry to

4  remove the -- the NFS's that are owed.  But that figure does

5  not include future payments pursuant to contracts, and that

6  was a decision that the accountants made based on

7  (indiscernible) system that we book all the future contract

8  payments.  We just got hit with a huge tax liability in the

9  current year, and so they opt not to include AR beyond the

10 payments that we sought from clients but didn't collect.

11         TRUSTEE NG:  If the Debtor were to include the

12 future AR, what would the figure look like?

13         MR. DIAB:  As of right now or as of December --

14         TRUSTEE NG:  As of December -- I mean, is there a

15 difference?  I mean, is there a huge difference?  Well, what

16 about as of right -- as of right now?

17         MR. DIAB:  As of right now, I think that we were

18 putting the figure at roughly 60 million based on the

19 referral fees model that we're now adopting.  As of December

20 of 2022, when we still had all of the direct client payments

21 to account for, it probably would have been closer to $300

22 million in terms of all future contracts and payments due

23 thereunder.

24         TRUSTEE NG:  So, how did it go from 300 to 60

25 million dollars?

108

1          MR. DIAB:  That's a function of the percentage

2  split for the companies that are now servicing the clients,

3  so the 40 percent from CLG and 20 percent each from Phoenix

4  and Oakstone.  That's how the number is now 60 million,

5  because the remaining AR is going to belong to the firm

6  that's doing the servicing for the clients.

7          TRUSTEE NG:  Okay.  So, the Debtor's Schedule B

8  filed with the Court on April 4th -- and that's Docket

9  Number 33 -- shows the AR in the amount of $120 million.

10  So, how do you reconcile the numbers you just told me and

11  the $120 million?

12          MR. DIAB:  So, the $120 million would have to be

13  revised based upon the cancellations that we actually saw

14  happen as a result of these transitions and everything else

15  that was happening.  So, the 123 would have been a figure

16  that we would have determined in March at the time that we

17  were filing the petitions based on all of the clients

18  remaining onboard.  And in reality, clients cancelled with

19  LPG before the transfer and cancelled with the receiving law

20  firms post-transfer, in part because of the payment issue

21  with Merrick Bine, in part because they objected to the

22  transition.  And, so, the client base shrunk as a result of

23  -- of the movement from us, and that's why the future AR

24  also shrunk.

25          The 120 was a very rough figure.  The 60 million

109

1 itself is a rough figure. This client base is inconsistent

2 in terms of payment streams. Sometimes they perform really

3 well. Sometimes they perform poorly. So, it's a -- a best

4 guess.

5      TRUSTEE NG: Okay. And have the Debtors taken any

6 steps to try to recover the AR?

7      MR. DIAB: I would say no. The -- the policy

8 we've had from the inception of LPG is that we won't seek to

9 collect from clients that don't make payments. We'll

10 encourage them to make payments. We'll try to retain them

11 so that they remain clients, but if they want to leave, we

12 don't collect any payments that were owed at the time that

13 they leave. We don't even make demands out of them, engage

14 in collection action.

15      TRUSTEE NG: Okay. So, and that's to both

16 existing clients or clients who decided to leave LPG that

17 the policy is they don't -- that LPG does not try to make

18 any demands or collect on the AR?

19      MR. DIAB: Correct, and that's a function of the

20 positions the clients are in as individual discovering of

21 that and also concerns about how the State Bar would view

22 that practice, how seeking to collect from these individual

23 clients, that policy decision was made early on, and we

24 haven't changed it since.

25      TRUSTEE NG: Okay. So, the combined bank accounts

110

1   on that balance sheet shows that, you know, the balance as

2   of December 31st, 2022 was $2.5 million, but the Debtor only

3   listed $4500 in the Union Bank account as of the petition

4   date.

5          So, what happened to all that money?

6          MR. DIAB:  So, the operating costs in January but

7   then also when February -- in the month of February, when

8   the payment processing was no longer paying anything through

9   because the process was (indiscernible), all the existing

10  money that we had sort of in the bank from all these various

11  accounts we used to keep LPG operating as long as possible.

12  And then, when that money was gone, that's when we

13  essentially made a payroll and saw the mass exodus of

14  employees.  But any money that would have been in the

15  account at the end of December or the beginning of January

16  was used to cover all the expenses in January and February

17  of this year.

18          TRUSTEE NG:  Okay.  The balance sheet shows the

19  total liability as of December 31st to be $9.9 million.

20  Does that sound right?

21          MR. DIAB:  That sounds accurate, yes.

22          TRUSTEE NG:  And then the Debtor's schedule shows

23  liabilities about $140 million or so.  So, how do you go

24  from 9.9 as of December 31st of last year to $140 million

25  within the three months?

111

1        MR. DIAB:  We dispute the vast majority of the 140

2   million.  We were obviously advised by counsel that if

3   somebody is claiming a balance is owed, we have to report

4   that to the Court, but we do not believe that the vast

5   majority of purported creditors are actually creditors.

6   They either are seeking moneys that are not owed or they're

7   seeking to enforce contracts that they had already breached

8   and they're not permitted to enforce.  So, we think that the

9   actual amount owed to creditors is much closer to about $10

10  million, maybe a little bit less, in terms of actual

11  creditors.  These disputes obviously are going to have to be

12  adjudicated, but -- but we've marked the debts as disputed

13  on our schedules.

14        TRUSTEE NG:  Okay.  And --

15        MR. DIAB:  The balance sheet shows our -- our

16  position.

17        TRUSTEE NG:  I'm sorry.  I couldn't hear you.

18        MR. DIAB:  The balance sheet shows our position

19  with regard to who's actually a creditor and who's not.

20        TRUSTEE NG:  Okay.

21        MR. DIAB:  As of this time.

22        TRUSTEE NG:  Okay.  We -- we -- our office

23  requested a list of receivables with an aging, and we did

24  receive some kind of report from your office, but it does

25  not identify any account holders, and there's no aging is

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                                    0178

112

1 listed, just amount each month.  So, we would need a revised

2 aging report with those information in order for us to have

3 a meaningful understanding of what's going on.  You can send

4 it to your attorney.

5          MR. DIAB:  Just to clarify -- I apologize for

6 interrupting, but to clarify, you would prefer to see each

7 one of the clients and their payment streams?

8          TRUSTEE NG:  Right.

9          MR. DIAB:  And then multiplying out our 20 percent

10 or 40 percent?  Got it.

11          TRUSTEE NG:  Right.  I think if you have any

12 question, you can also contact our office after the meeting,

13 and we can explain to you what we need, but I think that

14 would be the information that we need so we can have an

15 understanding of what's going on.

16          On January 6th, '23, of this year, the Superior

17 Court for the State of California Orange County, Judge

18 Sherman, issued an order enjoining LPG from spending any

19 money that would result in less than $4.48 million cash in

20 hand.  And, similarly, on March 10th, '23, the State Court

21 issued a minute order enjoining the Debtor to spend any

22 money that would result in less than $4.48 million cash on

23 hand.

24          Are you aware of those two orders?

25          MR. DIAB:  Yes, we're aware of the orders.

*Briggs Reporting Company, Inc.*

113

1       TRUSTEE NG:  And can you explain why the Debtor

2  only has $4500 in the bank account as of the petition date?

3       MR. DIAB:  There's money held by the payment

4  processor which collects payments from clients.  Those

5  payments are held by the payment processor in an account for

6  benefit of LPG.  We believe that those funds belong to LPG

7  and would satisfy the minimum balance that the Superior

8  Court wanted us to hold.  And, so, our position is if the

9  payment processor's holding the $4.5 million, then we're

10 satisfying the Court's order.

11      In our operating account, we have never for one

12 minute in our history had four and a half million in the

13 operating account.  So, to the extent that -- that we're

14 enjoined from spending money to bring the -- the account

15 balance below four and a half million, we've never been

16 above it.  So, we couldn't bring it below.  But we don't

17 think that the Court was -- was using that hyper technical

18 interpretation.  We believe that they meant the total

19 account balances across all accounts adds up to the four and

20 a half million, which is easily the case when you look at

21 the payment processor's account and the amount of money

22 that's being held there.

23      TRUSTEE NG:  Well, actually --

24      MR. DIAB:  But that's the interpretation we've

25 taken.  It's never --

114

1          TRUSTEE NG:  Okay.  Understood.

2          MR. DIAB:  Go ahead.

3          TRUSTEE NG:  We have reviewed the bank statements

4     that you sent to our office like yesterday.  There were a

5     lot of them, and those bank statements, the Chase 3158, the

6     Chase 3133, I mean, they did have substantial deposits.  I

7     mean, even as of December the deposits were $8 million.  I

8     mean, the withdrawal was -- was a lot, was $8 million as

9     well, same as Chase 3133.  As of December, the deposit was

10    $4.38 million, and the withdrawals were $4.31 million.

11          So, it appears that the Debtor did have

12    substantial deposits in excess of the $4.5 million that the

13    Court ordered in expense account at one point.

14          MR. DIAB:  But the way that the deposits work, the

15    payment processors will send money through on a -- on a

16    daily basis any time it's (indiscernible) day.  And, so,

17    we'll receive the $4 million, $8 million, whatever the

18    number is.  We'll receive it as daily deposits of anywhere

19    from $100,000 to $1.5 million, but it never comes in as a

20    batch of four or five million or more than that amount.  The

21    largest it would ever come in as is $1.5, $1.6 million at

22    any one point in time, and when the money comes in, it's

23    obviously then spent on all the operating expenses that we

24    had operating a law firm that's -- that at the time was

25    active in 48 different states.  But the -- so, the payment

**Exhibit "2"**                                                    0181

115

1 processing trickles in in small batches, and it's spent at

2 the time that it trickles in.  It never pools.  It never

3 has, and it never would if this business model is to

4 succeed.

5        TRUSTEE NG:  Okay.  So, the Debtor listed a

6 transfer of $50,000 to City Capital within the 90 days prior

7 to the filing.  Do you know when the transfer took place?

8        MR. DIAB:  The transfer would have been in

9 February of 2023.  I don't know the exact date, but probably

10 somewhere around February 20th to 25th.

11        TRUSTEE NG:  And what was the reason?

12        MR. DIAB:  But that was the one transfer that was

13 made to City Capital.

14        TRUSTEE NG:  And what was the reason for that

15 transfer?

16        MR. DIAB:  City Capital had issued a loan.  It was

17 a -- another merchant cash advance.  So, that cash advance

18 called for payments of $50,000.  We made one such payment,

19 and then we defaulted on that obligation, and that's one of

20 the obligations that we reported as a secured obligation.

21        TRUSTEE NG:  Okay.  And the Debtor also lists a

22 transfer $12 million to Merrick Bank, and when was that

23 transfer?

24        MR. DIAB:  So, Merrick Bank collected the money

25 from LPG's clients.  The money was never sent to LPG.

116

1 Merrich Bine is holding that amount we believe, but, again,

2 that's an estimate.  We don't know the exact amount that

3 they're holding, but that amount that was being held and is

4 being held by Merrich Bine we're regarding as LPG funds, and

5 that's the reason for that notation.  But no amount was ever

6 sent from LPG to Merrich Bine.  That was collected from LPG

7 clients and held by Merrich Bine.

8         TRUSTEE NG:  Okay.  So, how long did the Debtor

9 actually use Merrich Bine services?

10         MR. DIAB:  So, Merrich Bine began processing

11 payments in September of 2022, and the last payment process

12 is March 10th of 2023, so, from September '22 to March of

13 '23.

14         TRUSTEE NG:  And they have been officially

15 terminated by the Debtor?

16         MR. DIAB:  Correct, and it was -- it was by mutual

17 consent because they had a contract to process payments, and

18 they agreed to stop.  They essentially agreed at least

19 temporarily to give up their contractual right at our

20 request that they stop collecting payments, and so that took

21 place in March.  The agreement was reached March 10th, and

22 they have not collected the payments since.

23         TRUSTEE NG:  Okay.  And the Debtor listed Merrich

24 Bank in its Schedule F as a creditor with a claim of $8

25 million.  What is the basis of that claim?

117

1       MR. DIAB:  In addition to being a payment
2  processor, Merrich Bine had purchased receivables from LPG.
3  They entered into receivable purchase agreements on three or
4  four different occasions, and those purchase agreements
5  called for payments out of LPG's receivable to Merrich Bine,
6  and so Merrich Bine was both a payment processor and also a
7  financier in the form of receivable purchaser.
8       TRUSTEE NG:  Okay.  I think previously you
9  mentioned that the Debtor may, you know, take -- may -- may
10 initiate, you know, adversary proceedings against either
11 Merrich Bine or Apocay (phonetic) in this bankruptcy case.
12 Does the Debtor contemplate any other litigation against any
13 other party in this bankruptcy?
14      MR. DIAB:  Yes, a number of other adversary
15 actions are contemplated.  As I mentioned earlier, there's a
16 dispute with Kevin Kirkler, the former acting CFO, and that
17 dispute involves money that LPG believes was taking
18 wrongfully, that LPG is going to seek to have returned.
19 Also, LPG believes there was a misappropriation of trade
20 secrets by Kevin Kirkler and another individual who is a
21 creditor named Mario Acevedo.  We believe that they shared
22 information with a competitor, and that competitor is
23 actively stealing clients from LPG.  They're LPG clients
24 that are located at other Law firms now, but they still have
25 a contract with LPG, and this Law firm is reselling them on

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                                          0184

118

1  this other platform that this Law firm runs.  And, so, we

2  anticipate an adversary complaint for the misappropriation

3  of LPG's trade secrets, including client lists.

4          And then there's a related action against a

5  company called Point Break Holdings, which is partnered with

6  Mario and Kevin in this new Law firm venture, and they're

7  also actively stealing clients from -- from the Law firms

8  that are LPG clients.  So, there's going to be an adversary

9  action against them for that interference with contractual

10 relations as well as violation of a contract that Point

11 Break had with LPG that restricted such conduct.  And, so,

12 those adversary actions are contemplated.

13         There was an -- one additional adversary action

14 would be against Debt Validation Fund and DVI Fund related

15 to money that was paid to them pursuant to agreements that

16 they both breached.  And, so, we would seek to return the

17 funds from those two individual purported creditors and seek

18 to -- to have those funds returned as a result of the breach

19 or the agreement by those two parties.

20         Dan, can you think of any other adversaries that

21 we discussed?

22         MR. MARCH:  No.  I was going to say that --

23 against Validation Partners, that's about $30 million.

24         MR. DIAB:  Yeah.  So, Validation Partners, which

25 is also listed as a creditor, we received an assignment from

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                                              0185

119

1  Pec Corporation of a roughly $30 million claim that Pec

2  Corporation had against Validation Partners, meaning

3  Validation Partners owed Pec Corporation $30 million that

4  was assigned to LPG. So, that's an asset of LPG that we're

5  going to seek.  It's that $30 million assignment that we'll

6  file as an adversary action against Validation Partners.

7  And, so, that's I guess the last of the adversaries.

8           TRUSTEE NG:  Okay.  And what about the -- the

9  potential lawsuit against Kevin?  How much was taken

10  wrongfully allegedly by him or his -- Mario?

11          MR. DIAB:  So, for Kevin, the amount in

12  controversy is $205,000, and that relates to transactions in

13  a bank account that -- that do not appear to have been

14  authorized by Dan or by myself, and that's one that is --

15  there's an ongoing conversation with Kevin and a desire to

16  resolve it amicably, but we don't know that that's going to

17  be the case, but that would be the amount in controversy.

18          TRUSTEE NG:  Okay.  And does the Debtor expect

19  anyone to sue the Debtor in this bankruptcy case?

20          MR. DIAB:  I'm sorry.  Could you repeat that

21  question?

22          TRUSTEE NG:  Do you expect anybody to sue the

23  Debtor in this bankruptcy case?

24          MR. DIAB:  So, the active lawsuits that were

25  already pending at the time of the filing of the petition

120

1   are the only lawsuits we envision.  We don't envision there

2   being any other lawsuits filed.

3         TRUSTEE NG:  Okay.  What is the plan for

4   reorganization here?

5         MR. DIAB:  So, our goal is to make all secured

6   creditors whole using the revenue stream from referral fees,

7   and then the balance of those referral fees would be made

8   available to the unsecured creditors pro rata.  The

9   complicating factor is the uncertain payment stream from the

10  client base.  And, so, over the next couple of months, we'll

11  have a good sense of exactly how this client base is going

12  to perform, that is of each service by three law firms that

13  are not LPG.  And then that would be the amount that's

14  available, but we think it would be easy to make secured

15  creditors whole, and there would be a sizeable amount left

16  for unsecured creditors.

17        TRUSTEE NG:  Okay.  At this point, I'm going to

18  turn to my colleagues, Marilyn Sorensen or the AUST, Cam

19  Miskins, to see if they have any follow-up questions.

20        MS. SORENSEN:  I do not, Queenie.

21        TRUSTEE NG:  Thank you.  I hear no response.

22  So --

23        MR. MISKINS:  I do not.

24        TRUSTEE NG:  Okay.  I'm sorry.  Cam, do you have

25  any questions?

121

1        MR. MISKINS:  No, I don't.

2        TRUSTEE NG:  Thank you.

3        So, at this point, I'm going to open the forum to

4  all creditors who would like to question the Debtor.  If so,

5  please announce yourself and state your name and if you're

6  an attorney and the party that you represent on the record,

7  please.

8        MR. BROWN (telephonic):  Hello.  Bob Brown.  I'm

9  an attorney.  I represent SDCO Tustin Executive Center.

10  It's the owner of the property located at 17542 East 7th

11  Street, Tustin, California, Suites 100, 105, 250 and 330.

12        Earlier in the examination, I heard the Debtors

13  representatives indicate they vacated that property in

14  February or March of 2023.  We have filed a motion for

15  relief from stay to recover possession of the property.

16        Has, in fact, the Debtor vacated those -- or

17  abandoned those premises?

18        MR. DIAB:  So, there -- there are no longer any

19  employees operating out of that space.  There's office

20  furniture that still has to be moved into storage, which we

21  anticipate completing by the end of this week, by Friday the

22  5th or Saturday the 6th, at which point we would be ready to

23  turn over possession.

24        MR. BROWN:  Okay.  Earlier I heard somebody say

25  that they vacated and gave the landlord notice that they'd

122

1  given up possession of the property, yet my client never

2  received that.  So, you anticipate vacating the property by

3  the end of next week?

4          MR. DIAB:  By the end of this week, correct, and

5  we'll have -- we'll make sure that notice is given to

6  (indiscernible) at the moment that everything has been

7  removed.

8          MR. BROWN:  Okay.  Very good.  I've got a motion

9  pending for relief from stay.  As I indicated, it's Docket

10 Number 19.  So, if Debtor's counsel would agree to give me

11 notice once the Debtor has vacated so we can take possession

12 of the property, I would appreciate that.  Obviously, we'll

13 dispose of any remaining items in the unit in accordance

14 with the Civil Code.  We will proceed with our motion for

15 relief from stay tomorrow just to make sure that this is

16 moving forward to conclusion.  But you anticipate being out

17 by the end of this week, correct?

18         MR. DIAB:  Correct.  And we don't have any

19 opposition to the motion as I understand it.

20         MR. BROWN:  Okay.  Very good.  Those are all the

21 questions that I have on behalf of my client.  Thank you.

22         TRUSTEE NG:  Thank you, Mr. Brown.

23     (Simultaneous speaking.)

24         MR. STOCKHOLD:  Go ahead, Dave.  This is Matt

25 Stockhold.

**Exhibit "2"**                                         0189

123

1          MR. CUSIO:  Okay.  This is David Cusio on behalf

2  of Debt Validation Fund 2, MCDVI Fund 1, and MCDVI Fund 2.

3          I want to follow up on a few things.  Mr. Diab,

4  you mentioned that the notes you had -- or, sorry -- the

5  notes that LPG had with my clients were breached by my

6  clients.  How do you believe those were breached?

7          MR. DIAB:  Well, we believe that for three

8  reasons.  The confidentiality term was breached when your

9  clients, both of them, shared confidential information to

10  Validation Partners, an adverse party in active litigation,

11  in November of 2023 -- of 2022, and they also violated the

12  non-disparagement clause by disparaging LPG and Dan March

13  and Tony Diab as individuals.  And then more important than

14  all of that, they continued to seek to support Validation

15  Partners in the collection of amounts that were allegedly

16  assigned.  So, the exchange was a promissory note for

17  assignment by the DVF and DVI Fund receivables from

18  Validation Partners.  But after that purported assignment,

19  the two entities continued to seek to collect and supported

20  Validation Partners in efforts to collect, which we think

21  violated both the covenant of good faith and fair dealing

22  and also, more directly, eviscerated the (indiscernible)

23  consideration to LPG for those two promissory notes.  And,

24  so, that's the position that would be outlined in the

25  adversary that we intend to file.

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                                    0190

124

1          MR. CUSIO:  And what was the confidentiality?

2    What was the confidential information that was disclosed

3    improperly?

4          MR. DIAB:  It was financial information as well as

5    the content of various meetings.  I would have weekly

6    meetings with Dave Zuck, McKenna, Eng Taing,

7    (indiscernible), Kevin Kirkler, and we would provide

8    confidential information regarding LPG's operations,

9    including its financial status and financial transactions,

10   and that information was given to Mike McLaughlin

11   (phonetic), counsel for Validation Partners, at meetings

12   that were witnessed by Eng Taing.  And, so, that information

13   that was conveyed was used by Validation Partners in

14   connection with their active litigation.  But, specifically,

15   it was financial information and operational information

16   shared with -- with Ross and his attorney, Mike.

17         MR. CUSIO:  Okay.  I want to -- I'm going back to

18   what we were talking about much earlier this morning.

19         Mr. March, aside from work with LPG, do you have

20   personal cases that you handle personally?

21         MR. MARCH:  I have a few.  I -- I handle

22   bankruptcies, yes.

23         MR. CUSIO:  Okay.  And how long had LPG been

24   making the lease payment for your office?

25         MR. MARCH:  I would say it's been about two years.

125

1          MR. CUSIO:  Okay.  And do they cover -- does LPG

2 cover the entire rent?

3          MR. MARCH:  Yes.

4          MR. CUSIO:  So, you don't pay any of the rents due

5 on your office space?

6          MR. MARCH:  No.

7          MR. CUSIO:  What were Mr. -- sorry.  The original

8 member of LPG was John, and I didn't catch his last name.

9          MR. MARCH:  Thompson.

10         MR. DIAB:  The last name is -- yes.  I'm sorry.

11         MR. CUSIO:  Johnson?

12         MR. DIAB:  It was Thompson.

13         MR. MARCH:  Oh, Thompson.  I'm sorry.  You said he

14 had concerns about liability.  What were those concerns?

15         MR. DIAB:  This is Tony.  I can address that

16 because he had raised those concerns direct to me.

17 Specifically, his concern related to the marketing companies

18 and their compensation method.  He had concerns that the way

19 that the marketing companies that would onboard files to

20 LPG, he felt that that compensation method may violate the

21 fee sharing ban between lawyers and non-lawyers.  And, so,

22 he raised that styled as an objection, and he said, after we

23 discussed the issue, he would prefer not to be counsel of

24 record for LPG and a shareholder of LPG, and that's when we

25 essentially began a search for his replacement.  But that

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                                                    0192

126

1  was the issue that he had raised as his objection.

2      MR. CUSIO:  Okay.  Mr. Diab, you were talking

3  about the -- some of the entities, your entities that

4  received compensation from LPG.  You mentioned Vulcan

5  Consulting Group and Strategic Consulting Solutions.  Were

6  there any other entities associated with you who received

7  money from LPG?

8      MR. DIAB:  The only other entity would be BAD,

9  Incorporated, which did business in post-processing, and

10  post-processing received money from LPG from February 2019

11  when LPG was formed, until June of 2021 when BAD,

12  Incorporated was essentially dissolved.  It was never

13  dissolved formally because there's outstanding liabilities,

14  but it was essentially nonoperational as of June 2021.  That

15  entity I had an interest in, and it also was receiving

16  payments from LPG.

17      MR. CUSIO:  And who are -- is that an LLC?  What

18  kind of entity is that?

19      MR. DIAB:  BAD was formed as an LLC in I believe

20  it was January 2018.  It was converted to a -- an S

21  Corporation sometime around May of 2019, if memory serves.

22  And, so, it was BAD, Incorporated at the time that it ceased

23  operations.  It was made up, when it was an LLC, of three

24  partners, Brian Really, Arosh Asante (indiscernible) and

25  Tony Diab.  So B for Brian, A for Asante, D for Tony, BAD,

127

1 Inc.

2          MR. CUSIO:  Got it.  And then who were its

3 officers when it was an S Corp. or did it have officers?

4          MR. DIAB:  It did have officers.  Brian Really was

5 the CEO, and Arosh Asante Berudi (phonetic) was the

6 treasurer, CFO.  The secretary was (indiscernible).  I never

7 held an officer position for the entity and didn't receive

8 compensation from the entity, meaning I wasn't on payroll or

9 a 1099 for BAD, Inc.

10          MR. CUSIO:  Strategic Consulting, is that an LLC

11 or was it an LLC at the time?

12          MR. DIAB:  Yes, that was and even remains a

13 limited liability corporation -- company, sorry.

14          MR. CUSIO:  And who are the members of Strategic

15 Consulting?

16          MR. DIAB:  There's one member.  His name is James

17 Hinson.  He's a sole member, and I believe that entity was

18 formed toward the end of 2021, November'ish 2021.

19          MR. CUSIO:  Okay.  And how do you spell Mr.

20 Hinson's last name?

21          MR. DIAB:  James is standard spelling.  Hinson is

22 H-I-N-S-O-N.

23          MR. CUSIO:  And I believe you said that there were

24 never written agreements between LPG and Vulcan and LPG and

25 Strategic Consulting, is that correct?  Did I get that

*Briggs Reporting Company, Inc.*

128

1  correct?

2        MR. DIAB:  Yes, that's correct.

3        MR. CUSIO:   Are there ever times that money went

4  from any of the payment processors directly to an entity

5  that you were associated with or to yourself as an

6  individual?

7        MR. DIAB:  The former, yes.  It went to entities I

8  was associated with, never to me as an individual.   But

9  money would have been directed from payment processors

10 direct to Vulcan Consulting Group.  This would have been now

11 2021 because Vulcan was only used in 2020, 2021, and so

12 payments would have been directed at -- so, on the payment

13 processor to Vulcan without passing through any LPG

14 operating accounts.

15       MR. CUSIO:  And that was in 2021?

16       MR. DIAB:  Correct.

17       MR. CUSIO:  Did it ever happen with -- sorry --

18 Strategic Consulting?

19       MR. DIAB:  With Strategic Consulting no, but there

20 may have been -- there may have been one other entity that

21 had received those directed payments which was called

22 Lineman and Associates, but in reality, that was just a DBA

23 for World Global Fund, and World Global Fund was one of the

24 merchant cash advance companies that had given money to LPG.

25 And they also received directed payments that never passed

**Exhibit "2"**                                                    **0195**

129

1 through any LPG account, and I have no interest in that

2 entity, but they were a sizeable financier of LPG during its

3 growth.

4       MR. CUSIO:  There was a dispute between LPG and

5 World global, correct?

6       MR. DIAB:  Correct, a substantial one that arose

7 in April of 2022.

8       MR. CUSIO:  What was the amount at issue in that

9 dispute?

10      MR. DIAB:  So, similar to Merrich Bine, we didn't

11 get firm numbers.  Our understanding is that something in

12 the neighborhood of $10 million was collected from World

13 Global using various DBA's.  Money was collected direct from

14 LPG clients.  It was not authorized.  They called it a

15 payment processing error, but essentially on April 7th and

16 8th of 2022, World Global initiated debits of virtually all

17 LPG clients.  They essentially tried to pull payments from

18 almost all LPG clients on dates that were not authorized.

19 The clients had not had a payment due on those dates, but

20 the money was pulled anyway.  The dispute resulted with

21 World Global issuing a refund to the clients.  At least as

22 far as we know they issued refunds to all the clients that

23 were affected, but we don't have any confirmation that that

24 was the case because some of our clients would not notice a

25 payment and wouldn't necessarily contact us to report the

130

1 additional payment, but it was our understanding that they

2 had refunded all the clients, but this dispute was the month

3 of April 2022, and it was roughly $10 million the amount in

4 controversy.  Out of that, we think the vast majority was

5 returned to clients.  We just don't have confirmation.

6        MR. CUSIO:  Was there ever a dispute with World

7 Global or what LPG claimed that World Global owed LPG money?

8        MR. DIAB:  Could -- could you ask that again?

9        MR. CUSIO:  Sure.  Was there ever a dispute where

10 LPG claimed that World Global owed LPG money?

11        MR. DIAB:  Yes.  So, both prior to and after this

12 payment processing error, LPG believes that World Global has

13 collected money that was due to LPG that wasn't being

14 remitted through.  Whether it was being held as a reserve or

15 simply not being reported, there was money that was supposed

16 to come to LPG that didn't, and that was before the payment

17 processing error.  After the payment processing error, there

18 was money due to LPG for the damage that was caused by World

19 Global's conduct, and that damage included additional

20 employee time and overtime.  It included refunds that had to

21 issue beyond the amount that was taken from clients to make

22 the clients whole.  For instance, somebody misses a car

23 payment, and now they have extra fees, and we have to make

24 them whole for that.  This is not the client's fault that

25 they couldn't make the payment.

**Exhibit "2"**                                                      **0197**

131

1     We also lost a tremendous number of clients, and

2 we -- so, we demand compensation for the clients that it

3 canceled.  We also at that time lost our BBB rating, which

4 had been an A plus.  We went to a no rating which impacted

5 our ability to onboard new clients.  So, that was the range

6 of damage caused by the April disaster, and we demanded

7 compensation after April.  We never received it.

8     MR. CUSIO:  LPG filed a lawsuit against World

9 Global, is that correct?

10     MR. DIAB:  Correct.  It was filed under seal in

11 the Eastern District of New York and subsequently dismissed

12 for lack of diversity jurisdiction.  We didn't have the

13 membership of the LLC.  And, so, we couldn't show that there

14 was complete diversity between all of the members of the

15 World Global, LLC and Litigation Practice Group, and for

16 that reason, the court in the Eastern District of New York

17 declined to exercise diversity jurisdiction.  It is our

18 intention to refile in California, but we -- we have not yet

19 refiled.  We still have another 11 months to be able to file

20 that action, but we have not yet filed any action against

21 him.

22     MR. CUSIO:  And do you -- is it LPG's intent still

23 to file that action?  Is that another adversary proceeding?

24     MR. DIAB:  We have discussed resolution with the

25 members of World Global, and that's still a discussion

132

1 that's ongoing.  If we can't resolve things amicably, which

2 seems to be the case, then that would be added to the list

3 of adversaries that we would file.  We had a conversation on

4 that subject as recent as this past Friday with one of the

5 members of World Global.  So, we're still pursuing

6 resolution, but it doesn't appear likely, in which case that

7 would be an additional adversary.

8 　　　　MR. CUSIO:  Do you -- do you personally receive

9 compensation from a company called Prime Logix, L-O-G-I-X?

10 　　　　MR. DIAB:  No.  So, I don't receive any

11 compensation from Prime Logix, but I believe it's spelled L-

12 O-G-I-X.  Is that what you said?

13 　　　　MR. CUSIO:  Yes.

14 　　　　MR. DIAB:  Yes.  So, Prime Logix, which is a

15 Wyoming entity I don't have an interest in and I haven't

16 received any payments from that entity.

17 　　　　MR. CUSIO:  And what does Prime Logix do?

18 　　　　MR. DIAB:  Prime Logix was affiliated with the Law

19 Firm Gallant Law Group, which was the law firm that had

20 Robert Tobia (phonetic) as its principal.  Robert's an

21 attorney licensed in Pennsylvania who works out of an office

22 in Philadelphia, and prime would provide support in the form

23 of customer service, mail processing, payment processing,

24 and -- and other functions to Gallant, and then that ceased

25 when Gallant essentially was folded maybe December of 2022,

*Briggs Reporting Company, Inc.*

**Exhibit "2"**　　　　0199

133

1  December, January.  Might have been January 2023.

2         MR. CUSIO:  Just -- just to clarify one thing, you

3  said that Prime Logix was affiliated with Gallant.  Does

4  that mean that -- are you using affiliate as there's common

5  ownership or the way you were using it earlier, that they

6  were working together?

7         MR. DIAB:  They were working together.  Prime

8  would have been the contracted party receiving payment from

9  Gallant, which was the party seeking assistance with

10 processing, but affiliation only in that they were working

11 together, and there was a financial arrangement, though,

12 overlapping ownership.

13        MR. CUSIO:  When money would go from the processor

14 to Vulcan without going through LPG, why would the money not

15 go through LPG?

16        MR. DIAB:  Well, it was a few different reasons.

17 One was the logistics of it.  There were delays, and

18 sometimes some payments had to be made on these cash advance

19 positions by Vulcan, and it couldn't delay because threats

20 were being made about filing TRO's, freezing bank accounts,

21 sending direction letters to vendors, et cetera.  And, so,

22 for expedience, we would sometimes send the money direct to

23 Vulcan to release to these cash advance companies.

24 Sometimes it was just a function of the bookkeeping that

25 when the money would go to LPG first, there was bookkeeping

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                                    0200

134

1  activity for the incoming revenue and then the outgoing

2  payment, and sometimes that would create delays but then

3  also create difficulties in how we recorded the transactions

4  between LPG and Vulcan after the transfer.  So, to make it

5  easy, we would do the transfer direct.  This wasn't sizable.

6  It wasn't raising millions of dollars.  It was probably a

7  few hundred thousand, but they were at points in time when

8  there was some time sensitivity, some urgency that required

9  the money to move fast, but that would be the -- sort of the

10 two-part reason, the bookkeeping and then the -- the need

11 for speed.

12         MR. CUSIO:  Mr. March, how long have you been the

13 only lawyer employed by LPG?

14         MR. MARCH:  Probably February of this year,

15 possibly even March.

16         MR. CUSIO:  As of the date of filing the

17 bankruptcy, were you the only attorney?

18         MR. MARCH:  Yes, that was actually working, yes.

19 I think there were a few attorneys -- there were still

20 attorneys working for LPG.  I don't know if they received

21 compensation.  As of March 17th, I think that was the last

22 one, amount that was paid to any attorneys at all at LPG,

23 including myself.

24         MR. CUSIO:  You said earlier -- I'm sorry.  I

25 don't remember if this was Mr. March or Mr. Diab -- that LPG

135

1 started losing employees in October and November of 2022.

2 Did I get that right?

3          MR. DIAB:  By -- sorry.  This is Tony, and I made

4 the statement earlier.  By choice, yes, we terminated

5 employees in the Las Vegas, Nevada office over the course of

6 October, November of 2022, and that was part of --

7          MR. CUSIO:  So, that --

8          MR. DIAB:  -- the (indiscernible).

9          MR. CUSIO:  Okay.  I want to make sure I

10 understand this correctly.  I believe you said that at the

11 peak, LPG had 67,000 active clients.  Is that correct?

12          MR. DIAB:  Correct, meaning a combination of

13 paying and completed payment clients, yes.

14          MR. CUSIO:  Payments and completed.  So, some of

15 these were not making payments any longer.  Were you still

16 -- was LPG still doing work on their behalf?

17          MR. DIAB:  Exactly.  So, we have clients that

18 complete the payments, sometimes early or sometimes on

19 track, but they have -- we have a lot that stretch well

20 beyond the completion of the payment stream.  And, so, we

21 may be handling a lawsuit for a year or two years after the

22 payments are finished.  We regard that as active because we

23 are continuing to do work, but there's no more payments

24 being made by the client.

25          MR. CUSIO:  And did I understand correctly that

136

1  the 400 to 600 California clients LPG still has, they have

2  completed their payment obligations, but LPG still has work

3  to close out those files, is that correct?

4          MR. DIAB:  That's correct.

5          MR. CUSIO:  And then the 67,000 active clients,

6  was that the number at the end of 2022?

7          MR. DIAB:  Yeah, that would have been -- so, that

8  -- that peak would have been somewhere around December 2022,

9  January 2023, that highwater mark.

10         MR. CUSIO:  And you said that a number of clients

11 had decided not to -- had decided -- I'm going to use the

12 word drop out.  That's not the right word but are no longer

13 working either with LPG, Oakstone, CLG or Phoenix, correct?

14         MR. DIAB:  That's correct.

15         MR. CUSIO:  And approximately what percentage of

16 th -- the 67,000 are -- decided to not work with any of

17 those entities?

18         MR. DIAB:  It would be that 5,000 figure that

19 we're aware of, meaning that was known to us before any

20 transfers were completed.  There were also subsequent

21 cancellations by clients who didn't want the transfer and

22 voiced that to the new law firm.  I don't have firm

23 statistics on that, but I would imagine it's probably

24 another 5,000.  So, probably 10,000 total clients out of the

25 67 that opted against transfer, either before or after the

**Exhibit "2"**                                              0203

137

1  transfer was completed.

2          MR. CUSIO:  Okay.  All right.  Just a second.

3  When -- you said that there were about 15,000 files that

4  were associated with Pec. How were those associated with

5  Pec?

6          MR. DIAB:  Pec had obtained some right to

7  receivable from the files, meaning it was entitled to some

8  percentage of the payment stream of those 15,000 clients,

9  and that was by virtue of a combination of receivable

10 purchases that Pec or a related entity had done.  Pec was

11 related to entities under the names 2Z, Carousel, and G2CC,

12 but it was a combination of receivable purchased by Pec and

13 then voluntary agreement between LPG and Pec to assign

14 receivables as a way of making Pec whole and satisfying the

15 obligations that LPG had under its promissory note to Pec

16 Corp.

17         MR. CUSIO:  Okay.

18         MR. DIAB:  What I would style an in-kind transfer.

19 Instead of money paid to Pec Corp., we gave them a right to

20 receivable, and Pec Corp. accepted that as satisfaction of

21 the obligation.

22         MR. CUSIO:  So, Pec received the right to the

23 receivable to get income stream, and then the files were

24 transferred to Oakstone, correct?

25         MR. DIAB:  Correct.  And, just to be clear, it was

**Exhibit "2"**                                                    0204

138

1 a percentage, not the entire payment stream, but a

2 percentage of the payment stream on those files, but that is

3 correct.

4        MR. CUSIO:  There was a UCC1 filed in -- on

5 February 2nd of 2023 by First Corporate Solutions, and it

6 identified your Debtor as the Litigation Practice Group, and

7 it identifies a list of about 15,000 accounts.  Is that the

8 -- or is that list the list of accounts that were the

9 receivables for Pec?

10        MR. DIAB:  I'm not -- I'm not certain, but I

11 believe so.  I know that Pec filed a UCC1.  I didn't know

12 whether they filed it direct or used an agent, but if it was

13 15,000 files listed, then in all likelihood, that was the

14 Pec UCC1 filing.

15        MR. CUSIO:  Is LPG doing anything to oversee the

16 work that Oakstone, CLG or Phoenix are doing?

17        MR. DIAB:  Yes, minimal oversight just by virtue

18 of the fact that we have very few hands on deck at LPG, but

19 we do have access to the CRM's for the three entities to be

20 able to see client files and when clients call in to lodge

21 complaints regarding the new servicing, we're able to see

22 what servicing has been completed and send messages to those

23 law firms about the complaint that we're receiving from the

24 clients.  We continue to have -- so, LPG has the office now

25 with Dan, Olga and Carl.  And, so, a lot of these are coming

Exhibit "2"                                                    0205

139

1  in by way of email.  And, so, we have some clients that will
2  call in and talk with Dan or Olga but other clients that
3  would email and then the message is relayed to the new firm.
4  If it's by email, usually by me, saying client so and so is
5  saying they can't get a call back on this case.  Can you
6  please contact them?  So, we have that minimal oversight and
7  the ability to communicate regarding client concerns, and
8  that's sort of the limit of the participation at this point.
9          MR. CUSIO:  What is -- you mentioned CRM.  What is
10 that?
11         MR. DIAB:  CRM is the -- essentially, it's all the
12 client data that's kept in one location.  The LPG CRM was
13 called Debt Pay Pro.  It was a Centric CRM.  It's network
14 based, and it would house all data regarding the clients.
15 So, it would have the case file.  It would have all the
16 clients' personal data, including credit reports.  It would
17 have their payment information, whatever they were using to
18 make their payments to us.  All the correspondence that we
19 received on behalf of the client or from the client would be
20 stored there.  And then notes are kept on every client
21 communication.  So, every time there's a call, an email or
22 letter, we record the content of the client communication
23 under the note section.  It's sort of a one-stop shop for
24 all information related to the client representation, and
25 each of the other firms also have CRM that performs a

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                                              **0206**

140

1  singular function.  For some you've got (indiscernible).

2  For others they use proprietary systems but we have access

3  to the CRM for each of those three entities with regard to

4  LPG clients.

5          MR. CUSIO:  Did Debt Pay Pro track money that was

6  pulled from the clients' accounts?

7          MR. DIAB:  Yes.  Debt Pay Pro had a system for

8  tracking client payment information.  The payment processes

9  were either API'd into Debt Pay Pro so that the payment

10 processor would speak to Debt Pay Pro directly and

11 automatically update client information.  Others who didn't

12 have that direct connection would send information in TSC

13 files, Excel files, and then would take that data and

14 populate it into Debt Pay Pro.  But, either way, the client

15 payment information was updated in Debt Pay Pro using one

16 method or the other.

17          MR. CUSIO:  And does LPG still have Debt Pay Pro?

18          MR. DIAB:  Our access to Debt Pay Pro was cut off

19 at the time that we filed the petition.  DebtProPay

20 terminated our access just before the filing of the

21 petition, if memory serves.  I think they had terminated

22 access on Friday afternoon, and we filed the petition on

23 Monday, but we had not had access to our DebtPayPro since

24 that time, although we did have a backup with all of the

25 DebtPayPro data that we can still access, but we're

141

1  accessing the backup that was pulled (indiscernible)

2  DebtPayPro has as of I think it's March 17th.

3          MR. CUSIO:  What is the CRM that Oakstone uses?

4          MR. DIAB:  Oakstone was using a combination of

5  Freshworks and Freshsales which are CRM's that Eng had

6  found.  Eng is from Pec Corp.  He had found those as

7  platforms that he liked, and then they were also using a

8  proprietary system that -- that is not a public CRM.  It's

9  available for purchase.  So, they had the combination of the

10 proprietary system and then this Freshworks, Freshsales, and

11 then Eng was also building his own CRM, although I think

12 that project has now stopped, and but that's what Oakstone

13 was using.  CLG uses DebtPayPro, and it's a very similar

14 platform to the DebtPayPro version that we were using.  So,

15 DebtPayPro was very convenient.

16         MR. CUSIO:  And then what does Phoenix use as a

17 CRM?

18         MR. DIAB:  They use the same proprietary system.

19 So, the Oakstone system is a combination of Freshworks,

20 Freshsales.  It is a proprietary system.  Phoenix is just

21 using that proprietary CRM system that was written by

22 developers at -- at Phoenix.

23         MR. CUSIO:  And, so, Phoenix is sharing its system

24 with Oakstone?  Is that what I understand, the proprietary

25 system?

142

1        MR. DIAB:  Yeah.  I mean, I believe that Oakstone

2   pays for a license to utilize that CRM right now, but that's

3   correct that it's -- in part, because Oakstone is using

4   other platforms as well, but in part, they're utilizing that

5   system.

6        MR. CUSIO:  Who is Israel Orozco, O-R-O-Z-C-O?

7        MR. DIAB:  He was one of the attorneys at LPG.  He

8   was a California licensed attorney.  And, so, he had worked

9   on the California docket of cases at LPG.  He also had

10  helped with some of the FDCPA cases that another attorney,

11  Richard Meyer (phonetic), was handling at -- at LPG.  But he

12  is a California attorney.

13       MR. CUSIO:  And when did he stop working for LPG?

14       MR. DIAB:  So, formally he stopped in March along

15  with everybody else, but I think even to the present day he

16  continues to consult with Dan regarding matters.  He's

17  finishing out client files even though he's not being paid

18  because he's counsel of record in the cases, and I think he

19  still communicates with Dan about his California docket to

20  make sure each one of those cases is concluded.  I'm not

21  sure how many he was still handling, but my understanding is

22  he was still working on them as recent as last week, but his

23  formal employment ended in -- sometime in March, along with

24  everybody else.

25       MR. CUSIO:  How many lawyers are working for LPG

**Exhibit "2"**                                    0209

143

1 in that kind of context?

2          MR. DIAB:  Well, that's a good question.  So, how

3 many of the lawyers are still handling cases even though

4 they're not being compensated?  I think that's -- probably a

5 lot of the attorneys that were employed by LPG are finishing

6 out cases that had been assigned before the termination of

7 their employment or before they quit, and that's obviously

8 because of the Rules of Professional Conduct in every state

9 that limit the circumstances in which an attorney can

10 withdraw from a case.  And if you've got a $2,000 collection

11 case, the judge doesn't want to see a motion to withdraw.

12 They want to see a settlement.  So, I think it's probably a

13 fair number, although I don't have statistics on that.

14          MR. CUSIO:  On the 15,000 client files that Pec

15 had an interest in the receivables for, what is the document

16 that shows Pec had that interest in those specific -- those

17 specific client files?

18          MR. DIAB:  I believe it was a receivable purchase

19 agreement that was executed as satisfaction of the

20 promissory note that LPG had given to Pec Corp, but the

21 actual document itself would have been style a receivable

22 purchase agreement.

23          MR. CUSIO:  What is Grayson Law Center?

24          MR. DIAB:  Grayson was one of the platforms that

25 Eng had been throwing around as a potential other platform

144

1 to onboard clients. My understanding is they're not

2 operational. In fact, I believe that with all of the

3 accusations that were being made against Oakstone, the

4 thought was that new clients would be onboarded to a

5 different platform and not commingled with the LPG pipeline,

6 but that was a plan that my understanding hadn't gotten off

7 the ground to date, and I don't believe that they're still

8 trying to get that off the ground. That would -- that would

9 be the function that it was supposed to serve, for new

10 clients that are unrelated to any LPG transfer.

11       MR. CUSIO: Back in about October, there was a

12 transfer of receivables to StratCap (phonetic). Why were

13 those receivables transferred to StratCap?

14       MR. DIAB: There was no receivable transferred to

15 StratCap. StratCap had sent an agreement to try to document

16 receivable purchases for the files that Validation Partners

17 had purportedly acquired, and I say purported because it was

18 an open question about whether Validation Partners had

19 documented all of the receivables that they had actually

20 purchased. And, so, Russ put together the list of what he

21 thought were all the Validation Partners' receivables that

22 were purchased. He wanted to execute a document and file a

23 UCC1 to sort of preserve the position of the Validation

24 Partners Investors, but he immediately upon filing, he

25 received objections from every different direction, and we

145

1  never proceeded with the agreement, meaning he never paid

2  the consideration that was due.  He never received any

3  payments on those files.  The actual transfer never took

4  place, but at least his desire to do a UCC1 filing to

5  perfect the interest in those files, in order to do so, you

6  have to have an underlying security agreement.  His fear was

7  lawsuits on individual investors claiming that Wes and Russ

8  as the co-managers of Validation Partners had failed to

9  fulfill their fiduciary duty because they had taken in

10 almost 70, 80 million dollars worth of money to buy

11 receivables, but they didn't perfect a single receivable

12 purchase.  And in that sense, in a proceeding like this,

13 they're treated as unsecured creditors, and Russ thought

14 that would create substantial liability for him as an

15 individual.  At that point in time, Russ had essentially

16 kicked Wes out of Validation Partners.  So, Wes couldn't do

17 anything to help Validation Partners perfect the interest of

18 the investors.  So, Wes was trying to do that but failed,

19 but he never received any payment pursuant to that

20 agreement.  He never paid the consideration called for by

21 the agreement.  In my understanding, he was withdrawing his

22 UCC1 filing, although I don't know if that's happened to

23 date.

24         MR. CUSIO:  After Mr. Thompson stopped being the

25 member of Litigation Practice Group, did he continue doing

146

1 work for Litigation Practice Group?

2        MR. DIAB:  He was listed as counsel of record on

3 certain cases.  And, in his position as counsel of record, I

4 don't know that he withdrew immediately upon relinquishing

5 his title of managing shareholder.  So, there was probably

6 matters that were active and lingered a few months after his

7 transition out as the head attorney at LPG.  But, again,

8 when you're listed on a docket, you'll stay there until some

9 form of motion is made, but I don't believe he engaged in

10 any actual after (indiscernible) after he transferred his

11 shares to Dan.

12        MR. CUSIO:  Did he continue to have access to an

13 LPG email account?

14        MR. DIAB:  I believe he did, and I believe he

15 still had access to the CRM.  I don't know that he ever

16 utilized it, but I believe he still did have some form of

17 login.  I don't know that John ever actually logged in,

18 though.

19        MR. CUSIO:  I want to make sure I got this

20 correct.  Did you say that Scott Eadie is the owner of

21 Oakstone?

22        MR. DIAB:  Correct.  My understanding is he is

23 sole shareholder and managing attorney for Oakstone.  So,

24 he'd be the sole owner.

25     (Pause.)

147

1          MR. CUSIO:  Did LPG default on its note with Pec?

2          MR. DIAB:  No.  LPG was still in compliance with

3 the terms of the Pec note at the time that it negotiated the

4 satisfaction of the note by virtue of the receivable

5 assignment.

6          MR. CUSIO:  Now, the -- you were asked some

7 questions about this earlier.  There's $120 million that's

8 listed in -- as accounts receivable over the last 90 days.

9 As I understand what you explained, that $120 million was

10 your expectation of the 20 percent -- the 20 to 40 percent,

11 20 percent with Oakstone and Phoenix and 40 percent with

12 CLG, that you expect LPG is going to receive, correct?

13         MR. DIAB:  Correct.

14         MR. CUSIO:  And then you had said that it's now

15 closer to 60?

16         MR. DIAB:  Correct.  Both were estimates.  And, as

17 you said, the strike between the 120 figure and the 60

18 figure is fallout from the transfer.  It resulted in a lot

19 more nonperformance than we anticipated.  Nonperformance

20 meaning a combination of cancellations and then clients that

21 aren't responsive and not making payments, which is

22 potentially going to turn into a cancellation.

23         MR. CUSIO:  So, when you mentioned the

24 approximately 10,000 cancellation, that was just official

25 cancellations?  Is that what I understand?

148

1        MR. DIAB:  Correct.  It doesn't include what I'll
2   call an NSF client, a client who had a bounced payment and
3   hasn't made an election of whether they're terminating the
4   agreement or not.  That number would be much larger,
5   probably another six to eight thousand clients, rough
6   estimate, but probably something like six to eight thousand
7   that are not performing and not responding.
8        MR. CUSIO:  So, if -- but if you had estimated 120
9   and now you're saying it's 60 million, that's about a 50
10  percent drop, right?
11       MR. DIAB:  Roughly 50 percent drop, correct.
12       MR. CUSIO:  But that only represents about 20,000
13  clients?
14       MR. DIAB:  Correct, and there were probably I
15  would say in the neighborhood of the high 40's, low 50's in
16  terms of performing clients at the time that -- that all
17  this began, so probably maybe about 40 percent of the
18  clients that would be in that nonperforming category, 40
19  percent of the formerly performing that are now not
20  performing.
21       In terms of determining receivable, though, some
22  clients are early in their contract and some are late.  And,
23  so, not every cancellation is going to have the same dollar
24  value.  A client that has two payments left versus a client
25  that has 20 payments left, I think would be weighted

**Exhibit "2"**                                                0215

149

1  differently.  But those are rough estimates.  They're not

2  precise figures.

3        MR. CUSIO:  Okay.  I -- sorry.  Hold on just a

4  second.  Are -- Mr. Diab, are you an owner of Validation

5  Partners?

6        MR. DIAB:  No.  I was -- so, Validation Partners

7  was owned by a couple of entities.  One of the entities was

8  StratCap, which is an entity that West Thomas owns, and Wes

9  sort of cut me into half of his entity, but I'm not myself

10 or through any entity that I own an owner in StratCap, which

11 is the indirect owner of Validation Partners, but I was

12 treated as the same thing, meaning, I was treated as though

13 I was essentially like one-quarter of Validation Partners.

14 That was from the beginning of Validation Partners, they

15 would treat me in that capacity and in that sense, sort of

16 an informal participant for Validation Partners.

17       MR. CUSIO:  What do you mean you were treated as

18 an owner, a 25 percent owner?

19       MR. DIAB:  Meaning I didn't actually -- sorry.

20 Meaning I didn't actually own anything.  There's nothing I

21 could sell.  I can't go to the bank and send a wire.  I

22 can't sign a document.  I can't sell a share, but I was

23 treated as though I could.  I was treated as though I was

24 one-fourth of the same, and Russ, to his credit, was always

25 very gracious in treating me in that same manner, as though

150

1 I were an actual owner, somebody who could actually do

2 something like sell a share, send a transfer.  So, that's

3 what I mean by informal.

4 　　　MR. CUSIO:  Was Pec's promissory note with LPG

5 perfected?

6 　　　MR. DIAB:  My understanding is that he did perfect

7 with the filing of the UCC.  I don't think that he filed it

8 under Pec Corp.  I think he filed it using an agent like a

9 CT Corp., but my understanding is that he did perfect it by

10 filing a UCC1.

11 　　(Pause.)

12 　　　MR. CUSIO:  Okay.  I do not have additional

13 questions at this point.

14 　　　MR. EDELMAN (telephonic):  This is Daniel Edelman.

15 I represent Carolyn Beach in the Mississippi litigation, and

16 I have some questions.

17 　　　When Validation Partners' counsel was asking

18 questions, he referred to merchant cash advance companies.

19 Can you explain what these companies did and identify them?

20 　　　MR. DIAB:  Yes.  So, merchant cash advance is a

21 receivable purchase.  It's styled a cash advance, but it's

22 actually just a purchase of receivables where the company

23 will buy a receivable at a factor rate.  A common factor

24 rate is a 149.  So, we would sell those dollars in

25 receivables.  We would receive them -- sorry.  We would sell

151

1  (indiscernible) in receivables.  We would only receive a

2  million dollars but have to pay $1.5 million.  So cash

3  advance is an expensive form of financing.  It almost always

4  takes the form of receivable purchase and comes along with

5  UCC1 filings and any enforcement mechanisms that are

6  available under Article 9 of he Uniform Commercial Code.  A

7  merchant cash advance companies -- sorry.  One step back.

8            LPG throughout its history has never been able to

9  qualify for financing from financial institutions, likely

10 because of the conflict of interest because we have

11 litigations for both plaintiff and defendant with every bank

12 in the country and almost every credit union.  And, so, we

13 really don't have the option to do financing through any

14 means other than receivable purchase.  Validation Partners

15 was a receivable purchase entity, but these cash advance

16 companies out of New York are also receivable purchasers,

17 and so the -- the names of receivable purchasers in New York

18 that we interacted with, World Global Fund was a large one,

19 Diverse Capital, Bridge Funding, Highbar Capital, Cobalt --

20           MR. EDELMAN:  I'm sorry.  What's the one you just

21 said?

22           MR. DIAB:  Highbar Capital, and then after that I

23 said Cobalt Funding Solutions, Cobalt, C-O-B-A-L-T.  There

24 was Clear Fund Solutions.  There was Clean Funding.

25           MR. EDELMAN:  Clean Funding?

152

1          MR. DIAB:   -- Capital -- yes, Clean Funding, Park

2   East Capital, EIN Capital.

3          MR. EDELMAN:   Can you spell -- what is this EIN

4   entity?

5          MR. DIAB:   EIN Capital, like an EIN number, is for

6   identification, but it was called EIN and then second word

7   Capital.

8          MR. EDELMAN:   Okay.

9          MR. DIAB:   There was Fundura, F-U-N-D-U-R-A.

10  There was MNS Funding, just the letters MNS and the second

11  word Funding.  There was Vertex, V-E-R-T-E-X.  And then I'm

12  trying to think of additional ones.  Green Fund was an

13  additional one.  And then MCA Cap, just the letters MCA and

14  then second word CAP.  I believe that's all of them -- I'm

15  sorry.  One more with a litigation in Florida, .69, LLC.

16         MR. EDELMAN:   .69, LLC.  Is there a list of the

17  names and addresses of these entities some place?

18         MR. DIAB:   Yeah.  The UCC1 filing in California,

19  the California Secretary of State maintains a listing of all

20  the UCC1's that were filed.  Each one of these cash advance

21  companies had filed a UCC.  Some are active.  Some are

22  terminated, but you'll see the exhaustive list there, and I

23  may have left some off.

24         MR. EDELMAN:   Okay.  You also mentioned some

25  receivable purchases.  Other than the merchant cash advance

Case 8:23-ap-01046-SC    Doc -1    Filed 07/12/23    Entered 07/12/23 13:49:48    Desc
Exhibit # 1 - 12    Page 222 of 584

153

1 companies, to whom did LPG sell receivables?

2       MR. DIAB:  So, LPG had I believe two different

3 receivable purchase agreements with Validation Partners,

4 LLC.  Validation Partners only attached one such agreement

5 to their complaint, but I believe that there is a second.

6 We're reviewing our records.  So, we had twice sold

7 receivables ourselves, meaning LPG sold receivables to

8 Validation Partners.  There was also a receivable assignment

9 to Pec Corporation.  It wasn't in exchange for money.  It

10 was in exchange for satisfaction of a promissory note, but

11 there was a conveyance of receivables to Pec Corporation.

12 And then that would be it in terms of the actual receivables

13 that LPG sold.

14       There were also receivables that parties that LPG

15 interacted with, they would also sell their receivables, but

16 that wasn't a contract with LPG.  That's a contract with a

17 third party, usually third party marketing companies, but

18 that's not -- not us.

19       MR. EDELMAN:  Okay.  What are these marketing

20 companies to which you refer?

21       MR. DIAB:  These are companies that locate and

22 onboard clients for LPG.  So, somebody opts in to receive,

23 you know, assistance with their debt, they get on the phone

24 with somebody.  They start talking through options, and the

25 person will say that LPG is a good fit based on your

**Exhibit "2"**                                                    0220

154

1  circumstances, and then there's compensation for the cost of

2  the lead, for the time spent on the phones, for the customer

3  service function that's provided after the sale.  These

4  companies would follow up and communicate with clients,

5  quality assurance and quality control measures.  So, they're

6  compensated for all these things.  We refer to them as

7  marketing affiliates, but they're essentially sales floors

8  that -- that do marketing for LPG.

9          MR. EDELMAN:  How many of these marketing

10 companies or affiliates are there?

11         MR. DIAB:  Over the years, we've had probably more

12 than 100 that we've worked with.  Some of them have sent

13 just one client.  Some have sent 10,000.  But there's a lot

14 of different companies we've worked with.  A lot of times

15 the companies will approach us and say essentially we'd like

16 to do work.  We'd strike an agreement.  It lasts for a

17 certain period of time.  There's a lot of turnover.  So,

18 these marketing companies usually will run campaigns for a

19 period of time and then move on to something else, but well

20 over 100 that we've worked with over the course of our years

21 of existence.

22         MR. EDELMAN:  Is there a list of these marketing

23 companies somewhere?

24         MR. DIAB:  Yeah.  LPG -- we -- we maintain a list,

25 and that's something we could provide if we needed to.

**Exhibit "2"**                                        0221

155

1          MR. EDELMAN:  Okay.  What is the general
2  compensation arrangement between LPG and the marketing
3  companies?
4          MR. DIAB:  It's changed over the years.  We record
5  different models.  But typically we're paying for the work
6  that's done in onboarding clients, and that -- that
7  onboarding function sometimes there will be additional
8  follow up after the contract is signed and the client is
9  enrolled.  But, essentially for -- it's payment for all the
10 different services that are rendered.  It starts with the
11 lead itself.  Then there's the sales function, which is
12 hourly time on the phone that he sells that to the clients,
13 and then there's the function after the sale, which is the
14 QA function, the QC function, ensuring that the client
15 understood what they signed up for, doing follow-up calls
16 several days later to reiterate what it is that they've
17 signed up for, how it works.  It's compensation for all
18 these different functions that it performed.
19         MR. EDELMAN:  Do the marketing companies transmit
20 the LPG client agreement to the client?
21         MR. DIAB:  The LPG CRM's that would transmit the
22 agreement.  So, there were employees, and there were
23 contractors that were inside of the CRM generating and
24 sending these e-signature documents to clients, and some of
25 them -- some of these contractors may have been marketing

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                                                    0222

156

1  companies.  That's correct.

2          MR. EDELMAN:  Okay.  Did the marketing companies

3  receive a percentage of the revenue stream from the client

4  or a fixed amount of money for a lead or how did that work?

5          MR. DIAB:  So, over the course of the five years

6  or so that we ran this, whether it was through LPG or

7  through predecessor law firms, essentially we would employ

8  different models.  Some of them are flat fees.  Some of them

9  are a percentage of the debt that's enrolled, and some of

10 them were a percentage of the revenue stream, which we're

11 not doing at this time.  We're not doing any onboarding at

12 this time, but we have tried to get away from that model,

13 but over the years of doing business, we've pegged it to

14 every different variable there is.

15         To your point, to be direct, there were times when

16 we were paying a percentage of the receivable.

17         MR. EDELMAN:  Do you recall who the largest

18 marketing companies were?

19         MR. DIAB:  I believe the largest was All Service

20 Financial, who I think is also on the phone through counsel,

21 has a dispute with us.  And I think in the end, All Service

22 is the biggest (indiscernible) that was a really sizable

23 litigating, GoFi, GoFi, G-O-F-I, and they are multiple

24 companies.  And they were also sizable kind of enrollments.

25         MR. EDELMAN:  And who were the one or two that you

157

1  mentioned previously?

2          MR. DIAB:  I'm sorry.  Could you say that again?

3          MR. EDELMAN:  Before GoFi, you mentioned one or

4  two large marketing companies.

5          MR. DIAB:  Yes, all --

6          MR. EDELMAN:  Can you repeat that?

7          MR. DIAB:  -- Service Financial.  Yeah.  So, it

8  was three words, All Service Financial.  They were the first

9  really large marketing company we worked with, and I think

10 they're still the largest today out of everybody.

11         MR. EDELMAN:  And that's the letter L Service

12 Financial?

13         MR. DIAB:  No.  All, so A-L-L, All Service

14 Financial.

15         MR. EDELMAN:  Oh, All.  Okay.  And what's your

16 third one?

17         MR. DIAB:  Those would be the two largest.  I

18 would say the next largest was a company called Paragon

19 Financial.  Paragon spelled P-A-R-A-G-O-N, and Paragon also

20 was -- was very sizable in terms of the onboarding that they

21 did, probably be the third largest.

22         MR. EDELMAN:  Do you know -- do you recall how

23 GoFi was compensated?

24         MR. DIAB:  GoFi never had a contract with LPG.  We

25 never formalized the terms, but they would receive a one-

158

1   time payment for the service of onboarding a client, the

2   payment range on the low end maybe $1100, on the high end

3   maybe $1640, $1700, or something in that range for the

4   service of getting a client from the point of lead to sale

5   to onboarding.  But we never had a formal agreement.

6           MR. EDELMAN:  Okay.  How was All Service Financial

7   compensated?

8           MR. DIAB:  At the time that All Service did its

9   agreement, a gentleman who's now passed away, named Brian

10  Really managed that relationship, and I don't know the terms

11  that were worked out with All Service, but that was back in

12  the Coast Processing days, so when BAD was still actively

13  managing a lot of these marketing relationships, and I

14  believe that Brian had worked out a share between Coast

15  Processing and All Service, but that's all conjecture on my

16  part.

17          MR. EDELMAN:  And Paragon Financial, how were they

18  compensated?

19          MR. DIAB:  GoFi and the same sort of arrangement

20  where LPG never had a contract with them, but we would work

21  through month by month in terms of compensation for the

22  service that they were actually performing, and the Paragon

23  relationship probably started in November of 2021 and

24  probably ended November of 2022.  I don't think we've

25  received anything from them since.

159

1        MR. EDELMAN:  Does the name Integrity Docs, LLC

2  mean anything in terms of relationship with LPG?

3        MR. DIAB:  Yeah.  Integrity Docs is a marketing

4  company that we've worked with at certain points in time.  I

5  believe I know the principal of Integrity, but I know that

6  Integrity was a marketing company, yes.

7        MR. EDELMAN:  Do you know how they were

8  compensated?

9        MR. DIAB:  That I don't know.  I know that they

10  were small, meaning they didn't do a lot of volume.  They

11  didn't have a ton of -- of clients, but they did onboard

12  clients, and I don't know the terms that they had.

13        MR. EDELMAN:  Does the name Vercy, V-E-R-C-Y, LLC

14  mean anything to you?

15        MR. DIAB:  Yes.  Vercy like Integrity, was an

16  affiliate that onboarded.  They onboarded around the same

17  time that Integrity was doing so, and generally they had a

18  -- essentially, it was an arrangement where they were paid

19  up front for the work that they did, but I don't know the

20  exact terms for Vercy's contract.

21        MR. EDELMAN:  Okay.  Does the name Debt Validation

22  Fund 2, LLC mean anything to you?

23        MR. DIAB:  Yeah.  I believe that that's the fund

24  that Dave Zuck managed.  They raised money and gave money to

25  Validation Partners to purchase receivables.  I believe

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                                        0226

160

1  that's the entity.

2          MR. EDELMAN:  Okay.  Is there a Debt Validation

3  Fund 1?

4          MR. DIAB:  Yes.  Debt -- again, if I remember

5  correct, Debt Validation Fund 1 would have been a direct

6  purchase of receivables that Dave Zuck did with Coast

7  Processing at the time where they would purchase I believe

8  it was All Service Financial clients and receive the

9  receivable from those clients in exchange for a payment that

10 was made, but that was not through Validation Partners.

11 That was something Direct that Dave did or his fund did with

12 the Coast Processing entity, if memory serves.

13         MR. EDELMAN:  Does the name MCDVI Fund 1 and 2,

14 LLC mean anything to you?

15         MR. DIAB:  Yes.  That would be the entities

16 managed by Ryan and Sean McKenna.  They had made investments

17 into Validation Partners, same purpose.

18     (Pause.)

19         MR. EDELMAN:  Does the name Flight Form, LLC mean

20 anything to you?

21         MR. DIAB:  Yes.  That was an entity that Eng Taing

22 had formed for the purpose of developing technologies that

23 would service clients in this industry.  It never got off

24 the ground.  My understanding is it never had any

25 transactions, never did any development.  It was identified

161

1  in a deposition that was taken in late January.  And, as a
2  result, Eng I think decided not to proceed with that
3  project, but that was a -- a company that he had formed for
4  the purpose of developing tech related to this industry,
5  this industry being unsecured debt.
6          MR. EDELMAN:  Does the name City Capital New York
7  mean anything?
8          MR. DIAB:  Yeah.  So, City Capital was a multi
9  cash advance company that issued I believe the -- the last
10 of all the cash advances.  That cash advance would have been
11 in February of this year, 2023, and they were a creditor,
12 received one payment, and then the filing took place, and
13 they're -- they're currently a creditor of LPG.
14         MR. EDELMAN:  Are there documents or files which
15 show the terms of LPG's dealings with these various merchant
16 cash advance companies?
17         MR. DIAB:  Yes.  For each one we have a receivable
18 purchase agreement that was executed.  Those receivable
19 purchase agreements have a security instrument underlying
20 the UCC1 filings for these entities, and we have those for
21 each one of the entities that I've referenced.
22         MR. EDELMAN:  Those are all the questions that I
23 have.
24         MR. KHANG:  Queenie, this is Joon Khang --
25         MS. SCHULMAN:  This is Amy Schulman from

162

1  Pennsylvania --

2          MR. KHANG:  We've been going for

3  about --

4          MS. SCHULMAN:  -- the Attorney General --

5          MR. KHANG:  Hold on.  Hold on.

6          TRUSTEE NG:  Mr. Kahn, go ahead.

7          MR. KHANG:  I have a question real quick.  This is

8  Joon Khang.  Yeah, we've been going for about three and a

9  half hours.  I don't know how many more creditors are on the

10 line who are going to ask more questions.  But I didn't

11 anticipate we were going to be on this call all day.

12         Is there any point that we can either cut this off

13 or continue this meeting, because, you know, unfortunately,

14 there are other matters that need to be tended to today as

15 well.  So, Queenie, is there something we can do about that?

16         TRUSTEE NG:  Well, I would like to give, you know,

17 other creditors a chance to ask questions today because

18 they --

19         MR. KHANG:  Right.

20         TRUSTEE NG:  -- waited for a long time, and I

21 think it's only, you know, the fair thing to do.  Can I just

22 get an idea of how many creditors are planning to ask

23 questions?  I know the Attorney General just --

24         MS. SCHULMAN:  Amy Schulman from the Attorney

25 General's Office in Pennsylvania.  I have just a few quick

*Briggs Reporting Company, Inc.*

163

1  questions.

2          TRUSTEE NG:   Okay.   And anyone else intends to ask
3  questions?

4          MR. STOCKHOLD:   Yeah.   This is Matthew Stockhold
5  on behalf of Debt Validation Fund 2, MCDVI Fund 1 and MCDVI
6  Fund 2.   I have a few follow-up questions on the schedules.

7          TRUSTEE NG:   Okay.   Anyone else?

8          MR. WHITE:   And then this is Frank White.   I
9  represent Maverick Bank Card.   I have just a small handful
10 of questions for Mr. Diab.

11         TRUSTEE NG:   Okay.   All right.   Anyone else?

12     (No response.)

13         TRUSTEE NG:   So, I think, Joon, there are only
14 three more creditors who would like to ask questions.   If
15 your client needs a break, a short break, I'll be happy to
16 do that.   Do you -- is that what you need or, otherwise, we
17 can just go ahead and, you know, ask -- let those three
18 creditors ask questions since they waited a long time as
19 well.

20         MR. DIAB:   I would prefer to just finish the
21 questions.   I don't need a break at this time.

22         TRUSTEE NG:   Okay.   Why don't we go from the order
23 of --

24         MR. MARCH:   Okay.   All right.   Let's go forward,
25 yeah.

**Exhibit "2"**                                    0230

164

1        TRUSTEE NG:  Okay.  Thank you so much.

2        MR. WHITE:  This is Frank White.  I have a small

3   handful of questions, and also I have to drop off in about

4   15 minutes.  I'm wondering if everyone can indulge and let

5   me go first.  It won't take more than a couple of minutes.

6        TRUSTEE NG:  That's fine with me.  I hope that's

7   fine with the Debtor as well.

8        MR. KHANG:  That's fine.

9        TRUSTEE NG:  Thank you so much, Counsel.

10        MR. WHITE:  Thank you.

11        Mr. Diab, again, my name is Frank White.  I

12   represent a company called Maverick Bank Card, which at

13   least until the petition date was doing some volume of

14   credit card processing for the Debtor.  I'm just wondering

15   if you're familiar with that relationship?

16        MR. DIAB:  Yes.  My understanding is that Maverick

17   would do the actual processing that approved the EquiPay and

18   was just a broker sitting in between, but I'm familiar with

19   Maverick, yes.

20        MR. WHITE:  Okay.  And are you aware whether the

21   Debtor is currently doing any processing through Maverick at

22   all?

23        MR. DIAB:  Zero processing as of March the 20th.

24   Should be zero processing.

25        MR. WHITE:  Okay.  Is there any reason why that --

165

1  the processing agreement between the Debtor and Maverick

2  can't be consensually rejected?

3           MR. DIAB:  I don't see any reason, no.

4           MR. WHITE:  Okay.  Then I'll just -- I'll reach

5  out to Mr. Khang later this week to see if we can't just

6  consensually arrange for that.  That's all I needed to know.

7  Thank you.

8           MR. DIAB:  Thank you.

9           MS. SCHULMAN:  If anyone wouldn't mind, this is

10 Amy Schulman from the Attorney General's Office.  I just

11 have some very quick questions, and I also have to jump off

12 the -- as well.

13          TRUSTEE NG:  Go ahead, Ms. Schulman.

14          MS. SCHULMAN:  Okay.  So, again, I'm calling from

15 the Pennsylvania Attorney General's Office here in

16 Pennsylvania, and we have received several complaints from

17 consumers who allege they paid LPG for debt settlement

18 services that were not provided.  So, I have a few questions

19 stemming from this.  Number one, where should we be sending

20 the complaints?  We had previously sent them to LPG for

21 purposes of mediation, and those complaints were not

22 responded to, and I would like to get a response to those

23 complaints.

24          MR. DIAB:  The best is if you could send it by

25 email.  Is that possible if I give you an email address?

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                                    0232

166

1          MS. SCHULMAN:  Okay.  Should I send them to --
2  yes, you or your counsel, just --
3          MR. DIAB:  If it's okay, it would be direct to us,
4  and it would be attention to Dan March and Tony Diab, and it
5  would be the email address, admin, A-D-M-I-N, @lpglaw.com.
6          MS. SCHULMAN:  Okay.  Next question, given the
7  fact that these accounts have largely been -- have been
8  transferred, can you identify the affiliated law firms here
9  in Pennsylvania that have received transfer of Pennsylvania
10 accounts?
11         MR. DIAB:  The -- the attorneys that are licensed
12 in the State of Pennsylvania that would be handling the
13 accounts from this universe of cases would be Jordan Kurth
14 (phonetic), Kelly Adams --
15         MS. SCHULMAN:  Can you -- I'm sorry.  Can you
16 spell these?
17         MR. DIAB:  Yes.  So, Jordan, J-O-R-D-A-N, Kurth,
18 K-U-R-T-H.  He's the first.  Kelly Adams is the second, K-E-
19 L-L-Y and then Adams, A-D-A-M-S.  The third would be Robert
20 Tobia.  Last name is spelled T-O-B-I-A.  And then the fourth
21 would be -- give me one second.
22     (Pause.)
23         MS. SCHULMAN:  And if you don't have the names, I
24 can follow up by way of email.  I don't want to hold
25 everyone up.

**Exhibit "2"**                                                0233

167

1       MR. DIAB:  So, for the fourth one, I'll follow up
2  by email in response, yes.
3       MS. SCHULMAN:  Okay.
4       MR. DIAB:  Thank you.
5       MS. SCHULMAN:  Next quick question.  Did anyone
6  from LPG ever meet in person or face to face with
7  Pennsylvania consumers in connection with these debt
8  settlement services?
9       MR. DIAB:  Yes.  Employee Jordan Kurth, our
10 attorney in the State of Pennsylvania, would have had a lot
11 of face-to-face meetings.  It would not have been with every
12 Pennsylvania client but with a certain portion of that
13 population.  So, Jordan would be the only LPG employee to
14 have met face to face.  There was a contractor, the fourth
15 law firm, that I can't recall at the moment.  They would
16 also have had meetings, but they were contractors of LPG,
17 not employees.
18      MS. SCHULMAN:  Okay.  Do you have any sense of how
19 many of the accounts entered into with LPG were with
20 Pennsylvania consumers?
21      MR. DIAB:  I would say the Pennsylvania pipeline,
22 again, at its peak was probably -- probably 2,000 to 2500
23 clients I would imagine, no more than that.
24      MS. SCHULMAN:  And I just want to confirm that LPG
25 is no longer soliciting business in Pennsylvania, is that

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                                      0234

168

1  correct?

2          MR. DIAB:  That's correct.

3          MS. SCHULMAN:  Okay.  And those are all my

4  questions today.  If for some reason additional questions

5  come to mind I'll reach out to that address at

6  admin@lpq.com.  Thank you everyone.  I really appreciate it.

7          TRUSTEE NG:  Thank you.  Thank you, Ms. Schulman.

8          MR. STOCKHOLD:  Hi.  This is Matt Stockhold

9  appearing on behalf of Debt Validation Fund 2, MCDVI Fund 1,

10  and MCDVI Fund 2.  I have a few follow-up questions.

11         On Schedule B, going back to the receivables for

12  $120 million, was any portion of that included in the $155

13  million dollar amount of revenue reported for 2022?

14         MR. DIAB:  No.  It should not have been.  It

15  should have been separate from that.

16         MR. STOCKHOLD:  And, along the same lines, is any

17  of that amount reported as part of the $30 million for the

18  first three months of 2023?

19         MR. DIAB:  Yes.  So, part of what was collected in

20  -- in 2023 may have overlapped with the $120 million figure.

21  The exact dollar amount of overlap I'm not sure, but there

22  would have been some overlap, yes.

23         MR. STOCKHOLD:  On the statement of financial

24  affairs, it says the gross income for the first three months

25  was $30 million.  Is that accurate?

169

1           MR. DIAB:   Correct.   But included in that figure

2   is payments processed by Merrich Bine and retained by

3   Merrich Bine and not sent to LPG.

4           MR. STOCKHOLD:   And of those amounts, are those

5   included in the receivables?

6           MR. DIAB:   There would have been some overlap

7   between the receivable quote of $120 million and payments

8   that would have been collected in March, but the amount of

9   overlap I'm not sure, but they would have been sent.

10          MR. STOCKHOLD:   Also on Schedule B you listed

11  $120,000 for a customer list.   What's the basis for that?

12          MR. DIAB:   So, in terms of viewing what LPG has as

13  a -- as an asset, something potentially of value, when you

14  review the matter, one thing that LPG possesses are client

15  data for clients that did not sign up for LPG services,

16  people that were in one way or another sold but didn't sign

17  up.   And, so, if we were to take that data, pool it and sell

18  it, we think that the estimated value would be $120,000.   We

19  don't think the State Bar would let us do it, but we

20  reported that as a potential asset since we didn't have time

21  to resolve the question of whether that type of sale of opt-

22  in data was permissible, but that's what we're referring to

23  would be a sale of leads of people that did not sign up for

24  client -- for LPG services, but we have their opt-in to

25  receive solicitation regarding debt resolution.

170

1      MR. STOCKHOLD:  Did you obtain an appraisal of the

2  value of that list or is that something that you determined

3  internally?

4      MR. DIAB:  That's based on what marketing

5  companies tell us they would pay for records for opt-in

6  methods, meaning a client that is saying they want help with

7  unsecured debt.  This is what you would do, for instance,

8  pay for records, but it was determined by us anecdotally.

9  It was not appraised.

10      MR. STOCKHOLD:  On Schedule D, which lists

11  creditors who have secured claims, the first creditor on the

12  list is Diverse Capital, LLC in the amount of approximately

13  $1.2 million.  What's the basis for this claim?

14      MR. DIAB:  We -- we dispute the claim, but Diverse

15  Capital has entered into a settlement agreement with LPG.

16  LPG believes that it performed under the settlement

17  agreement.  Diverse believes that we did not perform.  And

18  on the basis of nonperformance, the original obligations

19  spring back into existence.  And, so, they're saying the

20  balance due after applying all payments on the

21  (indiscernible) is that $1.1, $1.2 million figure, but that

22  is predicated on a breach of the settlement agreement, and

23  we deny that there was any breach of that agreement, but

24  that's where they calculate the figure.  That's what would

25  be left over after applying all payments, including

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                                        0237

171

1 settlement payments, to the original contractual obligation.

2 The balance owed would be that number that they quoted.

3       MR. WHITE:  Did they file a UCC1 financing

4 statement?

5       MR. DIAB:  Diverse did.  They filed it I believe

6 in December of 2021, but they filed it long ago.

7       MR. WHITE:  Do you know what they listed as

8 collateral in that statement?

9       MR. DIAB:  All accounts receivable of LPG was --

10 that's the standard language that was used in those UCC1's.

11       MR. WHITE:  Moving on to the next creditor, City

12 Capital New York, the amount of the claim is approximately

13 $2.9 million.  Is that a similar arrangement?

14       MR. DIAB:  No.  So, in the case of City Capital,

15 that was an advance that was taken in February while we were

16 trying to get through the period of time where payments were

17 being collected by Merrich Bine and not remitted to LPG.

18 So, we took a cash advance from Star Capital in February.

19 Despite that cash advance, we weren't able to stay afloat,

20 and so we defaulted on that position, but that was a new

21 agreement in February with Star, and it was an agreement

22 that we admittedly defaulted on.  We made one payment of

23 $50,000, and no other payments were made.

24       MR. WHITE:  And that was February of 2023?

25       MR. DIAB:  Correct.  That's when that position was

**Exhibit "2"**                                           0238

172

1 taken and the loan payment was made.

2     MR. WHITE:  Do you know if City Capital recorded
3 UCC1?

4     MR. DIAB:  They -- I do not believe that they did,
5 but I believe that they're related to an entity called BMS
6 Advance, LLC that did have a UCC1 previously recorded.  My
7 belief is that they're utilizing the BMF UCC1 that an
8 assignment took place, but I don't have verification of
9 that.  That's simply my belief in terms of how this industry
10 operates.

11     MR. WHITE:  Does the Debtor dispute this claim?

12     MR. DIAB:  No.  I don't believe that we have a
13 dispute as to the balance or the -- the claim.  There may be
14 a dispute as to whether it's cured because we don't know
15 whether it was perfected, but that would be the only open
16 question, not the balance or not the fact that it was a
17 default.

18     MR. WHITE:  To the extent that the Debtor plans to
19 challenge the validity or perfection of the lien, did you
20 amend the schedule to list it as disputed?

21     MR. DIAB:  Yes, we did.

22     MR. WHITE:  The next creditor on this is Fundura
23 Capital Group, listed as disputed, amount of $2.1 million.
24 Do you know if Fundura recorded a UCC1?

25     MR. DIAB:  Fundura recorded a UCC1 after the

173

1  initiation of litigation.  They filed suit in August of

2  2021, and we filed a counterclaim.  It didn't have a UCC1

3  filing.  They attempted to utilize the UCC1 of a related

4  company called Bridge Funding, but Bridge Funding's UCC had

5  been satisfied by a settlement.  The settlement was

6  consummated, paid in full, and the UCC1 of Bridge was

7  withdrawn.  When Fundura realized that -- that Fundura --

8  I'm sorry.  When Fundura realized that Bridge didn't have a

9  valid UCC1 on file, they attempted to file late.  They filed

10  in October I believe of 2021, but we're disputing that UCC1

11  as invalid.  It came after the filing of the lawsuit and

12  after we had successfully disputed the Bridge UCC1.  So, our

13  position is that it's an unsecured -- it's an unsecured

14  position that Fundura has, but also Fundura is an actual

15  loan.  Their receivable purchase agreement was paid in full,

16  and they attempted to do a no net renewal.  They attempted

17  to do a refinance where they simply increased the balance

18  that was owed.  That's not valid under New York law in our

19  position.  And, so, we're actually anticipating getting

20  money back from them.  We believe we overpaid them.  But on

21  the UCC issue, we don't believe they have a valid UCC1

22  filing of their usual filing, the filings they made in

23  October of -- of '21.

24          MR. WHITE:  Do you know what they listed as the

25  collateral securing the lien?

174

1          MR. DIAB:  It would have also said all accounts
2  receivable current and future.
3          MR. WHITE:  Does the Debtor anticipate filing an
4  adversary proceeding to challenge this claim?
5          MR. DIAB:  We already have -- so, we have the
6  active (indiscernible) claim.  We intend on removing the
7  action from New York State Court to this court, and so that
8  removal would likely be filed in the coming weeks.
9          MR. WHITE:  There are a number of creditors that
10 filed UCC1 financing statements that are not listed on
11 Schedule D.  So, I'll go through those just to see if the
12 Debtor's aware of them or what the relationship is.
13         Are you aware of an entity called Liberty Fund
14 Group?
15         MR. DIAB:  Yes.  Liberty had a position that was
16 satisfied in full.  THAT UCC1 should have been withdrawn.
17         MR. WHITE:  And you mentioned earlier StratCap
18 Management, LLC also appears to have filed a UCC1.  Do you
19 know what the status of that is?
20         MR. DIAB:  I believe they're withdrawing the UCC1,
21 but the underlying security agreement was never consummated.
22 So, it wouldn't be a valid UCC1 in any event, but I believe
23 they're withdrawing that.
24         MR. WHITE:  How about Franklin Capital Management,
25 LLC?

175

1        MR. DIAB:  Franklin Capital was a company that we

2  discussed a loan with.  They filed a UCC1 before any

3  documents were executed.  They asked us not to proceed with

4  it, but they never withdrew their UCC1 filing.  So, again, I

5  think it's an invalid UCC1 for lack of underlying security

6  agreement.

7        MR. WHITE:  Everyday Funding Group?

8        MR. DIAB:  Everyday Funding would have been an

9  entity related to Park East Capital and MCA Cap.  They did

10 have a position.  It was satisfied in full.  The UCC1 was

11 supposed to be removed as a result of that settlement.

12       MR. WHITE:  Are you familiar with Green Fund New

13 York?

14       MR. DIAB:  Yes.  Again, that was an entity with

15 which we settled.  We settled in full.  They were supposed

16 to terminate the UCC.  They never did.

17       MR. WHITE:  And you mentioned earlier World Global

18 Fund, LLC.  Are you aware of their UCC1 statement?

19       MR. DIAB:  Yes.  World Global had a UCC1 that was

20 filed, and a related entity, MNS Funding, had a UCC1 that

21 was filed.  Both have been satisfied.  I take that back.

22 World Global has been satisfied in full.  That one should

23 have been terminated.  MNS has a dispute as to whether

24 there's a balance still owed.  They haven't taken any action

25 on that, but they allege that there's a balance owed, and

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                                      0242

176

 1 that's why they're refusing to withdraw the UCC1 that

 2 (indiscernible) between us and MNS.

 3          MR. WHITE:  Is there a reason the Debtor did not

 4 include MNS Fund in its Schedule D?

 5          MR. DIAB:  No.  That's just an oversight.  We'll

 6 have to add them based on what they're claiming is still

 7 owed.  So, that's one that would have to be added.  We do

 8 believe we satisfied it, but they -- I mean (indiscernible)

 9 that's included in the amended schedule.

10          MR. WHITE:  What about MCA Capital Holdings, LLC?

11          MR. DIAB:  That is another entity that we had a

12 resolution.  We paid them in full.  They were supposed to

13 terminate their UCC1.

14          MR. WHITE:  BMF Advance?

15          MR. DIAB:  Similarly satisfied in full.  They had

16 filed a dismissal of the action in New York State Court

17 (indiscernible), but they still have their UCC1.  We believe

18 that City Capital is going to borrow that UCC1 and that's

19 why they haven't terminated, but they haven't formally

20 stated that to us.

21          MR. WHITE:  Would you amend the Schedule D to add

22 them then?

23          MR. DIAB:  BMF is not the one with the position.

24 Star Capital is, and so Star Capital -- not Star Capital,

25 sorry -- City Capital.  City Capital is listed as a -- as a

177

1   creditor, and City Capital is the one that would be using

2   the UCC1 to enforce the City Capital loan or advance I

3   should say.

4          MR. WHITE:  (Indiscernible) Franklin Capital

5   Management, LLC.  What about Franklin Capital Group, LLC?

6          MR. DIAB:  It's the same entity.  They filed two

7   different UCC's, but we didn't proceed with either entity as

8   a -- as a creditor.  So, they don't have any underlying

9   security agreement.

10          MR. WHITE:  And the next one is OHP LPG, LP.  Are

11   you familiar with that entity?

12          MR. DIAB:  Yes, but OHP had purchased receivables

13   of marketing companies, third parties, not of -- of LPG.

14   So, they shouldn't be filing a UCC1 on LPG.  They should

15   file it on the -- the marketing companies themselves, but --

16   but I'm aware of who they are and the fact that they filed a

17   UCC1.

18          MR. WHITE:  What about Proof Positive, LLC?

19          MR. DIAB:  That's similar.  Proof Positive has

20   purchased affiliate receivables but filed a UCC1 on LPG even

21   though LPG is not a party to the Proof Positive security

22   agreements.  So, I think it was just an erroneous filing,

23   but we're aware of who they are and the fact that they've

24   filed a UCC1.

25          MR. WHITE:  Are you aware of the fact that Debt

Exhibit "2"                                                          0244

178

1 Validation Fund 2, LLC, MCDVI Fund 1, LLC, and MCDVI Fund 2,

2 LLC filed UCC1 statements?

3        MR. DIAB:  Yes, I'm aware of those filings.  I

4 believe they took place in January.

5        MR. WHITE:  Is there a reason they were not -- is

6 there a reason they were not listed on Schedule D?

7        MR. DIAB:  So, those -- so, for two reasons.  The

8 underlying agreement had been breached before the filing of

9 the UCC1.  So, we don't believe that there's an underlying

10 security agreement that would rise to a valid UCC1 filing,

11 and at the second (indiscernible), we believe that that

12 filing was in the preference period, and we're going to

13 avoid it, but we consider them to be at most an unsecured

14 creditor and at least a debtor that owes us money for what

15 they took pursuant to those agreements that they breached.

16 That's our position on that subject.

17        MR. WHITE:  So, that was on Schedule F?

18        MR. DIAB:  I'm sorry.  Could you say that again?

19        MR. WHITE:  Did you list them on Schedule F?

20        MR. DIAB:  I know that they were listed on one of

21 the schedules, but I believe they were listed as an

22 unsecured creditor.

23        MR. WHITE:  You mentioned in your earlier

24 testimony a number of other entities such as .69, LLC, Green

25 Fund, Vertex, Highbar, Cobalt Funding.  Do any of those

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                    0245

179

1   entities have UCC1 financing statements on file?

2           MR. DIAB:  Yeah.  I think almost all of them have

3   UCC1 financing statements.  Some have terminated.  Some have

4   chosen not to terminate even though they should terminate

5   them, but I believe each one of those having a UCC1 at some

6   point.  A lot of the times they would file the UCC's under

7   CT Corporation, CFC or -- or some other agent for service of

8   process, but they -- so, they would file anonymously, but

9   they had UCC1's that are filed.

10          MR. WHITE:  But the Debtor took the position not

11  to list those on Schedule D?

12          MR. DIAB:  Yeah.  So, the -- the actual agreements

13  were satisfied.  There's no balance owed, and the UCC1's

14  that remain active are erroneous, should be terminated.

15          MR. WHITE:  Is there an employment agreement with

16  Mr. March?

17          MR. MARCH:  Yes.

18          MR. DIAB:  Mr. March -- and, yeah, his employment

19  with LPG, yes, he's got an employment agreement.

20          MR. MARCH:  Yes.

21          MR. WHITE:  Was there any amount owed to Mr. March

22  as of the petition date?

23          MR. DIAB:  Under -- as I said earlier, he was

24  shorted in the year 2022, but he voluntarily agreed not to

25  receive that additional compensation and in that sense is

**Exhibit "2"**                                                    0246

180

```
 1  not a creditor.  But he -- he was short in his -- his
 2  contractual compensation for the year 2022.
 3          MR. WHITE:  Does he intend to file a claim against
 4  the Debtor?
 5          MR. DIAB:  No.
 6          MR. WHITE:   Is there any money owed to any
 7  employees as of the petition date?
 8          MR. DIAB:  Yes.  There are, I believe, two pre-
 9  petition payrolls that were missed and one post-petition
10  payroll that was missed.  No, I take that back, now two.
11  So, two pre-petition and two post-petition payrolls that are
12  outstanding.
13          MR. WHITE:  And, Mr. Diab, the testimony earlier
14  was that somewhere around early 2021, you no longer received
15  compensation directly from the Debtor but it went through
16  the LLC's, and the reason for that was mentioned that it was
17  because it was Mr. Diab's background or to limit it.  Can
18  you provide more insight on that?
19          MR. DIAB:  Yeah.  One of the reasons was
20  background because of my disbarred status.  It raises
21  questions when my name appears on payroll records or any
22  other record.  So, we tried to eliminate that potential
23  source of prejudice against LPG by eliminating the use of my
24  name on -- on anything.  And, so, for that reason, the
25  payment would go to one of these LLC's, and then the LLC in
```

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                                                    0247

181

1  turn would pay me some portion.  But that decision was made

2  mostly because of the reaction that we would get when --

3  when that name was found on -- on a record.

4          MR. WHITE:  Before the disbarment, did you

5  practice law in California?

6          MR. DIAB:  Yes.  I was practicing law in

7  California and Nevada.  I had done so since 2010 in

8  California and 2012 in Nevada.

9          MR. WHITE:  And when -- when were you disbarred?

10          MR. DIAB:  Would have been -- it took effect in

11  January 2019.  I believe for both right about the same time

12  or right around --

13          MR. WHITE:  So, was that in California or Nevada?

14          MR. DIAB:  I believe they both entered orders --

15  sorry.  Nevada went first, but Nevada would have entered an

16  order right around January of 2019, and I think it was

17  actually February the 11th, 2019 that the -- that the

18  California Bar entered their involuntary inactive status,

19  and that's when LPG wanted to take over matters that I had

20  previously been handling.  This is now February 2019.

21          MR. WHITE:  So, what were the grounds for the --

22  what were the grounds for the disbarment?

23          MR. DIAB:  Both disbarments were related to the

24  same underlying representation.  It was the representation

25  of a (indiscernible) named Bashal Shamaria (phonetic) that I

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                                        **0248**

182

1  was undertaken.  He was a Las Vegas resident, and the
2  representation was in Nevada under the Nevada rules.  There
3  was also one small civil matter in the State of California
4  that I was handling for Bashal, and I was doing those
5  representations moonlighting while I was at a firm.  So, I
6  was employed at Shakardi and Fagan as an attorney and then
7  handling this -- these group of matters for Bashal on the
8  side essentially, and it was going through that
9  representation that the Nevada Bar made their -- you know,
10 their findings and decided to charge.  And when they issued
11 their charging document, I took a default and choose to
12 allow the disbarment to take place in Nevada.  California
13 then came in with a reciprocal action.  After the disbarment
14 started in Nevada, California essentially said the same, and
15 I did the same thing where I took a default in the
16 California proceeding, chose not to participate, and the
17 default was entered right around February 11, 2019, and I
18 remember the date because we had a deposition that same day,
19 and it was the last deposition that I did, and then right
20 after that, the involuntary inactive set in.  And then about
21 a week later, LPG was formed.
22        MR. WHITE:  And LPG was formed to take over your
23 client files?
24        MR. DIAB:  Yeah.  So, essentially all the files
25 that were being handled by the entity as a sole

**Exhibit "2"**                                            0249

183

1  proprietorship called Diab Law, all those entities had to be
2  moved to another law firm.  And, so, John had agreed to
3  launch LPG primarily to handle the Debtor cases that are
4  still the LPG, you know, pipeline to this day.  In addition,
5  there were, I don't know, 40 or 50 other cases that LPG took
6  on, everything from wrongful death to intellectual property
7  to employment law.  And all those matters were taken over by
8  LPG, and it's something that the State Bar was informed of
9  at the time.  When the involuntary inactive status set in,
10 we had to find counsel in short order because no appearances
11 were permissible.  And, so, the cases were all moved from
12 Diab Law to LPG in February 2019.
13       There's another attorney in addition to John
14 Thompson named Clara Young that was handling a lot of the
15 cases for Diab Law, and she continues to handle them as an
16 employee of LPG.  And, so, those cases were continued.  The
17 same attorney was handling them, the -- the associate,
18 Clara.  And, so, she just moved from one firm to the other
19 and continued to handle those same batch of cases.
20       MR. WHITE:  Do you know if LPG has any liability
21 stemming from the disbarment?
22       MR. DIAB:  No.  There was no overlap on the
23 disbarment aspect, but there was some liability related to
24 some of the cases that were transitioned, which LPG resolved
25 years ago.  There's some clients at the point of transition

184

1  that didn't -- essentially they were complaining about the

2  representation that Diab Law had rendered.  But now that

3  they were represented by LPG, LPG satisfied the dispute and

4  essentially settled with the clients.  There was a handful

5  of them.  This happened back in 2019 when the files were

6  transferred, but nothing stretched beyond that in 2019, at

7  least not that I'm aware of.

8          MR. WHITE:  Was there ever a criminal referral

9  relating to this disbarment?

10         MR. DIAB:  No, none, in Nevada or California.

11         MR. WHITE:  Turning to the list of the creditors

12 that have the 20 largest unsecured claims, there are a

13 number there that are listed as disputed.  I know you listed

14 my clients' claims as disputed and gave the reasons why

15 regrettably they're disputed.  What about Merrich Banes?

16 There was a claim for $8 million.  What's the basis for that

17 dispute?

18         MR. DIAB:  So, Merrich Bine was owed money on

19 receivable purchase agreements (indiscernible), but based on

20 what (indiscernible) like the damage caused by the payment

21 processing dispute in February and March, we don't believe

22 that we continue to owe them.  We think, if anything, we're

23 a net creditor because the damage was substantial, but

24 that's a difficult matter to have to be litigated, but on

25 paper they would still be owed but for the fact that they

*Briggs Reporting Company, Inc.*

185

1  collected payments and refused to send that, those amounts

2  to LPG and, thereby, caused damage.  If you take that away,

3  they would still be owed an additional I think roughly $8

4  million.  I believe that they believe the number to be

5  larger.  So, that $8 million figure is disputed, but whether

6  anything is owed is also disputed on account of the conduct.

7  That will require an adversary proceeding to resolve.

8          MR. WHITE:  Validation Partners, LLC is listed as

9  having a $25 million claim that is disputed.  What's the

10 basis for that dispute?

11         MR. DIAB:  The $25 million figure came from the

12 complaint that Validation Partners filed, and the dispute is

13 twofold.  One is that we also have a credit against

14 Validation Partners for the assignment from Pec Corp. for

15 about $28 million, which would make Validation Partners a

16 net debtor, not a net creditor.  But separate from that, we

17 don't believe there's any support for -- we don't believe

18 there's any support for the $25 million figure.  We think at

19 most the amount that would be owed, forget about our

20 assignment and our claims, the amount that would be owed

21 would be around $14 million, maybe $15 million, not $25

22 million to Validation Partners.  That's based on their

23 actual contract.  So, it's a two-part dispute.  One is we

24 don't think the $25 million is correct.  We think that

25 they're a net debtor and owe money to LPG and to the

186

1 bankruptcy estate.

2        MR. WHITE:  Business Centers of America is listed

3 as disputed in the amount of $2.4 million.  What's the basis

4 for that dispute?

5        MR. DIAB:  Business Centers of America had an

6 agreement with Coast Processing, the entity that I

7 referenced earlier.  They never had an agreement with LPG,

8 but we believe that they were claiming that LPG owed them

9 money.  They subsequently filed a lawsuit and did not name

10 LPG.  So, they may also join in stating that LPG does not

11 owe them any money, but -- but the claim had been made by

12 Business Centers of America that they are owed $2.4 million

13 and that LPG has to pay it as the company servicing the

14 clients that were relevant to the receivable purchase that

15 Business Centers of America made.  So, we reported it as

16 disputed, but the nature of that dispute is that LPG never

17 undertook an obligation to Business Centers of America.

18 Another entity did, and we think that they agree by virtue

19 of the fact that they filed suit and did not bring LPG, but

20 they haven't stated it a release of LPG in any way.  So,

21 they still have a question about whether LPG is liable.

22        MR. WHITE:  The Debtor is also disputing a $1.4

23 million claim by J.P. Morgan Chase for a corporate credit

24 card.  What's the reason for that dispute?

25        MR. DIAB:  So, there's a dispute about what amount

Exhibit "2"                                                    0253

187

1   was owed on the corporate credit card account that LPG has

2   to J.P. Morgan Chase.  We think that they're adding interest

3   and fees that they're not allowed to add to the balance that

4   was owed, and so we're disputing the amount.  We're not

5   disputing whether there's something owed, just how much is

6   owed as of today.

7          MR. WHITE:  The Debtor's also disputing a

8   approximately $250,000 claim for Outsource Accelerated,

9   Limited, an offshore call center.  What's the basis for

10  that?

11         MR. DIAB:  Yes.  Outsource Accelerated would bill

12  in advance before the services were rendered, sort of like a

13  retainer, and then they would pull from the amount as they

14  would render services.  We terminated their agreement, and

15  they still wanted us to prepay for a month of service even

16  though we weren't going to utilize them.  So, we disputed

17  the amount of the claim.  We think that they provided may 10

18  or 20 thousand dollars worth of service but not $250,000,

19  and they still wanted us to prepay the entire month, and we

20  believe it's because they were going to take that money and

21  keep it, but we didn't see any contractual right for them to

22  demand that amount.  So, that's the dispute there is that

23  they wanted to prepay even though we'd agreed they weren't

24  going to provide the services.  So, we weren't going to

25  prepay that amount.

**Exhibit "2"**                                      0254

188

1         MR. WHITE:  Net Suite Oracle is listed as being

2 owed $100,000 for bookkeeping software.  Why is that

3 disputed?

4         MR. DIAB:  Well, we attempted to switch from

5 Quickbooks to Net Suite in 2022.  The transition didn't

6 work, and Net Suite, who had assured us that it would,

7 continued to work with us for about six months and could not

8 get the data imported over.  It made our books a mess for

9 the year 2022, but because their platform didn't work, we

10 instructed them that we're not going to pay them, and we

11 switched back to Quickbooks.  I think -- obviously I think

12 that they're disputing that and they're still pursuing

13 collection, and that fee would have been their licensing

14 fee, but the licensing fee in our opinion (indiscernible)

15 because we didn't end up using Net Suite and because Net

16 Suite failed to import the information over to Quickbooks,

17 which caused substantial damage on the accounting side.

18         MR. WHITE:  Moving on to Schedule G, Executory

19 Contracts, besides the office leases and the lease with

20 Sharp Electronics, the Debtor listed some contracts with

21 California clients, but there are no other contracts listed

22 on Schedule G, for example, for the -- with the law firms

23 that the client files were transferred to or any other.

24         Is the Debtor going to amend Schedule G to include

25 all of its contracts?

189

1           MR. DIAB:  Yeah.  I believe the Schedule G is one

2  of the -- the schedules that would have to be amended.  So,

3  I do believe that an amended schedule will be filed.

4           MR. WHITE:  I have a few questions to finish up.

5  Does Mr. March, is he still working on the approximately 400

6  to 600 California cases that remain?

7           MR. DIAB:  Yes, he is.  He's handling those, and I

8  can allow him to speak obviously to that issue.

9           MR. MARCH:  Yes.  Yes, we are.

10          MR. WHITE:  And, as I understand from your prior

11 testimony, there's no current revenue stream for those

12 cases?

13          MR. MARCH:  That's correct.

14          MR. WHITE:  So, is the only monthly revenue from

15 the law firms that are paying 20 or 40 percent, is that

16 correct?

17          MR. MARCH:  Yes.

18          MR. WHITE:  And approximately how much each month

19 do you anticipate receiving from those firms?

20          MR. DIAB:  When the payments are processed, per

21 the usual, meaning they're out of the range of damage caused

22 by the payment processing dispute with Merrich Bane.  We

23 anticipate it will be roughly $2 million a month that would

24 come through from its resources.

25          MR. WHITE:  And of those $2 million, is the Debtor

**Exhibit "2"**                                    0256

190

1 entitled to all of those as earned fees or does a certain

2 amount of that pass through to other entities or, for

3 example, as part of -- you described three buckets of

4 services. One was, you know, resolving debts on behalf of

5 individuals. Does the Debtor provide services such as

6 collecting installment payments and then negotiating with

7 those clients' creditors to pay them off or does the Debtor

8 retain all those funds?

9        MR. DIAB: All of those funds would be retained.

10 Those funds are earned services fees paid to these other

11 three law firms that would be passed through on this

12 referral agreement. So, all of that money would be retained

13 by LPG and obviously available to fund a plan.

14        MR. WHITE: So, based on the $2 million in

15 revenue, what's the net income per month do you estimate?

16        MR. DIAB: Roughly $1.75 million, with the cost,

17 roughly $250,000.

18        MR. WHITE: And the 90 days leading up to the

19 bankruptcy case, the Debtor generated approximately $30

20 million in income but only paid City Capital. Is there a

21 reason no other creditors were paid during that period?

22        MR. DIAB: About 12 to 14 million out of that 30

23 was being held. And, so, that money wasn't available to us.

24 It's still essentially being held by Merrich Bine. So, the

25 amount that was actually available to us was much less and

191

1  went towards operating expenses mostly in January, but the

2  reason that more wasn't paid to either City Capital or any

3  other creditor is that the money was used for operating

4  expenses, and roughly half of it is not in our possession.

5  It's being held by the processor.

6        MR. WHITE:  And what was the basis for saying this

7  was an improper holding by Merrich Bine?

8        MR. DIAB:  Merrich Bine is a creditor and a

9  payment processor.  Under the agreement, they're permitted

10 to hold the money that was currently due and owing under

11 their creditor status as a receivable buyer, and the

12 remaining amount was supposed to be remitted to LPG.  The

13 remaining amount wasn't remitted to LPG, and that's the

14 amount that we believe rightfully belongs to us and is being

15 withheld, in violation of the contract between the parties

16 and also violation of law.  They don't have the right to

17 hold.  And if you're going to hold in the payment process,

18 you're have to give notice to the individual clients that --

19 that the third party is holding the funds, and no such

20 rights were given to our clients that Merrich Bine was

21 holding funds of the clients.  So, that's -- that's our

22 position on Merrich.

23        MR. WHITE:  And in the year leading up to the

24 filing, Mr. March testified that he received approximately

25 $100,000 per month.  Were there any other payments made to

*Briggs Reporting Company, Inc.*

192

1 officers or directors of the Debtor during that one-year

2 period?

3       MR. DIAB:  No.

4       MR. WHITE:  Did Mr. Diab receive any payments

5 during that period?

6       MR. DIAB:  During the year 2022?  No.  There were

7 -- (indiscernible) there were indirect payments made to

8 Strategic Consulting Solutions that were made back to LPG so

9 that it was a net zero at the end of the year.  So, for the

10 year as a whole, it was a net zero, but there was roughly

11 $480,000 sent to Strategic Consulting before it was sent

12 back to LPG.

13       MR. WHITE:  During that one-year were there any

14 payments made by the Debtor to any relatives of Mr. March?

15       MR. MARCH:  No.

16       MR. DIAB:  No.  I'm sorry.

17       MR. WHITE:  And same question for you, Mr. Diab,

18 any payments made to any of your relatives by the Debtor

19 during that one-year period?

20       MR. DIAB:  No.

21       MR. WHITE:  And were there any payments made to

22 any other insiders during the year leading up to the

23 bankruptcy filing?

24       MR. DIAB:  Did you say any other insider payments?

25 No.

**Exhibit "2"**            0259

193

1          MR. WHITE:  Those are all my questions for now.
2  Thank you.
3          TRUSTEE NG:  Thank you.
4          Are there any other creditors who would like to
5  ask questions?
6      (No response.)
7          TRUSTEE NG:  I just have a couple of follow-up
8  questions.  The Debtor indicated that they're moving to a
9  new address.  So, the Debtor needs to file a notice of
10 change of address with the Court with the new address.
11         The Debtor mentioned earlier that it missed two
12 pre-petition payroll.  I think that's what they said, and
13 then I don't recall seeing any employees listed in Schedule
14 E or F.  So, that looks like it has to be amended.
15         And, finally, I think the Debtor indicated that
16 Mr. March has an employment agreement with LPG.  I don't
17 think that's listed in Schedule G, and I'd also like a copy
18 of the employment agreement.  So, that's all the --
19         MR. MARCH:  Okay.
20         TRUSTEE NG:  -- information I have.  And I hear no
21 further response from anyone wanting to question the Debtor.
22 So, the matter is being concluded, and I want to thank
23 everyone for coming today.  I appreciate your help, Mr.
24 Khang and Mr. Diab and Mr. March.  Thank you so much.
25         UNIDENTIFIED SPEAKER:  Thank you.

*Briggs Reporting Company, Inc.*

**Exhibit "2"**                                                    **0260**

194

1        MR. SHANKMAN (telephonic):  This is Paul Shankman.
2 I have a few questions.
3        TRUSTEE NG:  Okay.  Can you please go ahead.
4 Thank you.
5        MR. SHANKMAN:  Yes.  This is Paul Shankman of
6 Fordis, LLP, and I represent Creditor Outsource, which is a
7 provider of employee services to the Debtor.  We have filed
8 a claim, Number 13, for over $300,000.  I have just a few
9 questions.
10       The Debtor had mentioned that the payment
11 processors were holding I believe several million dollars
12 which the estate contends should be property of the estate
13 and contemplates acting towards recovering those moneys.  Is
14 that correct?
15       MR. DIAB:  Correct.
16       MR. SHANKMAN:  And is there any reason why over a
17 month has passed since the filing of the case and no action
18 has been taken before the Court to do so since that seems to
19 be part of the lifeblood of the restructuring of this
20 estate?
21       MR. DIAB:  We have two issues.  One was an attempt
22 to voluntarily (indiscernible) with Merrich Bine, and that
23 conversation has been ongoing.  The other is that LPG
24 doesn't have resources.  We don't have manpower.  We don't
25 have money.  And, so, it's difficult for us to do much of

Exhibit "2"                                              0261

195

1  anything right now, but it's a high priority for us to

2  proceed with these adversaries, but we are also in direct

3  discussions with (indiscernible) trying to resolve the

4  dispute.  We just haven't been able to do so.

5          MR. SHANKMAN:  How much is in the DIP account

6  presently?

7          MR. DIAB:  I believe the balance is $6,000 and

8  change if I remember correctly.

9          MR. SHANKMAN:  Okay.  Madam Trustee, I have no

10 further questions.

11          TRUSTEE NG:  Thank you so much?  Are there any

12 other creditors who would like to ask questions?

13     (No response.)

14          TRUSTEE NG:  Okay.  I hear no response, and so

15 this matter is being concluded.  Thank you again everyone

16 for coming today.

17          ALL:  Thank you.

18     (Proceedings concluded.)

19

20          I certify that the foregoing is a correct

21 transcript from the electronic sound recording of the

22 proceedings in the above-entitled matter.

23

24 /s/ Holly Steinhauer_____    5-17-23_____
   Transcriber                      Date
25

# Exhibit "3"

<table>
<tr><td colspan="2"><b>Fill in this information to identify the case:</b></td></tr>
<tr><td>Debtor 1</td><td>THE LITIGATION PRACTICE GROUP P.C.</td></tr>
<tr><td>Debtor 2<br>(Spouse, if filing)</td><td></td></tr>
<tr><td>United States Bankruptcy Court for the:</td><td>Central District of California</td></tr>
<tr><td>Case number</td><td>8:23-bk-10571-SC</td></tr>
</table>

## Official Form 410

# Proof of Claim

04/22

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) that you received.

---

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

DEBRA PRICE

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

ROBERT P COCCO PC
Name

1500 WALNUT ST., STE. 900
Number     Street

PHILADELPHIA     PA     19102
City                State            ZIP Code

Contact phone  2153510200

Contact email  bob.cocco@phillyconsumerlaw.com

Where should payments to the creditor be sent? (if different)

Name

Number     Street

City                State            ZIP Code

Contact phone

Contact email

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

_ _ _ _ — _ _ _ _ — _ _ _ _ — _ _ _ _

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____     Filed on _____
                                                                    MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

---

**Proof of Claim**
                                  **Exhibit "3"**
                                                                        0263

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$_____50,000.00_ **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

actual and statutory damages including legal fees and costs

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed) _____ %

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

Official Form 410

**Exhibit "3"**
**Proof of Claim**

0264

page 2

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ _____ |
| ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ _____ |
| ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ _____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ _____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ _____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $ _____ |

\* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

---

**Part 3: Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    03/30/2023
                    MM / DD / YYYY

.s.Robert P Cocco, Esq.
_____
Signature

Print the name of the person who is completing and signing this claim:

| | |
|---|---|
| Name | ROBERT PETER COCCO |
| | First name        Middle name        Last name |
| Title | ATTY-AT-LAW |
| Company | ROBERT P COCCO P.C. |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 1500 WALNUT ST., STE. 900 |
| | Number        Street |
| | PHILADELPHIA        PA        19102 |
| | City        State        ZIP Code |
| Contact phone | 2153510200        Email bob.cocco@phillyconsumerlaw.com |

**Exhibit "3"**
Proof of Claim

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DEBRA PRICE,<br>319 Putnam Street<br>Scranton, PA 18508,<br><br>               Plaintiff,<br>     v.<br><br>LITIGATION PRACTICE GROUP P.C.<br>17542 E 17th Street, Suite 100,<br>Tustin CA 92780,<br><br>DANIEL MARCH, ESQ., individually and d/b/a<br>LITIGATION PRACTICE GROUP<br>17542 E 17th Street, Suite 100,<br>Tustin CA 92780;<br><br>MARQUE CAREY, ESQ.,<br>individually and d/b/a LITIGATION<br>PRACTICE GROUP<br>17542 E 17th Street, Suite 100,<br>Tustin CA 92780;<br><br>RANDALL CLARK, ESQ.,<br>individually and d/b/a LITIGATION<br>PRACTICE GROUP<br>17542 E 17th Street, Suite 100,<br>Tustin CA 92780;<br><br>MICHAEL ROBINSON, ESQ.,<br>individually and d/b/a LITIGATION<br>PRACTICE GROUP<br>17542 E 17th Street, Suite 100,<br>Tustin CA 92780;<br><br>JAYDE TRINH, ESQ., individually and d/b/a<br>LITIGATION PRACTICE GROUP<br>17542 E 17th Street, Suite 100,<br>Tustin CA 92780;<br><br>HOWARD GUTMAN, ESQ., individually and<br>d/b/a LITIGATION PRACTICE GROUP<br>17542 E 17th Street, Suite 100,<br>Tustin CA 92780;<br><br>             Defendants. | NO. |

## COMPLAINT

### I.    JURISDICTION AND VENUE

1.    Subject matter jurisdiction is conferred upon this Court by 15 U.S.C. §§ 45(a) and 53(b) and 28 U.S.C. §§ 1331, 1337(a), and 1345.

2.    Venue is proper in this District under 15 U.S.C. § 53(b) and 28 U.S.C. § 1391(b) and (c).

### II.    PARTIES

3.    Plaintiff, DEBRA PRICE, is an adult individual residing at the above captioned address.

4.    Defendant LITIGATION PRACTICE GROUP, P.C. ("LPG"), is California law firm with principal offices at the above captioned address in California and is a professional corporation conducting business in the Commonwealth of Pennsylvania.

5.    Defendant, DANIEL MARCH, ESQ. d/b/a LPG is an adult individual doing business as a debt settlement and credit repair organization at the above captioned address, at all times material also doing business as an attorney admitted to practice of law in the State of California and not so admitted in the Commonwealth of Pennsylvania.

6.    Defendant, MARQUE CAREY, ESQ. d/b/a LPG is an adult individual doing business as a debt settlement and credit repair organization at the above captioned address, at all times material also doing business as an attorney admitted to practice of law in the State of California and not so admitted in the Commonwealth of Pennsylvania.

7.    Defendant, RANDALL CLARK, ESQ. d/b/a LPG is an adult individual doing business as a debt settlement and credit repair organization at the above captioned

address, at all times material also doing business as an attorney admitted to practice of law in the State of California and not so admitted in the Commonwealth of Pennsylvania.

8.      Defendant, MICHAEL ROBINSON, ESQ. d/b/a LPG is an adult individual doing business as a debt settlement and credit repair organization at the above captioned address, at all times material also doing business as an attorney admitted to practice of law in the State of California and not so admitted in the Commonwealth of Pennsylvania.

9.      Defendant, JAYDE TRINH, ESQ. d/b/a LPG is an adult individual doing business as a debt settlement and credit repair organization at the above captioned address, at all times material also doing business as an attorney admitted to practice of law in the State of California and not so admitted in the Commonwealth of Pennsylvania.

10.     Defendant, HOWARD GUTMAN, ESQ. d/b/a LPG is an adult individual doing business as a debt settlement and credit repair organization at the above captioned address, at all times material also doing business as an attorney admitted to practice of law in the State of California and not so admitted in the Commonwealth of Pennsylvania.

11.     The individual attorney Defendants are sometimes collectively referred to herein as "the Attorney Defendants".

12.     Upon information and belief, LPG is nothing more than an alter ego of the Attorney Defendants over which they exercise complete dominion and control as a vehicle for the Attorney Defendants and their accomplices to deceive unsuspecting and desperate consumers into paying them large sums of money under the pretext of "debt settlement". The scheme involved promising debt relief to vulnerable consumers which is nothing more than an illusory scheme to collect funds from these consumers that they

could better use themselves to negotiate debt settlements or pursue alternate traditional forms of debt remediation as discussed below.

13.     At all times relevant hereto, defendants acted by and through their agents, servants, and employees who acted within the scope of their authority and within the course of their employment.

## III.    FACTUAL BACKGROUND

### A.    Background - Nature of Debt Settlement Operations Generally

14.     Debt settlement is a form of consumer debt relief, targeted to consumers with thousands of dollars of unsecured debt.

15.     Unlike debt remediation options such as traditional credit counseling, debt management plans, debt consolidation loans, and possibly bankruptcy, debt settlement is an aggressive form of debt relief in which consumers stop paying all of their unsecured debts and begin saving the money they would normally use to pay those debts.

16.     After several months, when the accounts are in default, the debt settlement company will contact the creditor, and negotiate a lump-sum payoff of the debt, ideally at a highly reduced percentage.

17.     The consumer then uses the money that he/she has been saving to pay the lump-sum, and can then have the benefit of a significant portion of their original debt being forgiven. As will be described later herein, defendants did not allow plaintiff to use saved funds for negotiated payoffs but incredibly demanded additional funds towards such payments.

18.     Because debt settlement only works if consumers are not making monthly payments on their unsecured debts (since creditors will not want to settle a debt if they

are receiving monthly payments), there are inherent risks involved with participating in a debt settlement program that can have catastrophic effects on the consumer. Specifically, consumers entering a debt settlement program may experience any or all of the following:

    a.   Because the creditor is no longer receiving monthly payments, creditors will likely engage in collection activities including filing a lawsuit against the consumer for breaking their contract.

    b.   The consumer will owe significantly more on their account if a settlement is reached and concomitantly reduce the actual savings from the debt settlement program because creditors will continue to assess interest, late fees, over-limit charges, and any other fees associated with the account.

    c.   The consumer's credit reports will reflect the late charges and non-payment of their unsecured debt causing the consumer's credit score to drop while participating in the program and the consumer may experience the long term effects of a low credit score, which can include difficulty in buying a house or car, obtaining insurance, or obtaining employment.

    d.   Creditors are under no obligation to accept, or even entertain, a settlement offer.

19.    Debt settlement is largely a "for-profit" industry involving companies charging consumers large fees typically calculated as a percentage of the total debt the consumer brings into the program and often collected in the first several months of the program.

**B. <u>Nature of Debt Validation /Credit Repair Services</u>**

**Exhibit "3"**

20. Since at least February 2021, and continuing thereafter, defendants, directly or through their representatives, have promoted, offered for sale, and sold credit repair services to consumers via Defendant LPG's Internet website which it maintains to attract consumers to purchase defendants' debt relief and credit repair services.

21. Through verbal statements by their representatives and through written statements on their website, defendants have offered "credit repair" services purporting to remove or attempt to remove derogatory information from, or improve, consumers' credit histories, credit records, or credit ratings.

22. Before providing any of the promised services, defendants' representatives request and obtain at least partial payment for these services.

23. Defendants require consumers to sign written contracts for defendants' services.

## C. The Credit Repair Organizations Act

24. The Credit Repair Organizations Act took effect on April 1, 1997, and has since that date remained in full force and effect.

25. Defendants are "credit repair organizations" as that term is defined in the Credit Repair Organizations Act, 15 U.S.C. § 1679a(3).

26. The purposes of the Credit Repair Organizations Act, according to Congress, are:

    a. to ensure that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services; and

    b. to protect the public from unfair or deceptive advertising and business

practices by credit repair organizations.

27. The Credit Repair Organizations Act prohibits credit repair organizations from charging or receiving any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform before such service is fully performed. 15 U.S.C. § 1679b(b).

28. Pursuant to Section 410(b)(1) of the Credit Repair Organizations Act, 15 U.S.C. § 1679h(b)(l ), any violation of any requirement or prohibition of the Credit Repair Organizations Act constitutes an unfair and deceptive act or practice in commerce in violation of § 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## IV.   FACTUAL ALLEGATIONS

29. On or about February 17, 2021, plaintiff entered into a standardized adhesion contract of exculpation with LPG in an illusory several page "Legal Services Agreement" contract whereby she agreed to pay $260.10 monthly to defendant "to invalidate your debts and remove such invalid debts from your credit reports", and, if it cannot do so, "may elect to have LPG negotiate a settlement on your behalf with the concerned creditor" (see **Exhibit A**).

30. The five credit card accounts plaintiff wished to have negotiated totaled over $16,000.00.

31. To pay the monthly fee, Plaintiff provided Defendants with a cancelled check to her personal checking account for which she was sole depositor.

32. The accounts plaintiff wished to have negotiated, and that LPG promised to remove from credit reporting by its contract, were accurate, but LPG nevertheless recommended that they be disputed as inaccurate.

33.     Defendants did not inform plaintiff and does not inform its customers generally that accurate negative credit items cannot be legally challenged as inaccurate.

34.     To make matters even more confusing, LPG presented Plaintiff with another written contract, this time with an affiliated entity and agent, Help Finance Group, LLC ("HFG"), which also promised to negotiate debts on plaintiff's behalf but, in exculpatory fine print in the contract, essentially disclaimed any obligation to perform any debt settlement or legal services for her, and disclaimed any representations that it would actually perform such services.

35.     At all times herein, Plaintiff only had contact with LPG and, upon information and belief, HFG was an agent of and/or alter ego of LPG and acted at its direction and control.

36.     In order to get relief from her cumulative debt, the HFG contract requires Plaintiff to agree to accumulate funds in a settlement savings fund escrow account over up to 180 days before any negotiation of debt can begin.

37.     On or about April 2022, Defendants withdrew the monthly $260.10 fee from a different checking account than had been authorized by Plaintiff, a checking account held jointly by Plaintiff and her husband as co-depositors.

38.     Two payments were withdrawn until Plaintiff's reported the issue to her bank and demanded Defendants return the two payments and cease any further withdrawals from the unauthorized account.

39.     Defendants have negotiated no debt reduction, indeed Plaintiff's debts have increased, and has removed none of the debts from her credit.  As a result, all of her debts have gone into collection while she has been enrolled in Defendants' program and

Plaintiff has been sued by one creditor in Lackawanna County, Docket no. MJ-45106-CV-0000117-2022.

40.     Defendants' contract with plaintiff for debt settlement and credit repair services is void insofar as it promises nothing real and its purpose is to give the appearance of legal propriety to illegal debt settlement activities detailed in this Complaint, thereby enriching defendant at the expense of heavily indebted Pennsylvania consumers, and preempting for itself consumers' money that should have been used to pay creditors or to file for bankruptcy relief.

41.     Plaintiff suffered ascertainable loss by reason of defendant's actions.

**Causes of Action**

<div align="center">

**COUNT I**
**VIOLATIONS OF THE CREDIT REPAIR ORGANIZATIONS ACT**

</div>

42.     In connection with the sale and performance of services for consumers by a credit repair organization, as that term is defined in § 403(3) of the Credit Repair Organizations Act, 15 U.S.C. § 1679a(3), defendants have charged or received money or other valuable consideration for the performance of credit repair services that defendants have agreed to perform before such services were fully performed. Defendants have thereby violated Section 404(b) of the Credit Repair Organizations Act. 15 U.S.C. § 1679b(b).

43.     In connection with the defendants' agreement to provide credit repair services, defendants violated the CROA, *inter alia*, § 1679b(a)(1) by making untrue or misleading statements to a consumer reporting agency; §1679b(a)(3) by misrepresenting its services; and §1679b(a)(4) by engaging in acts, practices or courses of business which constitute or result in the commission of a deception on its customers, plaintiff or the

<div align="center">

9
**Exhibit "3"**

</div>

consumer reporting agencies; §1679b(b) by charging and receiving money for the performance of its agreement before the service was fully performed; and §1679d(b) by failure to include the information required by that subsection.

## COUNT II
### VIOLATIONS OF THE FAIR CREDIT EXTENSION UNIFORMITY ACT (FCEUA) and
### PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (UTPCPL)
### (Plaintiff v. All defendants)

44.     Plaintiff incorporates all foregoing allegations as though set forth in full.

45.     Defendants are each a "debt collector" as defined by 73 P.S. § 2270.3 of the FCUEA in that, at all times herein, defendant was "engaging or aiding directly or indirectly in collecting a debt owed or alleged to be owed a creditor".

46.     Plaintiff is a "consumer" as defined by 73 P.S. § 2270.3 of the FCUEA.

47.     All of the above contacts by Defendants with plaintiff, including but not limited to attempting to settle the May 2017 debt, were "communications" relating to a debt as defined by 73 P.S. § 2270.3 of the FCUEA.

48.     Because Defendants' business model is premised on compromising the amount of debt owed rather than eliminating it as an attorney filing a chapter 7 bankruptcy or defending a debt collection litigation, all of the above contacts by Defendants were with the purpose of engaging or aiding indirectly in collecting plaintiff's debts owed or alleged to be owed to her creditors.

49.     Moreover, even Defendants' limited promise of compromising the amount of debt paid is illusory in that no results are promised, Ex. _, Sec. 3 titled, "No Guarantees of Results".

50.     Defendants, by their conduct as described above including but not limited to failing to settle any debt with plaintiff's creditors from "settlement savings fund" escrow account, violated the FDCPA including but not limited to the following:

a)  §1692e(5), engaged in false, deceptive, and misleading representations in connection with the debt collection activities described herein;

b)  §1692f Otherwise used unfair or unconscionable means to collect or attempt to collect a debt by collecting funds from plaintiff towards an illusory promise of debt remediation when, instead, plaintiff's debt burden was increased by the fees and charges collected by defendants resulting in no net financial relief to plaintiff and instead worsening her financial burdens.

51.     The foregoing acts and omissions of defendants in violation of the FDCPA, including but not limited to giving plaintiff a futile illusory contract to conceal the fact that defendants are not providing plaintiff with any legal services to settle any of her debts, constitute numerous and multiple *per se* violations of the FCEUA and UTPCPL, including but not limited to 73 P.S. § 2270.4(a), as evidenced by the following conduct:

a)  The use of false, deceptive or misleading representations or means in connection with the collection of a debt;

b)  The use of false representation or deceptive means to collect a debt or obtain information about a consumer;

c)  The use of unfair or unconscionable means to collect or attempt to collect an alleged debt;

52.     Defendants' acts which violated similar provisions in the Fair Debt Collection Practices Act ("FDCPA") as described above thereby renders such acts *per se* unfair and deceptive practice violations of the Unfair Trade Practices Consumer Protection Law, 73 P.S. § 201-1 *et. Seq.,* FCEUA, 73 P.S. § 2270.4(a).

<u>**COUNT II**</u>
**Breach of Contract/ Covenant of Good Faith and Fair Dealing**
**(Plaintiff v. the Attorney Defendants)**

53.     Plaintiff incorporates all foregoing allegations as though set forth in full.

54.     Plaintiff and Defendants entered into a contract for legal services.

55.     Defendants' aforementioned conduct constitutes a breach (express, implied, or as a matter of law) of that agreement to provide competent and effective legal services, as well as a breach of the covenant of good faith and fair dealing.

56.     As a direct and proximate cause of the aforementioned breach of the agreement to provide legal services, Plaintiff has been damaged, as set forth above.

<u>**COUNT III**</u> **- Breach of Fiduciary Duty**
**(Plaintiff v. the Attorney Defendants)**

57.     Plaintiff incorporates all foregoing allegations as though set forth in full.

58.     Plaintiff and Defendants were in a fiduciary, attorney-client relationship.

59.     Defendants' aforementioned conduct constitutes a breach of that fiduciary relationship.

60.     As a direct and proximate cause of the aforementioned breach of fiduciary duty, Plaintiff has been damaged as set forth above.

**PRAYER**

**WHEREFORE,** Plaintiff demands judgment against defendants, jointly and severally, or singly as indicated, for:

**Exhibit "3"**

0277

(a) Actual, compensatory, and punitive Damages for violation of CROA;

(b) Costs and reasonable attorney's fees for violation of CROA;

(c) Declaratory and injunctive relief, and such other and further relief as law or equity may provide for violation of CROA.

(d) Actual damages pursuant to 73 P.S.§ 201-9.2(a) against Defendants;

(e) Treble actual damages pursuant 73 P.S.§ 201-9.2(a) against Defendants;

(f) Costs of litigation and reasonable attorney's fees pursuant to 73 P.S.§ 201-9.2(a), and;

(g) Actual damages for breach of contract and fiduciary duty.

(h) Such other and further relief as the Court shall deem just and proper.

## **<u>JURY DEMAND</u>**

Plaintiff demands trial by jury.

ROBERT P. COCCO, P.C.
BY:   <u>/s/Robert P. Cocco</u>

Attorney for Plaintiff

Dated: May 10, 2022



THE LITIGATION PRACTICE GROUP
1351 Calle Avanzado | Suite 4
San Clemente, CA 92673
Tel 949.593.0440
Fax 949.415.7816

admin@coastprocessing.com

## LEGAL SERVICES AGREEMENT

### Legal Services

The Litigation Practice Group PC ("LPG") will provide debt validation services wherein it will assist you in removing erroneous or inaccurate information appearing on one or more of your credit reports by contesting debts appearing therein. This service is limited to information reported by creditors or purported creditors to credit bureaus. The purpose of this program is to challenge the legal validity of debts appearing on or being reported to credit bureaus. The cost of legal services rendered by LPG is set forth below, and those fees are earned by LPG for services rendered to you as set forth herein at the time such fees are paid.

### Client Authorization

You authorize LPG to challenge, where applicable, any debts appearing in your credit report(s) that you believe to be in any way invalid, inaccurate, or otherwise without a legal basis. You also authorize LPG to obtain a copy of your credit report to assist in the process of analyzing your account and developing a strategy regarding the invalidation of debts that are excessive or otherwise unauthorized by law. You further authorize LPG, acting under power of attorney for you, to affix your signature to documents sent on your behalf in relation to the matters addressed herein.

### Description of Services to be Performed

LPG will obtain your credit reports, analyze them, and develop strategies for correcting invalid or unlawful debts for which you should not be held legally responsible. Where appropriate, LPG will use existing laws and interact with creditors and credit bureaus on your behalf to invalidate your debts and remove such invalid debts from your credit reports. LPG will also interact with collection agencies, as applicable, to invalidate your debts by requiring them to supply evidence of your indebtedness to them, or any other legal mechanism. LPG will also consult with you regarding all aspects of the credit reporting process, including all laws applicable to the same. LPG will also investigate your delinquent accounts in order to determine the most effective method for invalidating your debts or otherwise removing any legal liability for such debts, up to and including the initiation of lawsuits on your behalf against your creditors and their third-party debt collectors.

In addition, if a lawsuit is filed against you, LPG will represent you in such a lawsuit and will not charge any additional fees for such representation provided such a lawsuit was initiated after the date you sign this Agreement. In the event a lawsuit was initiated against you before the date you execute this

ID: 3522897 Signed: 2021-02-17T14:29:29-06:00

Agreement and you elect to have LPG represent you, an additional fee of $500.00 will be charged. Where appropriate, if legal fees are recovered from an adverse party, LPG will retain such fees for its services. You will be responsible to pay any damages resulting from any lawsuit. Any costs incurred in a lawsuit will be paid by LPG out of the fees set forth below, including the fees of any attorney retained on your behalf in a jurisdiction in which LPG is not admitted to practice law. No additional payment from you to LPG will be necessary for the defense of any lawsuit filed against you after the date you execute this Agreement. You will, however, be responsible to pay any damages resulting from such lawsuits or any settlements reached in the course of such lawsuits.

## Fees

You will pay the following fees for the legal services provided by LPG. No fee or other cost will be charged or collected other than the following. This is the only amount you have to pay for LPG's services, and this fee is fixed, such that it is earned the moment it is transmitted to LPG. Upon request, LPG will provide an update of the progress of services performed under this agreement at reasonable intervals of no greater frequency than once a month.

## Refund Policy

If an account is fully validated by a creditor, such that no further dispute to the validity of the account could be made, you will receive a full refund of the fees that you paid towards the invalidation of that account (i.e., you will be refunded the fees paid in proportion to the debt that was validated). Should you have an outstanding balance with LPG at the time your refund is issued on the validated account, any refund will first be applied towards the outstanding balance. A client can elect to move to a debt settlement service on any validated account in lieu of obtaining a refund. If a client makes such an election, fees will no longer be collected for such account and debt settlement services will be performed for no additional fees.

## Debt Settlement

If LPG is unable to invalidate any debt, you may elect to have LPG negotiate a settlement on your behalf with the concerned creditor without any additional fees being charged to or incurred by you for such service. Any settlement reached with any such creditor shall be your responsibility. At the point that you reach a settlement with such creditor, your payment to LPG will be reduced and re-amortized to adjust for the settled account being removed from the representation herein contemplated. Please see the refund policy above for more details.

## Actions Required of You

You agree to provide LPG with any and all correspondence you receive from any creditor, credit bureau, attorney, or court of law. You further agree to keep a log of all communications, including telephonic and electronic communications, from any creditor or credit reporting agency.

## Right to Conduct Business Electronically and Contact You

ID: 3522897 Signed: 2021-02-17T14:29:29-06:00

You agree that LPG may contact you electronically and telephonically and that any and all business with LPG may be conducted electronically. You further agree that LPG may transmit data, including that regarding your credit profile, electronically. You further agree that any electronic communication carries the risk of disclosure to a third party and that LPG will not be held responsible for any such inadvertent disclosure of information. A facsimile or email transmission of this signed agreement, via an email attachment or otherwise, will be as valid as the original. This agreement may not be modified except in writing by both parties.

## Client Acknowledgements

By signing this agreement, you acknowledge that LPG has not instructed you to breach any contract, fail to make any required payment, or fail to perform any obligation you have lawfully incurred. LPG reserves the right to terminate this agreement if (a) client fails to make timely payment of the amount due under hereunder or (b) the client`s payments are returned multiple times for any reason. LPG will not pay your debts and does not guarantee that any debt you now have or may incur will be invalidated or settled in association with LPG's services. You understand and agree that you must forward any communication you receive in printed or electronic form from any creditor, court, or representative of other a creditor or a court to admin@coastprocessing.com and that you must keep a log of all telephonic communications with any creditor or credit reporting agency. **Do not sign this agreement until you have received and read the information statements and notices of cancellation required by state and federal law, even if otherwise advised. By signing this agreement, you acknowledge receipt of these disclosures prior to the time of signing and agree to the terms of this agreement. You, the client, may cancel this agreement at any time before midnight CST of the 5th day after the date of execution of this agreement via an email to admin@coastprocessing.com. In addition, you, the client may terminate LPG's services under this agreement at any time via an email to admin@coastprocessing.com.**

Client Signature: _Debra Price_                    Date: 2/17/2021

Co-Applicant Signature: _____      Date: _____

## Creditor Information

| Creditor | Account # | Amount Owed |
|----------|-----------|-------------|
| LENDINGCLU | ▉ | $7,007.00 |
| FNB OMAHA | ▉ | $4,413.00 |
| Cap one | ▉ | $1,450.00 |
| Cap one | ▉ | $1,331.00 |
| BARCLAYSBK | ▉ | $984.00 |
| | | **$15,185.00** |

ID: 3522897 Signed: 2021-02-17T14:29:26-06:00

## **Client Information**

Name: Debra Price

Address: 319 Putnam St, , Stranton PA 18508

Home

Cell Ph

Email:

Las 4 S

## **Co-Client Information**

Name:

Address: , ,

Home Phone:

Cell Phone:

Email:

Last 4 SSN:

**Exhibit "3"**                    **0282**

## **Schedule of Payments**

I agree to this payment schedule – Client Initials: *DP*_____

| Payment # | Process Date | Amount |
|---|---|---|
| 1 | Feb 26, 2021 | $260.10 |
| 2 | Mar 26, 2021 | $260.10 |
| 3 | Apr 26, 2021 | $260.10 |
| 4 | May 26, 2021 | $260.10 |
| 5 | Jun 28, 2021 | $260.10 |
| 6 | Jul 26, 2021 | $260.10 |
| 7 | Aug 26, 2021 | $260.10 |
| 8 | Sep 27, 2021 | $260.10 |
| 9 | Oct 26, 2021 | $260.10 |
| 10 | Nov 26, 2021 | $260.10 |
| 11 | Dec 27, 2021 | $260.10 |
| 12 | Jan 26, 2022 | $260.10 |
| 13 | Feb 28, 2022 | $260.10 |
| 14 | Mar 28, 2022 | $260.10 |
| 15 | Apr 26, 2022 | $260.10 |
| 16 | May 26, 2022 | $260.10 |
| 17 | Jun 27, 2022 | $260.10 |
| 18 | Jul 26, 2022 | $260.10 |
| 19 | Aug 26, 2022 | $260.10 |
| 20 | Sep 26, 2022 | $260.10 |
| 21 | Oct 26, 2022 | $260.10 |
| 22 | Nov 28, 2022 | $260.10 |
| 23 | Dec 27, 2022 | $260.10 |
| 24 | Jan 26, 2023 | $260.10 |
| 25 | Feb 27, 2023 | $260.10 |
| 26 | Mar 27, 2023 | $260.10 |
| 27 | Apr 26, 2023 | $260.10 |
| 28 | May 26, 2023 | $260.10 |
| 29 | Jun 26, 2023 | $260.10 |
| 30 | Jul 26, 2023 | $260.10 |
| 31 | Aug 28, 2023 | $260.10 |
| 32 | Sep 26, 2023 | $260.10 |
| 33 | Oct 26, 2023 | $260.10 |
| 34 | Nov 27, 2023 | $260.10 |
| 35 | Dec 26, 2023 | $260.10 |
| 36 | Jan 26, 2024 | $260.18 |

ID: 3522897 Signed: 2021-02-17T14:29:29-06:00

**Electronic Payment Authorization**

Bank Name: COMMUNITY BANK N.A.

Name on Account: Debra Price

Account Type:    Checking

___ Other (specify: _____ )

Routing Number:  ████████

Account Number:  ████████

Next Payment Date: Feb 26, 2021 Amount: $ 260.10

Recurring Payment Date: 26th

By signing below, I authorize and permit LPG or their designees, EPPS, Omnifund, Equipay, Forte, a CSG Company, or Authorize.NET to initiate electronic funds transfer via an Automated Clearing House system (ACH) from my account listed above.  I will also provide LPG with a voided check or savings deposit slip.

If necessary, LPG may make adjustments if errors have occurred during the transaction.  The date of the draft is listed above, however, if the draft date falls on a weekend or bank holiday, the debit transaction will take place on the next business day.  This authority will remain in effect until LPG is notified by the member in writing at least 5 days prior to the next scheduled draft date.  No other forms of cancellation by members will be observed.  If the debit is returned because of non-sufficient funds or uncollected funds, then the originator and its financial institution may reinitiate the entry up to two (2) times.  The reversal of funds from a client's account that was drafted in error cannot be made until seven business days from the draft date.  The member agrees to waive all rights of reversal or refusal of any payment on any draft that LPG may make against the member's bank account while services are performed.  The member agrees with all of the provisions and conditions outlined within.

**Acknowledgment of Refunds & Draft Date Changes**

ACH Refunds: If a refund is due such will be made through the ACH process only if the fees were made through the ACH process.  All refunds may take up to 10 days to process.  In the event my EFT or draft is returned from my bank unpaid, I agree that a fee of $25.00 or as allowed by law may be charged to my account via draft or EFT.  Furthermore, I warrant that I am authorized to execute this payment authorization and the above information is true and correct.  Draft Date Changes: A client may stop any ACH debit by providing written notice to LPG at least five (5) business days prior to the scheduled payment.  If you should need to notify us of your intent to cancel and/or revoke this authorization you must contact us five (5) days prior to the questioned debit being initiated.  Please call us at 949-593-0440 or at admin@coastprocessing.com.

Client Signature:  *Debra Price*                    Date: 2/17/2021

**Exhibit "3"**                                                   0284

Printed Name:          Debra Price

_____          _____

ID: 3522897 Signed: 2021-02-17T14:29:29-06:00

**Electronic Funds Transfer (EFT) Authorization to Debit Bank Account**

Account Owner Name: Debra Price

Social Security Number: ███████                            Birth Date: ███████

Address: 319 Putnam St            City: Stranton            State: PA      Zip:  18508

Mobile Phone #:                        Bank Name:  COMMUNITY BANK N.A.

Routing Number: ███████               Account Number:  ███████

Total Amount of Debit: $260.10        Date of Next Debit: Feb 26, 2021     Checking or Saving: Checking

I hereby apply for and agree to establish a non-interest bearing special purpose account (the "Account") with a bank ("Bank") selected by EPPS, LLC and/or its successors for the purpose of accumulating funds to pay for such goods and services as I so direct EPPS, LLC to perform.  This application is subject to Bank's customer identification program, as required by the USA PATRIOT ACT and other applicable laws, and accordingly, I hereby represent that the above information is true and complete to the best of my knowledge and belief.  The bank account information provided above may be subject to account validation processes to include pre-notation and a $0.01 micro-deposit.

| Schedule of Fees and Charges | |
| --- | --- |
| Monthly Banking Fee: | Included |
| ACH/EFT Fee Per Transaction | Included |
| Chargeback/Late Return Fee | Included |
| NSF Fee | Included |
| Account Closer Fee | Included |
| **PREMIUM DISBURSEMENT SERVICES** | |
| Wire Transfer | Included |
| FedEx/Overnight Next Day | Included |
| 2nd Day Check With Tracking | Included |

I hereby authorize Bank, directly or through EPPS, LLC, and/or its service providers, to administer the account on my behalf by (a) periodically transferring and depositing funds to the Account, via any payment media currently in use, and (b) periodically disbursing funds from the Account pursuant to instructions that I may give from time to time.  I hereby authorize payments from the Account for the fees and charges provided for in this application and in the agreement.  I hereby grant permission for Bank to share information regarding the Account with EPPS, LLC, and any other service provider to facilitate the transactions I may initiate that involve the Account, and with any other party that is essential to the administration of the Account on my behalf.  My signature below provides permission to be contacted by phone at the number provided with this authorization.  A payment reminder will be sent to your phone number via Text Messaging prior to the payment scheduled above. This authorization shall remain in full force and effect until I provide a verbal or written termination notice to EPPS.  Any such notice, and any other written notice that is provided for in this Application or the Agreement, shall be sent to EPPS, LLC at the address set forth in the Agreement. "EPPS-Ph# 800-215-3484" will appear on your bank statement

Account Holder's Signature: *Debra Price*                    Date: 2/17/2021

**Exhibit "3"**                                                   0286

E-Signature Completion Certificate





## Your Document Was Successfully Signed!

Congratulations, your document(s) was successfully signed. Please find
details below related to your e-signature submission.

### ℹ️ Signing Details

| | |
|---|---|
| **Document ID** | **Signer Email** |
| 3522897 | debbieprice98@yahoo.com |
| **Document Title** | **Signer IP Address** |
| Legal Service Agreement with LPG - ASF ( English ) | 73.175.109.248 |
| **Sender IP Address** | **Timestamp** |
| 45.22.90.58 | 2021-02-17T14:29:29-06:00 |
| **Number Of Signers** | **Document MD5 Hash** |
| 1 | d41d8cd98f00b204e9800998ecf8427e |

### ✳️ Document Audit

✔ Sent at 2021-02-17T14:25:23-06:00 from IP 45.22.90.58

✔ Delivered to debbieprice98@yahoo.com at 2021-02-17T14:27:48-06:00 from 73.175.109.248

✔ Adopted Signature at 2021-02-17T14:28:04-06:00 from 73.175.109.248

✔ Completed Signing at 2021-02-17T14:29:29-06:00 from 73.175.109.248

✔ PDF Generated at 2021-02-17T14:29:29-06:00

Sending Agent
Mozilla/5.0 (iPhone; CPU iPhone OS 14_4 like Mac OS X) AppleWebKit/605.1.15 (KHTML, like Gecko) Version/
14.0.3 Mobile/15E148 Safari/604.1

**Exhibit "3"**                                                              **0287**

## BRIEF IN SUPPORT

I. **INTRODUCTION**

Plaintiff essentially tries to hammer a square peg into a round hole by alleging that Defendants are subject to the Credit Repair Organizations Act ("CROA"), 15 U.S.C. §1679, *et seq.*, simply because they assist in developing creditworthy behavior or resolving debt. In her Complaint, Plaintiff provides no detail or facts of any kind that support her allegation that "Defendants are 'credit repair organizations'" such that Defendants would be subject to the CROA other than just blindly asserting that Defendants are credit repair organizations. (Doc. No. 1, ¶25). And, in any event, Congress's focus in enacting the CROA was on entities who assist in the improvement or repair of a consumer's credit record, credit history, or credit rating, and not the debt validation services that Defendant provides. Plaintiff attempts to make "debt validation" and "credit repair" services synonymous in her Complaint, but the two are distinct. Plaintiff has failed to plead facts that are necessary to state a claim for relief, and thus Count I of her Complaint should be dismissed.

Similarly, Count II should also be dismissed for these reasons. Plaintiff's own allegations show that Defendants are not considered to be "debt collectors" by statute, such that Count II must also be dismissed.

II. **PLAINTIFF'S ALLEGATIONS**

Defendants assist their clients in debt validation, debt relief, and collections harassment. (See Doc. 1-1, attached to Complaint as "Exhibit A"). Defendants do so, in part, by working to resolve their clients' existing debts through negotiation with client creditors individually. (*Id.*). Notably, the agreement expressly states the services Defendants would provide for Plaintiff. The services include (but are not limited to):

- Contesting debts;
- Obtaining client credit reports, analyzing them, and developing strategies for correcting invalid or unlawful debts for which the client should not be held legally responsible;
- Interacting with creditors and credit bureaus on the client's behalf to invalidate debts and remove such invalid debts from the client's credit reports;
- Interacting with collection agencies to invalidate the client's debts;
- Initiating lawsuits on the client's behalf against creditors and third-party debt collectors;
- Representing the client in a lawsuit filed against he or she;
- Negotiating debt settlements on the client's behalf.

(See Doc. 1-1, attached to Complaint as "Exhibit A").

None of these services include improving Plaintiff's credit record, credit history, credit rating, or providing advice or assistance to Plaintiff in improving her credit record, credit history, or credit rating. (*Id.*).

Plaintiff filed her Complaint on May 15, 2022. (See Doc. No. 1). However, the Complaint merely sets out a formulaic recitation of the requirements to be subject to the CROA. Thus, the Complaint has no allegations that this Court could infer that Defendants are "credit repair organizations" as required by the statute to be subject to liability. (See, generally, Plaintiff's Complaint).

Also taken from Plaintiff's own allegations is the fact that Defendants are not acting on behalf of any creditor. (See, generally, Plaintiff's Complaint). As such, Defendants are not debt collectors. (*Id.*).

## III.    LAW AND ARGUMENT

### A.    Legal Standard

To survive a motion to dismiss pursuant to FRCP 12(b)(6), a plaintiff must plead "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 546 (2007).  Thus, when legal conclusions are involved in the complaint "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to [those] conclusions," *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009), and "only a complaint that states a plausible claim for relief survives a motion to dismiss," *Id.* at 679. Thus, mere "labels and conclusions" and "a formulaic recitation of the elements of a cause of action" will not suffice and must be disregarded. *Khalik v. United Air Lines*, 671 F.3d 1188, 1190–91 (10th Cir. 2012).  In other words, a complaint must do more than allege the plaintiff's entitlement to relief.  "If the scope of the allegations in a complaint are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Robbins v. Oklahoma,* 519 F.3d 1242, 1247 (10th Cir.2008).

In considering a motion to dismiss, the Court is not deciding the issue of whether a plaintiff will ultimately prevail but is deciding if the plaintiff is entitled to offer evidence to support claims. *Burkhart v. Knepper,* 310 F. Supp. 2d 734, 744 (E.D. Pa. 2004).

### B.    Defendants Are Not "Credit Repair Organizations" Under the Credit Repair Organizations Act

The Credit Repair Organizations Act ("CROA") was enacted to protect the public from unfair or deceptive business practices by credit repair organizations. *Henry v. Westchester Foreign Autos, Inc.*, 522 F. Supp. 2d 610, 613 (SD NY 2007). Liability under CROA is limited

to credit repair organizations as defined in § 1679a(3) and persons in connection with the

activities of or transactions involving credit repair organizations. *Wright v. 21st Mortg. Corp. (In*

*re Wright)*, 2007 Bankr. LEXIS 1757, *40-41 (Bankr. ND Ala. 2207).

> A credit repair organization:
>
> (A) means any person who uses any instrumentality of interstate commerce or the
> mails to sell, provide, or perform (or represent that such person can or will sell,
> provide, or perform) any service, in return for the payment of money or other
> valuable consideration, for the express or implied purpose of—
>
> (i) improving any consumer's credit record, credit history, or credit rating; or
>
> (ii) providing advice or assistance to any consumer with regard to any activity or
> service described in clause (i).

15 U.S.C. 1679a(3).

Courts have held that credit repair organizations are only entities whose primary focus is

on the improvement or repair of a consumer's credit record and not those who focus is

developing creditworthy behavior or resolving debts. *Plattner v. Edge Solutions, Inc*., 422 F.

Supp. 2d 969 (ND Ill. 2006); *Walston v. Nationwide Credit, Inc*., 2019 U.S. Dist. LEXIS 147865

(ND Ill. August 30, 2019) (stating that "the definition of credit repair organization encompasses

'entities whose focus is on the improvement or repair of a consumer's credit record, credit history

or credit rating, explicitly or implicitly, not entities whose activities are aimed at assisting

consumers in developing "creditworthy behavior" and paying their debts, which may result in

improved actual credit as a collateral consequence, rather than as a program objective."); *White*

*v. Fin. Credit Corp*., 2001 U.S. Dist. LEXIS 21486 (ND Ill. December 20, 2001)(finding a

company that represented paying debts would improve credit history was not a credit repair

organization because its primary business focus was debt collection).

In *Plattner*, a company who offered a "Post Closing Credit Restoration Program" (in

addition to various debt payment and validation services), which falls directly into the purview

of being considered a "credit repair organization," was not a credit repair organization. *Id*. at 976. The court found that Congress did not intend the CROA to apply broadly to entities providing advice related to debt and debt repayment, which may result in improved credit as a collateral consequence. *Id*. at 975. Rather, Congress's focus in enacting the statute was on entities whose focus is the improvement or repair of a consumer's credit record, credit history, or credit rating. *Id*.

If the "Post Closing Credit Restoration Program" was the only service offered by the company in Plattner, it may have rendered it a "credit repair organization," however, when viewed in context with the company's primary debt management services, the purpose was to assist in managing a consumer's debt. *Id*. at 976. Summary judgment was granted in favor of the company. *Id*. at 976-977; See also *Wright v. 21st Mortg. Corp. (In re Wright)*, 2007 Bankr. LEXIS 1757 (Bankr. ND Ala. 2207)(holding the same); *Hillis v. Equifax Consumer Servs*., 237 F.R.D. 491 (ND GA 2006) (denying plaintiff's motion for summary judgment on the fact that defendant was a credit repair organization where defendant advertised that it could help improve an individual's credit outlook and credit score because such statements could be found to mean that defendant would only provide the individual with information so that the individual could take steps to improve their credit score on their own).

The same analysis applies to the situation at bar. The agreement Plaintiff entered into with Defendants stated that Defendants would provide Plaintiff services regarding her debt, including debt validation and debt relief. The services Defendants offered Plaintiff are similar to the services the company offered in *Plattner*. While debt assistance may implicitly improve credit, the CROA was not intended to encompass any entity that does so. *Plattner v. Edge Solutions, Inc*., 422 F. Supp. 2d 969, 975 (ND Ill. 2006). Liability under CROA is limited to

"credit repair organizations" and, because "credit repair organizations" do not include entities that offer debt validation and relief services, as Defendants do, Plaintiff has not plead a claim upon which relief can be granted.

Accordingly, because Defendants do not fit within the statutory definition of "credit repair organizations," Plaintiff can prove no set of facts that would entitle Plaintiff to recover on her allegations that Defendants violated the Credit Repair Organizations Act.  Count I of Plaintiff's Complaint should therefore be dismissed as a matter of law.

### C.        Defendants Are Not "Debt Collectors"

Plaintiff also asserts violations under the Fair Credit Extension Uniformity Act and Pennsylvania Unfair Trade Practices and Consumer Protection Law (Count II of the Complaint). These claims are premised on 73 P.S. § 2270.3, which defines a "debt collector" as a person not a creditor who is "*acting on behalf of a creditor*."  73 P.S. § 2270.3 (*emphasis added*).

It is clear from Plaintiff's allegations that Defendants are not acting on behalf of any creditors.  Rather, Defendants are adverse to all of Plaintiff's creditors.  Plaintiff alleges a fiduciary relationship with Defendants, which relationship allegedly arises based upon the engagement of Defendant LPG to assist in compromising debt owed to creditors.

Therefore, Plaintiff's own allegations bring Defendants outside the definition of "debt collector."  Consequently, Count II of Plaintiffs Complaint must be dismissed as a matter of law.

## IV.    <u>CONCLUSION</u>

For the aforementioned reasons, this Court should dismiss Count I and Count II of

Plaintiff's Complaint, with prejudice, for failure to state a claim.

<div style="text-align: right">

Respectfully submitted,

*/s/ Jordan M. Kurth*

_____
Jordan M. Kurth (PA B#: 317804)
The Litigation Practice Group PC
17542 17th St., Suite 100
Tustin, CA 92780
Phone: (949) 715-0644
Fax: (949) 415-7816
E-mail: JKurth@lpglaw.com
*Attorney for Defendants*

**LUPER NEIDENTHAL & LOGAN**
A Legal Professional Association

*/s/ Kyle T. Anderson*

_____
Christopher R. Pettit (OH B#: 0065694)
Matthew T. Anderson (OH B#: 0082730)
Kyle T. Anderson (OH B#: 0097806)
1160 Dublin Road, Suite 400
Columbus, Ohio 43215-1052
(614) 221-7663 Fax: (866) 345-4948
Email: cpettit@LNLattorneys.com
Email: manderson@LNLattorneys.com
Email: kanderson@LNLattorneys.com
*Attorneys for Defendants*

</div>

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing has been filed via the Court's electronic filing system on this 8th day of July 2022. Notice of filing will be performed by the Court's electronic filing system, and Parties may access the document through the Court's electronic filing system.

*/s/ Kyle T. Anderson*

Kyle T. Anderson (OH B#: 0097806)

*Attorney for Defendants*

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DEBRA PRICE,<br><br>            Plaintiff,<br><br>      v.<br><br>LITIGATION PRACTICE GROUP P.C.;<br><br>DANIEL MARCH, ESQ., individually and d/b/a LITIGATION PRACTICE GROUP;<br><br>MARQUE CAREY, ESQ., individually and d/b/a LITIGATION PRACTICE GROUP;<br><br>RANDALL CLARK, ESQ., individually and d/b/a LITIGATION PRACTICE GROUP;<br><br>MICHAEL ROBINSON, ESQ., individually and d/b/a LITIGATION PRACTICE GROUP;<br><br>JAYDE TRINH, ESQ., individually and d/b/a LITIGATION PRACTICE GROUP;<br><br>HOWARD GUTMAN, ESQ., individually and d/b/a LITIGATION PRACTICE GROUP,<br><br>            Defendants. | NO. 3:22-cv-00707-KM |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS COUNTS I AND II OF PLAINTIFF'S COMPLAINT**

By his undersigned counsel, Plaintiff Debra Price ("Plaintiff" or "Price") hereby opposes Defendants' Motion to Dismiss Plaintiff's Complaint (ECF.  )("Motion"), and says as follows:

**I.      INTRODUCTION & SUMMARY OF RELEVANT FACTS**

This civil action by Plaintiff against Defendants, attorneys acting individually and via a corporate entity ostensibly as debt negotiators for consumers like plaintiff to reduce their outstanding debt (Compl. ¶¶ 14-19) and fix their credit (Compl. ¶¶ 20-23), but in fact act according to an industry wide scheme to aid and enable creditor collection and deceive consumers to have them believe otherwise. Compl. ¶¶ 29-41.

1

As a result of Defendants' foregoing acts and omissions, Plaintiff has been damaged by increased credit costs over the past year and a half since entering Defendants' bogus debt relief/negotiation program including a collection lawsuit being filed against her by one of her enrolled creditors, Capitol One. Compl. ¶¶ 39.

Based on the well pled Amended Complaint (ECF 13) and the argument herein, Plaintiff requests that the Motion be DENIED in its entirety.  In the alternative, if the Court believes that additional facts are necessary for Plaintiff to proceed on his claims, he requests leave of the Court to file an Amended Complaint to address those deficiencies.

## II.  LEGAL STANDARD

The standard of review for a motion to dismiss is as follows:

> "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Threadbare" recitations of the elements of a claim supported only by "conclusory statements" will not suffice. *Id.* at 683, 129 S.Ct. 1937. Rather, a plaintiff must allege some facts to raise the allegation above the level of mere speculation. *Great Western Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 176 (3d Cir. 2010) (citing *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). In analyzing a motion to dismiss legal conclusions are disregarded, well-pleaded factual allegations are taken as true, and a determination is made whether those facts state a "plausible claim for relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).

*Frompovicz v. Niagara Bottling, LLC*, --- F.Supp.3d ----, No. CV 18-54, 2018 WL 4465879, at *2 (E.D. Pa. Sept. 18, 2018).

Finally, "upon granting a motion to dismiss, 'a district court must permit a curative amendment, unless an amendment would be inequitable or futile.' *Phillips v. Cnty. of Allegheny*,

Exhibit "3"

515 F.3d 224, 236 (3d Cir. 2008)." *Bramlett v. United States Dep't of Treasury*, No. CV 16-257, 2017 WL 1048366, at *8 (E.D. Pa. Mar. 20, 2017).

## III. ARGUMENT

### A. DEFENDANTS ARE WITHIN CROA'S DEFINITION OF "CREDIT REPAIR ORGANIZATION" OR, ALTERNATIVELY, PLEADED AS VIOLATING 1679B(A) WHICH VIOLATIONS APPLY TO ANY PERSON WHO COMMITS THEM.

CROA defines a "credit repair organization" broadly as any person who performs debt relief services "for the express or implied purpose of—(i) improving any consumer's credit record, credit history, or credit rating", 15 U.S.C. § 1679a(3)(A). Therefore, applying the CROA to debt relief services fits the remedial purpose of the Act and the broad definition of "credit repair organization." Because a consumer's credit score or creditworthiness is heavily influenced by the amount of debt owed and past due and because Debt relief or negotiation services are specifically designed to settle consumers' debts, such services will therefore have a direct impact on the Act's concern with "consumer's credit record, credit history, [and] credit rating". *Id.*

Indeed, it is important to note that, even where a debt relief company does not expressly offer credit repair, Courts have still found the broad remedial purpose of CROA fulfilled by debt settlement services alone due to their impact on a consumer's credit. For example, in *Day v. Persels & Assocs., L.L.C.*, 2015 WL 413224, at *17–19 (M.D. Fla. Jan. 30, 2015), the court held that a debt settlement law firm's services were implied to improve the consumer's credit. The plaintiff therein alleged that the law firm promised to reduce the consumer's debts, to help the consumer achieve "financial health," and to provide related services. *Id.* at *17. The law firm argued that, accepting those allegations as true, they were not subject to the CROA because CROA only applies to persons offering to correct or repair credit reports—not those that merely promise debt settlement. *Id.* The court rejected the law firm's interpretation, holding that the CROA does not

Exhibit "3"

distinguish between past and prospective credit. *Id.* at *18 (citing Zimmerman v. Puccio, 613 F.3d 60, 72 (1st Cir. 2010).

The cases cited by Defendants are all factually distinguishable from the facts of the case at hand. In *Plattner v Edge Solutions*, the defendant law firm acting as a debt relief agency, expressly disclaimed assurance as to credit repair and even gave notice that it could deteriorate by participation in their debt relief program. By contrast, much of the first page of Defendants' contract with Plaintiff herein describes the credit repair benefits of the program, see Compl. Ex. A, *e.g.*:

> The Litigation Practice Group PC ("LPG") … will assist you in removing erroneous or inaccurate information appearing on one or more of your credit reports by contesting debts appearing therein. This service is limited to information reported by creditors or purported creditors to credit bureaus. The purpose of this program is to challenge the legal validity of debts appearing on or being reported to credit bureaus.
>
> …
>
> LPG will obtain your credit reports, analyze them, and develop strategies for correcting invalid or unlawful debts for which you should not be held legally responsible. Where appropriate, LPG will use existing laws and interact with creditors and credit bureaus on your behalf to invalidate your debts and remove such invalid debts from your credit reports.

In *Walston v. Nationwide Credit*, the facts are a far cry from the instant facts wherein the plaintiff argued the novel theory that the defendant debt collection firm, not a debt relief firm, was acting as a credit repair organization by the terms of its debt collection letter attempting to collect the

4

plaintiff's debt despite the fact that there was no contractual relationship between the debtor and collector at all.  In *White v. Fin. Credit Corp*., a similar novel argument was made against a debt collector with whom the debtor had no contractual relationship.

Alternatively, certain provisions of the Act apply to any person who commits certain acts which "no person" may commit without violating the Act regardless of whether the person is deemed to be a "credit repair organization" under the Act.  Here, Plaintiff has pleaded violations in this respect of 15 U.S.C. § 1679b(a)(1),(3), and (4) (Compl. ¶ 43)[1].

## B. Defendants are within the FCEUA's definition of "debt collector"

Defendants move to dismiss Count II asserting its disputed factual contention that it is not a debt collector under the FCEUA.  Motion at 8.  More specifically, it claims, with no factual basis to do so, that it does not fall within the definition of a debt collector based on a truncated citation of the Act's definition of a debt collector as "a person not a creditor who is 'acting on behalf of a creditor'".  *Id.* 8.   As the Third Circuit has discussed regarding the FCEUA's definition of a debt collector:

> Whether a defendant is a "debt collector" under the FCEUA, however, is somewhat
> more complicated, because rather than adopting the FDCPA's definition of "debt

---

[1] (a) In general, **No person** may—

(1) make any statement, or counsel or advise any consumer to make any statement, which is untrue or misleading (or which, upon the exercise of reasonable care, should be known by the credit repair organization, officer, employee, agent, or other person to be untrue or misleading) with respect to any consumer's credit worthiness, credit standing, or credit capacity to—
    (A)  any consumer reporting agency (as defined in section 1681a(f) of this title); or
    (B) any person—
        (i) who has extended credit to the consumer; or
        (ii) to whom the consumer has applied or is applying for an extension of credit;
…
(3) make or use any untrue or misleading representation of the services of the credit repair organization; or
(4) engage, directly or indirectly, in any act, practice, or course of business that constitutes or results in the commission of, or an attempt to commit, a fraud or deception on any person in connection with the offer or sale of the services of the credit repair organization.

collector," the FCEUA provides its own. Under the FCEUA, a "debt collector" is "[a] person not a creditor... engaging or *aiding directly or indirectly* in collecting a debt...." *Id.* § 2270.3. The FCEUA includes within this definition "[a]n attorney, whenever such attorney attempts to collect a debt, as herein defined…

*Glover v. FDIC*, 698 F. 3d 139, 152 (3rd Cir. 2012)(emphasis added).

Here, there are <u>no</u> well pled facts before the Court to contradict Plaintiff's allegations that Defendants' debt settlement scheme offers no benefits to Plaintiff, but, at least indirectly, aids Plaintiff's creditors while her five (5) debts to them have gathered interest and late charges for 1 ½ years of Plaintiff's enrollment in the program and, regarding at least one debt, a collection lawsuit with accompanying litigation expenses[2] while Plaintiff has paid $4,000 into a dormant "settlement fund" administered by Defendants that has only benefited Defendants by paying them fees. Compl. ¶¶ 29, 37, 39-41.

Defendants also argue that Plaintiff pleading Defendants as her fiduciary somehow legally contradicts her FCEUA allegation that Defendants are also acting as collectors. Because this argument is made without support of legal citation to show that the allegations are mutually exclusive somehow, it warrants no substantive counter.  Indeed, it is expressly pled that Defendants' deceptive actions on behalf of creditors breach their fiduciary obligations to Plaintiff as her lawyers by failing to fulfill a purported beneficial negotiating role on her behalf.  It should be noted also that, violation of the FCEUA is also a violation of Pennsylvania's UTPCPL which imposes strict liability upon Defendants for such violation here:

> Thus, we hold that the General Assembly, by "eliminating the common law state of mind element (either negligence or intent to deceive)," (citation omitted), imposed strict liability on vendors who deceive consumers by creating a likelihood of confusion or misunderstanding in private, as well as public, causes of actions. Carelessness or intent, required for negligent or fraudulent misrepresentations, may be absent when perpetrating "deceptive conduct" under 73 P.S. § 201-2(4)(xxi). Given their varying degrees of requisite intent, a UTPCPL catchall violation and the torts of negligent and fraudulent misrepresentation raise separate legal issues,

---

[2] Motion Response Ex. 1 reflecting the public docketing of the collection lawsuit.

**Exhibit "3"**                                                                                  **0301**

as a matter of law.

*Gregg v. Ameriprise Financial, Inc.*, 195 A.3d 930, 940 (2018).

## IV.  CONCLUSION

Plaintiff believes his well pled Complaint sufficiently states claims for relief and Defendants' motion should be DENIED.  If the Court believes Plaintiff has not properly pled claims, she seeks leave to amend their pleading to correct any deficiencies.

[signatures on next page]

Dated: July 13, 2022

/s/Robert P. Cocco
Robert P. Cocco, Esquire
Attorney I.D. No. 61907
1500 Walnut St., Ste. 900
Philadelphia, PA  19102
(215) 351-0200
bob.cocco@phillyconsumerlaw.com

*Counsel for Plaintiffs*

8

# Exhibit "4"

<table>
<tr><td colspan="2"><strong>Fill in this information to identify the case:</strong></td></tr>
<tr><td>Debtor 1</td><td>Litigation Parctice Group</td></tr>
<tr><td>Debtor 2<br>(Spouse, if filing)</td><td></td></tr>
<tr><td>United States Bankruptcy Court for the:</td><td>Central District of California</td></tr>
<tr><td>Case number</td><td>8:23-BK-10571-SC</td></tr>
</table>



**FILED**

MAY 22 2023

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY:_____ Deputy Clerk

Official Form 410

# Proof of Claim

04/22

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

Arven Allen Knight
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor NONE

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Arven Knight
Name

1805 23rd St, SE Apt. 252B
Number        Street

Washington      DC      20020
City            State       ZIP Code

Contact phone 202-680-2347

Contact email Arvenk@aol.com

Where should payments to the creditor be sent? (if different)

Name

Number        Street

City            State       ZIP Code

Contact phone

Contact email

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____

Filed on ____ / ____ / ____
                MM    DD    YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

**Exhibit "4"**        0304

| | | | Amount entitled to priority |
|---|---|---|---|
| **12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ No | | |
| | ☑ Yes. *Check one:* | | |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | | $ |
| | ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | | $ |
| | ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | | $ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | | $ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | | $ |
| | ☑ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | | $ 5,500.00 |
| | * Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment. | | |

---

**Part 3:   Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Check the appropriate box:

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   05/13/2023
                   MM / DD / YYYY

Signature

Print the name of the person who is completing and signing this claim:

| | |
|---|---|
| Name | *Awen*  *Allen*  *Knight* |
| | First name   Middle name   Last name |
| Title | *Debtor/Self* |
| Company | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | *1805 23rd St. SE # 252B* |
| | Number   Street |
| | *Washington, DC*   *20020* |
| | City   State   ZIP Code |
| Contact phone | *202-680-2347*   Email *Arvenke@AOl.com* |

Official Form 410 | Proof of Claim | page 3

**Exhibit "4"**

0305

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☐ No
☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: __4__ __1__ __6__ __5__

FEIN 83-3885343

**7. How much is the claim?** $_____5,500.00_. Does this amount include interest or other charges?

☑ No
☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

LPG was to help me settle debt and did not satisfy the agreement a

**9. Is all or part of the claim secured?**

☑ No
☐ Yes. The claim is secured by a lien on property.

Nature of property:
☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*
☐ Motor vehicle
☑ Other. Describe: The debtor debit regular paymts. from my checking account u

Basis for perfection: NO lien filed.

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property: $_____
Amount of the claim that is secured: $_____
Amount of the claim that is unsecured: $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition: $_____

Annual Interest Rate (when case was filed)_____%
☐ Fixed
☐ Variable

**10. Is this claim based on a lease?**

☑ No
☐ Yes. Amount necessary to cure any default as of the date of the petition. $_____

**11. Is this claim subject to a right of setoff?**

☑ No
☐ Yes. Identify the property: _____

**Exhibit "4"**                                                                                     0306

*Arven Knight*

## Notice of Transition of Legal Services

From: LPG Law (support@lpglaw.com)

To:  arvenk@aol.com

Date: Wednesday, March 1, 2023 at 07:19 PM EST



### Hello Arven!

On behalf of the entire LPG team, I would like to extend my sincerest apologies for the poor customer service experience that you have recently experienced with our company. I understand that we have not met your expectations, appreciate your patience and understanding as our company works to improve our customer service.

Litigation Practice Group takes full responsibility for the inadequate service you have received, and I assure you that we are taking immediate steps to address the situation.

After careful consideration, I have decided to transfer your file in order to ensure that you receive the best legal services in the industry.  Your legal services will be transferred to Consumer Legal Group ("CLG"), a law firm I know and trust, and have worked extensively with in past.

This law firm, which is larger and more experienced in the area of consumer rights, is based in Manhattan and has expertise fighting the largest banks and creditors in the nation.  Its reputation has been built by attorneys across the country with a combined experience of more than 100 years of providing legal services to clients of all types.  This transition will allow CLG, which I have worked with multiple times during my career, to manage your account and continue to provide a high level of service to you throughout your debt resolution process.

Based on a negotiation I managed to complete, the terms of your agreement will remain the same, and you will not be required to pay anything more than what was agreed in your contract.  All your payments have been credited, and your monthly payment will remain on the same day and in the same amount. The length of your program and contract are also the same.  To be clear, your payment, the length of your program, and the services that you are offered will remain exactly the same and comes with a guarantee that if your debts are not resolved at the conclusion of your program, you will receive a full refund of the fees paid toward such debts.  Just as with Litigation Practice Group, CLG will represent you in any lawsuit filed against you without any additional cost to you.



Find messages, documents, photos or people    Advanced ⌄                                    Home

← Back  ↶  ⇐  →     Move  🗑 Delete  ⊘ Spam  ••• More          ▲  ▼  ✕

Compose

Today on AOL

Inbox          426K

Unread

Starred

Drafts          27

Sent

Spam

Trash

⌃ Less

Views          Hide

  Contacts
  Photos
  Documents
  Subscriptions
  Travel

Folders        Hide
+ New Folder
  Saved Mail
  AIM - Inbox    405
  AIM - Personal Fax n...
  AIM - Saved Mail
  AIM - Sent     115
  AIM - Spam     85
  Archive
  Arven - emails
  Notes
  SavedIMs

**LPG Account Update!**                                                 AOL/Inbox ☆

**Administration LPG** <administration@lpglaw.com>        Wed, Mar 29 at 4:13 PM  ☆

Dear Valued Client -

I am writing on behalf of Litigation Practice Group to update you regarding the
transition of your account.  We wanted to convey our sincere apologies for
the erroneous transfer of your file to Consumer Legal Group.  It was our
intention to transfer your file to Phoenix Law PC for servicing, but by mistake
your file was sent to Consumer Legal Group.  We have corrected this error
and your file has now been assigned to Phoenix Law PC.  A representative
from Phoenix Law PC will contact you to discuss your account and how they
will assist you as you complete the process of resolving your debt.

If you have any questions or would like to speak with a representative now,
please contact Phoenix Law PC at 424-622-4044.

Sincerely,

Daniel S. March
Managing Shareholder, LPG

# LPG LITIGATION
## PRACTICEGROUP

NOTICE: This email message (including any attachments) may contain material that is
confidential and/or legally privileged. Unless you are the intended recipient or are authorized
to receive information for the intended recipient, you may not use, copy, or disclose any part
of this message. If you have received this message in error, please notify us and delete all
copies of it. Thank you.

          ↶     ⇐     →     •••

Reply, Reply All or Forward

Get it now

To whom it may concern
I did not ask for my account
to be transfered anywhere at
all. Furthermore, I did not know at
the time of this email, LPG had filed
for chapter 11 bankruptcy either.
                                              Best
                                         A. Knight

Exhibit 1                                0308

This transfer will be completed today, on February 28, 2023, and a representative from CLG will reach out to you to welcome you to their law firm. Consumer Legal Group can be reached at 212-920-1247 or support@consumerlegalgroup.com should you wish to contact them. I wish you the best of luck and success in completion of your journey to being debt free.

Regards,

Daniel S. March

The Litigation Practice Group

P.O. Box 513018
Los Angeles, CA 90051-1018

https://litigationpracticegroup.com

## TO SPEAK WITH A TEAM MEMBER:
Call 949-229-6262 or Email support@lpglaw.com.



CONFIDENTIALITY AND DISCLAIMER NOTICE:

This email is intended for clients of the The Litigation Practice Group, also known as LPG. LPG is a debt resolution law firm, not a debt settlement company. We do not settle, consolidate, reduce, or pay your debts or offer any sort of loans or financing. Just a reminder that you are receiving this email because you are our client. This e-mail and any attachments are intended for the exclusive use of the intended recipient. If you are not the intended recipient, please delete this email. If you received this email in error, please notify the sender immediately by calling 949-229-6262, then delete this e-mail and any attachments. Any unauthorized use, dissemination, forwarding, printing, or copying of this email is strictly prohibited. Nothing contained in this email shall form the basis of an attorney-client relationship or constitute a waiver of any privilege.

This email was sent by The Litigation Practice Group, P.O. Box 513018
Los Angeles, CA 90051-1018 . You are receiving this email because you have signed up for our service. If you wish to no longer receive emails from us you can unsubscribe but you may miss out on important information about your account.

View this email in your browser

**Exhibit "4"**                                                                 0309

May 15, 2023

Arven Knight
1805 23Rd St. SE
Washington, DC 20020
202-680-2347
Arvenk@aol.com

United States Bankruptcy Court
Central District of California
Edward R. Roybal Federal Building and U.S. Courthouse
255 East Temple Street
Los Angeles, CA 90012

Dear Clerk of the Court,

I am writing to regarding the current bankruptcy proceedings for the Litigation Practice Group. I am a former client of their and they tried to switch me over to another company with my consent or knowledge. I reached out to them in August of 2021 with some debt issues that I was having. They promised me that they would help me invalidate or settle the debt for monthly payment of $250.00. I reached out to them every other month for a progress report. After a year and a half with their company, nothing wasn't settled and the creditors where still sending me letter as for their money. Recently as of 3-1-2023, I received a letter from the head of this company, Mr. Daniel March advising me that my account was being transferred to the Consumer Legal Group. I did not as for my case or files to be transferred to this company whom I knew nothing about. By this time, I started to be very suspicious of their business dealings and activity. I researched their company some more through Google. What I found was very shocking and disturbing to say the least. Their BBB ratings where very poor and had over 350 complaints filed just in 2023. Recently I found out that they are filing for Chapter 11 Bankruptcy! My heart fell through the floor! All I keep saying to myself is that, "I have been scammed!"

Furthermore, I have sent numerous correspondence to LPG and CLG requesting to cancel and close my accounts with them. I have heard back from CLG with a closure letter but nothing from LPG as of yet. I have sent five of six letters to LPG requesting closure of my account a full refund that I am entitled too. I writing to you as what seems to be my last change and effort of recovering my money that has been paid to LPG as of to date. The amount that LPG owes me to date is between $5368.00 -$5500.00. I have attached my claim form and supporting documentation for my case. I have learned my lesson regarding putting my money in suspicious hands! If you have questions, let me know.

Best regards,

Arven A. Knight

**Exhibit "4"**                                                            0310

5/18/23, 9:26 AM
AOL Mail - Regarding illegal transfer of account and full refund requested...

Case 8:23-bk-10571-SC  Doc 40-1 Filed 07/03/23  Entered 07/12/23 10:49:48  Desc
Exhibit # 1 - 12 of 19  Page 315 of 584

## Regarding illegal transfer of account and full refund requested...

From:  Arven Knight (arvenk@aol.com)

To:      support@mylpglaw.com

Cc:     arvenk@aol.com

Date:  Friday, March 10, 2023 at 01:57 PM EST

Mr. March,

I am emailing you regarding the transfer of my account from your company to the **Consumer Legal Group.**  This transfer was not authorized by me and should have never happened without my authorization.  I have contacted the Consumer Legal Group to cease all negotiations and cancel my account. This transfer was illegal and a breach of our contractual agreement.  Because of this, I am requesting you to refund me 100% of the funds already paid to your company as I am entitled by law and the email you sent to me on 3-3-2023.  To date, you owe me a refund of around **$5,368.00.  If this does not happen within the next 7 business days, I will have no other choice but to pursue other actions and means to get my refund.**

Regards,
Arven Knight
Arvenk@aol.com
202-680-2347


Written letter to LPG.docx
14.7kB


Debt Cancellation letter for CLG Arven Knight.pdf
146kB

**Exhibit "4"**

0311

# Termination of Your Debt Resolution Program

From:  support@consumerlegalgroup.org

To:  arvenk@aol.com

Date:  Tuesday, March 7, 2023 at 11:03 AM EST



Dear Arven,

We are emailing you to confirm the termination of your legal services agreement with The Consumer Legal Group PC regarding your debt resolution program.

As of Mar 07, 2023, your agreement has been terminated and all future payments/ACH transactions from your account have been canceled. No further payments will be taken because of the termination of your agreement.

As a result of this termination, we will notify all of your enrolled creditors that CLG no longer represents you with regard to your debt and instructed them to remove CLG's address from their system. Please take the time to contact your creditors and update your address with them so that you receive all correspondence from your creditors. You should do this is as quickly as possible because some mail may be time-sensitive, and CLG will not be forwarding your mail.

If this cancellation was in error, please contact us immediately at 212-920-1247.  Please do not hesitate to contact us if you ever have any questions or reconsider enrolling in our program. Our processing team is here for you.  We are available Monday-Friday from 9 AM to 5:30 PM EST.

Best regards,



**CONSUMER LEGAL GROUP PC**

Website consumerlegalgroup.org

Email support@consumerlegalgroup.org

Address PO Box 412 Elmsford, NY 10523

# Termination of Your Debt Resolution Program

From: support@consumerlegalgroup.org

To: arvenk@aol.com

Date: Tuesday, March 7, 2023 at 11:03 AM EST



Dear Arven,

We are emailing you to confirm the termination of your legal services agreement with The Consumer Legal Group PC regarding your debt resolution program.

As of Mar 07, 2023, your agreement has been terminated and all future payments/ACH transactions from your account have been canceled. No further payments will be taken because of the termination of your agreement.

As a result of this termination, we will notify all of your enrolled creditors that CLG no longer represents you with regard to your debt and instructed them to remove CLG's address from their system. Please take the time to contact your creditors and update your address with them so that you receive all correspondence from your creditors. You should do this is as quickly as possible because some mail may be time-sensitive, and CLG will not be forwarding your mail.

If this cancellation was in error, please contact us immediately at 212-920-1247. Please do not hesitate to contact us if you ever have any questions or reconsider enrolling in our program. Our processing team is here for you. We are available Monday-Friday from 9 AM to 5:30 PM EST.

Best regards,



**CONSUMER LEGAL GROUP PC**

Website consumerlegalgroup.org

Email support@consumerlegalgroup.org

Address PO Box 412 Elmsford, NY 10523

March 3, 2023

Arven Allen Knight
1805 23Rd St. SE Apt 252B
Washington, DC 20020
Document ID 4165177
202-680-2347
Arvenk@aol.com

Litigation Practice Group
P.O Box 513038
Los Angeles, CA 90051-1018

Dear Mr. Daniel March,

I am writing to you regarding my account with you and the transfer of my account to **Consumer Legal Group**. I spoke to someone from CLG on 3-7-2023 in their legal department and canceled the contract through them. Furthermore, I did not agree to this transfer verbally or physically and will not. I have contacted the CLG and canceled any contractual agreement that you made with them regarding my account (see CLG cancellation letter). This is a breach of contract between your business and myself as I was not informed of this beforehand and did not agree to such a transfer. On the other hand, I have made numerous attempts to contact your business through telephone, email, and the client portal. My attempts at reaching someone from your business have been unsuccessful thus far. I have not heard back from anyone in your business yet and this is very disappointing. To add, this has caused great financial, emotional, and mental stress on me and my family. I feel as though I am being scammed on a few levels. To date, I have made payments to your business totaling $**5368.00**. I am requesting that all my money be refunded back to me ASAP through my bank account which is the original method that you were receiving it. In the meantime, I expect to hear back from a member of your team within 7 business days or I will have no other choice but to pursue other means of getting my money refunded. If this issue is not resolved within two weeks, I will have no other choice but to contact the Better Business Bureau, social media, local news media, Federal Trade Commission, my local congressman's office, and the American Bar Association. I hope that we can resolve this matter asap.
I look forward to hearing from your company regarding my complaint and request.

Regards,

Arven Knight



P.O. Box 513018, Los Angeles, CA 90051-1018
Tel. (949) 715-0644 · Fax (949) 315-4332
Support@LPGLaw.com

## LEGAL SERVICES AGREEMENT

### Legal Services

The Litigation Practice Group PC ("LPG") will provide debt validation services wherein it will assist you in removing erroneous or inaccurate information appearing on one or more of your credit reports by contesting debts appearing therein. This service is limited to information reported by creditors or purported creditors to credit bureaus. The purpose of this program is to challenge the legal validity of debts appearing on or being reported to credit bureaus. The cost of legal services rendered by LPG is set forth below, and those fees are earned by LPG for services rendered to you as set forth herein at the time such fees are paid.

### Client Authorization

You authorize LPG to challenge, where applicable, any debts appearing in your credit report(s) that you believe to be in any way invalid, inaccurate, or otherwise without a legal basis. You also authorize LPG to obtain a copy of your credit report to assist in the process of analyzing your account and developing a strategy regarding the invalidation of debts that are excessive or otherwise unauthorized by law. You further authorize LPG, acting under power of attorney for you, to affix your signature to documents sent on your behalf in relation to the matters addressed herein.

### Description of Services to be Performed

LPG will obtain your credit reports, analyze them, and develop strategies for correcting invalid or unlawful debts for which you should not be held legally responsible. Where appropriate, LPG will use existing laws and interact with creditors and credit bureaus on your behalf to invalidate your debts and remove such invalid debts from your credit reports. LPG will also interact with collection agencies, as applicable, to invalidate your debts by requiring them to supply evidence of your indebtedness to them, or any other legal mechanism. LPG will also consult with you regarding all aspects of the credit reporting process, including all laws applicable to the same. LPG will also investigate your delinquent accounts in order to determine the most effective method for invalidating your debts or otherwise removing any legal liability for such debts, up to and including the initiation of lawsuits on your behalf against your creditors and their third-party debt collectors.

In addition, if a lawsuit is filed against you, LPG will represent you in such a lawsuit and will not charge any additional fees for such representation provided such a lawsuit was initiated after the date you sign this Agreement. In the event a lawsuit was initiated against you before the date you execute this Agreement and you elect to have LPG represent you, an additional fee of $500.00 will be charged. Where appropriate, if legal fees are recovered from an adverse party, LPG will retain such fees for its services. You will be responsible to pay any damages resulting from any lawsuit. Any costs incurred in a lawsuit will be paid by LPG out of the fees set forth below, including the fees of any attorney retained on your behalf in a jurisdiction in which LPG is not admitted to practice law. No additional payment from you to LPG will be necessary for the defense of any lawsuit filed against you after the date you execute this Agreement. You will, however, be responsible to pay any damages resulting from such lawsuits or any settlements reached in the course of such lawsuits.

### Fees

You will pay the following fees for the legal services provided by LPG. No fee or other cost will be charged or collected other than the following. This is the only amount you have to pay for LPG's services, and this fee is fixed, such that it is earned the moment it is transmitted to LPG. Upon request, LPG will provide an update of the progress of services performed under this

Page 1 of 7

ID: 4165177 Signed: 2021-08-05T16:50:50-05:00

**Exhibit "4"** 0315

agreement at reasonable intervals of no greater frequency than once a month.

## Refund Policy

If an account is fully validated by a creditor, such that no further dispute to the validity of the account could be made, you will receive a full refund of the fees that you paid towards the invalidation of that account (i.e., you will be refunded the fees paid in proportion to the debt that was validated). Should you have an outstanding balance with LPG at the time your refund is issued on the validated account, any refund will first be applied towards the outstanding balance. A client can elect to move to a debt settlement service on any validated account in lieu of obtaining a refund. If a client makes such an election, fees will no longer be collected for such account and debt settlement services will be performed for no additional fees.

## Debt Settlement

If LPG is unable to invalidate any debt, you may elect to have LPG negotiate a settlement on your behalf with the concerned creditor without any additional fees being charged to or incurred by you for such service. Any settlement reached with any such creditor shall be your responsibility. At the point that you reach a settlement with such creditor, your payment to LPG will be reduced and re-amortized to adjust for the settled account being removed from the representation herein contemplated. Please see the refund policy above for more details.

## Actions Required of You

You agree to provide LPG with any and all correspondence you receive from any creditor, credit bureau, attorney, or court of law. You further agree to keep a log of all communications, including telephonic and electronic communications, from any creditor or credit reporting agency.

## Right to Conduct Business Electronically and Contact You

You agree that LPG may contact you electronically and telephonically and that any and all business with LPG may be conducted electronically. You further agree that LPG may transmit data, including that regarding your credit profile, electronically. You further agree that any electronic communication carries the risk of disclosure to a third party and that LPG will not be held responsible for any such inadvertent disclosure of information. A facsimile or email transmission of this signed agreement, via an email attachment or otherwise, will be as valid as the original. This agreement may not be modified except in writing by both parties.

## Client Acknowledgements

By signing this agreement, you acknowledge that LPG has not instructed you to breach any contract, fail to make any required payment, or fail to perform any obligation you have lawfully incurred. LPG reserves the right to terminate this agreement if (a) client fails to make timely payment of the amount due under hereunder or (b) the client's payments are returned multiple times for any reason. LPG will not pay your debts and does not guarantee that any debt you now have or may incur will be invalidated or settled in association with LPG's services. You understand and agree that you must forward any communication you receive in printed or electronic form from any creditor, court, or representative of other a creditor or a court to support@lpglaw.com and that you must keep a log of all telephonic communications with any creditor or credit reporting agency. **Do not sign this agreement until you have received and read the information statements and notices of cancellation required by state and federal law, even if otherwise advised. By signing this agreement, you acknowledge receipt of these disclosures prior to the time of signing and agree to the terms of this agreement. You, the client, may cancel this agreement at any time before midnight CST of the 5th day after the date of execution of this agreement via an email to support@lpglaw.com. In addition, you, the client, may terminate LPG's services under this agreement at any time via an email to support@lpglaw.com.**

Client Signature: _____     Date: 8/5/2021
Co-Applicant Signature: _____     Date: _____

Page 2 of 7

ID: 4165177 Signed: 2021-08-05T16:50:50-05:00

**Exhibit "4"**                                                     0316

## Creditor Information

| Creditor | Account # | Amount Owed |
|----------|-----------|-------------|
| NAVY FCU | 9410 | $10,480.00 |
| SYNCBVALUEC | 223 | $1,835.00 |
| CBJCREW | 1478 | $1,381.00 |
| Capital One | 3883 | $932.00 |
| | | $14,628.00 |

ID: 4165177 Signed: 2021-08-05T16:50:50-05:00

**Exhibit "4"**                     0317

## Client Information

Name: Arven Knight

Address: 1805 23rd Street Se Apt. 252b, Washington DC 20020

Home Phone: 202-680-2347

Cell Phone:

Email: arvenk@aol.com

Las 4 SSN: XXX-XX-4317

## Co-Client Information

Name:

Address: ,

Home Phone:

Cell Phone:

Email:

Last 4 SSN:

ID: 4165177 Signed: 2021-08-05T16:50:50-05:00

**Exhibit "4"**                0318

## Schedule of Payments

I agree to this payment schedule – Client Initials: _l~x_____

| Payment # | Process Date | Amount |
|---|---|---|
| 1 | Aug 24, 2021 | $257.61 |
| 2 | Sep 30, 2021 | $257.61 |
| 3 | Nov 01, 2021 | $257.61 |
| 4 | Nov 30, 2021 | $257.61 |
| 5 | Dec 30, 2021 | $257.61 |
| 6 | Jan 31, 2022 | $257.61 |
| 7 | Mar 02, 2022 | $257.61 |
| 8 | Mar 30, 2022 | $257.61 |
| 9 | May 02, 2022 | $257.61 |
| 10 | May 31, 2022 | $257.61 |
| 11 | Jun 30, 2022 | $257.61 |
| 12 | Aug 01, 2022 | $257.61 |
| 13 | Aug 30, 2022 | $257.61 |
| 14 | Sep 30, 2022 | $257.61 |
| 15 | Oct 31, 2022 | $257.61 |
| 16 | Nov 30, 2022 | $257.61 |
| 17 | Dec 30, 2022 | $257.61 |
| 18 | Jan 30, 2023 | $257.61 |
| 19 | Mar 02, 2023 | $257.61 |
| 20 | Mar 30, 2023 | $257.61 |
| 21 | May 01, 2023 | $257.61 |
| 22 | May 30, 2023 | $257.55 |

ID: 4165177 Signed: 2021-08-05T16:50:50-05:00

**Exhibit "4"**                                              0319

**Electronic Payment Authorization**

Bank Name: PENTAGON FEDERAL CREDIT UNION

Name on Account: Arven Knight

Account Type:    Checking

___ Other (specify: _____ )

Routing Number: ██████████

Account Number: ██████████

Next Payment Date: Aug 24, 2021 Amount: $ 257.61

Recurring Payment Date: 30th

By signing below, I authorize and permit LPG or their designees, EPPS, Omnifund, Equipay, Forte, a CSG Company, or Authorize.NET to initiate electronic funds transfer via an Automated Clearing House system (ACH) from my account listed above. I will also provide LPG with a voided check or savings deposit slip.

If necessary, LPG may make adjustments if errors have occurred during the transaction. The date of the draft is listed above, however, if the draft date falls on a weekend or bank holiday, the debit transaction will take place on the next business day. This authority will remain in effect until LPG is notified by the member in writing at least 5 days prior to the next scheduled draft date. No other forms of cancellation by members will be observed. If the debit is returned because of non-sufficient funds or uncollected funds, then the originator and its financial institution may reinitiate the entry up to two (2) times. The reversal of funds from a client's account that was drafted in error cannot be made until seven business days from the draft date. The member agrees to waive all rights of reversal or refusal of any payment on any draft that LPG may make against the member's bank account while services are performed. The member agrees with all of the provisions and conditions outlined within.

## Acknowledgment of Refunds & Draft Date Changes

ACH Refunds: If a refund is due such will be made through the ACH process only if the fees were made through the ACH process. All refunds may take up to 10 days to process. In the event my EFT or draft is returned from my bank unpaid, I agree that a fee of $25.00 or as allowed by law may be charged to my account via draft or EFT. Furthermore, I warrant that I am authorized to execute this payment authorization and the above information is true and correct. Draft Date Changes: A client may stop any ACH debit by providing written notice to LPG at least five (5) business days prior to the scheduled payment. If you should need to notify us of your intent to cancel and/or revoke this authorization you must contact us five (5) days prior to the questioned debit being initiated. Please call us at 949-229-6262 or at support@lpglaw.com.

Client Signature: _~_____                                Date: 8/5/2021

Printed Name:    Arven Knight

ID: 4165177 Signed: 2021-08-05T16:50:50-05:00

**Exhibit "4"**                                                                 **0320**

### Electronic Funds Transfer (EFT) Authorization to Debit Bank Account

Account Owner Name: Arven Knight

Social Security Number: █████████          Birth Date: █████████

Address:1805 23rd Street Se Apt. 252b     City:Washington     State:DC     Zip: 20020

Mobile Phone #:          Bank Name: PENTAGON FEDERAL CREDIT UNION

Routing Number: █████████     Account Number: █████████

Total Amount of Debit: $257.61     Date of Next Debit:Aug 24, 2021     Checking or Saving: Checking

I hereby apply for and agree to establish a non-interest bearing special purpose account (the "Account") with a bank ("Bank") selected by EPPS, LLC and/or its successors for the purpose of accumulating funds to pay for such goods and services as I so direct EPPS, LLC to perform. This application is subject to Bank's customer identification program, as required by the USA PATRIOT ACT and other applicable laws, and accordingly, I hereby represent that the above information is true and complete to the best of my knowledge and belief. The bank account information provided above may be subject to account validation processes to include pre-notation and a $0.01 micro-deposit.

**Schedule of Fees and Charges**

| | |
|---|---|
| Monthly Banking Fee. | Included |
| ACH/EFT Fee Per Transaction | Included |
| Chargeback/Late Return Fee | Included |
| NSF Fee | Included |
| Account Closer Fee | Included |

**PREMIUM DISBURSEMENT SERVICES**

| | |
|---|---|
| Wire Transfer | Included |
| FedEx/Overnight Next Day | Included |
| 2nd Day Check With Tracking | Included |

I hereby authorize Bank, directly or through EPPS, LLC, and/or its service providers, to administer the account on my behalf by (a) periodically transferring and depositing funds to the Account, via any payment media currently in use, and (b) periodically disbursing funds from the Account pursuant to instructions that I may give from time to time. I hereby authorize payments from the Account for the fees and charges provided for in this application and in the agreement. I hereby grant permission for Bank to share information regarding the Account with EPPS, LLC, and any other service provider to facilitate the transactions I may initiate that involve the Account, and with any other party that is essential to the administration of the Account on my behalf. My signature below provides permission to be contacted by phone at the number provided with this authorization. A payment reminder will be sent to your phone number via Text Messaging prior to the payment scheduled above. This authorization shall remain in full force and effect until I provide a verbal or written termination notice to EPPS. Any such notice, and any other written notice that is provided for in this Application or the Agreement, shall be sent to EPPS, LLC at the address set forth in the Agreement. "EPPS-Ph# 800-215-3484" will appear on your bank statement

Account Holder's Signature:  _cͫ_          Date: 8/5/2021

ID: 4165177 Signed: 2021-08-05T16:50:50-05:00

Exhibit "4"          0321



E-Signature Completion Certificate

clixsign

## Your Document Was Successfully Signed!

Congratulations, your document(s) was successfully signed. Please find
details below related to your e-signature submission.

### ⚙ Signing Details

Document ID
**4165177**

Signer Email
**arvenk@aol.com**

Document Title
**LSA - LPG - English**

Signer IP Address
**172.58.188.54**

Sender IP Address
**184.177.21.253**

Timestamp
**2021-08-05T16:50:50-05:00**

Number Of Signers
**1**

Document MD5 Hash
**d41d8cd98f00b204e9800998ecf8427e**

### ⚙ Document Audit

✓ Sent at 2021-08-05T16:48:28-05:00 from IP 184.177.21.253

✓ Delivered to arvenk@aol.com at 2021-08-05T16:49:59-05:00 from 172.58.188.54

✓ Adopted Signature at 2021-08-05T16:50:17-05:00 from 172.58.188.54

✓ Completed Signing at 2021-08-05T16:50:50-05:00 from 172.58.188.54

✓ PDF Generated at 2021-08-05T16:50:50-05:00

Sending Agent
Mozilla/5.0 (iPhone; CPU iPhone OS 14_6 like Mac OS X) AppleWebKit/605.1.15 (KHTML, like Gecko) Version/
14.1.1 Mobile/15E148 Safari/604.1

**Exhibit "4"**

# Exhibit "5"

## Fill in this information to identify the case:

Debtor 1   The Litigation Practice Group P C

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court   **Central District of California**

Case number:  **23–10571**

FILED

**U.S. Bankruptcy Court**
**Central District of California**

5/30/2023

**Kathleen J. Campbell, Clerk**

## Official Form 410
## Proof of Claim

**04/22**

**Read the instructions before filling out this form.** This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) **that you received.**

| Part 1: | Identify the Claim |
|---|---|

| 1.**Who is the current creditor?** | Abigail Beaudin |
|---|---|
| | Name of the current creditor (the person or entity to be paid for this claim) |
| | Other names the creditor used with the debtor   Abby Beaudin |

| 2.**Has this claim been acquired from someone else?** | ☑ No |
|---|---|
| | ☐ Yes. From whom? |

| 3.**Where should notices and payments to the creditor be sent?** Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|---|
| | Abigail Beaudin | |
| | Name | Name |
| | 64 Thompson Street, APT 16 New York, NY 10012–64 | |
| | Contact phone   920–627–3794 | Contact phone |
| | Contact email   abbybeaudin@gmail.com | Contact email |
| | Uniform claim identifier for electronic payments in chapter 13 (if you use one): | |

| 4.**Does this claim amend one already filed?** | ☑ No |  |  |
|---|---|---|---|
| | ☐ Yes. Claim number on court claims registry (if known) | Filed on | |
| | | | MM / DD / YYYY |

| 5.**Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No |
|---|---|
| | ☐ Yes. Who made the earlier filing? |

Official Form 410                                   Proof of Claim                                   page 1

**Exhibit "5"**                                                                                 0323

<table>
<tr><td><strong>Part 2:</strong></td><td><strong>Give Information About the Claim as of the Date the Case Was Filed</strong></td></tr>
</table>

**6. Do you have any number you use to identify the debtor?**
☐ No
☑ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: 6262

**7. How much is the claim?** $ 19017.60

**Does this amount include interest or other charges?**
☑ No
☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**
Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).
Limit disclosing information that is entitled to privacy, such as healthcare information.

fraudulent legal services by a disbarred, misrepresenting attorney and debt settlement scam program

**9. Is all or part of the claim secured?**
☑ No
☐ Yes. The claim is secured by a lien on property.
**Nature of property:**
☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410–A) with this *Proof of Claim*.
☐ Motor vehicle
☐ Other. Describe:

**Basis for perfection:**

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $
**Amount of the claim that is secured:** $
**Amount of the claim that is unsecured:** $ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $

**Annual Interest Rate** (when case was filed) %
☐ Fixed
☐ Variable

**10. Is this claim based on a lease?**
☑ No
☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $

**11. Is this claim subject to a right of setoff?**
☑ No
☐ Yes. Identify the property:

Official Form 410　　　Proof of Claim　　　page 2

**Exhibit "5"**　　0324

| 12. | Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | | |
|---|---|---|---|
| | | ☑ No | |
| | | ☐ Yes. *Check all that apply:* | **Amount entitled to priority** |

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).   $ _____

☐ Up to $3,350 * of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).   $ _____

☐ Wages, salaries, or commissions (up to $15,150 *) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).   $ _____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).   $ _____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).   $ _____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies   $ _____

* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3:   Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157 and 3571.**

Check the appropriate box:

☑  I am the creditor.

☐  I am the creditor's attorney or authorized agent.

☐  I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐  I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   5/30/2023
_____
MM / DD / YYYY

/s/  Abigail Beaudin
_____
Signature

Print the name of the person who is completing and signing this claim:

| Name | Abigail Beaudin |
|---|---|
| | First name    Middle name    Last name |
| Title | Client / Creditor / Victim |
| Company | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer |
| Address | 64 Thompson Street, APT 16 |
| | Number   Street |
| | New York, NY 10012 |
| | City   State   ZIP Code |
| Contact phone | 920–627–3794 |
| | Email   abbybeaudin@gmail.com |

Official Form 410                    Proof of Claim                    page 3

**Exhibit "5"**                    0325



THE LITIGATION
PRACTICE GROUP
1351 Calle Avanzado | Suite 4
San Clemente, CA 92673
Tel 949.229.6262
Fax 949.415.7816
admin@coastprocessing.com

## LEGAL SERVICES AGREEMENT

### Legal Services

The Litigation Practice Group PC ("LPG") will provide debt validation services wherein it will assist you in removing erroneous or inaccurate information appearing on one or more of your credit reports by contesting debts appearing therein. This service is limited to information reported by creditors or purported creditors to credit bureaus.  The purpose of this program is to challenge the legal validity of debts appearing on or being reported to credit bureaus.  The cost of legal services rendered by LPG is set forth below, and those fees are earned by LPG for services rendered to you as set forth herein at the time such fees are paid.

### Client Authorization

You authorize LPG to challenge, where applicable, any debts appearing in your credit report(s) that you believe to be in any way invalid, inaccurate, or otherwise without legal basis. You also authorize LPG to obtain a copy of your credit report to assist in the process of analyzing your account and developing a strategy regarding the invalidation of debts that are excessive or otherwise unauthorized by law. You further authorize LPG, acting under power of attorney for you, to affix your signature to documents sent on your behalf in relation to the matters addressed herein.

### Description of Services to be Performed

LPG will obtain your credit reports, analyze them, and develop strategies for correcting invalid or unlawful debts for which you should not be held legally responsible. Where appropriate, LPG will use existing laws and interact with creditors and credit bureaus on your behalf to invalidate your debts and remove such invalid debts from your credit reports. LPG will also interact with collection agencies, as applicable, to invalidate your debts by requiring them to supply evidence of your indebtedness to them, or any other legal mechanism. LPG will also consult with you regarding all aspects of the credit reporting process, including all laws applicable to the same. LPG will also investigate your delinquent accounts in order to determine the most effective method for invalidating your debts or otherwise removing any legal liability for such debts, up to and including the initiation of lawsuits on your behalf against your creditors and their third party debt collectors.

In addition, if a lawsuit is filed against you, LPG will represent you in such lawsuit and will not charge any additional fees for such representation provided such lawsuit was initiated after the date you sign this Agreement.  In the event a lawsuit was initiated against you before the date you execute this Agreement and you elect to have LPG represent you, an additional fee of $500.00 will be charged. Where appropriate, if legal fees are recovered from an adverse party, LPG will retain such fees for its services.  You will be responsible to pay any damages resulting from any lawsuit.  Any costs incurred in a lawsuit will be paid by LPG out of the fees set forth below, including the fees of any attorney retained on your behalf in a jurisdiction in which LPG is not admitted to practice law. No additional payment from you to LPG will be necessary for the defense of any lawsuit filed against you after the date you execute this Agreement. You will, however, be responsible to pay any damages resulting from such lawsuits or any settlements reached in the course of such lawsuits.

### Fees

You will pay the following fees for the legal services provided by LPG. No fee or other cost will be charged or collected other than the following. This is the only amount you have to pay for LPG's services, and this fee is fixed, such that it is earned the moment it is transmitted to LPG. Upon request, LPG will provide an update of progress of services performed under this agreement at reasonable intervals of no greater frequency than once a month.

Exhibit "5"

0326

ID: 3065644 Signed: 2020-11-02T14:13:10-06:00

**Refund Policy**

If an account is fully validated by a creditor, such that no further dispute to the validity of the account could be made, you will receive a full refund of the fees that you paid towards the invalidation of that account (i.e., you will be refunded the fees paid in proportion to the debt that was validated). Should you have an outstanding balance with LPG at the time your refund is issued on the validated account, any refund will first be applied towards the outstanding balance. A client can elect to move to a debt settlement service on any validated account in lieu of obtaining a refund. If a client makes such an election, fees will no longer be collected for such account and debt settlement services will be performed for no additional fees.

**Debt Settlement**

If LPG is unable to invalidate any debt, you may elect to have LPG negotiate a settlement on your behalf with the concerned creditor without any additional fees being charged to or incurred by you for such service. Any settlement reached with any such creditor shall be your responsibility. At the point that you reach a settlement with such creditor, your payment to LPG will be reduced and re-amortized to adjust for the settled account being removed from the representation herein contemplated. Please see the refund policy above for more details.

**Actions Required of You**

You agree to provide LPG with any and all correspondence you receive from any creditor, credit bureau, attorney, or court of law. You further agree to keep a log of all communications, including telephonic and electronic communications, from any creditor or credit reporting agency.

**Right to Conduct Business Electronically and Contact You**

You agree that LPG may contact you electronically and telephonically, and that any and all business with LPG may be conducted electronically. You further agree that LPG may transmit data, including that regarding your credit profile, electronically. You further agree that any electronic communication carries the risk of disclosure to a third party, and that LPG will not be held responsible for any such inadvertent disclosure of information. A facsimile or email transmission of this signed agreement, via an email attachment or otherwise, will be as valid as the original. This agreement may not be modified except in writing by both parties.

**Client Acknowledgements**

By signing this agreement, you acknowledge that LPG has not instructed you to breach any contract, fail to make any required payment, or fail to perform any obligation you have lawfully incurred. LPG reserves the right to terminate this agreement if (a) client fails to make timely payment of the amount due under hereunder or (b) client`s payments are returned multiple times for any reason. LPG will not pay your debts, and does not guarantee that any debt you now have or may incur will be invalidated or settled in association with LPG's services. You understand and agree that you must forward any communication you receive in printed or electronic form from any creditor, court, or representative of other a creditor or a court to admin@coastprocessing.com, and that you must keep a log of all telephonic communications with any creditor or credit reporting agency. **Do not sign this agreement until you have received and read the information statements and notices of cancellation required by state and federal law, even if otherwise advised. By signing this agreement, you acknowledge receipt of these disclosures prior to the time of signing and agree to the terms of this agreement. You, the client, may cancel this agreement at any time before midnight CST of the 5th day after the date of execution of this agreement via an email to admin@coastprocessing.com. In addition, you, the client may terminate LPG's services under this agreement at any time via an email to admin@coastprocessing.com.**

Client Signature: _Abigail Beaudin_          Date: 11/2/2020

Co-Applicant Signature: _____          Date: _____

## Creditor Information

| Creditor | Account # | Amount Owed |
|----------|-----------|-------------|
| **JPMCB CARD** | ****9324 | $17,645.00 |
| **Tally** | ▮6763 | $15,468.00 |
| - | | $33,113.00 |

-

**Exhibit "5"**

ID: 3065644 Signed: 2020-11-02T14:13:10-06:00

## Client Information

Name: Abigail Beaudin

Address: 64 Thompson St Apt 16, , New York City NY 10012

Home Phone: 920-627-3794

Cell Phone: 920-627-3794

Email: abbybeaudin@gmail.com

Las 4 SSN: XXX-XX-6207

## Co-Client Information

Name:

Address: , ,

Home Phone:

Cell Phone:

Email:

Last 4 SSN:

**Exhibit "5"**

0329

ID: 3065644 Signed: 2020-11-02T14:13:10-06:00

## Schedule of Payments

I agree to this payment schedule – Client Initials: *AB*

| Payment # | Process Date | Amount |
|-----------|--------------|--------|
| 1 | Nov 16, 2020 | $197.46 |
| 2 | Dec 01, 2020 | $197.46 |
| 3 | Dec 15, 2020 | $197.46 |
| 4 | Jan 04, 2021 | $197.46 |
| 5 | Jan 15, 2021 | $197.46 |
| 6 | Feb 01, 2021 | $197.46 |
| 7 | Feb 16, 2021 | $197.46 |
| 8 | Mar 01, 2021 | $197.46 |
| 9 | Mar 15, 2021 | $197.46 |
| 10 | Apr 01, 2021 | $197.46 |
| 11 | Apr 15, 2021 | $197.46 |
| 12 | May 03, 2021 | $197.46 |
| 13 | May 17, 2021 | $197.46 |
| 14 | Jun 01, 2021 | $197.46 |
| 15 | Jun 15, 2021 | $197.46 |
| 16 | Jul 01, 2021 | $197.46 |
| 17 | Jul 15, 2021 | $197.46 |
| 18 | Aug 02, 2021 | $197.46 |
| 19 | Aug 16, 2021 | $197.46 |
| 20 | Sep 01, 2021 | $197.46 |
| 21 | Sep 15, 2021 | $197.46 |
| 22 | Oct 01, 2021 | $197.46 |
| 23 | Oct 15, 2021 | $197.46 |
| 24 | Nov 01, 2021 | $197.46 |
| 25 | Nov 15, 2021 | $197.46 |
| 26 | Dec 01, 2021 | $197.46 |
| 27 | Dec 15, 2021 | $197.46 |
| 28 | Jan 03, 2022 | $197.46 |
| 29 | Jan 18, 2022 | $197.46 |
| 30 | Feb 01, 2022 | $197.46 |
| 31 | Feb 15, 2022 | $197.46 |
| 32 | Mar 01, 2022 | $197.46 |
| 33 | Mar 15, 2022 | $197.46 |
| 34 | Apr 01, 2022 | $197.46 |
| 35 | Apr 15, 2022 | $197.46 |
| 36 | May 02, 2022 | $197.46 |
| 37 | May 16, 2022 | $197.46 |
| 38 | Jun 01, 2022 | $197.46 |
| 39 | Jun 15, 2022 | $197.46 |
| 40 | Jul 01, 2022 | $197.46 |
| 41 | Jul 15, 2022 | $197.46 |
| 42 | Aug 01, 2022 | $197.46 |
| 43 | Aug 15, 2022 | $197.46 |
| 44 | Sep 01, 2022 | $197.46 |
| 45 | Sep 15, 2022 | $197.46 |
| 46 | Oct 03, 2022 | $197.46 |
| 47 | Oct 17, 2022 | $197.46 |
| 48 | Nov 01, 2022 | $197.46 |

**Exhibit "5"**

0330

ID: 3065644 Signed: 2020-11-02T14:13:10-06:00

| 49 | Nov 15, 2022 | $197.46 |
| 50 | Dec 01, 2022 | $197.46 |
| 51 | Dec 15, 2022 | $197.46 |
| 52 | Jan 03, 2023 | $197.46 |
| 53 | Jan 17, 2023 | $197.46 |
| 54 | Feb 01, 2023 | $197.46 |
| 55 | Feb 15, 2023 | $197.46 |
| 56 | Mar 01, 2023 | $197.46 |
| 57 | Mar 15, 2023 | $197.46 |
| 58 | Apr 03, 2023 | $197.46 |
| 59 | Apr 17, 2023 | $197.46 |
| 60 | May 01, 2023 | $197.46 |
| 61 | May 15, 2023 | $197.46 |
| 62 | Jun 01, 2023 | $197.46 |
| 63 | Jun 15, 2023 | $197.46 |
| 64 | Jul 03, 2023 | $197.46 |
| 65 | Jul 17, 2023 | $197.46 |
| 66 | Aug 01, 2023 | $197.46 |
| 67 | Aug 15, 2023 | $197.46 |
| 68 | Sep 01, 2023 | $197.46 |
| 69 | Sep 15, 2023 | $197.46 |
| 70 | Oct 02, 2023 | $197.46 |
| 71 | Oct 16, 2023 | $197.46 |
| 72 | Nov 01, 2023 | $197.31 |

**Exhibit "5"**

ID: 3065644 Signed: 2020-11-02T14:13:10-06:00

**Electronic Payment Authorization**

Bank Name: Wells Fargo Bank

Name on Account: Abigail R Beaudin

Account Type:   Savings

_____ Other (specify: _____ )

Routing Number:    ██████████

Account Number:    ██████████

Next Payment Date: Nov 16, 2020 Amount: $ 197.46

Recurring Payment Date: 15th

By signing below, I authorize and permit LPG or their designees, to initiate electronic funds transfer via an Automated Clearing House system (ACH) from my account listed above.  I will also provide LPG with a voided check or savings deposit slip.

If necessary, LPG may make adjustments if errors have occurred during the transaction.  The date of the draft is listed above, however, if the draft date falls on a weekend or bank holiday, the debit transaction will take place on the next business day. This authority will remain in effect until LPG is notified by the member in writing at least 5 days prior to the next scheduled draft date.  No other forms of cancellation by member will be observed.  If the debit is returned because of non-sufficient funds of uncollected funds, then the originator and its financial institution may reinitiate the entry up to two (2) times.  The reversal of funds from a client's account that was drafted in error cannot be made until seven business days from the draft date.  The member agrees to waive all rights of reversal or refusal of any payment on any draft that LPG may make against the member's bank account while services are performed.  The member agrees with all of the provisions and conditions outlined within.

**Acknowledgement of Refunds & Draft Date Changes**

ACH Refunds: If a refund is due such will be made through the ACH process only if the fees were made through the ACH process.  All refunds may take up to 10 days to process.  In the event my EFT or draft is returned from my bank unpaid, I agree that a fee of $25.00 or as allowed by law may be charged to my account via draft or EFT.  Furthermore, I warrant that I am authorized to execute this payment authorization and the above information is true and correct.  Draft Date Changes: A client may stop any ACH debit by providing written notice to LPG at least five (5) business days prior to the scheduled payment.  If you should need to notify us of your intent to cancel and/or revoke this authorization you must contact us five (5) days prior to the questioned debit being initiated.  Please call us at 949-229-6262 or admin@coastprocessing.com.

Client Signature:  _Abigail Beaudin_____    Date: 11/2/2020 _____

Printed Name:       Abigail Beaudin _____            _____

**Exhibit "5"**

0332

ID: 3065644 Signed: 2020-11-02T14:13:10-06:00

## Electronic Funds Transfer (EFT) Authorization to Debit Bank Account

Account Owner Name: Abigail R Beaudin

Social Security Number: ███████          Birth Date: ███████

Address: 64 Thompson St Apt 16          City: New York City          State: NY          Zip: 10012

Mobile Phone #:          Bank Name: Wells Fargo Bank

Routing Number: ███████          Account Number: ███████

Total Amount of Debit: $197.46          Date of Next Debit: Nov 16, 2020          Checking or Saving: Savings

I hereby apply for and agree to establish a non-interest bearing special purpose account (the "Account") with a bank ("Bank") selected by EPPS, LLC and/or its successors for the purpose of accumulating funds to pay for such goods and services as I so direct EPPS, LLC to perform. This application is subject to Bank's customer identification program, as required by the USA PATRIOT ACT and other applicable laws, and accordingly, I hereby represent that the above information is true and complete to the best of my knowledge and belief. The bank account information provided above may be subject to account validation processes to include pre-notation and a $0.01 micro-deposit.

### Schedule of Fees and Charges

| | |
|---|---|
| Monthly Banking Fee: | Included |
| ACH/EFT Fee Per Transaction | Included |
| Chargeback/Late Return Fee | Included |
| NSF Fee | Included |
| Account Closer Fee | Included |

### PREMIUM DISBURSEMENT SERVICES

| | |
|---|---|
| Wire Transfer | Included |
| FedEx/Overnight Next Day | Included |
| 2nd Day Check With Tracking | Included |

I hereby authorize Bank, directly or through EPPS, LLC, and/or its service providers, to administer the Account on my behalf by (a) periodically transferring and depositing funds to the Account, via any payment media currently in use, and (b) periodically disbursing funds from the Account pursuant to instructions that I may give from time to time. I hereby authorize payments from the Account for the fees and charges provided for in this application and in the agreement. I hereby grant permission for Bank to share information regarding the Account with EPPS, LLC and any other service provider to facilitate the transactions I may initiate that involve the Account, and with any other party that is essential to the administration of the Account on my behalf. My signature below provides permission to be contacted by phone at the number provided with this authorization. A payment reminder will be sent to your phone number via Text Messaging prior to the payment scheduled above. This authorization shall remain in full force and effect until I provide a verbal or written termination notice to EPPS. Any such notice, and any other written notice that is provided for in this Application or the Agreement, shall be sent to EPPS, LLC at the address set forth in the Agreement. "EPPS-Ph# 800-215-3484" will appear on your bank statement

Account Holder's Signature: *Abigail Beaudin*          Date: 11/2/2020

**Exhibit "5"**

0333

ID: 3065644 Signed: 2020-11-02T14:13:10-06:00

E-Signature Completion Certificate





# Your Document Was Successfully Signed!

Congratulations, your document(s) was successfully signed. Please find details below related to your e-signature submission.

## ℹ Signing Details

| | |
|---|---|
| **Document ID** | **Signer Email** |
| 3065644 | abbybeaudin@gmail.com |
| **Document Title** | **Signer IP Address** |
| Legal Service Agreement with LPG ( English ) | 98.7.225.66 |
| **Sender IP Address** | **Timestamp** |
| 45.22.90.58 | 2020-11-02T14:13:11-06:00 |
| **Number Of Signers** | **Document MD5 Hash** |
| 1 | d41d8cd98f00b204e9800998ecf8427e |

## ⚙ Document Audit

✔ Sent at 2020-11-02T14:05:22-06:00 from IP 45.22.90.58

✔ Delivered to abbybeaudin@gmail.com at 2020-11-02T14:05:51-06:00 from 98.7.225.66

✔ Adopted Signature at 2020-11-02T14:06:06-06:00 from 98.7.225.66

✔ Completed Signing at 2020-11-02T14:13:10-06:00 from 98.7.225.66

✔ PDF Generated at 2020-11-02T14:13:11-06:00

Sending Agent
Mozilla/5.0 (Macintosh; Intel Mac OS X 10_14_6) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/ 86.0.4240.80 Safari/537.36

**Exhibit "5"**                    0334

| Date | Description | Amount |
|---|---|---|
| 04/17/23 | LPG Law 9492296262 230416 Abigail Beaudin | $316.96 |
| 04/05/23 | LPG Law 9492296262 230404 Abigail Beaudin | $316.96 |
| 03/01/23 | LPG 949-229-6262 DIRECT PAY 022823 2302288S2SO95CPE ABIGAILRBEAUDIN | $316.96 |
| 02/15/23 | LPG 949-229-6262 DIRECT PAY 021423 230214G4HNBQ6VR ABIGAILRBEAUDIN | $316.96 |
| 02/01/23 | LPG 949-229-6262 DIRECT PAY 013123 230131NACHCCTA9 ABIGAILRBEAUDIN | $316.96 |
| 01/17/23 | LPG 949-229-6262 DIRECT PAY 011623 230116CJDBH6O5O ABIGAILRBEAUDIN | $316.96 |
| 01/03/23 | LPG 949-229-6262 DIRECT PAY 123022 221230BL1C7RDAM ABIGAILRBEAUDIN | $316.96 |
| 12/15/22 | LPG 949-229-6262 DIRECT PAY SD1700 221215NX29RLLHC ABIGAILRBEAUDIN | $316.96 |
| 12/01/22 | LPG 949-229-6262 DIRECT PAY 113022 22113080FOYQ01Q ABIGAILRBEAUDIN | $316.96 |
| 11/15/22 | LPG 949-229-6262 DIRECT PAY 111422 221114IDHS6VTCY ABIGAILRBEAUDIN | $316.96 |
| 11/01/22 | LPG 949-229-6262 DIRECT PAY 103122 221031KVB2OX0MT ABIGAILRBEAUDIN | $316.96 |
| 10/17/22 | LPG 949-229-6262 DIRECT PAY 101422 221014BOI758ETD ABIGAILRBEAUDIN | $316.96 |
| 10/03/22 | LPG 949-229-6262 DIRECT PAY 093022 220930TSYCOPKW5 ABIGAILRBEAUDIN | $316.96 |
| 09/16/22 | LPG Legal Serv 91354473 LPG 9492296262 | $316.96 |
| 09/02/22 | LPG Legal Serv 91303042 LPG 9492296262 | $316.96 |
| 08/16/22 | LPG Legal Serv 91245123 LPG 9492296262 | $316.96 |
| 08/02/22 | LPG Legal Serv 91192707 LPG 9492296262 | $316.96 |
| 07/18/22 | LPG Legal Serv 91136034 LPG 9492296262 | $316.96 |
| 07/05/22 | LPG Legal Serv 91085130 LPG 9492296262 | $316.96 |

| Date | Description | Amount | |
|---|---|---|---|
| 07/05/22 | LPG Legal Serv 91085130 LPG 9492296262 | $316.96 | |
| 06/16/22 | LPG Legal Serv 91031061 LPG 9492296262 | $316.96 | |
| 06/02/22 | LPG Legal Serv 90989813 LPG 9492296262 | $316.96 | |
| 05/25/22 | LPG LPG Refund May 25 XXXXX6916 Abigail Beaudin | | $351.96 |
| 05/16/22 | LPG 9492296161 May 16 1049550302 ABIGAILRBEAUDIN | $316.96 | |
| 05/03/22 | LPG Legal Serv 90917792 LPG 9492296262 | $316.96 | |
| 04/18/22 | LPG Legal Serv 90875560 LPG 9492296262 | $316.96 | |
| 04/08/22 | LPG 9492296262 Apr 08 1049550272 ABIGAILRBEAUDIN | $316.96 | |
| 04/07/22 | LPG 9492296262 Apr 07 1049550278 ABIGAILRBEAUDIN | $316.96 | |
| 03/15/22 | LPG 9492296262 Mar 15 1049550278 ABIGAILRBEAUDIN | $316.96 | |
| 03/01/22 | LPG 9492296262 Mar 01 1049550272 ABIGAILRBEAUDIN | $316.96 | |
| 02/15/22 | LPG 9492296262 Feb 15 1049550266 ABIGAILRBEAUDIN | $316.96 | |
| 02/01/22 | LPG 9492296262 Feb 01 1049550260 ABIGAILRBEAUDIN | $316.96 | |
| 01/18/22 | LPG 9492296262 Jan 18 1049550254 ABIGAILRBEAUDIN | $316.96 | |
| 01/04/22 | OVERDRAFT FEE FOR A TRANSACTION POSTED ON 01/03 $316.96 LPG 9492296262 Jan 03 1049550248 ABIGAILRBEAUDIN | $35.00 | |
| 01/03/22 | LPG 9492296262 Jan 03 1049550248 ABIGAILRBEAUDIN | $316.96 | |
| 12/15/21 | LPG 9492296262 Dec 15 1049550242 ABIGAILRBEAUDIN | $316.96 | |
| 12/01/21 | LPG 9492296262 Dec 01 1049550236 ABIGAILRBEAUDIN | $316.96 | |

# Exhibit "6"

<table>
<tr><td colspan="2"><strong>Fill in this information to identify the case:</strong></td></tr>
</table>

Debtor 1    The Litigation Practice Group P C

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court    **Central District of California**

Case number:  **23–10571**

FILED

**U.S. Bankruptcy Court**
**Central District of California**

5/30/2023

**Kathleen J. Campbell, Clerk**

Official Form 410
## Proof of Claim

04/22

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
| --- | --- |

| 1. **Who is the current creditor?** | Hunter Hastings |
| --- | --- |
| | Name of the current creditor (the person or entity to be paid for this claim) |
| | Other names the creditor used with the debtor |

| 2. **Has this claim been acquired from someone else?** | ☑ No<br>☐ Yes. From whom? |
| --- | --- |

| 3. **Where should notices and payments to the creditor be sent?**<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?**<br><br>Hunter Hastings<br>Name<br><br>26847 Ellis Mill Rd<br>Seaford, DE 19973<br><br>Contact phone ____3023395462____<br>Contact email<br>__hunterhastings94@yahoo.com__<br><br>Uniform claim identifier for electronic payments in chapter 13 (if you use one):<br>_____ | **Where should payments to the creditor be sent?** (if different)<br><br>Name<br><br><br><br>Contact phone _____<br>Contact email _____ |
| --- | --- | --- |

| 4. **Does this claim amend one already filed?** | ☑ No<br>☐ Yes. Claim number on court claims registry (if known) _____    Filed on _____<br>MM / DD / YYYY |
| --- | --- |

| 5. **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No<br>☐ Yes. Who made the earlier filing? _____ |
| --- | --- |

Official Form 410                    Proof of Claim                    page 1

**Exhibit "6"**                    0337

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

| 6. **Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____ |

| 7. **How much is the claim?** | $ _____ 10021.56 | **Does this amount include interest or other charges?**<br>☑ No<br>☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

| 8. **What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br>Limit disclosing information that is entitled to privacy, such as healthcare information.<br><br>Services rendered for debt validation services that were incomplete |

| 9. **Is all or part of the claim secured?** | ☑ No<br>☐ Yes. The claim is secured by a lien on property.<br><br>**Nature of property:**<br>☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410–A) with this *Proof of Claim*.<br>☐ Motor vehicle<br>☐ Other. Describe: _____<br><br>**Basis for perfection:** _____<br><br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>**Value of property:** $ _____<br><br>**Amount of the claim that is secured:** $ _____<br><br>**Amount of the claim that is unsecured:** $ _____ (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>**Amount necessary to cure any default as of the date of the petition:** $ _____<br><br>**Annual Interest Rate** (when case was filed) _____ %<br><br>☐ Fixed<br>☐ Variable |

| 10. **Is this claim based on a lease?** | ☑ No<br>☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $ _____ |

| 11. **Is this claim subject to a right of setoff?** | ☑ No<br>☐ Yes. Identify the property: _____ |

Official Form 410         Proof of Claim         page 2

**Exhibit "6"**         0338

| 12. | Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No | | |
|---|---|---|---|---|
| | | ☐ Yes. *Check all that apply:* | | Amount entitled to priority |

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

$ _____

☐ Up to $3,350 * of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).

$ _____

☐ Wages, salaries, or commissions (up to $15,150 *) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).

$ _____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).

$ _____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).

$ _____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(_) that applies

$ _____

* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3: Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.
18 U.S.C. §§ 152, 157 and 3571.

Check the appropriate box:

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    5/30/2023

MM / DD / YYYY

/s/  Hunter Allen Hastings

Signature

Print the name of the person who is completing and signing this claim:

Name    Hunter Allen Hastings

First name    Middle name    Last name

Title

Company

Identify the corporate servicer as the company if the authorized agent is a servicer

Address    26847 Ellis Mil Rd

Number   Street
Seaford, DE 19973

City  State  ZIP Code

Contact phone _____    Email    hunterhastings94@yahoo.com

Official Form 410      Proof of Claim      page 3

**Exhibit "6"**      0339

## Notice of Transition of Legal Services

From: LPG Law (support@lpglaw.com)

To: hunterhastings94@yahoo.com

Date: Wednesday, March 1, 2023 at 07:04 PM EST



Hello Hunter!

On behalf of the entire LPG team, I would like to extend my sincerest apologies for the poor customer service experience that you have recently experienced with our company. I understand that we have not met your expectations, appreciate your patience and understanding as our company works to improve our customer service.

Litigation Practice Group takes full responsibility for the inadequate service you have received, and I assure you that we are taking immediate steps to address the situation.

After careful consideration, I have decided to transfer your file in order to ensure that you receive the best legal services in the industry.  Your legal services will be transferred to Consumer Legal Group ("CLG"), a law firm I know and trust, and have worked extensively with in past.

This law firm, which is larger and more experienced in the area of consumer rights, is based in Manhattan and has expertise fighting the largest banks and creditors in the nation.  Its reputation has been built by attorneys across the country with a combined experience of more than 100 years of providing legal services to clients of all types.  This transition will allow CLG, which I have worked with multiple times during my career, to manage your account and continue to provide a high level of service to you throughout your debt resolution process.

Based on a negotiation I managed to complete, the terms of your agreement will remain the same, and you will not be required to pay anything more than what was agreed in your contract.  All your payments have been credited, and your monthly payment will remain on the same day and in the same amount.

The length of your program and contract are also the same.  To be clear, your payment, the length of your program, and the services that you are offered will remain exactly the same and comes with a guarantee that if your debts are not resolved at the conclusion of your program, you will receive a full refund of the fees paid toward such debts.  Just as with Litigation Practice Group, CLG will represent you in any lawsuit filed against you without any additional cost to you.

This transfer will be completed today, on February 28, 2023, and a representative from CLG will reach out to you to welcome you to their law firm. Consumer Legal Group can be reached at 212-920-1247  or support@consumerlegalgroup.com should you wish to contact them. I wish you the best of luck and success in completion of your journey to being debt free.

Regards,

Daniel S. March

The Litigation Practice Group

P.O. Box 513018
Los Angeles, CA 90051-1018

https://litigationpracticegroup.com

**TO SPEAK WITH A TEAM MEMBER:**
Call 949-229-6262 or Email support@lpglaw.com.



CONFIDENTIALITY AND DISCLAIMER NOTICE:

This email is intended for clients of the The Litigation Practice Group; also known as LPG. LPG is a debt resolution law firm, not a debt settlement company. We do not settle, consolidate, reduce, or pay your debts or offer any sort of loans or financing. Just a reminder that you are receiving this email because you are our client. This e-mail and any attachments are intended for the exclusive

use of the intended recipient. If you are not the intended recipient, please delete this email. If you received this email in error, please notify the sender immediately by calling 949-229-6262, then delete this e-mail and any attachments. Any unauthorized use, dissemination, forwarding, printing, or copying of this email is strictly prohibited. Nothing contained in this email shall form the basis of an attorney-client relationship or constitute a waiver of any privilege.

This email was sent by The Litigation Practice Group, P.O. Box 513018
Los Angeles, CA 90051-1018 . You are receiving this email because you have signed up for our service. If you wish to no longer receive emails from us you can unsubscribe but you may miss out on important information about your account.

View this email in your browser

unsubscr be

## Important Payment Update Notice!

From:  service@phoenixlaw.co (service@phoenixlaw.co)

To:  hunterhastings94@yahoo.com

Date:  Wednesday, March 29, 2023 at 03:40 PM EDT



**(424) 622-4044**
**www.phoenixlaw.co**
**6080 Center Drive 6th Floor Los Angeles, CA 90045**

**Dear Valued Client,**

Congratulations and welcome to Phoenix Law PC! We are excited to have the opportunity to serve as your counsel through the process of resolving your debt  We understand that you have been represented by and have worked with Litigation Practice Group for some time, and that you are now at the tail end of your journey to becoming debt free.

As we transition your file from LPG to Phoenix Law, our attorneys will review your current status and determine the best strategies to employ to complete your representation. It is our understanding that another law firm, Consumer Legal Group, may have contacted you  We have spoken with LPG and Consumer Legal Group and have confirmed that your file was supposed to be assigned Phoenix Law. One of our representatives will contact you soon to discuss the process of transitioning your file and update you regarding the status of your file. In the meantime, if you have any questions please do not hesitate to contact us at 424 622 4044

Regards,

Ty Carrs

Managing Attorney, Phoenix Law

## LPG Account Update

From: Administration LPG (administration@lpglaw.com)

Date: Wednesday, March 29, 2023 at 04:26 PM EDT

Dear Valued Client

I am writing on behalf of Litigation Practice Group to update you regarding the transition of your account.  We wanted to convey our sincere apologies for the erroneous transfer of your file to Consumer Legal Group   It was our intention to transfer your file to Phoenix Law PC for servicing, but by mistake your file was sent to Consumer Legal Group.  We have corrected this error and your file has now been assigned to Phoenix Law PC   A representative from Phoenix Law PC will contact you to discuss your account and how they will assist you as you complete the process of resolving your debt

If you have any questions or would like to speak with a representative now, please contact Phoenix Law PC at 424-622-4044.

Sincerely,

Daniel S. March
Managing Shareholder, LPG



NOTICE  Thi   email me   age (including any attachment  ) may contain material that i   confidential and/or legally privileged. Unless you are the intended recipient or are authorized to receive information for the intended recipient, you may not use, copy, or disclose any part of this message. If you have received this message in error, please notify us and delete all copies of it. Thank you.

## Notice of Transition of Legal Services

From:   LPG Law (support@lpglaw.com)

To:      hunterhastings94@yahoo.com

Date:   Wednesday, March 1, 2023 at 07:04 PM EST



Hello Hunter!

On behalf of the entire LPG team, I would like to extend my sincerest apologies for the poor customer service experience that you have recently experienced with our company. I understand that we have not met your expectations, appreciate your patience and understanding as our company works to improve our customer service.

Litigation Practice Group takes full responsibility for the inadequate service you have received, and I assure you that we are taking immediate steps to address the situation.

After careful consideration, I have decided to transfer your file in order to ensure that you receive the best legal services in the industry.  Your legal services will be transferred to Consumer Legal Group ("CLG"), a law firm I know and trust, and have worked extensively with in past.

This law firm, which is larger and more experienced in the area of consumer rights, is based in Manhattan and has expertise fighting the largest banks and creditors in the nation.  Its reputation has been built by attorneys across the country with a combined experience of more than 100 years of providing legal services to clients of all types.  This transition will allow CLG, which I have worked with multiple times during my career, to manage your account and continue to provide a high level of service to you throughout your debt resolution process.

Based on a negotiation I managed to complete, the terms of your agreement will remain the same, and you will not be required to pay anything more than what was agreed in your contract.  All your payments have been credited, and your monthly payment will remain on the same day and in the same amount.

The length of your program and contract are also the same.  To be clear, your payment, the length of your program, and the services that you are offered will remain exactly the same and comes with a guarantee that if your debts are not resolved at the conclusion of your program, you will receive a full refund of the fees paid toward such debts.  Just as with Litigation Practice Group, CLG will represent you in any lawsuit filed against you without any additional cost to you.

This transfer will be completed today, on February 28, 2023, and a representative from CLG will reach out to you to welcome you to their law firm. Consumer Legal Group can be reached at 212-920-1247  or support@consumerlegalgroup.com should you wish to contact them. I wish you the best of luck and success in completion of your journey to being debt free.

Regards,

Daniel S. March

The Litigation Practice Group

P.O. Box 513018
Los Angeles, CA 90051-1018

https://litigationpracticegroup.com

**TO SPEAK WITH A TEAM MEMBER:**
Call 949-229-6262 or Email support@lpglaw.com.



CONFIDENTIALITY AND DISCLAIMER NOTICE:

This email is intended for clients of the The Litigation Practice Group; also known as LPG. LPG is a debt resolution law firm, not a debt settlement company. We do not settle, consolidate, reduce, or pay your debts or offer any sort of loans or financing. Just a reminder that you are receiving this email because you are our client. This e-mail and any attachments are intended for the exclusive

use of the intended recipient. If you are not the intended recipient, please delete this email. If you received this email in error, please notify the sender immediately by calling 949-229-6262, then delete this e-mail and any attachments. Any unauthorized use, dissemination, forwarding, printing, or copying of this email is strictly prohibited. Nothing contained in this email shall form the basis of an attorney-client relationship or constitute a waiver of any privilege.

This email was sent by The Litigation Practice Group, P.O. Box 513018
Los Angeles, CA 90051-1018 . You are receiving this email because you have signed up for our service. If you wish to no longer receive emails from us you can unsubscribe but you may miss out on important information about your account.

View this email in your browser

unsubscr be

**Exhibit "6"**                    0347



THE LITIGATION
PRACTICE GROUP

1351 Calle Avanzado | Suite 4
San Clemente, CA 92673
Tel 949.593.0440
Fax 949.415.7816

admin@coastprocessing.com

## LEGAL SERVICES AGREEMENT

### Legal Services

The Litigation Practice Group PC ("LPG") will provide debt validation services wherein it will assist you in removing erroneous or inaccurate information appearing on one or more of your credit reports by contesting debts appearing therein. This service is limited to information reported by creditors or purported creditors to credit bureaus. The purpose of this program is to challenge the legal validity of debts appearing on or being reported to credit bureaus.  The cost of legal services rendered by LPG is set forth below, and those fees are earned by LPG for services rendered to you as set forth herein at the time such fees are paid.

### Client Authorization

You authorize LPG to challenge, where applicable, any debts appearing in your credit report(s) that you believe to be in any way invalid, inaccurate, or otherwise without a legal basis. You also authorize LPG to obtain a copy of your credit report to assist in the process of analyzing your account and developing a strategy regarding the invalidation of debts that are excessive or otherwise unauthorized by law. You further authorize LPG, acting under power of attorney for you, to affix your signature to documents sent on your behalf in relation to the matters addressed herein.

### Description of Services to be Performed

LPG will obtain your credit reports, analyze them, and develop strategies for correcting invalid or unlawful debts for which you should not be held legally responsible. Where appropriate, LPG will use existing laws and interact with creditors and credit bureaus on your behalf to invalidate your debts and remove such invalid debts from your credit reports. LPG will also interact with collection agencies, as applicable, to invalidate your debts by requiring them to supply evidence of your indebtedness to them, or any other legal mechanism. LPG will also consult with you regarding all aspects of the credit reporting process, including all laws applicable to the same. LPG will also investigate your delinquent accounts in order to determine the most effective method for invalidating your debts or otherwise removing any legal liability for such debts, up to and including the initiation of lawsuits on your behalf against your creditors and their third-party debt collectors.

In addition, if a lawsuit is filed against you, LPG will represent you in such a lawsuit and will not charge any additional fees for such representation provided such a lawsuit was initiated after the date you sign this Agreement.  In the event a lawsuit was initiated against you before the date you execute this

ID: 3587041 Signed: 2021-03-07T19:28:33-06:00

Agreement and you elect to have LPG represent you, an additional fee of $500.00 will be charged. Where appropriate, if legal fees are recovered from an adverse party, LPG will retain such fees for its services. You will be responsible to pay any damages resulting from any lawsuit. Any costs incurred in a lawsuit will be paid by LPG out of the fees set forth below, including the fees of any attorney retained on your behalf in a jurisdiction in which LPG is not admitted to practice law. No additional payment from you to LPG will be necessary for the defense of any lawsuit filed against you after the date you execute this Agreement. You will, however, be responsible to pay any damages resulting from such lawsuits or any settlements reached in the course of such lawsuits.

## Fees

You will pay the following fees for the legal services provided by LPG. No fee or other cost will be charged or collected other than the following. This is the only amount you have to pay for LPG's services, and this fee is fixed, such that it is earned the moment it is transmitted to LPG. Upon request, LPG will provide an update of the progress of services performed under this agreement at reasonable intervals of no greater frequency than once a month.

## Refund Policy

If an account is fully validated by a creditor, such that no further dispute to the validity of the account could be made, you will receive a full refund of the fees that you paid towards the invalidation of that account (i.e., you will be refunded the fees paid in proportion to the debt that was validated). Should you have an outstanding balance with LPG at the time your refund is issued on the validated account, any refund will first be applied towards the outstanding balance. A client can elect to move to a debt settlement service on any validated account in lieu of obtaining a refund. If a client makes such an election, fees will no longer be collected for such account and debt settlement services will be performed for no additional fees.

## Debt Settlement

If LPG is unable to invalidate any debt, you may elect to have LPG negotiate a settlement on your behalf with the concerned creditor without any additional fees being charged to or incurred by you for such service. Any settlement reached with any such creditor shall be your responsibility. At the point that you reach a settlement with such creditor, your payment to LPG will be reduced and re-amortized to adjust for the settled account being removed from the representation herein contemplated. Please see the refund policy above for more details.

## Actions Required of You

You agree to provide LPG with any and all correspondence you receive from any creditor, credit bureau, attorney, or court of law. You further agree to keep a log of all communications, including telephonic and electronic communications, from any creditor or credit reporting agency.

## Right to Conduct Business Electronically and Contact You

ID: 3587041 Signed: 2021-03-07T19:28:33-06:00

You agree that LPG may contact you electronically and telephonically and that any and all business with LPG may be conducted electronically. You further agree that LPG may transmit data, including that regarding your credit profile, electronically.  You further agree that any electronic communication carries the risk of disclosure to a third party and that LPG will not be held responsible for any such inadvertent disclosure of information. A facsimile or email transmission of this signed agreement, via an email attachment or otherwise, will be as valid as the original. This agreement may not be modified except in writing by both parties.

**Client Acknowledgements**

By signing this agreement, you acknowledge that LPG has not instructed you to breach any contract, fail to make any required payment, or fail to perform any obligation you have lawfully incurred. LPG reserves the right to terminate this agreement if (a) client fails to make timely payment of the amount due under hereunder or (b) the client`s payments are returned multiple times for any reason. LPG will not pay your debts and does not guarantee that any debt you now have or may incur will be invalidated or settled in association with LPG's services. You understand and agree that you must forward any communication you receive in printed or electronic form from any creditor, court, or representative of other a creditor or a court to admin@coastprocessing.com and that you must keep a log of all telephonic communications with any creditor or credit reporting agency. **Do not sign this agreement until you have received and read the information statements and notices of cancellation required by state and federal law, even if otherwise advised.  By signing this agreement, you acknowledge receipt of these disclosures prior to the time of signing and agree to the terms of this agreement. You, the client, may cancel this agreement at any time before midnight CST of the 5th day after the date of execution of this agreement via an email to admin@coastprocessing.com.  In addition, you, the client may terminate LPG's services under this agreement at any time via an email to admin@coastprocessing.com.**

Client Signature: _____     Date: 3/7/2021

Co-Applicant Signature _____     Date: _____

**Creditor Information**

| Creditor | Account # | Amount Owed |
|---|---|---|
| PNC Bank | ****2333 | $4,766.00 |
| PNC Bank | ****1624 | $4,580.00 |
| ONEMAIN | ****8984 | $4,379.00 |
| JPMCB CARD | ****9272 | $3,925.00 |
| SYNCBCARECR | ****3044 | $1,945.00 |
| SYNCBPPMC | ****3460 | $1,065.00 |
|  |  | $20,660.00 |

**Exhibit "6"**                                    0350

-

**Exhibit "6"**                                                                    0351

ID: 3587041 Signed: 2021-03-07T19:28:33-06:00

## **Client Information**

Name: Hunter Hastings

Address: 26847 Ellis Mill Rd, , Seaford DE 19973

Home Phone: 302-339-5462

Cell Phone:

Email: hunterhastings94@yahoo.com

Las 4 SSN: XXX-XX-8567

## **Co-Client Information**

Name:

Address: , ,

Home Phone:

Cell Phone:

Email:

Last 4 SSN:

ID: 3587041 Signed: 2021-03-07T19:28:33-06:00

## **Schedule of Payments**

I agree to this payment schedule – Client Initials: _____

| Payment # | Process Date | Amount |
|---|---|---|
| 1 | Mar 12, 2021 | $217.86 |
| 2 | Mar 26, 2021 | $217.86 |
| 3 | Apr 09, 2021 | $217.86 |
| 4 | Apr 23, 2021 | $217.86 |
| 5 | May 07, 2021 | $217.86 |
| 6 | May 21, 2021 | $217.86 |
| 7 | Jun 04, 2021 | $217.86 |
| 8 | Jun 18, 2021 | $217.86 |
| 9 | Jul 02, 2021 | $217.86 |
| 10 | Jul 16, 2021 | $217.86 |
| 11 | Jul 30, 2021 | $217.86 |
| 12 | Aug 13, 2021 | $217.86 |
| 13 | Aug 27, 2021 | $217.86 |
| 14 | Sep 10, 2021 | $217.86 |
| 15 | Sep 24, 2021 | $217.86 |
| 16 | Oct 08, 2021 | $217.86 |
| 17 | Oct 22, 2021 | $217.86 |
| 18 | Nov 05, 2021 | $217.86 |
| 19 | Nov 19, 2021 | $217.86 |
| 20 | Dec 03, 2021 | $217.86 |
| 21 | Dec 17, 2021 | $217.86 |
| 22 | Dec 31, 2021 | $217.86 |
| 23 | Jan 14, 2022 | $217.86 |
| 24 | Jan 28, 2022 | $217.86 |
| 25 | Feb 11, 2022 | $217.86 |
| 26 | Feb 25, 2022 | $217.86 |
| 27 | Mar 11, 2022 | $217.86 |
| 28 | Mar 25, 2022 | $217.86 |
| 29 | Apr 08, 2022 | $217.86 |
| 30 | Apr 22, 2022 | $217.86 |
| 31 | May 06, 2022 | $217.86 |
| 32 | May 20, 2022 | $217.86 |
| 33 | Jun 03, 2022 | $217.86 |
| 34 | Jun 17, 2022 | $217.86 |
| 35 | Jul 01, 2022 | $217.86 |
| 36 | Jul 15, 2022 | $217.86 |
| 37 | Jul 29, 2022 | $217.86 |
| 38 | Aug 12, 2022 | $217.86 |
| 39 | Aug 26, 2022 | $217.86 |
| 40 | Sep 09, 2022 | $217.86 |
| 41 | Sep 23, 2022 | $217.86 |
| 42 | Oct 07, 2022 | $217.86 |
| 43 | Oct 21, 2022 | $217.86 |
| 44 | Nov 04, 2022 | $217.86 |
| 45 | Nov 18, 2022 | $217.86 |
| 46 | Dec 02, 2022 | $217.86 |
| 47 | Dec 16, 2022 | $217.86 |
| 48 | Dec 30, 2022 | $217.70 |

ID: 3587041 Signed: 2021-03-07T19:28:33-06:00

**Electronic Payment Authorization**

Bank Name: PNC BANK, NATIONAL ASSOCIATION

Name on Account: Hunter Hastings

Account Type:   Checking

_____ Other (specify: _____ )

Routing Number:   ██████████

Account Number:   ██████████

Next Payment Date: Mar 12, 2021 Amount: $ 217.86

Recurring Payment Date: 12th

By signing below, I authorize and permit LPG or their designees, EPPS, Omnifund, Equipay, Forte, a CSG Company, or Authorize.NET to initiate electronic funds transfer via an Automated Clearing House system (ACH) from my account listed above.  I will also provide LPG with a voided check or savings deposit slip.

If necessary, LPG may make adjustments if errors have occurred during the transaction.  The date of the draft is listed above, however, if the draft date falls on a weekend or bank holiday, the debit transaction will take place on the next business day.  This authority will remain in effect until LPG is notified by the member in writing at least 5 days prior to the next scheduled draft date.  No other forms of cancellation by members will be observed.  If the debit is returned because of non-sufficient funds or uncollected funds, then the originator and its financial institution may reinitiate the entry up to two (2) times.  The reversal of funds from a client's account that was drafted in error cannot be made until seven business days from the draft date.  The member agrees to waive all rights of reversal or refusal of any payment on any draft that LPG may make against the member's bank account while services are performed.  The member agrees with all of the provisions and conditions outlined within.

**Acknowledgment of Refunds & Draft Date Changes**

ACH Refunds: If a refund is due such will be made through the ACH process only if the fees were made through the ACH process.  All refunds may take up to 10 days to process.  In the event my EFT or draft is returned from my bank unpaid, I agree that a fee of $25.00 or as allowed by law may be charged to my account via draft or EFT.  Furthermore, I warrant that I am authorized to execute this payment authorization and the above information is true and correct.  Draft Date Changes: A client may stop any ACH debit by providing written notice to LPG at least five (5) business days prior to the scheduled payment.  If you should need to notify us of your intent to cancel and/or revoke this authorization you must contact us five (5) days prior to the questioned debit being initiated.  Please call us at 949-593-0440 or at admin@coastprocessing.com.

Client Signature: _____          Date: 3/7/2021

**Exhibit "6"**                    0355

Printed Name:      Hunter Hastings

_____    _____

ID: 3587041 Signed: 2021-03-07T19:28:33-06:00

**Electronic Funds Transfer (EFT) Authorization to Debit Bank Account**

Account Owner Name: Hunter Hastings

Social Security Number ▮▮▮▮▮           Birth Date: ▮▮▮▮▮

Address:26847 Ellis Mill Rd      City:Seaford     State:DE    Zip: 19973

Mobile Phone #:             Bank Name:  PNC BANK, NATIONAL ASSOCIATION

Routing Number: ▮▮▮▮▮      Account Number:  ▮▮▮▮▮

Total Amount of Debit: $217.86      Date of Next Debit:Mar 12, 2021    Checking or Saving: Checking

I hereby apply for and agree to establish a non-interest bearing special purpose account (the "Account") with a bank ("Bank") selected by EPPS, LLC and/or its successors for the purpose of accumulating funds to pay for such goods and services as I so direct EPPS, LLC to perform.  This application is subject to Bank's customer identification program, as required by the USA PATRIOT ACT and other applicable laws, and accordingly, I hereby represent that the above information is true and complete to the best of my knowledge and belief.  The bank account information provided above may be subject to account validation processes to include pre-notation and a $0.01 micro-deposit.

| Schedule of Fees and Charges | |
| --- | --- |
| Monthly Banking Fee: | Included |
| ACH/EFT Fee Per Transaction | Included |
| Chargeback/Late Return Fee | Included |
| NSF Fee | Included |
| Account Closer Fee | Included |
| **PREMIUM DISBURSEMENT SERVICES** | |
| Wire Transfer | Included |
| FedEx/Overnight Next Day | Included |
| 2nd Day Check With Tracking | Included |

I hereby authorize Bank, directly or through EPPS, LLC, and/or its service providers, to administer the account on my behalf by (a) periodically transferring and depositing funds to the Account, via any payment media currently in use, and (b) periodically disbursing funds from the Account pursuant to instructions that I may give from time to time.  I hereby authorize payments from the Account for the fees and charges provided for in this application and in the agreement.  I hereby grant permission for Bank to share information regarding the Account with EPPS, LLC, and any other service provider to facilitate the transactions I may initiate that involve the Account, and with any other party that is essential to the administration of the Account on my behalf.  My signature below provides permission to be contacted by phone at the number provided with this authorization.  A payment reminder will be sent to your phone number via Text Messaging prior to the payment scheduled above. This authorization shall remain in full force and effect until I provide a verbal or written termination notice to EPPS.  Any such notice, and any other written notice that is provided for in this Application or the Agreement, shall be sent to EPPS, LLC at the address set forth in the Agreement. "EPPS-Ph# 800-215-3484" will appear on your bank statement

Account Holder's Signature: *[signature]*          Date: 3/7/2021

**Exhibit "6"**                                     0357

ID: 3587041 Signed: 2021-03-07T19:28:33-06:00

E-Signature Completion Certificate





# Your Document Was Successfully Signed!

Congratulations, your document(s) was successfully signed. Please find details below related to your e-signature submission.

## 🛈 Signing Details

Document ID
3587041

Signer Email
hunterhastings94@yahoo.com

Document Title
Legal Service Agreement with LPG - ASF ( English )

Signer IP Address
98.252.13.234

Sender IP Address
45.22.90.58

Timestamp
2021-03-07T19:28:34-06:00

Number Of Signers
1

Document MD5 Hash
d41d8cd98f00b204e9800998ecf8427e

## ⚙ Document Audit

✔ Sent at 2021-03-07T19:21:13-06:00 from IP 45.22.90.58

✔ Delivered to hunterhastings94@yahoo.com at 2021-03-07T19:21:33-06:00 from 98.252.13.234

✔ Adopted Signature at 2021-03-07T19:28:10-06:00 from 98.252.13.234

✔ Completed Signing at 2021-03-07T19:28:33-06:00 from 98.252.13.234

✔ PDF Generated at 2021-03-07T19:28:34-06:00

Sending Agent
Mozilla/5.0 (Linux; Android 11; SAMSUNG SM-G973U) AppleWebKit/537.36 (KHTML, like Gecko) SamsungBrowser/13.2 Chrome/83.0.4103.106 Mobile Safari/537.36

**Exhibit "6"**                    0358

# Exhibit "7"

<table>
<tr><td colspan="2">

**Fill in this information to identify the case:**

Debtor 1   The Litigation Practice Group P C

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court   **Central District of California**

Case number:  **23–10571**

</td><td>

FILED

**U.S. Bankruptcy Court**
**Central District of California**

5/30/2023

**Kathleen J. Campbell, Clerk**

</td></tr>
</table>

## Official Form 410
## Proof of Claim

04/22

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

| Part 1: | Identify the Claim |
| --- | --- |

| | |
| --- | --- |
| 1. **Who is the current creditor?** | Debra M Archambault |
| | Name of the current creditor (the person or entity to be paid for this claim) |
| | Other names the creditor used with the debtor |

| | |
| --- | --- |
| 2. **Has this claim been acquired from someone else?** | ☑ No<br>☐ Yes. From whom? |

| | | |
| --- | --- | --- |
| 3. **Where should notices and payments to the creditor be sent?**<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?**<br><br>Debra M Archambault<br><br>Name<br><br>5 Carlann Lane<br>Valley Cottage, NY 10989<br><br><br>Contact phone _____ 845–499–5081 _____<br><br>Contact email<br>   darchambault66@gmail.com<br><br>Uniform claim identifier for electronic payments in chapter 13 (if you use one): | **Where should payments to the creditor be sent?** (if different)<br><br>Name<br><br><br><br><br>Contact phone _____<br><br>Contact email _____ |

| | |
| --- | --- |
| 4. **Does this claim amend one already filed?** | ☑ No<br>☐ Yes. Claim number on court claims registry (if known) _____  Filed on _____<br>MM / DD / YYYY |

| | |
| --- | --- |
| 5. **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No<br>☐ Yes. Who made the earlier filing? _____ |

**Exhibit "7"**                0359

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

| 6. **Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____ |

| 7. **How much is the claim?** | $ 10295.00 | **Does this amount include interest or other charges?**<br>☑ No<br>☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

| 8. **What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br>Limit disclosing information that is entitled to privacy, such as healthcare information.<br><br>Paid for debt solutions , never rendered according to contract with LPG/Theft of personal funds. |

| 9. **Is all or part of the claim secured?** | ☑ No<br>☐ Yes. The claim is secured by a lien on property.<br>**Nature of property:**<br>☐ Real estate.   If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410–A) with this *Proof of Claim*.<br>☐ Motor vehicle<br>☐ Other. Describe: _____<br><br>**Basis for perfection:** _____<br><br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>**Value of property:** $ _____<br>**Amount of the claim that is secured:** $ _____<br>**Amount of the claim that is unsecured:** $ _____ (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>**Amount necessary to cure any default as of the date of the petition:** $ _____<br><br>**Annual Interest Rate** (when case was filed) _____ %<br><br>☐ Fixed<br>☐ Variable |

| 10. **Is this claim based on a lease?** | ☑ No<br>☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $ _____ |

| 11. **Is this claim subject to a right of setoff?** | ☑ No<br>☐ Yes. Identify the property: _____ |

**Exhibit "7"**          0360

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No<br>☐ Yes. *Check all that apply:* | Amount entitled to priority |
|---|---|---|

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).  $_____

☐ Up to $3,350 * of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).  $_____

☐ Wages, salaries, or commissions (up to $15,150 *) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).  $_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).  $_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).  $_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(_) that applies  $_____

* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3: Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157 and 3571.

Check the appropriate box:

☑ I am the creditor.
☐ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   5/30/2023
MM / DD / YYYY

/s/  Debra M Archambault
Signature

Print the name of the person who is completing and signing this claim:

Name   Debra M Archambault
First name   Middle name   Last name

Title

Company

Identify the corporate servicer as the company if the authorized agent is a servicer

Address   5 Carlann Lane
Number   Street
Valley Cottage, NY 10989
City   State   ZIP Code

Contact phone   845-499-5081   Email   darchambault66@gmail.com

Official Form 410                Proof of Claim                page 3

**Exhibit "7"**                    **0361**

Exhibit # 1 - 12

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor 1 | Litigation Practice Group |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | Central District of California |
| Case number | 8:23-bk-10571-SC |

## Official Form 410

# Proof of Claim
04/22

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

---

### Part 1: Identify the Claim

**1. Who is the current creditor?**

Debra M. Archambault
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes.  From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Debra M Archambault
Name

5 Carlann Lane
Number     Street

Valley Cottage     NY     10989
City          State        ZIP Code

Contact phone 845-499-5081

Contact email darchambault66@gmail.com

Where should payments to the creditor be sent? (if different)

Name

Number     Street

City          State        ZIP Code

Contact phone _____

Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

— — — — — — — — — — — — — — — — — — — — — — — —

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.  Claim number on court claims registry (if known) _____

Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.  Who made the earlier filing? _____

---

Proof of Claim
Exhibit "7"

0562

Case 8:23-bk-10571-SC Claim 53-1 Filed 07/12/23 Desc

**Part 2:**    **Give Information About the Claim as of the Date the Case Was Filed**

**6. Do you have any number you use to identify the debtor?**

   ☐ No

   ☑ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor:   5   3   4   3

**7. How much is the claim?**

   $ _____ 10,295.00   **Does this amount include interest or other charges?**

     ☑ No

     ☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

   Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

   Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

   Limit disclosing information that is entitled to privacy, such as health care information.

   Funds paid , servcies not delieverd according to contract.(Fraud)

**9. Is all or part of the claim secured?**

   ☑ No

   ☐ Yes. The claim is secured by a lien on property.

     **Nature of property:**

     ☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

     ☐ Motor vehicle

     ☐ Other. Describe: _____

     **Basis for perfection:** _____

     Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

     **Value of property:**    $_____

     **Amount of the claim that is secured:**    $_____

     **Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

     **Amount necessary to cure any default as of the date of the petition:**    $_____

     **Annual Interest Rate** (when case was filed)_____%

     ☐ Fixed

     ☐ Variable

**10. Is this claim based on a lease?**

   ☑ No

   ☐ Yes. Amount necessary to cure any default as of the date of the petition.    $_____

**11. Is this claim subject to a right of setoff?**

   ☑ No

   ☐ Yes. Identify the property: _____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. Check one:

|  | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

---

**Part 3:   Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box:

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   05/29/0202
                  MM / DD / YYYY

Signature   _Debra M. Archambault_

**Print the name of the person who is completing and signing this claim:**

| Name | Debra | Marie | Archambault |
|---|---|---|---|
| | First name | Middle name | Last name |

Title   _____

Company   _____
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address   5 Carlann Lane
          Number      Street
          Valley Cottage          NY      10989
          City                    State   ZIP Code

Contact phone   845-499-5081          Email   darchambault66@gmail.com



P.O. Box 513018, Los Angeles, CA 90051-1018
Tel. (949) 715-0644 · Fax (949) 315-4332
Support@LPGLaw.com

## LEGAL SERVICES AGREEMENT

### Legal Services

The Litigation Practice Group PC, a State Bar of California licensed law corporation, and its employed and affiliated attorneys (collectively "LPG") will provide legal services wherein it will represent you in connection with the disputes you have with the creditors listed below (see Creditor Information). LPG will do the following as part of its representation of you:

- Assist you in stopping creditors and any related debt collectors from harassing or contacting you in connection with any of the debts identified below;
- Dispute the legal validity of the debts identified below;
- Assist you in removing erroneous or inaccurate information reported in connection with debts identified below;
- Represent you in any lawsuit filed against you in connection with any of these debts;
- Defend you against any collection activity or lawsuit on any invalidated debt at any point in time, without expiration, in connection with any debt identified below;
- Initiate legal action in a court of competent jurisdiction against any creditor that violates any state or federal law in connection with any debt identified below; and
- Determine your qualification for bankruptcy under Chapter 7 or Chapter 13 of the U.S. Bankruptcy Code, and counsel you regarding the procedures and effects of bankruptcy as well as your qualification to file the same.

LPG will serve as your attorney for all purposes in connection with these disputes and will be available to render all legal assistance necessary to resolve these debts. The fees that are set forth below are flat fees that are all inclusive – no additional fee or cost will be charged by LPG at any time during the duration of your dispute with the creditors identified below. All fees are earned by LPG at the time they are paid and are for services rendered to you as set forth herein.

### Client Authorization

You authorize LPG to challenge, where applicable, each of the debts listed below, which you believe to be in any way invalid, inaccurate, or otherwise without a legal basis. You also authorize LPG to obtain a copy of your credit report to assist in the process of analyzing your account and developing a strategy regarding the resolution of debts that are excessive or otherwise unauthorized by law. You further authorize LPG, acting under power of attorney for you, to affix your signature to documents sent on your behalf in relation to the matters addressed herein. Finally, you authorize LPG to communicate with you via email, text message, telephone, and facsimile. Any of the authorizations set forth herein can be revoked at any time by written communication.

## Description of Services to be Performed

LPG will obtain your credit reports, analyze them, and develop strategies for correcting invalid or unlawful debts for which you should not be held legally responsible. Where appropriate, LPG will use existing laws and interact with creditors and credit bureaus on your behalf to invalidate your debts and remove such invalid debts from your credit reports. LPG will also interact with collection agencies, as applicable, to invalidate your debts by requiring them to supply evidence of your indebtedness to them, or any other legal mechanism. LPG will also consult with you regarding all aspects of the credit reporting process, including all laws applicable to the same. LPG will also investigate your delinquent accounts in order to determine the most effective method for invalidating your debts or otherwise removing any legal liability for such debts, up to and including the initiation of lawsuits on your behalf against your creditors and their third-party debt collectors.

In addition, if a lawsuit is filed against you, LPG will represent you in such a lawsuit and will not charge any additional fees for such representation provided such a lawsuit was initiated after the date you sign this Agreement. In the event a lawsuit was initiated against you before the date you execute this Agreement and you elect to have LPG represent you, an additional fee of $500.00 will be charged. Where appropriate, if legal fees are recovered from an adverse party, LPG will retain such fees for its services. You will be responsible to pay any damages resulting from any lawsuit. Any costs incurred in a lawsuit will be paid by LPG out of the fees set forth below, including the fees of any attorney retained on your behalf in a jurisdiction in which LPG is not admitted to practice law. No additional payment from you to LPG will be necessary for the defense of any lawsuit filed against you after the date you execute this Agreement. You will, however, be responsible to pay any damages resulting from such lawsuits or any settlements reached in the course of such lawsuits.

## Fees

You will pay the fees set forth below for the legal services provided by LPG, which services are outlined above. No fee or other cost will be charged or collected beyond the flat fee set forth below. This is the only amount that you have to pay to LPG for its services, which includes any cost, filing fee or vendor's fee associated with LPG's representation of you, and this fee is not escrowed but rather earned received by LPG. This fee does NOT, however, include any settlement that you may have to pay to any creditor if you opt to settle a debt prior to or during the course of a lawsuit.

## Refund Policy

If you reach the conclusion of LPG's representation of you and a debt remains in dispute without resolution, you will be eligible to receive a full refund of the fees that you paid towards your representation in connection with that account (i.e., you will be refunded the fees paid in proportion to the debt that was not resolved). A debt is "in dispute" under this paragraph if, at the time of completion of LPG's representation of you, no lawsuit was filed regarding the debt, no settlement was reached regarding the debt, no acknowledgment of invalidity was received from the creditor regarding the debt, and the debt is still reporting to one of the following credit bureaus: Experian, Equifax, or Transunion.

Exhibit "7"

0366
ID: 4279563 Signed: 2021-08-25T14:06:45-05:00

## Debt Settlement

You may request that LPG settle any debt identified below at any point in the course of LPG's representation of you. Where requested, LPG will negotiate the most favorable settlement it is able to negotiate on your behalf. Any settlement reached as a result of your request shall be your responsibility, and shall be paid directly from you to the creditor. At the point that you reach a settlement with a creditor, your payment to LPG will be reduced and to adjust for the settled account being removed from the representation herein contemplated.  LPG will only settle a debt where litigation is active or contemplated.

## Actions Required of You

You agree to provide LPG with any and all correspondence you receive from any creditor, credit bureau, attorney, or court of law.  You further agree to keep a log of all communications, including telephonic and electronic communications, from any creditor or credit reporting agency to you from the date you execute this Agreement until the conclusion of your representation.

## Right to Conduct Business Electronically and Contact You

You agree that LPG may contact you electronically and telephonically and that any and all business with LPG may be conducted electronically. You further agree that LPG may transmit data, including that regarding your credit profile, electronically.  You further agree that any electronic communication carries the risk of disclosure to a third party and that LPG will not be held responsible for any such inadvertent disclosure of information. A facsimile or email transmission of this signed agreement, via an email attachment or otherwise, will be as valid as the original signed agreement. This agreement may not be modified except in writing by both parties.

## Malpractice Insurance

LPG hereby discloses that it maintains a malpractice insurance policy that covers its representation of you and that the limit of such policy is no less than $1,000,000.00 per claim and $1,000,000.00 per claimant. If you desire to make a claim against that insurance policy, you must first contact LPG and disclose your claim and the nature of the claim, at which point LPG agrees to assist you in obtaining any and all information necessary to prepare a file a claim.

## Applicable Law and Confidentiality

You understand and agree that LPG is based out of the State of California, is a licensed law corporation under the State Bar of California, and that California law applies to this Agreement.  You further understand that LPG is bound to strict rules of confidentiality and attorney-client privilege in connection with the rules applicable to attorneys licensed to practice law in the State of California. You further understand and agree that you have sought the representation of LPG with full knowledge of its location and licensing, and that LPG works with attorneys licensed in all 50 states and the District of Columbia as affiliated counsel to allow LPG to provide a complete representation of you in any state in which you are sued or in which a dispute might arise. You have the right to know the licensed attorney with whom LPG has affiliated in any state and at any time but understand and agree that LPG may choose to change the local attorney with whom it is affiliated in any given jurisdiction, provided only that at all times LPG shall have an affiliated attorney in all 50 states and the District of Columbia.

0367
ID: 4279563 Signed: 2021-08-25T14:06:45-05:00

## Client Acknowledgements

By signing this agreement, you acknowledge that LPG has not instructed you to breach any contract, fail to make any required payment, or fail to perform any obligation you have lawfully incurred. LPG reserves the right to terminate this agreement if (a) required by the State Bar of California Rules of Professional Conduct, (b) you refuse to communicate with LPG or respond to reasonable requests for information necessary to represent you in an effective way, (c) you fail to make timely payment of the amount due under hereunder, or (d) your payments are returned multiple times for any reason. LPG will not pay any of the debts identified below and does not guarantee that any debt you now have or may incur will be invalidated or settled in association with LPG's representation of you. You understand and agree that you must forward any communication you receive in printed or electronic form from any creditor, court, or representative of other a creditor or a court to the address, email, or fax number provided below, and that you must keep a log of all telephonic communications with any creditor or credit reporting agency. You, the client, may cancel this Agreement at any time by submitting three days' written notice of cancellation by mail, email, or fax, and shall not be responsible for any payments due after the date of cancellation. A payment due within three days of the date of written cancellation shall be processed and shall not be refunded.

Client Signature: _____

Date: 8/25/2021 _____

Co-Applicant Signature: _____

Date: _____

## THE LITIGATION PRACTICE GROUP PC

**Daniel S. March, Managing Shareholder**
**17542 E. 17th Street, Ste 100**
**Tustin, CA 92780**
**admin@lpglaw.com**
**Tel. 949.715.0644**
**Fax. 949.315.4332**

## Creditor Information

| Creditor | Account # | Debt Balance |
|---|---|---|
| PALISADESFCU | ░░░0001 | $20,961.00 |
| UPGRADEINC | ░7884 | $19,207.00 |
| ONEMAIN | ░░░0084 | $11,681.00 |
| Merrick Bank | ░░░5094 | $707.00 |
| MABTCONTF | ░░░8460 | $378.00 |
| CRDTONEBNK | ░░░0632 | $377.00 |
| CRDTONEBNK | ░░░5307 | $347.00 |
| | | **$53,658.00** |

ID: 4279563 Signed: 2021-08-25T14:06:45-05:00

### Client Information

**Name**: Debra Archambault
**Address**: 5 Carlann Lane, Valley Cottage NY 10989

**Home Phone:** 845-499-5081
**Cell Phone:**
**Email:** darchambault66@gmail.com
**Last 4 SSN:** XXX-XX-6609

## Schedule of Payments

I agree to this payment schedule – **Client Initials:** ___

| Payment # | Process Date | Amount |
|---|---|---|
| 1 | Sep 27, 2021 | $857.92 |
| 2 | Oct 25, 2021 | $857.92 |
| 3 | Nov 26, 2021 | $857.92 |
| 4 | Dec 27, 2021 | $857.92 |
| 5 | Jan 25, 2022 | $857.92 |
| 6 | Feb 25, 2022 | $857.92 |
| 7 | Mar 25, 2022 | $857.92 |
| 8 | Apr 25, 2022 | $857.92 |
| 9 | May 25, 2022 | $857.92 |
| 10 | Jun 27, 2022 | $857.92 |
| 11 | Jul 25, 2022 | $857.92 |
| 12 | Aug 25, 2022 | $857.92 |
| 13 | Sep 26, 2022 | $857.92 |
| 14 | Oct 25, 2022 | $857.92 |
| 15 | Nov 25, 2022 | $857.92 |
| 16 | Dec 27, 2022 | $857.92 |
| 17 | Jan 25, 2023 | $857.92 |
| 18 | Feb 27, 2023 | $857.92 |
| 19 | Mar 27, 2023 | $857.92 |
| 20 | Apr 25, 2023 | $857.92 |
| 21 | May 25, 2023 | $857.92 |
| 22 | Jun 26, 2023 | $857.92 |
| 23 | Jul 25, 2023 | $857.92 |
| 24 | Aug 25, 2023 | $857.92 |
| 25 | Sep 25, 2023 | $857.92 |
| 26 | Oct 25, 2023 | $857.92 |
| 27 | Nov 27, 2023 | $857.92 |
| 28 | Dec 26, 2023 | $858.00 |

## Electronic Payment Authorization

**Bank Name:** STERLING NATIONAL BANK
**Name on Account:** Debra Archambault
**Account Type:** Checking
        Other (specify: _____ )
**Routing Number:** ▮
**Account Number:** ▮
**Next Payment Date:** Sep 27, 2021 **Amount:** $ 857.92
**Recurring Payment Date:** 25th

By signing below, I authorize and permit LPG or their designees to initiate electronic funds transfer via an Automated Clearing House system (ACH) from my account listed above. I will also provide LPG with a voided check or savings deposit slip.

If necessary, LPG may make adjustments if errors have occurred during the transaction. The date of the draft is listed above, however, if the draft date falls on a weekend or bank holiday, the debit transaction will take place on the next business day. This authority will remain in effect until LPG is notified by the member in writing at least 5 days prior to the next scheduled draft date. No other forms of cancellation by members will be observed. If the debit is returned because of non-sufficient funds or uncollected funds, then the originator and its financial institution may reinitiate the entry up to two (2) times. The reversal of funds from a client's account that was drafted in error cannot be made until seven business days from the draft date. The member agrees to waive all rights of reversal or refusal of any payment on any draft that LPG may make against the member's bank account while services are performed. The member agrees with all of the provisions and conditions outlined within.

### Acknowledgment of Refunds & Draft Date Changes

ACH Refunds: If a refund is due such will be made through the ACH process only. Refunds may take up to 10 days to process. In the event my EFT or draft is returned from my bank unpaid, I agree that a fee of $25.00 or as allowed by law may be charged to my account via draft or EFT. Furthermore, I warrant that I am authorized to execute this payment authorization and the above information is true and correct. Draft Date Changes: A client may stop any ACH debit by providing written notice to LPG at least three (3) business days prior to the scheduled payment. If you should need to notify us of your intent to cancel and/or revoke this authorization you must contact us three (3) business days prior to the questioned debit being initiated.

**Client Signature:**
*Debra Archambault*
**Date:**
8/25/2021
**Printed Name:**
Debra Archambault

## Preauthorized Checking and ACH Authorization Form

I hereby apply for and agree to establish a non-interest bearing special purpose account (the "Account") with a bank ("Bank") selected by LPG, its payments processors, and/or their successors for the purpose of accumulating funds to pay for such goods and services as I so direct LPG to perform. This application is subject to Bank's customer identification program, as required by the USA PATRIOT ACT and other applicable laws, and accordingly, I hereby represent that the above information is true and complete to the best of my knowledge and belief. The bank account information provided above may be subject to account validation processes to include pre-notation and a $0.01 micro-deposit.

**Account Owner Name:** Debra Archambault

**Address:** 5 Carlann Lane   **City:** Valley Cottage   **State:** NY   **Zip:** 10989

**Mobile Phone #:**   **E-Mail:** darchambault66@gmail.com

## DESIGNATED BANK ACCOUNT INFORMATION

**Bank Name:** STERLING NATIONAL BANK

**Name as it appears on bank ACCOUNT:** Debra Archambault

**Routing Number:**             **Account Number:**             **Checking or Saving:** Checking

## DESIGNATED BANK ACCOUNT PAYMENT AUTHORIZATION SCHEDULE

**Total Amount of Debit:** $857.92        **Date of Next Debit:** Sep 27, 2021

I authorize Payment Automation Network to initiate Automatic Clearing House (ACH) or Electronic Funds Transfer (EFT) or Remotely Created Check (RCC) from my designated bank account at the financial institution identified above. I authorize Payment Automation Network to debit my bank account according to the schedule of debits provided to Payment Automation Network by me or on my behalf or as otherwise provided by agreement. I understand that debits will be withdrawn on the due date unless otherwise indicated and that sufficient funds must be available in designated account at least two (2) business days prior to the actual date of the debit. Upon my approval, Payment Automation Network may adjust the amount being debited from designated bank account. This authorization is to remain in force until the schedule of debits is completed or until Payment Automation Network has received written notification from me of a change or termination, allowing Payment Automation Network no fewer than five (5) business days to act. Payment Automation Network shall not be liable to any person for not completing a transaction as a result of any limit on my designated bank account or if a financial institution fails to honor any debit from such account. I understand it is my responsibility to notify Payment Automation Network immediately if a scheduled debit does not occur. I authorize Payment Automation Network to recover funds by ACH/EFT/RCC debit from my bank account in the event of an error or in the event that a prior debit is returned for any reason, including non-sufficient funds. I understand that a $25.00 service charge will be added for every NSF draft. I understand I can call Payment Automation Network at 800-813-3740 to cancel the automatic draft payments. Payments will be drafted on the payment due date of the original Servicing agreement. I understand and agree that Payment Automation Network, Inc. is a private company, and is not affiliated with any academic or

clixsign.



## Your Document Was Successfully Signed!

Congratulations, your document(s) was successfully signed. Please find
details below related to your e-signature submission

### Signing Details

4279563                                    oarchambault66@gmail.com

LSA - LPG - English New                    74.108.227.227

45.22.90.69                                2021-08-25T14:06:46-05:00

`                                          d41d8cd98f00b204e9800998ecf8427e

### Document Audit

✔ Sent at 2021-08-25T14:03:32-05:00 from IP 45.22.90.69

✔ Delivered to oarchambault66@gmail.com at 2021-08-25T14:03:56-05:00 from 74.108.227.227

✔ Adopted Signature at 2021-08-25T14:04:26-05:00 from 74.108.227.227

✔ Completed Signing at 2021-08-25T14:06:45-05:00 from 74.108.227.227

✔ PDF Generated at 2021-08-25T14:06:46-05:00

Mozilla/5.0 (Linux; Android 11; SM-G973U) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/92.0.4515.159
Mobile Safari/537.36

**Exhibit "7"**                                                              **0374**

---------- Forwarded message ----------
From: **BBB Info** <info@bbbcommunity.org>
Date: Wed, Apr 19, 2023 at 5:44 PM
Subject: Re: Message from BBB.org
To: Debbie Archambault <darchambault66@gmail.com>

Hello,

Thank you for the additional information. The information has been added to the complaint file.

Regards,
**BBB Info | Operations Department**
Better Business Bureau serving the Pacific Southwest
Local 602-264-1721
Toll-Free 800-600-7050
A Community of Trustworthy Businesses | bbb.org

*This email and any files transmitted with it regarding a* consumer *complaint and* your response *may be publicly posted on BBB's website. Therefore, please do not include any information that personally identifies your customer. BBB may edit the complaint or your response to remove personally identifiable information or inappropriate language.*

On Mon, Apr 17, 2023 at 7:45 AM Debbie Archambault <darchambault66@gmail.com> wrote:

# Claim # ▓▓▓1913

Please add to my claim the following information:

The total amount withdrawn from my checking account during this time was $10,295.04. This is the total refund I am seeking from LPG due to their fraudulent activities and misrepresenting the purpose of the debt resolution program.

Thank you,
Debbie

On Thu, Mar 23, 2023 at 11:18 AM BBB Info <info@bbbcommunity.org> wrote:
Hello,

You can email us at info@bbbcommunity.org and reference your complaint ID Number.

Thank you,

**BBB Info | Operations Department**
**Better Business Bureau serving the Pacific Southwest**
**Local** 602-264-1721
**Toll-Free** 800-600-7050
A Community of Trustworthy Businesses | bbb.org

*This email and any files transmitted with it regarding a* consumer *complaint* **and your response** *may be publicly posted on BBB's website. Therefore, please do not include any information that personally identifies your customer. BBB may edit the complaint or your response to remove personally identifiable information or inappropriate language.*

---------- Forwarded message ---------
From: <noreply@bbb.org>
Date: Wed, Mar 22, 2023 at 4:35 PM
Subject: Message from BBB.org
To: <info@bbbcommunity.org>

I filed a complaint and I realize that I did not indicate the amount of money I have paid and requested a refund for over 90 days ago. How can I add that to my complaint/ Thank you, Debbie 845-499-5081

*Sent from Debra Archambault (darchambault66@gmail.com)*

# Exhibit "8"

Fill in this information to identify the case:

Debtor 1     The Litigation Practice Group P.C.

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the: __Central_____ District of ___California_

Case number   8:23-bk-10571-SC

## Official Form 410

# Proof of Claim

04/22

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Fliers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

### Part 1:   Identify the Claim

| | |
|---|---|
| 1. Who is the current creditor? | **Carolyn Beech, on behalf of herself and a class**<br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the debtor |
| 2. Has this claim been acquired from someone else? | ☑ No<br>☐ Yes. From whom? |

| | | |
|---|---|---|
| 3. Where should notices and payments to the creditor be sent?<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Where should notices to the creditor be sent?<br><br>**Edelman, Combs, Latturner & Goodwin, LLC**<br>Name<br><br>**20 S. Clark Street, Suite 1500**<br>Number    Street<br><br>**Chicago,**      **IL**     **60603**<br>City      State     ZIP Code<br><br>Contact phone **312-739-4200**<br><br>Contact email **courtecl@edcombs.com** | Where should payments to the creditor be sent? (if different)<br><br>Name<br><br>Number    Street<br><br>City      State     ZIP Code<br><br>Contact phone<br><br>Contact email |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

| | |
|---|---|
| 4. Does this claim amend one already filed? | ☑ No<br>☐ Yes. Claim number on court claims registry (if known) _____     Filed on _____<br>                                                      MM / DD   / YYYY |
| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☑ No<br>☐ Yes. Who made the earlier filing? _____ |

**Exhibit "8"**

0377

## Part 2: Give Information About the Claim as of the Date the Case Was Filed

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$ _unliquidated_ . Does this amount include interest or other charges?

☐ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

money illegally obtained -- see attached

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

Nature of property:

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

Basis for perfection: _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property: $ _____

Amount of the claim that is secured: $ _____

Amount of the claim that is unsecured: $ _____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition:: $ _____

Annual Interest Rate (when case was filed) _____ %

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. Amount necessary to cure any default as of the date of the petition.       $ _____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

**Exhibit "8"**

**0378**

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3: Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  06 21 2023
                  MM / DD / YYYY

Signature

**Print the name of the person who is completing and signing this claim:**

| | |
|---|---|
| Name | Daniel          A.          Edelman |
| | First name      Middle name      Last name |
| Title | member |
| Company | Edelman, Combs, Latturner & Goodwin, LLC |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 20 S. Clark Street, Suite 1500 |
| | Number      Street |
| | Chicago,                    IL        60603 |
| | City                        State     ZIP Code |
| Contact phone | 312-739-4200 | Email courtecl@edcombs.com |

---

Official Form 410                     Proof of Claim                                    page 3

**Exhibit "8"**

0379

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
SANTA ANA

THE LITIGATION PRACTICE                )
GROUP P.C.,                            )
                                       )        8:23-bk-10571-SC
                Debtor.                )        Chapter 11
                                       )

## CLASS PROOF OF CLAIM BY CAROLYN BEECH

1.      Carolyn Beech, on behalf of herself and the class defined below, seeks damages

pursuant to the Credit Repair Organizations Act ("CROA"), 15 U.S.C. § 1679 et seq.

### PARTIES

2.      Carolyn Beech is a resident of Carriere, Mississippi.

3.      Debtor The Litigation Practice Group PC ("LPG") is a California corporation

with its principal offices at 17542 East 17th Street, Suite 100, Tustin, CA 92780.

4.      LPG was a credit repair organization that offered its clients services designed to

resolve their debt issues and improve their credit history, including working towards actively settling

debts for such consumers.

5.      The person actually responsible for operating LPG was Tony Diab, a disbarred

attorney.

6.      Although Daniel March was purportedly the sole officer of LPG, he acted as a

figurehead for Diab, who in fact has control over LPG's finances, trust account, operations, and

activities with respect to consumers, including the supervision of non-attorney staff who send letters

to credit bureaus and creditors on behalf of consumers. On information and belief, March

authorized Diab to use his name in connection with LPG operations as Diab sees fit, including

signing March's signature on contracts and communicating with third parties on behalf of LPG.

Diab used the name "Admin" and the email address "admin@lpglaw.com" when acting on behalf

of LPG.

7.      In exchange, March received an annual salary which, on information and belief, is

1

$600,000, plus bonuses.

8.    "Investors" raised capital for LPG's operations totaling over $60 million.

9.    The "investors" purchased at a discount accounts receivable owed by consumers to

LPG.

10.    The receivables were contracts entered into in violation of the CROA, as described

below.

11.    Clients were obtained by over 50 "Marketing Affiliates" who engaged in lead

generation – identifying and obtaining consumers to which LPG sells its services.

<div align="center">FACTS</div>

12.    In late 2021, LPG solicited Plaintiff Carolyn Beech for a "debt forgiveness"

program.

13.    Under this program:

    a.    LPG would negotiate settlements of Ms. Beech's delinquent debts,
amounting to $12,650.44;

    b.    Ms. Beech would pay $296.95 / month for 24 months.

14.    LPG specifically told Plaintiff Carolyn Beech that its program would repair her credit

and improve her credit score.

15.    Ms. Beech signed the following documents via her phone:

    a.    Legal services agreement (Exhibit A);

    b.    Electronic payment authorization (Exhibit B);

    c.    Preauthorized checking and ACH authorization form (Exhibit C).

16.    Each of the documents in Exhibits A-C was a standard form regularly used by

Defendant LPG.

17.    Ms. Beech was induced to enter into the agreement by a document on LPG's web

site, "Smarter Path to Debt Relief Services" (Exhibit D). This document suggested that LPG could

provide useful services to a consumer if the consumer answered the following questions in the

<div align="center">2</div>

<div align="center">**Exhibit "8"**                    0381</div>

affirmative:

     a.    "Has your credit score already been negatively impacted?"

     b.    "My credit report was damaged and needs to be worked on by a
knowledgeable lawyer."

18.    A consumer reading the material would understand from it that LPG could improve
one's credit score and repair credit damage.

19.    In addition, the services offered by LPG, of settling debts for less than the amounts
due, would necessarily result in credit repair, in that delinquent debts would be reported as settled,
and the consumer's credit utilization (amount of credit used compared to amount of credit available,
a key measure of creditworthiness) would be reduced.

20.    LPG also sent clients a brochure entitled "Your Lawyers for Debt Resolution to
Regain Financial Freedom" (Exhibit E). The services listed include, "My credit report was damaged
and needs to be worked on by a knowledgeable lawyer."

21.    The services performed by LPG were as follows:

     a.    LPG routinely sent clients' creditors a form letter disputing their debts
(Exhibit F).

     b.    The grounds of dispute asserted in Exhibit F were legally questionable or
baseless.

     c.    LPG routinely sent clients' creditors a form letter demanding that they cease
and  desist from further communications to the client (Exhibit G).

     d.    A short time after sending these letters, LPG routinely sent the major credit
bureaus form letters (Exhibits H-J) disputing the client's debts and
demanding "the immediate removal/ deletion of this account from my credit
report . . . ." This is sent by LPG but signed by the client with "poa" after
the signature, meaning "power of attorney."

22.    The effect of the removal of the accounts would be to improve the consumer's

3

credit score.

23.     After making three payments Ms. Beech ceased doing so after she was served with summonses and complaints on two of the debts that LPG had undertaken to negotiate for her.

## COUNT I -- CREDIT REPAIR ORGANIZATIONS ACT

24.     Ms. Beech incorporates paragraphs 1-23.

25.     The CROA was enacted "(1) to ensure that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services; and (2) to protect the public from unfair or deceptive advertising and business practices by credit repair organizations." 15 U.S.C. §1679(b).

26.     Ms. Beech is a "consumer" as defined by 15 U.S.C. §1679a(1).

27.     LPG is a "credit repair organization" as defined by 15 U.S.C. §1679a(3), in that it is a "person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of – (i) improving a consumer's credit, credit history, or credit rating, or (ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i)."

### Payment Before Services Fully Performed

28.     15 U.S.C. §1679b(b ) provides that "[n]o credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed."

29.     LPG violated §1679b(b) by charging and receiving money for services it agreed to perform before such services were fully performed.

30.     It is the standard policy and practice of  LPG to charge a monthly sum before services are fully performed.  The sale of "receivables" by LPG  – consumers' obligations under the contracts with LPG – necessitates charges before services are fully performed.

4

**Exhibit "8"**                                                    **0383**

31. LPG's practice of charging a monthly sum before services are performed is inherently in violation of the CROA.

32. This prohibition was included in the CROA because of repetitive instances in which credit repair organizations obtained payments toward credit repair services, the consumers discontinued such services (often when the creditors with whom debts were to be negotiated filed lawsuits), and the credit repair organizations obtained money in excess of any benefit to the consumer. The practice was considered inherently unfair and deceptive.

### Failure to Make Disclosures

33. The CROA provides that a credit repair organization must provide consumers with certain written disclosures in its contracts.

34. These disclosures are intended to provide consumers with information they need to avoid unnecessary use of expensive credit repair organizations.

35. 15 U.S.C. §1679c(a) requires provision of a written statement informing the consumer of their rights under the Fair Credit Reporting Act and the CROA.

36. 15 U.S.C. §1679c(b) provides that "the written statement required under this section shall be provided as a document which is separate from any written contract or other agreement between the credit repair organization and the consumer or any other written material provided to the consumer."

37. LPG violated 15 U.S.C. §§ 1679c(a)-(b) through its failure to provide the written disclosures required.

38. LPG never provided such disclosures, nor did it provide a separate document containing such disclosures.

39. On information and belief, it is the standard policy and practice of LPG to not provide the required disclosures.

### Failure to Provide Cancellation Rights

40. The CROA, pursuant to 15 U.S.C. §1679d(4), requires credit repair organization to

5

include, in the contract between them and a consumer, "a conspicuous statement in bold face type, in immediate proximity to the space reserved for the consumer's signature on the contract, which reads as follows: 'You may cancel this contract without penalty or obligation at any time before midnight of the 3rd business day after the date on which you signed the contract. See the attached notice of cancellation form for an explanation of this right.'"

41.    Under 15 U.S.C. §1679e, a credit repair organization must provide a consumer a separate notice of a consumer's cancellation right.

42.    The only disclosure of cancellation rights is a statement in the last two sentences of the six sentences on the fourth page of Exhibit A that "You, the client, may cancel this Agreement at any time by submitting three days' written notice of cancellation by mail, email or fax, and shall not be responsible for any payments due after the date of cancellation.  A payment due within three days of the date of written cancellation shall be processed and shall not be refunded."

43.    The statement is not that required by the CROA, and is not bold or conspicuous. There is no separate notice of right to cancel.

44.    It is the standard practice of  LPG to present cancellation rights in the manner described above.

45.    LPG violated 15 U.S.C. §§1679d(4) and 1679e through its failure to provide the disclosure required by the CROA both in the contract between the parties and in a separate form.

46.    The CROA requires a notice of cancellation rights because consumers would often contract for expensive and unnecessary credit repair services that they would, upon reflection, decide were expensive and unnecessary, only to find themselves contractually obligated.

47.    The CROA further dictates that any contract found not to be in compliance with the CROA "shall be treated as void" and "may not be enforced by any Federal or State court or any other person." 15 U.S.C. §1679f(c).

48.    The contracts of Ms. Beech and the members of the class described below are void.

6

49.     The CROA provides for damages in 15 U.S.C. §1679g:

(a)     Liability established

Any person who fails to comply with any provision of this subchapter with respect to any other person shall be liable to such person in an amount equal to the sum of the amounts determined under each of the following paragraphs:

    (1)     Actual damages

        The greater of—

            (A)     the amount of any actual damage sustained by such person as a result of such failure; or

            (B)     any amount paid by the person to the credit repair organization.

    (2)     Punitive damages

        (A)     Individual actions

            In the case of any action by an individual, such additional amount as the court may allow.

        (B)     Class actions

            In the case of a class action, the sum of—

            (i)     the aggregate of the amount which the court may allow for each named Ms. Beech; and

            (ii)     the aggregate of the amount which the court may allow for each other class member, without regard to any minimum individual recovery.

    (3)     Attorneys' fees

        In the case of any successful action to enforce any liability under paragraph (1) or (2), the costs of the action, together with reasonable attorneys' fees.

(b)     Factors to be considered in awarding punitive damages

In determining the amount of any liability of any credit repair organization under subsection (a)(2), the court shall consider, among other relevant factors—

    (1)     the frequency and persistence of noncompliance by the credit repair organization;

    (2)     the nature of the noncompliance;

7

      (3)    the extent to which such noncompliance was intentional; and

      (4)    in the case of any class action, the number of consumers adversely affected.

## CLASS ALLEGATIONS

50.    Ms. Beech brings this claim on behalf of a class, pursuant to Fed.Bank.R. 23(a) and 23(b)(3).

51.    The class consists of all persons residing in states other than Georgia who, on or after a date five years prior to the filing of this action, entered into contracts with LPG, which contracts were not cancelled within three business days.

52.    Ms. Beech may alter the class definitions to conform to developments in the case and discovery.

53.    On information and belief, there are more than 50,000 members of the class, and each class is so numerous that joinder of all members is not practicable.

54.    There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

      a.    Whether LPG engages in the practices described;

      b.    Whether such practices violates the CROA;

55.    Ms. Beech's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

56.    Ms. Beech will fairly and adequately represent the class members. Ms. Beech has retained counsel experienced in class actions and consumer litigation.

57.    A class action is superior for the fair and efficient adjudication of this matter, in that:

      a.    Individual actions are not economically feasible.

      b.    Members of the class are likely to be unaware of their rights;

      c.    Congress intended class actions to be the principal enforcement mechanism

**Exhibit "8"**          0387

under the CROA.

WHEREFORE, the Court should enter judgment in favor of Ms. Beech and the class members and against LPG for:

    i.    A declaration that the practices complained of herein are unlawful and violate the CROA;

    ii.    A declaration that the contracts of Ms. Beech and the class members are void;

    iii.    Actual damages as provided under 15 U.S.C. §1679g(a)(l);

    iv.    Punitive damages, as provided under 15 U.S.C. §1679g(a)(2)(A);

    v.    Litigation expenses, reasonable attorney fees and costs as provided under 15 U.S.C. §1679g(a)(3); and

    vi.    Such other or further relief as the Court deems appropriate.

Christopher J. Langley
SHIODA LANGLEY & CHANG, LLP
1800 N. Broadway Ste 200
Santa Ana, CA 92706
888-809-1768
chris@slclawoffice.com

_s/ Jason Graeber_
Jason Graeber

Jason Graeber
250 Beauvoir Road, Suite 4C
Biloxi, MS 39501
(228) 207-7117
jason@jasongraeberlaw.com

Daniel A. Edelman
Tara L. Goodwin
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200

9

**Exhibit "8"**     0388

(312) 419-0379 (FAX)
Email address for service:  courtecl@edcombs.com

T:\18577\Pleading\class proof of claim -- bankruptcy_Pleading.wpd

Exhibit "8"                                                                          0389

Case 8:23-ap-01046-SC Claim 82-1 Filed 07/06/23 Enered 07/12/23 13:49:48 Pg 4
Exhibit # 1 - 12 of Page 398 of 584
Case 1:22-cv-00057-HSO-BWR Document 47-1 Filed 04/21/23 Page 1 of 9

## EXHIBIT A

## Legal Services Agreement

Case 8:23-ap-01046-SC  Doc 82-1 Filed 07/22/23 Entered 07/12/23 13:49:48  Desc
Exhibit # 1 - 12 of Page 399 of 584
Case 1:22-cv-00057-HSO-BWR  Document 47-1  Filed 04/21/23  Page 2 of 9
Case 1:22-cv-00057-HSO-RHWR  Document 1-2  Filed 03/17/22  Page 2 of 9



P.O. Box 515018, Los Angeles, CA 90051-1018
Tel. (949) 715-0944 • Fax (949) 315-4392
Support@LPGLaw.com

## LEGAL SERVICES AGREEMENT

### Legal Services

The Litigation Practice Group PC, a State Bar of California licensed law corporation, and its employed and affiliated attorneys (collectively "LPG") will provide legal services wherein it will represent you in connection with the disputes you have with the creditors listed below (see Creditor Information). LPG will do the following as part of its representation of you:

* Assist you in stopping creditors and any related debt collectors from harassing or contacting you in connection with any of the debts identified below;

* Dispute the legal validity of the debts identified below;

* Assist you in removing erroneous or inaccurate information reported in connection with debts identified below;

* Represent you in any lawsuit filed against you in connection with any of these debts;

* Defend you against any collection activity or lawsuit on any invalidated debt at any point in time, without expiration, in connection with any debt identified below;

* Initiate legal action in a court of competent jurisdiction against any creditor that violates any state or federal law in connection with any debt identified below; and

* Determine your qualification for bankruptcy under Chapter 7 or Chapter 13 of the U.S. Bankruptcy Code, and counsel you regarding the procedures and effects of bankruptcy as well as your qualification to file the same.

LPG will serve as your attorney for all purposes in connection with these disputes and will be available to render all legal assistance necessary to resolve these debts. The fees that are set forth below are flat fees that are all inclusive—no additional fee or cost will be charged by LPG at any time during the duration of your dispute with the creditors identified below. All fees are earned by LPG at the time they are paid and are for services rendered to you as set forth herein.

### Client Authorization

You authorize LPG to challenge, where applicable, each of the debts listed below, which you believe to be in any way invalid, inaccurate, or otherwise without a legal basis. You also authorize LPG to obtain a copy of your credit report to assist in the process of analyzing your account and developing a strategy regarding the resolution of debts that are excessive or otherwise unauthorized by law. You further authorize LPG, acting under power of attorney for you, to affix your signature to documents sent on your behalf in relation to the matters addressed herein. Finally, you authorize LPG to communicate with you via email, text message, telephone, and facsimile. Any of the authorizations set forth herein can be revoked at any time by written communication.

**Exhibit "8"**                                                                                    0391

Case 8:23-bk-10571-SC   Claim 82-1   Filed 07/06/23   Entered 07/12/23 03:49:48   Desc
Exhibit # 1 - 1   Page 400 of 584
Case 1:22-cv-00057-HSO-BWR   Document 47-1   Filed 04/21/23   Page 3 of 9
Case 1:22-cv-00057-HSO-RHWR   Document 1-2   Filed 03/17/22   Page 3 of 9

### Description of Services to be Performed

LPG will obtain your credit reports, analyze them, and develop strategies for correcting invalid or unlawful debts for which you should not be held legally responsible. Where appropriate, LPG will use existing laws and interact with creditors and credit bureaus on your behalf to invalidate your debts and remove such invalid debts from your credit reports. LPG will also interact with collection agencies, as applicable, to invalidate your debts by requiring them to supply evidence of your indebtedness to them, or any other legal mechanism. LPG will also consult with you regarding all aspects of the credit reporting process, including all laws applicable to the same. LPG will also investigate your delinquent accounts in order to determine the most effective method for invalidating your debts or otherwise removing any legal liability for such debts, up to and including the initiation of lawsuits on your behalf against your creditors and their third-party debt collectors.

In addition, if a lawsuit is filed against you, LPG will represent you in such a lawsuit and will not charge any additional fees for such representation provided such a lawsuit was initiated after the date you sign this Agreement. In the event a lawsuit was initiated against you before the date you execute this Agreement and you elect to have LPG represent you, an additional fee of $500.00 will be charged. Where appropriate, if legal fees are recovered from an adverse party, LPG will retain such fees for its services. You will be responsible to pay any damages resulting from any lawsuit. Any costs incurred in a lawsuit will be paid by LPG out of the fees set forth below, including the fees of any attorney retained on your behalf in a jurisdiction in which LPG is not admitted to practice law. No additional payment from you to LPG will be necessary for the defense of any lawsuit filed against you after the date you execute this Agreement. You will, however, be responsible to pay any damages resulting from such lawsuits or any settlements reached in the course of such lawsuits.

### Fees

You will pay the fees set forth below for the legal services provided by LPG, which services are outlined above. No fee or other cost will be charged or collected beyond the flat fee set forth below. This is the only amount that you have to pay to LPG for its services, which includes any cost, filing fee or vendor's fee associated with LPG's representation of you, and this fee is not escrowed but rather earned and received by LPG. This fee does NOT, however, include any settlement that you may have to pay to any creditor if you opt to settle a debt prior to or during the course of a lawsuit.

### Refund Policy

If you reach the conclusion of LPG's representation of you and a debt remains in dispute without resolution, you will be eligible to receive a full refund of the fees that you paid towards your representation in connection with that account (i.e., you will be refunded the fees paid in proportion to the debt that was not resolved). A debt is "in dispute" under this paragraph if, at the time of completion of LPG's representation of you, no lawsuit was filed regarding the debt, no settlement was reached regarding the debt, no acknowledgment of invalidity was received from the creditor regarding the debt, and the debt is still reporting to one of the following credit bureaus: Experian, Equifax, or Transunion.

Case 8:23-ap-01046-SC  Doc 82-1  Filed 07/06/23  Entered 07/12/23 03:49:48  Page 7
Case 1:22-cv-00057-HSO-BWR  Document 47-1  Filed 04/21/23  Page 4 of 9
Case 1:22-cv-00057-HSO-RHWR  Document 1-2  Filed 03/17/22  Page 4 of 9

Exhibit # 1 - 12 of 62, Page 401 of 584

## Debt Settlement

You may request that LPG settle any debt identified below at any point in the course of LPG's representation of you. Where requested, LPG will negotiate the most favorable settlement it is able to negotiate on your behalf. Any settlement reached as a result of your request shall be your responsibility, and shall be paid directly from you to the creditor. At the point that you reach a settlement with a creditor, your payment to LPG will be reduced and to adjust for the settled account being removed from the representation herein contemplated. LPG will only settle a debt where litigation is active or contemplated.

## Actions Required of You

You agree to provide LPG with any and all correspondence you receive from any creditor, credit bureau, attorney, or court of law. You further agree to keep a log of all communications, including telephonic and electronic communications, from any creditor or credit reporting agency to you from the date you execute this Agreement until the conclusion of your representation.

## Right to Conduct Business Electronically and Contact You

You agree that LPG may contact you electronically and telephonically and that any and all business with LPG may be conducted electronically. You further agree that LPG may transmit data, including that regarding your credit profile, electronically. You further agree that any electronic communication carries the risk of disclosure to a third party and that LPG will not be held responsible for any such inadvertent disclosure of information. A facsimile or email transmission of this signed agreement, via an email attachment or otherwise, will be as valid as the original signed agreement. This agreement may not be modified except in writing by both parties.

## Malpractice Insurance

LPG hereby discloses that it maintains a malpractice insurance policy that covers its representation of you and that the limit of such policy is no less than $1,000,000.00 per claim and $1,000,000.00 per claimant. If you desire to make a claim against that insurance policy, you must first contact LPG and disclose your claim and the nature of the claim, at which point LPG agrees to assist you in obtaining any and all information necessary to prepare a file a claim.

## Applicable Law and Confidentiality

You understand and agree that LPG is based out of the State of California, is a licensed law corporation under the State Bar of California, and that California law applies to this Agreement. You further understand that LPG is bound to strict rules of confidentiality and attorney-client privilege in connection with the rules applicable to attorneys licensed to practice law in the State of California. You further understand and agree that you have sought the representation of LPG with full knowledge of its location and licensing, and that LPG works with attorneys licensed in all 50 states and the District of Columbia as affiliated counsel to allow LPG to provide a complete representation of you in any state in which you are sued or in which a dispute might arise. You have the right to know the licensed attorney with whom LPG has affiliated in any state and at any time but understand and agree that LPG may choose to change the local attorney with whom it is affiliated in any given jurisdiction, provided only that at all times LPG shall have an affiliated attorney in all 50 states and the District of Columbia.

Case 8:23-ap-01046-SC Doc 82-1 Filed 07/06/23 Entered 07/06/23 13:49:48 Desc
Exhibit # 1 - 1 of 4 Page 402 of 584
Case 1:22-cv-00057-HSO-BWR Document 47-1 Filed 04/21/23 Page 5 of 9
Case 1:22-cv-00057-HSO-RHWR Document 1-2 Filed 03/17/22 Page 5 of 9

### Client Acknowledgements

By signing this agreement, you acknowledge that LPG has not instructed you to breach any contract, fail to make any required payment, or fail to perform any obligation you have lawfully incurred. LPG reserves the right to terminate this agreement if (a) required by the State Bar of California Rules of Professional Conduct, (b) you refuse to communicate with LPG or respond to reasonable requests for information necessary to represent you in an effective way, (c) you fail to make timely payment of the amount due under hereunder, or (d) your payments are returned multiple times for any reason. LPG will not pay any of the debts identified below and does not guarantee that any debt you now have or may incur will be invalidated or settled in association with LPG's representation of you. You understand and agree that you must forward any communication you receive in printed or electronic form from any creditor, court, or representative of other a creditor or a court to the address, email, or fax number provided below, and that you must keep a log of all telephonic communications with any creditor or credit reporting agency. You, the client, may cancel this Agreement at any time by submitting three days' written notice of cancellation by mail, email, or fax, and shall not be responsible for any payments due after the date of cancellation. A payment due within three days of the date of written cancellation shall be processed and shall not be refunded.

Client Signature:

Date:

Co-Applicant Signature:

Date:

**THE LITIGATION PRACTICE GROUP PC**

**Daniel S. March, Managing Shareholder**
**17542 E. 17th Street, Ste 100**
**Tustin, CA 92780**
**Support@LPGLaw.com**
**Tel. 949.715.0644**
**Fax. 949.315.4332**

**Exhibit "8"**                          0394

## Creditor Information



| Creditor | Account # | Debt Balance |
|---|---|---|
| FSTHERITAG | | $3,206.00 |
| ONEMAIN | | $2,168.00 |
| 1st Franklin Financial | | $1,612.00 |
| FIRST SVG CC | | $562.00 |
| TBOMASPIRE | | $411.00 |
| FST PREMIER | | $376.00 |
| TBOMMILSTNE | | $327.00 |
| TBOMASPIRE | | $221.00 |
| FSB BLAZE | | $194.00 |
| Peral River Credit | | $2,416.00 |
| ADVANTAGE | | $1,157.44 |

Case 8:23-ap-01046-SC   Doc 82-1   Filed 07/22/23   Entered 07/22/23 13:49:48   Desc 20
Exhibit #1 - 12   Page 404 of 584
Case 1:22-cv-00057-HSO-BWR   Document 47-1   Filed 04/21/23   Page 7 of 9
Case 1:22-cv-00057-HSO-RHWR   Document 1-2   Filed 03/17/22   Page 7 of 9

**Client Information**

Name: Carolyn Becoh
Address:

Home Phone:
Cell Phone:
Email:
Last 4 SSN:

Case 8:23-ap-01014-SC Claim 82-1 Filed 07/06/23 Entered 07/12/23 13:49:48 Page 21
Case 1:22-cv-00057-HSO-BWR Document 47-1 Filed 04/21/23 Page 8 of 9
Exhibit #1 - 12 of Page 405 of 584
Case 1:22-cv-00057-HSO-RHWR Document 1-2 Filed 03/17/22 Page 8 of 9

## Schedule of Payments

I agree to this payment schedule – Client Initials: 

| Payment # | Process Date | Amount |
|-----------|--------------|--------|
| 1 | Dec 20, 2021 | $296.95 |
| 2 | Jan 18, 2022 | $296.95 |
| 3 | Feb 18, 2022 | $296.95 |
| 4 | Mar 18, 2022 | $296.95 |
| 5 | Apr 18, 2022 | $296.95 |
| 6 | May 18, 2022 | $296.95 |
| 7 | Jun 20, 2022 | $296.95 |
| 8 | Jul 18, 2022 | $296.95 |
| 9 | Aug 18, 2022 | $296.95 |
| 10 | Sep 19, 2022 | $296.95 |
| 11 | Oct 18, 2022 | $296.95 |
| 12 | Nov 18, 2022 | $296.95 |
| 13 | Dec 19, 2022 | $296.95 |
| 14 | Jan 18, 2023 | $296.95 |
| 15 | Feb 21, 2023 | $296.95 |
| 16 | Mar 20, 2023 | $296.95 |
| 17 | Apr 18, 2023 | $296.95 |
| 18 | May 18, 2023 | $296.95 |
| 19 | Jun 19, 2023 | $296.95 |
| 20 | Jul 18, 2023 | $296.95 |
| 21 | Aug 18, 2023 | $296.95 |
| 22 | Sep 18, 2023 | $296.95 |
| 23 | Oct 18, 2023 | $296.95 |
| 24 | Nov 20, 2023 | $296.94 |

Case 8:23-bk-10571-SC Claim 8-1 Filed 07/06/23 Desc Main Document Page 22
Case 1:22-cv-00057-HSO-BWR Document 47-1 Filed 04/21/23 Page 9 of 9
Exhibit #1 -12 Page 406 of 584
Case 1:22-cv-00057-HSO-RHWR Document 1-2 Filed 03/17/22 Page 9 of 9

E-Signature Completion Certificate

 clixsign.



## Your Document Was Successfully Signed!

Congratulations, your document(s) was successfully signed. Please find
details below related to your e-signature submission.

---

🔘 **Signing Details**

**Document ID**
4835311

**Signer Email**

**Document Title**
LSA - LPG - English New

**Signer IP Address**
172.58.168.70

**Sender IP Address**

**Timestamp**
2021-12-02T17:23:45-06:00

**Number Of Signers**
1

**Document MD5 Hash**

---

🔘 **Document Audit**

✔ Sent at 1969-12-31T18:00:00-06:00 from IP

✔ Delivered to                    2021-12-02T17:19:56-06:00 from 172.58.168.70

✔ Adopted Signature at 2021-12-02T17:21:52-06:00 from 172.58.168.70

✔ Completed Signing at 2021-12-02T17:23:45-06:00 from 172.58.168.70

✔ PDF Generated at 2021-12-02T17:23:45-06:00

**Sending Agent**
Mozilla/5.0 (Linux; Android 10; LM-K300) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/89.0.4389.105
Mobile Safari/537.36

**Exhibit "8"** 0398

# EXHIBIT B

## Electronic Payment Authorization

Case 8:23-ap-01046-SC Doc 82-1 Filed 07/06/23 Entered 07/10/23 13:49:48 Desc
Exhibit # 1 - 12 of Page 408 of 584
Case 1:22-cv-00057-HSO-BWR Document 47-2 Filed 04/21/23 Page 2 of 2
Case 1:22-cv-00057-HSO-RHWR Document 1-3 Filed 03/17/22 Page 2 of 2

## Electronic Payment Authorization

**Bank Name:** ▓▓▓▓▓▓
**Name on Account:** Carolyn Beech
**Account Type:** Checking
               Other (specify: _____ )
**Routing Number:** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
**Account Number:** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
**Next Payment Date:** Dec 20, 2021 **Amount:** $ 296.95
**Recurring Payment Date:** 18th

By signing below, I authorize and permit LPG or their designees to initiate electronic funds transfer via an Automated Clearing House system (ACH) from my account listed above. I will also provide LPG with a voided check or savings deposit slip.

If necessary, LPG may make adjustments if errors have occurred during the transaction. The date of the draft is listed above, however, if the draft date falls on a weekend or bank holiday, the debit transaction will take place on the next business day. This authority will remain in effect until LPG is notified by the member in writing at least 5 days prior to the next scheduled draft date. No other forms of cancellation by members will be observed. If the debit is returned because of non-sufficient funds or uncollected funds, then the originator and its financial institution may reinitiate the entry up to two (2) times. The reversal of funds from a client's account that was drafted in error cannot be made until seven business days from the draft date. The member agrees to waive all rights of reversal or refusal of any payment on any draft that LPG may make against the member's bank account while services are performed. The member agrees with all of the provisions and conditions outlined within.

## Acknowledgment of Refunds & Draft Date Changes

ACH Refunds: If a refund is due such will be made through the ACH process only. Refunds may take up to 10 days to process. In the event my EFT or draft is returned from my bank unpaid, I agree that a fee of $25.00 or as allowed by law may be charged to my account via draft or EFT. Furthermore, I warrant that I am authorized to execute this payment authorization and the above information is true and correct. Draft Date Changes: A client may stop any ACH debit by providing written notice to LPG at least three (3) business days prior to the scheduled payment. If you should need to notify us of your intent to cancel and/or revoke this authorization you must contact us three (3) business days prior to the questioned debit being initiated.

**Client Signature:**

▓▓▓▓▓▓▓▓▓▓

**Printed Name:**
Carolyn Beech

# EXHIBIT C

## Preauthorized checking and ACH authorization

Case 8:23-ap-01046-SC  Doc 82-1  Filed 07/06/23  Entered 07/12/23 01:49:48  Desc  26
Exhibit #-1 - 12  Page 410 of 584
Case 1:22-cv-00057-HSO-BWR   Document 47-3   Filed 04/21/23   Page 2 of 3
Case 1:22-cv-00057-HSO-RHWR   Document 1-4   Filed 03/17/22   Page 2 of 3

## Preauthorized Checking and ACH Authorization Form

I hereby apply for and agree to establish a non-interest bearing special purpose account (the "Account") with a bank ("Bank") selected by LPG, its payments processors, and/or their successors for the purpose of accumulating funds to pay for such goods and services as I so direct LPG to perform. This application is subject to Bank's customer identification program, as required by the USA PATRIOT ACT and other applicable laws, and accordingly, I hereby represent that the above information is true and complete to the best of my knowledge and belief. The bank account information provided above may be subject to account validation processes to include pre-notation and a $0.01 micro-deposit.

**Account Owner Name: Carolyn Beech**

**Address:** █████████████████████████████████

**Mobile Phone #:   E-Mail:** █████████████████████████

### DESIGNATED BANK ACCOUNT INFORMATION

**Bank Name:** ████████████

**Name as it appears on bank ACCOUNT:  Carolyn Beech**

**Routing Number:** ██████████  **Account Number:** ████████  **Checking or Saving:** █████████

### DESIGNATED BANK ACCOUNT PAYMENT AUTHORIZATION SCHEDULE

**Total Amount of Debit: $296.95        Date of Next Debit:Dec 20, 2021**

I authorize Payment Automation Network to initiate Automatic Clearing House (ACH) or Electronic Funds Transfer (EFT) or Remotely Created Check (RCC) from my designated bank account at the financial institution identified above. I authorize Payment Automation Network to debit my bank account according to the schedule of debits provided to Payment Automation Network by me or on my behalf or as otherwise provided by agreement. I understand that debits will be withdrawn on the due date unless otherwise indicated and that sufficient funds must be available in designated account at least two (2) business days prior to the actual date of the debit. Upon my approval, Payment Automation Network may adjust the amount being debited from designated bank account. This authorization is to remain in force until the schedule of debits is completed or until Payment Automation Network has received written notification from me of a change or termination, allowing Payment Automation Network no fewer than five (5) business days to act. Payment Automation Network shall not be liable to any person for not completing a transaction as a result of any limit on my designated bank account or if a financial institution fails to honor any debit from such account. I understand it is my responsibility to notify Payment Automation Network immediately if a scheduled debit does not occur. I authorize Payment Automation Network to recover funds by ACH/EFT/RCC debit from my bank account in the event of an error or in the event that a prior debit is returned for any reason, including non-sufficient funds. I understand that a $25.00 service charge will be added for every NSF draft. I understand I can call Payment Automation Network at 800-813-3740 to cancel the automatic draft payments. Payments will be drafted on the payment due date of the original Servicing agreement. I understand and agree that Payment Automation Network, Inc. is a private company, and is not affiliated with any academic or

governmental entity. The Payment Automation Network, Inc. service bridges the gap between the student loan consolidation company Software and ACH, EFT, or RCC processor. Payment Automation Network, Inc. is not a money transmitter or debt collection agency and does not receive money from individual debtors. Payment Automation Network, Inc. is not engaged in the business of debt or credit counseling or the provision of other services to individual debtors. Payment Automation Network, Inc. does not solicit, offer loan consolidation services, or provide services directly to individual debtors. Payment Automation Network, Inc. does not have a contractual relationship with individual debtors to affect the adjustment, compromise, or discharge of any loan account.

I have read and understand the information contained in this document and I affirm that the above information given by me is accurate and true to the best of my knowledge.

**Account Holder's Signature:**                 **Date: 12/2/2021**

**Exhibit "8"**                                                     **0403**

## EXHIBIT D

### Smarter Path to Debt Relief Services

3/8/22, 2:57 PM                         LPG Law - USA Debt Relief Legal Services Firm - Call Us!

SMARTER PATH TO

# Debt Relief
# Legal Services

GET IN TOUCH

FEATURED IN:

**Exhibit "8"**                                                          **0405**

Case 8:23-ap-01046-SC Claim 2-1 Filed 07/06/23 Entered 07/12/23 13:49:48 Desc
Exhibit # 1 - 12 Page 414 of 584
Case 1:22-cv-00057-HSO-BWR Document 47-4 Filed 04/21/23 Page 3 of 14
Case 1:22-cv-00057-HSO-RHWR Document 1-5 Filed 03/17/22 Page 3 of 14

3/8/22, 2:57 PM
LPG Law - USA Debt Relief Legal Services Firm - Call Us!



**Exhibit "8"**
0406

Case 8:23-ap-01046-SC Claim 82-1 Filed 07/22/23 Entered 07/12/23 13:48:48 Desc
Exhibit # 1 - 12 of Page 415 of 584
Case 1:22-cv-00057-HSO-BWR Document 47-4 Filed 04/21/23 Page 4 of 14
Case 1:22-cv-00057-HSO-RHWR Document 1-5 Filed 03/17/22 Page 4 of 14

3/8/22, 2:57 PM                    LPG Law – USA Debt Relief Legal Services Firm – Call Us!



WHY CHOOSE US?

# there's a dedicated team of attorneys for every legal matter.

At LPG Law, we have experienced attorneys for nearly every financial or legal matter. So, when you or your family face hardship, our team can litigate the debt, bankruptcy, or civil issue on your behalf to protect your future.

About Our Firm

**Exhibit "8"**                                                                  **0407**

Case 8:23-ap-01046-SC Claim 82-1 Filed 07/02/23 Entered 07/12/23 13:49:48 Desc 2
Exhibit # 1 - 12 Page 416 of 584
Case 1:22-cv-00057-HSO-BWR Document 47-4 Filed 04/21/23 Page 5 of 14
Case 1:22-cv-00057-HSO-RHWR Document 1-5 Filed 03/17/22 Page 5 of 14

3/8/22, 2:57 PM        LPG Law - USA Debt Relief Legal Services Firm - Call Us!

## DEDICATED & OUTCOME FOCUSED

# How Can Our **Debt Relief Attorneys** Help You?

### Step
### 1

## Call for a free phone consultation.

## 📞 949-229-6262

### Step
### 2

## An experienced debt relief attorney will speak with you and evaluate your case.

### Step
### 3

## If retained, we will move forward with the initial paperwork to begin working on your case.

**Exhibit "8"**        **0408**

Case 8:23-ap-01046-SC   Doc 82-1   Filed 07/22/23   Entered 07/11/23   13:49:48   Page 3
Case 1:22-cv-00057-HSO-BWR   Document 47-4   Filed 04/21/23   Page 6 of 14
Case 1:22-cv-00057-HSO-RHWR   Document 1-5   Filed 03/17/22   Page 6 of 14

WE **FIGHT HARD** WHEN REPRESENTING YOU.

# Debt Relief is Our #1 Specialty

Our expert legal team spans across the country in our various
locations from west coast to east coast with diverse backgrounds and
case experience that allows us to select the right attorney for every
case. Don't settle with a firm that has less resources to take on your
case and have the connections, know-how and access to fight hard
for you outside of court and in court when necessary.

Exhibit "8"

Case 8:23-ap-01046-SC Claim 82-1 Filed 07/06/23 Entered 07/12/23 13:49:48 Desc
Case 1:22-cv-00057-HSO-BWR Exhibit # 1 - 1 Document 47-4 Page 418 of 584 Filed 04/21/23 Page 7 of 14
Case 1:22-cv-00057-HSO-RHWR Document 1-5 Filed 03/17/22 Page 7 of 14

Has your **credit score** already been negatively
impacted?

Have you been denied employment **because of
your financial situtation?**

Have you been **doing everything just to pay
interest** and getting behind no matter what you
try?

Has your **creditor threatened** you for non
payment?

Have you been **struggling to pay multiple high-
interest rate credit cards** or personal loans?

Has your family been at risk **of losing your home
or other assets** as a result of your financial
hardship?

Were you **sent legal paperwork or a lawsuit** from
your creditors for non-payment or late

**Exhibit "8"**                          **0410**

Case 8:23-ap-01046-SC Claim 2-1 Filed 07/06/23 Entered 07/06/23 10:49:48 Desc
Exhibit # 1 - 12 Page 419 of 584
Case 1:22-cv-00057-HSO-BWR Document 47-4 Filed 04/21/23 Page 8 of 14
Case 1:22-cv-00057-HSO-RHWR Document 1-5 Filed 03/17/22 Page 8 of 14

3/8/22, 2:57 PM                    LPG Law - USA Debt Relief Legal Services Firm - Call Us!

Has your personal property or **car been
repossessed** as a result of late payments?

If your **answer is yes** to some of these questions,
you *might* have a **potential legal claim.**

**CONTACT US TODAY FOR A FREE
CONSULTATION**

📞 **(949) 229-6262**

# our core focus

LPG started with a respected group of established attorneys and has rapidly grown across
the country into new states as demand for our services has flourished due to
demonstrated success for our clients. We assist people that need general legal counsel,
financial advisory all the way to protecting individuals in court with our full suite of
litigation services.

**Exhibit "8"**                    **0411**

Case 8:23-bk-10571-SC Claim 82-1 Filed 07/06/23 Entered 07/12/23 03:49:48 Page 36
Case 1:22-cv-00057-HSO-BWR Document 47-4 Filed 04/21/23 Page 9 of 14
Exhibit # 1 - 12 of Page 420 of 584
Case 1:22-cv-00057-HSO-RHWR Document 1-5 Filed 03/17/22 Page 9 of 14

and wanted to put our expertise to good use helping individuals around the country
protect themselves from harassment from debtors.

## our firm

OVERVIEW

OUR MISSION

OUR ATTORNEYS

PRACTICE AREAS

WHAT OUR CLIENTS SAY

# FOCUSING EXCLUSIVELY ON

**Exhibit "8"**                          0412

Case 8:23-ap-01074-SC Doc 82-1 Filed 07/06/23 Entered 07/12/23 13:48 Page 7
Exhibit # 1 - 12 of Page 421 of 584
Case 1:22-cv-00057-HSO-BWR Document 47-4 Filed 04/21/23 Page 10 of 14
Case 1:22-cv-00057-HSO-RHWR Document 1-5 Filed 03/17/22 Page 10 of 14

# Debt Relief &
# Litigation

## *Protecting the Finances of Consumers and Average Americans*

Protecting your Finances. **Get a Free Consultation.**

  👤 **Full N**    ✉ **Email**    📞 **Phone**    **Desc**    ▨    |   Get Help Now   |

## WHAT WE DO

## Attorneys for **Consumers In Debt**, Civil and **Commercial** Legal Matters

Offering a way out of debt, collections harassment, legal action and financial burdens in 48 US states

**Exhibit "8"**                                      0413

Case 8:23-ap-01046-SC Claim 82-1 Filed 07/06/23 Entered 07/11/23 13:49:48 Pages 8
Case 1:22-cv-00057-HSO-BWR Document 47-4 Filed 04/21/23 Page 11 of 14
Exhibit # 1 - 1 of Page 422 of 584
Case 1:22-cv-00057-HSO-RHWR Document 1-5 Filed 03/17/22 Page 11 of 14

3/8/22, 2:57 PM                    LPG Law - USA Debt Relief Legal Services Firm - Call Us!

My largest **creditors** are threatening to send my case to court →

I need help consolidating **unstructured debt** from multiple sources and credit lines →

I need help with **civil litigation or arbitration.** →

I am being **harassed by creditors for collections.** →

My **credit report was damaged** and needs to be worked on by a knowledgeable lawyer. →

I am dealing with or facing imminent **personal bankruptcy issues** and seek legal advice →

I have **real estate** at risk from financial or legal issues →

**Exhibit "8"**                    0414

Case 8:23-ap-01014-SC Doc 82-1 Filed 07/06/23 Entered 07/11/23 03:49:48 Page 40
Exhibit # 1 - 12 of Page 424 of 584

Case 1:22-cv-00057-HSO-BWR Document 47-4 Filed 04/21/23 Page 13 of 14
Case 1:22-cv-00057-HSO-RHWR Document 1-5 Filed 03/17/22 Page 13 of 14

3/8/22, 2:57 PM                          LPG Law - USA Debt Relief Legal Services Firm - Call Us!

## DO I HAVE ANY OPTIONS TO AVOID BANKRUPTCY OR GOING TO COURT?    +

# Get A Legal
# Case Evaluation

### Our experts are here to answer your questions

CONTACT US TODAY

**ADDRESS**              **WANT TO TALK?**          **SOCIAL MEDIA**

**Exhibit "8"**                                                                 **0416**

Case 8:23-ap-01046-SC   Doc 82-1   Filed 07/06/23   Entered 07/12/23 13:49:48   Desc
Exhibit # 1 - 12of Page 425 of 584
Case 1:22-cv-00057-HSO-BWR   Document 47-4   Filed 04/21/23   Page 14 of 14
Case 1:22-cv-00057-HSO-RHWR   Document 1-5   Filed 03/17/22   Page 14 of 14

3/8/22, 2:57 PM

LPG Law - USA Debt Relief Legal Services Firm - Call Us!

**Exhibit "8"**                    **0417**

# EXHIBIT E

## Your Lawyers for Debt Resolution to Regain Financial Freedom



DEF00000121



**Exhibit "8"**                    **0419**

Case 8:23-ap-01046-SC Claim 82-1 Filed 07/06/23 Entered 07/12/23 13:49:48 Desc 4
Case 1:22-cv-00057-HSO-BWR Document 2-5 Filed 04/21/22 Page 3 of 11
Exhibit # 1 - 12 of 6 Page 428 of 584






WHY CHOOSE US?

# there's a dedicated team of attorneys for every legal matter.

At LPG Law, we have experienced attorneys for nearly every financial or legal matter. So, when you or your family face hardship, our team can litigate the debt, bankruptcy, or civil issue on your behalf to protect your future.

About Our Firm

DEDICATED & OUTCOME FOCUSED

How Can Our **Debt Relief Attorneys** Help You?

Call for a free phone consultation.

📞 **949-229-6262**

**Step 2**

An experienced debt relief attorney will speak with you and evaluate your case.

**Step 3**

If retained, we will move forward with the initial paperwork to begin working on your case.

WE **FIGHT HARD** WHEN REPRESENTING YOU.

# Debt Relief is Our #1 Specialty

Our expert legal team spans across the country in our various locations from west coast to east coast with diverse backgrounds and case experience that allows us to select the right attorney for every case. Don't settle with a firm that has less resources to take on your case and have the connections, know-how and access to fight hard for you outside of court and in court when necessary.

DEF00000123



Do you have creditors harassing you at work and home?

Has your credit score already been negatively impacted?

Have you been denied employment because of your financial situation?

Have you been doing everything just to pay interest and getting behind no matter what you try?

Has your creditor threatened you for non payment?

Have you been struggling to pay multiple high-interest rate credit cards or personal loans?

Has your family been at risk of losing your home or other assets as a result of your financial hardship?

Were you sent legal paperwork or a lawsuit from your creditors for non-payment or late payments?

Has your personal property or car been repossessed as a result of late payments?

If your **answer is yes** to to working with LPG *sign up* or give us a **call.**

CONTACT US TODAY FOR A FREE CONSULTATION

📞 **(949)229-6262**

DEF00000124



## our core focus

LPG started with a respected group of established attorneys and has rapidly grown across the country into new states as demand for our services has flourished due to demonstrated success for our clients. We assist people that need general legal counsel, financial advisory all the way to protecting individuals in court with our full suite of litigation services.

From inception we are dedicated to helping consumers and everyday Americans get control over their debt and finances. We've seen debt hurt loved ones, family members and wanted to put our expertise to good use helping individuals around the country protect themselves from harassment from debtors.

our firm

OVERVIEW

OUR MISSION

OUR ATTORNEYS

PRACTICE AREAS

WHAT OUR CLIENTS SAY



Protecting your Finances. Get a Free
Consultation.

DEF00000125



**WHAT WE DO**

# Attorneys for **Consumers In Debt**, Civil and **Commercial** Legal Matters

Offering a way out of debt, collections harassment, legal action and financial burdens in 48 US states

DEF00000126

case to court

I need help consolidating **unstructured debt** from
multiple sources and credit lines                                    →

I need help with **civil litigation or arbitration.**                →

I am being **harassed by creditors for collections.**                →

**My credit report was damaged** and needs to be
worked on by a knowledgeable lawyer.                                  →

I am dealing with or facing imminent **personal
bankruptcy issues** and seek legal advice                            →

**I have real estate** at risk from financial or legal
issues                                                               →

I need **business litigation services** for corporate
issues                                                               →

DEF00000127

**Exhibit "8"**                                                      **0425**

Case 8:23-ap-01570-SC Claim 82-1 Filed 07/06/23 Entered 07/12/23 13:49:48 Page 50
Case 1:22-cv-00057 USCA RMD Document 434 of 584 4/21/22 Page 9 of 11
Exhibit # 1 - 12 of Page 434 of 584



## TYPES OF DEBT WE WORK ON

We've been able to help countless individuals with their debt problems across a large variety of verticals from auto to credit card, personal loans, bankruptcy, equipment leases and business loans, lending club and even signature loans, summons, judgments and more. Explore some of the loan types we help service below.

| | |
|---|---|
| Credit Cards ▸ | Medical Bills ▸ |
| Private Student Loans ▸ | Timeshares ▸ |
| Lending Club ▸ | Auto Loans ▸ |
| Judgments ▸ | Summons ▸ |
| Unsecured Debt ▸ | Bankruptcy ▸ |
| Commercial Loans ▸ | Real Estate ▸ |

DEF00000128

**Exhibit "8"**

0426

# EXPERT ATTORNEYS IN DEBT RELIEF

With **Experience** and **Compassion**.

If you've been subject to harassment from your creditors or have found yourself in a difficult position financially from excessive credit card debt, bankruptcy, or civil issues our legal team can help. With extensive experience and service to 48 US states we have an expert ready for you.

Contact an expert debt relief attorney today to schedule a free and confidential consultation to discuss your situation. We look forward to serving you.

## Schedule A **Free** & **Confidential** Consultation

FULL NAME *

EMAIL *

PHONE *

BRIEF CASE DESCRIPTION

GET STARTED



DEF00000130

**Exhibit "8"**                0428

Case 8:23-ap-01014-SC Claim 82-1 Filed 07/06/23 Entered 07/12/23 13:49:48 Page 53
Exhibit #1 - 12 of 62 Page 437 of 584
Case 1:22-cv-00057-HSO-BWR Document 47-6 Filed 04/21/23 Page 1 of 3

## EXHIBIT F

## Form letter disputing their debts

Exhibit "8"                                                      0429

Case 8:23-ap-01046-SC Claim 82-1 Filed 07/06/23 Entered 07/12/23 13:49:48 Page 54
Exhibit #1 - 12 of 62 Page 438 of 584
Case 1:22-cv-00057-HSO-BWR Document 47-6 Filed 04/21/23 Page 2 of 3

December 27th, 2021
**PERSONAL AND CONFIDENTIAL**





P.O. Box 513018, Los Angeles, CA 90051-1018
Tel. (949) 715-0644 · Fax (949) 315-4332
Support@LPGLaw.com

||1||··||1||1·1||1||·1|1·1||1||·1||1·||1||1·1||1||1||1|
63 1 SP 0.530 ***********************SNGLP 956
1.1.599138.51.3
1ST FRANKLIN FINANCIAL
135 E TUGALO ST
TOCCOA GA 30577-2357

**Re:   Carolyn Beech**
**Dispute of Account: ****7101**

To Whom it May Concern:

I am writing to inform you that I have been retained by Carolyn Beech, born on 11/22/1954, bearing account number ****7101. My client hereby officially disputes the debt you allege my client owes to you. Please provide verification that my client incurred the obligation you assert, including the operative contract you assert my client entered into, and all documentation setting forth the purported amount owed on the account you allege. Please direct all communication regarding this account to me at the contact information provided above.

Specifically, my client disputes the validity of the debt you allege because my client did not incur the obligations you assert. Upon a review of my client's records, it appears that you have not complied with the Fair Credit Billing Act, Fair Debt Collections Practices Act, Truth in Lending Act, and Credit CARD Act of 2009. My client specifically raises, inter alia, the lack of legal capacity of you, the debt collector; the absence of a valid signature on any purported contract with you; the lack of a true bill in my client's possession concerning the purported account; and the lack of any verification of the alleged debt. Accordingly, please provide the following information:

-       The operative contract(s), and all of them, that you assert my client entered into with you

-       The name, address, phone number, and account number of the original creditor if you acquired my client's account after it was allegedly opened

-       Any affidavit of assignment if you are not the original purported creditor, including the date of assignment (if not found on the affidavit, please provide documentation to show the date of assignment)

-       The contract into which you entered with the original creditor, if applicable, to acquire the debt



my client allegedly owes

-   Proof that the statute of limitations has not expired on the debt my client allegedly owes to you

-   Proof that you possess a license to collect upon debts if you are not the original creditor on the purported account, including a license in the state in which you operate and the state in which my client resides

-   Proof that my client's purported account was never charged off by the original creditor or any subsequent debt collector who acquired collection rights from the original creditor

-   A copy of any judgment you purport to have concerning the debt my client allegedly owes

-   Documentation showing the legal capacity of the representative responding to this demand

If you fail to respond to this demand for verification and validation of the debt you allege my client owes to you according to state and federal law, my client will treat this debt as invalid and any further attempts to collect upon this debt will be considered a violation of such laws and will trigger legal action on behalf of my client. I look forward to an amicable resolution to this dispute, and await your response.

Sincerely,

Daniel S. March

DEF00000032

**Exhibit "8"**

0431

## EXHIBIT G

Cease and desist from further communications





P.O. Box 513018, Los Angeles, CA 90051-1018
Tel. (949) 715-0644 · Fax (949) 315-4332
Support@LPGLaw.com

December 27th, 2021
**PERSONAL AND CONFIDENTIAL**
1st Franklin Financial
135 E TUGALO ST
TOCCOA, GA 30577

## DEMAND TO CEASE AND DESIST FURTHER COMMUNICATIONS

Re:    Carolyn Beech
Account Number: ███████7101

To Whom It May Concern:

I represent Carolyn Beech in connection with the above-referenced account that you claim is owed by my client. We are exploring all options to resolve my client's debts, including bankruptcy.

Effective immediately, you are to **CEASE ALL COMMUNICATION** with my client; including, but not limited to, calling any telephone numbers associated with the above-referenced account, and/or calling any third parties. All further communications regarding the above-referenced account should be directed to my office.

If you have any questions regarding this matter, please contact Litigation Practice Group at 949-229-6262. Thank you for your attention to this matter.

Very truly yours,

Daniel S. March

Case 8:23-ap-01014-SC Claim 82-1 Filed 07/06/23 Entered 07/12/23 13:49:48 Page 58
Case 1:22-cv-00057-HSO-BWR Document 47-8 Filed 04/21/23 Page 1 of 2
Exhibit # 1 - 12 of Page 442 of 584

**EXHIBIT H**

Major credit bureaus form letters

Case 8:23-ap-01046-SC Claim 82-1 Filed 07/12/23 Entered 07/12/23 13:49:48 Desc
Exhibit #1 - 12 of 62 Page 443 of 584
Case 1:22-cv-00057-HSO-BWR Document 47-8 Filed 04/21/23 Page 2 of 2



P.O. Box 513018, Los Angeles, CA 90051-1018
Tel. (949) 715-0644 · Fax (949) 315-4332
Support@LPGLaw.com

February 22, 2022
**PERSONAL AND CONFIDENTIAL**
EQUIFAX
PO BOX 740256
ATLANTA, GA 30374

Re:    Carolyn Beech
Social Security No: XXX-XX-7188
Date of Birth: ▓▓▓▓▓
Address: 9 Pelican Lane, Carriere, MS 39426

To Whom It May Concern:

I am writing to dispute the following account:

**Creditor: FSTHERITAG**
**Account #** ▓ **3632**

Please take note that I adamantly deny liability for the above-referenced account, and hereby assert that I **DO NOT OWE** the account, that the balance listed is the **WRONG AMOUNT**, and that FSTHERITAG **CANNOT COLLECT** the account.

Based on the foregoing, pursuant to the Fair Credit Reporting Act, 15 U.S.C. § 1681 et al., I hereby demand the immediate **REMOVAL/DELETION** of this account from my credit report, and that you block any future reporting of the same.

Very truly yours,

Carolyn Beech
(poa)

DEF00000034

**Exhibit "8"**                                    **0435**

Case 8:23-ap-01014-SC Claim 82-1 Filed 07/02/23 Entered 07/12/23 13:49:48 Page 60
Exhibit #_1 - 12 of 62 Page 444 of 584
Case 1:22-cv-00057-HSO-BWR Document 47-9 Filed 04/21/23 Page 1 of 2

## EXHIBIT I

Major credit bureaus form letters

Case 8:23-ap-01046-SC Claim 82-1 Filed 07/22/23 Entered 07/12/23 13:49:48 Page 61
Case 1:22-cv-00057-HSO-BWR Document 4-9 Filed 04/21/23 Page 2 of 2
Exhibit #1 - 12 of Page 445 of 584



P.O. Box 515015, Los Angeles, CA 90051-1018
Tel. (949) 715-0644 · Fax (949) 315-4332
Support@LPGLaw.com

February 22, 2022

**PERSONAL AND CONFIDENTIAL**

EXPERIAN
PO BOX 4500
ALLEN, TX 75013

Re:    Carolyn Beech
Social Security No: XXX-XX-7188
Date of Birth
Address: 9 Pelican Lane., Carriere, MS 39426

To Whom It May Concern:

I am writing to dispute the following account:

**Creditor: FSTHERITAG**
**Account #: 3632**

Please take note that I adamantly deny liability for the above-referenced account, and hereby assert that I **DO NOT OWE** the account, that the balance listed is the **WRONG AMOUNT**, and that FSTHERITAG **CANNOT COLLECT** the account.

Based on the foregoing, pursuant to the Fair Credit Reporting Act, 15 U.S.C. § 1681 et al., I hereby demand the immediate **REMOVAL/DELETION** of this account from my credit report, and that you block any future reporting of the same.

Very truly yours,

Carolyn Beech
(poa)

DEF00000061

**Exhibit "8"**                                                      **0437**

# EXHIBIT J

## Major credit bureaus form letters

Case 8:23-ap-01046-SC  Doc 82-1 Filed 07/06/23 Entered 07/12/23 13:49:48  Desc
Exhibit # 1 - 12 of 20  Page 447 of 584
Case 1:22-cv-00057-HSO-BWR  Document # 10  Filed 04/21/23  Page 2 of 2



F.O. Box 513018, Los Angeles, CA 90051-1018
Tel. (949) 715-0644 · Fax (949) 315-4392
support@LPGLaw.com

February 22, 2022

**PERSONAL AND CONFIDENTIAL**

TRANSUNION
PO BOX 2000
CHESTER, PA 19016

Re:  Carolyn Beech
Social Security No: XXX-XX-7188
Date of Birth:
Address: 9 Pelican Lane., Carriere, MS 39426

To Whom It May Concern:

I am writing to dispute the following account:

Creditor: FSTHERITAG
Account #: 3632

Please take note that I adamantly deny liability for the above-referenced account, and hereby assert that I **DO NOT OWE** the account, that the balance listed is the **WRONG AMOUNT**, and that FSTHERITAG **CANNOT COLLECT** the account.

Based on the foregoing, pursuant to the Fair Credit Reporting Act, 15 U.S.C. § 1681 et al., I hereby demand the immediate **REMOVAL/DELETION** of this account from my credit report, and that you block any future reporting of the same.

Very truly yours,

Carolyn Beech
(poa)

DEF00000078

**Exhibit "8"**                                              **0439**

## PROOF OF SERVICE

     Daniel A. Edelman certifies that on June 21, 2023 the foregoing Class Proof of Claim by Carolyn Beech will be served by the court via NEF and hyperlink to the document. On June 21, 2023 I checked the CM/ECF docket for this bankruptcy case and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

| | |
|---|---|
| Joon M. Khang | joon@khanglaw.com |
| Christopher Celentino | christopher.celentino@dinsmore.com |
| D. Edward Hays | ehays@marshackhays.com |
| Kenneth Misken | Kenneth.M.Misken@usdoj.gov |
| Queenie K. Ng | queenie.k.ng@usdoj.gov |

                      /s/ Daniel A. Edelman
                      Daniel A. Edelman

Daniel A. Edelman (IL 0712094)
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service: courtecl@edcombs.com

# Exhibit "9"

```
 1              UNITED STATES BANKRUPTCY COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                       --oOo--

 4  In Re:                    ) Case No. 8:23-bk-10571-SC
                              )
 5  THE LITIGATION PRACTICE GROUP ) Chapter 11
    P.C.,                     )
 6                            ) Santa Ana, California
              Debtor.        ) Monday, June 12, 2023
 7  _____ ) 1:30 p.m.
                              )
 8  MARSHACK,                 ) Adv. No. 8:23-ap-01046-SC
                              )
 9          Plaintiff,        )
                              )
10      vs.                   )
                              )
11  DIAB, ET AL.,             )
                              )
12          Defendants.       )
    _____ )
13

14                           HEARING RE: PRELIMINARY
                             INJUNCTION
15
                             STATUS CONFERENCE HEARING RE:
16                           (1) CASE MANAGEMENT CONFERENCE
                             AND (2) REQUIRING STATUS
17                           REPORT

18              TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE SCOTT CLARKSON
19           UNITED STATES BANKRUPTCY JUDGE

20

21

22

23

24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.
```

ii

1  APPEARANCES:

2  For the Chapter 11 Trustee:      CHRISTOPHER CELENTINO, ESQ.
                                    JEREMY FREEDMAN, ESQ.
3                                   JONATHAN SERRANO, ESQ.
                                    Dinsmore & Shohl, LLP
4                                   655 West Broadway, Suite 800
                                    San Diego, California 92101
5
                                    ED HAYS, ESQ.
6                                   Marshack Hays, LLP
                                    870 Roosevelt
7                                   Irvine, California 92620

8  For the United States           KEN MISKEN, ESQ.
     Trustee:                       QUEENIE NG, ESQ.
9                                   LESLIE COHEN, ESQ.
                                    Office of the United States
10                                    Trustee
                                    411 West Fourth Street
11                                  Suite 7160
                                    Santa Ana, California 92701
12                                  (714) 338-3403

13  For Han Trinh and              RICHARD BAUM, ESQ.
      Jayde Trinh:                 The Law Office of Richard T.
14                                   Baum
                                   11500 West Olympic Boulevard
15                                 Suite 400
                                   Los Angeles, California 90064
16                                 (310) 231-6808

17  For Greyson Law Center:        DOUGLAS A. PLAZAK, ESQ.
                                   Reid & Hellyer, APC
18                                 3685 Main Street
                                   Suite 300
19                                 Riverside, California 92501
                                   (951) 682-1771
20
21  For Tony Diab and              TERI PHAM, ESQ.
      Daniel March:                JESSIE BOLLING, ESQ
22                                 Enenstein, Pham & Glass
                                   3200 Bristol Street, Suite 500
23                                 Costa Mesa, California 92626
                                   (657) 208-7770
24
25

*Briggs Reporting Company, Inc.*

iii

1 | APPEARANCES:  (cont'd.)

2 | For Bianca Loli and          LESLIE COHEN, ESQ.
  |   Lisa Cohen:                Leslie Cohen Law, PC
3 |                             1615-A Montana Avenue
  |                             Santa Monica, California 90403
4 |                             (310) 394-5900

5 | For Debt Validation         RICHARD H. GOLUBOW, ESQ
  |   Fund II, LLC, MC DVI      Winthrop, Golubow & Hollander,
6 |   Fund 1, LLC, MC DVI         LLP
  |   Fund 2, LLC:              1301 Dove Street
7 |                             Suite 500
  |                             Newport Beach, California
8 |                               92660

9 |                             DAVID COUSINEAU, ESQ.
  |                             Cappello & Noel, LLP
10|                             831 State Street
  |                             Santa Barbara, California
11|                               93101
  |                             (805) 564-2444
12|

13| For Consumer Legal Group:   RONALD RICHARDS, ESQ.
  |                             Law Offices of Ronald Richards
14|                               & Associates, APC
  |                             Post Office Box 11480
15|                             Beverly Hills, California
  |                               90213
16|

17| For BankUnited, N.A.:       HOWARD STEINBERG, ESQ.
  |                             Greenberg Traurig, LLP
18|                             1840 Century Park East
  |                             Suite 1900
19|                             Los Angeles, California 90067
  |                             (310) 586-7700
20|

21| For Ad Hoc Consumer         IRA KHARASCH, ESQ.
  |   Committee:                Pachulski, Stang Ziehl &
22|                               Jones, LLP
  |                             10100 Santa Monica Boulevard
23|                             Suite 1300
  |                             Los Angeles, California 90067
24|                             (310) 277-6910

25|

*Briggs Reporting Company, Inc.*

**Exhibit "9"**                                           0443

iv

```
 1  Court Recorder:              Sally Daniels
                                 United States Bankruptcy Court
 2                               411 West Fourth Street
                                 Suite 2030
 3                               Santa Ana, California 92701

 4  Transcriber:                 Briggs Reporting Company, Inc.
                                 9711 Cactus Street
 5                               Suite B
                                 Lakeside, California 92040
 6                               (310) 410-4151

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*Briggs Reporting Company, Inc.*

v

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Daniel March | 124 | 127 | 127 | 128 |
| | | | 151 | 147 |
| Tony Diab | 154 | 186 | 192 | -- |
| William Taylor Carss | 196 | 209 | -- | -- |

| EXHIBITS | | IDENTIFIED | RECEIVED |
|---|---|---|---|
| (None.) | | | |

**Exhibit "9"**                                                    0445

1

1    SANTA ANA, CALIFORNIA  MONDAY, JUNE 12, 2023  1:30 PM

2                       --oOo--

3    (Call to order of the Court. )

4         THE CLERK:  Please come to order.  This United

5    States Bankruptcy Court for the Central District of

6    California is now in session.  The Honorable Scott C.

7    Clarkson, Bankruptcy Judge, presiding.

8         THE COURT:  Good afternoon, everybody.  Please be

9    seated.  You're welcome.  I don't usually make this

10   announcement, but I would truly appreciate it if you would

11   put your phones on ringer off.  You can leave the phones on,

12   but just let's not have some disturbances of phones ringing.

13   I would truly appreciate that.

14        The second announcement is everyone on Zoom,

15   please mute your microphones until you desire to be

16   recognized.  I would truly appreciate it if everyone would

17   respect that request.

18        All right.  This is the June 12th, 2021, 1:30 p.m.

19   calendar.  Let's call item number two in the Marshack versus

20   Diab matter.  This is a hearing regarding preliminary

21   injunction.

22        May I have appearances, please?

23        MR. CELENTINO:  Good afternoon, your Honor.

24   Christopher Celentino of Dinsmore and Shohl, appearing on

25   behalf of trustee, Richard Marshack.  Other attorneys in my

*Briggs Reporting Company, Inc.*

**Exhibit "9"**                                              0446

124

1          THE CLERK:  If you could speak into the mic.

2          THE WITNESS:  Sure.

3          THE CLERK:  Thank you.

4          THE COURT:  But the microphone is very sensitive,

5    so you don't need to get close to it.  They're so sensitive

6    that I can hear the people that are whispering in the last

7    row from these microphones here, and I pay attention to

8    everything.  Go ahead.

9                    DIRECT EXAMINATION

10   BY MR. CELENTINO:

11   Q    Mr. March, thank you.  I understand from earlier you

12   are the attorney of record for the Debtor out of possession,

13   Litigation Practice Group, correct?

14   A    Correct.

15   Q    We heard earlier that you have approximately 200

16   clients left that you continue to provide services for, that

17   were services of Litigation -- clients of Litigation

18   Practice Group, correct?

19   A    Yes, Litigation California (indiscernible).

20   Q    Thank you.  As to those clients, are you aware that any

21   of them still have financial obligations owing to Litigation

22   Practice Group on their contract with Litigation Practice

23   Group?

24   A    I believe that none of them owed any money to LPG, and

25   if they did, I believe it was probably waived anyway.  So

*Briggs Reporting Company, Inc.*

**Exhibit "9"**                                                    **0447**

125

1  no, nobody owes anything.

2  Q    And you are the attorney of record for those clients in

3  pending cases now?

4  A    Yes, it's LPG, Litigation Practice Group P.C., my name

5  and then my bar number.

6  Q    And you've agreed to continue to finish out those cases

7  pursuant to the terms with those clients, correct?

8  A    I will, yes, and I have.

9  Q    Thank you.  Do you know who Wes Thomas is?

10 A    Not exactly.

11 Q    Do you remember that he was the chief financial officer

12 of LPG?

13 A    He was there -- he wasn't the CFO, but he was an -- he

14 was in charge, yeah.

15 Q    Okay.  You understand how -- let me start over.

16      The main source of revenue for LPG was through

17 contracts that allowed ACH draws from its clients, correct?

18 A    Yes.

19 Q    And those contracts were primarily monthly draws,

20 correct?

21 A    Yes.

22 Q    And there was a term period that was typically --

23      THE COURT:  Mr. Celentino.  Mr. Celentino, in

24 running this evidentiary hearing, I realized that there is

25 very few people here who are willing to or want to object to

126

1  the form of the question, but I would request that as much

2  as possible you not lead this witness, for purposes of

3  examination of the transcript later by appellate courts.

4  Let's hear what he has to say and not what you have to say.

5            MR. CELENTINO:  Fine.  Thank you.

6            THE COURT:  Thank you.

7  BY MR. CELENTINO:

8  Q    What is the average or typical duration of an LPG

9  client payment contract?

10 A    24 to 36 months.

11 Q    And you are aware that LPG relied upon those clients

12 ACH pulls for its livelihood, correct?

13 A    Yes.

14 Q    Did you ever direct anyone to make those ACH pulls from

15 a client?

16 A    I did not.

17 Q    Who at LPG directed those ACH pulls to take place?

18 A    I believe it's Tony Diab.

19 Q    Would anybody else have directed where the funds once

20 pulled were used -- were spent or directed?

21 A    No, I don't think so.

22            MR. CELENTINO:  Thank you.  I have nothing

23 further.

24            THE COURT:  Does anyone have questions for this

25 gentleman?

**Exhibit "9"**                                          0449

127

1          MR. MISKEN:  Just one question, your Honor.

2          THE COURT:  You can do two.

3          MR. MISKEN:  It might be two.

4                        CROSS EXAMINATION

5  BY MR. MISKEN:

6  Q    Ken Misken, assistant U.S. Trustee on the behalf of

7  United States Trustee.  Who is in charge at LPG?

8  A    I am.

9  Q    And you've been in charge since when?

10 A    About the end of 2019.

11 Q    Okay.

12         MR. MISKEN:  That's all the questions I have, your

13 Honor, two.

14         THE COURT:  Thank you.  Anyone else?

15         MR. CELENTINO:  I forgot one question, your Honor.

16 May I?

17         THE COURT:  Please.

18         MR. CELENTINO:  I forgot one.

19                       REDIRECT EXAMINATION

20 BY MR. CELENTINO:

21 Q    What was your compensation at LPG?

22 A    Ultimately, it was 1000,000 a month.

23         MR. CELENTINO:  Thank you.

24         THE COURT:  One hundred thousand a year or a

25 month?

128

1          THE WITNESS:  A month.  I didn't receive that
2  often, but that was my salary.
3          THE COURT:  Well, in the last year, how much have
4  you received?
5          THE WITNESS:  This year, about a 125,000.  I
6  haven't been paid since February 9th.  And then before that,
7  I was probably 250,000, $200,000 short of a $100,000 a
8  month.
9          THE COURT:  Do you have questions?
10          MS. PHAM:  I don't want to belabor this, your
11  Honor.  I was under the impression that we were going to
12  continue.  But if we're not continuing the hearing -- if
13  we're continuing the hearing, I would just simply submit
14  declarations, but if we're not, I'd like to have Mr. March
15  answer a few questions for the Court.
16          THE COURT:  Please.
17          MS. PHAM:  Okay.  Thank you.
18                    RECROSS EXAMINATION
19  BY MS. PHAM:
20  Q    Mr. March, can you explain to the Court what the
21  monthly payments were for?
22  A    We would agree with the client to pay a certain amount
23  of money.  It was a flat rate that would be divided over the
24  requisite period, whatever was negotiated, 24 months to 36
25  months, depending on the size of the debt.

*Briggs Reporting Company, Inc.*

**Exhibit "9"**                                         0451

129

1  Q    Is it a percentage of the debt or based on the size of

2  the debt?

3  A    It's based on the size of the debt and kind of

4  percentage of the debt as well.

5  Q    Was any of the -- were any of those payments intended

6  to service or pay the actual debt?

7  A    No, no.

8  Q    Okay.  That was just simply payment to the law firm?

9  A    Correct.

10 Q    Okay.  Earlier you were in the courtroom, you heard

11 some explanations, or, I guess, allegations made by the

12 trustee as to what the -- how the processing and payment

13 worked.  Did you hear all that?  Do you --

14 A    Yes.

15 Q    Can you explain to the Court exactly how the payment

16 processing worked, what functions the law firm did versus

17 the payment processors?

18 A    Well, once there was an agreement between ourselves and

19 the clients, it was in writing.  They had agreed to make the

20 monthly payment, but it would be through the ACH payment.

21 We didn't bill our invoice directly for that.  They had a

22 payment amount, a schedule that was set in the agreement,

23 and that was drawn every month, usually.  Sometimes those

24 payments weren't met.  Sometimes they were NSF.  sometimes

25 they were negotiated between myself and their staff to

130

1  whether they would make the payments or not or they would be

2  put on a back end or not make things -- whatever we decided

3  to do with the clients and ourselves.

4          THE COURT:  I don't understand the "back end."  If

5  no money is being paid to service the debt of the customers,

6  then what's the back end?

7          THE WITNESS:  There are times when a client was

8  out of work, that was anticipated -- or they just didn't

9  have the money or they had an emergency, they would contact

10  us.  And if they owed money -- but that month -- for the

11  next month --

12          THE COURT:  So payments were deferred?

13          THE WITNESS:  Yes.  Yes, they were divided out

14  over a scheduled period of time.

15          THE COURT:  Okay.  That's what I needed to

16  understand.  But you're telling me that no money that came

17  into LPG ever went to one of those clients' creditors?

18          THE WITNESS:  We have a term and provision in the

19  contract that basically says, okay, we -- to negotiate with

20  a client on a particular debt, if it was a litigation debt,

21  I would get involved or staff would get involved, and we

22  would actually refund the money back to the client to permit

23  them to make payments -- monthly payments as agreed to the

24  creditor.

25          THE COURT:  Yes, but they were paying you, and

*Briggs Reporting Company, Inc.*

**Exhibit "9"**                                    0453

131

1  you're paying directly

2          THE WITNESS:  NO.

3          THE COURT:  -- to any of the customer's creditors?

4          THE WITNESS:  No.  No, we wouldn't pay the

5  creditors.  We would actually -- well, it was money that was

6  supposed to be -- they had a choice, and they could

7  actually --

8          THE COURT:  Who had a choice?

9          THE WITNESS:  The client.

10         THE COURT:  And a choice to do what?

11         THE WITNESS:  To either accept money -- we would

12  refund the money back to them directly and they could make

13  the payment or we would actually refund the money, and we

14  would make the payments, sometimes, to the creditor.

15         THE COURT:  So you would make direct payments to

16  the creditors?

17         THE WITNESS:  Yes, from time to time.  From time

18  to time --

19         THE COURT:  I feel like I'm being whipsawed.

20         THE WITNESS:  No.  Well, it was --

21         THE COURT:  Because you earlier testified that you

22  didn't.

23         THE WITNESS:  Well, no, I said not directly.  We

24  would -- once we entered into a settlement with a client,

25  some money was -- they -- the client directed us to make a

132

1  payment to the creditor.

2        THE COURT:  So you made payments to creditors?

3        THE WITNESS:  Yes.

4        THE COURT:  Okay.

5        THE WITNESS:  With the client's understanding.

6        THE COURT:  Thank you.

7  BY MS. PHAM:

8  Q    You may have made payments on behalf of the client, but

9  did it come from the monthly payment that the client was

10 making, or was that a separate payment?

11 A    The monthly.

12 Q    I think that's the confusion.

13 A    The monthly.

14 Q    Okay.  It would come from the monthly, but the initial

15 contract was not for the payments to be intended to be

16 servicing the debt or paying debt?

17 A    No, never.  We weren't a consolidation company or

18 anything like that.

19 Q    Okay.  So maybe perhaps explain a little bit for us.

20 What exactly were the services of LPG?  Earlier, you heard

21 some statements by the trustee's counsel about debt

22 invalidation.

23 A    Well, we started -- well, the first service we would

24 actually perform is before any money was -- change hands at

25 all.  we run the credit scores, you know, the information we

*Briggs Reporting Company, Inc.*

**Exhibit "9"**                                                    0455

133

1   needed.  We would vet their accounts, make sure they weren't

2   any secured accounts.  We were unsecured accounts only.

3   Credit cards, those types of things.  We make sure that it

4   is was a type of debt that we could handle and that they

5   could handle, and then we would continue that ongoing

6   throughout the life of the contract to even after the life

7   of the contract if need be.  If there was a law suit or

8   something happened after the life of the contract, they

9   would contact us, and we would still represent that client

10  for as long as we would be in existence, I suppose.

11  Q    So some of the services that you heard from trustee's

12  counsel, one was debt invalidation.  So first, you got the

13  client, determine if they're an appropriate client for the

14  firm, someone the firm would assess, correct?

15  A    Yes, and then we would send out representation letters

16  to all the creditors that they wanted us to represent.  And

17  then that was done.  That was done in an ongoing basis.  The

18  client could request an update on what was going on.  We try

19  to do it every 30 days, and that's what a lot of our

20  employees were for.  So we would -- they would add service

21  -- they would add different clients.  At times, a client

22  would say, hey, you know what, I have a -- I mean, I have a

23  lease coming up on a car.  I want to buy a home.  I need to

24  -- can you resolve this debt?  So we would -- we go right

25  into that.  We would try to resolve a particular debt that

134

1   they had in mind that was a problem for them getting --

2   future creditor getting a lease or something like that.

3       And we would continue the process going down the list

4   with the hopes of -- you know, it was something only around

5   eight or nine-percent of the cases ever really got to any

6   litigation to the Court's point earlier.  Very few cases

7   would.  So it was about eight or nine-percent.  We would go

8   into litigation.  And at that point, they would send in all

9   the paperwork to us.  We would assign a counsel, if it was a

10  need, do you want three of four or five, six, I think, at

11  one time in California alone.

12  Q    Let me pause you there  just so we have a

13  question-and-answer here.  So do you explain -- so some of

14  it was debt negotiation?

15  A    At times when they requested specifically, yes.

16  Q    Okay.  Pre-litigation.  And then at some point,

17  sometimes, you said only eight to nine-percent would get to

18  litigation?

19  A    That's what was it was about, yes.

20  Q    Okay.  And then what would happen 0tigation, there was

21  a question earlier about some -- would you ever file an

22  action on behalf of a debtor?

23  A    Occasionally, we would file an action on behalf of a

24  debtor using an FDCPA, Fair Debt Collection Practices Act.

25  Q    Okay.

135

1  A    When through discovery, perhaps, we would take a look,

2  you'd see that they may be -- did something they weren't

3  supposed to do, or we would actually encourage clients to

4  tell us whether an inappropriate correspondence was made

5  through a debt collector or their agents or staff or anyone

6  to that effect, or anyone, and then we would try to, you

7  know, find out what was still going on with their accounts,

8  see what's going on.  If it seemed like a decent case, we

9  would go ahead and handle that particular case for them.

10 Q    Okay.  So you have a small percentage where you would

11 bring in action for on behalf of a debtor, a client?

12 A    Yes.

13 Q    Other litigation would be defending against an action

14 by a collector?

15 A    Ninety-eight percent we're defending against lawsuits,

16 right.

17 Q    And you're handling some of those cases presently?

18 A    Yes, I'm handling -- well, my -- yes, my office is

19 handling all of them.  I'm having some assistance from

20 former counsel that used to work for me, but they have --

21 the case is assigned to them before, and they're very

22 competent counsel.

23         THE COURT:  May I interrupt one second?

24         MS. PHAM:  Yes.

25         THE COURT:  Thank you.

136

1          THE WITNESS:  Sure.

2          THE COURT:  These were specifically collection

3  cases that were filed in the Superior Court of California

4  against the clients of LPG?

5          THE WITNESS:  Yes.

6          THE COURT:  Okay.

7          THE WITNESS:  In California, there were --

8          THE COURT:  In California?

9          THE WITNESS:  Yes.

10         THE COURT:  The ones you were working on?

11         THE WITNESS:  Yes.

12         THE COURT:  And so the question I have is what

13 were the defenses for these people?

14         THE WITNESS:  Well, if you don't allege any, then

15 it becomes a default, and you don't have the service.  So

16 that affords us -- there are several defenses or partial

17 defenses usually --

18         THE COURT:  Besides statute of limitations?

19         THE WITNESS:  Well, double billing.  We would

20 actually conduct discovery on our part.  But when we were

21 sent discovery -- in about 25-percent of the cases, we would

22 receive discovery.  So as part of the service we provided,

23 we did have to litigate that.  We did have to timely

24 respond.  We did have to discuss things with their clients,

25 prepare responses and get them back -- get the verifications

*Briggs Reporting Company, Inc.*

**Exhibit "9"**                                              0459

137

1   in writing, a lot going on there.  But occasionally, you

2   would find something that they did incorrectly, and there

3   were plenty of cases, plenty of cases where they simply just

4   dismissed the case.

5          THE COURT:  So in the last five years, how many

6   trials have you participated in?

7          THE WITNESS:  Well, I guess, about the end of

8   2019.  So it's about -- started in 2020.  So participated in

9   50 to 60.

10         THE COURT:  You actually went to court and had a

11  trial?

12         THE WITNESS:  Well, we were -- yes.

13         THE COURT:  I'm talking about bench trial or a

14  jury trial?

15         THE WITNESS:  Yes, it was always a bench trial.

16  It was done by -- this is during the pandemic, of course.

17  So it was all done that way.  They just now within the last

18  three, four months have an in-person --

19         THE COURT:  So you did approximately 50 trials in

20  defense of these clients?

21         THE WITNESS:  Yeah.  Yes, one we had later settled

22  at the date of the trial.  We resolved it --

23         THE COURT:  Well, that's different than during the

24  trial.

25         THE WITNESS:  Yes.

*Briggs Reporting Company, Inc.*

**Exhibit "9"**                                                    0460

138

1        THE COURT:  I'm asking you how many trials did you
2   do?
3        THE WITNESS:  I think about nearly 50 or so, I
4   think, over three years.
5        THE COURT:  Okay.  And over three years.  And how
6   many clients went to trial over those three years?
7        THE WITNESS:  Just with me or the whole firm?
8        THE COURT:  With you.
9        THE WITNESS:  Well, how many went as opposed to
10  how --
11       THE COURT:  You said you did 50 trials.
12       THE WITNESS:  Well, I believe so.
13       THE COURT:  How many of your clients that you were
14  representing didn't go to trial in the three years?
15       THE WITNESS:  Didn't appear?
16       THE COURT:  Did not go to trial -- not default,
17  that you settled?
18       THE WITNESS:  The vast majority.
19       THE COURT:  And so 1,000?
20       THE WITNESS:  That seems like a large amount.
21  From my particular calendar, I was handling a lot of the
22  CMCs initial stuff, discovery.  So I think 1,000 is -- I
23  would say 400 or 500.
24       THE COURT:  Four hundred?  Okay.  Thank you.
25       MS. PHAM:  Sorry.  I apologize.  So actually

139

1 | following on with the Court's --

2 |      THE COURT:  Well, I'm going to let you do some

3 | discovery later if you desire, but I think that it is not

4 | helpful for this preliminary injunction of what you're

5 | doing.

6 |      MS. PHAM:  I just wanted the Court to have a

7 | better picture of how the firm was actually operating.

8 |      THE COURT:  Yes.

9 |      MS. PHAM:  So I was going to have Mr. March

10 | testify about how the firm (indiscernible).  You just asked

11 | him about his --

12 |      THE COURT:  You seem to know a lot about the firm

13 | itself.

14 |      MS. PHAM:  From the little I've learned as of this

15 | morning, your Honor.

16 |      THE COURT:  No, I've learned the same as -- that

17 | -- as you've learned?

18 |      MS. PHAM:  Meaning how the firm has operated,

19 | because I the think misinformation --

20 |      THE COURT:  Some people can't read the room.  I'm

21 | asking you to hurry up and finish.

22 |      MS. PHAM:  I appreciate it, your Honor.  May I ask

23 | Mr. March to tell the Court approximately how many files and

24 | cases or matters each attorney handled from one?

25 |      THE COURT:  Well, if he knows.  Do you know?

140

1        THE WITNESS:  I don't know.

2  BY MS. PHAM:

3  Q    For example, yourself.  Starting with yourself.

4  A    Probably have to figure that by -- handle -- just

5  handle cases?

6  Q    Yeah, the caseload assigned.

7  A    One to two every day was a court appearance, one way or

8  the other, whether it be a CMC, whether it be an MSC.  I

9  mean, that's how many -- we have appearance or had

10 appearances.  We still have appearances every day.  And I

11 suspect we will for -- assuming that we -- I get to handle

12 these cases or I am going to handle the cases, that's

13 probably two years where the case is still (indiscernible),

14 I believe.

15       THE COURT:  When you say, "two years," you mean

16 it'll take two years to complete these cases?

17       THE WITNESS:  Yes.

18       THE COURT:  Okay.

19       THE WITNESS:  Yeah, the ones we have.  We have

20 court dates.  We have trial dates.

21       THE COURT:  I understand what goes on in the state

22 court.

23       THE WITNESS:  Two years.

24       THE COURT:  Do you have any other questions?

25       MS. PHAM:  Very last.

141

1  BY MS. PHAM:

2  Q    If you can explain to the Court in terms of -- you

3  heard some questioning about the trust account.  Why was no

4  money put into a trust account?

5  A    Well, as I had read the rules, it wasn't required,

6  unless it was a settlement case on the client's behalf.  We

7  got the money in and it was distributed immediately.  It was

8  a -- no money -- nothing was held on behalf of the client.

9  Q    You weren't billing hourly, were you?

10 A    No, we weren't billing hourly in the agreement.  The

11 written agreement called for us to have a fee.  It was known

12 upfront, and that's the way it was handled.

13        MS. PHAM:  Okay.  Thank you, your Honor.

14        THE COURT:  Thank you very much.  I think you're

15 done.  Thank you very much.

16        THE WITNESS:  Thank you, sir.

17        MR. COUSINEAU:  I'm sorry, your Honor.  May I ask

18 him a question?

19        THE COURT:  Who do you represent?

20        MR. COUSINEAU:  I represent Validation Fund and MC

21 DVI 1 and 2.

22        THE COURT:  Are you opposing the preliminary

23 injunction?

24        MR. COUSINEAU:  I am not opposing the preliminary

25 injunction.

142

1          THE COURT:  Tell me what you want to ask questions

2 about.

3          MR. COUSINEAU:  I wanted to ask him a couple of

4 questions about the transfer of files and the authority to

5 transfer the clients.  It's come up a number of times.

6          THE COURT:  And is that necessary under oath?

7          MR. COUSINEAU:  I think it is, your Honor.

8          THE COURT:  Okay.  Sit down.

9          MR. COUSINEAU:  It's based on questions your Honor

10 have --

11          THE COURT:  Please come forward and state your

12 name for the record and ask your several questions.

13          MR. COUSINEAU:  Thank you, your Honor.  Your

14 Honor, my name is David Cousineau, and I represent Debt

15 Validation Fund and MC DVI 1 and MC DVI 2.

16          THE COURT:  And are you a creditor?

17          MR. COUSINEAU:  Yes, your Honor.

18          THE COURT:  And Debt Validation Funds II?

19          MR. COUSINEAU:  Yes.

20          THE COURT:  They claim that they owe you

21 $65,385,489.44.  Is that about right?

22          MR. COUSINEAU:  That is about right, your Honor,

23 yes.

24          THE COURT:  Now, how in the world did Debt

25 Validation Fund II come to be a creditor in this estate for

*Briggs Reporting Company, Inc.*

143

1  $65,385,489.44?

2          MR. COUSINEAU:  Your Honor, would you -- I can

3  answer that question --

4          THE COURT:  Thank you.

5          MR. COUSINEAU:  -- and I can tell you that it's

6  the same for Debt Validation Fund.

7          THE COURT:  Well, let's try it for Debt Validation

8  Fund II.

9          MR. COUSINEAU:  Okay.  So for Debt Validation Fund

10  II.  Debt Validation Fund II invested through Validation

11  Partners into the stream of income that your Honor has heard

12  about, the stream of income that comes from the clients.  So

13  the Debt Validation Fund would purchase the stream of income

14  -- which was going to come in over an extended period --

15  would purchase it at a discount and then would get the

16  payments.  So there would be a return on that investment.

17  That's not where we get to the 65 million.

18          THE COURT:  Well, I understand.  So you've already

19  said that there is a contract involved?

20          MR. COUSINEAU:  There is a contract --

21          THE COURT:  And I'm assuming that there's a

22  contract that you have with the Debtor, the Litigation

23  Practice Group P.C.

24          MR. COUSINEAU:  I haven't gotten to that where --

25  there is a contract, yes, and I --

144

1           THE COURT:  Okay.  And what were there -- and what

2   was Debt Validation Fund II doing?  They were purchasing

3   streams of payments that have been generated by Litigation

4   Practice Group?

5           MR. COUSINEAU:  Correct, your Honor.

6           THE COURT:  How did it get to be 65 million plus?

7           MR. COUSINEAU:  So, your Honor, what happened was

8   in the summer of last year, spring, summer of last year,

9   payments were not getting made.  I had mentioned that we

10  invested --

11          THE COURT:  Spring or summer of 2022?

12          MR. COUSINEAU:  Correct.

13          THE COURT:  Okay.

14          MR. COUSINEAU:  And I had mentioned that we had

15  purchased these streams of income through Validation

16  Partners.

17          THE COURT:  And who is Validation -- Debt

18  Validation Fund II working with on the other side?  In other

19  words, I hate to use a word that no one understands.  But

20  who is the counterparty in that deal?

21          MR. COUSINEAU:  That was originally Validation

22  Partners.

23          THE COURT:  Okay.  So did you have a deal with

24  Litigation Practice Group?

25          MR. COUSINEAU:  That's exactly what I'm getting

145

1 to, your Honor.

2          THE COURT:  Please get to it.

3          MR. COUSINEAU:  So the Litigation Practice Group

4 would make payments to Validation Partners, who would make

5 payments to Debt Validation Fund.  Those payments stopped.

6 We tried to figure out what was going on.  My clients had

7 interactions with LPG where it was explained to them that if

8 they assigned that stream of income to LPG, as well as

9 rights to law suits against Validation Partners, LPG would

10 enter a secure promissory note with Debt Validation Fund

11 that would provide an additional -- a higher of money, but

12 paid out over a longer period of time.  So that's how we

13 entered into a contractual arrangement with the Debtor,

14 Litigation Practice Group.

15          THE COURT:  Okay.  And do you have a copy of that

16 agreement?

17          MR. COUSINEAU:  Your Honor, I --

18          THE COURT:  Not with you, but do you have your

19 copy of that agreement?

20          MR. COUSINEAU:  I do have a copy of that

21 agreement, yes.

22          THE COURT:  Would you provide that to the Chapter

23 11 Trustee?

24          MR. COUSINEAU:  I believe he has it, but I will

25 definitely -- I will -- sorry, I take that back.

146

```
 1          THE COURT:  If he already has it, that's fine --
 2          MR. COUSINEAU:  I think I've already given it to
 3  him.
 4          THE COURT:  -- but if not, please provide that
 5  contract.  And now, what is MC DIV Fund 1?
 6          MR. COUSINEAU:  DVI Fund II?
 7          THE COURT:  Yes.
 8          MR. COUSINEAU:  Yes.  That is another client of
 9  mine.
10          THE COURT:  Yes.
11          MR. COUSINEAU:  Same issue happened.
12          THE COURT:  Well, that's 36,810,655.64.
13          MR. COUSINEAU:  Right.  Of lesser investment.
14          THE COURT:  Now, it's morbid curiosity.  How much
15  was the discount?
16          MR. COUSINEAU:  How much was the discount?
17          THE COURT:  Yeah.
18          MR. COUSINEAU:  I don't remember offhand, your
19  Honor.
20          THE COURT:  Okay.  And Validation Partners, LLC?
21          MR. COUSINEAU:  That is not --
22          THE COURT:  Not your client.
23          MR. COUSINEAU:  -- Validation Partners is not my
24  client.
25          THE COURT:  Whose clients -- does anyone represent
```

147

1  Validation Partners LLC?

2          UNIDENTIFIED SPEAKER:  Not in court.

3          MR. COUSINEAU:  Not in the --

4          THE COURT:  Okay.  But they're owed approximately,

5  according to the schedule, 25 million.  And then we get down

6  to Marich Bein, but that's only eight million.  But I assume

7  that all of these were facilities that are not unlike the

8  Debt Validation Fund II.  Am I right?  Do you have any idea?

9          MR. COUSINEAU:  Marich Bein, I believe, was one of

10  the payment processors.  I don't know what that -- I can't

11  answer on that claim.

12          THE COURT:  Okay.  All right.  All right.  Now,

13  you've established your bona fide.  Thank you very much.

14  You may ask a few questions.

15          MR. COUSINEAU:  Thank you, your Honor.

16              FURTHER RECROSS EXAMINATION

17  BY MR. COUSINEAU:

18  Q    Good afternoon, Mr. March.

19  A    Hello.

20  Q    There were some discussions earlier and questions

21  earlier about clients that were transferred or that were

22  taken from LPG.  Do you remember that?

23  A    I do.

24  Q    Okay.  And there were discussions about some lawyers

25  and employees leaving to go to Greyson.  Do you remember

148

1  that?

2  A    I do.

3  Q    You as a person who's in charge of LPG, did you approve

4  the sending of the client files over to Greyson?

5  A    No, I did not.  Greyson, I think, was well after --

6  that they were with another law firm, either Phoenix or

7  Consumer Legal Group or Oakstone.  I wasn't part of any

8  decision with Greyson.

9            THE COURT:  Who would have made that decision?

10           THE WITNESS:  I was already -- we were already in

11 Chapter -- we already filed Chapter 11.  I wasn't doing

12 anything, really, with LPG other than managing my client

13 load.

14           THE COURT:  Let's try it again.  Who would have

15 made that decision?

16           THE WITNESS:  I don't know.

17           THE COURT:  Okay.

18 BY MR. COUSINEAU:

19 Q    So the lawyers that left and took clients, they did not

20 take clients from LPG.  They took the clients from one of

21 these other entities, Phoenix or Oakstone?

22 A    That is my understanding, yes.

23 Q    Okay.  Now, when clients were transferred to Phoenix

24 and Oakstone as well Consumer Law Group, did you authorize

25 the transfer of those files?

149

1  A    I did, after I -- yeah, we agreed that -- I thought it

2  was a -- in order to protect the clients and we were getting

3  no streaming money whatsoever, we were in dire straits.  Our

4  staff was leaving.  Counsel -- or local counsel all over the

5  United States was leaving.  I felt it incumbent on myself to

6  find a way somehow to get these clients representation,

7  whether it was litigation or whether it was just the files.

8  Q    And you negotiated agreements with Phoenix and Oakstone

9  and Consumer Law Group for them to pay a certain portion of

10 the fees they collected, correct?

11 A    I approved them.  I didn't negotiate them.

12 Q    Who negotiated them?

13 A    Mr. Diab.  Initially, when they first went, yes.

14 Q    Did you get client consent before you decided to send

15 the clients to Phoenix and Oakstone and Consumer Law Group?

16 A    We have provisions in the attorney-retainer agreement,

17 the services agreement, the initial (indiscernible) of

18 Litigation Practice Group.  That's how -- we didn't have

19 counsel throughout the United States.  So when we had a new

20 case or a litigation case, we did have to locate counsel,

21 and that's the only way we could do that.  So that's the

22 provision we used.

23        THE COURT:  And that's a unilateral decision by

24 Litigation Practice Group?

25        THE WITNESS:  Yes.

150

1          THE COURT:  The client would have no choice?

2          THE WITNESS:  They actually had a choice, and they

3  still have a choice, assuming there's any of them left, yes.

4          THE COURT:  How would they be told that they have

5  a choice other than read the initial contract?

6          THE WITNESS:  They were given a notice, I believe,

7  by e-mail, possibly mail, to each of the clients that we

8  had, and they were asked to say, here is where you can go.

9  And secondly, if you want out of it, if you want to

10  terminate it, we'll refund you your money as well.  There's

11  a 100-percent refund provision in all the agreements, and

12  some people have taken us up on it.  Some have not.  Some

13  just want the representation.  Some are like -- a lot of

14  people who want to stay with LPG.  But, yes, we were able to

15  provide a refund for any account that they were dissatisfied

16  with, or even if they were satisfied, they still had the

17  ability in the original agreements to go ahead and request a

18  refund, and some did.

19  BY MR. COUSINEAU:

20  Q    Mr. March, do you know what the provision is?  Is there

21  a specific provision number in the agreements?

22  A    I don't recall.  It's been a long time.

23  Q    Do you remember approximately what it says?

24  A    At this point, no, I don't recall.

25  Q    Did you get client authorization to transfer client

*Briggs Reporting Company, Inc.*

151

1 files prior to transferring them?

2 A    No.

3 Q    And by client files, I mean the actual files related to

4 the clients, the information about the client?

5 A    No, no, other than the unilateral decision to go ahead

6 and do that to make sure the clients were protected.

7         MR. COUSINEAU:  Your Honor, thank you.  I have no

8 further questions.

9         THE COURT:  Well, thank you.  Would there be any

10 redirect?  I believe there is.  There's always another

11 question.

12                REDIRECT EXAMINATION

13 BY MR. CELENTINO:

14 Q    Mr. March, if I present to you a document that is the

15 Litigation Practice Group retainer you were talking to --

16 talking about, could you identify it for us?

17 A    There were many iterations of them, but, yes.

18         MR. CELENTINO:  May I, your Honor, approach him?

19         THE WITNESS:  Okay.

20 BY MR. CELENTINO:

21 Q    Does that document on the screen appear to you to be

22 one iteration as you've indicated of the agreement between

23 LPG and a client?

24 A    It appears, yes.

25 Q    Okay.  And does that document identify that you have

152

1    the right to move the file to another law firm?

2    A    I believe it does.

3    Q    Would you read the sentence for the Court and for the

4    parties, that you believe identifies that you can move the

5    client to another law firm.

6    A            "You further understand and agree

7              you sought a representation of LPG with

8              full knowledge of its location and

9              licensing.  LPG works with attorney's

10             license in all 50 states and the

11             District of Columbia as affiliated

12             counsel to allow LPG provide complete

13             representation in the state in which

14             you're sued, or to which a dispute shall

15             rise, you shall have the right to know

16             the licensed attorney with whom LPG has

17             affiliated in any state and any time,

18             but understand and agree that LPG may

19             choose to change the local attorney with

20             whom it is affiliated in any

21             jurisdiction."

22   Q    And it's your belief that that means that LPG is not

23   responsible but will allow for the transfer of the client to

24   a completely different law firm?  Is that what you

25   understand that sentence to mean?

153

1   A    Yes.

2           MR. CELENTINO:  Okay.  Thank you.

3           THE COURT:  Thank you.  Get out while you can, Mr.

4   March.

5                              (The witness was excused.)

6           THE COURT:  Do you have any further witnesses?

7           MR. CELENTINO:  At the edge of the hour, your

8   Honor, I would like to call Tony Diab.

9           THE COURT:  Well, first of all, there is no edge

10  of the hour.  We are here.  This is important stuff, and

11  we're not going anywhere until we have resolution.  So if

12  you'd like to call Mr. Diab.  Is he under subpoena?

13          MR. CELENTINO:  He is under subpoena.  We

14  subpoenaed and served the summons on him with the complaint

15  and the order to show cause was served upon him.

16          THE COURT:  Is Mr. Diab here?

17          MR. CELENTINO:  He is here.

18          THE COURT:  Mr. Diab, would you like to come

19  forward?

20          Good afternoon, Mr. Diab.

21          THE COURT:  Good afternoon, your Honor.

22          THE CLERK:  Please raise your right hand.

23           TONY DIAB - PLAINTIFF'S WITNESS - SWORN

24          THE CLERK:  Please state your name and spell your

25  last name for the record.

154

1        THE WITNESS:  Tony Diab, D-I-A-B.

2        THE CLERK:  Thank you.

3              DIRECT EXAMINATION

4  BY MR. CELENTINO:

5  Q    Thank you, Mr. Diab.  At the 341(a) meeting of

6  creditors, you testified that you had no role in the

7  operations of LPG.  Is that correct?

8  A    That's not correct.

9  Q    What did you say your role was?

10 A    So my role was a combination of managing the vendors

11 and the administrative work of the firm, meaning there was

12 the practice of law at the law firm and there was everything

13 else.  And my job was the "everything else," meaning not the

14 practice of law, but the vendors and all the processes that

15 went into producing essentially the product that LPG

16 provided.

17 Q    Did you disclose to --

18        THE COURT:  Mr. Diab, Hold on.  Mr. Diab, he

19 didn't ask you the time frame of the services that you've

20 just described.  Can you help me understand when were you

21 doing this -- even -- or are you doing it now?

22        THE WITNESS:  So this would have been from

23 approximately February of 2019 until the date the petition

24 was filed.

25        THE COURT:  Thank you.  That helps me a great

*Briggs Reporting Company, Inc.*

**Exhibit "9"**                                          0477

155

1  deal.  Thank you.  I'm sorry for the interruption, but I

2  needed the date on this.

3          MR. CELENTINO:  I understand.

4  BY MR. CELENTINO:

5  Q   Who made the decision for the Litigation Practice Group

6  to file Chapter 11?

7  A    It was a conversation between Dan March and I.  We

8  discussed the pros and cons, and we opted to file the

9  Chapter 11 primarily to deal with the dispute that we had

10  with the payment processor.

11          THE COURT:  I'm sorry, you're speaking very fast.

12          THE WITNESS:  My apologies, your Honor.

13          THE COURT:  Dispute with?

14          THE WITNESS:  With a payment processor at the time

15  of the petition filing.

16          THE COURT:  Who was the payment processor?

17          THE WITNESS:  It was actually two, Marich Bein,

18  LLC and Equipay, which also went by the name of Profley

19  (phonetic).

20          THE COURT:  Thank you.

21  BY MR. CELENTINO:

22  Q   You heard the testimony earlier or the discussion

23  earlier about the way that the customer of the LPG has an

24  ACH pull from their account to a resolution account.  You

25  understand that process?

*Briggs Reporting Company, Inc.*

**Exhibit "9"**                                    **0478**

156

1  A    I understand the process of ACH pulls very well, yes,
2  sir.
3  Q    Okay.  And when Litigation Practice Group enters into a
4  contract with a proposed client, it was to be able to pull
5  the ACH monthly payment, correct?
6  A    Correct.  It would pull it two ways.  One is the ACH
7  debit that you referenced, and the other is payment by debit
8  card.  We processed both methods, no credit cards, only
9  debit.
10 Q    Okay.  Who made the decision when to instruct through
11 the process that it was time to make a client pull?
12 A    That depends on the payment processor.  Each payment
13 processor has different procedures and different methods
14 that they use both for receiving instructions and for how
15 they handled the funds.
16 Q    Understand that.  Who made the decision at Litigation
17 Practice Group to reach out to the payment processor at a
18 time to engage them in their process?
19 A    That would depend on what point in time.  And I'll give
20 you the whole history if that's okay with the Court.  And so
21 this venture began with Diab Law as the law firm, not
22 Litigation Practice Group, working together with Coast
23 Processing.  That would have been from roughly November 2017
24 until February of 2019.  During that time period, it would
25 have been the CFO of Coast Processing, Asante Bayrooti, who

*Briggs Reporting Company, Inc.*

**Exhibit "9"**                                   0479

157

1  would have made the decision regarding ACH processing.  When

2  Diab Law -- when my license was involuntarily set to

3  inactive and Diab law essentially closed, Litigation

4  Practice Group was formed, and Asante continued to perform

5  that function as the acting CFO -- not the actual officer or

6  director, but acting CFO of Litigation Practice Group from

7  February of 2019 until June of 2021.

8  Q    Who hired him?

9  A    He was hired by Dan March, but -- sorry.  At Coast

10 Processing, he was a principal.  So he was one of the

11 members of B.A.T. LLC, which turned into B.A.T.

12 Incorporated.  And he formally held the role of CFO at

13 B.A.T. Incorporated.  At LPG, first, it was John Thompson

14 and then Dan March that selected him to perform that

15 function, and he performed it very well.  In June 2021, when

16 he ceased his connection to LPG and Coast Processing, I took

17 over that function.  So from June 2021 until the petition

18 date, it would have been me that had that role.

19 Q    Okay.  Thank you.  So you were the person, then, that

20 made the decision that LPG was going to take an ACH transfer

21 from a client?

22 A    Yes, but I'll explain the process.  The clients were

23 enrolled.  Their enrollment was confirmed, and then the CRM

24 would automatically transmit that data to the payment

25 processor, meaning nobody had to push a button, make a phone

**Exhibit "9"**                                                      0480

158

1  call, send an e-mail.  It would automatically happen when

2  the enrollment was confirmed within the CRM.

3  Q    But that was at your instruction?

4  A    Correct.

5  Q    Okay.  And when the pull was pulled into the settlement

6  account, who made the decision where the money would be

7  sent?

8  A    So not all payment processors use a settlement account.

9  So we would have to go processor by processor.  Some like

10 Marich Bein, LLC had a settlement account, meaning the funds

11 would pull and sit in an account.  At the time, it was

12 BankUnited.  And then a decision was made to send the money

13 from BankUnited to whatever the destination would be.  That

14 was how Marich Bein performed their function.  World Global

15 performance --

16 Q    Let's stop with Marich Bein.  Who instructed Marich

17 Bein where to send that money?

18 A    So I would instruct Marich Bein where to send the money

19 -- sorry -- from the settlement account because they would

20 automatically put it there.  From the settlement account, I

21 would instruct where it would go after that.

22 Q    And when it was delivered after that, who made the

23 decision what it would be spent upon?

24 A    That was up to the accounting department.  So the

25 accounting department had certain automated payments that

159

1  they would regularly perform, and then there were certain

2  special requests.  And then the accounting department as a

3  whole would make decisions about which requests had which

4  priority.  We tracked that through an AP tracking chart to

5  show all of the payables, the due date, the aging, and then

6  decisions would be made.

7      For most decisions, it was low level, so the accounting

8  department would do it on their own.  For larger

9  transactions, they would usually consult Wes Thomas, while

10  he was the acting CFO, he was never an officer or director,

11  but he was the director of finance.  So Wes would be

12  involved.  I would always be involved.  And depending, there

13  may have been somebody else in the firm.  One of the

14  attorneys might have gotten involved if it's something that

15  they were demanding to be sent.  For instance, Jayde

16  sometimes would say this payment has to go out, and she

17  would intervene, or somebody else would make such a request.

18  So it was a group effort.

19  Q    Jayde, when she worked at LPG?

20  A    Correct.

21  Q    And you heard earlier that we discussed that Jayde is

22  now working for Greyson Law?

23  A    Correct.

24  Q    Yes.  Are you aware of her salary at Greyson Law?

25  A    I'm not aware of it and that I haven't seen it myself,

160

1 but I've heard rumors.

2 Q    What rumor have you heard?

3 A    I've heard --

4         MR. BAUM:  Your Honor, I'm going to object to that

5 as hearsay.

6         THE COURT:  Excuse me.  Well, it's not because

7 it's not for the truth of the matter asserted.  It's just

8 what a rumor is.  What I'll do -- excuse me --

9         MR. BAUM:  I'm sorry, your Honor.

10        THE COURT:  Okay.  I'll take it for what it's

11 worth.  And it's easier to get the answer and noting that

12 it's just a rumor, and it's not really relevant to arguing

13 about it.

14        MR. BAUM:  Thank you, your Honor.

15        THE WITNESS:  So this is semi speculation, but I

16 believe it's roughly 500,000 a year.

17 BY MR. CELENTINO:

18 Q    Do you know how many years she's been a practicing

19 attorney?

20 A    I believe she's practiced for a little over two years.

21 Q    Thank you.  I'm in the wrong business.

22        THE COURT:  No, you're not.

23 BY MR. CELENTINO:

24 Q    Fast forward for me to the date of the bankruptcy

25 petition.  The bankruptcy petition is filed.  I believe we

161

1 heard Mr. March say that by that time, you had negotiated,

2 and he had approved transfers of all but a few of Litigation

3 Practice Group clients.  Is that correct?

4 A    That's correct.  And the time frame would have -- it

5 would have began, I think late January, and it would have

6 stretched into the first week of March, those series of

7 transfers.

8 Q    Okay.  And series of transfers that were made to

9 Oakstone, when there was a falling out -- excuse me -- was

10 there a falling out between you and the parties at Oakstone?

11 A    I believe there was a falling out internal to Oakstone,

12 and then I became involved after that, and then there was a

13 falling out between me and Oakstone.

14 Q    Okay.  And when there was a falling out between you and

15 Oakstone -- and approximately when was that?

16 A    This would have been in, I would say, late April, early

17 May of this year, little over a month ago.

18 Q    And what happened at that time with the Oakstone files?

19 A    So Oakstone collapsed.  Essentially, it wasn't able to

20 service any files, and it ceased operations.  And at that

21 point, the files were transferred from Oakstone to Phoenix.

22 It was not a unilateral decision.  There were a lot of

23 people involved in that decision.

24 Q    Okay.  Did Oakstone request them to be transferred to

25 Phoenix?

*Briggs Reporting Company, Inc.*

162

1  A    They did.  So Scott Eadie was the principal of Oakstone

2  and was aware of the fact that they could not service the

3  clients, and he agreed that the clients had to be

4  transferred.

5  Q    And Scott Eadie is now the principal of Greyson Law,

6  correct?

7  A    Correct.  A lot of the former employees of Oakstone

8  after its collapse formed Greyson.

9  Q    When you were involved in the time frame that we've

10 talked about with Litigation Practice Group, you were aware

11 of the attorneys that Litigation Practice Group relied on to

12 assign clients to around the country, right?

13 A    Many of them, yes.  Not all.

14 Q    But that was a network you were generally aware of?

15 A    Yes.

16 Q    And so when the Litigation Practice Group clients were

17 transferred at your idea and Mr. March's approval to, take

18 an entity named Phoenix, for example.  Do you know whether

19 Phoenix contacted those same attorneys to work those same

20 files?

21 A    It was my understanding that Phoenix contacted every

22 client and then each attorney that was assigned to that

23 client after the point of transfer.

24 Q    Okay.  And were you involved at all with Phoenix?

25 A    I was involved in a consulting capacity but not related

*Briggs Reporting Company, Inc.*

**Exhibit "9"**                                    0485

163

1 to any client files.  So my communications with Phoenix

2 would have been limited to Ty Carss a handful of times per

3 month, Bianca and Stephanie regarding accounting matters, a

4 handful of times per week.  More frequent with Bianca and

5 Stephanie than with Ty, but it would have been consulting.

6 I was not typically consulted with any particular client

7 matter.  And when Ty would reach out to me, it was typically

8 to find local counsel, either somebody who could handle a

9 bankruptcy or in a state where he didn't already have a

10 relationship, trying to establish relationships so that

11 somebody could handle a client file, sort of the limit.

12 Q    Were you involved in the decision making to start

13 Phoenix Law Group?

14 A    I was.  And at the time, it was a successor to a prior

15 entity that I had more involvement with called Gallant Law

16 Group.

17 Q    And what happened with Gallant Law Group?

18 A    It was a joint venture that failed.  The joint venture

19 was with somebody named Nick Cole Schreiber (phonetic).  And

20 that joint venture failed in November of 2022, specifically

21 related to his objections over the Validation Partners

22 Litigation.  So he opted not to proceed with the JV, and we

23 formally dissolved it in November.

24 Q    Understood.  Okay.  Who hired Ty Carss to be the lead

25 lawyer at Phoenix Law?

164

1   A    He wasn't hired.  He is the principal of Phoenix, but

2   he was asked if he would serve as the managing attorney of a

3   new law firm that would take over the Gallant clients, and.

4   in fact, the Gallant client base.  So Gallant was the law

5   firm that was being serviced by an entity called Prime

6   Logix.  Prime continued, and it was under the direction of

7   Bianca Loli.  A new law firm was needed, and so we

8   approached Ty with that request.  He had done very well with

9   the clients.  He seemed interested.  So we asked if he would

10  be the managing attorney of this new entity called Phoenix,

11  and he accepted.

12  Q    So "we" implies you were part of that approach to Ty?

13  A    I was.

14  Q    Who was the other person or persons in the "we?"

15  A    The principal of Prime Logix, who was managing the

16  processing center, which is Rosa Bianca Loli.

17  Q    And the processing center was to process the client

18  pulls for the clients who were formerly clients of LPG that

19  had been transferred to other entities?

20  A    When we refer to processing, we mean mail processing,

21  customer service, phones, CRM.  It includes payment

22  processing, but that was a small part of what Prime Logix

23  would do.  And so it would do all of the customer service

24  and administrative function for the law firm.

25  Q    So it's like a third-party vendor to the law firm to

165

1 outsource the law firm services, right?

2 A    The services other than the practice of law, correct.

3 Q    Other than the practice of law.  Okay.  And Ms. Loli is

4 the owner of Prime Logix?

5 A    She was one of two.  It was owned by two individuals,

6 her and Nick Cole Schreiber.  Nick was no longer involved as

7 of November, and so she was the last remaining member of

8 that LLC.

9 Q    Prior to the outsourcing of those services to Ms. Loli,

10 weren't those services provided by staff at LPG itself?

11 A    No.  Prime Logix was in operation from May of 2022

12 until present, and it continued to provide that service for

13 the clients that they had onboarded through Gallant Law

14 Group.  And that servicing continued all the way until the

15 present day, actually, until the trustee's office obviously

16 took over the -- of the operation on June the 2nd.

17 Q    So there's a contract -- are you saying there's a

18 contract between Phoenix Law Group and Prime Logix to

19 provide all the staff support and other processing,

20 excluding legal services for Phoenix clients?

21 A    I believe the contract was with Phoenix and Maverick

22 Management Group, which was supposed to be a successor to

23 Prime Logix, but Prime is still operating alongside

24 Maverick, meaning they're both currently operating in that

25 identical capacity.

166

1  Q     And do you -- are you aware that Maverick and Prime

2  Logix provide those services also to Greyson Law?

3  A     I'm not aware of that, that that function is being

4  performed right now.  I think that Greyson is very distinct

5  from Phoenix and Prime and Maverick, and I don't think that

6  that's a good relationship.  I believe it's hostile.  Though

7  they have counsel who can address that issue.

8  Q     Is there any reason then -- let me backtrack.

9       Mr. Diab, you've testified that you've never been to

10  the Phoenix offices.  Is that right?

11  A     Not true.  Since it became Phoenix Law, I had not been.

12  But the same offices housed Gallant Law Group, and I visited

13  that multiple times.

14  Q     The same offices housed Gallant Law Group?

15  A     Correct.

16  Q     I see.  Okay.  Did the same offices house Phoenix Law

17  Group?

18  A     Yes.

19  Q     Okay.  And how about Oakstone when it was operating?

20  A     A different suite in the same space, but yes.

21  Q     Same space, okay.  Were you involved in the acquisition

22  of client files by LPG in the few weeks before the

23  bankruptcy petition was filed?

24  A     Acquisition of client files by LPG --

25  Q     Yes.

167

1  A      -- pre-petition?  I believe that LPG was still

2  onboarding clients as of the beginning of March, so I would

3  have still been involved then.  I think it was around March

4  13th that it stopped onboarding new clients, somewhere

5  around there.

6  Q     And the onboarding of new clients, are those -- is that

7  onboarding from a marketer?

8  A     Typically, yes, a marketing affiliate is the typical

9  route through which a client would be connected with LPG to

10 become enrolled.

11 Q     And a marketing affiliate, why do you call it

12 affiliate?

13 A     Because they're more than a simple vendor.  They sort

14 of service the clients start to finish.  They have an

15 ongoing retention function, an ongoing customer service

16 function.  The clients will constantly call back to the

17 marketing affiliate with questions, with their anxieties,

18 with their complaints.  A lot of times, we find out what

19 clients don't like about the law firm from the marketing

20 affiliate that has a much closer relationship with the

21 client.

22             THE COURT:  Who is the marketing affiliate?

23             THE WITNESS:  We've worked with over 150 over the

24 last five years, but there are companies of various sizes.

25 Some are one individual.  Some are floors with 100 people.

168

1  But they sell various products, and we established

2  relationship so that we would be one of the products that

3  they would sell.

4        THE COURT:  You call them an affiliate or they

5  call themselves an affiliate.  Where is the affiliation?

6        THE WITNESS:  So there is an affiliation agreement

7  between the -- in our case, it was LPG.  And now, it would

8  be whichever law firm in that marketing company.  But it's

9  an affiliation agreement that outlines the roles that they

10 are going to perform and the rules and restrictions that

11 apply to them, because we have a lot of restrictions on what

12 they can do.

13       THE COURT:  Is it a -- more of a joint venture or

14 a contractual relationship.  I'm trying to get a handle on

15 "affiliate."  In the bankruptcy community, we know what an

16 affiliate is, but I'm not sure -- I'm -- I don't want to be

17 biased with my understanding of what affiliates are in

18 bankruptcy context versus what your understanding is, with

19 respect to what an affiliate is.

20       THE WITNESS:  Yeah.  In our context, it's simply a

21 contractual relationship.  But we try to differentiate an

22 affiliate from a regular vendor because of the ongoing

23 nature of that relationship.  But it's a vendor by contract

24 is the more accurate.

25       THE COURT:  Vendor by contract.  Thank you.

**Exhibit "9"**                                                    0491

169

BY MR. CELENTINO:

1

2  Q    Is there a fee that is paid to that affiliate for the

3  assignment of that client to you?

4  A    Yes.

5  Q    And what does that fee constitute?

6  A    The fee is for the services that they render, which

7  includes the onboarding, that ongoing retention function,

8  and the ongoing customer service function.  And it varies

9  affiliate by affiliate.  Our approach has changed over the

10  years.  So we've had different forms of the affiliate

11  agreement and the contract, but it's for the services

12  rendered.

13        THE COURT:  Do you have any knowledge of any

14  connected ownership between the Debtor and any of these

15  affiliates?

16        THE WITNESS:  It would not be the Debtor, but I

17  myself Tony Diab had a connection to one marketing affiliate

18  called Asolution (phonetic) Debt Relief.  It's an affiliate

19  that did not last very long.  And it ceased operations -- as

20  far as LPG is concerned, it would have been August of 2022.

21  But that was not an LPG connection.  That was a Tony Diab

22  connection.  Otherwise, the answer would be no.

23        THE COURT:  Thank you.

24  BY MR. CELENTINO:

25  Q    Wasn't Coast Processing a marketing affiliate?

170

1  A    No.   Coast Processing did not do anything marketing.

2  It was like Prime Logix.   It was a company that would

3  provide processing service, which means customer service on

4  the phones, mail processing, inbound and outbound,

5  accounting, payment processing.

6  Q    So the marketing affiliate that refers a client to you

7  stays in contact with that client to make sure the client is

8  getting appropriate services?

9  A    Correct.   Sometimes they'll do payment reminders.

10  Sometimes they'll do regular outreach just to touch base

11  with the client and ensure that the --

12             THE COURT:   Is that a contractual requirement?

13             THE WITNESS:   It is.

14             THE COURT:   Thank you.

15  BY MR. CELENTINO:

16  Q    And the fee that the -- that LPG -- let's use LPG as an

17  example.   The fee that LPG pulls from the LPG client, is

18  some portion of that used to pay that marketing affiliate?

19  A    Yes.   The fees that LPG pulls from clients, that's

20  LPG's revenue, and LPG uses its revenue to compensate the

21  marketing companies for the services that they perform

22  pursuant to contract.

23  Q    I'm going to ask you to take a look at a document.   I'm

24  going to ask you some questions about that.

25       Do you see the document I have provided to you, Mr.

171

1  Diab?

2  A    Yes.

3  Q    Do you recognize that document?  Do you know what that

4  is?

5  A    I do.

6  Q    What is that?

7  A    This appears a screenshot of the Revolv/Worldpay

8  portal.  Revolv is the broker.  Worldpay is the actual

9  processor, but they use this portal to convey information

10 regarding process payments.

11 Q    Do you see in the upper left that it indicates

12 Litigation Practice Group P.C.?  Do you see that?

13 A    Yes.  The application for Revolv/Worldpay was initially

14 submitted by Litigation Practice Group.  It was approved

15 after the petition was filed when Phoenix Law had requested

16 payment processing through Revolv that the application

17 itself and the contract were submitted under Litigation

18 Practice Group, and at the time, I was the point of contact.

19 Q    Okay.  Thank you.  So on the upper right corner where

20 it says, "Hi, Tony Diab," do you recognize that as the login

21 that was probably assigned to you at some point?

22 A    Yes.  So when we first got approval from

23 Revolv/Worldpay, I was the user, and so they created a user

24 login for me, which I then transmitted to others to manage.

25 Q    So the number that's in the middle, the $9,333,000

**Exhibit "9"**                                               0494

172

1  number, what does that represent?

2  A    That's the amount that was attempted.  So from -- it

3  looks like the date ranges March the 28th to May the 19th.

4  So during that period of time, through this payment

5  processor, there was an attempt to collect 9.3 million.

6  Q    March the 28th through May 19th of this year.

7  A    Correct.  2023.

8  Q    Okay.  And you are saying that it was Revolv that later

9  approved other entities to use the Litigation Practice Group

10 portal?

11 A    So Litigation Practice Group never had a portal

12 pre-petition.  Post-petition when Phoenix Law was looking

13 for a way to process payments, the pending application with

14 Revolv was reignited, for lack of a better word.  So we had

15 a marketing affiliate called Bonus Financial.  And the

16 principal of Bonus Financial, his brother-in-law is Nathan

17 at Revolv and manages the Revolv payment processor.  So we

18 asked Jordan essentially for assistance in getting approval.

19 LPG could never get approved by Revolv.

20      And so Jordan got involved, communicated with Nathan,

21 and sometime at the end of March 2023, Nathan approved this

22 account for Phoenix Law to be able to pull payments.  But he

23 used the LPG application, specifically wanted to see the LPG

24 revenue stream and the LPG payment processing volume to get

25 approval to pull that level of ACH debit.  ACH is a credit

173

1  facility, so you have to get approved to be able to pull

2  this amount.

3  Q    The number of 6,308,000 and change, what does that

4  represent?

5  A    That's the amount that actually cleared.  So 9.3 was

6  the attempted debits.  The actual debits pulled would be 6.3

7  million.

8  Q    Revolv uses a settlement account, do they not?

9  A    To my knowledge, they do not.  The money is pulled from

10 the client and then deposited in the account that they're

11 directed to deposit to.  So when it was first formed, we

12 directed them to deposit to the Prime Logix account, and the

13 money would go from the client direct to that Prime Logix

14 account.  It would not stop in any intermediate account, to

15 my knowledge.

16 Q    Okay.  You were involved in the designation of that

17 money to go to Prime Logix?

18 A    Correct.  So the question arose at the time of the

19 approval which account would receive the funding from this

20 payment processor.  And we needed an account that was

21 seasoned, meaning an account that had been around long

22 enough to where the ACH and wire limits were high enough to

23 allow this business to function.  The business has a lot of

24 activity.  There are refunds that go out daily.  There are

25 payments that go out daily.  There's payments that come in

**Exhibit "9"**                                                    0496

174

1  daily.  So you have to have a bank account that's seasoned

2  to be able to manage that volume, otherwise the bank will

3  shut you down, and then you end up having to switch bank

4  accounts.  You spend a lot of time in a branch, and the

5  business doesn't function.  So we chose the most seasoned

6  account we had access to.

7  Q    So you wouldn't have been able to maintain this volume

8  had you said Phoenix Law Group?

9  A    No, they would not have approved Phoenix.  As a

10 relatively new entity that had maybe 1.8 million in revenue

11 per month, they would have never been approved for this

12 amount of ACH.

13 Q    But they did approve Litigation Practice Group?

14 A    That's correct.

15 Q    So why did they accept Prime Logix as the account to

16 direct the Litigation Practice Group funds to?

17 A    So Revolv, again, is the broker that sits in between

18 Worldpay, the payment processor, and the merchant.  In this

19 case, the merchant became Phoenix Law, although the

20 application was submitted by LPG.  So the question was

21 presented to Revolv, "Can we choose which account we want

22 the money funded to?"  They said, "Yeah, we'll send it

23 wherever you want.  You just have to tell us which account

24 to direct it to."  So we had the conversation, and then

25 directed it to the Prime Logix account.

175

1  Q    And who had that conversation?  Who's the "we" in your

2  statement?

3  A    So that would have been me and the person who was

4  managing Prime Logix and the processing center, which was

5  Bianca Loli.

6  Q    Okay.  Who hired those employees at Prime Logix.  Do

7  you know?

8  A    So Bianca would have been in charge of hiring and

9  training the employees at Prime Logix.

10  Q    Did you have any role in that?

11  A    The initial batch of employees hired in June of 2022, I

12  think there were maybe three referrals that I made to

13  Bianca.  She subsequently terminated them all.  Apparently

14  my referrals weren't very good.  But I did hire about three

15  of the initial batch of trainees.  And then after that, I

16  was asked not to be involved.

17  Q    So why -- what happened in June of 2022 that it made

18  sense for the law firm to stop providing the incidental

19  services and contract with Bianca Loli's company?

20  A    So this was a new venture, meaning it was unrelated to

21  LPG.  So Valiant Law Group, which became Gallant Law Group

22  -- Gallant was formed.  The head attorney was Robert Tobia.

23  He practices out of Philadelphia, Pennsylvania.

24        And so Nick Cole Schreiber, who had run one of

25  these marketing affiliates I referenced, he wanted to do a

176

1  joint venture with me and specifically with Bianca and

2  establish a new law firm that would do the work of LPG, but

3  better, in his view.  And he would do the marketing.

4  Instead of having multiple affiliates, there would be one

5  marketing affiliate, and it would be a joint venture.

6       And so we launched that in June of 2022, with Nick and

7  Bianca owning Prime Logix and performing the administrative

8  and processing function, and then Bob Tobia, at the time

9  Valiant Law Group, which became Gallant Law Group, working

10  with me to establish a new attorney network and a new legal

11  process to be able to process files.

12       They started in June 2022.  The first clients were

13  enrolled in July of 2022, and then the joint venture fell

14  apart in November of 2022 when Nick wanted out.

15  Q    And so Gallant operated from about the time that Prime

16  Logix was started until about November of '22.  Is that what

17  you just said?

18  A    Correct.

19  Q    And did Gallant onboard any of its own clients in that

20  period of time?

21  A    It did, somewhere between eight and 10,000 clients.

22  Q    Okay.  And at that time, how many clients did LPG

23  transfer to Gallant?

24  A    Zero.  There was never a transfer from LPG to Gallant.

25  Q    Okay.  All right.  And when Gallant fell apart, what

177

1 happened to its clients?

2 A    So Nick Cole Schreiber continued to manage the Gallant

3 clients using his own processing center, and a negotiation

4 took place between he and essentially Bianca, with me

5 involved, because I had been Nick's joint venture partner,

6 although the joint venture fell apart.  And so we negotiated

7 essentially a split.  He took half of the files and formed a

8 new law firm called Centerpoint Law Group, and Bianca took

9 the other half of the files and they looked for a name, and

10 they settled on Phoenix Law.

11      And so essentially the files were split sometime in

12 December.  And then in January, Phoenix took its side.  Nick

13 took his side as Centerpoint, and the two continued to

14 function separate apart from one another.

15           THE COURT:  Just for clarification, January of

16 what year?

17           THE WITNESS:  Of this year.  2023.

18           THE COURT:  Thank you.

19 BY MR. CELENTINO:

20 Q    So a portion of the clients that went to Phoenix Law

21 Group were from Gallant and did not have an arrangement with

22 LPG.  Is that your -- is that your testimony?

23 A    That's correct.

24 Q    And that's the portion that went to Phoenix Law Group

25 in January of '23?

178

1  A     Correct.

2  Q     Okay.  And what about the transfer of LPG clients to

3  Oakstone?  Tell me about that.

4  A     So the Oakstone -- yeah, that took place at the end of

5  January.  So Eng Tiang had an entity called PEC (phonetic)

6  Corporation, which was a large investor, I think the second

7  or third largest investor in Validation Partners.

8         And so like the other members of Validation Partners,

9  he opted to exchange the obligation from Validation Partners

10 for an obligation from LPG.  So he executed an exchange

11 agreement.  He assigned his right to a roughly $28 million

12 payment stream from Validation Partners.  He assigned that

13 to LPG and in exchange received a promissory note from LPG

14 for about 30 million to be paid over three years, I think

15 total.

16        And so PEC Corporation, which is Eng, started to demand

17 that it receive files and break away from LPG.  It felt that

18 Validation Partners was going to obtain a receiver, that LPG

19 was going to, in Eng's terms, go down in flames.  And he

20 wanted to take essentially $30 million worth of clients and

21 leave.

22        And so he negotiated the formation of Oakstone.  He was

23 going to take his 15,000 clients at a roughly $2,000 per

24 client value.  We were going to extinguish the promissory

25 notes.  LPG no longer owed PEC Corporation any money.  PEC

*Briggs Reporting Company, Inc.*

**Exhibit "9"**                                                0501

179

1  Corporation would operate Oakstone, which is a name that Eng

2  had settled on, and LPG would continue to receive a

3  20-percent residual from the files that went to Oakstone.

4       So we signed the agreement.  Eng received the 15,000 or

5  so files.  The promissory note was extinguished, and

6  Oakstone was formed.  We were then on the verge of

7  transferring the files at the end of January when the

8  Validation Partners' lawsuit really heated up, and we rushed

9  the transfer to complete it.  And then Eng started up and

10 running with Oakstone, and then he managed that entity.  He

11 was sort of the Tony Diab of that entity, meaning not

12 practicing law, but doing everything else.

13 Q    Okay.  And what happened to those files?

14 A    Those files went to Oakstone.  Oakstone began

15 processing them at the beginning of February, meaning they

16 were providing the client services, customer service,

17 handling the lawsuits, everything else.  That started at the

18 beginning of February and ran all the way until the end of

19 April when Oakstone essentially dissolved.

20      THE COURT:  Mr. Celentino, we could go on with

21 this for hours, but remember, our focus today is the

22 preliminary injunction.

23      MR. CELENTINO:  Yes.  I understand.  I just want

24 to get to the very essence then, your Honor.

25 //

*Briggs Reporting Company, Inc.*

180

BY MR. CELENTINO:

Q    The Oakstone files at that collapse point, which is a
post-petition point, where did those files go?

A    So this would have been end of April, beginning of May.
The files were transferred from Oakstone to Phoenix because
Phoenix had the capacity to service the files.

Q    Okay.  Understand.  And so the revenue that was
originally LPG's transferred to Oakstone.  And it didn't
come back to LPG.  It came back to Phoenix.

A    So the revenue from the Oakstone files would have paid
into to Phoenix.  And Phoenix would have then had an
obligation to PEC Corporation for some amount of money that
PEC Corporation is still owed on those files.

     Eng disappeared at the beginning of May.  So nobody has
had any contact with him.  We've attempted to reach out to
him, multiple people, and he hasn't responded.

Q    I understand.  You live on a -- you live in a property
located on Cypress.  Is that correct?

A    I do currently reside at a property on Cypress Street.
That's correct.

Q    Reside, yes.

A    In Newport Beach.

          THE COURT:  Cypress in Los Angeles County?
Cypress in the Mediterranean?

          MR. CELENTINO:  Would you tell us the address

*Briggs Reporting Company, Inc.*

**Exhibit "9"**                                             0503

181

1  please?

2          THE COURT:  Where are you talking --

3          THE WITNESS:  So in Newport Beach, off of Birch

4  and Bristol.

5          THE COURT:  Thank you.

6  BY MR. CELENTINO:

7  Q    Off of Birch and Bristol.  What is the address at

8  Cypress?

9  A    20101 Southwest Cypress Street, Newport Beach,

10  California 92660.

11  Q    Thank you.  Do you own that property?

12  A    I do not.

13  Q    Do you rent that property?

14  A    I do.

15  Q    What is the monthly rent?

16  A    The monthly rent right now is at 43,500.

17  Q    Where do you get the money, that 43,500, to pay that

18  monthly rent?

19  A    I haven't since March, so I'm currently three months

20  behind and ready to move out by the end of this month.

21  Q    Okay.  Where did you get the money prior to that?  Was

22  it as you're consultant with these entities?

23  A    So income, both from the work that I did with LPG and

24  work that I did with other entities.

25  Q    I understand.  Okay.  Do you know if Phoenix has paid

182

1  any of the money it's supposed to be paying LPG for that

2  transfer?

3  A    No.  It has never paid any rent to my landlord, nor has

4  it paid me for that rent.

5  Q    Okay.  When the files were transferred from LPG to

6  Phoenix, Phoenix was supposed to pay something for those,

7  correct?

8  A    Phoenix was supposed to pay a residual on the revenue

9  that it collected from the files that came from LPG.  That's

10 correct.

11 Q    And has that happened?

12 A    There was a contract term that we had to finalize.  Mr.

13 Marshack asked that I send him the terms, because he's the

14 only one who could sign the agreement as the trustee once he

15 was appointed on May the 3rd.  I do not believe that

16 agreement was ever executed.  And so the terms were

17 established in principle prior to the transfer, but an

18 agreement was never executed.

19      And in the way of background, at the time of the

20 transfer, the payment processor (indiscernible) was

21 collecting money from all LPG clients regardless of their

22 location and holding the money.  So none of the firms could

23 operate, and all of them were sort of on the verge of

24 collapse.  So it was hard to finalize terms about exactly

25 how the 20-percent residual would be paid through.

183

1    The open question was what we do about the clients that
2  aren't making a payment but have to be serviced, because
3  Phoenix took on some 10,000 clients that don't have any
4  payments due.  But Phoenix had the capacity to service them,
5  and they were asked to service, and they agreed to do so,
6  even though they're doing it for free.  But we had to come
7  up with some method of compensating that batch of clients so
8  that Phoenix doesn't go under.
9  Q    Who made that decision for Phoenix to work for free?
10 A    I think that the decision -- it was a conversation
11 between me and the processing center, which was Prime
12 Logix/Maverick, and then it was conveyed to Ty.  I don't
13 believe Ty ever had a hand in that decision.  I think it was
14 only conveyed to him.
15 Q    Thank you.  My last question.  What vehicle is your
16 primary vehicle?
17 A    Right now, it's a Kia EV6 that a friend of mine gave me
18 yesterday to drive, because I don't currently have one.
19 Q    What happened to the Lamborghini?
20 A    I never owned a Lamborghini, and I'm not sure why
21 people think that I do.  I've had a friend who's -- who has
22 a Lamborghini that he's rented to me from time to time.  He
23 also lists it on Turo.  So when he's not able to rent it, he
24 stores it at my house.  I have a very big garage.
25 Q    Who is that friend?

184

1  A    His name is Keon (phonetic).

2  Q    Keon.  And his last name?

3  A    Fasafi (phonetic).

4  Q    Fasafi.  Was that the car that you were driving on the

5  morning of June 2nd?

6  A    I did drive that to Mr. Marshack's office to meet with

7  Ed Hays when they asked me to meet with them to discuss the

8  temporary restraining order and the -- and that's when they

9  served me with the order, and I did receive the order that

10  morning.

11  Q    And were you paying rent to your friend for the use of

12  the car that day?

13  A    I was not that day.

14  Q    Okay.  I have no further questions.

15         THE COURT:  I would like you to focus --

16         MR. CELENTINO:  Mr. Hays has a few, I think, your

17  Honor.

18         THE COURT:  I would like you to focus in on any

19  dots that you can connect with respect to Greyson Law

20  Center.

21         THE WITNESS:  I'm sorry, your Honor.  Was that for

22  me to respond to?

23         THE COURT:  For -- well, it's -- counsel.

24         MR. CELENTINO:  Your Honor --

25         THE COURT:  Let me put it bluntly, what's Greyson

185

1  Law Center doing in this case?

2          MR. CELENTINO:  I would move -- maybe -- I don't

3  know if you want me to get that from Mr. Diab, but I would

4  move in --

5          THE COURT:  Well, you -- now by me asking that

6  question, you know that I am interested in --

7          MR. CELENTINO:  I know.

8          THE COURT:  -- trying to understand what Greyson

9  Law Center is doing in this case.

10          MR. CELENTINO:  Right, so --

11          THE COURT:  So if you can solicit any information

12  that would help me, that would be great.

13          MR. CELENTINO:  My understanding with Greyson,

14  your Honor, is set forth in the declaration of Ty Carss,

15  which we submitted into evidence.  And I was going to call

16  Ty Carss next.

17          THE COURT:  Okay.  But not this count -- not this

18  witness.

19          MR. CELENTINO:  Not this person.

20          THE COURT:  Would someone like to cross examine or

21  direct examine, briefly, this witness that's related to the

22  preliminary injunction?

23          MS. PHAM:  Very briefly, your Honor.

24          THE COURT:  Please.

25          MS. PHAM:  Thank you.  Just in case you got lost,

186

1  Mr. Diab --

2           THE COURT:  For the record, your appearance.

3           MS. PHAM:  I apologize.  Thank you.  Good

4  afternoon again, your Honor.  Teri Pham, Enenstein Pham and

5  Glass, on behalf of the witness Tony Diab and also Mr. March

6  -- Daniel March.

7           THE COURT:  Sure.

8           MS. PHAM:  Thank you.

9                    CROSS EXAMINATION

10 BY MS. PHAM:

11 Q    Very briefly, Mr. Diab.  Have you ever had any

12 ownership interest in the Debtor, Litigation Practice Group?

13 A    No.

14 Q    You've heard -- we've heard a bunch of different law

15 firms being discussed in terms of receiving client files.  I

16 don't know if the number is six or nine.  Have you ever had

17 any ownership interest in any of those law firms that have

18 mentioned that received any client files?

19 A    No, I have not.

20 Q    Okay.  Gallant was one of them.

21 A    Yes.

22 Q    Any ownership interest in Gallant?

23 A    No.

24 Q    Phoenix?

25 A    No.

187

1  Q    Greyson?

2  A    No.

3  Q    Oakstone?

4  A    No.

5  Q    Consumer Legal Group?

6  A    No.

7  Q    Okay.  And we've heard talk of some payment processors.

8  Have you ever had any ownership interest in any of the

9  payment processors that handled any payments on behalf of

10 Litigation Practice Group?

11 A    No.

12 Q    Have you ever had any ownership interest in any of the

13 payment processors for any of the law firms that we just

14 mentioned?

15 A    No.  None.

16        MS. PHAM:  That's all I have, your Honor.

17        THE COURT:  Well, stay there.

18        MS. PHAM:  Okay.

19        THE COURT:  You gave us a long list of different

20 firms.

21        MS. PHAM:  Yes.

22        THE COURT:  And you've now solicited -- elicited

23 information that he had no ownership interest.  So what was

24 the first -- the Debtor, I think, was the first firm, the

25 Litigation Practice Group, correct?

188

1          MS. PHAM:  Correct.

2          THE COURT:  What compensation, over the last four

3    years, have you received from the Litigation Practice group

4    of any form?  Barter, compensation, W-2, 1099, or anything

5    that wasn't 1099.

6          THE WITNESS:  So direct compensation from LPG

7    would have been by 1099.  But I also did receive indirect

8    compensation through Coast Processing, which was a DBA of

9    B.A.T, Inc.  That was also a 1099 compensation.

10          THE COURT:  And how much did you receive in the

11    last four years?

12          THE WITNESS:  In the last four years, in the

13    aggregate from LPG, direct or indirect, would be somewhere

14    between three and three-and-a-half million.

15          THE COURT:  I'm not asking you for your tax

16    returns.  I'm asking you, have you filed your tax returns

17    for those years?

18          THE WITNESS:  I have not.

19          THE COURT:  Okay.  What was the next firm?

20          MS. PHAM:  Gallant.

21          THE COURT:  Did you ever receive any compensation

22    in any form from that organization?

23          THE WITNESS:  No, neither direct nor indirect.

24          THE COURT:  Okay.

25          THE WITNESS:  If I may -- if I may clarify.

189

1          THE COURT:  Sure.

2          THE WITNESS:  I did stand to receive, in the

3  future, compensation for the referral of marketing

4  affiliates and clients, but it never reached that point.

5          THE COURT:  But why didn't it reach that point?

6          THE WITNESS:  The joint venture fell apart when

7  Nick, the other half of the joint venture, decided he did

8  not want to continue.  And that was November.

9          THE COURT:  Thank you.

10          What was the next company that you solicited

11  information that he didn't own?

12          MS. PHAM:  In fact, you can do it as a group, your

13  Honor, because the answer is going to be the same, but you

14  can go ahead and ask.  Phoenix.

15          THE COURT:  Phoenix.

16          THE WITNESS:  The same.  No compensation direct

17  from Phoenix.

18          MS. PHAM:  Okay.

19          THE COURT:  What about indirect?

20          THE WITNESS:  No compensation indirect.  Although,

21  in the future, again, the anticipation was through referral

22  of marketing companies, once it began onboarding, I did

23  stand to make commissions on that relationship.

24          THE COURT:  So it was your intention to receive

25  compensation for those --  from those entities?

*Briggs Reporting Company, Inc.*

**Exhibit "9"**                                    0512

190

1          THE WITNESS:  In the future, once those

2  relationships were established, yes, your Honor.

3          THE COURT:  And why would you have received

4  compensation from those?

5          THE WITNESS:  Brokering the relationship with

6  these marketing companies that were looking for a home.

7          THE COURT:  What's the next one?

8          MS. PHAM:  Greyson, Oakstone, Consumer Legal

9  Group.

10          THE WITNESS:  Same answer as Phoenix for all

11  three.

12          THE COURT:  Thank you.

13          MS. PHAM:  Just to be clear, you've not received a

14  single dime from any one of those other law firms?

15          THE WITNESS:  Correct, direct nor indirect.

16          THE COURT:  But were you planning to?

17          THE WITNESS:  Yes.  In the future, through the

18  same mechanism.

19          THE COURT:  Okay.

20          MS. PHAM:  Which would have been --

21          THE COURT:  So you would have had they not -- if

22  the -- I don't even know.  What caused you not to receive

23  the compensation that you would have hoped to receive.

24          THE WITNESS:  None of these entities are

25  onboarding clients in any real volume right now.  The

191

 1  entities are all struggling and sort of teetering on the

 2  brink of collapse.  So none of them are in a position to

 3  onboard clients and pay the expensive marketing fees that

 4  are associated with that onboarding.

 5        THE COURT:  Exactly.  So the fact is that you

 6  would have had they succeeded.

 7        THE WITNESS:  Yes.  And they may still succeed in

 8  the future.

 9        THE COURT:  Would you -- are -- would -- are you

10  planning on receiving funds from those successful

11  operations?

12        THE WITNESS:  No, not unless I'm able to broker

13  relationships with them.  So that's a -- there's a step in

14  between that would have to take place.  But it's my hope and

15  my goal, but I don't know whether it's a reality.

16        THE COURT:  Thank you.  That helps a great deal.

17        MS. PHAM:  Just to be clear, would you be

18  receiving any compensation for the -- what we've been

19  calling the transfer of the LPG files to those groups?

20        THE WITNESS:  No, no compensation for that at all.

21        MS. PHAM:  Okay.  None whatsoever with respect to

22  the existing or pre-existing LPG clients, correct?

23        THE WITNESS:  Correct.  Neither direct nor

24  indirect.

25        MS. PHAM:  Okay.  This is for future compensation,

*Briggs Reporting Company, Inc.*

**Exhibit "9"**                                      0514

192

1 to the extent you help or assist in marketing for those

2 entities?

3           THE WITNESS:  In the future, correct, for new

4 clients only.

5           MS. PHAM:  Yeah.  Thank you, your Honor.

6           THE COURT:  Are there any other questions for this

7 witness?

8           MR. CELENTINO:  I have a couple on redirect, I'm

9 sorry.

10           THE COURT:  Thank you.

11                     REDIRECT EXAMINATION

12 BY MR. CELENTINO:

13 Q    Are you the owner of Vulcan?

14 A    I am not, but I am the operator -- the primary operator

15 of Vulcan Consulting Group.

16 Q    Who is the owner of Vulcan Consulting Group?

17 A    The owner -- the sole member is Lisa Cohen.

18 Q    Lisa Cohen.  Okay.  A few weeks ago, Vulcan made the

19 payroll at Phoenix.  Do you know how Vulcan made the payroll

20 at Phoenix?

21 A    Prime had transferred money to Vulcan because Prime's

22 account could not release any further funds, and they didn't

23 have checks.  And so the money was transferred to Vulcan,

24 and Vulcan issued payment to both marketing companies and

25 employees who needed to be paid.  I believe it was on a

*Briggs Reporting Company, Inc.*

193

1 Friday.

2 Q    And do you know where that money came from to Prime?

3 A    The money that went into Prime would have come from

4 Revolv, the payment processor pulling the clients that

5 Phoenix is servicing.

6 Q    You testified to us -- for us earlier that contracts

7 that were at Oakstone post-petition were coming back.  The

8 contracts that were transferred to Oakstone by LPG

9 post-petition were coming back, and they got transferred to

10 Oakstone instead.  I mean, it transferred to Phoenix

11 instead.  Who was the counterparty to the contract that

12 delivered those files, not back to LPG but to Phoenix?

13 A    So at no point were the files coming back to LPG, but

14 there was no contract between Oakstone and Phoenix.  Eng,

15 who would speak on behalf of Oakstone as to his position as

16 a creditor, was unwilling to communicate with anybody.  So

17 no agreements were reached with regard to PEC's interest in

18 the Oakstone files?  To my knowledge, there was no agreement

19 between Scott Eadie or anyone else at Oakstone with Ty or

20 anyone else at Phoenix to transfer the files.  The decision

21 was made because the clients weren't being serviced and

22 Phoenix had the capacity to onboard the clients, and so the

23 clients were transferred.

24 Q    Who caused the clients to be notified that they were

25 now going to Phoenix?

194

1  A    On the Oakstone side -- I'm not sure I could speculate.

2  Han was the administrator in charge of Oakstone, so I

3  believe she would have initiated that process, but I don't

4  know that for a fact.  That's speculation.

5  Q    Okay.  Okay.

6         MR. CELENTINO:  Thank you.

7  BY MR. CELENTINO:

8  Q    I'm sorry, I had forgotten this one.  The assignment of

9  the LPG files to Consumer Law Group was for Consumer Law

10  Group to pay a referral fee for that assignment.  What

11  percentage was that referral fee?

12  A    The negotiated agreement with Consumer Legal Group was

13  40-percent.

14  Q    Okay.  And the negotiated agreement with Phoenix was

15  what?

16  A    Twenty-percent.

17  Q    Why?

18  A    Consumer Legal Group did a really poor job of

19  negotiating.  And so we went back and forth about the

20  pricing, and they agreed to 40-percent, which I thought was

21  generous, but I wasn't going to say no to it.  It's coming

22  to LPG.

23         MR. CELENTINO:  Okay.  Thank you.

24         THE COURT:  Mr. Diab, before you leave, earlier in

25  the day, someone made a crack about people liking you or not

*Briggs Reporting Company, Inc.*

195

1 liking you.  I unfortunately doubled down on that with my

2 own weird sense of humor when I said, "You'll have to get in

3 line."  I want to apologize for that.  That was uncalled

4 for, and I shouldn't have said it.  If I hurt your feelings

5 or if I irritated you, I'm very, very sorry.

6        THE WITNESS:  You did not, no need to apologize.

7 And it is a long list.  Your Honor is correct.

8        THE COURT:  Again, I shouldn't have said it, and I

9 regret it.

10        THE WITNESS:  Thank you, your Honor.

11        THE COURT:  Thank you.

12        Well, Mr. Celentino, would you like to call Mr.

13 Carss now?

14        MR. CELENTINO:  At this late honor -- late hour,

15 your Honor?

16        THE COURT:  I'm not in any rush.

17        MR. CELENTINO:  That's fine.  I was going to move

18 the submission of his declaration.

19        THE COURT:  It is already in the record.  It is

20 submitted.

21        MR. CELENTINO:  Then I call Mr. Carss.

22        THE CLERK:  Please raise your right hand.

23     WILLIAM TAYLOR CARSS - PLAINTIFF'S WITNESS - SWORN

24        THE CLERK:  Please you state your name and spell

25 your name for the record?

**Exhibit "10"**

**Litigation Practice Group Script**

Hello **[CLIENT NAME]**, This is **[YOUR FIRST NAME]** at **[Affiliate Name]**. You were chatting with **[Rep Name]** and I'm calling for your appointment. The notes here say you owe about BLANK. Is that about, right? Great so I'm going to ask you a few questions and we'll go over some options to see what we can do to help. So…

- What type of debt are you dealing with? We can include credit cards, store cards, personal loans, medical bills, collection accounts, repossession.
- And what state are you in?
- Alright and tell me a bit about what happened to create this situation?
- Do you have a co-signer on any of this?
- Are you married? (If yes try to get husband/wife on phone) And this ($$ DEBT AMOUNT) that you have – about how much are you paying per month on that? Is that affordable to you?
- How long have you had this debt? How long have you been paying $$$ for?
- Have you missed any payments? IF YES – Has anybody shown up at your door to serve you a summons or try to take you to court?
- Any idea what your interest rates are - approximately?
- How's your credit? When are your next payments due? CALCULATE HOW MUCH CLIENT PAID ON THIS DEBT OVER TIME: # Months Paid x Avg Payment = $$
- So, you have paid $$ so far on this debt – have you seen the balances go down much - Have you made any progress?!
- So, after you pay your bills, every month are you putting any money in the bank? Wow, so is all your disposable income going towards keeping up on this interest? Do you have savings?
- Are you living paycheck to paycheck because that's what we need to know to help you?
- When are you hoping to retire/how old are you? Are you still using these cards?

When you can't pay off your balances you spend 25-30% extra on everything. Now when you buy $100 worth of groceries, you're paying $300 over 5 years. In the pay forever plan you pay endless interest to maintain and protect your credit to try to avoid collections. It's throwing money into thin air. It sounds like you could really use a lower payment. It would be great for you to pay cash for everything - maybe start an emergency fund.

Americans have been brainwashed to believe that being able to borrow money is important but somehow everybody forgot the lesson about making smart financial decisions and building savings and wealth. Most people have almost no savings but tons of debt. It's a broken system and the problem is miseducation. We were told that building good credit was important but that's how everybody gets into this debt cycle. Nobody learned that what's more important is saving money and building wealth. Most people I talk to make good money but are drowning in debt. Sadly, the credit card companies love you. You're their best type of customer who is sacrificing financial security just to keep up on interest payments and protect your credit score. Credit scores can always be repaired, but you never get back the interest you have paid just by trying to manage and stay afloat.

The lack of an emergency fund is the number one reason people struggle to get out of debt. Without having savings to address the other unexpected expenses that always come up, your only option is to use credit cards to weather these storms, which ruins any progress you've made. These interest rates are criminal. Many of these card companies – big names like bank of America and Citi – they've been sued for millions about their lending practices.

*\*RECAP\* Time to go over what they have told you - Recap how they got here and what the future looks like if they go down this road - how much longer they will likely pay this on this path – and just where they stand.*

**RECAP:** How much they currently \*\*OWE\*\*

**RECAP:** How much monthly:

**RECAP:** How much Yearly:

**RECAP:** Total Paid so far:

**RECAP:** If they have made any progress:

**RECAP:** How much longer they will pay and how much **END WITH:** "It sounds like you are in a debt cycle."

<u>Last Question: So, what made you want to take care of this now?</u>

**PROGRAM SECTION:**

It sounds like that plan isn't working so let's see if we can get you some help. About 90% of people with debt make minimum payments so you're not alone. It's a <u>**pay forever plan**</u> where all you do is pay interest and penalties, and it can take 17-20 years of making minimum payments to get out of this situation. Have you looked at the payoff dates on your statements? **Refer to Hooked on Interest Chart**

Everybody at some point runs into financial difficulty but if you're hoping for a fresh start we can help. I'll go over all your options for dealing with debt, but from what you've told me I already know what you should qualify for. Have you talked to anybody about different programs, or should I go over everything? So, some people do Credit Counseling, or Debt Management. With Credit Counseling you make one payment to all your creditors and pay back 100% of the debt plus interest. You pay back your debt in full plus several years of interest so realistically unless your credit is perfect like 740, a debt management program is still 6-10 years to get out of debt.

*Do you own your home?*

**Exhibit "10"**                                                                                    **0520**

**IF YES:** A lot of our clients first consider Home Equity Loans or Refinancing their houses, draining their 401k's. It's just not a smart financial decision. Any financial advisor will tell you should NEVER secure unsecured debt. If you own your home, you should never consider putting your best asset at risk - And using your tax deferred retirement savings in your 401k to pay unsecured debt puts your future financial security at risk. I want to help you move forward financially not backwards.

- **Consolidation Loans:** They're simply dangerous – everybody thinks "I'm just going to get a loan to pay off my debt and get one payment," but these loans are worse than having multiple payments. They have double digit interest rates often higher than your cards. The idea of having one payment sounds great to everyone, but the reality is you can pay far more in interest with the way they calculate the APR, and once you can't keep up with that giant payment once a month it can be devastating. Unless you can afford a much higher payment than what you pay now monthly you should avoid them at all costs. They can be scary. Plus you're just taking debt from your left hand and putting it in your right. You're not really resolving the debt.

- **Debt Settlement:** You pay about 80% of what you owe. **Have you talked to any debt settlement companies?** Thankfully, you shouldn't need to do debt settlement. It can get ugly because despite what debt settlement companies tell you- all of your accounts go to collections and sit there for years destroying your credit until you've saved up the money to settle. When you finally get a settlement with the collection agency you save a bit of money, but you are not paying off your debt for less, like they want you to believe. Instead, they're settling with a 3rd party collection agency, so it destroys your credit for 4-6 years and leads to owing the IRS and having a giant tax bill. I wouldn't recommend it. Some people do debt settlement thinking that they're paying their bills but just for less money but that's not the case – that's what debt settlement companies want you to believe to make the program sound better, but we enroll for all programs including debt settlement, so we have to tell you how it really works.

- **Bankruptcy:** I don't even want to go there with you or to that extreme. Bankruptcy is expensive. and stays on your Public Record forever. In addition, the time to rehabilitating your credit can be twice to three times as long with bankruptcy as compared to other solutions. But from what you've told me you should qualify for a debt resolution program.

Are you familiar with debt resolution? In a Debt Resolution program, you pay less than half of what you owe, with **ZERO** interest, and won't end up owing the IRS. It's the most affordable way to fix this debt problem and the quickest way to get you a fresh start if you qualify. But what I'll do is pull up your information, figure out which of your accounts are eligible, and see if we can get you an approval – sound good?



*********PULL CREDIT**********

Okay **[Client Name]**, what's your address, your date of birth, and your social. Alright give me a moment and I'm going to pull up your credit report so we can go through each line item…

*1. GET CREDIT REPORT* - Okay **[Client Name]**, your report just popped up. Let's go through this line by line and then we'll put in for approval.

*2. **PAYMENTS*** – *Ask them when their payments are due – "Let's get you started before you waste anymore payments towards interest. Find out how much they paid on each debt -when they last paid – and WRITE INFORMATION IN VANILLASOFT.*

*3. **Tell them you're putting everything in for approval:*** Alright so I'm able to include a total of **[REFRESH CALCULATOR ON RIGHT]** in debt and a total of **[Number of Accounts]** accounts and I'm putting this in for an approval now. Bear with me…

---

*REITERATE THEIR SITUATION AND WHY THIS WILL HELP*

---

After going over your credit report it's clear to me why this debt is preventing you from getting ahead. Like so many people who call us you're using high interest credit cards as part of your budget which prevents you from having money in the bank. Unfortunately, you got used to being in debt, where every $30-dollar purchase costs you $100 over 3 years because you pay interest on it. When is your next payment due again? (Wait for answer)

Credit scores can always be repaired, but you will never get back the money spent on interest just trying to stay afloat. You've paid over (INSERT AMOUNT) over last (# of YEARS) mostly towards interest and you've made no progress. If you continue this plan what's going to change? You're looking at 15 plus years until you pay off this debt. We can get you some help and a fresh start. I want to help you have money again and use a debit card instead of high interest credit cards that put you in this situation. Right now, the payments you're making to maintain this debt are directly preventing you from being able to put money in the bank and save for the future. When something does come up that you're not expecting, you get behind again because you're paying interest instead of building an emergency fund. Do you see how you are in a debt cycle? When was the last time you had money in your bank that wasn't going towards upcoming bills?

---

***4. QUOTE THE CLIENT****: Determine payment that works. Aim for the highest payment you believe they can afford - If the client cannot do it extend and extend again. (If they ask for something lower than the 3rd payment, quote them out at 36 months).*

---

Alright, so just bear with me a moment, I'm trying to move some numbers around to see the best possible deal I can get you but most importantly make it, so you succeed in this program.

*CLOSE 1:* **Good News, I can get you on an "#" month program with a first payment of "$$$" and then "$$$" per month for "#" months. You're going to save "x" every month and "x" in principal right off the bat, plus you pay zero interest instead of all that interest you're paying every year that has kept you in the debt cycle.**

**CAN YOU AFFORD "$$$$" PER MONTH TO FIX YOUR DEBT PROBLEM??**

*If YES –* **Continue & Run!** Alright, let me walk you through the process so you understand how this works. We are enrolling you with Litigation Practice Group, who are experienced debt resolution

attorneys. They will resolve your debt problem. **For our clients, they have chosen to stop making their payments to their current creditors**. Although it will affect your credit while you are in the program, many of our clients that graduate the program and are back to good credit standing. Most clients are not too concerned about the short-term effect on credit if they know they can be out of debt and back to normal credit standing on average within 3 years.

Once you are enrolled in LPG's resolution program, the attorneys send out a dispute package to each creditor and/or collection agency demanding that they provide the correct documentation and proof of their right to collect from you pursuant to state and federal law. If the creditors and collection agencies are unable to provide accurate documentation, which we find is often the case, the debt is classified as invalid and unable to be collected upon. Typically, if you don't pay a creditor for about 3-5 months, they sell your debt to a collection agency for pennies. In addition to that, they've already made their money back on the interest you've been paying AND they get a tax write-off. Now when those original creditors sell your debt to a collection agency, again they sell it for pennies on the dollar without the legal right to collect which is the paperwork you signed with your ORIGINAL creditor. **But, if you remember, you most likely applied online with no real signature or application or paperwork. That's where the issues start. You were never properly qualified for these accounts and in direct conflict with all the lending laws put into place to protect you**.

These creditors have your private information on them and are legally protected by the consumer protection laws and privacy rights put in place by congress. Under the "Fair Debt Collections Practices Act" any debt collector has to prove their legal right to collect money from you, but it's only when you make them prove it, that is where the attorneys at LPG come in to help you. A lot of people don't understand the way the laws and legal process so, let's put it in English for you, we're going to use your (highest debt on credit report) for example. If you stop paying on your (debt) for 3-5 months while LPG demands they validate the account, they are going to sell your debt to a collection agency, everybody knows that part.

Now here is what 99% of people don't know, when (debt) sells your debt to, let's say ABC collection agency, they are going to sell it for pennies on the dollar. When (debt) sells your debt to Bob, you no longer owe (debt) ANYTHING, you owe ABC collection agency. (debt) has made their money back in interest alone that covers them for the debt, they are also going to get a tax write off. These credit card companies never lose a penny on anyone, they always get their money back. When (debt) sells your debt it is illegal for (debt) to give ABC collection agency the original paperwork you signed with (debt) because it has your private information on it, like your social, date of birth, and your street address. Once that debt is sold to ABC collection agency, these Attorneys with LPG are ALL over ABC, demanding to see that paperwork. When ABC cannot produce that paperwork, that debt becomes invalid. What that means to you is, you no longer owe ABC collection agency anything and remember (debt) they have already sold off your debt and been paid so you're not obligated to pay either of them anything. The attorneys will send you a letter in the mail as proof that you no longer owe this debt to anyone. **This process continues for all your accounts until they are all resolved. You are also represented through the statute of limitations, meaning if the debt comes back, LPG resolves it again and again until it's completely gone.**

*Refer to FDCPA doc for explanation.*

Does that make MORE sense?

"Address any doubt that comes."

Did you understand my explanation better?

LPG's team has worked in business law since 1982 in both state and federal courts. That's a huge advantage for our clients when it comes to invalidating debt as they know how the big creditors work. **They utilize all the consumer protection and lending laws such as the FDCPA, FCRA, FCBA, the credit card act of 2009, the Truth in Lending Act and predatory lending laws.** Many people ask what happens if the debt is not invalidated. Although rare, it does happen. LPG guarantees its services so if the debt is not invalidated, then your worst-case scenario is that they swap to debt settlement. If for some reason a debt came back valid then any money that was spent towards the validation process on that debt would be refunded back and reallocated towards settlement fees. In that case the LPG attorneys would help settle the debt for you with that creditor. Even if an account gets a summons, you will have an attorney representing you with no additional fees, giving you the ability to break your debt cycle with confidence because you have an attorney by your side seeing the process through to completion. But most importantly with LPG, paying back your debt doesn't become a life sentence. Do you see how that will help you finally break this debt cycle? I know it was a long explanation – do you have any questions for me?

Alright so again I want to make it clear that the payments you're making are not going towards your debt - because that would be debt settlement- but instead they're going to pay LPG - those are their **retainer** - to resolve these accounts and help your credit worthiness which is why this program is half the cost of a straight debt settlement program. So, in order to help you solve this debt problem in under two years I broke the **retainer** into manageable payments so you can affordably get through this program, hopefully get some payment relief, and maybe even start an emergency fund. And of course, the most important goal I had is to help you finally get your financial life back in order by eliminating this debt and all the interest so you can start saving money again.

**Close 2: Okay, so ($$$) per month for (# of months) and you're out from under it. Our job is to make sure you succeed in this program. Is $$$ per month going to be manageable for you to get by without having to put money back on your credit cards each month so we can fix this debt problem for good, get you back to a good credit standing, and get you a fresh start?**

*PRE-Docs Showing Future:* **Okay, you and I need to do some paperwork and then I'll send everything for e-sign, and I'm going to schedule you for a Welcome Call**. Litigation Practice Group customer service will reach out to you a bunch in the first few months of the program for updates and progress reports so **what's the best time of day to reach you?** And the best number?

*SET PAYMENT:* **Can we process your first payment BLANK (think about when they said their payments are due – maybe go 7 days out?) so we can get started?** *(If nothing else ask when next pay day is).* **And is the BLANK** *(keep same day if possible)* **of the month good for you. So, you'll have your first payment on (DATE) and then monthly on every (DAY) of the month.**

*BANKING:* **Alright and do you want to use a checking or savings account for the payments? Is that in your name? Let's start with the routing number first please – and the account?**

---

*Docs. This is simply getting the client's info necessary to generate docs.*

---

Ok. Now I'm going to send you everything for Clixsign – have you done an Clixsign before? Okay, I'll walk you through each page and make sure you understand everything and that all your information is correct.

---

*\*\*\*\*\*\*\*\*\*\*\*\*\*SEND ESIGN – GO OVER IT\*\*\*\*\*\*\*\*\*\*\*\*\*\**

---

You are looking for an email from Debt Pay Pro. Once you click on it you will see a link that will take you to the document. When the window opens the first thing you will see is a box asking you to create a signature and an initial that will be displayed where it's required. Now you should see the agreement with the Litigation Practice Group at the top of the page. We are going to go through the documents together, it's very simple, but at any time if you have any questions, please stop me so we can address them as they come.

**Legal Services:** The first section describes the legal debt services program you are enrolling in. You are hiring attorneys to assist you with invalidating your debt.

**Client Authorization:** This allows LPG to speak on your behalf to the different entities that are required to perform these services. That would include: Your creditors, collection agencies, and the 3 credit reporting agencies.

**Description of services to be performed:** This is the program services provided by LPG. LPG will review and analyze your credit report to develop a strategy to invalidate your debts. LPG will utilize all consumer protection laws to achieve your goal of resolving these debts. Once LPG has proven that the 3rd party entities do not have the legal right to collect, the debt has been invalidated and no further attempts to collect can be made by anyone. The second paragraph covers any action taken should you receive a summons on any of your accounts. At no additional fee, LPG will represent you in negotiating a settlement for this account. If any of your accounts have already issued you a summons prior to signing this agreement, a fee of $500.00 will be charged to represent you. You are not currently being sued on any of these accounts, right? (NO) good, so that fee does not apply to you.

**Fees:** This section is to confirm there are no additional, or hidden fees. The monthly payment and term show further down on this agreement is the amount you pay for these services.

**Refund Policy:** If any of your enrolled accounts are fully validated by the creditor during the process, you are entitled to a refund of the fees paid towards that account. You have the option to transition that account towards a settlement and any refund owed can be put towards that process.

**Debt Settlement:** Any validated account that you choose to transition to settlement is removed from your program cost and your payments are adjusted to reflect a lower total debt amount. There are no additional fees for settling the account however you would be responsible for paying the settlement to the creditor.

**Actions Required of you:** You only have one role in this entire process. Send in any and all correspondence from the creditors or collection agencies. That includes emails and phone calls as well.

**Right to Conduct Business and to contact you:** This allows LPG to contact you via, Phone, Email, and Text while you are in the program as well as send all documentation electronically on your behalf.

**Client Acknowledgment:** This is your acknowledgement that you are making the decision to stop payments to the creditors voluntarily, that if you are unable to maintain your monthly payments your program may be terminated, there is no guarantee that the accounts will be invalidated and that you are responsible for sending LPG all creditor communication.

**** CLIENT SIGNATURE: CLICK/TAP TO PLACE SIGNATURE****

**Creditor Information**: This is the list of accounts LPG will be assisting you with.

**Client Information:** This is your personal information. Please review this and make sure all information is correct.

**Schedule of Payments:** This is a schedule of your monthly payments and the dates they will be drafted. If any payment falls on a weekend of holiday, it will never come out early, it will always be the next business day. There is a place to initial at the top, this initial is stating you agree to **these payments only.**

**** CLIENT INITAL: CLICK/TAP TO PLACE SIGNATURE****

**Electronic Payment Authorization:** This is your banking information you provided to me. There is a place to Initial and sign to authorize them to debit your account for services rendered. That is the agreement, any questions? (no) Okay let's go back and sign it. If you go back up to client acknowledgments near the top, you will see your first signature. Should be a red tab you can click on. Click that, and it should take you to the next one. There are 4 total. Once you have hit them all a box will appear allowing you to complete the signing. You will click Complete signing and we are done.

**** CLIENT SIGNATURE: CLICK/TAP TO PLACE SIGNATURE****

Okay so I want to go over the process: So, I'm going to make sure you get a Welcome Call from LPG within the next two days or so. You'll receive the Welcome Email, and they'll do a short education and introduction as well to make sure I have covered everything and explained the process correctly. Before I let you go, please remember, **the first 12-24 months** of the program are the most difficult. Also, because you have looked into debt relief, you will probably be getting calls from other companies offering you, their services. Remember, we are an enrollment agency, we offer every debt program there is. Based on your goals we went this route as it provides the most savings with the fastest results to reach them. Please save my number, if you have any questions or concerns along the way, I am still here for you. Last thing, **[account manager]** our accounts manager will be reaching out to you. Their job is to check in on you, and help you navigate through the next steps of the process.

She/He is a great asset for you to make sure your file is always moving forward. She/He will call from a **949** number. Sounds good?

**Educational Outreach Script**

**Page 1**

Hello, I am trying to reach {FIRSTNAME}?

Hi **{FIRSTNAME}**. My name is **{SYSTEMUSER_FIRSTNAME}** and I'm calling from **The Litigation Practice Group on a recorded line.** We are going to handle the **Debt Resolution Program** that you recently enrolled in with **{ASSIGNED_TO}**.

I am calling to welcome you to our program and to discuss your account in detail and how our program will benefit you. I also want to let you know that if you haven't received our welcome package in the mail yet, you will shortly. For security purposes could you please verify the last four digits of your Social Security Number and your date of birth (also acceptable is the address and phone number).

SSN: {SSN}

Date of Birth: {DOB}

First, thank you for choosing The Litigation Practice Group to help you with your financial situation. The program you enrolled in is the **most effective debt resolution program** in the marketplace today because it is designed and operated by attorneys licensed to practice law. **At The Litigation Practice Group, our goal is to not only help you clear your debt, but also to help get you back to a normal credit standing.**  Although you went over our process in detail with **{ASSIGNED_TO}**, it is very important to us that you have any additional questions answered as we begin the process.

**Page 2**

**First, we will immediately give notice to your creditors that you are represented by counsel and that all communication should be directed to your attorneys.** This will ensure that your creditors or any related debt collectors immediately cease communication with you. If throughout the process of resolving your debts, your creditors continue to harass or intimidate you regarding any of your accounts enrolled, **we will review that communication for violations of your rights and immediately file suit against the creditor on your behalf.**

During this initial part of the program, your credit report will undergo an audit and any incorrect or negative items impacting your credit report will be evaluated. For this to be corrected, we will be contacting the credit bureaus to challenge the erroneous information. The initial dispute letters to the credit bureaus and letters or representation to your creditors have been prepared for you and have already been sent out. Please remember that the timeframe for the credit bureaus to investigate and respond is 45-60 days. You should receive any responses in the mail. They will come in a plain white envelope. Please make sure you send those to LPG or upload them in your client portal.

**Page 3**

**Now please keep in mind that the first few months are the most difficult phase in the program. You will most likely start receiving collection calls from the creditors. This is normal. We encourage you to answer these calls and tell the caller that you have hired LPG to represent you for this account and that we are exploring all options including bankruptcy and then politely hang up. That will let them know to contact us and help slow the calls.**

**Any questions so far?**

**Page 4**

To be clear, you have hired us as your law firm and the fees that you pay are for our representation of you. As a result, **we work for you and will do everything in our power to assist you and give meaning to the rights that you have under federal law.**

A few more things before I let you go; throughout this process you have an attorney assisting you and you have the right to speak with an attorney to address any and all questions you have regarding the debts you have hired us to help you resolve.  If at any time you want to speak with an attorney, call us and schedule a time, and one of our attorneys will contact you to discuss whatever issue you wish to address regarding your accounts.

**Page 5**

The Welcome Package has all of this information and more details regarding the program. Please take the time to thoroughly read that welcome package because it gives a lot of great information on the process and what your role is in this program.

**Before we end the call, do you have any questions or clarification?**

It has been such a pleasure speaking with you today **{FIRSTNAME}**, I appreciate your time and your patience. Again, we want to welcome you and we look forward to working with you and assisting you with your program. I hope you have a great day!

Thank you again for trusting us to serve as your attorneys, and do not hesitate to reach out to us if there is anything that we can do to assist you throughout this process.

Before we hang up, I do need read the following disclosure to you:

**<span style="color:red">LPG is a law firm and not a settlement or consolidation company. We do not pay your creditors wit the funds that you pay. Rather those funds go directly to attorney's fees to resolve your debts.</span>**

I would like to confirm that you have been speaking with (YOUR NAME).

Thank you for your time and we look forward to working with you. Have a great day!

# Exhibit "11"

# Litigation Practice Group

**Case #:** ▉▉▉2777

| | | | |
|---|---|---|---|
| **Consumer Info:** | ▉▉▉▉▉▉▉ | **Business Info:** | Litigation Practice Group<br>17542 17th St Ste 100<br>Tustin, CA 92780<br>9497150648 |

**Date Filed:** 8/18/2022 2:15:59 AM

**Nature of the Complaint:** Repair Issues

**Consumer's Original Complaint:**

I signed up for the debt resolution program with the Litigation Practice group in 2020. I was given a total amount need to resolve my agreed debts which I paid in full over the agreed 15 month period. When I received a summons for a judgement being Dwight against me by one of my creditors I sent this information to the group who assigned Legal council. I sent the asked information to this council but they never filled a response or any action on my behalf as was in the agreement terms of my program. Now there is a default judgment against me with a greater debt then I started with. I am infuriated that despite numerous calls I still have not be given the support I was told I would have and am now facing consequences that could have been avoided had I been informed no action would be taken. Seeking help to have either my money returned to me or my agreed upon contact full filled .

**Consumer's Desired Resolution:**

Refund or compliance to agreed services

## Complaint Messages

**08/24/2022 - Madlin Batoon**

Respond to Complaint

We have been in contact with the client's assigned legal counsel and we are working diligently to resolve all her concerns. Our VP of legal compliance will also reached out to client this week to provide further resolution.

# Litigation Practice Group

**Case #:** ███5323

| | | | |
|---|---|---|---|
| **Consumer Info:** | ████████ | **Business Info:** | Litigation Practice Group PO Box 513018 Los Angeles, CA 90051 9497150648 |

**Date Filed:** 11/10/2022 11:59:31 AM

**Nature of the Complaint:** Repair Issues

**Consumer's Original Complaint:**

Litigation Practice Group originally represented to me that they would "invalidate my debts" and if I paid them instead of my creditors, my debts would be resolved through their process. Only later did I realize all they really did was dispute the debt through the credit bureaus. They didn't actually pay any of my creditors although I did pay LPG every month. All my debts still remain. They collected almost $4,000 from me and didn't resolve any of my debts. Further they were supposedly representing me legally for these debts. A creditor sued me and LPG said they would be hiring local counsel to represent me at the hearing and I didn't need to appear. As the court date got closer, LPG stopped returning my calls. A receptionist would answer the phone and always say no one was available and they would call me back but never did. The court date came and luckily I appeared. The judge said if I had not appeared a judgment would be taken against me and LPG was essentially a scam. I am now working with this creditor directly myself to resolve the pending lawsuit.

**Consumer's Desired Resolution:**

Refund

# Complaint Messages

**11/15/2022 - Madlin Batoon**

Respond to Complaint

It is unfortunate that the customer is dissatisfied with our services, because we performed as contracted

A personalized program was developed and agreed upon with the customer, based on the customers debt load and her ability to save.  That program was to last an estimated twenty four months.  She has completed fifteen. The customers settlement aggregate surpasses our target.  The customer was fully educated about our the length of the program during the enrollment process and her signed enrollment documents signify that she both understood and agreed to that. The customer was also educated about the effects of participation in our program.

**Exhibit "11"**                                                                 0534

# Litigation Practice Group

**Case #:** ████0542

| | |
|---|---|
| **Consumer Info:** ████████████ | **Business Info:** Litigation Practice Group<br>17542 17th St Ste 100<br>Tustin, CA 92780<br>9497150648 |

**Date Filed:** 2/24/2023 9:11:08 AM

**Nature of the Complaint:** Refund / Exchange Issues

**Consumer's Original Complaint:**

LPG has destroyed me financially. I enrolled in this program with Litigation Practice Group in September 2020. I paid them $6925, but nothing has been resolved. On June 2022 I found that my bank account gets garnished by one of the creditors who took the whole money that I received from my tax return ($5600) and I have another judgment against me because The attorney did not attend the court for both creditors. I called LPG and told me to contact the attorney******. When I called him several times. The only answer that I got from him was, let me see what I could do for you. I did not hear from him or the program for 3 months. I tried to call the lawyer, but his phone disconnected and was no longer working. After several attempts, I managed to speak with an employee MS B*****from the Legal department. She doesn't even know what's going on with my case and I must explain to her that my bank account gets garnished two times from Banc of America and Citibank and sent her all the documents showing the Lawyer did not attend any court day. She apologized to me, and I asked her for my full refund. She did agree to give me my refund and told me that she has to send the refund request to the up manager V*******. I was waiting for my refund until V**** called me and told me I am eligible only for a half refund because they have to pay the lawyer who didn't do anything for me and missed the court day 2 times. I declined the offer then she approved me for $4516 and sent me an e-mail with that on Jan 10, 2023 ( thank you for speaking with me yesterday. I am contacting you to confirm that your refund of $4,516.45 has been approved and will be issued to you as a check within 10 business days. If you have any questions and/or concerns, please feel free to contact me). Of course, I did not get any refund until now. I call and Email Every week MS V**** But no response because the line is always busy if I reach her the only, I got from her is a promise that I will receive my refund by next week. This company ruined my credit which was excellent before I hired them. They destroyed my life. I lost my job, I have a family to take care of. From January 10 2023 waiting for my refund, spend hours on the phone trying to get someone to speak with. I am so stuck and really don't know what to do anymore. Any advice on where to go from here...PLEASE HELP!

**Consumer's Desired Resolution:**

Refund

## Complaint Messages

**03/03/2023 - Madlin Batoon**

Respond to Complaint

# Litigation Practice Group

**Case #:** ▉▉▉8742

| | | | |
|---|---|---|---|
| **Consumer Info:** | ▉▉▉▉▉▉ | **Business Info:** | Litigation Practice Group<br>PO Box 513018<br>Los Angeles, CA 90051<br>9497150648 |

**Date Filed:** 3/23/2023 12:00:06 AM

**Nature of the Complaint:** Contract Issues

**Consumer's Original Complaint:**

Approximately three years ago, in 2020. I was attempting to payoff my debt. I received a mailer from the Litigation Practice Law Group which included four of the highest balances of my debtors. The total balance of all of my combined debts was approximately $17,000. I placed a phone call to the Litigation Practice Law Group attorney. I expressed exactly what my desires were regarding payoff of all of my debts. The attorney explained that four of my debt would be consolidated. In order to settle the debts via payment plan, would be $296.00 per month for three years. I commenced to making monthly payments from that point on for a total of two and a half years. Monthly payments were withdrawn from my Checking account in the amount of $296.00 directly paid to the Litigation Practice Law Group. Payments were made faithfully, no payments were ever missed. Periodically I received phone calls from the Litigation Practice Law Group trying to ascertain whether I had been receiving correspondence from any of my debtors. I assured them that I had not been receiving any calls or correspondence at that time. I would inquire as to whether or not my debts had been paid or not, to which the attorney that I spoke with assured me that they were being time. All phone calls to this office had been recorded. One day out of the blue, two deputy Sheriff's appeared at my residence to serve me a summons to appear in court. A civil lawsuit was filed against me on 10 January 2022, I was totally appalled, shocked, and humiliated by the Sheriffs' presence. Immediately after I was served the subpoena, I contacted the Litigation Practice Law Group and spoke with an attorney advising her of the summons for me to appear in court. I was extremely upset with the fact that Sheriff's were serving me with a subpoena to appear in court on a matter that I had been assured that the Litigation Practice Law Group had been paying my debtors, as agreed. The attorney assured me that there was no cause for alarm because the debtors were in fact being paid as agreed. She further explained that when you appear in court, they will have an attorney there to represent you. Prior to my court date, I contacted the attorney that was supposed to be representing me in court. When I appeared in court, the judge informed me that the case had been removed from the docket by the attorney(s) representing Synchrony Bank and Litigation Practice Group. At that point I was under the impression that the case had been settled between both parties. After I left court, I contacted the Litigation Practice Law Group and inquired as to why was I not informed that the court date had been cancelled. Afterwards, I had received several calls from the Litigation Practice Law Group inquiring as to whether or not I had been receiving any calls from any of my creditors, to which I would reply that I had not received any calls or correspondence from any creditors. I would always ask if my bills were being paid, to which the attorney would always reply, yes, they are all being

paid. In November 2022, I received a phone call from an attorney from the Litigation Practice Law Group, informing me that it is urgent that I go online to receive and sign the Consent Judgment. At that time, I expressed to the attorney my disbelief that I would be required to pay anything since I had already paid the Litigation Practice Law Group almost $8,000.00, to which he explained that he agreed with me and that they would waive the last six payments. I then asked the attorney whether I would receive any of my money back to which he referred me to the finance department. They agreed to pay me $5,500.00 and that they would keep $2,400 for attorney's fees and that I would receive a check within fourteen days. After ten days, I contacted the law group, and they explained that they had four more days in which to send the check. After fourteen days, they advised that they would not be refunding any money because I had not given them a chance to represent me fully. The second reason was they are not a debt consolidation company. I received a Consent Judgment for my signature, via e-mail. The purpose was for me to resume paying Synchrony Bank the total amount due which they agreed to settle for $10,776.00 for 24 months, at an amount of $449.00 monthly, which I again was totally shocked by. I felt that this was totally unprofessional and that the tactics were not right and fraudulent. This company should not be allowed to operate in this capacity. They knew that they had settled for over a year and had not contacted me,, but continued to take my money.

**Consumer's Desired Resolution:**

Refund

# Litigation Practice Group

**Case #:** ████6595

| | | | |
|---|---|---|---|
| **Consumer Info:** | ██████████ | **Business Info:** | Litigation Practice Group |
| | | | PO Box 513018 |
| | | | Los Angeles, CA 90051 |
| | | | 9497150648 |

**Date Filed:** 3/27/2023 10:00:55 AM

**Nature of the Complaint:** Service Issues

**Consumer's Original Complaint:**

I am another one who fell victim to this company's lies. I was lead to believe my debt invalidation would take 30 months of me making monthly payments of $258.72 for a total of $7620.44 to invalidate $12,908 worth of debt. At the time, my credit was impeccable as I was current with all my creditors. Yet I was up to my eyeballs in debt that would take me 30 years to pay off and I was struggling to pay minimum payments. They led me to believe I needed to stop making payments to my creditors so that my creditors would sell my debt and this would make it easier to invalidate the debt. They told me that my credit would take a hit but they assured me that my credit would be all cleaned up by the 24 month and I would be totally debt free by the 30th months. I was told this every three months since December 2020 when I opened up my case with them. When I had finally had a bad gut feeling that these people were shady we were at the end of my 2nd year and they stopped answering my calls, emails and just began ignoring me. After my 25th payment, which was January 2023 and paying them $6585.56 they transitioned me to another law firm, Oakstone Law firm so they don't have to deal with me. They still took out $258.72 in February 2023 which they weren't supposed to take. After that payment, it made it a grand total of $6844.28 how much I had paid them at the beginning of my 3rd year and I have nothing to show for my money. I tried to call them, and email them to ask for a refund but couldn't get a hold of them no how. Not only am I out $6844.28, the debt is still in my record, my credit is nowhere near the impeccable credit that I once had. Not to mention the total debt increased to $15, 267.00 whereas I was led me to believe my debt would decrease. Now, I am being sued by one of my creditors and I have very little left to address this lawsuit and to fix my credit. I demand a refund from this company. I feel deceived, violated and cheated out of my hard earned money.

**Consumer's Desired Resolution:**

Refund

# Litigation Practice Group

**Case #:** ▮▮▮1242

| | | |
|---|---|---|
| **Consumer Info:** | ▮▮▮ | **Business Info:** Litigation Practice Group |
| | | PO Box 513018 |
| | | Los Angeles, CA 90051 |
| | | 9497150648 |

**Date Filed:** 3/29/2023 9:00:12 PM

**Nature of the Complaint:** Refund / Exchange Issues

**Consumer's Original Complaint:**

On 01/05/22- I received an email from LPG law (email attached) that they would be servicing my debt resolution account that was formerly services by Citadel. In the email it specifically says, "Your file is now being serviced by a law firm, LPG, with licensed counsel in every state. As a result, if you are sued by a creditor, or are being harassed by a creditor and need to sue them, LPG will handle your representation for no additional fee - such service is already included the fees you have paid." Over the next few months, I received tons of email communication and phone calls from LPG with updates to my account. In Sept 2022, I received a summons for one of my accounts which I quickly uploaded to the LPG portal on 09/03/22. I received acknowledge that LPG received the summons and someone even called my to go over my income and monthly expenses. In December 2022, I received an email from someone in the HR Dept where I work that my wages were being garnished. I uploaded the garnishment letter (attached) to LPG law client portal and sent a message but no one responded. So, I scheduled a phone conference and on December 30th, I had a phone conference with Juliette at Litigation Practice Group who said that their office was going to take care of the wage garnishments. My wages continued to get garnished at $1400 per month! So, I scheduled another phone conference and received a google calendar invite for Jan 27th at 11:40 PM with Monica Bahena...she never called me! I scheduled another phone conference and received a google calendar invite for Feb 1st at 1:40 PM with Selena Garcia...she never called me. Now there are no open appointments available on their calendar. It is now almost April and my wages are still getting garnished at $1400/month. I am more in debt and than before paying for this debt consolidation assistance. My family is living off credit cards and the stress is unimaginable.

**Consumer's Desired Resolution:**

Wage garnishments to end.  Refund the amount of the wages garnishments.  Assistance with my debt resolution.

**Exhibit "11"**                                                                                      0539

# Litigation Practice Group

**Case #:** ▮▮▮▮5810

| | | | |
|---|---|---|---|
| **Consumer Info:** |  | **Business Info:** | Litigation Practice Group<br>PO Box 513018<br>Los Angeles, CA 90051<br>9497150648 |

**Date Filed:** 3/30/2023 3:01:12 PM

**Nature of the Complaint:** Refund / Exchange Issues

**Consumer's Original Complaint:**

Our account with LPG has been doubled billed again for at least the 3rd time for $792.80. The date of occurrence was 3/8/2023. We've tried to call via phone and have no resolution, nor been able to discuss with LPG. We've faxed twice now, due to receiving a blocked email message using the mylpglaw.com. We have finally made it thru this nightmare to the last month and they double bill us again. They hide behind the Coast Processing team and just moved us to Consumer Legal Group PC on 3/1/2023 and now we've received notice that we are moving to Phoenix Law as of 3/30. Consumer Legal Group billed us the second time after LPG billed the first.. LPG has been terrible to deal with and horribly represented us legally. We've paid for 18 months and have nothing to show for it. We would have been better off telling the sales lawyer to go away and let us handle our situation on our own. LPG is a predator and needs to be shut down. Our client id is 445786344 Our advice to others is to run away from LPG and will ensure that we reach out to numerous media outlets as well, in order to protect others.

**Consumer's Desired Resolution:**

Refund

## Complaint Messages

### 04/13/2023 - Madlin Batoon

Respond to Complaint

We appreciate you bringing this issue to our attention and we are very grateful for the opportunity to respond. This issue is already escalated the the right department and someone will reach out to you so we can help you resolve this.

We apologize for the inconvenience.

# Litigation Practice Group

**Case #:** ██████3431

| | | |
|---|---|---|
| **Consumer Info:** | ██████████ | |
| **Business Info:** | | Litigation Practice Group<br>PO Box 513018<br>Los Angeles, CA 90051<br>9497150648 |

**Date Filed:** 4/1/2023 11:00:15 AM

**Nature of the Complaint:** Contract Issues

**Consumer's Original Complaint:**

I enrolled with this group over 2 and half years ago. They were to help manage my debt and negotiate on my behalf to stop compounding fines and fees. They starting taking monthly payment from me of $268. I have lawsuits filed against me from creditors because LPG said to stop paying them. Then the lawyer who LPG assigned to my account did not show up for judgement. I received a default judgment. When I called to ask what my result was they assigned my account to a new lawyer. They worked to negotiate payment. LPG has taken over $7000 from me in payment for no results. They then filed for Chp 11 and transferred my account to another similar practice. I am now left owing over $10,000 to creditors, a credit report that is trash and no resolution. I now have to work on my own with creditors, lawyers and possible bank account garnishment. LPG does not return phone calls or emails.

**Consumer's Desired Resolution:**

Correction to a credit report; Contact by the business

# Litigation Practice Group

**Case #:** ███6330

| | |
|---|---|
| **Consumer Info:** ████████ | **Business Info:** Litigation Practice Group<br>PO Box 513018<br>Los Angeles, CA 90051<br>9497150648 |

**Date Filed:** 4/2/2023 1:30:29 PM

**Nature of the Complaint:** Service Issues

**Consumer's Original Complaint:**

Three years ago my wife and I was looking into consolidating some debt. During our search we came across a company called Coast. They offered the best payments and quickest payoff in their "debt relief program". Sounded like a no brainer so we signed up. We were instructed to not pay anymore bills that it would mess up the payoff amounts and timeline. A few months in we started getting letters and phone calls from the companies we owed. After several phone calls and emails to "coast" we find out that the money we were sending them WAS NOT getting distributed to our debts but instead this is a debt invalidation company, we were missled in the beginning But at this point we were already messed up in the middle and they assured us that we would be taken care of by their "team" of lawyers. Coast ended up changing their name to LPG halfway through this. Two years into it I get a summons delivered that one of my debtors was taking me to court, I contacted LPG who said they assigned a local attorney to my case. This local attorney never showed up for court or would ever return emails. They did this twice. Second attorney would return calls but after judgment was filed against me she then admitted that she couldn't practice law in my state and couldn't do anything. I've been calling and emailing LPG with no response or answer. LPG is a scam. That take your money by missleading you then when your in too deep and credit is ruined your left with nothing but bankruptcy. I'm sure they will reply to this saying it has been sent to the appropriate person but that will be another lie.

**Consumer's Desired Resolution:**

Refund

# Litigation Practice Group

**Case #:** ▮17846

| | | | |
|---|---|---|---|
| **Consumer Info:** | ▮ | **Business Info:** | Litigation Practice Group<br>PO Box 513018<br>Los Angeles, CA 90051<br>9497150648 |

**Date Filed:** 4/10/2023 2:30:08 PM

**Nature of the Complaint:** Billing or Collection Issues

**Consumer's Original Complaint:**

In February of 2023 I signed up as a client with Litigation Practice Group to do a Debt Resolution on my Credit cards. They sent paperwork telling me how they would proceed and how the program works. Then, after giving them all of my information, they referred me to another Law Practice called Consumer Legal Group. Litigation Practice group was supposed to transfer my file to CLG but CLG keeps saying that LPG hasn't sent them yet. I was supposed to fill out and sign consent forms and return them to CLG , but CLG says they can't send them until LPG sends my file to them. I have tried to contact LPG through many ways, email , Client Portal, and Phone and never get a response. I have already notified my creditors that I am going through a debt resolution through CLG and was originally told by LPG that I was to give them CLG's phone number to contact regarding my accounts. That is the same phone number I tried to contact CLG at and cannot reach anyone( even by being on hold for hours!). CLG is deducting $251.30 from my checking account monthly ( both March 2023 and April 2023 so far). Meanwhile my creditors keep calling saying that they have heard NOTHING from CLG and that they need consent forms signed by me to even speak to them. Forms that I have never been sent by CLG. They have provided ZERO service to me but have taken my money!! LPG, the original group I started with has all my my credit card info: Account numbers, Exp dates, codes on the back of all of the cards, and my checking account info where the money is being removed monthly by CLG. I can reach NEITHER company for anything, information, updates. NO voice to voice contact has been successfully made to either company. Meanwhile my credit card companies are charging me late fees and this is destroying my credit rather than helping to fix it. UPDATE: Successfully Contacted CLG, they are refunding what they removed from my bank account. Still trying to successfully contact LPG.

**Consumer's Desired Resolution:**

Refund

**Exhibit "11"**                                                                 0543

# Litigation Practice Group

**Case #:** ████4847

| | | | |
|---|---|---|---|
| **Consumer Info:** | ████████ | **Business Info:** | Litigation Practice Group<br>PO Box 513018<br>Los Angeles, CA 90051<br>9497150648 |

**Date Filed:** 4/17/2023 12:00:53 PM

**Nature of the Complaint:** Repair Issues

**Consumer's Original Complaint:**

I was told that when I signed up with Litigation Practice Group and paid the fee that they would help to repair my credit and that it could take two years to see results. The service would cover if I had to go to court, a lawyer would be in court to represent me, as well as they would work on validating debt and debt settlement. It's been 2 years and 4 months since i signed the contract and NOTHING has been done on my credit. They tell me they are working on it and to watch my mail for responses from creditors, but since I'm not even receiving responses from creditors I have a hard time believing they are doing anything with my credit. Now here's the part that frustrates me most, I was summoned to court on a debt and LPG told me that this debt wasn't covered by my contract. They told me they would be charging me $500 for the lawyer to respond to the summons, I agreed, but then the lawyer ended up having me call the creditor myself to negotiate a settlement and never did respond to the summons or the court, now I cannot get a hold of anyone for anything and they won't call me when I used the scheduler for a return call. I have been taken for a little over $5,300 by this company- it's all been a scam! My credit has not seen any changes and they give me a generic explanation every time saying they're "reaching out to creditors" and that it takes two years to see any changes- the two years is up, there have been no changes, they do not communicate with me. I have tried calling them repeatedly and it's always busy, I tried texting them from a number they have texted me from- nothing. I have tried to setup calls on their calendar service and they'll text that someone will call soon and no one calls. I'm frustrated, I've done everything they told me to do and I have seen no evidence to support that they are doing what they claimed to be doing for the fee that I was charged.

**Consumer's Desired Resolution:**

Billing Adjustment

# Litigation Practice Group

**Case #:** ▮▮▮▮5604

| | |
|---|---|
| **Consumer Info:** ▮▮▮▮▮▮ | **Business Info:** Litigation Practice Group<br>PO Box 513018<br>Los Angeles, CA 90051<br><br>http://litigationpracticegroup.com |

**Date Filed:** 5/2/2023 12:23:38 PM

**Nature of the Complaint:** Billing or Collection Issues

**Consumer's Original Complaint:**

I enrolled a contact with LPG to take care of credit cards and other debts that I had. I paid the company $384 a month for 3 years. My last payment was made on 1/3/23. In June of 2022, I received a summon from Goldman Sachs regarding my debt with them so I forward the paperwork to LPG. They acknowledged that you received the information and that they would be handling it and that I didn't have to do anything else.. Well approximately 8 months later I received a certified letter of garnishment from Goldman Sachs stating that they was garnishing my bank account. When I pulled up my account, that had garnishment everything I had in my checking and saving account with my bank. Totaling over $3,800. I tried to get in contact with LPG to find that the company was no longer in business .. all email came back. When I called the number it goes to Phoenix Law Service who tell me that they have taken over my account but cannot help me with this garnishment because it was assigned to an attorney with LPG but the attorney can not be reach. With all of that being said, I'm out the $27, 648.00 that I paid LPG and other 3,800 that was garnished. Plus, I may be garnished again for the remaining balance that is owed to Goldman Sachs. I want this company to refund the amount garnished and to fulfill their obligation of settling my account with my creditor.

**Consumer's Desired Resolution:**

Refund

# Litigation Practice Group

**Case #:** ███6950

| | | | |
|---|---|---|---|
| **Consumer Info:** | ████ | **Business Info:** | Litigation Practice Group<br>PO Box 513018<br>Los Angeles, CA 90051<br>9497150648 |

**Date Filed:** 5/31/2023 5:00:45 PM

**Nature of the Complaint:** Service Issues

**Consumer's Original Complaint:**

I paid $312.00 for 30 months for this company to pay off my credit card I have not heard anything from them, and my daughter called with me on 3 way calling and was told the company went bankrupt and that Phoenix Law group had taken over and they were "ripping" apart the files to figure out what they needed to do. However, Cole, at Phoenix Law group said they were only on retainer, and that the $10,000 I had paid LPG was only for Phoenix to be on retainer and not to pay off card. The bank has no information from either company to try and settle the loan payoff. They stated that the amount is now over $17,000 owed bc no payments have been made in over 3 years. I was told by LPG that they would be paying off this account, which started out at $10,000. PLG said they would not be helping me to get the $10,000 back, but they were on retainer, but couldn't tell me how they would be helping. so, my complaint is with both companies. I am 73 years old and only have an income $600. I need help. I'm sure my credit is also now ruined.

**Consumer's Desired Resolution:**

Refund

# Litigation Practice Group

**Case #:** ████1007

| | | | |
|---|---|---|---|
| **Consumer Info:** | ████████ | **Business Info:** | Litigation Practice Group |
| | ████████ | | PO Box 513018 |
| | ████████ | | Los Angeles, CA 90051 |
| | ████████ | | 9497150648 |

**Date Filed:** 2/24/2023 11:57:32 AM

**Nature of the Complaint:** Billing or Collection Issues

**Consumer's Original Complaint:**

In September 2022, I was sold on using the debt dispute services of Litigation Practice Group (LPG) by a 3rd party company called Point Break Financial. In October, 2022, LPG began withdrawing their fee from my bank account in the amount of $288.60/month for a total 24 payments. At first, LPG seemed to be doing what they said they would but that turned out to be a lie. They said they'd sent dispute and cease collection notices to creditors, but I've since learned they hadn't sent them to all my creditors. In February, 2023, LPG Law attempted to debit a second payment from my bank account. I was forced to put a stop payment on the second charge to prevent my account from being overdrawn. Since then, I have attempted daily to contact LPG Law by telephone, email and text, as well as through their client portal. LPG Law is not answering the phone or responding to any attempts to speak with anyone. Only a few of my creditors have received cease-and-desist letters and NONE have received Powers of Attorney from LPG Law. LPG Law has caused me major damage. While I was in debt before hiring LPG Law, I was making payments on time. Now, my credit is seriously ruined. LPG Law is evidently not a legitimate business and appears to have disappeared. On February 22, 2023, I received an email from a Phoenix Law Co. saying they'd purchased my LPG account and that this new law firm would be handling my case. I've discovered Phoenix is a new company that just opened in January, 2023. Phoenix's principal owner is Ty Carss, who until December, 2022, was doing estate planning and bankruptcy law in Carlsbad, CA. I caught Phoenix reps in several lies. I suspect that Phoenix is a reincarnation of LPG Law. I want to cancel the contract and stop all further payments to Phoenix/LPG Law. Furthermore, I am demanding an immediate full refund of all money paid to LPG Law in the amount of $1,154.40. I want my money back!

**Consumer's Desired Resolution:**

Billing Adjustment

# Litigation Practice Group

**Case #:** ████2884

| | | | |
|---|---|---|---|
| **Consumer Info:** | ████████ | **Business Info:** | Litigation Practice Group |
| | ████████ | | PO Box 513018 |
| | ████████ | | Los Angeles, CA 90051 |
| | ████████ | | 9497150648 |

**Date Filed:** 3/1/2023 7:02:55 PM

**Nature of the Complaint:** Billing or Collection Issues

**Consumer's Original Complaint:**

I had a "contract" with this company and not one cease or desist letter has been sent to the previous firm and now my credit has tanked, I tried to call and it seems like my number has been blocked. "Stephanie" was who set my account up and had no problem setting up a payment plan of $274.12 money has been taken out but no work on their end. This company has to be a complete scam that steals money by buying your info then selling it. Please please somebody help as now the other firm is send me to court for the "default" in payments to them. Due to LPG telling me directly to call my bank and stop payments for the other original firm whom they were supposed to be helping me with. I want my money back and "contract" CANCELLED.

**Consumer's Desired Resolution:**

Refund; Contact by the business

# Litigation Practice Group

**Case #:** ███6149

| | | | |
|---|---|---|---|
| **Consumer Info:** | ████████ | **Business Info:** | Litigation Practice Group |
| | ████████ | | PO Box 513018 |
| | ████████ | | Los Angeles, CA 90051 |
| | ████████ | | 9497150648 |

**Date Filed:** 3/28/2023 10:00:04 PM

**Nature of the Complaint:** Customer Service Issues

**Consumer's Original Complaint:**

I enrolled in a debt relief program with LPG on 4 MAR 2022 while fully understanding its terms and conditions. During this time, I was getting letters from collection agencies and notified several times to LPG about an issue dealing with change of ownership from a couple of credit cards that did not show up on the original credit report requested by them. Right after Thanksgiving of 2022, I got sued by 2 creditors and LPG was only able to reach a settlement payment with them (A CLEAR SIGNAL THAT THEIR PROGRAM IS NOT EFFECTIVE). Moreover, I was still getting letters from collection agencies despite the cease and desist communications sent by LPG (and no action whatsoever was taken by the law firm). On 10 FEB 2023 I got an email from LPG telling me that THEY WILL NOT BE ABLE TO CONTINUE REPRESENTING ME AND THAT MY ACCOUNT WAS ALREADY TRANSFERRED TO ANOTHER LAW FIRM: Phoenix Law (this transfer was done unexpectedly, and without any prior consultation with me - a clear UNETHICAL BEHAVIOR displayed by LPG). On 13 FEB 2023 I contacted Phoenix Law regarding the ongoing issues that were NOT taken care by LPG (letters and emails from collection agencies and change of ownership from a couple of credit cards). Phoenix Law told me that as soon as they evaluate the current status of my account they will proceed to take action on those issues. 45 DAYS LATER I AM STILL RECEIVING EMAILS AND LETTERS FROM COLLECTION AGENCIES. Phoenix Law DOESN'T HAVE AN ONLINE CUSTOMER PORTAL WHERE I WOULD BE ABLE TO MONITOR ANY DEVELOPMENTS REGARDING MY ACCOUNT nor did they assign me an account manager. WORST OF ALL, LITIGATION PRACTICE GROUP TOOK MONEY FROM MY BANK ACCOUNT FOR THE PERIOD CORRESPONDING TO THE MONTH OF MARCH 2023 WHILE PHOENIX LAW DID NOT COLLECT ANY FUNDS. Today 28 MAR 2023, I officially ended my relationship with Phoenix Law. This program doesn't work for me, therefore I'M OFFICIALLY REQUESTING A FULL REFUND from LPG the money I have already invested with them for 1 YEAR: $9636.06

**Consumer's Desired Resolution:**

Refund

# Litigation Practice Group

**Case #:** ██████2661

| | | | |
|---|---|---|---|
| **Consumer Info:** | ████████ | **Business Info:** | Litigation Practice Group |
| | | | 17542 17th St Ste 100 |
| | | | Tustin, CA 92780 |
| | | | 9497150648 |

**Date Filed:** 2/6/2023 4:22:57 PM

**Nature of the Complaint:** Billing or Collection Issues

**Consumer's Original Complaint:**

On or about December 16, 2022 I signed on to the LPG Law for help with my credit card and personal loan debts. I was told there would be no upfront fee but on 12-22-2022 $427.04 was debited from my account without a warning. I expected to pay after the services started. On 12-27-2022 I received a message saying that "cease and desist letters" had been sent. The companies did not receive them. I cancelled service on 1-11-2023 because I can't afford the service. On 1-23-2023 LPG debited my account again for $427.04, well after I cancelled. Since 1-23-2023 I have been unable to get anyone to respond to emails or calls to individuals while calls to LPG end after 10 minutes. I have tried nearly every day in hopes of getting to talk to someone. They passed my file to a Consumer group but they had to return it to LPG because they are the company that owes me the money. Calls to LPG ended after a 10 minute wait so I have yet to be successful. This has gone on for over 2 weeks.

**Consumer's Desired Resolution:**

Refund

## Complaint Messages

**02/08/2023 - Madlin Batoon**

Respond to Complaint

Thank you for bringing this issue to our attention. We sincerely apologize that you were charged twice for your account.

This is a terrible mistake caused by a glitch in our billing system, and we're currently looking into how this could have happened.

In the meantime, we will process the full refund. Please allow 3-5 business days for the amount to appear back on your account.

Getting overcharged is a stressful and frustrating ordeal, and we're sorry once again to have put you through that. If there are any other issues or questions, please don't hesitate to contact us.

# Litigation Practice Group

**Case #:** ███9070

| | | | |
|---|---|---|---|
| **Consumer Info:** | ███ | **Business Info:** | Litigation Practice Group |
| | | | 17542 17th St Ste 100 |
| | | | Tustin, CA 92780 |
| | | | 9497150648 |

**Date Filed:** 10/31/2022 4:30:32 PM

**Nature of the Complaint:** Customer Service Issues

**Consumer's Original Complaint:**

while looking through social media i came across an add claiming to help you get out of cc debt. I put in my information and not long after a man from this company name name Laurence contacted me. He asked me if i could afford 256.+ change a month to work with his attorneys so that i could become debt free. He advised to me to stop paying my accounts and to tell the creditors that this law firm was representing me Lpg Law and Attorney March was one of the best. So i agreed because being newly single i was between a rock and a hard place. after a time went by and 1000.00+ dollars in payments later i was still getting harassing's phone calls and letters. i called reached out to Laurence and did not receive an response i sent a message over the email on my account and nothing. So i decided to cancel and file a bbc complaint. when did this i was told that i needed to contact laurence directly he scolded and advised to have the creditors call them directly. i did the calls and correspondence still did not stop. more time went by and i tried to call again i was told now that i had to wait until the companies sold my debt to the debt collections agencies so they could negotiate with them to lower my debt. i was at this point furious. i paid this company to send out a 1 letter to all my creditors and then tell me i have to wait until they sell my debt in order for them to do anything on my account. so i cancelled my account and demanded my 1000.00+ dollars back i paid. ive been ignored and heard nothing.

**Consumer's Desired Resolution:**

Refund

## Complaint Messages

### 11/07/2022 - Madlin Batoon

Respond to Complaint

Attempts have been made to contact the customer; however, their voicemail is full and we have been unable to leave messages.  The customer should contact LPG for further assistance.

# Litigation Practice Group

**Case #:** ████4505

| | | | |
|---|---|---|---|
| **Consumer Info:** | ████ | **Business Info:** | Litigation Practice Group |
| | | | 17542 17th St Ste 100 |
| | | | Tustin, CA 92780 |
| | | | 9497150648 |

**Date Filed:** 4/21/2022 6:13:11 PM

**Nature of the Complaint:** Billing or Collection Issues

**Consumer's Original Complaint:**

Account Number: ████████. Agreement start January- 2021 I hired the company to do debt consolidation over a matter of time through an agreement. I have not been able to get in touch with this business. I don't even know the status of my debt consolidation. I am getting collection notices, subpoenas- finally spoke with the company they mentioned I would get something in the mail but it has been 3 week and I still haven't received anything. I have been making monthly payments that have been consistently coming out of my account. This is the only interaction I have with them. I have been there for 1 year and a 1/2 and all I have been doing is getting charged and no action taken. THEY SHOULD AT LEAST BE PROVIDING UPDATES! This is insane- I just feel like I am getting charged by a company where I cant event speak to someone. They only answer the phone if they think it is someone new. I wanted to know the status of our agreement but at this time due to the unresponsiveness on agreed upon services and my payments being take that i would like my money back for work not done in the agreement

**Consumer's Desired Resolution:**

Refund; Contact by the business

## Complaint Messages

**04/27/2022 - Daniel March**

Respond to Complaint

It's always important for us to cater to our clients needs as much as possible, so we apologize for any inconvenience this has caused you. Your account was escalated to the attention of the appropriate leadership.  The newly assigned legal counsel has been in touch with the client with an update and next steps for the next settlements, We will follow-up again at the end of the week.  We look forward to assisting the client through the successful completion of her program.

# Litigation Practice Group

**Case #:** ██████0551

| | | | |
|---|---|---|---|
| **Consumer Info:** | ██████ | **Business Info:** | Litigation Practice Group |
| | | | 17542 17th St Ste 100 |
| | | | Tustin, CA 92780 |
| | | | 9497150648 |

**Date Filed:** 11/22/2022 9:49:51 AM

**Nature of the Complaint:** Service Issues

**Consumer's Original Complaint:**

I have been attempting to reach a representative by phone and email for two months now. When I try and call, I am put into an endless cue of waiting and my call has never been connected to a person. When the company calls me, it is obvious the person is simply reading a script. When I asked a specific question about how to send documentation that my account has been paid off, I was told to upload letters from my credit counseling company indicating this. I have done this, and TWO MONTHS LATER I have heard nothing from the company. The collection of my monthly amount should cease now that my accounts have been paid off - this is even indicated on the dashboard in my account online!!! It is IMPOSSIBLE to speak with a knowledgeable representative and the customer service AFTER THE DOCUMENTS ARE SIGNED is HORRIBLE.

**Consumer's Desired Resolution:**

Refund; Modification/discontinuance of an advertised claim

# Complaint Messages

### 11/28/2022 - Madlin Batoon

Respond to Complaint

A complete review of the client's account was conducted and revealed that a clerical error had taken place when the customer provided updated information.  We apologize for the inconvenience and frustration that this error caused. We were able to reinstate the customer's settlements and look forward to assisting her with the completion of her program.  Our VP of Customer Relations tried to reach the client to clarify the situation and offer further resolution.

# Litigation Practice Group

**Case #:** ███9682

| | | | |
|---|---|---|---|
| **Consumer Info:** | ███████ | **Business Info:** | Litigation Practice Group |
| | | | 17542 17th St Ste 100 |
| | | | Tustin, CA 92780 |
| | | | 9497150648 |

**Date Filed:** 2/1/2022 6:05:34 PM

**Nature of the Complaint:** Refund / Exchange Issues

**Consumer's Original Complaint:**

I signed up with LPG in June of last year and have been told nothing but they sent cease & desist letters. I have received settlement offers from debtors that I forward to them and they state they are awaiting another 60 days for creditors to remove from my credit profile. Most of my debtors are not listed on my credit profile. I have requested a refund and cancelation of services and no one has responded. I am very unhappy with the service, the almost $600 per month I have been paying could have paid off most of my debts by now.

**Consumer's Desired Resolution:**

Refund

## Complaint Messages

**02/08/2022 - Tony Diab**

Respond to Complaint

 ,

We appreciate you bringing this issue to our attention and we are very grateful for the opportunity to respond. Messages have been left from the appropriate representative. Kindly review your emails and texts and respond accordingly for future assistance.

# Litigation Practice Group

**Case #:** ████5839

| | | | |
|---|---|---|---|
| **Consumer Info:** | ████████ | **Business Info:** | Litigation Practice Group |
| | | | 17542 17th St Ste 100 |
| | | | Tustin, CA 92780 |
| | | | 9497150648 |

**Date Filed:** 3/24/2022 2:50:08 PM

**Nature of the Complaint:** Service Issues

**Consumer's Original Complaint:**

First signed up through "coast processing" in March of last year. Have been sending money monthly ever since. Only thing I've noticed is my chances of improving my credit going down and down. Still receiving collection calls and when I finally reach someone at LPG who claim to take my info down and claim they send out a cease and desist letter it still happens. To the point I could be on the phone for 30 min at a time simply to get a progress report on what it is exactly I'm paying for. I want out of this contract immediately. I have lost enough money to a company that as far as I can see has done nothing to help me. The accounts I've had have been off my credit report now for months and they are still taking my money.

**Consumer's Desired Resolution:**

Cancellation of the program immediately with any refund necessary since my money has been used for nothing as far as I can see

## Complaint Messages

### 03/30/2022 - Daniel March

Respond to Complaint

A complete review of the client's account was conducted and revealed that a technical error had taken place when the client called us.  We apologize for the inconvenience and frustration that this error caused. We were able to reinstate the client's settlements and look forward to assisting him with the completion of his program.  Our legal counsel has been in contact with the customer to inform him of our progress

**Exhibit "11"**                    0555

# Exhibit "12"

IN THE SUPREME COURT OF THE STATE OF NEVADA

IN THE MATTER OF DISCIPLINE OF
TONY DIAB, BAR NO. 12954.

No. 77318

FILED

JAN 14 2019



*ORDER OF DISBARMENT*

This is an automatic review of a Southern Nevada Disciplinary Board hearing panel's recommendation that attorney Tony Diab be disbarred based on violations of RPC 1.3 (diligence), RPC 1.4 (communication), RPC 3.4 (fairness to opposing party or counsel), and RPC 8.4(c) (misconduct). Because no briefs have been filed, this matter stands submitted for decision based on the record. SCR 105(3)(b).

The State Bar has the burden of showing by clear and convincing evidence that Diab committed the violations charged. *In re Discipline of Drakulich*, 111 Nev. 1556, 1566, 908 P.2d 709, 715 (1995). Here, however, the charges alleged in the complaint are deemed admitted because Diab withdrew his answer and requested a default be entered against him, resulting in the panel entering a default. SCR 105(2).

The record therefore establishes that Diab violated the above-referenced rules. He redirected a $375,000 settlement payment, which was to be deposited directly into a client's account, and had it deposited into his own personal bank account. When the client inquired about the settlement payment, Diab falsely asserted that he was negotiating the deposit with the opposing party and went as far as to provide the client with a fraudulent email from opposing counsel contesting the payment. After, the client called

SUPREME COURT
OF
NEVADA

(O) 1947A

**Exhibit "12"**

19- 01887
0586

the opposing party and learned that the payment was made to Diab directly, Diab promised to repay the client but only if the client signed an agreement releasing any claims the client may have against Diab. Needing the funds, the client signed the agreement without having another attorney review it, but the client did not understand that the agreement allowed Diab to keep $372,000 of the $375,000 payment. Once the client retained outside counsel to sue Diab, Diab forged a retainer agreement, which he alleged was signed by the client in person on December 2, 2016, and that provided that Diab could retain the $375,000 as attorney fees. The client, however, provided travel receipts demonstrating that he could not have signed the agreement in person on that day because he was not in California, as alleged by Diab. Diab's former employer eventually settled the matter with the client, agreeing to pay the client $375,000, plus the attorney fees and costs the client incurred in recovering that amount.

Additionally, Diab represented the same client's brother in a criminal matter, in which Diab told to the client and his brother that he had successfully had a warrant for the brother's arrest quashed. Diab even provided the brothers an order quashing the arrest warrant. Diab, however, never made an appearance in the criminal matter or filed anything on behalf of the brother in the matter and the arrest warrant was still pending. The order Diab gave the client and his brother was fraudulent: it was from a different court than the one to which the brother's matter was assigned and included a forged signature of a judge.

Turning to the appropriate discipline, we review the hearing panel's recommendation de novo. SCR 105(3)(b). Although, we "must . . . exercise independent judgment," the panel's recommendation is persuasive. *In re Discipline of Schaefer*, 117 Nev. 496, 515, 25 P.3d 191, 204 (2001). In

determining the appropriate discipline, we weigh four factors: "the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors." *In re Discipline of Lerner*, 124 Nev. 1232, 1246, 197 P.3d 1067, 1077 (2008).

Diab knowingly violated duties to his clients (diligence, communication), the public (failure to maintain personal integrity), and the profession (misconduct). Diab's misconduct injured his clients. Specifically, his client had to retain new counsel to recover the settlement funds and he was deprived of those funds for a period of time preventing him from expanding his business and resulting in a loss of business opportunities. Diab's misconduct also injured the integrity of the profession. The baseline sanction for Diab's misconduct before considering aggravating and mitigating circumstances is disbarment. *See* Standards for Imposing Lawyer Sanctions, *Compendium of Professional Responsibility Rules and Standards*, Standard 5.11 (Am. Bar Ass'n 2017) (providing that disbarment is appropriate if an attorney "engages in serious criminal conduct, a necessary element of which includes ... misrepresentation, fraud, ... misappropriation, or theft" or "engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice").

The record supports the hearing panel's findings of three aggravating circumstances (dishonest or selfish motive, pattern of misconduct, and multiple offenses) and one mitigating circumstance (absence of prior disciplinary record). We agree with the panel that the single mitigating circumstance does not warrant discipline less than disbarment, particularly considering the aggravating circumstances.

Further, because Diab's misconduct was extreme and he went to great lengths to cover up his initial acts of misconduct, including fraudulently creating an email, a retainer agreement, and a district court order, disbarment is appropriate.

       Accordingly, we disbar attorney Tony Diab from the practice of law in Nevada. Such disbarment is irrevocable. SCR 102(1). Diab shall pay the costs of the disciplinary proceedings, including $3,000 under SCR 120, within 30 days from the date of this order. Further, to the extent Diab's actions have not been reported to law enforcement, we direct the State Bar to refer this matter to the appropriate law enforcement agencies. The parties shall comply with SCR 115 and SCR 121.1.

       It is so ORDERED.

_____, C.J.
Gibbons

_____, J.      _____, J.
Pickering                   Hardesty

_____, J.      _____, J.
Parraguirre              Stiglich

_____, J.      _____, J.
Cadish                    Silver

cc:   Chair, Southern Nevada Disciplinary Panel
      Tony M. Diab
      Bar Counsel, State Bar of Nevada
      Executive Director, State Bar of Nevada
      Perry Thompson, Admissions Office, U.S. Supreme Court

**SUPREME COURT**
**FILED**

(State Bar Court No. 17-O-04174)

DEC 11 2019

**Jorge** Navarrete Clerk

S258336

_____
Deputy

# IN THE SUPREME COURT OF CALIFORNIA

### En Banc

In re TONY M. DIAB on Discipline

The court orders that Tony M. Diab (Respondent), State Bar Number 277343, is disbarred from the practice of law in California and that Respondent's name is stricken from the roll of attorneys.

Respondent must comply with California Rules of Court, rule 9.20, and perform the acts specified in subdivisions (a) and (c) of that rule within 30 and 40 calendar days, respectively, after the effective date of this order.

Costs are awarded to the State Bar in accordance with Business and Professions Code section 6086.10 and are enforceable both as provided in Business and Professions Code section 6140.7 and as a money judgment.

**CANTIL-SAKAUYE**

_Chief Justice_

I, Jorge Navarrete, Clerk of the Supreme Court
of the State of California, do hereby certify that the
preceding is a true copy of an order of this Court as
shown by the records of my office.
   Witness my hand and the seal of the Court this
_____ day of **DEC 1 1 2019** 20_____
                    Month
By _____
          Deputy

**Exhibit "12"**                                    **0560**

**PUBLIC MATTER**

**FILED**

SEP 1 2 2018

STATE BAR COURT
CLERK'S OFFICE
LOS ANGELES

1  STATE BAR OF CALIFORNIA
OFFICE OF CHIEF TRIAL COUNSEL
2  MELANIE J. LAWRENCE, No. 230102
INTERIM CHIEF TRIAL COUNSEL
3  JOHN T. KELLEY, No. 193646
ASSISTANT CHIEF TRIAL COUNSEL
4  R. KEVIN BUCHER, No. 132003
SUPERVISING ATTORNEY
5  KIMBERLY G. ANDERSON, No. 150359
SENIOR TRIAL COUNSEL
6  845 South Figueroa Street
Los Angeles, California 90017-2515
7  Telephone: (213) 765-1083

8

9                          STATE BAR COURT

10              HEARING DEPARTMENT - LOS ANGELES

11

12  In the Matter of:                    )  Case No.  17-O-04174
                                         )
13  TONY M. DIAB,                        )  NOTICE OF DISCIPLINARY CHARGES
    No.  277343,                         )
14                                       )
                                         )
15  A Member of the State Bar.           )
                                         )
16

17              <u>**NOTICE - FAILURE TO RESPOND!**</u>

18  **IF YOU FAIL TO FILE A WRITTEN ANSWER TO THIS NOTICE
WITHIN 20 DAYS AFTER SERVICE, OR IF YOU FAIL TO APPEAR AT
19  THE STATE BAR COURT TRIAL:**

20  **(1)  YOUR DEFAULT WILL BE ENTERED;
(2)  YOUR STATUS WILL BE CHANGED TO INACTIVE AND YOU
21        WILL NOT BE PERMITTED TO PRACTICE LAW;
(3)  YOU WILL NOT BE PERMITTED TO PARTICIPATE FURTHER IN
22        THESE PROCEEDINGS UNLESS YOU MAKE A TIMELY MOTION
        AND THE DEFAULT IS SET ASIDE, AND;
23  (4)  YOU SHALL BE SUBJECT TO ADDITIONAL DISCIPLINE.
        SPECIFICALLY, IF YOU FAIL TO TIMELY MOVE TO SET ASIDE
24        OR VACATE YOUR DEFAULT, THIS COURT WILL ENTER AN
        ORDER RECOMMENDING YOUR DISBARMENT WITHOUT
25        FURTHER HEARING OR PROCEEDING. SEE RULE 5.80 ET SEQ.,
        RULES OF PROCEDURE OF THE STATE BAR OF CALIFORNIA.**

26

27

28

kwiktag®   237 304 999

The State Bar of California alleges:

<u>JURISDICTION</u>

1.  TONY M. DIAB ("respondent") was admitted to the practice of law in the State of California on June 29, 2011, was a member at all times pertinent to these charges, and is currently a member of the State Bar of California.

<div align="center">
COUNT ONE<br>
Case No. 17-O-04174<br>
Rules of Professional Conduct, Rule 3-110(A)<br>
[Failure to Perform with Competence]
</div>

2.  On or about July 6, 2016, Vishal Chamaria ("Vishal") employed respondent to perform legal services, namely to defend Vishal in a personal injury case entitled *California Automobile Ins. Co. v. Vishal Chamaria,* Riverside County (California) Superior Court, case no. RIC1606614, which respondent intentionally, recklessly, or repeatedly failed to perform with competence, in willful violation of Rules of Professional Conduct, rule 3-110(A), by the following:

    a.  failing to notify Vishal that respondent was served with a set of requests for admissions on behalf of Vishal;

    b.  failing to respond to the requests for admissions propounded by plaintiff;

    c.  failing to oppose plaintiff's motion to deem requests admitted; and

    d.  failing to inform Vishal that plaintiff's motion to deem requests admitted was granted on January 25, 2017

<div align="center">
COUNT TWO<br>
Case No. 17-O-04174<br>
Business and Professions Code, Section 6068(m)<br>
[Failure to Inform Client of Significant Developments]
</div>

3.  Respondent failed to keep respondent's client, Vishal Chamaria ("Vishal"), reasonably informed of significant developments in the case entitled *California Automobile Ins. Co. v. Vishal Chamaria,* Riverside County (California) Superior Court, case no. RIC1606614, a

<div align="center">
-2-<br>
<strong>Exhibit "12"</strong>
</div>

matter in which respondent had agreed to provide legal services, in willful violation of Business and Professions Code, section 6068(m), by failing to inform the client of the following:

    a.   failing to inform Vishal that requests for admissions were propounded by plaintiff;

    b.   failing to inform Vishal that he had failed to timely respond to the requests for admissions;

    c.   failing to inform Vishal that he had failed to oppose plaintiff's motion to deem requests admitted;

    d.   failing to inform Vishal that plaintiff's motion to deem requests admitted was granted on January 25, 2017; and

    e.   failing to inform Vishal that on or about March 22, 2017, respondent settled the matter at mediation without Vishal's knowledge or consent.

<div align="center">

**COUNT THREE**
Case No. 17-O-04174
Rules of Professional Conduct, Rule 3-510
[Failure to Communicate a Settlement Offer]

</div>

4.  On or about March 22, 2017, while respondent was representing his client, Vishal Chamaria ("Vishal"), in a personal injury case entitled *California Automobile Ins. Co. v. Vishal Chamaria*, Riverside County (California) Superior Court, case no. RIC1606614, respondent learned of a settlement offer, and respondent did not communicate any of the terms or conditions of the offer to Vishal, and settled the matter without Vishal's consent or knowledge, in willful violation of the Rules of Professional Conduct, rule 3-510.

<div align="center">

**COUNT FOUR**
Case No. 17-O-04174
Rules of Professional Conduct, Rule 3-110(A)
[Failure to Perform with Competence]

</div>

5.  On or about  February 20, 2017, Vishal Chamaria ("Vishal") employed respondent to perform legal services, namely to represent his brother, Vivek Chamaria ("Vivek"), in a criminal case entitled *State of Nevada vs. Vivek Chamaria*, Las Vegas Justice Court, case no. 17F01221X, and specifically, to get an outstanding arrest warrant against Vivek quashed.

<div align="center">-3-</div>

1        6.  Between on or about February 20, 2017 and on or about May 9, 2017, respondent

2    failed to take any action to quash the warrant, and thereby intentionally, recklessly, or repeatedly

3    failed to perform with competence, in willful violation of Rules of Professional Conduct, rule 3-

4    110(A).

5    <div style="text-align:center">COUNT FIVE</div>

6    <div style="text-align:center">Case No. 17-O-04174<br>Business and Professions Code, Section 6068(m)</div>

7    <div style="text-align:center">[Failure to Inform Client of Significant Development]</div>

8        7.  Respondent failed to keep respondent's client, Vivek Chamaria ("Vivek"), reasonably

9    informed of significant developments in a matter in which respondent had agreed to provide

10   legal services, by failing to inform Vivek that the arrest warrant in Vivek's criminal case entitled

11   *State of Nevada vs. Vivek Chamaria*, Las Vegas Justice Court, case no. 17F01221X had not been

12   quashed, in willful violation of Business and Professions Code, section 6068(m).

13   <div style="text-align:center">COUNT SIX</div>

14   <div style="text-align:center">Case No. 17-O-04174<br>Business and Professions Code, section 6106</div>

15   <div style="text-align:center">[Moral Turpitude – Misrepresentation to Clients]</div>

16       8.  On or about April 3, 2017, respondent advised his client Vivek Chamaria ("Vivek")

17   and Vivek's brother, Vishal Chamaria ("Vishal"), that he had filed a motion to quash a warrant

18   that had issued against Vivek, in the case entitled *State of Nevada v. Vivek Chamaria*, Las Vegas

19   Justice Court, Case no. 17F01221X ("the criminal case"), that he had attended a hearing on the

20   motion to quash, and that the court had in fact quashed the warrant, when respondent knew that

21   he had not filed a motion to quash the warrant, he had not attended a hearing on a motion to

22   quash, and the court had not issued any order quashing the warrant. Respondent knew that his

23   statements were false and misleading, and respondent thereby committed acts involving moral

24   turpitude, dishonesty or corruption in willful violation of Business and Professions Code, section

25   6106.

26       9.  A violation of section 6106 may result from intentional conduct or grossly negligent

27   conduct. Respondent is charged with committing intentional misrepresentation. However, should

28   the evidence at trial demonstrate that respondent committed misrepresentation as a result of gross

<div style="text-align:center">-4-<br><strong>Exhibit "12"</strong></div>

<div style="text-align:right">0564</div>

1   negligence, respondent must still be found culpable of violating section 6106 because

2   misrepresentation through gross negligence is a lesser included offense of intentional

3   misrepresentation.

4                                    COUNT SEVEN

5                                Case No. 17-O-04174
                         Business and Professions Code, section 6106
6                          [Moral Turpitude – False Pretenses]

7           10. On or about April 11, 2017, respondent sent Vishal and Vivek Chamaria ("the

8   Chamarias") an email, stating that the Court had granted a Motion to Quash Vivek's arrest

9   warrant on April 3, 2017, in the case entitled *State of Nevada v. Vivek Chamaria*, Las Vegas

10  Justice Court, Case no. 17F01221X, when respondent knew the court had not granted a motion to

11  quash Vivek's arrest warrant. Respondent also attached a falsified court order to the April 11,

12  2017 email, with a falsified signature of Judge Amy Chelini, when respondent knew that no such

13  order had issued, and that Judge Chelini had not signed such an order. Respondent thereby

14  committed acts involving moral turpitude, dishonesty or corruption in willful violation of

15  Business and Professions Code, section 6106.

16          11. A violation of section 6106 may result from intentional conduct or grossly negligent

17  conduct. Respondent is charged with committing intentional misrepresentation and falsification

18  of evidence. However, should the evidence at trial demonstrate that respondent committed

19  misrepresentation and falsification of evidence as a result of gross negligence, respondent must

20  still be found culpable of violating section 6106 because misrepresentation through gross

21  negligence is a lesser included offense of intentional misrepresentation.

22                                   COUNT EIGHT

23                               Case No. 17-O-04174
                         Business and Professions Code, section 6106
24                    [Moral Turpitude – Conversion and Misappropriation]
25
            12. Respondent was employed by Vishal and Vivek Chamaria ("the Chamarias") on
26
    December 27, 2016, to review the final draft of a Termination Agreement between P&V L.L.C.,
27
    Chop Shop L.L.C., and Ameritel Management Incorporated ("ATI"), and to obtain payment
28

                                          -5-

1    from ATI relating to the Termination Agreement. On or about May 1, 2017, respondent diverted

2    $375,000.00 in funds belonging to "the Chamarias", owners of P&V L.L.C. and Chop Shop

3    L.L.C., and improperly converted the funds for his own personal benefit.

4         13. On or about May 1, 2017, respondent emailed Adam Sgro ("Sgro"), counsel for ATI,

5    with instructions to wire the $375,000.00 installment  payment owed to the Chamarias, pursuant

6    to the Termination Agreement, into his personal Bank of America account, no. xxxxxxxx1081

7    ("personal account"). The installment payment was scheduled to be deposited into the P&V

8    L.L.C. and Chop Shop L.L.C. business account on or about May 1, 2017, but respondent

9    instructed payment be made to his personal account, representing to Sgro that the wire deposit

10   into his personal account was on behalf of respondent's clients, the Chamarias.

11        14. Respondent knew that he had improperly and dishonestly converted the funds without

12   the knowledge or consent of the Chamarias to divert the $375,000.00 and respondent never

13   informed the Chamarias that he had received the $375,000.00 on or about May 1, 2017. From on

14   or about May 1, 2017, to the present, respondent has intentionally not paid the $375,000.00 owed

15   to the Chamarias, and intentionally converted and misappropriated the funds, thereby committing

16   an act involving moral turpitude, dishonesty or corruption in willful violation of Business and

17   Professions Code, section 6106.

18        15. A violation of section 6106 may result from intentional conduct or grossly negligent

19   conduct.  Respondent is charged with committing an intentional conversion and

20   misappropriation. However, should the evidence at trial demonstrate that respondent converted

21   and misappropriated the funds as a result of grossly negligent conduct, respondent must still be

22   found culpable of violating section 6106 because misappropriation through gross negligence is a

23   lesser included offense of intentional conversion.

24   ///

25   ///

26   ///

27   ///

28

-6-
**Exhibit "12"**                                                                 0566

1

## COUNT NINE

2

Case No. 17-O-04174
Rules of Professional Conduct, Rule 4-100(B)(1)
[Failure to Notify of Receipt of Client Funds]

3

4        16. On or about May 1, 2017, respondent received on behalf of respondent's clients,

5   Vishal and Vivek Chamaria ("the Chamarias"), funds owed to the Chamarias pursuant to a

6   Termination Agreement between P&V L.L.C., Chop Shop L.L.C., and Ameritel Management

7   Incorporated ("ATI"). Respondent failed to notify the Chamarias of respondent's receipt of funds

8   on behalf of the Chamarias, in willful violation of the Rules of Professional Conduct, rule 4-

9   100(B)(1).

10

## COUNT TEN

11

Case No. 17-O-04174
Rules of Professional Conduct, Rule 4-100(A)
[Failure to Deposit Client Funds in Trust Account]

12

13        17. On or about May 1, 2017, respondent received on behalf of respondent's clients,

14  Vishal and Vivek Chamaria ("the Chamarias"), funds owed to the Chamarias pursuant to a

15  Termination Agreement between P&V L.L.C., Chop Shop L.L.C., and Ameritel Management

16  Incorporated ("ATI").  Respondent failed to deposit $375,000.00 in funds received for the benefit

17  of the Chamarias in a Client Trust Account, in willful violation of the Rules of Professional

18  Conduct, rule 4-100(A).

19

## COUNT ELEVEN

Case No. 17-O-04174
Rules of Professional Conduct, Rule 4-100(B)(4)
[Failure to Pay Client Funds Promptly]

20

21        18. On or about May 1, 2017, respondent received, on behalf of respondent's clients,

22  Vishal and Vivek Chamaria ("the Chamarias"), funds owed to the Chamarias as owners of P&V

23  L.L.C. and Chop Shop L.L.C., $375,000.00, pursuant to a Termination Agreement between the

24  Chamarias and Ameritel Management Incorporated ('ATI').  Of this sum, the Chamarias were

25  entitled to the entire $375,000.00. On or about May 1, 2017, the Chamarias first requested

26  payment of the funds, but were informed by respondent that ATI was withholding payment. On

27  or about May 11, 2017, Vishal Chamaria met with respondent in Orange County California, after

28

1   receiving an email from ATI's counsel, Adam Sgro, confirming that the installment payment had

2   been made and received by respondent on May 1, 2017, and demanded immediate payment of

3   the funds. To date, respondent has failed to pay promptly, as requested by respondent's client,

4   $375,000.00 in respondent's possession in willful violation of the Rules of Professional Conduct,

5   rule 4-100(B)(4).

6                                    COUNT TWELVE

7                                 Case No. 17-O-04174
                         Business and Professions Code, section 6106
8                        [Moral Turpitude – Misrepresentation to Clients]

9         19. On or about December 27, 2016, Vishal and Vivek Chamaria ("the Chamarias")

10   employed respondent to review the final draft of a Termination Agreement between the

11   Chamarias, as owners of P&V L.L.C. and Chop Shop L.L.C., and Ameritel Management

12   Incorporated ("ATI") . The Chamarias had negotiated the terms of the agreement themselves,

13   from on or about November 24, 2016 through on or about December 27, 2016, but were advised

14   to seek counsel before executing the final agreement. Respondent obtained a copy of the final

15   draft of the Termination Agreement, and advised his clients to execute it on December 30, 2016.

16        20. Between on or about May 1, 2017 through May 12, 2017, respondent made the

17   following representations to the Chamarias, in connection with his handling the review of the

18   Termination Agreement, when respondent knew or was grossly negligent in not knowing that the

19   representations were false, and thereby committed acts involving moral turpitude, dishonesty or

20   corruption, in willful violation of Business and Professions Code section 6106:

21        a.   On or about May 1, 2017, respondent stated to Vishal Chamaria that ATI was

22             refusing to make the final installment payment of $375,000.00 as a result of an

23             alleged chargeback dispute pursuant to paragraph 4 of the Termination Agreement,

24             when respondent knew there was no such chargeback.

25        b.   Beginning on or about May 1, 2017, when a $375,000.00 installment payment was

26             scheduled to be deposited into the Chamarias' P&V L.L.C. and Chop Shop L.L.C.

27             business account, through on or about May 4, 2017, respondent, via multiple

28             telephone and text messages, represented to the Chamarias that he was in on-going

-8-

**Exhibit "12"**                                                          0568

1    negotiations with ATI's counsel, Adam Sgro ("Sgro"), regarding ATI's delay in

2    payment, when in fact respondent had already received the $375,000.00.

3    c.    On or about May 5, 2017, in furtherance of respondent's representations, he

4    forwarded the Chamarias two separate emails he claimed to have sent to Sgro,

5    disputing the alleged chargebacks, when respondent knew that the emails had been

6    falsified, as respondent himself converted payment of those funds into his personal

7    Bank of America account, no. xxxxxxxx1081 on May 1, 2017, and misappropriated

8    them.

9    d.    On or about May 10, 2017, respondent forwarded a purported email chain between

10    himself and Sgro to the Chamarias. By the contents of those emails, respondent

11    represented to the Chamarias that they were negotiating a $90,000.00 lease dispute,

12    and the reason why the $375,000.00 installment had not been made, when in fact

13    respondent knew the email chain was falsified and had already received the

14    $375,000.00.

15    21. A violation of section 6106 may result from intentional conduct or grossly negligent

16 conduct. Respondent is charged with committing intentional misrepresentations. However,

17 should the evidence at trial demonstrate that respondent committed the misrepresentations as a

18 result of gross negligence, respondent must still be found culpable of violating section 6106

19 because misrepresentation through gross negligence is a lesser included offense of intentional

20 misrepresentation.

21                                   <u>COUNT THIRTEEN</u>

22                                   Case No. 17-O-04174
                          Business and Professions Code, section 6106
23                             [Moral Turpitude - Misrepresentation]

24    22. On or about December 14, 2017 respondent made the following representations to a

25 State Bar investigator, in connection with his handling the review of the Termination Agreement,

26 and his handling of Vivek Chamaria's ("Vivek") criminal matter:

27

28

a.  Respondent stated that he entered into a fee agreement with the Chamarias related to the Termination Agreement between P&V L.L.C., Chop Shop L.L.C., and Ameritel Management Corporation ("ATI"), and attached a copy of the purported fee agreement to his letter responding to the State Bar investigative letter.

b.  Respondent stated that he and Vishal Chamaria ("Vishal") executed a settlement agreement related to the ATI representation, whereby Vishal agreed to take $3,000.00 of the $375,000.00 installment payment from ATI, and the remaining $372,000.00 would remain with respondent as attorney fees.

c.  Respondent stated that he never agreed to represent Vivek Chamaria in his criminal matter, and never received a $7,500.00 flat fee for the representation, but that the $7,500.00 deposit was from the P&V L.L.C. account and was in connection with a different matter respondent was handling for P&V L.L.C.

23. Respondent made these representations when he knew or was grossly negligent in not knowing that the representations were false, and thereby committed acts involving moral turpitude, dishonesty or corruption in willful violation of Business and Professions Code, section 6106.

24. A violation of section 6106 may result from intentional conduct or grossly negligent conduct.  Respondent is charged with committing intentional misrepresentation.  However, should the evidence at trial demonstrate that respondent committed misrepresentation as a result of gross negligence, respondent must still be found culpable of violating section 6106 because misrepresentation through gross negligence is a lesser included offense of intentional misrepresentation.

### NOTICE - INACTIVE ENROLLMENT!

**YOU ARE HEREBY FURTHER NOTIFIED THAT IF THE STATE BAR COURT FINDS, PURSUANT TO BUSINESS AND PROFESSIONS CODE SECTION 6007(c), THAT YOUR CONDUCT POSES A SUBSTANTIAL THREAT OF HARM TO THE INTERESTS OF YOUR CLIENTS OR TO THE PUBLIC, YOU MAY BE INVOLUNTARILY ENROLLED AS AN INACTIVE MEMBER OF THE STATE BAR.  YOUR INACTIVE ENROLLMENT WOULD BE IN ADDITION TO ANY DISCIPLINE RECOMMENDED BY THE COURT.**

-10-

Exhibit "12"

0570

1

2

## NOTICE - COST ASSESSMENT!

3   **IN THE EVENT THESE PROCEDURES RESULT IN PUBLIC
DISCIPLINE, YOU MAY BE SUBJECT TO THE PAYMENT OF COSTS**

4   **INCURRED BY THE STATE BAR IN THE INVESTIGATION, HEARING
AND REVIEW OF THIS MATTER PURSUANT TO BUSINESS AND
PROFESSIONS CODE SECTION 6086.10.**

5

6                                          Respectfully submitted,

7                                          THE STATE BAR OF CALIFORNIA
                                           OFFICE OF CHIEF TRIAL COUNSEL

8

9

10   DATED:  September 12, 2018          By: _____
                                             KIMBERLY G. ANDERSON

11                                           Senior Trial Counsel

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Exhibit "12"**                                                   0571

# DECLARATION OF SERVICE
by
U.S. FIRST-CLASS MAIL / U.S. CERTIFIED MAIL / OVERNIGHT DELIVERY / FACSIMILE-ELECTRONIC TRANSMISSION

CASE NUMBER(s): 17-O-04174

I, the undersigned, am over the age of eighteen (18) years and not a party to the within action, whose business address and place of employment is the State Bar of California, 845 South Figueroa Street, Los Angeles, California 90017, declare that:

- on the date shown below, I caused to be served a true copy of the within document described as follows:

## NOTICE OF DISCIPLINARY CHARGES

☐ **By U.S. First-Class Mail:** (CCP §§ 1013 and 1013(a))      ☒ **By U.S. Certified Mail:** (CCP §§ 1013 and 1013(a))
- in accordance with the practice of the State Bar of California for collection and processing of mail, I deposited or placed for collection and mailing in the City and County
- of Los Angeles.

☐ **By Overnight Delivery:** (CCP §§ 1013(c) and 1013(d))
- I am readily familiar with the State Bar of California's practice for collection and processing of correspondence for overnight delivery by the United Parcel Service ('UPS').

☐ **By Fax Transmission:** (CCP §§ 1013(e) and 1013(f))
Based on agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax numbers listed herein below. No error was reported by the fax machine that I used. The original record of the fax transmission is retained on file and available upon request.

☐ **By Electronic Service:** (CCP § 1010.6)
Based on a court order or an agreement of the parties to accept service by electronic transmission, I caused the documents to be sent to the person(s) at the electronic addresses listed herein below. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

     ☐ *(for U.S. First-Class Mail)* in a sealed envelope placed for collection and mailing at Los Angeles, addressed to: *(see below)*

     ☒ *(for Certified Mail)* in a sealed envelope placed for collection and mailing as certified mail, return receipt requested,
Article No.:    9414 7266 9904 2111 0224 88      at Los Angeles, addressed to: *(see below)*

     ☐ *(for Overnight Delivery)* together with a copy of this declaration, in an envelope, or package designated by UPS,
Tracking No.:          addressed to: *(see below)*

| Person Served | Business-Residential Address | Fax Number | Courtesy Copy to: |
|---|---|---|---|
| TONY M. DIAB | DIAB LAW<br>620 NEWPORT CENTER DR, STE 670<br>NEWPORT BEACH, CA 92660-8055 | Electronic Address | |

☐ **via inter-office mail regularly processed and maintained by the State Bar of California addressed to:**

**N/A**

I am readily familiar with the State Bar of California's practice for collection and processing of correspondence for mailing with the United States Postal Service, and overnight delivery by the United Parcel Service ('UPS'). In the ordinary course of the State Bar of California's practice, correspondence collected and processed by the State Bar of California would be deposited with the United States Postal Service that same day, and for overnight delivery, deposited with delivery fees paid or provided for, with UPS that same day.

I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date on the envelope or package is more than one day after date of deposit for mailing contained in the affidavit.

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct. Executed at Los Angeles, California, on the date shown below.

DATED: September 12, 2018         SIGNED: _____
                                     NATALIE FLORES
                                     Declarant