1 | Christopher B. Ghio (State Bar No. 259094)
Christopher Celentino (State Bar No. 131688)
2 | Yosina M. Lissebeck (State Bar No. 201654)
Jeremy B. Freedman (State Bar No. 308752)
3 | **DINSMORE & SHOHL LLP**
655 West Broadway, Suite 800
4 | San Diego, CA 92101
Telephone:  619.400.0500
5 | Facsimile:  619.400.0501
christopher.ghio@dinsmore.com
6 | christopher.celentino@dinsmore.com
yosina.lissebeck@dinsmore.com
7 | jeremy.freedman@dinsmore.com

8 | Special Counsel to Richard A. Marshack, Chapter 11 Trustee

9

10 | **UNITED STATES BANKRUPTCY COURT**

11 | **CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION**

12

13 | In re:

| Case No.: 8:23-bk-10571-SC

14 | THE LITIGATION PRACTICE GROUP P.C.,

| Chapter 11

15 |      Debtor.

| **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF CHAPTER 11 TRUSTEE RICHARD A. MARSHACK'S SALE MOTION [DK. 136] AND SUPPORTING POCKET BRIEF**

16

17

18 | Date:  July 21, 2023
Time:  10:00 a.m. (pacific time)
Judge: Hon. Scott C. Clarkson
Place:  Courtroom 5C
     411 W. Fourth Street
     Santa Ana, CA  92701

19

20

21

22 | **TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

23 |      Pursuant to Federal Rules of Evidence, Rule 201, adopted by C.D. Cal. Bankr. L.B.R. 7055-

24 | 1, Richard A. Marshack, solely in his capacity as the Chapter 11 Trustee of Litigation Practice Group,

25 | P.C. (the "Trustee") hereby respectfully requests that the Court take judicial notice of the documents

26 | listed below in support of the Trustee's Motion for Entry of an Order (A) Approving Sale, Subject to

27 | Overbid, of Assets Free and Clear of All Liens, Claims, Encumbrances and Interests Pursuant to 11

28 | U.S.C. § 363(b) and (B) Approving Assumption and Assignment of Certain Executory Contracts and

1

Unexpired Leases and Other Agreements [Dk. 136] (the "Sale Motion") and the Pocket Brief in Support of the Sale Motion (the "Pocket Brief"):

1.  CFPB, Bureau of Consumer Financial Protection, *The Consumer Credit Card Market*, September 2021 (https://files.consumerfinance.gov/f/documents/cfpb_consumer-credit-card-market-report_2021.pdf) (last accessed, July 14, 2023), **Exhibit A.**

2.  Bd. of Govs. of the Fed. Reserve System, *G.19, Consumer Credit* (Jan. 2021), https://www.federalreserve.gov/releases/g19/current (last accessed, July 14, 2023), **Exhibit B.**

3.  Purdue Pharma L.P., et al., v, Commonwealth of Massachusetts (In re Purdue Pharma, L.P., Bankr. S.D.N.Y. Case No. 19-23649 (RDD) Adv. Pro. No. 19-08289; Docket #105; Second Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for Preliminary Injunction entered November 6, 2019, **Exhibit C**.

4.  In re Purdue Pharma, L.P., Bankr. S.D.N.Y. Case No. 19-23649 (RDD); Docket #1175; Notice of Filing of Monitor's Report filed May 20, 2020, **Exhibit D**.

Judicial notice is warranted because the documents are a true and correct copies of official public records, related to matters pertaining to a bankruptcy case and the regulatory authority of a public entity of the United States, whose authenticity is capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. *See* Fed. R. Evid. 201(b); *Gerritsen v. Warner Bros. Entm't Inc.*, 112 F. Supp. 3d 1011, 1033 (C.D. Cal. 2015) (the court can take judicial notice of "[p]ublic records and government documents available from reliable sources

///

//

///

///

///

///

///

///

1  on the Internet," such as websites run by governmental agencies), *citations omitted*; *see also, Taylor*

2  *v. IC Sys.*, No. CIV 20-494-TUC-CKJ, 2022 U.S. Dist. LEXIS 182566 (D. Ariz. Oct. 5, 2022)

3  (granting the request for judicial notice of a Consumer Financial Protection Bureau report).

4

5  Dated:  July 17, 2023                          Respectfully submitted,

6                                                 DINSMORE & SHOHL LLP

7

8                                    By:  */s/ Yosina M. Lissebeck*
                                         Christopher B. Ghio
9                                        Christopher Celentino
                                         Yosina M. Lissebeck
10                                       Jeremy Freedman
                                         Special Counsel to Richard A. Marshack,
11                                       Chapter 11 Trustee

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT A**

**BUREAU OF CONSUMER FINANCIAL PROTECTION | SEPTEMBER 2021**

# The Consumer Credit Card Market



# Message from the Acting Director



Credit cards are one of the most commonly-held and widely-used financial products in America — over 175 million Americans hold at least one credit card. During the COVID-19 pandemic, credit cards played a vital role as both a source of credit in emergencies and a payment method as more transactions occurred online.

As the fifth biennial report to Congress on the credit card market, this report details how swift actions by both the public and private sectors likely impacted how many consumers used their credit cards and managed their debts during the pandemic. To address hardships caused by COVID-19, the Federal government provided consumers direct relief by issuing a series of economic impact payments, providing enhanced unemployment benefits, suspending student loan payments and interest accrual for federally held loans, offering mortgage forbearance, and enacting a moratorium on evictions. At the same time, credit card issuers provided voluntary relief to consumers by offering payment deferral and fee waivers.

Supported by these efforts, this report finds that the decline in credit card debt during the pandemic was unprecedented in speed and magnitude. Measures of consumer stress, such as late payment incidence and the share of accounts delinquent, hit record lows.

This report also highlights areas in the credit card market that may entail risks for consumers such as system deficiencies related to implementing relief programs and automatic payment processes. The Bureau continues to monitor indicators of credit card use, cost, and availability to identify potential for consumer harm, as well as study the impact of new, innovative products.

Our credit card market report is intended to present the latest research on this vital market to consumers, issuers, and policymakers. As many consumers, particularly those with non-prime credit scores, still face numerous hardships due to COVID-19, this report remains critical. The Bureau will carry out its mission in ensuring this market continues to benefit all participants during these times of heightened uncertainty.

EXHIBIT A
Page 6

Sincerely,

*David K. Uejio*

David Uejio

EXHIBIT A

Page 7

# Table of contents

**Message from the Acting Director** .......................................................................................1

**Table of contents** ...............................................................................................................3

**Executive summary** ...........................................................................................................5

**1. Introduction** ...............................................................................................................13

    1.1   Review mandate ...................................................................................................13

    1.2   Report scope.........................................................................................................14

    1.3   Methodology.........................................................................................................15

**2. Use of credit** ...........................................................................................................25

    2.1   Product prevalence ..............................................................................................25

    2.2   Debt levels ...........................................................................................................27

    2.3   Purchase volume .................................................................................................31

    2.4   Repayment ...........................................................................................................33

    2.5   Delinquency.........................................................................................................41

    2.6   Charge-off...........................................................................................................44

**3. Cost of credit** ...........................................................................................................46

    3.1   Total cost of credit...............................................................................................46

    3.2   Interest charged...................................................................................................48

    3.3   Fees assessed.......................................................................................................52

**4. Availability of credit** ................................................................................................61

    4.1   New accounts ......................................................................................................61

    4.2   Existing accounts ................................................................................................77

EXHIBIT A
Page 8

**5.    Practices of credit card issuers** ...........................................................**86**

    5.1    Rewards.........................................................................87

    5.2    Deferred interest.............................................................. 91

    5.3    Balance transfers............................................................ 100

    5.4    Cash advances............................................................... 104

    5.5    COVID-19 response........................................................... 108

    5.6    Card agreements ............................................................ 121

**6.    Credit card debt collection** ...........................................**127**

    6.1    Debt collection markets......................................................127

    6.2    Collections prior to charge-off............................................. 131

    6.3    Recovery following charge-off ............................................ 144

    6.4    Litigation ...................................................................153

    6.5    Credit card debt collection during COVID-19........................................155

**7.    Innovation** ..............................................................**158**

    7.1    Product innovation ....................................................... 158

    7.2    Consumer adoption of innovative technologies .................................... 169

**Appendix A:    Supporting figures** ...........................................**177**

# Executive summary

Credit cards are central to the financial lives of over 175 million American consumers. Over the last few years and through 2019, the credit card market, the largest U.S. consumer lending market measured by number of users, continued to grow in almost all measures until suddenly reversing course in March 2020. Despite macroeconomic shocks to the financial system, credit card market conditions remain relatively stable at the time of this report writing, with that stability likely supported by robust fiscal measures, lower consumer discretionary spending, and voluntary industry relief programs.

The COVID-19 pandemic significantly impacted how many consumers used and interacted with credit cards. Far fewer consumers applied for new credit cards in 2020 than the year prior. During the pandemic, existing cardholders paid off the highest share of their credit card debt in recent years. Additionally, late payment and default rates fell to historic lows, most notably for consumers with below-prime scores.

At the same time, credit cards continued to play a vital role as both a payment method and source of credit. Consumers still used their cards to facilitate transactions, smooth consumption, and earn rewards. As physical stores closed and a greater share of commerce was transacted digitally, cardholders benefited from the consumer protections afforded to credit cards such as limitations on liability and enhanced security.

In response to pandemic-related hardship, issuers provided a considerable number of payment deferrals and fee waivers to their cardholders in 2020. However, consumers calling their credit card issuers often faced long wait times to access these relief programs. Additionally, complaints submitted to the Bureau regarding credit cards spiked in the second quarter of 2020 and

remained elevated throughout the year.[1] Overall reported satisfaction with credit cards issuers fell significantly during the pandemic but remained higher than post-Great Recession levels.[2] Despite these indicators of lower consumer satisfaction, credit card issuers continue to generate profitable annual returns consistent with historic levels relative to other market lending activities even with an initial decline during the first half of 2020.[3]

In 2019 and 2020, innovation continued to reshape the credit card market for both users and providers. New providers, including large and small financial institutions as well as startup and mainstream technology companies have entered—or are in the process of entering—the market with competing products, features, and methods for issuing credit cards.[4]

This executive summary provides some background for the report, then summarizes key findings.

**BACKGROUND**

In 2009, Congress passed the Credit Card Accountability Responsibility and Disclosure Act (CARD Act or Act).[5] The Act made substantial changes to the credit card market. The CARD Act mandated new disclosures and underwriting standards, curbed certain fees, and restricted interest rate increases on existing balances. Among the CARD Act's many provisions was a

---

[1] Bureau of Consumer Fin. Prot., *Consumer Response Annual Report*, at 39 (Mar. 2021), https://files.consumerfinance.gov/f/documents/cfpb_2020-consumer-response-annual-report_03-2021.pdf. Billing disputes remain the largest complaint category.

[2] *See* Press Release, J.D. Power, *Customers Losing Faith in Credit Card Issuers as COVID-19 Pandemic Lingers, J.D. Power Finds* (Aug. 20, 2020), https://www.jdpower.com/business/press-releases/2020-us-credit-card-satisfaction-study.

[3] Bd. of Governors for the Fed. Rsrv. Sys., *Report to the Congress on the Profitability of Credit Card Operations of Depository Institutions* (July 2021), https://www.federalreserve.gov/publications/files/ccprofit2021.pdf.

[4] Reference in this report to any specific commercial product, service, firm, or corporation name is for the information and convenience of the public and does not constitute endorsement or recommendation by the Bureau.

[5] The Act superseded a number of earlier regulations that had been finalized, but had not yet become effective, by the Office of Thrift Supervision (OTS), the National Credit Union Administration (NCUA), and the Board of Governors of the Federal Reserve System. Those earlier rules were announced in December of 2008 and published in the Federal Register the following month. *See* 74 FR 5244 (Jan. 29, 2009); 74 FR 5498 (Jan. 29, 2009). The rules were withdrawn in light of the CARD Act. *See* 75 FR 7657, 75 FR 7925 (Feb. 22, 2010).

requirement that the Board of Governors of the Federal Reserve System (Board) report every two years on the state of the consumer credit card market. With the passage of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act) in 2010, that requirement transferred to the Bureau of Consumer Financial Protection (Bureau) alongside broader responsibility for administering most of the CARD Act's provisions. This is the fifth report published pursuant to that obligation, building on prior reports published by the Bureau in 2013, 2015, 2017, and 2019. [6]

The CARD Act was enacted over ten years ago. [7] Since its passage, researchers, including the Bureau, have studied the effects of the CARD Act on the cost and availability of credit to consumers. This year the Bureau conducted a review of rules implementing the Act per section 610 of the Regulatory Flexibility Act, [8] and the Bureau expects to release its determination this fall.

**THE 2021 REPORT**

This report continues the approach of the Bureau's previous reports. The Bureau revisits similar baseline indicators to track key market developments and trends. It also revisits some in-depth topics to assess how the market has changed. For example, the current report updates the deferred interest analysis last conducted in the 2017 Report. The Bureau also discusses the

---

[6] *See* Bureau of Consumer Fin. Prot., *Card Act Report* (Oct. 1, 2013) (2013 Report), http://files.consumerfinance.gov/f/201309_cfpb_card-act-report.pdf; Bureau of Consumer Fin. Prot., *The Consumer Credit Card Market* (Dec. 2015) (2015 Report), http://files.consumerfinance.gov/f/201512_cfpb_report-the-consumer-credit-card-market.pdf; Bureau of Consumer Fin. Prot., *The Consumer Credit Card Market* (Dec. 2017) (2017 Report), https://files.consumerfinance.gov/f/documents/cfpb_consumer-credit-card-market-report_2017.pdf; Consumer Fin. Prot., *The Consumer Credit Card Market* (Aug. 2010) (2019 Report), https://files.consumerfinance.gov/f/documents/cfpb_consumer-credit-card-market-report_2019.pdf. The Bureau also held a conference in 2011 in which numerous market stakeholders contributed information and perspective on developments in the credit card market. *See* Press Release, Bureau of Consumer Fin. Prot., *CFPB Launches Public Inquiry on the Impact of the Card Act* (Dec. 19, 2012), https://www.consumerfinance.gov/about-us/newsroom/consumer-financial-protection-bureau-launches-public-inquiry-on-the-impact-of-the-card-act.

[7] Credit Card Accountability Responsibility and Disclosure Act of 2009, Public Law 111-24, 123 Stat. 1734 (2009).

[8] Public Law 96-354, 94 Stat. 1164 (1980) (5 U.S.C. 601 *et seq.*).

effects of COVID-19 throughout the report and specifically adds a section about its impact on credit card issuers and their responses to consumers' needs.

Below is a summary of the core findings from each section of the report:

▪ Total outstanding credit card balances continued to grow and peaked in 2019 at $926 billion, but, by the second quarter of 2020, consumers reduced card balances to $811 billion, the largest six-month reduction in U.S. history. At the end of 2020, debt crept back up to $825 billion. The share of accounts with a revolving balance declined in 2020, and more consumers paid down their card debt in 2020. Utilization rates declined across credit score tiers, and the share of consumers with below-prime scores who used 90 percent or more of their general purpose credit line fell to record lows. A declining share of consumers were late in making their payments as of the second quarter of 2020.

▪ The total cost of credit (TCC) on revolving accounts continued to increase through 2019 but declined modestly in 2020. The 2020 declines in TCC for general purpose and private label cards were 0.8 and 1.5 percentage points, respectively. Recent TCC decreases are largely a result of decreases in the indices underlying variable rates, such as the prime rate, and lower overall fees assessed. The Bureau estimates that the five rate decreases by the Federal Reserve from early-2019 through 2020 led to a cumulative roughly $18 billion that credit card borrowers did not pay over that period. Accounts held by consumers with deep subprime credit scores saw the greatest drop in fee-to-balance ratios in 2020.

▪ Most measures of credit card availability decreased in 2020 after continued growth since the Great Recession. Application volume for credit cards decreased sharply in 2020 from its peak level in 2019, likely due to the interaction between reduced acquisition efforts by issuers and a decline in consumer demand. Approval rates also declined modestly in 2020. Driven by these contractions in both supply and demand, annual growth in the number of credit card accounts opened and the amount of credit line on new accounts reached its lowest level since 2013. Total credit line across all consumer credit cards fell slightly in 2020 from a post-Great Recession high of over $4.5 trillion in 2019 but remained above 2018 levels. Existing accounts held by consumers with subprime and deep subprime scores saw

the greatest constriction in available line.[9] While credit line decrease (CLD) incidence increased for consumers with below-prime credit scores, issuers did not substantially deviate from previous line management trends during the pandemic.

- Digital engagement is growing consistently across all age groups and nearly every platform type. The share of consumers electing to receive statements digitally (e-statements) rather than by mail is continuing to increase, though the pace of adoption tapered in 2020. E-statement adoption has been surpassed by mobile app adoption as a method to engage with issuers.

- Many consumers received some form of relief on their credit card debts from their credit card providers during the pandemic. The Bureau estimates that over 25 million consumer credit card accounts representing approximately $68 billion in outstanding credit card debt entered relief programs in 2020, figures vastly higher than in prior years. The Bureau also estimates that surveyed issuers' cardholders were able to forgo principal payments of anywhere from $0.5 billion to $1.5 billion against their credit card debts in 2020 due to these relief programs. Entries into payment deferral relief were spread fairly evenly across credit score tiers, but accounts held by consumers with lower scores received payment deferrals at the highest rate.

- Since the 2019 Report, issuers have lowered the range of their daily limits on debt collection phone calls for delinquent credit card accounts while increasing the use of emails in collection. However, survey respondents reported that, on average, only 31.9 percent of accounts that received email clicked open their emails.

- Innovations aimed at expanding credit access, particularly for less creditworthy borrowers, continued to grow in both the number of offerings and users. Buy Now, Pay Later (BNPL) products are offering a new form of purchasing with payments spread out over time, typically in four installments. Credit card issuers are offering similar plans, providing consumers more ways to manage their cash flow.

---

[9] These trends of constricting credit availability do not appear to continue in 2021. *See* Corinne Candilis & Ryan Sandler, *Credit card limits are rising for most groups after stagnating during the pandemic,* Bureau of Consumer Fin. Prot. (Aug. 11, 2021), https://www.consumerfinance.gov/about-us/blog/credit-card-limits-rising-for-most-groups-after-stagnating-during-pandemic/.

**CURRENT AND FUTURE BUREAU WORK IN THIS MARKET**

Over the past two years, the Bureau has been actively engaged in the credit card market and is taking measures to address regulatory uncertainty, identify compliance deficiencies as well as research new emerging technologies and products to ensure the adequacy of consumer protection and a transparent and competitive marketplace for all consumers.

- In June of 2020, the Bureau released a Notice of Proposed Rulemaking (NPRM) concerning the anticipated discontinuation of LIBOR, [10] including proposing examples of replacement indices that satisfy Regulation Z requirements. [11] As proposed, the rule would allow credit card issuers to replace the LIBOR index used in setting variable rates on many existing accounts with a replacement index before LIBOR becomes unavailable, if certain conditions were met. To the Bureau's knowledge, there are millions of consumer credit card accounts indexed on LIBOR. The proposed rulemaking should help credit card providers transition those affected accounts to a replacement index in an orderly manner. The Bureau expects to issue a final rule in January 2022. [12]

- Through the Prioritized Assessments conducted in May of 2020, the Bureau found that credit card issuers generally provided some form of relief to consumers experiencing hardships as a result of COVID-19, such as "skip-a-pay" or payment deferrals for one to six months, with or without interest accrual. [13] Other relief options included lowered interest rates, waivers of annual and other fees, and extended deferred interest periods for credit card accounts that had already received deferred interest. However, the Bureau also identified certain issues that may raise the risk of consumer harm such as system

---

[10] Press Release, Bureau of Consumer Fin. Prot., *CFPB Takes Steps to Facilitate LIBOR Transition* (June 4, 2020), https://www.consumerfinance.gov/about-us/newsroom/cfpb-facilitates-libor-transition/.

[11] 85 FR 36938 (June 18, 2020), https://www.govinfo.gov/content/pkg/FR-2020-06-18/pdf/2020-12239.pdf.

[12] Office of Info. & Regulatory Affairs, *Amendments to Regulation Z to Facilitate Transition From LIBOR* (2021), https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202104&RIN=3170-AB01.

[13] Bureau of Consumer Fin. Prot., *Supervisory Highlights COVID-19 Prioritized Assessments Special Edition, Issue 23* (Jan. 2021), https://files.consumerfinance.gov/f/documents/cfpb_supervisory-highlights_issue-23_2021-01.pdf.

EXHIBIT A
Page 15

deficiencies related to implementing relief programs and automatic payment processes, as well as delays in timely delivery of certain disclosures and responding to billing disputes.

▪ The Bureau continues to monitor the expansion of credit access, especially when new and innovative technologies are used. Credit access expansion can be positive but should be done responsibly and in a way that is understandable to consumers. Consumers will be better served if the use of such technologies are clearly explained in case of adverse actions.[14] Forms of point-of-sale financing, such as BNPL products, offer not only convenience but a new way of financing for many consumers. The Bureau encourages all providers in this space to take steps to make sure users of these products are adequately informed of the risks of such products.

▪ The Bureau encourages study into the effects of certain lending practices and their impact on credit scores, particularly for those consumers with non-prime credit scores. Practices such as credit line decreases (CLD) and account closure not only reduce consumers' access to credit but also potentially inflate their credit utilization rate. This could adversely affect consumers' credit scores without any other changes in their behavior. Additionally, over the past decade, a declining share of credit card issuers reported information on a borrower's actual payment amount to nationwide consumer reporting agencies, which may have implications for consumer access to credit.

▪ As indicated in its January 28, 2021 announcement,[15] the Bureau intends to take bold and swift action on racial equity in financial services, including in the areas of credit card marketing and lending. Existing data available to the Bureau do not allow the Bureau to fully examine the disparity in use, cost, and availability of credit cards by racial groups. The Bureau intends to explore options to incorporate racial data in its data sources to inform its future work.

---

[14] Bureau of Consumer Fin. Prot., *Tech Sprint on Electronic Disclosures of Adverse Action Notices* (Oct. 2020), https://www.consumerfinance.gov/rules-policy/innovation/cfpb-tech-sprints/electronic-disclosures-tech-sprint/.

[15] Bureau of Consumer Fin. Prot., *The Bureau is taking much-needed action to protect consumers, particularly the most economically vulnerable* (Jan. 28, 2021), https://www.consumerfinance.gov/about-us/blog/the-bureau-is-taking-much-needed-action-to-protect-consumers-particularly-the-most-economically-vulnerable/.

- As described in the new technical specifications issued on August 20, 2021, the Bureau's "Collect" website will be the mandatory vehicle issuers must use to submit credit card agreements and their associated data in 2022 and beyond. Not only does Collect provide a simplified submission process and robust audit trail for issuers, it will allow the Bureau and other organizations to expand their current research on credit card agreements. [16]

---

[16] Bureau of Consumer Fin. Prot., *Technical Specifications for Credit Card Agreement and Data Submission Required under TILA and the CARD Act (Regulation Z)* (Aug. 20, 2021), https://files.consumerfinance.gov/f/documents/cfpb_tech-specs-credit-card-agreement-data-submissions_final-rule_2021-08.pdf.

EXHIBIT A
Page 17

# 1.    Introduction

## 1.1    Review mandate

The CARD Act became law on May 22, 2009. Its stated purpose was to "establish fair and transparent practices related to the extension of credit" in the credit card marketplace.[17] The Dodd-Frank Act, which became law on July 21, 2010, established the Bureau and, one year later, transferred authority and responsibility for implementing and enforcing the CARD Act from the Board to the Bureau.

Among those responsibilities Congress originally assigned the Board was a mandate to "review, within the limits of its existing resources available for reporting purposes, [the] consumer credit card market [every two years]."[18] In 2012, the Board and the Bureau agreed that responsibility for the review passed to the Bureau under the terms of the Dodd-Frank Act. This report represents the Bureau's fifth mandated biennial report on its review of the consumer credit card market, following the Bureau's reports on the market in 2013, 2015, 2017, and 2019.[19]

---

[17] *See supra* note 5, at 1. A full summary of the CARD Act rules implemented by the Board is at pages 11 through 13 of the Bureau's 2013 Report. *See* 2013 Report, *supra* note 6. The Bureau subsequently reissued these rules without material changes in December 2011. The Bureau later revised one CARD Act rule issued by the Board. On November 7, 2012, the Bureau proposed selected revisions to the ability-to-pay rules, which were intended to address a number of unintended impacts of the prior rule on consumers who did not work outside the home. The final rule implementing this revision became effective on May 3, 2013, with an associated compliance deadline of November 4, 2013. *See* 78 FR 25818 (May 3, 2013). On March 22, 2013, the Bureau finalized another revision to the CARD Act rules in response to a federal court ruling in 2012 that had granted a preliminary injunction to block a part of the Board's 2011 rule from taking effect. The final rule became effective March 28, 2013. *See* 78 FR 18795 (Mar. 28, 2013). *See also* Press Release, Bureau of Consumer Fin. Prot., *CFPB Finalizes Credit CARD Act Rule* (Mar. 22, 2013), https://www.consumerfinance.gov/about-us/newsroom/consumer-financial-protection-bureau-finalizes-credit-card-act-rule.

[18] 15 U.S.C. § 1616(a) (2012).

[19] See generally, *supra* note 6.

# 1.2    Report scope

This report fulfills Congress's directive to review the consumer credit card market in two overlapping ways. First, it responds to the general congressional mandate in section 502 of the CARD Act to review and report on the "consumer credit card market." Second, it addresses "within the limits of [the Bureau's] existing resources available for reporting purposes" topics explicitly enumerated by Congress for inclusion in this review, including:

1.  the terms of credit card agreements and the practices of credit card issuers;

2.  the effectiveness of disclosure of terms, fees, and other expenses of credit card plans;

3.  the adequacy of protections against unfair or deceptive acts or practices relating to credit card plans; and

4.  whether or not, and to what extent, the implementation of this Act and the amendments made by this Act have affected:

    a)  the cost and availability of credit, particularly with respect to non-prime borrowers;

    b)  the safety and soundness of credit card issuers;

    c)  the use of risk-based pricing; or

    d)  credit card product innovation.[20]

The CARD Act also requires the Bureau to "solicit comment from consumers, credit card issuers, and other interested parties" in connection with its review.[21] As in past years, the Bureau has done so through a Request for Information (RFI) published in the Federal Register, and the

---

[20] 15 U.S.C. § 1616(a) (2012). While this report presents information which may be relevant to assessments of safety and soundness issues relating to credit card issuers, the Bureau does not produce any further analysis on this subject in this report. The prudential regulators (*e.g.*, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, and the National Credit Union Administration) have the primary responsibility for monitoring the safety and soundness of financial institutions.

[21] 15 U.S.C. § 1616(b) (2012).

Bureau discusses specific evidence or arguments provided by commenters throughout the report.[22]

# 1.3    Methodology

This section reviews several aspects of the Bureau's general methodology in compiling this report. Methodological approaches used in specific sections of this report are explained in more detail in those sections.

## 1.3.1    Data sources

This report leverages several data sources. It primarily relies on sources already held by the Bureau, by other Federal regulators, and by industry stakeholders. All results reported from data throughout this report aggregate results from multiple industry participants.[23]

Sources include the following:

1.  Data from the Bureau's Consumer Credit Panel (CCP), which is a comprehensive, national 1-in-48 longitudinal sample of de-identified credit records maintained by one of the three nationwide consumer reporting agencies. Other Bureau products, such as the Consumer Credit Trends reports, rely on these data.[24] These data contain no personal identifiers, such as name, address, or Social Security number.

---

[22] Request for Information Regarding Consumer Credit Card Market, 85 FR 53299 (Aug. 28, 2020). The RFI also separately solicited comment on the Bureau's review of the CARD Act consistent with section 610 of the Regulatory Flexibility Act (RFA). Public Law 96-354, 94 Stat. 1164 (1980). That review is out of the scope of this report.

[23] No results in this report can be used to identify the outcomes or practices of individual entities. At the same time, outcomes and patterns observed in the market as a whole may not be true for (or may only apply in a limited degree to) any particular industry player.

[24] *See* Bureau of Consumer Fin. Prot., *Consumer Credit Trends*, https://www.consumerfinance.gov/data-research/consumer-credit-trends/ (last visited Jan. 11, 2021). For CCP research related to COVID-19, *see* also Ryan Sandler & Judith Ricks, *Special issue brief: The early effects of the COVID-19 pandemic on consumer credit,*

EXHIBIT A
Page 20

2. De-identified information that the Board collects as part of its "Y-14M" (Y-14) data collection. The Board collects these data monthly from bank holding companies that have total consolidated assets exceeding $50 billion.[25] The Board shares with the Bureau data from Y-14 banks. The data received by the Bureau cover the period from the middle of 2012 through the present and accounted for just under 70 percent of outstanding balances on consumer credit cards as of year-end 2020.[26]

Information in the Y-14 data do not include any personal identifiers. Additionally, accounts associated with the same consumer are not linked across or within issuers. The Y-14 does not include transaction-level data pertaining to consumer purchases. In addition, this study reports only aggregate measures and reveals no information about any specific issuer.

These data replace loan-level credit card collections that the Bureau previously collected.[27] The Bureau no longer requires or oversees the collection of any loan-level credit card data on an ongoing basis.

---

Bureau of Consumer Fin. Prot. (Aug. 31, 2020), https://www.consumerfinance.gov/data-research/research-reports/special-issue-brief-early-effects-covid-19-pandemic-on-consumer-credit/; Éva Nagypál, *Special issue brief: The Recovery of Credit Applications to Pre-Pandemic Levels,* Bureau of Consumer Fin. Prot. (July 27, 2021), https://files.consumerfinance.gov/f/documents/cfpb_recovery-of-credit-applications-pre-pandemic-levels_report_2021-07.pdf; and Ryan Sandler, *Delinquencies on credit accounts continue to be low despite the pandemic,* Bureau of Consumer Fin. Prot. Blog (June 16, 2021), https://www.consumerfinance.gov/about-us/blog/delinquencies-on-credit-accounts-continue-to-be-low-despite-the-pandemic/.

[25] *See* Bd. of Governors. of the Fed. Rsrv. Sys., *Report Forms FR Y-14M,* https://www.federalreserve.gov/apps/reportforms/reportdetail.aspx?sOoYJ+5BzDYnbIw+U9pka3sMtCMop2oV (last visited Jan. 11, 2021) (for more information on the Y-14M collection).

[26] The Board has expanded the fields it collects from banks over time; therefore, some results reported below do not extend all the way back to 2012. Additionally, these data are periodically revised retroactively, and are therefore not fully static. These issuers represent a large portion of the market but are not necessarily representative of the portion of the market not covered by the data the Bureau receives. The remainder of the market, representing a substantial number of consumer credit cards, are outside the scope of the Y-14 data used by the Bureau because, among other reasons, they are issued by banks with assets of less than $50 billion, or are issued by non-banks, such as credit unions. Results reported from Y-14 data throughout this report should be interpreted accordingly.

[27] *See generally* Bureau of Consumer Fin. Prot., *Sources and Uses of Data,* at 57-58 (Sept. 26, 2018), https://www.consumerfinance.gov/data-research/research-reports/sources-and-uses-data-bureau-consumer-financial-protection/.

3. Information provided in response to a series of data filing orders made to several industry participants, comprised of two distinct sets:[28]

   a) Data requested from a broad and diverse group of issuers to address a range of topics that neither CCP nor Y-14 data can address. This report refers to these data as Mass Market Issuer (MMI) data. These data cover application and approval volumes, rates, and channels, deferred interest, digital account servicing, certain aspects of the impact of COVID-19 on consumers and issuers, and loss mitigation policies and practices, including debt collection.

   b) Data requested from a diverse group of specialized issuers. These summary data, which focus on basic indicators of usage and cost, in places supplement the Y-14 to allow for a broader or more detailed perspective into certain facets of the market than either the Y-14 or CCP allow. Where these data supplement Y-14 data, those data are collectively called "Y-14+".[29]

4. The CFPB's Credit Card Agreement Database, an online database available to the public at http://www.consumerfinance.gov/credit-cards/agreements, was created pursuant to the CARD Act. It contains most credit card agreements available to consumers as of quarter's end for each quarter from the third quarter of 2011 to the fourth quarter of 2014, and from the first quarter of 2016 to present.[30] After the fourth quarter of 2014, the Bureau temporarily suspended collection of agreements for one year to reduce burden while the Bureau developed a more streamlined and automated electronic submission system.[31] Submission and publication resumed in the first quarter of 2016. Agreements in the second quarter of 2019 are incomplete due to technical submission issues at the Bureau, and

---

[28] The Bureau notes that many players in the credit card industry are also entities with which the Bureau has one or more institutional relationships, such as a research partnership or membership on a Bureau-convened body.

[29] As discussed in note 26 *supra*, the Y-14 data cover a large but not representative portion of the credit card market. The Y-14+ data cover a larger and more representative portion of the credit card market, but the remaining uncovered portion is still substantial, and the Y-14+ data should similarly not be considered representative of that uncovered portion.

[30] Credit card issuers are not required to submit any credit card agreements to the Bureau if the card issuer has fewer than 10,000 open credit card accounts as of the last business day of the calendar quarter. 12 CFR 1026.58(c)(5).

[31] 80 FR 21153 (Apr. 17, 2015); 12 CFR 1026.58(g).

EXHIBIT A
Page 22

agreements in 2020 and 2021 may include omissions due to the Bureau's previous COVID-19 regulatory flexibility statement.[32]

5. Responses to the RFI, which sought comment on all aspects of the review described in Section 1.2 above.[33] The RFI generated 11 comments.[34] That total includes six letters from trade associations representing credit card issuers and other market participants, two letters from individual issuers, one letter from an industry-side market participant, one letter from a consumer advocacy group, and one letter from a consumer.

6. Credit card complaints that consumers have submitted to the Bureau's Office of Consumer Response.[35]

7. Commercially available data sources to which the Bureau subscribes that focus on the credit card industry, including mail volume monitoring reports, industry analyst reports, and data services and analytics from industry consultants.

8. Numerous public sources, including but not limited to Securities and Exchange Commission (SEC) filings, analyst reports, studies and data produced by other regulators, academic scholarship, and the trade press.

9. Other information gathered informally through Bureau market monitoring activities.

## 1.3.2    Credit scores

Throughout this report, the Bureau refers to consumer credit scores. Lenders use these scores to predict a consumer's relative likelihood of default compared to other consumers. Credit scores

---

[32] Bureau of Consumer Fin. Prot., *Statement on Supervisory and Enforcement Practices Regarding Bureau Information Collections for Credit Card and Prepaid Account Issuers* (Mar. 26, 2020), https://files.consumerfinance.gov/f/documents/cfpb_data-collection-statement_covid-19_2020-03.pdf.

[33] 82 FR 13313 (Mar. 10, 2017).

[34] As noted in note 22 *supra,* the RFI also solicited comment on the Bureau's review of the CARD Act consistent with the RFA, which is out of the scope of this report. The count of comments above includes all responses to the RFI, including those that addressed that RFA review, as well as certain other comments which were removed due to privacy concerns.

[35] Bureau of Consumer Fin. Prot., *Consumer Complaint Database,* https://www.consumerfinance.gov/data-research/consumer-complaints/ (last visited Aug. 18, 2021).

provided by major national consumer reporting agencies are used by most credit card issuers to determine consumers' eligibility for credit and to set pricing for credit lines.[36] Data relied upon in this report include widely-used, commercially-available credit scores.

There are two important limitations to the way the Bureau uses credit scores in this report. Different credit score models, while fundamentally similar, may include or exclude different data points or weight them differently. First, this means that data are aggregated on the basis of credit score even though not all consumer credit scores are computed using identical methodologies. Second, it means that, when reporting certain measures over longer time horizons, the introduction of new models and changes in the prevalence of various models complicates comparisons between different points in time. In some cases, one or both of those two issues could affect which "credit score tier" applies to a certain account or consumer. ("Credit score tiers" are defined further below). The Bureau believes that different credit scoring methodologies, over the time periods and set of market participants examined in this report, are sufficiently consistent that it remains informative and useful to report aggregated results and changes over time by credit score. The Bureau nevertheless proceeds with caution when assigning precision, beyond a reasonable degree, to certain results.

When reporting results by credit score in this report, scores are grouped into five tiers. This five-tier grouping aligns with the groupings used in the Bureau's 2017 and 2019 Reports on the credit card market and the Bureau's Consumer Credit Trends reporting, as well as other Bureau research and reports. Table 1 shows the distribution of adults, scored adults, and scored cardholders in each credit score tier.

**TABLE 1:**    CREDIT SCORE RANGE SHARES AS OF Q4 2019 (CCP)

| Credit score tiers | U.S. adult population | U.S. scored population | U.S. scored credit cardholding population |
|---|---|---|---|
| Superprime (scores of 720 or greater) | 41% | 54% | 64% |
| Prime (scores from 660 to 719) | 12% | 16% | 16% |

---

[36] Section 7.1.1 discusses the increased reliance of some credit card lenders on data and/or scores other than those provided by the major national credit bureaus.

| | | | |
|---|---|---|---|
| Near-prime (scores from 620 to 659) | 6% | 8% | 8% |
| Subprime (scores from 580 to 619) | 5% | 7% | 6% |
| Deep subprime (scores of 579 or less) | 12% | 16% | 7% |
| Thin or stale score file | 12% | -% | -% |
| Credit invisible[37] | 11% | -% | -% |

Credit scores in the CCP and Y-14 are refreshed regularly. Unless noted otherwise, accounts and consumers are classified into score tiers based on their credit score at that time. As a result, when analyzing trends over time within a particular credit score tier, the set of accounts or consumers in a tier changes over time. This fact is especially important to note given that many consumers experience changes in their credit score that are large enough to move them from one credit tier to another.[38]

An additional note of caution in interpreting credit scores is warranted due to COVID-19. In past reports, the Bureau has noted a general trend of increase in consumer credit scores.[39] However, research suggests that the Coronavirus Aid, Relief, and Economic Security Act's (CARES Act) forbearance provisions, in combination with income support programs and reduced consumption during the pandemic, accelerated a decline in the share of borrowers with subprime credit scores.[40] This pronounced improvement in credit scores complicates analyses of credit measures using the above classifications during 2020.

---

[37] This estimate of the percentage of the U.S. adult population who are credit invisible is based on data from 2010. *See* Kenneth P. Brevoort, Philipp Grimm, & Michelle Kambara, *Data Point: Credit Invisibles,* Bureau of Consumer Fin. Prot., at 6 (May 2015), http://files.consumerfinance.gov/f/201505_cfpb_data-point-credit-invisibles.pdf.

[38] *See* 2015 Report, *supra* note 6, at 53-55.

[39] *See* 2019 report, *supra* note 6, at 22.

[40] See Sarena Goodman, Geng Li, Alvaro Mezza, & Lucas Nathe, *Developments in the Credit Score Distribution over 2020,* Bd. of Governors. of the Fed. Rsrv. Sys. (Apr. 2021), https://www.federalreserve.gov/econres/notes/feds-notes/developments-in-the-credit-score-distribution-over-2020-20210430.htm.

### 1.3.3    Other definitions

This subsection defines certain additional terms used frequently throughout this report. This is not exhaustive of all remaining defined terms in this report; for example, other defined terms more particular to certain sections or subsections of this report are introduced in those sections or subsections.

Throughout most of this report, the term "general purpose credit card" refers to credit cards that can transact over a network accepted by a wide variety of merchants, including the Visa, Mastercard, American Express, and Discover networks. The term "private label" refers to cards that can only be used at one merchant or a small group of related merchants.[41] In some instances, mainly in certain parts of Sections 4 and 5, the term "retail" refers to a combined category of private label cards and some network-branded cards that are managed by a business unit that specializes in retail credit cards.[42]

There are many ways to take a snapshot of consumer credit card indebtedness. The Bureau relies on two of the most prevalent, using nominal figures unless otherwise indicated. The first one entails measuring the current amount owed by consumers on a specific date, regardless of where in any individual consumer's billing cycle that date falls. Debt calculated in this manner is referred to as "outstandings." For example, if one were to report the total amount owed by consumers on credit cards as of December 31, 2020, it would be referred to as outstandings.

The second method entails measuring the amount owed by consumers at the end of their billing cycles, regardless of whether those cycles fall on a certain date. The Bureau refers to debt calculated in this manner as "balances," and in most cases as "cycle-ending balances." For example, if one were to report the total amount owed by consumers at the end of their billing

---

[41] Private label cards generally transact over a private network maintained by the issuer to which the merchant is granted access. Some cards can transact over both a private label network and a general purpose network. For example, a consumer may be issued a card that features a merchant's brand as well as a general purpose network brand. When used at the merchant, the transaction may be routed over the issuer's private network, but at other merchants the transaction is routed over the general purpose network. For the purposes of this report, those cards are considered to be general purpose credit cards except where explicitly noted otherwise.

[42] Retail cards do not include network-branded cards that carry hotel or airline branding, even if those cards are managed by a business unit that specializes in retail credit cards.

EXHIBIT A
Page 26

cycles that concluded in December 2020, it would be referred to as cycle-ending balances and, for some accounts, would calculate balances as of, *e.g.*, the 10th of the month.

This report also uses the term "debt" to refer to both of these amounts interchangeably. Note also that consumer debt on credit cards (whether calculated as month-end outstandings or cycle-end balances) includes both "revolving" debt—the amount owed on accounts for which the balance was not paid in full by the immediately prior statement due date—and "transacting" debt—charges incurred on accounts for which the balance was paid in full by the immediately prior statement due date. While transacting accounts represent a large share of all credit card purchase volume, revolving accounts generally represent a large share of all credit card debt at any given point in time. More detail on revolving and transacting patterns is provided in the subsequent sections of this report.

Throughout this report, the Bureau refers to "COVID-19." While a full recounting of the onset of COVID-19 is beyond the scope of this report, it is important to reiterate here both the speed and the breadth with which the pandemic took hold. Within a period spanning just a few weeks, from mid-March to early-April of 2020, the World Health Organization declared COVID-19 to be a pandemic;[43] the United States declared a nationwide emergency;[44] and most U.S. states and territories promulgated mandatory stay-at-home orders.[45] As described elsewhere in this report, this period was characterized by sharp declines of movements of persons and activities entailing person-to-person interaction across the United States, with sharp attendant economic consequences too broad and varied to recount in full here. In summary, however, the total number of employed persons in the country dropped from approximately 150 million to 130 million from February to April 2020,[46] and the total annualized rate of wage and salary

---

[43] *See* World Health Organization, *WHO Director-General's opening remarks at the media briefing on COVID-*19 (Mar. 11, 2020), https://www.who.int/director-general/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[44] *See* 85 FR 15337 (Mar. 18, 2020).

[45] *See* Moreland, Amanda, et. al., *Timing of State and Territorial COVID-19 Stay-at-home orders and changes in population movement,* CDC (Sep. 4, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6935a2.htm.

[46] Fed. Rsrv. Bank of St. Louis, *Total Nonfarm Payroll,* https://fred.stlouisfed.org/series/PAYNSA (last visited Aug. 18, 2021).

disbursements to all employees dropped from $9.7 trillion to $8.7 trillion,[47] accompanied by an even starker decline in the annualized rate of personal consumption expenditures, from $14.9 trillion to $12.1 trillion.[48]

Except where otherwise and explicitly noted, all such references to "COVID-19" are used as shorthand for the period of economic crisis and broad social disruption beginning in 2020 associated with the onset of the COVID-19 pandemic, not the illness caused by the SARS-CoV-2 coronavirus. For example, the sentence "COVID-19 led to credit card issuers expanding their relief programs," signifies that issuers expanded their relief programs in response to the economic crisis precipitated by the pandemic, not because of the direct impact of the illness on issuers. In contrast, the sentence "Fears of contracting the COVID-19 disease appear to have led to increased use of contactless payments by consumers," does, in fact, refer directly to the impact of the pandemic on consumers.

Throughout this report, the Bureau refers to the "Great Recession," which officially began in the final quarter of 2007 and ended in the second quarter of 2009. [49] The Bureau also refers to the "COVID-19 recession," which officially began in February 2020 and concluded in April 2020.[50] Those references are generally used for convenience and should not be interpreted as a statement as to precisely when the recession began or concluded. Discussions of these time periods may also include broader commentary on economic conditions following the official trough in gross domestic product.

---

[47] Fed. Rsrv. Bank of St. Louis, *Compensation of Employees, Received: Wage and Salary Disbursements,* https://fred.stlouisfed.org/series/A576RC1 (last visited Aug. 18, 2021).

[48] Fed. Rsrv. Bank of St. Louis, *Personal Consumption Expenditures,* https://fred.stlouisfed.org/series/PCE (last visited Aug. 18, 2021).

[49] Nat'l Bureau of Econ. Rsch., *Business Cycle Dating Committee Announcement September 20, 2010* (Sep. 20, 2010), https://www.nber.org/news/business-cycle-dating-committee-announcement-september-20-2010.

[50] Nat'l Bureau of Econ. Rsch., *Business Cycle Dating Committee Announcement July 19, 2021* (July 19, 2021), https://www.nber.org/news/business-cycle-dating-committee-announcement-july-19-2021.

EXHIBIT A
Page 28

## 1.3.4    Limitations

The limitations inherent to the Bureau's methodology in this report are substantially similar to those inherent in the Bureau's previous reports on the credit card market.[51] Those limitations are restated here briefly.

First, while the Bureau would ideally like data and evidence that allows it to definitively identify the causes of certain outcomes, the data available generally do not allow it to do so. The Bureau cautions against interpreting factual observations in the study as definitively proving or disproving particular causal relationships. Correlations presented throughout this report do not necessarily indicate causation.

Second, each of the data sources the Bureau analyzes have particular limitations. Some sources are not a comprehensive view of the market; some are limited to the account level or the aggregate level; and some are purely qualitative. Not all data sources use consistent definitions or delineations or cover the same periods, products, or phenomena. To the extent possible, the Bureau mitigates these limitations. Every attempt is made to harmonize definitions and to identify those places where the Bureau is unable to do so.

---

[51] *See, in particular,* the 2015 Report, *supra* note 6, at page 27.

EXHIBIT A
Page 29

# 2.    Use of credit

To provide a foundation for analyses in subsequent sections, this section reviews market measures that cover several aspects of the consumer credit card market.

First, this section describes the prevalence of credit cards and the size of the market. By some measures, such as total credit card debt outstanding, the market has generally contracted over the course of the pandemic as consumers paid down balances, in part due to federal stimulus measures.[52] By other indicators, such as the total number of open general purpose card accounts, the market has never been so expansive.

Second, this section looks at spending and repayment behavior. Some of these data point to potentially significant differences between the credit card debt held by consumers prior to the pandemic and the debt they hold today.

Last, this section reports on delinquency and charge-off rates. These remain below historic norms even as widely relied-upon macroeconomic indicators—like the unemployment rate—have spiked and remain elevated relative to pre-pandemic periods.

## 2.1    Product prevalence

The Bureau estimates that 181 million of the 258 million adults in the United States (70 percent) had a credit card account in their name as of the end of 2020.[53] Around 90 million consumers

---

[52] *See* Matthew Dalton & AnnaMaria Andriotis, *Consumers, Flush With Stimulus Money, Shun Credit-Card Debt*, Wall St. J. (Aug. 2, 2020), https://www.wsj.com/articles/consumers-flush-with-stimulus-money-shun-credit-card-debt-11596373201.

[53] This estimate is according to coverage of credit records present in the CCP sample, though this does not include authorized users, who are individuals designated by the primary account holder to use the same credit account. A recent report from the Federal Reserve finds 83 percent of consumers report having at least one credit card. *See* Bd. of Governors of Fed. Rsrv. Sys., *Report on the Economic Well-Being of U.S. Households in 2020*, at 42 (May 2021),

hold at least one general purpose and at least one private label card. Some 79 million hold only general purpose cards. Just under 9 million hold only private label cards.

General purpose cards remain prevalent, while private label cardholding has become relatively less common. By year-end 2020, there were 485 million open general purpose card accounts and 214 million open private label accounts. For general purpose card accounts, that represents the high-water mark for open accounts since at least 2005, while the number of open private label accounts has remained nearly unchanged since 2013. General purpose cardholding is just as common today as it was prior to the Great Recession, though that share is down from 63 percent on the eve of the pandemic. In contrast, 36 percent of adults held at least one private label card in 2020, compared to 52 percent in 2005. Consumers in all credit score tiers have seen declines in private label card account holding. Most general purpose and private label cards are held by consumers with superprime scores, as shown in Figure 1.

**Figure 1:**    CREDIT CARD ACCOUNTS, YEAR-END 2020 (CCP)



https://www.federalreserve.gov/publications/files/2020-report-economic-well-being-us-households-202105.pdf. A recent report from the Federal Reserve Bank of Atlanta stated that 78 percent of consumers reported holding a credit card, *see* Kevin Foster, Claire Greene, & Joanna Stavins, *The 2020 Survey of Consumer Payment Choice: Summary Results* (Fed. Rsrv. Bank of Atlanta, Working Paper No. 21-1, 2021), https://www.atlantafed.org/-/media/documents/banking/consumer-payments/survey-of-consumer-payment-choice/2020/2020-survey-of-consumer-payment-choice.pdf. For estimates of the adult population in the United States, *see Stella Ogunwole et. al,* Population Under Age 18 Declined Last Decade, Census Bureau (Aug. 12, 2021), https://www.census.gov/library/stories/2021/08/united-states-adult-population-grew-faster-than-nations-total-population-from-2010-to-2020.html.

The share of consumers with below-prime scores holding at least one open credit card account fell in 2020 following several years of moderate growth. Cardholding dropped significantly across these credit score tiers during and shortly after the Great Recession. This metric has grown in recent years in the lower credit tiers but fell in 2020 and has yet to return to pre-COVID-19 recession levels for cardholders in any below-prime credit tier. As of year-end 2020, fewer than half of consumers with deep subprime scores held a credit card, while near-prime and subprime cardholding remains significantly more common than deep subprime cardholding, at 91 percent and 78 percent respectively.

**Figure 2:**    SHARE OF CONSUMERS WITH NON-PRIME SCORES WITH AT LEAST ONE CREDIT CARD (CCP)



Cardholders carry fewer cards as of year-end 2020 than they did in 2018. The average cardholder carried 3.8 cards in 2020, compared to 4 in 2018. This decrease may reflect reduced demand for new cards during the pandemic, but it may also reflect an increase in card closures as issuers endeavored to reduce their exposure to potential losses during uncertain economic times.

## 2.2    Debt levels

Consumer credit card debt had been increasing every year since 2011, before reversing course suddenly following the onset of the pandemic. Credit card debt peaked in 2019 at $926 billion, but by the second quarter of 2020 consumers had reduced card balances to $811 billion, the largest six-month reduction in U.S. history. By the end of 2020, debt had crept back up to $825 billion. Adjusted for inflation, current debt stands at 2016 levels, as shown in Figure 3.

**Figure 3:**    AVERAGE CREDIT CARD BALANCES, NOMINAL AND INFLATION-ADJUSTED (CCP, BLS)[54]



General purpose credit card debt declined sharply in 2020, reversing a long-term trend of balance growth. In its last report the Bureau noted that balances had more-or-less steadily increased since the end of 2010 to nominal pre-Great recession levels. By the fourth quarter of 2020, however, general purpose credit card debt stood at $745 billion, well below the $793 billion mark reached in the fourth quarter of 2018. The decrease in balances is significant for cardholders in all score tiers – deep subprime cardholders reduced their balances by 24 percent in the second quarter of 2020 alone. This result has likely been caused by a temporary reduction in spending during the first few months of the pandemic, coupled with the impact of federal relief programs such as Economic Impact Payments and payment suspensions on other products such as federally held student loans.

Private label credit card debt had also been growing rapidly in recent years, before declining in 2020. After rising to $91 billion in the fourth quarter of 2018, private label debt fell to $82 billion in the fourth quarter of 2020, a decline of 10 percent. Similar to general purpose cards, private label balance declines were most significant for cardholders with deep subprime scores, who reduced balances by 36 percent in 2020, the largest year-over-year decline since at least 2005.

---

[54] This chart displays average cycle-ending balances calculated across each full year, which decreases the effect of seasonality. *See* Bur. Of Labor Stat., Series CUUR0000SA0, https://www.bls.gov/ (last accessed June 14, 2021).

**GENERAL PURPOSE**

Indebted general purpose cardholders in every credit score tier reduced their average balances significantly in 2020, but cardholders with prime scores remain the most indebted. For consumers who held at least one such card with a balance, average general purpose credit card balances were roughly $5,700 as of the end of 2018. At the end of 2019, that figure had risen to $5,800, before declining to roughly $5,000 by the end of 2020. Average balances declined for cardholders in all credit score tiers by 13 to 20 percent year-over-year in 2020, as shown in Figure 4. However, cardholders with prime credit scores continue to show significantly higher credit card balances on average than cardholders in any other credit score tier, at more than $8,000 per indebted general purpose cardholder as of the end of 2020.

**Figure 4:**    AVERAGE PER-CARDHOLDER CREDIT CARD BALANCES, GENERAL PURPOSE (CCP)



Many events and consumer behavioral trends may have contributed to the declines in general purpose card debt in 2020. As discussed in the next section, the beginning of the pandemic saw declines in spending, which may have enabled some cardholders to use those funds to pay down debt. Unprecedented levels of direct government assistance, such as Economic Impact Payments, enhanced unemployment benefits, and payment and interest suspensions on federally-held student loans may have provided some consumers with additional disposable income usable to reduce balances.[55] Reductions in payments on other credit products, such as mortgages following a refinance to lower rates, may also have been a factor. However, some

---

[55] *See, e.g.*, Stefan Lembo Stolba, *Credit Card Debt in 2020: Balances Drop for the First Time in Eight Years*, Experian (Nov. 2020), https://www.experian.com/blogs/ask-experian/state-of-credit-cards/.

EXHIBIT A
Page 34

evidence also suggests that, rather than reduce debt, some consumers may have simply shifted purchasing behavior away from credit cards to debit cards or other forms of credit, such as buy-now pay-later or personal loan products. The debt paydown was also likely unevenly distributed, with those individuals that lost their jobs reporting a greater likelihood to have increased balances in the prior twelve months.[56] Similarly, cardholders did not equally benefit from CARES Act provisions.[57]

**PRIVATE LABEL**

In contrast to general purpose card trends, average per-cardholder balances for private label cardholders rose during the first and second quarters of 2020, before declining somewhat by the end of the year. Average private label balances for all credit tiers reached new peak nominal levels in late 2019 and 2020. Average per-cardholder private label balances rose to its highest level of more than $1,600 in mid-2020 before falling to less than $1,500 by the end of the year. While private label balances are lower on average then general purpose cards, cardholders with prime scores remain the biggest carriers of private label debt. Average private label balances for cardholders with prime scores peaked at $2,300 in mid-2020 before declining to roughly $2,200 by year-end 2020.

---

[56] *See* Bd. of Governors of Fed. Rsrv. Sys., *Report on the Economic Well-Being of U.S. Households in 2020*, at 42 (May 2021), https://www.federalreserve.gov/publications/files/2020-report-economic-well-being-us-households-202105.pdf. Bureau research finds some evidence that support this finding. *See* Sandler & Ricks, *supra* note 24, at 24-25.

[57] *See* AnnaMaria Andriotis & Orla McCaffrey, *Pausing Loan Payments During Coronavirus Is Producing Uneven Results*, Wall St. J. (Nov. 2020), https://www.wsj.com/articles/pausing-loan-payments-during-coronavirus-is-producing-uneven-results-11606559401.

**Figure 5:**    AVERAGE PER-CARDHOLDER CREDIT CARD BALANCES, PRIVATE LABEL (CCP)



## 2.3    Purchase volume

Purchase volume on general purpose cards grew steadily for several years before declining rapidly in the early part of the pandemic, but volumes returned to previous levels by the end of 2020. For all of 2019 and early 2020, general purpose card purchase volumes for card issuers in the Bureau's sample typically exceeded $500 billion each quarter. Yet, general purchase volumes fell 21 percent in the second quarter of 2020.[58] In contrast, private label card spending is much lower at roughly $40 billion per quarter and has remained relatively flat since at least 2015. Some of the declines in general purpose purchase volumes can be attributed to reductions in spending on travel, restaurants, and entertainment, categories of activities that became much less common during the pandemic.[59]

---

[58] The Bureau's 2019 Report relied on Nilson data, which considers a wider range of products and purchases than the Y-14+ data.

[59] For more information on COVID-19, *see* Section 5.5.

EXHIBIT A
Page 36



**Figure 6:**    CREDIT CARD PURCHASE VOLUME (Y-14+)

Cardholders in all credit score tiers contributed to the decline in purchase volumes in the second quarter of 2020, but most tiers saw purchase volumes rebound to previous highs by the end of the year. Cardholders with superprime scores accounted for 83 percent of all general purpose card purchase volume in 2020, and in the last quarter of the year their spending was 67 percent higher than in the first quarter of 2015. Cardholders with prime scores made up 11 percent of spending in 2020 but saw spending decline in the second quarter of 2020 to only 6 percent higher than in the first quarter of 2015, and volumes have yet to return to where they were prior to the pandemic. While growth in spending since 2015 was greatest for cardholders with deep subprime scores in percentage terms, these cardholders account for less than 1 percent of general purpose purchase volume.



**Figure 7:**    CREDIT CARD PURCHASE VOLUME, GENERAL PURPOSE (Y-14+) (INDEXED TO Q1 2015 = 100)

# 2.4    Repayment

## 2.4.1    Revolving rates

Accounts with balances can be identified as exhibiting one of two basic patterns in any given cycle. "Transacting" accounts pay off the previous cycle's balance in full before the end of the next cycle. "Revolving" accounts pay some amount less than that.[60] Although an account can move back and forth between transacting and revolving, many accounts reveal persistent payment behavior over time.[61] The Bureau calculates the share of accounts revolving in a given cycle as the number of accounts that revolve divided by the total number of revolving and transacting accounts. The denominator excludes accounts that fail to satisfy either condition and are "neither transacting nor revolving."

Over the past two years, a decreasing share of general purpose accounts revolved a balance from one month to the next. Figure 8 shows the decline in revolver activity from 2018 to 2020 was true for every credit tier except prime. For cardholders with lower scores, this trend is particularly noteworthy as the share of revolving subprime and deep-subprime general purpose accounts fell 6 and 7 percentage points respectively from 2018 levels. The decrease in revolver activity is a significant shift in payment behavior that predates but may have been accelerated by the pandemic.

---

[60] The methodology for determining whether an account is revolving has changed from when the Bureau reported on this in 2017 or 2019. In this report, an account is considered "revolving" in a cycle if its beginning balance is larger than the sum of payments received in a cycle. If the sum of payments is equal to or exceeds a non-zero beginning balance, it is considered "transacting." If an account does not satisfy either condition (for example if the beginning balance is zero) it is "neither transacting nor revolving." The denominator excludes accounts in a transitioning status. Figures that use Y-14 and Y-14+ data are based only on accounts that are "open and active" in a given month or cycle

[61] *See* 2015 Report, *supra* note 6, at 50-52 (citing Benjamin J. Keys & Jialan Wang, *Minimum Payments and Debt Paydown in Consumer Credit Cards* (U. of Chicago Harris Sch. of Pub. Pol'y, Working Paper 2016), https://www.nber.org/papers/w22742.

**Figure 8:**    SHARE OF ACCOUNTS REVOLVING, GENERAL PURPOSE (Y-14+)



In contrast to general purpose, Figure 9 shows that the overall share of private label accounts that revolve increased in 2019 and remained at an elevated level in 2020. Over three-fourths of private label accounts now pay less than the previous cycle's balance each cycle. An increase in revolver activity by consumers with near-prime scores or higher drove the expansion in the total share of revolving accounts. There was no significant change in revolving rates for subprime and deep subprime accounts from 2018 levels. For all credit tiers, a greater share of private label accounts revolves a balance each month than general purpose accounts.

**Figure 9:**    SHARE OF ACCOUNTS REVOLVING, PRIVATE LABEL (Y-14+)



While the Bureau can only quantify the share of accounts that revolve, recent data from the Survey of Consumer Payment Choice suggests that the share of consumers who revolve is at its lowest point since 2015. At the time of the survey in October 2020, 51.3 percent of consumers with a credit card reported carrying a balance at some point in the last 12 months, down one

percentage point from 2019, while 40.7 percent reported carrying a balance within the last month, down six percentage points from 2019.[62] Federal Reserve Board data from the annual Survey of Household Economics and Decisionmaking (SHED) support this conclusion, with 48 percent of survey cardholders in 2020 reporting that they never carried an unpaid balance during the preceding 12 months, a two percentage point increase from 2019 levels.[63]

## 2.4.2    Payment rates

Payment rates provide an additional measure of consumer reliance on credit cards as a source of consumer credit.[64] The payment rate is the share of total cycle-beginning balances paid that cycle.[65]

General purpose card payment rates continue to grow, driven by steadily increasing payments by cardholders with superprime scores in 2019 and a marginal rise in payments by cardholders with lower scores in 2020. About one-third of total general purpose cycle beginning balances are now paid by cycle's end, but repayment differs by credit score. Superprime accounts pay half of their total balances each cycle. In contrast, all other tiers pay less than one-sixth. Yet, payment rates for subprime and deep subprime accounts slightly increased in 2020. Higher payment amounts coupled with lower purchase volume contributed to a decline in debt starting in the second quarter of 2020. As purchase volumes began to rise in the latter half of the year,

---

[62] *See supra* note 53 and Fed. Rsrv. Bank of Atlanta, *2020 SCPC Tables* (Jan. 2021), https://www.atlantafed.org/-/media/documents/banking/consumer-payments/survey-of-consumer-payment-choice/2020/tables_scpc2020.pdf.

[63] *See* Bd. Of Governors for the Fed. Rsrv. Sys., *Report on the Economic Well-Being of U.S. Households in 2020*, at 42 (May 2021), https://www.federalreserve.gov/publications/files/2020-report-economic-well-being-us-households-202105.pdf. *See also* Bd. Of Governors for the Fed. Rsrv. Sys., *Report on the Economic Well-Being of U.S. Households in 2019*, at 30 (May 2020), https://www.federalreserve.gov/publications/files/2019-report-economic-well-being-us-households-202005.pdf.

[64] Payment measures cannot be shown at the consumer level because the CCP does not contain payment data. The Y-14 is used instead for these views.

[65] Thus, a payment rate of 100 percent corresponds to all account balances being paid in full, and a payment rate of zero percent indicates that no one is paying any credit card bill even in part.

EXHIBIT A
Page 40

payment rates remained comparatively elevated, explaining the decline in average balances.[66] Economic Impact Payments and the deferral of other debt obligations during the pandemic supported higher payment rates. Payment rates in 2020 were also affected by issuer relief programs like "skip-a-pay."[67]

**Figure 10:**    PAYMENT RATE, GENERAL PURPOSE (Y-14+)



Private label payment rates rose for the first time in five years. While the overall increase was small in magnitude, the trend reversal is significant, as it was driven by consumers with lower credit scores. As the share of subprime and deep subprime revolvers did not substantively change from 2019 to 2020, it is likely these consumers paid down a portion of previously incurred retail card debt less than the total balance. Private label payment rates for consumers with superprime scores continue to be double that of all other tiers. One explanation for lower private label payment rates may be the prevalence of deferred interest promotions, which incentivize consumers to pay less than the full balance prior to promotion expiration.[68]

---

[66] *See* Sections 2.2 and 2.3 for further data on average debt and purchase volumes.

[67] *See* Section 5.5 for further information on short-term payment deferral programs.

[68] *See* 2017 Report, *supra* note 6, at 58 (finding that deferred interest promotional balances outstanding for consumers with superprime scores were equivalent to over half of private label balances owed by those same consumers). For more information regarding deferred interest promotions, *see* Section 5.2.



**Figure 11:**    PAYMENT RATE, PRIVATE LABEL (Y-14+)

The distribution of payment rates is bimodal. About two-fifths of accounts pay their balances in full. Over one-third pay less than 10 percent of their balances. In comparison, Figure 12 shows a much smaller percentage pay between 10 percent and 100 percent of their balances each month. This is likely driven by persistent transacting and revolving activity over time. Payment amount is used by reporting agencies to calculate credit score, partially explaining the stark difference in payment behaviors among tiers. However, recent research by the Bureau suggests that only about half of the largest credit card issuers furnish actual payment data.[69]

---

[69] Logan Herman, Jonah Kaplan, & Austin Mueller, *Quarterly Consumer Credit Trends: Payment Amount Furnishing & Consumer Reporting*, Bureau of Consumer Fin. Prot. (Nov. 12, 2020), https://www.consumerfinance.gov/data-research/research-reports/quarterly-consumer-credit-trends-payment-amount-furnishing-consumer-reporting/.

**Figure 12:**    DISTRIBUTION OF PAYMENT AMOUNTS ACROSS HIGH, LOW, AND INTERMEDIATE PAYMENTS, 2020 (Y-14)



## 2.4.3    Payment methods

More consumers than ever are paying their credit card bills online or via mobile app. Concurrently, the use of paper-based payments has declined. These trends are true overall and for each age group. Yet adoption of digital payments for older consumers accelerated in 2020 as technological literacy increased during the pandemic. When using an issuer's online portal or mobile app, consumers can generally authorize non-recurring "one-time" payments or recurring "automatic" payments. For all methods, consumers can choose any payment amount and date but often choose the minimum payment or full statement balance as prominently displayed payment options.

The share of consumers enrolled in automatic payments continues to increase. In 2020, 20 percent of active accounts within the scope of the MMI survey were enrolled in automatic payments at year-end compared to 16 percent in 2018.[70] Automatic payment eliminates late fee

---

[70] Some studies have reported markedly higher consumer-reported rates of automatic payment. *See, e.g.*, Mercator Advisory Group, *U.S. Consumers and Credit: Rising Usage*, at 38 (Dec. 2018), https://www.mercatoradvisorygroup.com/Reports/Consumers-and-Credit--Rising-Usage/. It is possible that consumers who self-report overstate the extent of their use of automatic payment. Consumers may also be including *pre-authorized* one-time payments as automatic payments.

EXHIBIT A
Page 43

charges which has been reported in surveys as the main benefit of enrollment.[71] However, it could potentially lead to overdraft charges on checking accounts. The Bureau has not attempted to quantify this impact or to determine fee incidence rates associated with automatic payment.

**Figure 13:** SHARE OF ACTIVE ACCOUNTS THAT MADE A PAYMENT IN THE LAST CYCLE OF THE YEAR BY PAYMENT METHOD, GENERAL PURPOSE (MMI)[72]



In 2019 and 2020, the use of automatic and non-automatic online payments continued to increase while payment of general purpose card statements by paper fell into single-digits. As shown in Figure 14, the age group with the highest share of accounts making an automatic payment (at 18 percent) are cardholders aged 25 to 64. Consumers under age 25 are about as likely to use automatic payments as those 65 years and older—roughly 15 percent for both groups. Despite increasing adoption of automatic payments for all demographics over the past two years, barriers to adoption remain. Surveys report that those who do not enroll in automatic payments express a desire to maintain manual controls, such as varying payment amount or checking statements first.[73]

---

[71] *See* Auriemma Consulting Group, *Buy Now, Pay Later, Instant Issuance and Automatic Payments, The Payments Report*, at 12 (Mar. 2021).

[72] Values do not sum to 100 percent as certain forms of payment, such as telephone and payments from a third-party, are not included.

[73] *See* Auriemma Consulting Group, *supra* note 71.

EXHIBIT A
Page 44

**Figure 14:** SHARE OF ACTIVE PAYMENT-MAKING ACCOUNTS THAT MADE AT LEAST ONE AUTOMATIC PAYMENT IN THE LAST CYCLE OF THE YEAR VIA ONLINE PORTAL OR MOBILE APP BY AGE, GENERAL PURPOSE (MMI)



There was little change in the use of non-automatic online payments in 2019, yet the total share of accounts utilizing this payment method jumped for consumers over 25 in 2020. Three-fifths of accounts in 2020 made at least one electronic payment via online portal or mobile app. Younger consumers are still significantly more likely to use one-time digital payments, but evidence suggests other age groups may be rapidly enrolling in digital servicing platforms.

**Figure 15:** SHARE OF ACTIVE PAYMENT-MAKING ACCOUNTS THAT MADE AT LEAST ONE "ONE-TIME" ELECTRONIC PAYMENT IN THE LAST CYCLE OF THE YEAR VIA ONLINE PORTAL OR MOBILE APP BY AGE, GENERAL PURPOSE (MMI)



Paper-based payments remain a prominent payment method for older Americans, but that appears to be changing. In 2017, 31 percent of consumers 65 and older that made a payment in the final month of the year used a paper check at least once that cycle. In 2020, that figure had fallen to 21 percent. Yet, the difference between age groups remains stark—only 1 percent of

consumers under 25 and 4 percent of consumers between the ages of 25 and 64 used a paper check to pay their credit card bill in the last payment cycle of 2020. Additionally, one academic researcher has found the use of active choice formats like digital, as opposed to paper, payments may increase the amount consumers pay, which could lead to lower debt levels.[74]

**Figure 16:**    SHARE OF ACTIVE PAYMENT-MAKING  ACCOUNTS THAT MADE AT LEAST ONE PAPER PAYMENT  IN THE LAST CYCLE OF THE YEAR BY AGE, GENERAL  PURPOSE (MMI)



## 2.5   Delinquency

General purpose and private label card delinquency rates continued to increase throughout 2019, maintaining their upward trend following the Great Recession and reaching a peak at the end of the year. [75] From the first quarter of 2020 onward, however, both general purpose and

---

[74] "Our findings that minimum required payment rates, statement balance payoff rates, and average payment amounts are higher in active choice formats typical of credit card account portals (versus traditional open choice formats on credit card paper billing statements) suggest that online repayment may impact debt levels. Downward shifts toward the minimum required amount increase long-term debt, while upward shifts toward the full balance decrease debt, so the relative propensity of each behavior will influence the degree to which aggregated debt levels increase or decrease over time." *See* Salisbury Comment Letter, at 2-3.

[75] When a consumer fails to make a required minimum payment by the due date, the credit card account becomes "delinquent." Because credit scores are heavily influenced by delinquency and charge-offs, these measures are not shown by credit score.

private label delinquency rates started to decline and continued to fall up until the final quarter of the year, erasing six years of increases.

This trend most likely reflects the impact of government financial relief enacted to offset the financial hardship imposed by COVID-19 and the resulting recession.[76] Bureau research utilizing survey data also implies that the falling delinquency rate over the course of the pandemic reflects both private and public relief, including unemployment relief and loan forbearance programs. Additional Bureau research suggests the share of accounts actively receiving assistance increased through the first half of 2020.[77]

**Figure 17:**    SHARE OF ACCOUNTS 60 OR MORE DAYS DELINQUENT (CCP)[78]



Convergence in account delinquency rates for general purpose and private label card continued throughout 2019 and 2020, with rates moving in near lockstep throughout 2020. One explanation for the convergence over the past decade may be that private label card issuers are

---

[76] For more information regarding issuer response to the COVID-19, see Section 5.5. *See also* Scott Fulford, Marie Rush, & Eric Wilson, *Data Point: Changes in consumer financial status during the early months of the pandemic: Evidence from the second wave of the Making Ends Meet survey*, Bureau of Consumer Fin. Prot. (Apr. 2021), https://files.consumerfinance.gov/f/documents/cfpb_making-ends-meet-wave-2_report_2021-04.pdf.

[77] *See* Sandler & Ricks, *supra* note 24, at 24-25.

[78] Figures 17 and 18 use the delinquency definition "60 or more days delinquent," meaning that the account is at least three minimum monthly payments behind on debt repayment. This is considered "severe" delinquency.

increasingly offering cards to consumers with lower credit scores. In addition, COVID-19 related financial relief and interventions may impact accounts uniformly across card type.

The share of balances 60 or more days delinquent also decreased in 2020, although general purpose card balances exhibited a sharper decline than that of private label. Private label balance delinquency rates fell from a peak of 2.4 percent at end of year 2019 to just under 3 percent by third quarter 2020, undoing three years of upward trends. General purpose balance delinquency rates also peaked in 2019, although at a lower rate of 2.4 percent, and then fell to 1.6 percent by third quarter 2020, a low not seen since 2016.

Even as account delinquency rates for general purpose and private label cards converged in the wake of the Great Recession, delinquency rates as shares of balances diverged, as shown in Figure 18. However, throughout 2020, the measured disparity between rates by card type fell from a maximum of 2 percentage points in 2019 to closer to one percentage point in 2020. This slight convergence may reflect uniform impacts of policy interventions and consumer behavior in response to the COVID-19 recession across card types, similarly to the increased convergence of the share of delinquency rates by accounts for both general purpose and private label cards.

**Figure 18:**    SHARE OF BALANCES 60 OR MORE DAYS DELINQUENT (CCP)



EXHIBIT A
Page 48

# 2.6    Charge-off

Charged-off balances also declined through the COVID-19 recession, but less uniformly than delinquency rates.[79] Private label charge-offs reached a peak of around 15 percent at the end of 2019 and fell throughout 2020 to around 5 percent. This observed pattern reflects the higher volatility of private label charge-off rates in comparison to general purpose. General purpose charge-offs remained roughly consistent around 6 percent until mid-year 2020, then fell to around 3.5 percent. Private label charge-offs and general purpose charge-offs exhibit a convergence over the period similar to that of delinquency rates.

Declines (or moderation, in the case of general purpose cards) in charged-off balances began before the pandemic and subsequent financial relief, but, over the course of 2020, charge-offs across both card types fell in lockstep. This decline likely reflects the economic impact of government and private interventions in response to COVID-19. Forward-looking statements made by several major issuers suggest issuers expect that charge-offs could return to pre-pandemic levels in the medium term, based on recent increases in delinquency rates.[80]

---

[79] Accounts that remain delinquent for 180 days must be "charged off," meaning that the issuer can no longer consider the outstanding balance as an asset on its balance sheet. Delinquent accounts may have to be charged off prior to 180 days in certain circumstances as, for example, with a bankruptcy. *See* Off. of the Comptroller of the Currency, *Policy Implementation – The Guidance Attached to this Bulletin Continues to Apply to Federal Savings Associations*, OCC Bulletin 2000-20 (June 20, 2000), https://occ.gov/news-issuances/bulletins/2000/bulletin-2000-20.html.

[80] Issuers note losses have remained low but may rise in the next year or two. "[W]e now expect our card net charge-off rate to be around 250 basis points for the year. ... pre-COVID, we would have thought that our loss rate in card this year would have been 3.3%, 3.5%. So it just gives you a sense there that tailwind on credit is significant." JPMorgan Chase & Co., *Q1 2021 Results – Earnings Call Transcript*, Seeking Alpha (Apr. 14, 2021), https://seekingalpha.com/article/4419192-jpmorgan-chase-and-co-jpm-ceo-jamie-dimon-on-q1-2021-results-earnings-call-transcript; "With respect to credit, delinquencies are expect to increase from the current levels. So, we now believe the peak will occur later than we anticipated, likely in early 2022. While current delinquencies will result in lower net charge-offs in the second quarter, we expect net charge-offs to rise resulting from the increases in delinquencies as we move through 2021." Synchrony Financial, *Q1 2021 Results – Earnings Call Transcript*, Seeking Alpha (Apr. 27. 2021), https://seekingalpha.com/article/4421546-synchrony-financial-2021-q1-results-earnings-call-transcript; "The increase in card net charge-offs from the prior quarter was driven by accounts that had been in Skip-a-Pay and did not gear. ... Looking forward, we expect minimal impact to charge-offs from this population." Discover Financial Services, *Q1 2021 Results – Earnings Call Transcript*, Seeking Alpha (Apr. 22. 2021), https://seekingalpha.com/article/4420711-discover-financial-services-dfs-ceo-roger-hochschild-on-q1-2021-results-earnings-call.

**Figure 19:**    ANNUALIZED RATE OF GROSS OUTSTANDING BALANCES CHARGED OFF (CCP)



# 3.    Cost of credit

As its predecessors did, this report assesses overall costs to credit card consumers using the Bureau's total cost of credit (TCC) measure. TCC captures the totality of payments by consumers to issuers as an annualized percentage of cycle-ending balances on their accounts.[81] This section also looks separately at the main components of TCC—interest charges and fees.[82] Cardholders revolving debt from one month to the next pay the majority of fees and interest. This analysis focuses primarily (but not exclusively) on costs to revolving cardholders.

## 3.1    Total cost of credit

TCC on accounts that carried a balance increased in 2019, but 2020 saw total cost return to 2018 levels. The general purpose card cost of credit increased from 15.3 percent in 2015 to 18.5 percent in 2019, but costs declined to 17.7 percent in 2020. As discussed in more detail below, both the prior-year cost increases and the 2020 decrease were driven by broader shifts in the interest rate environment; fee costs in every credit tier have been flat. Between August 2019 and March 2020, the prime rate decreased a total of 2 percentage points, which drove the decline in TCC, because most consumer credit cards have variable rates that are tied to changes in the prime rate.[83]

---

[81] Cost data are from the Y-14, augmented by summary data that the Bureau collected from a range of issuers not included in that source. Y-14 data do not permit consumer-level cost reporting. For more detail on Y-14 data, see Section 1.3.1. Although this report uses broader cost data than previous iterations did, the Bureau does not claim that these data are representative of the market not covered by the data. TCC does not include the cash value of any rewards that may have been earned by the cardholder.

[82] The TCC metric was initially introduced in the 2013 Report and has since been used in the 2015 Report, 2017 Report, and 2019 Report. *See* 2013 Report, *supra* note 6, at 19; 2015 Report, *supra* note 6, at 76; 2017 Report, *supra* note 6, at 72; 2019 Report, *supra* note 6, at 55.

[83] For further discussion of variable rates, *see* Section 3.2.2.

EXHIBIT A
Page 51

**Figure 1:**    TOTAL COST OF CREDIT, REVOLVING ACCOUNTS, GENERAL PURPOSE (Y-14+)



On the private label side, TCC on revolving accounts similarly rose in 2019 before receding in 2020, both overall and for every credit tier except superprime. Despite some narrowing over the last few years, TCC remains consistently higher, both overall, and within every credit tier, on private label accounts, as compared to general purpose accounts. As with general purpose cards, fee costs on private label cards have also been roughly stable on net or declining between 2017 and 2020. In 2015, the overall gap in TCC was 8.2 percentage points between the two card types. By 2020, this had fallen to 4.6 percentage points.

**Figure 2:**    TOTAL COST OF CREDIT, REVOLVING ACCOUNTS, PRIVATE LABEL (Y-14+)



# 3.2    Interest charged

Interest charges increased in 2019 before receding in 2020. Both non-promotional retail annual percentage rates (APR)s and effective interest rates (EIR) on consumer credit cards followed this pattern.[84] In 2020 the average APR for general purpose and private label cards fell to 19.2 percent and 25.7 percent, respectively. As with TCC, the fall in interest charges is in part the result of changes in prevailing market interest rates.[85]

**Figure 3:**    AVERAGE APR, GENERAL PURPOSE (Y-14+)



[84] For closed-end loan products, the APR captures certain fees as well as the interest rate. 15 U.S.C. § 1606(a)(1) (2012); 12 CFR 1026.22(b). However, for open-end credit, including credit cards, the APR is calculated using the periodic rate. 15 U.S.C. § 1637 (a)(4), (b)(5) (2012); 12 CFR 1026.2(a)(21), 1026.14.

[85] "Data from form FR 2835a indicate that the average credit card interest rate across all accounts decreased to 14.5 percent during 2020 before inching up to 14.7 percent in the fourth quarter of 2020. At the same time, the two-year Treasury rate—a measure of the baseline, or "risk free," rate—fell to less than 0.2 percent." Bd. Of Governors for the Fed. Rsrv. Sys., *Report to the Congress on the Profitability of Credit Card Operations of Depository Institutions - July 2021* (July 2021), https://www.federalreserve.gov/publications/files/ccprofit2021.pdf.

**Figure 4:**     AVERAGE  APR,  PRIVATE  LABEL  (Y-14+)



2017    2018    2019    2020

## 3.2.1    Effective interest rates

While APR is a useful barometer of issuer pricing strategies, "effective interest rate" may provide a better measure of the cost of interest to cardholders because EIR incorporates the effect of short-term promotions and cash advances. An EIR is computed by annualizing the total of all interest charges consumers paid divided by those consumers' cycle-ending balances.[86] Figure 3 shows that EIRs for general purpose cards with revolving balances increased roughly 70 basis points from 15.6 percent in 2018 to 16.3 percent in 2019, before falling 60 basis points to 15.7 percent in 2020. Each credit tier experienced similar movements over that period.

---

[86] EIRs differ from nominal rates for two reasons. First, consumers may have various balances on a single account (such as cash advances and balance transfers), not all of which are subject to the APR typically applied to purchases on that account. Second, consumers may have different patterns of payment and spending within a cycle. Due to the average daily balance method that most credit card issuers use to calculate interest charges, this means that two accounts subject to the same retail APR that conclude a cycle with identical balances may nevertheless properly be assessed different interest charges as a result of differences in the composition and fluctuation of those balances over the course of the cycle.

EXHIBIT A
Page 54

**Figure 5:**    EFFECTIVE  INTEREST  RATE, REVOLVING  ACCOUNTS, GENERAL  PURPOSE  (Y-14+)



The picture for private label is different, with EIRs across the period staying mostly flat from 2015 to 2018 before declining slightly in 2020. As the next subsection shows, this contrast is partly because fewer private label cards are priced with a variable rate, so fewer private label cards benefitted from the index interest rate declines in 2020.

**Figure 6:**    EFFECTIVE  INTEREST  RATE, REVOLVING  ACCOUNTS, PRIVATE  LABEL  (Y-14+)



## 3.2.2    Upward repricing

Upward repricing declined to near-zero in 2019 and 2020, both because index interest rates have declined over this period and the CARD Act continues to restrict upward repricing outside of certain limited exceptions. Bureau data suggests that most account repricing is driven by the variable rate exception, which permits card issuers to increase the APR when the rate varies according to a publicly-available index not under the issuer's control and there is an increase in

that index.[87] As of the end of 2020, more than 90 percent of general purpose and less than half of private label balances in the Y-14 were carried on "variable rate" cards of this kind.

Unlike in prior years, declines in interest rates have reduced the APRs on many cards in the past two years, reducing the cost of credit card borrowing for many consumers. The Bureau estimates that the five rate decreases by the Federal Reserve from early-2019 through 2020 led to a cumulative roughly $18 billion that credit card borrowers did not pay over that period.[88]

A second notable exception called the "delinquency exception" permits issuers to increase rates when a consumer does not pay at least the minimum periodic payment within 60 days after it is due.[89] Issuers are also required to provide consumers experiencing repricing due to delinquency a notice including a statement of the reason for the increase, and include notification that the increased rate will cease to apply if the issuer receives six consecutive required minimum periodic payments on or before the payment due date.[90] For consumers that meet the six timely minimum payments requirement, issuers are required to reduce that rate.[91] Issuers must also conduct a periodic review based on certain factors, and reduce the annual percentage rate applicable to the consumer's account, as appropriate[92].

---

[87] 12 CFR 1026.55(b)(2).  For more on CARD Act limits on repricing, *see* the 2013 Report, *supra* note 6, at pages 11, 27-29.  Issuers that use variable rate pricing mostly rely on *The Wall Street Journal*'s U.S. prime rate. A small percentage of the accounts, however, are linked to the London interbank offered rate (LIBOR). The status of LIBOR is in flux, which creates certain risks for cards linked to LIBOR. *See* Appendix A at Figure 1 for a chart showing changes in the federal funds rate and the associated prime rate.

[88] This calculation uses historical quarterly balances multiplied by the cumulative declines in rates from 2019 to 2020, assuming no consumer response to the rate changes. If consumer borrowing patterns changed in response, the actual impact may be different

[89] 12 CFR 1026.55(b)(4).

[90] *Id.*

[91] *Id.*

[92] 12 CFR 1026.59.  Some issuers have failed to implement this provision and have since provided compensation to impacted cardholders. *See* Consent Order at 3-9, *In re CITIBANK N.A.*, 2018-CFPB-0003 (Jun. 29, 2018), https://files.consumerfinance.gov/f/documents/bcfp_citibank-na_consent-order_2018-06.pdf

EXHIBIT A
Page 56

# 3.3    Fees assessed

Collectively, fees comprise just under one-fifth of total consumer costs and for consumers who exclusively transact, fees are the primary source of direct cost. In 2020, cardholders were assessed $20.8 billion in fees, down from $23.6 billion in 2019, due in large part to significant increases in fee waivers during the pandemic.[93] Fees take a variety of forms including annual fees, transactional fees (*e.g.*, for cash advances), and penalty fees (such as late fees or over-limit fees). The CARD Act imposed several substantive pricing controls on both the amounts of penalty fees consumers could be charged and the conditions under which such fees could be imposed.[94]

## 3.3.1    Total fees

Measured as a share of overall account balances, total fees on revolving accounts declined in 2020 on both general purpose and private label accounts but remain higher for private label accounts. Relative to balances, fees incurred on private label accounts that revolve are higher than on general purpose accounts that do so.[95] For private label accounts, fees were equivalent to 5.2 percent of balances as of the end of 2020, down from 6.2 percent in 2019; on general purpose, they were 2.0 percent of balances, down from 2.2 percent.

Within certain credit tiers, however, the fee picture is changing. Figure 7 shows that general purpose accounts held by consumers with deep subprime credit scores saw fee-to-balance ratios fall the most in 2020, from 10.9 to 9.8 percent, continuing a trend observed since 2015 when the ratio was 12.1 percent. Even so, these tiers have fee ratios that are several multiples of those for

---

[93] Total fee amount is based on data collected from banks represented by the Y-14+ collection. *See* Section 1.3.1 for more information about the Bureau's data sources.

[94] *See, e.g.*, 15 U.S.C. §§ 1637(k), (n), 1665d (2012). CARD Act pricing restrictions have resulted in a substantial decline in overall fee costs to consumers since the pre-CARD Act period. *See* 2013 Report, *supra* note 6, at 34. CARD Act fee restrictions, of course, may have led to compensating changes in interest rates. For example, one commenter asserts that changes brought about by the CARD Act have resulted in higher interest rate margins "as issuers sought alternative ways to manage portfolio-wide risk." *See* ABA Comment Letter, at 2.

[95] This is in part the product of lower average balances on private label accounts. (Section 2.2.1 contains data on average account balances for different card types, by credit tier.) The Bureau's 2019 Report contains more information on this point. *See* 2019 Report, *supra* note 6, at 32-33.

accounts held by consumers with higher credit scores. Similarly, fee-to-balance ratios for private label accounts dropped in 2020 for all credit score tiers. Total balances decreased in 2020 as discussed in Section 2.2, but fees fell further as a result of, among other pandemic-era effects, fee waivers.[96]

**Figure 7:** TOTAL FEES INCURRED IN THE YEAR AS A PERCENTAGE OF AVERAGE CYCLE-ENDING BALANCES, REVOLVING ACCOUNTS, GENERAL PURPOSE (Y-14+)



## 3.3.2    Fee composition

Over the last few years, fee composition has changed relatively little. Figure 8 shows trends for general purpose cards over this period. The largest change is the increase in annual fees as a share of total fees. Annual fee trends are covered in more detail in the next subsection below. This increase comes largely at the expense of late fees and balance transfer fees, even as the number and volume of annual fees have increased. Figure 8 also shows that several other fees remain prevalent on general purpose cards, including fees for balance transfers and cash advances.[97]

---

[96] For more on fee waivers, *see* Section 5.5.

[97] For more information on cash advance and balance transfer trends, *see* Sections 5.2 and 5.3.

**Figure 8:**    SHARE OF TOTAL FEES COSTS INCURRED BY TYPE OF FEE, GENERAL PURPOSE (Y-14+)



For private label cards, late fees make up the overwhelming majority of all fees assessed—89 percent in 2020. This represents a slight decrease over the last two years, from 91 percent in 2018.

## 3.3.3    Late fees

In a reversal of consistent growth trends, total late fee volume decreased in 2020. Late fee reductions can be attributed to a combination of factors related to the pandemic, such as economic impact payments, shifts in consumer behavior such as spending, saving, and repayment, and late fee reversals and waivers.[98] Issuers in the Y-14+ assessed nearly $14 billion in late fees in 2019, compared to less than $12 billion in 2020, as shown in Figure 9. The share of card accounts held by consumers in each credit tier declines steeply with scores, but late fee volumes are relatively similar across these tiers. Consumers with superprime scores hold 59 percent of card accounts but pay only 21 percent of late fee volumes; by contrast, consumers with deep subprime scores hold about 6 percent of card accounts but generate 24 percent of late fee volumes.

---

[98] For more information on card issuer responses to COVID-19, *see* Section 5.5.

**Figure 9:**    LATE FEE VOLUME (Y-14+)



Issuers generally assess a late fee to consumers who do not make at least their minimum payment by the monthly due date. These and other "penalty" fees were targeted by specific CARD Act provisions, and the dollar amounts of such fees are now subject to CARD Act restrictions.[99] In general, these fees have to be "reasonable and proportional."[100] There is a regulatory "safe harbor" for specific fee amounts, which the Bureau adjusts for inflation annually.[101] Initially, the safe harbor was set at $25 for an initial late fee and $35 for a second late fee within six billing cycles of a prior late fee. In 2021, the safe harbors are $29 and $40 respectively.[102]

Since 2018, average late fees have continued to increase, from about $28 to $31 in 2020. They nevertheless remain below their nominal pre-CARD Act level of $33 in 2008, and well below the

---

[99] 15 U.S.C. § 1665d(a) (2012).

[100] *Id.*; 12 CFR 1026.52(b).

[101] Regulation Z requires the Bureau to annually adjust the safe harbors to reflect changes in the Consumer Price Index. 12 CFR 1026.52(b)(1)(ii)(D). The Bureau has also introduced a tool to promote transparency in this calculation. Bureau of Consumer Fin. Prot., Office of Compliance & Guidance, *Calculating Adjustments to the Safe Harbor Limits on Credit Card Issuer Fees*, https://www.consumerfinance.gov/compliance/compliance-resources/consumer-cards-resources/truth-lending-annual-threshold-adjustments/ (last visited Jan. 11, 2021). The most recent safe harbor amounts went into effect in January 2021. 83 FR 43503 (Aug. 27, 2018).

[102] 12 CFR 1026.52(b)(1)(ii); Comment 52(b)(1)(ii)-2.i.

EXHIBIT A
Page 60

$40 inflation-adjusted figure in 2020 dollars.[103] Since 2014, when the original penalty safe harbors first increased for inflation, most large issuers have taken advantage of the increased safe harbors by increasing their fee amounts. However, issuers appear to vary in the speed and consistency with which they implement increases across their products and portfolios. Additionally, issuers may as a courtesy offer to reverse late fee charges if the cardholder has a history of paying on time, particularly for cardholders with superprime scores. In combination with the two-tier safe harbor (one amount for the first instance, and a different amount for subsequent instances within one of the next six billing cycles), these practices make it challenging to assess what drives changes in average late fee amounts overall.

Late fee incidence declined somewhat in 2020 likely due to federal pandemic relief and card issuer fee waivers, but late fees continue to represent the highest share of total fee costs incurred, especially for cardholders with lower credit scores or those who carry balances on private label cards.[104] On average, consumers incur less than one late fee per year per general purpose account. This rate remained steady from 2015 to 2019, before declining in 2020. Accounts held by consumers in lower credit score tiers incur more late fees than those in higher tiers. For example, accounts held by consumers with deep subprime credit scores average more than three late fees a year. Accounts held by consumers with superprime or prime scores average less than one. Late fee incidence rates are higher for private label accounts, both overall and within every credit tier. For example, private label accounts held by consumers with deep subprime scores averaged more than four late fees per year in 2020.

---

[103] *See* 2013 Report, *supra* note 6, at 23. The Bureau of Labor Statistics reports the average CPI-U in 2008 was 215.3, compared to 258.8 in 2020. *See supra* note 54.

[104] For more information regarding card issuer responses to COVID-19, *see* Section 5.5.



**Figure 10:**    LATE FEE INCIDENCE, GENERAL PURPOSE (Y-14+)



### 3.3.4    Annual fees

Annual-fee volume has risen significantly over the last few years. For issuers in the data set, annual-fee revenue totaled roughly $600 million in the first quarter of 2015; annual-fee revenue topped $1.3 billion in every quarter of 2020.[105] As discussed further below, this is a function of increases in the average annual fee for accounts charged a fee, but is also due to steady quarterly increases in the total number of accounts incurring an annual fee, even while the percentage of accounts with such fees has decreased.

---

[105] As used in this report, an "annual fee" refers to any participation or maintenance fee assessed to the consumer as a condition of holding the general purpose card account, regardless of any pattern of usage.



**Figure 11:**    ANNUAL-FEE VOLUME, GENERAL PURPOSE (Y-14+)



Average annual fees have been rising in all credit tiers, but the products received differ across credit score tiers. As shown in Figure 12, annual fees averaged roughly $94 per card with a fee in 2020, and that number has been increasing steadily for all credit score tiers. In particular, annual-fee accounts held by consumers with superprime scores averaged nearly $111 in annual fees in 2020, reflecting the increased prevalence in the past two years of richer rewards credit cards that carry higher annual fees. Revenue from cards held by consumers with prime scores is typically returned to cardholders to varying degrees in the form of rewards.[106] In contrast, cardholders in lower credit tiers may pay annual fees to offset credit risk or higher operating costs relative to lower revolving balances.[107]

---

[106] For more on rewards, *see* Section 5.1.

[107] *See* 2017 Report, *supra* note 6, at 91-92.

**Figure 12:**    AVERAGE ANNUAL FEE, GENERAL PURPOSE ACCOUNTS CHARGED AN ANNUAL FEE (Y-14)[108]



While average annual fees have been rising, annual fees have steadily become less common for general purpose card accounts held by cardholders in every credit tier except superprime since 2015. Roughly 22 percent of subprime and deep subprime card accounts had an annual fee in 2020, compared to nearly 39 percent in 2015. Similarly, 19 percent of near-prime accounts carried an annual fee in 2020, compared to 27 percent in 2015. In part, the reduction in annual-fee prevalence for cardholders with below-prime scores was driven by an increase in the share of no-annual-fee card originations to consumers in these score tiers. Since 2016, however, most of that increase was due to originations of no-annual-fee secured cards which, while they do not charge a fee, still require some money be held as a deposit.

---

[108] Average annual fee is calculated as the total number of months in each year and credit tier that an account with an observed annual fee is open times the annual fee observed for those accounts divided by the total number of account months in each year and credit tier that those annual fee-paying accounts are open.

**Figure 13:**    ANNUAL-FEE PREVALENCE, GENERAL PURPOSE (Y-14)



2017   2018   2019   2020

## 3.3.5    Other fees

The quarterly volume of other fees issuers collect on credit cards has not changed significantly in recent years. This fee category includes fees for payments returned for insufficient funds (NSF fees) or exceeding the credit limit (over-limit fees); debt suspension fees; balance transfer fees; and cash advance fees, among others. The 2015 Report showed that these fees, considered collectively, have steadily declined in prevalence since 2008.[109] Over-limit fees that were common prior to the implementation of the CARD Act remained almost nonexistent in 2019 and 2020.[110]

---

[109] *See* 2015 Report, *supra* note 6, at 71-72.

[110] Section 3.3.5 of the 2017 Report notes that many issuers appear to have simply ceased assessing over-limit fees altogether, rather than maintain an opt-in regime. *See* 2017 Report, *supra* note 6, at 96-97.

# 4.    Availability of credit

As in prior reports, this section examines measures relating to credit card availability. It explores two broad areas: first, new account origination; second, credit limits and line changes after origination. [111] To do so, it tracks the credit card account life cycle. It starts with marketing and consumer applications across a range of channels. Next, it addresses issuer approvals as well as new account and line origination. Finally, this section ends with credit lines available to consumers and issuer line management of existing accounts. The interaction between reduced marketing efforts, fewer applications, and lower approval rates caused a dramatic decrease in originations in 2020. While credit line decreases (CLD) increased for consumers with below-prime credit scores, issuers did not substantially deviate from previous line management trends during the pandemic.

## 4.1    New accounts

The analysis below examines patterns of credit card marketing and consumer credit shopping, consumer applications, approval rates for new accounts, and the volume of new account and line origination. Where possible, the analysis reviews how these measures vary by credit score tier as well as by product and marketing channel.

---

[111] Issuers assign a credit line limit to each new account that determines how much a consumer generally is permitted to borrow on the account, at least initially. In subsequent periods issuers may adjust the credit line, as discussed in more detail in Section 4.2.3.

## 4.1.1    Marketing and comparison shopping

Credit card issuers adjust their marketing and origination practices based on changes in consumer behavior, industry competition, and the economy. Issuers primarily solicit consumer demand for credit cards through broad-based advertising like television commercials, and through targeted marketing. For years, issuers have increased credit card marketing across digital platforms, and credit card advertising on social media is becoming more prominent, as consumers spend more time online.[112] Yet in 2020, issuers reduced marketing across the board in accordance with the increased pandemic-related economic uncertainty.[113]

While credit card issuers have generally sent less mail to consumers since the Great Recession, direct mail solicitations fell to new lows after the pandemic's onset and persisted at this reduced level for the remainder of 2020. On average, issuers sent 311 million direct mail solicitations per month in 2019, up 12.2 percent from 2017 levels but still less than half of pre-2009 monthly volumes. However, in May 2020, this metric dropped to 121 million then further plummeted 48 percent in June. Mail volume related to acquisitions reached a low of 61.6 million in July, declining more than 80 percent from its March 2020 level. As shown in Figure 1, direct mail solicitations had yet to recover by the end of 2020 and remained below 100 million.[114]

---

[112] For more information on digital servicing and adoption of new technologies, see section 7.2. *See also* Michael J. Wolf, *How Covid-19 Has Transformed the Amount of Time We Spend Online*, Wall St. J. (Aug. 7, 2020), https://www.wsj.com/articles/how-covid-19-has-transformed-the-amount-of-time-we-spend-online-01596818846.

[113] Issuers note decreasing card acquisition efforts in Q2 2020. "The majority of the expense reduction was in brand marketing and card acquisition costs as we align marketing spend with the impacts of the economic environment and tightened credit criteria." Discover Financial Services, *Q2 2020 Results – Earnings Call Transcript*, Seeking Alpha (July 23, 2020), https://seekingalpha.com/article/4360233-discover-financial-services-dfs-ceo-roger-hochschild-on-q2-2020-results-earnings-call; "[W]e dramatically reduced our proactive marketing efforts for new card acquisition and reinvested in value proposition enhancements, resulting in a 16% decline in marketing expenses in the second quarter." American Express, *Q2 2020 Results – Earnings Call Transcript*, Seeking Alpha (July 24, 2020), https://seekingalpha.com/article/4360706-american-express-axp-ceo-steve-squeri-on-q2-2020-results-earnings-call-transcript.

[114] Data made available to the Bureau by Mintel Comperemedia and Competiscan.

**Figure 1:**    MONTHLY MAIL VOLUME (COMPETISCAN, MINTEL COMPEREMEDIA)[115]



Once a consumer is actively looking for a new credit card, third-party comparison sites (TPC sites) offer information intended to make it easier for consumers to compare credit cards. [116] Some sites let consumers personalize the card offerings shown by using data provided by the consumer or third-party information authorized by the consumer. While that information helps personalize recommendations, some consumers may ultimately find their application does not get approved for a site-listed card for which they apply.

## 4.1.2    Applications

U.S. consumers submitted over 140 million credit card applications in 2020, a significant decline from the over 172 million applications submitted in 2019. [117] To apply for a card, consumers submit an application through one of several channels, such as going online, using a mobile app, calling the issuer, or by walking into a bank branch or retail store to fill out a paper or digital application in-person. The issuer then decides whether to issue a credit card based on

---

[115] Data following October 2019 were supplied by Competiscan. Data prior to this date were supplied by Mintel Comperemedia.

[116] For more on third-party comparison sites, *see* 2017 Report, *supra* note 6, at page 265.

[117] Bureau research on credit applications found that, by the spring of 2021, credit card applications were back to pre-pandemic levels. *See* Nagypál, *supra* note 24, at 3.

its internal underwriting process.[118] Issuers consider economic and market conditions when determining whether to loosen or tighten underwriting standards for approving individual card applicants.

Figure 2 shows that trends in application volume in 2019 differed by credit tier but that the pandemic led to a dramatic and generalizable decrease in demand for general purpose cards.[119] Compared to 2017 levels, application volume remained steady or increased for all tiers but near-prime in 2019, as application volume for consumers with no score and with subprime or deep subprime scores surpassed 2016 highs.[120] Application growth halted for general purpose cards in 2020, as the total volume for mass market issuers was 59 million, falling in every score tier and 26 percent overall. Near-prime, subprime, and deep subprime credit score tiers saw the greatest percent change year-over-year. The previously discussed, industry-wide reduction in marketing expenditure could explain part of this decline. Additionally, decreased household spending and increased government support could reduce the need for credit and partially explain the decline in applications during the pandemic.[121]

---

[118] In addition to an issuer's internal processes, issuers are required to consider an applicant's ability to pay the minimum monthly payment on an account prior to opening a credit card account under an open-end (not home-secured) consumer credit plan or increasing a credit line on such an account. 12 CFR 1026.51(a)(1)(i) (2019).

[119] "MMI" data are provided by a set of larger issuers that make up the substantial majority of the credit card market. Even so, these issuers may not be representative of other issuers.

[120] MMI data account for a smaller share of the overall market as they reach deeper into the credit spectrum. Accordingly, approval rate data in the two lowest score tiers has been combined.

[121] *See* Alison Felix & Samantha Shampine, *Consumer Spending Declines, Shifts in Response to the Pandemic*, Fed. Rsrv. Bank of Kansas City (Feb. 17, 2021), https://www.kansascityfed.org/research/economic-bulletin/consumer-spending-declines-shifts-in-response-to-the-pandemic/; Survey data suggest that demand for credit cards fell in 2020 and there was no meaningful increase in unmet credit need. *See also* Jessica Lu & Wilbert van der Klaauw, *Consumer Credit Demand, Supply, and Unmet Need during the Pandemic*, Fed. Rsrv. Bank of New York (May 20, 2021), https://libertystreeteconomics.newyorkfed.org/2021/05/consumer-credit-demand-supply-and-unmet-need-during-the-pandemic.html.

**Figure 2:**    APPLICATION VOLUME FOR MASS MARKET ISSUERS, GENERAL PURPOSE (MMI)



The pandemic-related decline in retail application volume was smaller in magnitude than that of general purpose cards and driven by consumers with near-prime or higher credit scores.[122] In 2020, consumers submitted over 81 million applications for retail cards to mass market issuers, down from 92 million retail card applications the year prior. As shown in Figure 3, both 2019 and 2020 application volume increased relative to 2018 levels for consumers with subprime and deep subprime credit scores and consumers with no score. Both overall and in every credit score tier, there were more applications for retail cards than general purpose cards in 2020, as has been historically true.

---

[122] Sections 4.1.2 and 4.1.3 divide the market into "general purpose" and "retail," which is slightly different from the "general purpose" and "private label" categorization used elsewhere in the report. See Section 1.3 for more information on these differences.

EXHIBIT A
Page 70



**Figure 3:**    APPLICATION  VOLUME FOR MASS MARKET  ISSUERS,  RETAIL (MMI)



## DIGITAL APPLICATIONS

Applications can be submitted via a number of channels, though importantly there is some overlap (for example, a consumer may apply for a card digitally using a mobile device). In 2020, 88 percent of general purpose card applications were submitted digitally. In stark contrast, 55 percent of 2020 retail card applications were via digital channels. However, digital channel volume grew 34 percent year-over-year for retail applications, as this was the first year less than half of retail applications were submitted in person. This was largely affected by store closures during the pandemic as retail sales plunged.[123]

One subset of digital channel that has become increasingly prominent is mobile devices, as the majority of applications for general purpose cards are now submitted via phone or tablet. The mobile channel accounted for 52 percent of new applications in 2020, up from 43 percent in 2018.[124] As shown in Figure 4, the increasing percentage of applications from consumers with higher scores drove growth, as the share for consumers with both prime and superprime credit scores increased 7 percentage points in 2020. Despite this expansion, the share of superprime

---

[123] *See* Section 5.5 for more information on the impact of COVID-19. *See also* Alina Selyukh, *Pandemic Hits Spending Hard; 79% Dive In Clothing Sales Leads A Record Plunge*, Nat'l Pub. Radio (May 15, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/05/15/856253115/retail-wipeout-sales-plunge-a-record-16-4-in-april.

[124] Figures 4 through 11 rely on MMI data. The Bureau's MMI survey grouped mobile phones and tablets as "mobile devices."

EXHIBIT A
Page 71

applications via mobile device remains about half that of consumers with subprime or deep subprime scores. Meanwhile, the share of mobile applications for consumers with lower or no scores may be plateauing, as two-thirds of subprime and deep subprime applications are now submitted via mobile device. A decline in prescreened offers via mail and fewer applications submitted in person due to bank branch closures could explain the growing share of mobile applications. [125] Additionally, some new credit cards exclusively accepted applications through the mobile channel at their initial launches. [126]

**Figure 4:**   SHARE OF CREDIT CARD APPLICATIONS SUBMITTED VIA MOBILE DEVICES, GENERAL PURPOSE (MMI)



For retail cards, overall levels of mobile penetration remain lower than for general purpose cards, yet the trend toward mobile channels accelerated in 2020 after years of steady growth. Most retail applications by consumers with subprime and deep subprime scores now come from mobile devices. As shown in Figure 5, mobile penetration for applicants with higher scores remained at or below 40 percent. However, these tiers saw an increased share of applications

---

[125] *See* Orla McCaffrey, *People Aren't Visiting Branches. Banks Are Wondering How Many They Actually Need*, Wall St. J. (June 7, 2020), https://www.wsj.com/articles/people-arent-visiting-branches-banks-are-wondering-how-many-they-actually-need-11591531200.

[126] *See* Katie Deighton, *Venmo's New Credit Card Puts QR Codes Front and Center*, Wall St. J. (Oct. 7, 2020), https://www.wsj.com/articles/venmos-new-credit-card-puts-qr-codes-front-and-center-11602064801; *see also* Press Release, Apple, *Apple Card launches today for all US customers* (Aug. 20, 2019), https://www.apple.com/newsroom/2019/08/apple-card-launches-today-for-all-us-customers/.

EXHIBIT A
Page 72

submitted via the mobile channel. The year-over-year growth from 2019 to 2020 may reflect the diminished impact of point-of-sale applications due to pandemic-related store closures and an increased adoption of mobile apps by retailers. [127]

**Figure 5:**    SHARE OF CREDIT CARD APPLICATIONS SUBMITTED VIA MOBILE DEVICES, RETAIL (MMI)



## TPC SITE APPLICATIONS

For the first time in 2020, the share of general purpose applications via the TPC site channel decreased. [128] Figure 6 reflects that, previously, consumers with lower scores were more likely to apply via a TPC site than those with higher scores. Now, both overall and for each credit score tier, about one in five consumers apply via TPC sites. Typically, TPC sites assist consumers in finding cards for which they are likely qualified when they seek credit. Additionally, some TPC sites advised consumers it might be more difficult to get approved for a credit card during the

---

[127] *See* Press Release, Synchrony, *Synchrony Expands Arsenal of Digital Payment Technology Solutions for Partners; Provides Touchless Shopping Options for Customers* (Sep. 29, 2020), https://www.prnewswire.com/news-releases/synchrony-expands-arsenal-of-digital-payment-technology-solutions-for-partners-provides-touchless-shopping-options-for-customers-301140943.html.

[128] An additional number of consumers review TPC sites before applying directly with the issuer. Those applications are not reflected in the TPC data below.

EXHIBIT A
Page 73

pandemic.[129] Warnings by TPC sites of lower issuer approval rates could partially explain the decrease in applications by consumers with subprime or deep subprime scores beyond a general decline in credit demand. In tandem, the increasing share of consumers with superprime scores applying via TPC site may be partially attributed to the decrease in direct card offers via mail typically aimed at this tier.

**Figure 6:**    SHARE OF CREDIT CARD APPLICATIONS SUBMITTED VIA TPC SITES, GENERAL PURPOSE (MMI)



### 4.1.3  Approvals

Since 2015, approval rates on general purpose cards have declined. As shown in Figure 7, the pandemic accelerated this trend. The overall approval rate decreased from 41 percent in 2019 to 36 percent in 2020. Consumers with prime and near-prime credit scores saw the greatest reduction in approval rates of 11 and 10 percentage points respectively as institutions tightened underwriting in response to the pandemic. The Federal Reserve Board's quarterly Senior Loan Officer Survey found that in the third quarter of 2020, 71.7 percent of senior loan officers at

---

[129] *See* Kimberly Palmer, *How to Increase Your Chances of Credit Card Approval,* NerdWallet (July 30, 2020), https://www.nerdwallet.com/article/credit-cards/how-to-increase-your-chances-of-credit-card-approval; *see also* Ethan Steinberg, *Why banks are struggling to assess creditworthiness during the coronavirus pandemic,* The Points Guy (July 7, 2020), https://thepointsguy.com/news/why-banks-are-struggling-to-assess-creditworthiness-during-the-coronavirus-pandemic/.

EXHIBIT A
Page 74

domestic banks reported tightening standards on credit card loans—the highest share in the survey's two-decade history. [130]

**Figure 7:**    APPROVAL  RATE, GENERAL  PURPOSE  (MMI)



Retail card approval rates were stable in 2019 and then dropped overall and in every credit tier in 2020, similar to general purpose. Consumers with near-prime scores experienced the largest decline, dropping from 58 percent in 2019 to 48 percent in 2020. For consumers with superprime scores, the approval rate for retail card applications decreased by 2 percentage points. Approval rates for subprime and deep subprime tiers and consumers dropped year-over-year but were on par with 2018 levels. While issuers tightened underwriting overall, this suggests that consumers with prime and near-prime scores were most affected by increased rejection rates as their applications may have been approved in prior years.

---

[130] However, the deterioration in credit performance feared early in the pandemic did not materialize, and issuers reported a net loosening of standards in 2021. Bd. Of Governors for the Fed. Rsrv. Sys., *Senior Loan Officer Opinion Survey on Bank Lending Practices* (May 20, 2021), https://www.federalreserve.gov/data/sloos/sloos-202104-chart-data.htm.

**Figure 8:**    APPROVAL RATE, RETAIL (MMI)



Approval rates vary substantially by application channel. Pre-screened solicitations and mail channels tend to have the highest approval rates. Rates for mobile and digital channels are typically lower but vary by credit tier. TPC site approval rates remain higher than mobile approval rates both overall and in every score tier for general purpose cards.

## MOBILE APPROVALS

Slightly under one quarter of all consumers applying via mobile device are now approved for both general purpose and retail cards. However, approval trends differ by card type and credit score tier. As shown in Figure 9, higher approval rates of near-prime and lower credit score tiers drove an overall marginal increase in general purpose approvals in 2019. Yet this trend reversed in 2020 as all consumers except those with no score saw a substantial drop in approvals for applications submitted via mobile device.

**Figure 9:**    APPROVAL RATE FOR APPLICATIONS SUBMITTED VIA MOBILE DEVICES, GENERAL PURPOSE (MMI)



On the retail side, the overall rate has remained steady since 2015 but its composition by credit score tier has shifted. As shown in Figure 10, the share of superprime approvals increased in 2020 as the approval rate for every other credit score declined. For consumers with near-prime scores and above, mobile approval rates remain higher for retail than for general purpose card applications.

**Figure 10:**    APPROVAL RATE FOR APPLICATIONS SUBMITTED VIA MOBILE DEVICES, RETAIL (MMI)



## TPC SITE APPROVALS

TPC sites directly facilitated an all-time high of over 7 million approvals in 2019, but the number of mass market approvals via TPC site decreased 49 percent in 2020. This decline can be almost entirely attributed to the 48 percent reduction in applications via the TPC site channel discussed above. The approval rate via TPC site channel approvals overall is 32 percent, which has been consistent for the past four years. Approval rates declined for every credit tier in 2020 yet consumers with lower scores still had a greater chance of approval via TPC site than overall.

**Figure 11:**    SHARE OF CREDIT CARD APPROVALS FACILITATED BY TPC SITES, GENERAL PURPOSE (MMI)



## 4.1.4    Account origination

A significant drop in new applications by consumers and moderate declines in the percentage of approvals by issuers led to the origination of 21.5 percent fewer new credit cards in 2020 than the year prior. In 2020, consumers opened 84.8 million new credit card accounts: 53.7 million general purpose and 31.1 million private label. [131]

General purpose origination account volume overall reached its lowest point since 2013, as account origination for all credit tiers dropped in 2020. As shown in Figure 12, originations for consumers with superprime scores decreased 25 percent and fell to their Great Recession-era low. Yet, application volumes for consumers with subprime and deep subprime scores remained above 2017 levels. Roughly 24 million cards were issued to consumers with superprime credit scores, 13 million to prime, seven million to near-prime, five million to subprime, and five million to consumers with deep subprime scores.

---

[131] The data source used in this subsection is the CCP, which offers a broader view of the market but does not allow the Bureau to identify all "retail" cards. As a result, this subsection uses "private label" as it does in other sections that reference the CCP. See Section 1.3 for more on the data sources used in this report.

**Figure 12:**   ANNUAL NEW ACCOUNT VOLUME, GENERAL PURPOSE (CCP)



Private label origination trends differ as origination volume continued to decrease from 2016 highs in every tier. Figure 13 shows that the overall decrease in 2020 was driven by a drop in superprime volume to twenty-first century lows. Originations to consumers with prime scores fell to lows not seen since the Great Recession while those with near-prime or lower scores remained closer to Great Recession highs.

**Figure 13:**   ANNUAL NEW ACCOUNT VOLUME, PRIVATE LABEL (CCP)



The share of consumers opening cards declined in 2020, and for consumers with prime and superprime scores, that share is now below Great Recession lows. In 2020, 20 percent of consumers in the CCP opened a credit card, compared to roughly 25 percent in the three preceding years. For the superprime tier, its 20 percent share is the lowest it has been since at least 2006. The share was highest in 2020 for consumers with prime scores at 25 percent, but even that remains the tier's lowest share in recent history. In contrast, a greater share of consumers with near-prime and subprime scores opened cards than did consumers with

superprime scores in 2020. Despite the credit tightening indicated in surveys, consumers with below-prime scores were more likely to open a new card in 2020 than they did prior to the CARD Act in 2009.

## 4.1.5    New account credit line

In 2019, the total credit line on new accounts was almost $500 billion, slightly surpassing 2016 levels but still far below its pre-Great Recession highs; this value dropped over 30 percent in 2020 to $331 billion. The decline in overall new line is a result of a complex interaction between consumer demand for credit during the pandemic and issuer willingness to supply it. Superprime credit lines saw the largest decrease in total new line of $118 billion, a 33 percent change. This accounted for over three-fourths of the total reduction in new account credit line. This appears to be driven by a decrease in credit demand by consumers with superprime scores as applications fell but approval rates remained fairly strong. In comparison, consumers with deep subprime scores saw the second highest percent change as total new account credit line decrease 33 percent or by slightly over one billion dollars, from 2019. However, this change at the extensive margin may not fully explain the pandemic-related decline in credit line volume, as some issuers limited risk by offering smaller credit lines to new applicants in 2020.

In 2020, general purpose cards accounted for over three-fourths of new line volume but represented 86 percent of the year-over-year decline in new line. After reaching a new post-Great Recession high in 2019, total new general purpose line dropped by over 30 percent in 2020. Previously, line growth was driven by superprime accounts; subsequently, one can attribute most of the line reduction to this tier.

The a*verage* new line for general purpose cards fell by 18 percent in 2020. Figure 14 shows that the average new line for all consumers increased every year from 2010 to 2018 and remained steady in 2019. The average initial line for consumers with superprime scores still exceeded Great Recession levels despite falling from $9,208 in 2019 to $7,842 in 2020. For consumers with deep subprime scores, pandemic-related tightening of credit lines was a continuation of a five-year decline for general purpose accounts.



**Figure 14:**    AVERAGE CREDIT LINE ON NEW ACCOUNTS, GENERAL PURPOSE (CCP)



While the interaction between consumer demand and issuer supply was ambiguous for general purpose cards, the 22 percent drop in new private label credit lines can be explained primarily by fewer superprime applications as approval rates and average credit line did not decrease to the same degree. Total new private label credit lines decreased to $78 billion in 2020 from $100 billion the year prior. Over $15 billion of this decrease was a reduction in credit lines for new superprime accounts. Superprime lines also saw the greatest percent change in 2020 with a 25 percent reduction, with deep subprime a close second with a 24 percent decline. New near-prime and subprime lines declined from 2019 levels of $7.4 and $2.7 billion to $6.4 and $2.2 billion respectively. However, this decrease accounts for a small percentage of the overall decline in new private label credit lines.

Average new private label lines reached their highest nominal value since 2005 of $2,553 in 2019. In 2020, they remained above 2018 levels despite a two percent reduction overall. As shown in Figure 15, average line by credit tier remained stable in 2020. This contrasts with a decrease in average credit lines for all credit score tiers for general purpose cards. Since new average line for private label cards did not dramatically change in 2020 while the total new line fell by almost a quarter, the change in private label credit line is likely due to fewer new accounts in 2020 as stores closed and discretionary spending dropped during the pandemic.[132]

---

[132] *See* Selyukh, *supra* note 123. For more on credit card purchase volumes, *see* Section 2.3.

EXHIBIT A
Page 81

**Figure 15:**    AVERAGE  CREDIT  LINE ON NEW ACCOUNTS, PRIVATE  LABEL (CCP)



## 4.2    Existing accounts

Total credit line across all consumer credit cards exceeded $4.5 trillion in 2019. In 2020, it decreased slightly, as driven by a decline in private label lines, but still far exceeded 2018 levels. The total credit line for general purpose was $3.9 trillion in both 2019 and 2020. Most of this is accounted for by total *unused* line on accounts held by consumers with superprime scores equaling $3.2 trillion in 2020.[133] In comparison, unused line on accounts held by consumers with subprime and deep subprime scores equaled $24.4 billion, and total general purpose credit line for each other credit tier except superprime decreased in 2020. Total credit line available for private label cards fell in both 2019 and 2020. The present subsection examines this issue in more detail by looking at a range of account-level and cardholder-level measures on existing accounts for each score tier and card type.

### 4.2.1    Average credit line

Average general purpose credit line *per account* increased slightly in 2019 before finishing lower in 2020 at about $8,000. These changes were mirrored across all credit score tiers. The average

---

[133] Unused line on superprime accounts totaled more than $3.2 trillion in 2020. Almost all of that was on general purpose cards.

general purpose line *per cardholder* increased in 2019 and then decreased in 2020 for all credit scores, as the average value overall returned to 2018 levels. As Figure 16 shows, consumers with mid-range and lower scores were most affected by issuers tightening of credit supply during the COVID-19 national emergency. Average line for consumers with near-prime, subprime, and deep subprime scores across all cards decreased over 10 percent. In comparison, average credit line for superprime cardholders fell by 5 percent.

**Figure 16:**    AVERAGE  CREDIT LINE PER CARDHOLDER, GENERAL  PURPOSE (CCP)



The private label picture is very different, as cardholders in all tiers reached new high average credit lines in 2019 and remain high in 2020. In 2020 average private label credit line per card was almost $2,700, marking a new high. The average private label card has about one-third more line now than in 2012. Accounts held by consumers in lower credit tiers show slower growth over the same period, but no tier remains below its pre-recession high. At the cardholder level, after reaching new highs in 2019, in 2020 average line declined to 4 percent below where they were on average in 2018. Coupled with higher average lines at the card level, it is likely this represents an increase in account closures. [134]

---

[134] For more information regarding account closures, *see* Section 4.2.3.

## 4.2.2    Utilization

Revolving credit for general purpose cards in 2020 amounted to less than one-fifth of total line available for the first time since before the Great Recession. Despite overall increases in the total dollar value of line available over the past decade, utilization has been remarkably stable as *unused* line rose in tandem. Therefore, the overall decrease in the utilization rate to 18.5 percent in 2020 from 21.4 percent the two prior years is a significant deviation from the mean. As shown in Figure 17, general purpose utilization decreased in every credit tier. In 2020, credit limits for general purpose cards stayed relatively constant while total debt fell; this lead to a decrease in the utilization rate. [135] As utilization rate is used of credit scoring, it will be interesting to see how the distribution of credit scores shift if credit card debt continues to contract.

**Figure 17:**    AVERAGE  UTILIZATION RATE  BY  CREDIT  SCORE  TIER,  GENERAL  PURPOSE  (CCP)



In addition to an overall decline in total utilization, the share of consumers with below-prime scores who have used 90 percent or more of their general purpose credit line reached record lows in 2020. Since 2015, slightly above three-fifths of consumers with below-prime scores met or exceeded this threshold of limited available credit as shown in Figure 18. This measure dropped to 56.8 percent in the second quarter of 2020. During this time the CARES Act Economic Impact Payments, Pandemic Unemployment Assistance Program, mortgage

---

[135] *See* sections 2.2.1, 2.4, and 4.2.3

forbearance, student loan payment suspension and other programs provided consumers with additional cash or lower payments. In addition, consumer spending dropped sharply.

**Figure 18:**    QUARTERLY SHARE OF BELOW-PRIME CARDHOLDERS WITH AT LEAST 90 PERCENT UTILIZATION ACROSS ALL CARDS, GENERAL PURPOSE (CCP)



## 4.2.3    Credit line management

Credit lines on existing accounts are not static. Issuers can increase or decrease them without consumer consent. Credit line increases (CLI) are somewhat restricted by the CARD Act's ability-to-pay requirements, but issuers confront a range of more substantial regulatory restrictions on repricing existing balances. [136] Previous research published by the Bureau studied whether issuers may use line management to respond to risk revealed post-origination or changes in nationwide economic conditions. [137]

**CREDIT LINE INCREASE**

As shown in Figures 19 and 20, annual CLI incidence in 2020 was around 3 percent for both general purpose and private label cards. Prior to the pandemic, 4 percent of accounts received a

---

[136] The ability-to-pay rules require that issuers consider an applicant's ability to pay the minimum monthly payment on an account prior to opening a credit card account under an open-end (not home-secured) consumer credit plan or increasing a credit line on such an account. 12 CFR 1026.51(a)(1)(i). *See also* 15 U.S.C. § 1665e (2012). Repricing of existing balance is only allowed under a set of relatively narrow circumstances. *See* 12 CFR 1026.55(b).

[137] *See* 2017 Report, *supra* note 6, at 158-162.

CLI each year. While this decline may indicate some hesitancy on the part of issuers to initiate new CLIs during the pandemic, yearly incidence remained at or close to post-Great Recession norms for all credit tiers.

The median general purpose CLI in 2020 was $1500 compared to $2000 in 2019. This was the first overall decrease in median value in a decade, as issuers offered every credit tier smaller line increases on par with 2012 levels. Yet this trend masks tier differentials as the median increase for consumers with superprime scores is still ten times that of consumers with deep subprime scores. However, consumers with prime scores saw the greatest change as their median CLI dropped from $1550 to $1000 in 2020.

**Figure 19:**    ANNUAL  CREDIT  LINE  INCREASE  INCIDENCE,  GENERAL  PURPOSE  (CCP)



For private label cards, the median line increase was $700 in both 2019 and 2020. Consumers with superprime, near-prime, and deep subprime scores saw no change in their median line increases over the past four years while each lower credit score tier was offered a lower median line in 2020 than a year prior.

**Figure 20:**    ANNUAL  CREDIT  LINE  INCREASE  INCIDENCE,  PRIVATE  LABEL (CCP)



## CREDIT LINE DECREASE

General purpose card issuers did not meaningfully change their line management of existing accounts in response to economic uncertainty during the pandemic, despite media reports to the contrary. In the second quarter of 2020, 0.9 percent of general purpose accounts saw a decrease in available credit line from issuers. This did not change year over year and remained far below its highest quarterly value of 3.7 percent of general purpose accounts experiencing CLDs at the height of the Great Recession. As has been the norm, a higher percentage of consumers with below-prime scores experienced CLDs while cardholders with superprime and prime scores were less likely to experience a change in their credit lines. All tiers followed a similar trend of a moderate increase in CLDs as shown in Figure 20. Yet, both overall and for all credit tiers, a higher percentage of consumers still saw their general purpose credit lines increased than decreased in 2020. One explanation may be that card issuers resisted reducing credit lines to avoid angering their customers. [138]

---

[138] *See, e.g.*, Kevin Wack, *Credit card lenders clamp down to mitigate coronavirus risk*, American Banker (May 29, 2020), https://www.americanbanker.com/news/credit-card-lenders-clamp-down-to-mitigate-coronavirus-risk.

EXHIBIT A
Page 87

**Figure 21:**    ANNUAL CREDIT LINE DECREASE INCIDENCE, GENERAL PURPOSE (CCP)



Evidence suggests that private label card issuers may be reacting to heightened risk of below-prime borrowers in their portfolios by using CLDs to limit their exposure. For private label cards, CLDs increased from a quarterly value of 2.1 percent in 2019 to 4.3 percent in the third quarter of 2020 before returning to 2.2. percent in the fourth quarter but were still far below the 2008 peak of 13.4 percent. As shown in Figure 22, consumers with subprime and deep subprime scores have been much more likely to see private label CLDs since the Great Recession than those in higher credit tiers. However, this differential expanded in 2020 as CLD incidence for consumers with deep subprime scores increased by two percentage points to 10 percent annually and exceeded its 2008 peak while that of superprime only saw half a percentage point increase. Continuing previously reported trends, the annual rate of CLDs was only higher than that of CLIs for private label accounts with subprime or lower credit scores.

**Figure 22:**    ANNUAL CREDIT LINE DECREASE INCIDENCE, PRIVATE LABEL (CCP)



While the incidence of CLDs marginally increased during the pandemic, the magnitude of these line decreases was on par with or lower than in previous years. Like the median CLI value in 2020, the dollar value of CLDs per account decreased for both card types. The median CLD for general purpose cards is now slightly above $2500 as driven by an increase in CLDs on prime consumers. For private label cards, this value decreased 13 percent in 2020 and is now about $1000.

There is little evidence to support an unprecedented, industry-wide slashing of existing credit limits as widely reported during the COVID-19 national emergency.[139] Research on the early effects of the pandemic on consumer credit found borrowers with superprime and prime scores experienced relatively more reductions on existing account limits.[140] This is likely driven primarily by reductions in line for consumers with significant unused credit, such as cardholders with superprime and prime scores. However, for consumers who did experience a CLD during the pandemic, this reduction in credit availability was surprising and often acutely felt, as evidenced by a 65 percent increase in complaints related to CLDs in 2020.[141] CLDs may also have long-term effects on credit scores. FICO estimated that a severe CLD could result in a 9 point reduction of a cardholder's credit score.[142] The Bureau intends to further study the effects of CLD and its impact on credit utilization and credit scores, in particular for those consumers with non-prime credit scores.

## ACCOUNT CLOSURE

About 2 percent of both general purpose and private label accounts are closed each year. This has been true for the past decade, and it remained true in 2020. Accounts can be closed by the

---

[139] *See, e.g.,* Kristopher Brooks, *70 million people just had their credit card limits cut or accounts closed,* CBS News (July 22, 2020), https://www.cbsnews.com/news/credit-card-limits-reduced-closed-70-million-cardholders/.

[140] *See* Sandler & Ricks, *supra* note 24, at 22.

[141] See Cons. Fin. Prot. Bur., *Consumer Response Annual Report,* at 118 (Mar. 2021), https://www.consumerfinance.gov/data-research/research-reports/2020-consumer-response-annual-report/.

[142] 9 points was the average decline in FICO score for an up to 50 percent decrease in available credit limit based on simulations using data from prior downturns. *See* FICO, *North America  What FICO Score Dynamics from Prior Downturns and Natural Disasters Can Tell Us About the Road Ahead* (Oct. 2020), https://www.fico.com/en/latest-thinking/demand-webinar/north-america-what-fico-score-dynamics-prior-downturns-and-natural.

consumer, closed by the creditor, or closed for inactivity. For all card types, the annual account closure incidence for consumers with deep subprime credit scores are two to three times more likely than those in higher credit tiers as shown in Figures 23 and 24. Yet other research suggests that the slight increase in account closures from March to June 2020 primarily affected superprime and prime borrowers.[143] In those months, there were higher account closures by creditors and closures for inactivity.

**Figure 23:**    ANNUAL ACCOUNT CLOSURE INCIDENCE, GENERAL PURPOSE (CCP)



**Figure 24:**    ANNUAL ACCOUNT CLOSURE INCIDENCE, PRIVATE LABEL (CCP)



---

[143] *See* Sandler & Ricks, *supra* note 24, at 22.

# 5.    Practices of credit card issuers

In the CARD Act, Congress directs the Bureau to review "the terms of credit card agreements and the practices of credit card issuers" and "the effectiveness of disclosure of terms, fees, and other expenses of credit card plans."[144] Therefore, this section describes trends and developments in issuer practices related to four common credit card features: credit card rewards, deferred interest promotions, balance transfers, and cash advances. For each feature, it discusses its prevalence in the market, costs associated with utilizing the feature, and any changes issuers or third parties have made in supporting consumers who choose to use them. The section then describes changes in issuer practices made in response to COVID-19, such as the promulgation of consumer relief programs, and adjustments made to operations considering safety concerns. Finally, this section reviews changes to credit card agreements observed over time.

In particular, for the four account features discussed below, the impact of the pandemic on credit card issuers is large and clear. Consequently, the direct issuer response to COVID-19 had a similarly large impact on consumers, primarily through widely available payment deferral.

---

[144] 15 U.S.C. § 1616(a)(1)-(2).

EXHIBIT A
Page 91

# 5.1   Rewards

Credit cards offering rewards remain popular with cardholders, despite pandemic-related declines in travel that temporarily reduced the utility of some forms of rewards. [145] This section reviews recent rewards trends.

## 5.1.1   Prevalence

The share of credit card spending accounted for by rewards cards has continued to increase since 2018. That is true both overall and for each credit score tier, with growth particularly notable for consumers with lower credit scores. By the end of 2020, even consumers with deep subprime scores put more than 60 percent of their credit card purchase volume on rewards cards, and consumers with near-prime scores put nearly three-fourths of their spending on rewards cards. [146] Trends in reward-card purchase volume as a share of total spending are shown in Figure 1.

**Figure 1:**    SHARE OF PURCHASE VOLUME ON A REWARDS CARD, GENERAL PURPOSE (Y-14+)



---

[145] For a detailed discussion of what aspects are generally shared by those credit card account features commonly denoted as "rewards," *see* 2015 Report, *supra* note 6, at 209-212.

[146] J.D. Power reported in 2020 that consumers who self-report as "fully understanding how to earn and redeem points" have an average spend that is $307 more than the average spend of consumers who self-report as not fully understanding their rewards programs. *See* J.D. Power Satisfaction Study, *supra* note 2.

Rewards cards remain popular, driven by the higher end of the credit spectrum. Shifting preferences towards rewards cards reflect survey findings that show rewards as the predominant factor in choosing a card.[147] While cardholders with subprime and deep subprime scores are less likely than consumers with superprime scores to originate rewards cards, these cardholders still put more than one-half of their credit card spending on rewards cards, as shown in Figure 2.[148]

Cardholders continue to embrace rewards cards, and increasingly prefer cash rewards to miles.[149] In 2020, cash rewards card spending increased the most of any group, accounting for one third of general purpose card spending. Spending on miles rewards cards fell to 18 percent in 2020, which coincided with a sharp decline in travel spending as a result of pandemic-related travel restrictions.[150] Cards that earn other types of rewards, such as points, special offers, or discounts, remain the most common by purchase volume at 39 percent.

---

[147] Similarly, J.D. Power's 2018 survey found that 47 percent of credit card customers who switched to a new card within the past 12 months did so for a better rewards program. *See* J.D. Power, *Credit Card Rewards Battle Continues as Customers Seek Better Programs* (Aug. 16, 2018), https://www.jdpower.com/business/press-releases/2018-us-credit-card-satisfaction-study. In its 2013 Report, the Bureau references a 2011 Mercator Customer Monitor Survey showing rewards were the number one reason to apply for a selected card at that time as well. 2013 Report, *supra* note 6, at 82 n.94.

[148] For information on the share of new accounts with rewards by credit tier, see 2015 report, *supra* note 6, at 100.

[149] Issuers' new card offerings post-pandemic recession reflect this shift. *See, e.g.,* Jennifer Surane, *Credit Cards Revive Rewards battle with New Cash-Back Offerings*, Bloomberg (July 19, 2021), https://www.bloomberg.com/news/articles/2021-07-19/rewards-war-returns-with-a-spate-of-new-cash-back-credit-cards?sref=25rnPxpS.

[150] Visa reported travel spending fell about 80 percent in March of 2020, with restaurant and entertainment segments down at least 50 percent. Emily Bary, *Visa sees 'significant deterioration' in spending but some areas are showing improvement*, MarketWatch (Apr. 30, 2020), https://www.marketwatch.com/story/visa-earnings-top-expectations-but-coronavirus-prompts-significant-deterioration-in-spending-2020-04-30.

**Figure 2:**    SHARE OF PURCHASE VOLUME BY REWARD TYPE, GENERAL PURPOSE (Y-14+)



## 5.1.2    Developments

Card issuers altered rewards programs in response to changes in consumer spending and reward redemption behavior during the pandemic, especially those rewards cards that focused on travel, entertainment, and restaurants, and that carry an annual fee. During the pandemic, several issuers made changes to bonus earning by increasing rewards for spending in areas such as grocery and home delivery and by offering statement credits or redemption options for items people were more likely to use while staying home such as video streaming services and cellphone bills.[151] Some issuers also extended the time allowed to meet spend requirements to earn sign-up bonuses.[152] These programmatic changes were likely aimed at keeping customers from moving spending away from their card, downgrading to lower-fee products, or canceling their card altogether. However, at the time of this writing, most restrictions have been lifted, and

---

[151] *See* AnnaMaria Andriotis, *Travel Bans Take Shine Off Banks' Premium Rewards Cards*, Wall St. J.(June 28, 2020), https://www.wsj.com/articles/travel-bans-take-shine-off-banks-premium-rewards-cards-11593336600. *See also* Katie Deighton, *Credit-Card Providers Scramble to Update Customer Benefits as International Travel Ban Drags On*, Wall St. J. (Sept. 2, 2020), https://www.wsj.com/articles/credit-card-providers-scramble-to-update-customer-benefits-as-international-travel-ban-drags-on-11599940800.

[152] *See* Alexandria White, *Amex is offering new cardholders 3 more months to earn welcome bonus*, CNBC (Updated May 6, 2021), https://www.cnbc.com/select/amex-extends-welcome-bonus-for-new-cardholders/.

issuers are shifting the focus of rewards programs back towards travel and entertainment, suggesting issuers anticipate a return to previous spending behavior. [153]

Rewards remain important to cardholders, but consumer reward preferences have changed significantly since the Bureau's previous report; it remains unclear how much of that change is temporary due to pandemic restrictions. [154] Among cardholders who opened a new card, the three most-cited reasons for doing so were attractive rewards, benefits, and sign-up offers. [155] Cardholders also tend to use rewards cards more – the share of cardholders reporting a non-rewards card as their most frequently used card declined from 23 percent in 2019 to 17 percent in 2020. [156] Consumers continue to favor cash rewards in 2020 – 55 percent of consumers preferred to redeem rewards for charges or a check, compared to 44 percent in 2019 and 26 percent in 2016. [157] However, at least one issuer has also observed increases in reward points levels, indicating many consumers may be accumulating points to use once they resume travel. [158]

New forms of rewards announced since the Bureau's prior report, such as cryptocurrency and student loan repayment, may prove attractive to some consumers. In late 2020 and early 2021, Gemini, BlockFi, and SoFi announced credit cards that offer cash back in the form of

---

[153] *See* Kevin Wack, *Card issuers reliant on miles, hotel rewards await travel rebound*, American Banker (Mar. 22, 2021), https://www.americanbanker.com/payments/news/card-issuers-reliant-on-miles-hotel-rewards-await-travel-rebound. "As vaccinations continue and more people return to traveling, card issuers are anticipating that rich sign on bonuses and flexibility with rewards will spark new interest with consumers." Competiscan, *Travel Consumer Cards* (Q1 2021), at 3.

[154] *See* AnnaMaria Andriotis & Alison Sider, *Airline Cards Lose Luster as Coronavirus Persists*, Wall St. J. (Dec. 3, 2020), https://www.wsj.com/articles/airline-cards-lose-luster-as-coronavirus-persists-11606991400.

[155] Auriemma Research, *Impact of Credit Line Changes and Loan Forbearance, Attitudes toward Low or No-APR Cards, and 'Refer a Friend' Programs, Cardbeat US* (Apr. 2021), at 53.

[156] Auriemma Research, *2020 Trend Database, Cardbeat US* (Mar. 2021), at 6.

[157] Auriemma Research, *2020 Trend Database, The Payments Report* (Mar. 2021), at 16.

[158] *See* Wack, *supra* note 153.

cryptocurrency stored in an affiliated investment account. [159] One survey found that nearly four-in-ten cardholders report they would be likely to redeem points for cryptocurrency. [160] These preferences are inversely correlated with age, as younger consumers expressed greater likelihood to redeem points for cryptocurrency. [161] In addition to its crypto option, SoFi also gives users the option to put cash toward student loan balances. [162] As a reward for card repayment, SoFi states they will lower the APR of the card by one percentage point after 12 timely payments. [163] Laurel Road also introduced a card for students that provides greater cashback redemption if used to pay down student loans. [164] Similar to affinity cards that generate rewards with spending but pass the funds to social causes or affiliated organizations, Aspiration introduced a card that rewards users by planting trees to offset the user's carbon footprint. [165]

## 5.2    Deferred interest

Deferred interest ("DI") promotions are a large feature of the retail consumer credit card market. Almost always associated with private label and retail co-brand cards, deferred interest

---

[159] Block Fi Blog, *Join the Waitlist for the World's First-Ever Bitcoin Rewards Credit Card* (Dec. 1, 2020), https://blockfi.com/bitcoin-card-crypto-rewards; Gemini Blog, *Gemini to Offer Credit Card with Crypto Rewards* (Jan. 14, 2021), https://www.gemini.com/blog/gemini-to-offer-credit-card-with-crypto-rewards; SoFi, SoFi Credit Card, https://www.sofi.com/credit-card/ (last accessed May 26, 2021).  In 2014, the Bureau issued a consumer advisory warning to consumers about the risks of virtual currencies such as Bitcoin. *See* Cons. Fin. Prot. Bur., *CFPB Warns Consumers About Bitcoin* (Aug. 11, 2014), https://www.consumerfinance.gov/about-us/newsroom/cfpb-warns-consumers-about-bitcoin/.

[160] This statistic is from interviews with 803 credit card users conducted in 2020. *See* Auriemma Research, *Impact of Credit Line Changes and Loan Forbearance, Attitudes toward Low or No-APR Cards, and 'Refer a Friend' Programs,* Cardbeat US (Apr. 2021), at 52.

[161] *Id.*

[162] *See* SoFi *supra* note 159.

[163] Competiscan, *Consumer Credit Cards Overview* (Q4 2020), at 7.

[164] *See* Laurel Road, Laurel Road Student Loan Cashback Card, https://www.laurelroad.com/healthcare-banking/cash-back-credit-card/ (last accessed May 28, 2021).

[165] *See* Aspiration, Zero, https://www.aspiration.com/zero (last accessed May 27, 2021).

promotions are generally presented to consumers as an option to finance larger purchases. Consumers are given a fixed period of at least six months during which all interest charges are "deferred"—the issuer calculates how much interest the consumer would owe at the account's retail APR, but does not immediately charge it to the consumer.[166] If the consumer pays down the full promotional balance during the promotional period, the deferred interest is never charged, and the consumer has gained the benefit of low-cost financing—almost always zero percent.[167] Conversely, a consumer who does not pay in full during the promotional period will generally have all the deferred interest capitalized into their balance at the promotion's conclusion. As noted above, in the case of private label cards, the average retail APR is roughly 24 percent.[168]

This section builds on prior work to identify new and emerging trends in the prevalence and cost of deferred interest programs. The Bureau's 2015 Report analyzed the legal background and current status of deferred interest promotions. It also reported findings from promotional-level data covering the full portfolios of several large DI issuers over a period of several years. The Bureau's 2017 Report looked at promotional spending, payoff rates, and amount of deferred interest assessed by merchant category, promotion duration, and credit score. For 2021, the Bureau again solicited information to analyze spending, payoff rates, and deferred interest assessed.

The Bureau also solicited information regarding issuers' response to COVID-19 with respect to deferred interest programs and found that issuers generally made few-to-no changes to their

---

[166] Deferred interest promotions of less than six months are effectively prohibited by the CARD Act and Regulation Z. 15 U.S.C. § 1666i-2(b); 12 CFR § 1026.55(b)(1); Comment 55(b)(1)-3.

[167] Generally, minimum payments alone are insufficient to repay the balance within the promotional period. In some cases, promotional balances are subject to an interest rate greater than zero percent during the promotional period, but by far the most common promotional interest rate is zero percent. In some cases issuers may also assess an up-front fee for enrollment in deferred interest programs.

[168] One industry trade group pointed to deferred interest promotions as providing value to consumers. *See* ABA Comment Letter, at 16. Consumer advocates, by contrast, have called for deferred interest to be banned or, barring that, substantially restructured. *See* NCLC Comment Letter, at 12-14. One study by Wallethub found that 74 percent of people think "deferred interest" is unfair, 61 percent think it should be illegal, and 52 percent of people don't know how it works. Alina Comoreanu, *Deferred Interest Study: Which Retailers Use It?*, Wallethub (Nov. 17, 2020), https://wallethub.com/edu/cc/deferred-interest-study/25707.

deferred interest-specific marketing, underwriting, and product structure. This does not account for issuers who made broader changes to how they marketed, underwrote, or otherwise offered retail credit cards; such changes may have had indirect effects on the marketing and availability of deferred interest products. Most issuers reported providing DI-specific relief to consumers impacted by COVID-19, generally on a by-request basis. Such relief generally took the form of extensions of promotional periods, in some cases alongside broader forbearance measures and in some cases as independently offered relief. Extensions were generally two-to-three months in length.

## 5.2.1   Prevalence

Deferred interest promotions remain generally popular with consumers, with purchase volumes relatively high despite pandemic-era disruptions in retail sales. Total purchase volume, as shown in Figure 3, was over $60 billion in 2020, flat since 2019 but an increase of 16 percent from 2017. Growth since 2017 was driven by consumers with superprime scores, which saw aggregate purchase amounts increase 20 percent from 2017 to 2020. Consistent with the findings of previous Bureau reports, consumers with higher credit scores comprise the bulk of deferred interest purchase activity. In 2020, the number of deferred interest purchases increased more than 50 percent overall from 2018 levels. In 2020, the number of transactions for promotions with a duration of less than a year was twice that of two years prior while the number of purchases with longer term length promotions remained close to previous levels.

**Figure 3:**    TOTAL PURCHASE VOLUME ON DEFERRED INTEREST PROMOTIONS (DI)



Deferred interest promotions are generally used to finance larger purchases. As a result, they tend to be used most at merchants that specialize in offering larger-ticket goods or services. In

2017 the Bureau reported that four-fifths of all deferred interest dollars were spent at merchants that specialize in five specific product or service categories, with the remainder spent either at merchants that specialize in other types of goods or services, or at merchants without a clear specialization. [169] In 2020 that figure has risen to six-sevenths. The largest driver of deferred interest consumer use is spending on home improvement; that sector, in contrast to travel and entertainment spending, saw an increase in spending driven by COVID-19, [170] which may help explain the relative persistence of deferred interest promotion volume in 2020 even as overall credit card purchase volume and indebtedness declined.



**Figure 4:**    TOTAL PURCHASE VOLUME ON DEFERRED INTEREST PROMOTIONS BY MERCHANT CATEGORY (DI)



The mix of spending across merchants varies substantially by credit score tier as well as over time. Figure 4 displays the deferred interest promotional spending consumers made at each type of merchant. Figure 5 breaks down that spending by credit score tier in 2020. The Bureau's 2017 report noted that consumers with superprime scores tend to concentrate their deferred interest

---

[169] *See* 2017 Report, *supra* note 6, at 103. "Other" includes department stores and shopping channels, where many of the actual products offered and sold may fall under one or more of the five enumerated categories. The actual share of spending on those types of goods and services, therefore, may be even higher than the merchant share may imply.

[170] *See, e.g.*, Kermit Baker, *Despite Devastating Effects on the Broader Economy, Pandemic has been a Boon for US Home Improvement,* Joint Center for Housing Studies of Harvard Univesity (Mar. 25, 2021), https://www.jchs.harvard.edu/blog/despite-devastating-effects-broader-economy-pandemic-has-been-boon-us-home-improvement.

spending at home improvement merchants. [171] That remains the case, but consumers with subprime and deep subprime scores now also concentrate more of their deferred interest purchases on home improvement, rather than healthcare which was a significant category in 2017. In fact, the share of deferred interest promotional spending on home improvement had risen from 38 percent in 2018 to nearly half of all deferred interest spending in 2020, reflecting pandemic-era changes in spending behavior. By contrast, the share of promotional spending on electronics fell in 2020 for consumers in all tiers and now ranks below healthcare.

**Figure 5:**    SHARE OF PROMOTIONAL SPENDING BY MERCHANT CATEGORY, 2020 (DI)



Over the past several years, the Bureau has observed a shift toward shorter promotions, as seen in Figure 6. While purchase volume on promotions of 12 to 17 months and promotions exceeding 18 months have remained consistent at about $15 billion and $19 billion per year respectively, purchase volume on promotions of 6 to 11 months has grown from $20 billion in 2017 to nearly $28 billion in 2020. In 2020, these shorter duration promotional purchases increased while medium and longer-term duration purchases decreased, possibly due to concerns surrounding the longer-term impact of the pandemic on consumer finances.

---

[171] *See* 2017 Report, *supra* note 6, at 104.

**Figure 6:**    TOTAL PURCHASE VOLUME ON DEFERRED INTEREST PROMOTIONS BY DURATION (DI)



Consumers in lower credit score tiers increasingly utilize shorter promotions on average than consumers with higher credit scores. In 2020, 65 percent of promotional purchase volume made by consumers with deep subprime scores had a promotion duration of less than 12 months, compared to 45 percent for superprime. That share has increased from 50 percent in 2017. One explanation may be that promotion length usually increases with the size of the purchase. For example, a $500 appliance might be six or 12 months, while a $3,000 furniture purchase could offer a promotional period of several years. The average promotional purchase amount for a consumer with a superprime score is roughly twice that of a cardholder with a deep subprime score. Another reason may be that promotional offers are becoming more common for smaller purchase amounts. The average promotional purchase amount declined from $899 to $637 between 2018 and 2020, as shown in Figure 7.

**Figure 7:**    AVERAGE PURCHASE AMOUNT ON DEFERRED INTEREST PROMOTIONS (DI)



EXHIBIT A
Page 101

## 5.2.2    Repayment

Rates of promotion repayment within the promotional period have generally increased since the Bureau last reported this rate.[172] The Bureau's 2015 Report found that overall promotion-level and balance-level payoff rates from 2009 to 2013 lay between 76 and 82 percent.[173] The Bureau's 2017 Report found that promotion payoff rates on six to 17 month promotions originated in 2015 were 72 percent, and balance payoff rates were 74 percent. This report finds promotion payoff rates of 81 percent and balance payoff rates of 82 percent in 2020, a marked increase from previous years. [174]

Cardholders of all credit score tiers increased payoff rates in 2020, but the effect was most notable for consumers with below-prime scores. The Bureau's 2013, 2015, and 2017 Reports found deferred interest payoff rates to be strongly correlated with credit score.[175] The correlation between payoff rates and credit score generally persists into the current observation period, as shown in Figure 8.[176] On one end of the spectrum, 89 percent of superprime balances were paid off in 2020, the same percentage as in 2019. In contrast, 62 percent of subprime and deep subprime balances were paid off during the promotion period in 2020, up from 54 and 51 percent respectively in 2019. In terms of the number of promotions, in 2020 cardholders in all

---

[172] The methodology the Bureau uses has evolved. Payoff rates on deferred interest products can be expressed in several ways, including: (1) the number of total deferred interest promotions in which the full balance is repaid prior to the end of the deferred interest period divided by the total number of deferred interest products originated; and (2) the dollar volume of promotional balances paid in full during the promotional period divided by the total dollar volume of deferred interest balances originated. The 2013 Report generally used the second measure, referred to here as the "balance payoff rate." The 2015 Report used both the first measure, referred to here as the "promotion payoff rate," and the second measure. This report again uses both measures. The rates reported in this report, however, are not directly comparable to those in prior reports for two reasons. First, the issuer samples are different, with the 2017 Report covering a wider range of DI issuers. Second, the 2017 Report generally split the lowest credit tier from the 2015 Report into two separate tiers, with deep subprime now beginning below 580 rather than below 620.

[173] 2015 Report, *supra* note 6, at 164.

[174] 2017 Report, *supra* note 6, at 108.

[175] 2017 Report, *supra* note 6, at 107-108; 2015 Report, *supra* note 6, at 167-169; 2013 Report, *supra* note 6, at 80.

[176] Consumers with no credit score demonstrated payoff rates in line with the overall averages. They are therefore not shown here.

credit score tiers reached their highest payoff rates since at least 2015, with cardholders with below-prime scores repaying two thirds of their deferred interest promotions within the promotional period, consistent with increased payment rates on credit cards generally as noted in Section 2.4.2.

**Figure 8:**    BALANCE PAYOFF RATE ON DEFERRED INTEREST PROMOTIONS (DI)



### 5.2.3    Cost

Consumers who pay off the deferred interest promotion prior to expiration do not pay deferred interest. However, consumers who do not repay, generally incur the full amount of the deferred interest, often incurring significant costs. Those costs have generally been rising over the period for which the Bureau has data: the aggregate amount of deferred interest assessed to consumers increased by 45 percent from 2015 to 2020, to just over $2.5 billion in total.[177]

---

[177] Bureau data do not currently allow for a determination of how much of this growth is driven by volume growth, and how much, if any, is driven by deterioration in payoff rates.

**Figure 9:**    TOTAL DEFERRED INTEREST ASSESSED (DI)



Consumers who fail to pay the balance prior to the end of the promotion are assessed deferred interest at roughly the same effective interest rates regardless of credit score, as shown in Figure 10. Deferred interest promotions are typically conducted on private label cards, which carry APRs that do not vary much between credit score tiers. Naturally, longer promotions carry higher deferred interest amounts at expiration, but on an annualized basis the costs are the same for those that fail to repay during the promotional period.

**Figure 10:**    DEFERRED INTEREST ASSESSED AS A SHARE OF PROMOTIONAL PURCHASE AMOUNT FOR PROMOTIONS THAT INCURRED DEFERRED INTEREST (DI)



Consumers in lower score tiers pay relatively more to finance purchases with deferred interest than do cardholders with superprime scores because they are less likely to repay within the promotional period. However, effective costs are declining for cardholders with below-prime scores as their repayment rates increase. Figure 11 shows the amount of deferred interest

assessed in a year as a share of the total deferred interest purchase volume for all promotions in that year by consumer credit score tier. This metric serves as a proxy for expected cost at the time the purchase was made for consumers in each credit score tier. Figure 11 shows cardholders with below-prime scores in 2020 have an expected cost of about 8 percent of the purchase price, while cardholders with superprime scores may expect to pay about 3 percent of the deferred interest purchase amount on average. Rising repayment rates among cardholders with below-prime scores increases the probability that these consumers will repay within the promotional window. Concurrently, private label interest rates have remained steady. Together, these trends result in a lower expected cost for consumers in below-prime credit tiers.

**Figure 11:**   DEFERRED INTEREST ASSESSED AS A SHARE OF ANNUAL PURCHASE VOLUME FOR ALL DEFERRED INTEREST PROMOTIONS (DI)



Deferred interest promotions continue to provide consumers with complex challenges when they decide how to finance a purchase, as well as in making payments on their balances. The Bureau continues to monitor this area for risks to consumers.

# 5.3   Balance transfers

Balance transfer offers enable the consumer to potentially reduce the cost of carrying their debts. Some credit cards offer promotional balance transfers rates to incentivize consumers to apply for or increase their use of a credit card account. Generally, balance transfers shift existing balances from other cards onto the new one; consumers are typically offered a lower interest rate on the transferred balance (often zero percent) but generally are also required to pay an

upfront fee assessed as a share of the transferred balance. In addition to transfers of debt from another credit card, most balance transfer offers allow consumers to pay off debt related to other loans and bills.[178] By the conclusion of the promotional period, if the consumer does not execute another balance transfer or has not repaid the balance, the remainder of the balance becomes subject to a non-promotional interest rate, which is almost always higher than the balance transfer promotional rate.

## 5.3.1    Prevalence

Balance transfers became significantly less common during the pandemic, though evidence suggests those offers may be returning as the economic outlook stabilizes. Following four years of growth, balance transfer volume fell 36 percent year-over-year to $35 billion in 2020, and quarterly balance transfer incidence fell from 0.9 percent in 2019 to 0.4 percent at year's end in 2020, as issuers looked to limit exposure to potential future losses given the uncertain economic outlook.[179] In 2019, over half of total acquisition mail volume included promotional balance transfer offers.[180] In 2020, the minority of direct mail offers included promotional rates, in tandem with a rapid decline in mail volume overall.[181] By year-end 2020, balance transfer incidence began to tick back up and appears to be returning to pre-pandemic levels as the economy recovers.[182]

---

[178] Many transactions effectuated using a "convenience check" may also be treated as balance transfers by issuers. However, not all such transactions are so treated; depending on how it is used, some may be treated similarly to cash advances. The Bureau therefore excludes convenience check transactions from this analysis (and from its analysis of cash advances in Section 5.4), acknowledging that this likely excludes at least some volume that may be identical or near-identical from the consumer perspective.

[179] *See* AnnaMaria Andriotis & Veronica Dagher, *Credit-Card Balance Transfers Are Harder to Come By*, Wall St. J. (June 6, 2020), https://www.wsj.com/articles/credit-card-balance-transfers-are-harder-to-come-by-11591435801.

[180] Data provided by Competiscan.

[181] *Id. See* Section 4.1 for further information on direct mail volume in 2020.

[182] *See* Sara Rathner, *Why Balance Transfer Credit Cards Are Starting to Blossom Again*, Nerdwallet (June 4, 2021), https://www.nerdwallet.com/article/credit-cards/balance-transfer-credit-cards-starting-to-blossom-again.

As shown in Figure 12, balance transfers are primarily utilized by consumers with prime and superprime credit scores. This remained the case even as balance transfer incidence declined sharply across all credit score tiers in 2020– as a percentage of total balance transfer volume in 2020, cardholders with prime scores made up 78 percent and 20 percent respectively.

**Figure 12:**    QUARTERLY  BALANCE  TRANSFER  INCIDENCE,  GENERAL  PURPOSE  (Y-14+)



The average size of balance transfers has not changed significantly since the Bureau's last report. Balance transfers for cardholders with superprime scores averaged roughly $5,600 in the fourth quarters of both 2019 and 2020. Balance transfers by cardholders with prime scores averaged about $4,300 in the fourth quarter of 2020, down slightly from just under $4,500 in the same quarter a year prior.

## 5.3.2   Cost

Measured as a percentage of the amount that cardholders transfer, the average fee for balance transfers has increased since 2018. Balance transfers generally charge an initial fee, followed by a low interest rate on the transferred balance for a set period of time or until the balance is repaid.[183] From 2015 to 2018, the average balance transfer fee declined from 3.2 to 2.8 percent. In 2019 and 2020, the average balance transfer fee was 3.0 percent. Consumers use balance transfers to take advantage of low promotional interest rates. In both 2019 and 2020, the vast

---

[183] Some issuers offer introductory no fee balance transfers for new cards, but this does not appear to be a common practice in the industry.

majority of credit card solicitations sent to new prospects included an introductory 0 percent balance transfer rate.[184] Depending on the duration of the promotion and the degree of interest rate reduction, as well as the consumer's repayment behavior, this cost savings can be significantly higher than the upfront cost of the initial balance transfer fee.

Besides the initial fee and interest, consumers may also incur costs associated with the loss of a grace period on their purchase balances when making a balance transfer, which can result in an increase in interest charges on other purchases. Cardholders who were using the card to transact prior to the balance transfer stand to lose their grace period on new purchases, even if they continue to repay the full amount of new purchases each month. For example, a "transacting" consumer that routinely spends around $500 on their credit card each month and pays that balance in full, that then transfers a balance to that card and does not pay that balance in full, may begin incurring interest charges on their monthly $500 spending at the card's retail APR rate, even if the transferred balance is subject to a zero percent interest rate.[185] While transacting accounts represent only a minority of all accounts that effect balance transfers, as noted in a prior report, most of these formerly-transacting cardholders went on to make purchases before the balance transfer was paid, incurring interest charges on those new purchases and increasing the effective cost of the transfer.[186]

---

[184] Data provided by Competiscan.

[185] Some issuers permit consumers to enjoy a grace period on new purchases while revolving a transferred balance during the promotional period, but the prevailing practice appears to be that revolving balance transfers does eliminate the grace period on regular purchases. Issuers are required to provide certain disclosures to consumers which include information regarding the potential loss of a grace period when balances are not paid in full. 12 C.F.R. § 1026.6(b)(2)(v). Issuer disclosures on balance transfers show that some issuers have revised their applicable grace period policies. These disclosures show that some issuers now allow consumers to retain their grace period while revolving a transferred balance so long as they pay the balance generated by new purchases in full each month. Although issuers lose some interest revenue from this type of change, consumers stand to benefit from balance transfer costs being clearer. In addition, issuers may realize some benefits. The decreased cost of new purchases may cause increased use of the card for such purchases. In addition, the issuer may avoid any customer service costs associated with the prevailing grace period policy on balance transfers. *See* 2017 Report, *supra* note 6, at 193.

[186] *See* 2015 Report, *supra* note 6, at 126; *see also* 2017 Report, *supra* note 6, at 191-193.

EXHIBIT A
Page 108

# 5.4    Cash advances

The cash advance feature, offered on many general purpose credit cards, allows consumers to obtain cash or cash equivalents using a portion of their card's credit line (20 percent of the line is common), sometimes called the "cash line."[187] Unlike balance transfers, cash advances are available to any cardholder with sufficient available cash credit line on a card that has the feature. Consumers can access cash advances through a variety of means; ATM withdrawals may be the most well-known form of cash advance, but they are not the only one. Issuers may treat certain credit card purchases as cash advances; this can include such uses as the purchase of chips at a casino, gold at a bank, foreign currency, traveler's checks, gift cards, prepaid cards, convenience checks, and virtual currencies;[188] The funding of peer-to-peer transfers may also be treated by some issuers as a cash advance.[189] In some cases, when a consumer links a credit card to a deposit account in order to cover overdrafts on the latter, the credit card issuer will treat that overdraft as a cash advance.

## 5.4.1    Prevalence

Cash advance volumes were mostly flat leading up to the pandemic but fell sharply during the pandemic and remain well below previous levels. Prior to the pandemic, cash advance volume averaged roughly $3 billion per quarter with some seasonal fluctuations, typically showing slightly higher volumes in the third quarter of each year. As shown in Figure 13 below, the second quarter of 2020 saw cash advance volume decline to less than $2 billion before rising to roughly $2.5 billion for the remainder of 2020. One explanation for the decline in cash advance

---

[187] To the Bureau's knowledge, some private label cards provide a cash advance feature at the point of sale, but the practice is not common and does not fall within the scope of this section.

[188] Many transactions effectuated using a "convenience check" may also be treated as cash advances by issuers. However, not all such transactions are so treated; depending on how it is used, some may be treated similarly to balance transfers. The Bureau therefore excludes convenience check transactions from this analysis (and from its analysis of balance transfers in Section 5.2), acknowledging that this likely excludes at least some volume that may be identical or near-identical from the consumer perspective.

[189] *See* Ann Carrns, *Beware the Fees That Come With Some Money Transfers on Apps*, N.Y. Times (Apr. 24, 2020), https://www.nytimes.com/2020/04/24/your-money/fees-mobile-app-payments.html. *See also* Aaron Hurd & Dia Adams, *Using A Credit Card To Send Money On PayPal—Should You?*, Forbes (June 3, 2021), https://www.forbes.com/advisor/credit-cards/using-a-credit-card-to-send-money-on-paypal-should-you/.

volume may be that measures aimed at mitigating the economic impact of COVID-19, such as economic stimulus payments and enhanced unemployment benefits, met some of the need consumers may otherwise have had for cash during the pandemic. This is generally a positive sign for consumers, as cash advances can be a relatively costly form of credit, as discussed in Section 5.4.2.

**Figure 13:**    QUARTERLY CASH ADVANCE VOLUME, GENERAL PURPOSE (Y-14+)



Cash advance usage has continued its decline for consumers in all credit score tiers, even omitting the singular decline in the second quarter of 2020. Cash advance volumes may have been steady prior to the pandemic, but as the number of credit cards has increased, the incidence of cash advance feature usage has declined. Cash advance incidence is relatively uniform across credit score tiers, except for consumers with superprime scores who use cash advances markedly less than all other cardholders. Cash advance incidence has continued to decline over the last few years, particularly in the below-prime market segment, as shown in Figure 14.

**Figure 14:**    QUARTERLY CASH ADVANCE INCIDENCE, GENERAL PURPOSE (Y-14+)



Average cash advance line is greater for consumers with higher scores, with superprime cardholders averaging $3,000 per card, while below-prime score tiers average $1,000 or less. Most credit cards restrict access to the cash advance feature by stipulating a separate smaller cash advance line that is also part of the cardholder's overall line. Cardholders may utilize the cash advance feature in an amount that is the smaller of either the remaining available line or the maximum cash advance line on the card. Given the utilization rate for cards held by consumers in below-prime tiers tends to be high, cash advances are likely more limited by the remaining card balance than the cash advance line amount. With minimum per-use fees, this might mean a cash advance may be more expensive as a share of the amount consumers receive, as discussed in Section 5.4.2.

**Figure 15:**    AVERAGE CASH ADVANCE LINE, GENERAL PURPOSE (Y-14)



EXHIBIT A
Page 111

## 5.4.2    Cost

The cash advance cost structure can be complex, and costs depend on the amount advanced, upfront fees, interest rates, and the timing of repayment.[190] Fee structures can be relatively complex, with some card agreements stipulating different cash advance fee percentages and minimum fee amounts for different cash advance transactions, such as lower fees for ATM transactions and higher fees for cash equivalents like casino chips.[191] Cash advance APRs are typically higher than purchase APRs, and these transactions are not usually subject to any kind of grace period, meaning they begin accruing interest at that higher APR at the point that the cash advance is taken, even if the cardholder pays their balance in full every month.[192]

Cash advance fees overall fell in 2020 as a result of decreased usage, while remaining steady as a share of cash advance volume. Fee volumes had been stable prior to the pandemic, totaling just under $750 million per year for issuers in the Y-14+ data.[193] In 2020, due to declines in usage, cash advance fee volume fell to roughly $550 million, a decline of nearly 27 percent. As a share of volume, cash advance fees averaged 5.0 percent in 2019 and 2020, slightly lower than the 5.2-5.3 percent seen from 2016 to 2018. Cash advance fee ratios are noticeably higher for cardholders in lower score tiers, as shown in Figure 16. Minimum fixed fee amounts for cash advances in a two-way pricing structure, such as "$10 or 5%," can translate to high cash advance fee ratios for cardholders who take a small dollar amount cash advance. This is more often the case for cardholders with little remaining available credit on their cards.

---

[190] While the vast majority of credit cards charge an upfront fee for cash advances, the Bureau is aware of at least one card that does not.

[191] *See, e.g.,* U.S. Bank, *Cardmember Agreement for U.S. Bank National Association Visa® and Mastercard® Classic, Gold and Platinum Accounts,* https://applications.usbank.com/oad/teamsite/decisioning/usbank/docs/global_default/FR006213482_03_USB. pdf.

[192] Indirect costs to cardholders such as interest on balances from purchases that would otherwise be treated as interest free due to a grace period are not included in calculations of cash advance costs, but remain an important consideration.

[193] Due to a technical error, the aggregate cash advance fee volume figure was misreported in the 2019 Report and has therefore been restated correctly here.

**Figure 16:**    QUARTERLY CASH ADVANCE FEES RELATIVE TO CASH ADVANCE VOLUME, GENERAL PURPOSE (Y-14+)



## 5.5    COVID-19 response

The onset of COVID-19 across the United States in the second half of the first quarter of 2020 triggered a sharp response from consumers, businesses, and government entities. The sum effect of those responses was to abruptly render many ordinary activities prohibited or impracticable, which severely impacted the financial security of many consumers. As described below, individuals were advised to avoid unnecessary travel outside the home, many businesses closed temporarily or permanently, and many workers were laid off or furloughed.

That economic crisis had two significant impacts for credit card issuers. First, as described in more detail below, credit card issuers' operational models suddenly became untenable, necessitating a drastic and rapid shift to new ways of doing business. Second, the widespread cessation of a great deal of in-person activity sparked the swiftest deterioration in economic conditions in modern history, imperiling the ability of millions of consumers to make adequate, timely payments of their debts.

This report generally focuses on the state of the consumer credit card market, and in particular the impact of COVID-19 on consumer cardholders. The pandemic also had a significant effect on the companies that issue credit cards to consumers; how those issuers responded to the crisis was a major factor in the ultimate effects of the pandemic on consumer cardholders. This section therefore summarizes the impact of COVID-19 on the largest credit card issuers, as well as the responses by those issuers to the pandemic. First, this section examines the operational

response of issuers to COVID-19, including actions relating to staffing, risk management, and account servicing. Second, it focuses on issuers' relief efforts.[194]

With regard to issuers' operational posture, issuers moved quickly to adjust operations in response to the new conditions precipitated by COVID-19; while issuers generally responded similarly in some ways (e.g., shifting employees to remote work wherever possible), their mitigation attempts varied more in others (e.g., existing credit line management). Issuers struggled to maintain existing levels of account servicing, especially at the onset of the pandemic. Issuers' relief efforts likely resulted in consumers preserving billions of dollars in liquidity following, and especially immediately following, the onset of the pandemic.

Overall, consumers expressed heightened dissatisfaction with their credit cards following the onset of the pandemic; complaints to the Bureau relating to credit cards rose significantly beginning in the first quarter of 2020, and remain at levels elevated relative to the recent pre-pandemic years, as shown below in Figure 17.[195]

---

[194] Except where noted, data supporting this section come from the Bureau's MMI survey. Therefore, and as noted elsewhere in this report, it only represents the experiences of the largest credit card issuers, with the attendant caveats also noted elsewhere in this report. While out of scope, the Bureau notes significant evidence for operational impacts and relief efforts made by smaller banks and credit unions. *See, e.g.*, Laura Alix, *Small-dollar loans highlight banks' coronavirus relief efforts* (Mar. 25, 2020), https://www.americanbanker.com/news/small-dollar-loans-highlight-banks-coronavirus-relief-efforts.

[195] *See supra* note 2.

109    BUREAU OF CONSUMER FINANCIAL PROTECTION — CONSUMER CREDIT CARD MARKET REPORT

**Figure 17:**    MONTHLY CREDIT CARD COMPLAINTS



However, overall complaints to the Bureau rose significantly; the total volume of complaints received by the Bureau in 2020 exceeded 2019 volumes by over 50 percent, and certain sectors saw much larger increases in complaint volume, either in raw totals, relative to previous volumes, or both.[196]

## 5.5.1    Operational impacts and response

COVID-19 necessitated a sharp adjustment in the operational posture of major credit card issuers. Credit card issuers were faced with a series of challenges in how to address demand for credit, the need for relief, and the servicing of existing accounts. Issuers were forced to contend with all of these challenges simultaneously, in a compressed timeframe, with a high degree of uncertainty regarding the short and long-term impact of the pandemic on the economy. Actions taken by issuers to address these challenges varied significantly, making a comprehensive picture of issuers' response to COVID-19 difficult to assemble, especially in those areas where issuers' responses proved more varied.[197]

---

[196] *See Consumer Response Annual Report, supra* note 1, at 9.

[197] Note that, while drawing on a different source of data representing a different group of issuers, the Bureau's Winter 2021 Supervisory Highlights draws many similar conclusions about issuers' operational challenges and responses in the wake of COVID-19, as well as relating to issuer relief efforts. *See Supervisory Highlights, supra* note 13, at 13-14.

**UNDERWRITING AND CREDIT MANAGEMENT**

All surveyed issuers reduced new credit availability in response to the onset of the pandemic. Among the most common measures were raising underwriting standards on new accounts and pausing or raising underwriting standards on credit line increases (both proactive and reactive). [198] Many issuers also reported limiting or raising underwriting standards on certain secondary features on accounts, such as balance transfers, cash advances, or over limit transactions.

Issuers' approach to the lines of credit already available to their cardholders varied. Some issuers reported decreasing credit lines and closing inactive or high-risk accounts at a higher frequency. [199] However, other issuers reported at least temporarily pausing credit line decreases, certain types of account closures, and certain types of pricing increase activity as well as providing other forms of targeted credit expansion.

**ACCOUNT SERVICING**

COVID-19 led to a large and sudden increase in consumer servicing needs. This spike was driven by requests for relief (discussed in the following subsection) and by a wave of disputed transactions. While MMI data on disputes are limited and varied, they nonetheless point to a sharp uptick in the volume of consumer disputes around the onset of the pandemic compared to the prior year, with an even sharper increase in dollars at stake in those disputes. These disputes were disproportionately driven, by higher-score consumers disputing transactions on general purpose cards; transactions directly related to travel expenditures experienced an even larger relative spike in transactions and dollar disputed compared to other categories.

---

[198] *See supra* note 193.

[199] For more on credit line management, *see* Section 4.2.3. Some issuers also discussed these actions in earnings calls early in the pandemic. *See, e.g.*, Synchrony Financial, *Q1 2020 Results – Earnings Call Transcript*, Seeking Alpha (Apr. 21, 2020), https://seekingalpha.com/article/4421711-synchrony-financials-syf-ceo-brian-doubles-on-q1-2021-results-earnings-call-transcript; ("[W]e're continuing to utilize internal and credit bureau triggers to dynamically reevaluate the customers' creditworthiness to manage credit exposure, as well as leveraging the latest technology to passively authenticate customers and more selectively target high risk behavior."); American Express, *Q2 2020 Results – Earnings Call Transcript*, Seeking Alpha (July 24, 2020), https://seekingalpha.com/article/4360706-american-express-axp-ceo-steve-squeri-on-q2-2020-results-earnings-call-transcript. ("[W]e have been very diligent about looking at people who are inactive card members and canceling those cards.").

EXHIBIT A
Page 116

At the same time consumer servicing needs were increasing, the pandemic also severely impacted the ability of credit card issuers to process consumer servicing requests. This impact was most sharply felt at call centers both domestic and abroad, which issuers reported were largely closed or extremely restricted in their operations for an extended period following the onset of the pandemic due to safety concerns and public health-driven closure orders. However, similar impacts also reverberated through other aspects of relevant "back office" operations— issuers reported difficulties and delays in processing both inbound and outbound mail, difficulties maintaining digital servicing portals, and inadequate levels of total or appropriately-trained staff to handle certain types of disputes or aspects of the dispute process.

Issuers responded to these servicing constraints by implementing measures to bolster capacity and reduce customer wait times. Some measures included allowing staff to work from home where feasible, adding training to allow more staff to handle disputes, hiring new staff, increasing allowances for staff to work overtime, increasing dollar-amount thresholds for certain forms of expedited dispute resolution, and making adjustments to customer communications across various channels. In many cases issuers reported deploying these measures rapidly, within weeks or even in some cases days of the March 13, 2020 federal emergency declaration.[200]

Consumers who requested to speak with a customer service representative nevertheless experienced much longer wait times around the onset of the pandemic. On average, consumers experienced wait times in the second quarter of 2020 that were many multiples of both the first quarter of 2020 and the second quarter of 2019, and in some cases an order of magnitude longer. These wait times generally fell substantially over the course of the year; by the fourth quarter of 2020, while most issuers reported higher wait times than the comparable quarter of 2019, those wait times were nevertheless much closer to levels observed in 2019 in most cases.

---

[200] *See* 85 FR 15337. Notably, issuers almost wholly abstained from availing themselves from the flexibility offered by the Bureau's May 3, 2020 "Statement on Supervisory and Enforcement Practices Regarding Regulation Z Billing Error Resolution Timeframes in Light of the COVID-19 Pandemic," which "inform[ed] creditors of the Bureau's flexible supervisory and enforcement approach during this pandemic regarding the timeframe within which creditors complete their investigations of consumers' billing error notices." *See* Bureau of Consumer Fin. Prot., *Statement on Supervisory and Enforcement Practices Regarding Regulation Z Billing Error Resolution Timeframes in Light of the COVID-19 Pandemic* (May 3, 2020), https://files.consumerfinance.gov/f/documents/cfpb_statement_regulation-z-error-resolution-covid-19_2020-05.pdf.

There was not, however, an apparent spike in the total volume of consumer calls to surveyed issuers following the onset of the pandemic. Most issuers reported a decline in total call volumes in the second quarter of 2020 from the prior quarter, with none reporting more than a slight uptick. This contrasts with 2019, when quarter-over-quarter volumes were much more stable in the first half of the year. This decline persisted into the remainder of the year, with surveyed issuers reporting (in aggregate) receiving only about five-sixths of the total incoming call volume in the second half of 2020 as they did in 2019. This decline was also observable for the subset of calls in which a consumer requested to speak with a customer service representative. Such calls also represented a relatively constant share of all calls over 2019 and 2020. These findings suggest that wait time spikes were largely driven by decreased capacity by issuers to field calls, rather than an increase in such calls, though Bureau data cannot rule out the possibility that the composition of calls made to issuers increased in complexity or difficulty.[201]

In some ways, the consumer impact of the acute destabilization in issuer customer service might have been worse if issuers had not established digital servicing channels prior to the pandemic. As described in more detail in Section 7.2.1 below, increasing numbers of consumer credit card accounts are enrolled in digital servicing portals. While Bureau survey data do not directly allow for measuring this, other information indicates that consumers expanded their use of digital servicing channels for their financial accounts.[202] If consumers increasingly substituted such channels for servicing activity they may have previously done via phone or at a branch location, this could explain why issuers did not report a large spike in consumer calls.

**ADDITIONAL OPERATIONAL IMPACTS**

Issuers reported a variety of other operational changes in response to COVID-19 and its effects. For example, many issuers made significant changes to their overall marketing and solicitation posture, reducing, or eliminating solicitations and messaging with themes that may have been seen as dissonant with the moment (e.g., exhortations to spend on travel). Issuers refocused

---

[201] For example, the Bureau's debt collection-specific data indicates that issuers saw a large influx of calls relating specifically to consumer relief, which may have been more complex or time-consuming to resolve than many common pre-pandemic call subjects. See Section 6.5 *infra*.

[202] *See e.g.,* Ellen Sheng, *Coronavirus crisis mobile banking surge is a shift that's likely to stick,* CNBC (May 27, 2020), https://www.cnbc.com/2020/05/27/coronavirus-crisis-mobile-banking-surge-is-a-shift-likely-to-stick.html.

efforts on more consonant themes and on messaging specific to relief. Several issuers reported accelerating existing efforts to transition their portfolios to contactless cards. [203] Several issuers also made significant changes to their rewards programs; for example, several issuers extended the timeframes for earning sign-up bonuses or avoiding rewards expiration, or allowed accumulated rewards to be redeemed in ways perceived as better suited to the moment.

## 5.5.2    Consumer relief

Data show that a large and likely-unprecedented number of consumers received some form of relief on their credit card debts following the onset of COVID-19, all of which was provided voluntarily by issuers. Unlike servicers of federally-backed mortgages, which were mandated by the CARES Act to provide certain types of forbearance to mortgagors, card issuers were not subject to any federal mandate to provide relief on consumers debts. This section discusses first the form of consumer relief offered by major credit card issuers and second the impact of that relief. [204] This section describes only relief provided to consumers by issuers that directly impacted their credit card accounts; other forms of relief which may have been offered and which could have indirectly impacted consumers' ability to manage their credit card debts are not considered here. While this section relies solely on MMI data, other sources of information supplement and generally support reported findings. [205]

---

[203] Usage of contactless payment methods increased significantly after the onset of COVID-19 (both in the U.S. and in other jurisdictions), likely due to public perceptions that such methods entailed a lower risk of transmission of COVID-19. For more information regarding contactless payment adoption, *see* Section 7.2.2.

[204] Issuers represented by these data represent a large portion of the market but are not necessarily representative of the portion of the market not covered by the data the Bureau receives. Additionally, issuer practices regarding the measurement and tracking of the scope and impact of their relief efforts varied considerably, limiting the Bureau's ability to draw precise conclusions from the data provided. The COVID-19 crisis was unprecedented in severity and swiftness as well as in its impact on issuers' operations, but the Bureau expects this experience will inform the ongoing efforts of credit card issuers and other consumer finance companies to design strategies to both directly address future crises as well as more-robustly track the impacts of those strategies to better allow for their evaluation and improvement.

[205] *See, e.g.,* Auriemma Research, *Impact of Credit Line Changes and Loan Forbearance, Attitudes toward Low or No-APR Cards, and 'Refer a Friend' Programs*, at 34-42 (Apr. 2021). *N.b.* that many credit card issuers are also publicly-traded, and many such issuers provided information regarding the structure, take-up, and impact of their relief efforts in mandatory filings as well as associated materials.

**FORM OF RELIEF**

Issuers generally reported offering relief programs to consumers affected by natural disasters or other hardships prior to COVID-19. These programs vary widely across a number of key criteria, including eligibility, form of relief and benefit, length, other conditions of receiving the benefits, and terms of exit, with different programs serving different purposes or functions in managing consumer accounts. While some commonalities were prevalent across issuers' programs, no two issuers offered exactly the same suite of relief programs.

Many surveyed issuers offered short- and long-term payment plans, which generally allowed consumers to address outstanding debts by reducing interest rates and payment amounts due for the duration of the program; these programs were structured to allow distressed consumers to escape delinquency and reduce their indebtedness, but also generally restricted a consumer's use of the card during enrollment.

Some issuers also reported offering a variety of short-term relief programs for consumers affected by natural disasters. The most common such type of program generally allowed consumers in areas affected by natural disasters to reduce or skip a required payment, to temporarily suppress certain fees, and/or to forestall certain other activities and events associated with their account (for example, blocking credit line decreases that may have otherwise occurred). Other issuers offered programs with similar benefits, but not explicitly targeted or limited to consumers affected by natural disasters.

All surveyed issuers reported offering relief specific to COVID-19. Issuers reported developing and deploying new relief programs, and/or modifying existing relief programs within weeks of the March 13, 2020 federal emergency declaration. All issuers offered a program which allowed consumers to skip payments, with some issuers also offering COVID-19-specific programs allowing for relief on a longer timescale. No issuer reported freezing access to, discarding, or otherwise substituting COVID-19 relief for existing programs. Issuers generally reported engaging in significant marketing campaigns around their relief programs, especially following the onset of the pandemic, using a variety of channels to inform consumers about the existence of these programs and key details, such as eligibility and impact on account status.

Upon request, all issuer "skip-a-pay" programs allowed consumers to forgo making monthly minimum payments, including any finance charges, without any impact on an account's delinquency status. Issuers generally allowed for broad eligibility, though some issuers restricted access to skip-a-pay programs to accounts that were not already severely delinquent

and/or in certain other statuses (for example, bankruptcy).[206] Issuers generally reported requiring applicants to attest to COVID-19-induced hardship, but did not require consumers to provide documentation or other evidence of such hardship in order to obtain relief.

While issuers generally waived any late or insufficient funds (NSF) fees associated with the account in that cycle, issuers varied more in how they handled interest charges. Some issuers waived finance charges as part of their skip-a-pay programs, while others did not (while still allowing payment of those charges to be deferred while consumers were enrolled); still other issuers handled different types of interest charges differently (for example, waiving monthly finance charges generally while assessing-and-deferring certain promotional interest charges). Most issuers waived payments for a single cycle upon request, though some waived more, and all issuers allowed consumers to re-enroll in skip-a-pay programs for several consecutive cycles.

Some issuers reported modifying or withdrawing certain aspects of their COVID-19 relief approach over the course of 2020. For example, some issuers who initially waived finance charges for skip-a-pay consumers later reinstated them on a deferred basis; some issuers reduced the number of cycles for which a consumer qualified after a single enrollment, or capped the total number of consecutive cycles for which a consumer could be enrolled.

Among the Bureau's statutory objectives is to ensure "outdated, unnecessary, or unduly burdensome regulations are regularly identified and addressed in order to reduce unwarranted regulatory burdens."[207] As part of its MMI survey, the Bureau asked issuers whether any provision of any federal consumer financial law (as defined in 12 U.S.C. § 5481(14)) inhibited, impeded, or prevented them from offering any relief program they considered, or impacted the scope or terms of any relief program they offered. All issuers responded in the negative. The Bureau continues to monitor consumer financial markets for indications that provisions of

---

[206] While Bureau data does not allow for determining whether consumers who had been struggling previously with their indebtedness had access to relief programs in practice, other data suggest a significant share of such consumers were able to access issuer relief — per Auriemma, "As of Q3-20, 55% of cardholders who had missed a payment in the past 12 months were offered a forbearance option from a credit card issuer. 75% of those individuals took their credit card issuer up on the offer, likely contributing to the lower proportion who missed a payment by Q4-20." *See* Auriemma Research, *2020 Trend Database, Cardbeat,* at 7.

[207] 12 U.S.C. § 5511(b)(3).

federal consumer financial law or their implementing regulations may cause undue burden or otherwise entail unintended adverse consequences for consumers. [208]

## IMPACT OF RELIEF

Large numbers of consumers benefitted from issuers' relief programs in 2020. Bureau data indicate that approximately 25 million consumer credit card accounts entered relief programs in 2020, representing approximately $68 billion in consumer debt subject to voluntary issuer relief. Entry into relief was concentrated around the onset of the pandemic; the second quarter alone saw over two-fifths of the year's entry into relief by number of accounts (and over half by amount of consumer debt); by the fourth quarter, entry into relief had declined to levels closer to pre-COVID-19 levels, though it was still elevated.

Payment-deferral programs were the major driver of the robust increase in relief, though fee reversals and waivers or interest rate reductions were also more common in 2020. [209] Over 13 million accounts received some form of payment deferral (interest-accruing or non-interest accruing) representing over $50 billion in consumer indebtedness. [210] These figures were well over an order of magnitude higher than the comparable figures for 2019. The bulk of the remaining relief consisted of fee reversals or waivers, which were also elevated compared to 2019, with accounts and debts receiving such relief in 2020 representing an approximate 20

---

[208] *See e.g.* Bureau of Consumer Fin. Prot., *Statement on Supervisory and Enforcement Practices Regarding Electronic Credit Card Disclosures in Light of the COVID-19 Pandemic* (June 3, 2020), https://files.consumerfinance.gov/f/documents/cfpb_e-sign-credit-card_statement_2020-06.pdf; *see also* Bureau of Consumer Fin. Prot., *Open-End (not Home-Secured) Rules FAQs related to the COVID-19 Pandemic* (May 13, 2020), https://files.consumerfinance.gov/f/documents/cfpb_faqs_open-end-rules-covid-19_2020-05.pdf.

[209] While payment deferrals were by far the largest overall component of overall relief efforts, that does not mean that other relief efforts were not impactful for consumers. *See, e.g.,* Auriemma, "Among these who were offered and took a temporary interest rate reduction, 19% of them were able to increase the number [or] amount of credit card payments they could make." *See supra* note 205, at 8).

[210] The structure of the MMI survey entailed some potential double-counting (or triple-counting, etc.) of accounts if such accounts received more than one type of relief during a quarter. However, in practice this appears to have been limited, with the sum total of all individual relief types reported representing approximately 29 million accounts and $78 billion in consumer debt, numbers not much greater than the total reported receiving any relief (a figure which counts each account only once). Therefore, it appears that most accounts only received one type of relief during a quarter, with most of the double-counting likely coming from accounts that received both payment deferrals and fee reversals or waivers.

percent and 50 percent increase over 2019, respectively. Accounts and debt enrolled in interest rate reduction relief or other forms of relief were mostly in line with 2019 levels. General purpose accounts represented roughly six-in-ten accounts granted a payment deferral in 2020, with retail accounts representing the balance, but general-purpose accounts represented nearly four-fifths of the consumer debt subject to a payment deferral in 2020. [211]

Based on those findings and subject to certain assumptions, the Bureau estimates that surveyed issuers' cardholders were able to forgo principal payments of anywhere from $0.5 billion to $1.5 billion against their credit card debts in 2020 due to these relief programs. While making similar inferences regarding the interest payments consumers were permitted to forgo is more challenging, it is plausible that the figure may be comparable to the above estimate for principal payments. [212,213] Especially when incorporating information about the relief utilized by cardholders of other issuers not within the MMI survey, it is likely that all consumer cardholders were able to forgo several billion dollars in otherwise-mandatory payments to credit card companies over the course of 2020. This relief came at a time when many consumers found themselves suddenly facing joblessness or reduced incomes while simultaneously at risk from COVID-19. The scale of this relief and the speed with which it was deployed therefore likely represented substantial benefits to the consumers who received it, allowing them to redeploy their limited and, likely in many cases, interrupted or diminished flow of income and other incoming funds towards other urgent needs.

Entries into payment deferral relief were spread fairly evenly across credit score tiers. In 2020, nearly four million prime accounts held by surveyed issuers received payment deferrals, compared to nearly three million superprime and near-prime accounts and closer to two million

---

[211] Consumers carry higher balances on average on general purpose accounts. *See* Section 2.2.1.

[212] The Bureau's MMI survey did not indicate how many consumers were presently revolving at the time they entered relief, which means Bureau data cannot determine what share of consumers who were permitted to skip a mandatory payment were skipping payments which included a finance charge as well as a principal payment.

[213] In most cases the interest nonetheless accrued, meaning the benefit to consumers was primarily one of preserved liquidity at a moment of crisis, not a discount on their costs of indebtedness. However, a not-insignificant share of payment deferrals were accompanied by interest waivers, meaning that in those cases issuers permanently forewent that income to the benefit of consumers.

EXHIBIT A
Page 123

subprime and deep subprime accounts. [214] However, accounts held by consumers with lower scores received payment deferrals at the highest rates of any credit score tier – nearly one-in-six subprime and deep subprime accounts received a payment deferral, compared to roughly one-in-ten among near-prime, one-in-twenty among prime, and just one-in-one-hundred among superprime accounts. As a share of balances, lower-score consumers showed an even greater relative impact from deferral programs. Rates of overall payment deferral peaked in the second quarter of 2020, with about 3 percent of consumer accounts (and nearly 7 percent of consumer credit card debt) receiving such a deferral in that period.

Available data suggest broad-based access to issuers' relief programs generally, but it remains unclear how many consumers were unaware of or unable to take advantage of issuer relief programs. While the Bureau's data provide limited further visibility into whether more-vulnerable consumers were able to fully and equally benefit from relief efforts, other evidence suggests that large numbers of such consumers were indeed able to access relief from their credit card issuers. Data from the August 2020 Survey of Consumer Financial Expectations found that 11 percent of those surveyed reported receiving some assistance from their credit card company. [215] Nonwhite cardholders were much more likely to receive credit card debt relief than white cardholders at 19.7 percent and 9.7 percent respectively. [216] Additionally, a greater share of consumers with incomes less than $60 thousand per year received relief than those with higher incomes. Cardholders who faced an income drop in 2020 were also more likely to receive relief. [217]

---

[214] Unsurprisingly given the higher average balances held by consumers with higher credit scores (*see* Section 2.2 above), this distribution was more skewed towards higher-score accounts when examined through the lens of consumer debt, with prime accounts representing nearly two-fifths of all debt receiving payment deferrals, nearly twice as much as deep subprime and subprime accounts combined.

[215] Beyond payment forbearance, this also includes fee and interest rate reductions and credit card limit increases. *See* Rajashri Chakrabarti, Jessica Lu, Joelle Scally, and Wilbert van der Klaauw, *Who Received Forbearance Relief?*, Federal Reserve Bank of New York (Aug. 2, 2021), https://libertystreeteconomics.newyorkfed.org/2021/08/who-received-forbearance-relief/.

[216] *Id.*

[217] *Id.*

Unlike the Great Recession, cardholders have largely avoided delinquency and charge off, as of the time of this report writing. As noted above in Section 2, overall rates of delinquency and charge-off *declined* significantly following the onset of COVID-19.[218] Several factors likely played a role in this development, such as extensive public aid to consumers (including Economic Impact Payments, increased unemployment insurance payments and expanded unemployment insurance coverage, and the Paycheck Protection Program), government-mandated forbearance on certain types of loans (including some mortgages and student loans), an increase in charitable giving,[219] state and federal moratoria and other limitations on tenant eviction, and other forbearance and relief voluntarily offered by financial institutions, as well as the recovery in employment and income over the latter half of 2020. However, much of that aid may not have made its way to struggling consumers with credit card debts until weeks or months after those consumers experienced a sudden and unexpected loss in income.[220] As noted earlier, surveyed issuers made payment deferral widely and rapidly available after the onset of the pandemic. This may have served to tide many consumers over until they could access those supports and programs outlined above.

---

[218] *See* Sections 2.5 and 2.6.

[219] *See, e.g.*, AFP Foundation for Philanthropy, *FEP Reports,* https://afpglobal.org/fepreports (last visited Aug. 18, 2021).

[220] To take one such aid program as an example, the IRS reported distributing nearly 90 million Economic Impact Payments totaling over $160 billion between the passage of the CARES Act on March 27, 2020 and April 17, 2020. *See* IRS, *Treasury, IRS deliver 89.5 million Economic Impact Payments in first three weeks, release state-by-state Economic Impact Payment figures* (Apr. 28, 2020), https://www.irs.gov/newsroom/treasury-irs-deliver-89-point-5-million-economic-impact-payments-in-first-three-weeks-release-state-by-state-economic-impact-payment-figures. Those figures reached approximately 127 million and $216 billion, respectively, by May 8th, and 159 million and $267 billion by June 3rd, 2020, with distribution continuing after that point as well. *See* IRS, *Treasury, IRS release latest state-by-state Economic Impact Payment figures* (May 8, 2020), https://www.irs.gov/newsroom/treasury-irs-release-latest-state-by-state-economic-impact-payment-figures and *see also* IRS, *159 million Economic Impact Payments processed; Low-income people and others who aren't required to file tax returns can quickly register for payment with IRS Non-Filers tool* (Jun, 3, 2020), https://www.irs.gov/newsroom/159-million-economic-impact-payments-processed-low-income-people-and-others-who-arent-required-to-file-tax-returns-can-quickly-register-for-payment-with-irs-non-filers-tool. As noted earlier in this subsection, the economic deterioration brought on by COVID-19 was extremely swift, with 20 million jobs vanishing by the end of April 2020. It is therefore plausible that at least some consumers with credit card debt who experienced a sudden loss of job or other income in late March or early April of 2020 may not have received their Economic Impact Payments until several months later, highlighting the potential impact to those consumers of being able to defer their credit card payments during that intervening period.

EXHIBIT A
Page 125

# 5.6    Card agreements

Pursuant to the CARD Act and the Bureau's implementing regulations, the Bureau has collected agreements for open-end consumer credit card plans on a quarterly basis since 2011.[221] Recent technological investments in text analysis software allow the Bureau to present some initial findings from more than 10,000 cardholder agreements submitted by credit card issuers pursuant to those CARD Act requirements over the past five years. These documents from the CFPB's Credit Card Agreement Database ("Database") represent most agreements and their associated pricing addenda for general purpose cards based on submissions at year's end from 2016 through 2020.[222] Previous Bureau reports utilized only a sample of documents from the Database to examine agreement length, readability, and late fee terms.[223] This section is broader in scope than those prior efforts and examines agreement length and grade level alongside Spanish-language presence and arbitration-clause incidence, while also showing how credit card agreements change over time.

Relying on text analysis software rather than manual review poses new difficulties. If none of an issuer's agreements for a given quarter could be successfully scanned by optical character recognition (OCR), then the institution is excluded from analysis. Some 11.8 percent of submissions were not possible to transform using OCR. On average each quarter, 21.8 percent of issuers had at least one agreement that did not scan, and 10.6 percent of institutions had zero agreements that successfully scanned. Due to the submission practice of several issuers where an agreement includes pricing information for multiple distinct credit card products, the Bureau cannot currently determine the share of products or consumers impacted by specific agreement provisions. Card issuers are also not required to submit any agreements to the Bureau if that issuer has fewer than 10,000 open card accounts as of the last business day of the calendar

---

[221] Prior to July 21, 2011, this responsibility belonged to the Board. The Bureau suspended this collection for a one-year period in order to pursue certain process improvements. 80 FR 21153 (Apr. 17, 2015); 12 C.F.R. § 1026.58(g).

[222] The fourth quarter of 2020 may include omissions due to regulatory flexibility due to the Bureau's COVID-19 regulatory flexibility statement. *See supra* note 32.

[223] The 2013 report reviewed a sample of cardholder agreements for large issuers to examine potential CARD Act impacts on agreement length and form, and the 2015 report expanded this analysis by relying on a bigger sample from different classes of issuer. In the 2019 report, the Bureau examined the late fee terms of credit card agreements from banks included in the Y-14+ panel.

quarter.[224] Taken together, while these challenges may limit the representativeness of the results, the Bureau believes the volume of agreements analyzed is sufficient to reliably draw certain conclusions from these data, presented herein.

## 5.6.1    Readability

The decisions issuers make when drafting cardholder agreements determine which consumers can be expected to be able to read and understand their credit card's terms and conditions. Three barriers to comprehension of cardholder agreements explored in this section include length, complexity, and English proficiency.

Larger issuers tend to offer longer agreements, as measured by the number of sentences in each document. Figure 18 depicts the length of agreements for different issuer groups over time. The bars illustrate the median number of sentences per document for each credit card issuer group. The black vertical lines for each bar show the 25th and 75th percentiles. While the median agreement length for smaller banks has increased slightly since 2016, its variance has as well. In contrast, credit unions outside the top 20 issuers by outstandings tend to have shorter cardholder agreements than any other group – the 75th percentile sentence length for credit unions is below the median value of all other institutions over the past five years.

---

[224] 12 CFR § 1026.58(c)(5).

**Figure 18:**    MEDIAN  SENTENCE  COUNT  OF GENERAL  PURPOSE  CARDHOLDER  AGREEMENTS



While the top issuers' agreements may be longer on average, they are also easier to read. Figure 19 shows the median Flesch-Kincaid grade level by issuer class. This metric approximates complexity and calculates expected reading level by considering the average number of words per sentence and syllables per word in a document. The median Flesch-Kincaid grade level of 12.4 in the 2020 data indicates fewer than half of all agreements should be readable by a high-school graduate. This has steadily increased from a value of 12.0 in 2016. However, agreements in the top quartile for smaller banks and credit unions now equal or exceed the expected reading level of cardholders who have completed two years of post-secondary education. Previous research found that about half of adults could not read a book at an eighth-grade level; this analysis suggests that most Americans would find the median agreement above their reading level.[225]

---

[225] These estimates correspond with findings from previous reports, *see generally supra* note 6. *See also* Institute of Education Sciences National Center for Educational Statistics, *The Health Literacy of America's Adults*, U.S. Department of Education (Sep. 2006), https://nces.ed.gov/pubs2006/2006483.pdf.

**Figure 19:**    MEDIAN  FLESCH-KINCAID  GRADE  LEVEL  OF  GENERAL  PURPOSE  CARDHOLDER
AGREEMENTS



As over one-fifth of the U.S. population over the age of five speaks a language other than English at home, and more than 26 million people have limited English proficiency ("LEP"), a wide swath of consumers may face difficulties understanding credit card terms and conditions if agreements are only available in English.[226] Since Spanish speakers constitute the largest share of the LEP population, the analysis focused specifically on the availability of agreements in Spanish.

While not required by regulation, about a dozen issuers submitted Spanish-language agreements to the database in 2020. Half of these are banks located in Puerto Rico, two are smaller institutions located in California and New York, and the remainder are major issuers. To explore the larger question of the prevalence of Spanish-translated agreements, the Bureau also examined agreements published on the top 20 issuers' public websites and found that less than one-third provided easily-accessible Spanish translations of cardholder agreements. This limited analysis does not consider other methods through which institutions may service the LEP population such as interpretation services or Spanish-speaking customer service lines. Additionally, the rise of digital servicing and mobile banking has led to greater access to credit

---

[226]Chinese, Vietnamese, Korean, and Tagalog speakers sequentially represent the largest LEP populations in the United States after Spanish. *See* 82 FR 53482.

card services for the LEP population over the past decade as issuers increasingly include functionality that allows consumers to change their language preferences. [227]

## 5.6.2    Arbitration clauses

The use of arbitration clauses in general purpose agreements offered by credit card issuers appears to have increased over the past five years, as measured by the percentage of institutions who included at least one reference to arbitration in their submissions to the database at year's end. As shown in Figure 20, large issuers are more likely than smaller banks and credit unions to include arbitration clauses in cardholder agreements, but credit unions are increasingly adopting this practice. A previous manual review of 423 credit card contracts submitted to the Database in 2013 found that 15.8 percent of issuers included arbitration clauses in their credit card contracts. [228] As of 2013, 75 percent of the 20 largest bank issuers used arbitration clauses while only 3.3 percent of credit unions did so. [229] These values are nearly identical to 2016 levels in a sample of agreements from 535 issuers. Since then, the percentage of the top 20 largest issuers that include arbitration clauses in at least one of their contracts has remained largely static while the percentage of credit unions with at least one arbitration clause at year's end has

---

[227] *See* Payments Dive, *Us Bank adds functionality to mobile app, including Spanish language and account insights* (Aug. 22, 2019), https://www.paymentsdive.com/ex/mpt/news/us-bank-adds-functionality-to-mobile-app-including-spanish-language-and-account-insights/; Hilary Burns, *Bank of America redesigns mobile app, adds Spanish-language  option*, Charlotte Business Journal (July 21, 2016), https://www.bizjournals.com/charlotte/news/2016/07/21/bank-of-america-redesigns-mobile-app-adds-spanish.html; Chase, Press Release, *Chase Launches New Spanish Online Banking Experience* (Oct. 4, 2012), https://www.businesswire.com/news/home/20121004005714/en/Chase-Launches-New-Spanish-Online-Banking-Experience.

[228] Bureau of Consumer Fin. Prot., *Arbitration Study,* at 10 (Mar. 2015), https://files.consumerfinance.gov/f/201503_cfpb_arbitration-study-report-to-congress-2015.pdf.

[229] *Id.*

EXHIBIT A
Page 130

tripled.[230] While some institutions allow consumers to opt-out of arbitration provisions within a stated period after signing an agreement, the process to do so may be burdensome.[231]

**Figure 20:**    ARBITRATION CLAUSE INCIDENCE IN GENERAL PURPOSE CARDHOLDER AGREEMENTS



---

[230] The change in the percentage of top 20 issuers using arbitration clauses in 2020 is due to the practices of one issuer. *See* Emily Flitter, *JPMorgan Chase Seeks to Prohibit Card Customers From Suing*, N.Y. Times (June 4, 2019), https://www.nytimes.com/2019/06/04/business/jpmorgan-chase-credit-card-arbitration.html.

[231] The communication expressing this intent to reject an arbitration clause often must be printed and physically mailed to the company, although there are reports of at least one issuer allowing consumers to opt-out via text message. *See* Barbar Krasnoff, *You should opt out of the Apple Card's arbitration clause—here's how,* The Verge (Aug. 20, 2019), https://www.theverge.com/2019/8/20/20813800/apple-card-pay-arbitration-clause-goldman-sachs-credit-how-to-opt-out.

# 6.    Credit card debt collection

As part of its review of the practices of credit card issuers, the Bureau surveyed several large issuers to better understand practices and trends in credit card debt collection. These same large credit card issuers were also surveyed for the Bureau's reports published in 2015, 2017, and 2019. Findings from the Bureau's current survey (the MMI dataset) are reported in this section.

First, this section provides background information on the overall market for consumer debt collection. Second, this section reviews issuer policies and practices with respect to resolving delinquent debt prior to charge-off, including communication practices, use of first-party and third-party collectors, and loss mitigation programs. Third, this section reports on the recovery of debt following charge-off, including measures of recovery of charged-off debt through various channels, such as third-party agency collections, debt sale, and litigation. Finally, this section highlights COVID-19-pandemic-related developments in credit card debt collections practices.

## 6.1    Debt collection markets

After several years of growth, consumer debt surpassed its 2008 peak in 2017, rising to a new high of $14.3 trillion in the first quarter of 2020, according to the New York Federal Reserve. [232] Non-housing debt, which comprises most of the debt in third-party collections, rose to a new high of $4.2 trillion in the first quarter of 2020. During the pandemic, non-housing debt saw a record decline of $86 billion in the second quarter of 2020, followed by $15 billion and $37

---

[232] These consumer debt figures are in nominal dollars and are unadjusted for inflation and population growth, which have both increased over time. *See* Fed. Rsrv. Bank of New York, *Quarterly Report on Household Debt and Credit 2020: Q4* (Nov. 2020), https://www.newyorkfed.org/medialibrary/interactives/householdcredit/data/pdf/hhdc_2020q4.pdf.

EXHIBIT A
Page 132

billion increases in the third and fourth quarters of 2020 and an $18 billion decline in the first quarter of 2021, respectively.[233] This change was primarily driven by a record $76 billion decline in credit card debt during the second quarter.[234]

## DEBT COLLECTION INDUSTRY SIZE

Most large credit card issuers use their own employees and resources to collect some portion of their delinquent debts. Many creditors also engage third parties to collect debts on their behalf or sell uncollected debts to debt buyers who then collect the debts themselves or through a third party. Third-party debt collection industry revenue has declined in recent years, decreasing from an estimated $14.1 billion in 2013 to $12.7 billion in 2019.[235] After years of decline, employment in the third-party debt collection industry has leveled off since 2017 to roughly 141,000 US workers as of 2019.[236] The industry continues to consolidate, with the number of debt collection enterprises declining by 30 percent and the number of debt collection establishments declining by 28 percent from 2011-2019, as can be seen in Figure 1.[237]

---

[233] *See* Section 2.2 for further discussion of repayment trends.

[234] Auto loan debt, student loan debt, and other types of non-housing debt have seen relatively modest changes during 2020.

[235] *See* Gabriel Schulman, *Debt Collection Agencies in the US*, IBISWorld (Dec. 2020).

[236] *Id.*

[237] *Id.*

**Figure 1:**    DEBT COLLECTION INDUSTRY SHRINKAGE BY ENTERPRISES AND ESTABLISHMENTS, 2010-2020 (IBISWORLD)[238]



## TYPES OF CONSUMER DEBT

Debt collection affects millions of Americans. About 26 percent of consumers have a third-party collection tradeline furnished to their credit report, according to the Bureau's Consumer Credit Panel (CCP). A Bureau survey on consumers' experiences with debt collection found that about one-in-three consumers with a credit file — over 70 million consumers — indicated that they had been contacted by at least one creditor or collector trying to collect one or more debts during the year prior to the survey.[239] Debt collection efforts include phone calls, letters, emails, filing lawsuits, and other methods to collect alleged debts from consumers.

Most consumers with collection tradelines on their credit files have medical, telecommunications, retail, or banking and financial services debt.[240] In 2018, healthcare debt made up 58 percent of third-party collections tradelines in the Bureau's CCP.[241] However,

---

[238] "Enterprises" refers to the number of debt collection businesses in operation. Each enterprise may have multiple locations; thus, "establishments" is a larger figure.

[239] Bureau of Consumer Fin. Prot., *Consumer Experiences with Debt Collections: Findings from the CFPB's Survey of Consumer Views on Debt* (Jan. 2017), https://www.consumerfinance.gov/documents/2251/201701_cfpb_Debt-Collection-Survey-Report.pdf.

[240] Bureau of Consumer Fin. Prot., *Consumer Financial Protection Bureau Releases Report on Third-Party Debt Collections* (July 2019), https://www.consumerfinance.gov/about-us/newsroom/bureau-releases-report-third-party-debt-collections/.

[241] *Id.*

several debt types may be underreported because they are furnished by the creditor and hence do not appear as collections tradelines. In particular, credit card debt likely accounts for a much larger share of accounts in third-party collections than the below figure suggests.

**Figure 2:**    DISTRIBUTION OF ORIGINAL CREDITOR TYPE AMONG THIRD-PARTY COLLECTIONS TRADELINES IN Q2 2018 (CCP)[242]



A large majority of the industry's revenue is generated by firms contracting with creditors and debt buyers to collect their debts on a contingency fee basis. In contingency fee collections, the creditor and the collector each receive a share of the amount collected. A small share of collectors employs fixed fee collections.

The three largest debt buyers' share of total revenue increased by 27 percent from 2015 to 2019.[243] A significant source of industry revenue comes from debt buyers, who purchase accounts (usually contained in portfolios) from the original creditor or other debt buyers and then generally seek to collect on the debt, either by themselves or through third-party debt collectors. Whereas third-party contingency collectors receive only a percentage share of recoveries, debt buyers purchase the debt at a fraction of the account balance, and their revenue consists of the total amount recovered. If debt buyers use third-party debt collectors to recover for them, the debt buyers typically pay a share of the amount collected to the third-party debt collectors. According to the CCP, debt buyers furnished 12.5 percent of third-party collections

[242] *Id.*

[243] *See* Schulman, *supra* note 235.

tradelines. The Bureau has found that portfolios of charged-off debt may also be available to purchase through online debt marketplaces.[244] During much of 2020, participants in the debt collection industry reported an increase in consumer contacts and payments. Some states instituted pandemic measures that impacted the debt collection industry and consumers, such as include prohibitions on new wage garnishments or bank attachments, and requirements that consumers be offered the option to defer scheduled payments.[245]

# 6.2    Collections prior to charge-off

This section reviews surveyed issuers' policies, procedures, and practices with respect to resolving delinquent debt prior to accounts reaching 180 days of delinquency. In response to the Bureau's survey, issuers provided information regarding restrictions on contacting consumers, use of electronic communications (*e.g.*, email or SMS), technology and software used as part of their collection strategies, use of first- and third-party collectors, and loss mitigation practices for collection activities prior to charge-off.[246]

All respondents reported conducting some pre-charge-off collection activities in-house. An issuer's in-house collection efforts may include such methods as calling, texts, emails, letters, web chat, and social media. Most of the issuers also supplemented the activities of their in-house agents with first-party collectors: outside collectors who work under the name and the direction of the creditor when collecting on delinquent debt. An issuer may also turn to a third-party agency to collect in the agency's own name and not in the name of the original creditor. More than half of the surveyed issuers worked with third-party collectors prior to charge-off.

---

[244] Bureau of Consumer Fin. Prot., *Market Snapshot: Online Debt Sales* (Jan. 2017), https://www.consumerfinance.gov/documents/2249/201701_cfpb_Online-Debt-Sales-Report.pdf/.

[245] Bureau of Consumer Fin. Prot., *Supervisory Highlights COVID-19 Prioritized Assessments Special Edition, Issue 23* (Jan. 2021), https://files.consumerfinance.gov/f/documents/cfpb_supervisory-highlights_issue-23_2021-01.pdf.

[246] Most issuers use proprietary case management software for their internal collections. Issuers rely on a small number of vendors for their dialer software and hardware, mainly Avaya and Aspect dialers.

## 6.2.1    Pre-charge-off communications

Issuers reported having policies in place that specify the frequency with which their collectors can call, leave voicemails, email, text, and otherwise contact a consumer regarding a delinquent account. Table 1 below provides the ranges of issuers' policy limits on consumer contact via various media and actual average attempts for each of those media. Issuers reported that their call intensity strategies depended on an account's stage of delinquency and risk level, among other factors.

**TABLE 1:**    RANGES OF CONSUMER CONTACT POLICY LIMITS AND ACTUAL AVERAGE ATTEMPTS IN 2020 (MMI)

| Policy limit or actual attempts | Phone call attempts per day | Phone calls after right party contact | Voicemails per day | Postal letters per month |
|---|---|---|---|---|
| Policy limit | 3 to 11 | No additional calls on contact date | 1 to 2 | 1 to 4 |
| Actual average attempts[247] | 1.25 to 2.99 | Zero per account on contact date | 0.04 to 0.90 | 0.23 to 1.64 |

Issuers reported far fewer contact attempts on average per account than allowed by policies. All surveyed issuers reported that their policies included daily caps per account on phone calls. Daily contact attempt policy limits ranged from three calls to 11 calls per account. Noticeably, the ends of this range increased from their previous values of two and nine, respectively, as discussed in the Bureau's 2019 Report.[248] A minority of respondents also set a weekly cap on telephone call attempts at 21 to 77 calls per week per account, and a minority set customer-level caps, which ranged from six to nine attempts per day. While most issuers surveyed allowed no more than one voicemail per account per day, a small minority reported allowing two voicemails

---

[247] Average attempts via the telephone and voicemail channels were defined as the number of calls made or voicemails left to all accounts that were called divided by the number of unique delinquent accounts that were called in a given period of time. For postal letters sent, average attempts by letter was defined as the number of letters sent to delinquent accounts divided by the number of unique delinquent accounts. The time frames were daily, weekly, or monthly, depending on common practices in that channel.

[248] *See* 2019 Report, *supra* note 6, at 314.

EXHIBIT A
Page 137

per account per day. This differs from the findings in the Bureau's 2019 Report, at which time all respondents reported a policy limit of one voicemail per account per day.[249] The actual average number of voicemails per account per day ranged from 0.04 to 0.90 in 2020. Issuers averaged between 1.3 and 3.0 contact attempts via telephone per day. Even though policy maximums increased since the 2019 report, actual average attempts decreased from the range in the 2019 report of 1.4 to 3.5. However, no issuer allowed calls to continue within a given day once "right party contact" has been made. Right party contact occurs when the issuer or collector can reach and speak with the consumer whom the issuer believes is responsible for the debt via telephone. The majority of respondents reported that they did not track in-house and first-party contact attempts separately for pre-charge-off collections. Quarterly right party contact rates in 2020 averaged between 0.6 percent and 8.1 percent for in-house and first-party collections and between 0.5 percent and 7.0 percent for third-party collections.[250] Issuers who placed pre-charge-off accounts with third-party collection agencies stated that they often assign "high risk," late-stage delinquent accounts to third-party collectors, reducing right-party contact rates.

All the issuers surveyed also reported using email as part of their credit card collection strategy, but the degree to which they used it varied widely. The reported percentage of email-eligible accounts (defined as accounts for which the consumer provided a valid email address and agreed to be contacted at that address) ranged from 71.5 to 92.6 percent. The monthly average percent of email-eligible accounts increased from 68.3 percent in 2018 to 84.1 percent in 2020. Roughly two-thirds of accounts with eligible email identification received an email related to debt collection.[251] Therefore, the percent of all pre-charge off delinquent accounts that received an email increased from 45.8 percent in 2018 to 52.8 percent, implying greater adoption of the email channel by card issuers. However, survey respondents reported that on average, only 31.9 percent of accounts that received email clicked open their emails.[252] This low click-open rate

---

[249] *Id.*

[250] The survey defined "right party contact rate" as the number of times live contact with the primary or joint account holder or power of attorney of the debt was made during the quarter divided by the total number of outbound dialer attempts made to delinquent accounts in the quarter.

[251] This figure is similar to the figure in the 2019 Report, *supra* note 6.

[252] The click-open rate was not tracked in the prior report.

EXHIBIT A
Page 138

could be attributed to consumer concerns about email spam. An average of less than one percent of emails bounced back, potentially indicating that issuers generally have valid emails on their files. Many issuers reported using email proactively for account servicing (*e.g.*, sending reminders about a pending withdrawal from a consumer's bank account for a recurring payment) as part of their pre-charge-off communication strategy. Fewer issuers stated that they used email only reactively, such as when a consumer initiated a conversation online or requested that documents be sent by email. Issuers who reported using email typically restricted the number of emails that could be sent to 2 or 3 emails per week.

**TABLE 2:**    EMAIL, TEXT, AND WEB CHAT ELIGIBILITY AND ENGAGEMENT RATES, MONTHLY AVERAGES 2020 (MMI)

|  | Email | Text | Web chat |
|---|---|---|---|
| Percent of accounts eligible for the channel[253] | 84.1% | 60.3% | Not applicable |
| Percent of eligible accounts engaged[254] | 62.8% | 36.6% | 1.40% |
| Click-open rate[255] | 31.9% | Not applicable | Not applicable |
| Bounce-back rate[256] | 0.9% | Not applicable | Not applicable |

The share of issuers using text messages as part of their credit card collection strategy has continued to increase since the Bureau began tracking this figure in its 2017 Report. While in the 2019 Report, less than two-thirds of those surveyed said they sent mobile text messages to

---

[253] Defined as the total number of unique delinquent accounts with a consented email address or text-consented cell phone number in a month divided by the total number of unique delinquent accounts in that same month.

[254] Defined as the number of unique delinquent accounts that were emailed in a month divided by the total number of unique delinquent accounts with a consented email address in that same month.

[255] Defined as the number of emails sent to delinquent accounts that were clicked open in a month divided by the total number of emails sent to delinquent accounts in that same month.

[256] Defined as the number of emails sent to delinquent accounts returned undeliverable in a month divided by total number of emails sent to delinquent accounts in that same month.

communicate with delinquent consumers, almost all respondents said they used text messages during the latest survey period. Two-thirds of issuers surveyed also reported engaging with delinquent consumers via "web chat," where a consumer can click a chat button on the issuer's webpage to communicate about their debt with a collections agent, which remained stable from the last report. In addition to account management, most issuers allowed consumers to handle settlement negotiations and payment arrangements via web chat. Some issuers restricted the use of web chat services to pre-charge off collections only. Surprisingly, the percent of eligible accounts engaged via web chat declined since the 2019 report from 2.5 percent to 1.4 percent, contrary to industry-wide trends towards greater adoption of digital channels. Most issuers did not track data on the use of electronic channels (email, text, and web chat) by their third-party collectors. All respondents reported not utilizing social media communication as a collection tool for obtaining information about or communicating with consumers.

## COLLECTING FROM LIMITED ENGLISH PROFICIENCY (LEP) CUSTOMERS

All surveyed credit card issuers had the capacity, within their collections function, to accommodate consumers with Limited English Proficiency or consumers that express the desire to communicate in a language other than English. A minority of respondents indicated providing web chat services in Spanish. Most issuers had a unit of bilingual collectors to communicate with consumers with a Spanish-language preference. For communicating with consumers with preferences for other foreign languages, all issuers leveraged translation services. In cases where the third-party collectors cannot provide such services, they are required to return the accounts back to the card issuer. For the two-thirds of surveyed issuers that tracked consumer language preferences, the share of pre-charge-off delinquent balances owed by consumers that expressed a preference for a language other than English averaged 3.7 percent in 2020, while it varied from a low of 2.2 percent to a high of 7.6 percent among issuers.

## PRE-DELINQUENT COLLECTIONS

While only some issuers reported having pre-delinquent collections strategies in the 2019 survey, almost all issuers reported having such strategies in place in the current survey. The pre-delinquent collections strategies involved pursuing collections on accounts that were current and past the payment due date (*i.e.,* had not become delinquent yet). These issuers focused on subsets of these accounts that were tagged as high-risk, based on factors such as risk score, high balance, over-limit condition, and past delinquency. While most issuers pursue softer contact strategies on such accounts, such as email and text reminders, a few respondents did not differentiate these accounts from other pre-charge off delinquent accounts in collections.

## 6.2.2    First-party collections

Pre-charge off, two-thirds of issuers used first-party collectors to support in-house collection activities. Those issuers typically reported allocating work randomly between in-house and first-party collectors based on collector availability, requiring that first-party collectors place outbound calls, handle inbound calls, and document their work using issuers' own case management system and dialer technology. Issuers reported that they generally do not track pre-charge-off account placements separately between in-house and first-party collections. Most issuers that used first-party collectors noted that they do not place any specific sub-segments of accounts with first-party agencies. However, a minority of respondents allocated higher-risk accounts to first-party collectors.

First-party collection companies were typically paid on a full-time employee ("FTE") basis, unlike the contingency fee model used to compensate third-party collectors. On average, issuers reported keeping 96 percent of pre-charge-off debt balances to be worked in-house and by first-party collectors, with the remaining 4 percent placed with third-party collectors.[257] The number of unique first-party agencies used across issuers remained relatively stable year-over-year between 2019 and 2020, with 18 unique agencies in 2019 and 17 in 2020. These figures marked a significant increase from the 11 unique agencies reported for 2018. Banks that used first-party agencies reported employing four unique first-party agencies on average in 2020, with a low of one to a high of six. The services of one particular agency were used by half of the respondents.

## 6.2.3    Third-party contingency collections

More than half of the surveyed issuers worked with third-party contingency collectors prior to charge-off, which remained the same compared to the Bureau's 2019 Report.[258] All surveyed issuers reported using a combined total of 62 unique third-party agencies in 2019 and 55 in 2020. For issuers that used third-party collection agencies prior to charge-off, the average share of pre-charge-off debt placed with third-party collectors remained flat at 4 percent between

---

[257] These figures represent the percentage of pre-charge off balances that each issuer retained for in-house and first-party collections and placed with third-party collectors, averaged across all issuers.

[258] *See* 2019 Report, *supra* note 6.

2019 and 2020. The share of pre-charge off third-party placements declined significantly from the 11 percent reported in 2018. A minority of respondents placed specialized account types with third-party collectors, such as debt consolidation, deceased, and pending bankruptcy accounts. Issuers that used third-party agencies reported employing 12 unique third-party agencies on average in 2020, with a low of five to a high of 20. The services of five particular agencies were used by half of the respondents in 2020.

**AGENCY COMPENSATION**

Most issuers that contracted with third-party agencies for pre-charge-off collections paid a contingency fee that was a percentage of the amount collected. These fees ranged from 9.5 percent to 23.0 percent, which is likely attributable to differences in the risk profile of the accounts being placed with third-party collectors. The average third-party pre-charge off contingency fee was 15.7 percent in 2020, which compares to 15.3 percent in 2018. Generally, highly collectible accounts command lower contingency fees compared to those perceived as being more difficult to collect. For instance, some respondents placed specialized account types with third-party collectors, such as debt consolidation, deceased, and pending bankruptcy accounts, thereby impacting the contingency fees offered. Most issuers also provided additional incentives to third-party collectors based on their performance relative to a set financial target or to the performance of other collection agencies.

## 6.2.4    Performance

Prior to charge-off, issuers generally kept debts that were in an early stage of delinquency or were assessed as having a relatively high likelihood of recovery for in-house collections. Issuers generally placed accounts in the later stages of delinquency, closed accounts, and accounts where no contact had been made with the primary account owner for an extended period of time. Accounts placed with third-party collectors had an average balance 12 percent higher and a FICO score 12 percent lower than accounts kept in-house. Respondents also noted that they may assign accounts with special circumstances to third-party collection agencies with specialized collections expertise in the relevant area, such as those where the consumer was engaged with debt settlement companies, the accountholder was deceased, or bankruptcy applications were pending. As a result, in-house collections generally had higher liquidation and cure rates but lower charge-off-rates, relative to third-party collections, as seen in Figure 3

below.[259] These performance indicators have all remained relatively stable year-over-year since 2017.

**Figure 3:** AVERAGE QUARTERLY PERFORMANCE FOR INTERNAL AND THIRD-PARTY COLLECTIONS, 2020 (MMI)



## 6.2.5    Loss mitigation and re-aging practices

Credit card issuers used re-aging and various loss mitigation practices, including short- and long-term forbearance programs, debt management plans offered by consumer credit counseling agencies, and debt settlement. Issuers reported that they generally structured their loss mitigation practices conforming to guidance issued by the Federal Financial Institutions

---

[259] The quarterly liquidation rate is defined as total pre-charge-off delinquent dollars collected in a given quarter as a percent of total pre-charge off delinquent dollars in that same quarter. Cure rate is defined as the percent of pre-charge off delinquent dollars in a given quarter that were repaid to current status by the end of the same quarter. Charge-off rate is defined as the percent of pre-charge off delinquent dollars that charged off (representing contractual charge-offs as well as accounts charged off for bankruptcy, notice of decease, etc.) as of the end of the same quarter. These quarterly rates are averaged across all issuers and weighted by issuer's share of total pre-charge-off delinquent dollars. Finally, the 2018 quarterly average was calculated across all four quarters.

Examination Council ("FFIEC") and the federal banking agencies on the use of these collections tools. [260]

## RE-AGING

Re-aging returns a delinquent, open-end credit card account to current status without collecting the total amount of principal, interest, and fees that are contractually due. Issuers' policies allow re-aging of open-end accounts when a borrower makes at least three consecutive minimum monthly payments or an equivalent amount in a lump-sum payment. The number of re-ages on an account is limited to one in 12 months and two in five years. An account that is enrolled in a long-term internal forbearance or debt management program may be eligible for a third re-age within the five-year period. All surveyed issuers' re-aging policies aligned with the guidance offered by the FFIEC and federal banking agencies. [261]

According to the current survey, re-aged balances as a percentage of total delinquent dollars have continued to remain below two percent for each quarter since 2017, [262] with the average at 1.6 percent in 2020. However, there was considerable variation among the card issuers in terms of the share of pre-charge-off balances that were re-aged: the 2020 quarterly average ranged from as low as 0.4 percent to a maximum of 5.9 percent. This wide range may reflect variation in each issuer's underlying portfolio composition.

## FORBEARANCE PROGRAMS

Forbearance programs are designed to assist borrowers experiencing financial hardship. These programs can be "temporary" or "short-term," aimed at assisting borrowers experiencing hardships expected to last 12 or fewer months, or "long-term," intended to aid borrowers experiencing continued hardships lasting longer than 12 months. Issuers reported that their

---

[260] *See generally* FFIEC, *Uniform Retail Credit Classification and Account Management Policy: Policy Implementation,* 65 FR 36903 (June 12, 2000); Office of the Comptroller of the Currency, Board of Governors of the Federal Reserve System, Federal Deposit insurance Corporation, Office of Thrift Supervision, *Credit Card Lending: Account Management and Loss Allowance Guidance, OCC Bulletin 2003-1* (Jan. 8, 2003), https://occ.gov/news-issuances/bulletins/2003/bulletin-2003-1.html.

[261] *Id.*

[262] *See* 2017 Report, *supra* note 6, at 318.

long-term programs generally require borrowers to repay their credit card debt within 60 months. In order to meet this amortization timeframe, creditors may need to substantially reduce interest rates, eliminate fees, and lower monthly required payment amount. All issuers surveyed generally reported assessing borrower's willingness and ability to pay as per the terms of the forbearance program including documenting the reason, severity, and duration of the cardholder's financial difficulty. All surveyed issuers' forbearance policies aligned with the guidance offered by the FFIEC and federal banking agencies. [263]

More than half of the survey respondents did not offer short-term forbearance programs over the last several years. Instead, these issuers generally offered long-term programs as an alternative regardless if borrower's hardship is short term or long term in nature. However, all issuers reported accommodating COVID-19 related hardship assistance requests by offering various temporary short-term assistances such as skip-a-pay. Most issuers also reported that that they do not allow their third-party collection agencies to offer and enroll borrowers in hardship programs, due to the complexity of managing these programs.

**CREDIT COUNSELING AGENCIES**

Issuers work with consumer credit counseling agencies ("CCAs") to help borrowers resolve their financial hardships, as an additional component of their loss mitigation efforts. CCAs work with borrowers to develop a budget and a debt management plan ("DMP") for all the consumer's enrolled debts, which may be owed to multiple creditors. These plans generally involve paying creditors a fixed payment amount at a reduced interest rate.

Most respondents reported funding CCAs through a "fair share" payment, which is a payment based on a percentage of the amount the consumer has paid back to the issuer. However, a few of the respondents fund their CCAs through grant funding. Several issuers reported working with CCAs on debt relief pilot programs such as "less-than-full-balance programs" and DMPs with extended amortization that extend beyond the traditional DMP.

---

[263] *Id.*

**Figure 4:**    QUARTERLY FORBEARANCE NEW ENROLLMENT AND ACTIVE INVENTORY AS A SHARE OF
DELINQUENT BALANCES (MMI)[264]



All issuers reported offering one or more types of forbearance or debt management programs with varying interest rates, monthly fixed payment amounts, and amortization periods. The total new enrollment rate, measured as a percent of pre-charge-off delinquent dollars newly enrolled in various forbearance programs and DMPs, increased by 76 percent from 2019 to 2020. Most of this increase came from the significant increase in short-term program enrollment in the second quarter of 2020 as many issuers responded to COVID-19. New enrollment in short-term programs jumped by 240 percent in 2020 compared to 2019: 1.7 percent in 2019 and 5.8 percent in 2020. In contrast, the long-term internal program enrollment rate registered only a modest 14 percent increase during the same period. Interestingly, the enrollment rate in DMPs declined by 20 percent in 2020. The average quarterly new enrollment rate among individual issuers ranged widely from a low of 0.5 percent to a high of 14.2 percent in 2020.

While the total forbearance inventory increased moderately in 2018 and 2019, it increased by almost 50 percent in 2020 compared to 2019 mostly due to the significant increase in short-term program enrollment in 2020 in response to the pandemic.

**DEBT SETTLEMENT**

Debt settlements occur when an issuer agrees to accept less than the full balance owed by the borrower as full satisfaction of the balance owed. Such settlements can occur either pre- or -

---

[264] "Inventory" refers to total balances for all accounts that are in active status in a forbearance program as of the end of the quarter.

post-charge off. Most issuers have policies in place to proactively offer settlements directly to consumers who meet the standardized risk criteria set by the creditor. These offers are extended via in-house operations or through third parties. The settlement enrollment rate, the percent of balances enrolled in settlement, increased from 2019 to 2020 by 21 percent and 9 percent for pre- and post-charge off, respectively, with most of the increases occurring in the second and third quarters of 2020. These increases align with reported gains in consumer liquidity from various economic stimulus payments and related debt pay-down by consumers during the pandemic. The settlement enrollment rate was higher for post-charge off balances (1.8 percent in 2020) than pre-charge off balances (0.8 percent in 2020). Among surveyed issuers, the quarterly pre-charge-off settlement enrollment rate ranged from 0.1 percent to 1.6 percent, and quarterly post-charge off settlement enrollment rate ranged from 0.5 percent to 3.4 percent. Pre-charge off settlement enrollment occurs when an account seriously past due — i.e., 130 days past due, on average, while post-charge off settlement occurs at 443 days past the charge-off date, on average.

**Figure 5:**    PERCENT OF BALANCES ENROLLED IN SETTLEMENT (MMI)



Pre-charge-off balances are settled with a single lump-sum payment or multiple installments. Installment settlements typically consist of three payments, but pursuant to guidance from the Office of the Comptroller of the Currency for national banks and federal savings associations the

total duration of the payments should not exceed three months.[265] However, post-charge-off settlements can be structured over any length of time. Average account settlement rate—the amount paid as a percent of the of the balance owed by the borrower for accounts that were settled—remained steady between 2019 and 2020 at about 51 percent pre-charge-off and 50 percent post-charge-off in 2020, though there was some variation in the rates among individual respondents.

## DEBT SETTLEMENT COMPANIES

Borrowers sometimes work with debt settlement companies ("DSCs"), which are typically for-profit entities with the primary objective of enrolling qualified borrowers in a debt settlement program.[266] These firms do not receive any compensation from issuers. Instead, they typically assess the borrower a fee based on the original debt balance and contingent upon completing a settlement with the creditor. Since enrolled consumers stop making payments to creditors, borrowers who work with the DSCs typically find that their accounts continue to grow in delinquency and are reported to the credit reporting agencies.[267] Issuers may also pursue legal collections on these accounts. DSCs often advise consumers to send a cease and desist communication letter to creditors as part of the program. Those issuers who sell debt often sell charged-off debt with a cease and desist communication order to debt buyers because such orders generally make it more difficult to recover debt.

All the surveyed issuers have established policies and procedures on how to manage accounts enrolled with DSCs. Most issuers maintain a policy of not working directly with DSCs. Some issuers have policies that allow the accounts placement with special third-party agencies for

---

[265] *See* Office of the Comptroller of the Currency, *Comptroller's Handbook: Credit Card Lending, Version 1.2* (Jan. 2017), https://www.occ.treas.gov/publications/publications-by-type/comptrollers-handbook/credit-card-lending/pub-ch-credit-card.pdf.

[266] *See* Greg J. Regan, *Options for Consumers in Crisis: An Updated Economic Analysis of The Debt Settlement Industry* (Data as of Mar. 31, 2017), American Fair Credit Council (Feb. 5, 2018), https://americanfaircreditcouncil.org/wp-content/uploads/2018.02.05-AFCC-Report-Consumers-in-Crisis.pdf.

[267] One RFI commenter wrote that consumers have "limited niche choices in debt relief assistance," while also lacking data necessary to make informed choices about debt relief products and services. The commenter advocated greater disclosure of performance data for non-profit and for-profit debt relief providers, including "success rate, the impact to future retirement savings, credit report/score impact, protection from legal action, and cost of the solution." *See* Steve Rhode Comment Letter, at 2.

EXHIBIT A
Page 148

potential litigation. Most issuers that work with DSCs reported that they offer DSCs the same settlement policies available to consumers who call the creditor directly to request settlements. The share of balances enrolled in settlement by DSCs to the total was 54 percent and 44 percent, respectively, for pre-and post-charge-off balances in 2020. This relative share of balances enrolled in DSCs settlement varied significantly among the issuers. For instance, in 2020, this share ranged from a low of 9 percent to a high of 60 percent for pre-charge-off debt and from 23 percent to 62 percent in post-charge-off debt. [268]

# 6.3   Recovery following charge-off

Once an account charges off, it is placed into one of a variety of channels to facilitate further recovery of the balance owed, such as internal collections, third-party agency placement, litigation, and debt sale. Issuers may also warehouse certain accounts where balances are considered unlikely to be repaid. [269] In 2020, issuers in the sample charged off $38 billion in debt, a 10 percent decline from 2019. In general, the current survey found that:

- All issuers warehoused a significant portion of their overall post-charge-off inventory;

- All issuers used third-party agencies throughout the entire review period to collect at least a portion of their charged-off debt;

- Most issuers engaged in internal collections, though for a relatively small portion of their charged-off debt;

- Most issuers engaged in post-charge-off litigation to collect debt from consumers;

---

[268] If the forgiven debt exceeds $600, issuers may file a 1099-C for "Cancellation of Debt" with the Internal Revenue Service. Most issuers disclose to the consumer, at the time of settlement offer, the potential tax implications of the settlement, either as part of a telephone script or via letter.

[269] Warehoused balances are generally those that issuers do not actively seek to collect and generally include accounts issuers considered to be uncollectible or unlikely to be repaid, including older accounts that may be past the statute of limitations. Some issuers also reported that they may place accounts in warehouse status when transitioning these accounts between placements.

- Most issuers reported holding a sizeable amount of debt past the statute of limitation in their inventory; and

- A minority of issuers, the same ones as reported in Bureau's 2019 Report, sold debt in the current survey period as well.

Surveyed issuers reported holding an average of 28 percent of their overall post-charge-off balance inventory in warehouse status, as shown in Figure 6.[270]

Issuers reported placing nearly 18 percent of their post-charge-off inventory with third-party agencies in any given quarter between 2019 and 2020. While there was significant variation in third-party placements between issuers, the percentage of debt that each issuer placed with third-party agencies remained stable during the survey period. Among issuers, third-party placement share ranged from one percent to 50 percent of an issuer's total post-charge-off inventory in 2019 and 2020. This range has narrowed compared to the range of eight percent to 73 percent reported in 2017 and 2018. The range of placement into internal recovery was similarly varied among issuers.

Most issuers sued some consumers to recover unpaid balances after charge-off. On average, issuers litigated almost 12 percent of their post-charge-off balance inventory. Issuers reported holding 13 percent of their inventory in time-barred status. Finally, as noted in the Bureau's 2015, 2017, and 2019 Reports, few issuers reported leveraging debt sales as part of their post-charge-off recovery strategy. Those issuers who sold debt reported selling an average of five percent of their post-charge-off balance inventory.

---

[270] The warehouse category includes accounts that are considered uncollectible for various reasons (*e.g.*, accounts lacking current contact information for the accountholder despite many attempts to locate them).

**Figure 6:**    SHARE OF CHARGE-OFF BALANCE INVENTORY BY RECOVERY CHANNEL IN 2019 AND 2020 (MMI)[271]



## 6.3.1    Internal recovery

Internal recovery is not a significant piece of most issuers' overall recovery strategy for post-charge-off debt. A minority of the issuers used internal recovery as a significant piece of their overall recovery strategy, while the majority generally retained only those accounts that were ineligible for third-party placement or that were awaiting placement in another channel. On average about eight percent of an issuer's post-charge-off inventory was pursued through internal recovery in 2019 and 2020; however, one issuer chose to retain and internally recover 29 percent of its post-charge-off inventory during the survey period.

## 6.3.2    Third-party recovery

All issuers employed third-party agencies to recover post-charge-off debt, all on a contingency-fee basis. Most surveyed issuers placed between one percent and 50 percent of their charged-off

---

[271] Green bars represent the average share of post charge-off balances inventory. The issuers provided the status of post-charge-off balance inventory as of the end of each quarter in 2019 and 2020. The distributions for 2019 and 2020 were averaged by issuer, and then averaged across issuers. Black lines running through each bar represent the range of the share of post charge-off balances only for issuers that used that channel. In other words, the ranges do not include zero values, since some issuers did not use that channel. "Other" category includes accounts in Probate and Bankruptcy statuses.

balances with third-party collectors during the current survey period. Issuers described a number of reasons for placing charged-off debt with third-party agencies, including improved recovery, internal resource constraints, and the need for specialized expertise in recovering certain "special segments" of debt (*e.g.*, debt owed by deceased consumers, accounts in bankruptcy status and accounts with cease communication requests from the debtor). If an agency cannot recover money or establish contact on an account in the specified period, the creditor will generally recall the account and place with another agency.

## PERFORMANCE

Recovery performance is measured by the "cumulative recovery rate," which is the share of the charged-off balance that has been recovered over an extended period. Recovery on charged-off debt can occur over several months or years. As the debt ages and the account moves from one placement to another, the incremental share of the charged-off balances that the issuer expects to recover from that account generally decreases.

For debt that charged off in the first quarter of 2017, issuers recovered an average of 17 percent of the charged-off balance within a four-year period. Nearly two-thirds of this recovery occurred within the first two-years following charge-off. Quarterly vintages show stable performance over the review period, although the latest vintage (Q3 2020) appeared to be lagging other vintages. As debt ages, incremental gains in recovery decline. Figure 7 below shows the average cumulative recovery rates for balances that charged off each quarter between the first quarter of 2017 and the fourth quarter of 2020.[272] While issuers recovered 8.3 percent in the first-year post-charge-off for the Q1 2017 vintage, they recovered an additional 4.3 percent, during the second year and recovered only 4.1 percent during the next two years combined.

---

[272] These rates reflect the cumulative recovery on the debt across all potential placement channels, including internal placement, third-party agency placement, litigation, and any proceeds from debt sales. Longer recovery periods mean that the issuers have had more time to collect on the debt, so the cumulative recovery rate rises over time.

**Figure 7:**    CUMULATIVE  RECOVERY  RATES  FOR QUARTERLY  VINTAGES  BY MONTHS FOLLOWING CHARGE-OFF (MMI)[273]



## AGENCY COMPENSATION

Issuers who used third-party agencies to collect on post-charge-off debt typically paid a contingency fee that was a percentage of the amount of debt collected. Contingency fees are based on the level of placement (*e.g.*, primary, secondary, tertiary, and quaternary), with later placements typically receiving higher contingency fees as the debt ages and recovery becomes more difficult. In 2020, contingency fees ranged from 18 to 25 percent for primary placement, from 22 to 37 percent for secondary placement, from 28 to 45 percent for tertiary placement, and from 23 to 47 percent for quaternary placement. Some issuers reported higher contingency fees for some earlier placement than for later placement. These respondents noted that they engaged third party collectors who leverage digital-only approaches to collections for some older placements which incurred overall lower collection costs and hence lower contingency fees.

---

[273] Here, each "quarterly vintage" represents balances for all accounts which charged off at any time during the given quarter. Cumulative recovery includes all proceeds collected post-charge-off, including through third-party collections, litigation, and debt sales.

**VENDOR MANAGEMENT**

Issuers manage their third-party vendors' compliance with the issuers' policies, procedures, applicable regulatory requirements, and financial performance targets using a variety of methods. These included:

- Monitoring of randomly sampled collection calls on a periodic basis;

- Periodic audits, including on-site visits; and

- Complaint intake, tracking, investigation, resolution, and trend analysis. All issuers have limits on consumer contact attempts that they extend to their third-party contingency agencies and monitor through quality assurance testing, routine audits, and call sampling.

Most issuers either prohibit or strictly limit their third-party collectors from using email and text to initiate contact with borrowers in post-charge-off collections, although information may be sent via these channels if a borrower specifically requests it. Only a minority of the surveyed issuers reported that they sent an agency placement notification letter to alert the borrower that their debt had been placed with a third-party agency. These letters informed borrowers that their debt had been transferred and provided the name and contact information of the third-party agency. All surveyed issuers monitored their third-party agencies' collections performance, both relative to the issuer's stated targets and to the performance of other agencies in the network.

## 6.3.3    Debt sales

As part of their post-charge-off recovery strategy, some credit card issuers may sell credit card debt at a discounted rate to pre-selected debt buyers, receiving a fraction of the outstanding account balances sold. Typically, these sales are structured as "forward-flow" contracts, where a pool of accounts that meet pre-determined criteria (*e.g.*, at charge-off or post-primary placement) are sold to the debt buyer on an ongoing (*e.g.*, monthly) basis. Issuers may also occasionally identify additional segments of accounts and sell them on an ad-hoc basis depending upon market conditions. Finally, issuers may employ specific debt sale strategies for special segments like accounts where the issuer has received a notice of bankruptcy, where specialized expertise may be required to recover the amount owed. Generally, after the sale, creditors update the accounts to credit reporting agencies as "Sold/Transferred" with a $0 balance.

## MARKET STRUCTURE

The debt-buying market for credit card debt remains highly concentrated among a few buyers that purchase debt from many of the same issuers. Most of the surveyed issuers that sold debt reported selling to an average of 10 buyers year-over-year. However, there is a general trend of consolidation among surveyed issuers' debt buyer networks: the Bureau's 2017 Report found that in 2016, 20 unique debt buyers bought debt from the surveyed issuers that sold debt, while the current survey found that there were 17 unique buyers in 2020.[274] Nine buyers purchased debt from two or more issuers, while six buyers bought debt from all the issuers that sold debt.

## DEBT SALE VOLUME

Fewer than half of issuers surveyed sold debt in 2019 and 2020, and these issuers were the same ones that reported selling debt in the Bureau's 2017 and 2019 Reports. Issuers that reported that they did not sell debt in 2019 and 2020 also indicated that they have no plans to do so in 2021. A majority of issuers that sold debt during 2020 reported that they planned to sell roughly the same amount as in prior years while a minority of the issuers reported planning for a lower percentage of debt to be sold in 2021 compared to 2020. In general, issuers that planned to reduce their debt sale in 2021 are expecting lower delinquencies and losses. The survey respondents that sold debt in 2020 indicated that they planned to sell between 38 percent and 50 percent of their freshly-charged-off debt in 2021 at an expected average price ranging from $0.10 to $0.12 per dollar of debt.

Issuers that sold debt in 2019 and 2020 reported that in that period, roughly 5 percent of total post-charge-off inventory was sold to debt buyers. Figure 4 compares the distribution of total post-charge-off inventory by recovery channel for issuers that did and did not sell debt in 2019 and 2020. Issuers that did not sell debt kept a greater portion of their post charge-off balances in the internal recovery channel. All issuers held a significant share of debt in the warehouse category though sellers kept relatively higher percentages at any given time, perhaps, awaiting ad hoc sales decisions. It appears that those issuers who sell debt do so well before accounts reach time-barred status as the share of post charge-off inventory in time-barred status is much lower (2 percent) compared to the share (31 percent) for those who do not sell.

---

[274] *See* 2017 Report, *supra* note 6, at 327.

**Figure 8:**    SHARE OF CHARGED-OFF BALANCE INVENTORY BY CHANNEL FOR ISSUERS THAT DID AND DID NOT SELL DEBT (MMI)[275]



## DEBT PRICE

The overall average price of debt decreased from 12 percent to 11 percent of face value between 2019 and 2020. Figure 9 shows the average price of debt by type. Charged-off debt generally sells for a fraction of the account balance owed or "face value," at a price largely dependent upon the age of the debt. Additionally, certain special segments of debt, such as accounts for which the issuer has received notice of bankruptcy, may command higher prices. The price of bankruptcy accounts may be above the overall average price of debt sold because the buyer may be able to recover a larger portion of the debt by filing proofs of claim as part of the bankruptcy process. However, the price of freshly-charged-off debt increased from 12 percent to 13 percent of face value over the same period. The price of freshly-charged-off debt is now three percentage points lower than its previous high of 16 percent reported in 2016.[276]

---

[275] Bars represent the average share of total charged-off balance inventory in each of the five recovery channels. The issuers provided the share of balances placed in each channel by quarter as of the end of the quarter for 2019 and 2020. The distributions for 2019 and 2020 were averaged by issuer, and then averaged across issuers that sold debt and issuers that did not sell debt. "Other" category includes accounts in Probate and Bankruptcy statuses.

[276] *See* 2017 Report, *supra* note 6, at 329.

**Figure 9:**    AVERAGE PRICE OF DEBT SOLD AS A PERCENTAGE OF ACCOUNT BALANCE BY TYPE OF DEBT SOLD (MMI)



Debt sold after one or more placements fetched lower prices (11 percent for post-primary and 7 percent for postsecondary and beyond). Accounts where the collector received a request to cease and desist communications were priced at 13 percent in 2020 while accounts with power of attorney on file sold at much higher price (22 percent in 2020). Accounts in for which there was a chapter 13 bankruptcy notice sold for a significantly higher price of 23 percent in 2020 compared to a 14 percent price received in 2018, suggesting higher expected recoveries from such accounts.

**DEBT SALE CONTRACTS**

All survey respondents that sold debt reported that they provide buyers with key documents and account information at the time of sale, including the account's last 12 statements, amount and date of the last account payment, etc. After the debt is sold, issuers reported that they may provide additional documentation at the buyer's request, including cardholder agreements, written applications, affidavits, and earlier account statements. While most issuers who sold debt reported that debt buyers do not pay a fee to access these documents, a minority reported charging a fee to provide additional documentation.

All surveyed issuers that sold debt also stated that they send out "goodbye" letters to the cardholder. These letters inform borrowers of the sale and provide the name and contact information of the buyer.

Contractual restrictions imposed on buyers by all surveyed issuers that sold debt are generally consistent with OCC Bulletin 2014-37, and include:[277]

- Restrictions on resale of the debt, which is limited to special circumstances (*e.g.*, the buyer exiting the market);

- Restrictions on buyers' ability to litigate purchased accounts; and

- Prohibitions on litigation by buyers on debt that is past the statute of limitations.

Debt sale contracts generally do not restrict debt buyers from reporting to credit reporting agencies. Instead, the contracts require that the buyer adhere to all Fair Credit Reporting Act requirements.

# 6.4    Litigation

As of 2020, all surveyed issuers reported using litigation strategies for both pre- and post-charge-off accounts, although only a minority of issuers reported initiating litigation proceedings prior to charge-off. According to the Bureau's current survey, issuers may select accounts for litigation based on factors such as account balance and estimated likelihood of payment (indicated by the presence of assets and employment income). All issuers in the survey that litigated credit card debt reported that they used an external network of attorneys. A minority of issuers also reported that they leverage an internal attorney network to execute their litigation strategies. As observed in the Bureau's 2017 and 2019 Reports, a few issuers noted that they may litigate accounts upon notification that a consumer is working with a debt settlement company.

All issuers that litigated debt reported that the volume of new balances placed in the litigation channel declined significantly during the survey period, with year-over-year decline ranging from nearly 5 to 49 percent across issuers. These declines came mainly in the second and third quarters of 2020 in response to pandemic-related developments including court closures. Since

---

[277] *See* Office of the Comptroller of the Currency, *Consumer Debt Sales - Risk Management Guidance, OCC Bulletin 2014-37* (Aug. 4, 2014), http://www.occ.gov/news-issuances/bulletins/2014/bulletin-2014-37.html.

then, issuers have increased litigation volume, though not up to pre-pandemic levels. For issuers that used the litigation channel, litigated balances as a percentage of total post-charge-off inventory ranged from a low of five percent to a high of 24 percent. Survey respondents generally selected higher-balance accounts from their portfolios for litigation, with average litigated account balances ranging from $2,700 to $12,300 across issuers during the current survey period, compared to average pre-charge-off balances ranging from $940 to $5,800.

**DEFAULT JUDGMENTS**

A default judgment is a ruling in favor of the plaintiff collector when the defendant consumer has failed to respond to a summons or to appear in court. More than half of the issuers that use litigation as a strategy did not report default judgments separately. However, respondents who do track default judgments separately reported that more than 69 percent of all judgments entered were default judgments. This ratio was consistent with the Bureau's previous reports and remained relatively flat between 2017 and 2020 among issuers who reported default judgments separately.[278]

**LITIGATION RECOVERY**

After a creditor has won a judgment on a litigated account, recovery may occur over a prolonged period. To recover the debt, the issuer may exercise a wage garnishment against the debtor or ask the debtor to enroll in a payment plan. Thus, litigation generally produces a steady stream of recoveries from accounts with judgments against them, spread over a longer time period that may span several years. Figure 10 shows the cumulative recovery rate by months since judgment for vintages of accounts where a judgment was obtained between 2017 and 2020. Issuers recovered an average of 34 percent of all judgment balance at 48 months since the judgment was received, the longest performance window captured in the survey). The average four-year cumulative recovery rate for accounts with judgments was twice the overall four-year cumulative recovery rate for all charged-off accounts (compare with Figure X). Accounts with judgments may have higher cumulative recovery rates because issuers disproportionately litigate more accounts with a higher ability to repay, which depends on borrowers' assets, employment, and other income. Cumulative recoveries from judgment accounts increased steadily over time as

---

[278] *See* 2017 Report, *supra* note 6, at 326.

each vintage aged and a consistent flow of payments were applied to the account. Accounts with default judgments generally had lower cumulative recovery rates than those with non-default judgments (29 percent compared to 45 percent at 48 months since judgment).

**Figure 10:**    CUMULATIVE  RECOVERY  RATES  BY MONTHS  SINCE JUDGMENT  WAS RECEIVED  (MMI)



## 6.5   Credit card debt collection during COVID-19

COVID-19 brought significant disruption to credit card issuers.[279] Issuers responded to these disruptions and related pressures in varying ways, entailing both operational changes as well as (at least temporary) changes to debt collection policies, procedures, and practices.

In response to various state and federal restrictions including stay-at-home orders and other business restrictions, all card issuers reported migrating from on-site to work-from-home arrangements for their collections operations. Some issuers reported temporarily closing several brick-and-mortar collections operations sites due to state and local restrictions. All issuers adopted remote monitoring of these work-from-home agents, while implementing added information security measures, such as restrictions on printing documents at home from

---

[279] For a broader discussion of the impact of COVID-19 on credit card issuers and their response to the pandemic, *see* Section 5.5.

employer-provided computers. While issuers allowed remote work as a temporary response to the pandemic, many issuers indicated that they would continue to provide work-from-home options to at least some employees on a permanent basis. The Bureau's supervisory prioritized assessments also identified similar responses by debt collectors.

Issuers noted an uptick in inbound call volumes, especially in the second quarter 2020, from impacted consumers seeking relief.[280] Issuers deployed several tactics to meet this increased demand, including increasing hiring, reducing outbound calls, further leveraging digital channels, encouraging consumers to use self-servicing options on their interactive voice-response (IVR) platforms, and online enrollment into consumer relief programs. At least some issuers reported that some of these measures may be made permanent.

Pursuant to COVID-19, many issuers suspended placing accounts with third parties in states where there were various state-mandated debt collections restrictions, including making outbound calls. Many issuers also paused legal collection efforts, such as lawsuits, judgments, garnishments, and bank levies, in response to various state restrictions and court-closures. While many issuers reported resuming filing new lawsuits starting in the second half of 2020, some still have not restarted new wage garnishments as of December 2020 and bank levies due to the difficulties in identifying the source of stimulus funds in consumer's bank account.

In addition to offering the existing suite of short-term and long-term hardship programs, all issuers reported offering some version of a skip-a-pay program with varying lengths.[281] Some issuers reported expanding proactive settlement offer campaigns, along with lowering the settlement threshold by five to 10 percent, in order to accommodate pandemic-impacted consumers. All issuers reported modifying their agency-placement recall strategy to accommodate non-payment due to enrollment in pandemic related hardship programs. All issuers reported adhering to CARES Act credit reporting requirements by ensuring that accounts that meet the terms of various accommodation programs did not advance from their current level of delinquency while enrolled in those programs.

---

[280] For more on call volumes and wait times, *see* Section 5.5.

[281] *See* section 5.5 for more information on issuer relief programs.

Those issuers who used debt sales as part of their recovery strategy reported adjustments to the timing and volume of sales in response to the pandemic. A minority of issuers who sold debt reported temporarily suspending sales in states with various restrictions on debt collections. These issuers also reported receiving generally lower prices for sold debt during initial period of the pandemic. Issuers who sold debt generally report that both sales volume and prices recovered fully to pre-pandemic levels by the end of 2020.

EXHIBIT A
Page 162

# 7.    Innovation

The Bureau's Congressional mandate to review the credit card marketplace specifically instructs the agency to "assess card product innovation." [282] As noted in the 2019 Report, consumer and provider access to digital technology continues to affect the design and offering of consumer credit products and change the ways in which consumers obtain and use credit cards.

This section covers some recent developments in more detail. Section 7.1 reviews new products and developments in the credit card market since the 2019 Report, including the growth of certain point-of-sale lending products. Section 7.2 discusses consumer adoption of innovative technologies, particularly those that have seen rapid growth as a result of COVID-19.

## 7.1    Product innovation

The Bureau's statutory mission includes facilitating innovation in markets for consumer financial products and services. [283] Since issuing the 2019 Report, the Bureau has observed, and in some cases directly facilitated, the development and expansion of new products and features in the credit card market. Some of these innovations implicate a broad array of regulatory

---

[282] 15 U.S.C. § 1616(a)(4)(D)  (2012).  Congress established the Bureau's statutory purpose as ensuring that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive. *See* 12 U.S.C.  5511(a) (2012). The Bureau's objective includes exercising its authorities for the purpose of ensuring that markets for consumer financial products and services operate transparently and efficiently to facilitate access and innovation. *See* 12 U.S.C. 5511(b)(5) (2012).

[283] *See* 12 U.S.C. § 5511(b)(5).

provisions that card issuers working in this space must navigate carefully. In general, recent innovations fall in and into three categories:

- Credit access and availability, particularly for less creditworthy borrowers;
- Fixed-payment features and non-card 'buy-now-pay-later' point-of-sale credit products, and
- Other innovations, including virtual cards and new forms of rewards redemption.

## 7.1.1    Credit access and availability

Recent innovations have opened new options for thin-file or credit invisible borrowers to acquire credit cards and build or repair their credit history.[284] These new offerings leverage a number of innovative approaches, including the use of new types of data to facilitate underwriting as well as new types of product structures and features. In some cases, these new offerings make use of consumer authorized access to account data held at other institutions.[285] Consumer authorized access to account data supports the collection of cash flow information used in underwriting by some creditors.[286]

[284] Kenneth P. Brevoort et al., *Data Point: Credit Invisibles*, Bureau of Consumer Fin. Prot. (May 2015), http://files.consumerfinance.gov/f/201505_cfpb_data-point-credit-invisibles.pdf. The Bureau estimates 26 million U.S. adults lack sufficient data to generate a typical credit bureau score, either because they do not possess any reported credit history or because their credit history is limited or stale.

[285] The Bureau is considering a rulemaking to implement section 1033 of the Dodd-Frank Act to address the availability of consumer financial account data in electronic form. In November 2020, the Bureau released an Advance Notice of Proposed Rulemaking (ANPRM) concerning consumer data access to implement section 1033, accepting comments until early February 2021. The Bureau is reviewing comments received in response to the ANPRM and considering those comments in assessing potential next steps. Bureau of Consumer Fin. Prot., *Spring 2021 Rulemaking Agenda* (June 11, 2021), https://www.consumerfinance.gov/about-us/blog/spring-2021-rulemaking-agenda/.

[286] Consumer authorized access to account data also supports several other provider use cases such as identity verification, authentication, and facilitation of payments and disbursements.

EXHIBIT A
Page 164

Some providers are offering new types of secured credit cards to consumers lacking credit scores or credit files.[287] For example, issuer Varo Bank introduced a credit card which reserves the amount spent from a linked bank account to ensure users never miss a payment. According to Varo, the card is aimed at consumers seeking to establish or improve their credit score.[288] Similarly, fintech provider Chime offers a secured credit card that features a variable spending limit based on the amount the consumer places in its secured account, without requiring a credit check.[289] Another example is fintech provider Self, which offers a secured credit card to borrowers of its credit builder installment loan who allocate a portion of their secured loan funds to the secured credit card account without requiring a credit check or additional deposit.[290]

As noted above, some recent credit card innovation has occurred at least in part due to Bureau engagement. One such example relates to a proposed design for a secured credit card offered by issuer Synchrony Financial. Pursuant to an application by Synchrony, in 2020 the Bureau issued a compliance assistance sandbox (CAS) approval order to Synchrony Financial regarding their proposal to develop a "dual-feature credit card" (DFCC) designed for consumers with limited or damaged credit history.[291] Synchrony's application describes a process whereby a card would be provided to consumers as a secured card with a required security deposit but may become eligible to be converted to an unsecured card following 12 months of satisfactory repayment activity. Unlike a typical secured card, the terms of both secured use and unsecured use would

---

[287] The 2017 Report discusses secured credit cards in more detail, including the potential for secured credit cards to facilitate thin- or no-file consumers' efforts to build or rebuild their credit profiles. *See* 2017 Report, *supra* note 6, Section 6.

[288] Varo Bank, *Varo Bank Introduces Varo Believe, a New and Better Way for Millions of Americans to Build Credit* (Feb. 25, 2021), https://www.varomoney.com/press_release/varo-bank-introduces-varo-believe-a-new-and-better-way-for-millions-of-americans-to-build-credit/.

[289] Chime. *Chime Credit Builder,* https://www.chime.com/credit-builder/.

[290] Self, *Introducing the Self Visa Credit Card,* https://www.self.inc/visa-secured-credit-card.

[291] Bureau of Consumer Fin. Prot., *Consumer Financial Protection Bureau Issues Approval Order to Facilitate the Use of Dual Usage Credit Cards* (Dec. 30, 2020), https://www.consumerfinance.gov/about-us/newsroom/consumer-financial-protection-bureau-issues-approval-order-to-facilitate-the-use-of-dual-usage-credit-cards/. *See also* Bureau of Consumer Fin. Prot., *Policy on the Compliance Assistance Sandbox* (Sept. 10, 2019), https://www.consumerfinance.gov/documents/7989/cfpb_final-policy-on-cas.pdf.

be disclosed at the opening of the "dual-feature credit card" account. The terms would then be redisclosed with the opportunity to 'opt in' to unsecured use. Synchrony applied for a CAS approval order because the product structure of the DFCC raised questions about the applicability of existing law both to Synchrony's disclosure of the two modes of use and to the substance of the envisioned graduation mechanism. The Bureau is monitoring the consumer impact of this product through data Synchrony provides on a quarterly basis.

Other providers have introduced novel structures or features into their credit card offerings for borrowers with limited credit history. For example, in 2020 fintech TomoCredit introduced a credit card that does not require applicants to have a credit score. The card has a mandatory seven-day automatic payment mechanism designed to allow users to build credit without carrying a balance.[292] Further, Acima, a subsidiary of rent-to-own retailer Rent-A-Center, announced a "lease-to-own" payments card for credit constrained customers that can be used to complete lease transactions at participating Acima merchants for certain purchases.[293]

Additionally, Apple announced a feature called "Apple Card Family" that would allow partners and families to build a shared credit history.[294] Apple states that the card can be shared or merged by eligible spouses or partners over age 18 as co-owners. Eligible co-owners must have an Apple device with the latest version of iOS that supports Apple Card and meet all other eligibility requirements for Apple Card. Parents can also share their card with children over 13 years of age with optional spending limits and controls (like 'authorized users'), but co-owners are responsible for repayment. Payment history is furnished to the credit bureaus for co-owners as well as other users who 'opt in' to credit reporting. Existing Apple Card users can also merge their accounts, creating a credit line with a higher shared limit while keeping the lower APR of the two accounts.

---

[292] *See* TomoCredit, Frequently Asked Questions, https://tomocredit.com/faq.

[293] BusinessWire, *Acima Unveils Industry's First Lease-to-Own Anywhere Virtual Payments Card* (Apr. 14, 2021), https://www.businesswire.com/news/home/20210414005272/en/Acima-Unveils-Industry%E2%80%99s-First-Lease-to-Own-Anywhere-Virtual-Payments-Card.

[294] Apple Inc., Press Release, *Apple introduces Apple Card Family, enabling people to share Apple Card and build credit together* (Apr. 20, 2021), https://www.apple.com/newsroom/2021/04/apple-introduces-apple-card-family-enabling-people-to-share-apple-card-and-build-credit-together/.

About 10 of the largest U.S. banks will collaborate to share data on customers' deposit accounts as part of an initiative to extend credit to thin-file or credit invisible borrowers.[295] The banks will use bank account data from other financial institutions to help underwrite credit card applications from borrowers who may have insufficient credit history. The collaboration began through a project launched by the OCC in 2020 called Project REACh, or the Roundtable for Economic Access and Change and is designed to help banks lend to individuals who do not have credit scores but are financially responsible.

Credit access expansion can be positive but should be done responsibly and in a way that is understandable to consumers. In its 2019 Report, the Bureau discussed the potential of new technology in underwriting, such as machine learning and alternative data, to expand credit access.[296] The Bureau's market monitoring indicates use of these technologies has continued to grow since 2019, including in the offering of consumer credit cards.[297] However, published

---

[295] *See* Peter Rudegeair et al., JPMorgan, *Others Plan to Issue Credit Cards to People With No Credit Scores*, Wall St. J. (May 13, 2021), https://www.wsj.com/articles/jpmorgan-others-plan-to-issue-credit-cards-to-people-with-no-credit-scores-11620898206.

[296] *See* 2019 Report, *supra* note 6, *at* 182. The Bureau also issued a joint statement with four other federal financial regulatory agencies on the use of alternative data in underwriting. Bureau of Consumer Fin. Prot., *Federal Regulators Issue Joint Statement on the Use of Alternative Data in Credit Underwriting* (Dec. 2019), https://www.consumerfinance.gov/about-us/newsroom/federal-regulators-issue-joint-statement-use-alternative-data-credit-underwriting/.

[297] For example, a fintech startup called Deserve launched a digital-only credit card which uses machine learning and alternative data in its underwriting. Another credit card company called Petal uses alternative data in its underwriting. Petal recently spun off underwriting unit in an effort to market its alternative data underwriting services to other lenders. Zachary Miller, *'Financial providers need actionable insights, not raw data': Credit card company Petal spins off B2B data unit, Prism Data*, Tearsheet (Apr. 27, 2021), https://tearsheet.co/data/financial-providers-need-actionable-insights-not-raw-data-credit-card-company-petal-spins-off-b2b-data-unit-prism-data/; Businesswire, *Deserve Launches Digital First Card on Mastercard Network for Mobile-First Experience* (Apr.28, 2021), https://www.businesswire.com/news/home/20210428005653/en/. The Bureau understands that in many cases, data to support such alternative data-powered underwriting is procured via consumer-permissioned data access, a subject of the Bureau's recent Advance Notice of Proposed Rulemaking on "Consumer Access to Financial Records." 85 FR 71003 (Nov. 6, 2020).

findings from a New York Department of Financial Services investigation describe common consumer confusion related to the use of these technologies.[298]

## 7.1.2    Buy now, pay later loans

In recent years, the market and reach of certain point-of-sale lending products — widely referred to as "buy now, pay later" ("BNPL") loans — have grown significantly and now may compete with credit cards at both the online and the physical point of sale.[299] BNPL lenders such as Affirm, Klarna, and Afterpay offer consumers the opportunity to "split" a purchase into a number of installments at the point-of-sale of merchant partners. Consumers generally repay BNPL loans through debit and credit cards, typically by automatic repayment. In the 2019 Report, the Bureau noted that "[s]ome of these products have shown rapid growth—and attracted calls for more regulatory attention—in foreign markets."[300] Since that time, the popularity of BNPL has continued to grow, both abroad and in the United States. One market observer estimates that U.S. BNPL lending jumped from $3 billion in 2019 to $39 billion in

---

[298] The NY DFS noted these findings in its investigation of allegations of discrimination against women in the underwriting of the Apple Card, issued by Goldman Sachs. That investigation noted consumer misconceptions regarding credit underwriting for people with shared finances and a lack of transparency in the explanations of credit decisions presented to consumers. The investigation also noted a six-month waiting period on responses to credit decision appeals. New York State Dept. of Fin. Serv., *Report on Apple Card Investigation* (Mar. 2021), https://www.dfs.ny.gov/reports_and_publications/202103_report_apple_card_investigation. Currently, federal law mandates that lenders explain only credit denials to applicants, not the reasons for the amount and terms of credit granted. In response to the perceived lack of transparency, Goldman introduced new consumer education tools explaining what factors are used in setting credit terms and providing step-by-step instructions that consumers can complete to become eligible for the Apple Card. *See* Apple Inc., *Designed to support your financial health*, https://www.apple.com/apple-card/financial-health/.

[299] Estimates for the size of the entire BNPL market vary. However, some of the largest BNPL lenders saw significant growth in 2020. For example, Afterpay financed over $9.8B in loans in North America during the second half of 2020, up 106 percent year-over-year. By the end of 2020, Afterpay had 8.1M active North American users, up 127 percent Year-over-year. Similarly, Klarna reached 14M U.S. consumers by the end of 2020, up 115 percent Year-over-year. *See Afterpay, ASX Announcements* (2021), https://corporate.afterpay.com/investors/asx-announcements#. *See also Klarna, Annual financial statement release* (2021), https://www.klarna.com/assets/2021/02/25062747/Annual-Financial-Statement-Release-Klarna-Bank-AB-publ-2020-Final.pdf.

[300] 2019 Report, *supra* note 6, at 177.

2020, and will exceed $100 billion annually within three years.[301] BNPL lending has also continued to attract regulatory attention (as well as calls for further regulatory attention) domestically and internationally.[302] BNPL providers are among the growing number of non-banks that utilize consumer-authorized access to account data to deliver their service. Access to information from consumer accounts at financial institutions is used by BNPL providers for several purposes, including to verify consumer information and to facilitate payments.

The increased pace of adoption of BNPL has been partially attributed to COVID-19, during which many consumers shifted spending online.[303] This shift presented an opportunity for retailers partnering with financial companies to offer BNPL at digital point of sale—the primary channel by which the product is offered.

---

[301] Brian Riley, *Buy Now, Pay Later: Gaining Scale and the Disrupting Status Quo in Lending*, Mercator Advisory Grp. (May 07, 2021), https://www.mercatoradvisorygroup.com/Reports/Buy-Now,-Pay-Later-:-Gaining-Scale-and-the-Disrupting-Status-Quo-in-Lending/.

[302] For example, The U.K. announced that BNPL credit agreements would be regulated by the Financial Conduct Authority, the country's financial regulator. In Sweden, new rules were passed which would discourage online shoppers from paying with credit—including BNPL products. In California, BNPL lenders have come under scrutiny from state regulators for making loans without state lending licenses. Press Release, CA Dep't of Fin. Prot. and Innovation, *Point-of-Sale Lender QuadPay Agrees to Cease Illegal Loans, Pay Refunds in Settlement with the California Department of Business Oversight* (Apr. 22, 2020), https://dbo.ca.gov/2020/04/22/point-of-sale-lender-quadpay-agrees-to-cease-illegal-loans-pay-refunds-in-settlement-with-the-california-department-of-business-oversight/;Press Release, CA Dep't of Fin. Prot. and Innovation, *Point-of-Sale Lender Sezzle Agrees to Cease Illegal Loans, Pay Refunds in Settlement with the California Department of Business Oversight* (Jan. 16, 2020), https://dfpi.ca.gov/2020/01/16/point-of-sale-lender-sezzle-agrees-to-cease-illegal-loans-pay-refunds-in-settlement-with-the-california-department-of-business-oversight/; Ketharaman Swaminathan, *Sweden bids to steer customers away from installment payments amid fears over mounting debt*, Finextra (July, 02, 2021), https://www.finextra.com/newsarticle/36141/sweden-bids-to-steer-customers-away-from-installment-payments-amid-fears-over-mounting-debt.

[303] Peter Rudegeair et al., *Covid-19 Economy Boosts 'Buy Now, Pay Later' Installment Services*, Wall St. J. (Dec. 30, 2020), https://www.wsj.com/articles/covid-19-economy-boosts-buy-now-pay-later-installment-services-11609340400; Stuart Condie, *'Buy Now Pay Later' Is Having a Moment as Pandemic Changes Shopping Habits*, Wall St. J. (July 11, 2020), https://www.wsj.com/articles/buy-now-pay-later-is-having-a-moment-as-pandemic-changes-shopping-habits-11594459800.

The extent to which BNPL competes directly with credit cards — either as a means of payment for consumers' purchases or as a means of purchase financing — is unclear.[304] While BNPL loans are offered at the point-of-sale to facilitate quick extensions of credit and likely capture some volume from other payment methods like credit cards, it is possible that a portion of BNPL volume comes from *de novo* sales originating from the availability of BNPL itself.

Certain key differences between BNPL loans and credit cards may present risks to consumers. Unlike credit card providers, BNPL lenders are not required to consider ability to repay before extending credit.[305] Additionally, BNPL loans may not provide the same disclosures as other types of consumer credit.[306] BNPL late fees are not associated with specific regulations like credit card late fees, and BNPL users do not have the same billing error resolution procedures that are available to credit card users.

Traditional credit card issuers are investing in more ways to offer their own "fixed-payment" features, possibly in response to BNPL's explosive growth. In the 2019 Report, the Bureau discussed fixed-payment features offered on some credit cards which utilize a card's existing line

---

[304] A recent consumer survey appeared to indicate that consumers view BNPL as a potential alternative to credit cards. In that survey, 62 percent of respondents said that BNPL could replace their credit cards, but only 27 percent would like for that to happen. *See* Maurie Backman, *Study: Buy Now, Pay Later Services Continue Explosive Growth, Motley Fool* (July 20, 2020), https://www.fool.com/the-ascent/research/buy-now-pay-later-statistics/. Furthermore, not all card issuers support BNPL transactions. Capital One blocked its customers from using its credit cards to pay off BNPL loans, citing risks associated with BNPL transactions. *See* Byron Kaye, *Capital One stops 'risky' buy-now-pay-later credit card transactions*, Reuters (Dec. 07, 2020), https://www.reuters.com/article/us-capital-one-fin-payments-idCAKBN28H0OR.

[305] BNPL loans that are structured as zero-interest loans of four payments or less typically are not reported to credit bureaus. As a result, users can potentially "stack" BNPL loans across different providers, leading to potential situations in which consumers may face difficulty repaying one or many loans. There is some evidence that BNPL loans pose a risk of overextension. In Australia, a country where the market for BNPL loans is mature and the product is well-established in the consumer financial ecosystem, the country's financial regulator found that BNPL users with credit cards were much more likely to be revolvers than other credit card users. Additionally, survey data showed that 20% of BNPL users cut back on essentials and 15% took out additional credit to make BNPL payments. Austrl. Sec. & Inv. Comm'n, *REP 672 Buy now pay later: An industry update* (Nov. 16, 2020), https://asic.gov.au/regulatory-resources/find-a-document/reports/rep-672-buy-now-pay-later-an-industry-update/.

[306] For BNPL loans that are structured as zero-interest loans of four payments or less, some providers state that they do not meet the TILA definition of "creditor" and therefore do not have to provide TILA disclosures. Some BNPL loans are structured as longer-term installment loans; these loans are subject to TILA and other requirements.

EXHIBIT A
Page 170

for a repayment plan that is separate from payments made towards the revolving feature in the account.[307] American Express's "Plan It" feature was recently added to the point of sale of American Express's travel website.[308] Alliance Data Systems acquired a BNPL provider and partnered with financial services provider Fiserv to enable point-of-sale lending products for merchants using Fiserv's merchant acquiring services.[309] Synchrony Financial announced plans to offer a short-term installment loan product to its retail partners in late 2021.[310] Barclays also announced a partnership with a BNPL provider to offer "white-label" point-of-sale financing options to merchants.[311]

Two card networks are developing capabilities to facilitate point-of-sale lending options. Visa is piloting 'Visa Installments,' a four-payment installment solution that will allow issuers to streamline merchant integration at the merchant's digital POS.[312] Visa Installments turns already-approved credit lines into installment payment options for Visa cardholders. The pilot program involves TSYS, the first issuer technology partner to offer Visa's new solution enabling participating financial institutions to offer installment plans to their cardholders. Similarly, Mastercard announced it would develop installment capabilities with TSYS to deliver installment capabilities to issuers, who could then offer installment solutions to Mastercard

---

[307] *See* 2019 Report, *supra* note 6, at 177-179.

[308] Previously, "Plan It" was only available retroactively for card purchases that were already made.

[309] PR Newswire-Alliance Data, *Alliance Data's Bread To Enable Point-of-Sale Lending for Fiserv Merchant Clients* (Apr. 2021), https://www.prnewswire.com/news-releases/alliance-datas-bread-to-enable-point-of-sale-lending-for-fiserv-merchant-clients-301279942.html, PR Newswire-Alliance Data, *Alliance Data Completes Acquisition of Bread* (Dec. 4, 2020), https://www.prnewswire.com/news-releases/alliance-data-completes-acquisition-of-bread-301186414.html.

[310] *See* Polo Rocha, *Synchrony's new 'Pay in 4' loan borrows from buy now/pay later upstarts*, American Banker (Sep. 9, 2021), https://www.americanbanker.com/news/synchronys-new-pay-in-4-loan-borrows-from-buy-now-pay-later-upstarts.

[311] Barclays, *Barclays US Consumer Bank Expands Point-of-Sale Financing Suite to Include Installment Options Powered by Amount* (Apr. 27, 2021), https://www.prnewswire.com/news-releases/barclays-us-consumer-bank-expands-point-of-sale-financing-suite-to-include-installment-options-powered-by-amount-301277216.html.

[312] *See* PYMNTS, *Visa Launches Visa Installments Pilots in the US* (July 14, 2020), https://www.pymnts.com/digital-payments/2020/visa-launches-visa-installments-pilots-in-the-us/.

cardholders.[313] In 2019, Mastercard acquired Vyze, a POS platform that connects merchants with multiple lenders.[314] Through Vyze, merchants can connect with lenders and consumers can access those credit options both in-store and online.

The Bureau continues to monitor the developing market for new forms of point-of-sale financing, both those offered independently from and in conjunction with credit card products, in order to ensure consumers are adequately informed about financial offerings, that consumers are protected from risky practices, and that markets continue to provide consumer-friendly innovation and competition.

### 7.1.3    Other innovations

Card issuers and other financial services companies continue to innovate in ways that aim to attract or serve consumers. For example, several card issuers now offer instant issuance of credit cards upon approval.[315] Some card issuers also offer virtual credit card features which allow users to transact on their main credit card account through a separate, unique credit card number. Generally, users can limit a virtual card number to a specific merchant, transaction, or dollar amount. According to card issuers, virtual cards can help reduce fraud and give users more control over their online spending.[316] In 2019, Mastercard announced its "True Name"

---

[313] *See* Mastercard, *Mastercard Expands Installment Offerings Through Global Partnerships, Empowers More Consumers to Choose When to Pay with Pre-Sale, Point of Sale, and Post-Sale Payment Options* (Sept. 2, 2020), https://investor.mastercard.com/investor-news/investor-news-details/2020/Mastercard-Expands-Installment-Offerings-Through-Global-Partnerships-Empowers-More-Consumers-to-Choose-When-to-Pay-with-Pre-Sale-Point-of-Sale-and-Post-Sale-Payment-Options/default.aspx.

[314] *See* PYMNTS, *Mastercard buys POS Financing Provider Vyze* (Apr. 15, 2019), https://www.pymnts.com/mastercard/2019/acquisition-vyze-pos-financing/.

[315] After approval, Users can add a new credit card to their digital wallets, access their card number through a bank's website or mobile app, or—in some cases, for private label cards—receive a scannable barcode to use at the retailer associated with the card. Barclays, *Barclays US Consumer Bank Expands Point-of-Sale Financing Suite to Include Installment Options Powered by Amount* (Apr. 27, 2021), https://www.prnewswire.com/news-releases/barclays-us-consumer-bank-expands-point-of-sale-financing-suite-to-include-installment-options-powered-by-amount-301277216.html.

[316] *See, e.g.*, Capital One, *Virtual Numbers*, https://www.capitalone.com/applications/eno/virtualnumbers and Citibank, *Virtual Account Numbers*, https://www.cardbenefits.citi.com/Products/Virtual-Account-Numbers.

EXHIBIT A
Page 172

initiative, which permits cardholders to use their preferred name instead of their legal name on credit and debit cards, a common issue for transgender and gender non-binary individuals whose preferred names may differ from their legal ones.[317] Two major card-issuing banks announced they have implemented this feature.[318] Lastly, Venmo, a digital payments platform with a social media component owned by PayPal, introduced a credit card imprinted with a QR code which users can scan to activate their card or allow others to scan to send or request funds through Venmo.[319]

The Bureau continues to note ongoing innovation in rewards programs, which are central to how many credit card products are marketed to consumers. These innovations include delivering rewards value in new forms. For example, at least three providers—SoFi, BlockFi, and Gemini—have announced plans to offer credit card rewards redeemable for virtual currencies.[320] Another provider allows users to pay rent through their card without additional fees and redeem rewards for a down payment on a home.[321] Additionally, SoFi allows credit card rewards to be

---

[317] *See* Mastercard, *Who we are*, https://www.mastercard.us/en-us/vision/who-we-are/pride.html, last accessed Aug. 23, 2021).

[318] Citigroup, *Citi Launches "True Name" Feature With Mastercard Across the U.S.* (Oct. 19, 2020), https://www.citigroup.com/citi/news/2020/201019a.htm; https://www.bmoharris.com/main/personal/true-name/.

[319] PYMNTS, *Venmo Launches Credit Card Featuring User QR Codes* (Oct. 5, 2020), https://www.pymnts.com/news/payment-methods/2020/venmo-launches-credit-card-featuring-user-qr-codes/.

[320] BlockFi Blog, *Join the Waitlist for the World's First-Ever Bitcoin Rewards Credit Card*, BlockFi Blog (Dec. 1, 2020), https://blockfi.com/bitcoin-card-crypto-rewards. Tyler Winklevoss, Gemini Blog, *Gemini to Offer Credit Card with Crypto Rewards*, Gemini Blog (Jan. 14, 2021), https://www.gemini.com/blog/gemini-to-offer-credit-card-with-crypto-rewards. In 2014, the Bureau issued a consumer advisory, warning consumers about the risks of virtual currencies such as Bitcoin. *See supra* note 159.

[321] The provider, Bilt Technologies Inc., says it will mail landlords paper checks on behalf of the tenant (and card user) and then charge the renter's credit card account with no additional fee. Will Parker, Renters *Could Collect Home Down-Payment Points With Credit Card*, Wall St. J. (Updated June 25, 2021), https://www.wsj.com/articles/renters-could-collect-home-down-payment-points-with-credit-card-11624356000.

redeemed for repayment of other non-card debt held by SoFi, including SoFi Student Loan Refinance and SoFi Personal Loans. [322]

# 7.2    Consumer adoption of innovative technologies

Consumer adoption of innovative technologies related to credit card payments and account servicing continued to grow over 2019 and 2020 and was likely accelerated by COVID-19. Pandemic-driven concerns around the use of cash or touching a payment terminal appeared to further the digital evolution at the point of sale, driving enablement and adoption of contactless payment methods such as "tap and pay" and digital wallets. [323]

## 7.2.1    Digital servicing tools

Consumer enrollment in digital account servicing grew at least partially in response to some of the disruptions caused by the pandemic. For example, bank branch closures, shortened hours, postal service delays, or social distancing may have further incentivized consumers to use online or mobile tools to check balances or cash a check more frequently than in pre-pandemic periods. Difficulty reaching customer service representatives by phone due to call center adjustments may have led consumers to try virtual assistants to meet their needs. [324] Data show that despite the pandemic, some cardholders continue to interact with banks via traditional non-digital channels, but the trend toward adoption of digital servicing overall indicates these cardholders

---

[322] SoFi, *Once my SoFi Points are redeemed into a SoFi Personal Loan payment, when and how can I expect the payment to be applied?* https://support.sofi.com/hc/en-us/articles/360051403531-Once-my-points-are-redeemed-into-a-SoFi-Student-Loan-Refinance-payment-when-and-how-can-I-expect-the-payment-to-be-applied (last visited Aug. 17, 2021).

[323] Telis Demos and Dan Gallagher, *Is This the Year You Finally Stop Swiping Your Credit Card? The pandemic has accelerated usage of 'contactless' payments in U.S. stores. The ultimate winners from this transition remain far from certain,* Wall St. J. (Aug. 4, 2020), https://www.wsj.com/articles/is-this-the-year-you-finally-stop-swiping-your-credit-card-11597397428?PostID=18397976.

[324] For more information regarding call center volume, *see* Section 5.5.

increasingly represent a minority. This section uses MMI data to examine how consumers use digital account servicing platforms—online account servicing portals (online portals) and mobile apps.

**ONLINE BANKING AND MOBILE APPS**

Basic account servicing features are found in almost all online banking portals and mobile apps. Cardholders can review transactions (and dispute fraudulent ones), make payments, transfer balances, request cash advance PINs, activate new cards, request replacement cards, download full account statements, receive information about other card benefits, add or remove an authorized user from their accounts, inform their issuer of upcoming travel, report a card lost or stolen, change their account's due date, or send and read messages to and from account servicing professionals or chat with them in real-time.[325]

In recent years, the Bureau has noted additional functionality related to mobile apps, including card freezing, management of recurring card payments, additional card usage controls, and interactive digital interfaces for card balance payments.[326] Many of these service features likely proved particularly useful to some during the pandemic, as many banks closed branches or limited operating hours, and customers experienced longer call wait times. To assist with longer wait times, card companies have introduced AI-powered chatbots to navigate and execute digital account management functions and make transactions.[327] User engagement with these chatbots rose significantly through the pandemic.[328] Chatbots provide an alternative method of accessing the apps' features in addition to providing higher-order functionality, such as responding to questions about spending patterns. Cardholders can use voice or text to direct a chatbot to search for certain transactions, display basic account information, add an authorized user,

---

[325] *See* 2019 Report, *supra* note 6, at 173.

[326] *See* 2019 Report, *supra* note 6, at 172.

[327] Dawn Allcot, *Artificial Intelligence is Changing Credit Cards and Banking*, Bankrate.com (Feb. 4, 2019), https://www.bankrate.com/credit-cards/artificial-intelligence-banking-credit-card-rewards/.

[328] One such chatbot, Bank of America's virtual assistant 'Erica,' saw engagement jump 67 percent year-over-year to 17.2 million users in the fourth quarter of 2020. Rachel Green, *Bank of America ends 2020 with rising digital engagement despite squeezed margins*, Business Insider (Jan. 20, 2021), https://www.businessinsider.com/bofa-q4-earnings-missed-mark-but-digital-engagement-rose-2021-1.

summarize and plot monthly spending, or send alerts for upcoming bills, among other options. Many chatbots are responsive to both voice and text, with voice recognition requiring an additional layer of technology.

Digital engagement is growing consistently across all age groups and nearly every platform type. The share of people electing to receive statements digitally (e-statements) rather than by mail is continuing to increase, though the pace of adoption growth tapered in 2020. E-statement adoption has been surpassed by mobile app adoption as a method to engage with banks.

Figure 1 shows the share of active mass market credit card accounts enrolled in issuers' online portals and/or mobile apps.[329] As of 2020, 80 percent of active accounts are enrolled in online portals for general purpose cards, with increases across all age groups. That share is significantly higher than the 55 percent the Bureau reported as of 2014.[330]



**Figure 1:**    SHARE OF ACTIVE ACCOUNTS ENROLLED IN ONLINE PORTAL, MOBILE APPS, AND RECEIVING ONLY E-STATEMENTS, GENERAL PURPOSE (MMI)



Also noteworthy is the rise in the share of accounts enrolled in mobile apps, which has more than doubled in only five years, from 30 percent in 2015 to 64 percent in 2020. Mobile app adoption is more common among younger consumers but increases in adoption can be seen

---

[329] A consumer may be enrolled in an online portal and may also have the mobile app. In fact, some issuers require online enrollment before mobile app use can be engaged.

[330] 2015 Report, *supra* note 6, at 133.

across all age groups. In 2020, 93 percent of active accounts held by consumers under age 25 were enrolled in the issuer's mobile app. For consumers between the ages of 25 and 64, and over 65, mobile enrollment share was 71 percent and 36 percent, respectively. Overall, the Bureau expects the trend toward increasing mobile app adoption to continue.

**Figure 2:**    SHARE OF ACTIVE ACCOUNTS ENROLLED IN MOBILE APPS BY AGE, GENERAL PURPOSE (MMI)



**ELECTRONIC STATEMENTS**

As the Bureau noted in 2019, the share of people electing to receive statements digitally (e-statements) rather than by mail is continuing to increase significantly. The number of mass market accounts that receive only e-statements from their issuer has risen over the last five years and in 2020 was 56 percent. While electronic statements can be a convenient way to access account information, it is important consumers review electronic statements as thoroughly as they would paper statements.

As discussed in Section 2.4.3, a sizeable but declining portion of consumers still rely on paper to manage their accounts. Americans above age 65 tend to rely more on paper, with 21 percent choosing to make a paper payment in the last cycle of 2020, compared to 4 percent for ages 25-64. These findings generally align with the lower adoption rate of digital servicing tools among older Americans discussed earlier. As one commenter noted, paper statements remain an important mechanism to prompt payment for many consumers, particularly lower-income

families, and those without access to broadband internet, which includes 55 percent of Americans 65 years or older.[331]

## 7.2.2 Physical point-of-sale

In the 2019 Report, the Bureau identified three significant developments at the point-of-sale which provided greater speed, security, or convenience for consumers and merchants: elimination of signature requirements for EMV "chip" card transactions; near-field communication (NFC) acceptance at the physical POS, which supports the mobile wallet technologies and applications incorporated into most smartphones used by American consumers; and contactless card issuance and adoption. Since 2019, the popularity of contactless payments (both through contactless cards and NFC mobile wallets) has continued to grow, aided by health concerns about physical contact during COVID-19.

The increasing availability of contactless cards and terminals, coupled with pandemic-driven anxiety around high-touch surfaces, drove consumer adoption of contactless payments during the pandemic.[332] Visa and Mastercard reported approximately 40 percent year-over-year global growth in tap-to-pay or contactless transactions in the first quarter of 2020.[333] By the third quarter of 2020, contactless transactions accounted for over 40 percent of in-person

---

[331] "[W]e again urge the CFPB to protect the right and ability of consumers who want to keep receiving paper disclosures and billing statements by mail. Credit card issuers and other banks have aggressively pushed consumers to receive these important documents via electronic delivery but, as documented in our report *Paper Statements: An Important Consumer Protection*, these efforts can be harmful to consumers." *See* NCLC Comment Letter, at 21. *See also* Chi Chi Wu and Lauren Saunders, *Paper Statements: An Important Consumer Protection* (Mar. 2016), http://www.nclc.org/images/pdf/banking_and_payment_systems/paper-statements-banking-protections.pdf.

[332] A study conducted by Forrester and the National Retail Federation and released in mid-2020 found that 58 percent of surveyed retailers accept contactless card payments, up from 40 percent the prior year. The same survey found that 67 percent of retailers surveyed now accept some form of no-touch payment. See National Retail Federation, *Coronavirus leads to more use of contactless credit cards and mobile payments despite cost and security concerns* (Aug. 6, 2020), https://nrf.com/media-center/press-releases/coronavirus-leads-more-use-contactless-credit-cards-and-mobile-payments.

[333] *See* Telis Demos & John Gallagher, *Is This the Year You Finally Stop Swiping Your Credit Card?*, Wall St. J. (Aug. 14, 2020), https://www.wsj.com/articles/is-this-the-year-you-finally-stop-swiping-your-credit-card-11597397428?PostID=18397976.

transactions globally for both Visa and Mastercard.[334] In a survey conducted in the third quarter of 2020, nearly half of respondents said the pandemic prompted them to use contactless payments more often or for the first time.[335] In the last several years, the number of retail locations supporting NFC mobile wallets and contactless cards has grown significantly – over 70 percent of face-to-face transactions in the U.S. now occur at a contactless-enabled merchant location.[336] Card issuers are also accelerating plans for contactless distribution.[337]

In late 2020 and early 2021, both Visa and Mastercard announced services which would allow businesses of any size to turn any Android smartphone or tablet into a contactless payment acceptance device without any additional hardware.[338] The features could allow merchants to more easily accelerate the transition to contactless payments by providing a method for

---

[334] Chris Reid, Mastercard: "In 2020Q3, contactless transactions represented 41% of in-person purchases globally (up 30% year-over-year)" at Card Forum 2021, Mar. 16, 2021. Visa 2020 10-K, at 8; U.S. Sec. & Exch. Comm'n, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Nov. 19, 2020), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001403161/0504ac14-a3a9-4506-9352-aa15cd087268.pdf.

[335] See S&P Global, *451 Research: 2020 Year-In-Review Infographic*, S&P Market Intelligence Blog (Feb. 17, 2021), https://www.spglobal.com/marketintelligence/en/news-insights/blog/451-research-2020-year-in-review-infographic.

[336] For example, in early 2017, several years after its launch, Apple Pay was accepted at 36 percent of retail locations. As of early 2019, Apple reported that Apple Pay is accepted at 65 percent of retail locations. Retailers that support Apple Pay also support other mobile wallets such as Google Pay. See Press Release, Apple, *Apple Pay coming to Target, Taco Bell and more top US retail locations* (Jan. 22, 2019), https://www.apple.com/newsroom/2019/01/apple-pay-coming-to-target-taco-bell-and-more-top-us-retaillocations. See also Juli Clover, *Apple Pay Now Supported by 36% of Merchants in the United States*, MacRumors (Feb. 7, 2017), https://www.macrumors.com/2017/02/07/apple-pay-36-percent-united-states/. In its 2020 Annual Report, Visa reported that more than 70 percent of face-to-face transactions at checkout in the U.S. occur at a merchant that has the ability to accept contactless payment, and more than 80 of the top 100 merchants by transactions are enabled for tap to pay. (2020 Visa 10-K, at 8)

[337] See Payments Journal, *Card networks have stepped up their contactless distribution* (Jan. 6, 2021), https://www.paymentsjournal.com/card-networks-have-stepped-up-their-contactless-distribution/. *See also* Section 5.5.

[338] See Press Release, Mastercard, *Mastercard Pioneers Cloud Tap on Phone, its First Pilot of Cloud Point of Sale (POS) Acceptance Technology* (Jan. 11, 2021), https://www.mastercard.com/news/press/2021/january/mastercard-pioneers-cloud-tap-on-phone/; John Adams, *MOBILE POINT-OF-SALE: Visa debuts in-phone card acceptance as contactless takes off* (Oct. 21, 2020), https://www.paymentssource.com/news/visa-debuts-in-phone-card-acceptance-as-contactless-takes-off.

contactless payment acceptance without requiring a terminal. Mastercard's service is in pilot; Visa's service is expected to roll out in the U.S. in 2021.

Challenges to further adoption of contactless payments remain. There are several competing digital wallet networks and some retailers do not accept some major wallets. For a contactless transaction through a digital wallet to work, the retailer needs to accept both the digital wallet and the card stored in the digital wallet.[339] Additionally, many mobile phones utilize facial recognition for authentication, which is hampered by masks, often mandated in store locations.[340] Furthermore, some retailers have not upgraded their POS systems to accept contactless EMV transactions.[341] Finally, some consumers are reluctant to adopt contactless payments. One survey showed that, when asked, only one-third of respondents who reported they have a contactless card said they use tap-and-pay frequently to make purchases.[342]

For consumers who adopt mobile wallets, certain potential risks remain. For example, one commenter suggested that consumers who initiate card-on-file transactions through a mobile

---

[339] AnnaMaria Andriotis, *Apple Pay Offers Germ-Free Shopping—If Only We Could Figure Out How it Works,* Wall St. J. (Jan. 27, 2021), https://www.wsj.com/articles/apple-pay-offers-germ-free-shoppingif-only-we-could-figure-out-how-it-works-11611771110.

[340] An Apple software update (iOS 14.5 beta) provides a potential workaround for the issue of facial recognition with a mask for users who also use an Appl Watch. When a user raises their phone to their face to unlock it and the user is wearing an Apple Watch, the watch will communicate with the phone to unlock it. Lauren Goode, *The iPhone's Face ID Will Soon Work With a Mask—if You Have an Apple Watch* (Feb. 2, 2021), https://www.wired.com/story/iphone-face-id-mask-ios-beta/.

[341] A study conducted by Forrester and the National Retail Federation (cited earlier in this report) found that 58% of surveyed retailers accept contactless card payments, indicating some runway for further adoption by merchants. In addition, a survey indicated that a third of gas stations were likely to miss their extended deadline of April 2021 to upgrade EMV-enabled POS systems. *See supra* note 332, and Ted Rossman, *Deadline approaches for gas stations to upgrade to EMV chip technology* (Mar. 22, 2021), https://nrf.com/media-center/press-releases/coronavirus-leads-more-use-contactless-credit-cards-and-mobile-payments. The negative impact of COVID-19 on small businesses in particular could reduce the incentive and resources such businesses have to improve their point-of-sale systems.

[342] The authors of the paper which describes the survey's results cite a number of potential reasons for this hesitancy: 1) consumers who have the tool are not adopting it, 2) The conversion of cash may not be as high as hoped, and 3) consumers need a push to break their payment habits. *See* Tom Akana and Wei Ke, *Contactless Payment Cards: Trends and Barriers to Consumer Adoption in the U.S.,* Fed. Rsrv. Bank of Philadelphia (May 2020), https://www.philadelphiafed.org/-/media/frbp/assets/consumer-finance/discussion-papers/dp20-03.pdf.

wallet may not be aware of the way their data are being collected and used. In this example, a consumer initially "registers" their payment credentials with a merchant. When the consumer uses a mobile wallet instead of a credit card to initiate a card-on-file transaction, the wallet can create a token with the merchant, which is then used to facilitate future transactions. Once established, the token directs all future transactions with that merchant through the mobile wallet—even though the wallet may not appear prominently (or at all) in the transaction flow. Consumers may not realize that the wallets will continue to collect data.[343]

---

[343] *See* letter from Akerman to Wei Zhang (Markets) *re: CFPB CARD Act Study of Credit Card Market* (June 10, 2021).

# APPENDIX A:  SUPPORTING FIGURES

**Figure 1:**    FEDERAL FUNDS RATE COMPARED TO WSJ PRIME RATE (WSJ, FEDERAL RESERVE)[344]



---

[344] Fed. Rsrv. Bank of Fed. Reserve Bank of St. Louis, *Effective Federal Funds Rate*,
https://fred.stlouisfed.org/series/fedfunds (last visited July 11, 2021); Wall St. J., *Market Data Center*,
https://www.wsj.com/market-data/bonds/moneyrates (last visited July 11, 2021).

**EXHIBIT B**

# FEDERAL RESERVE statistical release

## G.19

### Consumer Credit
#### May 2023

For release at **3 p.m.** (Eastern Time)
July 10, 2023

In May, consumer credit increased at a seasonally adjusted annual rate of 1.8 percent. Revolving credit increased at an annual rate of 8.2 percent, while nonrevolving credit decreased at an annual rate of 0.4 percent.

### Consumer Credit Outstanding[1]
Seasonally adjusted. Billions of dollars except as noted.

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2022 Q1 | 2022 Q2[r] | 2022 Q3[r] | 2022 Q4[r] | 2023 Q1[r] | 2023 Mar[r] | 2023 Apr[r] | 2023 May[p] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total percent change (annual rate)[2]** | 4.5 | 4.6 | -0.3 | 5.9 | 8.0 | 8.2 | 8.2 | 7.3 | 7.4 | 4.3 | 4.8 | 5.0 | 1.8 |
| Revolving | 3.7 | 3.6 | -11.2 | 6.9 | 15.4 | 16.8 | 14.2 | 13.2 | 14.1 | 9.4 | 13.8 | 13.8 | 8.2 |
| Nonrevolving[3] | 4.8 | 5.0 | 3.5 | 5.6 | 5.7 | 5.6 | 6.2 | 5.4 | 5.2 | 2.6 | 1.7 | 2.0 | -0.4 |
| **Total flow (annual rate)[2,4]** | 172.7 | 185.1 | -12.0 | 246.0 | 354.9 | 365.1 | 368.8 | 337.0 | 348.8 | 206.3 | 229.0 | 243.9 | 86.0 |
| Revolving | 37.3 | 38.1 | -122.1 | 67.6 | 160.3 | 175.3 | 154.3 | 148.3 | 163.3 | 113.2 | 167.5 | 170.0 | 102.1 |
| Nonrevolving[3] | 135.3 | 147.0 | 110.1 | 178.3 | 194.6 | 189.8 | 214.6 | 188.7 | 185.5 | 93.1 | 61.4 | 73.9 | -15.1 |
| **Total outstanding** | 4,007.0 | 4,192.2 | 4,184.9 | 4,430.8 | 4,785.7 | 4,522.1 | 4,614.3 | 4,698.5 | 4,785.7 | 4,837.3 | 4,837.3 | 4,857.6 | 4,864.6 |
| Revolving | 1,053.8 | 1,092.0 | 974.6 | 1,042.2 | 1,202.5 | 1,086.1 | 1,124.6 | 1,161.7 | 1,202.5 | 1,230.8 | 1,230.8 | 1,245.0 | 1,253.0 |
| Nonrevolving[3] | 2,953.2 | 3,100.2 | 3,210.3 | 3,388.6 | 3,583.2 | 3,436.0 | 3,489.7 | 3,536.8 | 3,583.2 | 3,606.5 | 3,606.5 | 3,612.7 | 3,611.6 |

### Terms of Credit
Not seasonally adjusted. Percent except as noted.

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2022 Q1 | 2022 Q2[r] | 2022 Q3[r] | 2022 Q4[r] | 2023 Q1[r] | 2023 Mar[r] | 2023 Apr[r] | 2023 May[p] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Commercial bank interest rates[5]** | | | | | | | | | | | | | |
| New car loans | | | | | | | | | | | | | |
| 60-month | 5.02 | 5.31 | 5.02 | 4.82 | 5.36 | 4.52 | 4.85 | 5.50 | 6.55 | 7.48 | n.a. | n.a. | 7.81 |
| 72-month | 5.13 | 5.36 | 5.21 | 4.82 | 5.50 | 4.54 | 5.19 | 5.61 | 6.64 | 6.97 | n.a. | n.a. | 7.80 |
| Credit card plans | | | | | | | | | | | | | |
| All accounts | 14.22 | 15.05 | 14.71 | 14.60 | 16.26 | 14.56 | 15.13 | 16.27 | 19.07 | 20.09 | n.a. | n.a. | 20.68 |
| Accounts assessed interest | 16.04 | 16.98 | 16.28 | 16.45 | 17.91 | 16.17 | 16.65 | 18.43 | 20.40 | 20.92 | n.a. | n.a. | 22.16 |
| Personal loans | | | | | | | | | | | | | |
| 24-month | 10.32 | 10.32 | 9.51 | 9.38 | 9.87 | 9.39 | 8.73 | 10.16 | 11.21 | 11.48 | n.a. | n.a. | 11.48 |
| **Finance companies (new car loans)[6]** | | | | | | | | | | | | | |
| Interest rates | 6.1 | 6.4 | 5.2 | 4.6 | 5.2 | 4.4 | 5.0 | 5.5 | 6.1 | 6.4 | 6.4 | n.a. | n.a. |
| Maturity (months) | 66 | 67 | 69 | 67 | 67 | 66 | 66 | 66 | 67 | 66 | 66 | n.a. | n.a. |
| Amount financed (dollars) | 30,173 | 31,311 | 34,449 | 35,307 | 38,900 | 37,991 | 38,044 | 40,156 | 39,407 | 39,066 | 39,066 | n.a. | n.a. |

This release is generally issued on the fifth business day of each month. See the Statistical Release Schedule for more information.
Footnotes appear on the second and third pages.

EXHIBIT B
Page 184

**Consumer Credit Outstanding (Levels)**
Not seasonally adjusted
Billions of dollars

| | 2018 | 2019 | 2020 | 2021 | 2022[r] | 2022 | | | | 2023 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Q1 | Q2[r] | Q3[r] | Q4[r] | Q1[r] | Mar | Apr | May[p] |
| Total | 4,007.0 | 4,192.2 | 4,184.9 | 4,430.8 | 4,785.7 | 4,462.6 | 4,583.4 | 4,681.1 | 4,785.7 | 4,777.9 | 4,777.9 | 4,800.7 | 4,822.7 |
| **Major holders** | | | | | | | | | | | | | |
| Depository institutions | 1,687.4 | 1,774.1 | 1,687.5 | 1,827.2 | 2,032.2 | 1,830.9 | 1,915.1 | 1,959.3 | 2,032.2 | 2,002.5 | 2,002.5 | 2,023.9 | 2,043.5 |
| Finance companies | 534.4 | 537.7 | 551.4 | 577.0 | 573.4 | 572.8 | 570.4 | 570.2 | 573.4 | 575.9 | 575.9 | 577.8 | 581.5 |
| Credit unions | 481.2 | 498.0 | 505.1 | 532.0 | 636.7 | 547.2 | 584.4 | 616.3 | 636.7 | 645.0 | 645.0 | 649.3 | 649.6 |
| Federal government[7] | 1,236.3 | 1,319.2 | 1,381.0 | 1,436.4 | 1,487.3 | 1,455.0 | 1,457.1 | 1,479.1 | 1,487.3 | 1,499.7 | 1,499.7 | 1,495.0 | 1,493.5 |
| Nonprofit and educational institutions[8] | 31.3 | 27.3 | 24.1 | 22.4 | 20.3 | 22.0 | 21.6 | 21.1 | 20.3 | 20.2 | 20.2 | 20.1 | 19.8 |
| Nonfinancial business | 36.5 | 35.8 | 35.8 | 35.8 | 35.8 | 34.7 | 34.9 | 35.0 | 35.8 | 34.7 | 34.7 | 34.6 | 34.8 |
| **Major types of credit, by holder** | | | | | | | | | | | | | |
| Revolving | 1,053.8 | 1,092.0 | 974.6 | 1,042.2 | 1,202.5 | 1,024.8 | 1,088.3 | 1,123.2 | 1,202.5 | 1,169.6 | 1,169.6 | 1,185.7 | 1,205.9 |
| Depository institutions | 947.2 | 983.6 | 875.3 | 944.2 | 1,095.7 | 928.2 | 989.3 | 1,021.9 | 1,095.7 | 1,064.8 | 1,064.8 | 1,079.8 | 1,098.7 |
| Finance companies | 23.7 | 21.9 | 17.1 | 13.4 | 12.2 | 12.9 | 12.2 | 11.9 | 12.2 | 11.4 | 11.4 | 11.4 | 11.5 |
| Credit unions | 62.4 | 66.5 | 62.3 | 64.7 | 74.7 | 64.8 | 67.7 | 70.4 | 74.7 | 74.6 | 74.6 | 75.7 | 76.9 |
| Federal government[7] | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ |
| Nonprofit and educational institutions[8] | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ |
| Nonfinancial business | 20.5 | 20.0 | 20.0 | 20.0 | 20.0 | 18.9 | 19.1 | 19.1 | 20.0 | 18.9 | 18.9 | 18.8 | 18.9 |
| Nonrevolving | 2,953.2 | 3,100.2 | 3,210.3 | 3,388.6 | 3,583.2 | 3,437.8 | 3,495.1 | 3,557.9 | 3,583.2 | 3,608.3 | 3,608.3 | 3,614.9 | 3,616.7 |
| Depository institutions | 740.2 | 790.5 | 812.2 | 883.0 | 936.6 | 902.7 | 925.7 | 937.5 | 936.6 | 937.7 | 937.7 | 944.2 | 944.8 |
| Finance companies | 510.7 | 515.9 | 534.3 | 563.6 | 561.0 | 559.9 | 558.3 | 558.3 | 561.0 | 564.6 | 564.6 | 566.4 | 570.0 |
| Credit unions | 418.8 | 431.5 | 442.8 | 467.4 | 562.0 | 482.4 | 516.7 | 546.0 | 562.0 | 570.4 | 570.4 | 573.5 | 572.8 |
| Federal government[7] | 1,236.3 | 1,319.2 | 1,381.0 | 1,436.4 | 1,487.3 | 1,455.0 | 1,457.1 | 1,479.1 | 1,487.3 | 1,499.7 | 1,499.7 | 1,495.0 | 1,493.5 |
| Nonprofit and educational institutions[8] | 31.3 | 27.3 | 24.1 | 22.4 | 20.3 | 22.0 | 21.6 | 21.1 | 20.3 | 20.2 | 20.2 | 20.1 | 19.8 |
| Nonfinancial business | 16.0 | 15.8 | 15.8 | 15.8 | 15.8 | 15.8 | 15.8 | 15.9 | 15.8 | 15.8 | 15.8 | 15.8 | 15.8 |
| **Memo** | | | | | | | | | | | | | |
| Student Loans[9] | 1,566.9 | 1,637.9 | 1,693.9 | 1,733.4 | 1,764.1 | 1,747.5 | 1,744.0 | 1,761.7 | 1,764.1 | 1,774.9 | 1,774.9 | n.a. | n.a. |
| Motor Vehicle Loans[10] | 1,139.6 | 1,184.1 | 1,224.4 | 1,314.2 | 1,417.5 | 1,332.2 | 1,366.4 | 1,396.9 | 1,417.5 | 1,432.4 | 1,432.4 | n.a. | n.a. |

## Footnotes

1. Covers most credit extended to individuals, excluding loans secured by real estate. Includes receivables carried on the balance sheet of the institution as well as outstanding balances of pools upon which securities have been issued under the current accounting rule, most of those balances remain on the balance sheets of the loan originator.
2. The series for consumer credit outstanding and its components may contain breaks that result from discontinuities in source data. Percent changes are adjusted to exclude the effect of such breaks. In addition, percent changes are at a simple annual rate and are calculated from unrounded data.
3. Includes motor vehicle loans and all other loans not included in revolving credit, such as loans for mobile homes, education, boats, trailers, or vacations. These loans may be secured or unsecured.
4. Flow data represent changes in the level of credit due to economic and financial activity, and exclude breaks in the data series due to changes in methodology, source data, and other technical aspects of the estimation that could affect the level of credit.
5. Interest rates are annual percentage rates (APR) as specified by the Federal Reserve's Regulation Z. Interest rates for new-car loans and personal loans at commercial banks are simple unweighted averages of each bank's most common rate charged during the first calendar week of the middle month of each quarter. For credit card accounts, the rate for all accounts is the stated APR averaged across all credit card accounts at all reporting banks. The rate for accounts assessed interest is the annualized ratio of total finance charges at all reporting banks to the total average daily balances against which the finance charges were assessed (excludes accounts for which no finance charges were assessed).

Consumer Credit Outstanding (Flows)
Not seasonally adjusted
Billions of dollars, annual rate

| | 2018 | 2019 | 2020 | 2021 | 2022[r] | 2022 | | | | 2023 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Q1 | Q2[r] | Q3[r] | Q4[r] | Q1[r] | Mar[r] | Apr[r] | May[p] |
| **Total** | 172.7 | 185.1 | -12.0 | 246.0 | 354.9 | 127.3 | 483.2 | 390.7 | 418.6 | -31.5 | 49.3 | 273.7 | 264.1 |
| **Major holders** | | | | | | | | | | | | | |
| Depository institutions | 50.6 | 86.6 | -91.3 | 139.7 | 205.0 | 14.8 | 336.6 | 177.1 | 291.7 | -119.2 | 43.9 | 257.7 | 234.8 |
| Finance companies | -6.9 | 3.4 | 13.7 | 25.6 | -3.6 | -16.5 | -9.8 | -0.8 | 12.9 | 9.9 | 22.6 | 22.7 | 44.5 |
| Credit unions | 41.9 | 16.8 | 7.1 | 26.9 | 104.7 | 60.9 | 148.5 | 127.8 | 81.6 | 33.1 | 36.6 | 51.7 | 4.3 |
| Federal government[7] | 90.7 | 83.0 | 61.7 | 55.4 | 51.0 | 74.4 | 8.6 | 88.1 | 32.7 | 49.4 | 49.9 | -56.3 | -18.0 |
| Nonprofit and educational institutions[8] | -3.9 | -4.0 | -3.2 | -1.6 | -2.2 | -1.8 | -1.5 | -2.1 | -3.3 | -0.3 | -0.2 | -1.2 | -3.4 |
| Nonfinancial business | 0.2 | -0.7 | 0.0 | 0.0 | 0.0 | -4.5 | 0.9 | 0.5 | 3.0 | -4.4 | -3.7 | -0.9 | 1.8 |
| **Major types of credit, by holder** | | | | | | | | | | | | | |
| Revolving | 37.3 | 38.1 | -122.1 | 67.6 | 160.3 | -69.6 | 253.9 | 139.8 | 317.1 | -131.7 | 61.9 | 193.7 | 242.4 |
| Depository institutions | 35.5 | 36.4 | -113.0 | 68.9 | 151.5 | -63.8 | 244.4 | 130.2 | 295.3 | -123.6 | 67.3 | 180.0 | 226.5 |
| Finance companies | -2.9 | -1.9 | -4.8 | -3.7 | -1.2 | -2.0 | -2.9 | -1.2 | 1.1 | -3.3 | -3.0 | 1.0 | 0.8 |
| Credit unions | 4.4 | 4.2 | -4.3 | 2.4 | 10.0 | 0.8 | 11.5 | 10.6 | 17.3 | -0.3 | 0.6 | 13.4 | 13.4 |
| Federal government[7] | ... | ... | ... | ... | ... | ... | ... | ... | ... | ... | ... | ... | ... |
| Nonprofit and educational institutions[8] | ... | ... | ... | ... | ... | ... | ... | ... | ... | ... | ... | ... | ... |
| Nonfinancial business | 0.3 | -0.5 | 0.0 | 0.0 | 0.0 | -4.5 | 0.9 | 0.1 | 3.4 | -4.5 | -3.0 | -0.7 | 1.7 |
| Nonrevolving | 135.3 | 147.0 | 110.1 | 178.3 | 194.6 | 196.8 | 229.3 | 251.0 | 101.4 | 100.2 | -12.5 | 79.9 | 21.6 |
| Depository institutions | 15.1 | 50.3 | 21.7 | 70.8 | 53.5 | 78.7 | 92.2 | 46.9 | -3.6 | 4.5 | -23.4 | 77.7 | 8.3 |
| Finance companies | -4.1 | 5.2 | 18.5 | 29.2 | -2.3 | -14.6 | -6.9 | 0.4 | 11.8 | 13.2 | 25.6 | 21.7 | 43.8 |
| Credit unions | 37.6 | 12.7 | 11.3 | 24.6 | 94.6 | 60.1 | 137.0 | 117.2 | 64.2 | 33.4 | 36.0 | 38.3 | -9.1 |
| Federal government[7] | 90.7 | 83.0 | 61.7 | 55.4 | 51.0 | 74.4 | 8.6 | 88.1 | 32.7 | 49.4 | 49.9 | -56.3 | -18.0 |
| Nonprofit and educational institutions[8] | -3.9 | -4.0 | -3.2 | -1.6 | -2.2 | -1.8 | -1.5 | -2.1 | -3.3 | -0.3 | -0.2 | -1.2 | -3.4 |
| Nonfinancial business | -0.1 | -0.1 | 0.0 | 0.0 | 0.0 | 0.1 | -0.1 | 0.4 | -0.4 | 0.1 | -0.6 | -0.2 | 0.1 |
| **Memo** | | | | | | | | | | | | | |
| Student Loans[9] | 78.0 | 71.0 | 56.0 | 39.6 | 30.7 | 56.2 | -13.8 | 70.9 | 9.3 | 43.4 | 43.4 | n.a. | n.a. |
| Motor Vehicle Loans[10] | 33.7 | 44.5 | 40.3 | 89.7 | 103.3 | 72.0 | 136.8 | 122.0 | 82.4 | 59.5 | 59.5 | n.a. | n.a. |

6.  Covers most of the captive and non-captive finance companies. The series of finance company new car loan terms included in previous releases are discontinued. They remain available from the Data Download Program.
7.  Includes student loans originated by the Department of Education under the Federal Direct Loan Program and the Perkins Loan Program, as well as Federal Family Education Program loans that the government purchased under the Ensuring Continued Access to Student Loans Act.
8.  Includes student loans originated under the Federal Family Education Loan Program and held by educational institutions and nonprofit organizations.
9.  Includes student loans originated under the Federal Family Education Loan Program and the Direct Loan Program; Perkins loans; and private student loans without government guarantees. This memo item includes loan balances that are not included in the nonrevolving credit balances. For additional information, see public documentation. Data for this memo item are released for each quarter-end month.
10. Includes motor vehicle loans owned and securitized by depository institutions, finance companies, credit unions, and nonfinancial business. Includes loans for passenger cars and other vehicles such as minivans, vans, sport-utility vehicles, pickup trucks, and similar light trucks for personal use. Loans for boats, motorcycles and recreational vehicles are not included. Data for this memo item are not included in the nonrevolving credit balances. Data for this memo item are released for each quarter-end month.

r=revised, p=preliminary.  n.a.=not available.  ...=not applicable.

**EXHIBIT C**

EXHIBIT C

Page 187

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| Debtors.[1] | **(Jointly Administered)** |
| **PURDUE PHARMA L.P.,** *et al.*, | |
| Plaintiffs, | **Adv. Pro. No. 19-08289** |
| v. | |
| **COMMONWEALTH OF MASSACHUSETTS,** *et al.*, | |
| Defendants. | |

## SECOND AMENDED ORDER PURSUANT TO 11 U.S.C. § 105(a)
## GRANTING MOTION FOR A PRELIMINARY INJUNCTION

Upon the motion, dated September 18, 2019 ("**Motion**"), of Purdue Pharma L.P. and

certain affiliated debtors, as debtors and debtors in possession (collectively, "**Debtors**"), which

are plaintiffs in this adversary proceeding, for an order pursuant to section § 105(a) of title 11 of

the United States Code ("**Bankruptcy Code**") and Rule 7065 of the Federal Rules of Bankruptcy

Procedure ("**Bankruptcy Rules**"), to (i) enjoin the governmental defendants in this adversary

proceeding ("**Governmental Defendants**") from the commencement or continuation of their

active judicial, administrative, or other actions or proceedings against the Debtors that were or

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number
in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc.
(7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P.
(3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon
Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591),
Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140),
Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt
Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul
Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes
Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc.
(4014).  The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser
Boulevard, Stamford, CT 06901.

EXHIBIT C
Page 188

could have been commenced before the commencement of the case ("**Governmental Actions**"),

which are identified in Exhibit A to the Complaint, as well as the commencement or continuation

of any other actions against the Debtors alleging substantially similar facts or causes of action as

those alleged in the Governmental Actions, and (ii) enjoin the Governmental Defendants and the

private defendants ("**Private Defendants**") in this adversary proceeding from the

commencement or continuation of their active judicial, administrative, or other actions or

proceedings, identified in Exhibit B to the Complaint, and the commencement or continuation of

other actions alleging substantially similar facts or causes of action as those alleged in the actions

identified in Exhibit A or Exhibit B to the Complaint, against former or current (a) owners

(including any trusts and their respective trustees and beneficiaries), (b) directors, (c) officers,

(d) employees, and (e) other similar associated entities of the Debtors that were or could have

been commenced before the commencement of the case ("**Related Parties**," as identified in

Exhibit B to the Complaint,[2] and the claims against them described in this paragraph, the

---

[2] The Related Parties identified in Exhibit B to the Complaint are: The Purdue Frederick
Company Inc.; The P.F. Laboratories Inc.; Purdue Pharma Technologies Inc.; PLP Associates
Holdings L.P.; PLP Associates Holdings Inc.; BR Holdings Associates L.P.; BR Holdings
Associates Inc.; Rosebay Medical Company L.P.; Rosebay Medical Company, Inc.; Beacon
Company; PRA Holdings Inc.; Pharmaceutical Research Associates Inc.; Purdue Holdings L.P.;
Rhodes Pharmaceuticals Inc.; Rhodes Technologies Inc.; Coventry Technologies L.P.; MNP
Consulting Limited; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A.
Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Estate of
Mortimer Sackler; Estate of Raymond Sackler; Trust for the Benefit of Members of the
Raymond Sackler Family; Raymond Sackler Trust; Beverly Sackler, Richard S. Sackler, and
Jonathan D. Sackler, as Trustees Under Trust Agreement Dated November 5, 1964; Beverly
Sackler, Richard S. Sackler, and Jonathan D. Sackler, as Trustees Under Trust Agreement Dated
November 5, 1974; Paulo Costa; Cecil Pickett; Ralph Snyderman; Judith Lewent; Craig Landau;
Mark Timney; Stuart D. Baker; Frank Peter Boer; John Stewart; Russell Gasdia; Marv Kelly;
Shelli Liston; Heather Weaver; Doug Powers; Lori Fuller; Rodney Davis; Brandon Worley;
Donald Leathers; Wendy Kay; Michael Madden; LeAvis Sullivan; Jeffrey Ward; Beth Taylor;
Leigh Varnadore; Paul Kitchin; Mark Waldrop; Mark Radcliffe; Mark Ross; Patty Carnes; Carol
Debord; Jeff Waugh; Shane Cook; James David Haddox; Aida Maxsam; Tessa Rios; Amy K.
Thompson; Joe Coggins; Lyndsie Fowler; Mitchell "Chip" Fisher; Rebecca Sterling; Vanessa

EXHIBIT C
Page 189

"**Related-Party Claims**"); and the Court having jurisdiction to decide the Motion and the relief

requested therein under 28 U.S.C. §§ 157(a)-(b) and 1334(b); and there being due and sufficient

notice of the Motion; and the Court having reviewed the Complaint, the Motion, the Debtors'

brief in support of the Motion, the declarations in support of the Motion, and other evidence and

argument submitted by the Debtors in support thereof; all pleadings filed in support of the

Motion; and all objections filed in opposition or partial opposition to the Motion, as well as all

filed letters in response to the Motion; and upon the record of and representations made at the

hearing held by the Court on the Motion's request for entry of a preliminary injunction on

October 11, 2019 (the "**October 11 Hearing**") and at the hearing held on November 6, 2019 (the

"**November 6 Hearing**," together with the October 11 Hearing, the "**Hearings**"); and, after due

deliberation and for the reasons set forth on the record by the Court at the Hearings, good and

sufficient cause appearing having entered Orders on October 11, 2019 granting the Motion in

part and on October 18, 2019 amending such Order; and such Orders having contemplated a

procedure to amend the Orders further; and good and sufficient cause appearing to amend such

Orders as provided herein, the Court grants the Debtors' request to amend the Orders as provided

in this Amended Order, which amends and supersedes the Court's prior Orders.  Now, therefore,

the Court finds and concludes as follows:

        (a)      The Plaintiffs in these adversary proceedings are the Debtors.  The

Defendants in this adversary proceeding are the Governmental Defendants and the

Private Defendants, which are listed in the caption to the Complaint and in the

"Underlying Plaintiffs" column of Exhibit A and Exhibit B to the Complaint, with such

Exhibits being made a part of and incorporated in this Order.  The Defendants in this

---

Weatherspoon; Chris Hargrove; Brandon Hassenfuss; Joe Read; and Andrew T. Stokes.

EXHIBIT C

Page 190

adversary proceeding are all plaintiffs in judicial, administrative, or other actions or
proceedings that seek to hold the Debtors and/or the Related Parties, as identified in
Exhibit B, liable in connection with claims and/or causes of action arising out of or
otherwise related to the Debtors' prescription opioid business.

      (b)     The Court has jurisdiction over this matter pursuant to 28 U.S.C.
§§ 157(a)-(b) and 1334(b).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

      (c)     The Debtors have demonstrated that the continuation of the active
litigation against them and the Related Parties, identified in Exhibits A and B to the
Complaint, respectively, would result in irreparable harm to the Debtors and their
reorganization.

      (d)     The representatives of the Raymond Sackler family and of the Mortimer
Sackler family (collectively, the "**Sackler Families**") agreed on the record at the October
11 Hearing to toll all applicable statutes of limitations and similar time limits on the
commencement of Additional Actions against any member of the Sackler Families, and
to treat as inoperative all deadlines (including deadlines for appeals) in any currently
pending Related Party Claim against any member of the Sackler Families, for the
duration of this preliminary injunction.

      (e)     Accordingly, this Court finds it appropriate to enter a preliminary
injunction as provided herein pursuant to section § 105(a) of the Bankruptcy Code and
Rule 7065 of the Bankruptcy Rules.

      (f)     The legal and factual bases set forth in the Complaint, the Motion, the
Brief, other supporting papers, and at the Hearings establish just cause for the relief
granted herein.

EXHIBIT C
Page 191

Based on these findings, it is hereby:

ORDERED, that the Governmental Defendants and the Private Defendants are prohibited and enjoined[3] from (i) the commencement or continuation of their active judicial, administrative, or other actions or proceedings against the Debtors and/or Related Parties that were or could have been commenced before the commencement of the case under this title against the Debtors and/or the Related Parties arising from or in any way relating to the Debtors' prescription opioid business, including the actions reflected in the attached Exhibit A and Exhibit B, as well as (ii) from commencing or continuing any other actions against the Debtors or Related Parties alleging substantially similar facts or causes of action as those alleged in actions reflected in the attached Exhibit A and Exhibit B, in each case through and including Wednesday, April 8, 2020. The preliminary injunction period may be extended by further order of the Court.

ORDERED, that the Debtors in these chapter 11 cases shall be subject to the Voluntary Injunction annexed hereto as Appendix 1.

ORDERED, that the Debtors need not give security in connection with this injunctive relief.

ORDERED, that this Order shall be promptly filed in the Clerk's Office and entered into the record.

ORDERED, that the Debtors are authorized to take all steps necessary or appropriate to carry out this Order.

---

[3] Based upon the representations of counsel at the November 6 Hearing, the following entities are not enjoined pursuant to this Order, but voluntarily consent fully to abide by the terms of this Order until December 19, 2019: Arizona, the Ad Hoc Group of Non-Consenting States [Docket No. 296] and each of its members, and the Multi-State Governmental Entities Group [Docket No. 409] and each of its members (collectively, "**Potential Opt-out Parties**").  As discussed on the record at the November 6 Hearing, the Potential Opt-out Parties will promptly confer with counsel for the Debtors with respect to a consensual agreement regarding the time subsequent to December 19, 2019 to avoid being enjoined on and after the date on a further consensual basis.  For the avoidance of doubt, any failure to appeal this Order by an Potential Opt-out Party shall not prejudice the ability of such party to appeal any subsequent Order related to the subject matter of the Motion.

5

EXHIBIT C

ORDERED, that nothing in this Order shall prevent the Debtors from seeking a further

extension of the requested injunction.

ORDERED, that if, while the preliminary injunction provided for in this Order is

effective, either (i) any inactive litigation currently pending against the Debtors or Related

Parties becomes active, or (ii) any new action is commenced against the Debtors or Related

Parties (in either case, an "**Additional Action**"), the Debtors may promptly serve the plaintiff or

plaintiffs in such Additional Action ("**Applicable Plaintiff**") with a copy of the Complaint, the

Motion, the Debtors' memorandum of law in support of the Motion, and this Order (the

"**Service Documents**").  The Debtors shall file a notice of such service on the docket promptly

after service.  If the Applicable Plaintiff in such Additional Action does not file and serve an

objection within seven (7) days of service of the Service Documents, the Court may determine

whether such Additional Action should be enjoined pursuant to this Order without further

proceedings.  If the Applicable Plaintiff files and serves an objection, the Debtors shall have the

right to file and serve a response to the objection within seven (7) days of service of the

objection, after which the Court may determine whether such Additional Action should be

enjoined pursuant to this Order without further proceedings, or either party may seek to

schedule and provide notice of a hearing.

ORDERED, that all applicable statutes of limitations and similar time limits on the

commencement of Additional Actions, and all deadlines (including deadlines for appeals) in

any currently pending Governmental Action or Related Party Claim (including as agreed on the

record at the Hearing by the representatives of the Sackler Families), shall be tolled or

otherwise inoperative for the duration of this preliminary injunction.  This is without prejudice

to any party's rights to assert that any currently pending Governmental Action or Related Party

6

EXHIBIT C
Page 193

Claim is time barred, or that commencement of any Additional Action, or any other action taken

by a party with respect to any Governmental Action or Related Party Claim after the entry of

this Order would have been time barred or untimely had it been commenced or taken before the

entry of this Order.

 ORDERED, that nothing in this Order shall affect or abrogate the automatic stay as to the

Debtors under section 362 of the Bankruptcy Code.

 ORDERED, that this Court shall retain jurisdiction to hear and determine all matters

arising from or related to the implementation, interpretation, or enforcement of this Order.


Dated: White Plains, New York
  November 6, 2019

4:00 p.m.


     /s/ Robert D. Drain_____
     THE HONORABLE ROBERT D. DRAIN
     UNITED STATES BANKRUPTCY JUDGE

EXHIBIT C
Page 194

## **Appendix 1**

### **Voluntary Injunction**

EXHIBIT C
Page 195

## I.    DEFINITIONS

A.    "Bankruptcy Court" or "Court" shall mean the court presiding over the chapter 11 proceedings *In re Purdue Pharma L.P. et al.*, Case No. 19-23649-RDD (S.D.N.Y.).

B.    "Cancer-Related Pain Care" shall mean care that provides relief from pain caused by active cancer or ongoing cancer treatment, as distinguished from treatment provided during remission.

C.    "CDC Guideline Recommendations" shall mean the 12 enumerated Recommendations published by the U.S. Centers for Disease Control and Prevention (CDC) for the prescribing of opioid pain medication for patients 18 and older in primary care settings as part of its 2016 Guideline for Prescribing Opioids for Chronic Pain (CDC Guidelines), as updated or amended by the CDC.

D.    "Company" shall mean the Debtors as defined in these chapter 11 proceedings *In re Purdue Pharma L.P. et al.*, Case No. 19-23649-RDD (S.D.N.Y.).

E.    "Direct Customer Data" shall mean transaction information that the Company collects relating to the Company's direct customers' orders, including direct customer's wholesale orders, order history, and customer files.

F.    "Downstream Customer Data" shall mean transaction information that the Company collects relating to the Company's direct customers' sales to downstream customers, including chargeback data tied to the Company providing certain discounts, "867 data," and IQVIA data.

G.    "End-of-Life Care" shall mean care for persons with a terminal illness or at high risk for dying in the near future in hospice care, hospitals, long-term care settings, or at home.

H.    "Health Care Provider" shall mean any U.S.-based physician, nurse practitioner, physician assistant, dentist, pharmacist, podiatrist, nurse, or other person engaged in the business of providing health care services and/or prescribing an Opioid Product and any medical facility, practice, hospital, clinic, or pharmacy engaged in providing health care services and/or prescribing an Opioid Product in the United States.

I.    "Including but not limited to," when followed by a list or examples, shall mean that list or examples are illustrative instances only and shall not be read to be restrictive.

J.    "In-Kind Support" shall mean payment or assistance in the form of goods, commodities, services, or anything else of value.

K.    "Initial Covered Sackler Persons" shall mean the Estate of Beverly Sackler, David A. Sackler, Ilene Sackler, Jonathan D. Sackler, Kathe Sackler, Mortimer D.A. Sackler, Richard S. Sackler, Theresa Sackler, any trusts of which any of the foregoing are beneficiaries, and the trustees thereof (solely in their capacities as such), each Shareholder Party and each other entity or person that directly or indirectly owns equity in, or has voting control over, any of the Debtors, and in the event of the death of an

9

EXHIBIT C
Page 196

Initial Covered Sackler Person who is a natural person, other than a natural person who is an Initial Covered Sackler Person solely in the capacity as a trustee, the estate of such person.

L.  "Lobby" and "Lobbying" shall have the same meaning as such terms have under U.S. federal law and the law governing the person or entity being lobbied.

M.  "Opioid(s)" shall mean all natural, semi-synthetic, or synthetic chemicals that interact with opioid receptors on nerve cells in the body and brain.  The term "Opioids" shall not mean (i) methadone, buprenorphine, buprenorphine/naloxone (oral/sublingual), suboxone, and other substances when used exclusively to treat opioid or other substance use disorders, abuse, addiction, or overdose; (ii) raw materials and/or immediate precursors used in the manufacture or study of Opioids or Opioid Products, but only when such materials and/or immediate precursors are sold or marketed exclusively to DEA-licensed manufacturers or DEA-licensed researchers; or (iii) Opioids listed by the DEA as Schedule IV drugs pursuant to the federal Controlled Substances Act.

N.  "Opioid Product(s)" shall mean all natural, semi-synthetic, or synthetic chemicals that interact with  opioid receptors on nerve cells in the body and brain, and that are approved by the U.S. Food & Drug Administration (FDA) and listed by the DEA as Schedule II or III drugs pursuant to the federal Controlled Substances Act (including but not limited to codeine, fentanyl, hydrocodone, hydromorphone, meperidine, methadone, morphine, oxycodone, oxymorphone, tapentadol, tramadol, and buprenorphine for the treatment of pain). The term "Opioid Products(s)" shall not mean (i) methadone, buprenorphine, buprenorphine/naloxone (oral/sublingual), suboxone, and other substances to treat opioid or other substance use disorders, abuse, addiction, or overdose; (ii) raw materials and/or immediate precursors used in the manufacture or study of Opioids or Opioid Products, but only when such materials and/or immediate precursors are sold or marketed exclusively to DEA-licensed manufacturers or DEA-licensed researchers; or (iii) Opioid Products listed by the DEA as Schedule IV drugs pursuant to the federal Controlled Substances Act.

O.  "Promote," "Promoting," and "Promotion" shall mean the dissemination of information by the Company to a Third Party that is either likely or intended to influence prescribing practices of Health Care Providers in favor of prescribing greater amounts, quantities, doses, and/or strengths of Opioid Products.

P.  "Section" shall mean, unless the context requires otherwise, a Section of this injunction.

Q.  "Suspicious Order" shall have the same meaning as provided by the Controlled Substances Act, 21 U.S.C. §§ 801-904, and the regulations promulgated thereunder and analogous state laws and regulations

R.  "Third Party" shall mean any person or entity other than the Company or a government entity.

S.  "Treatment of Pain" shall mean the provision of therapeutic modalities to alleviate or reduce pain.

EXHIBIT C

Page 197

T.      "Unbranded Information" shall mean any information regarding an Opioid or Opioid Product that does not identify a specific product(s).

## II.      INJUNCTIVE RELIEF

### A.    Ban on Promotion

1.      The Company shall not Promote Opioids or Opioid Products, including by:

   a.      Employing or contracting with sales representatives or other persons to Promote Opioids or Opioid Products to Health Care Providers or patients;

   b.      Using speakers, key opinion leaders, thought leaders, lecturers, and/or speaking events for Promotion of Opioids or Opioid Products;

   c.      Sponsoring, or otherwise providing financial support or In-Kind Support to medical education programs;

   d.      Creating, sponsoring, operating, controlling, or otherwise providing financial support or In-Kind Support to any website, network and/or social or other media account for the Promotion of Opioids or Opioid Products;

   e.      Creating, sponsoring, distributing, or otherwise providing financial support or In-Kind Support for materials Promoting Opioids or Opioid Products, including but not limited to brochures, newsletters, pamphlets, journals, books, and guides;

   f.      Creating, sponsoring, or otherwise providing financial support or In-Kind Support for advertisements that Promote Opioids or Opioid Products, including but not limited to internet advertisements or similar content, and providing hyperlinks or otherwise directing internet traffic to advertisements;

   g.      Engaging in Internet search engine optimization or other techniques designed to Promote Opioids or Opioid Products by improving rankings or making content appear among the top results in an Internet search or otherwise be more visible or more accessible to the public on the Internet; and

   h.      Engaging in Internet marketing techniques that Promote Opioids or Opioid Products by identifying or generating sales leads, including through pop up ads or information obtained from web forms completed by prospective patients or consumers.

2.      Notwithstanding Sections II.A.1 and II.C, the Company may:

   a.      Maintain corporate websites;

EXHIBIT C
Page 198

b.     Maintain a website for any Opioid Product that contains principally the following content: the FDA-approved package insert, dosage strengths, dosage forms, packaging configurations, and medication guides,; a statement directing patients or caregivers to speak with a licensed Health Care Provider; Risk Evaluation and Mitigation Strategy (REMS) materials; contact information to report an adverse event or product complaint; and/or information regarding savings programs, savings cards, vouchers, coupons, or rebate programs for the Company's Opioid Products.

c.     Provide information or support the provision of information, as expressly required by (i) law, (ii) settlement agreement, (iii) court order, including order of the Bankruptcy Court, or (iv) any state or federal government agency, including providing all information necessary in order for the Company to comply with its regulatory obligations pursuant to the Federal Food, Drug, and Cosmetic Act, and/or (v) provide information about legal proceedings involving the Company;

d.     Engage Health Care Providers or other Third Parties to assist the Company in responding to, preparing for, and participating in, any initiatives, advisory committees, working groups, action plans, boards, meetings and/or hearings by any state or federal government or state or federal agencies or regulators, including the Food and Drug Administration.

e.     Provide the following by mail, electronic mail, on or though the Company's corporate or product websites or through other electronic or digital methods: FDA-approved package insert, medication guide, approved labeling for Opioid Products, Risk Evaluation and Mitigation Strategy materials, or other prescribing information or guidelines for Opioid Products that are published by a state or federal government agency with jurisdiction;

f.     Provide scientific and/or medical information in response to an unsolicited request by a Health Care Provider concerning Opioid Products by providing truthful, balanced, non-misleading, non-promotional scientific or medical information that is responsive to the specific request.  Such responses should be handled by medical or scientific personnel at the Company who are independent from the sales or marketing departments;

g.     Provide a response to any unsolicited question or request from a patient or caregiver by (i) directing the patient or caregiver to the FDA-approved labeling and reviewing the prescribing information with the patient as relevant to their inquiry, and, to the extent the question cannot be answered solely by reference to a specific provision of the FDA-approved labeling, providing a response that is truthful, balanced, non-misleading and fully consistent with the FDA-approved labeling, if applicable;

EXHIBIT C
Page 199

(ii) recommending that the patient or caregiver speak with a licensed Health Care Provider without naming any specific provider or healthcare institution; (iii) directing the patient or caregiver to speak with their insurance carrier regarding coverage of an Opioid Product; and/or (iv) directing the patient or caregiver to information concerning savings programs, vouchers, coupons, or rebate programs for the Company's Opioid Products;

h.     Provide information to a payor, formulary committee, distributor, or other similar entity with knowledge and expertise in the area of health care economics concerning the cost or availability of a Company Opioid Product, including the costs compared to the cost of an Opioid Product manufactured or distributed by another company.  Such information may include information about the stocking of the Opioid Product; product attributes of the Opioid Product as described in the FDA-approved labeling; tier status; applicable prescribing guidelines that are consistent with the FDA-approved labeling; step-edits for Opioid Products; restrictions; and/or prior authorization status concerning an Opioid Product;

i.     Sponsor or provide financial support or In-Kind Support for an accredited or approved continuing medical education program required by either an FDA-approved Risk Evaluation and Mitigation Strategy program, other federal or state law or regulation, or settlement, through an independent Third Party, which shall be responsible for determining the program's content without the participation of Company;

j.     Provide Unbranded Information in connection with managing pain in End-of-Life Care and/or Cancer-Related Pain Care relating to: the use of Opioids for the Treatment of Pain, as long as the Unbranded Information identifies Company as the source of the information; and

k.     Provide information about, discuss, or comment on, issues regarding mechanisms for preventing opioid abuse and misuse, including (i) abuse deterrent formulations and the use of blister packaging for opioid medications; (ii) the prevention, education, and treatment of opioid use disorders or opioid abuse, addiction, or overdose, including medication-assisted treatment for opioid addiction; and/or (iii) rescue medications for opioid overdose.

3.     The Company shall not engage in the following specific Promotional activity relating to any products that are indicated for the treatment of Opioid-induced side effects.  For the avoidance of doubt, nothing in this Section prohibits the Company's provision or dissemination of information or activities relating to: (i) the treatment of opioid use disorders; (ii) the prevention, education, and treatment of opioid abuse, addiction, or overdose, including medication-assisted treatment for opioid addiction; and/or (iii) rescue medications for opioid overdose:

13

EXHIBIT C
Page 200

a.   Employing or contracting with sales representatives or other persons to Promote products that are indicated for the treatment of Opioid-induced side effects to Health Care Providers or patients;

b.   Creating, sponsoring, or otherwise providing financial support or In-Kind Support for advertisements that Promote products that are indicated for the treatment of Opioid-induced side effects, including but not limited to internet advertisements or similar content, and providing hyperlinks or otherwise directing internet traffic to advertisements; and

c.   Engaging in any other Promotion of products that are indicated for the treatment of Opioid-induced side effects in a manner that encourages the utilization of Opioids or Opioid Products or normalizes the use of Opioids or Opioid Products for chronic pain.

4.   Notwithstanding Section II.A.3 directly above, the Company may engage in other marketing activities for products that are indicated or used for the treatment of Opioid-induced side effects, so long as such activities do not Promote Opioids or Opioid Products.  For the avoidance of doubt, nothing in Sections II.A.3 or 4 shall limit or otherwise restrict the ability of the Company to Promote products for occasional constipation or restrict the Company from Promoting (i) products relating to the treatment of opioid use disorders; (ii) products relating to the treatment of opioid abuse, addiction, or overdose, including medication-assisted treatment for opioid addiction; and/or (iii) rescue medications for opioid overdose.

5.   Treatment of Pain

a.   The Company shall not engage in Promotion of the Treatment of Pain in a manner that encourages the use of Opioids or Opioid Products.

b.   The Company shall not Promote the concept that pain is undertreated in a manner that encourages the use of Opioids or Opioid Products.

c.   The Company shall not knowingly use Third Parties to engage in the Promotion of the Treatment of Pain or Promote the concept that pain is undertreated in manners that encourage the use of Opioids or Opioid Products.

6.   To the extent that the Company engages in conduct permitted by Section II.A.2 above, the Company shall do so in a manner that is:

a.   Consistent with the CDC Guidelines Recommendations, as applicable; and

b.   Truthful, not misleading, accurate, and not deceptive.

EXHIBIT C
Page 201

7. For the avoidance of doubt, nothing in this injunction shall be construed or used to prohibit the Company in any way whatsoever from taking legal or factual positions in litigation, the bankruptcy proceedings, investigations, regulatory actions and initiatives, or other legal or administrative proceedings, or exercising its right to legally challenge the enactment of any federal, state, or local legislation, rule, or regulation, or in any way whatsoever prohibit or limit the Company's right to make public statements or respond to media reports or inquires relating to any legal, administrative, regulatory, or legislative proceedings.

**B.    No Financial Reward or Discipline Based on Volume of Opioid Sales**

1. The Company shall not provide financial incentives to its sales and marketing employees, or take disciplinary actions against its sales and marketing employees, that are directly based on, or tied to, sales volume or sales quotas for Opioid Products, unless otherwise permitted by the Bankruptcy Court.

2. The Company shall not offer or pay any remuneration directly or through a Third Party, to or from any person in return for the prescribing, sale, use or distribution of Opioid Product.  For the avoidance of doubt, this shall not prohibit the provision of rebates and/or chargebacks.

**C.    Ban on Funding/Grants to Third Parties to Promote Opioids**

1. The Company shall not provide financial support or In-Kind Support to any Third Party for purposes of Promoting Opioids or Opioid Products.  For avoidance of doubt, nothing in this Section prevents the Company from directly or indirectly supporting Third Parties as required by any Judgment, court order, including order of the Bankruptcy Court, settlement, or federal or state law or regulation.

2. The Company shall not operate, control, create, sponsor, or provide financial support or In-Kind Support to any medical society or patient advocacy group for the purpose of Promoting Opioids or Opioid Products.  For avoidance of doubt, nothing in this Section prevents the Company from supporting any medical society or patient advocacy group as required by any Judgment, court order, including order of the Bankruptcy Court, settlement, or federal or state law or regulation.

3. For the purposes of Promoting Opioids or Opioid Products, the Company shall not provide links to any Third Party website or materials or otherwise distribute materials created by a Third Party relating to any Opioids or Opioid Products. For avoidance of doubt, nothing in this Section prevents the Company from providing links to any Third Party website or materials or otherwise distributing materials created by a Third Parties that the Company supports as required by any Judgment, court order, including order of the Bankruptcy Court, settlement, or federal or state law or regulation.

EXHIBIT C
Page 202

4. The Company shall not knowingly use a Third Party, including Health Care Providers, to engage in any activity that the Company itself would be prohibited from engaging in pursuant to the injunction.

5. No director, officer, or management-level employee of the Company may concurrently serve as a director, board member, employee, agent, or officer of any entity that engages in Promotion relating to Opioids, Opioid Products, the Opioid-related Treatment of Pain, or products indicated to treat Opioid-related side effects.

6. The Company shall not advocate for the appointment of persons to the board, or hiring persons to the staff, of any entity that principally engages in the Promotion of Opioids and Opioid Products. For avoidance of doubt, nothing in this paragraph shall prohibit the Company from fully and accurately responding to unsolicited requests or inquiries about a person's fitness to serve as an employee or Board member at any such entity.

7. For the avoidance of doubt, nothing in Section II.C or this injunction shall be construed or used to prohibit the Company from providing financial or In-Kind Support to, or disseminating information about, Third Parties, including medical societies and patient advocate groups, who are principally involved in issues relating to (i) the treatment of opioid use disorders; (ii) the prevention, education, and treatment of opioid abuse, addiction, or overdose, including medication-assisted treatment for opioid addiction; and/or (iii) rescue medications for opioid overdose.

## D.  Lobbying Restrictions

1. The Company shall not directly, or by employing or controlling a Third Party, Lobby for the enactment of any federal, state, or local legislation or promulgation of any rule or regulation that:

   a. Encourages or requires Health Care Providers to prescribe Opioids or sanctions Health Care Providers for failing to prescribe Opioids or failing to treat pain with Opioids;

   b. Would have the effect of limiting access to any non-Opioid alternative pain treatments; or

   c. Pertains to the classification of any Opioid or Opioid Product as a scheduled drug under the Controlled Substances Act.

2. The Company shall not directly, or by employing or controlling a Third Party, Lobby against the enactment of any federal, state or local legislation or promulgation of any rule or regulation that supports:

16

EXHIBIT C

Page 203

     a.     The use of non-pharmacologic therapy and/or non-Opioid pharmacologic therapy to treat chronic pain over or instead of Opioid therapy, including but not limited to Third Party payment or reimbursement for such therapies;

     b.     The use and/or prescription of immediate release Opioids instead of extended release Opioids when Opioid therapy is initiated, including but not limited to Third Party reimbursement or payment for such prescriptions.

     c.     The prescribing of the lowest effective dose of an Opioid, including but not limited to Third Party reimbursement or payment for such prescription;

     d.     The limitation of initial prescriptions of Opioids to treat acute pain;

     e.     The prescribing and other means of distribution of naloxone to minimize the risk of overdose, including but not limited to Third Party reimbursement or payment for naloxone.

     f.     The use of urine testing before starting Opioid therapy and annual urine testing when Opioids are prescribed, including but not limited to Third Party reimbursement or payment for such testing;

     g.     Evidence-based treatment (such as using medication-assisted treatment with buprenorphine or methadone in combination with behavioral therapies) for Opioid Use Disorder, including but not limited to third party reimbursement or payment for such treatment; or

     h.     The implementation or use of Opioid drug disposal systems that have proven efficacy for the Company's Opioid Products.

3.     The Company shall not directly, or by employing or controlling a Third Party, Lobby against the enactment of any federal, state or local legislation or promulgation of any rule or regulation limiting the operation or use of PDMPs, including, but not limited to, provisions requiring Health Care Providers to review PDMPs when Opioid therapy is initiated and with every prescription thereafter.

4.     Nothing in Section II.D or this Injunction, however, limits the Company from:

     a.     Challenging the enforcement of, or suing to stop the enactment of, or for declaratory or injunctive relief with respect to any legislation, rules, or regulations, including legislation, rules, or regulations relating to any issues referred to in Section II.D.1;

     b.     Communications made by the Company in response to a statute, rule, regulation, or order requiring such communication;

EXHIBIT C
Page 204

    c.      Communications by a representative of the Company appearing before a federal or state legislative or administrative body, committee, or subcommittee as result of a mandatory order, subpoena commanding that person to testify or an unsolicited request from an elected or appointed official, federal or state legislative or administrative body, committee, or subcommittee.

    d.      Responding to an unsolicited request for the input on the passage of legislation or the promulgation of any rule or regulation.

    l.      Communications by the Company, including to elected or appointed officials, federal or state legislative or administrative bodies, committees, or subcommittees regarding (i) mechanisms for preventing opioid abuse and misuse, including abuse deterrent formulations and the use of blister packaging for opioid medications, (ii) the prevention, education, and treatment of opioid use disorders or opioid abuse, addiction, or overdose, including medication-assisted treatment for opioid addiction; and/or (iii) rescue medications for opioid overdose.

5.      The Company shall require all of its officers, employees and representatives engaged in Lobbying to certify in writing to them that they are aware of and will fully comply with the provisions of this injunction with respect to Lobbying.

**E.    Ban on High Dose Opioids**

**1.**    The Company shall abide by any decision by the FDA on the pending Citizens Petition dated September 1, 2017 (docket number FDA-2017-P-5396) requesting a ban on specific high doses of prescription oral and transmucosal Opioids that, when taken as directed, exceed 90 morphine milligram equivalents per day.

**F.    Ban on Prescription Savings Programs**

1.    The Company shall not directly, or by employing or controlling a Third Party, Promote savings card, vouchers, coupons, or rebate programs to Health Care Providers for any Opioid Product.  Nothing in this provision shall prohibit the Company from providing savings cards, vouchers, coupons, or rebate programs, including electronic point-of-dispense programs:  (i) in response to requests from Health Care Providers, patients, or other caregivers or (ii) on its website or product-specific websites.

2.    The Company shall not directly or through a Third Party provide financial support to any Third Party to avoid the prohibited conduct in Section II.F.1 above.

**G.    Self-Monitoring and Reporting of Direct and Downstream Customers.**

1.    The Company shall operate an effective monitoring and reporting system that shall include processes and procedures that:

EXHIBIT C
Page 205

a.    Reasonably analyze all collected Direct Customer Data to identify a Suspicious Order of a Company Opioid Product by a direct customer;

b.    Reasonably utilize available Downstream Customer Data to identify whether a downstream customer poses a material risk of diversion of a Company Opioid Product;

c.    Analyze all information that the Company receives that indicates an unreasonable risk of diversion activity of a Company Opioid Product or an unreasonable potential for diversion activity of a Company Opioid Product, by a direct customer or a downstream customer, including reports by employees and customers of the Company, Health Care Providers, law enforcement, state, tribal, or federal agencies, or the media; and

d.    Unless otherwise required by law, upon a relevant state's request, report to the relevant state agency any direct customer or downstream customer in each state that the Company has identified as part of the monitoring required by (a)-(c), above, and any Company customer relationship in each state that was terminated by the Company because of an unreasonable risk of diversion or unreasonable risk for potential for diversion.

2.    Upon request, the Company shall promptly provide reasonable assistance to law enforcement investigations of potential diversion and/or suspicious circumstances involving the Company's Opioid Products subject to, and without waiving, any applicable privilege objections.

3.    If one or more of the nation's three largest pharmaceutical distributors establishes a system to aggregate data concerning transactions of Opioid Products and/or concerning reports of Suspicious Orders of Opioid Products, and the system is designed to use information provided by manufacturers of Opioid Products, the Company shall provide information to such system to the extent reasonably available and feasible, subject to, and without waiving, any applicable privilege objections.

4.    The Company agrees that it will refrain from acting as a distributor of Opioid Products by providing an Opioid Product directly to a retail pharmacy or Health Care Provider or otherwise engaging in activity that requires it to be registered as a distributor under the Controlled Substances Act unless otherwise required by local, state, or federal law.  Nothing in this provision, however, prevents the Company from acting as a distributor of medications relating to (i) the treatment of opioid use disorders; (ii) the treatment of opioid abuse, addiction, or overdose, including medication-assisted treatment for opioid addiction; and (iii) rescue medications for opioid overdose.

19

EXHIBIT C
Page 206

**H.    Appointment and Responsibilities of Monitor.**

1.    The Company shall work expeditiously to retain a Monitor, and shall consult in good faith with the Official Committee of Unsecured Creditors, the Ad Hoc Group of Non-Consenting States, and the ad hoc committee of governmental and other contingent litigation claimants, as to proposed candidates for the Monitor.

2.    The Monitor shall perform its duties according to the terms of this injunction and shall be vested with all rights and powers reasonably necessary to carry out such powers, duties, authority, and responsibilities enumerated herein.

3.    The Monitor shall work with all diligence to confirm and oversee compliance with this injunction, and shall provide reports to the Company's Board of Directors and the Bankruptcy Court as outlined below.

4.    The Monitor shall:

   a.    subject to any legally recognized privilege and as necessary or to perform their duties hereunder, have full and complete access to the Company's personnel, books, records, and facilities, and to any other relevant information, as the Monitor may request.  The Company shall develop such information as the Monitor may request and shall fully, completely and promptly cooperate with the Monitor.  The Monitor may raise with the Court any issues relating to any failure of or delay in such cooperation for an expedited resolution by the Court;

   b.    serve, without bond or other security, at the cost and expense of the Company, with the Monitor's fees subject to final approval by the Court.  The Monitor shall have the authority to employ, upon Court approval, at the cost and expense of the Debtors' estates, such consultants, accountants, attorneys, and other representatives and assistants as are necessary to carry out the Monitor's and responsibilities.  The Monitor shall serve throughout the term of this injunction and submission of a final report;

   c.    have no obligation, responsibility or liability for the operations of the Company;

   d.    file a report no less than every 90 days regarding compliance by the Company with the terms of this injunction; provided that elements of any such report may be filed under seal or subject to such other confidentiality restrictions contained in the Protective Order.  The Court may, in response to such reports, provide further direction to the Monitor as it deems appropriate;

   e.    sign onto the Protective Order entered by the Court in this matter, and any confidentiality agreement consistent with the Protective Order as deemed necessary by the parties, and each of the Monitor's consultants,

EXHIBIT C
Page 207

accountants, attorneys and other representatives and assistants shall also sign onto the Protective Order entered by the Court, and any confidentiality agreement consistent with the Protective Order as deemed necessary by the parties; *provided, however*, that nothing shall restrict the Monitor from providing any information to the Court and the parties consistent with the terms of the Protective Order; and

f.    promptly seek an order requiring compliance or such other remedies as may be appropriate under the circumstances should the Company not comply with this injunction.

5.    **Disputes Regarding Compliance**

a.    If an Attorney General should have a reasonable basis to believe the Company is not in compliance with the terms of this injunction, the Attorney General shall notify the Company, via the Company's General Counsel, in writing of the specific objection, including identifying the provisions of this injunction that the practice appears to violate, and give the Company thirty (30) days to respond to the notification and cure the conduct at issue, if necessary.

b.    The Attorney General shall provide notification to the Monitor at the same time as notification is provided to the Company.  To the extent that the Company fails to cure the alleged conduct within the thirty (30) day period, the Monitor shall have ten (10) days to determine the appropriate action and response.  After that ten (10) day period and unless otherwise ordered by the Monitor or Bankruptcy Court, any Attorney General may petition the Bankruptcy Court  to enforce the terms of this injunction and/or to obtain any remedy as a result of alleged non-compliance with the Company.

I.    **Initial Covered Sackler Persons**

c.    The Initial Covered Sackler Persons shall not actively engage in the opioid business in the United States (other than by virtue of their ownership of beneficial interests in the Company), and shall not take any action that would interfere with the Company's compliance with its obligations under this injunction.

EXHIBIT C
Page 208

**EXHIBIT D**

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
James I. McClammy
Marc J. Tobak
Gerard X. McCarthy

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| **Debtors.[1]** | **(Jointly Administered)** |

## NOTICE OF FILING OF MONITOR'S REPORT

    **PLEASE TAKE NOTICE** that Purdue Pharma L.P. hereby files on behalf of Thomas J.

Vilsack, in his capacity as Monitor, the *Initial Monitor Report* attached as Exhibit A hereto.

Mr. Vilsack, as Monitor, prepared the *Initial Monitor Report* pursuant to the Voluntary

Injunction entered as part of the *Second Amended Order Pursuant to 11 U.S.C. § 105(a)*

*Granting Motion for a Preliminary Injunction*, entered on November 6, 2019 (the "**Preliminary**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

"Injunction Order"),[2] which requires that the Debtors retain a Monitor, and that the Monitor file

a report no less than every 90 days regarding compliance by the Company with the terms of the

Voluntary Injunction (the "**Monitor's Report**").  Purdue Pharma L.P. is filing the Initial

Monitor's Report as a courtesy to the Monitor, who has not retained counsel in connection with

these chapter 11 cases.

     **PLEASE TAKE FURTHER NOTICE** that a copy of the Monitor's Report and any

related papers may be obtained free of charge by visiting the website of Prime Clerk LLC at

https://restructuring.primeclerk.com/purduepharma.  You may also obtain copies of any

pleadings by visiting the Court's website at https://www.nysb.uscourts.gov in accordance with

the procedures and fees set forth therein.

Dated:    May 20, 2020
           New York, New York

          */s/ Marc J. Tobak*
          DAVIS POLK & WARDWELL LLP
          450 Lexington Avenue
          New York, New York 10017
          Telephone: (212) 450-4000
          Facsimile: (212) 701-5800
          Marshall S. Huebner
          Benjamin S. Kaminetzky
          James I. McClammy
          Marc J. Tobak
          Gerard X. McCarthy

          *Counsel to the Debtors*
          *and Debtors in Possession*

---

[2] Unless otherwise defined herein, each capitalized term shall have the meaning ascribed to such term in the Preliminary Injunction Order.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P., et al.,** | **Case No. 19-23649 (RDD)** |
| **Debtor.[1]** | **(Jointly Administered)** |

## INITIAL MONITOR REPORT

Comes now, Thomas J. Vilsack, as duly contracted Monitor for Purdue Pharma L.P. to report to the Court as follows:

### EXECUTIVE SUMMARY

This Initial Monitor Report will include an outline of actions taken to date to determine compliance with the terms and conditions of the Voluntary Injunction, a general description of the documents and records reviewed, and a set of recommendations provided to Purdue Pharma L.P. and the company's responses thereto. Officials at Purdue Pharma L.P. have been responsive and cooperative by providing documents in a timely and complete fashion and by arranging for multiple interviews with key officials and providing more than 9,000 pages of documentation at my request. Based on what has been reviewed to date and subject to the recommendations contained herein Purdue Pharma and the Initial Covered Sackler Persons appear to be making a good faith effort to comply with the terms and conditions of the Voluntary Injunction.

---

1 The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

## **INJUNCTION**

1.        On November 6, 2019, the Bankruptcy Court entered a Preliminary Injunction order as part of the above entitled bankruptcy case.  The Preliminary Injunction order included, as Appendix I, a Voluntary Injunction (Injunction) pursuant to which Purdue Pharma L.P., on its behalf and on behalf of its direct and indirect subsidiaries and general partner (collectively "Purdue Pharma"), agreed, in part, to retain a Monitor with the responsibility to report on compliance with the terms of the Injunction every 90 days. The Preliminary Injunction has been amended several times, but the Voluntary Injunction has remained the same each time.  A copy of the currently operative Preliminary Injunction order, entered by the Bankruptcy Court on April 14, 2020, including the Injunction is attached hereto and made a part hereof as Exhibit One.

2.        Under Part II Section A paragraph 1 a-h of the Injunction Purdue Pharma agreed to restrict the dissemination of information by Purdue Pharma or a Third Party on its behalf that was either likely or intended to influence prescribing practices of health care providers (HCPs) in favor of prescribing greater amounts, quantities, doses and/or strengths opioid products.

3.        Under Part II Section B paragraph 1 of the Injunction Purdue Pharma agreed not to provide any financial incentive to its sales and marketing employees or take any disciplinary action against any of its sales and marketing employees that was directly based on or tied to the sales volume or quotas for opioid products unless otherwise permitted by the above entitled Bankruptcy Court.

4.        Under Part II Section B paragraph 2 of the Injunction Purdue Pharma also agreed not to offer to pay any remuneration directly or through a Third Party to any person or entity for

2

the prescribing, sale, use, or distribution of opioid products other than the use of rebates or chargebacks.

5.      Under Part II Section C paragraph 1 and 6 of the Injunction Purdue Pharma agreed not to provide any financial support or In-Kind support to any Third Party, medical society, or patient advocate group for the purpose of promoting opioid or opioid products including but not limited to the following: providing links to Third Party websites related to opioids or opioid products, knowingly using a Third Party to engage in activity prohibited by the Injunction, enabling or advocating for the appointment of a director, board member, employee, agent, or officer to serve in a similar capacity concurrently in any entity that promotes opioids, opioid products or opioid related treatment of pain or opioid related side effects except as authorized under the Part II Section C paragraphs 1 and 7 of the Injunction.

6.      Under Part II Section D paragraph 1 of the Injunction Purdue Pharma agreed not directly or through a Third Party lobby for the enactment of any federal, state, or local legislation or for the promulgation of any rule or regulation that encourages or requires a health care provider to use opioids or sanctions a health care provider for the failure to prescribe or use opioids for the treatment of pain subject only to the limitations set forth in Part II paragraph D (4) of the Injunction.

7.      Under Part II Section D paragraph 2 Purdue Pharma agreed not to directly or through a Third Party lobby against the enactment of any federal, state or local legislation or against the promulgation of any rule or regulation encouraging non-pharmacological or non-opioid pharmacologic therapy for the treatment of pain, the use of lowest possible dosages where appropriate of opioids or immediate release opioids, a limitation on an initial prescription of an opioid product, reasonable preconditions including testing before prescribing an opioid product,

3

EXHIBIT D

Page 214

the use of or payment for evidence based treatments for opioid use disorder, and the implementation of a proper disposal system subject only to the limitations set forth in Part II Section D paragraph 4 of the Injunction.

8.          Under Part II Section D paragraph 3 of the Injunction Purdue Pharma agreed not to directly or through a Third Party lobby against the enactment of any federal, state or local legislation or against the promulgation of any rule or regulation that would limit the operation or use of PDMPs (Prescription Monitoring Program) including any requirement mandating the use of same before prescribing any opioid or opioid product.

9.          Under Part II Section E of the Injunction Purdue Pharma agreed to abide by whatever decision is made by the Food and Drug Administration (FDA) on the pending Citizens Petition dated September 1, 2017 concerning a ban on high doses of prescription and transmucosal opioids exceeding 90 morphine milligram equivalents.

10.         Under Part II Section F paragraph 1 of the Injunction Purdue Pharma agreed it would not directly or through a Third Party promote a savings card, voucher, coupons, or rebates programs to any health care provider for any opioid product or provide financial support to a Third Party to circumvent any such restriction. However, Purdue Pharma is authorized to provide savings cards, vouchers, coupons or rebate programs, including point-of-dispense programs, in response to requests or on its website under the Injunction.

11.         Under Part II Section G paragraph 1 a-d of the Injunction Purdue Pharma agreed to operate an effective monitoring and reporting system to detect suspicious orders and possible diversion of opioids and opioid products by a direct customer or identify whether a downstream customer poses a material risk of diversion.

4

12.     Under Part II Section G paragraph 2 of the Injunction Purdue Pharma agreed to promptly provide reasonable assistance to law enforcement agencies involved in investigations of potential diversions or suspicious circumstances involving Purdue Pharma opioid products.

13.     Under Part II Section G paragraph 3 of the Injunction Purdue Pharma agreed that when and if one or more of the three largest pharmaceutical distributors establishes a system to aggregate transaction data involving the sale of opioid products and/or reports of suspicious orders Purdue Pharma would provide information into that system to the extent available and feasible, provided that the system is designed to use information provided by manufacturers of opioid products.

14.     Under Part II Section G paragraph 4 of the Injunction Purdue Pharma agreed to refrain from acting as a distributor of opioid product (aside from rescue and treatment medications) directly to a retail pharmacy or health care provider that would require it to be registered as a distributor under the Controlled Substances Act unless otherwise required by local, state, or federal law.

15.     Under Part II Section I of the Injunction members of the Sackler family as identified and described in Part I Section K, as Initial Covered Sackler Person, agreed not to be actively engaged in the opioid business in the United States other than by virtue of their ownership interest in Purdue Pharma and that they would individually or collectively take no action interfere with the Purdue Pharma's responsibilities and duties under the Injunction.

## **MONITOR AGREEMENT**

16.     On February 13, 2020 the undersigned and Purdue Pharma executed the Purdue Monitoring Agreement, attached hereto and made part hereof as Exhibit Two and began

5

immediately to take steps to comply with the monitor responsibilities as outlined in Part II

Section H paragraphs 1-5 of the Injunction.

17.    After the execution of the Monitoring Agreement in person or telephonic

interviews were conducted of the following individuals whose titles were: Purdue Pharma

President and CEO, Purdue Pharma Senior V.P., General Counsel and Corporate Secretary,

Purdue Pharma Associate General Counsel, Purdue Pharma Chief Financial Officer, Purdue

Pharma V.P. Business Operations, Purdue Pharma V.P. Research and Development, Purdue

Pharma V.P. Medical Affairs, Purdue Pharma V.P. Chief Compliance Officer, Purdue Pharma

V.P. Sales and Marketing, Purdue Pharma V.P. Chief Scientific Officer, Purdue Pharma

Associate Director Ethics and Compliance, Purdue Pharma V.P. Federal Government Affairs,

Purdue Pharma Executive Director, Head of Government Affairs, Rhodes Pharmaceuticals L.P.

President, Rhodes Technologies President, Rhodes Pharmaceuticals L.P., V.P. Sales and

Marketing, Rhodes Pharmaceuticals L.P. and Rhodes Technologies V.P., General Counsel,

Rhodes Pharmaceuticals L.P. and Rhodes Technologies V.P., Chief Financial Officer, Purdue

Pharma Director of Health Policy, Purdue Pharma Head of Market Access, Purdue Pharma

Director Pharmacy Distribution Sales.

18.    After the execution of the Monitoring Agreement, documents and records, listed

in the document attached hereto and made a part hereof as Exhibit Three, were provided at an in

person meeting at the corporate headquarters on February 13, 2020 and subsequently reviewed.

19.    After the execution of the Monitoring Agreement documents and records, listed

in the document attached hereto and made a part hereof as Exhibit Four, were produced on

March 4, 2020 and March 8, 2020 and subsequently reviewed.

6

20.     After the execution of the Monitoring Agreement documents and records, listed in the document attached hereto and made a part hereof as Exhibit Five, were produced on March 19, 2020 and March 20, 2020 and subsequently reviewed.

21.     After the execution of the Monitoring Agreement documents and records, listed in the document attached hereto and made a part hereof as Exhibit Six, were produced on March 23, 2020 and subsequently reviewed.

22.     After the execution of the Monitoring Agreement documents and records listed in the document attached hereto and made a part hereof as Exhibit Seven were produced on April 13, 2020 and subsequently reviewed.

23.     After the execution of the Monitoring Agreement documents and records listed in the document attached hereto and made a part hereto as Exhibit Eight were produced on April 20, 21, 29, and 30, 2020 and subsequently reviewed.  After the execution of the Monitoring Agreement documents and records listed in the document attached hereto and made a part hereof as Exhibit Nine were produced on May 11, 2020 and subsequently reviewed.

24.     After the execution of the Monitoring Agreement websites and social media sites for Purdue Pharma and its related entities were examined and subsequently reviewed relating to opioids and opioid products including: PurduePharma.com, RhodesPharma.com, RxPatrol.com, Butrans.com, HysinglaER.com, Oxycontin.com, AskPurdueMedical.com, Purdue Twitter, and Purdue LinkedIn.

25.     After the execution of the Monitoring Agreement websites and social media sites were examined for Purdue Pharma and its related entities relating to non-opioid products and non opioid related activities including: ImbriumThera.com, AdlonTherapeutics.com, AvrioHealth.com, GreenFieldsVentures.com, SlowMag.com, ColaceCapsules.com,Senokot.com,

KiwiBalance.com, Betadine.com, FirstAidMyths.com, AdhansiaXR.com, Aptensioxr.com, Colace Instagram, Betadine Instagram, Senokot Instagram, Senokot YouTube, Colace YouTube, Imbrium Twitter, Adlon Twitter, Imbrium LinkedIn, Adlon LinkedIn and Greenfield LinkedIn.

26.    After the execution of the Monitoring Agreement websites, newsletters, magazines and journals for the American Pharmacists Association, American Society of Health System Pharmacists, America Pharmacist and National Community Pharmacy Association were reviewed.

27.    After the execution of the Monitoring Agreement the following journals and publications were examined: Pharmacy Today, Journal of Pharmaceutical Sciences and Pharmacy Library.

28.    After the execution of the Monitoring Agreement websites for McKesson Corp., AmerisourceBergen, Cardinal Health System, CuraScript Specialty Distribution, Morris and Dickerson, JM Smith, Rochester Drug Cooperative, NACDS, and Express Scripts were reviewed.

29.    After the execution of the Monitoring Agreement outreach was conducted with the Unsecured Creditor Committee, Non Consenting States Group, and Consenting States Group.

30.    After the execution of the Monitoring Agreement a letter from Senator Hassan to the FDA and response to concerns from Purdue Pharma and its related entities was reviewed.

31.    After the execution of the Monitoring Agreement the FDA website and comments contained therein relating to the activity of the Joint Meeting of the Anesthetic and Analgesic Drug Products Advisory Committee Product and Guideline were reviewed.

32.    After the execution of the Monitoring Agreement outreach was conducted to lawyers at Debevoise, Milbank, and Joseph Hage Aaronson as legal representatives of the

Sackler family members as Initial Covered Sackler Persons as defined and discussed in Part I Section K and Part II Section I of the Injunction requesting certification of compliance with the terms and conditions of the Injunction applicable to the Initial Covered Sackler Family Persons.

33.    After the execution of the Monitoring Agreement requests for additional information, clarifications of documents received, and identification of additional people to interview were made pursuant to emails sent to Purdue Pharma Associate General Counsel on February 17, 2020, on March 3,4,13,19 and 23, 2020, on April 7, 13, 15, 20, and 30 and on May 1, 2020.

## **PROMOTION PROHIBITED**

34.    Under the Injunction Part II Section A Purdue Pharma and its related entities are generally prohibited from promoting opioids or opioid products and cannot use a sales force to promote opioids and opioid products to health care professionals. In 2018 Purdue Pharma terminated its opioid and opioid products sales force.

35.    During the period from December 2019 to the present Purdue Pharma used and continues to use a third-party contract sales force consisting of approximately 90 people for the purpose of promoting its non-opioid product, Adhansia XR®, which is authorized under the terms and conditions of the Injunction. The sales force has received enhanced Adhansia training regarding how to address questions unrelated to the product. If an Adhansia sales representative is asked a question about opioids, he or she must not answer the question posed, and instead must refer the query to Purdue's Medical Affairs Department.

36.    During the period from December 2019 to the present Purdue Pharma has had and continues to have in-house and field based Market Access and Trade and Distribution teams that work with managed care organizations and pharmacy benefit managers in order to ensure

9

EXHIBIT D
Page 220

formulary coverage, as well as with wholesale customers to ensure that pharmacies maintain adequate supplies of branded opioid products are available to fill prescriptions being properly prescribed by health care providers.

37.　　　For branded opioid products Purdue Pharma's Trade and Distribution team negotiates agreements with most of its wholesalers to distribute opioid products from their central distribution centers for products produced in the Purdue Pharma manufacturing facilities in North Carolina. More than 90% of the branded opioid products are sold to and distributed by three wholesale distributors.

38.　　　The Trade and Distribution team at Purdue Pharma pays quarterly negotiated fees to its distributors per established agreements for which distributors agree to maintain certain minimum and maximum inventory levels and to provide updated inventory and sales data.

39.　　　The sales data collected from wholesalers is provided through a third-party contractor which is used for multiple purposes including the monitoring of suspicious orders by the Ethics and Compliance department.

40.　　　The fee gets paid quarterly as a credit against what the distributor pays for product. The primary purpose of this arrangement is to stabilize supply so that proper prescriptions get filled without delay. This arrangement does not appear to be designed to promote the use or sale of opioid products.  However, during the next 90 days more information will be sought to understand fully all the ways the data is used to ensure that none of the reasons related to encouraging more prescribing or use of opioid products.

41.　　　The Market Access team at Purdue Pharma focuses its efforts, in part, on overseeing the effort with managed care organizations and pharmacy benefit managers. Negotiations with managed care organizations and pharmacy benefit managers center on the

formulary status of the products being sold. Purdue Pharma pays a rebate to maintain the
appropriate status as a preferred or non-preferred product for each of its products.

42.     The benefit of being on a preferred status level in a formulary is that the co-pay
paid by the ultimate customer is less than it would be if the drug were in a non-preferred status.

43.     If Purdue Pharma engages in the purchase of data such purchases need to be
lawful and at a fair market value to maintain compliance with the terms and conditions of the
Injunction.

44.     If Purdue Pharma engages in providing rebates, such rebates must be at arm's
length and only with written prior approval.

45.     Over the next 90 days effort will be made to determine if data purchases and
concessions, if any, were made. If so, an examination will be into the reasons and circumstances
for the purchases or concessions.

46.     More inspection and investigation will be in this area to determine how best to
avoid a circumstance where a rebate negotiation crosses a line between a good faith effort on the
part of Purdue Pharma to ensure adequate product access as opposed to an unauthorized
promotion of opioid products contrary to the terms and conditions of the Injunction.

47.     In the training described in Paragraph 35 above the sales force is trained not to
answer questions asked about opioid products.  The sales force is not trained or authorized to
detail opioid products, does not receive compensation based on prescriptions of opioids by HCPs
they call on and operates as part of the non-opioid Adlon business of Purdue.  They are trained
not to answer any questions that cannot be answered with either approved Adhansia XR
promotional materials or Adhansia XR's Full Prescribing Information.  These questions,
including any relating to opioids, should be directed to Purdue Pharma Medical Information.

Purdue structured the Adhansia call list based on existing prescribers of ADHD medications, and not based on health care professionals who have prescribed opioids in the past. However, overlap occurred with 1,338 health care providers.

48.     **The recommendation has been made that the third-party sales force personnel involved with those overlapping health care providers execute on a semi-annual basis a certification that they have read the Injunction, have provided a list of any health care provider or customer called upon who may have inquired about opioid or opioid products, and acknowledge that each and every person on the list was only told to direct such inquiries to the Medical Affairs Department of Purdue Pharma. Purdue Pharma has agreed to this recommendation and has reached out to its third-party vendor to implement this recommendation.**

49.     Prior to the Injunction going into effect Purdue Pharma and its related entities funded and engaged a third-party to assist with an ongoing post marketing study, required by the Food and Drug Administration (FDA). The study is titled "OxyContin post marketing study #4- *Changes in Fatal and Non-fatal Overdose among Patients Dispensed OxyContin after its Reformulation with Abuse-deterrent Properties – A Healthcare Database Analysis with Linkage to the National Death Index-*"which was required by the FDA as a post-marketing study of the safety of OxyContin®.

50.     The study assessed changes in the rates of fatal and non-fatal overdose among people dispensed OxyContin or comparator opioids.

51.     As part of that study data was being collected for the purpose of supporting the study.

52.      In the normal course of business Purdue Pharma would at this point seek to publish the data in a scientific journal.

53.      The study included an estimation of the change in the incidence rates of unintentional fatal or non-fatal overdose (OD) in patients prescribed OxyContin before and after its reformulation in August 2010.

54.      The study also assessed changes in rates of overdose for OxyContin vs. individual primary and secondary comparator extended-release (ER) and immediate-release (IR) opioids around the time of OxyContin's reformulation.

55.      **A recommendation is that if such data is published in a scientific journal and Purdue Pharma intends to link to the scientific journal on websites controlled by Purdue Pharma that a disclaimer be provided that includes reference to the risks associated with opioids and opioid products and the appropriate warning information contained in package inserts, prescribing information and medication guides. Purdue Pharma has agreed to this recommendation.**

56.      On its current corporate website and social media sites Purdue Pharma indicates support for the following: wide dissemination of the medical guidance for patients who are prescribed opioid and opioid products, appropriate disposal for unused opioid products, the need for a patient's consent to be fully informed, the use of electronic prescribing and Prescription Monitoring Programs, the need for prescribers to have demonstrated competency in prescribing , the expanded availability of naloxone and medicated assisted treatment options for misuse, abuse and addiction, and the development of abuse deterrent formulations.

13

57.          All of these representations appear to be in compliance with the terms and conditions of the Injunction. However, the Rhodes Pharmaceutical L.P. (Rhodes) website does not provide direct access to that supportive language.

58.          **The recommendation is that the same cautionary language used on the Purdue Pharma website also should be used on the Rhodes website given it sells and distributes three branded opioid products and several generic opioid products. Purdue Pharma has agreed to this recommendation**.

59.          On the websites and social media sites identified in Paragraph 24 above Purdue Pharma provides a wide range of information related to opioids and opioid products including the following: key attributes of medications, and any savings plan or other resources for specific medications.

60.          On the Purdue Pharma websites and social media site there is language consistent with the product label, prescribing information, medication guidance, and package insert for each medication that outlines the risks of addiction, misuse and abuse, the direction to use non-opioid treatments first unless ineffective, proper disposal methods for unused product, encouragement to use Prescription Drug Monitoring Programs and the importance of prescribers having reviewed the Risk Evaluation and Mitigation Strategy (REMS) training recommendations before prescribing any opioid product.

61.          These websites require the viewer to acknowledge the risks, warning, and precautions before allowing the viewer a detailed review of any other information available on the site. Unlike on the sites identified in Paragraph 25 above that promote a specific non-opioid product dedicated to the site, the sites identified in Paragraph 24 contain no language or links to any other information that could be construed as promotional.

14

62.     However, the Purdue Pharma LinkedIn company page site is a site recommended for a change. While introducing the company to the 24,535 followers as of May 12, 2020, of the site reference is made to an employee base of 1,027 which does not reflect the decline in the number of employees since the Bankruptcy Court filing.

63.     **A recommendation is made to update with current and accurate information on the Purdue Pharma LinkedIn site. Purdue Pharma has agreed to this recommendation.**

64.     At the time of the filing of this Initial 90 Day Report the list of research investments involving opioids and opioid products, if any, for the period after January 1, 2019 to the present date is in draft form. Information on the website and documents provided by Purdue Pharma indicate that the only opioid related research that was funded in 2019 by Purdue Pharma relates either to the current 11 post marketing FDA required efforts that predated the Injunction or research related to a product called nalmefene which is a hydrochloride injection medication being tested to counteract an opioid overdose.

65.     These research efforts would appear to be consistent with and in compliance with the Injunction requirements subject only to the recommendations made in Paragraphs 55 above relating to the publication of any data from research efforts. It is expected that when the 2020 reports are filed a similar conclusion will likely be reached.

66.     There are no promotional materials for opioid or opioid products on Purdue Pharma's current website. Rhodes has on its website only a product catalogue that identifies generic and branded opioid products which are available for sale and distribution.

67.     Purdue Pharma and its related entities have complied with the requirements of Title 21 Chapter I Subchapter D of the Food and Drug Administration of the Health and Human

15

Services Department's Rules and Regulations by providing package inserts for all opioid

products sold by Purdue Pharma and its related entities. These package inserts contain specific

language outlining the numerous risks and hierarchy of risks associated with the use of opioid

products.

68.     The package inserts used for these products also contain the "Boxed Warning"

required by the Food and Drug Administration (FDA) that provides warnings, outlines a

precaution to take, identifies possible adverse consequences, points out more at-risk populations,

and alerts to the possibility of addiction, abuse and misuse.

69.     These warnings, precautions, alerts and directions are also fully described in the

Full Prescribing Information and Medication Guide that accompanies each product.

70.     In the prescribing information there is additional information including the

recommendation that anyone prescribing the opioid product complete the Risk Evaluation and

Mitigation Strategy (REMS) training.

71.     REMS training assures that each prescriber understands what opioids are, the

risks associated with the use of opioids, the importance of proper dosage, the activities to avoid

with the use of opioid products, the significance of the medication guide for patients, telltale

signs of possible misuse and the importance of naloxone availability.

72.     The Medication Guide designed for patients to read goes into detail about the

warnings and risks associated with opioids and opioid products.

73.     Labels for the opioid products also contain language to alert patients and

prescribers to risks and the need to review the medication guide.

74.     All of these materials and the messages contained therein appear compliant with

the ban against promotions in the Injunction.

16

75.　　　There is no evidence on social media for Purdue Pharma or any of its related entities of any promotion of opioids or opioid products.

76.　　　Recent twitter postings on the Purdue Pharma Website discuss the importance of having naloxone available to save a life if and when an overdose situation arises.

77.　　　On the Perspectives page of the Purdue Pharma website the only items appropriately highlighted are the need for reduced reliance on opioid products and how to handle addiction, misuse or abuse.

78.　　　Based on a review of social media and other media outlets outlined in Paragraphs 24 and 25 above Purdue Pharma does not currently promote the use of opioids or opioid products through the use of traditional or social media advertising, social media optimization techniques or links to other sites promoting opioids or opioid products.

79.　　　The first twenty entries that surface when Purdue Pharma is searched on the internet deal with the Bankruptcy case, the settlement of claims or opioid addiction, misuse or abuse.

80.　　　The filed reports from Purdue Pharma and Rhodes reflecting compliance with the federal Sunshine Act and with state expenditure reports required by Massachusetts, California, Connecticut, Vermont, New York, and Nevada were for expenditures in 2018 and involved payments made in conjunction with OxyContin, Butrans® and Hysingla®. All of these expenses were paid long before the Injunction was in force and effect.

81.　　　In addition, a draft of the 2019 federal Sunshine Act for Purdue Pharma and Rhodes was also provided with the understanding that the reports may change before filing.

17

82.     There were reported expenses on the 2019 reports paid after the effective date of the Injunction related to opioid products; however, those expenses appear to be limited only to the continued work associated with the FDA required post marketing studies.

83.     As such those expenses would not constitute promotion of opioid products under the terms and conditions of the Injunction. Request has been made for receipt of these reports on an ongoing basis when they are filed with the respective departments and jurisdictions to ensure compliance continues.

84.     Purdue Pharma is not precluded from providing comment or input into the regulatory proceedings of the FDA, but up to the filing of this report officials at Purdue Pharma have not provided any comment on the following matters pending before the FDA: the Meeting of the Anesthetic and Analgesic Drug Products Advisory Committee and the Drug Safety and Risk Management Advisory Committee (Docket Number FDA -2019-N-5611) - involving tramadol, celecoxib, and extended release oral tablet formulation of oxycodone submitted by Intellipharmaeceutics Corp.; (Docket FDA-2019-N-5552) - new drug application for oxycodegol.

85.     Purdue Pharma did provide comment, prior to the Injunction, in the FDA Docket 2017-P 5296 proceeding which is a Citizens' Petition to limit high dosage opioid products. However, Purdue Pharma took no position on the Citizens' Petition but raised questions for the FDA to consider as it proceeds to decide on the merits of the Citizens' Petition.

86.     No person or official on behalf of a Purdue Pharma or its related entities has provided comment or input on any of the following items pending at the FDA that might directly or indirectly be considered a promotion of opioids or opioid products: Registration and Registration Fees: Controlled Substance and List 1 Chemical (DEA- 2020-0007-0001 recovering

18

EXHIBIT D
Page 229

costs of diversion efforts through fee increases);Proposed Collection; Comment Request; Health Care Providers' Understanding of Opioid Analgesic Abuse Deterrent Formulations (FDA-2019-N-5973-0001 providing information on understanding and perception of abuse deterrent formulations); Medicare and Medicaid Programs: Contract Year 2021 and 2022 Policy and Technical Changes to the Medicare Advantage Program, Medicare Prescription Drug Benefit Program, Medicaid Program, Medicare Cost Plan Program and Programs of All Inclusive Care for the Elderly (CMS-2020-0010-0002 compliance with Bipartisan Budget Act of 2018, the Substance Use -Disorder Prevention that Promotes Opioid Recovery and Treatment for Patients and Communities Act, and 21st Century Cures Act); Request for Information on Vaping Products Associated with Lung Injuries (FDA - 2020-N- 0597-0001 use of vaping products associated with recent lung injuries);Registration Requirements for Narcotic Treatment Programs with Mobile Components (DEA-2020-0005-0001 operation of mobile components to dispense narcotic drugs/detoxification treatments at remote locations); Draft Infection Control Guideline FRN 02.26.2020 (CDC - 2020- 0011-0001 occupational infection prevention and control); Developing a Workplace Supported Recovery Program: A Strategy for Assisting Workers and Employers with the Nation's Opioid and Substance Use Disorder Epidemics; Request for Information (CDC-2020-0025-0001 NIOSH plan to develop research on Workplace Supported Recovery); Distribution of Traceable Opioid Material (TOM) Kits across U.S. Laboratories 2020-04083 (CDC -2020 0025-0001 kit access); and Delta Impact Cooperative Agreement Evaluation Data Collection Instruments 2020-04082. (CDC -2020-0023-0001).

87.    During 2019 Purdue Pharma did not have a sales force or marketing team for its branded opioid products so no money was spent on such a sales force or marketing team. Of the entire sales and marketing budget for 2019 only approximately 7% was spent on branded opioid

19

products. Of that 7% nearly 85% was spent on acquisition of data and the remaining 15% was spent primarily for storing and securing that data.

88.     The balance of the sales and marketing budget for the branded opioid products was for website maintenance, postage, data transition and savings card expense. None of these investments appears to be used to promote opioid product sales.

89.     Prior to the Bankruptcy proceeding, based on Drug Enforcement Agency (DEA) records OxyContin had a market share of approximately 4% of opioid prescriptions in the United States while today its prescription market share in the United States has declined to approximately 1.3% based on data provided by a third-party vendor.

90.     According to financial records covering calendar year 2019 provided by Purdue Pharma sales on OxyContin declined by approximately 20% from sales in 2018 and by nearly 60% from sales in 2015.

91.     According to financial records covering calendar year 2019 provided by Purdue Pharma sales of Butrans declined by approximately 45% from sales in 2018 and by nearly 50% from sales in 2017.

92.     According to financial records covering calendar year 2019 provided by Purdue Pharma sales of Hysingla declined by approximately 22% from sales in 2018 and by nearly 30% from sales in 2017.

## BONUS, SALARY AND INCENTIVES

93.     In 2019 bonus and financial incentives for Purdue Pharma was based on a company scorecard identifying three factors to be used to determine, if a bonus should be paid out: value creation (30%), efficiency and process optimization (60%), and people and culture (10%).

20

94.     To the extent the bonuses and financial incentives were based on efficiency and process optimization Purdue Pharma established a process of rewarding staff based on sales of products raising potential compliance concerns under the Injunction Part II Section H.

95.     However, for 2020 the scorecard criteria was significantly changed. The basic three factors of value creation, efficiency and process optimization and people and culture remained the same. Purdue's branded business operating profit remains a factor of the innovation and efficiency pillar of the 2020 scorecard.

96.     Instead, the company in the future would reward behavior that promoted an entrepreneurial mindset and advanced sales of only non opioid products. As a result the 2020 approach will no longer reward staff based on volume of opioid sales. If implemented as designed the current scorecard will be consistent with the Injunction provisions in Part II Section H.

97.     In 2019 the Purdue Pharma had a different compensation model than described in Paragraph 93 above for its Market Access Team. The Market Access Team's Compensation System of Incentives for the 6 employees involved in sales to Managed Care Organizations and Pharmacy Benefit Managers identified two factors to consider in determining staff compensation: individual performance and corporate performance.

98.     The individual performance element was based on an individual's performance of the "Top 10 Behaviors Based on Our Values" which do not appear directly related to product sales volumes or profits.

99.     The corporate performance element was divided into two elements: corporate performance tied to the annual corporate objectives and product performance of the non-opioid product Adhansia XR.

100.     In the documents and information requested no revision appears to have been made to the plan.

101.     **If that system and those factors remain in place a recommendation would be to state and clarify that in the corporate performance element neither top-line opioid product sales or volume specifically will be used as a factor in calculating salaries or bonus.**

## GRANTS AND IN KIND SUPPORT

102.     Under the Injunction Part II Section C Purdue Pharma and its related entities are prohibited from providing financial support or in kind support, such as grants, to any third party for the purposes of promoting opioid or opioid products.

103.     Purdue Pharma is not prevented under the Injunction from supporting efforts to combat opioid misuse, abuse and addiction.

104.     For any grant to be made now by Purdue Pharma the process requires a review by a multi-disciplinary committee, including the law department and the Ethics and Compliance department, not connected to the sales and marketing departments. Contributions requested by a customer cannot be approved.

105.     From November 26, 2019 to February 22, 2020 Purdue Pharma awarded grants to a variety of programs that involved either treatment or prevention of opioid misuse or abuse. Such grants would appear to be in compliance with Part II Section C of the Injunction.

106.     An example of the type of grants recently approved was to EVERFI in 6 states connected to Purdue Pharma and its related entities to help fund training materials and a health and wellness curriculum for K-12 students and teachers.

### THIRD PARTY PAYMENTS

107.　　　Under the Injunction Part II Section B Purdue Pharma is prohibited from paying any remuneration directly or through a third party for the promotion of the sale, prescribing, use or distribution of opioids and opioid products.

108.　　　Under the Injunction Part II Section C Purdue Pharma and its related entities are prohibited from offering or paying any remuneration to any third party to promote the prescribing, using, distributing, or selling opioids or opioid products.

109.　　　A review of the state audit reports from California, Connecticut, Nevada, Vermont, and Massachusetts and the Federal Spend Reports for Purdue Pharma for 2018 reflects that no payments that would have violated the Injunction had it been in place in 2018.

110.　　　The records for the first two months of 2019 were also reviewed and are in compliance with the Injunction and applicable Federal law.

### SAVINGS PROGRAM

111.　　　Under the Injunction Part II Section F Purdue Pharma is banned from promoting broadly defined prescription savings programs but allowed to have such plans and to respond to inquiries about available plans.

112.　　　 A review of company records indicated that Purdue Pharma and its related entities discontinued a savings plan for Butrans opioid products because a generic less expensive product became available.

113.　　　However, through a third-party vendor Purdue Pharma still offers savings plans for its OxyContin and Hysingla products.

23

EXHIBIT D
Page 234

114.     For both the OxyContin and Hysingla savings plans there are conditions and restrictions that are communicated on the company websites. The savings card information available for both products includes the "boxed warning" required for the products by the FDA. The savings card information available for both products through the company websites makes reference to the package insert, medication guide, and prescribing information for the products that sets forth a variety of warnings concerning the products and limitations on when and for what conditions the products should be used.

115.     The savings card information for both products prevents the savings card from being used for customers paying cash or for those patients covered by Medicare or Medicaid programs.

116.     The savings card information for OxyContin can only be used once every two weeks and is limited to a $70 savings and for Hysingla ER the benefits amount to $170 only after the customer has paid $25.

117.     The offering of only the two savings plans under the current terms and conditions outlined appears to be in compliance with the Injunction.

## SUSPICIOUS ORDER MONITORING

118.     Under the Injunction Part II Section G Purdue Pharma and its related entities is required to operate an effective monitoring and reporting system that reasonably analyzes collected direct customer data and available downstream customer data to identify suspicious orders as defined in the Injunction Part I Section Q.

119.     The company charged the Ethics and Compliance Department with operating the suspicious order monitoring program and directed the Associate Director of Ethics and

24

Compliance to lead that effort with backup assistance provided by three additional Purdue employees.

120.      The Associate Director of Ethics and Compliance has held this role since March 2019. From 2012 to 2018, she was an Associate Director of the Law Enforcement Liaison and Education program with Purdue Pharma's Corporate Security Department.

121.      She is a veteran law enforcement officer having served 15 years in the state of Georgia. Her last post prior to working for Purdue Pharma was as the Principal Agent for the Georgia State Medical Board. She served as the Georgia Chapter President of the National Association of Drug Diversion Investigators (2003-2020).

122.      Purdue Pharma has adopted a Standard Operating Procedure (SOP) for identifying suspicious orders of existing customers. The SOPs (as well as other non-opioid controlled substances) requires a quarterly review of chargeback data for covered opioids and opioid products, continuous reviews of orders, and a process for additional review when an order or customer is flagged.

123.      In addition, as of November 2019 Purdue Pharma required and will require its customers to complete an annual Wholesaler Due Diligence Questionnaire.

124.      The questionnaire in part is designed to provide information on the customer's own suspicious order monitoring program. The customer is asked whether its program is homegrown or third-party vendor provided, the extent of any Federal Drug Enforcement Agency (DEA) review of the system, the number of orders reported to the DEA for further investigation, and action taken when an order is found to be suspicious.

125.      The questionnaire asks whether a customer uses a Prescription Monitoring Program (PMP) to track patients seeking to fill a prescription at multiple pharmacies or seeking

to obtain prescriptions from multiple providers during a particular period of time.  The specifics of Prescription Monitoring Programs vary by state, and state laws and regulations typically limit access to Prescription Monitoring Program data.  The questionnaire also asks if customers review information on top prescribers for each customer and verify those prescribers through due diligence.

126.    Purdue Pharma's customers and its customers' customers take a variety of approaches in designing their SOMs programs, as reflected in the questionnaire responses.  They also deem varying numbers of orders to be suspicious under their suspicious order monitoring programs.

127.    A number of Purdue Pharma's customers provided questionnaire responses that were incomplete, unsigned, unresponsive, or lacked accompanying documentation.

128.    Examples include the following Wholesale Distributor Questionnaires: one distributor refused initially in its questionnaire to provide any information on its suspicious order monitoring system claiming it was proprietary; one distributor submitted an unsigned questionnaire; one distributor had not had its homegrown system reviewed by the DEA since 2007 based on its submission; one distributor clearly copied its questionnaire from another wholesale distributor raising serious questions about the truthfulness of the responses ; one distributor questionnaire indicated their suspicious order monitoring program was still being worked on and that no further report would be forthcoming until the summer of 2020; one distributor reported it had a "manual" system which had not been reviewed by the DEA; one distributor questionnaire made reference to an attachment explaining their suspicious order monitoring system that was not in fact attached; and one distributor questionnaire suggested it

26

was a pharmacy and did not need a suspicious order monitoring system. In most of the aforementioned examples no follow up occurred at a Purdue Pharma.

129.     The Associate Director of Ethics and Compliance started working for Purdue Pharma and its related entities in 2019 and began a series of visits to some of the wholesale customers.

130.     Her visits involve an inspection of security systems on the site and interviews with key staff involved in managing the storage of product and identifying suspicious orders.

131.     The notes of these visits reflect discussion of the storage of product, but do not provide documentation or discussion that might have occurred regarding the customers' suspicious order monitoring efforts.

132.     None of the visits in 2019 were to facilities of the largest distributors; however, some visits did occur in 2018.

133.     The suspicious order monitoring system used at Purdue Pharma and its related entities relies on two factors: (1) an algorithm that identifies orders of unusual size, pattern and/or frequency and (2) manual thresholds that are established for each customer. Either or both these factors can identify an order that requires additional review.

134.     The system relies on the use of an algorithm generated by third party vendor. It is based in part on national sales data. It uses a scoring system that takes into consideration a comparison of the order to a series of thresholds involving historic orders from the customer and from the industry. The cumulative score determines if the order is initially flagged.

135.     The system seeks to identify orders of unusual size, unusual frequency, or those deviating from normal purchasing patterns which is consistent with DEA guidance.

27

136.     If an order is flagged under the SOP, the order is reviewed and contact is made by email or by phone with the customer to determine if there is a reasonable explanation for the order. If there is not a satisfactory answer the order is rejected and the DEA is contacted.

137.     In 2019 Purdue Pharma and its related entities received 16,220 orders of which 2461 orders were flagged and 10 were reported to DEA.

138.     In the first two months of 2020 Purdue Pharma and its related entities 2084 orders were received with 340 orders being flagged and 10 orders reported to DEA.

139.     Under the SOP there is not a limit set on orders reported to the DEA before additional steps are taken to investigate the reasons for multiple reports or before a business relationship is terminated.

140.     In addition, in reviewing the Wholesaler Due Diligence Reports a question arises whether or not there is adequate staff to review and to follow up on any issues identified from the questionnaires such as those outlined in paragraph 128 above.

141.     Some of Purdue Pharma's customers have homegrown suspicious order monitoring systems. Little detail is provided for some of those systems and in some cases, customers refused to provide detail about their system. In addition, some of these customers have not had the DEA review the effectiveness of the system.

142.     Purdue Pharma's records reviewed to date reflect that at least one customer does not access a PMP system to check if their customer is patients are getting multiple prescriptions filled raising further concerns about monitoring efforts. It is unclear from the records reviewed whether this is due to state law restrictions on access to PMP data or if it is due to some other factor.

143.    Purdue Pharma is making an effort to monitor for suspicious orders. However, several steps could possibly strengthen the current system. An expert with experience as former Chief of Staff at DEA, Jodi Avergun, has been hired to review in detail the current system and to determine what, if any, recommendations could be made to strengthen it. The following may be areas to be examined: hiring additional staff or contracting with a third party to enable a more thorough review and follow up of the annual Wholesale Due Diligence Questionnaires, to allow for a more in-depth review of "homegrown" suspicious order monitoring systems, and to conduct more site visits that should be prioritized based on volume of activity and numbers of suspicious orders flagged.

144.    In addition, her review could include a recommendation to amend the SOPs setting forth under what conditions, if any, future orders should be stopped or curtailed if monitoring identifies a pattern of repeated suspicious orders from a wholesaler, a response to the annual questionnaire raises concerns of an unreasonable risk of diversion of opioid product, and/or a site visit leads to a concern that an unreasonable risk of diversion or theft of opioid product exists.

## LOBBYING

145.    Under the Injunction Part II Section D Purdue Pharma agreed to certain restrictions related to lobbying. At the federal level Purdue Pharma has a one person government affairs department that according to former V.P. of Federal Governmental Affairs, only monitors Congressional activity that may be relevant to Purdue Pharma or the pharmaceutical industry generally.

146.    Assisting former V.P. of Federal Government Affairs in monitoring efforts was Director of Health Policy at Purdue Pharma, who is assuming the role performed by former V.P.

29

of Federal Government Affairs with reference to the monitoring of federal government activities

following his retirement.

147.     Former V.P. of Federal Government Affairs represented that Purdue Pharma and

its related entities conducts no federal executive branch agency lobbying. However, he did

review on a regular basis the Federal Register and other subscription services that may report on

the DEA, the Food and Drug Administration and the Centers for Medicare and Medicaid.

148.     In the most recent federal lobbying disclosure former V.P. of Federal

Government Affairs on behalf of Purdue Pharma represented in the fourth quarter of 2019 the

company spent $200,000 on lobbying activities on substance abuse and addiction in the health

care and alcohol and drug general areas which appears consistent with the Injunction.

149.     Purdue Pharma and its related entities contracted with a lobbying firm during

2019.

150.     In its fourth quarter 2019 federal lobbying disclosure form the lobbying firm

notified the government that on behalf of Purdue Pharma the consulting group had monitored

activities related to drug abuse, misuse and prevention efforts.

151.     Former V.P. of Federal Government Affairs provided information that law firms

have been hired for monitor activities as well.

152.     One firm does not appear to have lobbied on behalf of Purdue Pharma during the

fourth quarter of 2019 based on federal lobbying disclosure forms.

153.     The other law firm did file a report for activities relating to access to abuse

deterrent pain medication in the third quarter of 2019 and its filing for the fourth quarter suggests

that its lobbying concluded on that activity reported in the third quarter. The last bill Purdue paid

the firm was in December 2018.

154.     While it is impossible to rule out an indirect benefit that may have accrued to Purdue Pharma the records reviewed to this point do not reflect any lobbying being done by Purdue Pharma that would be contrary to the provisions of the Injunction.

155.     For example, one retained lobbying firm was engaged on behalf of the Association for Accessible Medicine in connection with labeling of generic drugs which could possibly lead to a promotion of generic opioid products.

156.     **I recommend that any agreement with any of the federal government lobbyists or consultants identified herein hereafter be in writing and contain provisions spelling out in detail the Injunction prohibitions on lobbying and the agreement of the lobbyists or consultants to comply with the Injunction as it relates to lobbying. Purdue Pharma agrees with this Recommendation and has committed to implementing it.**

157.     The Injunction related only to direct lobbying and does not appear by the letter of the Injunction to cover indirect efforts or to restrict Purdue Pharma from being the beneficiary of indirect efforts.

158.     The Injunction requires that all persons engaged in lobbying on behalf of Purdue Pharma certify they have read the Injunction and understand its requirements. The lobbyists underwent a training on the Injunction.

159.     **I recommend that all federal lobbyists and consultants be required to furnish quarterly written reports identifying any and all issues and matters they lobbied or engaged in on behalf of Purdue Pharma and its related entities together with a certification by all lobbyists that they have abided by the conditions of the Injunction related to lobbying. Purdue Pharma agrees with this Recommendation and has committed to implementing it.**

31

160.     The Injunction Part II Section D restriction on lobbying also impacts efforts at the state and local government. The state and local efforts are conducted by the State Policy and Government Affairs Group within Purdue Pharma and its related entities under the direction of Purdue Pharma Executive Director, Head of Government Affairs.

161.     Purdue Pharma contracts with 22 lobbying firms in 22 states to keep abreast of state legislative activities and a limited amount of state regulatory activities. The firms enter into a master contract that is subsequently extended by an amendment at the expiration of the most recent term. Most of the agreements and extensions were executed before the Injunction so there is no reference to the requirements under the Injunction.

162.     Neither the master agreements nor extensions define in any detail the work to be performed under the contract. In later contracts reference is made to Statements of Work and Purchasing Orders; however, no written Statements of Work or Purchase Orders have been created.

163.     A review of state disclosure statements from the lobbyist firms retained by Purdue Pharma reflect that lobbying is being done on health care issues generally and opioid issues specifically.

164.     For example, the state lobbying firm in Delaware lobbied Senate Bill 34 for Purdue Pharma in 2019. Senate Bill 34 called for the assessment of a fee paid by opioid manufacturers, when and if, the manufacturer exceeds a certain level of production based on morphine milligram equivalents. The collected fee was to be used to pay for prevention services or opioid addiction treatment services. It is unclear from the filing if Purdue Pharma registered for, against or neutral on the bill.

32

165.    Another example of a more general filing was filed by the state lobbying firm working out of the state of Washington. The consulting group disclosed it was paid by Purdue Pharma during the period of September 2019 to December 2019. A time period covered time in which the Injunction came into full force and effect. The work done for Purdue during this period was described as work on Senate Bill 51 involving non opioid directives and coverage of non opioid therapy. It is again unclear if Purdue supported, opposed or remained neutral on the bill.

166.    In some cases in the past before the Injunction was issued state lobbyists on behalf of Purdue Pharma registered in opposition to budget bills and substantive bills related to opioid products.

167.    For example, the state lobbying firm lobbied and opposed on behalf of Purdue Pharma in the Massachusetts State Legislature SF 1711 and House File 1718 which sought to establish and fund an Opioid Stewardship Fund and HF 3654 that sought to compensate victims of opioid abuse. While the bills were proposed in 2019 those bills might still be considered in a biannual legislative session during 2020. Also, New Jersey disclosure forms filed by the state lobbying firm represented that it is lobbying on behalf of Purdue Pharma in opposing a tax on opioids to fund a prevention and rehabilitation program.

168.    The situation in the Massachusetts State Legislature and New Jersey State Legislature may also be at play in the New York State Legislature with S1507A,1507B, and 1507C and S1509A,1509B and 1509C, but it is unclear whether Purdue Pharma registered in opposition to these proposals. The lobbyist filing is confusing. Filings made on behalf of Purdue Pharma suggest that the lobbyist hired by Purdue Pharma was not monitoring the bills; however,

33

the same filings suggest that Purdue Pharma took a position on the bills but did not disclose what the position was. These bills were enacted into law in April of 2019.

169. **I recommend that all existing contracts and extensions for state lobbyists working on behalf of Purdue Pharma be amended spelling out in detail the specific prohibitions and requirements related to lobbying in the Injunction. The agreements should also include the lobbyist agreement to abide by the requirements and conditions of the Injunction related to lobbying. Purdue Pharma agrees to this recommendation.**

170. **I also recommend that the state lobbyists be required to furnish a quarterly written report identifying any and all issues and matters they lobbied or engaged in for Purdue Pharma, to include the position taken, if any, on any proposed law or regulation. Purdue Pharma agrees to this recommendation.**

171. **I also recommend that the lobbyists provide in writing a certification of compliance with the terms and conditions of the Injunction as it relates to lobbying. Purdue Pharma agrees to this recommendation.**

172. The work of the aforementioned 22 contract lobbying firms is currently supervised by 3 regional directors who handle multiple states and who report to Purdue Pharma Executive Director, Head of Government Affairs.

173. **The range of issues handled at the state level has included active opposition to efforts at the state level to tax opioids and opioid products. Such taxes, I believe, could have an impact on sales and opposition to such taxes could be perceived as promotion of opioid product use. The Company has advised me that it does not agree with this interpretation of the Voluntary Injunction. It believes that lobbying as to the fact of a tax would not constitute "promotion of opioid product use" as promotion is defined in the**

34

**Voluntary Injunction,** *see* **Section I.O.  Moreover, the Company believes that such lobbying is not captured under Sections II D.1.a-c of the Voluntary Injunction which prohibits, among other things, lobbying in favor of health care professionals prescribing opioids. Nonetheless, the Company has agreed with the Monitor that-unless it provides written notice to the Monitor-it will refrain from lobbying against the passage of an opioid tax. Additionally, the Company sought clarification that my interpretation of the Voluntary Injunction does not prohibit lobbying on the issue of how an opioid tax would be structured or administered.  I agree with that interpretation, and do not believe that advocacy regarding the structure and administration of opioid taxes would violate the Voluntary Injunction.**

174.     On other issues directly related to possible promotion Purdue Pharma has not directly opposed legislation adverse to its interests: other similarly situated pharmaceutical companies may have opposed the legislation or rule.

175.     Purdue Pharma's Director of Health Policy monitors the various federal relations offices for state governors who have representation in the nation's Capitol.

176.     In addition to the 22 state lobbying firms and the state federal relations offices the State Government Affairs Group also subscribes to a daily reporting service with Stateside.

177.     Stateside monitors activities at the state level for all 50 states that might impact a pharmaceutical company. In the system at Purdue Pharma certain items have been tabbed, including ADHD prescribing guidelines, drug pricing requirements, price lists, reimportation, Controlled Substances, substance abuse and drug abuse program access, Good Samaritan Laws, Prescription Monitoring Programs (PMP), Take Back Drug Days and drug disposal methods. Issues related to price lists, pricing requirements, reimportation, Controlled Substances, and

PMPs in particular could directly impact opioid and opioid products sales so they need to be closely monitored by the company to assure compliance with the Injunction.

178.     All those connected with the state and local lobbying efforts on behalf of Purdue Pharma have purportedly certified they have read the Injunction, understand its requirements and have been trained. I am still in the process of collecting written certifications from all who have lobbied and received the training.

## INITIAL COVERED SACKLER PERSONS

179.     Under the Injunction the Initial Covered Sackler Persons were not to be actively engaged in the opioid business in the United States or interfere with compliance with the Injunction.

180.     A review of the boards, officers and management team of each entity reflects no Initial Covered Sackler Person serving in any such capacity.

181.     As monitor I have received signed certifications from all of the named Initial covered Sackler Persons, including, David A. Sackler, Ilene Sackler, Jonathan D. Sackler, Kathe Sackler, Mortimer D.A. Sackler, Richard S. Sackler, Theresa Sackler and the Executor of the Estate of Beverly Sackler certifying that they have not actively engaged in the opioid business in the United States and have taken no action to interfere with Purdue Pharma's compliance with the Injunction.

## MISCELLANEOUS

182.     Purdue Pharma includes a number of subsidiaries. One such subsidiary is Greenfield Bioventures (Greenfield). Greenfield has acted as an investment fund for emerging technologies.

36

183.     A number of investments have been made by Purdue Pharma and its related entities based on representations from the company that involve a wide variety of technologies. However, as related to these investments, Greenfield entered into a license agreement concerning a rescue medication. Under the Part II, Section A, Paragraph 3 iii of the Injunction Purdue Pharma is not prohibited from activities related to rescue medications.

Wherefore, the undersigned Monitor respectfully submits this Initial 90 Day Report with the recommendations contained in Paragraphs 48, 55, 58, 63, 101, 143, 144, 156, 159, 169, 170, 171 and 173 therein.

_____

Thomas J. Vilsack
Monitor

# EXHIBIT 1

# PRELIMINARY INJUNCTION AND VOLUNTARY INJUNCTION

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.,* | **Case No. 19-23649 (RDD)** |
| Debtors.[1] | **(Jointly Administered)** |
| **PURDUE PHARMA L.P.,** *et al.,* | |
| Plaintiffs, | **Adv. Pro. No. 19-08289** |
| v. | |
| **COMMONWEALTH OF MASSACHUSETTS,** *et al.,* | |
| Defendants. | |

## NINTH AMENDED ORDER PURSUANT TO 11 U.S.C. § 105(a) GRANTING MOTION FOR A PRELIMINARY INJUNCTION

Upon the motion, dated September 18, 2019 ("**September 18 Motion**"), of Purdue

Pharma L.P. and certain affiliated debtors, as debtors and debtors in possession (collectively,

"**Debtors**"), that are plaintiffs in this adversary proceeding, for an order pursuant to

section 105(a) of title 11 of the United States Code ("**Bankruptcy Code**") and Rule 7065 of the

Federal Rules of Bankruptcy Procedure ("**Bankruptcy Rules**"), to (i) enjoin the governmental

defendants in this adversary proceeding ("**Governmental Defendants**") from the

commencement or continuation of their active judicial, administrative, or other actions or

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

proceedings against the Debtors that were or could have been commenced before the

commencement of the case ("**Governmental Actions**") that are included in the chart annexed

hereto as Appendix III, as well as the commencement or continuation of any other actions

against the Debtors alleging substantially similar facts or causes of action as those alleged in the

Governmental Actions, and (ii) enjoin the Governmental Defendants and the private defendants

("**Private Defendants**") in this adversary proceeding from the commencement or continuation of

their active judicial, administrative, or other actions or proceedings, included in the chart

annexed hereto as Appendix IV, and the commencement or continuation of other actions alleging

substantially similar facts or causes of action as those alleged in the actions identified in

Appendix III and Appendix IV, against current or former (a) owners (including any trusts and

their respective trustees and beneficiaries), (b) directors, (c) officers, (d) employees, and (e) other

similar associated entities of the Debtors that were or could have been commenced before the

commencement of the case ("**Related Parties**," as identified in Appendix IV,[2] and the claims

---

[2] The Related Parties are: The Purdue Frederick Company Inc.; The P.F. Laboratories Inc.;
Purdue Pharma Technologies Inc.; PLP Associates Holdings L.P.; PLP Associates Holdings Inc.;
BR Holdings Associates L.P.; BR Holdings Associates Inc.; Rosebay Medical Company L.P.;
Rosebay Medical Company, Inc.; Beacon Company; PRA Holdings Inc.; Pharmaceutical
Research Associates Inc.; Purdue Holdings L.P.; Rhodes Pharmaceuticals Inc.; Rhodes
Technologies Inc.; Coventry Technologies L.P.; MNP Consulting Limited; Richard S. Sackler;
Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly
Sackler; Theresa Sackler; David A. Sackler; Marianna Sackler; Estate of Mortimer Sackler;
Estate of Raymond Sackler; Trust for the Benefit of Members of the Raymond Sackler Family;
Raymond Sackler Trust; Beverly Sackler, Richard S. Sackler, and Jonathan D. Sackler, as
Trustees Under Trust Agreement Dated November 5, 1964; Beverly Sackler, Richard S. Sackler,
and Jonathan D. Sackler, as Trustees Under Trust Agreement Dated November 5, 1974; Paulo
Costa; Cecil Pickett; Ralph Snyderman; Judith Lewent; Craig Landau; Mark Timney; Stuart D.
Baker; Frank Peter Boer; John Stewart; Russell Gasdia; Marv Kelly; Shelli Liston; Heather
Weaver; Doug Powers; Lori Fuller; Rodney Davis; Brandon Worley; Donald Leathers; Wendy
Kay; Michael Madden; LeAvis Sullivan; Jeffrey Ward; Beth Taylor; Leigh Varnadore; Paul
Kitchin; Mark Waldrop; Mark Radcliffe; Mark Ross; Patty Carnes; Carol Debord; Jeff Waugh;
Shane Cook; James David Haddox; Aida Maxsam; Tessa Rios; Amy K. Thompson; Joe Coggins;
Lyndsie Fowler; Mitchell "Chip" Fisher; Rebecca Sterling; Vanessa Weatherspoon; Chris

against them described in this paragraph, the "**Related-Party Claims**"); and the Court having

jurisdiction to decide the Motion and the relief requested therein under 28 U.S.C. §§ 157(a)-(b)

and 1334(b); and there being due and sufficient notice of the Motion; and the Court having

reviewed the Complaint, the September 18 Motion, the Debtors' brief in support of the

September 18 Motion, the declarations in support of the September 18 Motion, and other

evidence and argument submitted by the Debtors in support thereof; all pleadings filed in support

of the September 18 Motion; and all objections filed in opposition or partial opposition to the

September 18 Motion, as well as all filed letters in response to the September 18 Motion; and

upon the record of and representations made at the hearing held by the Court on the September

18 Motion's request for entry of a preliminary injunction on October 11, 2019 (the "**October 11

Hearing**") and at the hearing held on November 6, 2019 (the "**November 6 Hearing**"); and,

after due deliberation and for the reasons set forth on the record by the Court at the Hearings,

good and sufficient cause appearing having entered Orders on October 11, 2019 granting the

Motion in part and on October 18, 2019 and November 6, 2019 amending such Order; and such

Orders having contemplated a procedure to amend the Orders further; and having entered Orders

on November 20, 2019, December 9, 2019, January 2, 2020, February 17, 2020 and March 4,

2020, amending such Orders further and enjoining actions brought by Additional Plaintiffs; and

upon the Court having reviewed the Debtors' motion to extend the Preliminary Injunction for an

additional 180 days filed on March 4 ("**March 4 Motion**," together with the September 18

Motion, the "**Motions**"), the declaration in support of the March 4 Motion, the Debtors' brief in

support of the March 4 Motion, all pleadings filed in support of the March 4 Motion; and all

---

Hargrave; Brandon Hassenfuss; Joe Read; Andrew T. Stokes; Nathan C. Grace; Jaclyn P.
Gatling; Leslie Roberson; Barbara C. Miller; Briann Parson-Barnes; Becca Beck Harville;
Lindsey Bonifacio; Tammy Heyward; James Speed; Damon Storhoff; Diana C. Muller; and
Draupadi Daley.

3

objections filed in opposition or partial opposition to the March 4 Motion; and upon the record

made at the telephonic hearing held on March 18, 2020 ("**March 18 Hearing**," together with the

October 11 Hearing and the November 6 Hearing, the "**Hearings**"); and upon good and

sufficient cause appearing to amend and extend such orders as provided therein, the Court grants

the Debtors' request to amend and extend the orders as provided in this Amended Order, which

amends and supersedes the prior orders.  Now, therefore, the Court finds and concludes as

follows:

(a)     The Defendants in this adversary proceeding are the Governmental

Defendants and the Private Defendants, that, along with the Additional Plaintiffs, are

listed in the "Underlying Plaintiffs" column of each of the charts annexed hereto as

Appendix III and Appendix IV, with such Appendices being made a part of and

incorporated in this Order.  The Defendants in this adversary proceeding and the

Additional Plaintiffs are all plaintiffs in judicial, administrative, or other actions or

proceedings that seek to hold the Debtors and/or the Related Parties, as identified in

Appendix IV, liable in connection with claims and/or causes of action arising out of or

otherwise related to the Debtors' prescription opioid business.

(b)     The Court has jurisdiction over this matter pursuant to 28 U.S.C.

§§ 157(a)-(b) and 1334(b).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

(c)     The Debtors have demonstrated that the continuation of the active

litigation against them and the Related Parties, identified in Appendix III and Appendix

IV, respectively, would result in irreparable harm to the Debtors and their reorganization.

(d)     The representatives of the Raymond Sackler family and of the Mortimer

Sackler family (collectively, the "**Sackler Families**") agreed on the record at the October

EXHIBIT D
Page 253

11 Hearing to toll all applicable statutes of limitations and similar time limits on the

commencement of Additional Actions against any member of the Sackler Families, and

to treat as inoperative all deadlines (including deadlines for appeals) in any currently

pending Related Party Claim against any member of the Sackler Families, for the

duration of this preliminary injunction.

(e)     Accordingly, this Court finds it appropriate to enter a preliminary

injunction as provided herein pursuant to section 105(a) of the Bankruptcy Code and

Rule 7065 of the Bankruptcy Rules.

(f)     The legal and factual bases set forth in the Complaint, the Motions, other

supporting papers, and at the Hearings establish just cause for the relief granted herein.

(g)     Arizona, California, Colorado, Connecticut, Delaware, the District of

Columbia, Hawaii, Idaho, Illinois, Iowa, Maine, Maryland, Massachusetts, Minnesota,

New Hampshire, New Jersey, New York, Nevada, North Carolina, Oregon,

Pennsylvania, Rhode Island, Vermont, Virginia, Washington, Wisconsin, the Ad Hoc

Group of Non-Consenting States (as listed on the October 11, 2019 Verified Statement

pursuant to Bankruptcy Rule 2019 filed under Docket No. 296 of Case No. 19-23649),

the ad hoc committee of government and other contingent litigation claimants and each of

its members (as listed on the October 10, 2019 Verified Statement pursuant to

Bankruptcy Rule 2019 filed under Docket No. 279 of Case No. 19-23649), and the Multi-

State Governmental Entities Group and each of its members[3] (as listed on the October 30,

---

[3] The following members of the Multi-State Governmental Entities Group are not Potential Opt-Out Parties and are instead bound to the terms of this Order until October 5, 2020: (1) Bryant C. Dunaway, in his official capacity as the District Attorney General for the Thirteenth Judicial District, Tennessee; (2) Jennings H. Jones, in his official capacity as the District Attorney General for the Sixteenth Judicial District, Tennessee; (3) Robert J. Carter, in his official

EXHIBIT D
Page 254

2019 Verified Statement pursuant to Bankruptcy Rule 2019 filed under Docket No. 409

of Case No. 19-23649) (collectively, the "**Potential Opt-Out Parties**") have each

consented and agreed to continue to abide by the terms of the *Eighth Amended Order*

*Pursuant To 11 U.S.C. § 105(a) Granting Motion For A Preliminary Injunction*, without

the need to have any order entered against them.

Based on these findings, it is hereby:

ORDERED, that the Governmental Defendants, other than those who are Potential

Opt-Out Parties, the Private Defendants, and the Additional Plaintiffs that have been bound by

the Third, Fourth, Fifth, Sixth, and Seventh Amended Orders are prohibited and enjoined from

(i) the commencement or continuation of their active judicial, administrative, or other actions or

proceedings against the Debtors and/or Related Parties that were or could have been commenced

before the commencement of the case under this title against the Debtors and/or the Related

Parties arising from or in any way relating to the Debtors' prescription opioid business, including

the actions reflected in Appendix III and Appendix IV, as well as (ii) from commencing or

continuing any other actions against the Debtors or Related Parties alleging substantially similar

facts or causes of action as those alleged in actions reflected in Appendix III and Appendix IV, in

each case through and including Monday, October 5, 2020.  The preliminary injunction period

may be extended by further order of the Court.

ORDERED, that each Potential Opt-Out Party may withdraw its consent on July 8, 2020

(the "**Opt-Out Date**")—by filing with the Bankruptcy Court a notice (a "**Withdrawal Notice**")

in the form attached hereto as Appendix II.  Each Potential Opt-Out Party filing a Withdrawal

capacity as the District Attorney General for the Seventeenth Judicial District, Tennessee;
(4) Brent A. Cooper, in his official capacity as the District Attorney General for the Twenty-
Second Judicial District, Tennessee; and (5) Lisa S. Zavogiannis, in her official capacity as the
District Attorney General for the Thirty-First Judicial District, Tennessee.

6

Notice must send a copy of the same to the Debtors' counsel at least two business days before such filing.  If any Potential Opt-Out Party files a Withdrawal Notice on the Opt-Out Date, then, no later than three business days after the Opt-Out Date, counsel for the Debtors shall submit to the Court for immediate entry a new proposed order that, upon its entry, will terminate the voluntary compliance of and instead bind each Potential Opt-Out Party that timely filed and served a Withdrawal Notice to the same terms imposed on other parties by the this Order from the Opt-Out Date until October 5, 2020.  For the avoidance of doubt, entry of this order shall not impair any rights of Potential Opt-Out Parties to appeal any subsequent order entered in connection with a Withdrawal Notice as contemplated herein.

ORDERED, that the March 4 Motion constitutes a joint motion of the Debtors and UCC to extend the stay beyond the Initial Stay Period as provided in paragraph 2 of the Amended and Restated Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties, *In re: Purdue Pharma, L.P. et al.*, Case No. 19:23649 (RDD) (Nov. 20, 2019) [ECF No. 518] ("**UCC Stipulation**").  All obligations under the UCC Stipulation, inclusive of obligations of any Covered Party as defined therein, that remain in effect during the Stay Period, as defined therein, shall remain in full force and effect so long as the Preliminary Injunction, as amended and extended, remains in effect.  For the avoidance of doubt, the Initial Stay Period as defined in the UCC Stipulation shall expire on April 8, 2020.

ORDERED, that the Debtors in these chapter 11 cases continue to be subject to the Voluntary Injunction annexed hereto as Appendix I through and including October 5, 2020.

ORDERED, that the Debtors need not give security in connection with this injunctive relief.

EXHIBIT D
Page 256

ORDERED, that this Order shall be promptly filed in the Clerk's Office and entered into the record.

ORDERED, that the Debtors are authorized to take all steps necessary or appropriate to carry out this Order.

ORDERED, that nothing in this Order shall prevent the Debtors from seeking a further extension of the requested injunction.

ORDERED, that if, while the preliminary injunction provided for in this Order is effective, either (i) any inactive litigation currently pending against the Debtors or Related Parties becomes active, or (ii) any new action is commenced against the Debtors or Related Parties (in either case, an "**Additional Action**"), the Debtors may promptly serve the plaintiff or plaintiffs in such Additional Action ("**Applicable Plaintiff**") with a copy of the Complaint, the Motions, the Debtors' memoranda of law in support of the Motions, and this Order (the "**Service Documents**").  The Debtors shall file a notice of such service on the docket promptly after service.  If the Applicable Plaintiff in such Additional Action does not file and serve an objection within seven (7) days of service of the Service Documents, the Court may determine whether such Additional Action should be enjoined pursuant to this Order without further proceedings.  If the Applicable Plaintiff files and serves an objection, the Debtors shall have the right to file and serve a response to the objection within seven (7) days of service of the objection, after which the Court may determine whether such Additional Action should be enjoined pursuant to this Order without further proceedings, or either party may seek to schedule and provide notice of a hearing.

ORDERED, that all applicable statutes of limitations and similar time limits on the commencement of Additional Actions, and all deadlines (including deadlines for appeals) in

any currently pending Governmental Action, Related Party Claim or action brought by an Additional Plaintiff (including as agreed on the record at the October 11 Hearing by the representatives of the Sackler Families), shall be tolled or otherwise inoperative for the duration of this preliminary injunction. This is without prejudice to any party's rights to assert that any currently pending Governmental Action, Related Party Claim or claim brought by an Additional Plaintiff is time barred, or that commencement of any Additional Action, or any other action taken by a party with respect to any Governmental Action, Related Party Claim or Additional Plaintiff after the entry of this Order would have been time barred or untimely had it been commenced or taken before the entry of this Order.

ORDERED, that nothing in this Order shall affect or abrogate the automatic stay as to the Debtors under section 362 of the Bankruptcy Code.

ORDERED, that the time for all defendants to answer the Complaint is extended to October 19, 2020, subject to further extension by agreement of the parties and/or order of the Court. All claims and defenses of the parties, including those under Rule 12 of the Federal Rules of Civil Procedure made applicable to this proceeding by Rule 7012 of the Bankruptcy Rules, are expressly preserved.

ORDERED, that the Pre-Trial Conference in this adversary proceeding, currently scheduled for April 8, 2020 at 10:00 am (Prevailing Eastern Time), is adjourned to October 19, 2020 at 10:00 am (Prevailing Eastern Time) before the Honorable Robert D. Drain, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas St., White Plains, New York, NY 10601.

ORDERED, that this Court shall retain jurisdiction to hear and determine all matters

arising from or related to the implementation, interpretation, or enforcement of this Order.

Dated: April 14, 2020
      White Plains, New York

                              */s/Robert D. Drain*
                              THE HONORABLE ROBERT D. DRAIN
                              UNITED STATES BANKRUPTCY JUDGE

## **Appendix I**

## **Voluntary Injunction**

11

EXHIBIT D
Page 260

# I.    DEFINITIONS

A.    "Bankruptcy Court" or "Court" shall mean the court presiding over the chapter 11 proceedings *In re Purdue Pharma L.P. et al.*, Case No. 19-23649-RDD (S.D.N.Y.).

B.    "Cancer-Related Pain Care" shall mean care that provides relief from pain caused by active cancer or ongoing cancer treatment, as distinguished from treatment provided during remission.

C.    "CDC Guideline Recommendations" shall mean the 12 enumerated Recommendations published by the U.S. Centers for Disease Control and Prevention (CDC) for the prescribing of opioid pain medication for patients 18 and older in primary care settings as part of its 2016 Guideline for Prescribing Opioids for Chronic Pain (CDC Guidelines), as updated or amended by the CDC.

D.    "Company" shall mean the Debtors as defined in these chapter 11 proceedings *In re Purdue Pharma L.P. et al.*, Case No. 19-23649-RDD (S.D.N.Y.).

E.    "Direct Customer Data" shall mean transaction information that the Company collects relating to the Company's direct customers' orders, including direct customer's wholesale orders, order history, and customer files.

F.    "Downstream Customer Data" shall mean transaction information that the Company collects relating to the Company's direct customers' sales to downstream customers, including chargeback data tied to the Company providing certain discounts, "867 data," and IQVIA data.

G.    "End-of-Life Care" shall mean care for persons with a terminal illness or at high risk for dying in the near future in hospice care, hospitals, long-term care settings, or at home.

H.    "Health Care Provider" shall mean any U.S.-based physician, nurse practitioner, physician assistant, dentist, pharmacist, podiatrist, nurse, or other person engaged in the business of providing health care services and/or prescribing an Opioid Product and any medical facility, practice, hospital, clinic, or pharmacy engaged in providing health care services and/or prescribing an Opioid Product in the United States.

I.    "Including but not limited to," when followed by a list or examples, shall mean that list or examples are illustrative instances only and shall not be read to be restrictive.

J.    "In-Kind Support" shall mean payment or assistance in the form of goods, commodities, services, or anything else of value.

K.    "Initial Covered Sackler Persons" shall mean the Estate of Beverly Sackler, David A. Sackler, Ilene Sackler, Jonathan D. Sackler, Kathe Sackler, Mortimer D.A. Sackler, Richard S. Sackler, Theresa Sackler, any trusts of which any of the foregoing are beneficiaries, and the trustees thereof (solely in their capacities as such), each Shareholder Party and each other entity or person that directly or indirectly owns equity in, or has voting control over, any of the Debtors, and in the event of the death of an

Initial Covered Sackler Person who is a natural person, other than a natural person who is an Initial Covered Sackler Person solely in the capacity as a trustee, the estate of such person.

L.    "Lobby" and "Lobbying" shall have the same meaning as such terms have under U.S. federal law and the law governing the person or entity being lobbied.

M.    "Opioid(s)" shall mean all natural, semi-synthetic, or synthetic chemicals that interact with opioid receptors on nerve cells in the body and brain.  The term "Opioids" shall not mean (i) methadone, buprenorphine, buprenorphine/naloxone (oral/sublingual), suboxone, and other substances when used exclusively to treat opioid or other substance use disorders, abuse, addiction, or overdose; (ii) raw materials and/or immediate precursors used in the manufacture or study of Opioids or Opioid Products, but only when such materials and/or immediate precursors are sold or marketed exclusively to DEA-licensed manufacturers or DEA-licensed researchers; or (iii) Opioids listed by the DEA as Schedule IV drugs pursuant to the federal Controlled Substances Act.

N.    "Opioid Product(s)" shall mean all natural, semi-synthetic, or synthetic chemicals that interact with  opioid receptors on nerve cells in the body and brain, and that are approved by the U.S. Food & Drug Administration (FDA) and listed by the DEA as Schedule II or III drugs pursuant to the federal Controlled Substances Act (including but not limited to codeine, fentanyl, hydrocodone, hydromorphone, meperidine, methadone, morphine, oxycodone, oxymorphone, tapentadol, tramadol, and buprenorphine for the treatment of pain). The term "Opioid Products(s)" shall not mean (i) methadone, buprenorphine, buprenorphine/naloxone (oral/sublingual), suboxone, and other substances to treat opioid or other substance use disorders, abuse, addiction, or overdose; (ii) raw materials and/or immediate precursors used in the manufacture or study of Opioids or Opioid Products, but only when such materials and/or immediate precursors are sold or marketed exclusively to DEA-licensed manufacturers or DEA-licensed researchers; or (iii) Opioid Products listed by the DEA as Schedule IV drugs pursuant to the federal Controlled Substances Act.

O.    "Promote," "Promoting," and "Promotion" shall mean the dissemination of information by the Company to a Third Party that is either likely or intended to influence prescribing practices of Health Care Providers in favor of prescribing greater amounts, quantities, doses, and/or strengths of Opioid Products.

P.    "Section" shall mean, unless the context requires otherwise, a Section of this injunction.

Q.    "Suspicious Order" shall have the same meaning as provided by the Controlled Substances Act, 21 U.S.C. §§ 801-904, and the regulations promulgated thereunder and analogous state laws and regulations

R.    "Third Party" shall mean any person or entity other than the Company or a government entity.

S.    "Treatment of Pain" shall mean the provision of therapeutic modalities to alleviate or reduce pain.

EXHIBIT D
Page 262

T.      "Unbranded Information" shall mean any information regarding an Opioid or Opioid Product that does not identify a specific product(s).

## II.      INJUNCTIVE RELIEF

**A.      Ban on Promotion**

1.      The Company shall not Promote Opioids or Opioid Products, including by:

      a.      Employing or contracting with sales representatives or other persons to Promote Opioids or Opioid Products to Health Care Providers or patients;

      b.      Using speakers, key opinion leaders, thought leaders, lecturers, and/or speaking events for Promotion of Opioids or Opioid Products;

      c.      Sponsoring, or otherwise providing financial support or In-Kind Support to medical education programs;

      d.      Creating, sponsoring, operating, controlling, or otherwise providing financial support or In-Kind Support to any website, network and/or social or other media account for the Promotion of Opioids or Opioid Products;

      e.      Creating, sponsoring, distributing, or otherwise providing financial support or In-Kind Support for materials Promoting Opioids or Opioid Products, including but not limited to brochures, newsletters, pamphlets, journals, books, and guides;

      f.      Creating, sponsoring, or otherwise providing financial support or In-Kind Support for advertisements that Promote Opioids or Opioid Products, including but not limited to internet advertisements or similar content, and providing hyperlinks or otherwise directing internet traffic to advertisements;

      g.      Engaging in Internet search engine optimization or other techniques designed to Promote Opioids or Opioid Products by improving rankings or making content appear among the top results in an Internet search or otherwise be more visible or more accessible to the public on the Internet; and

      h.      Engaging in Internet marketing techniques that Promote Opioids or Opioid Products by identifying or generating sales leads, including through pop up ads or information obtained from web forms completed by prospective patients or consumers.

2.      Notwithstanding Sections II.A.1 and II.C, the Company may:

      a.      Maintain corporate websites;

EXHIBIT D
Page 263

b.     Maintain a website for any Opioid Product that contains principally the following content: the FDA-approved package insert, dosage strengths, dosage forms, packaging configurations, and medication guides,; a statement directing patients or caregivers to speak with a licensed Health Care Provider; Risk Evaluation and Mitigation Strategy (REMS) materials; contact information to report an adverse event or product complaint; and/or information regarding savings programs, savings cards, vouchers, coupons, or rebate programs for the Company's Opioid Products.

c.     Provide information or support the provision of information, as expressly required by (i) law, (ii) settlement agreement, (iii) court order, including order of the Bankruptcy Court, or (iv) any state or federal government agency, including providing all information necessary in order for the Company to comply with its regulatory obligations pursuant to the Federal Food, Drug, and Cosmetic Act, and/or (v) provide information about legal proceedings involving the Company;

d.     Engage Health Care Providers or other Third Parties to assist the Company in responding to, preparing for, and participating in, any initiatives, advisory committees, working groups, action plans, boards, meetings and/or hearings by any state or federal government or state or federal agencies or regulators, including the Food and Drug Administration.

e.     Provide the following by mail, electronic mail, on or though the Company's corporate or product websites or through other electronic or digital methods: FDA-approved package insert, medication guide, approved labeling for Opioid Products, Risk Evaluation and Mitigation Strategy materials, or other prescribing information or guidelines for Opioid Products that are published by a state or federal government agency with jurisdiction;

f.     Provide scientific and/or medical information in response to an unsolicited request by a Health Care Provider concerning Opioid Products by providing truthful, balanced, non-misleading, non-promotional scientific or medical information that is responsive to the specific request.  Such responses should be handled by medical or scientific personnel at the Company who are independent from the sales or marketing departments;

g.     Provide a response to any unsolicited question or request from a patient or caregiver by (i) directing the patient or caregiver to the FDA-approved labeling and reviewing the prescribing information with the patient as relevant to their inquiry, and, to the extent the question cannot be answered solely by reference to a specific provision of the FDA-approved labeling, providing a response that is truthful, balanced, non-misleading and fully consistent with the FDA-approved labeling, if applicable;

15

(ii) recommending that the patient or caregiver speak with a licensed Health Care Provider without naming any specific provider or healthcare institution; (iii) directing the patient or caregiver to speak with their insurance carrier regarding coverage of an Opioid Product; and/or (iv) directing the patient or caregiver to information concerning savings programs, vouchers, coupons, or rebate programs for the Company's Opioid Products;

h.      Provide information to a payor, formulary committee, distributor, or other similar entity with knowledge and expertise in the area of health care economics concerning the cost or availability of a Company Opioid Product, including the costs compared to the cost of an Opioid Product manufactured or distributed by another company.  Such information may include information about the stocking of the Opioid Product; product attributes of the Opioid Product as described in the FDA-approved labeling; tier status; applicable prescribing guidelines that are consistent with the FDA-approved labeling; step-edits for Opioid Products; restrictions; and/or prior authorization status concerning an Opioid Product;

i.      Sponsor or provide financial support or In-Kind Support for an accredited or approved continuing medical education program required by either an FDA-approved Risk Evaluation and Mitigation Strategy program, other federal or state law or regulation, or settlement, through an independent Third Party, which shall be responsible for determining the program's content without the participation of Company;

j.      Provide Unbranded Information in connection with managing pain in End-of-Life Care and/or Cancer-Related Pain Care relating to: the use of Opioids for the Treatment of Pain, as long as the Unbranded Information identifies Company as the source of the information; and

k.      Provide information about, discuss, or comment on, issues regarding mechanisms for preventing opioid abuse and misuse, including (i) abuse deterrent formulations and the use of blister packaging for opioid medications; (ii) the prevention, education, and treatment of opioid use disorders or opioid abuse, addiction, or overdose, including medication-assisted treatment for opioid addiction; and/or (iii) rescue medications for opioid overdose.

3.      The Company shall not engage in the following specific Promotional activity relating to any products that are indicated for the treatment of Opioid-induced side effects.  For the avoidance of doubt, nothing in this Section prohibits the Company's provision or dissemination of information or activities relating to: (i) the treatment of opioid use disorders; (ii) the prevention, education, and treatment of opioid abuse, addiction, or overdose, including medication-assisted treatment for opioid addiction; and/or (iii) rescue medications for opioid overdose:

16

a.      Employing or contracting with sales representatives or other persons to Promote products that are indicated for the treatment of Opioid-induced side effects to Health Care Providers or patients;

b.      Creating, sponsoring, or otherwise providing financial support or In-Kind Support for advertisements that Promote products that are indicated for the treatment of Opioid-induced side effects, including but not limited to internet advertisements or similar content, and providing hyperlinks or otherwise directing internet traffic to advertisements; and

c.      Engaging in any other Promotion of products that are indicated for the treatment of Opioid-induced side effects in a manner that encourages the utilization of Opioids or Opioid Products or normalizes the use of Opioids or Opioid Products for chronic pain.

4.      Notwithstanding Section II.A.3 directly above, the Company may engage in other marketing activities for products that are indicated or used for the treatment of Opioid-induced side effects, so long as such activities do not Promote Opioids or Opioid Products.  For the avoidance of doubt, nothing in Sections II.A.3 or 4 shall limit or otherwise restrict the ability of the Company to Promote products for occasional constipation or restrict the Company from Promoting (i) products relating to the treatment of opioid use disorders; (ii) products relating to the treatment of opioid abuse, addiction, or overdose, including medication-assisted treatment for opioid addiction; and/or (iii) rescue medications for opioid overdose.

5.      Treatment of Pain

a.      The Company shall not engage in Promotion of the Treatment of Pain in a manner that encourages the use of Opioids or Opioid Products.

b.      The Company shall not Promote the concept that pain is undertreated in a manner that encourages the use of Opioids or Opioid Products.

c.      The Company shall not knowingly use Third Parties to engage in the Promotion of the Treatment of Pain or Promote the concept that pain is undertreated in manners that encourage the use of Opioids or Opioid Products.

6.      To the extent that the Company engages in conduct permitted by Section II.A.2 above, the Company shall do so in a manner that is:

a.      Consistent with the CDC Guidelines Recommendations, as applicable; and

b.      Truthful, not misleading, accurate, and not deceptive.

17

7. For the avoidance of doubt, nothing in this injunction shall be construed or used to prohibit the Company in any way whatsoever from taking legal or factual positions in litigation, the bankruptcy proceedings, investigations, regulatory actions and initiatives, or other legal or administrative proceedings, or exercising its right to legally challenge the enactment of any federal, state, or local legislation, rule, or regulation, or in any way whatsoever prohibit or limit the Company's right to make public statements or respond to media reports or inquires relating to any legal, administrative, regulatory, or legislative proceedings.

**B. No Financial Reward or Discipline Based on Volume of Opioid Sales**

1. The Company shall not provide financial incentives to its sales and marketing employees, or take disciplinary actions against its sales and marketing employees, that are directly based on, or tied to, sales volume or sales quotas for Opioid Products, unless otherwise permitted by the Bankruptcy Court.

2. The Company shall not offer or pay any remuneration directly or through a Third Party, to or from any person in return for the prescribing, sale, use or distribution of Opioid Product. For the avoidance of doubt, this shall not prohibit the provision of rebates and/or chargebacks.

**C. Ban on Funding/Grants to Third Parties to Promote Opioids**

1. The Company shall not provide financial support or In-Kind Support to any Third Party for purposes of Promoting Opioids or Opioid Products. For avoidance of doubt, nothing in this Section prevents the Company from directly or indirectly supporting Third Parties as required by any Judgment, court order, including order of the Bankruptcy Court, settlement, or federal or state law or regulation.

2. The Company shall not operate, control, create, sponsor, or provide financial support or In-Kind Support to any medical society or patient advocacy group for the purpose of Promoting Opioids or Opioid Products. For avoidance of doubt, nothing in this Section prevents the Company from supporting any medical society or patient advocacy group as required by any Judgment, court order, including order of the Bankruptcy Court, settlement, or federal or state law or regulation.

3. For the purposes of Promoting Opioids or Opioid Products, the Company shall not provide links to any Third Party website or materials or otherwise distribute materials created by a Third Party relating to any Opioids or Opioid Products. For avoidance of doubt, nothing in this Section prevents the Company from providing links to any Third Party website or materials or otherwise distributing materials created by a Third Parties that the Company supports as required by any Judgment, court order, including order of the Bankruptcy Court, settlement, or federal or state law or regulation.

18

4. The Company shall not knowingly use a Third Party, including Health Care Providers, to engage in any activity that the Company itself would be prohibited from engaging in pursuant to the injunction.

5. No director, officer, or management-level employee of the Company may concurrently serve as a director, board member, employee, agent, or officer of any entity that engages in Promotion relating to Opioids, Opioid Products, the Opioid-related Treatment of Pain, or products indicated to treat Opioid-related side effects.

6. The Company shall not advocate for the appointment of persons to the board, or hiring persons to the staff, of any entity that principally engages in the Promotion of Opioids and Opioid Products.  For avoidance of doubt, nothing in this paragraph shall prohibit the Company from fully and accurately responding to unsolicited requests or inquiries about a person's fitness to serve as an employee or Board member at any such entity.

7. For the avoidance of doubt, nothing in Section II.C or this injunction shall be construed or used to prohibit the Company from providing financial or In-Kind Support to, or disseminating information about, Third Parties, including medical societies and patient advocate groups, who are principally involved in issues relating to (i) the treatment of opioid use disorders; (ii) the prevention, education, and treatment of opioid abuse, addiction, or overdose, including medication-assisted treatment for opioid addiction; and/or (iii) rescue medications for opioid overdose.

**D.  Lobbying Restrictions**

1. The Company shall not directly, or by employing or controlling a Third Party, Lobby for the enactment of any federal, state, or local legislation or promulgation of any rule or regulation that:

    a. Encourages or requires Health Care Providers to prescribe Opioids or sanctions Health Care Providers for failing to prescribe Opioids or failing to treat pain with Opioids;

    b. Would have the effect of limiting access to any non-Opioid alternative pain treatments; or

    c. Pertains to the classification of any Opioid or Opioid Product as a scheduled drug under the Controlled Substances Act.

2. The Company shall not directly, or by employing or controlling a Third Party, Lobby against the enactment of any federal, state or local legislation or promulgation of any rule or regulation that supports:

19

a.    The use of non-pharmacologic therapy and/or non-Opioid pharmacologic therapy to treat chronic pain over or instead of Opioid therapy, including but not limited to Third Party payment or reimbursement for such therapies;

b.    The use and/or prescription of immediate release Opioids instead of extended release Opioids when Opioid therapy is initiated, including but not limited to Third Party reimbursement or payment for such prescriptions.

c.    The prescribing of the lowest effective dose of an Opioid, including but not limited to Third Party reimbursement or payment for such prescription;

d.    The limitation of initial prescriptions of Opioids to treat acute pain;

e.    The prescribing and other means of distribution of naloxone to minimize the risk of overdose, including but not limited to Third Party reimbursement or payment for naloxone.

f.    The use of urine testing before starting Opioid therapy and annual urine testing when Opioids are prescribed, including but not limited to Third Party reimbursement or payment for such testing;

g.    Evidence-based treatment (such as using medication-assisted treatment with buprenorphine or methadone in combination with behavioral therapies) for Opioid Use Disorder, including but not limited to third party reimbursement or payment for such treatment; or

h.    The implementation or use of Opioid drug disposal systems that have proven efficacy for the Company's Opioid Products.

3.    The Company shall not directly, or by employing or controlling a Third Party, Lobby against the enactment of any federal, state or local legislation or promulgation of any rule or regulation limiting the operation or use of PDMPs, including, but not limited to, provisions requiring Health Care Providers to review PDMPs when Opioid therapy is initiated and with every prescription thereafter.

4.    Nothing in Section II.D or this Injunction, however, limits the Company from:

a.    Challenging the enforcement of, or suing to stop the enactment of, or for declaratory or injunctive relief with respect to any legislation, rules, or regulations, including legislation, rules, or regulations relating to any issues referred to in Section II.D.1;

b.    Communications made by the Company in response to a statute, rule, regulation, or order requiring such communication;

    c.    Communications by a representative of the Company appearing before a federal or state legislative or administrative body, committee, or subcommittee as result of a mandatory order, subpoena commanding that person to testify or an unsolicited request from an elected or appointed official, federal or state legislative or administrative body, committee, or subcommittee.

    d.    Responding to an unsolicited request for the input on the passage of legislation or the promulgation of any rule or regulation.

    l.    Communications by the Company, including to elected or appointed officials, federal or state legislative or administrative bodies, committees, or subcommittees regarding (i) mechanisms for preventing opioid abuse and misuse, including abuse deterrent formulations and the use of blister packaging for opioid medications, (ii) the prevention, education, and treatment of opioid use disorders or opioid abuse, addiction, or overdose, including medication-assisted treatment for opioid addiction; and/or (iii) rescue medications for opioid overdose.

5.    The Company shall require all of its officers, employees and representatives engaged in Lobbying to certify in writing to them that they are aware of and will fully comply with the provisions of this injunction with respect to Lobbying.

**E.    Ban on High Dose Opioids**

**1.**    The Company shall abide by any decision by the FDA on the pending Citizens Petition dated September 1, 2017 (docket number FDA-2017-P-5396) requesting a ban on specific high doses of prescription oral and transmucosal Opioids that, when taken as directed, exceed 90 morphine milligram equivalents per day.

**F.    Ban on Prescription Savings Programs**

1.    The Company shall not directly, or by employing or controlling a Third Party, Promote savings card, vouchers, coupons, or rebate programs to Health Care Providers for any Opioid Product.  Nothing in this provision shall prohibit the Company from providing savings cards, vouchers, coupons, or rebate programs, including electronic point-of-dispense programs:  (i) in response to requests from Health Care Providers, patients, or other caregivers or (ii) on its website or product-specific websites.

2.    The Company shall not directly or through a Third Party provide financial support to any Third Party to avoid the prohibited conduct in Section II.F.1 above.

**G.    Self-Monitoring and Reporting of Direct and Downstream Customers.**

1.    The Company shall operate an effective monitoring and reporting system that shall include processes and procedures that:

21

    a.      Reasonably analyze all collected Direct Customer Data to identify a Suspicious Order of a Company Opioid Product by a direct customer;

    b.      Reasonably utilize available Downstream Customer Data to identify whether a downstream customer poses a material risk of diversion of a Company Opioid Product;

    c.      Analyze all information that the Company receives that indicates an unreasonable risk of diversion activity of a Company Opioid Product or an unreasonable potential for diversion activity of a Company Opioid Product, by a direct customer or a downstream customer, including reports by employees and customers of the Company, Health Care Providers, law enforcement, state, tribal, or federal agencies, or the media; and

    d.      Unless otherwise required by law, upon a relevant state's request, report to the relevant state agency any direct customer or downstream customer in each state that the Company has identified as part of the monitoring required by (a)-(c), above, and any Company customer relationship in each state that was terminated by the Company because of an unreasonable risk of diversion or unreasonable risk for potential for diversion.

2.      Upon request, the Company shall promptly provide reasonable assistance to law enforcement investigations of potential diversion and/or suspicious circumstances involving the Company's Opioid Products subject to, and without waiving, any applicable privilege objections.

3.      If one or more of the nation's three largest pharmaceutical distributors establishes a system to aggregate data concerning transactions of Opioid Products and/or concerning reports of Suspicious Orders of Opioid Products, and the system is designed to use information provided by manufacturers of Opioid Products, the Company shall provide information to such system to the extent reasonably available and feasible, subject to, and without waiving, any applicable privilege objections.

4.      The Company agrees that it will refrain from acting as a distributor of Opioid Products by providing an Opioid Product directly to a retail pharmacy or Health Care Provider or otherwise engaging in activity that requires it to be registered as a distributor under the Controlled Substances Act unless otherwise required by local, state, or federal law.  Nothing in this provision, however, prevents the Company from acting as a distributor of medications relating to (i) the treatment of opioid use disorders; (ii) the treatment of opioid abuse, addiction, or overdose, including medication-assisted treatment for opioid addiction; and (iii) rescue medications for opioid overdose.

**H.      Appointment and Responsibilities of Monitor.**

1.      The Company shall retain a Monitor.  On February 21, 2020, the Debtors retained Thomas J. Vilsack to serve as Monitor.

2.      The Monitor shall perform its duties according to the terms of this injunction and shall be vested with all rights and powers reasonably necessary to carry out such powers, duties, authority, and responsibilities enumerated herein.

3.      The Monitor shall work with all diligence to confirm and oversee compliance with this injunction, and shall provide reports to the Company's Board of Directors and the Bankruptcy Court as outlined below.

4.      The Monitor shall:

    a.      subject to any legally recognized privilege and as necessary or to perform their duties hereunder, have full and complete access to the Company's personnel, books, records, and facilities, and to any other relevant information, as the Monitor may request.  The Company shall develop such information as the Monitor may request and shall fully, completely and promptly cooperate with the Monitor.  The Monitor may raise with the Court any issues relating to any failure of or delay in such cooperation for an expedited resolution by the Court;

    b.      serve, without bond or other security, at the cost and expense of the Company, with the Monitor's fees subject to final approval by the Court. The Monitor shall have the authority to employ, upon Court approval, at the cost and expense of the Debtors' estates, such consultants, accountants, attorneys, and other representatives and assistants as are necessary to carry out the Monitor's and responsibilities.  The Monitor shall serve throughout the term of this injunction and submission of a final report;

    c.      have no obligation, responsibility or liability for the operations of the Company;

    d.      file a report no less than every 90 days regarding compliance by the Company with the terms of this injunction; provided that elements of any such report may be filed under seal or subject to such other confidentiality restrictions contained in the Protective Order.  The Court may, in response to such reports, provide further direction to the Monitor as it deems appropriate;

    e.      sign onto the Protective Order entered by the Court in this matter, and any confidentiality agreement consistent with the Protective Order as deemed necessary by the parties, and each of the Monitor's consultants, accountants, attorneys and other representatives and assistants shall also sign onto the Protective Order entered by the Court, and any

23

confidentiality agreement consistent with the Protective Order as deemed necessary by the parties; *provided, however*, that nothing shall restrict the Monitor from providing any information to the Court and the parties consistent with the terms of the Protective Order; and

f.    promptly seek an order requiring compliance or such other remedies as may be appropriate under the circumstances should the Company not comply with this injunction.

5.    **Disputes Regarding Compliance**

a.    If an Attorney General should have a reasonable basis to believe the Company is not in compliance with the terms of this injunction, the Attorney General shall notify the Company, via the Company's General Counsel, in writing of the specific objection, including identifying the provisions of this injunction that the practice appears to violate, and give the Company thirty (30) days to respond to the notification and cure the conduct at issue, if necessary.

b.    The Attorney General shall provide notification to the Monitor at the same time as notification is provided to the Company.  To the extent that the Company fails to cure the alleged conduct within the thirty (30) day period, the Monitor shall have ten (10) days to determine the appropriate action and response.  After that ten (10) day period and unless otherwise ordered by the Monitor or Bankruptcy Court, any Attorney General may petition the Bankruptcy Court  to enforce the terms of this injunction and/or to obtain any remedy as a result of alleged non-compliance with the Company.

I.    **Initial Covered Sackler Persons**

c.    The Initial Covered Sackler Persons shall not actively engage in the opioid business in the United States (other than by virtue of their ownership of beneficial interests in the Company), and shall not take any action that would interfere with the Company's compliance with its obligations under this injunction.

24

## **Appendix II**

## **Form of Withdrawal Notice**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| PURDUE PHARMA L.P., *et al.*, | Case No. 19-23649 (RDD) |
| Debtors.[4] | (Jointly Administered) |

## NOTICE OF WITHDRAWAL FROM THE PRELIMINARY INJUNCTION

By this notice of withdrawal (this "**Withdrawal Notice**"), [NAME OF PARTY] hereby provides notice of its withdrawal from voluntary compliance with the terms of the *Eighth Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction* [Docket No. ●] (the "**Preliminary Injunction Order**"), effective upon entry of the amended order (the "**Amended Order**") involuntarily binding [NAME OF PARTY] to the terms of such Amended Order until and including October 5, 2020.

[NAME OF PARTY]

By: _____

---

[4] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

**<u>Appendix III</u>**

**Chart of Governmental Actions**

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| *State Actions* | | | | | |
| 1. | AG | Alabama | The State of Alabama | The State of Alabama v. Purdue Pharma L.P., et al. | Cir. Ct. Montgomery Cnty. 03-CV-2019-901174 |
| 2. | AG | Alaska | State of Alaska | State of Alaska v. Purdue Pharma L.P., et al. | Super. Ct. AK, 3rd Jud. Dist. 3AN-17-09966 |
| 3. | AG | Arizona | State of Arizona, ex rel. Mark Brnovich, Attorney General | State of Arizona, ex rel. Mark Brnovich, Attorney General v. Purdue Pharma L.P., et al. | Super. Ct. Pima Cnty. C20182471 |
| 4. | AG | Arizona | State of Arizona, ex rel. Mark Brnovich, Attorney General | State of Arizona, ex rel. Mark Brnovich, Attorney General v. Purdue Pharma L.P., et al. | U.S. Supreme Court No. 22O151 |
| 5. | AG | Arkansas | State of Arkansas, ex rel. Leslie Rutledge | State of Arkansas, ex rel. Leslie Rutledge v. Purdue Pharma L.P., et al. | Cir. Ct. Pulaski Cnty. 60-CV-18-2018 |
| 6. | AG | California | The People of the State of California | The People of the State of California v. Purdue Pharma L.P., et al. | Los Angeles Cnty. Super. Ct. No. 19STCV19045 |
| 7. | AG | Colorado | The State of Colorado ex rel. Philip J. Weiser, Attorney General | The State of Colorado ex rel. Phil Weiser, Attorney General v. Purdue Pharma L.P., et al. | District Ct. Denver 2018CV33300 |
| 8. | AG | Connecticut | State of Connecticut | State of Connecticut v. Purdue Pharma L.P., et al. | Hartford State Super. Ct. No. X07 HHD-CV-19-6105325-S |
| 9. | AG | DC | District of Columbia | District of Columbia v. Purdue Pharma L.P., et al. | Super. Ct. District of Columbia 2019 CA 003680 B |
| 10. | AG | Delaware | State of Delaware, ex rel. Kathy Jennings | State of Delaware, ex rel. Kathy Jennings v. Purdue Pharma L.P., et al. | Super. Ct. of Delaware C.A. No. N18C-01-223 MMJ (CCLD) |
| 11. | AG | Florida | State of Florida, Office of the Attorney General, Department of Legal Affairs | State of Florida, Office of the Attorney General, Department of Legal Affairs v. Purdue Pharma L.P., et al. | Cir. Ct. Pasco Cnty. Case No. 2018-CA-001438 |
| 12. | AG | Georgia | State of Georgia | State of Georgia v. Purdue Pharma L.P., et al. | Super. Ct. Gwinnett Cnty. 19-A-00060-4 |
| 13. | AG | Guam | Territory of Guam | Territory of Guam v. Purdue Pharma, L.P., et al. | Super. Ct. Guam, Hagatna CV0220-19 |

Error! Unknown document property name.

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| 14. | AG | Hawaii | State of Hawaii, ex rel. Clare E. Connors, Attorney General | State of Hawaii, ex rel. Clare E. Connors, Attorney General v. Purdue Pharma L.P., et al. | 1st Cir. Ct. of Hawaii 09-1-0862-06 JHA |
| 15. | AG | Idaho | State of Idaho, Through Attorney General Lawrence G. Wasden | State of Idaho, Through Attorney General Lawrence G. Wasden vs. Purdue Pharma L.P., et al. | Ada County District Court CV01-19-10061 |
| 16. | AG | Illinois | The People of the State of Illinois | The People of the State of Illinois v. Purdue Pharma L.P., et al. | Cir. Ct. Cook Cnty. 2019-CH-04406 |
| 17. | AG | Indiana | State of Indiana | State of Indiana v. Purdue Pharma L.P., et al. | Cir. & Superior Ct. Marion Cnty. 49D01-1811-PL-045447 |
| 18. | AG | Iowa | State of Iowa, Thomas J. Miller, Attorney General of Iowa | State of Iowa, Thomas J. Miller, Attorney General of Iowa v. Purdue Pharma L.P., et al. | Polk Cnty. Dist. Ct. EQCE 084514 |
| 19. | AG | Kansas | State of Kansas, ex rel. Derek Schmidt, Attorney General | State of Kansas, ex rel. Derek Schmidt, Attorney General v. Purdue Pharma L.P., et al. | Shawnee Cnty. Dist. Ct. 2019-CV-000369 |
| 20. | AG | Louisiana | State of LA f/k/a Louisiana Dept. of Health | State of LA f/k/a Louisiana Dept. of Health v. Purdue Pharma L.P., et al. | 19th Judicial District Court, Parish of East Baton Rouge 668703 |
| 21. | AG | Maine | State of Maine | State of Maine v. Purdue Pharma L.P., Purdue Pharma Inc., Richard Sackler, Jonathan Sackler, Mortimer D.A. Sackler and Kathe Sackler | State of Maine Kennebec County Superior Court CV-19-112 |
| 22. | AG | Maryland | Consumer Protection Division Office of the Attorney General (Md.) | Consumer Protection Division Office of the Attorney General v. Purdue Pharma L.P., et al. | Consumer Protection Division of the Office of the Attorney General (Md.) / Office of Administrative Hearings CPD Case No.: 311366 OAH Case No. 1923474 |
| 23. | AG | Massachusetts | Commonwealth of Massachusetts | Commonwealth of Massachusetts v. Purdue Pharma L.P., et al. | Super. Ct. Suffolk Cnty. 1884-cv-01808 (BLS2) |
| 24. | AG | Minnesota | State of Minnesota by its Attorney General, Keith Ellison | State of Minnesota by its Attorney General, Keith Ellison v. Purdue Pharma L.P., et al. | 4th Jud. Dist. Ct., Hennepin Cnty. Ct. File No. 27-CV-18-10788 |

2

EXHIBIT D

Page 278

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| 25. | AG | Mississippi | State of Mississippi | State of Mississippi v. Purdue Pharma L.P., et al. | Hinds Cnty. 25CH1:15-cv-001814 |
| 26. | AG | Missouri | State of Missouri, ex rel. Eric Schmitt, in his official capacity as Missouri Attorney General | State of Missouri, ex rel. Eric Schmitt, in his official capacity as Missouri Attorney General v. Purdue Pharma L.P. | Cir. Ct. St. Louis City 1722-CC10626 |
| 27. | AG | Montana | State of Montana | State of Montana v. Purdue Pharma L.P., et al. | Lewis & Clark Cty. ADV-2017-949 |
| 28. | AG | Nevada | State of Nevada | State of Nevada v. McKesson Corp., et al. | Dist. Ct. Clark County A-18-796755-B |
| 29. | AG | New Hampshire | State of New Hampshire | State of New Hampshire v. Purdue Pharma L.P., et al. | Merrimack Super. Ct. 217-2017-CV-00402 |
| 30. | AG | New Jersey | Gurbir S. Grewal, Attorney General and Paul Rodriguez, Acting Director of the New Jersey Division of Consumer Affairs | Gurbir S. Grewal, et al. v. Purdue Pharma L.P., et al. | Super. Ct. NJ Chancery Div., Essex Cty. ESX-C-245-17 |
| 31. | AG | New Mexico | State of New Mexico, ex rel., Hector Balderas, Attorney General | State of New Mexico, ex rel., Hector Balderas, Attorney General v. Purdue Pharma L.P., et al. | Santa Fe Dist. D101-CV-201702541 |
| 32. | AG | New York | The People of the State of New York, by Letitia James, Attorney General of the State of New York | The People of the State of New York, by Letitia James, Attorney General of the State of New York v. Purdue Pharma L.P., et al. | Super. Ct. Suffolk Cnty. 400016/2018 |
| 33. | AG | North Carolina | State of North Carolina, ex rel. Joshua H. Stein, Attorney General | State of North Carolina, ex rel. Joshua H. Stein, Attorney General v. Purdue Pharma L.P., et al. | Super. Ct. Wake Cnty. 18-cvs-6051 |
| 34. | AG | North Dakota | State of North Dakota, ex rel. Wayne Stenehjem, Attorney General | State of North Dakota, ex rel. Wayne Stenehjem, Attorney General v. Purdue Pharma L.P., et al. | Dist. Ct. Burleigh Cnty. 08-2018-CV-01300 |
| 35. | AG | Ohio | State of Ohio, ex rel. David Yost, Ohio Attorney General | State of Ohio, ex rel. David Yost, Ohio Attorney General v. Purdue Pharma L.P., et al. | C.P. Ross Cnty. 17CI000261 |

3

EXHIBIT D
Page 279

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| 36. | AG | Oregon | State of Oregon, ex rel. Ellen F. Rosenblum, Attorney General for the State of Oregon | State of Oregon, ex rel. Ellen F. Rosenblum, Attorney General for the State of Oregon v. Purdue Pharma L.P., et al. | Cir. Ct. Multnomah Cnty. 18CV40526 |
| 37. | AG | Oregon | State of Oregon, ex rel. Ellen F. Rosenblum, Attorney General for the State of Oregon | State of Oregon, ex rel. Ellen F. Rosenblum, Attorney General for the State of Oregon v. Richard S. Sackler, et al. | Cir. Ct. Multnomah Cnty. 19CV22185 |
| 38. | AG | Pennsylvania | Commonwealth of Pennsylvania by Attorney General Josh Shapiro | Commonwealth of Pennsylvania by Attorney General Josh Shapiro v. Purdue Pharma L.P., et al. | Commonwealth Ct. of PA 257-M-19 |
| 39. | AG | Puerto Rico | The Commonwealth of Puerto Rico | The Commonwealth of Puerto Rico v. Purdue Pharma L.P., et al. | Super. Ct. San Juan SJ2019CV01659 |
| 40. | AG | Rhode Island | State of Rhode Island, by and through Peter Neronha, Attorney General | State of Rhode Island, by and through Peter Neronha, Attorney General v. Purdue Pharma L.P., et al. | Providence/Bristol County Super. PC-2018-4555 |
| 41. | AG | South Carolina | State of South Carolina, ex rel. Alan Wilson Attorney General | State of South Carolina, ex rel. Alan Wilson Attorney General v. Purdue Pharma L.P., et al. | Ct. Richland Cnty. 2017-CP-4004872 |
| 42. | AG | South Dakota | State of South Dakota, ex rel. Jason Ravnsborg, South Dakota Attorney General | State of South Dakota, ex rel. Jason Ravnsborg, South Dakota Attorney General v. Purdue Pharma L.P., et al. | Ct. Hughes Cnty. 32CIV18-000065 |
| 43. | AG | Tennessee | State of Tennessee, ex rel. Herbert H. Slatery III, Attorney General and Reporter | State of Tennessee, ex rel. Herbert H. Slatery III, Attorney General and Reporter v. Purdue Pharma L.P., a foreign limited partnership | Ct. Knox Cnty. 1-173-18 |
| 44. | AG | Texas | State of Texas | State of Texas v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-57003 |
| 45. | AG | Utah | Utah Division of Consumer Protection | In the Matter of Purdue Pharma L.P., et al. | Div. Consumer Protection DCP Case No. 107102 |
| 46. | AG | Vermont | State of Vermont | State of Vermont v. Purdue Pharma L.P., et al. | Super. Ct. Chittenden Civ. Div. 783-8-18-CRCV |

4

|  | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| 47. | AG | Virginia | Commonwealth of Virginia, ex rel. Mark R. Herring, Attorney General | Commonwealth of Virginia, ex rel. Mark R. Herring, Attorney General v. Purdue Pharma L.P., et al. | Cir. Ct. Tazewell Cnty. CL18-1076 |
| 48. | AG | Washington | State of Washington | State of Washington v. Purdue Pharma L.P., et al. | Super. Ct. King Cty. 17-2-25505-0 SEA |
| 49. | AG | West Virginia | State of West Virginia, ex rel. Patrick Morrisey, Attorney General | State of West Virginia, ex rel. Patrick Morrisey, Attorney General v. Purdue Pharma L.P., et al. | Cir. Ct. Boone Cnty. 19-C-92 |
| 50. | AG | Wisconsin | State of Wisconsin | State of Wisconsin v. Purdue Pharma L.P., et al. | Cir. Ct. Dane Cnty. 2019CX000009 |
| 51. | AG | Wyoming | State of Wyoming, ex rel. Bridget Hill, Attorney General | State of Wyoming, ex rel. Bridget Hill, Attorney General v. Purdue Pharma L.P., et al. | 1st Jud. Ct. Laramie Cnty. 188-776 |
| *Tribal (MDL)* | | | | | |
| 52. | Tribal | MDL | Puyallup Tribe of Indians | Puyallup Tribe of Indians v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45660 Master Case No. 17-md-2804 |
| 53. | Tribal | MDL | The Blackfeet Tribe of the Blackfeet Indian Reservation | The Blackfeet Tribe of the Blackfeet Indian Reservation v. AmerisourceBergen Drug Corp., et al. | N.D. Ohio 17:18-op-45749 Master Case No. 17-md-2804 |
| 54. | Tribal | MDL | The Muscogee (Creek) Nation | The Muscogee (Creek) Nation v. Purdue Pharma L.P., et al. | N.D. Ohio 1:18-op-45459 Master Case No. 17-md-2804 |
| *Tribal (State Court)* | | | | | |
| 55. | Tribal | Oklahoma | Apache Tribe of Oklahoma | Apache Tribe of Oklahoma v. Purdue Pharma L.P., et al. | Dist. Caddo Cnty. CJ-2019-69 |
| *Local Government (State Court)* | | | | | |
| 56. | Municipality | Arizona | Bullhead City | Bullhead City v. Allergan PLC, et al. | Mohave Cnty. Super. Ct. Case No. S8015cv201900591 |
| 57. | Municipality | Arizona | City of Glendale | City of Glendale v. Allergan PLC, et al. | Maricopa Cnty. Super. Ct. Case No. CV2019-010792 |

EXHIBIT D
Page 281

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| 58. | Municipality | Arizona | City of Prescott | City of Prescott v. Allergan PLC, et al. | Yavapai Cnty. Super. Ct. Case No. P1300cv201900393 |
| 59. | Municipality | Arizona | City of Surprise | City of Surprise v. Allergan PLC, et al. | Maricopa Cnty. Super. Ct. Case No. CV2019-003439 |
| 60. | Municipality | Arizona | County of Apache | County of Apache v. Allergan PLC, et al. | Apache Cnty. Super. Ct. Case No. S0100cv201900101 |
| 61. | Municipality | Arizona | County of La Paz | County of La Paz v. Allergan PLC, et al. | La Paz Cnty. Super. Ct. Case No. S1500cv201900053 |
| 62. | Municipality | Arizona | Pinal County | Pinal County v. Allergan PLC, et al. | Sup. Ct. Pinal Cnty. S1100CV201901448 |
| 63. | Prosecuting Attorney | Arkansas | State of Arkansas, ex rel. Scott Ellington; City of Little Rock; City of Fort Smith; City of Springdale; City of Jonesboro; City of North Little Rock; City of Conway; City of Rogers; City of Pine Bluff; City of Bentonville; City of Hot Springs; City of Benton; City of Texarkana; City of Sherwood; City of Jacksonville; City of Monticello; County of Arkansas; County of Ashley; County of Baxter; County of Benton; County of Boone; County of Bradley; County of Calhoun; County of Carroll; County of Chicot; County of Clark; | State of Arkansas, ex rel. Scott Ellington v. Purdue Pharma L.P., et al. | Cir. Ct., Crittenden Cnty. CV-2018-268 |

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| | | | County of Clay;<br>County of Cleburne;<br>County of Cleveland;<br>County of Columbia;<br>County of Conway;<br>County of Craighead;<br>County of Crawford;<br>County of Cross;<br>County of Dallas;<br>County of Desha;<br>County of Faulkner;<br>County of Franklin;<br>County of Fulton;<br>County of Garland;<br>County of Grant;<br>County of Greene;<br>County of Hempstead;<br>County of Hot Spring;<br>County of Howard;<br>County of Independence;<br>County of Izard;<br>County of Jackson;<br>County of Johnson;<br>County of Lafayette;<br>County of Lawrence;<br>County of Lee;<br>County of Lincoln;<br>County of Little River;<br>County of Logan;<br>County of Lonoke;<br>County of Madison;<br>County of Miller;<br>County of Mississippi;<br>County of Monroe;<br>County of Montgomery;<br>County of Ouachita;<br>County of Perry;<br>County of Phillips; | | |

7

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| | | | County of Pike; County of Poinsett; County of Polk; County of Pope; County of Prairie; County of Randolph; County of St. Francis; County of Saline; County of Scott; County of Searcy; County of Sebastian; County of Sevier; County of Sharp; County of Stone; County of Union; County of Van Buren; County of Washington; County of White; County of Woodruff; County of Yell | | |
| 64. | Municipality | California | City of El Monte, and The People of the State of California, by and through El Monte City Attorney Rick Olivarez | City of El Monte, and The People of the State of California, by and through El Monte City Attorney Rick Olivarez v. Purdue Pharma L.P., et al. | El Monte County Super. Ct. 19PCV10532 |

|     | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|-----|------|-------|---------------------------------------|-----------|----------------------|
| 65. | Municipality | California | City of Santa Ana; City of San Clemente; City of Encinitas; City of La Habra; City of La Mesa; City of Oxnard; City of Placentia; The People of the State of California, by and through Santa Ana City Attorney Sonia R. Carvalho, San Clemente City Attorney Scott C. Smith, Encinitas City Attorney Glenn Sabine, La Habra City Attorney Richard D. Jones, La Mesa City Attorney Glenn Sabine, Oxnard City Attorney Stephen Fischer, and Placentia City Attorney Christian Bettenhausen | City of Santa Ana, et al. v. Actavis Pharma, Inc., et al. | Super. Ct. Orange Cnty. 30-2019-01101802 |
| 66. | Municipality | California | County of Kern, and The People of the State of California, by and through Kern County Counsel Margo Raison | County of Kern, and The People of the State of California, by and through Kern County Counsel Margo Raison v. Purdue Pharma L.P., et al. | Kern Cnty. Super. Ct. BCV-19-100861 |
| 67. | Municipality | California | The People of the State of California, acting by and through Santa Clara County Counsel James R. Williams, Orange County District Attorney Tony Rackauckas, Los Angeles County Counsel Mary C. Wickham, and Oakland City Attorney Barbara J. Parker | The People of the State of California, acting by and through Santa Clara County Counsel James R. Williams, Orange County District Attorney Tony Rackauckas, Los Angeles County Counsel Mary C. Wickham, and Oakland City Attorney Barbara J. Parker v. Purdue Pharam L.P., et al. | Orange Co. Super Ct. 30-2014-00725287-CU-BT-CXC (short version: 14-725287) |

EXHIBIT D
Page 285

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| 68. | Municipality | Connecticut | The City of Ansonia; The City of Danbury; The City of Derby; The City of Norwalk | The City of Ansonia, The City of Danbury, The City of Derby, and The City of Norwalk v. Purdue Pharma L.P., et al. | Hartford State Super. Ct. HHD-CV-18-6098036-S |
| 69. | Municipality | Connecticut | City of New Britain | City of New Britain v. Purdue Pharma L.P., et al. | Hartford State Super. Ct. HHD-CV-18-6087132-S |
| 70. | Municipality | Connecticut | The Borough of Naugatuck; The City of Bridgeport; The City of Bristol; The City of Milford; The City of Shelton; The City of Torrington; The City of West Haven; The Town of Beacon Falls; The Town of East Hartford; The Town of Fairfield; The Town of Newtown; The Town of North Haven; The Town of Oxford; The Town of Southbury; The Town of Southington; The Town of Thomaston; The Town of Tolland' The Town of Woodbury | The City of Bridgeport, et al. v. Purdue Pharma L.P., et al. | Hartford State Super. Ct. HHD-CV-18-6088462-S |
| 71. | Municipality | Connecticut | The City of New Haven | The City of New Haven v. Purdue Pharma L.P., et al. | Hartford State Super. Ct. HHD-CV-17-6086134-S |
| 72. | Municipality | Connecticut | The City of New London | The City of New London v. Purdue Pharma L.P., et al. | Hartford State Super. Ct. HHD-CV-18-6094421-S |
| 73. | Municipality | Connecticut | The City of Waterbury | The City of Waterbury v. Purdue Pharma L.P., et al. | Hartford State Super. Ct. HHD-CV-17-6088121-S |

EXHIBIT D
Page 286

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| 74. | Municipality | Connecticut | The Town of Berlin; The Town of Bethlehem; The Town of Coventry; The Town of Middlebury; The Town of New Milford; The Town of Prospect; The Town of Roxbury; The Town of Seymour; The Town of Stratford; The Town of Wolcott | The Town of Berlin; The Town of Bethlehem; The Town of Coventry v. Purdue Pharma L.P., The Town of Middlebury; The Town of New Milford; The Town of Prospect; The Town of Roxbury;The Town of Seymour; The Town of Stratford; and The Town of Wolcott; et al. | Hartford State Super. Ct. HHD-CV-18-6099290-S |
| 75. | Municipality | Connecticut | Town of Wallingford | Town of Wallingford v. Purdue Pharma L.P., et al. | Hartford State Super. Ct. HHD-CV-18-6094422-S |
| 76. | Municipality | Illinois | County of Lake; Michael Nerheim, Lake County State's Attorney; Mark C. Curran, Jr., Lake County Sheriff; Dr. Howard Cooper, Lake County Coroner; The County of Lake in the Name of the People of the State of Illinois | County of Lake, et al. v. Purdue Pharma L.P., et al. | Cir. Ct. Cook Cnty. 2018-L-003728 |
| 77. | Municipality | Illinois | City of Sesser | City of Sesser v. Purdue Pharma L.P., et al. | Cir. Ct. Cook Cnty. 2019-L-008147 |
| 78. | Municipality | Illinois | City of Granite City, Illinois | City of Granite City, Illinois v. AmerisourceBergen Drug Corp., et al. | Cir. Ct. Madison Cnty. 2020-L-000587 |
| | | | | | Cir. Ct. Cook Cnty. 2019-L-010351 |
| 79. | Municipality | Illinois | The City of Burbank | The City of Burbank v. Purdue Pharma L.P., et al. | Cir. Ct. Cook Cnty. 2019-L-012659 |
| 80. | Municipality | Illinois | The City of Countryside | The City of Countryside v. Purdue Pharma L.P., et al. | Cir. Ct. Cook Cnty. 2019-L-012640 |
| 81. | Municipality | Illinois | The People of the State of Illinois and Boone County, Illinois | The People of the State of Illinois and Boone County, Illinois v. Purdue Pharma L.P., et al. | Cir. Ct. Boone Cnty. 2018-L-000007 |
| | | | | | Cir. Ct. Cook Cnty. 2019-L-004539 |

11

EXHIBIT D
Page 287

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| 82. | Municipality | Illinois | The People of the State of Illinois and Bureau County, Illinois | The People of the State of Illinois and Bureau County, Illinois v. Purdue Pharma L.P., et al. | Cir. Ct. Cook Cnty. 2018-L-004542 |
| 83. | Municipality | Illinois | The People of the State of Illinois and Champaign County, Illinois | The People of the State of Illinois and Champaign County, Illinois v. Purdue Pharma L.P., et al. | Cir. Ct. Champaign Cnty. 2018-L-000006 Cir. Ct. Cook Cnty. 2018-L-005935 |
| 84. | Municipality | Illinois | The People of the State of Illinois and Cook County, Illinois | The People of the State of Illinois and Cook County, Illinois v. Purdue Pharma L.P., et al. | Cir. Ct. Cook County 2017-L-013180 |
| 85. | Municipality | Illinois | The People of the State of Illinois, and DeKalb County, Illinois | The People of the State of Illinois, and DeKalb County, Illinois v. Purdue Pharma L.P., et al. | Cir. Ct. DeKalb Cnty. 2018-L-000072 Cir. Ct. Cook Cnty. 2018-L-013655 |
| 86. | Municipality | Illinois | The People of the State of Illinois, and DuPage County, Illinois | The People of the State of Illinois, and DuPage County, Illinois v. Purdue Pharma L.P., et al. | Cir. Ct. Cook Cnty. 2018-L-004542 |
| 87. | Municipality | Illinois | The People of the State of Illinois, and Henry County, Illinois | The People of the State of Illinois, and Henry County, Illinois v. Purdue Pharma L.P., et al. | Cir. Ct. Henry Cnty. 2018-L-000016 Cir. Ct. Cook Cnty. 2018-L-012690 |
| 88. | Municipality | Illinois | The People of the State of Illinois and Jersey County, Illinois | The People of the State of Illinois and Jersey County, Illinois v. Purdue Pharma L.P., et al. | Cir. Ct. Cook Cnty. 2018-L-003908 |
| 89. | Municipality | Illinois | The People of the State of Illinois, and Kane County, Illinois | The People of the State of Illinois, and Kane County, Illinois v. Purdue Pharma L.P., et al. | Cir. Ct. Cook Cnty. 2018-L-002943 |

EXHIBIT D
Page 288

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| 90. | Municipality | Illinois | The People of the State of Illinois and Kankakee County, Illinois | The People of the State of Illinois and Kankakee County, Illinois v. Purdue Pharma L.P., et al. | Kankakee Cnty. 2017-L-000104<br><br>Cir. Ct. Cook Cnty. 2018-L-004538 |
| 91. | Municipality | Illinois | The People of the State of Illinois, and Kendall County, Illinois | The People of the State of Illinois, and Kendall County, Illinois v. Purdue Pharma L.P., et al. | Cir. Ct. Kendall Cnty. 2018-L-000078<br><br>Cir. Ct. Cook Cnty. 2018-L-012741 |
| 92. | Municipality | Illinois | The People of the State of Illinois and LaSalle County | The People of the State of Illinois and LaSalle County v. Purdue Pharma L.P., et al. | Cir. Ct. LaSalle Cnty. 2018-L-000052<br><br>Cir. Ct. Cook Cnty. 2018-L-008722 |
| 93. | Municipality | Illinois | The People of the State of Illinois and Macon County, Illinois | The People of the State of Illinois and Macon County, Illinois v. Purdue Pharma L.P., et al. | Cir. Ct. Cook Cnty. 2018-L-002916 |
| 94. | Municipality | Illinois | The People of the State of Illinois, and Macoupin County, Illinois | The People of the State of Illinois, and Macoupin County, Illinois v. Purdue Pharma L.P., et al. | Cir. Ct. Macoupin Cnty. 2018-L-000030<br><br>Cir. Ct. Cook Cnty. 2018-L-013247 |
| 95. | Municipality | Illinois | The People of the State of Illinois, and McHenry County, Illinois | The People of the State of Illinois, and McHenry County, Illinois v. Purdue Pharma L.P., et al. | Cir. Ct. Cook Cnty. 2018-L-002948 |
| 96. | Municipality | Illinois | The People of the State of Illinois, and McLean County, Illinois | The People of the State of Illinois and McLean County, Illinois v. Purdue Pharma L.P. et al. | Cir. Ct. McLean Cnty. 2018-L-0000108 |
| 97. | Municipality | Illinois | The People of the State of Illinois, and Piatt County, Illinois | The People of the State of Illinois, and Piatt County, Illinois v. Purdue Pharma L.P., et al. | Cir. Ct. Piatt Cnty. 2018-L-000007<br><br>Cir. Ct. Cook Cnty. 2018-L-012689 |

EXHIBIT D
Page 289

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| 98. | Municipality | Illinois | The People of the State of Illinois, and Will County, Illinois | The People of the State of Illinois, and Will County, Illinois v. Purdue Pharma L.P., et al. | Cir. Ct. Cook Cnty. 2018-L-004546 |
| 99. | Municipality | Illinois | The Village of Bedford Park | The Village of Bedford Park v. Purdue Pharma L.P., et al. | Cir. Ct. Cook Cnty. 2018-L-008819 |
| 100. | Municipality | Illinois | Village of Bridgeview | Village of Bridgeview v. Purdue Pharma L.P., et al. | Cir. Ct. Cook Cnty. 2018-L-009526 |
| 101. | Municipality | Illinois | The Village of Evergreen Park | The Village of Evergreen Park v. Purdue Pharma L.P., et al. | Cir. Ct. Cook Cnty. 2018-L-012652 |
| 102. | Municipality | Illinois | Village of Hodgkins | Village of Hodgkins v. Purdue Pharma L.P., et al. | Cir. Ct. Cook Cnty. 2018-L-009848 |
| 103. | Municipality | Illinois | The Village of Lyons | The Village of Lyons v. Purdue Pharma L.P., et al. | Cir. Ct. Cook Cnty. 2018-L-008746 |
| 104. | Municipality | Illinois | The Village of Summit | The Village of Summit v. Purdue Pharma L.P., et al. | Cir. Ct. Cook Cnty. 2018-L-008803 |
| 105. | Municipality | Maryland | Anne Arundel County, Maryland | Anne Arundel County, Maryland v. Purdue Pharma L.P., et al. | Cir. Ct. Anne Arundel Cnty. C-02-CV-18-000021 |
| 106. | Municipality | Maryland | Mayor & City Council of Baltimore | Mayor & City Council of Baltimore v. Purdue Pharma L.P., et al. | Cir. Ct. Baltimore City 24C18000515 |
| 107. | Municipality | Massachusetts | City of Boston; The Boston Public Health Commission; The Boston Housing Authority | City of Boston, The Boston Public Health Commission, The Boston Housing Authority v. Purdue Pharma L.P., et al. | Super. Ct. Suffolk Cnty. 1884CV02860B |
| 108. | Municipality | Massachusetts | City of Cambridge | City of Cambridge v. Purdue Pharma L.P., et al. | Super. Ct. Middlesex Cnty. 1581CV1244 |
| 109. | Municipality | Massachusetts | City of Chicopee | City of Chicopee v. Purdue Pharma L.P., et al. | Super. Ct. Hampden Cnty. 1779CV00074 |
| 110. | Municipality | Massachusetts | City of Framingham | City of Framingham v. Purdue Pharma L.P., et al. | Super. Ct. Middlesex Cnty. 1581CV3883 |
| 111. | Municipality | Massachusetts | City of Gloucester | City of Gloucester v. Purdue Pharma L.P., et al. | Super. Ct. Essex Cnty. 1877CV01773 |
| 112. | Municipality | Massachusetts | City of Haverhill | City of Haverhill v. Purdue Pharma L.P., et al. | Super. Ct. Essex Cnty. 1877CV01762A |

14

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| 113. | Municipality | Massachusetts | City of Salem | City of Salem v. Purdue Pharma L.P., et al. | Super. Ct. Essex Cnty. 1899CV01767A |
| 114. | Municipality | Massachusetts | City of Worcester | City of Worcester v. Purdue Pharma L.P., et al. | Super. Ct. Suffolk Cnty. No. 1984CV00543 |
| 115. | Municipality | Massachusetts | Town of Canton | Town of Canton v. Purdue Pharma L.P., et al. | Super. Ct. Norfolk Cnty. 18-1582 |
| 116. | Municipality | Massachusetts | Town of Lynnfield | Town of Lynnfield v. Purdue Pharma L.P., et al. | Super. Ct. Essex Cnty. 1899CV01769D |
| 117. | Municipality | Massachusetts | Town of Natick | Town of Natick v. Purdue Pharma L.P., et al. | Super. Ct. Middlesex Cnty. 19-692 |
| 118. | Municipality | Massachusetts | Town of Randolph | Town of Randolph v. Purdue Pharma L.P., et al. | Super. Ct. Norfolk Cnty. 1982CV00400 |
| 119. | Municipality | Massachusetts | Town of Springfield | Town of Springfield v. Purdue Pharma L.P., et al. | Super. Ct. Hampden Cnty. 1579CV00906 |
| 120. | Municipality | Massachusetts | Town of Wakefield | Town of Wakefield v. Purdue Pharma L.P., et al. | Super. Ct. Middlesex Cnty. 1834158 |
| 121. | Municipality | Missouri | Butler County; Cape Girardeau County; Christian County; City of Independence; City of Joplin; Crawford County; Dent County; Dunklin County; Franklin County; Greene County; Iron County; Jasper County; Jefferson County; Madison County; Perry County; Ste. Genevieve County; Stone County; Taney County; Texas County; Washington County | Jefferson County, et al. v. Dannie E. Williams, M.D., et al. | 23rd Judicial Cir. Ct., St. Louis City 1522-CC00203 |
| 122. | Municipality | Missouri | Polk County, Missouri | Polk County, Missouri v. Allergan PLC, et al. | Cir. Ct. Polk Cnty. 19PO-CC11660 |

15

EXHIBIT D
Page 291

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| 123. | Municipality | Nevada | City of Henderson | City of Henderson v. Purdue Pharma L.P., et al. | Eighth Jud. Dist. Ct. Clark Cnty. A-19-800695-B Dept. 11 |
| 124. | Municipality | Nevada | City of Las Vegas | City of Las Vegas v. Purdue Pharma L.P., et al. | Eighth Jud. Dist. Ct. Clark Cnty. A-19-800697-B Dept. 27 |
| 125. | Municipality | Nevada | City of North Las Vegas | City of North Las Vegas v. Purdue Pharma L.P., et al. | Eighth Jud. Dist. Ct. Clark Cnty. A-19-800699-B Dept. 11 |
| 126. | Municipality | Nevada | City of Reno | City of Reno v. Purdue Pharma L.P., et al. | Eighth Jud. Dist Ct. Washoe Cnty. CV19-01895 |
| 127. | Municipality | New Jersey | City of Trenton | City of Trenton v. Purdue Pharma L.P., et al. | Super. Ct. NJ, Mercer Cnty. MER-L-001167-19 |
| 128. | Municipality | New Jersey | County of Ocean, NJ | County of Ocean, NJ v. Purdue Pharma L.P., et al. | Super. Ct. NJ, Ocean Cnty. OCN-L-0014740-19 |
| 129. | Municipality | New York | The City of Albany | The City of Albany v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400004/2019 |
| 130. | Municipality | New York | City of Alma, GA; Village of Amityville, NY; Town of Babylon, NY; Village of Babylon, NY; Village of Babylon, NY; Bacon County, GA; City of Bayonne, NJ; Village of Bellport, NY; City of Blackshear, GA; Town of Brookhaven, NY; City of Brunswick, GA; Chatham County, GA; Town of Clarkstown, NY; City of Clifton, NJ; Town of Clinton, NJ; Dade County, GA; City of Demorest, GA; East Hampton Village, NY; Village of East Rockaway, NY; City of Elizabeth, NJ; Village of Farmingdale, NY; | City of Alma, GA, et al. v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400001/2019 |

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| | | | Village of Floral Park, NY; Village of Garden City, NY; Village of Greenport, NY; Town of Haverstraw, NY; Town of Hempstead, NY; Town of Huntington, NY; Village of Island Park, NY; Village of Islandia, NY; Town of Islip, NY; Village of Lake Grove, NY; Village of Lawrence, NY; Village of Lindenhurst, NY; Village of Lloyd Harbor, NY; City of Long Beach, NY; Village of Lynbrook, NY; Village of Massapequa Park, NY; Village of Mill Neck, NY; Village of Millerton, NY; Village of New Hyde Park, NY; Village of Nissequoge, NY; Town of North Hempstead, NY; Village of Northport, NY; Village of Old Westbury, NY; Town of Orangetown, NY; Town of Oyster Bay, NY; Borough of Paramus, NJ; Village of Patchogue, NY; Pierce County, GA; City of Pooler, GA; Village of Poquott, NY; Village of Port Washington North, NY; City of Richmond Hill, GA; Town of Riverhead, NY; Village of Saltaire, NY; Town of Smithtown, NY; Town of Southampton, NY; Town of Southold, NY; | | |

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| | | | Village of Stewart Manor, NY; Village of Suffern, NY; Village of Valley Stream, NY; Village of the Branch, NY; Town of Wappinger, NY; Village of Wappinger Falls, NY; Village of West Hampton Dunes, NY; Village of West Haverstraw, NY; Village of Westbury, NY; Village of Hempstead, NY | | |
| 131. | Municipality | New York | The City of Buffalo | The City of Buffalo v. Purdue Pharma L.P., et al. | Sup. Ct. Erie Cnty. 813539-2019 |
| 132. | Municipality | New York | City of Ithaca | City of Ithaca v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty 400002/2018 |
| 133. | Municipality | New York | The City of Mount Vernon | The City of Mount Vernon v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400056/2019 |
| 134. | Municipality | New York | City of New York | City of New York v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty 400016/2018 |
| 135. | Municipality | New York | City of Plattsburgh | City of Plattsburgh v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400063/2019 |
| 136. | Municipality | New York | City of Schenectady | City of Schenectady v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400065/2019 |
| 137. | Municipality | New York | City of Troy | City of Troy v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400066/2019 |
| 138. | Municipality | New York | City of Yonkers | City of Yonkers v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400050/2019 |
| 139. | Municipality | New York | County of Broome | County of Broome v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400002/2017 |
| 140. | Municipality | New York | The County of Cattaraugus | The County of Cattaraugus v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400027/2019 |
| 141. | Municipality | New York | The County of Cayuga | The County of Cayuga v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400003/2019 |
| 142. | Municipality | New York | The County of Chautauqua | The County of Chautauqua v. Purdue Pharma L.P., et al. | Sup. Ct. Chautauqua Cnty. K1-2018-57 |
| 143. | Municipality | New York | The County of Chenango | The County of Chenango v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400031/2019 |

EXHIBIT D

Page 294

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| 144. | Municipality | New York | The County of Clinton | The County of Clinton v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty 400003/2018 |
| 145. | Municipality | New York | County of Columbia | County of Columbia v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400015/2018 |
| 146. | Municipality | New York | The County of Cortland | The County of Cortland v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400019/2018 |
| 147. | Municipality | New York | County of Dutchess | County of Dutchess v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400085/2017 |
| 148. | Municipality | New York | County of Erie | County of Erie v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400083/2017 |
| 149. | Municipality | New York | The County of Essex | The County of Essex v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty 400019/2019 |
| 150. | Municipality | New York | The County of Franklin | The County of Franklin v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty 400052/2018 |
| 151. | Municipality | New York | The County of Fulton | The County of Fulton v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400018/2018 |
| 152. | Municipality | New York | The County of Genesee | The County of Genesee v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400021/2018 |
| 153. | Municipality | New York | The County of Greene | The County of Greene v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400028/2018 |
| 154. | Municipality | New York | The County of Hamilton | The County of Hamilton v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty 400055/2018 |
| 155. | Municipality | New York | County of Herkimer | County of Herkimer v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400083/2019 |
| 156. | Municipality | New York | The County of Lewis | The County of Lewis v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400077/2019 |
| 157. | Municipality | New York | The County of Livingston | The County of Livingston v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400013/2018 |
| 158. | Municipality | New York | The County of Madison | The County of Madison v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400008/2019 |
| 159. | Municipality | New York | The County of Monroe | The County of Monroe v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400027/2018 |
| 160. | Municipality | New York | County of Montgomery | County of Montgomery v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400069/2019 |
| 161. | Municipality | New York | County of Nassau | County of Nassau v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400018/2017 |

EXHIBIT D
Page 295

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| 162. | Municipality | New York | County of Niagara | County of Niagara v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400012/2017 |
| 163. | Municipality | New York | The County of Ontario | The County of Ontario v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400001/2019 |
| 164. | Municipality | New York | County of Orange | County of Orange v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400004/2017 |
| 165. | Municipality | New York | County of Oswego | County of Oswego v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400087/2018 |
| 166. | Municipality | New York | The County of Otsego | The County of Otsego v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400024/2019 |
| 167. | Municipality | New York | The County of Putnam | The County of Putnam v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400014/2019 |
| 168. | Municipality | New York | County of Rensselaer | County of Rensselaer v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400201/2017 |
| 169. | Municipality | New York | County of St. Lawrence | County of St. Lawrence v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400012/2019 |
| 170. | Municipality | New York | County of Saratoga | County of Saratoga v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty 400100/2018 |
| 171. | Municipality | New York | County of Schenectady | County of Schenectady v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400089/2017 |
| 172. | Municipality | New York | County of Schoharie | County of Schoharie v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400050/2017 |
| 173. | Municipality | New York | The County of Schuyler | The County of Schuyler v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400024/2018 |
| 174. | Municipality | New York | County of Seneca | County of Seneca v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400069/2017 |
| 175. | Municipality | New York | The County of Steuben | The County of Steuben v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty 400064/2018 |
| 176. | Municipality | New York | County of Suffolk | County of Suffolk v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400001/2017 |
| 177. | Municipality | New York | County of Sullivan | County of Sullivan v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400067/2017 |
| 178. | Municipality | New York | The County of Tioga | The County of Tioga v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400002/2019 |
| 179. | Municipality | New York | County of Tompkins | County of Tompkins v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty 400031/2018 |

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| 180. | Municipality | New York | The County of Ulster | The County of Ulster v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400011/2019 |
| 181. | Municipality | New York | The County of Warren | The County of Warren v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400030/2019 |
| 182. | Municipality | New York | The County of Washington | The County of Washington v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400010/2019 |
| 183. | Municipality | New York | County of Westchester | County of Westchester v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400080/2018 |
| 184. | Municipality | New York | The County of Wyoming | The County of Wyoming v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty 400063/2018 |
| 185. | Municipality | New York | The Town of Amherst | The Town of Amherst v. Purdue Pharma L.P., et al. | Sup. Ct. Erie Cnty. 803887-2018 |
| 186. | Municipality | New York | The Town of Cheektowaga | The Town of Cheektowaga v. Purdue Pharma L.P., et al. | Sup. Ct. Erie Cnty. 805051-2018 |
| 187. | Municipality | New York | The Town of Lancaster | The Town of Lancaster v. Purdue Pharma L.P., et al. | Sup. Ct. Erie Cnty. 805350-2018 |
| 188. | Municipality | New York | The Town of Tonawanda | The Town of Tonawanda v. Purdue Pharma L.P., et al. | Sup. Ct. Erie Cnty. 810733-2018 |
| 189. | Municipality | New York | The Town of Wappinger, New York | The Town of Wappinger, New York v. Purdue Pharma L.P., et al. | Sup. Ct. Dutchess Cnty. 2018-54549 |
| 190. | Municipality | New York | The Village of Wappingers Falls, New York | The Village of Wappingers Falls, New York v. Purdue Pharma L.P., et al. | Sup. Ct. Dutchess Cnty. 2018-53838 |
| 191. | Municipality | Ohio | The County of Medina, Ohio; The State of Ohio ex rel. Prosecuting Attorney of Medina County, S. Forrest Thompson | The County of Medina, Ohio; The State of Ohio ex rel. Prosecuting Attorney of Medina County, S. Forrest Thompson v. Purdue Pharma L.P., et al. | Ct. Medina Cnty. 17CIV-0838 |
| 192. | Municipality | Oklahoma | Board of County Commissioners of Cleveland County | Board of County Commissioners of Cleveland County v. Purdue Pharma L.P., et al. | D. Cleveland Cnty. CJ-2019-592 |
| 193. | Municipality | Oklahoma | Board of County Commissioners of Greer County | Board of County Commissioners of Greer County v. Purdue Pharma L.P., et al. | D. Cleveland Cnty. CJ-2019-12 |

EXHIBIT D
Page 297

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| 194. | Municipality | Oklahoma | Board of County Commissioners of Hughes County | Board of County Commissioners of Hughes County v. Purdue Pharma L.P., et al. | D. Ct. Hughes Cnty. CJ-2019-36 |
| 195. | Municipality | Oklahoma | Board of County Commissioners of McCurtain County | Board of County Commissioners of McCurtain County v. Purdue Pharma L.P., et al. | D. Ct. McCurtain Cnty. CJ-2019-54 |
| 196. | Municipality | Oklahoma | Board of County Commissioners of Noble County | Board of County Commissioners of Noble County v. Purdue Pharma L.P., et al. | D. Ct. Noble Cnty. CJ-2019-05 |
| 197. | Municipality | Oklahoma | City of Burns Flat | City of Burns Flat v. Purdue Pharma L.P., et al. | D. Ct. Washita Cnty. CJ-2019-29 |
| 198. | Municipality | Pennsylvania | Bedford County | Bedford County v. Purdue Pharma L.P., et al. | Ct. Bedford Cnty. 180-2020 |
| 199. | Municipality | Pennsylvania | Wampum Borough | Wampum Borough v. Purdue Pharma L.P., et al. | Ct. Philadelphia Cnty. July Term 2018 No. 01963 |
| 200. | Municipality | Pennsylvania | City of Lock Haven | City of Lock Haven v. Purdue Pharma L.P., et al. | Ct. Clinton Cnty. 172-2018 |
| 201. | Municipality | Pennsylvania | City of Philadelphia | City of Philadelphia v. Allergan PLC, et al. | Ct. Philadelphia July Term 2018, No. 002718 |
| 202. | Municipality | Pennsylvania | City of Pittsburgh | City of Philadelphia v. Allergan PLC, et al. | Ct. Allegheny Cnty. GD-19-153 |
| 203. | Municipality | Pennsylvania | Commonwealth of PA, acting by and through Philadelphia District Attorney Lawrence S. Krasner | Commonwealth of PA, acting by and through Philadelphia District Attorney Lawrence S. Krasner v. Purdue Pharma L.P., et al. | Ct. Delaware Cnty. CV-2017-008095 PA Ct. Com. Pl. January Term 2018, No. 05594 |
| 204. | Municipality | Pennsylvania | Commonwealth of PA, acting by James Martin; People of Lehigh County and Lehigh County, PA | Commonwealth of PA, acting by James Martin; People of Lehigh County and Lehigh County, PA v. Purdue Pharma L.P., et al. | Ct. Lehigh Cnty. 2018-C-0716 |

EXHIBIT D
Page 298

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| 205. | Municipality | Pennsylvania | Commonwealth of Pennsylvania, acting by and through Francis T. Chardo, the District Attorney of Dauphin County | Commonwealth of Pennsylvania, acting by and through Francis T. Chardo, the District Attorney of Dauphin County v. AmerisourceBergen Drug Corp., et al. | C.P. Dauphin Cnty., 12th Jud. Dist. 2019-CV-7795-CV |
| 206. | Municipality | Pennsylvania | Commonwealth of Pennsylvania, acting by and through Jack Daneri, the District Attorney of Erie County | Commonwealth of Pennsylvania, acting by and through Jack Daneri, the District Attorney of Erie County v. AmerisourceBergen Drug Corp., et al. | C.P. Erie Cnty., 6th Jud. Dist. 12835-19 |
| 207. | Municipality | Pennsylvania | Commonwealth of Pennsylvania, Acting by and through Jack Stollsteimer, the District Attorney of Delaware County | Commonwealth of Pennsylvania, Acting by and through Jack Stollsteimer, the District Attorney of Delaware County v. AmerisourceBergen | C.P. Delaware Cnty. CV-2020-002026 |
| 208. | Municipality | Pennsylvania | Commonwealth of Pennsylvania, acting by and through John T. Adams, the District Attorney of Berks County | Commonwealth of Pennsylvania, acting by and through John T. Adams, the District Attorney of Berks County v. AmerisourceBergen Drug Corp., et al. | C.P. Berks Cnty. 19-12232 |
| 209. | Municipality | Pennsylvania | Commonwealth of Pennsylvania, Acting by and through Matthew D. Weintraub, the District Attorney of Bucks County | Commonwealth of Pennsylvania, Acting by and through Matthew D. Weintraub, the District Attorney of Bucks County v. AmerisourceBergen Drug Corp., et al. | C.P. Bucks Cnty. 2020-00639 |
| 210. | Municipality | Pennsylvania | Armstrong County, PA | Armstrong County, PA v. Purdue Pharma L.P., et al. | C.P. Armstrong Cnty. 2018-1570-CV |
| 211. | Municipality | Pennsylvania | County of Allegheny | County of Allegheny v. Purdue Pharma L.P., et al. | C.P. Allegheny Cnty. 18-006155 |
| 212. | Municipality | Pennsylvania | Beaver County, Pennsylvania | Beaver County, Pennsylvania v. Purdue Pharma L.P., et al. | C.P. Beaver Cnty. 11542-2017 |
| 213. | Municipality | Pennsylvania | County of Bradford | County of Bradford v. Purdue Pharma L.P., et al. | C.P. Bradford Cnty. 2019-CV-0059 |

EXHIBIT D
Page 299

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| 214. | Municipality | Pennsylvania | Bucks County | Bucks County v. Purdue Pharma L.P., et al. | C.P. Bucks Cnty. No. 2018-03144 |
| 215. | Municipality | Pennsylvania | Cambria County, Pennsylvania | Cambria County, Pennsylvania v. Purdue Pharma L.P., et al. | C.P. Cambria Cnty 2017-4131 |
| 216. | Municipality | Pennsylvania | County of Carbon | County of Carbon v. Purdue Pharma L.P., et al. | C.P. Carbon Cnty. No. 18-0990 |
| 217. | Municipality | Pennsylvania | County of Clarion | County of Clarion v. Purdue Pharma L.P., et al. | C.P. Clarion Cnty. 285-2018 |
| 218. | Municipality | Pennsylvania | Clearfield County | Clearfield County, Pennsylvania v. Purdue Pharma L.P., et al. | C.P. Clearfield Cnty. 2018-484-CD |
| 219. | Municipality | Pennsylvania | Clinton County | Clinton County v. Purdue Pharma L.P., et al. | C.P. Clinton Cnty. 752-18 |
| 220. | Municipality | Pennsylvania | County of Cumberland | County of Cumberland v. Purdue Pharma L.P., et al. | C.P. Cumberland Cnty. 2017-2147 |
| 221. | Municipality | Pennsylvania | Dauphin County, PA | Dauphin County, PA v. Purdue Pharma L.P., et al. | C.P. Dauphin Cnty. 2018-CV-716-CV |
| 222. | Municipality | Pennsylvania | Delaware County | Delaware County, Pennsylvania v. Purdue Pharma L.P., et al. | C.P. Delaware Cnty. No. 2017-008095 |
| 223. | Municipality | Pennsylvania | County of Erie | County of Erie v. Purdue Pharma L.P., et al. | C.P. Erie Cnty. 12-18 |
| 224. | Municipality | Pennsylvania | County of Fayette | County of Fayette v. Purdue Pharma L.P., et al. | C.P. Fayette Cnty. 2017-2676 |
| 225. | Municipality | Pennsylvania | Franklin County | Franklin County v. Purdue Pharma L.P., et al. | C.P. Franklin Cnty. 2019-445 |
| 226. | Municipality | Pennsylvania | County of Greene | County of Greene v. Purdue Pharma L.P., et al. | C.P. Greene Cnty. 782-2017 |
| 227. | Municipality | Pennsylvania | Lackawanna County, Pennsylvania | Lackawanna County, Pennsylvania v. Purdue Pharma L.P., et al. | C.P. Lackawanna Cnty. 17-CV-5156 |
| 228. | Municipality | Pennsylvania | Lawrence County, Pennsylvania | Lawrence County, Pennsylvania v. Purdue Pharma L.P., et al. | C.P. Beaver Cnty 11105-2017 |
| 229. | Municipality | Pennsylvania | Mercer County | Mercer County v. Purdue Pharma L.P., et al. | C.P. Mercer Cnty. 2019-596 |
| 230. | Municipality | Pennsylvania | People of Northampton County and Northampton County, PA | People of Northampton County and Northampton County, PA v. Purdue Pharma L.P., et al. | C.P. Northampton Cnty. 2019-1557 |

24

EXHIBIT D

Page 300

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| 231. | Municipality | Pennsylvania | Pike County, Pa. | Pike County, Pa. v. Purdue Pharma L.P., et al. | C.P. Pike Cnty. No. 602-2018 |
| 232. | Municipality | Pennsylvania | Schuylkill County, Pennsylvania | Schuylkill County, Pa. v. Purdue Pharma L.P., et al. | C.P. Schuylkill Cnty. S-1241-18 |
| 233. | Municipality | Pennsylvania | County of Monroe | County of Monroe v. Purdue Pharma L.P., et al. | C.P. Monroe Cnty. 3973-CV-18 |
| 234. | Municipality | Pennsylvania | County of Tioga | County of Tioga v. Purdue Pharma L.P., et al. | C.P. Tioga Cnty. 563-CV-2018 |
| 235. | Municipality | Pennsylvania | County of Washington | County of Washington v. Purdue Pharma L.P., et al. | C.P. Washington Cnty. 2017-6268 |
| 236. | Municipality | Pennsylvania | County of Westmoreland | County of Westmoreland v. Purdue Pharma L.P., et al. | C.P. Westmoreland Cnty 2017-5975 |
| 237. | Municipality | Pennsylvania | County of York | County of York v. Purdue Pharma L.P., et al. | C.P. York Cnty. 2017-003372 |
| 238. | Municipality | Pennsylvania | The Municipality of Norristown and The Township of West Norriton | The Municipality of Norristown and The Township of West Norriton v. Purdue Pharma L.P., et al. | C.P. Montgomery Cnty. 2017-12178 |
| 239. | Municipality | Pennsylvania | Mahoning Township | Mahoning Township v. Purdue Pharma L.P., et al. | C.P. Philadelphia Cnty. 180203466 |
| 240. | Municipality | Pennsylvania | Newtown Township | Newtown Township v. Purdue Pharma L.P., et al. | C.P. Bucks Cnty. 2018-03043 |
| 241. | Municipality | Pennsylvania | Warrington Township | Warrington Township v. Purdue Pharma L.P., et al. | C.P. Bucks Cnty. 2018-04956 |
| 242. | Municipality | South Carolina | City of Charleston | City of Charleston v. Purdue Pharma L.P., et al. | C.P. Charleston Cnty. 2017-CP-10-04294 |
| 243. | Municipality | South Carolina | City of North Charleston | City of North Charleston v. Purdue Pharma L.P., et al. | C.P. Charleston Cnty. 2017-CP-10-03978 |
| 244. | Municipality | South Carolina | County of Abbeville | County of Abbeville v. Rite Aid of South Carolina Inc., et al. | C.P. Abbeville Cnty. 2019-CP-01-00154 |
| 245. | Municipality | South Carolina | County of Aiken | County of Aiken v. Rite Aid of South Carolina Inc., et al. | C.P. Aiken Cnty. 2019-CP-02-01086 |
| 246. | Municipality | South Carolina | County of Allendale | County of Allendale v. Purdue Pharma L.P., et al. | C.P. Allendale Cnty. 2018-CP-03-00125 |
| 247. | Municipality | South Carolina | County of Anderson | County of Anderson v. Rite Aid of South Carolina Inc., et al. | C.P. Anderson Cnty. 2019-CP-04-01108 |

25

EXHIBIT D
Page 301

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| 248. | Municipality | South Carolina | County of Bamberg | County of Bamberg v. Purdue Pharma L.P., et al. | C.P. Bamberg Cnty. 2018-CP-05-00189 |
| 249. | Municipality | South Carolina | County of Barnwell | County of Barnwell v. Purdue Pharma L.P., et al. | C.P. Barnwell Cnty. 2018-CP-06-00329 |
| 250. | Municipality | South Carolina | County of Beaufort | County of Beaufort v. Purdue Pharma L.P., et al. | C.P. Beaufort Cnty. 2018-CP-07-01245 |
| 251. | Municipality | South Carolina | County of Calhoun | County of Calhoun v. Rite Aid of South Carolina, Inc., et al. | C.P. Calhoun Cnty. 2018-CP-09-00065 |
| 252. | Municipality | South Carolina | County of Cherokee | County of Cherokee v. Rite Aid of South Carolina, Inc., et al. | C.P. Cherokee Cnty. 2018-CP-11-00503 |
| 253. | Municipality | South Carolina | County of Chesterfield | County of Chesterfield v. Rite Aid of South Carolina, Inc., et al. | C.P. Chesterfield Cnty. 2018-CP-13-00410 |
| 254. | Municipality | South Carolina | County of Clarendon | County of Clarendon v. Rite Aid of South Carolina Inc., et al. | C.P. Clarendon Cnty. 2018-CP-14-00236 |
| 255. | Municipality | South Carolina | County of Colleton | County of Colleton v. Purdue Pharma L.P., et al. | C.P. Colleton Cnty. 2018-CP-15-00438 |
| 256. | Municipality | South Carolina | County of Dillon | County of Dillon v. Rite Aid of South Carolina Inc., et al. | C.P. Dillon Cnty. 2018-CP-17-00213 |
| 257. | Municipality | South Carolina | County of Dorchester | County of Dorchester v. Purdue Pharma L.P., et al. | C.P. Dorchester Cnty. 2018-CP-18-01122 |
| 258. | Municipality | South Carolina | County of Edgefield | County of Edgefield v. Rite Aid of South Carolina Inc., et al. | C.P. Edgefield Cnty. 2018-CP-19-00120 |
| 259. | Municipality | South Carolina | County of Fairfield | County of Fairfield v. Rite Aid of South Carolina, Inc., et al. | C.P. Fairfield Cnty. 2018-CP-20-00272 |
| 260. | Municipality | South Carolina | County of Florence | County of Florence v. Rite Aid of South Carolina Inc., et al. | C.P. Florence Cnty. 2018-CP-21-01213 |
| 261. | Municipality | South Carolina | Greenville County | Greenville County v. Purdue Pharma L.P., et al. | C.P. Greenville Cnty. 2018-CP-23-01294 |
| 262. | Municipality | South Carolina | County of Greenwood | County of Greenwood v. Rite Aid of South Carolina, Inc., et al. | C.P. Cherokee Cnty. 2018-CP-24-00775 |
| 263. | Municipality | South Carolina | County of Hampton | County of Hampton v. Purdue Pharma L.P., et al. | C.P. Hampton Cnty. 2018-CP-25-00258 |
| 264. | Municipality | South Carolina | County of Horry | County of Horry v. Rite Aid of South Carolina Inc., et al. | C.P. Horry Cnty. 2014-CP-26-02684 |

Prepared Document - Case ... Filed ... Entered ... 18:58:... Main Document ... Page 304 of 275

EXHIBIT D
Page 302

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| 265. | Municipality | South Carolina | County of Jasper | County of Jasper v. Purdue Pharma L.P., et al. | C.P. Jasper Cnty. 2018-CP-27-00332 |
| 266. | Municipality | South Carolina | County of Kershaw | County of Kershaw v. Purdue Pharma L.P., et al. | C.P. Kershaw Cnty. 2018-CP-28-00553 |
| 267. | Municipality | South Carolina | County of Lancaster | County of Lancaster v. Rite Aid of South Carolina Inc., et al. | C.P. Lancaster Cnty. 2019-CP-29-00540 |
| 268. | Municipality | South Carolina | County of Laurens | Coun-02ty of Laurens v. Rite Aid of South Carolina, Inc., et al. | C.P. Laurens Cnty. 2018-CP-30-00606 |
| 269. | Municipality | South Carolina | County of Lee | County of Lee v. Rite Aid of South Carolina, Inc., et al. | C.P. Lee Cnty. 2019-CP-31-00207 |
| 270. | Municipality | South Carolina | County of Lexington | County of Lexington v. Purdue Pharma L.P., et al. | C.P. Lexington Cnty. 2018-CP-32-02207 |
| 271. | Municipality | South Carolina | County of Marion | County of Marion v. Rite Aid of South Carolina Inc., et al. | C.P. Marion Cnty. 2019-CP-33-00299 |
| 272. | Municipality | South Carolina | County of McCormick | County of McCormick v. Rite Aid of South Carolina Inc., et al. | C.P. McCormick Cnty. 2019-CP-35-00031 |
| 273. | Municipality | South Carolina | County of Oconee | County of Oconee v. Rite Aid of South Carolina, Inc., et al. | C.P. Oconee Cnty. 2018-CP-37-00458 |
| 274. | Municipality | South Carolina | County of Orangeburg | County of Orangeburg v. Rite Aid of South Carolina, Inc., et al. | C.P. Orangeburg Cnty. 2018-CP-38-00841 |
| 275. | Municipality | South Carolina | County of Pickens | County of Pickens v. Purdue Pharma L.P., et al. | C.P. Pickens Cnty. 2018-CP-39-00675 |
| 276. | Municipality | South Carolina | County of Saluda | County of Saluda v. Rite Aid of South Carolina Inc., et al. | C.P. Clarendon Cnty. 2019-CP-41-00111 |
| 277. | Municipality | South Carolina | Spartanburg County | Spartanburg County v. Purdue Pharma L.P., et al. | C.P. Spartanburg Cnty. 2019-CP-42-00760 |
| 278. | Municipality | South Carolina | County of Sumter | County of Sumter v. Rite Aid of South Carolina Inc., et al. | C.P. Sumter Cnty. 2018-CP-43-00891 |
| 279. | Municipality | South Carolina | County of Union | County of Union v. Rite Aid of South Carolina, Inc., et al. | C.P. Union Cnty. 2019-CP-44-00288 |
| 280. | Municipality | South Carolina | County of Williamsburg | County of Williamsburg v. Purdue Pharma L.P., et al. | C.P. Williamsburg Cnty. 2018-CP-45-00276 |
| 281. | Municipality | South Carolina | County of York | County of York v. Rite Aid of South Carolina, Inc., et al. | C.P. York Cnty. 2019-CP-46-02446 |

EXHIBIT D
Page 303

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| 282. | Municipality | South Carolina | Town of Mount Pleasant | Town of Mount Pleasant v. Purdue Pharma L.P., et al. | C.P. Charleston Cnty. 2019-CP-10-04302 |
| 283. | District Attorney General / Municipality | Tennessee | Bryant C. Dunaway, in his official capacity as the District Attorney General for the Thirteenth Judicial District, TN and on behalf of all political subdivisions therein, Including Clay County, City of Celine, Cumberland County, City of Crab Orchard, City of Crossville, Town of Pleasant Hill, Dekalb County, Town of Alexandria, Town of Dowelltown, Town of Liberty, City of Smithville, Overton County, Town of Livingston, Pickett County, Town of Byrdstown, Putnam County, City of Algood, Town of Baxter, City of Cookeville, Town of Monterey, White County, Town of Doyle, City of Sparta; Jenning H. Jones, in his official capacity as the District Attorney General for the Sixteenth Judicial District, TN and on behalf of all political subdivisions therein, including Cannon County, Town of Auburntown, Town of Woodbury, Rutherford County, City of Eaglevill, City of La Vergne, City of Murfreesboro, Town of Smyrna; Robert J. Carter, in his official capacity as the District Attorney General for the Seventeenth Judicial District, TN and on behalf of all political subdivisions therein, | Bryant C. Dunaway, et al. v. Purdue Pharma L.P., et al. | Cir. Ct. Cumberland Cnty. CCI-2018-CV-6331 |

EXHIBIT D
Page 304

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|------|-------|---------------------------------------|-----------|---------------------|
| | | | including Bedord County, Town of Bell Buckle, Town of Normandy, City of Shelbyville, Town of Wartrace, Lincoln County, City of Ardmore, City of Fayetteville, Town of Petersburg, Marshall County, Town of Chapel Hill, Town of Cornersville, City of Lewisburg, Moore County, City of Lynchburg;<br><br>Brent A. Cooper, in his official capacity as the District Attorney General for the Twenty-Second Judicial District, TN and on behalf of all political subdivisions therein, including Giles County, City of Elkton, Town of Lynnville, City of Minor Hill, City of Pulaski, Lawrence County, Town of Ethridge, City of Iron City, City of Lawrenceburg, City of Loretto, City of St. Joseph, Maury County, City of Columbia, City of Mount Pleasant, City of Spring Hill, Wayne County, City of Clifton, City of Collinwood, City of Waynesboro;<br><br>Lisa S. Zavogiannis, in her official capacity as the District Attorney General for the Thirty-First Judicial District, TN and on behalf of all political subdivisions therein, including Van Buren County, Town of Spencer, Warren County, Town of Centertown, City of McMinnville, Town of Morrison, | | |

29

EXHIBIT D
Page 305

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| | | | Town of Viola; Baby Doe, by and through his Mother. | | |
| 284. | District Attorney General / Municipality | Tennessee | Jared Effler, in his official capacity as the District Attorney General for the Eigth Judicial District, TN; Charme Allen, in her official capacity as the District Attorney General for the Sixth Judicial District; Dave Clark, in his official capacity as the District Attorney General for the Seventh Judicial District, TN; Russell Johnson, in his official capacity as the District Attorney General for the Ninth Judicial District, TN; Stephen Crump, in his official capacity as the District Attorney General for the Tenth Judicial District, TN; Jimmy Dunn, in his official capacity as the District Attorney General for the Fourth Judicial District, TN; Mike Taylor, in his official capacity as the District Attorney General for the Twelfth Judicial District, TN Baby Doe #1; Baby Doe #2 | Jared Effler, et al. v. Purdue Pharma L.P., et al. | Eastern Section at Knoxville Court of Appeals No. E2018-01994-COA-R3-CV |

30

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| 285. | District Attorney General / Municipality | Tennessee | Barry Staubus, in his official capacity as the District Attorney General for the Second Judicial District and on behalf of all political subdivisions therein;<br><br>Tony Clark, in his official capacity as the District Attorney General for the First Judicial District and on behalf of all political subdivisions therein;<br><br>Dan Armstrong, in his official capacity as the District Attorney General for the Third Judicial District and on behalf of all political subdivisions therein;<br><br>Baby Doe, by and through his Guadian Ad Litem | Barry Staubus, et al. v. Purdue Pharma L.P., et al. | Cir. Ct. Sullivan Cnty. No. C-41916 |
| 286. | Municipality | Tennessee | Shelby County, by the Shelby Board of Commissioners | Shelby County, by the Shelby Board of Commissioners v. Purdue Pharma L.P., et al. | Cir. Ct. Shelby Cnty. No. CT-004500-17 |
| 287. | Municipality | Texas | City of Houston, Texas | City of Houston, Texas v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-73219 |
| 288. | Municipality | Texas | County of Bee | County of Bee v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-76897 |
| 289. | Municipality | Texas | County of Bexar | County of Bexar v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77066 |
| 290. | Municipality | Texas | County of Burnet | County of Burnet v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77090 |
| 291. | Municipality | Texas | County of Cameron | County of Cameron v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77093 |
| 292. | Municipality | Texas | County of Cass | County of Cass v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-76905 |
| 293. | Municipality | Texas | County of Cooke | County of Cooke v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-76907 |

EXHIBIT D
Page 307

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| 294. | Municipality | Texas | County of Coryell | County of Coryell v. Purdue Pharma L.P., et al. | Coryell Cnty. Dist. Ct. 2018-77097 |
| 295. | Municipality | Texas | County of Dallas | County of Dallas v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77098 |
| 296. | Municipality | Texas | County of Delta | County of Delta v. AmerisourceBergen Drug Corp., et al. | Harris Cnty. Dist. Ct. 2018-77104 |
| 297. | Municipality | Texas | County of Dimmit | County of Dimmit v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-76933 |
| 298. | Municipality | Texas | County of Ector | County of Ector v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-76934 |
| 299. | Municipality | Texas | County of El Paso | County of El Paso v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-76970 |
| 300. | Municipality | Texas | County of Falls | County of Falls v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77106 |
| 301. | Municipality | Texas | County of Fannin | County of Fannin v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-76974 |
| 302. | Municipality | Texas | County of Grayson | County of Grayson v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-76994 |
| 303. | Municipality | Texas | County of Harrison | County of Harrison v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77108 |
| 304. | Municipality | Texas | County of Hidalgo | County of Hidalgo v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77109 |
| 305. | Municipality | Texas | County of Hopkins | County of Hopkins v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77111 |
| 306. | Municipality | Texas | County of Houston | County of Houston v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77021 |
| 307. | Municipality | Texas | Johnson County | Johnson County v. Purdue Pharma, L.P. et al. | Harris Cnty. Dist. Ct. 2018-77346 |
| 308. | Municipality | Texas | County of Kendall | County of Kendall v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77023 |
| 309. | Municipality | Texas | County of Kerr | County of Kerr v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77114 |
| 310. | Municipality | Texas | County of Liberty | County of Liberty v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77116 |
| 311. | Municipality | Texas | County of Limestone | County of Limestone v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77025 |

EXHIBIT D
Page 308

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| 312. | Municipality | Texas | County of Marion | County of Marion v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77026 |
| 313. | Municipality | Texas | County of McMullen | County of McMullen v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77067 |
| 314. | Municipality | Texas | County of Milam | County of Milam v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77141 |
| 315. | Municipality | Texas | County of Nacogdoches | County of Nacogdoches v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77027 |
| 316. | Municipality | Texas | County of Nueces; Nueces County Hospital District | County of Nueces and Nueces County Hospital District v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77083 |
| 317. | Municipality | Texas | County of Orange | County of Orange v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77036 |
| 318. | Municipality | Texas | County of Panola | County of Panola v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77037 |
| 319. | Municipality | Texas | County of Parker | County of Parker v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77143 |
| 320. | Municipality | Texas | County of Potter | County of Potter v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77039 |
| 321. | Municipality | Texas | County of Robertson | County of Robertson v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77043 |
| 322. | Municipality | Texas | County of San Patricio | County of San Patricio v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77075 |
| 323. | Municipality | Texas | County of Shelby | County of Shelby v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77062 |
| 324. | Municipality | Texas | County of Travis | County of Travis v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77144 |
| 325. | Municipality | Texas | County of Trinity | County of Trinity v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77080 |
| 326. | Municipality | Texas | County of Van Zandt | County of Van Zandt v. AmerisourceBergen Drug Corp., et al. | Harris Cnty. Dist. Ct. 2018-77150 |
| 327. | Municipality | Texas | County of Waller | County of Waller v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77153 |
| 328. | Municipality | Texas | County of Wood | County of Wood v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77081 |

EXHIBIT D
Page 309

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| 329. | Municipality | Utah | Cache County, Utah; Rich County, Utah | Cache County, Utah; Rich County, Utah v. Purdue Pharma L.P., et al. | 1st Dist. Ct. Cache Cnty. 190100112 |
| 330. | Municipality | Utah | Davis County | Davis County v. Purdue Pharma L.P., et al. | 2nd Dist. Ct. Davis Cnty. 180700870 |
| 331. | Municipality | Utah | Grand County | Grand County v. Purdue Pharma L.P., et al. | 7th Jud. Dist. Ct. Grand Cnty. 180700040 |
| 332. | Municipality | Utah | Iron County | Iron County v. Purdue Pharma L.P., et al. | 5th Jud. Dist. Ct. Iron Cnty. 180500149 |
| 333. | Municipality | Utah | Millard County | Millard County v. Purdue Pharma L.P., et al. | 4th Jud. Dist. Ct. Millard Cnty. 180700044 |
| 334. | Municipality | Utah | Salt Lake County | Salt Lake County v. Purdue Pharma L.P., et al. | 3rd Jud. Dist. Ct. Salt Lake Cnty. 180907421 |
| 335. | Municipality | Utah | San Juan County | San Juan County v. Purdue Pharma L.P., et al. | 7th Jud. Dist. Ct. Grand Cnty. 180700040 |
| 336. | Municipality | Utah | Sanpete County | Sanpete County v. Purdue Pharma L.P., et al. | 6th Jud. Dist. Ct. Sanpete Cnty. 180600095 |
| 337. | Municipality | Utah | Emery County; Juab County; Piute County; Sevier County; Wayne County; | Sevier County, Utah; Juab County, Utah; Emery County, Utah; Wayne County, Utah; and Piute County, Utah v. Purdue Pharma L.P., et al. | 6th Jud. Dis. Ct. Sevier Cnty. 190600050 |
| 338. | Municipality | Utah | Summit County, Utah | Summit County, Utah v. Purdue Pharma L.P., et al. | 3rd Dist. Ct. Summit Cnty. 180500119 |
| 339. | Municipality | Utah | Tooele County, Utah | Tooele County, Utah v. Purdue Pharma L.P., et al. | 3rd Dist. Ct. Tooele Cnty. 180300423 |
| 340. | Municipality | Utah | Uintah County, Utah; Duscesne County, Utah; Daggett County, Utah; Tri-County Health Department | Uintah County, Utah; Duscesne County, Utah; Daggett County, Utah; and Tri-County Health Department v. Purdue Pharma L.P., et al. | 8th Dist. Ct. Uintah Cnty. 180800056 |
| 341. | Municipality | Utah | Wasatch County, Utah | Wasatch County, Utah v. Purdue Pharma L.P., et al. | 4th Dist. Ct. Wasatch Cnty. 180500079 |
| 342. | Municipality | Utah | Washington County, Utah; Kane County, Utah; Beaver County, Utah; Garfield County, Utah | Washington County, Utah; Kane County, Utah; Beaver County, Utah; Garfield County, Utah v. Purdue Pharma L.P., et al. | 5th Dist. Ct. Washington Cnty. 180500179 |

EXHIBIT D
Page 310

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| 343. | Municipality | Utah | Weber County, Utah | Weber County, Utah v. Purdue Pharma L.P., et al. | 2nd Dist. Ct. Weber Cnty. 180903087 |
| 344. | Municipality | Virginia | City of Martinsville, Virginia | City of Martinsville, Virginia v. Purdue Pharma L.P., et al. | Cir. Ct. Martinsville Cnty. CL18000240-00 |
| 345. | Municipality | Virginia | Dinwiddie County, Virginia | Dinwiddie County, Virginia v. Purdue Pharma L.P., et al. | Cir. Ct. Dinwiddie Cnty. CL19000317-00 |
| 346. | Municipality | Virginia | The County Board of Arlington County, Virginia | The County Board of Arlington County, Virginia v. Purdue Pharma L.P., et al. | Cir. Ct. Arlington Cnty. CL18001081-00 |
| 347. | Municipality | Virginia | Mecklenburg County | Mecklenburg County, Virginia v. Purdue Pharma L.P., et al. | Cir. Ct. Mecklenburg County CL18000558-00 |
| 348. | Municipality | West Virginia | Brooke County Commission; Hancock County Commission; Harrison County Commission; Lewis County Commission; Marshall County Commission; Ohio County Commission; Tyler County Commission; Wetzel County Commission | Brooke County Commission, Hancock County Commission, Harrison County Commission, Lewis County Commission, Marshall County Commission, Ohio County Commission, Tyler County Commission, and Wetzel County Commission v. Purdue Pharma L.P., et al.<br><br>Consolidated before MLP In re Opioid Litigation | Cir. Ct. Marshall Cnty. 17-C-248H 17-C-249H 17-C-250H 17-C-251H 17-C-252H 17-C-253H 17-C-254H 17-C-255H<br><br>Cir. Ct. Kanawha County 19-C-9000 |

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| 349. | Municipality | West Virginia | The County Commission of Mason County; The County Commission of Barbour County; Mayor Chris Tatum on behalf of The Village of Barboursville; The County Commission of Taylor County; The County Commission of Webster County; Mayor Don E. McCourt, on behalf of the Town of Addison a/k/a The Town of Webster Springs | The County Commission of Mason County; The County Commission of Barbour County; Mayor Chris Tatum on behalf of The Village of Barboursville; The County Commission of Taylor County; The County Commission of Webster County; and Mayor Don E. McCourt, on behalf of the Town of Addison a/k/a The Town of Webster Springs v. Purdue Pharma L.P., et al.<br><br>Consolidated before MLP In re Opioid Litigation | Cir. Ct. Marshall County<br>19-C-4H<br>19-C-5H<br>19-C-6H<br>19-C-7H<br>19-C-8H<br>19-C-9H<br><br>Cir. Ct. Kanawha County<br>19-C-9000 |
| 350. | Municipality | West Virginia | Mayor Peggy Knotts Barney, on behalf of the City of Grafton; Mayor Philip Bowers, on behalf of the City of Philippi | Mayor Peggy Knotts Barney, on behalf of the City of Grafton, and Mayor Philip Bowers, on behalf of the City of Philippi v. Purdue Pharma L.P., et al.<br><br>Consolidated before MLP In re Opioid Litigation | Cir. Ct. Marshall Cnty.<br>19-C-51<br>19-C-52<br><br>Cir. Ct. Kanawha County<br>19-C-9000 |
| 351. | Municipality | West Virginia | Monongalia County Commission; Marion County Commission; Doddridge County Commission; Randolph County Commission; and Upshur County Commission | Monongalia County Commission; Marion County Commission; Doddridge County Commission; Randolph County Commission; and Upshur County Commission v. Purdue Pharma L.P., et al.<br><br>Consolidated before MLP In re Opioid Litigation | Cir. Ct. Marshall Cnty.<br>19-C-32H<br>19-C-33H<br>19-C-34H<br>19-C-35H<br>19-C-36H<br><br>Cir. Ct. Kanawha County<br>19-C-9000 |

EXHIBIT D
Page 312

|  | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| 352. | Municipality | West Virginia | Roane County Commission; The City of Spencer; Jackson County Commission; The City of Ripley; The Town of Ravenswood; Wood County Commission; The City of Williamstown; Wirt County Commission; The Town of Elizabeth; Pleasants County Commission; City of St. Mary's; Ritchie County Commission; Town of Harrisville | Roane County Commission; The City of Spencer; Jackson County Commission; The City of Ripley; The Town of Ravenswood; Wood County Commission; The City of Williamstown; Wirt County Commission; The Town of Elizabeth; Pleasants County Commission; City of St. Mary's; Ritchie County Commission; Town of Harrisville v. Mylan Pharmaceuticals Inc., et al.<br><br>Consolidated before MLP In re Opioid Litigation | Cir. Ct. Marshall Cnty. 19-C-96H 19-C-108H<br><br>Cir. Ct. Kanawha County 19-C-9000 |
| _Local Government (MDL)_ | | | | | |
| 353. | Municipality | MDL | Broward County, Florida | Broward County, Florida v. Purdue Pharma L.P., et al. | N.D. Ohio 1:18-op-45332 Master Case No. 17-md-2804 |
| 354. | Municipality | MDL | Cabell County Commission; City of Huntington, West Virginia | Cabell County Commission and City of Huntington, West Virginia v. AmerisourceBergen Drug Corp., et al. | N.D. Ohio 1:17-op-45053 (Cabell) 1:17-op-45054 (Huntington) Master Case No. 17-md-2804 |
| 355. | Municipality | MDL | City of Chicago | City of Chicago v. Purdue Pharma L.P., et al. | N.D. Ohio 1:17-op-45169 Master Case No. 17-md-2804 |
| 356. | Municipality | MDL | City of Cleveland | City of Cleveland v. AmerisourceBergen Drug Corp., et al. | N.D. Ohio 1:18-op-45132 Master Case No. 17-md-2804 |
| 357. | Municipality | MDL | City of Dothan, Alabama | City of Dothan, Alabama v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45886 Master Case No. 17-md-2804 |

EXHIBIT D
Page 313

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| 358. | Municipality | MDL | City of Henderson, Kentucky | City of Henderson, Kentucky, on behalf of themselves and all other similarly situated home rule cities v. Purdue Pharma L.P., et al. | N.D. Ohio 1:20-op-45062 Master Case No. 17-md-2804 |
| 359. | Municipality | MDL | City of Stuart, Florida | City of Stuart, Florida v. Purdue Pharma L.P., et al. | N.D. Ohio 1:20-op-45124 Master Case No. 17-md-2804 |
| 360. | Municipality | MDL | Clinton County, Missouri | Clinton County, Missouri v. Allergan PLC, et al. | N.D. Ohio 1:20-op-45130 Master Case No. 17-md-2804 |
| 361. | Municipality | MDL | County of Alameda; City of Costa Mesa; City of Anaheim; City of Santa Ana; City of San Clemente; City of Encinitas; City of La Habra; City of La Mesa; City of Oxnard; City of Placentia; The People of the State of California, by and through Alameda County Counsel Donna Ziegler, Costa Mesa City Attorney Kimberly Hall Barlow, and Anaheim City Attorney Robert Fabela, Santa Ana City Attorney Sonia R. Carvalho, San Clemente City Attorney Scott C. Smith, Encinitas City Attorney Leslie Devaney, La Habra City Attorney Richard D. Jones, La Mesa City Attorney Glenn Sabine, Oxnard City Attorney Stephen Fischer, and Placentia City Attorney Christian Bettenhausen | County of Alameda, et al. v. Richard Sackler, et al. | N.D. Ohio 1:20-op-45055 Master Case No. 17-md-2804 |

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| 362. | Municipality | MDL | County of Summit, Ohio; Summit County Public Health; The City of Akron; State of Ohio ex rel., Prosecuting Attorney for Summit County, Sherri Bevan Walsh; Director of Law for the City of Akron, Eve Belfance | County of Summit, Ohio, et al. v. Purdue Pharma L.P., et al. | N.D. Ohio 1:18-op-45090 Master Case No. 17-md-2804 |
| 363. | Municipality | MDL | County of Monroe | County of Monroe v. Purdue Pharma L.P., et al. | N.D. Ohio 1:18-op-45158 Master Case No. 17-md-2804 |
| 364. | Municipality | MDL | Hardin County Fiscal Court, on behalf of Hardin County; Breckinridge County Fiscal Court, on behalf of Breckinridge County; Green County Fiscal Court, on behalf of Green County; Meade County Fiscal Court, on behalf of Meade County; Ohio County Fiscal Court, on behalf of Ohio County, on behalf of themselves and all other similarly situated counties (Fiscal Courts) | Hardin County Fiscal Court, et al. v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45063 Master Case No. 17-md-2804 |
| 365. | Municipality | MDL | Pike County, Missouri | Pike County, Missouri v. Allergan PLC, et al. | N.D. Ohio 1:19-op-45131 Master Case No. 17-md-2804 |
| 366. | Municipality | MDL | The City of Pascagoula, Mississippi | The City of Pascagoula, Mississippi v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45934 Master Case No. 17-md-2804 |
| 367. | Municipality | MDL | The City of Wichita, Kansas | The City of Wichita, Kansas v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45781 Master Case No. 17-md-2804 |
| 368. | Municipality | MDL | The County Commissioner of Carroll County Maryland | The County Commissioner of Carroll County Maryland v. Actavis PLC, et al. | N.D. Ohio 1:19-op-45052 Master Case No. 17-md-2804 |

EXHIBIT D
Page 315

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| 369. | Municipality | MDL | The County of Cuyahoga, Ohio; State of Ohio ex rel., Prosecuting Attorney of Cuyahoga County, Michael C. O'Malley | The County of Cuyahoga, Ohio, and State of Ohio ex rel., Prosecuting Attorney of Cuyahoga County, Michael C. O'Malley v. Purdue Pharma L.P., et al. | N.D. Ohio 1:17-op-45004 Master Case No. 17-md-2804 |
| *Local Government (Federal Court Pending Transfer to MDL)* | | | | | |
| 370. | Municipality | Alabama | Alexander City, Alabama | Alexander City, Alabama v. Purdue Pharma L.P., et al. | M.D. Ala. 3:19-cv-00630 |
| 371. | Municipality | Alabama | City of Ashland, Alabama | City of Ashland, Alabama v. Purdue Pharma L.P., et al. | N.D. Ala. 2:19-cv-01812 |
| 372. | Municipality | Alabama | City of Brent, Alabama | City of Brent, Alabama v. Purdue Pharma L.P., et al. | N.D. Ala. 7:19-cv-01565 |
| 373. | Municipality | Alabama | City of Brundidge, Alabama | City of Brundidge, Alabama v. Purdue Pharma L.P., et al. | M.D. Ala. 2:19-cv-00861 |
| 374. | Municipality | Alabama | City of Center Point, Alabama | City of Center Point, Alabama v. Purdue Pharma L.P., et al. | N.D. Ala. 2:19-cv-01812 |
| 375. | Municipality | Alabama | City of Chickasaw, Alabama | City of Chickasaw, Alabama v. Purdue Pharma L.P., et al. | S.D. Ala. 1:20-cv-00117 |
| 376. | Municipality | Alabama | City of Eufaula, Alabama | City of Eufaula, Alabama v. Purdue Pharma L.P., et al. | M.D. Ala. 2:19-cv-00862 |
| 377. | Municipality | Alabama | City of Fairfield, Alabama | City of Fairfield, Alabama v. Purdue Pharma L.P., et al. | N.D. Ala. 2:20-cv-00202 |
| 378. | Municipality | Alabama | City of Geneva, Alabama | City of Geneva, Alabama v. Purdue Pharma L.P., et al. | M.D. Ala. 1:19-cv-00763 |
| 379. | Municipality | Alabama | City of Headland, Alabama | City of Headland, Alabama v. Purdue Pharma L.P., et al. | M.D. Ala. 1:19-cv-00886 |
| 380. | Municipality | Alabama | City of Lanett, Alabama | City of Lanett, Alabama v. Purdue Pharma L.P., et al. | M.D. Ala. 3:19-cv-00885 |
| 381. | Municipality | Alabama | City of Leeds, Alabama | City of Leeds, Alabama v. Purdue Pharma L.P., et al. | N.D. Ala. 2:20-cv-00201 |
| 382. | Municipality | Alabama | City of Level Plains, Alabama | City of Level Plains, Alabama v. Purdue Pharma L.P., et al. | M.D. Ala. 1:20-cv-00137 |
| 383. | Municipality | Alabama | City of Linden, Alabama | City of Linden, Alabama v. Purdue Pharma L.P., et al. | S.D. Ala. 2:20-cv-00129 |
| 384. | Municipality | Alabama | City of Luverne, Alabama | City of Luverne, Alabama v. Purdue Pharma L.P., et al. | M.D. Ala. 2:20-cv-00136 |

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| 385. | Municipality | Alabama | City of Oxford, Alabama | City of Oxford, Alabama v. Purdue Pharma L.P., et al. | N.D. Ala. 1:19-cv-01401 |
| 386. | Municipality | Alabama | City of Pell City, Alabama | City of Pell City, Alabama v. Purdue Pharma L.P., et al. | N.D. Ala. 4:20-cv-00203 |
| 387. | Municipality | Alabama | City of Satsuma, Alabama | City of Satsuma, Alabama v. Purdue Pharma L.P., et al. | S.D. Ala. 1:20-cv-00127 |
| 388. | Municipality | Alabama | City of Uniontown, Alabama | City of Uniontown, Alabama v. Purdue Pharma L.P., et al. | S.D. Ala. 1:20-cv-00128 |
| 389. | Municipality | Alabama | Coosa County, Alabama | Coosa County, Alabama v. Purdue Pharma L.P., et al. | M.D. Ala. 2:19-cv-00752 |
| 390. | Municipality | Alabama | Crenshaw County, Alabama | Crenshaw County, Alabama v. Purdue Pharma L.P., et al. | M.D. Ala. 2:19-cv-00753 |
| 391. | Municipality | Alabama | Escambia County, Alabama | Escambia County, Alabama v. Purdue Pharma L.P., et al. | S.D. Ala. 1:20-cv-00134 |
| 392. | Municipality | Alabama | Geneva County, Alabama | Geneva County, Alabama v. Purdue Pharma L.P., et al. | M.D. Ala. 1:20-cv-00135 |
| 393. | Municipality | Alabama | Perry County, Alabama | Perry County, Alabama v. Purdue Pharma L.P., et al. | S.D. Ala. 2:20-cv-00113 |
| 394. | Municipality | Alabama | Russell County, Alabama | Russell County, Alabama v. Purdue Pharma L.P., et al. | M.D. Ala. 3:19-cv-00646 |
| 395. | Municipality | Alabama | Town of Dauphin Island, Alabama | Town of Dauphin Island, Alabama v. Purdue Pharma L.P., et al. | S.D. Ala. 1:20-cv-00135 |
| 396. | Municipality | Alabama | Town of Faunsdale, Alabama | Town of Faunsdale, Alabama v. Purdue Pharma L.P., etal. | S.D. Ala. 2:20-cv-00142 |
| 397. | Municipality | Alabama | Town of Vance, Alabama | Town of Vance, Alabama v. Purdue Pharma L.P., et al. | N.D. Ala. 7:19-cv-01564 |
| 398. | Municipality | California | City of Santa Ana and the People of the State of California, by and through Santa Ana City Attorney Sonia R. Carvalho | City of Santa Ana and the People of the State of California, by and through Santa Ana City Attorney Sonia R. Carvalho v. Purdue Pharma L.P., et al. | N.D. Cal. 3:17-cv-02324 |

EXHIBIT D
Page 317

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| 399. | Municipality | California | City of Fullerton and the People of the State of California by and through Fullerton City Attorney Richard D. Jones | City of Fullerton and the People of the State of California by and through Fullerton City Attorney Richard D. Jones v. Purdue Pharma L.P., et al. | N.D. Cal. 3:19-cv-02321 |
| 400. | Municipality | California | City of Irvine and the People of the State of California by and through Irvine City Attorney Jeffrey Melching | City of Irvine and the People of the State of California by and through Irvine City Attorney Jeffrey Melching v. Purdue Pharma L.P., et al. | N.D. Cal. 3:19-cv-02323 |
| 401. | Municipality | California | City of San Clemente and the People of the State of California by and through San Clemente City Attorney Scott C. Smith | City of San Clemente and the People of the State of California, by and through San Clemente City Attorney Scott C. Smith v. Purdue Pharma L.P., et al. | N.D. Cal. 4:19-cv-02326 |
| 402. | Municipality | California | City of Costa Mesa and the People of the State of California by and through Costa Mesa City Attorney Kimberly Hall Barlow | City of Costa Mesa and the People of the State of California by and through Costa Mesa City Attorney Kimberly Hall Barlow v. Purdue Pharma L.P., et al. | N.D. Cal. 4:19-cv-02320 |
| 403. | Municipality | California | City of Westminster and the People of the State of California by and through Westminster City Attorney Richard D. Jones | City of Westminster and the People of the State of California by and through Westminster City Attorney Richard D. Jones v. Purdue Pharma L.P., et al. | N.D. Cal. 3:19-cv-02325 |
| 404. | Municipality | California | County of Alameda and the People of the State of California by and through County Counsel Donna Ziegler | County of Alameda and the People of the State of California by and through County Counsel Donna Ziegler v. Purdue Pharma L.P., et al. | N.D. Cal. 3:19-cv-02307 |
| 405. | Municipality | California | The City and County of San Francisco, California and the People of the State of California, acting by and through San Francisco City Attorney Dennis J. Herrera | The City and County of San Francisco, California and the People of the State of California, acting by and through San Francisco City Attorney Dennis J. Herrera v. Purdue Pharma L.P., et al. | N.D. Cal. 3:18-cv-07591 |

EXHIBIT D
Page 318

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| 406. | Municipality | Delaware | City of Dover, a municipal corporation of the State of Delaware; City of Seaford, a municipal corporation of the State of Delaware; Kent County, a political subdivision of the State of Delaware | City of Dover, a municipal corporation of the State of Delaware; City of Seaford, a municipal corporation of the State of Delaware; and Kent County, a political subdivision of the State of Delaware v. Purdue Pharma L.P., et al. | D. Del. 1:19-cv-00581 |
| 407. | Municipality | Florida | City of Ocala, Florida | City of Ocala, Florida v. Purdue Pharma L.P., et al. | M.D. Fla. 5:19-cv-00440 |
| 408. | Municipality | Hawaii | County of Hawai'i | County of Hawai'i v. Purdue Pharma L.P., et al. | D. Haw. 1:19-cv-00581 |
| 409. | Municipality / Class Action | Hawaii | County of Kaua'i, a political subdivision of the State of Hawaii, for themselves individually, and on behalf of all similarly situated persons, and on behalf of the general public, as a class | County of Kaua'i, a political subdivision of the State of Hawaii, for themselves individually, and on behalf of all similarly situated persons, and on behalf of the general public, as a class v. CVS Health Corporation, et al. | D. Haw. 1:19-cv-00377 |
| 410. | Municipality | Louisiana | Town of Abita Springs, Louisiana | Town of Abita Springs, Louisiana v. Purdue Pharma Inc., et al. | E.D. La. 2:18-cv-14521 |
| 411. | Municipality | Louisiana | Warren Montgomery, Duly Elected 22nd Judicial District Attorney for the Parishes of St. Tammany and Washington | Warren Montgomery, Duly Elected 22nd Judicial District Attorney for the Parishes of St. Tammany and Washington v. Purdue Pharma Inc., et al. | E.D. La. 2:18-cv-14516 |
| 412. | Municipality | Maine | City of Rockland, State of Maine | City of Rockland, State of Maine v. Purdue Pharma L.P., et al. | D. Me. 2:19-cv-00373 |
| 413. | Municipality | Maine | Knox County, State of Maine | Knox County, State of Maine, individually, and on behalf of all others similarly situated v. Purdue Pharma L.P., et al. | D. Me. 2:19-cv-00371 |
| 414. | Municipality | Maryland | Howard County | Howard County, Maryland v. Purdue Pharma L.P., et al. | D. Md. 1:19-cv-02116 |

EXHIBIT D
Page 319

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| 415. | Municipality | Michigan | Charter Township of Harrison | Charter Township of Harrison v. The Pain Center USA, PLLC, et al. | E.D. Mich. 2:19-cv-11681 |
| 416. | Municipality | Michigan | City of Sterling Heights | City of Sterling Heights v. The Pain Center USA, PLLC, et al. | E.D. Mich. 2:19-cv-11685 |
| 417. | Municipality | Michigan | City of Warren | City of Warren v. The Pain Center USA, PLLC, et al. | E.D. Mich. 2:19-cv-11687 |
| 418. | Municipality | Minnesota | City of Coon Rapids, Minnesota | City of Coon Rapids, Minnesota v. Purdue Pharma L.P., et al. | D. Minn. 0:19-cv-02379 |
| 419. | Municipality | Missouri | Camden County, Missouri | Camden County, Missouri v. Williams et al. | E.D. Mo. 4:19-cv-02930 |
| 420. | Municipality | Missouri | St. Francois County | St. Francois County v. Dannie E. Williams, M.D., et al. | E.D. Mo. 4:19-cv-01722 |
| 421. | Municipality | Nevada | Clark County | Clark County v. Purdue Pharma L.P., et al. | D. Nev. 2:19-cv-01616 |
| 422. | Municipality | New Hampshire | Carroll County | Carroll County v. Teva Pharmaceuticals USA, Inc., et al. | D. N.H. 1:19-cv-01097 |
| 423. | Municipality | New Hampshire | Coos County | Coos County v. Teva Pharmaceuticals USA, Inc., et al. | D. N.H. 1:19-cv-01095 |
| 424. | Municipality | New Jersey | County of Burlington, NJ | County of Burlington, NJ v. Purdue Pharma L.P., et al. | D. N.J. 1:19-cv-13684 |
| 425. | Municipality | New Jersey | Cumberland County | Cumberland County v. Purdue Pharma L.P., et al. | D. N.J. 1:19-cv-19134 |
| 426. | Municipality | New Jersey | Township of Brick | Township of Brick v. Purdue Pharma Inc., et al. | D. N.J. 3:19-cv-17998 |
| 427. | Municipality | New York | City of Amsterdam | City of Amsterdam v. Purdue Pharma L.P. | N.D. N.Y. 1:19-cv-00896 |
| 428. | Municipality | New York | City of Auburn | City of Auburn v. Purdue Pharma L.P., et al. | W.D. N.Y. 6:19-cv-06490 |
| 429. | Municipality | New York | City of Ogdensburg | The City of Ogdensburg v. Purdue Pharma L.P., et al. | N.D. N.Y 8:19-cv-00782 |
| 430. | Municipality / Class Action | New York | City of Poughkeepsie | The City of Poughkeepsie, individually, and on behalf of all others similarly situated v. Purdue Pharma L.P. | S.D. N.Y. 7:19-cv-06800 |

44

EXHIBIT D
Page 320

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| 431. | Municipality | New York | City of Rochester | City of Rochester v. Purdue Pharma L.P., et al. | E.D.N.Y. 2:18-cv-03800 |
| 432. | Municipality | New York | City of Saratoga Springs | The City of Saratoga Springs v. Purdue Pharma L.P., et al. | N.D.N.Y. 1:19-cv-00789 |
| 433. | Municipality | Ohio | The County of Fayette, Ohio; The State of Ohio ex rel. Prosecuting Attorney of Fayette County, Jess Weade | The County of Fayette, Ohio; The State of Ohio ex rel. Prosecuting Attorney of Fayette County, Jess Weade v. Purdue Pharma L.P., et al. | S.D. Ohio 2:19-cv-04347 |
| 434. | Municipality | Oklahoma | Board of County Commissioners of Atoka County | Board of County Commissioners of Atoka County v. Purdue Pharma L.P., et al. | E.D. Okla. 6:19-cv-00279 |
| 435. | Municipality | Oklahoma | Board of County Commissioners of Caddo County | Board of County Commissioners of Caddo County v. Purdue Pharma L.P., et al. | W.D. Okla. 5:19-cv-00710 |
| 436. | Municipality | Oklahoma | Board of County Commissioners of Cimarron County | Board of County Commissioners of Cimarron County v. Purdue Pharma L.P., et al. | W.D. Okla. 5:19-cv-00776 |
| 437. | Municipality | Oklahoma | Board of County Commissioners of Coal County | Board of County Commissioners of Coal County v. Purdue Pharma L.P., et al. | E.D. Okla. 6:19-cv-00405 |
| 438. | Municipality | Oklahoma | Board of County Commissioners of Grady County | Board of County Commissioners of Grady County v. Purdue Pharma L.P., et al. | W.D. Okla. 5:19-cv-00703 |
| 439. | Municipality | Oklahoma | Board of County Commissioners of Haskell County | Board of County Commissioners of Haskell County v. Purdue Pharma L.P., et al. | E.D. Okla. 6:19-cv-00280 |
| 440. | Municipality | Oklahoma | Board of County Commissioners of Jackson County | Board of County Commissioners of Jackson County v. Purdue Pharma L.P., et al. | W.D. Okla. 5:19-cv-01108 |

EXHIBIT D
Page 321

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| 441. | Municipality | Oklahoma | Board of County Commissioners of Jefferson County | Board of County Commissioners of Jefferson County v. Purdue Pharma L.P., et al. | W.D. Okla. 5:19-cv-00721 |
| 442. | Municipality | Oklahoma | Board of County Commissioners of Kay County | Board of County Commissioners of Kay County v. Purdue Pharma L.P., et al. | W.D. Okla. 5:19-cv-00884 |
| 443. | Municipality | Oklahoma | Board of County Commissioners of Latimer County | Board of County Commissioners of Latimer County v. Purdue Pharma L.P., et al. | E.D. Okla. 6:19-cv-00282 |
| 444. | Municipality | Oklahoma | Board of County Commissioners of LeFlore County | Board of County Commissioners of LeFlore County v. Purdue Pharma L.P., et al. | E.D. Okla. 6:19-cv-00362 |
| 445. | Municipality | Oklahoma | Board of County Commissioners of Lincoln County | Board of County Commissioners of Lincoln County v. Purdue Pharma L.P., et al. | W.D. Okla. 5:19-cv-01109 |
| 446. | Municipality | Oklahoma | Board of County Commissioners of Logan County | Board of County Commissioners of Logan County v. Purdue Pharma L.P., et al. | W.D. Okla. 5:19-cv-00984 |
| 447. | Municipality | Oklahoma | Board of County Commissioners of Love County | Board of County Commissioners of Love County v. Purdue Pharma L.P., et al. | E.D. Okla. 6:19-cv-00320 |
| 448. | Municipality | Oklahoma | Board of County Commissioners of Major County | Board of County Commissioners of Major County v. Purdue Pharma L.P., et al. | W.D. Okla. 5:19-cv-00879 |
| 449. | Municipality | Oklahoma | Board of County Commissioners of Okfuskee County | Board of County Commissioners of Okfuskee County v. Purdue Pharma L.P., et al. | E.D. Okla. 6:19-cv-00300 |
| 450. | Municipality | Oklahoma | Board of County Commissioners of Oklahoma County | Board of County Commissioners of Oklahoma County v. Purdue Pharma L.P., et al. | W.D. Okla. 5:19-cv-00926 |

EXHIBIT D
Page 322

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| 451. | Municipality | Oklahoma | Board of County Commissioners of Pottawatomie County | Board of County Commissioners of Pottawatomie County v. Purdue Pharma L.P., et al. | W.D. Okla. 5:19-cv-00880 |
| 452. | Municipality | Oklahoma | Board of County Commissioners of Texas County | Board of County Commissioners of Texas County v. Purdue Pharma L.P., et al. | W.D. Okla. 5:19-cv-00987 |
| 453. | Municipality | Oklahoma | Board of County Commissioners of Woods County | Board of County Commissioners of Woods County v. Purdue Pharma L.P., et al. | W.D. Okla. 5:19-cv-00878 |
| 454. | Municipality | Oklahoma | Board of County Commissioners of Woodward County | Board of County Commissioners of Woodward County v. Purdue Pharma L.P., et al. | W.D. Okla. 5:19-cv-01110 |
| 455. | Municipality | Oklahoma | City of Anadarko | City of Anadarko v. Purdue Pharma L.P., et al. | W.D. Okla. 5:19-cv-00815 |
| 456. | Municipality | Oklahoma | City of Bethany | City of Bethany v. Purdue Pharma L.P., et al. | W.D. Okla. 5:19-cv-00804 |
| 457. | Municipality | Oklahoma | City of Fort Cobb | City of Fort Cobb v. Purdue Pharma L.P., et al. | W.D. Okla. 5:19-cv-00816 |
| 458. | Municipality | Oklahoma | City of Jenks | City of Jenks v. Purdue Pharma L.P., et al. | N.D. Okla. 4:19-cv-00380 |
| 459. | Municipality | Oklahoma | City of Seminole | City of Seminole v. Purdue Pharma L.P., et al. | E.D. Okla. 6:19-cv-00291 |
| 460. | Municipality | Oklahoma | City of Shawnee | City of Shawnee v. Purdue Pharma L.P., et al. | W.D. Okla. 5:19-cv-00711 |
| 461. | Municipality | Pennsylvania | Adams County | Adams County v. Purdue Pharma L.P., et al. | E.D. Pa. 2:19-cv-04438 |
| 462. | Municipality | Pennsylvania | City of Allentown, Pennsylvania | City of Allentown, Pennsylvania v. AmerisourceBergen Drug Corp., et al. | E.D. Pa. 5:19-cv-03884 |
| 463. | Municipality | Texas | County of Angelina | County of Angelina v. Allergan PLC, et al. | S.D. Tex. 4:19-cv-03590 |
| 464. | Municipality | Texas | County of Burleson | County of Burleson v. Purdue Pharma L.P., et al. | S.D. Tex. 4:19-cv-03845 |

EXHIBIT D
Page 323

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| 465. | Municipality | Texas | County of Duval | County of Duval v. Purdue Pharma L.P., et al. | S.D. Tex. 4:19-cv-02504 |
| 466. | Municipality | Texas | County of Freestone | County of Freestone v. Purdue Pharma L.P., et al. | S.D. Tex. 4:19-cv-03983 |
| 467. | Municipality | Texas | Ellis County | Ellis County v. Purdue Pharma L.P., et al. | S.D Tex. 4:19-cv-02256 |
| 468. | Municipality | Texas | County of Jim Hogg | County of Jim Hogg v. Purdue Pharma L.P., et al. | S.D Tex. 4:19-cv-02816 |
| 469. | Municipality | Texas | County of Kleberg | County of Kleberg v. Purdue Pharma L.P., et al. | S.D. Tex. 4:19-cv-02815 |
| 470. | Municipality | Texas | Rockwall County | Rockwall County v. Purdue Pharma L.P., et al. | S.D. Tex. 4:19-cv-02181 |
| 471. | Municipality | Texas | County of Williamson | County of Williamson v. Purdue Pharma L.P., et al. | S.D. Tex. 4:19-cv-03299 |
| 472. | Municipality | Virginia | Amherst County, Virginia | Amherst County, Virginia v. Mallinckrodt PLC, et al. | W.D. Va. 6:20-cv-00077 |
| 473. | Municipality | Virginia | Botetourt County, Virginia | Botetourt County, Virginia v. Mallinckrodt PLC, et al. | W.D. Va. 7:19-cv-00759 |
| 474. | Municipality | Virginia | Charlotte County | Charlotte County, Virginia v. Purdue Pharma L.P., et al. | W.D. Va. 4:20-cv-00029 |
| 475. | Municipality | Virginia | City of Emporia | City of Emporia, Virginia v. Purdue Pharma L.P., et al. | E.D. Va. 3:19-cv-00513 |
| 476. | Municipality | Virginia | City of Fredericksburg | City of Fredericksburg, Virginia v. Purdue Pharma L.P., et al. | E.D. Va. 3:19-cv-00457 |
| 477. | Municipality | Virginia | City of Portsmouth | City of Portsmouth v. McKesson Corporation, et al. | E.D. Va. 2:19-cv-00331 |
| 478. | Municipality | Virginia | City of Radford | City of Radford v. Purdue Pharma L.P., et al. | W.D. Va. 7:19-cv-00525 |
| 479. | Municipality | Virginia | City of Waynesboro | The City of Waynesboro, Virginia v. Purdue Pharma L.P., et al. | W.D. Va. 5:19-cv-00058 |
| 480. | Municipality | Virginia | Culpeper County | Culpeper County, Virginia v. Purdue Pharma L.P., et al. | W.D. Va. 3:19-cv-00037 |
| 481. | Municipality | Virginia | Cumberland County | Cumberland County, Virginia v. Purdue Pharma L.P., et al. | W.D. Va. 6:20-cv-00054 |
| 482. | Municipality | Virginia | Greensville County | Greensville County, Virginia v. Purdue Pharma L.P., et al. | E.D. Va. 3:19-cv-00459 |

EXHIBIT D
Page 324

| | Type | State | Underlying Plaintiff(s) (Last, First) | Case Name | Court / Case Number |
|---|---|---|---|---|---|
| 483. | Municipality | Virginia | Loudoun County | Loudoun County, Virginia v. Purdue Pharma L.P., et al. | E.D. Va. 1:19-cv-00778 |
| 484. | Municipality | Virginia | Patrick County | Patrick County, Virginia v. Purdue Pharma L.P., et al. | W.D. Va. 4:19-cv-00032 |
| 485. | Municipality | Virginia | Prince George County | Prince George County, Virginia v. Purdue Pharma L.P., et al. | E.D. Va. 3:19-cv-00458 |
| 486. | Municipality | Virginia | Shenandoah County | Shenandoah County, Virginia v. Purdue Pharma L.P., et al. | W.D. Va. 5:19-cv-00056 |
| 487. | Municipality | Virginia | Wise County Board of Supervisors | Wise County Board of Supervisors v. AmerisourceBergen Drug Corporation, et al. | W.D. Va. 2:19-cv-00039 |
| *Tribal (Federal Court Pending Transfer to MDL)* | | | | | |
| 488. | Tribal | Oklahoma | Citizen Potawatomi Nation | Citizen Potawatomi Nation v. Purdue Pharma L.P., et al. | W.D. Okla. 5:19-cv-00955 |
| 489. | Tribal | Oklahoma | Delaware Nation | Delaware Nation v. Purdue Pharma L.P., et al. | W.D. Okla. 5:19-cv-00956 |
| 490. | Tribal | Oklahoma | Pawnee Nation of Oklahoma | Pawnee Nation of Oklahoma v. Purdue Pharma L.P., et al. | N.D. Okla. 4:19-cv-00556 |
| 491. | Tribal | Oklahoma | Sac & Fox Nation | Sac & Fox Nation v. Purdue Pharma L.P., et al. | W.D. Okla. 5:19-cv-00957 |
| 492. | Tribal | Oklahoma | The Osage Nation | The Osage Nation v. Purdue Pharma L.P., et al. | N.D. Okla. 4:19-cv-00485 |
| 493. | Tribal | Oklahoma | Thlopthlocco Tribal Town | Thlopthlocco Tribal Town v. Purdue Pharma L.P., et al. | N.D. Okla. 4:19-cv-00557 |

EXHIBIT D
Page 325

# Appendix IV

## Chart of Related Party Actions

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| *State Actions* | | | | | | |
| 1. | The Purdue Frederick Company Inc. | AG | Alabama | The State of Alabama | The State of Alabama v. Purdue Pharma L.P., et al. | Cir. Ct. Montgomery Cnty. 03-CV-2019-901174 |
| 2. | The Purdue Frederick Company | AG | Alaska | State of Alaska | State of Alaska v. Purdue Pharma L.P., et al. | Super. Ct. AK, 3rd Jud. Dist. 3AN-17-09966 |
| 3. | The Purdue Frederick Company Inc. (d/b/a The Purdue Frederick Company); Richard Sackler; Theresa Sackler; Kathe Sackler; Jonathan Sackler; Mortimer D.A. Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt | AG | Arizona | State of Arizona, ex rel. Mark Brnovich, Attorney General | State of Arizona, ex rel. Mark Brnovich, Attorney General v. Purdue Pharma L.P., et al. | Super. Ct. Pima Cnty. C20072471 |
| 4. | Richard Sackler; Theresa Sackler; Kathe Sackler; Jonathan Sackler; Mortimer D.A. Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt; The Purdue Frederick Company Inc. (d/b/a The Purdue Frederick Company); Purdue Holdings L.P.; PLP Associates Holdings L.P.; BR Holdings Associates L.P.; Rosebay Medical Company L.P.; Beacon Company | AG | Arizona | State of Arizona, ex rel. Mark Brnovich, Attorney General | State of Arizona, ex rel. Mark Brnovich, Attorney General v. Purdue Pharma L.P., et al. | U.S. Supreme Court No. 22O151 |
| 5. | The Purdue Frederick Company Inc. | AG | Arkansas | State of Arkansas, ex rel. Leslie Rutledge | State of Arkansas, ex rel. Leslie Rutledge v. Purdue Pharma L.P., et al. | Cir. Ct. Pulaski Cnty. 60CV-18-2018 |

Error! Unknown document property name.

EXHIBIT D

Page 327

|   | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 6. | Dr. Richard S. Sackler The Purdue Frederick Company Inc. | AG | California | The People of the State of California | The People of the State of California v. Purdue Pharma L.P., et al. | Los Angeles Cnty. Super. Ct. 19STCV19045 |
| 7. | MNP Consulting Limited; Richard Sackler; Mortimer D.A. Sackler; Jonathan Sackler; Kathe Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Russell Gasdia; Mark Timney; Craig Landau; James David Haddox | AG | Colorado | The State of Colorado ex rel. Philip J. Weiser, Attorney General | The State of Colorado ex rel. Philip J. Weiser, Attorney General v. Purdue Pharma L.P., et al. | Dist. Ct. Denver 2018CV33300 |
| 8. | Richard Sackler; Theresa Sackler; Kathe Sackler; Jonathan Sackler; Mortimer D.A. Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt; Frank Peter Boer; Paulo Costa; Cecil Pickett; Ralph Snyderman; Judy Lewent; John Stewart; Mark Timney Purdue Holdings L.P.; PLP Associates Holdings L.P.; BR Holdings Associates L.P.; Rosebay Medical Company, L.P.; Beacon Company | AG | Connecticut | State of Connecticut | State of Connecticut v. Purdue Pharma L.P., et al. | Hartford State Super. Ct. NO. X07 HHD-CV-19-6105325-S |
| 9. | Richard S. Sackler, M.D. | AG | DC | District of Columbia | District of Columbia v. Purdue Pharma L.P., et al. | Super. Ct. District of Columbia 2019 CA 003680 B |

EXHIBIT D
Page 328

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 10. | Richard Sackler; Jonathan Sackler; Mortimer D.A. Sackler; Kathe Sackler; Ilene Sackler Lefcourt; Theresa Sackler; David Sackler | AG | Delaware | State of Delaware, ex rel. Kathleen Jennings | State of Delaware, ex rel. Kathleen Jennings v. Richard Sackler, et al. | Super. Ct. of Delaware C.A. No. N19C-09-062 MMJ (CCLD) |
| 11. | The Purdue Frederick Company Inc. | AG | Delaware | State of Delaware, ex rel. Kathy Jennings | State of Delaware, ex rel. Kathy Jennings v. Purdue Pharma L.P., et al. | Super. Ct. of Delaware C.A. No. N18C-01-223 MMJ (CCLD) |
| 12. | The Purdue Frederick Company Inc. | AG | Florida | State of Florida, Office of the Attorney General, Department of Legal Affairs | State of Florida, Office of the Attorney General, Department of Legal Affairs v. Purdue Pharma L.P., et al. | Cir. Ct. Pasco Cnty. Case No. 2018-CA-001438 |
| 13. | The Purdue Frederick Company Inc. | AG | Georgia | State of Georgia | State of Georgia v. Purdue Pharma L.P., et al. | Super. Ct. Gwinnett Cnty. 19-A-00060-4 |
| 14. | The Purdue Frederick Company Inc. | AG | Guam | Territory of Guam | Territory of Guam v. Purdue Pharma, L.P., et al. | Super. Ct. Guam, Hagatna CV1020-19 |
| 15. | The Purdue Frederick Company Inc.; Richard S. Sackler; Beverly Sackler; David A. Sackler; Ilene Sackler Lefcourt; Jonathan Sackler; Kathe Sackler; Mortimer D.A. Sackler; Theresa Sackler | AG | Hawaii | State of Hawaii, ex rel. Clare E. Connors, Attorney General | State of Hawaii, ex rel. Clare E. Connors, Attorney General v. Purdue Pharma L.P., et al. | 1st Cir. Ct. of Hawaii 09-1-0862-06 JHA |
| 16. | Richard Sackler; Theresa Sackler; Kathe Sackler; Jonathan Sackler; Mortimer D.A. Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt | AG | Idaho | State of Idaho, Through Attorney General Lawrence G. Wasden | State of Idaho, Through Attorney General Lawrence G. Wasden v. Purdue Pharma L.P., et al. | Ada County District Court CV01-19-10061 |

19-23649-rdd Doc 3149-14 Filed 07/20/2021 Entered 07/20/2021 15:08:58 Exhibit Order Granting Preliminary Injunction and Exhibit A Injunction  Pg 81 of 275

3

|  | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 17. | Richard Sackler; Mortimer D.A. Sackler; Kathe Sackler; Ilene Sackler Lefcourt; Jonathan Sackler; Beverly Sackler; Theresa Sackler; David Sackler | AG | Illinois | The People of the State of Illinois | The People of the State of Illinois v. Purdue Pharma L.P., et al. | Cir. Ct. Cook Cnty. 2019-CH-04406 |
| 18. | The Purdue Frederick Company Inc. | AG | Indiana | State of Indiana | State of Indiana v. Purdue Pharma L.P., et al. | Marion Cir. / Super. Ct., Civ. Div. 10 49D10-1811-PL-045447 |
| 19. | Richard Sackler; Theresa Sackler; Kathe Sackler; Jonathan Sackler; Mortimer D.A. Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt | AG | Indiana | State of Indiana | State of Indiana v. Richard Sackler, et. al. | Marion Cir. / Super. Ct., Civ. Div. 13 49D13-1905-PL-020498 |
| 20. | The Purdue Frederick Company Inc.; The P.F. Laboratories Inc.; Richard S. Sackler | AG | Iowa | State of Iowa, Thomas J. Miller, Attorney General of Iowa | State of Iowa, Thomas J. Miller, Attorney General of Iowa v. Purdue Pharma L.P., et al. | Polk Cnty. Dist. Ct. EQCE 084514 |
| 21. | The Purdue Frederick Company Inc. | AG | Kansas | State of Kansas, ex rel. Derek Schmidt, Attorney General | State of Kansas, ex rel. Derek Schmidt, Attorney General v. Purdue Pharma L.P., et al. | Shawnee Cnty. Dist. Ct. 2019-cv-000369 |
| 22. | The Purdue Frederick Company Inc. | AG | Louisiana | State of LA f/k/a Louisiana Dept. of Health | State of LA f/k/a Louisiana Dept. of Health v. Purdue Pharma L.P., et al. | 19th Judicial District Court, Parish of East Baton Rouge Suit No. 661638 |
| 23. | Richard Sackler; Jonathan Sackler; Mortimer D.A. Sackler; Kathe Sackler | AG | Maine | State of Maine | State of Maine v. Purdue Pharma L.P., et al. | Kennebec County Superior Court CV-19-112 |

EXHIBIT D
Page 330

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 24. | The Purdue Frederick Company Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Theresa Sackler; David A. Sackler | AG | Maryland | Consumer Protection Division Office of the Attorney General (MD) | Consumer Protection Division Office of the Attorney General v. Purdue Pharma L.P., et al. | Consumer Protection Division of the Office of the Attorney General (Md.) / Office of Administrative Hearings CPD Case No.: 311366 OAH Case No. 1923474 |
| 25. | Richard Sackler; Theresa Sackler; Kathe Sackler; Jonathan Sackler; Mortimer D.A. Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt; Peter Boer; Paulo Costa; Cecil Pickett; Ralph Synderman; Judith Lewent; Craig Landau; John Stewart; Mark Timney; Russell J. Gasdia | AG | Massachusetts | Commonwealth of Massachusetts | Commonwealth of Massachusetts v. Purdue Pharma L.P., et al. | Super. Ct. Suffolk Cnty. C.A. No. 1884-cv-01808 (BLS2) |
| 26. | The Purdue Frederick Company Inc.; Richard Sackler; Kathe Sackler; Mortimer D.A. Sackler; Jonathan Sackler; David Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler | AG | Minnesota | State of Minnesota by its Attorney General, Keith Ellison | State of Minnesota by Attorney General, Keith Ellison v. Purdue Pharma L.P., et al. | 4th Jud. Dist. Ct., Hennepin Cnty. Court File No. 27-CV-18-10788 |
| 27. | The Purdue Frederick Company Inc. | AG | Mississippi | State of Mississippi | State of Mississippi v. Purdue Pharma L.P., et al. | Hinds Cnty. 25CH1:15-cv-001814 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 28. | The Purdue Frederick Company Inc. | AG | Missouri | State of Missouri, ex rel. Eric Schmitt, in his official capacity as Missouri Attorney General | State of Missouri, ex rel. Eric Schmitt, in his official capacity as Missouri Attorney General v. Purdue Pharma L.P. | Cir. Ct. St. Louis City 1722-CC10626 |
| 29. | The Purdue Frederick Company Inc. | AG | Montana | State of Montana | State of Montana v. Purdue Pharma L.P., et al. | Lewis & Clark Cty. ADV-2017-949 |
| 30. | The Purdue Frederick Company Inc.; P.F. Laboratories, Inc.; Purdue Holdings L.P.; PLP Associates Holdings L.P.; Rosebay Medical Company L.P.; Beacon Company; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; David A. Sackler; Beverly Sackler; Theresa Sackler | AG | Nevada | State of Nevada | State of Nevada v. McKesson Corp, et al. | Dist. Ct. Clark County A-19-796755-B |
| 31. | The Purdue Frederick Company Inc. | AG | New Hampshire | State of New Hampshire | State of New Hampshire v. Purdue Pharma L.P., et al. | Merrimack Super. Ct. 217-2017-CV-00402 |
| 32. | Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler | AG | New Hampshire | State of New Hampshire | State of New Hampshire v. Richard S. Sackler, et al. | Merrimack Super. Ct. 217-2019-CV-00617 |
| 33. | The Purdue Frederick Company Inc. | AG | New Jersey | Gurbir S. Grewal, Attorney General and Paul Rodriguez, Acting Director of the New Jersey Division of Consumer Affairs | Gurbir S. Grewal, et al. v. Purdue Pharma L.P., et al. | Super. Ct. NJ Chancery. Div., Essex Cty. ESX-C-245-17 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 34. | Richard S. Sackler; Jonathan D. Sackler; Ilene Sackler Lefcourt; Kathe Sackler; Beverly Sackler; Mortimer D.A. Sackler; Theresa Sackler; David A. Sackler | AG | New Jersey | Gurbir S. Grewal, Attorney General and Paul Rodriguez, Acting Director of the New Jersey Division of Consumer Affairs | Gurbir S. Grewal, et al. v. Richard S. Sackler, et al. | Super. Ct. NJ Chancery. Div., Essex Cty. ESX-C-115-19 |
| 35. | The Purdue Frederick Company Inc. | AG | New Mexico | State of New Mexico, ex rel., Hector Balderas, Attorney General | State of New Mexico, ex rel., Hector Balderas, Attorney General v. Purdue Pharma L.P., et al. | Santa Fe Dist. D-101-CV-201702541 |
| 36. | Richard S. Sackler; Beverly Sackler; David A. Sackler; Ilene Sackler Lefcourt; Jonathan D. Sackler; Kathe Sackler; Mortimer D.A. Sackler; Theresa Sackler | AG | New Mexico | State of New Mexico, ex rel., Hector Balderas, Attorney General | State of New Mexico, ex rel., Hector Balderas, Attorney General v. Richard S. Sackler, et al. | Santa Fe Dist. D-101-CV-201902399 |
| 37. | The Purdue Frederick Company Inc; The P.F. Laboratories Inc.; Purdue Holdings L.P.; Rosebay Medical Company L.P.; The Beacon Company; PLP Associates Holdings L.P.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler | AG | New York | The People of the State of New York, by Letitia James, Attorney General of the State of New York | The People of the State of New York, by Letitia James, Attorney General of the State of New York v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400016-2018 |

7

EXHIBIT D

Page 333

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 38. | Purdue Pharma Technologies Inc.; The Purdue Frederick Company Inc. | AG | North Carolina | State of North Carolina, ex rel. Joshua H. Stein, Attorney General | State of North Carolina, ex rel. Joshua H. Stein, Attorney General v. Purdue Pharma L.P., et al. | Super. Ct. Wake Cnty. 18-cv-6051 |
| 39. | Richard Sackler; Mortimer D.A. Sackler; Jonathan Sackler; Kathe Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David Sackler | AG | North Carolina | State of North Carolina, ex rel. Joshua H. Stein, Attorney General | State of North Carolina, ex rel. Joshua H. Stein, Attorney General v. Richard Sackler, et al. | Super. Ct. Wake Cnty. 19-cv-12596 |
| 40. | The Purdue Frederick Company Inc. | AG | North Dakota | State of North Dakota, ex rel. Wayne Stenehjem, Attorney General | State of North Dakota, ex rel. Wayne Stenehjem, Attorney General v. Purdue Pharma L.P., et al. | Dist. Ct. Burleigh Cnty. 08-2018-CV-01300 |
| 41. | The Purdue Frederick Company Inc. | AG | Ohio | State of Ohio, ex rel. David Yost, Ohio Attorney General | State of Ohio, ex rel. David Yost, Ohio Attorney General v. Purdue Pharma L.P., et al. | C.P. Ross Cnty 17CI000261 |
| 42. | The Purdue Frederick Company Inc. | AG | Oregon | State of Oregon, ex rel. Ellen F. Rosenblum, Attorney General for the State of Oregon | State of Oregon, ex rel. Ellen F. Rosenblum, Attorney General for the State of Oregon v. Purdue Pharma L.P., et al. | Cir. Ct. Multnomah Cnty. 18CV40526 |
| 43. | Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; David A. Sackler; Beverly Sackler; Theresa Sackler; | AG | Oregon | State of Oregon, ex rel. Ellen F. Rosenblum, Attorney General for the State of Oregon | State of Oregon, ex rel. Ellen F. Rosenblum, Attorney General for the State of Oregon v. Purdue Pharma L.P., et al. | Cir. Ct. Multnomah Cnty. 19CV22185 |

EXHIBIT D
Page 334

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 44. | Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Ilene Sackler Lefcourt; David A Sackler; Beverly Sackler; Theresa Sackler | AG | Oregon | State of Oregon, ex rel. Ellen F. Rosenblum, Attorney General for the State of Oregon | State of Oregon, ex rel. Ellen F. Rosenblum, Attorney General for the State of Oregon v. Richard S. Sackler, et al. | Cir Ct. Multnomah Cnty. 19CV44161 |
| 45. | The Purdue Frederick Company Inc. | AG | Pennsylvania | Commonwealth of Pennsylvania by Attorney General Josh Shapiro | Commonwealth of Pennsylvania by Attorney General Josh Shapiro v. Purdue Pharma L.P., et al. | Commonwealth Ct. of PA 257-md-19 |
| 46. | Richard Sackler; Theresa Sackler; Kathe Sackler; Jonathan Sackler; Mortimer D.A. Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt | AG | Pennsylvania | Commonwealth of Pennsylvania by Attorney General Josh Shapiro | Commonwealth of Pennsylvania by Attorney General Josh Shapiro v. Richard Sackler, et al. | Commonwealth Ct. of PA 508-md-19 |
| 47. | The Purdue Frederick Company Inc. | AG | Puerto Rico | The Commonwealth of Puerto Rico | The Commonwealth of Puerto Rico v. Purdue Pharma, et al. | Super. Ct. San Juan SJ2018CV01659 |
| 48. | The Purdue Frederick Company Inc.; Rhodes Technologies Inc.; Richard S. Sackler | AG | Rhode Island | State of Rhode Island, by and through Peter F. Neronha, Attorney General | State of Rhode Island, by and through Peter F. Neronha, Attorney General v. Purdue Pharma L.P., et al. | Providence/Bristol County Super. Ct. PC-18-4555 |
| 49. | Richard Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; David A. Sackler; Beverly Sackler; Theresa Sackler | AG | Rhode Island | State of Rhode Island, by and through Peter F. Neronha, Attorney General | State of Rhode Island, by and through Peter F. Neronha, Attorney General v. Richard S. Sackler, et al. | Providence/Bristol County Super. Ct. PC-19-9399 |
| 50. | The Purdue Frederick Company Inc. | AG | South Carolina | State of South Carolina, ex rel. Alan Wilson Attorney General | State of South Carolina, ex rel. Alan Wilson Attorney General v. Purdue Pharma L.P., et al. | C.P. Richland Cnty. 2017CP4004872 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 51. | The Purdue Frederick Company Inc. | AG | South Dakota | State of South Dakota, ex rel. Jason Ravnsborg, South Dakota Attorney General | State of South Dakota, ex rel. Jason Ravnsborg, South Dakota Attorney General v. Purdue Pharma L.P., et al. | Cir. Ct. Hughes Cnty. 32CIV18-000065 |
| 52. | The Purdue Frederick Company Inc. | AG | Texas | State of Texas | State of Texas v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77003 |
| 53. | The Purdue Frederick Company; Richard Sackler, M.D.; Kathe Sackler, M.D. | AG | Utah | Utah Division of Consumer Protection | In the Matter of Purdue Pharma L.P. et al. | Division of Consumer Protection of the Department of Commerce of the State of Utah DCP Case No. 107102 |
| 54. | The Purdue Frederick Company Inc. | AG | Vermont | State of Vermont | State of Vermont v. Purdue Pharma L.P., et al. | Super. Ct. Chittenden Civ. Div. 757-9-18-CRCV |
| 55. | Richard S. Sackler; Beverly Sackler; David A. Sackler; Ilene Sackler Lefcourt; Jonathan D. Sackler; Kathe Sackler; Mortimer D.A. Sackler; Theresa Sackler | AG | Vermont | State of Vermont | State of Vermont v. Richard S. Sackler, et al. | Super. Ct. Chittenden Civ. Div. 469-5-19-CNCV |
| 56. | The Purdue Frederick Company Inc.; Richard Sackler; Jonathan Sackler; Kathe Sackler; Mortimer D.A. Sackler | AG | Virginia | Commonwealth of Virginia, ex rel. Mark R. Herring, Attorney General | Commonwealth of Virginia, ex rel. Mark R. Herring, Attorney General v. Purdue Pharma L.P., et al. | Cir. Ct. Tazewell Cnty. CL18-1076 |
| 57. | The Purdue Frederick Company Inc. | AG | Washington | State of Washington | State of Washington v. Purdue Pharma L.P., et al. | Super. Ct. King Cty. 17-2-25505-0 SEA |
| 58. | Richard Sackler, M.D. | AG | West Virginia | State of West Virginia, ex rel. Patrick Morrisey, Attorney General | State of West Virginia, ex rel. Patrick Morrisey, Attorney General v. Purdue Pharma L.P., et al. | Cir. Ct. Boone Cnty. 19-C-62 |
| 59. | Richard S. Sackler | AG | Wisconsin | State of Wisconsin | State of Wisconsin v. Purdue Pharma L.P., et al. | Cir. Ct. Dane Cnty. 2019CX000009 |

10

EXHIBIT D
Page 336

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 60. | The Purdue Frederick Company Inc. | AG | Wyoming | State of Wyoming, ex rel. Bridget Hill, Attorney General | State of Wyoming, ex rel. Bridget Hill, Attorney General v. Purdue Pharma L.P., et al. | 1st Jud. Ct. Laramie Cnty. 190-576 |
| **Tribal (MDL)** | | | | | | |
| 61. | The Purdue Frederick Company Inc. | Tribal | MDL | Puyallup Tribe of Indians | Puyallup Tribe of Indians v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45660 Master Case No. 17-md-2804 |
| 62. | The Purdue Frederick Company Inc. | Tribal | MDL | The Blackfeet Tribe of the Blackfeet Indian Reservation | The Blackfeet Tribe of the Blackfeet Indian Reservation v. AmerisourceBergen Corp., et al. | N.D. Ohio 1:18-op-45749 Master Case No. 17-md-2804 |
| 63. | The Purdue Frederick Company Inc. | Tribal | MDL | The Muscogee (Creek) Nation | The Muscogee (Creek) Nation v. Purdue Pharma L.P., et al. | N.D. Ohio 1:18-op-45459 Master Case No. 17-md-2804 |
| **Tribal (State Court)** | | | | | | |
| 64. | The Purdue Frederick Company Inc. | Tribal | Oklahoma | Apache Tribe of Oklahoma | Apache Tribe of Oklahoma v. Purdue Pharma L.P., et al. | D. Ct. Caddo Cnty. CJ-2019-69 |
| **Local Government (MDL)** | | | | | | |
| 65. | The Purdue Frederick Company Inc. | Municipality | MDL | Broward County, Florida | Broward County, Florida v. Purdue Pharma L.P., et al. | N.D. Ohio 1:18-op-45332 Master Case No. 17-md-2804 |
| 66. | The Purdue Frederick Company Inc.; Rhodes Technologies, Inc.; Richard S. Sackler, M.D.; Kathe A. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler | Municipality | MDL | Cabell County Commission; City of Huntington, West Virginia | Cabell County Commission and City of Huntington, West Virginia v. Purdue Pharma, et al. | N.D. Ohio 1:17-op-45053 (Cabell) N.D. Ohio 1:17-op-45054 (Huntington) Master Case No. 17-md-2804 |

EXHIBIT D
Page 337

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 67. | The Purdue Frederick Company Inc. | Municipality | MDL | City of Chicago | City of Chicago v. Purdue Pharma L.P., et al. | N.D. Ohio 1:17-op-45169 Master Case No. 17-md-2804 |
| 68. | The Purdue Frederick Company Inc. | Municipality | MDL | City of Cleveland | City of Cleveland v. AmerisourceBergen Drug Corp., et al. | N.D. Ohio 1:18-op-45132 Master Case No. 17-md-2804 |
| 69. | The Purdue Frederick Company Inc. | Municipality | MDL | City of Dothan, Alabama | City of Dothan, Alabama v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45886 Master Case No. 17-md-2804 |
| 70. | Richard Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt; Jonathan Sackler; Kathe Sackler; Mortimer D.A. Sackler; Theresa Sackler; The Purdue Frederick Company Inc; Rhodes Technologies Inc. | Municipality | MDL | City of Henderson, Kentucky | City of Henderson, Kentucky, on behalf of themselves and all other similarly situated home rule cities v. Purdue Pharma L.P., et al. | N.D. Ohio 1:20-op-45062 Master Case No. 17-md-2804 |
| 71. | The Purdue Frederick Company Inc. | Municipality | MDL | The City of Pascagoula, Mississippi | The City of Pascagoula, Mississippi v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45934 Master Case No. 17-md-2804 |
| 72. | The Purdue Frederick Company Inc. | Municipality | MDL | City of Stuart, Florida | City of Stuart, Florida v. Purdue Pharma L.P., et al. | N.D. Ohio 1:20-op-45124 Master Case No. 17-md-2804 |
| 73. | The Purdue Frederick Company Inc. | Municipality | MDL | The City of Wichita, Kansas | The City of Wichita, Kansas v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45781 Master Case No. 17-md-2804 |
| 74. | Beverly Sackler; David A. Sackler; Ilene Sackler Lefcourt; Jonathan | Municipality | MDL | Clinton County, Missouri | Clinton County, Missouri v. Allergan PLC, et al. | N.D. Ohio 1:20-op-45130 Master Case No. 17-md- |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| | D. Sackler; Kathe A. Sackler; Mortimer D.A. Sackler; Theresa Sackler | | | | | 2804 |
| 75. | Jonathan Sackler; Richard Sackler; Mortimer D.A. Sackler; Kathe Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David Sackler; Trust for the Benefit of the Members of the Raymond Sackler Family | Municipality | MDL | County of Alameda; City of Costa Mesa; City of Anaheim; City of Santa Ana; City of San Clemente; City of Encinitas; City of La Habra; City of La Mesa; City of Oxnard; City of Placentia; The People of the State of California, by and through Alameda County Counsel Donna Ziegler, Costa Mesa City Attorney Kimberly Hall Barlow, and Anaheim City Attorney Robert Fabela, Santa Ana City Attorney Sonia R. Carvalho, San Clemente City Attorney Scott C. Smith, Encinitas City Attorney Leslie Devaney, La Habra City Attorney Richard D. Jones, La Mesa City Attorney Glenn Sabine, Oxnard City Attorney Stephen Fischer, and Placentia City Attorney Christian Bettenhausen | County of Alameda, et al. v. Richard Sackler, et al. | N.D. Ohio 1:20-op-45055 Master Case No. 17-md-2804 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 76. | Richard Sackler; Theresa Sackler; Mortimer D.A. Sackler; Beverly Sackler; Kathe Sackler; Jonathan Sackler; David Sackler; Ilene Sackler Lefcourt | Municipality | MDL | The County Commissioner of Carroll County Maryland | The County Commissioner of Carroll County Maryland v. Actavis PLC, et al. | N.D. Ohio 1:20-op-45052 Master Case No. 17-md-2804 |
| 77. | The Purdue Frederick Company Inc. | Municipality | MDL | The County of Cuyahoga, Ohio; State of Ohio ex rel., Prosecuting Attorney of Cuyahoga County, Michael C. O'Malley | The County of Cuyahoga Ohio, and State of Ohio ex rel., Prosecuting Attorney of Cuyahoga County, Michael C. O'Malley v. Purdue Pharma L.P., et al. | N.D. Ohio 1:18-op-45332 Master Case No. 17-md-2804 |
| 78. | The Purdue Frederick Company Inc. | Municipality | MDL | County of Monroe | County of Monroe v. Purdue Pharma L.P., et al. | N.D. Ohio 1:18-op-45158 Master Case No. 17-md-2804 |
| 79. | The Purdue Frederick Company Inc. | Municipality | MDL | County of Summit, Ohio; Summit County Public Health; The City of Akron; State of Ohio ex rel., Prosecuting Attorney for Summit County, Sherri Bevan Walsh and the Director of Law for the City of Akron, Eve Belfance | County of Summit, Ohio et al. v. Purdue Pharma L.P. et al. | N.D. Ohio 1:18-op-45090 Master Case No. 17-md-2804 |

EXHIBIT D
Page 340

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 80. | Richard Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt; Jonathan Sackler; Kathe Sackler; Mortimer D.A. Sackler; Theresa Sackler; The Purdue Frederick Company Inc; Rhodes Technologies Inc. | Municipality | MDL | Hardin County Fiscal Court, on behalf of Hardin County; Breckinridge County Fiscal Court, on behalf of Breckinridge County; Green County Fiscal Court, on behalf of Green County; Meade County Fiscal Court, on behalf of Meade County; Ohio County Fiscal Court, on behalf of Ohio County, on behalf of themselves and all other similarly situated counties (Fiscal Courts) | Hardin County Fiscal Court, et al. v. Purdue Pharma L.P., et al. | N.D. Ohio 1:20-op-45063 Master Case No. 17-md-2804 |
| 81. | Beverly Sackler; David A. Sackler; Ilene Sackler Lefcourt; Jonathan D. Sackler; Kathe A. Sackler; Mortimer D.A. Sackler; Theresa Sackler | Municipality | MDL | Pike County, Missouri | Pike County, Missouri v. Allergan PLC, et al. | N.D. Ohio 1:20-op-45131 Master Case No. 17-md-2804 |
| *Local Government (Federal Court Pending Transfer to MDL)* | | | | | | |
| 82. | The Purdue Frederick Company Inc. | Municipality | Alabama | Alexander City, Alabama | Alexander City, Alabama v. Purdue Pharma L.P., et al. | M.D. Ala. 3:19-cv-00630 |
| 83. | The Purdue Frederick Company Inc. | Municipality | Alabama | City of Ashland, Alabama | City of Ashland, Alabama v. Purdue Pharma L.P., et al. | N.D. Ala. 2:19-cv-01812 |
| 84. | The Purdue Frederick Company Inc. | Municipality | Alabama | City of Brent, Alabama | City of Brent, Alabama v. Purdue Pharma L.P., et al. | N.D. Ala. 7:19-cv-01565 |
| 85. | The Purdue Frederick Company Inc. | Municipality | Alabama | City of Brundidge, Alabama | City of Brundidge, Alabama v. Purdue Pharma L.P., et al. | M.D. Ala. 2:19-cv-00861 |
| 86. | The Purdue Frederick Company Inc. | Municipality | Alabama | City of Center Point, Alabama | City of Center Point, Alabama v. Purdue Pharma L.P., et al. | N.D. Ala. 2:19-cv-01812 |

EXHIBIT D
Page 341

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 87. | The Purdue Frederick Company Inc. | Municipality | Alabama | City of Chickasaw, Alabama | City of Chickasaw, Alabama v. Purdue Pharma L.P., et al. | S.D. Ala. 1:20-cv-00117 |
| 88. | The Purdue Frederick Company Inc. | Municipality | Alabama | City of Eufaula, Alabama | City of Eufaula, Alabama v. Purdue Pharma L.P., et al. | M.D. Ala. 2:19-cv-00862 |
| 89. | The Purdue Frederick Company Inc. | Municipality | Alabama | City of Fairfield, Alabama | City of Fairfield, Alabama v. Purdue Pharma L.P., et al. | N.D. Ala. 2:20-cv-00202 |
| 90. | The Purdue Frederick Company Inc. | Municipality | Alabama | City of Geneva, Alabama | City of Geneva, Alabama v. Purdue Pharma L.P., et al. | M.D. Ala. 1:19-cv-00763 |
| 91. | The Purdue Frederick Company Inc. | Municipality | Alabama | City of Headland, Alabama | City of Headland, Alabama v. Purdue Pharma L.P., et al. | M.D. Ala. 1:19-cv-00886 |
| 92. | The Purdue Frederick Company Inc. | Municipality | Alabama | City of Lanett, Alabama | City of Lanett, Alabama v. Purdue Pharma L.P., et al. | M.D. Ala. 3:19-cv-00885 |
| 93. | The Purdue Frederick Company Inc. | Municipality | Alabama | City of Leeds, Alabama | City of Leeds, Alabama v. Purdue Pharma L.P., et al. | N.D. Ala. 2:20-cv-00201 |
| 94. | The Purdue Frederick Company Inc. | Municipality | Alabama | City of Level Plains, Alabama | City of Level Plains, Alabama v. Purdue Pharma L.P., et al. | M.D. Ala. 1:20-cv-00137 |
| 95. | The Purdue Frederick Company Inc. | Municipality | Alabama | City of Linden, Alabama | City of Linden, Alabama v. Purdue Pharma L.P., et al. | S.D. Ala. 2:20-cv-00129 |
| 96. | The Purdue Frederick Company Inc. | Municipality | Alabama | City of Luverne, Alabama | City of Luverne, Alabama v. Purdue Pharma L.P., et al. | M.D. Ala. 2:20-cv-00136 |
| 97. | The Purdue Frederick Company Inc. | Municipality | Alabama | City of Oxford, Alabama | City of Oxford, Alabama v. Purdue Pharma L.P., et al. | N.D. Ala. 1:19-cv-01401 |
| 98. | The Purdue Frederick Company Inc. | Municipality | Alabama | City of Pell City, Alabama | City of Pell City, Alabama v. Purdue Pharma L.P., et al. | N.D. Ala. 4:20-cv-00203 |
| 99. | The Purdue Frederick Company Inc. | Municipality | Alabama | City of Satsuma, Alabama | City of Satsuma, Alabama v. Purdue Pharma L.P., et al. | S.D. Ala. 1:20-cv-00127 |
| 100. | The Purdue Frederick Company Inc. | Municipality | Alabama | City of Uniontown, Alabama | City of Uniontown, Alabama v. Purdue Pharma L.P., et al. | S.D. Ala. 1:20-cv-00128 |
| 101. | The Purdue Frederick Company Inc. | Municipality | Alabama | Coosa County, Alabama | Coosa County, Alabama v. Purdue Pharma L.P., et al. | M.D. Ala. 2:19-cv-00752 |
| 102. | The Purdue Frederick Company Inc. | Municipality | Alabama | Crenshaw County, Alabama | Crenshaw County, Alabama v. Purdue Pharma L.P., et al. | M.D. Ala. 2:19-cv-00753 |
| 103. | The Purdue Frederick Company Inc. | Municipality | Alabama | Escambia County, Alabama | Escambia County, Alabama v. Purdue Pharma L.P., et al. | S.D. Ala. 1:20-cv-00134 |
| 104. | The Purdue Frederick Company Inc. | Municipality | Alabama | Geneva County, Alabama | Geneva County, Alabama v. Purdue Pharma L.P., et al. | M.D. Ala. 1:20-cv-00135 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 105. | The Purdue Frederick Company Inc. | Municipality | Alabama | Perry County, Alabama | Perry County, Alabama v. Purdue Pharma L.P., et al. | S.D. Ala. 2:20-cv-00113 |
| 106. | The Purdue Frederick Company Inc. | Municipality | Alabama | Russell County, Alabama | Russell County, Alabama v. Purdue Pharma L.P., et al. | M.D. Ala. 3:19-cv-00646 |
| 107. | The Purdue Frederick Company Inc. | Municipality | Alabama | Town of Dauphin Island, Alabama | Town of Dauphin Island, Alabama v. Purdue Pharma L.P., et al. | S.D. Ala. 1:20-cv-00135 |
| 108. | The Purdue Frederick Company Inc. | Municipality | Alabama | Town of Faunsdale, Alabama | Town of Faunsdale, Alabama v. Purdue Pharma L.P., et al. | S.D. Ala. 2:20-cv-00142 |
| 109. | The Purdue Frederick Company Inc. | Municipality | Alabama | Town of Vance, Alabama | Town of Vance, Alabama v. Purdue Pharma L.P., et al. | N.D. Ala. 7:19-cv-01564 |
| 110. | Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | Municipality | California | The City and County of San Francisco, California and the People of the State of California, acting by and through San Francisco City Attorney Dennis J. Herrera | The City and County of San Francisco, California and the People of the State of California, acting by and through San Francisco City Attorney Dennis J. Herrera v. Purdue Pharma L.P., et al. | N.D. Cal. 3:18-cv-07591 |
| 111. | The Purdue Frederick Company, Inc.; Richard Sackler; Trust for the Benefit of Members of the Raymond Sackler Family; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler | Municipality | California | City of Costa Mesa and the People of the State of California by and through Costa Mesa City Attorney Kimberly Hall Barlow | City of Costa Mesa and People of the State of California by and through Costa Mesa City Attorney Kimberly Hall Barlow v. Purdue Pharma L.P. | N.D. Cal. 4:19-cv-02320 |

EXHIBIT D
Page 343

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 112. | The Purdue Frederick Company, Inc.; Richard Sackler; Trust for the Benefit of Members of the Raymond Sackler Family; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler | Municipality | California | City of Fullerton and the People of the State of California by and through Fullerton City Attorney Richard D. Jones | City of Fullerton and the People of the State of California by and through Fullerton City Attorney Richard D. Jones v. Purdue Pharma L.P. | N.D. Cal. 3:19-cv-02321 |
| 113. | The Purdue Frederick Company, Inc.; Richard Sackler; Trust for the Benefit of Members of the Raymond Sackler Family; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler | Municipality | California | City of Irvine and the People of the State of California by and through Irvine City Attorney Jeffrey Melching | City of Irvine and the People of the State of California by and through Irvine City Attorney Jeffrey Melching v. Purdue Pharma L.P. | N.D. Cal. 3:19-cv-02323 |

EXHIBIT D

Page 344

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 114. | The Purdue Frederick Company, Inc.; Richard Sackler; Trust for the Benefit of Members of the Raymond Sackler Family; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler | Municipality | California | City of San Clemente and the People of the State of California by and through San Clemente City Attorney Scott C. Smith | City of San Clemente and the People of the State of California, by and through San Clemente City Attorney Scott C. Smith v. Purdue Pharma L.P. | N.D. Cal. 4:19-cv-02326 |
| 115. | The Purdue Frederick Company, Inc.; Richard Sackler; Trust for the Benefit of Members of the Raymond Sackler Family; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler | Municipality | California | City of Santa Ana and the People of the State of California, by and through Santa Ana City Attorney Sonia R. Carvalho | City of Santa Ana and the People of the State of California, by and through Santa Ana City Attorney Sonia R. Carvalho v. Purdue Pharma L.P. | N.D. Cal. 3:19-cv-02324 |

EXHIBIT D
Page 345

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 116. | The Purdue Frederick Company, Inc.; Richard Sackler; Trust for the Benefit of Members of the Raymond Sackler Family; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler | Municipality | California | City of Westminster and the People of the State of California by and through Westminster City Attorney Richard D. Jones | City of Westminster and the People of the State of California by and through Westminster City Attorney Richard D. Jones v. Purdue Pharma L.P. | N.D. Cal. 3:19-cv-02325 |
| 117. | The Purdue Frederick Company, Inc.; Richard Sackler; Trust for the Benefit of Members of the Raymond Sackler Family; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler | Municipality | California | County of Alameda and the People of the State of California by and through County Counsel Donna Ziegler | County of Alameda and People of the State of California by and through County Counsel Donna Ziegler v. Purdue Pharma L.P. | N.D. Cal. 3:19-cv-02307 |
| 118. | The Purdue Frederick Company Inc.; Richard Sackler; Theresa Sackler; Kathe Sackler; Jonathan Sackler; Mortimer D.A. Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt | Municipality | Delaware | City of Dover, a municipal corporation of the State of Delaware; City of Seaford, a municipal corporation of the State of Delaware; Kent County, a political subdivision of the State of Delaware | City of Dover, a municipal corporation of the State of Delaware; City of Seaford, a municipal corporation of the State of Delaware; and Kent County, a political subdivision of the State of Delaware v. Purdue Pharma L.P., et al. | D. Del. 1:19-cv-01749 |

|  | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 119. | The Purdue Frederick Company Inc. | Municipality | Florida | City of Ocala, Florida | City of Ocala, Florida v. Purdue Pharma L.P., et al. | M.D. Fla. 5:19-cv-00440 |
| 120. | The Purdue Frederick Company Inc.; The P.F. Laboratories, Inc.; Rhodes Pharmaceuticals Inc.; Raymond Sackler Family; Mortimer Sackler Family; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Trust for the Benefit of Members of the Raymond Sackler Family | Municipality | Hawaii | County of Hawai'i | County of Hawai'i v. Purdue Pharma L.P., et al. | D. Haw. 1:19-cv-00581 |
| 121. | The Purdue Frederick Company Inc.; The P.F. Laboratories, Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Raymond Sackler Family; Mortimer Sackler Family; Richard S. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Trust for the Benefit of Members of the Raymond Sackler Family | Municipality /Class Action | Hawaii | County of Kaua'i, a political subdivision of the State of Hawaii, for themselves individually, and on behalf of all similarly situated persons, and on behalf of the general public, as a class | County of Kaua'i, a political subdivision of the State of Hawaii, for themselves individually, and on behalf of all similarly situated persons, and on behalf of the general public, as a class v. CVS Health Corporation, et al. | D. Haw. 1:19-cv-00377 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 122. | The Purdue Frederick Company Inc. | Municipality | Louisiana | Town of Abita Springs, Louisiana | Town of Abita Springs, Louisiana v. Purdue Pharma Inc., et al. | E.D. La. 2:19-cv-14521 |
| 123. | The Purdue Frederick Company Inc. | Municipality | Louisiana | Warren Montgomery, Duly Elected 22nd Judicial District Attorney for the Parishes of St. Tammany and Washington | Warren Montgomery, Duly Elected 22nd Judicial District Attorney for the Parishes of St. Tammany and Washington v. Purdue Pharma Inc., et al. | E.D. La. 2:19-cv-14516 |
| 124. | The Purdue Frederick Company inc. | Municipality | Maine | City of Rockland, State of Maine | City of Rockland, State of Maine v. Purdue Pharma L.P., et al. | D. Me. 2:19-cv-00373 |
| 125. | The Purdue Frederick Company Inc. | Municipality | Maine | Knox County, State of Maine | Knox County, State of Maine, individually, and on behalf of all others similarly situated v. Purdue Pharma L.P., et al. | D. Me. 2:19-cv-00371 |
| 126. | The Purdue Frederick Company Inc. | Municipality | Maryland | Howard County | Howard County, Maryland v. Purdue Pharma L.P., et al. | D. Md. 1:19-cv-02116 |
| 127. | The Purdue Frederick Company Inc. | Municipality | Michigan | Charter Township of Harrison | Charter Township of Harrison v. The Pain Center USA, PLLC, et al. | E.D. Mich. 2:19-cv-11681 |
| 128. | The Purdue Frederick Company Inc. | Municipality | Michigan | City of Sterling Heights | City of Sterling Heights v. The Pain Center USA, PLLC, et al. | E.D. Mich. 2:19-cv-11685 |
| 129. | The Purdue Frederick Company Inc. | Municipality | Michigan | City of Warren | City of Warren v. The Pain Center USA, PLLC, et al. | E.D. Mich. 2:19-cv-11687 |
| 130. | Richard S. Sackler | Municipality | Missouri | Camden County, Missouri | Camden County, Missouri v. Williams et al. | E.D. Mo. 4:19-cv-02930 |
| 131. | The Purdue Frederick Company Inc.; Richard S. Sackler, M.D. | Municipality | Missouri | St. Francois County | St. Francois County v. Bonnie E. Williams, M.D., et al. | E.D. Mo. 4:19-cv-01722 |
| 132. | The Purdue Frederick Company Inc.; Aida B. Maxsam | Municipality | Nevada | Clark County | Clark County v. Purdue Pharma L.P., et al. | D. Nev. 2:19-cv-01616 |

EXHIBIT D
Page 348

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 133. | Richard Sackler; Jonathan Sackler; Mortimer D.A. Sackler; David Sackler; Kathe Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; Cecil Pickett; Paulo Costa; Ralph Snyderman; Frank Boer; Judy Lewent; John Stewart; Craig Landau; Mark Timney; Russell Gasdia; Trust for the Benefit of Members of the Raymond Sackler Family; The P.F. Laboratories, Inc. | Municipality | New Hampshire | Carroll County | Carroll County v. Teva Pharmaceuticals USA, Inc., et al. | D. N.H. 1:19-cv-01097 |
| 134. | Richard Sackler; Jonathan Sackler; Mortimer D.A. Sackler; David Sackler; Kathe Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; Cecil Pickett; Paulo Costa; Ralph Snyderman; Frank Boer; Judy Lewent; John Stewart; Craig Landau; Mark Timney; Russell Gasdia; | Municipality | New Hampshire | Coos County | Coos County v. Teva Pharmaceuticals USA, Inc., et al. | D. N.H. 1:19-cv-01095 |

EXHIBIT D
Page 349

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| | Trust for the Benefit of Members of the Raymond Sackler Family; The P.F. Laboratories, Inc. | | | | | |
| 135. | The Purdue Frederick Company Inc.; The P.F. Laboratories, Inc.; Rhodes Pharmaceuticals, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Trust for the Benefit of Members of the Raymond Sackler Family | Municipality | New Jersey | County of Burlington, NJ | County of Burlington, NJ v. Purdue Pharma L.P., et al. | D.N.J. 1:19-cv-13684 |
| 136. | The Purdue Frederick Company Inc.; Rhodes Technologies Inc. | Municipality | New Jersey | Cumberland County | Cumberland County v. Purdue Pharma L.P., et al. | D. N.J. 1:19-cv-19134 |
| 137. | The Purdue Frederick Company | Municipality | New Jersey | Township of Brick | Township of Brick v. Purdue Pharma Inc., et al. | D. N.J. 3:19-cv-17998 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 138. | The Purdue Frederick Company Inc.; The P.F. Laboratories, Inc.; Rhodes Pharmaceuticals Inc.; Raymond Sackler Family; Mortimer Sackler Family; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Trust for the Benefit of Members of the Raymond Sackler Family | Municipality | New York | City of Amsterdam | City of Amsterdam v. Purdue Pharma L.P. | N.D.N.Y. 1:19-cv-00896 |
| 139. | The Purdue Frederick Company Inc.; The P.F. Laboratories, Inc.; Rhodes Pharmaceuticals Inc.; Rhodes Technologies Inc.; Raymond Sackler Family; Mortimer Sackler Family; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Trust for the Benefit of Members of the Raymond Sackler Family | Municipality | New York | City of Auburn | City of Auburn v. Purdue Pharma L.P., et al. | E.D.N.Y. 2:18-cv-03800 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 140. | The Purdue Frederick Company Inc.; The P.F. Laboratories, Inc.; Rhodes Pharmaceuticals Inc.; Raymond Sackler Family; Mortimer Sackler Family; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Trust for the Benefit of Members of the Raymond Sackler Family | Municipality | New York | City of Ogdensburg | The City of Ogdensburg v. Purdue Pharma L.P., et al. | N.D.N.Y 8:19-cv-00782 |
| 141. | The Purdue Frederick Company Inc.; The P.F. Laboratories, Inc.; Rhodes Pharmaceuticals Inc.; Raymond Sackler Family; Mortimer Sackler Family; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Trust for the Benefit of the Raymond Sackler Family | Municipality / Class Action | New York | City of Poughkeepsie | The City of Poughkeepsie, individually, and on behalf of all others similarly situated v. Purdue Pharma L.P. | S.D.N.Y. 7:19-cv-06800 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 142. | The Purdue Frederick Company Inc.; The P.F. Laboratories, Inc.; Rhodes Pharmaceuticals Inc.; Rhodes Technologies Inc.; Raymond Sackler Family; Mortimer Sackler Family; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Trust for the Benefit of Members of the Raymond Sackler Family | Municipality | New York | City of Rochester | City of Rochester v. Purdue Pharma L.P., et al. | W.D.N.Y. 6:19-cv-06490 |
| 143. | The Purdue Frederick Company Inc.; The P.F. Laboratories, Inc.; Rhodes Pharmaceuticals Inc.; Raymond Sackler Family; Mortimer Sackler Family; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Trust for the Benefit of Members of the Raymond Sackler Family | Municipality | New York | City of Saratoga Springs | The City of Saratoga Springs v. Purdue Pharma L.P., et al. | N.D.N.Y. 1:19-cv-00789 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 144. | The Purdue Frederick Company Inc. | Municipality | Ohio | The County of Fayette, Ohio; The State of Ohio ex rel. Prosecuting Attorney of Fayette County, Jess Weade | The County of Fayette, Ohio; The State of Ohio ex rel. Prosecuting Attorney of Fayette County, Jess Weade v. Purdue Pharma L.P., et al. | S.D. Ohio 2:19-cv-04347 |
| 145. | The Purdue Frederick Company Inc. | Municipality | Oklahoma | Board of County Commissioners of Atoka County | Board of County Commissioners of Atoka County v. Purdue Pharma L.P., et al. | E.D. Okla. 6:19-cv-00279 |
| 146. | The Purdue Frederick Company Inc. | Municipality | Oklahoma | Board of County Commissioners of Caddo County | Board of County Commissioners of Caddo County v. Purdue Pharma L.P., et al. | W.D. Okla. 5:19-cv-00710 |
| 147. | The Purdue Frederick Company | Municipality | Oklahoma | Board of County Commissioners of Cimarron County | Board of County Commissioners of Cimarron County v. Purdue Pharma L.P., et al. | W.D. Okla. 5:19-cv-00776 |
| 148. | The Purdue Frederick Company Inc. | Municipality | Oklahoma | Board of County Commissioners of Coal County | Board of County Commissioners of Coal County v. Purdue Pharma L.P., et al. | E.D. Okla. 6:19-cv-00405 |
| 149. | The Purdue Frederick Company Inc. | Municipality | Oklahoma | Board of County Commissioners of Grady County | Board of County Commissioners of Grady County v. Purdue Pharma L.P., et al. | W.D. Okla. 5:19-cv-00703 |
| 150. | The Purdue Frederick Company Inc. | Municipality | Oklahoma | Board of County Commissioners of Haskell County | Board of County Commissioners of Haskell County v. Purdue Pharma L.P., et al. | E.D. Okla. 6:19-cv-00280 |
| 151. | The Purdue Frederick Company Inc. | Municipality | Oklahoma | Board of County Commissioners of Jackson County | Board of County Commissioners of Jackson County v. Purdue Pharma L.P., et al. | W.D. Okla. 5:19-cv-01108 |
| 152. | The Purdue Frederick Company Inc. | Municipality | Oklahoma | Board of County Commissioners of Jefferson County | Board of County Commissioners of Jefferson County v. Purdue Pharma L.P., et al. | W.D. Okla. 5:19-cv-00721 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 153. | The Purdue Frederick Company Inc. | Municipality | Oklahoma | Board of County Commissioners of Kay County | Board of County Commissioners of Kay County v. Purdue Pharma L.P., et al. | W.D. Okla. 5:19-cv-00884 |
| 154. | The Purdue Frederick Company Inc. | Municipality | Oklahoma | Board of County Commissioners of Latimer County | Board of County Commissioners of Latimer County v. Purdue Pharma L.P., et al. | E.D. Okla. 6:19-cv-00282 |
| 155. | The Purdue Frederick Company Inc. | Municipality | Oklahoma | Board of County Commissioners of LeFlore County | Board of County Commissioners of LeFlore County v. Purdue Pharma L.P., et al. | E.D. Okla. 6:19-cv-00362 |
| 156. | The Purdue Frederick Company Inc. | Municipality | Oklahoma | Board of County Commissioners of Lincoln County | Board of County Commissioners of Lincoln County v. Purdue Pharma L.P., et al. | W.D. Okla. 5:19-cv-01109 |
| 157. | The Purdue Frederick Company Inc. | Municipality | Oklahoma | Board of County Commissioners of Logan County | Board of County Commissioners of Logan County v. Purdue Pharma L.P., et al. | W.D. Okla. 5:19-cv-00984 |
| 158. | The Purdue Frederick Company Inc. | Municipality | Oklahoma | Board of County Commissioners of Love County | Board of County Commissioners of Love County v. Purdue Pharma L.P., et al. | E.D. Okla. 6:19-cv-00320 |
| 159. | The Purdue Frederick Company Inc. | Municipality | Oklahoma | Board of County Commissioners of Major County | Board of County Commissioners of Major County v. Purdue Pharma L.P., et al. | W.D. Okla. 5:19-cv-00879 |
| 160. | The Purdue Frederick Company Inc. | Municipality | Oklahoma | Board of County Commissioners of Okfuskee County | Board of County Commissioners of Okfuskee County v. Purdue Pharma L.P., et al. | E.D. Okla. 6:19-cv-00300 |
| 161. | The Purdue Frederick Company Inc. | Municipality | Oklahoma | Board of County Commissioners of Oklahoma County | Board of County Commissioners of Oklahoma County v. Purdue Pharma L.P., et al. | W.D. Okla. 5:19-cv-00926 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 162. | The Purdue Frederick Company Inc. | Municipality | Oklahoma | Board of County Commissioners of Pottawatomie County | Board of County Commissioners of Pottawatomie County v. Purdue Pharma L.P., et al. | W.D. Okla. 5:19-cv-00880 |
| 163. | The Purdue Frederick Company Inc. | Municipality | Oklahoma | Board of County Commissioners of Texas County | Board of County Commissioners of Texas County v. Purdue Pharma L.P., et al. | W.D. Okla. 5:19-cv-00987 |
| 164. | The Purdue Frederick Company Inc. | Municipality | Oklahoma | Board of County Commissioners of Woods County | Board of County Commissioners of Woods County v. Purdue Pharma L.P., et al. | W.D. Okla. 5:19-cv-00878 |
| 165. | The Purdue Frederick Company Inc. | Municipality | Oklahoma | Board of County Commissioners of Woodward County | Board of County Commissioners of Woodward County v. Purdue Pharma L.P., et al. | W.D. Okla. 5:19-cv-01110 |
| 166. | The Purdue Frederick Company Inc. | Municipality | Oklahoma | City of Anadarko | City of Anadarko v. Purdue Pharma L.P., et al. | W.D. Okla. 5:19-cv-00815 |
| 167. | The Purdue Frederick Company Inc. | Municipality | Oklahoma | City of Bethany | City of Bethany v. Purdue Pharma L.P., et al. | W.D. Okla. 5:19-cv-00804 |
| 168. | The Purdue Frederick Company Inc. | Municipality | Oklahoma | City of Fort Cobb | City of Fort Cobb v. Purdue Pharma L.P., et al. | W.D. Okla. 5:19-cv-00816 |
| 169. | The Purdue Frederick Company Inc. | Municipality | Oklahoma | City of Jenks | City of Jenks v. Purdue Pharma L.P., et al. | N.D. Okla. 4:19-cv-00380 |
| 170. | The Purdue Fredick Company Inc. | Municipality | Oklahoma | City of Seminole | City of Seminole v. Purdue Pharma L.P., et al. | E.D. Okla. 6:19-cv-00291 |
| 171. | The Purdue Frederick Company Inc. | Municipality | Oklahoma | City of Shawnee | City of Shawnee v. Purdue Pharma L.P., et al. | W.D. Okla. 5:19-cv-00711 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 172. | The Purdue Frederick Company Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Trust for the Benefit of Members of the Raymond Sackler Family; The P.F. Laboratories, Inc.; Stuart D. Baker | Municipality | Pennsylvania | Adams County | Adams County v. Purdue Pharma L.P., et al. | E.D. Pa. 2:19-cv-04438 |
| 173. | The Purdue Frederick Company Inc. | Municipality | Pennsylvania | City of Allentown, Pennsylvania | City of Allentown, Pennsylvania v. AmerisourceBergen Drug Corp., et al. | E.D. Pa. 5:19-cv-03884 |
| 174. | The Purdue Frederick Company Inc. | Municipality | Texas | County of Angelina | County of Angelina v. Allergan PLC, et al. | S.D. Tex. 4:19-cv-03590 |
| 175. | The Purdue Frederick Company Inc. | Municipality | Texas | County of Burleson | County of Burleson v. Purdue Pharma L.P., et al. | S.D. Tex. 4:19-xc-03845 |
| 176. | The Purdue Frederick Company Inc. | Municipality | Texas | County of Duval | County of Duval v. Purdue Pharma L.P., et al. | S.D. Tex. 4:19-cv-02504 |
| 177. | The Purdue Frederick Company Inc. | Municipality | Texas | County of Freestone | County of Freestone v. Purdue Pharma L.P., et al. | S.D. Tex. 4:19-cv-03983 |
| 178. | The Purdue Frederick Company Inc. | Municipality | Texas | County of Jim Hogg | County of Jim Hogg v. Purdue Pharma L.P., et al. | S.D. Tex. 4:19-cv-02816 |
| 179. | The Purdue Frederick Company Inc. | Municipality | Texas | County of Kleberg | County of Kleberg v. Purdue Pharma L.P., et al. | S.D. Tex. 4:19-cv-02815 |
| 180. | The Purdue Frederick Company Inc. | Municipality | Texas | County of Williamson | County of Williamson v. Purdue Pharma L.P., et al. | S.D. Tex. 4:19-cv-03299 |
| 181. | The Purdue Frederick Company Inc. | Municipality | Texas | Ellis County | Ellis County v. Purdue Pharma L.P., et al. | S.D Tex. 4:19-cv-02256 |

EXHIBIT D
Page 357

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 182. | The Purdue Frederick Company Inc. | Municipality | Texas | Rockwall County | Rockwall County v. Purdue Pharma L.P., et al. | S.D. Tex. 4:19-cv-02181 |
| 183. | Jonathan Sackler; Richard Sackler; Mortimer D.A. Sackler; Kathe Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David Sackler; John Stewart; Mark Timney; Craig Landau; Russell Gasdia | Municipality | Virginia | Amherst County, Virginia | Amherst County, Virginia v. Mallinckrodt PLC, et al. | W.D. Va. 6:19-cv-00077 |
| 184. | Jonathan Sackler; Richard Sackler; Mortimer D.A. Sackler; Kathe Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David Sackler; John Stewart; Mark Timney; Craig Landau; Russell Gasdia | Municipality | Virginia | Botetourt County, Virginia | Botetourt County, Virginia v. Mallinckrodt PLC, et al. | W.D. Va. 7:19-cv-00759 |
| 185. | The Purdue Frederick Company Inc. | Municipality | Virginia | Charlotte County | Charlotte County, Virginia v. Purdue Pharma L.P., et al. | W.D. Va. 4:19-cv-00029 |
| 186. | The Purdue Frederick Company Inc. | Municipality | Virginia | City of Emporia | City of Emporia, Virginia v. Purdue Pharma L.P., et al. | E.D. Va. 3:19-cv-00513 |
| 187. | The Purdue Frederick Company Inc. | Municipality | Virginia | City of Fredericksburg | City of Fredericksburg, Virginia v. Purdue Pharma L.P., et al. | E.D. Va. 3:19-cv-00457 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 188. | The Purdue Frederick Company Inc.; Richard Sackler; Theresa Sackler; Kathe Sackler; Jonathan Sackler; Mortimer D.A. Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt | Municipality | Virginia | City of Portsmouth | City of Portsmouth v. McKesson Corporation, et al. | E.D. Va. 2:19-cv-00331 |
| 189. | The Purdue Frederick Company Inc. | Municipality | Virginia | City of Radford | City of Radford v. Purdue Pharma L.P., et al. | W.D. Va. 7:19-cv-00525 |
| 190. | The Purdue Frederick Company Inc.; Richard Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt; Jonathan Sackler; Kathe Sackler; Mortimer D.A. Sackler; Theresa Sackler; John Stewart; Mark Timney; Craig Landau; Russell Gasdia; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc. | Municipality | Virginia | City of Waynesboro, Virginia | The City of Waynesboro, Virginia v. Purdue Pharma L.P., et al. | W.D. Va. 5:19-cv-00058 |
| 191. | The Purdue Frederick Company Inc. | Municipality | Virginia | Culpeper County | Culpeper County, Virginia v. Purdue Pharma L.P., et al. | W.D. Va. 3:19-cv-00037 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 192. | The Purdue Frederick Company Inc.; Richard Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt; Jonathan Sackler; Kathe Sackler; Mortimer D.A. Sackler; Theresa Sackler; John Stewart; Mark Timney; Craig Landau; Russell Gasdia; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc. | Municipality | Virginia | Cumberland County | Cumberland County, Virginia v. Purdue Pharma L.P., et al. | W.D. Va. 6:19-cv-00054 |
| 193. | The Purdue Frederick Company Inc. | Municipality | Virginia | Greensville County | Greensville County, Virginia v. Purdue Pharma L.P., et al. | E.D. Va. 3:19-cv-00459 |
| 194. | The Purdue Frederick Company Inc. | Municipality | Virginia | Loudoun County | Loudoun County, Virginia v. Purdue Pharma L.P., et al. | E.D. Va. 1:19-cv-00778 |
| 195. | The Purdue Frederick Company Inc.; Richard Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt; Jonathan Sackler; Kathe Sackler; Mortimer D.A. Sackler; Theresa Sackler; John Stewart; Mark Timney; Craig Landau; Russell Gasdia; Rhodes Pharmaceuticals Inc. | Municipality | Virginia | Patrick County | Patrick County, Virginia v. Purdue Pharma L.P., et al. | W.D. Va. 4:19-cv-00032 |
| 196. | The Purdue Frederick Company Inc. | Municipality | Virginia | Prince George County | Prince George County, Virginia v. Purdue Pharma L.P., et al. | E.D. Va. 3:19-cv-00458 |

EXHIBIT D

Page 360

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 197. | The Purdue Frederick Company Inc.; Richard Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt; Jonathan Sackler; Kathe Sackler; Mortimer D.A. Sackler; Theresa Sackler; John Stewart; Mark Timney; Craig Landau; Russell Gasdia; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc. | Municipality | Virginia | Shenandoah County | Shenandoah County, Virginia v. Purdue Pharma, L.P., et al. | W.D. Va. 5:19-cv-00056 |
| 198. | The Purdue Frederick Company Inc. | Municipality | Virginia | Wise County Board of Supervisors | Wise County Board of Supervisors v. AmerisourceBergen Drug Corporation, et al. | W.D. Va. 2:19-cv-00039 |
| **Tribal (Federal Court Pending Transfer to MDL)** | | | | | | |
| 199. | The Purdue Frederick Company Inc. | Tribal | Oklahoma | Citizen Potawatomi Nation | Citizen Potawatomi Nation v. Purdue Pharma L.P., et al. | W.D. Okla. 5:19-cv-00955 |
| 200. | The Purdue Frederick Company Inc. | Tribal | Oklahoma | Delaware Nation | Delaware Nation v. Purdue Pharma L.P., et al. | W.D. Okla. 5:19-cv-00956 |
| 201. | The Purdue Frederick Company Inc. | Tribal | Oklahoma | Pawnee Nation of Oklahoma | Pawnee Nation of Oklahoma v. Purdue Pharma L.P., et al. | N.D. Okla. 4:19-cv-00556 |
| 202. | The Purdue Frederick Company Inc. | Tribal | Oklahoma | Sac & Fox Nation | Sac & Fox Nation v. Purdue Pharma L.P., et al. | W.D. Okla. 5:19-cv-00957 |
| 203. | The Purdue Frederick Company Inc. | Tribal | Oklahoma | The Osage Nation | The Osage Nation v. Purdue Pharma L.P., et al. | N.D. Okla. 4:19-cv-00485 |
| 204. | The Purdue Frederick Company Inc. | Tribal | Oklahoma | Thlopthlocco Tribal Town | Thlopthlocco Tribal Town v. Purdue Pharma L.P., et al. | N.D. Okla. 4:19-cv-00557 |
| **Hospital, Individual & Third Party Payor (Federal Court Pending Transfer to MDL)** | | | | | | |
| 205. | The Purdue Frederick Company, Inc.; Richard Sackler; Beverly Sackler; | Hospital | Alabama | The DCH Health Care Authority; The Healthcare Authority for Baptist | The DCH Health Care Authority; The Healthcare Authority for Baptist Health, an affiliate of UAB Health | S.D. Ala. 1:19-cv-00756 |

EXHIBIT D
Page 361

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| | David Sackler; Ilene Sackler Lefcourt; Jonathan Sackler; Kathe Sackler; Mortimer D.A. Sackler; Theresa Sackler; John Stewart; Mark Timney; Craig Landau; Russell Gasdia; Joe Coggins; Lyndsie Fowler; Mitchell "Chip" Fisher; Rebecca Sterling; Vanessa Weatherspoon; Chris Hargrave; Brandon Hassenfuss; Joe Read | | | Health, an affiliate of UAB Health System; Medical West Hospital Authority, an affiliate of UAB Health System; Evergreen Medical Center, LLC; Gilliard Health Services, Inc.; Crestwood Healthcare, L.P.; Triad of Alabama, LLC; QHG of Enterprise, Inc.; Affinity Hospital, LLC; Gadsden Regional Medical Center, LLC; Foley Hospital Corporation; The Health Care Authority of Clarke County, Alabama; BBH PBMC, LLC; BBH, WBMC, LLC; BBH SBMC, LLC; BBH CBMC, LLC; BBH BMC, LLC | System; Medical West Hospital Authority, and affiliate of UAB Health System; Evergreen Medical Center, LLC; Gilliard Health Services, Inc.; Crestwood Healthcare, L.P.; Triad of Alabama, LLC; QHG of Enterprise, Inc.;  Affinity Hospital, LLC; Gadsden Regional Medical Center, LLC; Foley Hospital Corporation; The Health Care Authority of Clarke County, Alabama; BBH PBMC, LLC; BBH, WBMC, LLC; BBH SBMC, LLC; BBH CBMC, LLC; BBH BMC, LLC v. Purdue Pharma, et al. | |
| 206. | The Purdue Frederick Company Inc. | Hospital | Florida | West Volusia Hospital Authority | West Volusia Hospital Authority v. Purdue Pharma L.P., et al. | M.D. Fla. 6:19-cv-01765 |
| 207. | The Purdue Frederick Company Inc.; Richard Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt; Jonathan Sackler; Kathe Sackler; Mortimer D.A. Sackler; Theresa Sackler; | Hospital | Kentucky | Bowling Green-Warren County Community Hospital Corporation; The Medical Center at Clinton County, Inc.; The Medical Center at Franklin, Inc.; Arh Tug Valley Health Services, Inc. f/k/a Highlands Hospital | Bowling Green-Warren County Community Hospital Corporation; The Medical Center at Clinton County, Inc.; Medical Center at Franklin, Inc.; Arh Tug Valley Health Services, f/k/a Highlands Hospital Corporation; Baptist | W.D. Ky. 1:19-cv-00148 |

EXHIBIT D
Page 362

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| | John Stewart; Mark Timney; Craig Landau; Russell Gasdia; Tessa Rios; Amy K. Thompson | | | Corporation; Baptist Healthcare System, Inc.; Baptist Health Madisonville, Inc.; Baptist Health Richmond, Inc.; Grayson County Hospital Foundation, Inc.; The Harrison Memorial Hospital, Inc.; Saint Elizabeth Medical Center, Inc.; St. Claire Medical Center, Inc.; Taylor County Hospital District Health Facilities Corporation | Healthcare System, Inc.; Baptist Health Madisonville, Inc.; Baptist Health Richmond, Inc.; Grayson County Hospital Foundation, Inc.; The Harrison Memorial Hospital, Inc.; Saint Elizabeth Medical Center, Inc.; St. Claire Medical Center, Inc. and Taylor County Hospital District Health Facilities Corporation v. Purdue Pharma, L.P., et al. | |
| 208. | Richard Sackler; Theresa Sackler; Kathe Sackler; Jonathan Sackler; Mortimer D.A. Sackler; David Sackler; Ilene Sackler Lefcourt | Individual | Massachusetts | Hickey, Thomas | Thomas Hickey v. Purdue Pharma L.P., et al. | D. Mass. 1:19-cv-11806 |
| 209. | The Purdue Frederick Company Inc. | Wrongful Death | Mississippi | Carr, Gary | Gary Carr, individually, as next friend and on behalf of all wrongful death beneficiaries of Luther Carr, deceased v. Charles E. Berry, M.D., et al. | N.D. Miss. 3:19-cv-00246 |

EXHIBIT D
Page 363

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 210. | The Purdue Frederick Company Inc.;<br>Rhodes Technologies Inc.;<br>Rhodes Pharmaceuticals Inc.;<br>The P.F. Laboratories Inc.;<br>Richard S. Sackler;<br>Jonathan D. Sackler;<br>Mortimer D.A. Sackler;<br>Kathe A. Sackler;<br>Ilene Sackler Lefcourt;<br>Beverly Sackler;<br>Theresa Sackler;<br>David A. Sackler;<br>Trust for the Benefit of Members of the Raymond Sackler Family;<br>Stuart D. Baker | Third Party Payor | Pennsylvania | I-Kare Treatment Center, LLC | I-Kare Treatment Center, LLC v. Purdue Pharma L.P., et al. | E.D. Pa.<br>2:19-cv-03899 |
| 211. | Richard Sackler;<br>Jonathan Sackler;<br>Mortimer D.A. Sackler;<br>David Sackler;<br>Kathe Sackler;<br>Ilene Sackler Lefcourt;<br>Beverly Sackler;<br>Theresa Sackler;<br>Trust for the Benefit of Members of the Raymond Sackler Family;<br>The P.F. Laboratories, Inc.;<br>Stuart D. Baker | Third Party Payor | Pennsylvania | Public Service Insurance Company | Public Service Insurance Company v. Janssen Pharmaceuticals et al. | E.D. Pa.<br>2:19-cv-05904 |
| 212. | Richard Sackler;<br>Mortimer David Alfons Sackler;<br>The Sackler Family;<br>Russell J. Gasdia;<br>Craig Landau | Individual | Rhode Island | Heden, Keith D. | Keith D. Heden v. Purdue Pharmaceuticals LLC | D. R.I.<br>2:19-cv-00586 |
| 213. | Rhodes Technologies, Inc.;<br>Richard S. Sackler, M.D.;<br>Kathe A. Sackler; Jonathan D. | Class Action | Tennessee | Rhodes, Roger;<br>Silvers, Anthony;<br>Spradlen, Lea Anne | Roger Rhodes, Anthony Silvers, and Lea Anne Spradlen, on behalf of | M.D. Tenn.<br>3:19-cv-00885 |

EXHIBIT D
Page 364

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| | Sackler; Mortimer D.A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler | | | | themselves and all others similarly situated v. Rhodes Technologies, Inc., et al. | |
| 214. | The Purdue Frederick Company; Richard Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt; Jonathan Sackler; Kathe Sackler; Mortimer D.A. Sackler; Theresa Sackler; John Stewart; Mark Timney; Craig Landau; Russell Gasdia; Andrew T. Stokes | Hospital | Tennessee | Takoma Regional Hospital, Inc. f/k/a Takoma Regional Hospital, Inc.; Amisub (SFH), Inc.; Baptist Womens Health Center, LLC; Campbell County Hma, LLC; Clarksville Health System, G.P.; Cleveland Tennessee Hospital Company, LLC; Cocke County Hma, LLC; Dickenson Community Hospital; Hawkins County Memorial Hospital f/k/a Hawkins County Memorial Hospital; Jefferson County HMA, LLC; Johnston Memorial Hospital, Inc.; Lebanon HMA, LLC f/k/a Lebanon HMA, Inc.; Lexington Hospital Corporation; Metro Knoxville HMA, LLC; Mountain States Health | Takoma Regional Hospital, Inc. f/k/a/ Takoma Hospital, Inc., et al., v. Purdue Pharma, L.P., et al. | E.D. Tenn. 2:19-cv-00157 |

EXHIBIT D
Page 365

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| | | | | Alliance f/k/a Johnson City Medical Center Hospital, Inc.; Northeast Tennessee Community Health Centers, Inc.; Norton Community Hospital, Saint Francis Hospital — Bartlett, Inc. f/k/a Tenet Health System Bartlett, Inc.; Shelbyville Hospital Company, LLC f/k/a Shelbyville Hospital Corporation; Smyth County Community Hospital; Tullahoma HMA, LLC f/k/a Tullahoma HMA, Inc.; Wellmont Health System F/K/A Brmc/Hvhmc, Inc. | | |
| 215. | The Purdue Frederick Company, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Trust for the Benefit of Members of the Raymond Sackler Family; The P.F. Laboratories, Inc. | Neonatal Abstinence Syndrome ("NAS") | West Virginia | Tilley, Mary | Mary Tilley, as next friend of K.B. Tilley, a minor child under the age of 18 v. Purdue Pharma L.P., et al. | S.D. W. Va. 2:19-cv-00566 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 216. | The Purdue Frederick Company Inc.; Richard Sackler | Individual | Wisconsin | Petty, Larry, Sr.; Petty, Elizabeth | Larry Petty, Sr., et al. v. Purdue Pharma L.P., et al. | W.D. Wisc. 3:20-cv-00078 |
| **_Local Government (State Court)_** | | | | | | |
| 217. | The Purdue Frederick Company Inc.; Richard Sackler; Theresa Sackler; Kathe Sackler; Jonathan Sackler; Mortimer D.A. Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt | Municipality | Arizona | Bullhead City | Bullhead City v. Allergan PLC, et al. | Mohave Cnty. Super. Ct. S8015cv201900591 |
| 218. | The Purdue Frederick Company Inc.; Richard Sackler; Theresa Sackler; Kathe Sackler; Jonathan Sackler; Mortimer D.A. Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt | Municipality | Arizona | City of Glendale | City of Glendale v. Allergan PLC, et al. | Maricopa Cnty. Super. Ct. Case No. CV2019-010792 |
| 219. | The Purdue Frederick Company, Inc.; Richard Sackler; Theresa Sackler; Kathe Sackler; Jonathan Sackler; Mortimer D.A. Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt | Municipality | Arizona | City of Prescott | City of Prescott v. Allergan PLC, et al. | Yavapai Cnty. Super. Ct. P1300cv201900393 |

Case 8:23-ap-01046-SC    Doc 1-5    Filed 04/12/23    Entered 04/12/23 15:08:58    Main Document
Preliminary Injunction and Equitable Injunction    Pg 119 of 275

EXHIBIT D
Page 367

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 220. | The Purdue Frederick Company Inc.; Richard Sackler; Theresa Sackler; Kathe Sackler; Jonathan Sackler; Mortimer D.A. Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt | Municipality | Arizona | City of Surprise | City of Surprise v. Allergan PLC, et al. | Maricopa Cnty. Super. Ct. Case No. CV2019-003439 |
| 221. | The Purdue Frederick Company Inc.; Richard Sackler; Theresa Sackler; Kathe Sackler; Jonathan Sackler; Mortimer D.A. Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt | Municipality | Arizona | County of Apache | County of Apache v. Allergan PLC, et al. | Apache Cnty. Super. Ct. Case No. S0100cv201900101 |
| 222. | The Purdue Frederick Company Inc.; Richard Sackler; Theresa Sackler; Kathe Sackler; Jonathan Sackler; Mortimer D.A. Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt | Municipality | Arizona | County of La Paz | County of La Paz v. Allergan PLC, et al. | La Paz Cnty. Super. Ct. Case No. S1500cv201900053 |
| 223. | Richard Sackler; Theresa Sackler; Kathe Sackler; Jonathan Sackler; Mortimer D.A. Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt | Municipality | Arizona | Pinal County | Pinal County v. Allergan PLC, et al. | Sup. Ct. Pinal Cnty. S1100CV201901448 |

EXHIBIT D

Page 368

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 224. | The Purdue Frederick Company Inc.; Rhodes Technologies Inc. | Prosecuting Attorney | Arkansas | State of Arkansas, ex rel. Scott Ellington; County of Arkansas; County of Ashley; County of Baxter; County of Benton; County of Boone; County of Bradley; County of Calhoun; County of Chicot; County of Clark; County of Clay; County of Cleburne; County of Columbia; County of Conway; County of Craighead; County of Crawford; County of Cross; County of Dallas; County of Desha; County of Faulkner; County of Franklin; County of Fulton; County of Garland; County of Grant; County of Greene; County of Hempstead; County of Hot Spring; County of Howard; County of Independence; County of Izard; County of Jackson; County of Johnson; County of Lafayette; County of Lawrence; County of Lee; County of Lincoln; | State of Arkansas, ex rel. Scott Ellington v. Purdue Pharma L.P., et al. | Cir. Ct., Crittenden Cnty. CV-2018-268 |

43

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| | | | | County of Little River; County of Logan; County of Lonoke; County of Madison; County of Miller; County of Mississippi; County of Monroe; County of Montgomery; County of Ouachita; County of Perry; County of Phillips; County of Pike; County of Poinsett; County of Polk; County of Pope; County of Prairie; County of Randolph; County of St. Francis; County of Saline; County of Scott; County of Searcy; County of Sebastian; County of Sevier; County of Sharp; County of Stone; County of Union; County of Van Buren; County of Washington; County of White; County of Woodruff; County of Yell; County of Carroll; County of Newton; County of Cleveland; City of Little Rock; City of Fort Smith; City of Springdale; City of Jonesboro; | | |

44

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| | | | | City of North Little Rock; City of Conway; City of Rogers; City of Pine Bluff; City of Bentonville; City of Hot Springs; City of Benton; City of Texarkana; City of Sherwood; City of Jacksonville; City of Monticello | | |
| 225. | The Purdue Frederick Company Inc.; Richard S. Sackler; Trust for the Benefit of Memebers of the Raymond Sackler Family; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler | Municipality | California | City of El Monte, and The People of the State of California, by and through El Monte City Attorney Rick Olivarez | City of El Monte, and the People of the State of California, by and through El Monte City Attorney Rick Olivarez v. Purdue Pharma L.P., et al. | El Monte Cnty. Super. Ct. 19STCV10532 |

45

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 226. | Beverly Sackler; David A. Sackler; Ilene Sackler Lefcourt; Jonathan D. Sackler; Kathe A. Sackler; Mortimer D.A. Sackler; P.F. Laboratories; PLP Associates Holdings; Purdue Holdings L.P.; Richard S. Sackler; Rosebay Medical Company L.P.; The Beacon Company; The Purdue Frederick Company Inc.; Theresa Sackler | Municipality | California | City of Santa Ana; City of San Clemente; City of Encinitas; City of La Habra; City of La Mesa; City of Oxnard; City of Placentia; The People of the State of California, by and through Santa Ana City Attorney Sonia R. Carvalho, San Clemente City Attorney Scott C. Smith, Encinitas City Attorney Glenn Sabine, La Habra City Attorney Richard D. Jones, La Mesa City Attorney Glenn Sabine, Oxnard City Attorney Stephen Fischer, and Placentia City Attorney Christian Bettenhausen | City of Santa Ana, et al. v. Actavis Pharma, Inc., et al. | Super. Ct. Orange Cnty. 30-2019-01101802 |
| 227. | The Purdue Frederick Company Inc.; Richard Sackler; Trust for the Benefit of Memebers of the Raymond Sackler Family; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler | Municipality | California | County of Kern, and The People of the State of California, by and through Kern County Counsel Margo Raison | County of Kern, and The People of the State of California, by and through Kern County Counsel Margo Raison v. Purdue Pharma L.P., et al. | Kern Cnty. Super. Ct. BCV-19-100861 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 228. | The Purdue Frederick Company Inc. | Municipality | California | The People of the State of California, acting by and through Santa Clara County Counsel James R. Williams, Orange County District Attorney Tony Rackauckas, Los Angeles County Counsel Mary C. Wickham, and Oakland City Attorney Barbara J. Parker | The People of the State of California, acting by and through Santa Clara County Counsel James R. Williams, Orange County District Attorney Tony Rackauckas, Los Angeles County Counsel Mary C. Wickham, and Oakland City Attorney Barbara J. Parker v. Purdue Pharma L.P., et al. | Orange County Super. Ct. 30-2014-00725287-CU-BT-CXC (Short version: 14-725287) |
| 229. | The Purdue Frederick Company Inc. | Municipality | Connecticut | City of Ansonia; The City of Danbury; The City of Derby; The City of Norwalk | The City of Ansonia, City of Danbury, The City of Derby, and The City of Norwalk v. Purdue Pharma L.P., et al. | Hartford State Super. Ct. HHD-CV-18-6098036-S |
| 230. | The Purdue Frederick Company Inc. | Municipality | Connecticut | City of Bridgeport; The Borough of Naugatuck; The Town of Southbury; The Town of Woodbury; The Town of Fairfield; The Town of Beacon Falls; The City of Milford; The Town of Oxford; The City of West Haven; The Town of North Haven; The Town of Thomaston; The City of Torrington; The City of Bristol; The Town of East | The City of Bridgeport v. Purdue Pharma L.P., et al. | Hartford State Super. Ct. HHD-CV-18-6088462-S |

47

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| | | | | Hartford; The Town of Southington; The Town of Newtown; The City of Shelton; The Town of Tolland | | |
| 231. | The Purdue Frederick Company Inc. | Municipality | Connecticut | City of New Britain | City of New Britain v. Purdue Pharma L.P., et al. | Hartford State Super. Ct. HHD-CV-18-6087132-S |
| 232. | The Purdue Frederick Company Inc. | Municipality | Connecticut | City of New Haven | City of New Haven v. Purdue Pharma L.P., et al. | Hartford State Super. Ct. HHD-CV-17-6086134-S |
| 233. | The Purdue Frederick Company Inc. | Municipality | Connecticut | City of New London | The City of New London v. Purdue Pharma L.P., et al. | Hartford State Super. Ct. HHD-CV-18-6094421-S |
| 234. | The Purdue Frederick Company Inc. | Municipality | Connecticut | City of Waterbury | City of Waterbury v. Purdue Pharma L.P., et al. | Hartford State Super. Ct. HHD-CV-17-6088121-S |
| 235. | The Purdue Frederick Company Inc. | Municipality | Connecticut | Town of Stratford; The Town of Berlin; The Town of Middlebury; The Town of Seymour; The Town of Prospect; The Town of Wolcott; The Town of Bethlehem; The Town of New Milford; The Town of Roxbury; The Town of Coventry | The Town of Stratford; Town of Berlin; The Town of Middlebury; The Town of Seymour; The Town of Prospect; The Town of Wolcott; The Town of Bethlehem; The Town of New Milford; The Town of Roxbury; and The Town of Coventry v. Purdue Pharma L.P., et al. | Hartford State Super. Ct. HHD-CV-18-6099290-S |
| 236. | The Purdue Frederick Company Inc. | Municipality | Connecticut | Town of Wallingford | Town of Wallingford v. Purdue Pharma L.P., et al. | Hartford State Super. Ct. HHD-CV-18-6094422-S |
| 237. | The Purdue Frederick Company Inc. | Municipality | Illinois | City of Burbank | The City of Burbank v. Purdue Pharma L.P., et al. | Cir. Ct. Cook Cnty. 2018L012659 |
| 238. | The Purdue Frederick Company Inc. | Municipality | Illinois | City of Countryside | The City of Countryside v. Purdue Pharma L.P., et al. | Cir. Ct. Cook Cnty. 2018L012640 |
| 239. | The Purdue Frederick Company Inc. | Municipality | Illinois | City of Granite City, Illinois | City of Granite City, Illinois v. AmerisourceBergen Corp., et al. | Cir. Ct. Madison Cnty. 2018-L-00587<br><br>Cir. Ct. Cook Cnty. 2018-L-010351 |

Case 8:23-ap-01046-SC    Doc 1-5 Filed 04/14/23    Entered 04/14/23 08:56:58    Desc Exhibit Page 126 of 275

EXHIBIT D
Page 374

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 240. | The Purdue Frederick Company Inc. | Municipality | Illinois | City of Sesser | City of Sesser v. Purdue Pharma L.P., et al. | Cir. Ct. Cook Cnty. 2019-L-008147 |
| 241. | The Purdue Frederick Company Inc. | Municipality | Illinois | County of Lake; Michael Nerheim, Lake County State's Attorney; Mark C. Curran, Jr., Lake County Sheriff; Dr. Howard Cooper, Lake County Coroner; The County of Lake in the Name of the People of the State of Illinois | County of Lake, et al. v. Purdue Pharma L.P., et al. | Cir. Ct. Cook Cnty. 2018-L-003728 |
| 242. | The Purdue Frederick Company Inc. | Municipality | Illinois | The People of the State of Illinois and Boone County, Illinois | The People of the State of Illinois and Boone County, Illinois v. Purdue Pharma L.P., et al. | Cir. Ct. Boone Cnty. 2018-L-000007

Cir. Ct. Cook Cnty. 2018-L-004539 |
| 243. | The Purdue Frederick Company Inc. | Municipality | Illinois | The People of the State of Illinois, and Bureau County, Illinois | The People of the State of Illinois and Bureau County, Illinois v. Purdue Pharma L.P., et al. | Cir. Ct. Cook Cnty. 2018-L-004542 |
| 244. | The Purdue Frederick Company Inc. | Municipality | Illinois | The People of the State of Illinois and Champaign County, Illinois | The People of the State of Illinois and Champaign County, Illinois v. Purdue Pharma L.P., et al. | Cir. Ct. Champaign Cnty. 2018-L-000006

Cir. Ct. Cook Cnty. 2018-L-005935 |
| 245. | The Purdue Frederick Company Inc. | Municipality | Illinois | The People of the State of Illinois, and Cook County, Illinois | The People of the State of Illinois and Cook County, Illinois v. Purdue Pharma L.P., et al. | Cir. Ct. Cook County 2017-L-013180 |
| 246. | The Purdue Frederick Company Inc. | Municipality | Illinois | The People of the State of Illinois, and DeKalb County, Illinois | The People of the State of Illinois, and DeKalb County, Illinois v. Purdue Pharma L.P., et al. | Cir. Ct. DeKalb Cnty. 2018-L-000072

Cir. Ct. Cook Cnty. 2018-L-013655 |

49

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 247. | The Purdue Frederick Company Inc. | Municipality | Illinois | The People of the State of Illinois, and DuPage County, Illinois | The People of the State of Illinois and DuPage County, Illinois v. Purdue Pharma L.P., et al. | Cir. Ct. Cook Cnty. 2018-L-004542 |
| 248. | The Purdue Frederick Company Inc. | Municipality | Illinois | The People of the State of Illinois, and Henry County, Illinois | The People of the State of Illinois, and Henry County, Illinois v. Purdue Pharma L.P., et al. | Cir. Ct. Henry Cnty. 2018-L-000016<br><br>Cir. Ct. Cook Cnty. 2018-L-012690 |
| 249. | The Purdue Frederick Company Inc. | Municipality | Illinois | The People of the State of Illinois, and Jersey County, Illinois | The People of the State of Illinois, and Jersey County, Illinois v. Purdue Pharma L.P., et al. | Cir. Ct. Cook Cnty. 2018-L-003908 |
| 250. | The Purdue Frederick Company Inc. | Municipality | Illinois | The People of the State of Illinois, and Kane County, Illinois | The People of the State of Illinois and Kane County, Illinois v. Purdue Pharma L.P., et al. | Kankakee Cnty. 2017-L-000104<br><br>Cir. Ct. Cook Cnty. 2018-L-004538 |
| 251. | The Purdue Frederick Company Inc. | Municipality | Illinois | The People of the State of Illinois, and Kankakee County | The People of the State of Illinois, and Kankakee County, Illinois v. Purdue Pharma L.P., et al. | Kankakee Cnty. 2017-L-000104<br><br>Cir. Ct. Cook Cnty. 2018-L-004538 |
| 252. | The Purdue Frederick Company Inc. | Municipality | Illinois | The People of the State of Illinois, and Kendall County, Illinois | The People of the State of Illinois, and Kendall County, Illinois v. Purdue Pharma L.P., et al. | Cir. Ct. Kendall Cnty. 2018-L-000078<br><br>Cir. Ct. Cook Cnty. 2018-L-012741 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 253. | The Purdue Frederick Company Inc.; The P.F. Laboratories Inc.; Rhodes Pharmaceuticals Inc.; Rhodes Technologies Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit Members of the Raymond Sackler Family; Sutart D. Baker | Municipality | Illinois | The People of the State of Illinois, and LaSalle County | The People of the State of Illinois and LaSalle County v. Purdue Pharma L.P., et al. | Cir. Ct. LaSalle Cnty. 2019-L-000052<br><br>Cir. Ct. Cook Cnty. 2019-L-008722 |
| 254. | The Purdue Frederick Company Inc. | Municipality | Illinois | The People of the State of Illinois, and Macon County, Illinois | The People of the State of Illinois, and Macon County, Illinois v. Purdue Pharma L.P., et al. | Cir. Ct. Cook Cnty. 2018-L-002916 |
| 255. | The Purdue Frederick Company Inc. | Municipality | Illinois | The People of the State of Illinois, and Macoupin County, Illinois | The People of the State of Illinois, and Macoupin County, Illinois v. Purdue Pharma L.P., et al. | Cir. Ct. Macoupin Cnty. 2018-L-000030<br><br>Cir. Ct. Cook Cnty. 2018-L-013247 |
| 256. | The Purdue Frederick Company Inc. | Municipality | Illinois | The People of the State of Illinois, and McHenry County, Illinois | The People of the State of Illinois, and McHenry County, Illinois v. Purdue Pharma L.P., et al. | Cir. Ct. Cook Cnty. 2018-L-002948 |

EXHIBIT D
Page 377

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 257. | The Purdue Frederick Company Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit Members of the Raymond Sackler Family; Sutart D. Baker | Municipality | Illinois | The People of the State of Illinois, and McLean County, Illinois | The People of the State of Illinois and McLean County, Illinois v. Purdue Pharma L.P. et al. | Cir. Ct. McLean Cnty. 2019-L-0000108 |
| 258. | The Purdue Frederick Company Inc. | Municipality | Illinois | The People of the State of Illinois, and Piatt County, Illinois | The People of the State of Illinois, and Piatt County, Illinois v. Purdue Pharma L.P., et al. | Cir. Ct. Piatt Cnty. 2018-L-000007 Cir. Ct. Cook Cnty. 2018-L-012689 |
| 259. | The Purdue Frederick Company Inc. | Municipality | Illinois | The People of the State of Illinois, and Will County, Illinois | The People of the State of Illinois, and Will County, Illinois v. Purdue Pharma L.P., et al. | Cir. Ct. Cook Cnty. 2018-L-004546 |
| 260. | The Purdue Frederick Company Inc. | Municipality | Illinois | Village of Bedford Park | Village of Bedford Park v. Purdue Pharma L.P., et al. | Cir. Ct. Cook Cnty. 2018-L-008819 |
| 261. | The Purdue Frederick Company Inc. | Municipality | Illinois | Village of Bridgeview | Village of Bridgeview v. Purdue Pharma L.P., et al. | Cir. Ct. Cook Cnty. 2018-L-009526 |
| 262. | The Purdue Frederick Company Inc. | Municipality | Illinois | Village of Evergreen Park | Village of Evergreen Park v. Purdue Pharma L.P., et al. | Cir. Ct. Cook Cnty. 2018-L-012652 |
| 263. | The Purdue Frederick Company Inc. | Municipality | Illinois | Village of Hodgkins | Village of Hodgkins v. Purdue Pharma L.P., et al. | Cir. Ct. Cook Cnty. 2018-L-009848 |
| 264. | The Purdue Frederick Company Inc. | Municipality | Illinois | Village of Lyons | Village of Lyons v. Purdue Pharma L.P., et al. | Cir. Ct. Cook Cnty. 2018-L-008746 |
| 265. | The Purdue Frederick Company Inc. | Municipality | Illinois | Village of Summit | Village of Summit v. Purdue Pharma L.P., et al. | Cir. Ct. Cook Cnty. 2018-L-008803 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 266. | The Purdue Frederick Company; Rhodes Technologies Inc.; Jonathan D. Sackler; Kathe A. Sackler; Mortimer D.A. Sackler; Richard S. Sackler; David Sackler; Theresa Sackler; Ilene Sackler Lefcourt; Beverly Sackler | Municipality | Maryland | Anne Arundel County | Anne Arundel County, Maryland v. Purdue Pharma L.P., et al. | Cir. Ct. Anne Arundel Cnty. C-02-CV-18-000021 |
| 267. | The Purdue Frederick Company Inc.; Richard Sackler; Theresa Sackler; Kathe Sackler; Jonathan Sackler; Mortimer D.A. Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt | Municipality | Maryland | Mayor & City Council of Baltimore | Mayor & City Council of Baltimore v. Purdue Pharma L.P., et al. | Cir. Ct. Baltimore City 25C1800515 |
| 268. | The Purdue Frederick Company Inc. | Municipality | Massachusetts | City of Boston; The Boston Public Health Commission; The Boston Housing Authority | City of Boston, The Boston Public Health Commission, The Boston Housing Authority v. Purdue Pharma L.P., et al. | Super. Ct. Suffolk Cnty. 1884CV02860B |
| 269. | The Purdue Frederick Company Inc.; Richard Sackler; Theresa Sackler; Kathe Sackler; Jonathan Sackler; Mortimer D.A. Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt | Municipality | Massachusetts | City of Cambridge | City of Cambridge v. Purdue Pharma L.P., et al. | Super. Ct. Middlesex Cnty. 19-1044 |

EXHIBIT D
Page 379

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 270. | The Purdue Frederick Company Inc. Richard Sackler; Theresa Sackler; Kathe Sackler; Jonathan Sackler; Mortimer D.A. Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt | Municipality | Massachusetts | City of Chicopee | City of Chicopee v. Purdue Pharma L.P., et al. | Super. Ct. Hampden Cnty. 1979CV00074 |
| 271. | The Purdue Frederick Company Inc. Richard Sackler; Theresa Sackler; Kathe Sackler; Jonathan Sackler; Mortimer D.A. Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt | Municipality | Massachusetts | City of Framingham | City of Framingham v. Purdue Pharma L.P., et al. | Super. Ct. Middlesex Cnty. 18-3483 |
| 272. | The Purdue Frederick Company Inc. Richard Sackler; Theresa Sackler; Kathe Sackler; Jonathan Sackler; Mortimer D.A. Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt | Municipality | Massachusetts | City of Gloucester | City of Gloucester v. Purdue Pharma L.P., et al. | Super. Ct. Essex Cnty. 1877CV01773 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 273. | The Purdue Frederick Company Inc. Richard Sackler; Theresa Sackler; Kathe Sackler; Jonathan Sackler; Mortimer D.A. Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt | Municipality | Massachusetts | City of Haverhill | City of Haverhill v. Purdue Pharma L.P., et al. | Super. Ct. Essex Cnty. 1899CV01762A |
| 274. | The Purdue Frederick Company Inc. Richard Sackler; Theresa Sackler; Kathe Sackler; Jonathan Sackler; Mortimer D.A. Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt | Municipality | Massachusetts | City of Salem | City of Salem v. Purdue Pharma L.P., et al. | Super. Ct. Essex Cnty. 1899CV01767A |
| 275. | The Purdue Frederick Company Inc.; Richard Sackler; Theresa Sackler; Kathe Sackler; Jonathan Sackler; Mortimer D.A. Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt | Municipality | Massachusetts | City of Worcester | City of Worcester v. Purdue Pharma L.P., et al. | Super. Ct. Suffolk Cnty. No. 1984CV000543 |

EXHIBIT D
Page 381

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 276. | The Purdue Frederick Company Inc.<br>Richard Sackler;<br>Theresa Sackler;<br>Kathe Sackler;<br>Jonathan Sackler;<br>Mortimer D.A. Sackler;<br>Beverly Sackler;<br>David Sackler;<br>Ilene Sackler Lefcourt | Municipality | Massachusetts | Town of Canton | Town of Canton v. Purdue Pharma L.P., et al. | Super. Ct. Norfolk Cnty. 18-1582 |
| 277. | The Purdue Frederick Company Inc.<br>Richard Sackler;<br>Theresa Sackler;<br>Kathe Sackler;<br>Jonathan Sackler;<br>Mortimer D.A. Sackler;<br>Beverly Sackler;<br>David Sackler;<br>Ilene Sackler Lefcourt | Municipality | Massachusetts | Town of Lynnfield | Town of Lynnfield v. Purdue Pharma L.P., et al. | Super. Ct. Essex Cnty. 1899CV01769D |
| 278. | The Purdue Frederick Company Inc.;<br>Richard Sackler;<br>Theresa Sackler;<br>Kathe Sackler;<br>Jonathan Sackler;<br>Mortimer D.A. Sackler;<br>Beverly Sackler;<br>David Sackler;<br>Ilene Sackler Lefcourt | Municipality | Massachusetts | Town of Natick | Town of Natick v. Purdue Pharma L.P., et al. | Super. Ct. Middlesex Cnty. 19-646 |

EXHIBIT D
Page 382

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 279. | The Purdue Frederick Company Inc; Richard Sackler; Theresa Sackler; Kathe Sackler; Jonathan Sackler; Mortimer D.A. Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt | Municipality | Massachusetts | Town of Randolph | Town of Randolph v. Purdue Pharma L.P., et al. | Super. Ct. Norfolk Cnty. 1982CV00400 |
| 280. | The Purdue Frederick Company Inc. Richard Sackler; Theresa Sackler; Kathe Sackler; Jonathan Sackler; Mortimer D.A. Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt | Municipality | Massachusetts | Town of Springfield | Town of Springfield v. Purdue Pharma L.P., et al. | Super. Ct. Hampden Cnty. 18-938 |
| 281. | The Purdue Frederick Company Inc. Richard Sackler; Theresa Sackler; Kathe Sackler; Jonathan Sackler; Mortimer D.A. Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt | Municipality | Massachusetts | Town of Wakefield | Town of Wakefield v. Purdue Pharma L.P., et al. | Super. Ct. Middlesex Cnty. 18-3458 |
| 282. | Beverly Sackler; David A. Sackler; Ilene Sackler Lefcourt; Jonathan D. Sackler; Kathe A. Sackler; Mortimer D.A. Sackler; Theresa Sackler | Municipality | Missouri | Polk County, Missouri | Polk County, Missouri v. Allergan PLC, et al. | Cir. Ct. Polk Cnty. 1922-CC11660 |

EXHIBIT D
Page 383

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 283. | The Purdue Frederick Company; Richard S. Sackler | Municipality | Missouri | Jefferson County; Butler County; Cape Girardeau County; Christian County; City of Independence; City of Joplin; Crawford County; Dent County; Dunklin County; Franklin County; Greene County; Iron County; Jasper County; Madison County; Perry County; Ste. Genevieve County; Stone County; Taney County; Texas County; Washington County | Jefferson County, et al. v. Purdue Pharma L.P., et al. | 22nd Judicial Circuit Court, St. Louis City 1922-CC00203 |
| 284. | The Purdue Frederick Company Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; David A. Sackler; Beverly Sackler; Theresa Sackler; PLP Associates Holdings L.P.; Rosebay Medical Company L.P.; Beacon Company; Aida B. Maxsam | Municipality | Nevada | City of Henderson | City of Henderson v. Purdue Pharma L.P., et al. | Eighth Jud. Dist Ct. Clark Cnty. A-19-800695-B Dept. 11 |

EXHIBIT D
Page 384

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 285. | The Purdue Frederick Company Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; David A. Sackler; Beverly Sackler; Theresa Sackler; PLP Associates Holdings L.P.; Rosebay Medical Company L.P.; Beacon Company; Aida B. Maxsam | Municipality | Nevada | City of Las Vegas | City of Las Vegas v. Purdue Pharma L.P., et al. | Eighth Jud. Dist Ct. Clark Cnty. A-19-800697-B Dept. 27 |
| 286. | The Purdue Frederick Company Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; David A. Sackler; Beverly Sackler; Theresa Sackler; PLP Associates Holdings L.P.; Rosebay Medical Company L.P.; Beacon Company; Aida B. Maxsam | Municipality | Nevada | City of North Las Vegas | City of North Las Vegas v. Purdue Pharma L.P., et al. | Eighth Jud. Dist Ct. Clark Cnty. A-19-800699-B Dept. 11 |
| 287. | The Purdue Frederick Company Inc.; Aida B. Maxsam | Municipality | Nevada | City of Reno | City of Reno v. Purdue Pharma L.P., et al. | Eighth Jud. Dist Ct. Washoe Cnty. CV18-01895 |

EXHIBIT D
Page 385

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 288. | The Purdue Frederick Company Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard Sackler; Theresa Sackler; Kathe Sackler; Jonathan Sackler; Mortimer D.A. Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt | Municipality | New Jersey | City of Trenton | City of Trenton v. Purdue Pharma L.P., et al. | Super. Ct. NJ, Mercer Cnty. MER-L001167-19 |
| 289. | The Purdue Frederick Company Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family; Rhodes Techologies, Inc.; Rhodes Pharmaceuticals, Inc.; The P.F. Laboratories, Inc.; Stuart D. Baker | Municipality | New Jersey | County of Ocean, New Jersey | County of Ocean, New Jersey v. Purdue Pharma L.P., et al. | Super. Ct. NJ, Ocean Cnty. OCN-L-001474-19 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 290. | The Purdue Frederick Company; The P.F. Laboratories Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family; Stuart D. Baker | Municipality | New York | City of Albany | City of Albany v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400004/2019 |
| 291. | The Purdue Frederick Company Inc. | Municipality | New York | City of Alma, GA; Village of Amityville, NY; Town of Babylon, NY; Village of Babylon, NY; Village of Babylon, NY; Bacon County, GA; City of Bayonne, NJ; Village of Bellport, NY; City of Blackshear, GA; Town of Brookhaven, NY; City of Brunswick, GA; Chatham County, GA; Town of Clarkstown, NY; City of Clifton, NJ; Town of Clinton, NJ; Dade County, GA; City of Demorest, GA; East Hampton Village, | City of Alma, GA, et al. v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400031/2019 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| | | | | NY; Village of East Rockaway, NY; City of Elizabeth, NJ; Village of Farmingdale, NY; Village of Floral Park, NY; Village of Garden City, NY; Village of Greenport, NY; Town of Haverstraw, NY; Town of Hempstead, NY; Town of Huntington, NY; Village of Island Park, NY; Village of Islandia, NY; Town of Islip, NY; Village of Lake Grove, NY; Village of Lawrence, NY; Village of Lindenhurst, NY; Village of Lloyd Harbor, NY; City of Long Beach, NY; Village of Lynbrook, NY; Village of Massapequa Park, NY; Village of Mill Neck, NY; | | |

62

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| | | | | Village of Millerton, NY; Village of New Hyde Park, NY; Village of Nissequoge, NY; Town of North Hempstead, NY; Village of Northport, NY; Village of Old Westbury, NY; Town of Orangetown, NY; Town of Oyster Bay, NY; Borough of Paramus, NJ; Village of Patchogue, NY; Pierce County, GA; City of Pooler, GA; Village of Poquott, NY; Village of Port Washington North, NY; City of Richmond Hill, GA; Town of Riverhead, NY; Village of Saltaire, NY; Town of Smithtown, NY; Town of Southampton, NY; Town of Southold, NY; Village of Stewart Manor, NY; Village of Suffern, NY; | | |

63

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| | | | | Village of Valley Stream, NY; Village of the Branch, NY; Town of Wappinger, NY; Village of Wappinger Falls, NY; Village of West Hampton Dunes, NY; Village of West Haverstraw, NY; Village of Westbury, NY; Village of Hempstead, NY | | |
| 292. | The Purdue Frederick Company Inc.; The P.F. Laboratories Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; David A. Sackler; Beverly Sackler; Theresa Sackler; Stuart D. Baker | Municipality | New York | The City of Buffalo | The City of Buffalo v. Purdue Pharma L.P., et al. | Sup. Ct. Erie Cnty. 811359-2019 |

EXHIBIT D
Page 390

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 293. | The Purdue Frederick Company; The P.F. Laboratories; PRA Holdings, Inc.; Pharmaceutical Research Associates, Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Coventry Technologies L.P.; PLP Associates Holdings L.P.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Beverly Sackler, Richard S. Sackler, and Jonathan D. Sackler, as Trustees under Trust Agreement dated November 5, 1974 | Municipality | New York | City of Ithaca | City of Ithaca v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty 400002/2018 |
| 294. | The Purdue Frederick Company Inc. | Municipality | New York | City of Mount Vernon | The City of Mount Vernon v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400016/2019 |

EXHIBIT D
Page 391

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 295. | The Purdue Frederick Company Inc.; The P.F. Laboratories Inc.; Rhodes Technologies Inc; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Trust for the Benefit of Members of the Raymond Sackler Family | Municipality | New York | City of New York | City of New York v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty 400006/2018 |
| 296. | The Purdue Frederick Company Inc.; The P.F. Laboratories Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family; Stuart D. Baker | Municipality | New York | City of Plattsburgh | City of Plattsburgh v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400003/2019 |

EXHIBIT D
Page 392

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 297. | The Purdue Frederick Company Inc.; The P.F. Laboratories Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family; Stuart D. Baker | Municipality | New York | City of Schenectady | City of Schenectady v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400005/2019 |
| 298. | The Purdue Frederick Company Inc.; The P.F. Laboratories Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family; Stuart D. Baker | Municipality | New York | City of Troy | City of Troy v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400006/2019 |

EXHIBIT D
Page 393

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 299. | The Purdue Frederick Company Inc.; The P.F. Laboratories; PRA Holdings, Inc.; Pharmaceutical Research Associates, Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Coventry Technologies L.P.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Beverly Sackler, Richard S. Sackler, and Jonathan D. Sackler, as Trustees under Trust Agreement dated November 5, 1974 | Municipality | New York | City of Yonkers | City of Yonkers v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400020/2019 |
| 300. | The Purdue Frederick Company Inc.; The P.F. Laboratories; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Trust for the Benefit of Members of the Raymond | Municipality | New York | County of Broome | County of Broome v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400002/2017 |

EXHIBIT D
Page 394

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| | Sackler Family | | | | | |
| 301. | The Purdue Frederick Company Inc. | Municipality | New York | County of Cattaraugus | The County of Cattaraugus v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400027/2019 |
| 302. | The Purdue Frederick Company Inc. | Municipality | New York | County of Cayuga | The County of Cayuga v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400013/2019 |
| 303. | The Purdue Frederick Company Inc. | Municipality | New York | County of Chautauqua | The County of Chautauqua v. Purdue Pharma L.P., et al. | Sup. Ct. Chautauqua Cnty. KI-2018-57 |
| 304. | The Purdue Frederick Company Inc. | Municipality | New York | County of Chenango | The County of Chenango v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400021/2019 |
| 305. | The Purdue Frederick Company Inc.; The P.F. Laboratories; PRA Holdings, Inc.; Pharmaceutical Research Associates, Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Coventry Technologies L.P.; PLP Associates Holdings L.P.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Beverly Sackler, Richard S. Sackler, and Jonathan D. Sackler, as Trustees under Trust Agreement dated November 5, 1974 | Municipality | New York | County of Clinton | The County of Clinton v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty 400003/2018 |

EXHIBIT D
Page 395

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 306. | The Purdue Frederick Company Inc.; The P.F. Laboratories, Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Trust for the Benefit of Members of the Raymond Sackler Family oratories Inc. | Municipality | New York | County of Columbia | County of Columbia v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400015/2018 |
| 307. | The Purdue Frederick Company Inc.; The P.F. Laboratories Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Trust for the Benefit of Members of the Raymond Sackler Family | Municipality | New York | County of Cortland | County of Cortland v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400019/2018 |

EXHIBIT D
Page 396

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 308. | The Purdue Frederick Company Inc.; The P.F. Laboratories Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Trust for the Benefit of Members of the Raymond Sackler Family | Municipality | New York | County of Dutchess | County of Dutchess v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400005/2017 |
| 309. | The Purdue Frederick Company Inc.; The P.F. Laboratories; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Trust for the Benefit of Members of the Raymond Sackler Family | Municipality | New York | County of Erie | County of Erie v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400003/2017 |
| 310. | The Purdue Frederick Company Inc. | Municipality | New York | County of Essex | County of Essex v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty 400019/2019 |

EXHIBIT D
Page 397

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 311. | The Purdue Frederick Company Inc.; The P.F. Laboratories; PRA Holdings, Inc.; Pharmaceutical Research Associates, Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Coventry Technologies L.P.; PLP Associates Holdings L.P. Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Beverly Sackler, Richard S. Sackler, and Jonathan D. Sackler, as Trustees under Trust Agreement dated November 5, 1974 | Municipality | New York | County of Franklin | County of Franklin v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty 400012/2018 |
| 312. | The Purdue Frederick Company Inc.; The P.F. Laboratories Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; | Municipality | New York | County of Fulton | County of Fulton v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400018/2018 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| | Trust for the Benefit of Members of the Raymond Sackler Family | | | | | |
| 313. | The Purdue Frederick Company Inc.; The P.F. Laboratories; PRA Holdings, Inc.; Pharmaceutical Research Associates, Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Coventry Technologies L.P.; PLP Associates Holdings L.P.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Beverly Sackler, Richard S. Sackler, and Jonathan D. Sackler, as Trustees under Trust Agreement dated November 5, 1974 | Municipality | New York | County of Genesee | County of Genesee v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400011/2018 |
| 314. | The Purdue Frederick Company Inc.; The P.F. Laboratories Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; | Municipality | New York | County of Greene | County of Greene v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400008/2018 |

73

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| | Theresa Sackler; David A. Sackler; Stuart D. Baker; Trust for the Benefit of Members of the Raymond Sackler Family | | | | | |
| 315. | The Purdue Frederick Company Inc.; The P.F. Laboratories; PRA Holdings, Inc.; Pharmaceutical Research Associates, Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Coventry Technologies L.P.; PLP Associates Holdings L.P.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Beverly Sackler, Richard S. Sackler, and Jonathan D. Sackler, as Trustees under Trust Agreement dated November 5, 1974 | Municipality | New York | County of Hamilton | County of Hamilton v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty 400005/2018 |

74

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 316. | The Purdue Frederick Company Inc.; The P.F. Laboratories Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Trust for the Benefit of Members of the Raymond Sackler Family | Municipality | New York | County of Herkimer | County of Herkimer v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400008/2019 |
| 317. | The Purdue Frederick Company Inc.; The P.F. Laboratories Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family; Stuart D. Baker | Municipality | New York | County of Lewis | County of Lewis v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400007/2019 |
| 318. | The Purdue Frederick Company Inc. | Municipality | New York | County of Livingston | County of Livingston v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400013/2018 |
| 319. | The Purdue Frederick Company Inc. | Municipality | New York | County of Madison | County of Madison v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400028/2019 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 320. | The Purdue Frederick Company Inc.; The P.F. Laboratories Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Trust for the Benefit of Members of the Raymond Sackler Family | Municipality | New York | County of Monroe | County of Monroe v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400017/2018 |
| 321. | The Purdue Frederick Company Inc.; The P.F. Laboratories Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Trust for the Benefit of Members of the Raymond Sackler Family | Municipality | New York | County of Montgomery | The County of Montgomery v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400009/2019 |

EXHIBIT D
Page 402

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 322. | The Purdue Frederick Company Inc.; The P.F. Laboratories; PRA Holdings, Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Pharmaceutical Research Associates, Inc.; Coventry Technologies L.P.; PLP Associates Holdings L.P.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Beverly Sackler, Richard S. Sackler, and Jonathan D. Sackler, as Trustees under Trust Agreement dated November 5, 1974 | Municipality | New York | County of Nassau | County of Nassau v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk County 400008/2017 |
| 323. | The Purdue Frederick Company Inc.; The P.F. Laboratories; PRA Holdings, Inc.; Pharmaceutical Research Associates, Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Coventry Technologies L.P.; PLP Associates Holdings L.P.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; | Municipality | New York | County of Niagara | County of Niagara v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400012/2017 |

EXHIBIT D
Page 403

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| | Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Beverly Sackler, Richard S. Sackler, and Jonathan D. Sackler, as Trustees under Trust Agreement dated November 5, 1974 | | | | | |
| 324. | The Purdue Frederick Company Inc.; The P.F. Laboratories Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Trust for the Benefit of Members of the Raymond Sackler Family | Municipality | New York | County of Ontario | The County of Ontario v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400001-2019 |

EXHIBIT D
Page 404

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 325. | The Purdue Frederick Company Inc.; The P.F. Laboratories; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Trust for the Benefit of Members of the Raymond Sackler Family | Municipality | New York | County of Orange | County of Orange v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400004/2017 |
| 326. | The Purdue Frederick Company Inc.; The P.F. Laboratories Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Trust for the Benefit of Members of the Raymond Sackler Family | Municipality | New York | County of Oswego | County of Oswego v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400007/2018 |
| 327. | The Purdue Frederick Company Inc. | Municipality | New York | County of Otsego | County of Otsego v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400023/2019 |
| 328. | The Purdue Frederick Company Inc. | Municipality | New York | County of Putnam | County of Putnam v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400014/2019 |

EXHIBIT D
Page 405

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 329. | The Purdue Frederick Company Inc.; The P.F. Laboratories; PRA Holdings, Inc.; Pharmaceutical Research Associates, Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Coventry Technologies L.P.; PLP Associates Holdings; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Beverly Sackler, Richard S. Sackler, and Jonathan D. Sackler, as Trustees under Trust Agreement dated November 5, 1974 | Municipality | New York | County of Rensselaer | County of Rensselaer v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400011/2017 |

EXHIBIT D
Page 406

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 330. | The Purdue Frederick Company Inc.; The P.F. Laboratories; PRA Holdings, Inc.; Pharmaceutical Research Associates, Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Coventry Technologies L.P.; PLP Associates Holdings L.P.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Beverly Sackler, Richard S. Sackler, and Jonathan D. Sackler, as Trustees under Trust Agreement dated November 5, 1974 | Municipality | New York | County of Saratoga | County of Saratoga v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty 400009/2018 |
| 331. | The Purdue Frederick Company Inc.; The P.F. Laboratories; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; | Municipality | New York | County of Schenectady | County of Schenectady v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400009/2017 |

EXHIBIT D
Page 407

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| | Trust for the Benefit of Members of the Raymond Sackler Family | | | | | |
| 332. | The Purdue Frederick Company Inc.; The P.F. Laboratories; PRA Holdings, Inc.; Pharmaceutical Research Associates, Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Coventry Technologies L.P.; PLP Associates Holdings L.P.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Beverly Sackler, Richard S. Sackler, and Jonathan D. Sackler, as Trustees under Trust Agreement dated November 5, 1974 | Municipality | New York | County of Schoharie | County of Schoharie v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400010/2017 |
| 333. | The Purdue Frederick Company Inc.; The P.F. Laboratories; PRA Holdings, Inc.; Pharmaceutical Research Associates, Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Coventry Technologies L.P.; PLP Associates Holdings L.P.; Richard S. Sackler; | Municipality | New York | County of Schuyler | County of Schuyler v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400014/2018 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| | Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Beverly Sackler, Richard S. Sackler, and Jonathan D. Sackler, as Trustees under Trust Agreement dated November 5, 1974 | | | | | |
| 334. | The Purdue Frederick Company Inc.; The P.F. Laboratories Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Trust for the Benefit of Members of the Raymond Sackler Family | Municipality | New York | County of Seneca | County of Seneca v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400006/2017 |

EXHIBIT D
Page 409

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 335. | The Purdue Frederick Company Inc.; The P.F. Laboratories; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Trust for the Benefit of Members of the Raymond Sackler Family | Municipality | New York | County of St. Lawrence | County of St. Lawrence v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk County 400002/2019 |
| 336. | The Purdue Frederick Company Inc.; The P.F. Laboratories; PRA Holdings, Inc.; Pharmaceutical Research Associates, Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Coventry Technologies L.P.; PLP Associates Holdings L.P.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Beverly Sackler, Richard S. Sackler, and Jonathan D. | Municipality | New York | County of Steuben | County of Steuben v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty 400004/2018 |

EXHIBIT D

Page 410

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| | Sackler, as Trustees under Trust Agreement dated November 5, 1974 | | | | | |
| 337. | The Purdue Frederick Company Inc.; The P.F. Laboratories; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Trust for the Benefit of Members of the Raymond Sackler Family | Municipality | New York | County of Suffolk | County of Suffolk v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk County 400001/2017 |
| 338. | The Purdue Frederick Company Inc.; The P.F. Laboratories; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Trust for the Benefit of Members of the Raymond Sackler Family | Municipality | New York | County of Sullivan | County of Sullivan v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400007/2017 |

EXHIBIT D
Page 411

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 339. | The Purdue Frederick Company Inc. | Municipality | New York | County of Tioga | County of Tioga v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400022/2019 |
| 340. | The Purdue Frederick Company Inc.; The P.F. Laboratories; PRA Holdings, Inc.; Pharmaceutical Research Associates, Inc.; Coventry Technologies L.P.; PLP Associates Holdings L.P.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals L.P.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Beverly Sackler, Richard S. Sackler, and Jonathan D. Sackler, as Trustees under Trust Agreement dated November 5, 1974 | Municipality | New York | County of Tompkins | County of Tompkins v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty 400001/2018 |

EXHIBIT D
Page 412

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 341. | The Purdue Frederick Company Inc.; The P.F. Laboratories Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Trust for the Benefit of Members of the Raymond Sackler Family | Municipality | New York | County of Ulster | County of Ulster v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400011-2019 |
| 342. | The Purdue Frederick Company Inc. | Municipality | New York | County of Warren | County of Warren v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400030/2019 |
| 343. | The Purdue Frederick Company Inc.; The P.F. Laboratories Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Trust for the Benefit of Members of the Raymond Sackler Family | Municipality | New York | County of Washington | County of Washington v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400010/2019 |

EXHIBIT D
Page 413

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 344. | The Purdue Frederick Company Inc.; The P.F. Laboratories; PRA Holdings, Inc.; Pharmaceutical Research Associates, Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Coventry Technologies L.P.; PLP Associates Holdings L.P.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Beverly Sackler, Richard S. Sackler, and Jonathan D. Sackler, as Trustees under Trust Agreement dated November 5, 1974 | Municipality | New York | County of Westchester | County of Westchester v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400010/2018 |
| 345. | The Purdue Frederick Company Inc.; The P.F. Laboratories Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; | Municipality | New York | County of Wyoming | County of Wyoming v. Purdue Pharma L.P., et al. | Sup. Ct. Suffolk Cnty. 400013/2018 |

EXHIBIT D
Page 414

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| | Trust for the Benefit of Members of the Raymond Sackler Family | | | | | |
| 346. | The Purdue Frederick Company Inc. | Municipality | New York | Town of Amherst | Town of Amherst v. Purdue Pharma L.P., et al. | Sup. Ct. Erie Cnty. 803887-2018 |
| 347. | The Purdue Frederick Company Inc. | Municipality | New York | Town of Cheektowaga | Town of Cheektowaga v. Purdue Pharma L.P., et al. | Sup. Ct. Erie Cnty. 806151-2018 |
| 348. | The Purdue Frederick Company Inc. | Municipality | New York | Town of Lancaster | Town of Lancaster v. Purdue Pharma L.P., et al. | Sup. Ct. Erie Cnty. 809160-2018 |
| 349. | The Purdue Frederick Company Inc. | Municipality | New York | Town of Tonawanda | Town of Tonawanda v. Purdue Pharma L.P., et al. | Sup. Ct. Erie Cnty. 810783-2018 |
| 350. | The Purdue Frederick Company Inc. | Municipality | New York | The Town of Wappinger, New York | The Town of Wappinger, New York v. Purdue Pharma L.P., et al. | Sup. Ct. Dutchess Cnty. 2019-54549 |
| 351. | The Purdue Frederick Company Inc. | Municipality | New York | The Village of Wappingers Falls, New York | The Village of Wappingers Falls, New York v. Purdue Pharma L.P., et al. | Sup. Ct. Dutchess Cnty. 2019-53838 |
| 352. | The Purdue Frederick Company Inc. | Municipality | Ohio | The County of Medina, Ohio; The State of Ohio ex rel. Prosecuting Attorney of Medina County, S. Forrest Thompson | The County of Medina, Ohio; The State of Ohio ex rel. Prosecuting Attorney of Medina County, S. Forrest Thompson v. Purdue Pharma L.P., et al. | C.P. Medina Cnty. 19-CIV-0838 |
| 353. | The Purdue Frederick Company Inc. | Municipality | Oklahoma | Board of County Commissioners of Cleveland County | Board of County Commissioners of Cleveland County v. Purdue Pharma L.P., et al. | D. Ct. Cleveland Cnty. CJ-2019-592 |
| 354. | The Purdue Frederick Company Inc. | Municipality | Oklahoma | Board of County Commissioners of Greer County | Board of County Commissioners of Greer County v. Purdue Pharma L.P., et al. | D. Ct. Greer Cnty. CJ-2019-12 |
| 355. | The Purdue Frederick Company Inc. | Municipality | Oklahoma | Board of County Commissioners of Hughes County | Board of County Commissioners of Hughes County v. Purdue Pharma L.P., et al. | D. Ct. Hughes Cnty. CJ-2019-36 |

EXHIBIT D
Page 415

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 356. | The Purdue Frederick Company Inc. | Municipality | Oklahoma | Board of County Commissioners of McCurtain County | Board of County Commissioners of McCurtain County v. Purdue Pharma L.P., et al. | D. Ct. McCurtain Cnty. CJ-2019-54 |
| 357. | The Purdue Frederick Company Inc. | Municipality | Oklahoma | Board of County Commissioners of Noble County | Board of County Commissioners of Noble County v. Purdue Pharma L.P., et al. | D. Ct. Noble Cnty. CJ-2019-05 |
| 358. | The Purdue Frederick Company Inc. | Municipality | Oklahoma | City of Burns Flat | City of Burns Flat v. Purdue Pharma L.P., et al. | D. Ct. Washita Cnty. CJ-2019-29 |
| 359. | The Purdue Frederick Company Inc. | Municipality | Pennsylvania | Armstrong County | Armstrong County, PA v. Purdue Pharma L.P., et al. | C.P. Armstrong Cty. 2017-1570-CV |
| 360. | The Purdue Frederick Company Inc. | Municipality | Pennsylvania | Beaver County, Pennsylvania | Beaver County, Pennsylvania v. Purdue Pharma L.P., et al. | C.P. Beaver Cnty 11326-2017 |
| 361. | The Purdue Frederick Company Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Rhodes Technologies, Inc.; Rhodes Pharmaceuticals, Inc.; Trust for the Benefit of Members of the Raymond Sackler Family; The P.F. Laboratories, Inc.; Stuart D. Baker | Municipality | Pennsylvania | Bedford County | Bedford County v. Purdue Pharma L.P., et al. | C.P. Bedford Cnty. 180-2020 |
| 362. | The Purdue Frederick Company Inc. | Municipality | Pennsylvania | Bucks County | Bucks County v. Purdue Pharma L.P., et al. | C.P. Bucks Cnty. No. 2018-03144 |
| 363. | The Purdue Frederick Company Inc. | Municipality | Pennsylvania | Cambria County, Pennsylvania | Cambria County, Pennsylvania v. Purdue Pharma L.P., et al. | C.P. Cambria Cnty 2017-4131 |

90

EXHIBIT D
Page 416

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 364. | The Purdue Frederick Company Inc.; Richard Sackler; Theresa Sackler; Jonathan Sackler; Kathe Sackler; Jonathan Sackler; Mortimer D.A. Sackler; Beverly Sackler; Ilene Sackler Lefcourt; Craig Landau; John Stewart; Mark Timney | Municipality | Pennsylvania | City of Lock Haven | City of Lock Haven v. Purdue Pharma L.P., et al. | C.P. Clinton Cnty. 1126-2018 |
| 365. | The Purdue Frederick Company Inc. | Municipality | Pennsylvania | City of Philadelphia | City of Philadelphia v. Allergan PLC, et al. | C.P. Philadelphia January Term, 2018 No. 02718 |
| 366. | The Purdue Frederick Company Inc. | Municipality | Pennsylvania | City of Pittsburgh | City of Pittsburgh v. Purdue Pharma L.P., et al. | C.P. Allegheny Cnty. 18-006153 |
| 367. | The Purdue Frederick Company Inc. | Municipality | Pennsylvania | Clearfield County, Pennsylvania | Clearfield County, Pennsylvania v. Purdue Pharma L.P., et al. | C.P. Clearfield Cnty. 2018-1484-CD |
| 368. | The Purdue Frederick Company Inc. | Municipality | Pennsylvania | Clinton County | Clinton County v. Purdue Pharma L.P., et al. | C.P. Clinton Cnty. 752-2018 |
| 369. | The Purdue Frederick Company Inc. | Municipality | Pennsylvania | Commonwealth of PA, acting by and through Philadelphia District Attorney Lawrence S. Krasner | Commonwealth of PA, acting by and through Philadelphia District Attorney Lawrence S. Krasner v. Purdue Pharma L.P., et al. | C.P. Delaware Cnty. CV-2017-008095  Phila. Ct. Com. Pl., January Term 2018, No. 05594 |
| 370. | The Purdue Frederick Company Inc. | Municipality | Pennsylvania | Commonwealth of Pennsylvania, acting by and through John T. Adams, the District Attorney of Berks County | Commonwealth of Pennsylvania, acting by and through John T. Adams, District Attorney of Berks County v. AmerisourceBergen Drug Corp., et al. | C.P. Berks Cnty. 19-18232 |

EXHIBIT D
Page 417

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 371. | The Purdue Frederick Company Inc. | Municipality | Pennsylvania | Commonwealth of Pennsylvania, acting by and through Francis T. Chardo, the District Attorney of Dauphin County | Commonwealth of Pennsylvania, acting by and through Francis T. Chardo, the District Attorney of Dauphin County v. AmerisourceBergen Drug Corp., et al. | C.P. Dauphin Cnty., 12th Jud. Dist. 2019-CV-7795-CV |
| 372. | The Purdue Frederick Company Inc. | Municipality | Pennsylvania | Commonwealth of Pennsylvania, acting by and through Jack Daneri, the District Attorney of Erie County | Commonwealth of Pennsylvania, acting by and through Jack Daneri, the District Attorney of Erie County v. AmerisourceBergen Drug Corp., et al. | C.P. Erie Cnty., 6th Jud. Dist. 12837-19 |
| 373. | The Purdue Frederick Company Inc. | Municipality | Pennsylvania | Commonwealth of PA, acting by James Martin; People of Lehigh County and Lehigh County, PA | Commonwealth of PA, acting by James Martin; People Lehigh County and Lehigh County, PA v. Purdue Pharma L.P., et al. | C.P. Lehigh Cnty. 2018-C-0716 |
| 374. | The Purdue Frederick Company Inc. | Municipality | Pennsylvania | Commonwealth of Pennsylvania, Acting by and through Jack Stollsteimer, the District Attorney of Delaware County | Commonwealth of Pennsylvania, Acting by and through Jack Stollsteimer, the District Attorney of Delaware County v. AmerisourceBergen | C.P. Delaware Cnty. CV-2020-002026 |
| 375. | The Purdue Frederick Company Inc. | Municipality | Pennsylvania | Commonwealth of Pennsylvania, Acting by and through Matthew D. Weintraub, the District Attorney of Bucks County | Commonwealth of Pennsylvania, Acting by and through Matthew D. Weintraub, the District Attorney of Bucks County v. AmerisourceBergen Drug Corp., et al. | C.P. Bucks Cnty. 2020-00639 |
| 376. | The Purdue Frederick Company Inc. | Municipality | Pennsylvania | County of Allegheny | County of Allegheny v. Purdue Pharma L.P., et al. | C.P. Allegheny Cnty. 18-006155 |
| 377. | The Purdue Frederick Company Inc. | Municipality | Pennsylvania | County of Bradford | County of Bradford v. Purdue Pharma L.P., et al. | C.P. Bradford Cnty. 2018-CV-0059 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 378. | The Purdue Frederick Company Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Trust for the Benefit of Members of the Raymond Sackler Family, The P.F. Laboratories, Inc., Stuart D. Baker | Municipality | Pennsylvania | County of Carbon | County of Carbon v. Purdue Pharma L.P., et al. | C.P. Carbon Cnty. No. 18-0990 |
| 379. | The Purdue Frederick Company Inc. | Municipality | Pennsylvania | County of Clarion | County of Clarion v. Purdue Pharma L.P., et al. | C.P. Clarion Cnty. 285-CD-2018 |
| 380. | The Purdue Frederick Company Inc. | Municipality | Pennsylvania | County of Cumberland | County of Cumberland v. Purdue Pharma L.P., et al. | C.P. Cumberland 2018-02147 |
| 381. | The Purdue Frederick Company Inc. | Municipality | Pennsylvania | County of Erie | County of Erie v. Purdue Pharma L.P., et al. | C.P. Erie Cnty. 11577-18 |
| 382. | The Purdue Frederick Company Inc. | Municipality | Pennsylvania | County of Fayette | County of Fayette v. Purdue Pharma L.P., et al. | C.P. Fayette County 2017-2676 |
| 383. | The Purdue Frederick Company Inc. | Municipality | Pennsylvania | County of Greene | County of Greene v. Purdue Pharma L.P., et al. | C.P. Greene Cnty. 791-2017 |
| 384. | The Purdue Frederick Company Inc. | Municipality | Pennsylvania | County of Monroe | County of Monroe v. Purdue Pharma L.P., et al. | C.P. Monroe Cnty. 3972-CV-18 |
| 385. | The Purdue Frederick Company Inc. | Municipality | Pennsylvania | County of Tioga | County of Tioga v. Purdue Pharma L.P., et al. | C.P. Tioga Cnty. 563-CV-2018 |
| 386. | The Purdue Frederick Company Inc. | Municipality | Pennsylvania | County of Washington | County of Washington v. Purdue Pharma L.P., et al. | C.P. Washington Cnty. 2017-6268 |
| 387. | The Purdue Frederick Company Inc. | Municipality | Pennsylvania | County of Westmoreland | County of Westmoreland v. Purdue Pharma L.P., et al. | C.P. Westmoreland Cnty. 2017-5975 |
| 388. | The Purdue Frederick Company Inc. | Municipality | Pennsylvania | County of York | County of York v. Purdue Pharma L.P., et al. | C.P. York Cnty. 2017-SU-003372 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 389. | The Purdue Frederick Company Inc. | Municipality | Pennsylvania | Dauphin County, PA | Dauphin County, PA v. Purdue Pharma L.P., et al. | C.P. Dauphin Cnty. 2018-CV-716 |
| 390. | The Purdue Frederick Company Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Trust for the Benefit of Members of the Raymond Sackler Family; The P.F. Laboratories, Inc.; Stuart D. Baker | Municipality | Pennsylvania | Delaware County | Delaware County, Pennsylvania v. Purdue Pharma L.P., et al. | C.P. Delaware Cnty. No. 2017-008095 |
| 391. | The Purdue Frederick Company Inc. | Municipality | Pennsylvania | Franklin County | Franklin County v. Purdue Pharma L.P., et al. | C.P. Franklin Cnty. 2019-2445 |
| 392. | The Purdue Frederick Company Inc. | Municipality | Pennsylvania | Lackawanna County, Pennsylvania | Lackawanna County, Pennsylvania v. Purdue Pharma L.P., et al. | C.P. Lackawanna Cnty. 17-cv-5156 |
| 393. | The Purdue Frederick Company Inc. | Municipality | Pennsylvania | Lawrence County, Pennsylvania | Lawrence County, Pennsylvania v. Purdue Pharma L.P., et al. | C.P. Beaver Cnty. 11180-2017 |
| 394. | The Purdue Frederick Company Inc. | Municipality | Pennsylvania | Mahoning Township | Mahoning Township v. Purdue Pharma L.P., et al. | C.P. Philadelphia Cnty. 180603466 |
| 395. | The Purdue Frederick Company inc. | Municipality | Pennsylvania | Mercer County | Mercer County v. Purdue Pharma L.P., et al. | C.P. Mercer Cnty. 2018-1596 |
| 396. | The Purdue Frederick Company Inc. | Municipality | Pennsylvania | The Municipality of Norristown and The Township of West Norriton | The Municipality of Norristown and The Township of West Norriton v. Purdue Pharma L.P., et al. | C.P. Montgomery Cnty. 2019-12178 |
| 397. | The Purdue Frederick Company Inc. | Municipality | Pennsylvania | Newtown Township | Newtown Township v. Purdue Pharma L.P., et al. | C.P. Bucks Cnty. 2019-03043 |

EXHIBIT D
Page 420

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 398. | The Purdue Frederick Company Inc. | Municipality | Pennsylvania | People of Northampton County and Northampton County, PA | People of Northampton County and Northampton County, PA v. Purdue Pharma L.P., et al. | C.P. Northampton County C48-cv-2017-11557 |
| 399. | The Purdue Frederick Company Inc. | Municipality | Pennsylvania | Pike County, Pa. | Pike County, Pa. v. Purdue Pharma L.P., et al. | C.P. Pike Cnty. No. 602-2018 |
| 400. | The Purdue Frederick Company Inc. | Municipality | Pennsylvania | Schuylkill County, Pa. | Schuylkill County, Pa. v. Purdue Pharma L.P., et al. | C.P. Schuylkill Cnty. S-1241-18 |
| 401. | The Purdue Frederick Company Inc. | Municipality | Pennsylvania | Wampum Borough | Wampum Borough v. Purdue Pharma L.P., et al. | C.P. Philadelphia Cnty. July Term 2018 No. 01963 |
| 402. | The Purdue Frederick Company Inc.; Richard Sackler; Theresa Sackler; Kathe Sackler; Jonathan Sackler; Mortimer D.A. Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt | Municipality | Pennsylvania | Warrington Township | Warrington Township v. Purdue Pharma L.P., et al. | C.P. Bucks Cnty. 2019-04956 |
| 403. | The Purdue Frederick Company Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; P.F. Laboratories Inc.; Leavis Sullivan; Leigh Varnadore; Paul Kitchin; Beth Taylor; Mark Waldrop; Michael Madden; Wendy Kay; Jeffrey Ward; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; | Municipality | South Carolina | City of Charleston | City of Charleston v. Purdue Pharma L.P., et al. | C.P. Charleston Cnty. 2019-CP-10-04294 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| | Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family; Stuart D. Baker | | | | | |
| 404. | The Purdue Frederick Company Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; P.F. Laboratories Inc.; Leavis Sullivan; Leigh Varnadore; Paul Kitchin; Beth Taylor; Mark Waldrop; Michael Madden; Wendy Kay; Jeffrey Ward; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family; Stuart D. Baker | Municipality | South Carolina | City of North Charleston | City of North Charleston v. Purdue Pharma L.P., et al. | C.P. Charleston Cnty. 2019-CP-10-03978 |

EXHIBIT D
Page 422

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 405. | The Purdue Frederick Company Inc.; Rhodes Pharmaceuticals Inc.; Rhodes Technologies Inc.; P.F. Laboratories, Inc.;Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit Members of the Raymond Sackler Family; Stuart D. Baker; Leavis Sullivan; Beth Taylor; Leigh Varnadore; Paul Kitchin; Wendy Kay; Michael Madden; Jeffrey Ward; Mark Waldrop | Municipality | South Carolina | County of Abbeville | County of Abbeville v. Rite Aid of South Carolina, Inc., et al. | C.P. Abbeville Cnty. 2019-CP-01-00154 |
| 406. | The Purdue Frederick Company Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceutical Inc.; P.F. Laboratories, Inc.;Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; | Municipality | South Carolina | County of Aiken | County of Aiken v. Rite Aid of South Carolina, Inc., et al. | C.P. Aiken Cnty. 2019-CP-02-01086 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| | Trust for the Benefit Members of the Raymond Sackler Family; Stuart D. Baker; Leavis Sullivan; Beth Taylor; Leigh Varnadore; Paul Kitchin; Wendy Kay; Michael Madden; Jeffrey Ward; Mark Waldrop | | | | | |
| 407. | The Purdue Frederick Company Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit Members of the Raymond Sackler Family; Stuart D. Baker; Leavis Sullivan; Beth Taylor; Leigh Varnadore; Paul Kitchin; Wendy Kay; Michael Madden; Jeffrey Ward; Mark Waldrop | Municipality | South Carolina | County of Allendale | County of Allendale v. Rite Aid of South Carolina, et al. | C.P. Allendale Cnty. 2018-CP-03-00125 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 408. | The Purdue Frederick Company Inc.; P.F. Laboratories, Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit Members of the Raymond Sackler Family; Stuart D. Baker; Leavis Sullivan; Beth Taylor; Leigh Varnadore; Paul Kitchin; Wendy Kay; Michael Madden; Jeffrey Ward; Mark Waldrop | Municipality | South Carolina | County of Anderson | County of Anderson v. Rite Aid of South Carolina, Inc., et al. | C.P. Anderson Cnty. 2018-CP-04-01108 |
| 409. | The Purdue Frederick Company Inc.; P.F. Laboratories, Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; | Municipality | South Carolina | County of Bamberg | County of Bamberg v. Rite Aid of South Carolina, Inc., et al. | C.P. Bamberg Cnty. 2018-CP-05-00189 |

EXHIBIT D
Page 425

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| | Trust for the Benefit Members of the Raymond Sackler Family; Stuart D. Baker; Leavis Sullivan; Beth Taylor; Leigh Varnadore; Paul Kitchin; Wendy Kay; Michael Madden; Jeffrey Ward; Mark Waldrop | | | | | |
| 410. | The Purdue Frederick Company Inc.; P.F. Laboratories, Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit Members of the Raymond Sackler Family; Stuart D. Baker; Leavis Sullivan; Beth Taylor; Leigh Varnadore; Paul Kitchin; Wendy Kay; Michael Madden; Jeffrey Ward; Mark Waldrop | Municipality | South Carolina | County of Barnwell | County of Barnwell v. Aid of South Carolina | C.P. Barnwell Cnty. 2018-CP-06-00329 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 411. | The Purdue Frederick Company Inc.; P.F. Laboratories, Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit Members of the Raymond Sackler Family; Stuart D. Baker; Leavis Sullivan; Beth Taylor; Leigh Varnadore; Paul Kitchin; Wendy Kay; Michael Madden; Jeffrey Ward; Mark Waldrop | Municipality | South Carolina | County of Beaufort | County of Beaufort v. Rite Aid of South Carolina, Inc., et al. | C.P. Beaufort Cnty. 2018-CP-07-01245 |

101

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 412. | The Purdue Frederick Company Inc.; Rhodes Technologies Inc; Rhodes Pharmaceuticals Inc; P.F. Laboratories, Inc.;Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit Members of the Raymond Sackler Family; Stuart D. Baker; Leavis Sullivan; Beth Taylor; Leigh Varnadore; Paul Kitchin; Wendy Kay; Michael Madden; Jeffrey Ward; Mark Waldrop | Municipality | South Carolina | County of Calhoun | County of Calhoun v. Rite Aid of South Carolina Inc., et al. | C.P. Calhoun Cnty. 2019-CP-09-00065 |
| 413. | The Purdue Frederick Company Inc.; P.F. Laboratories, Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; | Municipality | South Carolina | County of Cherokee | County of Cherokee v. Rite Aid of South Carolina Inc., et al. | C.P. Cherokee Cnty. 2018-CP-11-00503 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| | Trust for the Benefit Members of the Raymond Sackler Family; Stuart D. Baker; Leavis Sullivan; Beth Taylor; Leigh Varnadore; Paul Kitchin; Wendy Kay; Michael Madden; Jeffrey Ward; Mark Waldrop | | | | | |
| 414. | The Purdue Frederick Company Inc.; P.F. Laboratories, Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit Members of the Raymond Sackler Family; Stuart D. Baker; Leavis Sullivan; Beth Taylor; Leigh Varnadore; Paul Kitchin; Wendy Kay; Michael Madden; Jeffrey Ward; Mark Waldrop | Municipality | South Carolina | County of Chesterfield | County of Chesterfield, Rite Aid of South Carolina Inc. et al. | C.P. Chesterfield Cnty. 2018-CP-13-00410 |

103

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 415. | The Purdue Frederick Company Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit Members of the Raymond Sackler Family; Stuart D. Baker; Leavis Sullivan; Beth Taylor; Leigh Varnadore; Paul Kitchin; Wendy Kay; Michael Madden; Jeffrey Ward; Mark Waldrop | Municipality | South Carolina | County of Clarendon | County of Clarendon v. Rite Aid of South Carolina, Inc., et al. | C.P. Clarendon Cnty. 2019-CP-14-00236 |
| 416. | The Purdue Frederick Company Inc.; P.F. Laboratories, Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; | Municipality | South Carolina | County of Colleton | County of Colleton v. Rite Aid of South Carolina, Inc., et al. | C.P. Colleton Cnty. 2018-CP-15-00438 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| | Trust for the Benefit Members of the Raymond Sackler Family; Stuart D. Baker; Leavis Sullivan; Beth Taylor; Leigh Varnadore; Paul Kitchin; Wendy Kay; Michael Madden; Jeffrey Ward; Mark Waldrop | | | | | |
| 417. | The Purdue Frederick Company Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit Members of the Raymond Sackler Family; Stuart D. Baker; Leavis Sullivan; Beth Taylor; Leigh Varnadore; Paul Kitchin; Wendy Kay; Michael Madden; Jeffrey Ward; Mark Waldrop | Municipality | South Carolina | County of Dillon | County of Dillon v. Richard of South Carolina, Inc. Dil. | C.P. Dillon Cnty. 2019-CP-17-00213 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 418. | The Purdue Frederick Company Inc.; P.F. Laboratories, Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit Members of the Raymond Sackler Family; Stuart D. Baker; Leavis Sullivan; Beth Taylor; Leigh Varnadore; Paul Kitchin; Wendy Kay; Michael Madden; Jeffrey Ward; Mark Waldrop | Municipality | South Carolina | County of Dorchester | County of Dorchester v. Rite Aid of South Carolina, Inc., et al. | C.P. Dorchester Cnty. 2018-CP-18-01122 |
| 419. | The Purdue Frederick Company Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; | Municipality | South Carolina | County of Edgefield | County of Edgefield v. Rite Aid of South Carolina, Inc., et al. | C.P. Edgefield Cnty. 2019-CP-19-00120 |

106

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| | Trust for the Benefit Members of the Raymond Sackler Family; Stuart D. Baker; Leavis Sullivan; Beth Taylor; Leigh Varnadore; Paul Kitchin; Wendy Kay; Michael Madden; Jeffrey Ward; Mark Waldrop | | | | | |
| 420. | The Purdue Frederick Company Inc.; P.F. Laboratories, Inc.; Rhodes Pharmaceuticals Inc.; Rhodes Technologies Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit Members of the Raymond Sackler Family; Stuart D. Baker; Leavis Sullivan; Beth Taylor; Leigh Varnadore; Paul Kitchin; Wendy Kay; Michael Madden; Jeffrey Ward; Mark Waldrop | Municipality | South Carolina | County of Fairfield | County of Fairfield v. Aid of South Carolina, et al. | C.P. Fairfield Cnty. 2018-CP-20-00272 |

107

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 421. | The Purdue Frederick Company Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit Members of the Raymond Sackler Family; Stuart D. Baker; Leavis Sullivan; Beth Taylor; Leigh Varnadore; Paul Kitchin; Wendy Kay; Michael Madden; Jeffrey Ward; Mark Waldrop | Municipality | South Carolina | County of Florence | County of Florence v. Rite Aid of South Carolina, Inc., et al. | C.P. Florence Cnty. 2019-CP-21-01213 |

EXHIBIT D
Page 434

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 422. | The Purdue Frederick Company Inc.; P.F. Laboratories, Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit Members of the Raymond Sackler Family; Stuart D. Baker; Leavis Sullivan; Beth Taylor; Leigh Varnadore; Paul Kitchin; Wendy Kay; Michael Madden; Jeffrey Ward; Mark Waldrop | Municipality | South Carolina | County of Greenwood | County of Greenwood v. Rite Aid of South Carolina, Inc., et al. | C.P. Cherokee Cnty. 2018-CP-24-00775 |
| 423. | The Purdue Frederick Company Inc.; P.F. Laboratories, Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; | Municipality | South Carolina | County of Hampton | County of Hampton v. Rite Aid of South Carolina, Inc., et al. | C.P. Hampton Cnty. 2018-CP-25-00258 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| | Trust for the Benefit Members of the Raymond Sackler Family; Stuart D. Baker; Leavis Sullivan; Beth Taylor; Leigh Varnadore; Paul Kitchin; Wendy Kay; Michael Madden; Jeffrey Ward; Mark Waldrop | | | | | |
| 424. | The Purdue Frederick Company Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit Members of the Raymond Sackler Family; Stuart D. Baker; Leavis Sullivan; Beth Taylor; Leigh Varnadore; Paul Kitchin; Wendy Kay; Michael Madden; Jeffrey Ward; Mark Waldrop | Municipality | South Carolina | County of Horry | County of Horry v. Rite Aid of South Carolina, Inc., et al. | C.P. Horry Cnty. 2019-CP-26-02684 |

110

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 425. | The Purdue Frederick Company Inc.; P.F. Laboratories, Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit Members of the Raymond Sackler Family; Stuart D. Baker; Leavis Sullivan; Beth Taylor; Leigh Varnadore; Paul Kitchin; Wendy Kay; Michael Madden; Jeffrey Ward; Mark Waldrop | Municipality | South Carolina | County of Jasper | County of Jasper v. Rite Aid of South Carolina, Inc., et al. | C.P. Jasper Cnty. 2018-CP-27-00332 |
| 426. | The Purdue Frederick Company Inc.; P.F. Laboratories, Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; | Municipality | South Carolina | County of Kershaw | County of Kershaw v. Rite Aid of South Carolina, Inc., et al. | C.P. Kershaw Cnty. 2018-CP-28-00553 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| | Trust for the Benefit Members of the Raymond Sackler Family; Stuart D. Baker; Leavis Sullivan; Beth Taylor; Leigh Varnadore; Paul Kitchin; Wendy Kay; Michael Madden; Jeffrey Ward; Mark Waldrop | | | | | |
| 427. | The Purdue Frederick Company Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceutical Inc.; P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit Members of the Raymond Sackler Family; Stuart D. Baker; Leavis Sullivan; Beth Taylor; Leigh Varnadore; Paul Kitchin; Wendy Kay; Michael Madden; Jeffrey Ward; Mark Waldrop | Municipality | South Carolina | County of Lancaster | County of Lancaster v. Aid of South Carolina, et al. | C.P. Lancaster Cnty. 2019-CP-29-00540 |

EXHIBIT D
Page 438

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 428. | The Purdue Frederick Company Inc.; P.F. Laboratories, Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit Members of the Raymond Sackler Family; Stuart D. Baker; Leavis Sullivan; Beth Taylor; Leigh Varnadore; Paul Kitchin; Wendy Kay; Michael Madden; Jeffrey Ward; Mark Waldrop | Municipality | South Carolina | County of Laurens | County of Laurens v. Rite Aid of South Carolina, Inc., et al. | C.P. Laurens Cnty. 2018-CP-30-00606 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 429. | The Purdue Frederick Company Inc.; P.F. Laboratories, Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit Members of the Raymond Sackler Family; Stuart D. Baker; Leavis Sullivan; Beth Taylor; Leigh Varnadore; Paul Kitchin; Wendy Kay; Michael Madden; Jeffrey Ward; Mark Waldrop | Municipality | South Carolina | County of Lee | County of Lee v. Rite Aid of South Carolina, Inc., et al. | C.P. Lee Cnty. 2018-CP-31-00207 |
| 430. | The Purdue Frederick Company Inc.; P.F. Laboratories, Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; | Municipality | South Carolina | County of Lexington | County of Lexington v. Rite Aid of South Carolina, Inc., et al. | C.P. Lexington Cnty. 2018-CP-32-02207 |

EXHIBIT D
Page 440

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| | Trust for the Benefit Members of the Raymond Sackler Family; Stuart D. Baker; Leavis Sullivan; Beth Taylor; Leigh Varnadore; Paul Kitchin; Wendy Kay; Michael Madden; Jeffrey Ward; Mark Waldrop | | | | | |
| 431. | The Purdue Frederick Company Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit Members of the Raymond Sackler Family; Stuart D. Baker; Leavis Sullivan; Beth Taylor; Leigh Varnadore; Paul Kitchin; Wendy Kay; Michael Madden; Jeffrey Ward; Mark Waldrop | Municipality | South Carolina | County of Marion | County of Marion v. Purdue of South Carolina, Inc. et al. | C.P. Marion Cnty. 2019-CP-33-00299 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 432. | The Purdue Frederick Company Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit Members of the Raymond Sackler Family; Stuart D. Baker; Leavis Sullivan; Beth Taylor; Leigh Varnadore; Paul Kitchin; Wendy Kay; Michael Madden; Jeffrey Ward; Mark Waldrop | Municipality | South Carolina | County of McCormick | County of McCormick v. Rite Aid of South Carolina, Inc., et al. | C.P. McCormick Cnty. 2019-CP-35-00031 |
| 433. | The Purdue Frederick Company Inc.; P.F. Laboratories, Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; | Municipality | South Carolina | County of Oconee | County of Oconee v. Rite Aid of South Carolina, Inc., et al. | C.P. Oconee Cnty. 2018-CP-37-00458 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| | Trust for the Benefit Members of the Raymond Sackler Family; Stuart D. Baker; Leavis Sullivan; Beth Taylor; Leigh Varnadore; Paul Kitchin; Wendy Kay; Michael Madden; Jeffrey Ward; Mark Waldrop | | | | | |
| 434. | The Purdue Frederick Company Inc.; P.F. Laboratories, Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit Members of the Raymond Sackler Family; Stuart D. Baker; Leavis Sullivan; Beth Taylor; Leigh Varnadore; Paul Kitchin; Wendy Kay; Michael Madden; Jeffrey Ward; Mark Waldrop | Municipality | South Carolina | County of Orangeburg | County of Orangeburg v. Rite Aid of South Carolina, Inc. et al. | C.P. Orangeburg Cnty. 2018-CP-38-00841 |

|  | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 435. | The Purdue Frederick Company Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit Members of the Raymond Sackler Family; Stuart D. Baker; Leavis Sullivan; Beth Taylor; Leigh Varnadore; Paul Kitchin; Wendy Kay; Michael Madden; Jeffrey Ward; Mark Waldrop | Municipality | South Carolina | County of Pickens | County of Pickens v. Rite Aid of South Carolina, Inc., et al. | C.P. Pickens Cnty. 18-CP-39-00675 |

118

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 436. | The Purdue Frederick Company Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit Members of the Raymond Sackler Family; Stuart D. Baker; Leavis Sullivan; Beth Taylor; Leigh Varnadore; Paul Kitchin; Wendy Kay; Michael Madden; Jeffrey Ward; Mark Waldrop | Municipality | South Carolina | County of Saluda | County of Saluda v. Rite Aid of South Carolina, Inc., et al. | C.P. Clarendon Cnty. 2019-CP-41-00111 |
| 437. | The Purdue Frederick Company Inc.; Rhodes Techonologies Inc.; Rhodes Pharmaceuticals Inc.; P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; | Municipality | South Carolina | County of Sumter | County of Sumter v. Rite Aid of South Carolina, Inc., et al. | C.P. Sumter Cnty. 2019-CP-43-00891 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| | Trust for the Benefit Members of the Raymond Sackler Family; Stuart D. Baker; Leavis Sullivan; Beth Taylor; Leigh Varnadore; Paul Kitchin; Wendy Kay; Michael Madden; Jeffrey Ward; Mark Waldrop | | | | | |
| 438. | The Purdue Frederick Company Inc.; P.F. Laboratories, Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit Members of the Raymond Sackler Family; Stuart D. Baker; Leavis Sullivan; Beth Taylor; Leigh Varnadore; Paul Kitchin; Wendy Kay; Michael Madden; Jeffrey Ward; Mark Waldrop | Municipality | South Carolina | County of Union | County of Union v. Rite Aid of South Carolina, Inc., et al. | C.P. Union Cnty. 2018-CP-44-00288 |

120

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 439. | The Purdue Frederick Company Inc.; P.F. Laboratories, Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit Members of the Raymond Sackler Family; Stuart D. Baker; Leavis Sullivan; Beth Taylor; Leigh Varnadore; Paul Kitchin; Wendy Kay; Michael Madden; Jeffrey Ward; Mark Waldrop | Municipality | South Carolina | County of Williamsburg | County of Williamsburg v. Rite Aid of South Carolina, Inc., et al. | C.P. Williamsburg Cnty. 2018-CP-45-00276 |
| 440. | The Purdue Frederick Company Inc.; P.F. Laboratories, Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; | Municipality | South Carolina | County of York | County of York v. Rite Aid of South Carolina, Inc., et al. | C.P. York Cnty. 2018-CP-46-02446 |

EXHIBIT D
Page 447

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| | Trust for the Benefit Members of the Raymond Sackler Family; Stuart D. Baker; Leavis Sullivan; Beth Taylor; Leigh Varnadore; Paul Kitchin; Wendy Kay; Michael Madden; Jeffrey Ward; Mark Waldrop | | | | | |
| 441. | The Purdue Frederick Company Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit Members of the Raymond Sackler Family; Stuart D. Baker; Leavis Sullivan; Beth Taylor; Leigh Varnadore; Paul Kitchin; Wendy Kay; Michael Madden; Jeffrey Ward; Mark Waldrop | Municipality | South Carolina | Greenville County | Greenville County v. Purdue Aid of South Carolina, Inc., et al. | C.P. Greenville Cnty. 2018-CP-23-01294 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 442. | The Purdue Frederick Company Inc.; P.F. Laboratories, Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit Members of the Raymond Sackler Family; Stuart D. Baker; Leavis Sullivan; Beth Taylor; Leigh Varnadore; Paul Kitchin; Wendy Kay; Michael Madden; Jeffrey Ward; Mark Waldrop | Municipality | South Carolina | Spartanburg County | Spartanburg County v. Rite Aid of South Carolina, Inc., et al. | C.P. Spartanburg Cnty. 2018-CP-42-00760 |

123

EXHIBIT D
Page 449

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 443. | The Purdue Frederick Company Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; P.F. Laboratories Inc.; Leavis Sullivan; Leigh Varnadore; Paul Kitchin; Beth Taylor; Mark Waldrop; Michael Madden; Wendy Kay; Jeffrey Ward; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family; Stuart D. Baker | Municipality | South Carolina | Town of Mount Pleasant | Town of Mount Pleasant v. Purdue Pharma L.P., et al. | C.P. Charleston Cnty. 2019-CP-10-04302 |
| 444. | The Purdue Frederick Company Inc. | District Attorney General / Municipality | Tennessee | Barry Staubus, in his official capacity as the District Attorney General for the Second Judicial District and on behalf of all political subdivisions therein;  Tony Clark, in his official capacity as the District Attorney General for the First Judicial District and on | Barry Staubus, et al. v. Purdue Pharma L.P., et al. | Cir. Ct. Sullivan Cnty. No. C-41916 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| | | | | behalf of all political subdivisions therein; Dan Armstrong, in his official capacity as the District Attorney General for the Third Judicial District and on behalf of all political subdivisions therein; Baby Doe, by and through his Guadian Ad Litem | | |
| 445. | The Purdue Frederick Company Inc.; Richard Sackler | District Attorney General / Municipality | Tennessee | Bryant C. Dunaway, in his official capacity as the District Attorney General for the Thirteenth Judicial District, TN and on behalf of all political subdivisions therein, Including Clay County, City of Celine, Cumberland County, City of Crab Orchard, City of Crossville, Town of Pleasant Hill, Dekalb County, Town of Alexandria, Town of Dowelltown, Town of Liberty, City of Smithville, Overton County, Town of Livingston, Pickett County, Town of Byrdstown, Putnam County, City of Algood, | Bryant C. Dunaway, et al. v. Purdue Pharma L.P., | Cir. Ct. Cumberland Cnty. CCI-2018-CV-6331 |

EXHIBIT D
Page 451

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| | | | | Town of Baxter, City of Cookeville, Town of Monterey, White County, Town of Doyle, City of Sparta; Jenning H. Jones, in his official capacity as the District Attorney General for the Sixteenth Judicial District, TN and on behalf of all political subdivisions therein, including Cannon County, Town of Auburntown, Town of Woodbury, Rutherford County, City of Eaglevill, City of La Vergne, City of Murfreesboro, Town of Smyrna; Robert J. Carter, in his official capacity as the District Attorney General for the Seventeenth Judicial District, TN and on behalf of all political subdivisions therein, including Bedord County, Town of Bell Buckle, Town of Normandy, City of Shelbyville, Town of Wartrace, Lincoln County, City of | | |

126

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| | | | | Ardmore, City of Fayetteville, Town of Petersburg, Marshall County, Town of Chapel Hill, Town of Cornersville, City of Lewisburg, Moore County, City of Lynchburg;<br><br>Brent A. Cooper, in his official capacity as the District Attorney General for the Twenty-Second Judicial District, TN and on behalf of all political subdivisions therein, including Giles County, City of Elkton, Town of Lynnville, City of Minor Hill, City of Pulaski, Lawrence County, Town of Ethridge, City of Iron City, City of Lawrenceburg, City of Loretto, City of St. Joseph, Maury County, City of Columbia, City of Mount Pleasant, City of Spring Hill, Wayne County, City of Clifton, City of Collinwood, City of Waynesboro;<br><br>Lisa S. Zavogiannis, in her official capacity as the District Attorney | | |

127

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| | | | | General for the Thirty-First Judicial District, TN and on behalf of all political subdivisions therein, including Van Buren County, Town of Spencer, Warren County, Town of Centertown, City of McMinnville, Town of Morrison, Town of Viola; <br><br> Baby Doe, by and through his Mother | | |
| 446. | The Purdue Frederick Company Inc. | District Attorney General / Municipality | Tennessee | Jared Effler, in his official capacity as the District Attorney General for the Eigth Judicial District, TN; <br><br> Charme Allen, in her official capacity as the District Attorney General for the Sixth Judicial District; <br><br> Dave Clark, in his official capacity as the District Attorney General for the Seventh Judicial District, TN; <br><br> Russell Johnson, in his official capacity as the District Attorney General for the Ninth Judicial District, TN; | Jared Effler, et al. v. Purdue Pharma L.P., et al. | Eastern Section at Knoxville Court of Appeals No. E2018-01994-COA-R3-CV |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| | | | | Stephen Crump, in his official capacity as the District Attorney General for the Tenth Judicial District, TN; Jimmy Dunn, in his official capacity as the District Attorney General for the Fourth Judicial District, TN; Mike Taylor, in his official capacity as the District Attorney General for the Twelfth Judicial District, TN Baby Doe #1; Baby Doe #2 | | |
| 447. | The Purdue Frederick Company Inc. | Municipality | Tennessee | Shelby County, by the Shelby Board of Commissioners | Shelby County, by the Shelby Board of Commissioners v. Purdue Pharma L.P., et al. | Cir. Ct. Shelby Cnty. No. CT-004500-17 |
| 448. | The Purdue Frederick Company Inc. | Municipality | Texas | City of Houston, Texas | City of Houston, Texas v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2019-43219 |
| 449. | The Purdue Frederick Company Inc. | Municipality | Texas | County of Bee | County of Bee v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-76897 |
| 450. | The Purdue Frederick Company Inc. | Municipality | Texas | County of Bexar | County of Bexar v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77066 |
| 451. | The Purdue Frederick Company Inc. | Municipality | Texas | County of Burnet | County of Burnet v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77090 |
| 452. | The Purdue Frederick Company Inc. | Municipality | Texas | County of Cameron | County of Cameron v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77093 |
| 453. | The Purdue Frederick Company Inc. | Municipality | Texas | County of Cass | County of Cass v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-76905 |
| 454. | The Purdue Frederick Company Inc. | Municipality | Texas | County of Cooke | County of Cooke v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-76907 |

EXHIBIT D
Page 455

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 455. | The Purdue Frederick Company Inc. | Municipality | Texas | County of Coryell | County of Coryell v. Purdue Pharma L.P., et al. | Coryell Cnty. Dist. Ct. 2018-77097 |
| 456. | The Purdue Frederick Company Inc. | Municipality | Texas | County of Dallas | County of Dallas v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77098 |
| 457. | The Purdue Frederick Company Inc. | Municipality | Texas | County of Delta | County of Delta v. AmerisourceBergen Drug Corp., et al. | Harris Cnty. Dist. Ct. 2018-77093 |
| 458. | The Purdue Frederick Company Inc. | Municipality | Texas | County of Dimmit | County of Dimmit v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-76905 |
| 459. | The Purdue Frederick Company Inc. | Municipality | Texas | County of Ector | County of Ector v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-76907 |
| 460. | The Purdue Frederick Company Inc. | Municipality | Texas | County of El Paso | County of El Paso v. Purdue Pharma L.P., et al. | Coryell Cnty. Dist. Ct. 2018-77097 |
| 461. | The Purdue Frederick Company Inc. | Municipality | Texas | County of Falls | County of Falls v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77098 |
| 462. | The Purdue Frederick Company Inc. | Municipality | Texas | County of Fannin | County of Fannin v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77093 |
| 463. | The Purdue Frederick Company Inc. | Municipality | Texas | County of Grayson | County of Grayson v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-76994 |
| 464. | The Purdue Frederick Company Inc. | Municipality | Texas | County of Harrison | County of Harrison v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77108 |
| 465. | The Purdue Frederick Company Inc. | Municipality | Texas | County of Hidalgo | County of Hidalgo v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77109 |
| 466. | The Purdue Frederick Company Inc. | Municipality | Texas | County of Hopkins | County of Hopkins v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77111 |
| 467. | The Purdue Frederick Company Inc. | Municipality | Texas | County of Houston | County of Houston v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77021 |
| 468. | The Purdue Frederick Company Inc. | Municipality | Texas | County of Kendall | County of Kendall v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77023 |
| 469. | The Purdue Frederick Company Inc. | Municipality | Texas | County of Kerr | County of Kerr v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77114 |
| 470. | The Purdue Frederick Company Inc. | Municipality | Texas | County of Liberty | County of Liberty v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77116 |
| 471. | The Purdue Frederick Company Inc. | Municipality | Texas | County of Limestone | County of Limestone v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77025 |
| 472. | The Purdue Frederick Company Inc. | Municipality | Texas | County of Marion | County of Marion v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77026 |

EXHIBIT D
Page 456

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 473. | The Purdue Frederick Company Inc. | Municipality | Texas | County of McMullen | County of McMullen v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77067 |
| 474. | The Purdue Frederick Company Inc. | Municipality | Texas | County of Milam | County of Milam v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77141 |
| 475. | The Purdue Frederick Company Inc. | Municipality | Texas | County of Nacogdoches | County of Nacogdoches v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77027 |
| 476. | The Purdue Frederick Company; The Purdue Frederick Company Inc. | Municipality | Texas | County of Nueces; Nueces County Hospital District | County of Nueces and Nueces County Hospital District v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77083 |
| 477. | The Purdue Frederick Company Inc. | Municipality | Texas | County of Orange | County of Orange v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77036 |
| 478. | The Purdue Frederick Company Inc. | Municipality | Texas | County of Panola | County of Panola v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77037 |
| 479. | The Purdue Frederick Company Inc. | Municipality | Texas | County of Parker | County of Parker v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77143 |
| 480. | The Purdue Frederick Company Inc. | Municipality | Texas | County of Potter | County of Potter v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77039 |
| 481. | The Purdue Frederick Company Inc. | Municipality | Texas | County of Robertson | County of Robertson v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77043 |
| 482. | The Purdue Frederick Company; The Purdue Frederick Company Inc. | Municipality | Texas | County of San Patricio | County of San Patricio v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77075 |
| 483. | The Purdue Frederick Company Inc. | Municipality | Texas | County of Shelby | County of Shelby v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77062 |
| 484. | The Purdue Frederick Company Inc. | Municipality | Texas | County of Travis | County of Travis v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77144 |
| 485. | The Purdue Frederick Company Inc. | Municipality | Texas | County of Trinity | County of Trinity v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77080 |
| 486. | The Purdue Frederick Company Inc. | Municipality | Texas | County of Van Zandt | County of Van Zandt v. AmerisourceBergen Drug Corp., et al. | Harris Cnty. Dist. Ct. 2018-77150 |
| 487. | The Purdue Frederick Company Inc. | Municipality | Texas | County of Waller | County of Waller v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77153 |
| 488. | The Purdue Frederick Company Inc. | Municipality | Texas | County of Wood | County of Wood v. Purdue Pharma L.P., et al. | Harris Cnty. Dist. Ct. 2018-77081 |

131

EXHIBIT D
Page 457

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 489. | The Purdue Frederick Company Inc. | Municipality | Texas | Johnson County | Johnson County v. Purdue Pharma, L.P. et al. | Harris Cnty. Dist. Ct. 2018-87346 |
| 490. | The Purdue Frederick Company Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Trust for the Benefit of the Raymond Sackler Family; Rhodes Technologies Inc.; Rhodes Pharmaceuticals, Inc.; The P.F. Laboratories, Inc. | Municipality | Utah | Cache County, Utah; Rich County, Utah | Cache County, Utah; Rich County, Utah v. Purdue Pharma L.P., et al. | 1st Dist. Ct. Cache Cnty. 190100112 |
| 491. | The Purdue Frederick Company | Municipality | Utah | Davis County | Davis County v. Purdue Pharma L.P., et al. | 2nd Dist. Ct. Davis Cnty. 180700870 |
| 492. | The Purdue Frederick Company | Municipality | Utah | Grand County | Grand County v. Purdue Pharma L.P., et al. | 7th Jud. Dist. Ct. Grand Cnty. 180700040 |
| 493. | The Purdue Frederick Company | Municipality | Utah | Iron County | Iron County v. Purdue Pharma L.P., et al. | 5th Jud. Dist. Ct. Iron Cnty. 180500149 |
| 494. | The Purdue Frederick Company | Municipality | Utah | Millard County | Millard County v. Purdue Pharma L.P., et al. | 4th Jud. Dist. Ct. Millard Cnty. 180700044 |
| 495. | The Purdue Frederick Company Inc. | Municipality | Utah | Salt Lake County | Salt Lake County v. Purdue Pharma L.P., et al. | 3rd Jud. Dist. Ct. Salk Lake Cnty. 180902421 |
| 496. | The Purdue Frederick Company | Municipality | Utah | San Juan County | San Juan County v. Purdue Pharma L.P., et al. | 7th Jud. Dist. Ct. Grand Cnty. 180700040 |
| 497. | The Purdue Frederick Company | Municipality | Utah | Sanpete County | Sanpete County v. Purdue Pharma L.P., et al. | 6th Jud. Dist. Ct. Sanpete Cnty. 180600095 |

EXHIBIT D
Page 458

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 498. | The Purdue Frederick Company Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Trust for the Benefit of the Raymond Sackler Family; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; The P.F. Laboratories, Inc. | Municipality | Utah | Sevier County; Juab County; Emery County; Wayne County; Piute County | Sevier County, Utah, Juab County, Utah, Emery County, Utah, Wayne County, Utah, and Piute County, Utah v. Purdue Pharma L.P., et al. | 6th Jud. Dis. Ct. Sevier Cnty. 190600050 |
| 499. | The Purdue Frederick Company Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Trust for the Benefit of the Raymond Sackler Family; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; The P.F. Laboratories, Inc. | Municipality | Utah | Summit County, Utah | Summit County, Utah v. Purdue Pharma L.P., et al. | 3rd Dist. Ct. Summit Cnty. 180500119 |

EXHIBIT D
Page 459

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 500. | The Purdue Frederick Company Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Trust for the Benefit of the Raymond Sackler Family; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; The P.F. Laboratories, Inc. | Municipality | Utah | Tooele County, Utah | Tooele County, Utah v. Purdue Pharma L.P., et al. | 3rd Dist. Ct. Tooele Cnty. 180300423 |
| 501. | The Purdue Frederick Company Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Trust for the Benefit of the Raymond Sackler Family; Rhodes Technologies Inc.; Rhodes Pharmaceuticals, Inc.; The P.F. Laboratories, Inc. | Municipality | Utah | Uintah County, Utah; Duscesne County, Utah; Daggett County, Utah; Tri-County Health Department | Uintah County, Utah; Duscesne County, Utah; Daggett County, Utah; Tri-County Health Department v. Purdue Pharma L.P., et al. | 8th Dist. Ct. Uintah Cnty. 180800056 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 502. | The Purdue Frederick Company Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Trust for the Benefit of the Raymond Sackler Family; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; The P.F. Laboratories, Inc. | Municipality | Utah | Wasatch County, Utah | Wasatch County, Utah v. Purdue Pharma L.P., et al. | 4th Dist. Ct. Wasatch Cnty. 180500079 |
| 503. | The Purdue Frederick Company Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Trust for the Benefit of the Raymond Sackler Family; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; The P.F. Laboratories, Inc. | Municipality | Utah | Washington County, Utah; Kane County, Utah; Beaver County, Utah; Garfield County, Utah | Washington County, Utah; Kane County, Utah; Beaver County, Utah; Garfield County, Utah v. Purdue Pharma L.P., et al. | 5th Dist. Ct. Washington Cnty. 190500179 |

EXHIBIT D
Page 461

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 504. | The Purdue Frederick Company Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Stuart D. Baker; Trust for the Benefit of the Raymond Sackler Family; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; The P.F. Laboratories, Inc. | Municipality | Utah | Weber County, Utah | Weber County, Utah v. Purdue Pharma L.P., et al. | 2nd Dist. Ct. Weber Cnty. 180903087 |
| 505. | The Purdue Frederick Company Inc. | Municipality | Virginia | City of Martinsville, Virginia | City of Martinsville, Va. v. Purdue Pharma L.P., et al. | Cir. Ct. Martinsville Cnty. CL18000240-00 |
| 506. | The Purdue Frederick Company Inc. | Municipality | Virginia | The County Board of Arlington County, Virginia | The County Board of Arlington County, Virginia v. Purdue Pharma L.P., et al. | Cir. Ct. Arlington Cnty. CL19001081-00 |
| 507. | The Purdue Frederick Company Inc. | Municipality | Virginia | Dinwiddie County, Virginia | Dinwiddie County, Virginia v. Purdue Pharma L.P., et al. | Cir. Ct. Dinwiddie Cnty. CL19-317 |
| 508. | The Purdue Frederick Company Inc. | Municipality | Virginia | Mecklenburg County | Mecklenburg County, Virginia v. Purdue Pharma L.P., et al. | Cir. Ct. Mecklenburg County CL19000558-00 |

EXHIBIT D
Page 462

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 509. | The Purdue Frederick Company Inc. <br> Mark Radcliffe; <br> Mark Ross; <br> Patty Carnes | Municipality | West Virginia | Brooke County Commission; Hancock County Commission; Harrison County Commission; Lewis County Commission; Marshall County Commission; Ohio County Commission; Tyler County Commission; Wetzel County Commission | Brooke County Commission, Hancock County Commission, Harrison County Commission, Lewis County Commission, Marshall County Commission, Ohio County Commission, Tyler County Commission, and Wetzel County Commission v. Purdue Pharma L.P., et al. | Cir. Ct. Marshall Cnty. <br> 17-C-248H <br> 17-C-249H <br> 17-C-250H <br> 17-C-251H <br> 17-C-252H <br> 17-C-253H <br> 17-C-254H <br> 17-C-255H <br><br> Consolidated before MLP In re Opioid Litigation , Cir. Ct. Kanawha County 19-C-9000 |
| 510. | The Purdue Frederick Company Inc.; <br> Patty Carnes; <br> Carol Debord; <br> Jeff Waugh; <br> Shane Cook; <br> Mark Ross | Municipality | West Virginia | The County Commission of Mason County; The County Commission of Barbour County; Mayor Chris Tatum on behalf of The Village of Barboursville; The County Commission of Taylor County; The County Commission of Webster County; Mayor Don E. McCourt, on behalf of the Town of Addison a/k/a The Town of Webster Springs | The County Commission of Mason County; The County Commission of Barbour County; Mayor Chris Tatum on behalf of The Village of Barboursville; The County Commission of Taylor County; The County Commission of Webster County; and Mayor Don E. McCourt, on behalf of the Town of Addison a/k/a The Town of Webster Springs v. Purdue Pharma L.P., et al. | Cir. Ct. Marshall County <br> 19-C-4H <br> 19-C-5H <br> 19-C-6H <br> 19-C-7H <br> 19-C-8H <br> 19-C-9H <br><br> Consolidated before MLP In re Opioid Litigation, Cir. Ct. Kanawha County 19-C-9000 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 511. | The Purdue Frederick Company Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; David A. Sackler; Beverly Sackler; Theresa Sackler; Trust for the Benefit of the Mortimer Sackler Family; Trust for the Benefit of the Raymond Sackler Family; Mark Ross; Patty Carnes; Carol DeBord; Jeff Waugh; Shane Cook | Municipality | West Virginia | Mayor Peggy Knotts Barney, on behalf of the City of Grafton; Mayor Philip Bowers, on behalf of the City of Philippi | Mayor Peggy Knotts Barney, on behalf of the City of Grafton, and Mayor Philip Bowers, on behalf of the City of Philippi v. Purdue Pharma L.P., et al. | Cir. Ct. Marshall Cnty. 19-C-151 19-C-152<br><br>Consolidated before MLP In re Opioid Litigation, Cir. Ct. Kanawha County 19-C-9000 |
| 512. | The Purdue Frederick Company Inc.; Mark Radcliffe; Mark Ross; Patty Carnes | Municipality | West Virginia | Monongalia County Commission; Marion County Commission; Doddridge County Commission; Randolph County Commission; Upshur County Commission | Monongalia County Commission; Marion County Commission; Doddridge County Commission; Randolph County Commission; and Upshur County Commission v. Purdue Pharma L.P., et al. | Cir. Ct. Marshall Cnty. 18-C-222H 18-C-233H 18-C-234H 18-C-235H 18-C-236H<br><br>Consolidated before MLP In re Opioid Litigation, Cir. Ct. Kanawha County 19-C-9000 |

EXHIBIT D
Page 464

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 513. | The Purdue Frederick Company Inc.; Mark Radcliffe; Mark Ross; Patty Carnes; Jeff Waugh; Carol Debord; Amanda Bias Hayes; Doug Powers | Municipality | West Virginia | Roane County Commission; The City of Spencer; Jackson County Commission; The City of Ripley; The Town of Ravenswood; Wood County Commission; The City of Williamstown; Wirt County Commission; The Town of Elizabeth; Pleasants County Commission; City of St. Mary's; Ritchie County Commission; Town of Harrisville | Roane County Commission; The City of Spencer; Jackson County Commission; The City of Ripley; The Town of Ravenswood; Wood County Commission; The City of Williamstown; Wirt County Commission; The Town of Elizabeth; Pleasants County Commission; City of St. Mary's; Ritchie County Commission; Town of Harrisville v. Mylan Pharmaceuticals Inc., | Cir. Ct. Marshall Cnty. 19-C-96-108H |
| *Hospital (MDL)* | | | | | | |
| 514. | The Purdue Frederick Company Inc. | Hospital | MDL | Danville Regional Medical Center, LLC | Danville Regional Medical Center, LLC v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45788 Master Case No. 17-md-2804 |
| 515. | The Purdue Frederick Company, Inc. | Hospital | MDL | Triad Health Systems, Inc. | Triad Health Systems, and all other similarly situated Federally Qualified Healthcare Systems and Clinics v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45780 Master Case No. 17-md-2804 |

EXHIBIT D
Page 465

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 516. | The Purdue Frederick Company Inc. | Hospital | MDL | West Boca Medical Center, Inc. | West Boca Medical Center, Inc. v. AmerisourceBergen Drug Corp., et al. | N.D. Ohio 1:18-op-45530 Master Case No. 17-md-2804 |
| | ***Hospital, Individual, Third Party Payor, University (State Court)*** | | | | | |
| 517. | Richard Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt; Jonathan Sackler; Kathe Sackler; Mortimer D.A. Sackler; Theresa Sackler; John Stewart; Mark Timney; Craig Landau; Russell Gasdia; Joe Coggins; Lyndsie Fowler; Mitchell "Chip" Fisher; Rebecca Sterling; Vanessa Weatherspoon; Chris Hargrave; Brandon Hasenfuss; Joe Read; Rhodes Technologies Inc. | Hospital | Alabama | Mobile County Board of Health; Family Oriented Primary Health Care Clinic | Mobile County Board of Health and Family Oriented Primary Health Care Clinic v. Richard Sackler, et al. | Cir. Ct. Mobile Cnty. 02-CV-2019-902806 |
| 518. | The Purdue Frederick Company Inc.; Richard Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt; Kathe Sackler; | Hospital | Arizona | Kingman Hospital, Inc.; Arizona Spine and Joint Hospital LLC; Bullhead City Hospital Corporation; Carondelet St. Joseph's Hospital; | Kingman Hospital, Inc.; Arizona Spine and Joint Hospital LLC; Bullhead City Hospital Corporation; Carondelet St. Joseph's Hospital; Holy Cross | Mohave Cnty. Sup. Ct. S8015cv201900563 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| | Mortimer D.A. Sackler; Theresa Sackler; John Stewart; Mark Timney; Craig Landau; Russell Gasdia | | | Holy Cross Hospital, Inc.; Hospital Development of West Phoenix, Inc.; Northwest Hospital, LLC; Oro Valley Hospital, LLC; Oasis Hospital; Orthopedic and Surgical Specialty Company, LLC; St. Mary's Hospital of Tucson; VHS Acquisition Subsidiary Number 1, Inc.; VHS Arrowhead, Inc. | Hospital, Inc.; Hospital Development of West Phoenix, Inc.; Northwest Hospital, LLC; Oro Valley Hospital, LLC; Oasis Hospital; Orthopedic and Medical Specialty Company, LLC; St. Mary's Hospital of Tucson; VHS Acquisition Subsidiary Number 1, Inc.; and VHS Arrowhead, Inc. v. Purdue Pharma L.P., et al. | |
| 519. | The Purdue Frederick Company Inc. | Hospital | Arizona | Tucson Medical Center | Tucson Medical Center v. Purdue Pharma L.P., et al. | Super. Ct. Pima County C20184991 |
| 520. | Richard Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt; Jonathan Sackler; Kathe Sackler; Mortimer D.A. Sackler; Theresa Sackler; John Stewart; Mark Timney; Craig Landau; Russell Gasdia; Barbara C. Miller; Briann Parson-Barnes; Becca Beck Harville; Lindsey Bonifacio; Tammy Heyward; James Speed, Damon Storhoff; Diana C. Muller; Draupadi Daley | Hospital | Florida | Florida Health Sciences Center, Inc.; North Broward Hospital District; Halifax Hospital Medical Center, Bayfront HMA Medical Center, LLC; CGH Hospital, Ltd.; Citrus HMA, LLC; Central Florida Health; Crestview Hospital Corporation; Delray Medical Center, Inc.; Flagler Hospital, Inc.; Good Samaritan Medical Center, Inc.; Haines City HMA, LLC; Hernando HMA, | Florida Health Sciences Center, Inc., et al. v. Richard Sackler, et a. | Cir. Ct. Broward Cnty. 19-018882 |

EXHIBIT D
Page 467

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| | | | | LLC; Hialeah Hospital, Inc.; HMA Santa Rosa Medical Center, LLC; Key West HMA, LLC; Lake Shore HMA, LLC; Lake Wales Hospital Corporation; Larkin Community Hospital Palm Springs Campus, LLC; Larkin Community Hospital, Inc; Larkin Community Hospital Behavioral Service, Inc.; Leesburg Regional Medical Center, Inc.; Lifemark Hospitals of Florida, Inc.; Live Oak HMA, LLC; Naples HMA, LLC; North Shore Medical Center, Inc.; Osceolasc LLC; Palm Beach Gardens Community Hospital, Inc.; Port Charlotte HMA, LLC; Punta Gorda HMA, LLC; St. Mary's Medical Center, Inc.; Starke HMA, LLC; The Villages Tri-County Medical Center, Inc.; and Venice HMA, LLC | | |
| 521. | The Purdue Frederick Company Inc.; Rhodes Pharmaceuticals Inc.; Rhodes Technologies Inc.; Beverly Sackler; David A. Sackler; | University | Louisiana | The Board of Supervisors for Louisiana State University and Agricultural and Mechanical College | The Board of Supervisors for Louisiana State University and Agricultural and Mechanical College v. AmerisourceBergen Drug Corp., et al. | 19th Jud. Dist. Ct. East Baton Rouge Parish C-694318 24 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| | Ilene Sackler Lefcourt; Jonathan D. Sackler; Kathe A. Sackler; Mortimer D.A. Sackler; Richard S. Sackler; Theresa Sackler; Stuart Baker; Raymond Sackler Trust | | | | | |
| 522. | Nathan C. Grace; Jaclyn P. Gatling; Leslie Roberson | Hospital | Mississippi | Singing River Health System; Anderson Regional Health System; Biloxi HMA, LLC d/b/a Merit Health Biloxi; Clarksdale HMA, LLC d/b/a Northwest Mississippi Medical Center; Field Memorial Community Hospital d/b/a Field Health System; Jackson HMA, LLC d/b/a Merit Health Central; Magnolia Regional Health Center; Madison HMA, LLC d/b/a Merit Health Madison; Brandon HMA, LLC d/b/a Merit Health Rankin; Wesley Health System, LLC d/b/a Merit Health Wesley; Natchez Hospital Company, LLC d/b/a | Singing River Health System; Anderson Regional Health System; Biloxi HMA, LLC d/b/a Merit Health Biloxi; Clarksdale HMA, LLC d/b/a Northwest Mississippi Medical Center; Field Memorial Community Hospital d/b/a Field Health System; Jackson HMA, LLC d/b/a Merit Health Central; Magnolia Regional Health Center; Madison HMA, LLC d/b/a Merit Health Madison; Brandon HMA, LLC d/b/a Merit Health Rankin; Wesley Health System, LLC d/b/a Merit Health Wesley; Natchez Hospital Company, LLC d/b/a Merit Health Natchez; North Sunflower Medical Center; River Oaks Hospital, LLC d/b/a Merit Health River Oaks; Vicksburg Healthcare | Ch. Ct. Jackson Cnty. 30-CH-1:19-cv-01879 |

19-03060-rdd Doc 13-7 Filed 04/23/20 Entered 04/23/20 16:08:58 Main Document Pg 21 of 275 Preliminary Injunction (Fourth Amended Order) Pg 321 of 375

143

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| | | | | Merit Health Natchez; North Sunflower Medical Center; River Oaks Hospital, LLC d/b/a Merit Health River Oaks; Vicksburg Healthcare, LLC d/b/a Merit Health River Region and Merit Health River Region West; Roh, LLC d/b/a Merit Health Women's Hospital; Tippah County Hospital; Alliance Healthcare System; Memorial Hospital at Gulfport; Delta Regional Medical Center; Progressive Medical Management of Batesville d/b/a Panola Medical Center; Boa Vida Hospital of Abderdeen, MS, LLC | d/b/a Merit Health River Region and Merit Health River Region West; Roh, LLC d/b/a Merit Health Women's Hospital; Tippah County Hospital; Alliance Healthcare System; Memorial Hospital at Gulfport; Delta Regional Medical Center; Progressive Medical Management of Batesville d/b/a Panola Medical Center; Boa Vida Hospital of Abderdeen, MS, LLC; Nathan C. Grace, et al. | |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 523. | The Purdue Frederick Company Inc.;<br>The P.F. Laboratories Inc.;<br>Purdue Holdings L.P.;<br>Rosebay Medical Company L.P.;<br>The Beacon Company;<br>PLP Associates Holdings L.P.;<br>Richard S. Sackler;<br>Jonathan D. Sackler;<br>Mortimer D.A. Sackler;<br>Kathe A. Sackler;<br>Ilene Sackler Lefcourt;<br>David A. Sackler;<br>Beverly Sackler;<br>Theresa Sackler;<br>Estate of Dr. Richard Sackler;<br>Estate of Mortimer Sackler;<br>Estate of Raymond Sackler | Individual | New Jersey | Hill, Fredrick | Fredrick Hill v. Purdue Pharma L.P., et al. | Super Ct. NJ Camden Cnty.<br>L-003693-19 |
| 524. | The Purdue Frederick Company Inc. | Individual | New Jersey | Perez, Francisco | Francisco Perez, individually, as administrator and administrator ad prosequendum for the Estate of Tanny Robles-Perez, Fransheka Robles Gomez, Sarai Perez Robles, a minor, by Francisco Perez, his/her guardian ad litem v. Favido Revordero, M.D., et al. | Super. Ct. NJ Passaic Cnty.<br>PAS-L-003289-18 |

EXHIBIT D
Page 471

|  | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 525. | The Purdue Frederick Company Inc. | Estate | New York | The Estate of Justine Maria Aliotta; Aliotta, Joanne individually and as administratrix of the Estate of Justine Marie Aliotta, deceased; Torres Julissa Cecelia, an infant by her guardian Joanne Aliotta, on behalf of themselves and Plaintiff Class Consisting of all other persons in New York so situated | The Estate of Justine Maria Aliotta, et al. v. Purdue Pharma Inc., et al. | Sup. Ct. Richmond Cnty. 152057-2019 |
| 526. | Jonathan Sackler; Richard Sackler; Mortimer D.A. Sackler; Kathe Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David Sackler | Estate | North Carolina | Leysen, Patty Carol, Administrator of the Estate of Brian Keith Johnston | Patty Carol Leysen, et al. AmerisourceBergen Drug Corp., et al. | Sup. Ct. Davidson Cnty. 20-cvs-112 |
| 527. | Jonathan Sackler; Richard Sackler; Mortimer D.A. Sackler; Kathe Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David Sackler | Estate | North Carolina | Stevens, Susan K., Administratrix of the Estate of Toria Capri Stevens | Susan Stevens, et al. v. AmerisourceBergen Drug Corp., et al. | Sup. Ct. Forsyth Cnty. 20-cvs-352 |
| 528. | Beverly Sackler; David Sackler; Ilene Sackler Lefcourt; Jonathan Sackler; Kathe Sackler; Mortimer D.A. Sackler; Richard Sackler; Theresa Sackler | Estate | North Carolina | Williams, Sonji B., Administratrix of the Estate of Tyler Michael Wain Williams | Sonji B. Williams, Administratrix of the Estate of Tyler Michael Wain Williams v. AmerisourceBergen Drug Corp., et al. | Super. Ct. Gaston Cnty. 19-cvs-5192 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 529. | The Purdue Frederick Company Inc. | Third Party Payor | Pennsylvania | AFSCME District Council 33 Health & Welfare Fund | AFSCME District Council 33 Health & Welfare Fund v. Purdue Pharma L.P., et al. | C.P. Philadelphia 180302269 |
| 530. | The Purdue Frederick Company Inc. | Third Party Payor | Pennsylvania | AFSCME District Council 47 Health & Welfare Fund | AFSCME District Council 47 Health & Welfare Fund v. Purdue Pharma L.P., et al. | C.P. Philadelphia 180302255 |
| 531. | The Purdue Frederick Company Inc. | Third Party Payor | Pennsylvania | Bricklayers and Allied Craftworkers Local Union No. 1 of PA/DE Health and Welfare Fund | Bricklayers and Allied Craftworkers Local Union No. 1 of PA/DE Health and Welfare Fund v. Purdue Pharma L.P., et al. | C.P. Philadelphia 180302256 |
| 532. | The Purdue Frederick Company Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family; Stuart D. Baker | Third Party Payor | Pennsylvania | Carpenters Health & Welfare Fund of Philadelphia & Vicinity | Carpenters Health & Welfare of Philadelphia & Vicinity v. Purdue Pharma L.P., et al. | C.P. Philadelphia 180302264 |
| 533. | The Purdue Frederick Company Inc. | Estate | Pennsylvania | Davidson, Karen A., Individually, and Administratrix of the Estate of John C. Davidson, deceased | Karen Davidson, et al. v. Ignacio Badiola, M.D., et al. | C.P. Philadelphia Cnty. 200100381 |

147

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 534. | The Purdue Frederick Company Inc. | Third Party Payor | Pennsylvania | International Brotherhood of Electrical Workers Local 728 Family Healthcare Plan | International Brotherhood of Electrical Workers Local 728 Family Healthcare Plan v. Allergan, PLC, et al. | C.P. Philadelphia No. 003872 |
| 535. | The Purdue Frederick Company Inc. | Third Party Payor | Pennsylvania | International Brotherhood of Electrical Workers Local 98 Health & Welfare Fund and International Brotherhood of Electrical Workers Local 89 Sound and Communication Health & Welfare Fund | International Brotherhood of Electrical Workers Local 98 Health & Welfare Fund and International Brotherhood of Electrical Workers Local 89 Sound and Communication Health & Welfare Fund v. Endo Pharmaceuticals, Inc., et al. | C.P. Philadelphia Cnty. 002063 |
| 536. | The Purdue Frederick Company Inc. | Third Party Payor | Pennsylvania | International Union of Painters and Allied Trades, District Council No. 21 Welfare Fund | International Union of Painters and Allied Trades District Council No. 21 Welfare Fund v. Allergan, PLC, et al. | C.P. Philadelphia Cnty. 001983 |
| 537. | The Purdue Frederick Company Inc. | Third Party Payor | Pennsylvania | Iron Workers District Council of Philadelphia and Vicinity, Benefit Fund | Iron Workers District Council of Philadelphia and Vicinity, Benefit Fund v. Abbott Laboratories, Inc. | C.P. Philadelphia Cnty. 180502442 |
| 538. | The Purdue Frederick Company Inc. | Third Party Payor | Pennsylvania | Philadelphia Federation of Teachers Health and Welfare Fund | Philadelphia Federation of Teachers Health and Welfare Fund v. Endo Pharmaceuticals, Inc., et al. | C.P. Philadelphia Cnty. 180403891 |
| 539. | The Purdue Frederick Company Inc. | Third Party Payor | Pennsylvania | Southeastern Pennsylvania Transportation Authority | Southeastern Pennsylvania Transportation Authority v. Endo Pharmaceuticals, Inc., et al. | C.P. Philadelphia Cnty. March Term 2018 No. 02923 |
| 540. | The Purdue Frederick Company Inc. | Third Party Payor | Pennsylvania | Steamfitters Local 449 Medical & Benefit Fund | Steamfitters Local 449 Medical & Benefit Fund v. Allergan PLC, et al. | C.P. Philadelphia Cnty. 19091412 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 541. | The Purdue Frederick Company Inc. | Third Party Payor | Pennsylvania | The Trustees of the Unite Here Local 634 Health & Welfare Fund | The Trustees of the Unite Here Local 634 Health & Welfare Fund v. Purdue Pharma L.P., et al. | C.P. Philadelphia Cnty. 180401123 |
| 542. | The Purdue Frederick Company Inc. | Third Party Payor | Pennsylvania | UFCW Local 23 and Employers Health Fund | UFCW Local 23 and Employers Health Fund v. Endo Pharmaceuticals, Inc. | C.P. Philadelphia Cnty. 180403485 |
| 543. | The Purdue Frederick Company Inc. | Third Party Payor | Pennsylvania | Western Pennsylvania Electrical Employees Insurance Trust Fund | Western Pennsylvania Electrical Employees Insurance Trust Fund v. Endo Pharmaceuticals Inc., et al. | C.P. Philadelphia Cnty. 181002038 |
| 544. | The Purdue Frederick Company Inc.; Richard Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt; Jonathan Sackler; Kathe Sackler; Mortimer Sackler; Theresa Sackler; John Stewart; Mark Timney; Craig Landau; Russell Gasdia | Hospital | Texas | Dallas County Hospital District d/b/a Parkland Health & Hospital System; Palo Pinto County Hospital District a/k/a Palo Pinto General Hospital; Guadalupe Valley Hospital a/k/a Guadalupe Regional Medical Center; VHS San Antonio Partners, LLC d/b/a Baptist Medical Center, Mission Trail Baptist Hospital, North Central Baptist Hospital, Northeast Baptist Hospital, and St. Luke's Baptist Hospital; Nacogdoches Medical Center; Resolute Hospital Company, LLC d/b/a Resolute Health; The Hospitals of | Dallas County Hospital District d/b/a Parkland Health & Hospital System; Palo Pinto County Hospital District a/k/a Palo Pinto General Hospital; Guadalupe Valley Hospital a/k/a Guadalupe Regional Medical Center; VHS San Antonio Partners, LLC d/b/a Baptist Medical Center, Mission Trail Baptist Hospital, North Central Baptist Hospital, Northeast Baptist Hospital, and St. Luke's Baptist Hospital; Nacogdoches Medical Center; Resolute Hospital Company, LLC d/b/a Resolute Health; The Hospitals of Providence East Campus; The Hospitals of Providence Memorial Campus; The Hospitals of Providence Sierra Campus; The Hospitals of Providence Transmountain | Dallas Cnty. Dist. Ct. DC-19-13794 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| | | | | Providence East Campus; The Hospitals of Providence Memorial Campus; The Hospitals of Providence Sierra Campus; The Hospitals of Providence Transmountain Campus; VHS Brownsville Hospital Company, LLC d/b/a Valley Baptist Medical Center - Brownsville; VHS Harlingen Hospital Company, LLC d/b/a Valley Baptist Medical Center; Armc, L.P. d/b/a Abilene Regional Medical Center; College Station Hospital, LP; Granbury Hospital Corporation d/b/a Lake Granbury Medical Center; Navarro Hospital, L.P. d/b/a Navarro Regional Hospital; Brownwood Hospital, L.P. d/b/a Brownwood Regional Medical Center; Victoria of Texas, L.P. d/b/a Detar Hospital Navarro and Detar Hospital North; | Campus; VHS Brownsville Hospital Company, LLC d/b/a Valley Baptist Medical Center - Brownsville; VHS Harlingen Hospital Company, LLC d/b/a Valley Baptist Medical Center; Armc, L.P. d/b/a Abilene Regional Medical Center; College Station Hospital, LP; Granbury Hospital Corporation d/b/a Lake Granbury Medical Center; Navarro Hospital, L.P. d/b/a Navarro Regional Hospital; Brownwood Hospital, L.P. d/b/a Brownwood Regional Medical Center; Victoria of Texas, L.P. d/b/a Detar Hospital Navarro and Detar Hospital North; Laredo Texas Hospital Company, L.P. d/b/a Laredo Medical Center; San Angelo Hospital, L.P. d/b/a San Angelo Community Medical Center; Cedar Park Health System, L.P. d/b/a Cedar Park Regional Medical Center; NHCI of Hillsboro, Inc. d/b/a Hill Regional Hospital; Longview Medical Center, L.P. d/b/a Longview Regional Medical Center; and Piney Woods Healthcare System, L.P. d/b/a | |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| | | | | Laredo Texas Hospital Company, L.P. d/b/a Laredo Medical Center; San Angelo Hospital, L.P. d/b/a San Angelo Community Medical Center; Cedar Park Health System, L.P. d/b/a Cedar Park Regional Medical Center; NHCI of Hillsboro, Inc. d/b/a Hill Regional Hospital; Longview Medical Center, L.P. d/b/a Longview Regional Medical Center; Piney Woods Healthcare System, L.P. d/b/a Woodland Heights Medical Center | Woodland Heights Medical Center v. Purdue Pharma L.P., et al. | |
| 545. | The Purdue Frederick Company Inc.; Richard D. Sackler | Third Party Payor | Texas | Fire and Police Retirement Health Care Fund, San Antonio | Fire and Police Retirees Health Care Fund, San Antonio v. Richard D. Sackler, et al. | Harris Cnty. Dist. Ct. 2018-33724 |
| 546. | The Purdue Frederick Company; Richard Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt; Jonathan Sackler; Kathe Sackler; Mortimer D.A. Sackler; Theresa Sackler; John Stewart; | Hospital | West Virginia | West Virginia University Hospitals Inc.; Appalachian Regional Healthcare, Inc.; Bluefield Hospital Company, LLC; Broaddus Hospital Association; Camden-Clark Memorial Hospital | West Virginia University Hospitals Inc.; Appalachian Regional Healthcare, Inc.; Bluefield Hospital Company, LLC; Broaddus Hospital Association; Camden-Clark Memorial Hospital Corporation; Charleston Area Medical Center, Inc.; Charles Town General Hospital; City Hospital, Inc.; | Civ. Action Nos. 19-C-69 through 19-C-88 and 19-C-134 through 19-C-139 Consolidated before MLP In re Opioid Litigation, Cir. Ct. Kanawha County 19-C-9000 |

EXHIBIT D
Page 477

| Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|
| Mark Timney; Craig Landau; Russell Gasdia; Mark Radcliffe; Mark Ross; Patty Carnes | | | Corporation; Charleston Area Medical Center, Inc.; The Charles Town General Hospital; City Hospital, Inc.; Community Health Association d/b/a Jackson General Hospital; Davis Memorial Hospital; Grafton City Hospital, Inc.; Grant Memorial Hospital; Greenbrier VMC, LLC; Monongalia County General Hospital Company; Oak Hill Hospital Corporation d/b/a Plateau Medical Center; Potomac Valley Hospital of W. Va., Inc.; Preston Memorial Hospital Corporation; Princeton Community Hospital Association, Inc.; Reynolds Memorial Hospital Inc.; St. Joseph's Hospital of Buckhannon, Inc.; Stonewall Jackson Memorial Hospital Company; United Hospital Center, | Community Health Association d/b/a Jackson General Hospital; Davis Memorial Hospital; Grafton City Hospital, Inc.; Grant Memorial Hospital; Greenbrier VMC, LLC; Monongalia County General Hospital Company; Oak Hill Hospital Corporation d/b/a Plateau Medical Center; Potomac Valley Hospital of W. Va., Inc.; Preston Memorial Hospital Corporation; Princeton Community Hospital Association, Inc.; Reynolds Memorial Hospital Inc.; St. Joseph's Hospital of Buckhannon, Inc.; Stonewall Jackson Memorial Hospital Company; United Hospital Center, Inc.; Webster County Memorial Hospital, Inc.; Wetzel County Hospital Association; Williamson Memorial Hospital, LLC; and Braxton County Memorial Hospital, Inc. v. Purdue Pharma, et al. | |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| | | | | Inc.; Webster County Memorial Hospital, Inc.; Wetzel County Hospital Association; Williamson Memorial Hospital, LLC.; Braxton County Memorial Hospital, Inc. | | |
| **Estate, Individual, Third Party Payor (MDL)** | | | | | | |
| 547. | The Purdue Frederick Company, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; Trust for the Benefit of Members of the Raymond Sackler Family; The P.F. Laboratories, Inc. | NAS | MDL | A.M.H. | A.M.H., individually and as next friend or guardian of minor Baby C.E., and on behalf of all others similarly situated v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45052 Master Case No. 17-md-2804 |

EXHIBIT D
Page 479

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 548. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Alexander, Melba | Melba Alexander, individually and as next friend and guardian of Baby B.H.R. v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45502 Master Case No. 17-md-2804 |
| 549. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Ambrosio, Melissa | Melissa Ambrosio, individually and as next friend of Baby G.A., on behalf of themselves and others similarly situated v. Purdue Pharma L.P., et al. | N.D. Ohio 1:18-op-45375 Master Case No. 17-md-2804 |

EXHIBIT D
Page 480

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 550. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Artz, Jennifer | Jennifer Artz, individually and as next friend and guardian of Baby I.A.A., on behalf of themselves and all others similarly situated v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45459 Master Case No. 17-md-2804 |
| 551. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Atkinson, Sandra | Sandra Atkinson, individually and as next friend and guardian of Baby L.C.C. v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45531 Master Case No. 17-md-2804 |

EXHIBIT D
Page 481

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 552. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Berzinski, April | April Berzinski, individually and as next friend and guardian of Baby A.Z. v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45503 Master Case No. 17-md-2804 |
| 553. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Brant, Shelby L. | Shelby L. Brant, individually and as next friend and guardian of Baby L.A.B on behalf of themselves and others similarly situated v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45494 Master Case No. 17-md-2804 |

EXHIBIT D
Page 482

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 554. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Brumbarger, Brandi | Brandi Brumbarger, individually and as next friend and guardian of Baby J.B.B., on behalf of themselves and all others similarly situated v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45469 Master Case No. 17-md-2804 |
| 555. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Carlson, Desiree | Desiree Carlson, individually and as next friend and guardian of Baby J.S., on behalf of themselves and all others similarly situated v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45487 Master Case No. 17-md-2804 |

EXHIBIT D
Page 483

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 556. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Chancey, Musette | Musette Chancey, individually and as next friend and guardian of Babies D.C.1. and D.C.2. v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45533 Master Case No. 17-md-2804 |
| 557. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Cherry, Angela | Angela Cherry, individually and as next friend and guardian of Baby Z.C. on behalf of themselves and others similarly situated v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45490 Master Case No. 17-md-2804 |
| 558. | The Purdue Frederick Company Inc. | Third Party Payor | MDL | Cleveland Bakers and Teamsters Health and Welfare Fund and Pipe Fitters Local Union No. 120 Insurance Fund | Cleveland Bakers and Teamsters Health and Welfare Fund and Pipe Fitters Union No. 120 Insurance Fund v. Purdue Pharma L.P., et al., | N.D. Ohio 1:18-op-45432 Master Case No. 17-md-2804 |

EXHIBIT D
Page 484

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 559. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Collier, Jessica | Jessica Collier, individually and as next friend and guardian of Baby A.P. v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45506 Master Case No. 17-md-2804 |
| 560. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Cruz, Gloria | Gloria Cruz, individually and as next friend and guardian of Baby C.E.L., on behalf of themselves and all others similarly situated v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45466 Master Case No. 17-md-2804 |

EXHIBIT D
Page 485

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 561. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Delancey, Christina | Christina Delancey, individually and as next friend and guardian of Baby A.J.W., on behalf of themselves and all others similarly situated v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45480 Master Case No. 17-md-2804 |
| 562. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | DeMaro, Samantha | Samantha DeMaro, individually and as next friend and guardian of J.W.L.B., on behalf of themselves and all others similarly situated v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45465 Master Case No. 17-md-2804 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 563. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Dixon, Deborah | Deborah Dixon, as next friend and guardian of baby S.E.T. v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45511 Master Case No. 17-md-2804 |
| 564. | The Purdue Frederick Company Inc. | NAS | MDL | Doe, John | John Doe, by and through Jane Doe, his parent and natural guardian, on behalf of himself and all others similarly situated v. Purdue Pharma L.P., et al. | N.D. Ohio 1:18-op-46318 Master Case No. 17-md-2804 |
| 565. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Doyle, Erin | Erin Doyle, individually and as Mother and Custodian of Baby D.F., on behalf of themselves and all others similarly situated v. AmerisourceBergen Drug Corporation LLC, et al. | N.D. Ohio 1:18-op-46327 Master Case No. 17-md-2804 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 566. | The Purdue Frederick Company Inc., Rhodes Technologies Inc., Rhodes Pharmaceuticals Inc., The P.F. Laboratories Inc., Richard S. Sackler, Jonathan D. Sackler, Mortimer D.A. Sackler, Kathe A. Sackler, Ilene Sackler Lefcourt, Beverly Sackler, Theresa Sackler, David A. Sackler, Trust for the Benefit of Members of the Raymond Sackler Family; Stuart D. Baker | Third Party Payor | MDL | Drywall Tapers Insurance Fund | Drywall Tapers Insurance Fund v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45810 Master Case No. 17-md-2804 |
| 567. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Ellis, Esperanza | Esperanza Ellis, individually and as next friend and guardian of Baby S.O.B. on behalf of themselves and others similarly situated v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45464 Master Case No. 17-md-2804 |

EXHIBIT D
Page 488

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 568. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Flach, Brittany | Brittany Flach, individually and as next friend and guardian of Babies A.B. and G.B., on behalf of themselves and all others similarly situated v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45488 Master Case No. 17-md-2804 |
| 569. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Flanagan, Darren and Elena | Darren and Elena Flanagan, individually and as adoptive parents and next friend of Baby K.L.F., on behalf of themselves and all others similarly situated v. Purdue Pharma L.P., et al. | N.D. Ohio 1:18-op-45405 Master Case No. 17-md-2804 |

EXHIBIT D
Page 489

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 570. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Gauthier, Krista; Sawyers, Angela; Springborn, Jessica | Krista Gauthier, Angela Sawyers, and Jessica Springborn, individually and as next friends and guardians of Babies D.L.D., M.A.S., and N.S., on behalf of themselves and all others similarly situated v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45478 Master Case No. 17-md-2804 |
| 571. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Gauthier, Mechelle | Mechelle Gauthier, individually and as next friend and guardian of B.L. v. Purdue Pharma, et al. | N.D. Ohio 1:19-op-45514 Master Case No. 17-md-2804 |

EXHIBIT D
Page 490

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 572. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Gibson, Amanda | Amanda Gibson, individually and as next friend and guardian of Baby B.A. v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45515 Master Case No. 17-md-2804 |
| 573. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Gilson, Jamiee | Jamiee Gilson, as next friend and guardian of Baby J.D. v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45461 Master Case No. 17-md-2804 |

EXHIBIT D
Page 491

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 574. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Goforth, Rebecca | Rebecca Goforth, individually and as next friend and guardian of Babies A.S. and N.S. v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45532 Master Case No. 17-md-2804 |
| 575. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Goldman, Jenni | Jenni Goldman, individually and as next friend and guardian of Babies J.K.W. and M.J.R. v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45516 Master Case No. 17-md-2804 |

EXHIBIT D
Page 492

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 576. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Goss, Heather | Heather Goss, individually and as next friend and guardian of Babies C.B. and V.B. v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45518 Master Case No. 17-md-2804 |
| 577. | The Purdue Frederick Company Inc. | Wrongful Death | Mississippi | Greer, Julia | Julia Greer, individually and as next friend and on behalf of all wrongful death beneficiaries of Rose Greer, deceased v. Charles Eddie, M.D., et al. | N.D. Ohio 1:19-op-46117 Master Case No. 17-md-2804 |
| 578. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Hamawi, Marijha; Lara, Meghan | Marijha Hamawi, individually and as next friend and guardian of Babies K.L.H. and N.A.W.; and Meghan Lara, individually and as next friend and guardian of Babies K.L.H. and N.A.W., on behalf of themselves and all others similarly situated v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45477 Master Case No. 17-md-2804 |

EXHIBIT D
Page 493

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 579. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Hampel, Jessica | Jessica Hampel, individually and as next friend and guardian of Baby A.M.H., on behalf of themselves and all others similarly situated v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45473 Master Case No. 17-md-2804 |
| 580. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Herring, Courtney | Courtney Herring, individually and as next friend and guardian of Baby M.T. v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45519 Master Case No. 17-md-2804 |

EXHIBIT D
Page 494

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 581. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Howell, Reannan | Reannan Howell, individually and as next friend and guardian of Baby N.J.D. v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45520 Master Case No. 17-md-2804 |
| 582. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Hunt, Shannon | Shannon Hunt, Individually and as Next Friend and Guardian of Minor S.J.H. on Behalf of All Others Similarly Situated v. Purdue Pharma L.P., et al. | N.D. Ohio 1:18-op-45681 Master Case No. 17-md-2804 |

EXHIBIT D
Page 495

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 583. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Hutchins, Kiana | Kiana Hutchins, individually and as next friend and guardian of Baby T.E. v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45505 Master Case No. 17-md-2804 |
| 584. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Ivie, Billie | Billie Ivie, individually as next friend and guardian of Baby A.I., on behalf of themselves and all others similarly situated v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45489 Master Case No. 17-md-2804 |

EXHIBIT D
Page 496

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 585. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Johnson, Aracya | Aracya Johnson, individually and as guardian of Baby R.H. v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45521 Master Case No. 17-md-2804 |
| 586. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Johnson, Jamie | Jamie Johnson, individually and as next friend and guardian of Babies K.J. and J.D. v. Purdue Pharma, et al. | N.D. Ohio 1:19-op-45504 Master Case No. 17-md-2804 |

171

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 587. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Kirk, Krystle | Krystle Kirk, individually and as next friend and guardian of Baby B.K. v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45509 Master Case No. 17-md-2804 |
| 588. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Kommer, Elizabeth | Elizabeth Kommer, individually and as next friend and guardian of C.K. v. Purdue Pharmaton L.P., et al. | N.D. Ohio 1:19-op-45522 Master Case No. 17-md-2804 |

EXHIBIT D
Page 498

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 589. | The Purdue Frederick Company Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; The P.F. Laboratories Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family; Stuart D. Baker | Third Party Payor | MDL | Laborers Local 1298 of Nassau & Suffolk Counties Welfare Fund | Laborers Local 1298 of Nassau & Suffolk Counties Welfare Fund v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45813 Master Case No. 17-md-2804 |
| 590. | The Purdue Frederick Company Inc., Rhodes Technologies Inc., Rhodes Pharmaceuticals Inc., The P.F. Laboratories Inc., Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family; Stuart D. Baker | Third Party Payor | MDL | Local 8A-28A Welfare Fund | Local 8A-28A Welfare Fund v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45809 Master Case No. 17-md-2804 |

173

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 591. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Lechuga, Niola | Niola Lechuga, individually and as next friend and guardian of Babies Q.H.L. and A.G.L., on behalf of themselves and all others similarly situated v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45468 Master Case No. 17-md-2804 |
| 592. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Lively, Carol | Carol Lively, individually and as next friend and guardian of Baby L.L. v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45523 Master Case No. 17-md-2804 |

EXHIBIT D
Page 500

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 593. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Lyle, Alyssa | Alyssa Lyle, individually and as next friend and guardian of Baby A.W. v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45524 Master Case No. 17-md-2804 |
| 594. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Martin, Kimberly | Kimberly Martin, individually and as next friend and guardian of Baby A.M. v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45510 Master Case No. 17-md-2804 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 595. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Martin, Penny | Penny Martin, individually and as next friend and guardian of Baby D.M. v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45508 Master Case No. 17-md-2804 |
| 596. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Martinez, Jacquelynn | Jacquelynn Martinez, individually and as next friend and guardian of the minor J.M., on behalf of themselves and all others similarly situated v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45484 Master Case No. 17-md-2804 |

EXHIBIT D
Page 502

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 597. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Massey, Melanie | Melanie Massey, individually and as next friend and guardian of Babies S.L.M. and K.D.R. v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45525 Master Case No. 17-md-2804 |
| 598. | Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family; The P.F. Laboratories, Inc.; The Purdue Frederick Company Inc.; Stuart D. Baker | Third Party Payor | Massachusetts | Mayflower Municipal Health Group | Mayflower Municipal Health Group v. Johnson & Johnson, et al. | N.D. Ohio 1:19-op-45897 Master Case No. 17-md-2804 |

EXHIBIT D
Page 503

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 599. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | McAnany, Samantha | Samantha McAnany, individually and as next friend and guardian of Baby A.L.M. v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45526 Master Case No. 17-md-2804 |
| 600. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Means, Corey | Corey Means, individually and as next friend and guardian of Baby E.D.M. on behalf of themselves and others similarly situated v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45470 Master Case No. 17-md-2804 |

EXHIBIT D
Page 504

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 601. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Meinecke, Kjellsi | Kjellsi Meinecke, individually and as next friend and guardian of Baby J.B., on behalf of themselves and all others similarly situated v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45493 Master Case No. 17-md-2804 |
| 602. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Moore, Bobbie Lou | Bobbie Lou Moore, individually and as next friend and guardian of minor of minor R.R.C., on behalf of themselves and all others similarly situated v. Purdue Pharma L.P., et al. | N.D. Ohio 1:18-op-46305 Master Case No. 17-md-2804 |

EXHIBIT D
Page 505

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 603. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Muffley, Amanda | Amanda Muffley, individually and as next friend and guardian of Baby M.S. v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45507 Master Case No. 17-md-2804 |
| 604. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Ortiz, Maria | Maria Ortiz, individually and as next friend and guardian of Baby A.O., on behalf of themselves and all others similarly situated v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45492 Master Case No. 17-md-2804 |

EXHIBIT D
Page 506

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 605. | The Purdue Frederick Company Inc.; Rhodes Technologies Inc.; Rhodes Pharmaceuticals Inc.; The P.F. Laboratories Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family; Stuart D. Baker | Third Party Payor | MDL | Painting Industry Insurance Fund | Painting Industry Insurance Fund v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45793 Master Case No. 17-md-2804 |
| 606. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Patterson, Gena | Gena Patterson, individually and as next friend and guardian of Baby F.P. v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45534 Master Case No. 17-md-2804 |

EXHIBIT D
Page 507

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 607. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Paul, Chloe | Chloe Paul, individually and as next friend and guardian of Baby A.R.P., on behalf of themselves and all others similarly situated v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45467 Master Case No. 17-md-2804 |
| 608. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Perkins, Jessica | Jessica Perkins, individually and as next friend and guardian of Babies P.A.R. and R.A. v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45535 Master Case No. 17-md-2804 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 609. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Peterson, Sally | Sally Peterson, individually and as next friend and guardian of Baby E.A.P., on behalf of themselves and all others similarly situated v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45472 Master Case No. 17-md-2804 |
| 610. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Puckett, Heather | Heather Puckett, individually and as next friend and guardian of Baby C.M.B. v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45539 Master Case No. 17-md-2804 |

EXHIBIT D
Page 509

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 611. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Rees, Deric; Rees, Ceonda | Deric Rees and Ceonda Rees, individually and as next friend and guardian of baby T.W.B. on behalf of themselves and all others similarly situated v. McKesson Corp., et al. | N.D. Ohio 1:18-op-45252 Master Case No. 17-md-2804 |
| 612. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Richardson, Waikeisha | Waikeisha Richardson, individually and as next friend and guardian of babies E.M.1. and E.M.2. v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45538 Master Case No. 17-md-2804 |
| 613. | The Purdue Frederick Company Inc. | NAS | MDL | Riling, Andrew G.; Riling, Beverly | Andrew G. Riling and Beverly Riling, as next friends of A.P. Riling, a minor under the age of 18, v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45056 Master Case No. 17-md-2804 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 614. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Roach, Tyler M. | Tyler M. Roach, natural Tutor on behalf of his minor child, Baby K.E.R., and as class representative for all Neonatal Abstinence Syndrome afflicted babies born in Louisiana v. McKesson Corp., et al. | N.D. Ohio 1:18-op-45662 Master Case No. 17-md-2804 |
| 615. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Rodriguez, Jessica | Jessica Rodriguez, individually and as next friend and guardian of M.A.P., on behalf of themselves and all others similarly situated v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45463 Master Case No. 17-md-2804 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 616. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Salmons, Walter; Salmons, Virginia | Walter and Virginia Salmons, individually and as the next friend or guardian of Minor W.D. and on behalf of all other similarly situated v. Purdue Pharma L.P., et al. | N.D. Ohio 1:18-op-45268 Master Case No. 17-md-2804 |
| 617. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Scully, Jenny | Jenny Scully, individually and as next friend and guardian of Baby I.S. v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45544 Master Case No. 17-md-2804 |
| 618. | The Purdue Frederick Company Inc. | NAS | MDL | Shaffer, Jodi | Jodi Shaffer, individually and as next friend and guardian of minor R.C., on behalf of themselves and all others similarly situated v. Purdue Pharma L.P., et al. | N.D. Ohio 1:18-op-46302 Master Case No. 17-md-2804 |

EXHIBIT D
Page 512

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 619. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Shepard, Amy | Amy Shepard, individually and as next friend and guardian of Baby E.S. v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45536 Master Case No. 17-md-2804 |
| 620. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Shewmake, Shilo | Shilo Shewmake, individually and as next friends and guardians of Babies L.S., A.S., and J.S., on behalf of themselves and all others similarly situated v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45482 Master Case No. 17-md-2804 |

EXHIBIT D
Page 513

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 621. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Shockley, Kayla | Kayla Shockley, individually and as next friend and guardian of Baby M.G.L. v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45527 Master Case No. 17-md-2804 |
| 622. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Simonson, Alicia | Alicia Simonson, individually and as next friend and guardian of Baby M.S. on behalf of themselves and others similarly situated v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45479 Master Case No. 17-md-2804 |

EXHIBIT D
Page 514

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 623. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Stewart, Wendy | Wendy Stewart, individually and as next friend and guardian of Baby K.J.C., on behalf of themselves and all others similarly situated v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45481 Master Case No. 17-md-2804 |
| 624. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Taylor, Jessica | Jessica Taylor, individually and as next friend and guardian of Baby D.S.S. v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45528 Master Case No. 17-md-2804 |

EXHIBIT D
Page 515

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 625. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Taylor, Lori | Lori Taylor, individually and as next friend and guardian of Baby M.T. v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45529 Master Case No. 17-md-2804 |
| 626. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Thomas, Jennifer | Jennifer Thomas, individually and as next friend and guardian of Baby A.S.S. v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45542 Master Case No. 17-md-2804 |

EXHIBIT D
Page 516

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 627. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Tindall, Nichole | Nichole Tindall, individually and as next friend and guardian of Baby L.M. v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45530 Master Case No. 17-md-2804 |
| 628. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Tuttle, Nicole | Nicole Tuttle, individually and as next friend and guardian of Baby A.T. on behalf of themselves and others similarly situated v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45476 Master Case No. 17-md-2804 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 629. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Underwood, Taylor Brooke | Taylor Brooke Underwood, individually and as next friend and guardian of Baby C.U. v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45537 Master Case No. 17-md-2804 |
| 630. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | VonCannon, Caroline | Caroline VonCannon, individually and as next friend and guardian of Babies C.W. and S.W. v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45540 Master Case No. 17-md-2804 |
| 631. | The Purdue Frederick Company Inc. | NAS | MDL | W.E., by and through her guardian and next friend, Pamela Osborne | W.E., by and through her guardian and next friend, Pamela Osborne, on behalf of herself and all others similarly situated v. Purdue Pharma L.P., et al. | N.D. Ohio 1:18-op-46347 Master Case No. 17-md-2804 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 632. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Warren, Desirae | Desirae Warren, individually and as next friend and guardian of Baby A.W., on behalf of themselves and all others similarly situated v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45486 Master Case No. 17-md-2804 |
| 633. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Watson, Paula | Paula Watson, individually and as next friend and guardian of Baby D.M. v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45545 Master Case No. 17-md-2804 |

EXHIBIT D
Page 519

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 634. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Weatherwax, Quincy | Quincy Weatherwax, individually and as next friend and guardian of Baby L.W., on behalf of themselves and all others similarly situated v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45483 Master Case No. 17-md-2804 |
| 635. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Whitley, Roxie; Denson, Chris; Denson, Diane; Holland, James; Holland, Teri | Roxie Whitley, individually and as next friend of Baby Z.B.D.; Chris and Diane Denson, individually and as next friends of Baby L.D.; and James and Teri Holland, individually and as next friends of Babby A.C., on behalf of themselves and others similarly situated v. Purdue Pharma L.P., et al. | N.D. Ohio 1:18-op-45598 Master Case No. 17-md-2804 |

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 636. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Whittaker, Shelley | Shelley Whittaker, individually and as next friend and guardian of Babies E.W., G.L.O., and N.S.G., on behalf of themselves and all others similarly situated v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45475 Master Case No. 17-md-2804 |
| 637. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Whittington, Katherine | Katherine Whittington, individually and as next friend and guardian of Babies S.W. and A.W. v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45541 Master Case No. 17-md-2804 |

EXHIBIT D
Page 521

| | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 638. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Williams, Farrah | Farrah Williams, individually and as next friend and guardian of Baby A.W., on behalf of themselves and all others similarly situated v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45485 Master Case No. 17-md-2804 |
| 639. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Wood, Rachel | Rachel Wood, Individually and as Next Friend and Guardian of Minor O.B. and on Behalf of All Others Similarly Situated v. Purdue Pharma L.P., et al. | N.D. Ohio 1:18-op-45264 Master Case No. 17-md-2804 |

EXHIBIT D
Page 522

|  | Related Parties | Action Type | State | Underlying Plaintiff(s) (Last, First) | Case Caption | Court/Case Number |
|---|---|---|---|---|---|---|
| 640. | The Purdue Frederick Company, Inc.; Rhodes Technologies Inc.; Rhodes Phamaceuticals Inc.; The P.F. Laboratories, Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; Trust for the Benefit of Members of the Raymond Sackler Family | NAS | MDL | Wright, Naomi | Naomi Wright, individually and as next friend and guardian of Baby M.W. v. Purdue Pharma L.P., et al. | N.D. Ohio 1:19-op-45543 Master Case No. 17-md-2804 |
| **_MDL Appeals_** | | | | | | |
| 641. | The Purdue Frederick Company Inc. | Class Action | MDL | Hanlon, Amanda; Gardner, Amy | Amanda Hanlon, et al. v. Purdue Pharma L.P., et al. | 6th Cir. 19-3398 |

EXHIBIT D
Page 523

# EXHIBIT 2

# MONITOR AGREEMENT

## Purdue Monitor Agreement

This monitor agreement (the "Agreement") dated as February __, 2020 ("Effective Date"), is entered into between Tom Vilsack ("Monitor") and Purdue Pharma L.P. ("PPLP").

## Recitals

WHEREAS, on September 15, 2019, PPLP and its direct and indirect subsidiaries and general partner (collectively, the "Debtors" or "Purdue") each commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), which cases are being jointly administered under Case No. 19-23649 (the "Chapter 11 Cases");

WHEREAS, on October 11, 2019, the Bankruptcy Court entered the *Order Pursuant to 11 U.S.C. § 105(a) Granting, in Part, Motion for a Preliminary Injunction* [ECF No. 82] in a related adversary proceeding, Adv. Pro. No. 19-08289 (the "Adversary Proceeding"), pursuant to which the Debtors are subject to the Voluntary Injunction (as modified by: *Amended Order Pursuant to 11 U.S.C. § 105(a) Granting, in Part, Motion for a Preliminary Injunction* [ECF No. 89], *Second Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction* [ECF No. 105], *Third Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction* [ECF No. 115], *Fourth Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction* [ECF No. 126], *Fifth Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction* [ECF No. 132], *Sixth Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction* [ECF No. 139], and any subsequent orders of the Bankruptcy Court, each of which shall automatically be deemed part of this Agreement upon entry of such order by the Bankruptcy Court. collectively referred to as, the "Voluntary Injunction"), each of which can be found by the references identified in Appendix 1 attached hereto; and

WHEREAS, the Voluntary Injunction provides that the Debtors shall work expeditiously to retain a Monitor on the terms set forth in the Voluntary Injunction.

NOW THEREFORE, in consideration of the mutual covenants contained herein, the parties agree as follows:

## Agreement

**Appointment and Term of Monitor.** Purdue hereby appoints the Monitor to undertake those duties and responsibilities of the Monitor set forth in the Voluntary Injunction and as may hereafter be ordered by the Bankruptcy Court. All terms in this Agreement are to be interpreted in a manner consistent with the Voluntary Injunction.

The term of the Monitor shall begin on the date that this Agreement is executed by the Monitor and Purdue and shall continue until the close of the Chapter 11 Cases or such other time as the Bankruptcy Court may hereafter order.

The Monitor may terminate his appointment under this Agreement, without cause, no earlier than ninety (90) days after the receipt of written notice of termination by Purdue's General Counsel.

**Rights, Powers and Responsibilities of the Monitor.** The Monitor shall have all of the rights, powers and responsibilities set forth in Section II.H of the Voluntary Injunction as well as any other rights, powers and responsibilities as may hereafter be ordered by the Bankruptcy Court. The Monitor acknowledges and agrees that he will abide by the terms of the Voluntary Injunction as of the Effective Date, and acknowledges and agrees that any subsequent orders entered by the Bankruptcy Court relating to the Voluntary Injunction will be incorporated herein upon entry, and that the Monitor will then have all of the rights, powers, and responsibilities set forth in the Voluntary Injunction as amended by any such subsequent order.

**Agreements of Purdue.** Purdue agrees to fully, completely and promptly cooperate with the Monitor as set forth in the Voluntary Injunction. Such cooperation shall include instructing and encouraging each of its officers, directors, employees, professional advisors and consultants to carry out such acts as are necessary for the company to fulfill its agreement to cooperate.

**Monitor Compensation and Costs.** The Monitor shall serve without bond or other security and shall be compensated by Purdue for work on this engagement at a rate of **[redacted]** per hour. In addition, Purdue shall pay all reasonable out of pocket expenses reasonably incurred by the Monitor in performance of the engagement. The Monitor will submit receipts and any other back-up documentation reasonably requested by Purdue ("Expense Documentation") for any expenses for which the Monitor seeks reimbursement hereunder, and the Monitor agrees Purdue shall not be liable for any expenses for which there is no adequate Expense Documentation. Purdue will pay the Monitor within forty-five (45) days of its receipt of a correct, undisputed invoice, provided that the Monitor's compensation is subject to final approval by the Bankruptcy Court.

**Other Consultants.** The Monitor shall have the authority to employ, upon Purdue's prior written consent, such consent not to be unreasonably withheld, delayed or conditioned, and upon the Bankruptcy Court's approval, such consultants as may be necessary to carry out his responsibilities, at Purdue's cost and expense. Requests to employ consultants should be directed to Purdue's General Counsel, and will be decided upon no later than ten (10) days from their receipt. The Monitor will work in good faith with Purdue to ensure such approved consultants will follow Purdue's policies and procedures with respect to any payments remitted directly by Purdue.

**Miscellaneous.**

Standard of Performance; Representations. The Monitor will conduct business in accordance with all applicable (i) ethical code requirements, (ii) regulatory requirements, (iii) government-issued rules and guidance, including those relating to data privacy and security, and (iv) all applicable federal, state and local laws, regulations and orders. The Monitor represents and covenants that the Monitor is, and during the term of this Agreement will remain, in compliance with all applicable federal, state and local laws, regulations and orders.

<u>Conflict of Interest.</u>  In the event the Monitor becomes aware that he, or any consultants working under this Agreement, has or may have a conflict of interest that may affect, or could have the appearance of affecting, the Monitor or persons working with the Monitor from performing any of the duties under this Agreement, the Monitor shall promptly inform Purdue.  If the Monitor or a consultant works for, or provides services to, the federal government, whether as a full-time or part-time federal government employee or a special federal government employee or consultant, the Monitor represents by signing this Agreement that no real or apparent conflict of interest exists by entering into this Agreement with Purdue.  Except for disclosures expressly contemplated herein, the Monitor represents and warrants that he is not required to give any notice or obtain any consent from any person or entity in connection with the execution and delivery of this Agreement.

<u>Confidentiality.</u>  The Monitor agrees that he will promptly sign the governing Protective Order entered by the Bankruptcy Court, and that he will cause any approved consultants to sign the Protective Order, and that he and any consultants hereinafter retained will be subject to the terms of the Protective Order and any confidentiality orders that are consistent with the Protective Order.

<u>Choice of Law.</u>  This Agreement is governed by and construed in accordance with the laws of the State of New York (without giving effect to the principles thereof relating to conflicts of law) applicable to contracts negotiated, executed and performed entirely.

<u>Waiver amendment modification.</u>  This Agreement sets forth all terms of engagement between the Monitor and Purdue.  No waiver, amendment or other modification of this Agreement shall be effective unless in writing and signed by each party to be bound thereby.

<u>Independent Contractor.</u>  The Monitor is an independent contractor and not an agent, employee, joint venturer or partner of Purdue for income tax purposes or otherwise.  No life, casualty, or disability insurance, workers' compensation, or health, retirement or any other employment benefits shall be paid by Purdue to or for the benefit of the Monitor.

<u>Counterparts.</u>  This Agreement may be executed in counterparts each of which shall be considered effective as an original signature.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

BY:

**PURDUE PHARMA L.P.**                              **MONITOR**

_____              _____
MARC L. KESSELMAN                                    TOM VILSACK
Senior Vice President,
General Counsel & Corporate Secretary

## Appendix I

*Order Pursuant to 11 U.S.C. § 105(a) Granting, in Part, Motion for a Preliminary Injunction* [ECF No. 82]

*Amended Order Pursuant to 11 U.S.C. § 105(a) Granting, in Part, Motion for a Preliminary Injunction* [ECF No. 89]

*Second Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction* [ECF No. 105]

*Third Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction* [ECF No. 115]

*Fourth Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction* [ECF No. 126]

*Fifth Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction* [ECF No. 132]

*Sixth Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction* [ECF No. 139]

*Seventh Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction* [ECF No. 145]

*Eighth Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction* [ECF No. 168]

*Ninth Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction* [ECF No. 175]

# EXHIBIT 3

# LIST OF DOCUMENTS AND MATERIALS RECEIVED FROM PURDUE PHARMA AND RELATED ENTITIES FEBRUARY 13, 2020

**LIST OF DOCUMENTS AND MATERIALS RECEIVED FROM PURDUE**
**PHARMA AND RELATED ENTITIES FEBRUARY 13, 2020**

Purdue Monitoring Agreement
Protective Order Filed January 28, 2020 - Document 784
Company Overview Materials
Company Background Documents
Voluntary Injunction training materials
Company Policies and Standard Operating Procedures
OxyContin Package Insert and Medication Guide
CDC Guideline for Prescribing Opioids for Chronic Pain
FDA Guidance on Advertising and Promotion
FDA Guidance on Unsolicited Requests
FDA Guidance on Communications with Payors

# EXHIBIT 4

# PURDUE PHARMA DOCUMENTS PRODUCED MARCH 4 AND 8, 2020

**PURDUE PHARMA DOCUMENTS PRODUCED MARCH 4 AND 8, 2020**

Federal and State Aggregate Spend Reports
Company Policies and Reports
Company Standard Operating Procedures
List of Research and Development Studies
Product Catalogue

# EXHIBIT 5

# PURDUE PHARMA DOCUMENTS DELIVERED MARCH 19 AND 20, 2020

**PURDUE PHARMA DOCUMENTS DELIVERED MARCH 19 AND 20, 2020**

Medical Inquiry Logs
Suspicious Ordering Monitoring documents
Federal Aggregate Spend Reports
Industry Alerts

# EXHIBIT 6

# PURDUE PHARMA DOCUMENTS DELIVERED MARCH 23, 2020

**PURDUE PHARMA DOCUMENTS DELIVERED MARCH 23, 2020**

Suspicious Order Monitoring Documents

# EXHIBIT 7

# PURDUE PHARMA PRODUCED
# APRIL 13, 2020

### PURDUE PHARMA PRODUCED APRIL 13, 2020

Financial Records
FDA Submissions and Communications
Lobbying Agreements

# EXHIBIT 8

# PURDUE DOCUMENTS PRODUCED
# APRIL 20, 21, 29, AND 30, 2020

**PURDUE DOCUMENTS PRODUCED APRIL 20, 21, 29, AND 30, 2020**

FDA Communications
Federal Aggregate Spend Reports
Lobbying Agreements
Lobbying Communications
Lobbying Disclosure Forms
Draft Scientific Publications

# EXHIBIT 9

# DOCUMENTS RECEIVED FROM
# PURDUE PHARMA – MAY 11, 2020

**PURDUE DOCUMENTS PRODUCED MAY 11, 2020**

Lobbying Reports
Lobbying Agreement

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address
is:       655 W. Broadway, Suite 800, San Diego, California  92101

A true and correct copy of the foregoing document entitled (*specify*):

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF CHAPTER 11 TRUSTEE RICHARD A. MARSHACK'S
SALE MOTION [DK. 136] AND SUPPORTING POCKET BRIEF**

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d);
and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling
General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the
document. On July 17, 2023, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding
and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at
the email addresses stated below:

⊠        Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On July 17, 2023, I served the following persons and/or entities at the last known addresses in this bankruptcy
case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United
States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a
declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐        Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state
method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on July 17, 2023, I
served the following persons and/or entities by personal delivery, overnight mail service, or (for those who
consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge
here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later
than 24 hours after the document is filed.

        **JUDGE'S COPY**
        The Honorable Scott C. Clarkson
        United States Bankruptcy Court
        Central District of California
        Ronald Reagan Federal Building and Courthouse
        411 West Fourth Street, Suite 5130 / Courtroom 5C
        Santa Ana, CA 92701-4593

☐        Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| July 17, 2023 | Caron Burke | /s/ Caron Burke |
|---------------|-------------|-----------------|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August  2010*                                                    **F 9013-3.1.PROOF.SERVICE**

1.    **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

Eric Bensamochan on behalf of Interested Party Courtesy NEF
eric@eblawfirm.us, G63723@notify.cincompass.com

Eric Bensamochan on behalf of Interested Party Eric Bensamochan
eric@eblawfirm.us, G63723@notify.cincompass.com

Ronald K Brown on behalf of Creditor SDCO Tustin Executive Center, Inc.
ron@rkbrownlaw.com

Christopher Celentino on behalf of Plaintiff Richard A. Marshack
christopher.celentino@dinsmore.com, caron.burke@dinsmore.com

Christopher Celentino on behalf of Trustee Richard A Marshack (TR)
christopher.celentino@dinsmore.com, caron.burke@dinsmore.com

Shawn M Christianson on behalf of Interested Party Courtesy NEF
cmcintire@buchalter.com, schristianson@buchalter.com

Randall Baldwin Clark on behalf of Interested Party Randall Baldwin Clark
rbc@randallbclark.com

Leslie A Cohen on behalf of Interested Party Courtesy NEF
leslie@lesliecohenlaw.com, jaime@lesliecohenlaw.com;clare@lesliecohenlaw.com

Jenny L Doling on behalf of Interested Party INTERESTED PARTY
jd@jdl.law, dolingjr92080@notify.bestcase.com;15994@notices.nextchapterbk.com

Daniel A Edelman on behalf of Creditor Carolyn Beech
dedelman@edcombs.com, courtecl@edcombs.com

Christopher Ghio on behalf of Plaintiff Richard A. Marshack
christopher.ghio@dinsmore.com, Kristina.Heller@Dinsmore.com

Christopher Ghio on behalf of Trustee Richard A Marshack (TR)
christopher.ghio@dinsmore.com, Kristina.Heller@Dinsmore.com

Jeffrey I Golden on behalf of Creditor Anaheim Arena Management, LLC
jgolden@go2.law,
kadele@ecf.courtdrive.com;cbmeeker@gmail.com;lbracken@wgllp.com;gestrada@wgllp.com;golden.jeff
reyi.b117954@notify.bestcase.com

Jeffrey I Golden on behalf of Creditor Anaheim Ducks Hockey Club, LLC
jgolden@go2.law,
kadele@ecf.courtdrive.com;cbmeeker@gmail.com;lbracken@wgllp.com;gestrada@wgllp.com;golden.jeff
reyi.b117954@notify.bestcase.com

Jeffrey I Golden on behalf of Interested Party Courtesy NEF
jgolden@go2.law,
kadele@ecf.courtdrive.com;cbmeeker@gmail.com;lbracken@wgllp.com;gestrada@wgllp.com;golden.jeff
reyi.b117954@notify.bestcase.com

Richard H Golubow on behalf of Creditor Debt Validation Fund II, LLC
rgolubow@wghlawyers.com, jmartinez@wghlawyers.com;svillegas@wghlawyers.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                    **F 9013-.1.PROOF.SERVICE**

Richard H Golubow on behalf of Creditor MC DVI Fund 1, LLC
rgolubow@wghlawyers.com, jmartinez@wghlawyers.com;svillegas@wghlawyers.com

Richard H Golubow on behalf of Creditor MC DVI Fund 2, LLC
rgolubow@wghlawyers.com, jmartinez@wghlawyers.com;svillegas@wghlawyers.com

D Edward Hays on behalf of Interested Party Courtesy NEF
ehays@marshackhays.com,
ehays@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com;cmendoza@marshackhays.com;cmendoza@ecf.courtdrive.com

D Edward Hays on behalf of Trustee Richard A Marshack (TR)
ehays@marshackhays.com,
ehays@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com;cmendoza@marshackhays.com;cmendoza@ecf.courtdrive.com

Alan Craig Hochheiser on behalf of Creditor City Capital NY
ahochheiser@mauricewutscher.com, arodriguez@mauricewutscher.com

Garrick A Hollander on behalf of Creditor Debt Validation Fund II, LLC
ghollander@wghlawyers.com, jmartinez@wghlawyers.com;svillegas@wghlawyers.com

Garrick A Hollander on behalf of Creditor MC DVI Fund 1, LLC
ghollander@wghlawyers.com, jmartinez@wghlawyers.com;svillegas@wghlawyers.com

Garrick A Hollander on behalf of Creditor MC DVI Fund 2, LLC
ghollander@wghlawyers.com, jmartinez@wghlawyers.com;svillegas@wghlawyers.com

Razmig Izakelian on behalf of Creditor OHP-CDR, LP
razmigizakelian@quinnemanuel.com

Joon M Khang on behalf of Debtor The Litigation Practice Group P.C.
joon@khanglaw.com

Ira David Kharasch on behalf of Interested Party Ad Hoc Consumer Claimants Committee
ikharasch@pszjlaw.com

Ira David Kharasch on behalf of Interested Party Courtesy NEF
ikharasch@pszjlaw.com

Nicholas A Koffroth on behalf of Creditor Committee Committee of Unsecured Creditors
nkoffroth@foxrothschild.com, khoang@foxrothschild.com

David S Kupetz on behalf of Defendant Marich Bein, LLC
David.Kupetz@lockelord.com, mylene.ruiz@lockelord.com

David S Kupetz on behalf of Interested Party Courtesy NEF
David.Kupetz@lockelord.com, mylene.ruiz@lockelord.com

Christopher J Langley on behalf of Interested Party Courtesy NEF
chris@slclawoffice.com,
omar@slclawoffice.com;langleycr75251@notify.bestcase.com;ecf123@casedriver.com

Daniel A Lev on behalf of Interested Party Courtesy NEF

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                 F 9013-.1.PROOF.SERVICE

daniel.lev@gmlaw.com, cheryl.caldwell@gmlaw.com;dlev@ecf.courtdrive.com

Michael D Lieberman on behalf of Creditor Phillip A. Greenblatt, PLLC
mlieberman@lipsonneilson.com

Yosina M Lissebeck on behalf of Trustee Richard A Marshack (TR)
Yosina.Lissebeck@Dinsmore.com, caron.burke@dinsmore.com

Richard A Marshack (TR)
pkraus@marshackhays.com, rmarshack@iq7technology.com;ecf.alert+Marshack@titlexi.com

Laila Masud on behalf of Interested Party Courtesy NEF
lmasud@marshackhays.com, lmasud@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com

Laila Masud on behalf of Interested Party Richard A. Marshack
lmasud@marshackhays.com, lmasud@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com

Laila Masud on behalf of Plaintiff Richard Marshack
lmasud@marshackhays.com, lmasud@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com

Laila Masud on behalf of Trustee Richard A Marshack (TR)
lmasud@marshackhays.com, lmasud@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com

Kenneth Misken on behalf of U.S. Trustee United States Trustee (SA)
Kenneth.M.Misken@usdoj.gov

Byron Z Moldo on behalf of Interested Party Byron Moldo
bmoldo@ecjlaw.com, amatsuoka@ecjlaw.com,dperez@ecjlaw.com

Alan I Nahmias on behalf of Interested Party Courtesy NEF
anahmias@mbn.law, jdale@mbnlawyers.com

Victoria Newmark on behalf of Interested Party Courtesy NEF
vnewmark@pszjlaw.com

Queenie K Ng on behalf of U.S. Trustee United States Trustee (SA)
queenie.k.ng@usdoj.gov

Keith C Owens on behalf of Creditor Committee Committee of Unsecured Creditors
kowens@foxrothschild.com, khoang@foxrothschild.com

Teri T Pham on behalf of Attorney Teri Pham
tpham@epglawyers.com, ttpassistant@epglawyers.com

Douglas A Plazak on behalf of Defendant Greyson Law Center PC
dplazak@rhlaw.com

Ronald N Richards on behalf of Defendant Consumer Legal Group, PC
ron@ronaldrichards.com, 7206828420@filings.docketbird.com

Ronald N Richards on behalf of Interested Party Courtesy NEF
ron@ronaldrichards.com, 7206828420@filings.docketbird.com

Gregory M Salvato on behalf of Creditor Mari Agape

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

F 9013-.1.PROOF.SERVICE

gsalvato@salvatoboufadel.com,
calendar@salvatolawoffices.com;jboufadel@salvatoboufadel.com;gsalvato@ecf.inforuptcy.com

Gregory M Salvato on behalf of Interested Party Courtesy NEF
gsalvato@salvatoboufadel.com,
calendar@salvatolawoffices.com;jboufadel@salvatoboufadel.com;gsalvato@ecf.inforuptcy.com

Olivia Scott on behalf of Creditor Azzure Capital LLC
olivia.scott3@bclplaw.com

Olivia Scott on behalf of Creditor Hi Bar Capital LLC
olivia.scott3@bclplaw.com

Jonathan Serrano on behalf of Plaintiff Richard A. Marshack
jonathan.serrano@dinsmore.com

Jonathan Serrano on behalf of Trustee Richard A Marshack (TR)
jonathan.serrano@dinsmore.com

Paul R Shankman on behalf of Attorney Paul R. Shankman
PShankman@fortislaw.com, info@fortislaw.com

Paul R Shankman on behalf of Creditor United Partnerships, LLC
PShankman@fortislaw.com, info@fortislaw.com

Leslie Skorheim on behalf of U.S. Trustee United States Trustee (SA)
leslie.skorheim@usdoj.gov

Howard Steinberg on behalf of Defendant BankUnited, N.A.
steinbergh@gtlaw.com, pearsallt@gtlaw.com;howard-steinberg-6096@ecf.pacerpro.com

Andrew Still on behalf of Interested Party Courtesy NEF
astill@swlaw.com, kcollins@swlaw.com

United States Trustee (SA)
ustpregion16.sa.ecf@usdoj.gov

Sharon Z. Weiss on behalf of Creditor Azzure Capital LLC
sharon.weiss@bclplaw.com, raul.morales@bclplaw.com,REC_KM_ECF_SMO@bclplaw.com

Sharon Z. Weiss on behalf of Creditor Hi Bar Capital LLC
sharon.weiss@bclplaw.com, raul.morales@bclplaw.com,REC_KM_ECF_SMO@bclplaw.com

Johnny White on behalf of Creditor Debt Relief Group, LLC
JWhite@wrslawyers.com, jlee@wrslawyers.com

Johnny White on behalf of Interested Party Courtesy NEF
JWhite@wrslawyers.com, jlee@wrslawyers.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                **F 9013-.1.PROOF.SERVICE**