Michael A. Sweet (SBN 184345)
Keith C. Owens (SBN 184841)
Nicholas A. Koffroth (SBN 287854)
**FOX ROTHSCHILD LLP**
10250 Constellation Blvd., Suite 900
Los Angeles CA 90067
Telephone:    (310) 598-4150
Facsimile:    (310) 556-9828
msweet@foxrothschild.com
kowens@foxrothschild.com
nkoffroth@foxrothschild.com

*Proposed* Counsel For Official Committee of Unsecured Creditors

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SANTA ANA DIVISION**

| | |
|---|---|
| In re:<br><br>THE LITIGATION PRACTICE GROUP, P.C.,<br><br>       Debtor. | Chapter 11<br><br>Case No. 8:23-bk-10571-SC<br><br>**BRIEF OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS ADDRESSING QUESTIONS RAISED IN COURT'S ORDER REQUESTING ADDITIONAL BRIEFING IN SUPPORT OF SALE MOTION**<br><br>**<u>Hearing Date and Time</u>**<br><br>Date:     July 21, 2023<br>Time:     10:00 a.m.<br>Location:  Courtroom 5C<br>           411 West Fourth Street<br>           Santa Ana, California 92701<br>               or<br>            *via ZoomGov* |

# TABLE OF CONTENTS

I.    Introduction ............................................................................................................. 1

II.    Factual Background ................................................................................................ 2

III.    Legal Analysis ....................................................................................................... 5

    A.    The LSAs Are Not Void as a Matter of Law and Can Be Assumed, Assigned and Reformed to Comply with Applicable Law. .................................................. 5

        1.    CROA Does Not Apply ........................................................................... 5

        2.    LSAs Are Not Void Under the TSR, Assuming, *Arguendo*, That the TSR Applies .......................................................................................... 9

        3.    Severance and Reformation Are Permitted Under California Law .......... 10

        4.    Concerns About Unconscionability Can Be Addressed ........................... 13

    B.    The Bankruptcy Court has Authority to Approve a Sale Even if Aspects of the Debtor's Business May Be Illegal .......................................................................... 14

    C.    Necessary Conditions .................................................................................... 15

        1.    Opt-Out Provision .................................................................................. 15

        2.    Other Protections .................................................................................... 18

    D.    The Trustee Should Hold Funds Pending Expiration of the Opt-Out Period ....... 20

IV.    Reservation of Rights ............................................................................................. 21

V    Conclusion ............................................................................................................. 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Garvin v. Cook Invs.*,
    922 F.3d 1031 (9th Cir. 2019)............................................................................................ 14

*Addair v. Stockton Unified School Dist.*,
    162 Cal.App.4th 1436 (2008) ........................................................................................... 11

*Ajamian v. CantorCO2e, L.P.*,
    203 Cal. App. 4th 771 (2012) .......................................................................................... 12

*Armendariz v. Found. Health Psychcare Servs., Inc.*,
    24 Cal. 4th 83 (2000) ....................................................................................................... 11

*Bilbao v. Pac. Insolvency All., LLC*,
    No. CV 21-7736-GW-PVCX, 2022 WL 2160415 (C.D. Cal. Feb. 4, 2022) ...................... 6

*In re Borders Group, Inc.*,
    2011 WL 5520261 (Bankr. S.D.N.Y. Sept. 27, 2011) ..................................................... 16

*In re Boy Scouts of America and Delaware BSA, LLC*,
    642 B.R. 504 (Bankr. D. Del. 2022) ................................................................................ 16

*Carpenter v. Opportunity Fin., LLC*,
    2023 WL 2960327 (C.D. Cal. March 29, 2023) ............................................................... 17

*Cicle v. Chase Bank*,
    583 F.3d 548 (8th Cir. 2009).......................................................................................... 14

*Cir. City Stores, Inc. v. Mantor*,
    335 F.3d 1101 (9th Cir. 2003) ......................................................................................... 17

*In re Cred Inc.*,
    2023 WL 2245371 (Bankr. D. Del. Feb. 27, 2023) ......................................................... 16

*In re Creger*,
    403 B.R. 381 (Bankr. W.D. Va. 2009)............................................................................. 13

*In re CW Nevada, LLC*,
    602 B.R. 717 (Bankr. D. Nev. 2019) ............................................................................... 14

*In re Egghead.com, Inc.*,
    2001 WL 35671549 (Bankr. N.D. Cal. Sept. 21, 2001)................................................... 16

*In re Enron Corp.*,
    2002 WL 32155473 (Bankr. S.D.N.Y. Oct. 4, 2002) ...................................................... 16

*Fair v. Bakhtiari*,
    195 Cal.App.4th 1135, 125 Cal.Rptr.3d 765 (2011)........................................................ 10

*Fluke v. Cashcall, Inc.*,
   2009 WL 1437592 (E.D. Pa. March 22, 2010) ...................................................................... 17

*In re Gilmore*,
   284 B.R. 801 (Bankr. E.D. Va. 2002) ..................................................................................... 13

*In re Golden Books Family Entertainment, Inc.*,
   269 B.R. 300 (Bankr. D. Del. 2001) ........................................................................................ 16

*In re Golfsmith Int'l Holdings, Inc.*,
   2016 WL 10574673 (Bankr. D. Del. Nov. 2, 2016) ................................................................ 16

*Greene v. CCDN, LLC*,
   853 F. Supp. 2d 739 (N.D. Ill. 2011) ........................................................................................ 6

*Guadagno v. E*Trade Bank*,
   592 F.Supp.2d 1263 (C.D. Cal. 2008) ..................................................................................... 17

*In re Hacienda Company LLC*,
   647 B.R. 748 (Bankr. C.D. Cal. 2003) .............................................................................. 14, 15

*In re Jevic Holding Corp.*,
   2010 WL 3431985 (Bankr. D. Del. Aug. 27, 2010) ................................................................ 16

*Jones v. First American Title Ins. Co.*,
   107 Cal.App.4th 381 (2003) .................................................................................................... 12

*Keene v. Harling*,
   61 Cal.2d 318 (1964) ............................................................................................................... 11

*Lim v. TForce Logistics, LLC*,
   8 F.4th 992 (9th Cir. 2021) ..................................................................................................... 12

*Marathon Entm't, Inc. v. Blasi*,
   42 Cal.4th 974 (2008) ........................................................................................................ 10, 11

*Mohamed v. Uber Techs., Inc.*,
   848 F.3d 1201 (9th Cir. 2016)........................................................................................... 11, 17

*Parada v. Super. Ct.*,
   176 Cal.App.4th 1554 (2009) .................................................................................................. 12

*In re Pierson*,
   447 B.R. 840 (Bankr. N.D. Ohio 2011) ................................................................................... 11

*Pinnacle Museum Tower Ass'n v. Pinnacle Market Dev. (US), LLC*,
   55 Cal. 4th 223 (2012) ............................................................................................................. 12

*Plattner v. Edge Sols., Inc.*,
   422 F. Supp. 2d 969 (N.D. Ill. 2006) ........................................................................................ 6

*Stone v. Mid Am. Bank & Tru. Co.*,
   2018 WL 4701843 (E.D. Wash. Aug. 31, 2018) ..................................................................... 17

*Stout v. FreeScore, LLC*,
    743 F.3d 680 (9th Cir. 2014) ............................................................................ 7

*In re Tenn-Fla Partners*,
    1993 WL 151346 (Bankr. W.D. Tenn. April 29, 1993) ....................................... 16

*Vianu v. AT&T Mobility LLC*,
    No. 19-cv-03602-LB, 2020 WL 3103797 (N.D. Cal. June 11, 2020) ................... 11

*Walston v. Nationwide Credit, Inc.*,
    No. 18 C 7877, 2019 WL 4139002 (N.D. Ill. Aug. 30, 2019) .............................. 6

*White v. Fin. Credit Corp.*,
    2001 WL 1665386 (N.D. Ill. Dec. 27, 2001) ...................................................... 6

*In re Yashouafar*,
    2019 WL 342536 ............................................................................................... 12

**Statutes and Other Authorities**

11 U.S.C. § 105 .................................................................................................... 13

11 U.S.C. § 365(c)(1) ............................................................................................ 15

Credit Repair Organizations Act, 15 U.S.C. § 1679, *et seq.* .................................. 5

15 U.S.C. § 1679(b) .............................................................................................. 5

15 U.S.C. § 1679(f)(a) ........................................................................................... 5

15 U.S.C. § 1679a(3)(A) ...................................................................................... 5, 6

15 U.S.C. § 1679f(c) .............................................................................................. 5

Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. § 6101,
    *et seq* ............................................................................................................... 9

16 C.F.R. § 310, *et seq.* ........................................................................................ 9

16 C.F.R. § 310.4(a)(2) .......................................................................................... 9

16 CFR § 310.3. § 310.2(o) .................................................................................... 9

Cal. Civ. Code § 3400 ........................................................................................... 12

Cal. Civ. Code § 3401 ........................................................................................... 12

Cal. Civ. Code § 3402 ........................................................................................... 12

Cal. Civ. Code § 1599 ........................................................................................... 10

Cal. Civ. Code § 1670.5 ..................................................................................... 12, 13

Cal. Civ. Code § 1670.5(a) .................................................................................. 11, 13

Cal. Civ. Code § 3399 .................................................................................................... 12

CAL. R. PROF. CONDUCT 1.17(b)(2)(i) ......................................................................... 15

1    The Official Committee of Unsecured Creditors (the "Committee") of The Litigation

2    Practice Group, P.C. (the "Debtor") appointed in the above-referenced bankruptcy case (the

3    "Bankruptcy Case") pending under chapter 11 of title 11 of the United States Code (the

4    "Bankruptcy Code"),[1] hereby submits this brief (the "Brief") addressing the question raised in the

5    Court's *Order Requesting Additional Briefing in Support of Sale Motion* [Docket No. 206] (the

6    "Sale Briefing Order").   In support of this Brief, the Committee refers to the record in this

7    Bankruptcy Case and the argument of counsel at any hearing on the Sale Motion (defined below),

8    and respectfully states as follows:

9                                      **I.**

10                              **INTRODUCTION**

11    The proposed sale requires the Committee to walk a fine line balancing the significant

12    benefit to the estate of a value-maximizing sale with the legal compliance requirements necessary

13    to properly authorize a sale and protect consumers.  The Committee was appointed to protect the

14    interests of the Debtor's general unsecured creditors, many of whom are also consumer clients who

15    engaged the Debtor to perform debt relief services under the LSAs.[2]  In response to the Court's

16    Order for briefing concerning the sale, the Committee undertook an analysis of the Trustee's

17    proposed assumption and assignment of the LSAs and applicable law to determine whether the

18    estate is capable of transferring the LSAs while complying with applicable law.  Based on this

19    analysis, the Committee concluded that the Court has authority to approve the proposed sale,

20    including the assumption and assignment of the LSAs, if the LSAs and APA are adequately

21    reformed to ensure compliance with all applicable law and provide certain oversight and safeguard

22    protections to consumers.  Chief among the necessary protections for consumer clients is the receipt

23    of clear notice advising them of their rights to "opt out" from having their LSAs assumed and

24

25

26    [1] Unless otherwise defined herein, all references to "Section" or "§" refer to a section of the
Bankruptcy Code.

27

28    [2] All capitalized terms in this Introduction shall have the meanings ascribed to them elsewhere in
this brief.

assigned, and oversight of the buyer's performance of the assigned LSAs by a Court-appointed Monitor with Committee input and participation

Importantly, the Debtor's clients engaged the Debtor because they presumably needed assistance addressing their debts. Allowing the LSAs to be assumed, assigned and reformed to comply with applicable law while providing clear notice to clients of their right to opt out of the sale and assumption, assignment and reformation of the LSAs, will provide the Debtor's clients with the opportunity to receive continued debt validation and related services under a legally valid and enhanced framework that better protects their rights and interests, or the ability to walk away from the LSA without repercussion, and to assert a claim against the bankruptcy estate and to potentially seek a refund to the extent required under applicable law.[3]

## II.

## FACTUAL BACKGROUND

On March 20, 2023 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

The Debtor provided debt validation services for its clients, consisting of individual consumers. The Debtor claims to have had more than 50,000 consumers clients and is a party to approximately 22,000 Legal Services Agreements (the "LSAs") that involve "active client files" that are subject to the Sale Motion (defined below).  The Committee is aware of at least two versions of the LSAs, which have been incorporated in the record as Exhibits A through F to the *Declaration of Marilyn Sorensen* (the "Sorensen Declaration" in support of the *United States Trustee's Opposition to:  (1) Motion for Order Approving Stipulation Between the Debtor; Consumer Legal Group, P.C.; LGS Holdco, LLC; and Set Forth, Inc. f/k/a Debtpaypro; and (2) Motion for Approving Stipulation re Avoidance and Recovery of Avoidable Transfers to Defendant Phoenix Law, PC and Turnover of All Related Property to the Trustee and Order of Dismissal Without Prejudice of Defendants Williams Taylor Carss and Maria Eeya Tan* [Docket No. 209].  For the Court's convenience, the form LSAs are attached hereto as **Exhibit A** (hereinafter referred to as

---

[3] The Committee reserves all rights with respect to any substantive objections to the sale, which will be addressed in a subsequent filing.

"LSA Version 1") and **Exhibit B** (hereinafter referred to as "LSA Version 2"),[4] and pertinent language from each is reproduced below.

On May 4, 2023, the Court entered an order [Docket No. 58] appointing Richard A. Marshack as chapter 11 trustee (the "Trustee") in this Bankruptcy Case.  On June 13, 2023, the Trustee filed a motion [Docket No. 102] for the approval of reimbursement procedures for counsel to a proposed *ad hoc* committee of consumer claimants.  On June 27, 2023, the Court entered an order [Docket No. 151] approving a stipulation [Docket No. 149] voluntarily dismissing the *ad hoc* committee motion in light of the appointment of the Committee and the agreement that a majority of the Committee's members will remain consumer claimants.

On June 23, 2023, the Office of the United States Trustee (the "UST") appointed [Docket No. 134] the Committee.  On June 29, 2023, the UST expanded [Docket No. 157] the Committee's membership from five to seven members.  On June 29, 2023, the Committee retained proposed counsel.

On July 7, 2023, the Trustee filed a *Motion for Entry of an Order (A) Approving Sale, Subject to Overbid, of Assets Free and Clear of All Liens, Claims, Encumbrances and Interests Pursuant to 11 U.S.C. § 363(b) and (B) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and Other Agreements* [Docket no. 191] (the "Sale Motion").  The Sale Motion was filed with an *Application for Order Setting Hearing on Shortened Time* [Docket No. 192] (the "Shortened Time Application").  On July 10, 2023, the Court entered an order setting a hearing on the Sale Motion on shortened time for July 10, 2023, at 2:00 p.m.

Through the Sale Motion, the Trustee, among other things, is seeking to assume and assign the LSAs to Consumer Legal Group PC ("CLG") subject to overbids. According to the Sale Motion, upon assignment, the LSAs will be reformed "(i) to comply with applicable law; (ii) to require performance in accordance with applicable law; (iii) to define earned fees in accordance with applicable laws; and (iv) permit consumer consent to the transfer of the contract to [the Purchaser]

---

[4] The sample LSA attached hereto as Exhibit A was originally included as part of Exhibit B to the Sorensen Declaration, while the sample LSA attached hereto as Exhibit B was originally included as part of Exhibit E to the Sorensen Declaration.

and counsel in accordance with California Model Rule 1.17." *Sale Motion,* at 17.  The Trustee also submits a proposed reform services agreement (the "Reformed Agreement") between CLG and the Debtor's consumer clients that would replace the LSAs upon assignment of the LSAs to CLG.  *See* Declaration of Richard A. Marshack (the "Trustee's Declaration") in support of the Sale Motion, Exhibit "4" [Docket No. 191-1].  For ease of reference, a copy of the Reformed Agreement is attached as **Exhibit C** hereto.

A proposed Asset Purchase Agreement (the "APA") is attached as Exhibit 1 to the Trustee's Declaration.  The purchase price for the proposed sale is $8 million plus a fee equal to 20% of all amounts collected by CLG on "Active Executory Contracts" (as defined in the APA) and 15% of all amounts collected by CLG on "Inactive Executory Contracts" (as defined in the APA).

On July 10, 2023, the Committee filed an opposition to the Shortened Time Application (the "Committees Initial Opposition") [Docket No. 198], raising several concerns with the proposed sale assignment of the LSAs to CLG.

Following the hearing on July 10, 2023, the Court entered the Sale Briefing Order, requesting interested parties to file a separate pocket brief on certain questions set forth in the Sale Briefing Order concerning the Trustee's proposed sale.  This Brief addresses the questions posed in the Sale Briefing Order.[5]

On July 12, 2023, the UST filed a *Motion to Convert Case to Chapter 7 Pursuant to 11 U.S.C. § 1112(b)* (the "Motion to Convert") [Docket No. 218].  In the Motion to Convert, the UST argues, among other things, that LSAs are void as a matter of law, and therefore cannot be assigned to CLG.

---

[5] On July 11, 2023, the Court entered a separate scheduling order scheduling a hearing on the Sale Motion for July 21, 2023 at 10:00 a.m. and requiring oppositions to be filed by July 19, 2023 [Docket No. 214]. Unless the Committee is able to reach an agreement with the Trustee on significant material issues, the Committee intends to file a more substantive opposition to the Sale Motion in accordance with the scheduling order.

**III.**

**LEGAL ANALYSIS**

**A.      The LSAs Are Not Void as a Matter of Law and Can Be Assumed, Assigned and Reformed to Comply with Applicable Law.**

     **1.      CROA Does Not Apply**

In the Motion to Convert, the UST argues, among other things, that the LSAs are void as a matter of law under the Credit Repair Organizations Act, 15 U.S.C. § 1679, *et seq.* (the "CROA"). The stated purposes of the CROA are: "(1) to ensure that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services; and (2) to protect the public from unfair or deceptive advertising and business practices of credit repair organizations." 15 U.S.C. § 1679(b).

The CROA defines a "credit repair organization" as:

> any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, **for the express or implied purpose of – (i) improving any consumer's credit record, credit history, or credit rating; or (ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i)**….

15 U.S.C. § 1679a(3)(A) (emphasis added).  The CROA further provides a contract for services subject to the CROA that is noncompliant with the CROA "(1) shall be treated as void; and (2) may not be enforced by any Federal or State court or any other person." 15 U.S.C. § 1679f(c). Similarly, a consumer waiver of any protection under the CROA shall be treated as void and unenforceable. 15 U.S.C. § 1679(f)(a).

While the Committee has concerns about certain provisions of the LSAs, the Reformed Agreement, and the APA, as detailed below, and after consulting with the Trustee, the Committee does not believe that the Debtor is a "credit repair organization" ("CRO") as defined in the CROA. As one recent court explained:

> [Plaintiff] asserts that Nationwide is a "credit repair organization" because it offered him the opportunity to pay his debt and to regain

- 5 -

his American Express card membership and because doing those things could "improve [his] credit record/history/rating." That misunderstands what it means to be a credit repair organization. As just noted, a credit repair organization is a business that "sell[s], provide[s], or perform[s] ... any service ... for the express or implied purpose of ... improving any consumer's credit record, credit history, or credit rating." 15 U.S.C. § 1679a(3)(A). Particularly given the emphasized text, the definition of credit repair organization encompasses "entities whose focus is on the improvement or repair of a consumer's credit record, credit history or credit rating, explicitly or implicitly, not entities whose activities are aimed at assisting consumers in developing 'creditworthy behavior' and paying their debts, which may result in improved actual credit as a collateral consequence, rather than as a program objective." *Plattner v. Edge Sols., Inc.*, 422 F. Supp. 2d 969, 975 (N.D. Ill. 2006) (emphasis added). ***Put another way, for an entity to be a credit repair organization, the purpose of the service provided by the entity, and not just the service's incidental effect, must be the improvement or repair of the consumer's credit record.*** *See Greene v. CCDN, LLC*, 853 F. Supp. 2d 739, 752 (N.D. Ill. 2011) (citing *Plattner* with approval); *White v. Fin. Credit Corp.*, 2001 WL 1665386, at *6 (N.D. Ill. Dec. 27, 2001) ("[T]he CROA is aimed at companies that are in the business of performing 'any service ... in return for' money for the purpose of improving a party's credit history") (omission in original).

*Walston v. Nationwide Credit, Inc.*, No. 18 C 7877, 2019 WL 4139002, at *4 (N.D. Ill. Aug. 30, 2019) (emphasis added) (some internal citations omitted).

In *Plattner v. Edge Sols., Inc.*, the Illinois district court explained that the company was a debt-settlement company, rather than a credit-repair organization as the company had "ma[de] clear that participation in [its] program [would] likely result in damage to the participant's credit" and "that the participant's credit is outside the scope of the program" and the company "did not represent or even imply that [its] program was designed to improve the participant's credit as required for [it] to be a credit repair organization." 422 F. Supp. 2d 969, 974-75 (N.D. Ill. 2006). *But see Bilbao v. Pac. Insolvency All., LLC*, No. CV 21-7736-GW-PVCX, 2022 WL 2160415, at *3 (C.D. Cal. Feb. 4, 2022) ("[A] debt settlement company, also qualifies as a credit reporting agency based on Plaintiff's allegation that Defendant orally communicated that it could repair her credit in addition to reducing her debt and the plain language of the CROA"). Similarly in *Hillis v. Equifax Consumer Servs., Inc.*, the United States District Court for the Northern District of

Georgia explained that due the legislative history of the CROA, "Congress defined a CRO in a way that focuses not on 'credit' generally, but instead on those who claim they can undo or improve a consumer's past, historical, displayable, and tangible credit record."  237 F.R.D. 491, 516 (N.D. Ga. 2006) (finding the defendant not to be a credit-repair organization); *cf. Stout v. FreeScore, LLC*, 743 F.3d 680, 687 (9th Cir. 2014) (holding that FreeScore was a CRO because "while not actually providing credit repair services, [FreeScore] has represented that it can or will sell, provide, or perform a service ***for the purpose of providing advice or assistance to a consumer with regard to improving a consumer's credit record, history, or rating***.") (emphasis added).

Here, the services provided by the Debtor under the LSAs are not primarily focused on "repairing" consumers' credit reports or improving a consumer's credit history or rating.  Rather, the LSAs provide that the Debtor will engage directly with creditors and collection agencies to invalidate or otherwise compromise debts, including initiating legal action on behalf of consumers. For example, LSA Version 1 describes the "Legal Services" to be provided by the Debtor as:

> [The Debtor] will provide debt validation services wherein it will assist you in removing erroneous or inaccurate information appearing on one or more of your credit reports by contesting debts appearing therein.  This service is limited to information reported by creditors or purported creditors to credit bureaus.  The purpose of this program is to challenge the legal validity of debts appearing on or being reported to credit bureaus…

*See* Exhibit A.  Meanwhile, LSA Version 2, sets forth the following itemized list of "Legal Services" as part of the Debtor's representation of the client, including:

- Assist you in stopping creditors and any related debt collectors from harassing or contacting you in connection with any debts identified below;

- Dispute the legal validity of the debts identified below;

- Assist you in removing erroneous or inaccurate information reported in connection with debts identified below;

- Represent you in any lawsuit filed against you in connection with any of these debts;

- Defend you against any collection activity or lawsuit on any invalidated debt at any point in time, without expiration, in connection with any debt identified below;

- Initiate legal action in a court of competent jurisdiction against any creditor that violates any state or federal law in connection with any debt identified below; and

- Determine your qualification for bankruptcy under Chapter 7 or Chapter 13 of the U.S. Bankruptcy Code, and counsel you regarding the procedures and effects of bankruptcy as well as your qualification to file the same.

*See* Exhibit B.  The "Legal Services" LSA Version 2 also states that "[the Debtor] will serve as your attorney for all purposes in connection with these disputes and will be available to render all legal assistance necessary to resolve these debts." *Id.*

Additionally, the "Description of Services to be Performed" section of the LSAs (both versions) states, in relevant part:

> Where appropriate, LPG will use existing laws and interact with creditors and credit bureaus on your behalf to invalidate your debts and remove such invalid debts from your credit reports.  LPG will also interact with collection agencies, as applicable, to invalidate your debts by requiring them to supply evidence of your indebtedness to them, or any other legal mechanism.  LPG will also consult with you regarding all aspects of the credit reporting process, including all laws applicable to the same.   LPG will also investigate your delinquent accounts in order to determine the most effective method for invalidating your debts or otherwise removing legal liability for such debts, up to and including the initiation of lawsuits on your behalf against your creditors and their third-party debt collectors.

> In addition, if a lawsuit is filed against you, LPG will represent you in such a lawsuit and will not charge any additional fees for such representation provided such a lawsuit was initiated after the date you sign this Agreement.  In the event a lawsuit was initiated against you before the date you execute this Agreement and you elect to have LPG represent you, an additional fee of $500.00 will be charged….

Exhibits A and B.  Additionally, in the "Debt Settlement" section of the LSAs (both versions), it is expressly contemplated that the consumer may "elect to have LPG negotiate a settlement on your behalf with the concerned creditor…." *Id.*

While the Committee does not believe that the issue is as clear cut as the Trustee or the United States Trustee argue, the Committee believes that the stronger argument is that the Debtor is in the business of "debt settlement", including service as legal counsel for its clients, rather than

1   "credit repair", and therefore, the CROA does not apply.  In particular, because the purposes of the

2   services provided by the Debtor is not the improvement or repair of the consumer's credit record,

3   the Committee believes that the better argument is that the Debtor does not fall within the definition

4   of a CRO.  While one impact of the Debtor's successful services may be a positive change in credit

5   reporting, the primary goal is to form a strategy for addressing the consumer's debts and deal

6   directly with creditors and collection agencies.  The Committee also understands that the Trustee

7   will offer expert testimony that the Debtor is not subject to the CROA.

8       **2.**    **LSAs Are Not Void Under the TSR, Assuming, *Arguendo*, That the TSR**

9       **Applies**

10      The UST also asserts that the LSAs violate the Telemarketing Sales Rule, 16 C.F.R. § 310,

11  *et seq*. (the "TSR"), which implements the Telemarketing and Consumer Fraud and Abuse

12  Prevention Act, 15 U.S.C. § 6101, *et seq*, and is intended to address deceptive and abusive

13  telemarketing acts or practices.  The TSR prohibits deceptive telemarketing acts or practices by

14  "any seller" or "telemarketer" from engaging in certain conduct including, among other things, the

15  failure of the seller or telemarketer to make certain required disclosures before a consumer enrolls

16  in an offered program or making certain misrepresentations in the sale of goods or services.  *See*

17  16 CFR § 310.3.  Section 310.2(o) of the TSR covers entities that provide "debt relief service",

18  which is defined as "any program or service represented, directly or by implication, to renegotiate,

19  settle, or in any way alter the terms of payment or other terms of the debt between a person and one

20  or more unsecured creditors or debt collectors, including, but not limited to, a reduction in the

21  balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector."  In

22  addition, Section 310.4 prohibits any seller or telemarketer from requesting or receiving payment

23  of any fee or consideration for goods or services represented "to remove derogatory information

24  from, or improve, a person's credit history, credit record or credit rating."  16 C.F.R. § 310.4(a)(2).

25  The TSR provides that covered business can only charge fees for telemarketing services after

26  providing consumers with documentation reflecting that the promised results have been achieved.

27      As discussed above, under the "Debt Settlement" section, the LSAs provide that the

28  consumer may "elect to have LPG negotiate a settlement on your behalf with the concerned

1   creditor….." However, the Debtor does not represent that the services provided are intended "to

2   remove derogatory information from, or improve, a person's credit history, credit record or credit

3   rating."  Although not clear cut, the Committee believes that the TSR may arguably apply with

4   respect to the services performed.  However, unlike CROA, which provides that a violation of the

5   TSR nullifies and makes unenforceable the underlying agreement, there is no such provision that

6   applies under the TSR.  As such, the Committee believes that the Court can reform the LSAs to

7   require the buyer to comply with all applicable laws under the supervision of a Court-appointed

8   monitor without deciding today whether the Debtor in fact violated the TSR.  Any consumer client

9   who wishes to opt out of the proposed assumption, assignment and reformation of an LSA should

10  be entitled to do so and preserve all of its rights, remedies and claims including the right to any

11  refunds that may available under applicable law.  To the extent the Debtor collected fees from its

12  clients prior to providing services, the clients may have claims which can be addressed through a

13  plan, as further discussed below. The Committee therefore believes that even if the TSR applies,

14  the LSAs can be reformed to be in compliance with the TSR going forward.

15          **3.      Severance and Reformation Are Permitted Under California Law**

16          The Committee believes that the LSAs may be reformed to comply with applicable law.[6]

17  In particular, several provisions of the California Civil Code contemplate severance of illegal

18  portions of a contract and reformation.  For instance, section 1599 of the California Civil Code

19  provides that "[w]here a contract has several distinct objects, of which one at least is lawful, and

20  one at least is unlawful, in whole or in part, the contract is void as to the latter and valid as to the

21  rest."  Cal. Civ. Code § 1599.  The provision "codifies the common law doctrine of severability of

22  contracts."  *Fair v. Bakhtiari*, 195 Cal.App.4th 1135, 1157, 125 Cal.Rptr.3d 765 (2011).  In such

23  instances, "the decision whether to sever the illegal portions and enforce the remainder is a

24  discretionary decision for the trial court to make based on equitable considerations."  *Id.*, at 1157;

25  *see also Marathon Entm't, Inc. v. Blasi*, 42 Cal.4th 974, 996 (2008) (in deciding whether a contract

26

_____

[6] The LSA Version 1 does not include a choice of law provision; however, as the Debtor is a
27  California law firm, the Committee analyzes severance and reformation under California law.  *See*
Ex. A.  By contrast, LSA Version 2 includes an acknowledgement that "California law applies to
28  this Agreement."  Ex. B.

1   is severable, "[t]he overarching inquiry is whether the interests of justice … would be furthered by

2   severance.").  California courts generally "take a very liberal view of severability, enforcing valid

3   parts of an apparently indivisible contract where the interests of justice or the policy of law would

4   be furthered." *Addair v. Stockton Unified School Dist.*, 162 Cal.App.4th 1436, 150 (2008).  Indeed,

5   "[i]t has long been the rule in this state that [w]hen the transaction is of such a nature that the good

6   part of the consideration can be separated from that which is bad, the Courts will make the

7   distinction, for the … law … [divides] according to common reason; and having made that void

8   that is against law, lets the rest stand.." *Keene v. Harling*, 61 Cal.2d 318, 320-21 (1964) (internal

9   quotation marks omitted).  Severance of illegal provisions is thus favored in order "to prevent

10  parties from gaining undeserved benefit or suffering undeserved detriment as a result of voiding

11  the entire agreement – particularly where there has been full or partial performance of the contract."

12  *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 123-24 (2000).  To this end,

13  "[i]f the illegality is collateral to the main purpose of the contract and the illegal provision can be

14  extirpated from the contract by means of severance or restriction, then such severance and

15  restriction are appropriate." *Marathon Entm't, Inc. v. Blasi*, 42 Cal.4th at 996.

16        Similarly, section 1670.5(a) of the California Civil Code provides:  "If the court as a matter

17  of law finds the contract or any clause of the contract to have been unconscionable at the time it

18  was made, the court may refuse to enforce the contract, or it may enforce the remainder of the

19  contract without the unconscionable clause, or it may so limit the application of any unconscionable

20  clause as to avoid any unconscionable result."  Cal. Civ. Code § 1670.5(a).  Under California law,

21  a contract must be both procedurally and substantively unconscionable before a court may refuse

22  to enforce it as unconscionable.  *Mohamed v. Uber Techs., Inc*., 848 F.3d 1201, 1210 (9th Cir.

23  2016) (*citing Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th at 114) (internal

24  quotation marks omitted). The party opposing a provision bears the burden of proving it is

25  unconscionable. *Vianu v. AT&T Mobility LLC*, No. 19-cv-03602-LB, 2020 WL 3103797, at *6

26  (N.D. Cal. June 11, 2020). Additionally, "a contract of adhesion is not per se procedurally

27  unconscionable under California law. Instead, the focus of whether a contract is procedurally

28  unconscionable will concern two overall factors: oppression and surprise." *In re Pierson*, 447 B.R.

840, 850 (Bankr. N.D. Ohio 2011) (citing *Parada v. Super. Ct.*, 176 Cal.App.4th 1554, 1568 (2009)) (internal quotation marks omitted). In comparison, "[s]ubstantive unconscionability pertains to the fairness of an agreement's actual terms and to assessments of whether they are overly harsh or one-sided." *Pinnacle Museum Tower Ass'n v. Pinnacle Market Dev. (US), LLC*, 55 Cal. 4th 223, 346 (2012).  Of further note, "[s]everance is not permitted if the court would be required to augment the contract with additional terms because § 1670.5 does not authorize reformation by augmentation." *Lim v. TForce Logistics, LLC*, 8 F.4th 992, 1005 (9th Cir. 2021); *see also  Ajamian v. CantorCO2e, L.P.*, 203 Cal. App. 4th 771, 803 (2012) (recognizing that "the entire provision is unenforceable if the only way to cure the unconscionability is in effect to rewrite the agreement, [because] courts cannot cure contracts by reformation or augmentation" (citations and quotation marks omitted))."

Further, section 3399 of the California Civil Code provides that "[w]hen, through fraud or a mutual mistake of the parties, or a mistake of one party, which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised on the application of a party aggrieved, so as to express that intention, so far as it can be done without prejudice to rights acquired by third persons, in good faith and for value."  Cal. Civ. Code § 3399. *See also In re Yashouafar*, 2019 WL 342536, at *10 (Bankr. C.D. Cal. Jan. 25, 2019 (discussing reformation under the statute).  Reformation is a remedy that "is equitable in nature and not restricted to the exact situations stated in section 3399." *Jones v. First American Title Ins. Co.*, 107 Cal.App.4th 381, 388 (2003).

These provisions interplay with other sections of the California Civil Code, including:

- Section 3400: "For purposes of revising a contract, it must be presumed that all the parties thereto intended to make an equitable and conscientious agreement."  Cal. Civ. Code § 3400.

- Section 3401: "In revising a written instrument, the court may inquire what the instrument was intended to mean, and what were intended to be its legal consequences, and is not confined to the inquiry what the language of the instrument was intended to be."  Cal. Civ. Code § 3401.

- Section 3402: "A contract may be revised and then specifically enforced." Cal. Civ. Code § 3402.

1    Bankruptcy courts also generally recognize the ability to reform an agreement, including

2 through the broad equitable authority under section 105(a) of the Bankruptcy Code.[7] *See, e.g.*, *In*

3 *re Creger*, 403 B.R. 381, 386 (Bankr. W.D. Va. 2009) (observing that with respect of reforming

4 agreement, a "bankruptcy court may grant such equitable relief pursuant to 11 U.S.C. § 105 if

5 'necessary or appropriate to carry out the provision[s] of this title.'"); *In re Gilmore*, 284 B.R. 801

6 (Bankr. E.D. Va. 2002) (noting the availability of reformation of an agreement as an equitable

7 remedy).

8    Here, if the LSAs are not subject to the CROA, the Committee does not believe that the

9 entirety of the LSAs are void as a matter of law, and that any illegal or ambiguous provisions can

10 either be severed or reformed in connection with assigning the agreements as part of a sale.  The

11 Committee believes that the LSAs can be reformed so long as the reformed agreements do not

12 augment what is currently provided in the LSAs including, but not limited to, any right to request

13 a refund as set for therein.  Moreover, allowing the LSAs to be assigned to the buyer and reformed,

14 in a process that provides the Debtor's clients with an informed choice to opt-out of the assignment,

15 will eliminate any prejudice to the Debtor's clients who may wish to choose to have ongoing

16 services.  In other words, clients will have the choice to continue to receive the debt relief services

17 they originally contracted with the Debtor to provide, but under an enhanced and legally

18 compliance framework, or will have the choice to opt-out and have their agreements rejected rather

19 than assigned to the buyer.

20    **4.**    **Concerns About Unconscionability Can Be Addressed**

21    In its Motion to Convert, the UST also argues that the LSAs are unconscionable, and

22 therefore cannot be assigned. However, as discussed above, to the extent the LSAs have

23 unconscionable provisions, those provisions can be severed or reformed in connection with

24 assignment.  As noted, section 1670.5 of the California Civil Code expressly contemplates that a

25 court "may enforce the remainder of the contract without the unconscionable clause, or it may so

26 limit the application of the unconscionable clause as to avoid any unconscionable result." Cal. Civ.

27

28

---

[7] Pursuant to section 105(a), "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

1    Code § 1670.5(a).  Further, as discussed below, providing the Debtor's clients with an opt-out right

2    and including certain other protections and disclosures in the Reformed Agreement can negate

3    unconscionability concerns.  All told, if all contracts of adhesion were unconscionable and

4    unenforceable, much of commerce would "screech to a halt."  *Cicle v. Chase Bank*, 583 F.3d 548,

5    555 (8th Cir. 2009).

6    **B.      The Bankruptcy Court has Authority to Approve a Sale Even if Aspects of the**

7    **Debtor's Business May Be Illegal**

8          Although the Committee does not believe that the LSAs as a whole are *per se* illegal, the

9    Bankruptcy Court has authority to approve the proposed sale so long as there are sufficient

10   protections that would ensure that the buyer complies with all applicable law.  For example, Judge

11   Bason recently held that the presence of illegal elements in a case does not necessarily foreclose a

12   bankruptcy court from exercising jurisdiction and acting.  In *In re Hacienda Company LLC*, 647

13   B.R. 748 (Bankr. C.D. Cal. 2003), the court found that a debtor's ties to cannabis did not require

14   dismissal simply due to the illegality of cannabis under federal law and noted:

15          [The] Bankruptcy Court would be overstepping its role, and acting
           contrary to Congress' directives within the Bankruptcy Code, if it
16         were to deny creditors, debtors, employees, equity investors, and
           other constituencies the benefits and protections of bankruptcy based
17         on the facts and circumstances presented.  In general, this Bankruptcy
           Court should defer to prosecutors, and all of the types of persons
18         mentioned above, to use their discretion about whether and how to
           address any violations of nonbankruptcy law.
19

20   *Id.* at 757-78.[8]  The Committee believes that the Court has authority to approve a sale, assumption

21   and assignment of the LSAs to a buyer with the proviso that consumers must have the ability to opt

22

23   ───────────────────────
     [8] Although distinguishable in some respects, courts within the Ninth Circuit have expressed an
24   openness to exercise jurisdiction in cannabis-related matters notwithstanding the federally illicit
     status.  *See, e.g., Garvin v. Cook Invs.*, 922 F.3d 1031 (9th Cir. 2019) (affirming confirmation of a
25   chapter 11 plan that would be supported by rental income from a cannabis cultivating tenant); *In re
     Burton*, (610 B.R. 633, 637 (B.A.P. 9th Cir. 2020 (stating that "the mere presence of marijuana near
26   a bankruptcy case does not automatically prohibit a debtor from bankruptcy relief."); *In re CW
     Nevada, LLC*, 602 B.R. 717, 747 (Bankr. D. Nev. 2019) (noting that "there may be cases where
27   Chapter 11 relief is appropriate for an individual or a non-individual entity directly engaged in a
     marijuana-related business."  Additionally, the court in *In re Hacienda*, took judicial notice of a
28   variety of situations where a bankruptcy court could exercise jurisdiction notwithstanding potential
     illicit implications, including restaurants or apartment buildings with ongoing health and safety

out of any proposed assumption and assignment of their LSAs, and assurance that the buyer will operate in a manner consistent with all applicable laws, and subject to oversight by a Court-appointed monitor under the jurisdiction of the Court.

**C.    Necessary Conditions**

As discussed, the Committee believes that the LSAs are not void as a matter of law and that any legally questionable or ambiguous provisions can be severed or reformed to bring the agreements into legal compliance upon assignment. However, the Committee believes that the assignment process and the reformed language must contain certain features to ensure that the Debtor's clients have informed choice and are not prejudiced.

**1.    Opt-Out Provision**

First and foremost, it is critical that the Debtor's clients have an opportunity to opt-out of the assignment of their LSAs being assigned to CLG (or another buyer), and that the opt-out notice provides clear information to the clients regarding their rights and also provides sufficient time for the clients to exercise their opt-out rights.[9]

Section 365(c) of the Bankruptcy Code, provides, in relevant part:

> The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if –(1)(A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and (B) such party does not consent to assumption or assignment…

11 U.S.C. § 365(c)(1).

With respect to the consent requirement, opt-out provisions have been recognized by bankruptcy courts in assignment and other scenarios as manifesting informed consent by a

---

violation, and individual debtors that failed to pay parking fines or taxes or engaging in criminal gang activity. *In re Hacienda*, 647 B.R. at 755.

[9] In addition to the issues addressed in this section, a 90-day opt-out notice is also appropriate given that the Trustee concedes that the sale is subject to Rule 1.17 of the California Rules of Professional Conduct. *See* CAL. R. PROF. CONDUCT 1.17(b)(2)(i).

counterparty to an agreement that does not exercise the opt-out right. *See, e.g., In re Egghead.com, Inc.,* 2001 WL 35671549 (Bankr. N.D. Cal. Sept. 21, 2001) (court approved opt-out notices for counterparties in order approving debtor's sale of certain assets, including assignment of contracts and leases); *In re Golfsmith Int'l Holdings, Inc.*, 2016 WL 10574673, at *22 (Bankr. D. Del. Nov. 2, 2016) (in an order approving sale, assumption and assignment of contracts and leases, court approved a provision allowing purchaser to convert the debtor's customers to the purchasers' privacy policy who did not opt-out by the opt-out deadline); *In re Borders Group, Inc.*, 2011 WL 5520261 (Bankr. S.D.N.Y. Sept. 27, 2011) (order approving sale of intellectual property included procedure for debtor's customer to opt-out of the transfer of the personal identifiable information to the purchaser); *In re Golden Books Family Entertainment, Inc.*, 269 B.R. 300, 303 (Bankr. D. Del. 2001) (noting court's prior order deeming parties who failed to object to the proposed sale "to have given the consent contemplated by the Bankruptcy Code Sections 365(c)(1) and (f)(1) to the assumption … and the assignment of such Executory Contract to the [Buyers]."). *See also In re Boy Scouts of America and Delaware BSA, LLC*, 642 B.R. 504 (Bankr. D. Del. 2022) (noting that consent to third-party releases in plan inferred from parties' failures to respond to opt-out which was prominently displayed on ballot); *Arsenal Intermediate Holdings, LLC*, 2023 WL 2655592, at *1 (Bankr. D. Del. March 27, 2023) ("This Court concludes that in the typical case, so long as the disclosure is prominent and conspicuous, and impaired creditors are given the ability to opt out simply by marking their ballot or by some other comparable device, it is appropriate to infer consent from a creditor's failure to opt out."); *In re Cred Inc.*, 2023 WL 2245371, at *2 (Bankr. D. Del. Feb. 27, 2023) (court pushed for enhanced notice of an opt-out provisions where creditors would be deemed to consent to the transfer of their claims unless they affirmatively opted out); *In re Enron Corp.*, 2002 WL 32155473 (Bankr. S.D.N.Y. Oct. 4, 2002) (utilizing an opt out method for determining the universe of employees who will be deemed to accept a settlement); *In re Jevic Holding Corp.*, 2010 WL 3431985, at *1 (Bankr. D. Del. Aug. 27, 2010) (opt-out notice for potential class members of their right to opt-out of the class); *In re Tenn-Fla Partners*, 1993 WL 151346 (Bankr. W.D. Tenn. April 29, 1993) (using opt-out ballots to allow bondholders to "opt out" of having their names released to the debtor).

Non-bankruptcy courts applying California law have also approved the use of opt-out provisions in various scenarios, including observing under California law that a contract is not unconscionable if the consumer has a meaningful opportunity to opt out. *See, e.g., Carpenter v. Opportunity Fin., LLC*, 2023 WL 2960327, at *4 (C.D. Cal. March 29, 2023) (*citing Mohamed v. Uber Techs., Inc.,*, 848 F.3d 1201, 1211 (9th Cir. 2016) (stating that "[a] meaningful opportunity to negotiate or reject the terms of a contract must mean something more than an empty choice."); *Cir. City Stores, Inc. v. Mantor*, 335 F.3d 1101, 1106 (9th Cir. 2003) ("At a minimum, a party must have reasonable notice of his opportunity to negotiate or reject the terms of a contract, and he must have an actual, meaningful, and reasonable choice to exercise that discretion."); *Guadagno v. E*Trade Bank*, 592 F.Supp.2d 1263, 1269-70 (C.D. Cal. 2008) (finding that a 60-day opt-out provision of a class-action waiver in an arbitration clause "was not presented on a take-it-or-leave-it basis" and was therefore not unconscionable); *see also Fluke v. Cashcall, Inc.*, 2009 WL 1437592, at *6-7 (E.D. Pa. March 22, 2010) (discussing *Guadagno v. E*Trade* and noting generally that arbitration agreements that contain opt-out provisions are "not unconscionable because such agreements are not unilaterally imposed, but instead give the consumer a meaningful choice as to the contract's terms."); *Stone v. Mid Am. Bank & Tru. Co.*, 2018 WL 4701843, at *6 (E.D. Wash. Aug. 31, 2018) (opt-out provision provided counterparty with a meaningful choice where the party had at least two months to opt-out and was informed with a warning in bold type and all capital letters that she had that right and the consequences of not opting-out.).

The Committee submits that in order for the LSAs to be assigned and reformed, it is paramount that the Debtor's clients be provided with clear notice of the transaction, detailing the right to opt-out by a date certain (after a sufficient period) and the consequences for failing to opt-out. Such an opt-out provision will ensure that the Debtor's clients are provided with a meaningful choice in determining whether to continue a relationship with the buyer under the Reformed Agreement, or terminate the relationship, and will negate questions of unconscionability for those who elect to not opt-out. Additionally, as discussed above, an appropriate opt-out provision will eliminate prejudice to the Debtor's clients because they will either elect to continue having the services that they originally contracted for, but under a legally compliant and enhanced framework,

1    or they may opt-out and any claims they may have will be preserved in the Bankruptcy Case. There

2    is more risk for prejudice if the Debtor's clients are denied the choice altogether, as in that scenario,

3    those who wish to continue receiving debt relief services, may have their options limited. Moreover,

4    as noted, the sale will increase the prospects of recovery for creditors, many of which include the

5    Debtor's clients.

6            The Committee has discussed including an opt-out provision in the APA with the Trustee

7    and CLG, but the specifics have not yet been worked out. Any opt-out provision must be prepared

8    in consultation with the Committee to ensure that it provides sufficient notice, including with regard

9    to the language used in the notice, the explanation of the process and reformations to the LSAs, the

10    length of the opt-out period, and how the notice is displayed and communicated. On the last point,

11    based the *Declaration of Christopher Celentino Regarding Notice of Sale to Consumer Clients* filed

12    on July 13, 2023 [Docket No. 233], the Debtor has the ability to electronically transfer a notice to

13    its approximately 40,000 consumer clients through a database email program, which can include a

14    DropBox link. The Committee believes that this can provide an efficient means to deliver notice of

15    the proposed assignment of the LSAs, the Reformed Agreement, and the right to opt-out, to the

16    Debtor's clients.

17        **2.    Other Protections**

18            The Committee submits that the following additional protections are needed to protect the

19    Debtor's clients in the event the LSAs are to be assigned and reformed:[10]

20        1)    **Legal Compliance**:   CLG (or other buyer) must represent that the Reformed

21    Agreement will be in compliance with all applicable Federal and State laws, and that any reformation

22    of the LSAs has been done strictly to bring the Reformed Agreement into legal compliance and is

23    not being done to change any other material terms in the LSAs.

24        2)    **Refund Provision**: The Reformed Agreement cannot contain more onerous terms

25    than the original LSAs. Most notably, the LSAs contain the following refund policies:

26

---

27    [10] This list is non-exhaustive, and the Committee reserves the right to supplement this list and raise
further concerns with the proposed sale, the APA, and the Reformed Agreement, in its objection to
28    the Sale Motion.

**LSA Version 1:**

If an account is fully validated by a creditor, such that no further dispute to the validity of the account could be made, you will receive a full refund of the fees that you paid toward the invalidation of that account (i.e., you will be refunded the fees paid in proportion to the debt that was invalidated).  Should you have an outstanding balance with LPG at the time your refund is issued on the validated account, any refund will first be applied towards the outstanding balance.  A client can elect to move to a debt settlement service on any validated account in lieu of obtaining a refund.  If a client makes such an election, fees will no longer be collected for such account and debt settlement services will be performed for no additional fees.

**LSA Version 2:**

If you reach the conclusion of LPG's representation of you and a debt remains in dispute without resolution, you will be eligible to receive a full refund of the fees that you paid towards your representation in connection with that account (i.e.., you will be refunded the fees paid in proportion to the debt that was not resolved).  A debt is "in dispute" under this paragraph if, at the time of completion of LPG's representation of you, no lawsuit was filed regarding the debt, no settlement was reached regarding the debt, no acknowledgment of invalidity was received from the creditor regarding the debt, and the debt is still reporting to one of the following credit bureaus: Experian, Equifax, or Transunion

*See* Exhibits A and B.

In contrast, the Reformed Agreement's refund policy states: "You may cancel this agreement at any time and will not be required to pay for any further services as of the date of cancellation.  Any fee You pay, however, shall be deemed earned at the time it is paid *and is not refundable*." (emphasis added).  This is a material change from the original LSAs that is not necessary to reform the agreement to be legally compliant and imposes a more onerous term on the Debtor's clients.  The Reformed Agreement must include the same refund provision in the LSAs.

3) **Fee Disclosure**:  The LSAs included fee schedules to be paid by the Debtor's clients.  The Reformed Agreement appears to require payment of a flat fee, but the amount or method of calculation of the flat fee is unclear from the draft Reformed Agreement.  There needs to be additional disclosure as to how the flat fee is to be calculated.  Additionally, in the event that it is determined that the Reformed Agreement is subject to the CROA and/or the TSR, the Reformed

1    Agreement must include language providing that no fees will be charged until services are

2    performed by CLG (or other buyer) as set forth in the CROA and/or the TSR.

3        4)    **Monitor**: The APA envisions the appointment of a monitor to oversee the

4    assignment of the LSAs and ensure that the Debtor's clients are protected.  The selection of the

5    Monitor should be subject to the Committee's approval and the Committee should have oversight

6    ability over the Monitor.

7    **D.    The Trustee Should Hold Funds Pending Expiration of the Opt-Out Period**

8        The Sale Briefing Order also requested a discussion on the estate's use or disposition of

9    funds collected from the Debtor's clients since the Trustee's appointment.  It is the Committee's

10   understanding, subject to verification, that as of the Petition Date, the Debtor collected and held

11   fees in an operating account.  It appears that these funds were commingled, and may be difficult or

12   impossible to trace to any individual consumer client.[11]  The Committee believes that, while the

13   Court must ultimately determine entitlement to these funds, such determination does not need to be

14   made prior to approving the sale so long as the Trustee continues to hold these funds.  On the other

15   hand, to the extent that ACH pulls have been received after the Petition Date, such funds are being

16   held in trust by the Trustee.  The Committee submits that these funds follow the LSAs and can be

17   remitted to the buyer only to the extent that consumer clients do not timely opt out, and after the

18   120-day period in which the buyer may choose to remove such LSAs from the list of Assumed

19   Contracts.  The remainder of the funds should continue to be held by the Trustee pending a

20   determination of treatment in a plan, including a process to determine what fees collected by the

21   Debtor (including before the Petition Date, and collected by the Trustee since his appointment, have

22   been "earned."

23

24

25

26

27   [11]  The Committee believes this is the likely scenario but reserves the right to investigate the
Debtor's treatment and disposition of fees collected from clients.

28

IV.

## **RESERVATION OF RIGHTS**

The Committee expressly reserves all rights with respect to substantive briefing and argument on the Sale Motion.  Nothing contained herein shall be construed as an admission with respect to the Sale Motion, a waiver of arguments, claims, or defenses, or an election of remedies.

V

## **CONCLUSION**

Based on the foregoing, the Committee respectfully submits that the LSAs may be assumed, assigned and reformed, provided that the process and terms include certain protections for the Debtor's consumer clients, including an appropriate and sufficient opt-out notice.

Dated: July 17, 2023                         Respectfully submitted,

**FOX ROTHSCHILD LLP**


*By:*  */s/Keith C. Owens*
Proposed Counsel to Official Committee
of Unsecured Creditors

**Exhibit A**



P.O. Box 513018, Los Angeles, CA 90051-1018
Tel. (949) 715-0644 · Fax (949) 315-4332
Support@LPGLaw.com

## LEGAL SERVICES AGREEMENT

### Legal Services

The Litigation Practice Group PC ("LPG") will provide debt validation services wherein it will assist you in removing erroneous or inaccurate information appearing on one or more of your credit reports by contesting debts appearing therein. This service is limited to information reported by creditors or purported creditors to credit bureaus. The purpose of this program is to challenge the legal validity of debts appearing on or being reported to credit bureaus. The cost of legal services rendered by LPG is set forth below, and those fees are earned by LPG for services rendered to you as set forth herein at the time such fees are paid.

### Client Authorization

You authorize LPG to challenge, where applicable, any debts appearing in your credit report(s) that you believe to be in any way invalid, inaccurate, or otherwise without a legal basis. You also authorize LPG to obtain a copy of your credit report to assist in the process of analyzing your account and developing a strategy regarding the invalidation of debts that are excessive or otherwise unauthorized by law. You further authorize LPG, acting under power of attorney for you, to affix your signature to documents sent on your behalf in relation to the matters addressed herein.

### Description of Services to be Performed

LPG will obtain your credit reports, analyze them, and develop strategies for correcting invalid or unlawful debts for which you should not be held legally responsible. Where appropriate, LPG will use existing laws and interact with creditors and credit bureaus on your behalf to invalidate your debts and remove such invalid debts from your credit reports. LPG will also interact with collection agencies, as applicable, to invalidate your debts by requiring them to supply evidence of your indebtedness to them, or any other legal mechanism. LPG will also consult with you regarding all aspects of the credit reporting process, including all laws applicable to the same. LPG will also investigate your delinquent accounts in order to determine the most effective method for invalidating your debts or otherwise removing any legal liability for such debts, up to and including the initiation of lawsuits on your behalf against your creditors and their third-party debt collectors.

In addition, if a lawsuit is filed against you, LPG will represent you in such a lawsuit and will not charge any additional fees for such representation provided such a lawsuit was initiated after the date you sign this Agreement. In the event a lawsuit was initiated against you before the date you execute this Agreement and you elect to have LPG represent you, an additional fee of $500.00 will be charged. Where appropriate, if legal fees are recovered from an adverse party, LPG will retain such fees for its services. You will be responsible to pay any damages resulting from any lawsuit. Any costs incurred in a lawsuit will be paid by LPG out of the fees set forth below, including the fees of any attorney retained on your behalf in a jurisdiction in which LPG is not admitted to practice law. No additional payment from you to LPG will be necessary for the defense of any lawsuit filed against you after the date you execute this Agreement. You will, however, be responsible to pay any damages resulting from such lawsuits or any settlements reached in the course of such lawsuits.

### Fees

You will pay the following fees for the legal services provided by LPG. No fee or other cost will be charged or collected other than the following. This is the only amount you have to pay for LPG's services, and this fee is fixed, such that it is earned the moment it is transmitted to LPG. Upon request, LPG will provide an update of the progress of services performed under this

Page 1 of 7

ID: 4165177 Signed: 2021-08-05T16:50:50-05:00

00089

agreement at reasonable intervals of no greater frequency than once a month.

## Refund Policy

If an account is fully validated by a creditor, such that no further dispute to the validity of the account could be made, you will receive a full refund of the fees that you paid towards the invalidation of that account (i.e., you will be refunded the fees paid in proportion to the debt that was validated). Should you have an outstanding balance with LPG at the time your refund is issued on the validated account, any refund will first be applied towards the outstanding balance. A client can elect to move to a debt settlement service on any validated account in lieu of obtaining a refund. If a client makes such an election, fees will no longer be collected for such account and debt settlement services will be performed for no additional fees.

## Debt Settlement

If LPG is unable to invalidate any debt, you may elect to have LPG negotiate a settlement on your behalf with the concerned creditor without any additional fees being charged to or incurred by you for such service. Any settlement reached with any such creditor shall be your responsibility. At the point that you reach a settlement with such creditor, your payment to LPG will be reduced and re-amortized to adjust for the settled account being removed from the representation herein contemplated. Please see the refund policy above for more details.

## Actions Required of You

You agree to provide LPG with any and all correspondence you receive from any creditor, credit bureau, attorney, or court of law. You further agree to keep a log of all communications, including telephonic and electronic communications, from any creditor or credit reporting agency.

## Right to Conduct Business Electronically and Contact You

You agree that LPG may contact you electronically and telephonically and that any and all business with LPG may be conducted electronically. You further agree that LPG may transmit data, including that regarding your credit profile, electronically. You further agree that any electronic communication carries the risk of disclosure to a third party and that LPG will not be held responsible for any such inadvertent disclosure of information. A facsimile or email transmission of this signed agreement, via an email attachment or otherwise, will be as valid as the original. This agreement may not be modified except in writing by both parties.

## Client Acknowledgements

By signing this agreement, you acknowledge that LPG has not instructed you to breach any contract, fail to make any required payment, or fail to perform any obligation you have lawfully incurred. LPG reserves the right to terminate this agreement if (a) client fails to make timely payment of the amount due under hereunder or (b) the client's payments are returned multiple times for any reason. LPG will not pay your debts and does not guarantee that any debt you now have or may incur will be invalidated or settled in association with LPG's services. You understand and agree that you must forward any communication you receive in printed or electronic form from any creditor, court, or representative of other a creditor or a court to support@lpglaw.com and that you must keep a log of all telephonic communications with any creditor or credit reporting agency. **Do not sign this agreement until you have received and read the information statements and notices of cancellation required by state and federal law, even if otherwise advised. By signing this agreement, you acknowledge receipt of these disclosures prior to the time of signing and agree to the terms of this agreement. You, the client, may cancel this agreement at any time before midnight CST of the 5th day after the date of execution of this agreement via an email to support@lpglaw.com. In addition, you, the client, may terminate LPG's services under this agreement at any time via an email to support@lpglaw.com.**

Client Signature: _____     Date: 8/5/2021 _____

Co-Applicant Signature _____     Date: _____

Page 2 of 7

ID: 4165177 Signed: 2021-08-05T16:50:50-05:00

00090

## Creditor Information

| Creditor | Account # | Amount Owed |
|---|---|---|
| NAVY FCU | 9410 | $10,480.00 |
| SYNCBVALUEC | 1223 | $1,835.00 |
| CBJCREW | 1478 | $1,381.00 |
| Capital One | 3883 | $932.00 |
| | | $14,628.00 |

ID: 4165177 Signed: 2021-08-05T16:50:50-05:00

00091

## Client Information

Name: Arven Knight

Address: 1805 23rd Street Se Apt. 252b, Washington DC 20020


Home Phone: 202-680-2347

Cell Phone:

Email: arvenk@aol.com

Las 4 SSN: XXX-XX-4317

## Co-Client Information

Name:

Address: ,


Home Phone:

Cell Phone:

Email:

Last 4 SSN:

ID: 4165177 Signed: 2021-08-05T16:50:50-05:00

00092

## Schedule of Payments

I agree to this payment schedule – Client Initials: _l~y_

| Payment # | Process Date | Amount |
|---|---|---|
| 1 | Aug 24, 2021 | $257.61 |
| 2 | Sep 30, 2021 | $257.61 |
| 3 | Nov 01, 2021 | $257.61 |
| 4 | Nov 30, 2021 | $257.61 |
| 5 | Dec 30, 2021 | $257.61 |
| 6 | Jan 31, 2022 | $257.61 |
| 7 | Mar 02, 2022 | $257.61 |
| 8 | Mar 30, 2022 | $257.61 |
| 9 | May 02, 2022 | $257.61 |
| 10 | May 31, 2022 | $257.61 |
| 11 | Jun 30, 2022 | $257.61 |
| 12 | Aug 01, 2022 | $257.61 |
| 13 | Aug 30, 2022 | $257.61 |
| 14 | Sep 30, 2022 | $257.61 |
| 15 | Oct 31, 2022 | $257.61 |
| 16 | Nov 30, 2022 | $257.61 |
| 17 | Dec 30, 2022 | $257.61 |
| 18 | Jan 30, 2023 | $257.61 |
| 19 | Mar 02, 2023 | $257.61 |
| 20 | Mar 30, 2023 | $257.61 |
| 21 | May 01, 2023 | $257.61 |
| 22 | May 30, 2023 | $257.55 |

ID: 4165177 Signed: 2021-08-05T16:50:50-05:00

00093

## Electronic Payment Authorization

Bank Name: PENTAGON FEDERAL CREDIT UNION

Name on Account: Arven Knight

Account Type:   Checking

___ Other (specify: _____ )

Routing Number: ██████

Account Number: ████

Next Payment Date: Aug 24, 2021 Amount: $ 257.61

Recurring Payment Date: 30th

By signing below, I authorize and permit LPG or their designees, EPPS, Omnifund, Equipay, Forte, a CSG Company, or Authorize.NET to initiate electronic funds transfer via an Automated Clearing House system (ACH) from my account listed above. I will also provide LPG with a voided check or savings deposit slip.

If necessary, LPG may make adjustments if errors have occurred during the transaction. The date of the draft is listed above, however, if the draft date falls on a weekend or bank holiday, the debit transaction will take place on the next business day. This authority will remain in effect until LPG is notified by the member in writing at least 5 days prior to the next scheduled draft date. No other forms of cancellation by members will be observed. If the debit is returned because of non-sufficient funds or uncollected funds, then the originator and its financial institution may reinitiate the entry up to two (2) times. The reversal of funds from a client's account that was drafted in error cannot be made until seven business days from the draft date. The member agrees to waive all rights of reversal or refusal of any payment on any draft that LPG may make against the member's bank account while services are performed. The member agrees with all of the provisions and conditions outlined within.

## Acknowledgment of Refunds & Draft Date Changes

ACH Refunds: If a refund is due such will be made through the ACH process only if the fees were made through the ACH process. All refunds may take up to 10 days to process. In the event my EFT or draft is returned from my bank unpaid, I agree that a fee of $25.00 or as allowed by law may be charged to my account via draft or EFT. Furthermore, I warrant that I am authorized to execute this payment authorization and the above information is true and correct. Draft Date Changes: A client may stop any ACH debit by providing written notice to LPG at least five (5) business days prior to the scheduled payment. If you should need to notify us of your intent to cancel and/or revoke this authorization you must contact us five (5) days prior to the questioned debit being initiated. Please call us at 949-229-6262 or at support@lpglaw.com.

Client Signature: ⟍⟋⟍    Date: 8/5/2021

Printed Name:   Arven Knight

ID: 4165177 Signed: 2021-08-05T16:50:50-05:00

00094

## Electronic Funds Transfer (EFT) Authorization to Debit Bank Account

Account Owner Name: Arven Knight

Social Security Number: ▓▓▓▓▓        Birth Date: ▓▓

Address:1805 23rd Street Se Apt. 252b        City:Washington        State:DC    Zip: 20020

Mobile Phone #:        Bank Name: PENTAGON FEDERAL CREDIT UNION

Routing Number: ▓▓▓▓        Account Number: ▓▓▓▓▓

Total Amount of Debit: $257.61        Date of Next Debit:Aug 24, 2021    Checking or Saving: Checking

I hereby apply for and agree to establish a non-interest bearing special purpose account (the "Account") with a bank ("Bank") selected by EPPS, LLC and/or its successors for the purpose of accumulating funds to pay for such goods and services as I so direct EPPS, LLC to perform. This application is subject to Bank's customer identification program, as required by the USA PATRIOT ACT and other applicable laws, and accordingly, I hereby represent that the above information is true and complete to the best of my knowledge and belief. The bank account information provided above may be subject to account validation processes to include pre-notation and a $0.01 micro-deposit.

### Schedule of Fees and Charges

| | |
|---|---|
| Monthly Banking Fee. | Included |
| ACH/EFT Fee Per Transaction | Included |
| Chargeback/Late Return Fee | Included |
| NSF Fee | Included |
| Account Closer Fee | Included |

**PREMIUM DISBURSEMENT SERVICES**

| | |
|---|---|
| Wire Transfer | Included |
| FedEx/Overnight Next Day | Included |
| 2nd Day Check With Tracking | Included |

I hereby authorize Bank, directly or through EPPS, LLC, and/or its service providers, to administer the account on my behalf by (a) periodically transferring and depositing funds to the Account, via any payment media currently in use, and (b) periodically disbursing funds from the Account pursuant to instructions that I may give from time to time. I hereby authorize payments from the Account for the fees and charges provided for in this application and in the agreement. I hereby grant permission for Bank to share information regarding the Account with EPPS, LLC, and any other service provider to facilitate the transactions I may initiate that involve the Account, and with any other party that is essential to the administration of the Account on my behalf. My signature below provides permission to be contacted by phone at the number provided with this authorization. A payment reminder will be sent to your phone number via Text Messaging prior to the payment scheduled above. This authorization shall remain in full force and effect until I provide a verbal or written termination notice to EPPS. Any such notice, and any other written notice that is provided for in this Application or the Agreement, shall be sent to EPPS, LLC at the address set forth in the Agreement. "EPPS-Ph# 800-215-3484" will appear on your bank statement

Account Holder's Signature:  _c⌐_        Date: 8/5/2021

ID: 4165177 Signed: 2021-08-05T16:50:50-05:00

00095

**Exhibit B**



# LEGAL SERVICES AGREEMENT

## Legal Services

The Litigation Practice Group PC, a State Bar of California licensed law corporation, and its employed and affiliated attorneys (collectively "LPG") will provide legal services wherein it will represent you in connection with the disputes you have with the creditors listed below (see Creditor Information). LPG will do the following as part of its representation of you:

- Assist you in stopping creditors and any related debt collectors from harassing or contacting you in connection with any of the debts identified below;
- Dispute the legal validity of the debts identified below;
- Assist you in removing erroneous or inaccurate information reported in connection with debts identified below;
- Represent you in any lawsuit filed against you in connection with any of these debts;
- Defend you against any collection activity or lawsuit on any invalidated debt at any point in time, without expiration, in connection with any debt identified below;
- Initiate legal action in a court of competent jurisdiction against any creditor that violates any state or federal law in connection with any debt identified below; and
- Determine your qualification for bankruptcy under Chapter 7 or Chapter 13 of the U.S. Bankruptcy Code, and counsel you regarding the procedures and effects of bankruptcy as well as your qualification to file the same.

LPG will serve as your attorney for all purposes in connection with these disputes and will be available to render all legal assistance necessary to resolve these debts. The fees that are set forth below are flat fees that are all inclusive – no additional fee or cost will be charged by LPG at any time during the duration of your dispute with the creditors identified below. All fees are earned by LPG at the time they are paid and are for services rendered to you as set forth herein.

## Client Authorization

You authorize LPG to challenge, where applicable, each of the debts listed below, which you believe to be in any way invalid, inaccurate, or otherwise without a legal basis. You also authorize LPG to obtain a copy of your credit report to assist in the process of analyzing your account and developing a strategy regarding the resolution of debts that are excessive or otherwise unauthorized by law. You further authorize LPG, acting under power of attorney for you, to affix your signature to documents sent on your behalf in relation to the matters addressed herein. Finally, you authorize LPG to communicate with you via email, text message, telephone, and facsimile. Any of the authorizations set forth herein can be revoked at any time by written communication.

ID: 4279563 Signed: 2021-08-25T14:06:45-05:00

## Description of Services to be Performed

LPG will obtain your credit reports, analyze them, and develop strategies for correcting invalid or unlawful debts for which you should not be held legally responsible. Where appropriate, LPG will use existing laws and interact with creditors and credit bureaus on your behalf to invalidate your debts and remove such invalid debts from your credit reports. LPG will also interact with collection agencies, as applicable, to invalidate your debts by requiring them to supply evidence of your indebtedness to them, or any other legal mechanism. LPG will also consult with you regarding all aspects of the credit reporting process, including all laws applicable to the same. LPG will also investigate your delinquent accounts in order to determine the most effective method for invalidating your debts or otherwise removing any legal liability for such debts, up to and including the initiation of lawsuits on your behalf against your creditors and their third-party debt collectors.

In addition, if a lawsuit is filed against you, LPG will represent you in such a lawsuit and will not charge any additional fees for such representation provided such a lawsuit was initiated after the date you sign this Agreement.  In the event a lawsuit was initiated against you before the date you execute this Agreement and you elect to have LPG represent you, an additional fee of $500.00 will be charged. Where appropriate, if legal fees are recovered from an adverse party, LPG will retain such fees for its services.  You will be responsible to pay any damages resulting from any lawsuit.  Any costs incurred in a lawsuit will be paid by LPG out of the fees set forth below, including the fees of any attorney retained on your behalf in a jurisdiction in which LPG is not admitted to practice law. No additional payment from you to LPG will be necessary for the defense of any lawsuit filed against you after the date you execute this Agreement. You will, however, be responsible to pay any damages resulting from such lawsuits or any settlements reached in the course of such lawsuits.

## Fees

You will pay the fees set forth below for the legal services provided by LPG, which services are outlined above. No fee or other cost will be charged or collected beyond the flat fee set forth below. This is the only amount that you have to pay to LPG for its services, which includes any cost, filing fee or vendor's fee associated with LPG's representation of you, and this fee is not escrowed but rather earned received by LPG. This fee does NOT, however, include any settlement that you may have to pay to any creditor if you opt to settle a debt prior to or during the course of a lawsuit.

## Refund Policy

If you reach the conclusion of LPG's representation of you and a debt remains in dispute without resolution, you will be eligible to receive a full refund of the fees that you paid towards your representation in connection with that account (i.e., you will be refunded the fees paid in proportion to the debt that was not resolved). A debt is "in dispute" under this paragraph if, at the time of completion of LPG's representation of you, no lawsuit was filed regarding the debt, no settlement was reached regarding the debt, no acknowledgment of invalidity was received from the creditor regarding the debt, and the debt is still reporting to one of the following credit bureaus: Experian, Equifax, or Transunion.

ID: 4279563 Signed: 2021-08-25T14:06:45-05:00

## Debt Settlement

You may request that LPG settle any debt identified below at any point in the course of LPG's representation of you. Where requested, LPG will negotiate the most favorable settlement it is able to negotiate on your behalf. Any settlement reached as a result of your request shall be your responsibility, and shall be paid directly from you to the creditor. At the point that you reach a settlement with a creditor, your payment to LPG will be reduced and to adjust for the settled account being removed from the representation herein contemplated. LPG will only settle a debt where litigation is active or contemplated.

## Actions Required of You

You agree to provide LPG with any and all correspondence you receive from any creditor, credit bureau, attorney, or court of law. You further agree to keep a log of all communications, including telephonic and electronic communications, from any creditor or credit reporting agency to you from the date you execute this Agreement until the conclusion of your representation.

## Right to Conduct Business Electronically and Contact You

You agree that LPG may contact you electronically and telephonically and that any and all business with LPG may be conducted electronically. You further agree that LPG may transmit data, including that regarding your credit profile, electronically. You further agree that any electronic communication carries the risk of disclosure to a third party and that LPG will not be held responsible for any such inadvertent disclosure of information. A facsimile or email transmission of this signed agreement, via an email attachment or otherwise, will be as valid as the original signed agreement. This agreement may not be modified except in writing by both parties.

## Malpractice Insurance

LPG hereby discloses that it maintains a malpractice insurance policy that covers its representation of you and that the limit of such policy is no less than $1,000,000.00 per claim and $1,000,000.00 per claimant. If you desire to make a claim against that insurance policy, you must first contact LPG and disclose your claim and the nature of the claim, at which point LPG agrees to assist you in obtaining any and all information necessary to prepare a file a claim.

## Applicable Law and Confidentiality

You understand and agree that LPG is based out of the State of California, is a licensed law corporation under the State Bar of California, and that California law applies to this Agreement. You further understand that LPG is bound to strict rules of confidentiality and attorney-client privilege in connection with the rules applicable to attorneys licensed to practice law in the State of California. You further understand and agree that you have sought the representation of LPG with full knowledge of its location and licensing, and that LPG works with attorneys licensed in all 50 states and the District of Columbia as affiliated counsel to allow LPG to provide a complete representation of you in any state in which you are sued or in which a dispute might arise. You have the right to know the licensed attorney with whom LPG has affiliated in any state and at any time but understand and agree that LPG may choose to change the local attorney with whom it is affiliated in any given jurisdiction, provided only that at all times LPG shall have an affiliated attorney in all 50 states and the District of Columbia.

ID: 4279563 Signed: 2021-08-25T14:06:45-05:00

## Client Acknowledgements

By signing this agreement, you acknowledge that LPG has not instructed you to breach any contract, fail to make any required payment, or fail to perform any obligation you have lawfully incurred. LPG reserves the right to terminate this agreement if (a) required by the State Bar of California Rules of Professional Conduct, (b) you refuse to communicate with LPG or respond to reasonable requests for information necessary to represent you in an effective way, (c) you fail to make timely payment of the amount due under hereunder, or (d) your payments are returned multiple times for any reason. LPG will not pay any of the debts identified below and does not guarantee that any debt you now have or may incur will be invalidated or settled in association with LPG's representation of you. You understand and agree that you must forward any communication you receive in printed or electronic form from any creditor, court, or representative of other a creditor or a court to the address, email, or fax number provided below, and that you must keep a log of all telephonic communications with any creditor or credit reporting agency. You, the client, may cancel this Agreement at any time by submitting three days' written notice of cancellation by mail, email, or fax, and shall not be responsible for any payments due after the date of cancellation. A payment due within three days of the date of written cancellation shall be processed and shall not be refunded.

Client Signature: _____

Date: 8/25/2021 _____

Co-Applicant Signature: _____

Date: _____


**THE LITIGATION PRACTICE GROUP PC**

**Daniel S. March, Managing Shareholder**
**17542 E. 17th Street, Ste 100**
**Tustin, CA 92780**
**admin@lpglaw.com**
**Tel. 949.715.0644**
**Fax. 949.315.4332**

00145
ID: 4279563 Signed: 2021-08-25T14:06:45-05:00

## Creditor Information

| Creditor | Account # | Debt Balance |
|----------|-----------|--------------|
| PALISADESFCU | ████0001 | $20,961.00 |
| UPGRADEINC | ███7884 | $19,207.00 |
| ONEMAIN | ████0084 | $11,681.00 |
| Merrick Bank | ███5094 | $707.00 |
| MABTCONTF | ███8460 | $378.00 |
| CRDTONEBNK | ███0632 | $377.00 |
| CRDTONEBNK | ███5307 | $347.00 |
| | | **$53,658.00** |

00146
ID: 4279563 Signed: 2021-08-25T14:06:45-05:00

## Client Information

**Name**: Debra Archambault
**Address**: 5 Carlann Lane, Valley Cottage NY 10989

**Home Phone**: 845-499-5081
**Cell Phone**:
**Email:** darchambault66@gmail.com
**Last 4 SSN:** XXX-XX-6609

ID: 4279563 Signed: 2021-08-25T14:06:45-05:00

## Schedule of Payments

I agree to this payment schedule – **Client Initials:**

| Payment # | Process Date | Amount |
|---|---|---|
| 1 | Sep 27, 2021 | $857.92 |
| 2 | Oct 25, 2021 | $857.92 |
| 3 | Nov 26, 2021 | $857.92 |
| 4 | Dec 27, 2021 | $857.92 |
| 5 | Jan 25, 2022 | $857.92 |
| 6 | Feb 25, 2022 | $857.92 |
| 7 | Mar 25, 2022 | $857.92 |
| 8 | Apr 25, 2022 | $857.92 |
| 9 | May 25, 2022 | $857.92 |
| 10 | Jun 27, 2022 | $857.92 |
| 11 | Jul 25, 2022 | $857.92 |
| 12 | Aug 25, 2022 | $857.92 |
| 13 | Sep 26, 2022 | $857.92 |
| 14 | Oct 25, 2022 | $857.92 |
| 15 | Nov 25, 2022 | $857.92 |
| 16 | Dec 27, 2022 | $857.92 |
| 17 | Jan 25, 2023 | $857.92 |
| 18 | Feb 27, 2023 | $857.92 |
| 19 | Mar 27, 2023 | $857.92 |
| 20 | Apr 25, 2023 | $857.92 |
| 21 | May 25, 2023 | $857.92 |
| 22 | Jun 26, 2023 | $857.92 |
| 23 | Jul 25, 2023 | $857.92 |
| 24 | Aug 25, 2023 | $857.92 |
| 25 | Sep 25, 2023 | $857.92 |
| 26 | Oct 25, 2023 | $857.92 |
| 27 | Nov 27, 2023 | $857.92 |
| 28 | Dec 26, 2023 | $858.00 |

ID: 4279563 Signed: 2021-08-25T14:06:45-05:00

## Electronic Payment Authorization

**Bank Name:** STERLING NATIONAL BANK
**Name on Account:** Debra Archambault
**Account Type:** Checking
       Other (specify: _____ )
**Routing Number:** <span>█████████</span>
**Account Number:** <span>█████████</span>
**Next Payment Date:** Sep 27, 2021 **Amount:** $ 857.92
**Recurring Payment Date:** 25th

By signing below, I authorize and permit LPG or their designees to initiate electronic funds transfer via an Automated Clearing House system (ACH) from my account listed above. I will also provide LPG with a voided check or savings deposit slip.

If necessary, LPG may make adjustments if errors have occurred during the transaction. The date of the draft is listed above, however, if the draft date falls on a weekend or bank holiday, the debit transaction will take place on the next business day. This authority will remain in effect until LPG is notified by the member in writing at least 5 days prior to the next scheduled draft date. No other forms of cancellation by members will be observed. If the debit is returned because of non-sufficient funds or uncollected funds, then the originator and its financial institution may reinitiate the entry up to two (2) times. The reversal of funds from a client's account that was drafted in error cannot be made until seven business days from the draft date. The member agrees to waive all rights of reversal or refusal of any payment on any draft that LPG may make against the member's bank account while services are performed. The member agrees with all of the provisions and conditions outlined within.

## Acknowledgment of Refunds & Draft Date Changes

ACH Refunds: If a refund is due such will be made through the ACH process only. Refunds may take up to 10 days to process. In the event my EFT or draft is returned from my bank unpaid, I agree that a fee of $25.00 or as allowed by law may be charged to my account via draft or EFT. Furthermore, I warrant that I am authorized to execute this payment authorization and the above information is true and correct. Draft Date Changes: A client may stop any ACH debit by providing written notice to LPG at least three (3) business days prior to the scheduled payment. If you should need to notify us of your intent to cancel and/or revoke this authorization you must contact us three (3) business days prior to the questioned debit being initiated.

**Client Signature:**
*Debra Archambault*
**Date:**
8/25/2021
**Printed Name:**
Debra Archambault

ID: 4279563 Signed: 2021-08-25T14:06:45-05:00

## Preauthorized Checking and ACH Authorization Form

I hereby apply for and agree to establish a non-interest bearing special purpose account (the "Account") with a bank ("Bank") selected by LPG, its payments processors, and/or their successors for the purpose of accumulating funds to pay for such goods and services as I so direct LPG to perform. This application is subject to Bank's customer identification program, as required by the USA PATRIOT ACT and other applicable laws, and accordingly, I hereby represent that the above information is true and complete to the best of my knowledge and belief. The bank account information provided above may be subject to account validation processes to include pre-notation and a $0.01 micro-deposit.

**Account Owner Name:** Debra Archambault

**Address:** 5 Carlann Lane   **City:** Valley Cottage   **State:** NY   **Zip:** 10989

**Mobile Phone #:**   **E-Mail:** darchambault66@gmail.com

## DESIGNATED BANK ACCOUNT INFORMATION

**Bank Name:** STERLING NATIONAL BANK

**Name as it appears on bank ACCOUNT:** Debra Archambault

**Routing Number:** ▉▉▉▉   **Account Number:** ▉▉▉▉   **Checking or Saving:** Checking

## DESIGNATED BANK ACCOUNT PAYMENT AUTHORIZATION SCHEDULE

**Total Amount of Debit:** $857.92   **Date of Next Debit:** Sep 27, 2021

I authorize Payment Automation Network to initiate Automatic Clearing House (ACH) or Electronic Funds Transfer (EFT) or Remotely Created Check (RCC) from my designated bank account at the financial institution identified above. I authorize Payment Automation Network to debit my bank account according to the schedule of debits provided to Payment Automation Network by me or on my behalf or as otherwise provided by agreement. I understand that debits will be withdrawn on the due date unless otherwise indicated and that sufficient funds must be available in designated account at least two (2) business days prior to the actual date of the debit. Upon my approval, Payment Automation Network may adjust the amount being debited from designated bank account. This authorization is to remain in force until the schedule of debits is completed or until Payment Automation Network has received written notification from me of a change or termination, allowing Payment Automation Network no fewer than five (5) business days to act. Payment Automation Network shall not be liable to any person for not completing a transaction as a result of any limit on my designated bank account or if a financial institution fails to honor any debit from such account. I understand it is my responsibility to notify Payment Automation Network immediately if a scheduled debit does not occur. I authorize Payment Automation Network to recover funds by ACH/EFT/RCC debit from my bank account in the event of an error or in the event that a prior debit is returned for any reason, including non-sufficient funds. I understand that a $25.00 service charge will be added for every NSF draft. I understand I can call Payment Automation Network at 800-813-3740 to cancel the automatic draft payments. Payments will be drafted on the payment due date of the original Servicing agreement. I understand and agree that Payment Automation Network, Inc. is a private company, and is not affiliated with any academic or

00150
ID: 4279563 Signed: 2021-08-25T14:06:45-05:00

**Exhibit C**

**Services Provided**

The Consumer Legal Group PC, a licensed law corporation and its employed and affiliated attorneys (collectively "CLG") will provide legal services wherein it will represent You ("You") in connection with disputes You (may) have with the creditors listed below (see Enrolled Accounts). CLG is prepared to do the following as part of its representation of You:

- Assist You in stopping creditors and any related debt collectors from harassing or contacting You in connection with any of the debts identified below;
- Dispute the legal validity of the debts identified below based upon information provided by You;
- Assist You in addressing erroneous or inaccurate information in connection with debts identified below;
- Represent You in any lawsuit filed against You in connection with any of these debts;
- Defend You against any collection activity or lawsuit on any debt identified below at any point in time, without expiration;
- Initiate legal action in a court of competent jurisdiction against any creditor that violates any state or federal law in connection with any debt identified below; and
- Determine Your qualification for bankruptcy under Chapter 7 or Chapter 13 of the U.S. Bankruptcy Code, and counsel You regarding the procedures and effects of bankruptcy as well as Your qualification to file the same. CLG does not engage in the practice of bankruptcy law but we will evaluate Your file and determine the best course of action for You which may be bankruptcy.

Importantly, pursuant to relevant Rules of Professional Conduct, by way of general information and as a disclaimer, CLG makes no representation or guarantee that it will accomplish all of the tasks identified herein given that some matters, information, and ability are outside and beyond CLG's control.

CLG (or its local counsel as designated on a case-by-case basis) will serve as Your attorney for all purposes in connection with these disputes and will be available to render legal assistance necessary to resolve these debts. The fees that are set forth below are flat fees that are all inclusive – no additional fee or cost will be charged by CLG at any time during the duration of Your dispute with the creditors identified below. Fees paid to CLG are in connection with and contemplation of the services described herein and are earned by CLG at the time they are paid and are for services rendered to You as set forth herein.

You understand that You are hiring a New York law firm which employs attorneys who are licensed to practice law in the states of New York and New Jersey, primarily because not every creditor is located or has an office in the state where You live and not all creditors are based in the state where You live. You acknowledge that CLG performs services pursuant to the Fair Debt Collections Practices Act as well as other federal statutes and You have an issue which may arise thereunder. You therefore authorize CLG to represent You, regardless of the state where You reside and that You authorize CLG to engage local counsel in the individual state where You reside to represent You as if CLG was representing You itself.

EXHIBIT 4
Page 234

**Client Authorization**

You authorize CLG to challenge, where applicable and based on the information You provide, each of the debts listed below, which You believe and advise CLG to be in any way invalid, inaccurate, or otherwise without a legal basis. You also authorize CLG to obtain a copy of Your credit report to assist in the process of analyzing Your account and developing a strategy regarding the resolution of debts that are excessive or otherwise unauthorized by law. However, it is expressly understood and agreed that CLG is not a credit repair organization, is not engaged in credit repair, and will not be undertaking any work as to Your credit repair, even though CLG's work services towards resolving debt may have an effect and impact on Your credit. You further authorize CLG, acting under power of attorney for You, to affix Your signature to documents sent on Your behalf in relation to the matters addressed herein. Finally, You authorize CLG to communicate with You via email, text message, telephone, and facsimile. Any of the authorizations set forth herein can be revoked at any time by written communication to CLG.

You understand that failure to pay debts as they become due will adversely affect Your credit score and will likely continue to incur late fees and penalties on the accounts during period of representation.

**Description of Services to be Performed**

CLG will obtain Your credit reports, analyze them, and develop strategies for correcting invalid or unlawful debts for which You should not be held legally responsible. Again, it is expressly understood and agreed that CLG is not a credit repair organization, is not engaged in credit repair, and will not be undertaking any work as to Your credit repair, even though CLG's work services towards resolving debt may have an effect and impact on Your credit. Where appropriate, CLG will use existing laws and interact with creditors and credit bureaus on Your behalf to invalidate Your debts and remove such invalid debts from Your credit reports. CLG will also interact with collection agencies, as applicable, to invalidate Your debts by requiring them to supply evidence of Your indebtedness to them, or any other legal mechanism(s). CLG will also investigate Your "delinquent" accounts to determine the most effective method for invalidating Your debts or otherwise removing any legal liability for such debts, up to and including the initiation of lawsuits on Your behalf against Your creditors and their third-party debt collectors.

In addition, if a lawsuit is filed against You, CLG will represent You in such a lawsuit and will not charge any additional fees for such representation provided such a lawsuit was initiated after the date You sign this Agreement and after at least one payment to CLG has been made in accordance with the schedule contemplated herein.  In the event a lawsuit was initiated against You before the date You execute this Agreement and You elect to have CLG represent You, an additional fee of $500.00 will be charged. Where appropriate, if legal fees are recovered from an adverse party, CLG will retain such fees for its services.  You will be responsible for any damages resulting from any lawsuit.  Any costs incurred in a lawsuit will be paid by CLG out of the fees set forth below, including the fees of any attorney retained on Your behalf in a jurisdiction in which CLG is not admitted to practice law. No additional payment from You to CLG will be necessary for the

EXHIBIT 4

Page 235

defense of any lawsuit filed against You after the date You execute this Agreement and after at least one payment to CLG has been made in accordance with the schedule contemplated herein. You will, however, be responsible for any damages resulting from such lawsuits or any settlements reached during such lawsuits.

CLG does not, as part of its representation of You, include the following services: (i) tax, financial planning, or accounting advice (note that the discharge of debt can trigger a taxable event so the appropriate tax professional should be consulted), (ii) modification, collection, or improvement of Your credit reports or credit score, (iii) bankruptcy services, (iv) except as provided for herein, representation in any matter before any court or arbitration hearing, including but not limited to foreclosure proceedings; (v) guarantee elimination of harassment or collection calls from credits or collectors though we will do our best to cause them to be ceased. CLG does not guarantee any services nor any outcome in Your (or any) legal matter.

## Fees

You will pay the fees set forth below for the legal services provided by CLG (CLG's services are outlined above). No fee or other cost will be charged or collected beyond the flat fee set forth below (or the $500 charge for a lawsuit which was initiated prior to Your signing this Agreement). This is the only amount that You must pay to CLG for its services, which includes any cost, filing fee or vendor's fee associated with CLG's representation of You, and this fee is not escrowed but rather earned received by CLG. This fee does NOT, however, include any settlement that You may have to pay to any creditor if You opt to settle a debt prior to or during the course of a lawsuit.

## Refund Policy

You may cancel this agreement at any time and will not be required to pay for any further services as of the date of cancellation.  Any fee You pay, however, shall be deemed earned at the time it is paid and is not refundable. {PAGEBREAK}

## Debt Settlement

You understand that CLG is not a settlement company and the fees You are paying are for the services of CLG's attorneys. It is expressly understood and agreed that CLG is not a credit repair organization, is not engaged in credit repair, and will not be undertaking any work as to Your credit repair, even though CLG's work services towards resolving debt may have an effect and impact on Your credit.

If You enroll any debt that is legally deemed "secured" (which is subject to and governed by a security interest) such as a car loan wherein a lender has a right to repossess the vehicle or other secured item, You are prepared and understand that the item may be repossessed or You may otherwise lose possession of the item while CLG works its process to challenge and dispute the underlying debt.

## Actions Required of You

EXHIBIT 4
Page 236

You agree to provide CLG with all correspondence You receive from any creditor, credit bureau, attorney, or court of law.  You further agree to keep a log of all communications, including telephonic and electronic communications, from any creditor or credit reporting agency to You from the date You execute this Agreement until the conclusion of Your representation.

You agree to: (i) provide CLG with all information and documents regarding the debt(s) You seek to modify. Such information provided must contain the current account balance and the name of the creditor and account number; (ii) As an ongoing obligation, You will provide all information related to the debt as requested by CLG. All information provided by You must be truthful and accurate. CLG is under no obligation to verify information supplied by You. You will forward all correspondence from creditors and collection agencies, including collection letters, demands and complaints within five (5) days to CLG. If a creditor or collection agency telephones client, You will not engage in debt resolution discussions. If a creditor or collection agency engages in harassing or abusive conduct, You will promptly notify CLG and provide complete and accurate information regarding such contacts; (iii) You will timely respond to all requests, communications or documentation from CLG or its representatives and will promptly provide CLG with any change of address or other contact information; (iv) You shall make payments as set forth herein, a copy of said schedule is attached hereto and incorporated by this reference. You agree to make all the payments on the designated dates; and (v) You agree to timely and fully pay all debt modification settlements negotiated by CLG.

You expressly understand and agree that communication with CLG and any agent (including counsel) engaged by CLG to act on Your behalf is of paramount importance. Proper representation and service cannot be provided if You cease or fail to communicate with CLG or its agent(s). If CLG attempts to contact You and is unsuccessful because You do not answer, return calls, respond to communication, You understand and acknowledge that such (in)action can have significant consequences, including potential judgments or garnishments. In such a case, CLG reserves the right to cease representing You and to terminate this Agreement, in accordance with relevant state bar ethical and court obligations and considerations.

**Right to Conduct Business Electronically and Contact You**

You agree that CLG may contact You electronically and telephonically and that all business with CLG may be conducted electronically. You further agree that CLG may transmit data, including that regarding Your credit profile, electronically.  You further agree that any electronic communication carries the risk of disclosure to a third party and that CLG will not be held responsible for any such inadvertent disclosure of information. A facsimile or email transmission of this signed agreement, via an email attachment or otherwise, will be as valid as the original signed agreement. This agreement may not be modified except in writing by both parties.

**Malpractice Insurance**

CLG hereby discloses that it maintains a malpractice insurance policy that covers and insures its representation of You. If You desire to make a claim against that insurance policy, You must first contact CLG and disclose Your claim and the nature of the claim, at which point CLG agrees to

EXHIBIT 4
Page 237

assist You in obtaining any and all information necessary to prepare a file a claim. Any claim brought against CLG must be brought within six (6) months of the claimed offense.

## Applicable Law and Confidentiality

You understand and agree that CLG is based out of the State of New York, is a licensed law corporation under the State Bar of New York, and that New York law applies to this Agreement. You further understand that CLG is bound to strict rules of confidentiality and attorney-client privilege in connection with the rules applicable to attorneys licensed to practice law in the State of New York. You further understand and agree that You have sought the representation of CLG with full knowledge of its location and licensing, and that CLG works with other/local/outside attorneys licensed in nearly all 50 states and the District of Columbia as affiliated counsel to allow CLG to provide a complete representation of You in nearly every state in which You are sued or in which a dispute might arise. You have the right to know the licensed attorney with whom CLG has affiliated in any state and at any time but understand and agree that CLG may choose to change the local attorney with whom it is affiliated in any given jurisdiction, always provided only that CLG shall have an affiliated attorney engaged to represent Your interests. At any time that You would like to know the identity of local counsel, which is working on Your file, please do not hesitate to contact us though as part of our protocol, we often introduce You to local counsel as the matter develops.

This Agreement constitutes the entire agreement of CLG and You, it being understood and agreed that all prior and contemporaneous representations, statements, understandings and agreements, whether oral/verbal or written, between CLG and You or made on CLG's behalf, at any time, or which were purportedly made on CLG's behalf, concerning the subject matter of this Agreement, the scope of services to be performed, any guarantees or representations as to what CLG will do, are merged into this Agreement, which alone fully and completely expresses their agreement, and that the same is entered into after full investigation. You agree that You have not relied upon any statement or representation, of any kind, made by anyone, whether oral/verbal or written, not embodied in this Agreement made by the other or any third party acting on behalf of the other.

Fee Dispute Resolution: Part 1215 of Title 22 of the Codes, Rules and Regulations of the State of New York, which governs written letters of engagement, if the client has a dispute with the attorney regarding fees, the client has the option of instituting civil litigation or proceeding in arbitration. The client has the right to arbitrate fee disputes between $1,000 and $50,000 pursuant to part 137 of the rules of the chief administrator. Arbitration is considered to be an efficient and less costly method of resolving disputes. If the client chooses arbitration as a forum, the arbitration result will be final and binding. A single arbitrator will hear disputes of $6,000 or less. A panel of three arbitrators, one member of which is not an attorney, will hear disputes of more than $6,000 up to $50,000. Arbitrators are usually chosen by an independent arbitration association and are impartial as well as being familiar with the areas of law and/or facts involved in the dispute. Should there be a dispute regarding fees, the law of New York shall apply in arbitration as well as civil litigation.

{PAGEBREAK}

EXHIBIT 4
Page 238

## Client Acknowledgements

By signing this agreement, You acknowledge that CLG has not instructed You to breach any contract, fail to make any required payment, or fail to perform any obligation You have lawfully incurred. CLG reserves the right to terminate this agreement if (a) required by the State Bar of New York Rules of Professional Conduct, (b) You refuse to communicate with CLG or respond to reasonable requests for information necessary to represent You in an effective way, (c) You fail to make timely payment of the amount due under hereunder, or (d) Your payments are returned multiple times for any reason. CLG will not pay any of the debts identified below and does not guarantee that any debt You now have or may incur will be invalidated or settled in association with CLG's representation of You. You understand and agree that You must forward any communication You receive in printed or electronic form from any creditor, court, or representative of other a creditor or a court to the address, email, or fax number provided below, and that You must keep a log of all telephonic communications with any creditor or credit reporting agency. You, the client, may cancel this Agreement at any time by submitting three days' written notice of cancellation by mail, email, or fax, and shall not be responsible for any payments due after the date of cancellation. A payment due within three days of the date of written cancellation shall be processed and shall not be refunded.

If, during the course of representation, CLG believes a creditor or agent of any creditor may have violated a federal or state consumer protection law (including, but not limited to, the Fair Debt Collection Practices Act or Truth in Lending Act) with respect to You, You authorize CLG to pursue such claim against such party on Your behalf. You recognize that CLG may incur additional attorney fees in pursuing such a claim. CLG may recover any additional fees from the creditor using federal or state consumer protection laws that permit attorney's fees to be recovered from the creditor or creditor's agent if the claim is successful. If a debt listed hereon is settled together with a claim against the creditor for a violation of consumer protection law, and the creditor pays CLG's attorney's fees incurred in pursuing the claim, CLG may credit You with a pro rata portion of fees paid with respect to the debt settled.

**You may cancel this contract without penalty or obligation at any time before midnight of the 3rd business day after the date on which You signed the contract. A separate though related "Notice of Right to Cancel" is being provided to Client contemporaneous with this Agreement. See the attached notice of cancellation form for an explanation of this right.**

| | |
|---|---|
| Client Signature: | {SIGNATURE} |
| Date: | {SIGNDATE} |
| Co-Applicant Signature: | {COSIGNATURE} |
| Date: | {COSIGNDATE} |

**CONSUMER LEGAL GROUP PC**

**Aryeh Weber, Chairman**
**PO Box 412 Elmsford, NY 10523**

EXHIBIT 4
Page 239

**Support@ConsumerLegalGroup.org**
**Tel. 212.920.1247**

{{NEW_PAGE}}

Program Acknowledgements

The monthly payments I am making go towards Consumer Legal Group PC attorney representation fees.

Initial:

{{INITIAL}}

The attorney fees I am paying will go to Consumer Legal Group PC and not to my creditors. The fees do not accumulate towards a settlement, and they will not be used to pay my creditors / debts.

Initial:

{{INITIAL}}

Consumer Legal Group PC is a law firm specializing in debt resolution; NOT debt settlement. I understand the difference.

Initial:

{{INITIAL}}

If I receive a lawsuit on an enrolled account, Consumer Legal Group PC will represent me and handle all legal proceedings at no additional cost.

Initial:

{{INITIAL}}

Depending on my current credit standing, this program may have a temporary negative effect on my credit.

Initial:

{{INITIAL}}

I understand that if any of the enrolled debts are auto loans, secured, or have any type of collateral, those items may be repossessed.

Initial:

{{INITIAL}}

{PAGEBREAK}

EXHIBIT 4
Page 240

**Enrolled Accounts**

{Creditor List}

{PAGEBREAK}

## Client Intake Form

**Name:** {FULLNAME}
**Address:** {FULLADDRESS}

**Home Phone:** {PHONE}
**Cell Phone:** {PHONE3}
**Email:** {EMAIL}
**Last 4 SSN:** {ENCSSN}

{PAGEBREAK}

**Schedule of Payments**

I agree to this payment schedule – **Client Initials:** {INITIAL}

{DraftSchedule}

{PAGEBREAK}

**Electronic Payment Authorization**

| | |
|---|---|
| **Bank Name:** | {BANKNAME} |
| **Name on Account:** | {NAMEONACCT} |
| **Account Type:** | {ACCTTYPE} |
| | Other (specify: {INPUT}) |
| **Routing Number:** | {ROUTINGNUM} |
| **Account Number:** | {ACCOUNTNUM} |
| **Next Payment Date:** | {PM1_DATE}          **Amount:** ${PM1} |
| **Recurring Payment Start Date:** | {StartDate} |

By signing below, I authorize and permit CLG or their designees to initiate electronic funds transfer via an Automated Clearing House system (ACH) from my account listed above. I will also provide CLG with a voided check or savings deposit slip.

If necessary, CLG may make adjustments if errors have occurred during the transaction. The date of the draft is listed above, however, if the draft date falls on a weekend or bank holiday, the debit transaction will take place on the next business day. This authority will remain in effect until CLG

EXHIBIT 4
Page 241

is notified by the Client in writing at least 5 days prior to the next scheduled draft date. No other forms of cancellation by Client(s) will be observed. If the debit is returned because of non-sufficient funds or uncollected funds, then the originator and its financial institution may reinitiate the entry up to two (2) times. The reversal of funds from a client's account that was drafted in error cannot be made until seven business days from the draft date. The Client agrees to waive all rights of reversal or refusal of any payment on any draft that CLG may make against the Client's bank account while services are performed. The Client agrees with all of the provisions and conditions outlined within.

**Acknowledgment of Refunds & Draft Date Changes**

ACH Refunds: If a refund is due such will be made through the ACH process only. Refunds may take up to 10 days to process. In the event my EFT or draft is returned from my bank unpaid, I agree that a fee of $25.00 or as allowed by law may be charged to my account via draft or EFT. Furthermore, I warrant that I am authorized to execute this payment authorization and the above information is true and correct. Draft Date Changes: I may stop any ACH debit by providing written notice to CLG at least three (3) business days prior to the scheduled payment. If I should need to notify CLG of my intent to cancel and/or revoke this authorization, I must contact CLG not less than three (3) business days prior to the questioned debit being initiated.

| | |
|---|---|
| **Client Signature:** | **{SIGNATURE}** |
| **Date:** | **{SIGNDATE}** |
| **Printed Name:** | **{FULLNAME}** |

{PAGEBREAK}

**Preauthorized Checking and ACH Authorization Form**

**Account Owner Name:** {NAMEONACCT}

**Address:** {ADDRESS} {ADDRESS2}     **City:** {CITY}  **State:** {STATE}  **Zip:** {ZIP}

**Mobile Phone #:**     {PHONE2}          **E-Mail:**      {EMAIL}

## DESIGNATED BANK ACCOUNT INFORMATION

**Bank Name:** {BANKNAME}

**Name as it appears on bank ACCOUNT:**     {NAMEONACCT}

**Routing Number:** {ROUTINGNUM}  **Account Number:** {ACCOUNTNUM}  **Checking or Saving:** {ACCTTYPE}

EXHIBIT 4
Page 242

Case 8:23-ap-01046-SC   Doc 19   Filed 07/10/23   Entered 07/10/23 15:22:44   Desc Main
Declaration of Richard A. Marshack   Page 56 of 58
Case 8:23-ap-01046-SC   Doc 19   Filed 07/10/23   Entered 07/10/23 16:25:02   Desc Main
Declaration of Richard A. Marshack   Page 244 of 289

## DESIGNATED CREDIT/DEBIT INFORMATION

**Card Holder Name:** {CC_NAME}
**Card Number:**       {CC_NUM}
**Expiration Date:**   {CC_EXP}
**CVC:**               {CC_CVV}

## DESIGNATED ACCOUNT PAYMENT AUTHORIZATION SCHEDULE

**Total Amount of Debit:**        ${PM1}      **Date of Next Debit:**        {PM1_DATE}

I hereby apply for and agree to establish a non-interest bearing special purpose account (the "Account") with a bank ("Bank") selected by CLG and/or its successors for the purpose of accumulating funds to pay for such goods and services as I so direct, or any other service provider selected by CLG, to perform. This application is subject to Bank's customer identification program, as required by the USA PATRIOT ACT and other applicable laws, and accordingly, I hereby represent that the above information is true and complete to the best of my knowledge and belief. The bank account information provided above may be subject to account validation processes to include pre-notation and a $0.01 micro-deposit.

I hereby authorize Bank, directly or any other service provider selected by CLG, to administer the Account on my behalf by (a) periodically transferring and depositing funds to the Account, via any payment media currently in use, and (b) periodically disbursing funds from the Account pursuant to instructions that I may give from time to time. I hereby authorize payments from the Account for the fees and charges provided for in this application and in the agreement. I hereby grant permission for Bank to share information regarding the Account with any service provider to facilitate the transactions I may initiate that involve the Account, and with any other party that is essential to the administration of the Account on my behalf. My signature below provides permission to be contacted by phone at the number provided with this authorization. A payment reminder may be sent to my phone number via text messaging prior to the payment schedule above.

This authorization shall remain in full force and effect until I provide a verbal or written termination notice to CLG or such other service provider as is selected by CLG. Any such notice, and any other written notice that is provided for in this Application or the Agreement, shall be sent to CLG directly at the address set forth in the Agreement.

Account Holder's
Signature:              {SIGNATURE}                    Date:    {SIGNDATE}

EXHIBIT 4
Page 243

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is 10250 Constellation Boulevard, Suite 900, Los Angeles, CA 90067.

A true and correct copy of the foregoing documents entitled: BRIEF OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS ADDRESSING QUESTIONS RAISED IN COURT'S ORDER REQUESTING ADDITIONAL BRIEFING IN SUPPORT OF SALE MOTION  on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.    <u>TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)</u>**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document.  On 7/17/2023, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Eric Bensamochan**    eric@eblawfirm.us, G63723@notify.cincompass.com
- **Ronald K Brown**    ron@rkbrownlaw.com
- **Christopher Celentino**    christopher.celentino@dinsmore.com, caron.burke@dinsmore.com
- **Shawn M Christianson**    cmcintire@buchalter.com, schristianson@buchalter.com
- **Randall Baldwin Clark**    rbc@randallbclark.com
- **Leslie A Cohen**    leslie@lesliecohenlaw.com, jaime@lesliecohenlaw.com;clare@lesliecohenlaw.com
- **Daniel A Edelman**    dedelman@edcombs.com, courtecl@edcombs.com
- **Christopher Ghio**    christopher.ghio@dinsmore.com, Kristina.Heller@Dinsmore.com
- **Jeffrey I Golden**    jgolden@go2.law, kadele@ecf.courtdrive.com;cbmeeker@gmail.com;lbracken@wgllp.com;gestrada@wgllp.com;golden.jeffreyi.b117954@notify.bestcase.com
- **Richard H Golubow**    rgolubow@wghlawyers.com, jmartinez@wghlawyers.com;svillegas@wghlawyers.com
- **D Edward Hays**    ehays@marshackhays.com, ehays@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com;cmendoza@marshackhays.com;cmendoza@ecf.courtdrive.com
- **Alan Craig Hochheiser**    ahochheiser@mauricewutscher.com, arodriguez@mauricewutscher.com
- **Garrick A Hollander**    ghollander@wghlawyers.com, jmartinez@wghlawyers.com;svillegas@wghlawyers.com
- **Razmig Izakelian**    razmigizakelian@quinnemanuel.com
- **Joon M Khang**    joon@khanglaw.com
- **Ira David Kharasch**    ikharasch@pszjlaw.com
- **Nicholas A Koffroth**    nkoffroth@foxrothschild.com, khoang@foxrothschild.com
- **David S Kupetz**    David.Kupetz@lockelord.com, mylene.ruiz@lockelord.com
- **Christopher J Langley**    chris@slclawoffice.com, omar@slclawoffice.com;langleycr75251@notify.bestcase.com;ecf123@casedriver.com
- **Daniel A Lev**    daniel.lev@gmlaw.com, cheryl.caldwell@gmlaw.com;dlev@ecf.courtdrive.com
- **Michael D Lieberman**    mlieberman@lipsonneilson.com
- **Yosina M Lissebeck**    Yosina.Lissebeck@Dinsmore.com, caron.burke@dinsmore.com
- **Richard A Marshack (TR)**    pkraus@marshackhays.com, rmarshack@iq7technology.com;ecf.alert+Marshack@titlexi.com
- **Laila Masud**    lmasud@marshackhays.com, lmasud@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com
- **Kenneth Misken**    Kenneth.M.Misken@usdoj.gov
- **Byron Z Moldo**    bmoldo@ecjlaw.com, amatsuoka@ecjlaw.com,dperez@ecjlaw.com
- **Alan I Nahmias**    anahmias@mbn.law, jdale@mbnlawyers.com

- **Victoria Newmark**    vnewmark@pszjlaw.com
- **Queenie K Ng**    queenie.k.ng@usdoj.gov
- **Teri T Pham**    tpham@epglawyers.com, ttpassistant@epglawyers.com
- **Douglas A Plazak**    dplazak@rhlaw.com
- **Ronald N Richards**    ron@ronaldrichards.com, 7206828420@filings.docketbird.com
- **Gregory M Salvato**    gsalvato@salvatoboufadel.com,
  calendar@salvatolawoffices.com;jboufadel@salvatoboufadel.com;gsalvato@ecf.inforuptcy.com
- **Olivia Scott**    olivia.scott3@bclplaw.com
- **Jonathan Serrano**    jonathan.serrano@dinsmore.com
- **Paul R Shankman**    PShankman@fortislaw.com, info@fortislaw.com
- **Leslie Skorheim**    leslie.skorheim@usdoj.gov
- **Andrew Still**    astill@swlaw.com, kcollins@swlaw.com
- **United States Trustee (SA)**    ustpregion16.sa.ecf@usdoj.gov
- **Sharon Z. Weiss**    sharon.weiss@bclplaw.com,
  raul.morales@bclplaw.com,REC_KM_ECF_SMO@bclplaw.com
- **Johnny White**    JWhite@wrslawyers.com, jlee@wrslawyers.com;eweiman@wrslawyers.com

**2.    SERVED BY UNITED STATES MAIL**:  On July 17, 2023, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows.

Parties not on ECF but require service of filings:

Grobstein Teeple LLP
23832 Rockfield Blvd suite 245
Lake Forest, CA 92630

Jason Patterson Stopnitzky
52 Cupertino Circle
Aliso Viejo, CA 92656

**3.    SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on July 17, 2023, I served the following persons and/or entities by personal delivery, mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

The Honorable Scott C. Clarkson
United States Bankruptcy Court, Central District of California
411 West Fourth Street, Suite 5130 / Courtroom 5C
Santa Ana, CA 92701-4593

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct

| 7/17/2023 | Kimberly Hoang | /s/ Kimberly Hoang |
|-----------|----------------|--------------------|
| *Date* | *Printed Name* | *Signature* |