## DECLARATION OF KATHLEEN P. MARCH ESQ.

I, KATHLEEN P. MARCH, declare:

1.  I am an attorney in good standing, admitted to practice law in California and New York.  I own and run The Bankruptcy Law Firm, PC, counsel to Greyson Law Center PC ("Greyson") on Greyson's Motion for Administrative Claim, and on Greyson's herein Motion for order ordering Trustee Marshack's attorney, Christopher Celentino, Esq., to restore Greyson's access to Greyson's data, which Celentino and Celentino's field agents seized from Greyson, on 6/2/23 and on 6/12/23, and thereafter, and which Celentino/his field agents, have kept Greyson locket out of, to present. My firm is also counsel of record defending Greyson in Trustee Marshack's adversary proceeding.  I make this Declaration in support of Greyson's herein Motion.

2.  Attached to my Declaration, as **Exhibit A**, are the relevant pages of debtor Litigation Practice Group PC's ("LPG") pacer bankruptcy docket.  The pacer docket shows LPG filed its Chapter 11 bankruptcy case on 3/20/23, and was originally a debtor in possession.

3.  Bankruptcy Court had, on 5/8/23, entered an Order [Dkt65], granting the Application of the Office of US Trustee, to appoint Richard Marshack as Chapter 11 Trustee for LPG.  That Order [dkt.65] is **Exhibit B** to this Declaration.  The Notice of Entry on that Order shows that Order was not served on Greyson, or on anyone else.

---

**NOTICE OF MOTION AND MOTION OF *GREYSON LAW CENTER PC*, FOR AN ORDER (1) VACATING THE 5/26/23 LOCKOUT AND PRELIMINARY INJUNCTION ORDER AS TO GREYSON, AND (2) ORDERING TRUSTEE MARSHACK'S ATTORNEY, CELENTINO, TO RESTORE *GREYSON'S* ACCESS TO ALL OF *GREYSON'S* DATA, WHICH CELENTINO SEIZED AND LOCKED *GREYSON* OUT OF ON 5/2623 AND 6/12/23, CONTINUING TO PRESENT; DECLARATIONS OF HAN TRINH AND  KATHLEEN P. MARCH, ESQ.**                                                                2**

4.     On 5/25/23 Marshack filed adversary proceeding 8:23-ap-01046-SC [dkt

entry 93 on main case docket].  The relevant pages of the adversary proceeding pacer

docket are **Exhibit C** hereto.

5.     On 5/25/23-- the same day Marshack filed his adversary proceeding--

Marshack, filed **under seal**, a motion [dkt.4 in adversary proceeding docket], moving

for lockout and preliminary injunction.  Marshack's motion to seal is dkt 3 in adv

proc docket (attached as **Exhibit E** to this Declaration), and states Marshack requests

sealing because Marshack does not want to alert debtor to Marshack's investigation

and strategy.  BkyCt's order granting sealing is dkt.11 in adv proceeding (and is

attached as **Exhibit F** to this Declaration).

6.     **Exhibit H** is the California Secretary of State printout showing Greyson

was created by filing with Secretary of State on 5/12/23, which is almost 2 months

after LPG filed bankruptcy.

7.     On 5/26/23 the Bankruptcy Court granted Trustee Marshack dkt.13, the

***Lockout and Preliminary Injunction Order*** [copy of that ***Lockout and Preliminary***

***Injunction Order*** is **Exhibit D** to this Declaration. So far as the pacer docket for the

adversary proceeding shows, no defendants had notice of that 5/26/23 hearing, they

hadn't been served with the adversary proceeding or with Trustee's emergency

motion for the lockout and preliminary injunction order, and no defendants had

---

**NOTICE OF MOTION AND MOTION OF *GREYSON LAW CENTER PC*, FOR AN ORDER (1) VACATING
THE 5/26/23 LOCKOUT AND PRELIMINARY INJUNCTION ORDER AS TO GREYSON, AND (2)
ORDERING TRUSTEE MARSHACK'S ATTORNEY, CELENTINO, TO RESTORE *GREYSON'S* ACCESS TO
ALL OF *GREYSON'S* DATA, WHICH CELENTINO SEIZED AND LOCKED *GREYSON* OUT OF ON 5/2623
AND 6/12/23, CONTINUING TO PRESENT; DECLARATIONS OF HAN TRINH AND  KATHLEEN P.
MARCH, ESQ.**                                                                                 22

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

notice on 5/26/23, that the Bankruptcy Court had granted the 5/26/23 lockout and

preliminary injunction Order.

8.    That adversary proceeding docket shows that the summonses for that

adversary proceeding, to serve Greyson, Han, and Jayde, with Trustee's adversary

proceeding complaint, were not issued until 6/2/23—which was a week **after** the

5/26/23 lockout order and preliminary injunction [dkt.13 in adv proc docket, attached

as **Exhibit D** hereto] was granted to Trustee Marshack by the Bankruptcy Court.

9.    In my 35 years of bankruptcy experience, trustees usually promptly

inform parties in interest that they have been appointed as trustees.  That is NOT the

case here.  The LPG pacer docket shows Trustee Marshack and his attorneys

**concealed** that Trustee Marshack had been appointed; concealed (by not serving

summonses) that Trustee had filed an adversary proceeding (8;23-ap-01046-SC)

against Tony Diab and many additional defendants, including Greyson Law Center

PC, and Han and Jayde Trinh; concealed that Trustee had moved for a lockout order

and preliminary injunction (by Trustee **filing** Trustee's emergency motion for lockout

order and preliminary injunction **under seal)**;  and concealed that Trustee's motion

for lockout and preliminary injunction had been granted on 5/26/23, until Trustee

personnel arrived to lock the Greyson personnel out of the Greyson offices at 3345

Michelson Dr., Irvine, CA, 92612, Suite 400, on 6/2/23.

---

**NOTICE OF MOTION AND MOTION OF *GREYSON LAW CENTER PC*, FOR AN ORDER (1) VACATING THE 5/26/23 LOCKOUT AND PRELIMINARY INJUNCTION ORDER AS TO GREYSON, AND (2) ORDERING TRUSTEE MARSHACK'S ATTORNEY, CELENTINO, TO RESTORE *GREYSON'S* ACCESS TO ALL OF *GREYSON'S* DATA, WHICH CELENTINO SEIZED AND LOCKED *GREYSON* OUT OF ON 5/2623 AND 6/12/23, CONTINUING TO PRESENT; DECLARATIONS OF HAN TRINH AND  KATHLEEN P. MARCH, ESQ.**

10.    Granting the 5/26/23 Lockout and Preliminary Injunction Order against

entities—such as Phoenix Law Center—which was an alter ego of debtor LPG,

protected the LPG bankruptcy estate.

11.    But granting the 5/26/23 Lockout and Preliminary Injunction Order, **as to

Greyson**, was error, because Trustee's attorney Celentino obtained the 5/26/23

Lockout and Preliminary Injunction Order against Greyson, based **on false

allegations** of Celentino's Declarants, that Greyson was an alter ego of debtor LPG.

12.    Greyson was not, and has never been, the alter ego of debtor LPG (as

Han Trinh's Declaration hereto attests).

13.    By proceeding on a sealed motion, with no notice to Greyson (or anyone

else) on 5/26/23, Celentino **assumed the risk** that Greyson—which did not get to

defend itself at the 5/26/23 hearing, would be "collateral damage" caused bythe

Lockout and Preliminary Injunction Order being granted against Greyson, and

Greyson was collateral damage.

14.    Pursuant to FRBP Rule 9011(b)(3), Celentino was required to perform

"**reasonable inquiry**" regarding whether or not Greyson was an alter ego of debtor

LPG, **before** Celentino filed Celentino's Motion moving for the *Lockout and

Preliminary Injunction Order* **against Greyson**.    Celentino had over two months to

investigate:  Debtor LPG filed bankruptcy on 3/20/23.  Celentino's adversary

proceeding and *Motion* was not filed until 5/25/23; *Lockout and Preliminary*

**NOTICE OF MOTION AND MOTION OF *GREYSON LAW CENTER PC*, FOR AN ORDER (1) VACATING
THE 5/26/23 LOCKOUT AND PRELIMINARY INJUNCTION ORDER AS TO GREYSON, AND (2)
ORDERING TRUSTEE MARSHACK'S ATTORNEY, CELENTINO, TO RESTORE *GREYSON'S* ACCESS TO
ALL OF *GREYSON'S* DATA, WHICH CELENTINO SEIZED AND LOCKED *GREYSON* OUT OF ON 5/2623
AND 6/12/23, CONTINUING TO PRESENT; DECLARATIONS OF HAN TRINH AND  KATHLEEN P.
MARCH, ESQ.**                                                                     5

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Injunction Order* entered 5/26/23  (see main case, and adversary proceeding pacer

dockets attached as Exhibits hereto).

15.    Reasonable investigation by Celentino, as required by FRBP Rule

9011(b)(3), to ascertain whether or not there was **evidentiary support** for alleging

Greyson was an alter ego of LPG, was particularly essential here, because Celentino

moved by sealed Motion, and had his Motion heard and granted ex parte (no notice to

Greyson), so Greyson had no opportunity to appear and defend itself, before the

5/26/23 *Lockout and Preliminary Injunction Order* was granted against Greyson.

16.    Celentino failed his Rule 9011(b)(3) duty to perform reasonable inquiry

to determine whether or not Celentino had **evidentiary support** for alleging Greyson

was an alter ego of LPG, **before** Celentino moved for the *Lockout and Preliminary*

*Injunction Order* against Greyson:  On 6/12/23, Celentino admitted to this Court that

Greyson was NOT an alter ego of LPG.  If Celentino had done reasonable inquiry, as

required by Rule 9011(b)(3), to determine whether or not Celentino had **evidentiary**

**support** for moving for the *Lockout and Preliminary Injunction Order* **against**

**Greyson, before** Celentino  moved for the *Lockout and Preliminary Injunction*

*Order* **against Greyson**, Celentino would have determined that Greyson was NOT an

alter ego of LPG, **before** Celentino moved for and obtained the *Lockout and*

*Preliminary Injunction Order* against Greyson.

---

**NOTICE OF MOTION AND MOTION OF *GREYSON LAW CENTER PC*, FOR AN ORDER (1) VACATING THE 5/26/23 LOCKOUT AND PRELIMINARY INJUNCTION ORDER AS TO GREYSON, AND (2) ORDERING TRUSTEE MARSHACK'S ATTORNEY, CELENTINO, TO RESTORE *GREYSON'S* ACCESS TO ALL OF *GREYSON'S* DATA, WHICH CELENTINO SEIZED AND LOCKED *GREYSON* OUT OF ON 5/2623 AND 6/12/23, CONTINUING TO PRESENT; DECLARATIONS OF HAN TRINH AND  KATHLEEN P. MARCH, ESQ.**                                                              **25**

17.    At the 6/12 23 hearing,  Celentino **admitted that Greyson was not an alter ego of LPG**.  **Exhibit G** hereto is the full Transcript of the 6/12/23 Bankruptcy Court hearing.  Page 33 bottom to page 34 top is where Trustee Marshack's attorney Celentino **admitted** that Greyson Law Center PC was **not** an alter ego of debtor LPG.

18.    As soon as Celentino made that admission, at the 6/12/23 court hearing, Celentino **had a duty to promptly take steps to undo the damage Celentino and his field agents had caused Greyson, by the 6/2/23 lockout/seizures/freezes; but did NOT do so.**

19.    Celentino was **negligent** in using flimsy, hearsay, false alter ego allegations against Greyson, to obtain the Lockout and Peliminary Injunction Order against Greyson, on no notice to Greyson.

20.    Celentino and Celentino's field agents compounded their negligence, by their inexcusable, several months of delay of taking steps to UNDO the severe damage they had caused Greyson, by the 6/2/23 lockout of Greyson staff (including lockout of Greyson administrator Han Trinh) from the Greyson offices, and, in the lockout, seizing Greyson's 48 client files—which Celentino did not return to Greyson for a month;  seizing all the computers in Greyson's offices (including Han's computer and the computer of Greyson's supervising attorney, Scott Eadie, Esq), and changing the passwords, so that Han and supervising attorney Scott Eadie could not

1   access the essential Greyson data on those computers, or on the cloud backup to those

2   computers, and NEVER to date returning those computers or their data to Greyson;

3
4   locking Greyson out of Greyson's emails and websites, which Celentino has NEVER

5   to date restored to Greyson; and freezing Greyson's bank account and payment

6   processor account. (All in Han Trinh Decl hereto).

7
8   21.    Worse yet, despite Celentino admitting, at the 6/12/23 hearing, that

9   Greyson was NOT an alter ego of LPG, Celentino, **after** Court on 6/12/23, seized and

10  locked Greyson out of Greyson's LUNA client management software and data, which

11
12  Greyson used to manage Greyson's clients, and did not restore Greyson's access to

13  Greyson's LUNA account until 7/7/23, and then only for an inadequate 2 week

14  period (all in Han Trinh's Declaration hereto).

15
16  22.    The conduct of Celetino and his field agents was more than just

17  negligence.  Celentino's months of delays, including Celentino's month long delay in

18
19  returning Greyson's client files to Greyson, constitute both conversion of Greyson's

20  assets, and constitute unfair competition, against Greyson, by Celentino, an agent of

21  debtor LPG.

22
23  23.    On 6/15/23, Celentino, as counsel for Trustee Marshack, amended his

24  adversary proceeding complaint, to remove the allegations that Greyson was an alter

25  ego of LPG.  But the 6/15/23 amended complaint alleged Greyson had received

26  fraudulent transfers.  (Amended Complaint, filed 6/15/23, is dkt.62 on adversary

27

28  **NOTICE OF MOTION AND MOTION OF *GREYSON LAW CENTER PC*, FOR AN ORDER (1) VACATING
THE 5/26/23 LOCKOUT AND PRELIMINARY INJUNCTION ORDER AS TO GREYSON, AND (2)
ORDERING TRUSTEE MARSHACK'S ATTORNEY, CELENTINO, TO RESTORE *GREYSON'S* ACCESS TO
ALL OF *GREYSON'S* DATA, WHICH CELENTINO SEIZED AND LOCKED *GREYSON* OUT OF ON 5/2623
AND 6/12/23, CONTINUING TO PRESENT; DECLARATIONS OF HAN TRINH AND  KATHLEEN P.
MARCH, ESQ.**

proceeding docket).  However, fraudulent transfer allegations would not have entitled

Trustee to lockout Greyson, or to seize Greyson's assets (including Greyson's client

files and Greyson's computers, all of which were Greyson assets) or to freeze/lock

Greyson out of Greyson's bank account, payment processor, emails, LUNA client

management system, or website; or to divert Greyson's US mail to Celentino.

24.    In 35 years of bankruptcy work, I have never seen a lockout and

preliminary injunction order, as was issued here, issued in a fraudulent transfer case.

25.    The only way Celentino got the 5/26/23 *Lockout and Preliminary

Injunction Order*, against Greyson, was by the **false allegation** that Greyson was an

alter ego of LPG.

I declare under penalty of perjury that the foregoing is true and correct and that

this Declaration is executed at Los Angeles, California, on December 6, 2023.


_____/s/ Kathleen P. March_____
**KATHLEEN P. MARCH**

NOTICE OF MOTION AND MOTION OF *GREYSON LAW CENTER PC*, FOR AN ORDER (1) VACATING
THE 5/26/23 LOCKOUT AND PRELIMINARY INJUNCTION ORDER AS TO GREYSON, AND (2)
ORDERING TRUSTEE MARSHACK'S ATTORNEY, CELENTINO, TO RESTORE *GREYSON'S* ACCESS TO
ALL OF *GREYSON'S* DATA, WHICH CELENTINO SEIZED AND LOCKED *GREYSON* OUT OF ON 5/2623
AND 6/12/23, CONTINUING TO PRESENT; DECLARATIONS OF HAN TRINH AND  KATHLEEN P.
MARCH, ESQ.                                                                            **28**

DsclsDue, PlnDue, DEFER, APPEAL

# U.S. Bankruptcy Court
## Central District of California (Santa Ana)
## Bankruptcy Petition #: 8:23-bk-10571-SC

*Date filed:* 03/20/2023
*341 meeting:* 04/24/2023
*Deadline for objecting to discharge:* 06/23/2023

*Assigned to:* Scott C Clarkson
Chapter 11
Voluntary
Asset

**Debtor**
**The Litigation Practice Group P.C.**
17542 17th St
Suite 100
Tustin, CA 92780
ORANGE-CA
Tax ID / EIN: 83-3885343

represented by **Joon M Khang**
KHANG & KHANG LLP
4000 Barranca Parkway, Suite 250
Irvine, CA 92604
949-419-3834
Fax : 949-419-3835
Email: joon@khanglaw.com

**Trustee**
**Richard A Marshack (TR)**
Marshack Hays Wood LLP
870 Roosevelt
Irvine, CA 92620
949-333-7777

represented by **Peter W Bowie**
Dinsmore & Shohl LLP
655 W. Broadway
Suite 800
San Diego, CA 92101
619-400-4521
Fax : 619-400-0501
Email: peter.bowie@dinsmore.com

**Christopher Celentino**
Dinsmore & Shohl LLP
655 W. Broadway
Suite 800
San Diego, CA 92101
619-400-0519
Fax : 619-400-0501
Email: christopher.celentino@dinsmore.com

**Christopher Ghio**
Dinsmore & Shohl, LLP
655 W. Broadway
Suite 800
92101
San Diego, CA 92101
619-400-0500
Fax : 619-238-1981
Email: christopher.ghio@dinsmore.com

# EXHIBIT A

**D Edward Hays**
Marshack Hays LLP
870 Roosevelt Ave

100

Irvine, CA 92620
949-333-7777
Fax : 949-333-7778
Email: ehays@marshackhays.com

**Yosina M Lissebeck**
Dinsmore & Shohl, LLP
655 W. Broadway
Suite 800
92101
San Diego, CA 92129
619-400-0473
Fax : 619-400-0501
Email: Yosina.Lissebeck@Dinsmore.com

**Laila Masud**
Marshack Hays Wood LLP
870 Roosevelt
Irvine, CA 92620
949-333-777
Fax : 949-333-7778
Email: lmasud@marshackhays.com

**Jonathan Serrano**
Dinsmore & Shohl LLP
550 S Hope Street
Suite 1765
Los Angeles, CA 91741
213-335-7758
Email: jonathan.serrano@dinsmore.com

*U.S. Trustee*
**United States Trustee (SA)**
411 W Fourth St., Suite 7160
Santa Ana, CA 92701-4593
(714) 338-3400

represented by **Kenneth Misken**
DOJ-Ust
Office of the United States Trustee
411 W. Fourth Street, #7160
Santa Ana, CA 92701
714-338-3405
Email: Kenneth.M.Misken@usdoj.gov

**Queenie K Ng**
411 West Fourth St.
Suite 7160
Santa Ana, CA 92701
714-338-3403
Fax : 714-338-3421
Email: queenie.k.ng@usdoj.gov

**Leslie Skorheim**
Office of the United States Trustee
411 W Fourth St Ste 7160
Santa Ana, CA 92701
714-338-3400
Email: leslie.skorheim@usdoj.gov

101

*Creditor Committee*
**Committee of Unsecured Creditors**
c/o Fox Rothschild LLP
Attn: Nicholas A. Koffroth
10250 Constellation Blvd.
Suite 900
Los Angeles, CA 90067
(310) 598-4150

represented by **Nicholas A Koffroth**
Fox Rothschild LLP
10250 Constellation Boulevard
Suite 900
Los Angeles, CA 90067
310-598-4150
Fax : 310-556-9828
Email: nkoffroth@foxrothschild.com

**Keith C Owens**
Fox Rothschild LLP
10250 Constellation Blvd.
Suite 900
Los Angeles, CA 90067
310-598-4150
Email: kowens@foxrothschild.com

| Filing Date | # | Docket Text |
|---|---|---|
| 05/01/2023 | 52<br>(3 pgs) | Amending Schedules (D) Filed by Debtor The Litigation Practice Group P.C.. (Khang, Joon) (Entered: 05/01/2023) |
| 05/01/2023 | | Receipt of Amending Schedules D and/or E/F (Official Form 106D, 106E/F, 206D, or 206E/F) (Fee)( 8:23-bk-10571-SC) [misc,amdsch] ( 32.00) Filing Fee. Receipt number A55409720. Fee amount 32.00. (re: Doc# 52) (U.S. Treasury) (Entered: 05/01/2023) |
| 05/01/2023 | 53<br>(1 pg) | Schedule G Non-Individual: Executory Contracts and Unexpired Leases (Official Form 106G or 206G) Filed by Debtor The Litigation Practice Group P.C.. (Khang, Joon) (Entered: 05/01/2023) |
| 05/01/2023 | 54<br>(18 pgs) | Statement of Financial Affairs for Non-Individual Filing for Bankruptcy (Official Form 107 or 207) *Amended* Filed by Debtor The Litigation Practice Group P.C.. (Khang, Joon) (Entered: 05/01/2023) |
| 05/01/2023 | 55<br>(17 pgs) | Chapter 11 Monthly Operating Report for the Month Ending: 03/31/2023 Filed by Debtor The Litigation Practice Group P.C.. (Khang, Joon) (Entered: 05/01/2023) |
| 05/02/2023 | 56<br>(10 pgs) | Objection (related document(s): 41 Notice filed by Debtor The Litigation Practice Group P.C.) /*Objection to Notice of Setting/Increasing Insider Compensation of Daniel March and Request for Hearing Thereon; Declaration of Marilyn Sorensen in Support Thereof; along with Proof of Service* Filed by U.S. Trustee United States Trustee (SA) (Ng, Queenie) (Entered: 05/02/2023) |
| 05/03/2023 | 57<br>(4 pgs) | Objection (related document(s): 56 Objection filed by U.S. Trustee United States Trustee (SA) *Joinder in Objection to Notice of Insider Compensation Filed by the Office of the United States Trustee* Filed by Creditors Debt Validation Fund II, LLC, MC DVI Fund 1, LLC, MC DVI Fund 2, LLC (Hollander, Garrick) (Entered: 05/03/2023) |
| 05/03/2023 | 68 | Hearing Held (RE: related document(s) 19 Motion for Relief from Stay - Unlawful Detainer RE: 17542 E. 17th Street, Suites 100, 105, 250 & 330, Tustin, CA 92780 filed by Creditor SDCO Tustin Executive Center, Inc.) |

102

| | | waiver. Extraordinary Relief Denied - Order by attorney. (JL) Modified on 5/18/2023 (NB8). (Entered: 05/09/2023) |
| --- | --- | --- |
| 05/03/2023 | 69 | Hearing Held (RE: related document(s)21 Motion By United States Trustee To Dismiss Or Convert Case Pursuant To 11 U.S.C. Section 1112(b) filed by U.S. Trustee United States Trustee (SA)) Motion Denied. Order by Attorney. (JL) Modified on 5/18/2023 (NB8). (Entered: 05/09/2023) |
| 05/04/2023 | 58 (2 pgs) | Order Directing United States Trustee To Appoint Chapter 11 Trustee. IT IS ORDERED: The Motion Shall Be And Hereby Is GRANTED, As Set Forth Herein. The United States Trustee Is Directed To Appoint A Chapter 11 Trustee In This Case. (BNC-PDF) (Related Doc # 21 ) Signed on 5/4/2023 (NB8) (Entered: 05/04/2023) |
| 05/04/2023 | 59 (3 pgs) | Order Granting Motion for relief from stay UNLAWFUL DETAINER To SDCO Tustin Executive Center, Inc. RE: 17542 E. 17th Street, Suites 100, 105, 250 And 330, Tustin, CA 92780 (Orange County) (BNC-PDF) (Related Doc # 19 ) Signed on 5/4/2023 (NB8) (Entered: 05/04/2023) |
| 05/06/2023 | 60 (4 pgs) | BNC Certificate of Notice - PDF Document. (RE: related document(s)58 Order on Generic Motion (BNC-PDF)) No. of Notices: 1. Notice Date 05/06/2023. (Admin.) (Entered: 05/06/2023) |
| 05/06/2023 | 61 (5 pgs) | BNC Certificate of Notice - PDF Document. (RE: related document(s)59 Motion for relief from stay UNLAWFUL DETAINER (BNC-PDF)) No. of Notices: 1. Notice Date 05/06/2023. (Admin.) (Entered: 05/06/2023) |
| 05/08/2023 | 62 (3 pgs) | Notice *of Appointment of Chapter 11 Trustee; along with Proof of Service* Filed by U.S. Trustee United States Trustee (SA). (Ng, Queenie) (Entered: 05/08/2023) |
| 05/08/2023 | 63 (3 pgs) | Notice */Acceptance of Appointment as Chapter 11 Trustee; along with Proof of Service* Filed by U.S. Trustee United States Trustee (SA). (Ng, Queenie) (Entered: 05/08/2023) |
| 05/08/2023 | 64 (7 pgs) | Application *For Order Approving Appointment of Trustee and Fixing Bond; along with Proof of Service* Filed by U.S. Trustee United States Trustee (SA) (Ng, Queenie) (Entered: 05/08/2023) |
| 05/08/2023 | 65 (1 pg) | Order Approving the U.S. Trustee's Application for the Appointment of a Chapter 11 Trustee. Richard A. Marshack is appointed as the Chapter 11 Trustee in the above captioned case. (BNC-PDF) (Related Doc 64) Signed on 5/8/2023 (AM). Modified on 5/8/2023 (AM). (Entered: 05/08/2023) |
| 05/09/2023 | 66 (1 pg) | Request for courtesy Notice of Electronic Filing (NEF) Filed by Hays, D. (Hays, D) (Entered: 05/09/2023) |
| 05/09/2023 | 67 (1 pg) | Request for courtesy Notice of Electronic Filing (NEF) Filed by Masud, Laila. (Masud, Laila) (Entered: 05/09/2023) |
| 05/10/2023 | 70 (3 pgs) | BNC Certificate of Notice - PDF Document. (RE: related document(s)65 Order on Generic Application (BNC-PDF)) No. of Notices: 1. Notice Date 05/10/2023. (Admin.) (Entered: 05/10/2023) |

103

| | | |
|---|---|---|
| 05/11/2023 | [71](#)<br>(3 pgs) | Request for special notice *and Notice of Appearance* Filed by Creditor City Capital NY. (Hochheiser, Alan) (Entered: 05/11/2023) |
| 05/15/2023 | [72](#)<br>(3 pgs) | Voluntary Dismissal of Motion *Notice Of Withdrawal Of Notice Of Motion And Motion Of Debt Validation Fund II, LLC, MC DVI Fund 1, LLC, And MC DVI Fund 2, LLC To Dismiss Chapter 11 Case Pursuant To 11 U.S.C. §§ 105, 305, 349, & 1112, Or In The Alteranative Convert This Case To Chapter 7 Or Appoint A Trustee* Filed by Creditors Debt Validation Fund II, LLC, MC DVI Fund 1, LLC, MC DVI Fund 2, LLC (RE: related document(s)[44](#) Motion to Dismiss Debtor *Notice Of Motion And Motion By DVF And MC DVI To Dismiss Chapter 11 Case Pursuant To 11 U.S.C. Sections 105, 305, 349, & 1112, Or In The Alternative Convert This Case To Chapter 7 Or Appoint A Trustee*). (Hollander, Garrick) (Entered: 05/15/2023) |
| 05/17/2023 | [73](#)<br>(1 pg) | Request for courtesy Notice of Electronic Filing (NEF) Filed by Richards, Ronald. (Richards, Ronald) (Entered: 05/17/2023) |
| 05/17/2023 | 74 | Hearing Continued On Motion (RE: related document [44](#) Motion By DVF And MC DVI To Dismiss Chapter 11 Case Pursuant To 11 U.S.C. Sections 105, 305, 349, And 1112, Or In The Alternative Convert This Case To Chapter 7 Or Appoint A Trustee) - HEARING ON MOTION CONTINUED TO JUNE 14, 2023 AT 1:30 P.M. IN COURTROOM 5C, LOCATED AT 411 WEST FOURTH STREET, SANTA ANA, CA 92701. STATUS REPORT DUE (14) FOURTEEN DAYS IN ADVANCE, The case judge is Scott C Clarkson (NB8) (Entered: 05/19/2023) |
| 05/19/2023 | [75](#)<br>(23 pgs) | Notice of Motion and Motion in Individual Ch 11 Case for Order Employing Professional (LBR 2014-1): Marshack Hays LLP as General Counsel *Application by Chapter 11 Trustee to Employ Marshack Hays LLP as General Counsel; Memorandum of Points and Authorities; Declaration of D. Edward Hays in Support; with proof of service* Filed by Trustee Richard A Marshack (TR) (Hays, D) (Entered: 05/19/2023) |
| 05/19/2023 | [76](#)<br>(13 pgs) | Notice of motion/application Filed by Trustee Richard A Marshack (TR) (RE: related document(s)[75](#) Notice of Motion and Motion in Individual Ch 11 Case for Order Employing Professional (LBR 2014-1): Marshack Hays LLP as General Counsel *Application by Chapter 11 Trustee to Employ Marshack Hays LLP as General Counsel; Memorandum of Points and Authorities; Declaration of D. Edward Hays in Support; with proof of service* Filed by Trustee Richard A Marshack (TR)). (Hays, D) (Entered: 05/19/2023) |
| 05/22/2023 | [77](#)<br>(1 pg) | Request for courtesy Notice of Electronic Filing (NEF) Filed by Golubow, Richard. (Golubow, Richard) (Entered: 05/22/2023) |
| 05/22/2023 | [78](#)<br>(1 pg) | Request for courtesy Notice of Electronic Filing (NEF) Filed by Kupetz, David. (Kupetz, David) (Entered: 05/22/2023) |
| 05/24/2023 | [79](#)<br>(1 pg) | Request for special notice Filed by Creditor Jason Patterson Stopnitzky. (Chayo, Leslie) (Entered: 05/24/2023) |
| 05/25/2023 | [93](#)<br>(29 pgs) | Adversary case 8:23-ap-01046. Complaint by Plaintiff: Richard A. Marshack against Defendants: Tony Diab , Daniel S. March , Rosa Bianca Loli , Lisa Cohen , William Taylor Carss , Eng Tang , Maria Eeya Tan , Jake Akers , Han Trinh , Jayde Trinh , Wes Thomas , Scott James Eadie , Jimmy Chhor , Dongliang Jiang , Oakstone Law Group PC , Greyson Law |

|  | | |
|---|---|---|
|  |  | Prime Westchester Group, LLC , Marich Bein Management, LLC , LGS Holdco, LLC , Consumer Legal Group, PC , Vulcan Consulting Group LLC , B.A.T. Inc. , Prime Logix, LLC , Teracel Blockchain Fund II LLC , EPPS , Equipay , Authorize Net , World Global , Optimumbank Holdings, Inc. , Marich Bein, LLC , BankUnited, N.A. , Revolv3, Inc. , Fidelity National Information Services, Inc. , Worldpay, Inc. , Worldpay Group , Merit Fund, LLC , Guardian , The United States Postal Service . Fee Amount $350 Nature of Suit: (72 (Injunctive relief - other)) ,(13 (Recovery of money/property - 548 fraudulent transfer)) ,(11 (Recovery of money/property - 542 turnover of property)) (VN) (Entered: 06/08/2023) |
| 05/31/2023 | 80 (1 pg) | Request for courtesy Notice of Electronic Filing (NEF) Filed by Lieberman, Michael. (Lieberman, Michael) (Entered: 05/31/2023) |
| 05/31/2023 | 81 (4 pgs) | Status Report for Chapter 11 Status Conference *with Proof of Service* Filed by Trustee Richard A Marshack (TR). (Hays, D) (Entered: 05/31/2023) |
| 06/05/2023 | 82 (1 pg) | Notice of Change of Address of Ronald W. Moore. Filed by Creditor Ronald W. Moore. [EDB] (VN) (Entered: 06/05/2023) |
| 06/06/2023 | 83 (1 pg) | Amended Notice of Change of Address (Zip Code) of Ronald W Moore. Filed by Creditor Ronald W. Moore. [EDB](VN) (Entered: 06/06/2023) |
| 06/06/2023 | 84 (1 pg) | Request for courtesy Notice of Electronic Filing (NEF) Filed by Salvato, Gregory. (Salvato, Gregory) (Entered: 06/06/2023) |
| 06/06/2023 | 85 (1 pg) | Request for courtesy Notice of Electronic Filing (NEF) Filed by Misken, Kenneth. (Misken, Kenneth) (Entered: 06/06/2023) |
| 06/07/2023 | 86 (17 pgs) | Application to Employ Bicher & Associates as Field Agent and Forensic Analyst *and Declaration in support; with Proof of Service* Filed by Trustee Richard A Marshack (TR) (Marshack (TR), Richard) (Entered: 06/07/2023) |
| 06/07/2023 | 87 (7 pgs) | Notice of Opportunity To Request a Hearing On Motion (LBR 9013-1(o)) *with Proof of Service* Filed by Trustee Richard A Marshack (TR) (RE: related document(s)86 Application to Employ Bicher & Associates as Field Agent and Forensic Analyst *and Declaration in support; with Proof of Service* Filed by Trustee Richard A Marshack (TR) (Marshack (TR), Richard)). (Marshack (TR), Richard) (Entered: 06/07/2023) |
| 06/07/2023 | 88 (2 pgs) | Order Advancing Status Conference To Be Heard Concurrently With Related Matters And Requiring Notice. IT IS ORDERED: The Court Hereby ORDERS That The Status Conference Be ADVANCED To JUNE 12, 2023, AT 1:30 P.M. To Be Heard Concurrently With Matters In Related Adversary Proceedings, And That The Chapter 11 Trustee Serve A Copy Of This Order To The Noticed Parties Within 24 Hours Of Entry Of This Order. (BNC-PDF) (Related Doc # 14 ) Signed on 6/7/2023 (NB8) (Entered: 06/07/2023) |
| 06/07/2023 | 89 (9 pgs) | Proof of service Filed by Trustee Richard A Marshack (TR) (RE: related document(s)88 ORDER to continue/reschedule hearing (BNC-PDF)). (Hays, D) (Entered: 06/07/2023) |
| 06/07/2023 | 90 (42 pgs; 2 docs) | Application to Employ Dinsmore & Shohl LLP as Special Counsel to Chapter 11 Trustee Filed by Trustee Richard A Marshack (TR) |

105

| | | |
|---|---|---|
| | | (Ramallah) (RE: related document(s)**1** Declaration of Christopher Celentino) (Celentino, Christopher) (Entered: 06/07/2023) |
| 06/07/2023 | **91** (6 pgs) | Notice *Of Filing Application Pursuant To 11 U.S.C. Section 327(a) Authorizing The Retention And Employment Of Dinsmore & Shohl LLP As Special Counsel For Chapter 11 Trustee Richard A. Marshack And Opportunity To Request A Hearing* Filed by Trustee Richard A Marshack (TR) (RE: related document(s)**90** Application to Employ Dinsmore & Shohl LLP as Special Counsel to Chapter 11 Trustee Filed by Trustee Richard A Marshack (Attachments: # 1 Declaration of Christopher Celentino)). (Celentino, Christopher) (Entered: 06/07/2023) |
| 06/07/2023 | **92** (6 pgs) | Statement *Of Disinterestedness For Employment Of Professional Person Under FRBP 2014* Filed by Trustee Richard A Marshack (TR). (Celentino, Christopher) (Entered: 06/07/2023) |
| 06/08/2023 | **94** (9 pgs) | Proof of service *Supplemental Proof of Service* Filed by Trustee Richard A Marshack (TR) (RE: related document(s)**91** Notice). (Celentino, Christopher) (Entered: 06/08/2023) |
| 06/09/2023 | **95** (20 pgs) | Application to Employ Grobstein Teeple LLP as Accountant *Notice of Application and Application of Chapter 11 Trustee, Richard A. Marshack, for Authorization to Employ Grobstein Teeple LLP as Accountants Effective May 12, 2023; Statement of Disinterestedness; Proof of Service; Exhibits A-B* Filed by Accountant Grobstein Teeple LLP. (Teeple, Joshua) (Entered: 06/09/2023) |
| 06/09/2023 | **96** (1 pg) | Request for courtesy Notice of Electronic Filing (NEF) Filed by Still, Andrew. (Still, Andrew) (Entered: 06/09/2023) |
| 06/09/2023 | **97** (4 pgs) | BNC Certificate of Notice - PDF Document. (RE: related document(s)**88** ORDER to continue/reschedule hearing (BNC-PDF)) No. of Notices: 1. Notice Date 06/09/2023. (Admin.) (Entered: 06/09/2023) |
| 06/12/2023 | 98 | Hearing Continued On Status Conference (RE: related document **14** - Status Conference RE: (1) Case Management Conference And (2) Requiring Status Report) - STATUS CONFERENCE HEARING CONTINUED TO JULY 19, 2023 AT 1:30 P.M. IN COURTROOM 5C, LOCATED AT 411 WEST FOURTH STREET, SANTA ANA, CA 92701. STATUS REPORT DUE FOURTEEN (14) DAYS IN ADVANCE. The case judge is Scott C Clarkson (NB8) (Entered: 06/13/2023) |
| 06/13/2023 | **99** (70 pgs) | Transcript regarding Hearing Held 05/25/23 RE: HEARING RE: EMERGENCY MOTION. Remote electronic access to the transcript is restricted until 09/11/2023. The transcript may be viewed at the Bankruptcy Court Clerk's Office on a public terminal **or** purchased through the Transcription Service Provider before the transcript access restriction has ended. [TRANSCRIPTION SERVICE PROVIDER: BRIGGS REPORTING COMPANY, INC., Telephone number 310-410-4151.]. Notice of Intent to Request Redaction Deadline Due By 6/20/2023. Redaction Request Due By 07/5/2023. Redacted Transcript Submission Due By 07/14/2023. Transcript access will be restricted through 09/11/2023. (Steinhauer, Holly) (Entered: 06/13/2023) |
| 06/13/2023 | **100** (1 pg) | Request for courtesy Notice of Electronic Filing (NEF) Filed by Langley, Christopher. (Langley, Christopher) (Entered: 06/13/2023) |

106

| 06/13/2023 | [101](#) (1 pg) | Request for courtesy Notice of Electronic Filing (NEF) Filed by Bensamochan, Eric. (Bensamochan, Eric) (Entered: 06/13/2023) |
|---|---|---|
| 06/13/2023 | [102](#) (25 pgs) | Emergency motion *Notice of Emergency Motion and Emergency Motion for Order Authorizing the Chapter 11 Trustee to Enter Into an Expense Reimbursement Agreement with the Ad Hoc Committee; with Proof of Service* Filed by Trustee Richard A Marshack (TR) (Hays, D) - [ORDER SHORTENING TIME GRANTED 6-13-2023. HEARING ON MOTION SET FOR JUNE 28, 2023 AT 11:00 A.M. IN COURTROOM 5C - ATTORNEY TO GIVE NOTICE] Modified on 6/14/2023 (NB8). (Entered: 06/13/2023) |
| 06/13/2023 | [103](#) (15 pgs) | Application shortening time Filed by Trustee Richard A Marshack (TR) (Hays, D) (Entered: 06/13/2023) |
| 06/13/2023 | [104](#) (1 pg) | Order Continuing Status Conference. IT IS ORDERED: The Status Conference Is Hereby CONTINUED TO JULY 19, 2023, AT 1:30 P.M. In Courtroom 5C, Located At 411 West Fourth Street, Santa Ana, CA 92701. A Status Report By The Chapter 11 Trustee Is Due 14 Days In Advance. The Chapter 11 Trustee Is To Provide Notice Of The Status Conference To All Creditors And File A Proof Of Service Within Seventy-Two Hours Of Entry Of This Order. (BNC-PDF) (Related Doc # [14](#) ) Signed on 6/13/2023 (NB8) (Entered: 06/13/2023) |
| 06/13/2023 | [105](#) (4 pgs) | Order Granting Application And Setting Hearing On Shortened Notice. The Hearing On The Notice Of Emergency Motion And Emergency Motion For Order Authorizing The Chapter 11 Trustee To Enter Into An Expense Reimbursement Agreement With Ad Hoc Committee Will Take Place On June 28, 2023 At 11:00 A.M. In Courtroom 5C, Located At 411 West Fourth Street, Santa Ana, CA 92701. (BNC-PDF) (Related Doc # [103](#) ) Signed on 6/13/2023 (NB8) (Entered: 06/13/2023) |
| 06/13/2023 | 106 | Hearing Set (RE: related document(s)[102](#) Emergency Motion For Order Authorizing The Chapter 11 Trustee To Enter Into An Expense Reimbursement Agreement With The Ad Hoc Committee filed by Trustee Richard A Marshack (TR) The Hearing date is set for 6/28/2023 at 11:00 AM at Crtrm 5C, 411 W Fourth St., Santa Ana, CA 92701. The case judge is Scott C Clarkson (NB8) (Entered: 06/13/2023) |
| 06/14/2023 | [107](#) (1 pg) | Request for courtesy Notice of Electronic Filing (NEF) Filed by Shankman, Paul. (Shankman, Paul) (Entered: 06/14/2023) |
| 06/14/2023 | [108](#) (17 pgs) | Notice of Hearing Filed by Trustee Richard A Marshack (TR) (RE: related document(s)[102](#) Emergency motion *Notice of Emergency Motion and Emergency Motion for Order Authorizing the Chapter 11 Trustee to Enter Into an Expense Reimbursement Agreement with the Ad Hoc Committee; with Proof of Service* Filed by Trustee Richard A Marshack (TR) (Hays, D) - [ORDER SHORTENING TIME GRANTED 6-13-2023. HEARING ON MOTION SET FOR JUNE 28, 2023 AT 11:00 A.M. IN COURTROOM 5C - ATTORNEY TO GIVE NOTICE] Modified on 6/14/2023 (NB8).). (Masud, Laila) (Entered: 06/14/2023) |
| 06/14/2023 | [109](#) (1 pg) | Request for courtesy Notice of Electronic Filing (NEF) Filed by Kharasch, Ira. (Kharasch, Ira) (Entered: 06/14/2023) |
| 06/14/2023 | [110](#) | Request for courtesy Notice of Electronic Filing (NEF) Filed by Newmark, |

107

| | 132 | Hearing Advanced On Status Conference (RE: related document 14 Status Conference RE: (1) Case Management Conference And (2) Requiring Status Report) - STATUS CONFERENCE HEARING ADVANCED TO JUNE 12, 2023 AT 1:30 P.M. IN COURTROOM 5C, LOCATED AT 411 WEST FOURTH STREET, SANTA ANA, CA 92701PER ORDER ADVANCING STATUS CONFERENCE TO BE HEARD CONCURRENTLY WITH RELATED MATTERS AND REQUIRING NOTICE ENTERED 6-7-2023 - (DOCKET NO. 88) (NB8) (Entered: 06/22/2023) |
|---|---|---|
| 06/14/2023 | | |
| 06/15/2023 | 111 (12 pgs) | Errata Filed by Trustee Richard A Marshack (TR) (RE: related document(s)102 Emergency motion *Notice of Emergency Motion and Emergency Motion for Order Authorizing the Chapter 11 Trustee to Enter Into an Expense Reimbursement Agreement with the Ad Hoc Committee; with Proof of Service*. (Hays, D) (Entered: 06/15/2023) |
| 06/15/2023 | 112 (4 pgs) | Declaration re: *Declaration of Trustee in Lieu of filing Monthly Operating Reports for April and May 2023 at this time; with Proof of Service* Filed by Trustee Richard A Marshack (TR). (Marshack (TR), Richard) (Entered: 06/15/2023) |
| 06/15/2023 | 113 (1 pg) | Request for courtesy Notice of Electronic Filing (NEF) Filed by White, Johnny. (White, Johnny) (Entered: 06/15/2023) |
| 06/15/2023 | 114 (4 pgs) | BNC Certificate of Notice - PDF Document. (RE: related document(s)104 ORDER to continue/reschedule hearing (BNC-PDF)) No. of Notices: 1. Notice Date 06/15/2023. (Admin.) (Entered: 06/15/2023) |
| 06/15/2023 | 115 (7 pgs) | BNC Certificate of Notice - PDF Document. (RE: related document(s)105 ORDER shortening time (BNC-PDF)) No. of Notices: 1. Notice Date 06/15/2023. (Admin.) (Entered: 06/15/2023) |
| 06/16/2023 | 116 (1 pg) | Transcript Order Form, regarding Hearing Date 06/12/23 Filed by Attorney Teri Pham. (Pham, Teri) ORDER NOT PROCESSED. Ordering Party to Contact Briggs Reporting for a Copy of the Transcript. Transcript was ordered in the adversary case in 8:23-AP-10146-SC. Modified on 6/20/2023 (JL). (Entered: 06/16/2023) |
| 06/16/2023 | 117 (1 pg) | Request for courtesy Notice of Electronic Filing (NEF) Filed by Lev, Daniel. (Lev, Daniel) (Entered: 06/16/2023) |
| 06/16/2023 | 118 (1 pg) | Request for courtesy Notice of Electronic Filing (NEF) Filed by Clark, Randall. (Clark, Randall) (Entered: 06/16/2023) |
| 06/16/2023 | 119 (38 pgs; 6 docs) | Motion to Borrow *Trustees Notice of Motion and Emergency Motion (I) for Entry of Interim Order: (A) Authorizing the Trustee to Obtain Post-Petition Financing and Superpriority Administrative Expense Claim Pursuant to 11 U.S.C. § 364; and (B) Setting Final Hearing; and Pursuant to Final Hearing, (II) for Entry of Final Order Approving Post-Petition Financing on a Final Basis; Memorandum of Points and Authorities; Declaration of Richard A. Marshack in Support Thereof; and Exhibits* Filed by Trustee Richard A Marshack (TR) (Attachments: # 1 Affidavit Declaration of Richard A. Marshack # 2 Exhibit Exhibit 1: Proposed Interim Order Granting Emergency Superpriority Financing by the Chapter 11 Trustee # 3 Exhibit Exhibit 2: Super-Priority Promissory Note # 4 |

| | | (Re: Search for Proof of Service) (Serrano, Jonathan) (Entered: 06/16/2023) |
|---|---|---|
| 06/16/2023 | 122 | Hearing Set (RE: related document(s)119 Trustee's Motion (I) For Entry Of Interim Order: (A) Authorizing The Trustee To Obtain Post-Petitioning Financing And Superpriority Administrative Expense Claim Pursuant To 11 U.S.C. Section 364; And (B) Setting Final Hearing; And Pursuant To Final Hearing, (II) For Entry Of Final Order Approving Post-Petition Financing On A Final Basis filed by Trustee Richard A Marshack (TR) The Hearing date is set for 6/20/2023 at 03:00 PM at Crtrm 5C, 411 W Fourth St., Santa Ana, CA 92701. The case judge is Scott C Clarkson (NB8) (Entered: 06/20/2023) |
| 06/17/2023 | 120 (4 pgs) | Statement *Statement Regarding Cash Collateral or Debtor in Possession Financing [FRBP 4001; LBR 4001-2]* Filed by Trustee Richard A Marshack (TR). (Serrano, Jonathan) (Entered: 06/17/2023) |
| 06/20/2023 | 121 (1 pg) | Request for courtesy Notice of Electronic Filing (NEF) Filed by Skorheim, Leslie. (Skorheim, Leslie) (Entered: 06/20/2023) |
| 06/20/2023 | 123 (8 pgs) | Declaration re: *of Chapter 11 Trustee's Counsel Regarding Proof of Notice of Hearing and Service of Emergency Financing Motion* Filed by Trustee Richard A Marshack (TR) (RE: related document(s)119 Motion to Borrow *Trustees Notice of Motion and Emergency Motion (I) for Entry of Interim Order: (A) Authorizing the Trustee to Obtain Post-Petition Financing and Superpriority Administrative Expense Claim Pursuant to 11 U.S.C. § 364; and (B) Set). (Serrano, Jonathan) (Entered: 06/20/2023)* |
| 06/20/2023 | 124 (6 pgs) | Notice of Appearance and Request for Notice *, with proof of service* by Olivia Scott Filed by Creditors Azzure Capital LLC, Hi Bar Capital LLC. (Scott, Olivia) (Entered: 06/20/2023) |
| 06/20/2023 | 125 | Hearing Held On Motion (RE: related document(s)119 Trustee's Emergency Motion (I) For Entry Of Interim Order: (A) Authorizing The Trustee To Obtain Post-Petition Financing And Superpriority Administrative Expense Claim Pursuant To 11 U.S.C. Section 364; And (B) Setting Final Hearing; And Pursuant To Final Hearing, (II) For Entry Of Final Order Approving Post-Petition Financing On A Final Basis filed by Trustee Richard A Marshack (TR)) - ORDER BY ATTORNEY - MOTION GRANTED (NB8) (Entered: 06/20/2023) |
| 06/21/2023 | 126 (41 pgs) | Declaration That No Party Requested a Hearing on Motion (LBR 9013-1(o)(3)) Filed by Trustee Richard A Marshack (TR) (RE: related document(s)75 Notice of Motion and Motion in Individual Ch 11 Case for Order Employing Professional (LBR 2014-1): Marshack Hays LLP as General Counsel *Application by Chapter 11 Trustee to Employ Marshack Hays LLP as General Counsel; Memorandum of Points and Author). (Masud, Laila) (Entered: 06/21/2023)* |
| 06/22/2023 | 127 (12 pgs) | Objection (related document(s): 102 Emergency motion *Notice of Emergency Motion and Emergency Motion for Order Authorizing the Chapter 11 Trustee to Enter Into an Expense Reimbursement Agreement with the Ad Hoc Committee; with Proof of Service* filed by Trustee Richard A Marshack (TR)) *United States Trustees Opposition To Emergency Motion Authorizing The Chapter 11 Trustee To Enter Into An Expense Reimbursement Agreement With The Ad Hoc Committee* Filed by U.S. |

109

11/15/23, 2:15 PM — Case 8:23-ap-01046-SC   Doc 290-2   Filed 12/06/23   Entered 12/06/23 15:33:01   Desc
Declaration of Kathleen L March w/Exhs A-H   Page 19 of 337

CM/ECF for U.S. Bankruptcy Court-CACB (NextGen 1.7.1.1)

| | | |
|---|---|---|
| | | First and Final United States Trustee (Trzaskalinski, Kenneth) (Entered: 06/22/2023) |
| 06/22/2023 | [128](#) (2 pgs) | Sua Sponte Request For Status Reports To Be Filed By (1) The Chapter 11 Trustee And (2) The United States Trustee By 5:00 P.M. Pacific Time, On June 23, 2023. IT IS ORDERED: By This Order, The Court Respectfully Requests That Trustees Prepare Brief Individual Status Reports On The Following Matters: 1. Understanding That The Chapter 11 Trustee Is Receiving Information On The Case On A Day-By Day, Perhaps Hour-By-Hour, Basis, The Chapter 11 Trustee Is To Provide A Report Updating The Information Contained In The Complaint (Docket [93](#) Of The Main Case). In Particular, The General Allegations Contained In Section B, Paragraphs 44 Through 47 (LPG's Ownership And Management) And Section C, Paragraphs 48 Through 52 (LPG's Business Structure, (Inclusive, Should Be Updated. 2. The United States Trustee Is To Report Its Intentions To Appoint A Committee To Represent The Interests Of The Clients/Customers Of The Debtor. (BNC-PDF) (Related Doc # [1](#) ) Signed on 6/22/2023 (NB8) (Entered: 06/22/2023) |
| 06/22/2023 | [129](#) (2 pgs) | Order Granting Application By Chapter 11 Trustee To Employ Marshack Hays LLP As General Counsel. IT IS ORDERED: The Application Is APPROVED. Trustee Is Authorized To Employ The Firm As His General Counsel Pursuant To 11 U.S.C. Section 327 At The Firm's Hourly Rates With Any Compensation And Reimbursement Of Costs To Be Paid By The Estate Only Upon Application To And Approval By The Court Pursuant To 11 U.S.C. Sections 330 And 331. In The Event The Underlying Bankruptcy Case Is Converted To A Chapter 7, There Is No Need For Firm To Seek To Be Re-Employed In The Converted Case. (BNC-PDF) Marshack Hays LLP (Related Doc # [75](#)) Signed on 6/22/2023. (NB8) (Entered: 06/22/2023) |
| 06/22/2023 | [130](#) (8 pgs) | Notice of lodgment *Notice of Lodgment of Order re Trustee's Notice of Motion and Emergency Motion (I) for Entry of Interim Order: (A) Authorizing The Trustee to Obtain Post-Petition Financing and Superpriority Administrative Expense Claim Pursuant to 11 U.S.C. § 364; and (B) Setting Final Hearing; and Pursuant to Final Hearing, (II) for Entry of Final Order Approving Post-Petition Financing on a Final Basis* Filed by Trustee Richard A Marshack (TR) (RE: related document(s)[119](#) Motion to Borrow *Trustees Notice of Motion and Emergency Motion (I) for Entry of Interim Order: (A) Authorizing the Trustee to Obtain Post-Petition Financing and Superpriority Administrative Expense Claim Pursuant to 11 U.S.C. § 364; and (B) Setting Final Hearing; and Pursuant to Final Hearing, (II) for Entry of Final Order Approving Post-Petition Financing on a Final Basis; Memorandum of Points and Authorities; Declaration of Richard A. Marshack in Support Thereof; and Exhibits* Filed by Trustee Richard A Marshack (TR) (Attachments: # 1 Affidavit Declaration of Richard A. Marshack # 2 Exhibit Exhibit 1: Proposed Interim Order Granting Emergency Superpriority Financing by the Chapter 11 Trustee # 3 Exhibit Exhibit 2: Super-Priority Promissory Note # 4 Exhibit Exhibit 3: UCC Search # 5 Proof of Service)). (Serrano, Jonathan) (Entered: 06/22/2023) |
| 06/22/2023 | [131](#) (4 pgs) | Interim Order Granting Emergency Superpriority Financing By The Chapter 11 Trustee. IT IS ORDERED: The Court GRANTS The Motion. APPROVES The Terms Of That Certain Super-Priority Promissory Note (The "Note") As Attached As Exhibit 2 To The Trustee's Declaration. Authorizes The Trustee To Borrow, And The Lender (As Defined In The Motion) To Advance Up To $800,000 In The Aggregate, Including An Initial Advance In The Amount Of $350,000 And A Subsequent Advance |

110

| | | |
|---|---|---|
| | | At ___% Per Annum, With The Full Balance, Including All Accrued Interest, Due And Payable In One Year From The Start Date (As Defined In The Note), With Payments First Credited To Interest Due And Any Remainder Credited To Principal, As Provided Under The Note, Subject To The Terms Of This Order. Sets A Final Hearing On The Motion For July 20, 2023 At 9:30 A.M. In Courtroom 5C, Located At 41 West Fourth Street, Santa Ana, CA 92701. (SEE ORDER FOR FURTHER RULING) (BNC-PDF) (Related Doc # 119) Signed on 6/22/2023 (NB8) (Entered: 06/22/2023) |
| 06/23/2023 | 133 (5 pgs) | Notice *of Billing Rates re Trustee's Emergency Motion re Expense Reimbursement Agreement* Filed by Interested Party Ad Hoc Consumer Claimants Committee (RE: related document(s)102 Emergency motion *Notice of Emergency Motion and Emergency Motion for Order Authorizing the Chapter 11 Trustee to Enter Into an Expense Reimbursement Agreement with the Ad Hoc Committee; with Proof of Service* Filed by Trustee Richard A Marshack (TR) (Hays, D) - [ORDER SHORTENING TIME GRANTED 6-13-2023. HEARING ON MOTION SET FOR JUNE 28, 2023 AT 11:00 A.M. IN COURTROOM 5C - ATTORNEY TO GIVE NOTICE] Modified on 6/14/2023 (NB8).). (Kharasch, Ira) (Entered: 06/23/2023) |
| 06/23/2023 | 134 (3 pgs) | Unsecured creditors' committee appointed *Appointment and Notice of Appointment of Official Committee of Unsecured Creditors by United States Trustee* Filed by U.S. Trustee United States Trustee (SA). (Skorheim, Leslie) (Entered: 06/23/2023) |
| 06/23/2023 | 135 (5 pgs) | Status report *United States Trustee's Status Report in Response to the Court's Sua Sponte Request* Filed by U.S. Trustee United States Trustee (SA) (RE: related document(s)128 Order (Generic) (BNC-PDF)). (Skorheim, Leslie) - See docket entry no.: 138 for corrections - Modified on 6/23/2023 (NB8). (Entered: 06/23/2023) |
| 06/23/2023 | 136 (1 pg) | Request for courtesy Notice of Electronic Filing (NEF) Filed by Cohen, Leslie. (Cohen, Leslie) (Entered: 06/23/2023) |
| 06/23/2023 | 137 (10 pgs) | Declaration re: *Supplemental Declaration of Joon M Khang in Support of Application to Employ Khang & Khang LLP* Filed by Debtor The Litigation Practice Group P.C. (RE: related document(s)42 Application to Employ KHANG & KHANG LLP as DEBTOR'S GENERAL BANKRUPTCY COUNSEL ). (Khang, Joon) (Entered: 06/23/2023) |
| 06/23/2023 | 138 | Notice to Filer of Error and/or Deficient Document **Document filed without electronic /s/ or holographic signature. THE FILER IS INSTRUCTED TO RE-FILE THE DOCUMENT WITH THE PROPER SIGNATURES.** (RE: related document(s)135 Status report filed by U.S. Trustee United States Trustee (SA)) (NB8) (Entered: 06/23/2023) |
| 06/23/2023 | 139 (5 pgs) | Status report *United States Trustee's Status Report in Response to the Court's Sua Sponte Request - corrected to add signature* Filed by U.S. Trustee United States Trustee (SA) (RE: related document(s)128 Order (Generic) (BNC-PDF)). (Skorheim, Leslie) (Entered: 06/23/2023) |
| 06/24/2023 | 140 (5 pgs) | BNC Certificate of Notice - PDF Document. (RE: related document(s)128 Order (Generic) (BNC-PDF)) No. of Notices: 1. Notice Date 06/24/2023. (Admin.) (Entered: 06/24/2023) |

111

| | | |
|---|---|---|
| 06/24/2023 | 141 (5 pgs) | BNC Certificate of Notice - PDF Document. (RE: related document(s)129 Order on Motion For Order Employing Professional (Ch 11)-(LBR 2014-1) (BNC-PDF)) No. of Notices: 1. Notice Date 06/24/2023. (Admin.) (Entered: 06/24/2023) |
| 06/24/2023 | 142 (7 pgs) | BNC Certificate of Notice - PDF Document. (RE: related document(s)131 Order on Motion to Borrow (BNC-PDF)) No. of Notices: 1. Notice Date 06/24/2023. (Admin.) (Entered: 06/24/2023) |
| 06/26/2023 | 143 (20 pgs) | Notice of Hearing Filed by Trustee Richard A Marshack (TR). (Serrano, Jonathan) (Entered: 06/26/2023) |
| 06/26/2023 | 144 (103 pgs) | Objection (related document(s): 102 Emergency motion *Notice of Emergency Motion and Emergency Motion for Order Authorizing the Chapter 11 Trustee to Enter Into an Expense Reimbursement Agreement with the Ad Hoc Committee; with Proof of Service* filed by Trustee Richard A Marshack (TR)) Filed by Creditor Carolyn Beech (Langley, Christopher) (Entered: 06/26/2023) |
| 06/26/2023 | 145 (49 pgs) | Declaration That No Party Requested a Hearing on Motion (LBR 9013-1(o)(3)) Filed by Trustee Richard A Marshack (TR) (RE: related document(s)90 Application to Employ Dinsmore & Shohl LLP as Special Counsel to Chapter 11 Trustee ). (Ghio, Christopher) (Entered: 06/26/2023) |
| 06/26/2023 | 146 (7 pgs) | Notice of lodgment *of Order* Filed by Trustee Richard A Marshack (TR) (RE: related document(s)90 Application to Employ Dinsmore & Shohl LLP as Special Counsel to Chapter 11 Trustee ). (Ghio, Christopher) (Entered: 06/26/2023) |
| 06/26/2023 | 147 (7 pgs) | Application Of Non-Resident Attorney To Appear In A Specific Case Per Local Bankruptcy Rule [LBR- 2090-1(b)] Filed by Daniel A. Edelman (NB8) (Entered: 06/26/2023) |
| 06/26/2023 | 148 (1 pg) | Order On Application Of Non-Resident Attorney To Appear In A Specific Case [LBR 2090-1(b)] IT IS ORDERED: The Application Is GRANTED And The Following Person May Appear As Requested In The Above-Entitled Case: Daniel A. Edelman. (BNC-PDF) Signed on 6/26/2023 (RE: related document(s)147 Application of non-resident attorney to appear in a specific case). (NB8) (Entered: 06/26/2023) |
| 06/26/2023 | 149 (6 pgs) | Stipulation By Richard A Marshack (TR) and *Office of the United States Trustee and Creditor Carolyn Beech for Dismissal of Emergency Motion for Order Authorizing the Chapter 11 Trustee to Enter Into An Expense Agreement with the Ad Hoc Committee [Re: Dk 102]; with Proof of Service* Filed by Trustee Richard A Marshack (TR) (Hays, D) (Entered: 06/26/2023) |
| 06/27/2023 | 150 (269 pgs) | Transcript regarding Hearing Held 06/12/23 RE: HEARING RE: PRELIMINARY INJUNCTION STATUS CONFERENCE HEARING RE: (1) CASE MANAGEMENT CONFERENCE AND (2) REQUIRING STATUS REPORT. Remote electronic access to the transcript is restricted until 09/25/2023. The transcript may be viewed at the Bankruptcy Court Clerk's Office on a public terminal **or** purchased through the Transcription Service Provider before the transcript access restriction has ended. [TRANSCRIPTION SERVICE PROVIDER: BRIGGS REPORTING COMPANY, INC., Telephone number 310-410-4151.]. Notice of Intent to 112 |

| | | Objection/Request for Redaction Request Due By 07/18/2023. Redacted Transcript Submission Due By 07/28/2023. Transcript access will be restricted through 09/25/2023. (Steinhauer, Holly) (Entered: 06/27/2023) |
|---|---|---|
| 06/27/2023 | [151](#) (2 pgs) | Order Approving Stipulation For Dismissal Of Emergency Motion For Order Authorizing The Chapter 11 Trustee To Enter Into An Expense Reimbursement Agreement With The Ad Hoc Committee. IT IS ORDERED: The Stipulation Is APPROVED In Its Entirety. The Motion Is DISMISSED Under FRCP 41(a)(1)(A)(ii) And LBR 9013-1(k). The Hearing On The Motion Scheduled For June 28, 2023, At 11:00 A.M., Is OFF CALENDAR Without The Need For Appearances. (BNC-PDF) (Related Doc # [149](#) ) Signed on 6/27/2023 (NB8) (Entered: 06/27/2023) |
| 06/28/2023 | [152](#) (30 pgs) | Declaration That No Party Requested a Hearing on Motion (LBR 9013-1(o)(3)) *with Proof of Service* Filed by Trustee Richard A Marshack (TR) (RE: related document(s)[86](#) Application to Employ Bicher & Associates as Field Agent and Forensic Analyst *and Declaration in support; with Proof of Service*). (Marshack (TR), Richard) (Entered: 06/28/2023) |
| 06/28/2023 | [153](#) (4 pgs) | BNC Certificate of Notice - PDF Document. (RE: related document(s)[148](#) ORDER on application of non-resident attorney to appear in a specific case per Local Bankruptcy rule (BNC-PDF)) No. of Notices: 1. Notice Date 06/28/2023. (Admin.) (Entered: 06/28/2023) |
| 06/28/2023 | 227 | Hearing Held On Motion (RE: related document(s)[102](#) Emergency Motion For Order Authorizing The Chapter 11 Trustee To Enter Into An Expense Reimbursement Agreement With The Ad Hoc Committee filed by Trustee Richard A Marshack (TR)) - HEARING ON MOTION OFF CALENDAR PER ORDER APPROVING STIPULATION FOR DISMISSAL OF EMERGENCY MOTION FOR ORDER AUTHORIZING THE CHAPTER 11 TRUSTEE TO ENTER INTO AN EXPENSE REIMBURSEMENT AGREEMENT WITH THE AD HOC COMMITTEE ENTERED 6-27-2023 - (DOCKET NO. [151](#)) (NB8) (Entered: 07/12/2023) |
| 06/29/2023 | [154](#) (1 pg) | Request for courtesy Notice of Electronic Filing (NEF) Filed by Golden, Jeffrey. (Golden, Jeffrey) (Entered: 06/29/2023) |
| 06/29/2023 | [155](#) (1 pg) | Order Granting Trustee's Application to Employ Bicher & Associates as Field Agent and Forensic Analyst (BNC-PDF) (Related Doc # [86](#)) Signed on 6/29/2023. (JL) (Entered: 06/29/2023) |
| 06/29/2023 | [156](#) (21 pgs) | Notice *Trustees Ex Parte Notice of Non-Material Modification to Promissory Note With Additional Lender as Part of Previously Approved Post-Petition Financing and Request for Approval of Same; Declaration of Richard A. Marshack in Support Thereof; and Exhibits* Filed by Trustee Richard A Marshack (TR) (RE: related document(s)[131](#) Interim Order Granting Emergency Superpriority Financing By The Chapter 11 Trustee. IT IS ORDERED: The Court GRANTS The Motion. APPROVES The Terms Of That Certain Super-Priority Promissory Note (The "Note") As Attached As Exhibit 2 To The Trustee's Declaration. Authorizes The Trustee To Borrow, And The Lender (As Defined In The Motion) To Advance Up To $800,000 In The Aggregate, Including An Initial Advance In The Amount Of $350,000 And A Subsequent Advance Of Up To $450,000, At An Interest Rate Of 8% Per Annum, With The Full Balance, Including All Accrued Interest, Due And Payable In One Year From The Start Date (As Defined In The Note), With Payments First Credited To Interest Due And Any Remainder Credited To Principal, As Provided Under The Note, Subject To The Terms Of This Order. Sets A Final Hearing On The Motion For July 20, 2023 At 9:30 A.M. In Courtroom 5C, |

113

| | | |
|---|---|---|
| | | West Fourth Street, Santa Ana, CA 92701 (SEE ORDER FOR FURTHER RULING) (BNC-PDF) (Related Doc # 119) Signed on 6/22/2023 (NB8)). (Ghio, Christopher) (Entered: 06/29/2023) |
| 06/29/2023 | 157<br>(3 pgs) | Unsecured creditors' committee appointed *Amended Appointment and Notice of Appointment of Official Committee of Unsecured Creditors by United States Trustee* Filed by U.S. Trustee United States Trustee (SA). (Skorheim, Leslie) (Entered: 06/29/2023) |
| 06/29/2023 | 158<br>(2 pgs) | Order Setting Trustee's Ex Parte Notice Of Non-Material Modification To Promissory Note With Additional Lender As Part Of Previously Approved Post-Petition Financing And Request For Approval Of Same (Docket 156 For Hearing And Requiring Notice. IT IS ORDERED: The Court Sets The Motion For Hearing On June 30, 2023, AT 12:30 P.M. Movant Is Required To Provide Notice Of The Hearing By Not Later Than 6:00 P.M. On June 29, 2023, To Debtor, The United States Trustee, All Creditors And Any Other Interested Parties. Opposition, If Any, May Be Raised At The Hearing. (BNC-PDF) (Related Doc # 156 ) Signed on 6/29/2023 (NB8) (Entered: 06/29/2023) |
| 06/29/2023 | 159 | Hearing Set (RE: related document 156 Order Setting Trustee's Ex Parte Notice Of Non-Material Modification To Promissory Note With Additional Lender As Part Of Previously Approved Post-Petition Financing And Request For Approval Of Same (Docket 156 For Hearing And Requiring Notice. The Hearing date is set for 6/30/2023 at 12:30 PM at Crtrm 5C, 411 W Fourth St., Santa Ana, CA 92701. The case judge is Scott C Clarkson (NB8) (Entered: 06/29/2023) |
| 06/29/2023 | 160<br>(9 pgs) | Notice *of Order Setting Trustees Ex Parte Notice of Non-Material Modification to Promissory Note With Additional Lender as Part of Previously Approved Post-Petition Financing and Request For Approval of Same [Dk.156] for Hearing and Requiring Notice* Filed by Trustee Richard A Marshack (TR) (RE: related document(s)156 Notice *Trustees Ex Parte Notice of Non-Material Modification to Promissory Note With Additional Lender as Part of Previously Approved Post-Petition Financing and Request for Approval of Same; Declaration of Richard A. Marshack in Support Thereof; and Exhibits* Filed by Trustee Richard A Marshack (TR) (RE: related document(s)131 Interim Order Granting Emergency Superpriority Financing By The Chapter 11 Trustee. IT IS ORDERED: The Court GRANTS The Motion. APPROVES The Terms Of That Certain Super-Priority Promissory Note ("The Note") As Attached As Exhibit 2 To The Trustee's Declaration. Authorizes The Trustee To Borrow, And The Lender (As Defined In The Motion) To Advance Up To $800,000 In The Aggregate, Including An Initial Advance In The Amount Of $350,000 And A Subsequent Advance Of Up To $450,000, At An Interest Rate Of 8% Per Annum, With The Full Balance, Including All Accrued Interest, Due And Payable In One Year From The Start Date (As Defined In The Note), With Payments First Credited To Interest Due And Any Remainder Credited To Principal, As Provided Under The Note, Subject To The Terms Of This Order. Sets A Final Hearing On The Motion For July 20, 2023 At 9:30 A.M. In Courtroom 5C, Located At 41 West Fourth Street, Santa Ana, CA 92701. (SEE ORDER FOR FURTHER RULING) (BNC-PDF) (Related Doc 119) Signed on 6/22/2023 (NB8)).). (Lissebeck, Yosina) (Entered: 06/29/2023) |
| 06/29/2023 | 161<br>(4 pgs) | Request for special notice *Notice of Appearance and Request For Special Notice and Service of Papers, and Request For Inclusion on Master Mailing List* Filed by Creditor Committee Committee of Unsecured Creditors. (Koffroth, Nicholas) (Entered: 06/29/2023) |
| 06/29/2023 | 162<br>(5 pgs) | BNC Certificate of Notice - PDF Document. (RE: related document(s)151 Order on Generic Motion (BNC-PDF)) No. of Notices: 1. Notice Date 06/29/2023. (Admin.) (Entered: 06/29/2023) |

| | | |
|---|---|---|
| 06/30/2023 | <u>163</u><br>(24 pgs) | Declaration re: *Declaration that No Party Requested a Hearing on Motion with Proof of Service and Attachment* Filed by Accountant Grobstein Teeple LLP (RE: related document(s)<u>95</u> Application to Employ Grobstein Teeple LLP as Accountant *Notice of Application and Application of Chapter 11 Trustee, Richard A. Marshack, for Authorization to Employ Grobstein Teeple LLP as Accountants Effective May 12, 2023; Statement of Disinterestedness; Proof of Service; Exhibits A-B* Filed by Accountant Grobstein Teeple LLP.). (Teeple, Joshua) (Entered: 06/30/2023) |
| 06/30/2023 | <u>164</u><br>(18 pgs) | Declaration re: *of Richard A. Marshack, Chapter 11 Trustee, Providing Copies of Executed Notes* Filed by Trustee Richard A Marshack (TR) (RE: related document(s)<u>156</u> Notice). (Lissebeck, Yosina) (Entered: 06/30/2023) |
| 06/30/2023 | 167 | Hearing Continued (RE: related document <u>156</u> Trustee's Ex Parte Notice Of Non-Material Modification To Promissory Note With Additional Lender As Part Of Previously Approved Post-Petition Financing And Request For Approval Of Same) HEARING ON MOTION CONTINUED TO AUGUST 10, 2023 AT 10:00 A.M. IN COURTROOM 5C, LOCATED AT 411 WEST FOURTH STREET, SANTA ANA, CA 92701. The case judge is Scott C Clarkson (NB8) Modified on 7/10/2023 (NB8). (Entered: 07/03/2023) |

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 11/15/2023 14:11:28 | | | |
| **PACER Login:** | kmarch80366 | **Client Code:** | P Han Jayde Trinh |
| **Description:** | Docket Report | **Search Criteria:** | 8:23-bk-10571-SC Fil or Ent: filed From: 5/1/2023 To: 6/30/2023 Doc From: 0 Doc To: 99999999 Term: included Format: html Page counts for documents: included |
| **Billable Pages:** | 13 | **Cost:** | 1.30 |

1   PETER C. ANDERSON
    UNITED STATES TRUSTEE
2   KENNETH M. MISKEN
    ASSISTANT UNITED STATES TRUSTEE
3   QUEENIE K. NG (State Bar No. 223803)
    TRIAL ATTORNEY
4   OFFICE OF THE UNITED STATES TRUSTEE
    411 W. 4th St., Suite 7160
5   Santa Ana, CA 92701
    Phone (714) 338-3400
6   Fax (714) 338-3421
    Queenie.K.Ng@usdoj.gov
7

```
                                       ┌─────────────────────────────┐
                                       │      FILED & ENTERED        │
                                       │                             │
                                       │        MAY 08 2023          │
                                       │                             │
                                       │  CLERK U.S. BANKRUPTCY COURT │
                                       │  Central District of California │
                                       │  BY mccall   DEPUTY CLERK   │
                                       └─────────────────────────────┘
```

8

9                 UNITED STATES BANKRUPTCY COURT

10         CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

11

| In re: | Case Number 8:23-bk-10571-SC |
|---|---|
| **THE LITIGATION PRACTICE GROUP, P.C.,** | CHAPTER 11 |
| | **ORDER APPROVING THE U.S. TRUSTEE'S APPLICATION FOR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE** |
| Debtor. | [NO HEARING REQUIRED] |

17       Upon consideration of the Application (the "Application") for the Appointment of a Chapter 11

18 Trustee (filed on May 8, 2023, as Bankr. Dkt. # 64) filed by the United States Trustee for Region 16 ("U.S.

19 Trustee") and good cause appearing therefore:

20      **IT IS HEREBY ORDERED THAT** the U.S. Trustee's Application is approved and Richard A.

21 Marshack is appointed as the Chapter 11 Trustee in the above captioned case.

22      **IT IS SO ORDERED**.

23     Date: May 8, 2023

24                           Scott C. Clarkson
                           United States Bankruptcy Judge

25

26

27

28

# EXHIBIT B

**U.S. Bankruptcy Court**
**Central District of California (Santa Ana)**
**Adversary Proceeding #: 8:23-ap-01046-SC**

*Assigned to:* Scott C Clarkson                                          *Date Filed:* 05/25/23
*Lead BK Case:* 23-10571
*Lead BK Title:* The Litigation Practice Group P.C.
*Lead BK Chapter:* 11
*Demand:*

*Nature[s] of Suit:* 72 Injunctive relief - other
                     13 Recovery of money/property - 548 fraudulent transfer
                     11 Recovery of money/property - 542 turnover of property


**Plaintiff**
-----------------------
**Richard A. Marshack,** *Chapter 11 Trustee*        represented by **Christopher Celentino**
                                                                     Dinsmore & Shohl LLP
                                                                     655 W. Broadway
                                                                     Suite 800
                                                                     San Diego, CA 92101
                                                                     619-400-0519
                                                                     Fax : 619-400-0501
                                                                     Email: christopher.celentino@dinsmore.com

                                                                     **Christopher Ghio**
                                                                     Dinsmore & Shohl, LLP
                                                                     655 W. Broadway Suite 800
                                                                     San Diego, CA 92101
                                                                     619-400-0500
                                                                     Fax : 619-238-1981
                                                                     Email: christopher.ghio@dinsmore.com
                                                                     *LEAD ATTORNEY*

                                                                     **Yosina M Lissebeck**
                                                                     Dinsmore & Shohl, LLP
                                                                     655 W. Broadway
                                                                     Suite 800
                                                                     92101
                                                                     San Diego, CA 92129
                                                                     619-400-0473
                                                                     Fax : 619-400-0501
                                                                     Email: Yosina.Lissebeck@Dinsmore.com

                                                                     **Jonathan Serrano**
                                                                     Dinsmore & Shohl LLP
                                                                     550 S Hope Street
                                                                     Suite 1765
                                                                     Los Angeles, CA 91741
                                                                     213-335-7758
                                                                     Email: jonathan.serrano@dinsmore.com

**EXHIBIT C**

V.

*Defendant*

----------------------

**Tony Diab**                                              represented by **Tony Diab**
                                                          PRO SE

                                                          **Teri T Pham**
                                                          Enenstein Pham Glass & Rabbat, LLP
                                                          3200 Bristol St Ste 500
                                                          Costa Mesa, CA 92626
                                                          (714) 292-0262
                                                          Fax : (714) 464-4770
                                                          Email: tpham@epgrlawyers.com
                                                          *TERMINATED: 10/17/2023*

*Defendant*

----------------------

**Daniel S. March**                                       represented by **Daniel S March**
                                                          17291 Irvine Blvd Ste 101
                                                          Tustin, CA 92780
                                                          714-665-4223
                                                          Fax : 714-665-4323
                                                          Email: marchlawoffice@gmail.com

                                                          **Teri T Pham**
                                                          Enenstein Pham Glass & Rabbat, LLP
                                                          3200 Bristol St Ste 500
                                                          Costa Mesa, CA 92626
                                                          (714) 292-0262
                                                          Fax : (714) 464-4770
                                                          Email: tpham@epgrlawyers.com
                                                          *TERMINATED: 09/21/2023*

*Defendant*

----------------------

**Rosa Bianca Loli**                                      represented by **Leslie A Cohen**
                                                          Leslie Cohen Law PC
                                                          1615-A Montana Ave
                                                          Santa Monica, CA 90403
                                                          310-394-5900
                                                          Fax : 310-394-9280
                                                          Email: leslie@lesliecohenlaw.com

*Defendant*

----------------------

**Lisa Cohen**                                            represented by **Leslie A Cohen**
                                                          (See above for address)

118

***Defendant***
-----------------------
**William Taylor Carss**                              represented by **William Taylor Carss**
                                                       PRO SE


***Defendant***
-----------------------
**Eng Tang**                                          represented by **Eng Tang**
                                                       PRO SE


***Defendant***
-----------------------
**Maria Eeya Tan**                                    represented by **Maria Eeya Tan**
                                                       PRO SE


***Defendant***
-----------------------
**Jake Akers**                                        represented by **Jake Akers**
                                                       PRO SE


***Defendant***
-----------------------
**Han Trinh**                                         represented by **Kathleen P March**
                                                       The Bankruptcy Law Firm, PC
                                                       10524 W. Pico Blvd Ste 212
                                                       Los Angeles, CA 90064
                                                       310-559-9224
                                                       Fax : 310-559-9133
                                                       Email: kmarch@bkylawfirm.com

                                                       **Douglas A Plazak**
                                                       POB 1300
                                                       Riverside, CA 92502
                                                       951-682-1771
                                                       Fax : 951-686-2415
                                                       Email: dplazak@rhlaw.com
                                                       *TERMINATED: 09/12/2023*


***Defendant***

119

**Jayde Trinh**            represented by **Kathleen P March**
(See above for address)

**Douglas A Plazak**
(See above for address)
*TERMINATED: 09/12/2023*

**Defendant**

------------------------

**Wes Thomas**            represented by **Wes Thomas**
PRO SE

**Defendant**

------------------------

**Scott James Eadie**            represented by **Douglas A Plazak**
(See above for address)

**Defendant**

------------------------

**Jimmy Chhor**            represented by **Jimmy Chhor**
PRO SE

**Defendant**

------------------------

**Dongliang Jiang**            represented by **Dongliang Jiang**
PRO SE

**Defendant**

------------------------

**Oakstone Law Group PC**            represented by **Oakstone Law Group PC**
PRO SE

**Defendant**

------------------------

**Greyson Law Center PC**            represented by **Kathleen P March**
(See above for address)

**Douglas A Plazak**

120

(See above for address)
*TERMINATED: 10/25/2023*

*Defendant*
-----------------------
**Phoenix Law Group, Inc.**                 represented by **Phoenix Law Group, Inc.**
                                            PRO SE

*Defendant*
-----------------------
**Maverick Management, LLC**                represented by **Maverick Management, LLC**
                                            PRO SE

*Defendant*
-----------------------
**LGS Holdco, LLC**                         represented by **Daniel A Lev**
                                            Greenspoon Marder, PA
                                            1875 Century Park East
                                            Ste 1900
                                            Los Angeles, CA 90067
                                            213-626-2311
                                            Fax : 954-771-9264
                                            Email: daniel.lev@gmlaw.com

*Defendant*
-----------------------
**Consumer Legal Group, PC**                represented by **Daniel A Lev**
                                            (See above for address)

                                            **Ronald N Richards**
                                            Law Offices of Ronald Richards & Assoc
                                            PO Box 11480
                                            Beverly Hills, CA 90213
                                            310-556-1001
                                            Fax : 310-277-3325
                                            Email: ron@ronaldrichards.com

*Defendant*
-----------------------
**Vulcan Consulting Group LLC**             represented by **Vulcan Consulting Group LLC**
                                            PRO SE

121

*Defendant*

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-

**B.A.T. Inc.**                                      represented by **B.A.T. Inc.**
***dba* Coast Processing**                                      PRO SE


*Defendant*

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-

**Prime Logix, LLC**                                      represented by **Prime Logix, LLC**
                                      PRO SE


*Defendant*

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-

**Teracel Blockchain Fund II LLC**                  represented by **Teracel Blockchain Fund II LLC**
                                      PRO SE


*Defendant*

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-

**EPPS**                                      represented by **EPPS**
                                      PRO SE


*Defendant*

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-

**Equipay**                                      represented by **Equipay**
                                      PRO SE


*Defendant*

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-

**Authorize Net**                                      represented by **Authorize Net**
                                      PRO SE


*Defendant*

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-

**World Global**                                      represented by **World Global**
                                      PRO SE

122

*Defendant*
\-----------------------
**Optimumbank Holdings, Inc.**                    represented by **Optimumbank Holdings, Inc.**
*dba* **Optimum Bank**                            PRO SE


*Defendant*
\-----------------------
**Marich Bein, LLC**                              represented by **David S Kupetz**
                                                  Locke Lord LLP
                                                  300 South Grand Ave Ste 2600
                                                  Los Angeles, CA 90071
                                                  (213) 485-1500
                                                  Fax : (213) 485-1200
                                                  Email: David.Kupetz@lockelord.com


*Defendant*
\-----------------------
**BankUnited, N.A.**                              represented by **Howard Steinberg**
                                                  Greenberg Traurig LLP
                                                  1840 Century Park East Ste 1900
                                                  Los Angeles, CA 90067-2121
                                                  310-586-7702
                                                  Fax : 310-586-0228
                                                  Email: steinbergh@gtlaw.com


*Defendant*
\-----------------------
**Revolv3, Inc.**                                 represented by **Revolv3, Inc.**
                                                  PRO SE


*Defendant*
\-----------------------
**Fidelity National Information Services,**       represented by **Fidelity National Information Services, Inc.**
**Inc.**                                          PRO SE
*dba* **FIS**


*Defendant*
\-----------------------
                                                  represented by **Worldpay, Inc.**

123

*Worldpay, Inc.* PRO SE

*Defendant*
-----------------------
**Worldpay Group**

represented by **Worldpay Group**
PRO SE

*Defendant*
-----------------------
**Merit Fund, LLC**

represented by **Merit Fund, LLC**
PRO SE

*Defendant*
-----------------------
**Guardian**

represented by **Guardian**
PRO SE

*Defendant*
-----------------------
**The United States Postal Service**

represented by **The United States Postal Service**
PRO SE

*Defendant*
-----------------------
**Fidelity National Information Services,
Inc. dba FIS**

represented by **Michael T Delaney**
Baker & Hostetler LLP
Key Tower
127 Public Square
Ste 2000
Cleveland, OH 44114-1214
216-621-0200
Email: mdelaney@bakerlaw.com

*Defendant*
-----------------------
**Worldpay, LLC**

represented by **Worldpay, LLC**
PRO SE

124

*Defendant*
-----------------------
**Touzi Capital, LLC**                          represented by **Daniel H Reiss**
                                                Levene, Neale, Bender, Yoo & Golubchik L.L.P.
                                                2818 La Cienega Avenue
                                                Los Angeles, CA 90034
                                                310-229-1234
                                                Fax : 310-229-1244
                                                Email: dhr@lnbyg.com

*Defendant*
-----------------------
**Heng Taing**                                  represented by **Heng Taing**
                                                PRO SE

*Defendant*
-----------------------
**Eng Taing**                                   represented by **Daniel H Reiss**
                                                (See above for address)

*Defendant*
-----------------------
**Stripe, Inc.**                                represented by **Eric D Goldberg**
                                                DLA Piper LLP
                                                2000 Avenue of the Stars
                                                Suite 400 North Tower
                                                Los Angeles, CA 90067
                                                310.595.3000
                                                Fax : 310.595.3357
                                                Email: eric.goldberg@dlapiper.com

*Defendant*
-----------------------
**Seamless Chex Inc.**                          represented by **Seamless Chex Inc.**
                                                PRO SE

*Defendant*
-----------------------
**Phoenix Law, PC**                             represented by **Phoenix Law, PC**
                                                PRO SE

125

*Defendant*
-----------------------
**Payliance, LLC**                                  represented by **Keith Barnett**
                                                    Troutman Pepper Hamilton Sanders LLP
                                                    600 Peachtree St Ste 3000
                                                    Suite 3000
                                                    Atlanta, GA 30308
                                                    404-885-3000
                                                    Email: keith.barnett@troutman.com


*Defendant*
-----------------------
**Maverick Management Group, LLC**                  represented by **Maverick Management Group, LLC**
                                                    PRO SE


*Defendant*
-----------------------
**Guardian Processing, LLC**                        represented by **Guardian Processing, LLC**
                                                    PRO SE


*Defendant*
-----------------------
**Dwolla, Inc.**                                    represented by **Dwolla, Inc.**
                                                    PRO SE


*Defendant*
-----------------------
**Max Chou**                                        represented by **Max Chou**
                                                    PRO SE


*Defendant*
-----------------------
**BAT Inc. dba Coast Processing**                   represented by **BAT Inc. dba Coast Processing**
                                                    PRO SE

*Defendant*
-----------------------

**Gallant Law Group**                             represented by **Meredith King**
                                                                Franklin Soto Leeds LLP
                                                                444 West C Street
                                                                Ste 300
                                                                San Diego, CA 92101
                                                                619-872-2520
                                                                Fax : 619-566-0221
                                                                Email: mking@fsl.law


*Defendant*
-----------------------

**OptimumBank Holdings, Inc.**                    represented by **Matthew A Lesnick**
*dba* **Optimum Bank**                                          Lesnick Prince & Pappas LLP
                                                                315 W. Ninth St #705
                                                                Los Angeles, CA 90015
                                                                213-493-6496
                                                                Fax : 310-396-0963
                                                                Email: matt@lesnickprince.com

                                                                **Lisa Patel**
                                                                Lesnick Prince and Pappas, LLP
                                                                315 W. Ninth St., Ste. 705
                                                                Los Angeles, CA 90015
                                                                213-224-7860
                                                                Fax : 213-493-6596
                                                                Email: lpatel@lesnickprince.com


*Trustee*
-----------------------

**Richard A Marshack (TR)**                       represented by **Christopher Celentino**
Marshack Hays Wood LLP                                          (See above for address)
870 Roosevelt
Irvine, CA 92620                                                **Christopher Ghio**
949-333-7777                                                    Dinsmore & Shohl, LLP
                                                                655 W. Broadway
                                                                Suite 800
                                                                92101
                                                                San Diego, CA 92101
                                                                619-400-0500
                                                                Fax : 619-238-1981
                                                                Email: christopher.ghio@dinsmore.com


*U.S. Trustee*
-----------------------

**United States Trustee (SA)**                    represented by **Kenneth Misken**

                                                                                        127

411 W Fourth St., Suite 7160
Santa Ana, CA 92701-4593
(714) 338-3400

Office of the United States Trustee
411 W. Fourth Street, #7160
Santa Ana, CA 92701
714-338-3405
Email: Kenneth.M.Misken@usdoj.gov
*LEAD ATTORNEY*

**Queenie K Ng**
411 West Fourth St.
Suite 7160
Santa Ana, CA 92701
714-338-3403
Fax : 714-338-3421
Email: queenie.k.ng@usdoj.gov
*LEAD ATTORNEY*

| Filing Date | # | Docket Text |
|---|---|---|
| 05/25/2023 | 1<br>(29 pgs) | Adversary case 8:23-ap-01046. Complaint by Plaintiff: Richard A. Marshack against Defendants: Tony Diab , Daniel S. March , Rosa Bianca Loli , Lisa Cohen , William Taylor Carss , Eng Tang , Maria Eeya Tan , Jake Akers , Han Trinh , Jayde Trinh , Wes Thomas , Scott James Eadie , Jimmy Chhor , Dongliang Jiang , Oakstone Law Group PC , Greyson Law Center PC , Phoenix Law Group, Inc. , Maverick Management, LLC , LGS Holdco, LLC , Consumer Legal Group, PC , Vulcan Consulting Group LLC , B.A.T. Inc. , Prime Logix, LLC , Teracel Blockchain Fund II LLC , EPPS , Equipay , Authorize Net , World Global , Optimumbank Holdings, Inc. , Marich Bein, LLC , BankUnited, N.A. , Revolv3, Inc. , Fidelity National Information Services, Inc. , Worldpay, Inc. , Worldpay Group , Merit Fund, LLC , Guardian , The United States Postal Service . Fee Amount $350 Nature of Suit: (72 (Injunctive relief - other)) ,(13 (Recovery of money/property - 548 fraudulent transfer)) ,(11 (Recovery of money/property - 542 turnover of property)) (VN) (Entered: 06/08/2023) |
| 05/25/2023 | 2<br>(3 pgs) | Document Sealed - Motion to file under seal (HC) (Entered: 05/25/2023) (NB8) (Entered: 06/08/2023) |
| 05/25/2023 | 3<br>(5 pgs) | Document Sealed - Memorandum of Points and Authorities in support of motion to file under seal. (HC) (Entered: 05/25/2023) (NB8) (Entered: 06/08/2023) |
| 05/25/2023 | 4<br>(37 pgs) | Document Sealed - Omnibus emergency motion. (HC) (Entered: 05/25/2023) (NB8) (Entered: 06/08/2023) |
| 05/25/2023 | 5<br>(52 pgs) | Document Sealed - Declaration #1 in support of emergency motion. (HC) (Entered: 05/25/2023) (NB8) (Entered: 06/08/2023) |

128

| 05/25/2023 | [6](#)<br>(21 pgs) | Document Sealed - Declaration #2 in support of emergency motion. (HC) (Entered: 05/25/2023) (NB8) (Entered: 06/08/2023) |
| 05/25/2023 | [7](#)<br>(72 pgs) | Document Sealed - Declaration #3 in support of emergency motion. (HC) (Entered: 05/25/2023) (NB8) (Entered: 06/08/2023) |
| 05/25/2023 | [8](#)<br>(217 pgs; 3 docs) | Document Sealed - Declaration #4 in support of emergency motion. (HC) Additional attachment(s) added on 5/25/2023 (HC). Additional attachment(s) added on 5/25/2023 (HC). (Entered: 05/25/2023) (NB8) (Entered: 06/08/2023) |
| 05/25/2023 | 9 | Hearing Set (RE: Emergency Motion) The Hearing date is set for 5/25/2023 at 04:00 PM at Crtrm 5C, 411 W Fourth St., Santa Ana, CA 92701. The case judge is Scott C Clarkson (NB8) (Entered: 05/25/2023) (NB8) (Entered: 06/08/2023) |
| 05/25/2023 | 10 | Hearing Held (RE: related document - Emergency Motion) ORDER BY ATTORNEY; MOTION GRANTED. PRELIMINARY INJUNCTION: JUNE 12, 2023 AT 1:30 P.M. IN COURTROOM 5C, LOCATED AT 411 WEST FOURTH STREET, SANTA ANA, CA 92701 (NB8) (Entered: 05/25/2023) (NB8) (Entered: 06/08/2023) |
| 05/26/2023 | [11](#)<br>(2 pgs) | Document Sealed - Order (NB8) (Entered: 05/26/2023) (NB8) (Entered: 06/08/2023) |
| 05/26/2023 | 12 | Request for a Certified Copy Fee Amount $11. (RE: related document(s) [11](#) Document Sealed) (HC) (Entered: 05/26/2023) (NB8) (Entered: 06/08/2023) |
| 05/26/2023 | [13](#)<br>(13 pgs) | Document Sealed - Order On Omnibus Emergency Motion (NB8) (Entered: 05/26/2023) (NB8) (Entered: 06/08/2023) |
| 05/26/2023 | 14 | Request for a Certified Copy Fee Amount $11. The document will be sent via email to :chris.celentino@dinsmore.com: Filed by Litigant Master File 2023-1 (RE: related document(s)[13](#) Document Sealed). (Celentino, Christopher) (Entered: 05/26/2023) (NB8) (Entered: 06/08/2023) |
| 05/26/2023 | [15](#)<br>(8 pgs) | Summons Issued On Tony Diab Date Issued 5/26/2023, Answer Due June 30, 2023; Daniel S. March Date Issued 5/26/2023, Answer Due June 30, 2023; Rosa Bianca Loli Date Issued 5/26/2023, Answer Due June 30, 2023; Lisa Cohen Date Issued 5/26/2023, Answer Due June 30, 2023; William Taylor Carss Date Issued 5/26/2023, Answer Due June 30, 2023; Eng Tang Date Issued 5/26/2023, Answer Due June 30, 2023; Maria Eeya Tan Date Issued 5/26/2023, Answer Due June 30, 2023; Jake Akers Date Issued 5/26/2023, Answer Due June 30, 2023; Han Trinh Date Issued 5/26/2023, Answer |

129

| | | Due June 30, 2023; Jayde Trinh Date Issued 5/26/2023, Answer Due June 30, 2023; Wes Thomas Date Issued 5/26/2023, Answer Due June 30, 2023; Scott James Eadie Date Issued 5/26/2023, Answer Due June 30, 2023; Jimmy Chhor Date Issued 5/26/2023, Answer Due June 30, 2023; Dongliang Jiang Date Issued 5/26/2023, Answer Due June 30, 2023; Oakstone Law Group PC Date Issued 5/26/2023, Answer Due June 30, 2023; Greyson Law Center PC Date Issued 5/26/2023, Answer Due June 30, 2023; Phoenix Law Group, Inc. Date Issued 5/26/2023, Answer Due June 30, 2023; Maverick Management, LLC Date Issued 5/26/2023, Answer Due June 30, 2023; LGS Holdco, LLC Date Issued 5/26/2023, Answer Due June 30, 2023; Consumer Legal Group, P.C. Date Issued 5/26/2023, Answer Due June 30, 2023; Vulcan Consulting Group LLC Date Issued 5/26/2023, Answer Due June 30, 2023; B.A.T. Inc. d/b/a Coase Processing Date Issued 5/26/2023, Answer Due June 30, 2023; Prime Logix, LLC Date Issued 5/26/2023, Answer Due June 30, 2023; Teracel Blockchain Fund II LLC Date Issued 5/26/2023, Answer Due June 30, 2023; Equipay Date Issued 5/26/2023, Answer Due June 30, 2023; Authorize.Net Date Issued 5/26/2023, Answer Due June 30, 2023; World Global Date Issued 5/26/2023, Answer Due June 30, 2023; Optimumbank Holdings, Inc. d/b/a Optimum Bank Date Issued 5/26/2023, Answer Due June 30, 2023; Marich Bein, LLC Date Issued 5/26/2023, Answer Due June 30, 2023; BankUnited, N.A. Date Issued 5/26/2023, Answer Due June 30, 2023; Revolv3, Inc. Date Issued 5/26/2023, Answer Due June 30, 2023; Fidelity National Information Services, Inc. d/b/a FIS Date Issued 5/26/2023, Answer Due June 30, 2023; Worldpay, Inc. Date Issued 5/26/2023, Answer Due June 30, 2023; Worldpay Group Date Issued 5/26/2023, Answer Due June 30, 2023 Merit Fund, LLC Date Issued 5/26/2023, Answer Due June 30, 2023; Guardian Date Issued 5/26/2023, Answer Due June 30, 2023; The United States Postal Service Date Issued 5/26/2023, Answer Due June 30, 2023. The Status Conference hearing to be held on August 15, 2023 at 10:30 AM at Courtroom 5C, 411 W Fourth Street, Santa Ana, CA 92701. The case judge is Scott C. Clarkson. (NB8) (Entered: 05/26/2023) (NB8) (Entered: 06/08/2023) |
| 05/26/2023 | 16 | Certified Copy Emailed to chris.celentino@dinsmore.com (Entered: 05/26/2023) (NB8) (Entered: 06/08/2023) |
| 05/30/2023 | 17 | Hearing Set (RE: Preliminary Injunction) The Hearing date is set for 6/12/2023 at 01:30 PM at Crtrm 5C, 411 W Fourth St., Santa Ana, CA 92701. The case judge is Scott C Clarkson (NB8) (Entered: 05/30/2023) (NB8) (Entered: 06/08/2023) |
| 05/30/2023 | 18 | Hearing Set (RE: Complaint) Status Conference hearing to be held on 8/15/2023 at 10:30 AM at Crtrm 5C, 411 W Fourth St., Santa Ana, CA 92701. The case judge is Scott C Clarkson (NB8) (Entered: 05/30/2023) (NB8) (Entered: 06/08/2023) |

| | | |
|---|---|---|
| 06/02/2023 | [19](#)<br>(17 pgs) | Declaration In Support Issuance Of Amended Order [Docket No. 13] (NB8) (Entered: 06/02/2023) (NB8) (Entered: 06/08/2023) |
| 06/02/2023 | [20](#)<br>(1 pg) | Request for courtesy Notice of Electronic Filing (NEF) Filed by Richards, Ronald. (Richards, Ronald) (Entered: 06/02/2023) (NB8) (Entered: 06/08/2023) |
| 06/02/2023 | [21](#)<br>(13 pgs) | Amended Order On Omnibus Emergency Motion (BNC-PDF) Signed on 6/2/2023. (NB8) (Entered: 06/02/2023) (NB8) (Entered: 06/08/2023) |
| 06/04/2023 | [22](#)<br>(14 pgs) | BNC Certificate of Notice - PDF Document. (RE: related document(s)[21](#) Amended Order (BNC-PDF)) No. of Notices: 0. Notice Date 06/04/2023. (Admin.) (Entered: 06/04/2023) (NB8) (Entered: 06/08/2023) |
| 06/06/2023 | [23](#)<br>(1 pg) | Request for courtesy Notice of Electronic Filing (NEF) by Kenneth Misken, Assistant United States Trustee Filed by Misken, Kenneth. (Misken, Kenneth) (Entered: 06/06/2023) (NB8) (Entered: 06/08/2023) |
| 06/06/2023 | [24](#)<br>(3 pgs) | Request that the Clerk Issue Another Summons and Notice of Status Conference (LBR 7004-1(a)(1)(B)) (NB8) (Entered: 06/06/2023) (NB8) (Entered: 06/08/2023) |
| 06/06/2023 | [25](#)<br>(8 pgs) | Another Summons Issued On Rosa Biancia Loli Date Issued 06/06/2023, Answer Due 07/11/2023; And Lisa Cohen Date Issued 06/06/2023, Answer Due 07/11/2023. Status Conference Hearing To Be Held On 08/29/2023 At 10:30 A.M. At Courtroom 5C, 411 West Fourth Street, Santa Ana, CA 92701. The Case Judge Is Scott C. Clarkson. (NB8) (Entered: 06/06/2023) (NB8) (Entered: 06/08/2023) |
| 06/07/2023 | [26](#)<br>(2 pgs) | Chapter 11 Trustee's Motion To Unseal Case 8:23-mp-102 (NB8) (Entered: 06/07/2023) (NB8) (Entered: 06/08/2023) |
| 06/07/2023 | [27](#)<br>(2 pgs) | Order On Chapter 11 Trustee's Motion To Unseal Case. IT IS ORDERED: That Certain ORDER GRANTING TRUSTEE'S MOTION FOR PERMISSION TO FILE OMNIBUS EMERGENCY MOTION AFTER SERVICE OF COURTESY COPY AND AFTER HEARING, AND UNDER SEAL Is Hereby Dissolved And The Identified Matters Within Adversary Proceeding Are No Longer Subject To SEAL. (SEE ORDER FOR FURTHER RULING) (Related Doc # [26](#)) Signed on 6/7/2023 (NB8) (Entered: 06/07/2023) (NB8) (Entered: 06/08/2023) |
| 06/08/2023 | [28](#)<br>(1 pg) | Transcript Order Form , regarding Hearing Date 05/25/23 Filed by U.S. Trustee United States Trustee (SA) (RE: related |

131

| | | document(s)[4] Omnibus Emergency Motion). (SD8) (Entered: 06/08/2023) (NB8). (Entered: 06/08/2023) |
|---|---|---|
| 06/08/2023 | 29 | Transcript Record Transmittal (Court transcript records have been uploaded to FDS). For Order Number: 23-SC-26. RE Hearing Date: 05/25/23, [TRANSCRIPTION SERVICE PROVIDER: Briggs Reporting Co, Inc, Telephone number (310) 410-4151.] (RE: related document(s)28 Transcript Order Form (Public Request) filed by U.S. Trustee United States Trustee (SA)) (SD8) (Entered: 06/08/2023) (NB8) (Entered: 06/08/2023) |
| 06/08/2023 | 30 (9 pgs) | Proof of service *of Order Advancing Status Conference to Be Heard Concurrently with the Related Matters and Requiring Notice* Filed by Trustee Richard A Marshack (TR). (Celentino, Christopher) (Entered: 06/08/2023) |
| 06/08/2023 | 31 (12 pgs) | Summons Service Executed on Jake Akers 6/2/2023; Authorize Net 6/2/2023; B.A.T. Inc. 6/2/2023; BankUnited, N.A. 6/2/2023; William Taylor Carss 6/2/2023; Jimmy Chhor 6/2/2023; Lisa Cohen 6/2/2023; Consumer Legal Group, PC 6/2/2023; Tony Diab 6/2/2023; Scott James Eadie 6/2/2023; Equipay 6/2/2023; Fidelity National Information Services, Inc. 6/2/2023; Greyson Law Center PC 6/2/2023; Guardian 6/2/2023; Dongliang Jiang 6/2/2023; LGS Holdco, LLC 6/2/2023; Rosa Bianca Loli 6/2/2023; Daniel S. March 6/2/2023; Marich Bein, LLC 6/2/2023; Maverick Management, LLC 6/2/2023; Merit Fund, LLC 6/2/2023; Oakstone Law Group PC 6/2/2023; Optimumbank Holdings, Inc. 6/2/2023; Phoenix Law Group, Inc. 6/2/2023; Prime Logix, LLC 6/2/2023; Revolv3, Inc. 6/2/2023; Maria Eeya Tan 6/2/2023; Eng Tang 6/2/2023; Teracel Blockchain Fund II LLC 6/2/2023; Wes Thomas 6/2/2023; Han Trinh 6/2/2023; Jayde Trinh 6/2/2023; Vulcan Consulting Group LLC 6/2/2023; World Global 6/2/2023; Worldpay Group 6/2/2023; Worldpay, Inc. 6/2/2023 (Celentino, Christopher) (Entered: 06/08/2023) |
| 06/08/2023 | 32 (10 pgs) | Summons Service Executed on Tony Diab 6/2/2023 (Celentino, Christopher) (Entered: 06/08/2023) |
| 06/08/2023 | 33 (10 pgs) | Summons Service Executed on B.A.T. Inc. 6/2/2023 (Celentino, Christopher) (Entered: 06/08/2023) |
| 06/08/2023 | 34 (4 pgs) | Proof of service *for Approvely Inc.* Filed by Plaintiff Richard A. Marshack. (Celentino, Christopher) (Entered: 06/08/2023) |
| 06/08/2023 | 35 (4 pgs) | Proof of service *for Amazon.com, Inc.* Filed by Plaintiff Richard A. Marshack. (Celentino, Christopher) (Entered: 06/08/2023) |

132

| | | |
|---|---|---|
| 06/08/2023 | [36](#)<br>(4 pgs) | Proof of service *for Bank United N.A.* Filed by Plaintiff Richard A. Marshack. (Celentino, Christopher) (Entered: 06/08/2023) |
| 06/08/2023 | [37](#)<br>(4 pgs) | Proof of service *for Optimum Bank Holdings Inc.* Filed by Plaintiff Richard A. Marshack. (Celentino, Christopher) (Entered: 06/08/2023) |
| 06/08/2023 | | Receipt of Adversary Filing Fee - $350.00 by 16. Receipt Number 80076736. (admin) (Entered: 06/08/2023) |
| 06/09/2023 | [38](#)<br>(9 pgs) | Summons Service Executed on Lisa Cohen 6/6/2023; Rosa Bianca Loli 6/6/2023 (Celentino, Christopher) (Entered: 06/09/2023) |
| 06/09/2023 | [39](#)<br>(10 pgs) | Summons Service Executed on William Taylor Carss 6/2/2023 (Celentino, Christopher) (Entered: 06/09/2023) |
| 06/09/2023 | [40](#)<br>(4 pgs) | Proof of service *for Stephanie King* Filed by Plaintiff Richard A. Marshack. (Celentino, Christopher) (Entered: 06/09/2023) |
| 06/09/2023 | [41](#)<br>(3 pgs) | Proof of service *for Han Trinh* Filed by Plaintiff Richard A. Marshack. (Celentino, Christopher) (Entered: 06/09/2023) |
| 06/09/2023 | [42](#)<br>(7 pgs) | Proof of service *for Approvely, Inc., Maverick Bankcard, Inc., Occams Advisory, Inc.* Filed by Plaintiff Richard A. Marshack. (Celentino, Christopher) (Entered: 06/09/2023) |
| 06/09/2023 | [43](#)<br>(7 pgs) | Proof of service *for World Globe, WorldPay, Inc., WorldPay Group* Filed by Plaintiff Richard A. Marshack. (Celentino, Christopher) (Entered: 06/09/2023) |
| 06/09/2023 | [44](#)<br>(4 pgs) | Proof of service *for Revolv3, Inc.* Filed by Plaintiff Richard A. Marshack. (Celentino, Christopher) (Entered: 06/09/2023) |
| 06/12/2023 | [45](#)<br>(116 pgs; 7 docs) | Status report Filed by Plaintiff Richard A. Marshack (RE: related document(s)[1](#) Complaint). (Attachments: # [1](#) Declaration of Richard A. Marshack # [2](#) Declaration of Christopher Celentino # [3](#) Declaration of Jonathan Serrano # [4](#) Declaration of Jeremy B. Freedman # [5](#) Declaration of Peter M. Schneider # [6](#) Declaration of Ty Carss) (Celentino, Christopher) (Entered: 06/12/2023) |
| 06/12/2023 | [46](#)<br>(7 pgs) | Opposition to (related document(s): [4](#) Document) *Motion for Turnover, Preliminary Injunction, Lock-Out, Redirection of US Mail* Filed by Defendant Greyson Law Center PC (Plazak, Douglas) (Entered: 06/12/2023) |
| 06/12/2023 | [47](#)<br>(90 pgs; 13 docs) | Opposition to (related document(s): [4](#) Document) *Motion for Turnover, et al.* Filed by Defendant Greyson Law Center PC (Attachments: # [1](#) Dec of Scott Eadie # [2](#) Declaration of Han |

| | | |
|---|---|---|
| | | Trial # 3 Declaration of Sally Yde # 4 Declaration of Peter Yde III # 5 Declaration of Steven Mader # 6 Declaration of Thomas Ayen # 7 Declaration of Lynn Kohn # 8 Declaration of Danita Goss # 9 Declaration o Leann Babcock-McCallu # 10 Declaration of Debora Jones # 11 Declaration of Keith Weaver # 12 Declaration of Tamer Fawzy) (Plazak, Douglas) (Entered: 06/12/2023) |
| 06/12/2023 | 48 (9 pgs) | Declaration re: *of Scott Eadie with Exhibits* Filed by Defendant Greyson Law Center PC. (Plazak, Douglas) (Entered: 06/12/2023) |
| 06/12/2023 | 49 (1 pg) | Request for courtesy Notice of Electronic Filing (NEF) Filed by Richards, Ronald. (Richards, Ronald) (Entered: 06/12/2023) |
| 06/12/2023 | 50 | Hearing Held On Motion (RE: related document 1 Preliminary Injunction) - ORDER BY ATTORNEY - PRELIMINARY INJUNCTION GRANTED (NB8) (Entered: 06/13/2023) |
| 06/13/2023 | 51 (1 pg) | Notice *Request Courtesy Notification of Electronic Filing (NEF)* Filed by Creditors MC DVI Fund 2, LLC, MC DVI Fund 1, LLC, Debt Validation Fund II, LLC. (Golubow, Richard) (Entered: 06/13/2023) |
| 06/13/2023 | 52 (4 pgs) | Proof of service *for Netsuite* Filed by Plaintiff Richard A. Marshack. (Celentino, Christopher) (Entered: 06/13/2023) |
| 06/13/2023 | 53 (4 pgs) | Proof of service *for Quickbooks - Intiut* Filed by Plaintiff Richard A. Marshack. (Celentino, Christopher) (Entered: 06/13/2023) |
| 06/13/2023 | 54 (4 pgs) | Proof of service *for Google* Filed by Plaintiff Richard A. Marshack. (Celentino, Christopher) (Entered: 06/13/2023) |
| 06/13/2023 | 55 (4 pgs) | Proof of service *for Microsoft* Filed by Plaintiff Richard A. Marshack. (Celentino, Christopher) (Entered: 06/13/2023) |
| 06/13/2023 | 56 (4 pgs) | Proof of service *for Amazon.com* Filed by Plaintiff Richard A. Marshack. (Celentino, Christopher) (Entered: 06/13/2023) |
| 06/13/2023 | 57 (10 pgs) | Summons Service Executed on Authorize Net 6/1/2023 (Celentino, Christopher) (Entered: 06/13/2023) |
| 06/13/2023 | 58 (10 pgs) | Summons Service Executed on Fidelity National Information Services, Inc. 6/1/2023 (Celentino, Christopher) (Entered: 06/13/2023) |
| 06/14/2023 | 59 (1 pg) | Request for courtesy Notice of Electronic Filing (NEF) Filed by Still, Andrew. (Still, Andrew) (Entered: 06/14/2023) |

| | | |
|---|---|---|
| 06/15/2023 | [60](#)<br>(1 pg) | Request for Recording of Court Proceedings . Fee Amount $32, Filed by U.S. Trustee United States Trustee (SA) . (JL) (Entered: 06/15/2023) |
| 06/15/2023 | [61](#)<br>(2 pgs; 2 docs) | Transcript Order Form , regarding Hearing Date 6/12/23 Filed by U.S. Trustee United States Trustee (SA) . (JL) Additional attachment(s) added on 6/15/2023 (JL). (Entered: 06/15/2023) |
| 06/15/2023 | [62](#)<br>(31 pgs) | Amended Complaint by Christopher Ghio on behalf of Richard A. Marshack against Fidelity National Information Services, Inc. dba FIS, Worldpay, LLC, Touzi Capital, LLC, Heng Taing, Eng Taing, Stripe, Inc., Seamless Chex Inc., Phoenix Law, PC, Payliance, LLC, Optimumbank Holdings, Inc. dba Optimum Bank, Maverick Management Group, LLC, Guardian Processing, LLC, Dwolla, Inc., Max Chou, BAT Inc. dba Coast Processing, Jake Akers, Authorize Net, BankUnited, N.A., William Taylor Carss, Jimmy Chhor, Lisa Cohen, Consumer Legal Group, PC, Tony Diab, EPPS, Scott James Eadie, Equipay, Greyson Law Center PC, Dongliang Jiang, LGS Holdco, LLC, Rosa Bianca Loli, Daniel S. March, Marich Bein, LLC, Merit Fund, LLC, Oakstone Law Group PC, Prime Logix, LLC, Revolv3, Inc., Maria Eeya Tan, Teracel Blockchain Fund II LLC, Wes Thomas, Han Trinh, Jayde Trinh, Vulcan Consulting Group LLC, World Global, Worldpay Group. (Ghio, Christopher) (Entered: 06/15/2023) |
| 06/15/2023 | [63](#)<br>(1 pg) | Request for courtesy Notice of Electronic Filing (NEF) Filed by White, Johnny. (White, Johnny) (Entered: 06/15/2023) |
| 06/15/2023 | 64 | Transcript Record Transmittal (Court transcript records have been uploaded to FDS). For Order Number: 23-SC-27. RE Hearing Date: 6/12/23, [TRANSCRIPTION SERVICE PROVIDER: BRIGGS REPORTING CO., INC., Telephone number Ph: (310) 410-4151.] (RE: related document(s)[61](#) Transcript Order Form (Public Request) filed by U.S. Trustee United States Trustee (SA)) (JL) (Entered: 06/15/2023) |
| 06/16/2023 | [65](#)<br>(18 pgs) | Notice of lodgment *of Order in Adversary Case* Filed by Plaintiff Richard A. Marshack (RE: related document(s)[3](#) Document). (Celentino, Christopher) (Entered: 06/16/2023) |
| 06/16/2023 | [66](#)<br>(22 pgs) | Declaration re: *Declaration of Christopher Celentino in Support of Notice of Lodgment of Preliminary Injunction* Filed by Plaintiff Richard A. Marshack (RE: related document(s)[65](#) Notice of Lodgment). (Celentino, Christopher) (Entered: 06/16/2023) |
| 06/16/2023 | [67](#)<br>(1 pg) | Request for courtesy Notice of Electronic Filing (NEF) Filed by Lev, Daniel. (Lev, Daniel) (Entered: 06/16/2023) |

| | | |
|---|---|---|
| 06/20/2023 | [68](#)<br>(4 pgs) | Summons Returned Unexecuted Re: Gallant Law Group, Jake Akers, Authorize Net, BAT Inc. dba Coast Processing, BankUnited, N.A., William Taylor Carss, Jimmy Chhor, Max Chou, Lisa Cohen, Consumer Legal Group, PC, Tony Diab, Dwolla, Inc., EPPS, Scott James Eadie, Equipay, Fidelity National Information Services, Inc. dba FIS, Greyson Law Center PC, Guardian Processing, LLC, Dongliang Jiang, LGS Holdco, LLC, Rosa Bianca Loli, Daniel S. March, Marich Bein, LLC, Maverick Management Group, LLC, Merit Fund, LLC, Oakstone Law Group PC, Optimumbank Holdings, Inc. dba Optimum Bank, Payliance, LLC, Phoenix Law, PC, Prime Logix, LLC, Revolv3, Inc., Seamless Chex Inc., Stripe, Inc., Eng Taing, Heng Taing, Maria Eeya Tan, Eng Tang, Teracel Blockchain Fund II LLC, The United States Postal Service, Wes Thomas, Touzi Capital, LLC, Han Trinh, Jayde Trinh, Vulcan Consulting Group LLC, World Global, Worldpay Group, Worldpay, LLC (Celentino, Christopher) (Entered: 06/20/2023) |
| 06/22/2023 | [69](#)<br>(6 pgs) | Request that the Clerk Issue Another Summons and Notice of Status Conference (LBR 7004-1(a)(1)(B)) Filed by Plaintiff Richard A. Marshack. (Ghio, Christopher) (Entered: 06/22/2023) |
| 06/23/2023 | [70](#)<br>(15 pgs) | Order On Trustee, Richard Marshack's Omnibus Motion Granting: (1) Turnover Of Estate Property And Recorded Information Pursuant To 11 U.S.C. Section 542; (2) Preliminary Injunction; (3) Lock-Out; (4) Re-Direction Of United States Parcel Services Mail; (5) Order To Show Cause RE Compliance With Court Order; And (6) Other Relief As Necessary To Efficient Administration Of This Matter. (SEE ORDER FOR FURTHER RULING) (BNC-PDF) (Related Doc # [4](#) ) Signed on 6/23/2023 (NB8) (Entered: 06/23/2023) |
| 06/23/2023 | [71](#)<br>(9 pgs; 2 docs) | Another Summons Issued on BAT Inc. dba Coast Processing Date Issued 6/23/2023, Answer Due 7/24/2023; Jimmy Chhor Date Issued 6/23/2023, Answer Due 7/24/2023; Max Chou Date Issued 6/23/2023, Answer Due 7/24/2023; Dwolla, Inc. Date Issued 6/23/2023, Answer Due 7/24/2023; Guardian Processing, LLC Date Issued 6/23/2023, Answer Due 7/24/2023; Maverick Management Group, LLC Date Issued 6/23/2023, Answer Due 7/24/2023; Payliance, LLC Date Issued 6/23/2023, Answer Due 7/24/2023; Phoenix Law, PC Date Issued 6/23/2023, Answer Due 7/24/2023; Seamless Chex Inc. Date Issued 6/23/2023, Answer Due 7/24/2023; Stripe, Inc. Date Issued 6/23/2023, Answer Due 7/24/2023; Eng Taing Date Issued 6/23/2023, Answer Due 7/24/2023; Heng Taing Date Issued 6/23/2023, Answer Due 7/24/2023; Touzi Capital, LLC Date Issued 6/23/2023, Answer Due 7/24/2023; Worldpay, LLC Date Issued 6/23/2023, Answer Due 7/24/2023 (RE: related document(s)[69](#) Request that the Clerk Issue Another Summons and Ntc of Status Conf (AP) filed by Plaintiff Richard A. Marshack) Status Conference |

| | | |
|---|---|---|
| | | hearing to be held on 9/12/2023 at 01:30 PM at Crtrm 5C, 411 W Fourth St., Santa Ana, CA 92701. The case judge is Scott C Clarkson (NB8) (Entered: 06/23/2023) |
| 06/23/2023 | [72](#)<br>(1 pg) | Request for courtesy Notice of Electronic Filing (NEF) Filed by Cohen, Leslie. (Cohen, Leslie) (Entered: 06/23/2023) |
| 06/23/2023 | [73](#)<br>(15 pgs; 4 docs) | Notice *Notice of Required Compliance with Rule 7026 of the Federal Rules of Bankruptcy Procedure and Rule 7026-1 of the Local Bankruptcy Rules* Filed by Plaintiff Richard A. Marshack. (Attachments: # [1](#) Exhibit Exhibit 1 # [2](#) Exhibit Exhibit 1(b) # [3](#) Exhibit Exhibit 2)(Serrano, Jonathan) (Entered: 06/23/2023) |
| 06/23/2023 | [74](#)<br>(13 pgs) | Status report *Status Conference Report* Filed by Plaintiff Richard A. Marshack (RE: related document(s)[71](#) Another Summons Issued). (Serrano, Jonathan) (Entered: 06/23/2023) |
| 06/25/2023 | [75](#)<br>(18 pgs) | BNC Certificate of Notice - PDF Document. (RE: related document(s)[70](#) Order on Generic Motion (BNC-PDF)) No. of Notices: 1. Notice Date 06/25/2023. (Admin.) (Entered: 06/25/2023) |
| 06/27/2023 | [76](#)<br>(269 pgs) | Transcript regarding Hearing Held 06/12/23 RE: HEARING RE: PRELIMINARY INJUNCTION STATUS CONFERENCE HEARING RE: (1) CASE MANAGEMENT CONFERENCE AND (2) REQUIRING STATUS REPORT. Remote electronic access to the transcript is restricted until 09/25/2023. The transcript may be viewed at the Bankruptcy Court Clerk's Office on a public terminal **or** purchased through the Transcription Service Provider before the transcript access restriction has ended. [TRANSCRIPTION SERVICE PROVIDER: BRIGGS REPORTING COMPANY, INC., Telephone number 310-410-4151.]. Notice of Intent to Request Redaction Deadline Due By 7/5/2023. Redaction Request Due By 07/18/2023. Redacted Transcript Submission Due By 07/28/2023. Transcript access will be restricted through 09/25/2023. (Steinhauer, Holly) (Entered: 06/27/2023) |
| 06/27/2023 | [77](#)<br>(6 pgs) | Stipulation By Richard A. Marshack and *Stipulation for Judgment (1) Avoiding, Recovering, and Preserving Transfers to Defendant, Phoenix Law Group, Inc.; (2) Turning Over of All Transferred Property to Trustee; and (3) Dismissing Without Prejudice Defendants William Taylor Carss and Maria Eeya Tan* Filed by Plaintiff Richard A. Marshack (Ghio, Christopher) (Entered: 06/27/2023) |
| 06/28/2023 | [78](#)<br>(3 pgs) | Proof of service *Supplemental Proof of Service For Stipulation (1) Avoiding, Recovering, and Preserving Transfers to Defendant, Phoenix Law Group, Inc.; (2) Turning Over of All Transferred Property to Trustee; and (3)* |

137

| | | |
|---|---|---|
| | | *Dismissing Without Prejudice Defendants William Taylor Carss and Maria Eeya Tan* Filed by Plaintiff Richard A. Marshack (RE: related document(s)77 Stipulation By Richard A. Marshack and *Stipulation for Judgment (1) Avoiding, Recovering, and Preserving Transfers to Defendant, Phoenix Law Group, Inc.; (2) Turning Over of All Transferred Property to Trustee; and (3) Dismissing Without Prejudice).* (Serrano, Jonathan) (Entered: 06/28/2023) |
| 06/30/2023 | 79 (20 pgs) | Answer to Complaint *Defendant Marich Bein, LLC's Answer To Plaintiff Richard A. Marshack's Amended Complaint* Filed by Marich Bein, LLC. (Kupetz, David) (Entered: 06/30/2023) |
| 06/30/2023 | 80 (5 pgs) | Notice *Notice of Appearance Of Counsel For Defendant Marich Bein, LLC* Filed by Defendant Marich Bein, LLC. (Kupetz, David) (Entered: 06/30/2023) |
| 06/30/2023 | 81 (15 pgs) | Stipulation By Richard A. Marshack and *Stipulation re Partial Settlement of Claims and Modification of Order on Trustee, Richard Marshack's Omnibus Emergency Motion as to Covered Parties and Defendants, Consumer Legal Group, P.C. and LGS HoldCo, LLC* Filed by Plaintiff Richard A. Marshack (Ghio, Christopher) (Entered: 06/30/2023) |
| 06/30/2023 | 82 (3 pgs) | Proof of service *Supplemental Proof of Service for Stipulation re Partial Settlement of Claims and Modification of Order on Trustee, Richard Marshack's Omnibus Emergency Motion as to Covered Parties and Defendants, Consumer Legal Group, P.C. and LGS Holdco, LLC* Filed by Plaintiff Richard A. Marshack. (Serrano, Jonathan) (Entered: 06/30/2023) |

| | PACER Service Center | |
|---|---|---|
| | **Transaction Receipt** | |
| | 11/15/2023 14:14:39 | |
| **PACER Login:** | kmarch80366 | **Client Code:** | P Han Jayde Trinh |
| **Description:** | Docket Report | **Search Criteria:** | 8:23-ap-01046-SC Fil or Ent: filed To: 6/30/2023 Doc From: 0 Doc To: 99999999 Term: included Format: html Page counts for documents: included |
| **Billable Pages:** | 10 | **Cost:** | 1.00 |

FILED

MAY 26 2023

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY:                    Deputy Clerk

ENTERED

MAY 26 2023

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY:                    Deputy Clerk

CHANGES MADE BY COURT

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

In re:

THE LITIGATION PRACTICE GROUP P.C.,

Debtor.

RICHARD A. MARSHACK,
Chapter 11 Trustee,

Plaintiff,

v.

TONY DIAB, an individual; DANIEL S. MARCH, an individual; ROSA BIANCA LOLI, an individual; LISA COHEN, an individual; WILLIAM TAYLOR CARSS, an individual; ENG TANG, an individual; MARIA EEYA TAN, an individual; JAKE AKERS, an individual; HAN TRINH, an individual; JAYDE TRINH, an individual; WES THOMAS, an individual; SCOTT JAMES EADIE, an individual; JIMMY CHHOR, an individual; DONGLIANG JIANG, an individual; OAKSTONE LAW GROUP PC; GREYSON LAW CENTER PC; PHOENIX LAW GROUP, INC.; MAVERICK MANAGEMENT, LLC; LGS HOLDCO, LLC; CONSUMER LEGAL GROUP, P.C.; VULCAN CONSULTING GROUP LLC; B.A.T. INC. d/b/a COAST PROCESSING; PRIME LOGIX, LLC; TERACEL BLOCKCHAIN FUND II LLC; EPPS; EQUIPAY; AUTHORIZE.NET; WORLD GLOBAL; OPTIMUMBANK HOLDINGS, INC. d/b/a OPTIMUM BANK; MARICH BEIN, LLC;

Case No.: 8:23-MP-00102

Chapter 11: 8:23-bk-10571

**ORDER ON TRUSTEE, RICHARD MARSHACK'S OMNIBUS *EMERGENCY* MOTION FOR:**
**1) TURNOVER OF ESTATE PROPERTY AND RECORDED INFORMATION PURSUANT TO 11 U.S.C. § 542;**
**2) PRELIMINARY INJUNCTION;**
**3) LOCK-OUT;**
**4) RE-DIRECTION OF UNITED STATES PARCEL SERVICES MAIL;**
**5) ORDER TO SHOW CAUSE RE COMPLIANCE WITH COURT ORDER; AND**
**6) OTHER RELIEF AS NECESSARY TO EFFICIENT ADMINISTRATION OF THIS MATTER**

Date: May 25, 2023
Time: **4:00 P.M.**
Judge: Hon. Scott C. Clarkson
Place: Courtroom 5C
411 W. Fourth Street
Santa Ana, CA 92701

# EXHIBIT D

139

1  BANKUNITED, N.A.; REVOLV3, INC.;
   FIDELITY NATIONAL INFORMATION
2  SERVICES, INC. d/b/a FIS; WORLDPAY, INC.;
   WORLDPAY GROUP; MERIT FUND, LLC;
3  GUARDIAN PROCESSING, LLC; THE
   UNITED STATES POSTAL SERVICE; and
4  DOES 1 through 100, inclusive,

5              Defendants.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1       In his capacity as the duly appointed and acting Chapter 11 Trustee, Richard Marshack

2 ("Trustee") filed an Omnibus Emergency Motion for Turnover of Estate Property and Recorded

3 Information Pursuant to 11 U.S.C. § 542; Preliminary Injunction; Lock-Out; Re-Direction of United

4 States Postal Service Mail; Setting an Order To Show Cause re Compliance with the Court's Order

5 as to Tony Diab, Rosa Loli aka Rosa Bianca Loli aka Bianca Loli ("Rosa Loli"), Lisa Cohen, Daniel

6 March and William Tyson "Ty" Carss; and Other As Necessary to the Efficient Administration of

7 this Matter under seal on May 25, 2023, which matter was heard on May 25, 2023, pursuant to Local

8 Bankruptcy Rule 9075-1. The Court, having considered the pleadings on file and the discussion of

9 the parties at the hearing, and having placed its findings of fact and conclusions of law in support of

10 this order orally on the record at the hearing, and finding that exigent circumstances exist and good

11 cause appearing therefor, hereby **ORDERS AS FOLLOWS**:

12       **TURNOVER ORDER OF ESTATE PROPERTY AND RECORDED INFORMATION:**

13       **A. RECORDED INFORMATION**

14       Within twenty-four (24) hours from the date of this Order or notice thereof, whichever is

15 later, the following information regarding any and all persons who signed a Legal Services Contract

16 with LPG or whose file was purchased or otherwise transferred to LPG; OakStone Legal Group, P.C.

17 ("OakStone"); Greyson Law, P.C. ("Greyson"); Gallant Law Group ("Gallant"); Phoenix Law

18 Group, P.C. (Phoenix"); LGS Holdco., LLC; Consumer Legal Group, P.C. ("CLG"); Maverick

19 Management, LLC ("Maverick"); Vulcan Consulting Group, LLC ("Vulcan"); BAT Inc. d/b/a Coast

20 Processing ("Coast Processing"); Strategic Consulting Solutions, LLC ("SCS"); Prime Logix, LLC

21 ("Prime Logix"); Tony Diab; Rosa Loli aka Rosa Bianca Loli aka Bianca Loli ("Rosa Loli"); Lisa

22 Cohen; Eng Tang; Maria Eeya Tan; Jake Akers; Jayde Trinh; Wes Thomas; Scott James; Eadie,

23 Jummi Chhor; Dongliang Jiang; and/or any other alias', agents or corporate entities affiliated with

24 same, for which the client's file remains open and/or continues to make payments under an agreed

25 upon installment contract, except those clients who signed a Legal Services Contract post-petition

26 (hereinafter "Client") shall be turned over to the Trustee by Debtor:

27       1. All Client files, including but not limited to names, contact information, client file

28 management, communications, account information, letters, pleadings, communications, payment

1  history, financial account information, credit reports, executed legal services contracts, automated

2  clearing house ("ACH") contracts, executed installment contracts, account balances, debts in dispute,

3  payment history, file status, settlements, debt invalidations and/or any other information created,

4  managed and stored electronically utilizing DebtPayPro, a Forth, Inc. ("DPP") software program's

5  software license, key or account, that was opened and is maintained and controlled by LPG;

6  OakStone; Greyson; Gallant; Phoenix; LGS Holdco., LLC; CLG; Maverick; Vulcan; Coast

7  Processing; SCS; Prime Logix; Tony Diab; Rosa Loli; Lisa Cohen; Eng Tang; Maria Eeya Tan; Jake

8  Akers; Jayde Trinh; Wes Thomas; Scott James; Eadie, Jummi Chhor; Dongliang Jiang; and/or any

9  other alias', agents or corporate entities affiliated with same (the "DPP Data");

10      2. All administrative usernames and passwords that give the Trustee access to any DPP

11  account held, maintained or controlled by LPG; OakStone; Greyson; Gallant; Phoenix; LGS Holdco.,

12  LLC; CLG; Maverick; Vulcan; SCS; Coast Processing; Prime Logix; Tony Diab; Rosa Loli; Lisa

13  Cohen; Eng Tang; Maria Eeya Tan; Jake Akers; Jayde Trinh; Wes Thomas; Scott James; Eadie,

14  Jummi Chhor; Dongliang Jiang; and/or any other alias', agents or corporate entities affiliated with

15  same;

16      3. All Client files, including but not limited to names, contact information, client file

17  management, communications, account information, letters, pleadings, communications, payment

18  history, financial account information, credit reports, executed legal services contracts, ACH

19  contracts, executed installment contracts, account balances, debts in dispute, payment history, file

20  status, settlements, debt invalidations and/or any other information created, managed and stored

21  electronically utilizing proprietary software program "LUNA" hosted on Amazon Web Services

22  ("AWS") and located at the current domain "lunapp.com" that is maintained and controlled by LPG;

23  OakStone; Greyson; Gallant; Phoenix; LGS Holdco., LLC; CLG; Maverick; Vulcan; SCS; Coast

24  Processing; Prime Logix; Tony Diab; Rosa Loli; Lisa Cohen; Eng Tang; Maria Eeya Tan; Jake

25  Akers; Jayde Trinh; Wes Thomas; Scott James; Eadie, Jummi Chhor; Dongliang Jiang; and/or any

26  other alias', agents or corporate entities affiliated with same (the "Luna Data");

27      4. All administrative usernames and passwords that give the Trustee access to any AWS

28  account where Luna, its software program, databases and client information is held, stored and hosted

142

1 that is maintained or controlled by LPG; OakStone; Greyson; Gallant; Phoenix; LGS Holdco., LLC;

2 CLG; Maverick; SCS; Vulcan; Coast Processing; Prime Logix; Tony Diab; Rosa Loli; Lisa Cohen;

3 Eng Tang; Maria Eeya Tan; Jake Akers; Jayde Trinh; Wes Thomas; Scott James; Eadie, Jummi

4 Chhor; Dongliang Jiang; and/or any other alias', agents or corporate entities affiliated with same;

5      5. All ACH files related to Client information, details, accounts, history of electronic fund

6 transfers ("EFT"), payments, amounts held, interest on held amounts, penalty fees, nonsufficient fund

7 fees or other ACH related charges to the Clients stored electronically or in hard copy associated with

8 ACH processing service providers and/or affiliated financial institutions, including but not limited to

9 EPPS; EquiPay, LLC ("EquiPay"); Merit Fund, LLC ("Merit Fund"); Authorize.net a subsidiary of

10 Visa, Inc. ("Authorize.net"); World Global; OptimumBank Holdings, Inc. dba Optimum Bank

11 ("Optimum Bank"); BankUnited, Inc. ("BankUnited"); Marich Bein, LLC ("Marich Bein");

12 Revolv3, Inc. ("Revolv3"); Fidelity National Information Services, Inc. dba FIS , including but not

13 limited to its subsidiaries Worldpay, Inc., Worldpay Group or any other subsidiaries providing ACH

14 processing services ("FIS"); Guardian Processing, LLC ("Guardian"); and/or any entity associated

15 with the ACH identification transaction "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875"

16 or any such substantially similar ACH identification transaction (hereinafter the "ACH Data");

17      6. All files, information, reports, spreadsheets, account numbers, routing numbers, and

18 databases related to transfer of funds out of any account opened, maintained and controlled by LPG;

19 OakStone; Greyson; Gallant; Phoenix; LGS Holdco., LLC; CLG; Maverick; SCS; Vulcan; Coast

20 Processing; Prime Logix; Tony Diab; Rosa Loli; Lisa Cohen; Eng Tang; Maria Eeya Tan; Jake

21 Akers; Jayde Trinh; Wes Thomas; Scott James; Eadie, Jummi Chhor; Dongliang Jiang; and/or any

22 other alias', agents or corporate entities affiliated with same that were processed and executed by

23 ACH processing service providers and/or their affiliated financial institutions, including but not

24 limited to EPPS; EquiPay; Merit Fund; Authorize.net; World Global; Optimum Bank; BankUnited;

25 Marich Bein; Revolv3; FIS; Guardian; and/or any entity associated with the ACH identification

26 transaction "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875" or any such substantially

27 similar ACH identification transaction (hereinafter the "ACH Transfer Data");

28

3

7. All administrative usernames and passwords that give the Trustee access to any ACH processing accounts, software, database or other program at ACH processing service providers and/or affiliated financial institutions, including but not limited to EPPS; EquiPay; Merit Fund; Authorize.net; World Global; Optimum Bank; BankUnited; Marich Bein; Revolv3; FIS; Guardian; and/or any entity associated with the ACH identification transaction "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875" or any such substantially similar ACH identification transaction used to upload or input Client information, initiate Client ACH EFTs, transfer Client ACH funds to outside financial institutions or otherwise manage any account opened, maintained and controlled by LPG; OakStone; Greyson; Phoenix; LGS Holdco., LLC; CLG; SCS; Vulcan; Coast Processing; Prime Logix; Tony Diab; Rosa Loli; Lisa Cohen; Eng Tang; Maria Eeya Tan; Jake Akers; Jayde Trinh; Wes Thomas; Scott James; Eadie, Jummi Chhor; Dongliang Jiang; and/or any other alias', agents or corporate entities affiliated with same;

8. All accounting records, files, data and information for LPG; OakStone; Greyson; Gallant; Phoenix; LGS Holdco., LLC; CLG; SCS; Vulcan; Coast Processing; and Prime Logix stored on NetSuite, Quickbooks and Microsoft SharePoint, G-Suite or other permanent or cloud based systems (hereinafter the "Accounting Data");

9. All contracts, records, reports, information, data and details regarding the transfer or sale of any Client files or future Client ACH payments to any other law firm, organization, corporate entity, person(s), or investment group (otherwise known as factoring companies) by LPG; OakStone; Greyson; Phoenix; LGS Holdco., LLC; and/or CLG (hereinafter the "Client Transfer-Out Data");

10. All contracts, records, reports, information, data, cost basis, payment information and details regarding the transfer or receipt of any Client files or future Client ACH payments from any other law firm, organization, corporate entity, person(s), investment or marketing group (otherwise known as capping companies) to LPG; OakStone; Greyson; Gallant; Phoenix; LGS Holdco., LLC; Maverick; and/or CLG (hereinafter the "Client Transfer-In Data");

11. All information, data, tables, spreadsheets and reports regarding Client information stored on Formgrid, Inc. dba Airtable's ("Airtable") cloud based data management system used by LPG;

4

144

1  OakStone; Greyson; Phoenix; LGS Holdco., LLC; and/or CLG to manage the aforementioned

2  information (hereinafter the "Airtable Data"); and

3      12. All administrative usernames and passwords that give the Trustee access to any Airtable

4  account opened, maintained or controlled by LPG; OakStone; Greyson, Phoenix; LGS Holdco., LLC;

5  Maverick; and/or CLG; and

6      13. All email accounts related to LPG; OakStone; Greyson; Gallant; Phoenix; LGS Holdco.,

7  LLC; and/or CLG stored maintained and/or hosted on Office 365, g-suite or any other email server,

8  whether physical or cloud based servers (hereinafter "Email Data").

9  **B. ESTATE FUNDS**

10      Within five (5) calendar days from the date of this order or notice thereof, whichever is later,

11  the following shall be turned over to the Trustee by Debtor:

12      1. All post-petition Client ACH payments processed and received by LPG; OakStone;

13  Greyson; Gallant; Phoenix; LGS Holdco., LLC; CLG; Maverick; SCS; Vulcan; Coast Processing;

14  Prime Logix; Tony Diab; Rosa Loli; Lisa Cohen; Eng Tang; Maria Eeya Tan; Jake Akers; Jayde

15  Trinh; Wes Thomas; Scott James; Eadie, Jummi Chhor; Dongliang Jiang; and/or any other alias',

16  agents or corporate entities affiliated with same related to LPG Clients who entered into a Legal

17  Services Agreement pre-petition and who have received the services provided in the contract;

18      2. The $6,308,702.72 million dollars in post-petition ACH EFTs processed through LPG's

19  Revolv3, Inc. merchant account from March 2023 to the present, including any amounts that have

20  been transferred, wired or otherwise withdrawn from LPG's Revolv3, Inc. merchant account to

21  OakStone; Greyson; Gallant; Phoenix; LGS Holdco., LLC; CLG; Maverick; SCS; Vulcan; Coast

22  Processing; Prime Logix; Tony Diab; Rosa Loli; Lisa Cohen; Eng Tang; Maria Eeya Tan; Jake

23  Akers; Jayde Trinh; Wes Thomas; Scott James; Eadie, Jummi Chhor; Dongliang Jiang; and/or any

24  other alias', agents or corporate entities affiliated with same;

25  **TEMPORARY RESTRAINING ORDER**

26      From the date of this **ORDER** through and including, June 12, 2023, or as further Ordered

27  by this Court**:**

28

**1. Control Over ACH Transfers:** All covered entities and individuals (defined below) are hereby enjoined and shall not interfere with any ACH electronic funds transfer being executed pursuant to documents authorizing such transfers to be executed in favor of LPG as follows:

a) <u>Covered Entities and Individuals</u>: The following entities and individuals, and anyone acting on their behalf: LPG; OakStone; Greyson; Gallant; Phoenix; LGS Holdco., LLC; CLG; Maverick; Vulcan; Coast Processing; Prime Logix; SCS; Tony Diab; Rosa Loli; Lisa Cohen; Eng Tang; Maria Eeya Tan; Jake Akers; Jayde Trinh; Wes Thomas; Scott James; Eadie, Jummi Chhor; Dongliang Jiang; and/or any other alias', agents or corporate entities affiliated with same shall, absent further order from this Court:

i) <u>Enjoined Conduct re ACH Instructions</u>: No covered entity or individual shall initiate, cause to be initiated, or instruct any company or person that processes ACH transfers and/or their affiliated financial institutions, including EPPS; EquiPay; Merit Fund; Authorize.net; World Global; Optimum Bank; BankUnited; Marich Bein; Revolv3; FIS; Guardian; and/or any entity associated with the ACH identification transaction "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875" or any such substantially similar ACH identification transaction, to execute any ACH EFT on any file, financial institution, or current or former client of LPG, to or for the benefit of LPG, including but not limited to OakStone; Greyson; Phoenix; CLG; Prime Logix; SCS; Maverick; and/or Vulcan, without the express authorization of Trustee;

ii) <u>Enjoined Conduct re Bank Accounts</u>: No covered entity or individual shall open, or cause to be opened, any account, whether business or personal, that can receive or send money or anything of value, at any company including banking, financial, or similar institutions and/or receive, directly or indirectly, any funds drawn from ACH electronic fund transfers;

**2. Execution of ACH Transfer**: All covered entities and individuals (defined below) are hereby enjoined and prohibited from interfering with any ACH electronic funds transfer being executed pursuant to documents authorizing such transfers to be executed in favor of LPG as follows:

a) <u>Covered Entities and Individuals</u>: All companies capable of processing ACH electronic funds transfers, including EPPS; EquiPay; Merit Fund; Authorize.net; World Global; Optimum Bank; BankUnited; Marich Bein; Revolv3; FIS; Guardian; and/or any entity associated

6

146

with the ACH identification transaction "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875"

or any such substantially similar ACH identification transaction are enjoined absent further order of

this court, from:

        i) Enjoined Conduct re ACH Transfers: No covered entity or individual shall

transfer, wire, divert or otherwise permit the withdraw any funds received from any ACH electronic

funds transfer on any client file, financial institution, or current or former client of LPG, to or for the

benefit of LPG or any or more of its alleged assignees or transferees, including but not limited to

OakStone; Greyson; Gallant; Phoenix; LGS Holdco., LLC; CLG and/or Maverick to any financial

account maintained, owned or controlled by Vulcan; Coast Processing; Prime Logix; SCS; Tony

Diab; Rosa Loli; Lisa Cohen; Eng Tang; Maria Eeya Tan; Jake Akers; Jayde Trinh; Wes Thomas;

Scott James; Eadie, Jummi Chhor; Dongliang Jiang; and/or any other alias', agents or corporate

entities affiliated with same. All ACH funds held by any covered entity or individual shall be held in

trust until such time as written authorization and instruction is provided by Trustee;

        ii) Injunction Mandating Turnover to Trustee: all covered entities and

individuals shall hold in trust any and all funds, receipts, and transfers related to any account, file, or

current or former client of LPG; OakStone; Greyson; Phoenix; LGS Holdco., LLC; CLG; Maverick;

Vulcan; Coast Processing; Prime Logix; SCS; Tony Diab; Rosa Loli; Lisa Cohen; Eng Tang; Maria

Eeya Tan; Jake Akers; Jayde Trinh; Wes Thomas; Scott James; Eadie, Jummi Chhor; Dongliang

Jiang; and/or other alias', agents or corporate entities affiliated with same until expressly directed to

release, wire or transfer such funds by the Trustee and to a bank account whose information shall be

provided with any such request; and, shall upon request by the Trustee provide an accounting of any

and all such funds held in trust to the Trustee upon written request within 10 days of said request;

    3. LPG; OakStone; Greyson; Gallant; Phoenix; LGS Holdco., LLC; CLG; SCS; Vulcan;

Coast Processing; Prime Logix; SCS; Tony Diab; Rosa Loli; Lisa Cohen; Eng Tang; Maria Eeya

Tan; Jake Akers; Jayde Trinh; Wes Thomas; Scott James; Eadie, Jummi Chhor; Dongliang Jiang;

and/or any other alias', agents or corporate entities affiliated with same are hereby enjoined and shall

not incur, take out or pledge any receivables of LPG; OakStone; Greyson; Gallant; Phoenix; Prime

Logix; SCS; Maverick; and/or CLG without seeking leave of court;

7

1    4. Any and all funds held at Bank of America on behalf of Prime Logix and/or Vulcan,

2  including but not limited to account Nos. ending in xxx951 and xxx9021 and/or any other financial

3  accounts having received funds originating from LPG; OakStone; Greyson; Gallant; Phoenix; LGS

4  HoldCo., LLC; CLG; and/or Maverick shall be held in trust and shall not be with withdrawn, wired,

5  drawn against, moved, or otherwise transferred without the express consent of the Trustee in writing

6  and to a financial account identified by the Trustee at the time the authorization is provided.

7                                **LOCKOUT ORDER**

8    From the date of this **ORDER**:

9    1. All persons identified below are enjoined and shall not access or attempt to gain access

10  whether physically, remotely, electronically, or virtually to the following locations associated with

11  LPG; OakStone; Greyson; Gallant; Phoenix; LGS Holdco., LLC; CLG; Maverick; Vulcan; Coast

12  Processing; Prime Logix; SCS; Tony Diab; Rosa Loli; Lisa Cohen; Eng Tang; Maria Eeya Tan; Jake

13  Akers; Jayde Trinh; Wes Thomas; Scott James; Eadie, Jummi Chhor; Dongliang Jiang; and/or any

14  other alias', agents or corporate entities affiliated with same: a) 3343 Michelson Drive, Suite 400,

15  Irvine, California 92612; b) 17542 17th St Suite 100, Tustin, California 92780; b) Luna's domain

16  located on AWS; c) DPP Data or accounts; d) Accounting Data and/or accounts on NetSuite,

17  Quickbooks and Microsoft SharePoint, G-Suite or other permanent or cloud based systems; e) ACH

18  processing accounts, whether individual, merchant or business, held at any ACH processing or

19  affiliated financial institution, including but not limited to EPPS; EquiPay; Merit Fund;

20  Authorize.net; World Global; Optimum Bank; BankUnited; Marich Bein; Revolv3; FIS; Guardian;

21  and/or any entity associated with the ACH identification transaction "LPG 949-226-6262 #5 2363

22  RT 9 TOMS RIVER NJ 0875" or any such substantially similar ACH identification transaction; f)

23  Vulcan and/or PrimeLogix' financial accounts at Bank of America, including but not limited to

24  Account Nos. ending in xxx951 and xxx9021; and g) the Email Data, as follows:

25            i) Tony Diab;

26            ii) Rosa Loli aka Rosa Bianca Loli aka Bianca Loli;

27            iii) Lisa Cohen;

28            iv) Daniel March;

8

148

1       v) Eng Taing;

2       vi) Maria Eeya Tan;

3       vii) Jake Akers;

4       viii) Han Trinh;

5       ix) Jayde Trinh;

6       x) Wes Thomas;

7       xi) William Taylor "Ty" Carss;

8       x)  Scott James Eadie;

9       xi) Jimmy Chhor;

10       xii) Brad Lee; and

11       xiii) Dongliang Jiang.

12       **ORDER TO RE-DIRECT MAIL**

13       From the date of this **ORDER**:

14       1. Trustee is hereby authorized to instruct the United States Postal Service to re-direct any

15 and all mail processed by the United States Postal Service Directed to: a) LPG, 17542 17th St Suite

16 100, Tustin, California 92780; b) OakStone, 888 Prospect Street, Suite 200 La Jolla, California

17 92037; c) Phoenix, 3343 Michelson Drive, Suite 400, Irvine, California 92612; d) Prime Logix, 3343

18 Michelson Drive, Suite 400, Irvine, California 92612; e) CLG, PO Box 412 Elmsford, NY 10523; f)

19 Greyson, 3343 Michelson Drive, Suite 400, Irvine, California 92612; and/or any other address

20 associated with such entities, shall be forwarded and re-directed to an address provided by the Trustee

21 until such time as ordered by the Court.

22   **ORDER TO SHOW CAUSE RE WHY A PRELIMINARY INJUNCTION SHOULD NOT**

23       **ISSUE AND LIMITED EXAMINATION**

24       Tony Diab, Lisa Cohen, Rosa Loli, Daniel March, and William Taylor "Ty" Carss are hereby

25 ordered, provided that the summons and complaint in this adversarial proceeding captioned above

26 have been served upon said individuals, to appear on **Monday, June 12, 2023, at 1:30 pm** in

27 Courtroom 5C of the above captioned court located at 411 W. Fourth Street Santa Ana, California

28 92701:

9

1      1. For an order to show cause regarding why a preliminary injunction should not issue

2  regarding the Court's forgoing Temporary Restraining Order; and

3      2. To sit for a limited examination before the Court regarding the $6,308,702.72 million

4  dollars in ACH EFTs processed through Revolv3, Inc. from March 2023 to the present, and other

5  ACH ETFs processed post-petition through EPPS; EquiPay; Merit Fund; Authorize.net; World

6  Global; Optimum Bank; BankUnited; Marich Bein; Revolv3; FIS; Guardian; and/or any entity

7  associated with LPG and or the ACH identification transaction "LPG 949-226-6262 #5 2363 RT 9

8  TOMS RIVER NJ 0875" or any such substantially similar ACH identification transaction; or any

9  other ACH process company LPG; OakStone; Greyson; Gallant; Phoenix; LGS Holdco., LLC; CLG;

10  Maverick; Vulcan; Coast Processing; Prime Logix; SCS; or any ACH EFTs known to Tony Diab;

11  Rosa Loli; Lisa Cohen; Eng Tang; Maria Eeya Tan; Jake Akers; Jayde Trinh; Wes Thomas; Scott

12  James; Eadie, Jummi Chhor; Dongliang Jiang relating in any way to LPG or current or former

13  customers of LPG; and/or any other alias', agents or corporate entities affiliated with same have used,

14  initiated ACH EFTs, opened an account with or maintained since March 20, 2023.

15                      **NOTICE TO LPG CLIENTS**

16      Trustee is hereby authorized to provide notice to any and all LPG clients, including those

17  transferred and/or assigned to OakStone; Greyson; Gallant; Phoenix; LGS Holdco., LLC; CLG;

18  and/or Maeverick regarding: i) LPG's Bankruptcy filing; ii) pending evaluation of their file; and iii)

19  status prior to assuming or rejecting their contract in substantially the same form of notice attached

20  to this Order as Exhibit 1.

21                          # # #

22

23

24  Date: 5/26/23

25                                     Honorable Scott C. Clarkson

26                                     United States Bankruptcy Judge

27

28

Exhibit 1

[Client Name]
[Date]
[Address Line 1]
[Address Line 2]
[Address Line 3]
Tel:
Email:


**RE: STATUS REGARDING YOUR MATTER WITH THE
LITIGATION PRACTICE GROUP**

Dear [Name],

Please be advised that on May 20, 2023, The Litigation Practice Group ("LPG") filed for protection under Chapter 11 of the Bankruptcy Code. On May 8, 2023, the United States Bankruptcy Court—Central District of California, Case No. 8:23-bk-10571, appointed Richard Marshack, Esq. as the duly appointed Chapter 11 Trustee to oversee the administration of LPG's Bankruptcy matter. See Docket No. 65.

Subsequently, the United States Bankruptcy Court authorized Trustee to obtain information in order to review and evaluate the status of your file at LPG and/or any other debt relief law firm your file may have been transferred or assigned to at or around the time LPG filed for Bankruptcy, including but not limited to OakStone Legal Group, P.C.; Greyson Law, P.C.; Gallant Law Group; Phoenix Law Group, P.C.; LGS Holdco., LLC; Consumer Legal Group, P.C and/or Maverick Management, LLC.

Over the coming weeks, Trustee Richard Marshack will provide status of your file and continuation of legal services pursuant to the Legal Services Agreement with LPG.

We greatly appreciate your patience and cooperation while we work on your behalf.

Sincerely,

[Signatory name]



Christopher B. Ghio (State Bar No. 259094)
Christopher Celentino (State Bar No. 131688)
Jeremy B. Freedman (State Bar No. 308752)
**DINSMORE & SHOHL LLP**
655 West Broadway, Suite 800
San Diego, CA 92101
Telephone: 619.400.0500
Facsimile: 619.400.0501
christopher.ghio@dinsmore.com
christopher.celentino@dinsmore.com
jeremy.freedman@dinsmore.com

Proposed Special Counsel to Richard A. Marshack

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION**

| | |
|---|---|
| In re: | Case No.: 8:23-bk-10571-SC |
| THE LITIGATION PRACTICE GROUP P.C., | Adv. Proc. No. |
| Debtor. | Chapter 11 |

RICHARD A. MARSHACK,
Chapter 11 Trustee,

        Plaintiff,

        v.

TONY DIAB, an individual; DANIEL S.
MARCH, an individual; ROSA BIANCA LOLI,
an individual; LISA COHEN, an individual;
WILLIAM TAYLOR CARSS, an individual;
ENG TANG, an individual; MARIA EEYA TAN,
an individual; JAKE AKERS, an individual; HAN
TRINH, an individual; JAYDE TRINH, an
individual; WES THOMAS, an individual;
SCOTT JAMES EADIE, an individual; JIMMY
CHHOR, an individual; DONGLIANG JIANG,
an individual; OAKSTONE LAW GROUP PC;
GREYSON LAW CENTER PC; PHOENIX
LAW GROUP, INC.; MAVERICK
MANAGEMENT, LLC; LGS HOLDCO, LLC;
CONSUMER LEGAL GROUP, P.C.; VULCAN
CONSULTING GROUP LLC; B.A.T. INC. d/b/a
COAST PROCESSING; PRIME LOGIX, LLC;
TERACEL BLOCKCHAIN FUND II LLC;
EPPS; EQUIPAY; AUTHORIZE.NET; WORLD
GLOBAL; OPTIMUMBANK HOLDINGS, INC.

**MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
TRUSTEE, RICHARD A. MARSHACK'S
MOTION FOR PERMISSION TO FILE
OMNIBUS EMERGENCY MOTION
AFTER SERVICE OF COURTESY COPY
AND AFTER HEARING, AND UNDER
SEAL**

Date:  May 26, 2023
Time:  **T.B.D. By Clerk of Court**
Judge: Hon. Scott C. Clarkson
Place:  Courtroom 5C
       411 W. Fourth Street
       Santa Ana, CA 92701

**EXHIBIT E**

1 | d/b/a OPTIMUM BANK; MARICH BEIN, LLC;
BANKUNITED, N.A.; REVOLV3, INC.;
2 | FIDELITY NATIONAL INFORMATION
SERVICES, INC. d/b/a FIS; WORLDPAY, INC.;
3 | WORLDPAY GROUP; MERIT FUND, LLC;
GUARDIAN PROCESSING, LLC; THE
4 | UNITED STATES POSTAL SERVICE; and
DOES 1 through 100, inclusive,
5 |
6 |         Defendants.
7 |

## MEMORANDUM OF POINTS AND AUTHORITIES

Richard A. Marshack ("Trustee" or "Plaintiff"), the Court-appointed Chapter 11 Trustee in the Chapter 11 Bankruptcy Case No. 8:23-bk-10571-SC and Plaintiff in the as yet to be filed Adversary Case No. 1 which will be appended to the OMNIBUS EMERGENCY MOTION FOR: 1) TURNOVER OF ESTATE PROPERTY AND RECORDED INFORMATION PURSUANT TO 11 U.S.C. § 542; 2) PRELIMINARY INJUNCTION; 3) LOCK-OUT; 4) RE-DIRECTION OF UNITED STATES PARCEL SERVICES MAIL; AND 5) ISSUANCE OF ORDER TO SHOW CAUSE RE COMPLIANCE WITH COURT ORDER; AND [PROPOSED] ORDER THEREON ("Omnibus Emergency Motion"), hereby respectfully submits EMERGENCY MOTION FOR PERMISSION TO FILE OMNIBUS EMERGENCY MOTION AFTER SERVICE OF COURT'S COURTESY COPY AND AFTER HEARING, AND UNDER SEAL ("Seal Motion"), pursuant to Local Rule 5003-2(c) and 11 U.S.C. § 107, to prevent filed copies of the within Motion from appearing on the docket until such relief, if any be granted by the Court, can be effected.

## I. INTRODUCTION.

This Seal Motion is made on the grounds that the facts alleged and relief requested in the Omnibus Motion for Turnover of Bankruptcy Property contain confidential research as it pertains to claims the Trustee is investigating, analyzing and pursuing as to third parties who may be liable to the bankruptcy estate for losses, damages, or other forms of harm. It is critical that the work performed by Dinsmore & Shohl LLP ("Dinsmore") on these matters, including on the assessment of various potential claims and litigation strategies, remains confidential. Were such information to be disclosed publicly, it could materially disadvantage the bankruptcy estate and the Trustee's efforts to secure the

153

1  maximum recovery. Accordingly, the Trustee requests permission to file under seal his Omnibus

2  Emergency Motion.

3  ## II. DISCUSSION.

4  Local Rule 5003-2(c) provides, "[s]ubject to 11 U.S.C. § 107, a document may not be filed

5  under seal without a prior written order of the court." "On request of a party in interest, the bankruptcy

6  court *shall*... protect an entity with respect to a trade secret or *confidential research*, development,

7  or commercial information." 11 USC § 107(b)(1).

8  "A party seeking to seal a judicial record then bears the burden... by meeting the compelling

9  reasons standard. That is, the party must articulate compelling reasons supported by specific factual

10 findings... that outweigh the general history of access and the public policies favoring disclosure..."

11 *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1178-79 (9th Cir. 2006). "Relevant factors

12 include the public interest in understanding the judicial process and whether disclosure of the material

13 could result in improper use of the material for scandalous or libelous purposes or infringement upon

14 trade secrets." *Id.* at 679, n.6 (internal citations and quotations omitted). "In general, compelling

15 reasons sufficient to outweigh the public's interest in disclosure and justify sealing court records exist

16 when such court files might have become a vehicle for improper purposes, such as the use of records

17 to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets."

18 *Kamakana*, 447 F.3d at 1179 (internal citations and quotations omitted).

19 Here, compelling reasons exist to prevent the public disclosure of the Trustee's Omnibus

20 Motion. The Trustee's Omnibus Motion reveals the Trustee's confidential research and investigation

21 into the Debtor's conduct and transactions, and includes information concerning the potential claims,

22 defenses, and litigation strategies. Specifically, the information contained in the Omnibus Motion

23 reveals the Trustee's strategies to regain assets which appear to have been fraudulently transferred

24 from the bankruptcy estate. The information would alert the Debtor of the Trustee's investigation and

25 allow the Debtor to thwart the Trustee's efforts by diverting further assets from the Bankruptcy estate

26 into other entities. Further, the Omnibus Emergency Motion contains confidential research and

27 reveals the Trustee's strategy throughout its entirety, not just in portions, therefore the Trustee

28 requests the Court's permission to file the Omnibus Emergency Motion under seal in its entirety.

1    The Omnibus Emergency Motion relies on confidential information obtained from the factual

2    investigation conducted by Trustee's counsel. For example, Trustee's general counsel, Ed Hays

3    caught the Debtor's person most knowledgeable concerning LPG's dealings with vendors, Tony Diab

4    ("Diab"), in an outright lie regarding his access to LPG's merchant portal and confirming that in

5    excess of $6,000,000 dollars have been diverted from Debtor in the post-petition period. (Declaration

6    of Trustee Richard Marshack in Support of Omnibus Emergency Motion"Marshack Decl." at ¶¶ 6-

7    7.)

8        Exigent circumstances exist to grant the requested relief. It is anticipated that Diab by and

9    through the entities he controls will continue to initiate ACH transfers of client funds – to which LPG

10   is entitled – including for the bulk of LPG's prior clients on June 1, 2023, which is expected to exceed

11   $1 million dollars. Without an order granting the requested injunctive relief, Mr. Diab would again

12   have the ability to transfer such funds to other corporate entities he controls, including Vulcan

13   Consulting, Maverick Management, LLC, Prime Logix, LLC among many others under his control.

14   (Marshack Decl, at ¶ 15.)

15       As such, property of Debtor's Estate as set forth in the Omnibus Emergency Motion and

16   proposed order, is at great risk of further dissipation, loss, destruction, and fraudulent transfer.

17   (Marshack Decl, at ¶ 16.) In fact, it has been brought to the Trustee's attention that Diab is in the

18   process of creating new corporate entities in furtherance of his attempts to transfer property in which

19   Debtor has an interest as part of his deliberate efforts to hinder, delay, and defraud LPG's creditors.

20   (*Id.*)

21       The Omnibus Emergency Motion, if not filed under seal, would give Diab notice of the

22   Trustee's strategy and would give Diab an opportunity to transfer the property into other entities

23   which have not yet been discovered by the Trustee. Therefore, the Trustee respectfully requests the

24   Omnibus Emergency Motion be filed under seal in order to allow the Trustee to stop the dissipation

25   of property.

26   / / /

27   / / /

28   / / /

155

### III. CONCLUSION.

For the foregoing reasons, the Trustee requests permission to file his Omnibus Emergency after service of Court's courtesy copy and after hearing, and under seal. The Trustee further requests this Court hold an emergency hearing without notice to grant restraining orders to protect the status quo and prevent further dissipation of estate property.

Dated: May 25, 2023

Respectfully submitted,

DINSMORE & SHOHL LLP

By: /s/ Christopher B. Ghio
    Christopher B. Ghio
    Christopher Celentino
    Proposed Special Counsel to
    Richard A. Marshack

FILED & ENTERED

MAY 26 2023

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY bolte          DEPUTY CLERK

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>THE LITIGATION PRACTICE GROUP, P.C.<br><br><br><br><br><br><br><br>Debtor(s). | Misc. Case No.: 8:23-mp-00102-SC<br>Ch 11 Case No. 8:23-bk-10571-SC<br><br>CHAPTER 11<br><br>**ORDER GRANTING MOTION TO SEAL**<br><br>Date:        May 25, 2023<br>Time:        4:00 p.m.<br>Courtroom:   5C |

Upon consideration of the Motion to Seal filed by Chapter 11 Trustee Richard Marshack on May 25, 2023, and for good cause shown, it is hereby ORDERED as follows:

1. The Motion to Seal is GRANTED pursuant to 11 U.S.C. Section 107.

2. The following documents shall be sealed and restricted from public access:

   a. Motion to Seal

# EXHIBIT F

-1-

157

b. Trustee, Richard Marshack's Omnibus Emergency Motion for: (1) Turnover of Estate Property and Recorded Information Pursuant to 11 U.S.C. §542; (2) Preliminary Injunction; (3) Lock-out; (4) Re-direction of United States Parcel Services Mail; (5) Order to Show Cause re: Compliance with Court Order; (6) Other Relief as Necessary to the Efficient Administration of this Matter.

c. Declaration of Russ Squires

d. Declaration of Darius Newbold

e. Declaration of Richard Marshack

f. Declaration of Christopher Ghio

g. Related Adversary Complaint

3. The Clerk of Court is directed to implement appropriate measures to restrict public access to the sealed documents listed in paragraph 2, in accordance with the Court's procedures and applicable laws and regulations.

4. Parties to this case, their respective attorneys, and any other individuals who have access to the sealed documents shall maintain the confidentiality of the sealed documents and shall not disclose their contents or any information contained therein, except as otherwise required by law or with the express permission of the Court.

5. This Order shall remain in effect until further order of the Court.

**IT IS SO ORDERED.**

Date: May 26, 2023

Scott C. Clarkson
United States Bankruptcy Judge

158

1              UNITED STATES BANKRUPTCY COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                      --oOo--

4  In Re:                        ) Case No. 8:23-bk-10571-SC
                                 )
5  THE LITIGATION PRACTICE GROUP ) Chapter 11
   P.C.,                         )
6                                ) Santa Ana, California
            Debtor.             ) Monday, June 12, 2023
7  _____) 1:30 p.m.
                                 )
8  MARSHACK,                     ) Adv. No. 8:23-ap-01046-SC
                                 )
9           Plaintiff,           )
                                 )
10      vs.                      )
                                 )
11 DIAB, ET AL.,                 )
                                 )
12          Defendants.          )
   _____)
13

14                              HEARING RE: PRELIMINARY
                                INJUNCTION
15
                                STATUS CONFERENCE HEARING RE:
16                              (1) CASE MANAGEMENT CONFERENCE
                                AND (2) REQUIRING STATUS
17                              REPORT

18                  TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE SCOTT CLARKSON
19            UNITED STATES BANKRUPTCY JUDGE

20

21

22

23

24
   Proceedings recorded by electronic sound recording;
25 transcript produced by transcription service.

# EXHIBIT G

ii

```
 1  APPEARANCES:

 2  For the Chapter 11 Trustee:    CHRISTOPHER CELENTINO, ESQ.
                                   JEREMY FREEDMAN, ESQ.
 3                                 JONATHAN SERRANO, ESQ.
                                   Dinsmore & Shohl, LLP
 4                                 655 West Broadway, Suite 800
                                   San Diego, California 92101
 5
                                   ED HAYS, ESQ.
 6                                 Marshack Hays, LLP
                                   870 Roosevelt
 7                                 Irvine, California 92620

 8  For the United States         KEN MISKEN, ESQ.
      Trustee:                    QUEENIE NG, ESQ.
 9                                 LESLIE COHEN, ESQ.
                                   Office of the United States
10                                   Trustee
                                   411 West Fourth Street
11                                 Suite 7160
                                   Santa Ana, California 92701
12                                 (714) 338-3403

13  For Han Trinh and             RICHARD BAUM, ESQ.
      Jayde Trinh:                The Law Office of Richard T.
14                                   Baum
                                   11500 West Olympic Boulevard
15                                 Suite 400
                                   Los Angeles, California 90064
16                                 (310) 231-6808

17  For Greyson Law Center:        DOUGLAS A. PLAZAK, ESQ.
                                   Reid & Hellyer, APC
18                                 3685 Main Street
                                   Suite 300
19                                 Riverside, California 92501
                                   (951) 682-1771
20

21  For Tony Diab and             TERI PHAM, ESQ.
      Daniel March:               JESSIE BOLLING, ESQ
22                                 Enenstein, Pham & Glass
                                   3200 Bristol Street, Suite 500
23                                 Costa Mesa, California 92626
                                   (657) 208-7770
24

25
```

**Briggs Reporting Company, Inc.**

iii

APPEARANCES:  (cont'd.)

For Bianca Loli and            LESLIE COHEN, ESQ.
   Lisa Cohen:                 Leslie Cohen Law, PC
                               1615-A Montana Avenue
                               Santa Monica, California 90403
                               (310) 394-5900

For Debt Validation            RICHARD H. GOLUBOW, ESQ
   Fund II, LLC, MC DVI        Winthrop, Golubow & Hollander,
   Fund 1, LLC, MC DVI            LLP
   Fund 2, LLC:                1301 Dove Street
                               Suite 500
                               Newport Beach, California
                                  92660

                               DAVID COUSINEAU, ESQ.
                               Cappello & Noel, LLP
                               831 State Street
                               Santa Barbara, California
                                  93101
                               (805) 564-2444

For Consumer Legal Group:      RONALD RICHARDS, ESQ.
                               Law Offices of Ronald Richards
                                  & Associates, APC
                               Post Office Box 11480
                               Beverly Hills, California
                                  90213

For BankUnited, N.A.:          HOWARD STEINBERG, ESQ.
                               Greenberg Traurig, LLP
                               1840 Century Park East
                               Suite 1900
                               Los Angeles, California 90067
                               (310) 586-7700

For Ad Hoc Consumer            IRA KHARASCH, ESQ.
   Committee:                  Pachulski, Stang Ziehl &
                                  Jones, LLP
                               10100 Santa Monica Boulevard
                               Suite 1300
                               Los Angeles, California 90067
                               (310) 277-6910

iv

```
 1  Court Recorder:              Sally Daniels
                                 United States Bankruptcy Court
 2                               411 West Fourth Street
                                 Suite 2030
 3                               Santa Ana, California 92701

 4  Transcriber:                 Briggs Reporting Company, Inc.
                                 9711 Cactus Street
 5                               Suite B
                                 Lakeside, California 92040
 6                               (310) 410-4151

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

v

1                    I N D E X

2   WITNESSES:                DIRECT   CROSS   REDIRECT   RECROSS

3   Daniel March               124     127      127       128
                                                151       147
4
    Tony Diab                  154     186      192        --
5
    William Taylor Carss       196     209       --        --
6

7

8   EXHIBITS                            IDENTIFIED   RECEIVED

9   (None.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

1  SANTA ANA, CALIFORNIA  MONDAY, JUNE 12, 2023  1:30 PM

2  --oOo--

3  (Call to order of the Court. )

4  THE CLERK:  Please come to order.  This United

5  States Bankruptcy Court for the Central District of

6  California is now in session.  The Honorable Scott C.

7  Clarkson, Bankruptcy Judge, presiding.

8  THE COURT:  Good afternoon, everybody.  Please be

9  seated.  You're welcome.  I don't usually make this

10  announcement, but I would truly appreciate it if you would

11  put your phones on ringer off.  You can leave the phones on,

12  but just let's not have some disturbances of phones ringing.

13  I would truly appreciate that.

14  The second announcement is everyone on Zoom,

15  please mute your microphones until you desire to be

16  recognized.  I would truly appreciate it if everyone would

17  respect that request.

18  All right.  This is the June 12th, 2021, 1:30 p.m.

19  calendar.  Let's call item number two in the Marshack versus

20  Diab matter.  This is a hearing regarding preliminary

21  injunction.

22  May I have appearances, please?

23  MR. CELENTINO:  Good afternoon, your Honor.

24  Christopher Celentino of Dinsmore and Shohl, appearing on

25  behalf of trustee, Richard Marshack.  Other attorneys in my

2

1  office appearing are Jeremy Freedman and Jonathan Serrano.

2  And Mr. Marshack is present.

3          THE COURT:  Good afternoon to all of you.

4          MR. HAYS:  Good afternoon, your Honor, trustee's

5  general counsel, Ed Hays of Marshack Hays.

6          THE COURT:  Hello, Mr. Hays.

7          MR. MISKEN:  Good afternoon, your Honor.  Ken

8  Misken, Assistant United States Trustee on behalf of the

9  United States Trustee.  And with me today is Queenie Ng and

10 Leslie Cohen from my office.

11         THE COURT:  Great to see all of you.  Thank you

12 for coming today.

13         MR. BAUM:  Good afternoon, your Honor.  I'm

14 Richard Baum.  I represent Han Trinh and Jayde Trinh.

15         THE COURT:  Spell those names for the record,

16 please.

17         MR. BAUM:  Han is H-A-N.  Trinh is T-R-I-N-H.  And

18 Jayde is J-A-Y-D-E, Trinh, T-R-I-N-H.

19         THE COURT:  Thank you so much.  And welcome.

20         MR. BAUM:  Thank you.

21         MR. PLAZAK:  Good afternoon, your Honor.  Doug

22 Plazak of Reid & Hellyer for Greyson Law Center.

23         THE COURT:  Mr. Plazak, good to see you.

24         MS. PHAM:  Good afternoon, your Honor.  Teri Pham.

25 last name is P as in Peter, H-A-M as in Mary, along with my

3

1  colleague, Jessie Bolling -- Jessie Bolling.

2           THE COURT:  There you go.

3           MS. PHAM:  B-O-L-L-I-N-G on behalf of Tony Diab

4  and Daniel March.

5           THE COURT:  And Daniel's last name is spelled?

6           MS. PHAM:  March, M-A-R-C-H.

7           THE COURT:  Thank you.

8           MS. COHEN:  Good afternoon, your Honor.  Leslie

9  Cohen on behalf of Bianca Loli, L-O-L-I, and Lisa Cohen,

10  same as my last name, not related.  Thank you, your Honor.

11          THE COURT:  Good to see you.  Thank you for coming

12  today.

13          MR. GOLUBOW:  Good afternoon, your Honor.  Richard

14  Golubow, Winthrop Golubow Hollander, appearing on behalf of

15  Debt Validation Fund II, LLC, MC DVI Fund 1, LLC --

16          THE COURT:  Slow down.  I've got to write this

17  down.

18          MR. GOLUBOW:  I apologize.

19          THE COURT:  What's the second client?

20          MR. GOLUBOW:  MC DVI Fund 1, LLC.

21          THE COURT:  Thank you.

22          MR. GOLUBOW:  And MC DVI Fund

23  2, LLC.

24          THE COURT:  Thank you.  Good to see you.

25          MR. GOLUBOW:  Same here.

**Briggs Reporting Company, Inc.**

4

1    MR. COUSINEAU:  Good afternoon, your Honor.  David

2  Cousineau, last name is spelled C-O-U-S-I-N-E-A-U, and I

3  have the same clients as Mr. Golubow, Debt Validation Fund

4  and MC DVI 1 and 2.

5    THE COURT:  Welcome.

6    MR. COUSINEAU:  Thank you.

7    THE COURT:  Are there any appearances on Zoom?

8    MR. RICHARDS (telephonic):  Yes, your Honor.  Good

9  afternoon, Ronald Richards, Law Offices of Ronald Richards &

10  Associates, APC, for Consumer Legal Group.

11    THE COURT:  Good afternoon, sir.

12    Other appearances, please.

13    MR. STEINBERG (telephonic):  Yes.  Good afternoon,

14  your Honor.  Howard Steinberg of Greenberg Taurig appearing

15  on behalf of BankUnited, N.A.

16    THE COURT:  Good to see you, Mr. Steinberg.

17    MR. STEINBERG:  Thank you, your Honor.

18    THE COURT:  Are there other appearances on the

19  Zoom conference system?

20    Hearing none, let's hear from trustee's counsel

21  with respect to item number two, the preliminary injunction.

22    MR. CELENTINO:  Thank you, your Honor.  If I may,

23  I know that the Court would -- has called item number two

24  first.  We submitted declarations for item number one this

25  morning that also are declarations that support the request

5

1  in item number two.  We provided courtesy copies to the

2  Court timely.  I have extra copies for anybody in court who

3  did not get one because of electronic service.  I'd be happy

4  to provide them to them now.

5          I was hoping that I could provide to the Court in

6  the context of both the introduction of matter two and the

7  status report for where we are the information contained in

8  those declarations.

9          THE COURT:  I have a little bit of a quandary

10 here.  You said item number one.  I don't have that on my

11 calendar.  I have items number two and three, three being

12 the case management conference and the status report.

13         MR. CELENTINO:  My apology, your Honor.  I said

14 one and two.  I meant two and three.

15         THE COURT:  My confusion is alleviated.

16         MR. CELENTINO:  My apologies.

17         THE COURT:  Well, I would like you to proceed as

18 you would want to at this point --

19         MR. CELENTINO:  Okay.  Thank you.

20         THE COURT:  -- and we'll take it from there.

21         MR. CELENTINO:  One last one, your Honor.  As set

22 forth in those declarations and in that status report, which

23 I'm going to refer to in the context of item number two, the

24 history, your Honor will remember, and this was a trustee's

25 motion to prevent irreparable harm to issue an injunction

6

1   against parties that were in the process of dismantling the

2   Debtor, Litigation Practice Group, and to enjoin those

3   parties and entities and individuals working with them from

4   continuing to use the clients of Litigation Practice Group

5   and the ACH tools of Litigation Practice Group with respect

6   to those clients, to continue their attempt to monetize

7   their operations through the ACH pulls.  And I used the word

8   "pull" as the money that is withdrawn from a customer

9   account is colloquially referred to as a pull, and we

10  referred to it as that in the underlying motion.

11          The injunction was served on all parties except

12  for the few noted in the status report that's written.

13  There is, I think, one question regarding one party as to

14  whether or not we were provided with the correct apartment

15  number, but that party's counsel is here and can address

16  that.

17          For the most part, the parties have chosen to

18  cooperate with the trustee, and the status is fairly

19  straightforward as set forth in the status conference report

20  and the declarations.  The trustee has access to --

21          THE COURT:  Excuse me for one second.  There is a

22  technical issue here.  Let's find out what's wrong.

23          MR. CELENTINO:  Happy to pause, your Honor.

24          THE COURT:  Thank you.  I think we're fine.  While

25  we had that pause, I want for the record to note that docket

7

1  number 81 of the main case is the trustee's status report,

2  for anyone that's looking at the docket, docket number 81.

3      MR. CELENTINO:  Thank you, your Honor, with the

4  attached declarations.

5      THE COURT:  That would be another docket, I

6  believe.  Let's see if I can find that.  Do you happen to

7  have that?  It should either be docket number 81-1 or 82.

8  I'm not sure which --

9      Mr. Hays, you're usually on the spot with this.

10     MR. HAYS:  Thank you, your Honor, I'm looking it

11  up now.

12     THE COURT:  Thank you.  But please proceed, sir.

13     MR. CELENTINO:  We have them filed in the

14  adversary proceeding, your Honor, as document 45.  And that

15  is 45 through 45-5.

16     THE COURT:  Okay.  So with respect to the

17  adversary number, if anyone's looking, the adversary number

18  is 8:23-01046.  And I'm saying this for the record because

19  previously, this matter had been under seal, and it is no

20  longer under seal.  All of the pleadings are now contained

21  on the regular docket of the adversary proceeding or the

22  main docket in case number -- pardon me, 8:23-10571.

23     MR. CELENTINO:  Thank you, your Honor.  The

24  parties having been served as indicated on the record, the

25  trustee and his professionals appeared at the premises

8

1  operated by Phoenix Law Group at 4347 Michelson Drive.  On

2  Friday morning, June 2nd, we were led into the offices by

3  Mr. Carss and by Ms. King.  They are the folks who operate

4  the Phoenix Law Group in those premises.  And Mr. Carss has

5  been quite cooperative with the trustee, and he will be here

6  shortly.  He is a declarant in favour of the injunction and

7  the declarant supporting our status report.

8           THE COURT:  Thank you.

9           MR. CELENTINO:  He wanted me to let the Court know

10  that he has a competing appearance that he is attending to

11  in the outer conference.  And as soon as that competing

12  appearance break, he will get it continued.  He will be in

13  so we can discuss it.

14           THE COURT:  He's here.

15           MR. CELENTINO:  He made it, sorry.  He wasn't

16  where I thought he was going to sit, so I just assumed he --

17  my apologies.

18           THE COURT:  He is stealthy.

19           MR. CELENTINO:  He is stealth, your Honor.  He is.

20  The trustee has control over the database on which the

21  approximately 49,422 active files of Litigation Practice

22  Group exist.  Those files are under the operation, for the

23  most part, of Phoenix Law Group.  Many of those files were

24  transferred in a transaction to an entity whose counsel is

25  on the phone called Consumer Law Group or Consumer Legal

9

1  Group.

2          THE COURT:  That would be Mr. Richards?

3          MR. CELENTINO:  That's Mr. Richards.  And we've

4  developed a very nice relationship with Mr. Richards and his

5  clients.  They have been cooperating with the trustee.

6          In short, the urgency with which we expressed to

7  the Court that the consumers who are signed up with

8  Litigation Practice Group and who had monthly draws taken

9  out of their accounts to provide services by Litigation

10 Practice Group, who were transitioned to other law firms

11 including Phoenix Law Group were, in fact, being charged on

12 a monthly basis through the Litigation Practice Group portal

13 with the processor known as Revolv3.

14         THE COURT:  Spell that

15         MR. CELENTINO:  R-E-V-O-L-V and number three.  But

16 they pronounce it "revolve."

17         THE COURT:  Thank you.

18         MR. CELENTINO:  The Litigation Practice Group

19 portal subsequent to the service by the trustee of the

20 orders has taken $1.7 million --

21         THE COURT:  One second again, I apologize.

22         MR. CELENTINO:  No trouble.

23         THE COURT:  I'm sorry.  I don't know what the -- I

24 think we have to.  Is it not recording?

25         All right.  We have a technical problem.  I

10

1  apologize.  Sometimes these things happen.  It hasn't

2  happened to us in a long time, if ever.  We'll find out

3  what's going on.  I'm going to take a break.

4      (Proceedings recessed briefly.)

5          THE CLERK:  Please come to order.  Court is back

6  in session.

7          THE COURT:  Please be seated.

8          MR. KIRSCH:  Your Honor, good afternoon.  If I may

9  make an appearance.  I was waiting for you to call number

10 three on the status conference.  Ira Kharasch of Pachulski

11 Stang.  But the way it's going, it looks like they may start

12 running into each other.  So just to be on the safe side,

13 Ira Kharasch of Pachulski Stang on behalf of an ad hoc

14 consumer committee consisting of three members at this point

15 in time.

16         THE COURT:  Good afternoon and welcome.

17         Are there other parties that would like to make an

18 appearance on item number three, which is the status

19 conference.

20         Hearing none, I apologize for the disturbance of

21 our technology.  We'll try to get it better next time.

22         MR. CELENTINO:  Your Honor, that's absolutely

23 okay.  I will make a few mistakes today as well.  I already

24 did in misunderstanding that Mr. Carss was behind me.

25         So where I left off, your Honor, is I was trying

Case 8:23-ap-01046-SC   Doc 296-2   Filed 06/27/23   Entered 06/27/23 13:13:21   Desc
Declaration of Kathleen Donahue March Page 16 of 269   Page 83 of 337

11

1  to make sure that you understood the factual premise of why

2  we brought the motion under an emergency basis as we did,

3  and what we learned and that it turned out true.  I had just

4  started to report to the Court that the trustee has

5  segregated $1.7 million in funds that were taken from LPG

6  legacy clients through the LPG portal created by Revolv3.

7  The entity that assists Revolv3 in actually pulling the

8  funds from the client banks is a various number of WorldPay

9  entities.  And the 1.7 is the number as of right this

10 minute.  1.2 is the number that we've indicated in the

11 evidence that's before your Honor.

12        The concern that the trustee had was that some

13 operations were going on outside of the control of LPG that

14 were taking funds that belonged to customers of LPG.  And as

15 the Court knows, and as the original pleading set forth, it

16 was the province of the former managers of LPG or the former

17 personnel of LPG -- I suspect at some point today, we'll get

18 into to what extent who was giving the instructions.  But

19 they had taken the position that they could transition the

20 LPG clients notwithstanding a Chapter 11 bankruptcy, and

21 they had attempted to transition those clients in various

22 places.

23        So as part of the result of the enforcement of the

24 TRO and the meeting with personnel and those that cooperated

25 and turned over the information on logins and bank accounts

12

1   and passwords, the trustee has secured the data of those LPG

2   clients.  The trustee has secured that many of them are

3   being serviced by Phoenix Law.  The trustee has secured that

4   some of them are being serviced by Consumer Legal Group.

5   And the trustee has evidence before your Honor that some of

6   those clients are -- appear to be in the database as

7   Phoenix's clients but appeared to have been assigned to an

8   entity by the name of Greyson, and Greyson has counsel, and

9   we'll get an opportunity to hear from them at some point

10  today as well.

11          THE COURT:  So let's do a little recap for the

12  record.  You tell me when I get off base here.

13          On March 20, 2023, Litigation Practice Group P.C.

14  filed its case under Chapter 11 in the Central District of

15  California, correct?

16          MR. CELENTINO:  That is correct.

17          THE COURT:  And at that time, Litigation Practice

18  Group P.C. -- we'll call it the Debtor -- had a number of

19  clients, correct?

20          MR. CELENTINO:  Yes.

21          THE COURT:  What was it doing for those clients?

22          MR. CELENTINO:  Litigation Practice Group

23  purported to be in the business of debt invalidation and in

24  the business of litigation, defending clients when they are

25  sued by their credit card holders.  The process of debt

13

1  invalidation was an attempt to have the credit card company

2  stop enforcing the debt because they didn't have the proper

3  information to prove they were the transferee with legal

4  authority to pursue it.  In fact, as set forth in the

5  evidence before your Honor in our papers filed this morning,

6  we can report that since the execution of the TRO, the

7  trustee learned that one of those matters was successful.

8  The debt was invalidated.  The amount was returned to the

9  creditor.  And, in fact, the attorney's fees were paid by

10  litigation.

11         THE COURT:  So the first part of the Litigation

12  Practice Group activities was debt invalidation, and the

13  second was litigation once litigation was started by a

14  creditor?

15         MR. CELENTINO:  That is correct.

16         THE COURT:  Did litigation -- was litigation ever

17  started by clients of LPG?

18         MR. CELENTINO:  I cannot answer the question of my

19  personal knowledge.  We have others here who can answer that

20  question, but it is hard to imagine that it wasn't.

21         THE COURT:  So now, on or about the filing date of

22  the Debtor, the filing date being 3/20/2023, about how many

23  clients did LPG have?

24         MR. CELENTINO:  The answer to that question, your

25  Honor, is unclear.  And it's unclear because the argument

14

1  that clients were properly transitioned on or about that

2  date or just prior to Phoenix Law is an argument that is

3  being maintained.

4        THE COURT:  Well then let me back up six months

5  prior.

6        MR. CELENTINO:  Forty-nine-plus-thousand.

7        THE COURT:  Okay.  So six months or so prior to

8  the filing date of March 20, 2023, it is your understanding

9  that LPG had about 49,000 clients.

10       MR. CELENTINO:  That's correct.

11       THE COURT:  Is LPG a law firm?

12       MR. CELENTINO:  It purports to be a law firm.

13       THE COURT:  Okay.  Between the time LPG had 49,000

14  or so clients and the petition date, does the trustee have

15  any information of any clients that went to another law firm

16  or purported law firm with respect to their efforts that

17  were being exercised on their behalf by LPG?

18       MR. CELENTINO:  The information we have, your

19  Honor, is that roughly all but 200 of the clients were

20  transitioned, in the period immediately before the

21  bankruptcy and into the first few weeks of the bankruptcy,

22  away from LPG and into other entities, including the

23  transfer of some clients to the Consumer Legal Group and the

24  transfer of clients to Phoenix Law Group.  And there was an

25  intermediate step that the trustee has information, as we

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 18:13:21 Desc
Declaration of Kathleen P. March Page 20 of 126 Page 87 of 337

15

1  have put in the record for your Honor, that there was an

2  intervening group that was set up called Oakstone.

3       At some point, some of those clients were being

4  transitioned to Oakstone.  At some point, there was a

5  disagreement between the LPG management, let's say, and the

6  Oakstone recipients as to the terms of that transition.  And

7  then there has been an attempt to re-transition those

8  Oakstone clients to different locations.  Most of them

9  remain noted in the CRM database as active Phoenix Law Group

10  clients.

11       THE COURT:  So let me ask this question with

12  respect to the bankruptcy filing.  On March 24th, 2023, as

13  docket number 16, the Litigation Practice Group, the Debtor,

14  filed its official form 204, which is the 20 largest

15  unsecured claimants who are not insiders.  They listed as

16  number one and number two, Debt Validation Fund II, LLC with

17  a disputed breach of contract dispute of approximately

18  $65,385,489 and as the second largest creditor, MC DVI Fund

19  1, LLC, with a breach of contract dispute of $36,810,650.

20  And then it goes down to a measly 25 million and then 8

21  million, and 2.4 million from different creditors.

22       My question is this -- and I know we have counsel

23  here today from Debt Validation Fund II and I and MC DIV

24  Fund 1.  Is it the trustee's impression -- and I understand

25  this is not under oath, and there's no evidence that I'm

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 08:33:21 Desc
Declaration of Kathi DenHartog March Page 21 of 269 Page 88 of 337

16

1 asking for at this point, but it is -- is it your impression

2 that the diversion, the alleged diversion of clients, away

3 from the Litigation Practice Group to Phoenix, Oakstone, and

4 others have anything to do with these debts?

5          MR. CELENTINO:  In our view, that was at least a

6 significant factor in the diversion, without a doubt.

7          THE COURT:  Thank you.

8          All right.  Now, please proceed.  Those were some

9 of the underlying -- one more thing.  Does the Litigation

10 Practice Group P.C., the Debtor, have any other source of

11 income other than the consumers who are seeking assistance

12 in the efforts of debt invalidation and/or litigation?

13          MR. CELENTINO:  Not that we have identified in the

14 three weeks that the trustee has been appointed and we've

15 been doing the investigation.

16          THE COURT:  Thank you.  Please proceed.

17          MR. CELENTINO:  Thank you, your Honor.  So what

18 has transpired though is really dramatic.  And I think it's

19 important for the Court to understand it because we have it

20 in the declarations.  We also have Mr. Carss here to declare

21 it.  What has transpired is really dramatic.  Through the

22 use of the Litigation Practice Group portal that connects to

23 a processor that can pull credit card debt, the Litigation

24 Practice Group clients' amounts were being pulled into the

25 Litigation Practice Group portal.  And the way that works is

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 08:31:21 Desc
Declaration of Kathleen March Page 2 of 269 Page 89 of 337

17

1  important because we have it in the papers, but it's

2  important for the record.

3          When the instruction is given from the portal that

4  belongs to and is in the name of and the account exists in

5  the name of Litigation Practice Group, that portal

6  instruction goes to the processor, who now knows which

7  accounts from which what amount should be pulled into the

8  account, what's known as the settlement account, for the

9  Litigation Practice Group.  And the funds sit there while

10  the processor and the bank who the consumer banks at work it

11  out electronically.

12          And by that, I mean if the money is pulled by the

13  processor, but the credit card account is closed or the bank

14  account is closed, the pull shows coming up, but it doesn't

15  actually get pulled because it was closed.  If the money is

16  pulled from the consumer, but the consumer objects

17  immediately because they don't want their money pulled, then

18  it stays in suspense.  And that suspense account is known as

19  the settlement account.

20          And generally, because of the fairly high fees

21  that are being paid to these particular processors -- not

22  outside the ordinary in the industry, but fairly high fees,

23  Litigation Practice Group had approximately a three-day

24  settlement turnaround which meant once all of the over-ages,

25  under-ages, the under polls, the closed accounts, once all

18

1  that settles out, there is an amount of money sitting there

2  to be designated to go to Litigation Practice Group.  And

3  what's interesting is the evidence, as we've referred to in

4  the materials, is that somebody -- that's the big question

5  because everybody has got somebody to blame.  But somebody

6  gave the direction and authority for monies pulled for the

7  Litigation Practice Group to be diverted to accounts not in

8  the name or control of Litigation Practice Group.

9        THE COURT:  So let me stop you one more time and

10  just do a simple recap.

11        There is a hypothetical consumer, Mr. John Doe.

12  Mr. John Doe has retained LPG, Litigation Practice Group, to

13  assist his efforts in resolving debt that may or may not be

14  truly owed from a creditor.  And the creditor is typically a

15  credit card company or a vendor?

16        MR. CELENTINO:  Or an S & E of a credit card

17  company.  That's the most common.

18        THE COURT:  Or an S & E, that would be the debt

19  collector.

20        MR. CELENTINO:  That's the most common.  Yeah,

21  that's the most common, the debt collector.

22        THE COURT:  All right.  So that Mr. Doe gives a

23  credit card number to LPG.  So far so good?

24        MR. CELENTINO:  It's probably a bank account

25  number.

19

1          THE COURT:  Okay.

2          MR. CELENTINO:  Most likely a bank account number

3  for an ACH but --

4          THE COURT:  Okay.  A bank account with a routing

5  number and the account number.

6          MR. CELENTINO:  Exactly.

7          THE COURT:  All right.  And then when it is time

8  to, as you say, pull money from their bank account, it goes

9  into a processor, correct?

10         MR. CELENTINO:  Correct.

11         THE COURT:  And what is that processor?  Is it

12  another bank?

13         MR. CELENTINO:  It's an entity that's licensed in

14  the particular area to actually be an intermediary for a

15  party who is taking an ACH payment.

16         THE COURT:  Now, would that be sort of like an

17  escrow?

18         MR. CELENTINO:  It's not quite an escrow because

19  -- I mean, they treat it in many ways like an escrow because

20  as I said, the processor takes the money, holds it in a

21  suspense account until they're sure they have the money, and

22  then they credit it to the settlement account of the party

23  that had the authority to make the pull in the first place.

24         THE COURT:  All right.

25         MR. CELENTINO:  So, of course, if I may, if you've

20

1  given authority to LPG as the party to pull the funds,

2  there's a representation that's being made to the processor.

3  When they say, please make that pull, the representation

4  being made is that LPG has the authority and the contract

5  with that party to pull those funds for that purpose.

6         THE COURT:  How many processors are we talking

7  about here?

8         MR. CELENTINO:  In the course of this case and in

9  the course of what -- the order, the order itself has

10  enjoined, I believe, six -- and I'll have my associate count

11  them for sure -- different processors.  But as of the time

12  of the trustee's appointment, there was one account, one ACH

13  authorized account, and that ACH authorized account used

14  several of the different WorldPay entities to actually make

15  the pulls.

16         THE COURT:  So, now, the processor --

17         MR. CELENTINO:  So I am told that I was wrong,

18  your Honor.  There are nine total that are governed by the

19  order, and some of those have disputes as to whether they've

20  been pulling or not pulling under any instructions.  But we

21  have nine that are complying with the order and not making

22  any further pulls.

23         THE COURT:  Some entity contracts with the

24  processor to do that work, correct?

25         MR. CELENTINO:  Correct.

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 18:33:21 Desc
Declaration of Kathleen Marsh Page 26 of 269 Page 93 of 337

21

1          THE COURT:  In those nine processors that have now

2     been enjoined, how many were originally retained by the

3     Debtor?

4          MR. CELENTINO:  It does not look like any of them

5     have been retained by anybody else but the Debtor, as it

6     affects the parties that are our defendants.

7          THE COURT:  So all of them.

8          MR. CELENTINO:  All of them.

9          THE COURT:  Okay.  For instance, you mentioned

10    other entities like Phoenix and Consumer Law Group?

11         MR. CELENTINO:  Yes.

12         THE COURT:  Did they hire the processors to do the

13    pulls?

14         MR. CELENTINO:  It is unclear to us that that is

15    true.  We do not believe so.

16         THE COURT:  Do you have any contracts at this

17    point between the processors and the Debtor or any other

18    related entities that you've -- that are subject to the

19    preliminary injunction?

20         MR. CELENTINO:  We only have the Revolv3 contract,

21    and that is with Litigation Practice Group.  Our evidence

22    indicates that the only contract has ever been with the

23    Litigation Practice Group, and that different processors

24    were used for different reasons.  We don't know, and we

25    haven't completed a look back.  We've primarily focused on

22

1 the time frame from when the trustee was appointed to

2 current, and during that time frame and what appears to be

3 the time frame of the Chapter 11, the only processor and the

4 only Portal was with Revolv3.

5         And there is a different question as to Oakstone,

6 your Honor.  I want to separate Oakstone and Greyson from

7 this discussion.

8         THE COURT:  Yes, I actually misspoke.  I meant

9 Oakstone.  Oakstone, not the consumer entity.

10        MR. CELENTINO:  Oakstone, your Honor, is a

11 different one.

12        THE COURT:  Okay.

13        MR. CELENTINO:  And I don't want to confuse the

14 other entities with Oakstone.  I want to separate that, if I

15 may.  If I can finish, though, what we've learned about how

16 this money went and what we've been able to do because

17 that's very important.

18        THE COURT:  Yes, but I -- and we have all the time

19 in the world.

20        MR. CELENTINO:  Yes.

21        THE COURT:  Or at least I do.

22        MR. CELENTINO:  Okay.  I'll take the time to --

23        THE COURT:  I don't get paid by the hour.  The

24 point I'm trying to make is that we need a baseline of

25 information.

Case 3:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 18:13:21 Desc
Declaration of Matthew Doumont March Page 23 Ad 26 Page 95 of 337

23

1      MR. CELENTINO:  Yes.

2      THE COURT:  And I'm trying to extract that from

3  you.  You know -- you're like an iceberg.  I only see the

4  top 10 percent at this point.  I'm trying to see under the

5  water.

6      MR. CELENTINO:  And I do understand that.

7      THE COURT:  Okay.  So let me just ask us a few

8  more questions.

9      MR. CELENTINO:  Yes.

10      THE COURT:  Once the pull is made to the processor

11  and the funds clear, the processor is then asked to

12  distribute that money?

13      MR. CELENTINO:  Because the processor has pulled

14  the money pursuant to the LPG account, the processor now

15  identifies through that portal that the funds are ready for

16  settlement.  That is that we are ready to send the funds

17  through the portal, the LPG portal to wherever we're

18  designated to send the funds.

19      THE COURT:  And where would you normally designate

20  those funds?  The creditor who has been seeking an agreement

21  to pay less than what was owed for instance?

22      MR. CELENTINO:  So the way it should go is LPG,

23  the party with the authority to pull the funds to pay its

24  fee to resolve that creditors -- the debt between the

25  consumer and the creditor, should get the money into an LPG

24

1  account.  And subject to the law, LPG who made the pull

2  because it had the authority to make the pull should have

3  the funds.

4          THE COURT:  Shouldn't, under California Business

5  and Professions Code or other statutes, that those funds go

6  into an attorney-client trust fund?

7          MR. CELENTINO:  As of February 1 of 2022, for

8  California clients, the California entity, in this case,

9  California Law Firm, would not be authorized on pulls after

10  that time to spend those funds unless they either have

11  resolved the debt and made a payment to the creditor on

12  behalf of that consumer, or it's already a litigation

13  matter.

14          THE COURT:  So you're suggesting that my question

15  is appropriate but not clear?

16          MR. CELENTINO:  It's appropriate but not for all

17  of the pulls?

18          THE COURT:  No, I'm thinking -- my question was,

19  shouldn't the money go into a client trust account as we

20  both know what client trust accounts are and have defined

21  them in the past?  This does not seem like a client trust

22  account.

23          MR. CELENTINO:  It is not and shouldn't -- I don't

24  believe it is.  But the law imposes an obligation on the law

25  firm in California -- not all 50 states, but in California

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 18:13:21 Desc
Declaration of Kathleen March Page 30 of 269 Page 97 of 337

25

1 and only after February 1 of '22, the law imposes that the

2 money cannot be used for other purposes than the payment to

3 the creditor or -- yeah, period, cannot be used for purposes

4 other than payment to the creditor unless the creditor has

5 received one payment and then the money can be utilized by

6 the law firm however the law firm intends to utilize it,

7 subject, of course, to the appropriateness of the charge to

8 the client.

9          THE COURT:  The processor's duty is to receive the

10 funds from an appropriate bank account and hold them until

11 cleared and then wait for instructions?

12          MR. CELENTINO:  That's exactly correct.

13          THE COURT:  Who provides the instructions for

14 money that goes into a settlement account by a processor or

15 held by a processor to determine who gets the next step, the

16 next payment?

17          MR. CELENTINO:  In this case, then, Your Honor,

18 there is a different login and a different password into

19 that Revolv3 portal account.  The person on the other end of

20 that login -- and there is some finger pointing as to who

21 that person is, and maybe we'll satisfy that today in

22 questioning.  The person who has that different login to do

23 the direction has then gone in and directed where the money

24 should go.

25          THE COURT:  Whoever that might be, do you believe

26

1  that they would have a fiduciary duty as to the funds that

2  are in the processor's account?

3         MR. CELENTINO:  I believe that is unquestionably

4  true.

5         THE COURT:  So the person that is in charge -- or

6  let's put it this way.  The person who has directed those

7  funds -- and I'll use your date, since February 1, 2022, --

8  just for academic regularity -- has exercised their duties

9  as a fiduciary or perhaps have not exercised their duties as

10 a fiduciary, but they should have, to direct that money to

11 the appropriate party?

12        MR. CELENTINO:  That is what they were supposed to

13 do, yes.  And that is what I believe would be appropriate.

14 And then there's the added layer of the person directing the

15 settlement of those funds that have been pulled from those

16 Litigation Practice Group clients while the Litigation

17 Practice Group is operating in Chapter 11.  So they have a

18 fiduciary duty to creditors as well, on that date.

19        THE COURT:  Now, are you aware of any clients of

20 the Debtor who have been transferred to other organizations

21 doing similar work after the filing of the bankruptcy

22 petition?

23        MR. CELENTINO:  We do believe there are, your

24 Honor, and we do not have that number.  We expect to be able

25 to have that number and identify those accounts in just a

27

1   couple of days.

2            THE COURT:  Please proceed.

3            MR. CELENTINO:  Thank you.  And the irreparable

4   harm that we were concerned about in this whole process

5   found itself -- had occurred prior to the trustee getting

6   control of that settlement account and was destined to

7   occur, had the trustee and the order not been served and had

8   the Revolv3 entity, the WorldPay entity, and their clients

9   and lawyers not immediately cooperated.

10            THE COURT:  Explain what WorldPay is.

11            MR. CELENTINO:  WorldPay is the actual processor

12   with the connection to the bank that gets the portal

13   instruction to pull the ACH.  WorldPay is the actual party

14   that pulls the money and waits for the settlement.  WorldPay

15   is the entity that then credits the money to the settlement

16   account and informs the money is now able to be utilized as

17   directed.

18            THE COURT:  Who represents WorldPay here today?

19            MR. CELENTINO:  I don't believe WorldPay's counsel

20   is participating today, your Honor.

21            THE COURT:  Do you have the identity of that

22   counsel?

23            MR. CELENTINO:  I do.  May I check my records?

24            THE COURT:  Thank you.

25            MR. CELENTINO:  I do know there is an account rep

28

1 also that's worked with us that has made the portals

2 available to us so we can see every transaction from the

3 inception of the account.

4    THE COURT:  So if I referred to the current

5 processor as WorldPay, that would be enough?  Or is there

6 another processor?

7    MR. CELENTINO:  We would say the processor is

8 WorldPay or one of the many WorldPay different entities, but

9 yes, that is the processor.  But the settlement account is

10 opened at a portal through Revolv3, and that portal is

11 really the software company that operates and communicates

12 for this particular client with the processor.

13    THE COURT:  Has there been funds transferred from

14 the processor to any creditors of the clients in the past

15 three months.

16    MR. CELENTINO:  We cannot identify that, no.

17    THE COURT:  So where did the money go?

18    MR. CELENTINO:  That's what I wanted to tell you

19 first in answering your question.  So the counsel at the

20 WorldPay entities, sometimes called FLS Global -- FIS Global

21 is Samhitha, S-A-M-H-I-T-H-A, Medatia, M-E-D-A-T-I-A.

22    THE COURT:  Thank you.

23    MR. CELENTINO:  So in the last three months, that

24 instruction that is given through the different login at the

25 portal has directed those funds pulled through the LPG

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 18:13:21 Desc
Declaration of Kathleen March Page 34 of 269   Page 101 of 337

29

1  portal to go to three different entities.  One is called

2  Vulcan.  One is called Prime Logix.

3          THE COURT:  Prime?

4          MR. CELENTINO:  P-R-I-M-E L-O-G-I-X.  I believe it

5  might be a capital L.  And the third is Maverick Consulting.

6          THE COURT:  Do you have any idea of the breadth of

7  those funds?

8          MR. CELENTINO:  So the instruction that was given

9  before we glommed on to the funds on June 2nd was for all

10  1.2 million to go to the Prime Logix account.

11          THE COURT:  What about Vulcan or -- I'm sorry.

12          MR. CELENTINO:  They received different funds

13  prior to the one that we stopped on Monday.

14          THE COURT:  Does anyone here represent Prime

15  Logix?  Thank you.

16          MR. CELENTINO:  And here is the most interesting

17  part of what the bank records from Prime Logix and Maverick

18  appear to establish.  We think the bank records from Vulcan

19  will -- they haven't been turned over to us yet, but we're

20  promised cooperation on Vulcan.  But we have seen some of it

21  on the other side, as I'll explain in a minute.  And there's

22  a third entity that's affiliated with Oakstone.  I want to

23  keep them aside for a second still.  But it appears that by

24  directing the money that would go to Litigation Practice

25  Group, or perhaps it should be going to Phoenix, because

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 13:13:21 Desc
Declaration of Kathleen Corr March Page 35 of 269 Page 102 of 337

30

1  Phoenix is actually doing the work for the clients at the

2  time that the pull is made, as best we can tell, it looks

3  like that money going to Prime Logix and that money going to

4  Maverick has been used for -- some to pay the payroll at

5  Phoenix, most to pay the payroll at the entity called

6  Greyson Law, and some looks like it's the source of funds to

7  keep the prior managers of LPG in the comfort that they were

8  used to being in their lifestyle.  We intend, obviously, in

9  a short order -- as we go through this with Mr. Grobstein

10  and his folks, we intend in short order to be able to

11  provide you with a financial summary of all of that.

12          What I can say that was very disturbing is to know

13  for Mr. Carss that he has not been involved in how the

14  payroll gets paid.  He has not been involved in directing

15  the pulls from the LPG funds, and he has not been given the

16  opportunity to be involved in how that should be distributed

17  vis a vis Phoenix.

18          THE COURT:  Describe what Mr. Carss has done in

19  the last six months as an employee of LPG or any other

20  entity that's relevant to this discussion.

21          MR. CELENTINO:  So Mr. Carss has put it forth in

22  his declaration, your Honor.  His history was he was

23  originally hired by Mr. Diab to participate in the entity

24  called Oakstone when -- was that right?  Oakstone?

25          UNIDENTIFIED SPEAKER:  Gallant (phonetic).

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 18:13:21 Desc
Declaration of Kathleen Enright March Page 36 of 269 Page 103 of 337

31

1       MR. CELENTINO:  I'm sorry.  In an entity called

2  Gallant.  I forgot.  Gallant is another one like Oakstone,

3  but it didn't last very long.  So there was an entity named

4  Gallant that Mr. Diab hired Mr. Carss to work for as one of

5  the lawyers working in that law firm.  And Gallant was a

6  firm that was going to be receiving transfers of cases from

7  LPG.  That transaction didn't work out for reasons that are

8  not germane to today.  And then it was decided that perhaps,

9  a new entity called Phoenix should be incorporated.  Mr.

10  Diab reached out to Mr. Carss to hire Mr. Carss to be the

11  lead attorney at Phoenix.  And then Mr. Diab instructed

12  parties to get the transition of clients that were on their

13  way to Gallant instead to transition to Phoenix, and that is

14  in Mr. Carss declaration on file.

15       And Mr. Carss will tell you that he did his best

16  to coordinate the legal services that were being provided by

17  Phoenix to instruct employees how to cooperate with the

18  clients and how to deliver the client's communications and

19  needs to Mr. Carss.  And Mr. Carss was responsible for

20  retaining counsel for those consumer clients when litigation

21  matters were pursued.  There was an entire bevy as set forth

22  in Mr. Carss' declaration of LPG attorneys that were made

23  available to Mr. Carss to use -- on behalf of Phoenix, to

24  use and employ for the benefit of those consumers.

25       Interesting, at where we sit today is -- it looks

32

1  like between six and $9 million, some number we have not

2  been able to pinpoint, are the active valid monthly ACH

3  contracts that LPG has with its clients.

4        THE COURT:  So let's make sure that everyone

5  understands, or at least I understand.  The settlement is

6  made with a creditor or a collection agency, and the client

7  says I'll pay $100 a month.  That money is drawn from their

8  bank.  It is paid to the processor.  The processor under

9  instructions sends it to the creditor.

10        MR. CELENTINO:  The processor sends it to the law

11  firm.

12        THE COURT:  The law firm.  And then the law firm

13  is supposed to pay the monthly agreement?

14        MR. CELENTINO:  Correct.  That is as set forth in

15  the declaration of Mr. Schneider that we've submitted to

16  your Honor is how it's supposed to work.

17        THE COURT:  And how has it really been working?

18        MR. CELENTINO:  It appears in the last three weeks

19  to six weeks, it has been working such that the money does

20  not go to the law firm.  That money does not go to Phoenix.

21  The money that we've been able to determine so far goes to

22  Maverick Consulting or to Prime Logix for Maverick and Prime

23  Logix to spend it as they wish.

24        By way of example -- and I can bring a little bit

25  of the Greyson story in now.  By way of example, the Greyson

33

law firm which has 48 confirmed clients and there is some
dispute as to whether or not those clients ever were in the
LPG, Oakstone, Gallant, Phoenix system or not.  Those 48
clients with an expected monthly ACH pull of roughly $15,000
are clients of a law firm that has a payroll -- according to
that law firm's director of human resources, they have a
payroll -- assuming the hourly employees only work one hour
a year, the payroll is $5.67 million a year or 565,000 a
month.

So in the last few weeks, the direction was given
to pull the LPG client money, and then the direction was
given for that money to go to Prime Logix or Maverick.  And
that money was used at those locations to either compensate
personnel at Greyson and/or personnel at Phoenix and/or a
series of other purposes that were detailed to the to the
Court.  The point of course being no rational person would
run a law firm at a $5-million annual human resources cost
with a current revenue of 15,000 a month and continue to
have the pulls come from the Chapter 11 Debtors' account on
behalf of Chapter 11 Debtor clients.  He wouldn't be
operating that law firm legitimately.

It does not appear -- and this is one thing I want
to credit the folks that are appearing on behalf of Greyson.
We are going to want to modify -- the trustee is going to
want to amend its complaint.  It does not appear that

Case 8:23-ap-01046-SC  Doc 29-2  Filed 06/27/23  Entered 06/27/23 13:33:21  Desc
Declaration of Kathleen Cmirland with Exhibits  Page 39 of 269  Page 106 of 337

34

1  Greyson is an alter ego.  I'll take it at face value that

2  it's not, and that the two parties that founded it decided

3  to found it just for the purpose of siphoning the money from

4  LPG, not as an alter ego of LPG, but as an attempt to

5  destroy LPG and/or Phoenix.

6          So I believe, your Honor, the point here is I'm

7  happy, very happy to have Greyson, to the extent that the

8  services they're providing are being provided legally, take

9  their 48 clients and pay back the hundreds of thousands of

10  dollars of LPG money that has been utilized by them to pay

11  their employees.

12          Now, you're going to hear from Greyson, that

13  they're upset at the trustee because they had a payroll that

14  they were hoping that would go out on June 2nd, and they had

15  a payroll they were hoping would go out this Friday.  And

16  you can explain to them as much as I have explained to them,

17  your order doesn't put the trustee in charge.  The order

18  enjoins the use of the money.  But the notion that they're

19  upset that their attempt to take that money, regardless of

20  who authorized them to do so, from LPG clients for the

21  purposes of paying the expenses of a myriad of employees.

22  You can see in Mr. Plazak's papers, there are a myriad of

23  employees that work there that they were hoping LPGs

24  authorization would pay.

25          So when we get to what the injunction should look

35

1 like, I think it's a pretty simple one as it affects

2 Greyson.  They need to take their physical files, and we'll

3 print out the paper copies and deliver them to them.  They

4 need to get off the database that is operated by Phoenix,

5 and they need to go and make good to their employees on the

6 promises that they made for $5.79 million in annual salary

7 with the 48 clients they have.  Whether or not they can be

8 traced LPG will be a different question.

9      So the question in the trustee's mind is really

10 very simple as to Greyson.  The several $100,000 that had

11 been used to fund their business in the last few weeks,

12 maybe $30,000 of it is legitimately theirs, although

13 somehow, in some way, the LPG Portal was used to pull any

14 money that would have come from those folks because there is

15 no -- as Ms. Han told me on the phone, Greyson does not have

16 its own ACH processing capability, and I think the papers so

17 state.  So that's the issue with Greyson.

18      And so for the purposes of the order that your

19 Honor has asked us, the reason I wanted to get into this a

20 little bit is the order that we'll be seeking isn't exactly

21 just a continuation of the one your Honor entered.  It has a

22 issue with Greyson because that is nothing more than our

23 view, and ultimately we'll prove at trial that it's a

24 fraudulent conveyance partner of the former management of

25 LPG, and they have their own fiduciary and other duties that

36

1 they will have to attest to at some point.  But it is not an

2 alter ego of LPG.  It was, in fact, not designed to replace

3 LPG.  It was designed to kill LPG.  And that's not the same

4 thing as an alter ego.

5          THE COURT:  Well, kill and replace.

6          MR. CELENTINO:  Well, not succeed to LPG.  It's

7 doing it on its own, if you understand.

8          THE COURT:  I got you.  I understand your

9 position.

10          MR. CELENTINO:  I think the Office of the United

11 States Trustee is here.  I think they have and will raise

12 questions today and throughout the case about whether or not

13 the business that Greyson is running is a lawful business.

14 That's a different question.  They might not want me to

15 agree so quickly to give them their 48 clients, but I have

16 no problem with accepting -- and the trustee, I say I -- the

17 trustee on my recommendation has no problem accepting on its

18 face they're not an alter ego, giving them the paper copies

19 of their records as we print them out from our database and

20 letting them move on their way.  Whether they stay in the

21 current space or not, that's up to the landlord that has

22 given them permission.  That's not through Phoenix or

23 through LPG as best I can tell.

24          So that's where we're at.  We're at the point

25 where in a perfect world left untouched by your Honor's

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 18:33:21 Desc
Declaration of Kathleen Docel March Page 42 of 269 Page 109 of 337

37

1 order and the trustee's intervention, between six and $9

2 million on LPG accounts would have been pulled.  Between six

3 and $9 million a month would have been directed to these

4 other entities with no control to the fiduciary estate, no

5 control to LPG, and the clients, almost all of them, only

6 have signed agreements with LPG.

7          So one of the problems that the trustee identified

8 and this Court identified earlier on is the notion that a

9 transfer of a client account from one law firm to another,

10 there are complaints -- at the Better Business Bureau, there

11 are complaints that have been registered that we are -- and

12 we've heard a few of them ourselves, that folks don't

13 understand how they can get transitioned without their

14 consent.  But most of the folks that we have talked to have

15 had active matters in the last five days that the trustee

16 has been involved.  Most of the consumer creditors are more

17 upset if the folks they've been transitioned to are not

18 adequately representing them, then they are upset with the

19 transition.  In other words, if they had confidence that Mr.

20 Carss and his team would assist them, they would be happy to

21 continue to get the assistance they feel they bargained for.

22          And that brings us to the point of the trustee.

23 And before we really talked about what the preliminary

24 injunction should look like, we thought it made sense to get

25 a sense of what the end game is because without an end game

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 08:31:21 Desc
Declaration of Kathleen P. March Page 43 of 269 Page 110 of 337

38

1 in sight, the preliminary injunction can issue.  And if it

2 issues in its current state of affairs, that the trustee has

3 to continue to hold the funds, the trustee is not to extend

4 the funds, the trustee is to control whether or not any

5 other LPG customers have any pulls being taken, and

6 everybody else is enjoined from that interference.

7          If that's the order that becomes the preliminary

8 injunction, there is a serious question as to how those

9 consumer creditors who have bargained for something -- it

10 may not be the something that we see as the same value that

11 they saw.  It may be that they bargained for something they

12 thought had value but only existed to sponsor a highfalutin

13 lifestyle of a few folks that were with Litigation Practice

14 Group.  That may be what it is.

15          But one thing is for sure.  If their contracts are

16 cancelled midway through and there isn't an upstanding

17 attorney that tries to reach out to make sure they have

18 representation, they will find themselves at some point on

19 the barrel-head of a litigation.  They will find themselves

20 with a hollow claim against this Debtor until we are

21 successful on litigation against all the folks who brought

22 on this wrongdoing and, hopefully, find some pockets from

23 which to pay.  And they will be detrimentally hard and --

24 harmed and in further despair.

25          THE COURT:  Well, you will finish your sentence

39

1 sooner or later, right? Okay.

2 MR. CELENTINO: Please, you have a question, I'm

3 sure. I'm ready.

4 THE COURT: No. I have an observation, and I want

5 to make it now. At the first hearing, which was under seal

6 at the time and closed, I want to repeat that one of the

7 Court's first and most significant interest -- and I said

8 this to you and to the United States Trustee that the

9 consumer's protection and their rights was something that

10 this Court was going to take a very good look at and to

11 ensure in this kind of a situation that the Court and all of

12 the parties involved in this case are not going to do more

13 damage than they already might have done.

14 And that I wanted to specifically state on the

15 record at the time in the closed hearing to the U.S. Trustee

16 and to the trustee here that I wanted everyone to start

17 focusing not only on the money transfers and the possible

18 fraudulent transfers, but also to ensure as best we can that

19 the consumers who have innocently utilized the services of

20 LPG are not further harmed. And so it sounds like to me

21 that you're focusing very carefully on that. I know that

22 the United States Trustee will also, and this Court

23 appreciates that vision.

24 Other people will now like to say something, I'm

25 sure, and I'd like to have Mr. Marshack give you the note

40

1   and let him whisper things into your ears.

2        MR. CELENTINO:  We're good friends, your Honor.

3        THE COURT:  I know.  I can tell.

4        MR. CELENTINO:  The transition for your Honor with

5   other people wanting to talk, this might be the right time

6   because the focus was on the consumer.  Our status report

7   made it clear.  And your Honor may understand that Mr.

8   Marshak had the idea --

9        THE COURT:  Well, I don't want to go into that

10  right now.

11       MR. CELENTINO:  Okay.

12       THE COURT:  I want to stick with the first efforts

13  that the trustee has made with respect to the temporary

14  restraining order.  And for that reason, I would like you to

15  quickly inventory for me what has been frozen.

16       MR. CELENTINO:  What has been frozen is every bank

17  account that has been disclosed to us as a bank account from

18  which funds pulled from the LPG consumers has been deposited

19  and it has not been spent.  What has been frozen by the

20  trustee is the ability to pull through all of the processors

21  that have previously been used by this Debtor further monies

22  on and from those LPG consumers.

23       That does not mean -- your Honor, that does not

24  mean that somebody in this room or somebody outside this

25  room didn't keep a copy of the documentation.  They need to

41

1  create a new portal with a new processor and try to rip off

2  the estate or try to take those client pulls.  But at least,

3  as to the folks in the room and everybody we knew that had

4  been doing it for the last six months, it's been stopped and

5  redirected by the trustee with one exception.

6          And the last one I didn't get to -- I know you

7  want to give everybody else a chance, but the last one I did

8  not get to is the entity known as Oakstone.  Oakstone is an

9  entity that's run by a gentleman by the name of Eng, E-N-G.

10 Tiang, T-I-A-N-G.  He was properly served with process but I

11 don't believe he is here today.

12          Is Mr. Eng Tiang here?

13          People who know him say he has not.  He had a

14 falling out of some type with Mr. Diab, and Mr. Diab

15 reported that to Mr. Marshak and Mr. Hays and I on a

16 telephone call.  Whatever that falling out was, Mr. Eng

17 still has the ability and recently, according to our

18 records, managed to get a payment processor not named in our

19 original complaint to help Mr. Tiang pull $551,000 from LPG

20 consumers.  For what purpose, we don't know.

21          THE COURT:  Let me stop you right there.  Do you

22 know the name of that processor?

23          MR. CELENTINO:  We do.  It's called Pay Alliance.

24 Payliance.

25          MR. MARSHACK:  It's called Payliance,

42

1  P-A-Y-L-I-A-N-C-E.

2          THE COURT:  And why haven't they been added to

3  your complaint as the defendant?

4          MR. CELENTINO:  We have served them with a TRO,

5  and we're prepared to add them to the complaint today, and

6  we're prepared to seek an extension and special TRO as

7  against just them.  We're trying to get that figured out.

8  But, quite frankly, your Honor, today is Monday, and that

9  was Friday's revelation.

10         THE COURT:  That's 551,000 in the last week?

11         MR. CELENTINO:  That was in the last week.

12         THE COURT:  Okay.

13         MR. CELENTINO:  And we understand, obviously, that

14 the most of the complaints that we've heard from the

15 consumers, that are LPG consumers that are communicating

16 with Mr. Carss at Phoenix are complaining about that entity

17 pulling money from them because they don't know that entity.

18 They only know LPG.  So we are prepared and working as we

19 speak.  While we're in this courtroom, other lawyers at our

20 firm are working on the strategy to shut that down as

21 quickly as we can.

22         THE COURT:  What can the Court do to help you?

23         MR. CELENTINO:  Your Honor, I think if we were to

24 submit for an alias summons on Payliance and get them served

25 with the initial complaint and an order to show cause, we'll

43

1 work that out, I think, as quickly as possible because I

2 think that we simply need to get processed over the entities

3 that Mr. Tiang continues to work with.  And we're certain

4 that he is the source of it.  But they are simply ignoring

5 that they're not named.  That's the way we see it.

6         THE COURT:  Well, please put that request into

7 operation as quickly as possible.

8         MR. CELENTINO:  As indicated, your Honor, we have

9 somebody that's working on it right away.  And I understand

10 that in alliance with Payliance, that prior weeks, another

11 entity called Seamless Checks, another entity called the

12 Douala, another entity called Stripe, another entity called

13 Unity Financial, and perhaps payment processing at Bank of

14 the West, all took place at the direction of Mr. Tiang.

15         So we will do our very best to get before your

16 Honor tomorrow or later tonight when we get back.  What we

17 believe would be appropriate process to shut that down.

18         THE COURT:  Where can the trustee obtain a current

19 list of all of the accounts that are being debited from bank

20 accounts and sent -- or supposedly sent to various

21 creditors?

22         MR. CELENTINO:  We have a database that shows

23 everybody that has authorized LPG to make a pull on their

24 account.  We have the details of the 551,000 that was pulled

25 within the last week from those customers inappropriately,

Case 8:23-ap-01046-SC  Doc 296-2  Filed 06/27/23  Entered 06/27/23 13:31:21  Desc
Declaration of Kathleen Cornell March Page 49 of 269  Page 116 of 337

44

1  and we have the details of the other pulls that have been

2  made in the last three months.  Your question of me is that

3  complicated one because, as I indicated, based on our review

4  of applicable law, this entity can operate legally by taking

5  the money to itself and not necessarily going direct to a

6  creditor.  If your question is what I think it is -- and

7  maybe I misunderstood.  So let me try to make sure I

8  understand it.  Can we provide you a list of creditors who

9  are creditors of the clients who have received payments from

10  this law firm on behalf of its clients?  Is that what you're

11  asking?

12          THE COURT:  No.  My question was can the trustee

13  get that?  And the next is are creditors who are expected

14  to receive funds pursuant to settlement agreements.

15          MR. CELENTINO:  Yes, your Honor.  That is a more

16  complicated process, but the database has been secured.

17          THE COURT:  Very good.

18          MR. CELENTINO:  So we can get that state by state,

19  you know, 4,200 in California 49,000 in the country.  So Mr.

20  Grobstein's folks have a lot of work to do,

21          THE COURT:  Who has the authority to stop the

22  draws?

23          MR. CELENTINO:  Right now, the draws are through

24  the LPG portal.  The only customers are LPG, except for the

25  48 Greyson customers, hypothetically, let's say it that way

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 13:13:21 Desc
Declaration of Kathleen P. March Page 50 of 269 Page 117 of 337

45

1 that we can see that the trustee controls those customer

2 draws and the trustee has controlled it, unless anybody in

3 the room wants to try to use historical data against the

4 wishes of this Court and the trustee, it's stopped.

5      THE COURT:  Thank you.  Someone has their

6 telephone -- there it is.

7      MR. CELENTINO:  My apologies.

8      THE COURT:  Thank you.  Thank you.  Now, I think

9 what I would like to do is listen to the U.S. Trustee for

10 observations at this point.  I want to understand where the

11 government believes this case should be going, what your

12 intentions are, what are some of the steps that should be

13 taken to not only address the normal Chapter 11 process and

14 a Chapter 11 Trustee, but, of course, the aspect of consumer

15 protection.

16      MR. MISKEN:  Yes, your Honor.  Ken Misken,

17 assistant United States Trustee on behalf of the United

18 States Trustee.  The United States Trustee definitely has a

19 different view of whether this business could continue to

20 operate.  The Debtor's business is an illegal debt relief

21 scheme.  It pretended to be a law firm.  It violated the

22 Telemarketing Sales Rule, California Business Professions

23 Code.  The core fraud was that this entity told the public

24 that it was a law firm representing consumers, when it was

25 really just an illegal debt relief company.  It swallowed

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 13:13:21 Desc
Declaration of Kathleen March Page 54 of 269 Page 118 of 337

46

1 consumer's money, claiming that all the fees were earned

2 upon receipt in direct violation of law.

3         Now, I want to talk about the Telemarketing Sales

4 Rule a little bit.  This industry is governed by the

5 Telemarketing Sales Rule and its debt relief provisions,

6 which you can find at 16-CFR-310.1 at sec.  And I'm going to

7 referred to the Telemarketing Sales Rule as the TSR.  So the

8 TSR defines debt relief service as any program or service

9 represented directly or by implication to renegotiate,

10 settle, or in any way alter the terms of payment or other

11 terms of a debt between a person and one or more unsecured

12 creditors or debt collectors.  And it's not limited to a

13 reduction in the balance, the interest rate change or fees

14 owed by a person to an unsecured creditor.  And that is --

15 like, it is found in 16-CFR310.2.

16         So based upon some of the contracts that creditors

17 who have filed proofs of claim they -- a few have touched or

18 attached the contract between LPG and the consumer.  And for

19 example, Ms. Jarbone's proof of claim, that's filed at proof

20 of claim number 14.

21         THE COURT:  Spell the name.

22         MR. MISKEN:  J-A-R B-O-N-E.

23         THE COURT:  Thank you.

24         MR. MISKEN:  That's proof of claim number 14.  LPG

25 is a debt service provider and subject to the Telemarketing

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 08:13:21 Desc
Declaration of Kathleen Cmar March Pages 52 of 269 Page 119 of 337

47

1  Sales Rule.  Now, the TSR imposes a number of requirements

2  and prohibitions on debt services -- debt relief service

3  providers, and the most important is the TSR is ban on

4  advanced fees.  And that is 16-CFR-3104.4(a)(5)(i).  And

5  under this prohibition, debt relief service providers are

6  prohibited from requesting or receiving payment of any fee

7  or consideration for any debt relief service, until unless a

8  -- the seller or telemarketer has renegotiated, settled, or

9  reduced or otherwise altered the terms of at least one debt

10 pursuant to a settlement agreement, a debt management plan,

11 or other such valid contractual agreement executed by the

12 consumer.  And again, that's 16-CFR Section 310.4(a)(5)(i).

13        THE COURT:  So you're suggesting that no fee may

14 be charged by a debt release company until it has actually

15 succeeded?

16        MR. MISKEN:  That is correct, your Honor.  So just

17 looking at Ms. Jarbone's contract with LPG had proof of

18 claim number 14.  It shows that the payment of schedule fees

19 are due prior to any alterations of the term of the debt.

20 And, therefore, on its face, LPG is in violation of TSRs

21 advanced fee provisions.

22        THE COURT:  Say that one more time.  What is the

23 term that violates the 16-CFR-310 at sec?

24        MR. MISKEN:  As soon as the contract is signed,

25 that is a debt schedule that the consumer is required to pay

48

1 monthly.

2        THE COURT:  Even though there hasn't been a

3 settlement of their obligation to the third party?

4        MR. MISKEN:  That is correct.

5        THE COURT:  Can I ask you, if you -- have you

6 taken a deeper look -- not a very deep look, but what are

7 they charging per customer for such a contract?

8        MR. MISKEN:  Your Honor, we did take a look at a

9 couple of proofs of claims that were filed.  And just to

10 step back a little bit, last week, the U.S. Trustee's -- my

11 office, we sent an informal discovery request to the

12 trustee, now that they're in control of these records, to

13 really do a deep dive into that question.  But just looking

14 at the two proofs of claim, again, proof of claim number 14

15 Ms. Jarbone's claim, the consumer had $8,681 in debt.  LPG

16 charged the consumer $5,384.82, which is 62 percent of the

17 amount of the debt.  In claim 51 -- and that was filed by

18 Hunter Hastings, H-A-S-T-I-N-G-S. He had $20,660 in debt,

19 and LPG charged him $10,457.28, which is 51 percent of the

20 amount of the debt.

21        So I think by just looking at those two proofs of

22 claim, you can get the idea of what the harm to the consumer

23 is with the services that they are receiving, which, from

24 what we understand, when LPG signs up a consumer for their

25 service, and they start sending out these letters to the --

49

1   either the creditor and the credit reporting company, it's

2   really -- it's not done by lawyers.  There is forms that

3   they have where someone in a back room pushes a button,

4   sends out those letters to the creditors.  And that's pretty

5   much what I think -- when they say the service that the

6   consumer is getting, that's really what -- the service that

7   they're getting.

8          THE COURT:  Let me ask you another question.

9   16-CFR-310, who's the watchdog?  Who should have been

10  watching this company and determining whether or not they

11  were violating any federal rules?  And is it a civil matter

12  or a criminal matter?

13         MR. MISKEN:  I believe it's a civil matter, and

14  it's the CFPB, the Consumer Fraud Protection Bureau.

15         THE COURT:  What is that a sub agency of?  What

16  part of the United States government is the CFPB?

17         MR. MISKEN:  I think it's under -- I'm not sure,

18  your Honor.  I think it's under the Executive Department

19  back in 2008 to 2012 time period.  It was formed --

20         THE COURT:  It was the Senator Elizabeth Warren --

21         MR. MISKEN:  Elizabeth Warren, correct.

22         THE COURT:  -- action or legislation

23         MR. MISKEN:  That is correct.  When the housing

24  market crashed, they formed this -- the CFPB to ensure that

25  consumers weren't harmed by these types of financial

50

1  products.

2      THE COURT:  Well, it's my understanding that under

3  the prior executive administration, that was completely

4  unfunded or mostly unfunded.  You don't know?

5      MR. MISKEN:  I don't know.

6      THE COURT:  All right.  So other than the CFPB,

7  are there any other watchdogs that should have been

8  reviewing the actions of any entity that is subject to the

9  16-CFR-310?

10     MR. MISKEN:  One of the other statutes that we

11 were investigating to determine that there was a violation

12 was the Credit Repair Reorganization Act.  And that's 15-USC

13 Sections 1679 at sec.

14     THE COURT:  Now, I assume that that's civil also

15 and not a sentence under -- not under Title 18, that we're

16 only talking about civil penalties.

17     MR. MISKEN:  Correct.  And I believe that's right.

18 I believe it's the FTC that oversees that statute.  Yes.

19     THE COURT:  The federal -- okay.  The Federal

20 Trade Commission?

21     MR. MISKEN:  Yeah.

22     THE COURT:  Very good.  Please proceed.  Pardon me

23 for amplifying these things.  But I think that we're making

24 a very good record here.

25     Did you want to say something, sir?

51

1     UNIDENTIFIED SPEAKER:  No, your Honor.

2     THE COURT:  You're just exercising?

3     UNIDENTIFIED SPEAKER:  Yes, just readjusting.

4     THE COURT:  Please proceed.

5     MR. MISKEN:  Let's just say it's the United

6   States' position that every time LPG withdrew the customer's

7   funds by ACH or did ACH pulls, it violated the TSR.  The

8   trustee may be implicating himself and violate the TSR to

9   the extent he does any ACH pulls.  And it's even

10  questionable whether any of the ACH pulls that are being

11  held are even property of the estate.

12     THE COURT:  Well, that was my next question.

13  Whose money -- let put it in a more direct way.  The money

14  that comes from the consumer to the processor to the law

15  firm to the final destination, that being a creditor or a

16  claims management company, is any of that property of the

17  bankruptcy estate, in your view?

18     MR. MISKEN:  In my initial view, no, because it

19  was illegally obtained.  I need to do a deeper dive into

20  that --

21     THE COURT:  Well, hold on now.  Hold on now.  I

22  think you've misstated it.  If the Chapter 11 Debtor happens

23  to engage in an illegal act and yet is paid for the money,

24  the money is part of the estate.  And I say that because of

25  the definition of --

**Briggs Reporting Company, Inc.**

52

1        MR. MISKEN:  Yeah.

2        THE COURT:  -- property of the estate, which says,

3   basically, any way it is procured, any way it is obtained,

4   it is property of the estate.  So I think you might be a

5   little overshooting when you say it was obtained illegally.

6   But there's a more nuanced approach, and that is that did it

7   ever actually become funds that were controlled by the

8   bankruptcy estate, which then make it estate property?  By

9   the control alone --

10       MR. MISKEN:  Yeah.

11       THE COURT:  -- that can be estate property.  And

12  then, again, that's a very nuanced analysis, but we should

13  look at that.

14       MR. MISKEN:  That's what I was going to say, your

15  Honor.  That's on our list of one of the issues to look at.

16  We haven't done a deep dive on that because we're at the

17  beginning, and we are getting our hands and head wrapped

18  around the Debtor's business and the regulation of that

19  industry.  But that is something that we are looking closely

20  at.

21       THE COURT:  Very good.

22       MR. MISKEN:  So we had a phone call with the

23  trustee and his counsel last week, informed the trustee that

24  it was the U.S. Trustee's position that the ACHs should

25  stop, that the trustee should not try and sell this company

53

1  because it would involve this Court and the trustee with the

2  law violations.

3          THE COURT:  Well, let me ask you this.  Let's say

4  a nursing home operation was violating all kinds of health

5  codes, and even perhaps exercising criminal acts.  Wouldn't

6  the U.S. Trustee's office be interested in dealing with

7  those nursing home patients and making sure that they

8  weren't harmed any further in the process?  Because using

9  your analysis, you just assume shut down a nursing home.

10  And I don't even know I'm overstating this, so please, don't

11  get too touchy about this.

12          MR. MISKEN:  No, I understand.

13          THE COURT:  But using your analysis, you'd simply

14  shut down a nursing home and say you're on your own.  Asta

15  la vista.  I don't think you're wanting to do that.  I don't

16  think Mr. Anderson wants to do that.  I think he really does

17  want to make sure that we do as little harm when we're

18  sorting out the money issues.  Because a lot of this is all

19  about money, but some of it is about people and their lives.

20  And the money that is being pulled from the bank accounts

21  are generated from, perhaps, Social Security checks,

22  generated from pay checks where people are living pay check

23  to pay check, pulled out from money borrowed from someone

24  else when they don't have any money but they want to make

25  those payments to satisfy the debt relief issue.

Case 8:23-ap-01046-SC   Doc 296-2   Filed 06/27/23   Entered 06/27/23 18:13:21   Desc
Declaration of Kathleen Prendergast March Page 59 of 269   Page 126 of 337

54

1          Plus, I agree with you entirely.  Anybody who is

2   charging $5,000 for an $8,000 debt relief scheme is -- he

3   shouldn't be doing it.  And what's interesting is -- and I

4   don't have an answer for this, but is any of the money

5   that's being pulled from those accounts by the trustee

6   presently used to pay for the services, not going to the

7   ultimate creditor, but the services themselves in -- and

8   that would then fund the Chapter 11 case or Chapter 7 case?

9   Do you understand what I'm saying?

10         MR. MISKEN:  I believe so, your Honor.  The first

11  thing I just wanted to point out is that the contracted

12  proof of claim 14 -- if I could just get there real quick.

13  I have 51.  I'll say proof of claim 51 since I have that one

14  in front of me.  Under debt settlement.  It says, "Any

15  settlement reached with any such creditor shall be your

16  responsibility."

17         So I think any funds that the Debtor is receiving

18  are LPGs funds.  They don't use those funds to then pay

19  whatever was negotiated with the creditor.  It's the

20  consumer's responsibility --

21         THE COURT:  Well, that's contrary to what I've

22  been told by trustee's special counsel.

23         MR. MISKEN:  And I'm just looking at the contract.

24         THE COURT:  I understand.

25         MR. MISKEN:  I don't understand what's going on

55

1  behind the contract, but just looking at the plain language

2  of the contract, your Honor.

3           THE COURT:  Again, this is all exploratory --

4           MR. MISKEN:  Yes.

5           THE COURT:  -- at the time.  One of the things we

6  want to look at is whether or not the customer is thinking

7  that the money that's going to the account from their bank

8  account is being used to satisfy some of their debt, or is

9  it used only to pay the attorneys or so-called attorneys.

10 If that's happening, and that's what the contract reflects,

11 then some consumer organization -- and I don't believe that

12 the United States of America has such a consumer

13 organization that has any funds or ability to do that is

14 doing it, which means that either this Court can do it by

15 order, or we're just going to let it float out in the air

16 and ignore these people.  And I know that the United States

17 Trustee and the United States Department of Justice, of

18 which your organization is a department, doesn't want that

19 either.

20          MR. MISKEN:  That's exactly correct, your Honor.

21 In thinking about this case, it's the consumers who are at

22 the forefront of our thoughts.  And, I think, your Honor

23 said it before, it's what is the least harm to the

24 consumers?  Is there a sale where they're transferred to

25 another entity, continue to pay these high fees and receive

56

1  a little bit of service?  Or is it just cutting it off now

2  to where they don't pay any more of these monthly ACHs and

3  be free from that obligation?

4          THE COURT:  Let me ask you this.  Are these

5  contracts with LPG or affiliates executory contracts?

6          MR. MISKEN:  I believe they could be.

7          THE COURT:  Well, then they are subject to being

8  assumed or rejected, or, dare I say -- don't tell the

9  Supreme Court this -- ride through.  These are just

10  questions --

11          MR. MISKEN:  These are questions --

12          THE COURT:  -- that we need to analyse.

13          MR. MISKEN:  -- that we're looking at ourselves,

14  your Honor.

15          THE COURT:  Very good.

16          MR. MISKEN:  And I think that's one thing that the

17  trustee in his status report suggests a two to three-week

18  management order so that they could operate this Debtor so

19  that they could eventually have a sale to a reputable law

20  firm.  The concern that we have is -- we have all the same

21  questions that your Honor has.  I think for us to do our

22  diligence and to find the answers to those questions, we're

23  going to have to do a lot of discovery.  It's not going to

24  be a two-week process.

25          THE COURT:  Well, I don't think you're going to

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 13:13:21 Desc
Declaration of Kathleen P. March Page 62 of 269   Page 129 of 337

57

1 have to do a lot of discovery, you're going to have to do a

2 lot of cooperation.  And I'm not speaking to you.  I'm

3 speaking to the Chapter 11 Trustee.  And with my experience

4 with all of the counsels and the trustee, I know you're

5 going to get that experience -- the cooperation.  You'll

6 have full cooperation.  I know you'll have that.

7         MR. MISKEN:  I agree, your Honor.  We've had

8 fruitful conversations over the last two weeks, talking

9 about these issues.  I have an open door for them.  They

10 have an open door for me.  They have committed to adequately

11 respond to our informal discovery requests.  And when I

12 said, "discovery," I meant not with the information that the

13 trustee has, but looking at these marketers that -- the

14 individuals that went out and got these consumers, you know,

15 was there any fraud there?  What were they telling the

16 consumers to get them to sign up?

17         THE COURT:  Let me explain a little bit of my view

18 on the natural tension in a Chapter 11 case.  And this goes

19 to the issue that I raised before, that most Chapter 11

20 cases are about the money.  And then you have nursing home

21 cases, you have other cases such as this where there is a

22 combined interest in other matters besides the money.  The

23 natural tension is that the Chapter 11 Trustee is doing

24 their -- his primary job, and that is to figure out what he

25 has been -- what has fallen into the lap and to try to untie

58

1  the gordian knot of the various entities that he is now

2  seeing with money transfers over the last, perhaps, years.

3  The various agreements that have been made with previous

4  employees or previous directors or previous affiliates, and

5  now their own entities, and the other side of the fence, and

6  that is what you're raising.  And that is should any further

7  harm come to the consumer?

8          Now, there are two types of harm that could come

9  from the consumer.  The first is that money is being taken

10 out of their account.  If it is being taken out because of

11 an unconscionable contract that could never in this Court's

12 mind be assumed because of the -- either illegality of the

13 contract or the voidness because of the situation that that

14 it is unconscionable or other various reasons, if those are

15 wiped out and the payments are being made, I don't want -- I

16 don't want that to be on this Court's watch.  I don't want

17 that to happen.

18          On the other hand, by not doing the work that the

19 consumer contracted, they may actually be put into a worse

20 position.  I don't know if that exists, that worse position.

21 I don't know that at all.  I don't know if more people are

22 going to sue these consumers.  But I have been told by

23 special counsel for the trustee that most of these creditors

24 are those who are collection agencies.  And I know through

25 experience that they don't sue.  They try to actually pass

59

 1 them off to another collection agency for a heavier

 2 discount.  And sooner or later, it gets down to zero or so

 3 little amount that the law -- the filing fee for a state

 4 action is not worth it because of collectability.  That kind

 5 of analysis hasn't been made.  It's going to take some time.

 6 And somebody's got to make that analysis.

 7         Somebody has got to provide a service like a

 8 special examiner or a special master or someone who's

 9 actually looking out for those questions.  And I would like

10 the U.S. Trustee to think about what we can do to facilitate

11 in a Chapter 11 setting to make sure that that process

12 occurs.

13         MR. MISKEN:  Your Honor, I think that's exactly

14 right.  And in our informal discovery request to the Chapter

15 11 Trustee, those were the types of information that we were

16 requesting.  So I don't know if we would be able to analyse

17 40,000 clients, but we could do a sample, and that's what we

18 were planning on doing.  But I will go back and talk to the

19 U.S. Trustee and see if we could brainstorm if there is an

20 examiner or some other type of professional that could come

21 in and do that.

22         THE COURT:  Or an ad hoc committee.

23         MR. MISKEN:  That takes us to the ad hoc

24 committee, your Honor.

25         THE COURT:  I mean, there is options.

60

1          MR. MISKEN:  Yes.

2          THE COURT:  That's all I'm saying.

3          MR. MISKEN:  They are.

4          THE COURT:  All right.

5          MR. MISKEN:  Yes.

6          THE COURT:  Thank you very much.  If there is

7  anything else you'd like to add as a general note, then I'm

8  going to have to allow some other folks to talk.

9          MR. MISKEN:  Yesh.

10          THE COURT:  Because there's been a lot of

11  allegations and insinuations, and I'm sure they would want

12  to say something.

13          MR. MISKEN:  Yeah.  And the only thing I would add

14  to that, your Honor, is that we are doing our diligence to

15  find the answers to those questions.

16          THE COURT:  Well, the Court has always appreciated

17  the United States Trustee, and this is one of the most

18  important cases that I've had where the U.S. Trustee's

19  involvement is so significant and necessary.

20          MR. MISKEN:  Thank you, your Honor.

21          THE COURT:  Thank you.  Who else would like to

22  speak to the Court on the general propositions of what we've

23  been discussing so far?  Please come forward.  A man who

24  knows how to raise his hand.

25          MR. PLAZAK:  Thank you, your Honor.  Doug Plazak,

**Briggs Reporting Company, Inc.**

61

1  again, Reid and Hellyer for Greyson.  And as your Honor, I

2  think, is aware, we did file an opposition to the --

3          THE COURT:  I've read everything --

4          MR. PLAZAK:  Perfect.

5          THE COURT:  -- including the declarations and

6  understanding that those declarations are sworn.  And the

7  Court has lots of questions about the statements made in

8  these declarations.  So because the Court understands that

9  not only affirmative statements are important, but the lack

10 of clarity and the lack of transparency can be as

11 interesting to the Court as what you have said.  So you put

12 it into a Sherlock Holmes voice, it may be the dog that

13 didn't bark.  So please feel free.

14          MR. PLAZAK:  Understood, your Honor.  And I'm

15 happy to answer any questions you have to the best of my

16 ability.  In reviewing the trustee status conference report,

17 the first that lept out to me is what Mr. Celentino

18 articulated is the fact that Greyson is now essentially

19 unlike the other entities that are at issue here, that are

20 still, I believe, being treated and characterized as alter

21 egos.

22          THE COURT:  Excuse me.  Let me request that anyone

23 on Zoom please mute their microphones.  Thank you.  I

24 apologize.

25          MR. PLAZAK:  Thank you. Again, that they're being

**Briggs Reporting Company, Inc.**

62

1  -- still being thought of and considered as alter egos of

2  the Debtor.  The trustee has conceded that Greyson is not an

3  alter ego of the Debtor and therefore is -- should be carved

4  out of whatever preliminary injunction this Court might be

5  entertaining --

6          THE COURT:  Well, let's see what you conceived.

7  I've been told that you have about 48 clients.

8          MR. PLAZAK:  No, I don't -- well, what I

9  understand and what I believe that the declaration sets

10 forth is that presently, there's roughly 60 clients that

11 have client files.  However, a substantial part is that --

12 this isn't the opposition, your Honor.  A substantial part

13 of the revenue of Greyson right now is actually providing

14 legal assistance to the clients who have actually been sued.

15         THE COURT:  Stop there, right there.  Let me ask

16 you a question.

17         MR. PLAZAK:  Sure.

18         THE COURT:  Do you have engagement letters with

19 all these clients?  And would you produce them to the

20 Chapter 11 Trustee tomorrow?

21         MR. PLAZAK:  We have produced -- when you say

22 "engagement letters" --

23         THE COURT:  Well, my question is very simple.  Do

24 you have any retained -- retention letters from the 60

25 clients?

63

1          MR. PLAZAK:  Yes.  Well, we produced -- that's

2   part of the opposition.

3          THE COURT:  Okay, that's great.  Would you convey

4   them -- would you transfer copies of those?  And if you want

5   to allege an attorney-client privilege on a -- then you can

6   file them under seal at this point, and I'll look at them on

7   camera.

8          MR. PLAZAK:  Just so that I'm clear, just so we're

9   talking about a same thing.  When you say -- are you talking

10  about retainer agreements with a particular law firm?

11         THE COURT:  Let me just repeat what you're -- you

12  said.  I have about 60 client files.  Okay.  Well, I don't

13  know how many clients you have with those files.  It may

14  have a client with three or four different actions.  I don't

15  know.  So let's start at the beginning.  How many clients do

16  you have affiliated with this -- with LPG?

17         MR. PLAZAK:  Right.  And let's -- this is where I

18  think we have to clarify and qualify terms.  As I would

19  understand, you have an initial client who has debt relief

20  issues, okay?  That client may also turn into a litigation

21  client, but not necessarily, right?

22         THE COURT:  Right.

23         MR. PLAZAK:  So of the of the roughly 60 or so

24  clients that I'm speaking of, I don't believe any of them at

25  this moment --

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 18:13:21 Desc
Declaration of Kathleen March Page 69 of 269    Page 136 of 337

64

1    THE COURT:  You didn't speak of clients.  You said

2 client files.

3    MR. PLAZAK:  Well, there are clients --

4    THE COURT:  Excuse me one second.  Excuse me for

5 one second.  I'm about to throw off people from Zoom if they

6 don't -- if they don't mute their microphone.  So I'll give

7 you one fair warning.  I can tell by the system who's

8 speaking and who hasn't muted.  In about 10 -- in about 30

9 seconds, I will start eliminating people from the Zoom call.

10 They will not be able to get back in if they don't mute

11 their microphone.

12    Who is Darius Newbold (phonetic)?

13    Who is Dave Evans?  I'm telling you right now, if

14 you don't mute your microphone, you're going to be taken off

15 the call because you're interrupting the colloquy that we're

16 having today, and it's a very important colloquy.

17    Please proceed.

18    MR. PLAZAK:  Thank you.  So when I'm trying to

19 distinguish between clients and client files might -- and by

20 a "client file," all I'm referring to is a client who

21 initially has a contract with Greyson to perform debt relief

22 services.

23    THE COURT:  Stop right there.

24    MR. PLAZAK:  Sure.

25    THE COURT:  So you have a client, and you have how

65

 1  many clients that do debt relief services?

 2          MR. PLAZAK:  I believe right now, there -- and

 3  this is in the opposition, there are roughly 60 clients.

 4          THE COURT:  Fine.  How many of those clients do

 5  you have engagement letters with?

 6          MR. PLAZAK:  All of them I believe.

 7          THE COURT:  All of them?

 8          MR. PLAZAK:  And some of them -- some of which we

 9  filed as exhibits?

10          THE COURT:  Were these clients clients of LPG

11  prior?

12          MR. PLAZAK:  Some.

13          THE COURT:  Which ones?

14          MR. PLAZAK:  They're approximately -- I'm going

15  off of memory.  There were about 25, I believe, that were

16  former LPG clients.

17          THE COURT:  Fine.  And now you re-signed them and

18  you have engagement letters with them.  Is that correct?

19          MR. PLAZAK:  I don't -- here's what I don't know,

20  your Honor.  I do not -- the processes as I understood it

21  was this.  With respect to some of those clients, they were

22  in litigation, all right?

23          THE COURT:  Well, what do you mean, "in

24  litigation?"

25          MR. PLAZAK:  They were sued.

66

1          THE COURT:  Was your firm in litigation with

2  someone representing these people?

3          MR. PLAZAK:  Yes.  The way it works -- the way

4  that the model works is that they would be -- they would get

5  sued.  These people who had signed contracts would get sued

6  by a creditor which happens all the time.

7          THE COURT:  And then as an example, in what state?

8          MR. PLAZAK:  In multiple states, that's the --

9          THE COURT:  Well, what state?  Give me an example.

10          MR. PLAZAK:  I believe one of the states is

11  Indiana.

12          THE COURT:  So is your firm admitted to Indiana?

13          MR. PLAZAK:  No.  What would happen is this -- the

14  way I understand it would work is this, is that they would

15  be assigned counsel in Indiana who has a -- where there is

16  already a pre-existing relationship --

17          THE COURT:  Who would assign them counsel?

18          MR. PLAZAK:  The way it would work would be --

19          THE COURT:  Greyson?  Would Greyson assign them

20  counsel?

21          MR. PLAZAK:  Greyson would be a facilitator of

22  getting -- they have a contact --

23          THE COURT:  I don't know what that means,

24  "facilitator."  You call up some guy in Indiana, in

25  Indianapolis and say hey, Tommy, I have a new client for

Case 8:23-ap-01046-SC   Doc 296-2   Filed 06/26/23   Entered 06/26/23 13:13:21   Desc
Declaration of Kathleen March   Page 72 of 269   Page 139 of 337

67

1  you.  You do the work.  We'll give you 50 cents of whatever.

2          MR. PLAZAK:  It was actually simpler than that,

3  but my understanding is a flat fee.

4          THE COURT:  Okay.  We want you to defend the

5  collection action at the -- in the Indiana Superior Court

6  for Mr. Doe, and we'll pay you $2,500 to do it.

7          MR. PLAZAK:  Okay.

8          THE COURT:  Okay.  Do you have an agreement with

9  the debtor or with the creditor -- I should -- not the

10  creditor, the customer to do that.

11          MR. PLAZAK:  I'm not sure.  I'm not -- here's what

12  I don't know.  I don't know how the Indiana counsel, once

13  they are assigned that particular piece of litigation, goes

14  forward.  I do not know, for example, if the Indiana counsel

15  has a separate retainer letter.

16          THE COURT:  Right.  Who is the counterparty to

17  that Indiana attorney?

18          MR. PLAZAK:  When you say "counterparty," I don't

19  understand.

20          THE COURT:  Well, you have a contract.

21          MR. PLAZAK:  Yes.

22          THE COURT:  And you have two parties, okay?  And

23  the Indiana attorney is a party to the contract.  Who is the

24  other party?

25          MR. PLAZAK:  If there is -- I don't know that

68

1  there is a retainer agreement.

2          THE COURT:  Well, somebody hired that attorney.  I

3  want to know who hired that attorney?  Did Greyson do it, or

4  did the client do it?

5          MR. PLAZAK:  I don't know the answer to that

6  question.

7          THE COURT:  Well, you're going to find out and

8  tell the Chapter 11 Trustee's counsel.

9          MR. PLAZAK:  What I can tell you, though, is that

10  there are clients who are being represented in multiple

11  states, more than 30 states.

12          THE COURT:  Whose clients?

13          MR. PLAZAK:  Well, the ones that -- there are a

14  certain number of clients that were obtained through --

15          THE COURT:  Let's try it again.  Whose clients?

16          MR. PLAZAK:  Greyson's clients.

17          THE COURT:  Okay.  So you have --

18          MR. PLAZAK:  When I say, "Greyson's clients,"

19  these are clients that are provided through marketing --

20  what they call marketing affiliates.

21          THE COURT:  Well, then I have a more basic

22  question for you.

23          MR. PLAZAK:  Sure.

24          THE COURT:  Is Greyson a law firm?

25          MR. PLAZAK:  I don't know the answer to that

69

1  question.

2           THE COURT:  Excuse me?  You don't know the answer

3  to whether Greyson is a law firm?  What's the official name

4  of the Greyson -- I'm sorry, Greyson Law Center PC.  That's

5  the name of your client.

6           MR. PLAZAK:  I understand that.

7           THE COURT:  So you're telling me they're not a law

8  firm?

9           MR. PLAZAK:  I don't know.  I don't know.  As a

10 legal matter, I do not know whether or not they are

11 officially a law firm or not.

12          THE COURT:  Do you think they're holding

13 themselves out as a law firm?

14          MR. PLAZAK:  I don't know.

15          THE COURT:  Excuse me.  Who is speaking?  Let's

16 try it again.  Let's just summarize here.  Take a deep

17 breath, Scott.  You don't know if your client is a law firm

18 or not.  Is that a correct statement?

19          MR. PLAZAK:  I don't -- I do not know if they are

20 -- what the State of California would constitute a law firm.

21          THE COURT:  No, no.  I'm not asking you what the

22 State of  California said.  I want to know what you think.

23 You're the officer of the court here.

24          MR. PLAZAK:  I don't know.

25          THE COURT:  You have signed on as attorneys for

70

1  Greyson Law Center PC.  So you don't know if they are a law

2  firm or not?

3          MR. PLAZAK:  I do not.

4          THE COURT:  Okay.  Are there any lawyers involved

5  in Greyson Law Center PC?

6          MR. PLAZAK:  There are.

7          THE COURT:  Who is the primary lawyer?

8          MR. PLAZAK:  Scott Eadie.

9          THE COURT:  Spell that.

10          MR. PLAZAK:  E-A-D-I-E.

11          THE COURT:  And a member of the California Bar?

12          MR. PLAZAK:  He is.

13          THE COURT:  A member of the Indiana Bar?  Don't

14  know?

15          MR. PLAZAK:  I don't believe so.

16          THE COURT:  Okay.  So you have -- I just want to

17  summarize this.  If Greyson Law Center is not a law firm, it

18  doesn't need an attorney engagement letter.  Is that what

19  your position is?

20          MR. PLAZAK:  If it was -- say it again.  If

21  Greyson is not a law firm, it doesn't need --

22          THE COURT:  Right.  Law firms need an engagement

23  letter under California law.

24          MR. PLAZAK:  I don't know with specificity what --

25  and the reason I'm hesitant to answer is that U.S. Trustee

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 08:13:21 Desc
Declaration of Kathleen March Page 76 of 269 Page 143 of 337

71

1  has raised several issues with respect to debt collection

2  practices or debt relief practices.  And I don't know what

3  the specific requirements are as it relates to those.

4  You know, candidly, your Honor, I've been involved

5  in this case for a little more than 72 hours, and I have not

6  had an opportunity to investigate any of the issues as it

7  relates to whether or not these are legal business models.

8  The Chapter 11 Trustee believes that the business can be run

9  legally and there are legal business models.  I haven't had

10  an opportunity to do so.  I was I was retained, and I

11  focused primarily on the alter ego issues, which were the

12  issues that were raised by the motion and by the complaint,

13  which I was more prepared to address today.  But since those

14  issues were somewhat conceded by the Chapter 11 Trustee, I

15  have less to offer to you as it relates to the legality of

16  the business or whether or not these businesses can be run

17  legally, which the U.S. Trustee seems to think is not the

18  case.  But that will be something that I can I can look

19  into.

20  THE COURT:  Only if you wish to.  Anything else?

21  MR. PLAZAK:  Well, again, I think the issue again

22  with Greyson and what -- the motion that brings us here

23  today is as it relates to the preliminary injunction as it

24  relates to how things are going to proceed on a going

25  forward basis.  And as I say, Greyson is not -- is quite

72

1  different than the alter -- than the other entities who are

2  still being alleged to be alter egos.  And therefore, the

3  preliminary injunction should not relate to Greyson in the

4  same way that it would -- if at all, and it shouldn't relate

5  at all because they are not similarly situated as the other

6  entities.

7          THE COURT:  Greyson has employed roughly 140

8  people at the Suite 400 B location.  What do these 140

9  people do?

10         MR. PLAZAK:  I know that some of them are involved

11 in trying to process the various files that come in and also

12 -- again --

13         THE COURT:  Well, how does one process a file?

14         MR. PLAZAK:  Well, let me put it this way.  What I

15 do know is that, again, they are -- what Greyson is doing, I

16 believe, right now, primarily, is getting attorneys for

17 clients who are facing litigation in other states.  I

18 believe that's what their primary involvement.

19         THE COURT:  Let's stop for a second.  There are 60

20 client files.

21         MR. PLAZAK:  Yes.

22         THE COURT:  And you have 140 employees who are

23 processing 60 files.  Am I right?

24         MR. PLAZAK:  I don't -- well, I think it -- I

25 think it goes beyond that.

73

          THE COURT:  I mean, I'm reading it from your own

 2   papers.

 3          MR. PLAZAK:  I understand.

 4          THE COURT:  It's not -- you know, I'm not making

 5   these stuff up.  I'm reading our own papers.

 6          MR. PLAZAK:  I understand.

 7          THE COURT:  And I imagine that you only did have

 8   72 hours to jump into this.  I appreciate that, but I have

 9   read your papers.  So you don't have an answer for what

10   these 140 employees are doing, but we know -- except

11   processing clients files, and I've asked you what is the

12   process for processing -- pardon the iteration -- those

13   files, and you're now saying, they go out and hire attorneys

14   in Indiana and Michigan and Missouri and Iowa.  Is that what

15   they're doing?

16          MR. PLAZAK:  I believe that they're -- they help

17   facilitate getting counsel for those people, and to get --

18          THE COURT:  And how do they get -- how does

19   Greyson get money to pay these 140 people?

20          MR. PLAZAK:  Well, I believe that was the --

21   that's the issue that -- when counsel, Mr. Celentino, was

22   discussing the inability to make payroll, I believed, at

23   least in part, the way they were doing it was to access the

24   ACH mechanism to draw funds to pay, which were used to pay

25   predominantly, I believe, the attorneys and their staff who

74

1  were doing the litigation in other states.

2          THE COURT:  And who makes the processor deliver

3  that money to your accounts?

4          MR. PLAZAK:  I -- who --

5          THE COURT:  The processor --

6          MR. PLAZAK:  Yeah.

7          THE COURT:  -- takes the money from your bank

8  account, processor holds the money, make sure that the money

9  is good and then sends it to your bank account -- your

10  client's bank account to pay its -- to pay your 140 people.

11          MR. PLAZAK:  Sends it to -- I think it would be --

12  he would actually be send to the -- well, I'm not sure.

13  Here's what I don't know.  I don't know if it would go

14  directly to Greyson as opposed to go from the -- from ACH to

15  the attorneys in the other states.  I don't know the answer

16  to that.

17          THE COURT:  But who would direct the processor to

18  -- we know now that Greyson finds the lawyer in Indiana, and

19  then we know that Greyson makes a deal with that attorney in

20  Indiana because your own words, "It's a simple thing."  So

21  now, where do you get the money to pay the attorneys in

22  Indiana?

23          MR. PLAZAK:  I believe that at least previously,

24  it did come through that portal that we were talking about.

25          THE COURT:  Good.  Who tells the portal the name

75

1 of the attorney in Indiana?

2          MR. PLAZAK: I don't know the answer to that

3 question.

4          THE COURT: Well, wouldn't it be important to know

5 that whether Greyson's people -- who controls Greyson, by

6 the way?

7          MR. PLAZAK: Well, Scott Eadie is the owner and

8 principal.

9          THE COURT: Is there anyone else that controls the

10 bank accounts and the flow of money going in and out of

11 Greyson?

12          MR. PLAZAK: I don't know the answer to that.

13          THE COURT: Would you think that this gentleman

14 does have that authority?

15          MR. PLAZAK: He would have -- well, I don't know.

16 I don't know.

17          THE COURT: You don't know?

18          MR. PLAZAK: And for the purpose of today, I don't

19 know that it -- it's -- for the purpose of whether or not

20 there should be a further injunction on --

21          THE COURT: Well, let me explain to you that if

22 you don't know anything about it, then your papers are

23 fairly worthless, because they have made a strong case that

24 the preliminary injunction should go with respect to the

25 Greyson Law Center. And so, now, you're trying to rebut

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 18:13:21 Desc
Declaration of Kathleen Borror March Page 84 of 269 Page 148 of 337

76

1 that, and you're telling me you don't know, and I want --

2 I'm actually looking for an answer so I can see if they have

3 anything that they are not telling me or they're not telling

4 you the truth.  You're not telling me anything.  You don't

5 know anything, and I'm not complaining that you don't know

6 anything.  I'm just saying how can I, in fact, rule in your

7 favor if you don't have the information?

8          MR. PLAZAK:  Well, what is being sought is -- as

9 it relates to the other entities, is to continue the

10 preliminary injunction on the basis that these are alter

11 egos of the Debtor and therefore --

12          THE COURT:  I disagree.  It's not only that.

13 We'll get back to this.  But I hear your point.  Your point

14 is that none of the money coming into you -- your client,

15 has anything to do with the Litigation Practice Group.  Is

16 that your point?

17          MR. PLAZAK:  Generally speaking, yes.

18          THE COURT:  "Generally speaking" is not helpful.

19          THE COURT:  What I want to know --

20          MR. PLAZAK:  Well, you say nothing --

21          THE COURT:  -- are you telling me that no money

22 from clients of the Litigation Practice Group are going into

23 Greyson Law Center accounts?  It's a yes or no.

24          MR. PLAZAK:  I don't know that it's that easy, and

25 I'll -- let me see if I can explain why.  There -- because

77

1  we talked about the idea that there were former clients that

2  related to LPG, so I don't know if under your question if

3  that qualifies.

4          THE COURT:  Well, how do you get those clients

5  from LPG?

6          MR. PLAZAK:  As I mentioned before, the -- there

7  were clients who were pre-existing with LPG.  They had

8  pending litigation --

9          THE COURT:  About 25 clients.

10          MR. PLAZAK:  Something like that.

11          THE COURT:  Okay.

12          MR. PLAZAK:  They had pending litigation.  They

13  were advised that the attorney who was representing then was

14  no longer going to be representing them on behalf of LPG.

15          THE COURT:  And that's because the Greyson people

16  called them and told them that?

17          MR. PLAZAK:  No.

18          THE COURT:  And who told them that?

19          MR. PLAZAK:  Who told them that they were no

20  longer -- I don't know who specifically said it.  I don't

21  know.

22          THE COURT:  Well, I'm just asking you to -- I'm

23  asking you for a proffer of evidence of what you're saying.

24          MR. PLAZAK:  I don't know who told the client.  I

25  presume Kindelay (phonetic) was the attorney that told the

78

1  client that.

2          THE COURT:  The client -- the attorney --

3          MR. PLAZAK:  Would have said that --

4          THE COURT:  Said what?

5          MR. PLAZAK:  -- would have communicated that to

6  some degree -- something to the effect that I am no longer

7  going to be affiliated with LPG.  Something to that effect.

8          THE COURT:  And you must then sign a new contract

9  with Greyson Law Center?

10         MR. PLAZAK:  I don't know that they signed --

11 those ones, I don't know it signed new contracts.

12         THE COURT:  Well, wait a minute.  How did you get

13 those contracts if there is no contract?  How are you

14 processing these accounts?  I'm not even going to call the

15 clients because I'm not sure you are practicing law?

16         MR. PLAZAK:  I don't know that there was a new

17 client, but -- well, also what I would say is that these are

18 -- this is a de minimis part, and we're talking perhaps 25.

19 We're talking about an extremely de minimis part.

20         THE COURT:  Twenty-five of 60?

21         MR. PLAZAK:  Which is a extremely de minimis

22 number as relates to all of the clients of LPG.

23         THE COURT:  Well, one client -- one consumer fraud

24 is enough for me.  There's nothing de minimis about an

25 individual who is having their paycheck taken out of an

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 18:13:21 Desc
Declaration of Kathleen Court March Page 84 of 269 Page 151 of 337

79

1  account to pay the fees of Greyson and not having it go to

2  attorneys, or more importantly, to settlement.  Because

3  remember this, you've arranged for a flat fee.  You know

4  exactly what you're paying that local attorney in Indiana.

5  You know exactly.  I don't know how much it is.  Do you

6  happen to know what the average flat fee payment is?

7        MR. PLAZAK:  It's not a flat fee per case.  It's

8  essentially a monthly rate, I believe.

9        THE COURT:  A monthly rate?

10        MR. PLAZAK:  Correct.

11        THE COURT:  There is somebody behind you that

12  really wants to talk to you.

13        MR. TRINH:  May I be heard, your Honor?

14        THE COURT:  No.

15        MR. TRINH:  I can answer.

16        THE COURT:  Are you an attorney?

17        MR. TRINH:  No, sir.

18        THE COURT:  Have a seat, please.

19        You're not getting my point, are you?  But anyway.

20  All right.  Anything else?

21        MR. PLAZAK:  Well, again, as I say, it's -- I

22  believe that Greyson should be treated differently than the

23  other alter egos.  And again -- or the other affiliates,

24  rather, who are deemed to be alter egos.  And therefore --

25  and again, what's before the Court is again the concept of

80

1  whether or not the preliminary injunction should be

2  maintained as to the alter egos and as the trustee would --

3          THE COURT:  Well, I think your judicial admissions

4  made today pretty well give a good basis to continue the

5  injunction against Greyson.

6          MR. PLAZAK:  Well, I disagree, but I will leave it

7  at that.

8          THE COURT:  Thank you.

9          Would anyone else like to address the Court

10 briefly?

11         MR. BAUM:  Your Honor, I'd like to request just a

12 couple of minutes recess --

13         THE COURT:  I'll take five minutes.  Let's go with

14 five minutes.

15         MR. BAUM:  Thank you.

16         THE COURT:  Thank you.

17     (Proceedings recessed briefly.)

18         THE COURT:  We are back on the record now.  Thank

19 you.

20         I want to thank you for the break.

21         MR. BAUM:  It's my -- our pleasure, your Honor.

22         THE COURT:  Would anyone else like to discuss the

23 general matters we've already been engaged in?

24         MS. PHAM:  I would, your Honor.

25         THE COURT:  Would you like to come forward and

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 18:31:21 Desc
Declaration of Kathleen March Page 86 of 269   Page 153 of 337

81

1 state your appearance again.

2          MS. PHAM:  Thank you, Your Honor.  Good afternoon

3 again.  My name is Teri Pham, and my colleague, Jessie

4 Bolling, is also here.  I also wanted to point out I

5 neglected to mention earlier that my clients, Tony Diab and

6 Daniel March are also in the courtroom.

7          THE COURT:  Thank you.

8          MS. PHAM:  A couple of different things, your

9 Honor.  I'll try to go quickly.  I know it's late at this

10 point.

11          THE COURT:  First of all, did you file an

12 opposition to the request for a preliminary injunction?

13          MS. PHAM:  We did not, your Honor.

14          THE COURT:  Thank you.

15          MS. PHAM:  And I'll tell you we are at -- I am, at

16 least, at a bit of a disadvantage of as we were only

17 formerly retained just this morning.  My clients didn't

18 actually receive the order, and I didn't receive the papers.

19 They never received the papers until about an hour before

20 this hearing, your Honor.  So we had, while we're sitting

21 here, an opportunity to look at the documents very briefly

22 and listening to the statements being made in the courtroom

23 today, and --

24          THE COURT:  Would you like an opportunity to do

25 this in paper?

82

 1          MS. PHAM:  We had --

 2          THE COURT:  -- on paper, in pleadings?

 3          MS. PHAM:  We have not had an opportunity, your

 4   Honor.

 5          THE COURT:  No, no.  Would you like an opportunity

 6   to do it?

 7          MS. PHAM:  Absolutely.

 8          THE COURT:  Would you agree to a continuance of

 9   the temporary restraining order and other orders of this

10   Court until you have a chance to brief?

11          MS. PHAM:  We would, your Honor, but with some --

12   a few caveats because of --

13          THE COURT:  Well, I don't negotiate.  I'm just

14   telling you.  If you will or won't, it's up to you.  But I'm

15   just telling you that if I was to give you any further time,

16   it would be with the consideration that we would keep the

17   TRO in place.  So that's -- I'm not negotiating with you.

18   I'm simply telling you --

19          MS. PHAM:  I understand that, your Honor.  But if

20   I may ask, and this is not a negotiation, it's really more

21   of a clarification.  Because Mr. March is for all intents

22   and purposes at this point the only attorney with LPG.  As

23   you heard earlier today, there are still approximately 200

24   clients' cases, matters that LPG still has.  Someone needs

25   to service those clients.  They have --

Case 8:23-ap-01046-SC  Doc 296-2  Filed 06/27/23  Entered 06/27/23 13:13:21  Desc
Declaration of Kathleen P. March  Page 88 of 269  Page 155 of 337

83

1          THE COURT:  Well, those are the responsibility of

2  the Chapter 11 Trustee.

3          MS. PHAM:  Well, that is part of the issue, your

4  Honor.  I did attempt to reach out to the Chapter 11

5  Trustee's counsel earlier, and I assume they were preparing

6  for this hearing, so I didn't get a response as to who is

7  handling all of that at this point.  From what I'd heard

8  today, there are these --

9          THE COURT:  Well, you know, when you say

10  "processing," do you mean taking their money and paying

11  themselves?

12          MS. PHAM:  No, when I --

13          THE COURT:  Is that what you're talking about?

14          MS. PHAM:  No, your Honor.  I'd like to correct

15  and address some of those statements, and that's part of the

16  problem, your Honor.  I think there's a fundamental

17  misapprehension, misunderstanding as exactly how this all

18  worked.  And all due respect --

19          THE COURT:  And you're the perfect person to

20  explain it?

21          MS. PHAM:  Well, and my clients are here, as I

22  said, and they can explain.

23          THE COURT:  No, they're different.  Did your

24  clients -- Mr. Diab isn't a member of the California State

25  Bar.

84

1          MS. PHAM:  Correct.  Mr. March is.

2          THE COURT:  So you are, correct?

3          MS. PHAM:  I am.

4          THE COURT:  So you are the perfect person

5  representing him to explain how it works.

6          MS. PHAM:  Well, it's not Mr. Diab who was the

7  principal of the LPG Group.  It was Mr. March, who is the

8  counsel.

9          THE COURT:  Yes, but you represent Mr. Diab.

10          MS. PHAM:  I do.

11          THE COURT:  And Mr. Diab founded this

12  organization.

13          MS. PHAM:  No, that's not correct.

14          THE COURT:  Who did?

15          MS. PHAM:  So the original group -- law firm was

16  Mr. Diab.

17          THE COURT:  There.  I'd rest my case.

18          MS. PHAM:  Well, but that's not Litigation

19  Practice Group, your Honor.

20          THE COURT:  Okay.

21          MS. PHAM:  Litigation Practice Group is operated

22  as of -- I believe as of 2019 -- I may have my date wrong,

23  2019, 2020 -- by Mr. March.

24          THE COURT:  Well, let me ask you this.  Who filed

25  the bankruptcy case of LPG?

Case 8:23-ap-01046-SC Doc 270-2 Filed 06/27/23 Entered 06/27/23 18:13:21 Desc
Declaration of Kathleen March Page 90 of 269 Page 157 of 337

85

 1          MS. PHAM:  Mr. March as a sole principal on behalf

 2   of Litigation Practice Group.

 3          THE COURT:  Okay.  So he knows what's going on?

 4          MS. PHAM:  He does know what's going on.

 5          THE COURT:  Good.  And now, you know -- you're

 6   representing him.  So you know what's going on?

 7          MS. PHAM:  As of this morning, I can tell you how

 8   much I do know, your Honor.  I'm more than happy to explain

 9   all of it.

10          THE COURT:  Okay.  But now, let me ask you this.

11   Did you -- let me say it again.  Did you want to file any

12   papers in response to the preliminary injunction that we're

13   having a hearing on today?

14          MS. PHAM:  Yes, to address the issues, your Honor.

15   Again, we're not necessary opposing -- and that's part of

16   what I wanted to explain to your Honor.  There is a

17   fundamental misunderstanding as to how the process worked

18   and what the representation entails.  Now, the first issue

19   I'd like to address for your Honor is the monies coming in

20   are not to service the debt.

21          THE COURT:  Well, let's start this -- let's start

22   from the beginning.

23          MS. PHAM:  Sure.

24          THE COURT:  Okay.  Does LPG have any clients?

25          MS. PHAM:  As of this moment, virtually all

Case 8:23-ap-01046-SC Doc 276-2 Filed 06/27/23 Entered 06/27/23 18:13:21 Desc
Declaration of Kathleen March Page 94 of 269 Page 158 of 337

86

1  49,000, other than clients that may have now retained new

2  counsel, which we don't know since the transfer --

3          THE COURT:  Do you realize that you have not said

4  yes or no?

5          MS. PHAM:  Yes.

6          THE COURT:  And I'm asking you for a yes-or-no

7  answer.  Does LPG have any clients today?

8          MS. PHAM:  Absolutely.

9          THE COURT:  How many clients do they have?  And

10  you may estimate.

11          MS. PHAM:  As of today, I do not know the exact

12  number, your Honor.  I do know that Mr. March, on behalf of

13  LPG, is servicing roughly 200 active matters.

14          THE COURT:  And is that because he is a one-man

15  shop now, or is it because he only has 200 clients?

16          MS. PHAM:  Because he only has 200 clients,

17  because all other clients had been transitioned out, pre-

18  petition.  Not post-petition, pre-petition.

19          THE COURT:  I see.  Transition that to groups like

20  Phoenix --

21          MS. PHAM:  To Greyson when they left.  Again, when

22  Greyson's attorneys -- what -- this law firm at its height,

23  your Honor, had over 60 attorneys.

24          THE COURT:  So it is a law firm?

25          MS. PHAM:  It is a law firm.  100-percent it's a

87

1  law firm.

2     THE COURT:  Okay.  So Litigation Practice is a law

3  firm?

4     MS. PHAM:  Yes.

5     THE COURT:  Thank you.  See we're getting --

6  that's good.  Well done.

7     MS. PHAM:  And at its height, your Honor, it had

8  over 60 attorneys.  It had over 60,000 clients at one point

9  in time.

10     THE COURT:  And when did it last have 60

11  attorneys?

12     MS. PHAM:  I'm sorry.

13     THE COURT:  When did it last have 60 attorneys?

14     MS. PHAM:  My understanding is that it may be in

15  formation probably in 2019, 2020.

16     THE COURT:  And what about before it filed Chapter

17  11, a week before it filed Chapter 11?

18     MS. PHAM:  200 active matters.  The question is --

19     THE COURT:  No, no, no.  Attorneys.

20     MS. PHAM:  I'm sorry.  Attorneys?  Mr. March as

21  the only actual, I guess, employed attorney.  There are

22  contract attorneys, and that's partly what I think their --

23  Mr. -- counsel for Greyson is having a little bit

24  difficulty.  Some of the attorneys were W-2.  Some of them

25  were contract attorneys.

**Briggs Reporting Company, Inc.**

88

1          THE COURT:  Now, some of these attorneys that

2  worked for LPG, the Litigation Practice Group, did they go

3  to other companies like Greyson?

4          MS. PHAM:  I assume so.  I assume some of them --

5          THE COURT:  What do you mean you assume so?  Why

6  would you assume that?

7          MS. PHAM:  Because that's what we are hearing at

8  this point in time.

9          THE COURT:  I didn't hear that at all.

10          MS. PHAM:  Greyson's -- the attorneys, there is a

11  group of disgruntled employees and attorneys that left and

12  formed Greyson and took clients with them.  That's what --

13  that's one group.

14          THE COURT:  Okay.

15          MS. PHAM:  There are other groups that are --

16  again, these are contract lawyers.  So other groups formed

17  such as Phoenix Law Group, I think -- I don't know if

18  Consumer Legal Protection has its own attorneys and perhaps

19  then retained or contracted with some of the existing

20  contract attorneys that Litigation Practice Group formerly

21  contracted with.

22          THE COURT:  Uh-huh.

23          MS. PHAM:  So these are not all again W-2

24  attorneys who quit.

25          THE COURT:  But they were contract attorneys,

89

1  perhaps?

2          MS. PHAM:  Some of them were contract attorneys.

3          THE COURT:  So here's my first question.  Do you

4  have a pad of paper and a pencil?

5          MS. PHAM:  I do.

6          THE COURT:  Or a pen?

7          MS. PHAM:  Yes.

8          THE COURT:  Would you write this down?

9          MS. PHAM:  Yes.

10         THE COURT:  Provide Judge Clarkson and the Chapter

11  11 Trustee all of the names of every attorney that worked

12  for Litigation Practice Group since 2019.

13         MS. PHAM:  I believe most of that information is

14  already within the trustee's possession, but we are happy to

15  do that.

16         THE COURT:  Yeah, well, remember Judge Clarkson

17  wants that.

18         MS. PHAM:  I will do that.

19         THE COURT:  You're going to file that.

20         MS. PHAM:  We will find out and get all of that

21  information, your Honor.

22         THE COURT:  Get me the names and addresses and

23  telephone numbers.  And then now cross reference them with

24  every attorney or even paralegal, for that matter, who is

25  currently working on former LPG clients.

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 13:13:21 Desc
Declaration of Kathleen Cmit March Page 95 of 269   Page 162 of 337

90

1      MS. PHAM:  I wouldn't be able to cross reference.

2  I can prefer we provide the names, but we don't know -- my

3  clients, Mr. March and Mr. Diab, wouldn't know who now works

4  at these various law firms.  So I can provide the names, but

5  they'll have to do the cross referencing if they can get

6  that information

7      THE COURT:  How do they -- I'm sure they can.

8      MS. PHAM:  Yeah.

9      THE COURT:  How do they transfer the accounts from

10 the LPG to any of these other entities?

11     MS. PHAM:  So each of the clients were notified

12 that -- if you back up a bit early in history, your Honor,

13 when LPG unfortunately had a situation with its, I guess,

14 lender factor financing entity, Validation Partners, the

15 forum was no longer able to maintain payroll and service all

16 of the clients in order to protect the clients, which I'm

17 very to hear the Court and all counsel say that is the

18 primary goal of -- or focus of this Court.  That is the

19 primary goal of my clients as well, to make sure that all of

20 these -- they're not actually customers.  They are clients

21 -- all of the clients of the law firm are protected at this

22 point.  They had no choice but to then -- again, some of

23 them automatically were -- the firm former lawyers branched

24 off, took whatever clients they took with Greyson.

25     THE COURT:  Uh-huh.

1      MS. PHAM:  Other law firms formed, such as Phoenix

2  or Consumer Legal Protection Group.  They then notified

3  Litigation Practice Group --

4      THE COURT:  They.  They.

5      MS. PHAM:  -- Litigation Practice Group notified

6  each of the clients that your file is being transferred --

7  in the original engagement letter between Litigation

8  Practice Group and the client --

9      THE COURT:  Uh-huh.

10      MS. PHAM:  -- it actually has a provision that

11  they can outsource and assign their matters to other

12  attorneys and other service providers.  So they notified,

13  pursuant to the provision in the retainer agreement, that

14  the -- their file, this client's file, Mr. Smith, Mr. Jones,

15  is being assigned or transferred to, let's say, Phoenix or

16  Consumer Legal Group, and then Consumer Legal Group or

17  Phoenix or whichever other group is out there or handled the

18  matter would then contact the client and arrange for their

19  own transition there.

20      THE COURT:  What about Greyson?

21      MS. PHAM:  Greyson was their own entity as well, I

22  assume.  I don't know if their counsel doesn't know.  We

23  don't know what happened once it was on the end of a

24  different law firm.

25      THE COURT:  So they're dealing at least 25

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 18:13:21 Desc
Declaration of Kathleen Cimino March Page 97 of 269   Page 164 of 337

92

1 previous clients of LPG.

2          MS. PHAM:  Uh-huh.

3          THE COURT:  How did they get those clients?

4          MS. PHAM:  I assume -- I don't know.  We don't

5 know.  We don't have any information about what Greyson did,

6 but they assumed --

7          THE COURT:  Well, you must have -- then you must

8 have -- your comments are that you've notified every client

9 of yours and said, we are outsourcing the contract that we

10 have with you to someone else?

11          MS. PHAM:  We are no -- we're terminating our

12 services.  Your file is now being handled by -- I don't have

13 the exact wording.  We can get all the letters.  Actually,

14 it's in the trustee's possession already the notices that

15 were sent to each of the clients.  But Greyson, I'm assuming

16 maybe the difficulty is -- of counsel who is just here

17 explaining is, I think what it is is the attorney who is

18 actively servicing that file, whether in Indiana,

19 California, Florida, wherever it may be, would have reached

20 out to their own clients.  These clients are actually

21 retaining attorneys, not technically retaining the law firm.

22 So the attorney on the matter would have said to the client,

23 "I'm leaving this firm.  I'm going to a new firm.  Do you

24 want to come with me?"

25          THE COURT:  I'm sorry.  So someone at LPG

Case 8:23-ap-01046-SC    Doc 296-2   Filed 06/27/23   Entered 06/27/23 18:33:21   Desc
Declaration of Kathleen March   Page 98 of 269   Page 165 of 337

93

1  contacted a client of LPG's and said, "I'm leaving.  Come

2  with me, or would you like to come with me?"

3       MS. PHAM:  They would have left already and would

4  have done -- so if I were to leave my law firm, for example,

5  your Honor, I would do the same.

6       THE COURT:  How did they get the name and address

7  of that client?

8       MS. PHAM:  Because they're the active attorneys.

9  So if I'm -- I leave my firm --

10      THE COURT:  So they used LPG's files to gain the

11 identity of a client and then utilize the telephone number

12 or the e-mail address to get that file, correct?

13      MS. PHAM:  Well, they have an obligation -- a

14 duty, an ethical obligation --

15      THE COURT:  No, they don't.

16      MS. PHAM:  They --

17      THE COURT:  They don't have an obligation to steal

18 clients from their former firm because they're having a

19 dispute.

20      MS. PHAM:  No, they have to notify the client.  If

21 I'm an attorney in my firm, and I leave my firm --

22      THE COURT:  Yes.

23      MS. PHAM: -- I have to notify my client.

24      THE COURT:  You can say, "I'm no longer your

25 attorney because I'm no longer affiliated with the firm.

94

1  Thank you very much."  You think -- you're saying to me that

2  they can say, "I am no longer going there.  You can come

3  with me."

4          MS. PHAM:  They actually have an obligation under

5  -- they have an ethical obligation to notify the client of

6  that, your Honor --

7          THE COURT:  Notify them of what?  That they have

8  to come with me?

9          MS. PHAM:  That they are leaving the firm.  They

10  have an option to come with them.  In fact, that happens all

11  the time, because if you're no longer servicing the

12  client --

13          THE COURT:  Well, what happens all the time is a

14  subject of massive litigation --

15          MS. PHAM:  Yes.

16          THE COURT:  -- constantly of lawyers leaving other

17  firms and getting sued.

18          MS. PHAM:  Because technically, the client is

19  retaining the attorney, not the actual firm.  The attorney

20  is attorney of record or whatever it may be.  The attorney

21  has an ethical obligation to continue to service and

22  communicate to that client so that someone is handling that

23  client's files.

24          THE COURT:  Well, those attorneys can explain that

25  to the California State Bar.  They don't need to explain it

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 18:13:21 Desc
Declaration of Kathleen Pham March Page 100 of 293 Page 167 of 337

95

1  to me.

2          MS. PHAM:  Well, that is actually -- I'm glad you

3  raised that, your Honor, because you had a very good

4  question about who's the watchdog and who is the Consumer

5  Protection Agency.

6          THE COURT:  You're counting on the defenders at

7  the California State Bar to police the attorneys of

8  California?

9          MS. PHAM:  In fact, they did, your Honor.  I'm not

10  sure if the Court was aware of this.

11          THE COURT:  That would be the (indiscernible)

12  case?

13          MS. PHAM:  I'm not sure if your Honor is aware of

14  this, but there was an investigation of -- until Litigation

15  Practice Group.

16          THE COURT:  Like, what did they find out?

17          MS. PHAM:  I'm sorry?

18          THE COURT:  What did they find out?

19          MS. PHAM:  They determined there was no

20  unauthorized practice of law, and there was no violation

21  other than I think at that time, Mr. Diab had an e-mail

22  address with Litigation Practice Group, and he was not

23  allowed to use that, and that was it.

24          THE COURT:  Well, I'm confused.  Was Mr. Diab ever

25  a member of the California State Bar?

96

1          MS. PHAM:  He was at one point in time.

2          THE COURT:  And what happened?  Did he resign?

3          MS. PHAM:  He was -- my understanding is he was

4   suspended and disbarred.

5          THE COURT:  And what for?

6          MS. PHAM:  I believe the allegation was

7   mishandling of client's funds and mishandling of a file.

8   And so from that moment, he no longer practices law.

9          THE COURT:  What does he do?

10          MS. PHAM:  At this time, Mr. Diab has -- is fully

11  willing to cooperate, and he's happy to let your Honor know

12  -- and this partly why we would like an opportunity to brief

13  so we can explain exactly Mr. Diab's role.  There's no --

14          THE COURT:  Why would Mr. Diab worry about the

15  TROs at this point?

16          MS. PHAM:  Mr. Diab is not worried.  That's what

17  I'm telling, your Honor.

18          THE COURT:  What about Mr. March?

19          MS. PHAM:  Mr. March is not worried, other than to

20  the extent it prevents him from continuing to service the

21  clients when his -- when he is attorney of record at the

22  moment.

23          THE COURT:  Excellent.  Let me explain the

24  conundrum so that you completely understand.  The servicing

25  of those clients today, to the chagrin of the United States

**Briggs Reporting Company, Inc.**

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 18:33:21 Desc
Declaration of Kathleen Pham March Page 102 of 202 Page 169 of 337

97

1 Trustee, is in the hands of the Chapter 11 Trustee.  U.S.

2 Trustee doesn't want the Chapter 11 Trustee to be practicing

3 law.  Am I right about that?  Or practicing law with respect

4 to a Debtor in Possession?

5      MR. MISKEN:  That's probably right, your Honor.

6      THE COURT:  Yes, I think that's right.  Okay.  So

7 now the conundrum is that whether Mr. Marshack, the Chapter

8 11 Trustee is or isn't practicing law.  I don't understand

9 how Mr. March, who is apparently an employee of a Debtor not

10 in Possession, is still operating.  Maybe you can explain

11 that to me.

12      MS. PHAM:  And that is exactly the problem, your

13 Honor.  Mr. March is a licensed attorney, who is the counsel

14 of record for multiple files, at least 200 active files at

15 this point.

16      THE COURT:  Yes, but it is not my problem.

17      MS. PHAM:  And that's his --

18      THE COURT:  It is his problem, and he needs to

19 withdraw from those cases, I would think.

20      MS. PHAM:  Well, that's the question, your Honor.

21      THE COURT:  Well, it's not -- I'm not going to

22 authorize it, but I'm telling you, he is subject to the

23 Rules of Professional Conduct.  He has to make his own

24 choice, and if you, like his counsel, to help him, you

25 should make that.  But I'm not going to sit here and tell

98

1 him to do anything except get out of the way of Mr.

2 Marshack's operation of this Debtor until I decide whether

3 or not he should even be doing it as a Chapter 11 Trustee.

4         MS. PHAM: Well, that is the issue, your Honor,

5 and I'm glad your Honor is telling us.

6         THE COURT: There's no issue. I'm telling you.

7 Listen to me carefully. I don't have to win this argument.

8 I just have to tell you how it's going to be. Do you

9 understand that?

10         MS. PHAM: I understand what your Honor is telling

11 us, and that is exactly the clarification I wanted.

12         THE COURT: Or are you going to violate the orders

13 of this Court?

14         MS. PHAM: Your Honor, don't get me wrong. I am

15 not.

16         THE COURT: It's a yes-or-no question.

17         MS. PHAM: Absolutely not. Of course not, your

18 Honor.

19         THE COURT: Then it's easy for you.

20         MS. PHAM: We will follow the Court's order and

21 that's the clarification I wanted.

22         THE COURT: Then it's totally easy. Well, there

23 you have it. Mr. March should be dealing with the Chapter

24 11 Trustee for a quick transition of those clients. He

25 should not be operating a Chapter 11 case in the custody and

99

1 control of the Chapter 11 Trustee until and unless the

2 Chapter 11 Trustee gets this Court's permission to do so.

3          MS. PHAM:  And that's the issue that we have, and

4 that's the conundrum that my clients' in, your Honor, and

5 respectfully, that was the problem.

6          THE COURT:  Well, have I solved that conundrum

7 now?

8          MS. PHAM:  Well, we have -- they have ongoing --

9 and that is why I said I reached out to the trustee to find

10 out about the handling of the cases, and we hadn't heard

11 back, so I'm glad your Honor is telling us, because that's

12 the problem.  There are active ongoing hearings that someone

13 needs to attend.  From what we understand, the trustee is

14 not attending.

15          THE COURT:  Wait a minute.  Hearings where?  In

16 Ohio?  And Indiana?

17          MS. PHAM:  California.

18          THE COURT:  In California.  Is he appearing before

19 the Courts in the State of California on behalf of these

20 clients?

21          MS. PHAM:  Right now, he has no choice.  He has

22 to.

23          THE COURT:  Let me say it again.  Is he doing it?

24 I don't know if he has a choice or not, but is he doing it?

25          MS. PHAM:  At the moment, I believe that Mr. March

100

1  is here.

2          THE COURT:  Well, let's bring him here up.  Come

3  on up.  Let's get him on the record.

4          MS. PHAM:  And so that's the question, your Honor,

5  are you ordering him not to appear?

6          THE COURT:  Your name is?

7          MR. MARCH:  Daniel March.

8          THE COURT:  And, Mr. March, you're a member of the

9  California State Bar?

10          MR. MARCH:  I am, sir.

11          THE COURT:  Are you admitted to the District Court

12  in the Central District of California?

13          MR. MARCH:  Yes, sir.

14          THE COURT:  Are you currently representing any

15  clients of LPG in any state court matter today?

16          MR. MARCH:  Yes.

17          THE COURT:  Okay.  How many clients are you

18  representing?

19          MR. MARCH:  Approximately 200.

20          THE COURT:  Have you been in contact with the

21  Chapter 11 Trustee regarding your activities on behalf of

22  those clients?

23          MR. MARCH:  Yes.

24          THE COURT:  How are you being paid?

25          MR. MARCH:  I'm not.

Case 8:23-ap-01048-SC    Doc 296-2   Filed 06/27/23   Entered 06/27/23 18:13:21   Desc
Declaration of Kathleen March   Page 106 of 293   Page 173 of 337

101

1          THE COURT:  Why are you doing it?

2          MR. MARCH:  An obligation to the clients pre-

3   existing.

4          THE COURT:  Very good.  Good answer.  Correct

5   answer.

6          MR. MARCH:  Coming out of my pocket.

7          THE COURT:  Well, it's money out of your -- well,

8   it's time off your golf course, maybe.  I'm not sure you're

9   putting out any money.  Are you putting out any money?

10         MR. MARCH:  Considerably.

11         THE COURT:  Well, you may have an administrative

12   claim in this case if you can show that you assisted the

13   estate.  But in the meantime, Mr. March, you need to

14   immediately sit down with the counsel for Chapter 11

15   Trustee, Marshack.  Pick a counsel.  There are five of them

16   here.  Pick one, and then you'll need to do it now.  But you

17   need to sit down and understand what I'm about to tell you.

18   You are operating a business on behalf of a Chapter 11

19   estate that is controlled by a Chapter 11 Trustee.  He is

20   your boss.  Now, if you're doing it pro bono, we applaud.

21   But I think you're doing it because you want to continue

22   being a member of the California State Bar.  But you need to

23   protect yourself.  Number one rule in boxing, protect

24   yourself.  So you may want to be talking to your clients

25   about the position, or as your counsel, Ms. Pham, says, the

102

1 conundrum of I'm here, I'm working for free -- but did you

2 get a flat fee?

3          MR. MARCH:  It was a flat fee, the contracts.

4          THE COURT:  So you're -- you're not working for

5 free.  You got paid, and you agreed to take a flat fee for

6 that.  But anyway, that's another subject.  You need to talk

7 to Mr. Marshack about this, and you better sort it out

8 quickly.  In the meantime, I have a problem, and that is I

9 have a motion for a preliminary injunction.  Now, your

10 counsel hasn't answered my question.  Perhaps you could help

11 me since you're a member of the Bar.  Do you oppose the

12 preliminary injunction?

13          MR. MARCH:  No.

14          THE COURT:  Thank you.  Do you have anything else,

15 Ms. Pham?

16          MS. PHAM:  I wanted to clarify for the Court, and

17 I'm happy to do it in writing if the Court prefers so we

18 don't take up your time at this point, but that's the --

19 that wasn't the only issue we wanted to get clarification

20 on, and we're more than happy to work with counsel for the

21 trustees to figure out what Mr. March's ongoing duties would

22 be.

23          THE COURT:  Then mission accomplished.

24          MS. PHAM:  Thank you, your Honor.

25          THE COURT:  I have not told you what those duties

103

1   are.  You need to consult with the Chapter 11 Trustee.

2              MS. PHAM:  Thank you, your Honor.

3              THE COURT:  Is there anyone else that would like

4   to do -- Ms. Cohen, you've been patient.  Who do you

5   represent again, Ms. Cohen.

6              MS. COHEN:  Thank you, your Honor.  I have two

7   clients

8              THE COURT:  Mr. Cohen or Ms. Cohen.

9              MS. COHEN:  Ms. Cohen.

10             THE COURT:  No, I mean one of your clients is Ms.

11  Cohen.

12             MS. COHEN:  Yes, exactly, Lisa Cohen.  Not related

13  as far as -- probably back somewhere.

14             THE COURT:  Who is Lisa Cohen and your other

15  client?

16             MS. COHEN:  Lisa Cohen was a administrative

17  assistant for Mr. Diab, and Ms. -- my other client, Bianca

18  Loli, was --

19             THE COURT:  Would you spell that.

20             MS. COHEN:  L-O-L-I.

21             THE COURT:  Thank you.

22             MS. COHEN:  -- was involved in the processing

23  business.

24             THE COURT:  What does that mean?

25             MS. COHEN:  She was basically involved with the

104

1  company that did some -- I forget the words, but the funds

2  that --

3         THE COURT:  Well, there was a processor who takes

4  instructions from someone --

5         MS. COHEN:  Exactly.  That.

6         THE COURT:  -- to send money after it's been

7  cleared --

8         MS. COHEN:  That.

9         THE COURT:  -- to another attorney?

10        MS. COHEN:  That.  Thank you, your Honor.

11        THE COURT:  And that's Ms. Loli?

12        MS. COHEN:  Correct.

13        THE COURT:  And Ms. Loli would instruct the

14  processor of where to send the money?

15        MS. COHEN:  She would take the instructions.

16        THE COURT:  What do you mean "take the

17  instructions?"

18        MS. COHEN:  She was the one who received

19  instructions on where to send money.

20        THE COURT:  Okay.  Help me out here.

21        MS. COHEN:  That was her job as processor.

22        THE COURT:  She worked at the processor?

23        THE COURT:  Exactly.

24        MS. COHEN:  Who would she receive instructions

25  from?

105

1          THE COURT:  Your Honor, I don't have that

2   information at this time.

3          MS. COHEN:  Could you stop for a second.  Would

4   you turn around and talk to Ms. Loli, whisper in her ear and

5   ask if she knows the name of the person or persons that she

6   took instructions from?

7          THE COURT:  Yes.  Thank you, your Honor.

8          THE COURT:  Thank you, Ms. Cohen.

9          MS. COHEN:  Thank you, your Honor, and that was

10  the Phoenix.

11         THE COURT:  Phoenix?

12         MS. COHEN:  Yes.

13         THE COURT:  And anybody in particular at Phoenix?

14         MS. COHEN:  Can I go back?  She said the name of

15  the individual was Ty Carss.

16         MR. CARSS:  Excuse me.

17         MR. CELENTINO:  He'd like to be heard.

18         THE COURT:  I'm sorry.  Did somebody say

19  something?

20         MR. CARSS:  I'm sorry, your Honor.

21         MR. CELENTINO:  That's Mr. Carss.  He probably

22  would like to be heard next.

23         THE COURT:  I'm sorry.  Ty?

24         MS. LOLI:  I can --

25         MS. COHEN:  Does the Court --

106

1          THE COURT:  Why don't you come forward and spell

2  that name for us.  Come forward.

3          MS. LOLI:  Me?

4          THE COURT:  Yes.  And spell -- Mr. Carss, have a

5  seat.

6          MS. LOLI:  Okay.  So I --

7          MS. COHEN:  Just the name.  Just the spelling.

8          THE COURT:  I just want to know one thing.  Who is

9  the name of the person at Phoenix you were taking

10  instructions for -- from to direct money?

11          MS. LOLI:  Ty Carss did not tell me to direct the

12  money.

13          THE COURT:  No, no, you just said the name.

14          MS. LOLI:  No, he is the principal --

15          THE COURT:  Well, spell that name.

16          MS. LOLI:  I understand that he is the principal

17  of Phoenix.

18          THE COURT:  Let's try it again.  Spell that name.

19          MS. LOLI:  Carrs?  Ty Carrs?

20          THE COURT:  Spell it.

21          MS. LOLI:  T-Y.

22          THE COURT:  T-Y.

23          MS. LOLI:  C-A-R-R-S.

24          MR. CARSS:  No.

25          THE COURT:  C-A-R-R- -- how is the name spelt?

Case 8:23-ap-01046-SC Doc 276-2 Filed 06/27/23 Entered 06/27/23 18:33:21 Desc
Declaration of Kathleen Dunham March Page 12 of 299 Page 179 of 337

107

1          MS. LOLI:  C-A-R-S-S?  Sorry.  Sorry about that.

2          THE COURT:  C-A-R-R-S?

3          MS. LOLI:  Sorry.  C-A-R-S-S.

4          THE COURT:  Okay.  C-A-R-S-S.  Understand

5 something, I'm doing this for the record.

6          MS. LOLI:  Okay.

7          THE COURT:  Okay.  So Ty Carss, according to you

8 would -- you'd a conversation with Ty Carss.  You obviously

9 know his name.

10          MS. LOLI:  Correct.

11          THE COURT:  So why would you have a conversation

12 with Ty Carss?

13          MS. LOLI:  Ty Carss -- okay.  So I worked for --

14 or I owned Maverick Management Group.

15          THE COURT:  Spell that.

16          MS. LOLI:  Maverick, M-A-V-E-R-I-C-K.

17          THE COURT:  And what does Maverick do?

18          MS. LOLI:  Maverick just does the processing for a

19 law firm.

20          THE COURT:  And what does that mean, "processing?"

21          MS. LOLI:  That means I handle the relationships

22 with the vendors.  So outbound mail processing, inbound mail

23 processing, and the relationship with the payment

24 processors, although I did not have the one with Revolv3,

25 and I can explain that to you.

108

1          THE COURT:  That's okay.

2          MS. LOLI:  Or she can do that here in writing.

3          THE COURT:  I don't need to know.  Okay.  So now

4  see --

5          MS. LOLI:  Okay.  And then --

6          THE COURT:  -- what happened here was I asked Ms.

7  Cohen --

8          MS. LOLI:  Uh-huh.

9          THE COURT:  -- who gave Phoenix -- who from

10 Phoenix gave Maverick --

11         MS. LOLI:  Maverick.

12         THE COURT:  -- the direction to send money to

13 someone.

14         MS. LOLI:  So the relationship is -- I'm just

15 telling you.  I'm going to tell you.  I don't have enough

16 time, but --

17         THE COURT:  No, and I want you to tell me now.

18         MS. LOLI:  -- I'm trying to.  So --

19         MS. COHEN:  Just give --

20         MS. LOLI:  -- the relationship -- I don't have a

21 name because the relationship is that Maverick has this

22 relationship with the vendors to process anything for the

23 law firm.

24         THE COURT:  Now, who is a vendor?

25         MS. LOLI:  A vendor would be like Revolv3, but

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 18:43:21 Desc
Declaration of Kathleen Donahue March Page 114 of 202    Page 181 of 337

109

1  unfortunately, Revolv3 -- Revolv3 or Worldpay.  That was

2  actually LPG's payment processor, because when they called,

3  you know, us, and they were like, "Hey, we don't have a

4  place for these clients.  We took them, and we didn't

5  have --

6          THE COURT:  Wait, I'm sorry, we don't have a?

7          MS. LOLI:  We don't have any -- I'm trying to

8  explain.

9          MS. COHEN:  Would you explain how the instruction

10 was given.

11         MS. LOLI:  There is no instruction.  I just --

12 when I got the clients from LPG.

13         THE COURT:  Wait, I'm confused.  How does Maverick

14 know where to send the money?

15         MS. LOLI:  Because I was -- someone came to me and

16 said, "We have a payment processor that can process this

17 amount of money."  I didn't have a payment processor that

18 had that high limit.  So they told me from LPG, we have this

19 payment processor.  The problem was is that the clients were

20 transitioned to Phoenix.  So I had to communicate with

21 Revolv3, and I had to tell them we're now, you know,

22 Phoenix.  What do we do?  They said, "You can use it."  We

23 had to change the description because when the clients were

24 first debited by Revolv3 or Worldpay, it came through as

25 LPG, and a bunch of clients were claiming it was an

110

 1  unauthorized debit because they were no longer with LPG.

 2          THE COURT:  Ms. Loli, you've been -- am I

 3  pronouncing that right?  Ms. Loli.

 4          MS. LOLI:  Yeah.

 5          THE COURT:  You've been very helpful.

 6          MS. LOLI:  I'm sorry.  I just --

 7          THE COURT:  And I thank you.  I understand what

 8  you're saying.

 9          MS. LOLI:  What's that?

10          THE COURT:  Thank you so much.

11          MS. LOLI:  Okay.

12          THE COURT:  Ms. Cohen.

13          MS. COHEN:  Now, we've established who these

14  parties are.  I already told trustee's counsel we have no

15  objection to continuing the injunction of facts.  There's

16  obviously lots of facts.  It's complicated, and we need some

17  time to sort it through.  But I do want to represent on the

18  record that both my clients want to fully cooperate with the

19  trustee.

20          THE COURT:  And you have fully cooperated.  I have

21  read the papers.

22          MS. COHEN:  Thank you, your Honor.

23          THE COURT:  Thank you very much for your coming

24  today.  You've been helpful.

25          Anyone else?

Case 8:23-ap-01046-SC Doc 276-2 Filed 06/27/23 Entered 06/27/23 18:13:21 Desc
Declaration of Matthew Dumont March Page 146 of 289 Page 183 of 337

111

1   Yes, sir.  Or do you just want another break?

2           MR. BAUM:  Good afternoon, your Honor.  It's

3   Richard Baum.  I hope I can stay in the Court's good side

4   because everybody seem to appreciate the break that was

5   requested.  I needed to get some information from the

6   clients.  So I thank you.

7           THE COURT:  My pleasure.

8           MR. BAUM:  I represent Han Trinh and Jayde Trinh.

9   Han is not a lawyer.  Jayde is a lawyer in the State of

10  California.  I want to speak quickly to the idea of

11  protecting the clients of LPG to have left LPG to go on to

12  other places.  And that seems to be what the emphasis of the

13  Court's argument or colloquy with counsel was.

14          My clients are two of the people who are involved

15  in Greyson.  They receive -- Greyson receives information

16  regarding law suits that are -- have been initiated against

17  the clients and refers that matters to Greyson, and if I

18  could use their first names, Han and --

19          THE COURT:  Jayde.

20          MR. BAUM:  -- Jayde then find counsel to represent

21  those people.  A substantial number of people are

22  represented right now.  I understand by counsel that Han and

23  Jayde have located.  Han handles the administrative part of

24  it.  Jayde provides the legal oversight.  I think that that

25  should be allowed to continue.  I think that the injunction

112

1  gets in the way of that, in part, because the party that the

2  trustee has retained in order to go in and look at what's

3  going is a competitor.

4           THE COURT:  Now, who is that?

5           MR. BAUM:  That's Validation Partners.

6           THE COURT:  Thank you.

7           MR. BAUM:  It's a competitor.  My understanding is

8  that the -- that Han and Jayde feel that this party is

9  spying on them, trying to steal their own work, what they

10 can do, how they do it.

11          THE COURT:  I get you.  Let me ask you a few

12 questions.

13          MR. BAUM:  I was hoping you wouldn't say that,

14 Judge.  You come very tough on some people.

15          THE COURT:  No, no.  You see, that's why we're

16 here.  We are only here to learn today.  Almost only here to

17 learn.  Han and Jayde, what is their direct or indirect

18 interest with Greyson Law Center PC?

19          MR. BAUM:  They are both employees of Greyson.

20 Jayde is one of the licensed lawyers.  Han is the

21 administrator.

22          THE COURT:  How many attorneys does Greyson Law

23 Center have today?

24          MR. BAUM:  I don't know specifically how many.

25          THE COURT:  Ballpark it.

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 18:13:21 Desc
Declaration of Kathleen Ponte - March Pages 1-18 of 293 Page 185 of 337

113

1        UNIDENTIFIED SPEAKER:  Twenty-eight attorneys.

2        MR. BAUM:  Twenty-eight?

3        THE COURT:  Twenty-eight attorneys.

4        MR. BAUM:  That's what I'm told.

5        THE COURT:  How many non-attorneys?  Ballpark it.

6        UNIDENTIFIED SPEAKER:  Ninety.

7        UNIDENTIFIED SPEAKER:  Ninety to 100.

8        MR. BAUM:  Ninety.

9        THE COURT:  Ninety?  90 non-attorneys.  Would

10 those be administrative staff or paralegals or claims

11 administrators or claims adjudicators or collections -- what

12 do they do?

13        MR. BAUM:  I think all of those would fit within

14 -- fit to some of those people.

15        THE COURT:  And where is Greyson Law Center

16 located?

17        MR. BAUM:  I believe it's that -- it was that

18 address on Michelson.

19        THE COURT:  Michelson and Irvine.

20        MR. BAUM:  Yes.

21        THE COURT:  Okay.  Who is the owner of Greyson Law

22 Center?

23        MR. BAUM:  I believe --

24        UNIDENTIFIED SPEAKER:  Scott Eadie.

25        MR. BAUM:  Scott?  Scott Eadie.

114

1     UNIDENTIFIED SPEAKER:  Eadie.  E-A-D-I-E.

2     MR. BAUM:  Eazie

3     THE COURT:  Spell that.

4     UNIDENTIFIED SPEAKER:  E-A-D-I-E.

5     MR. BAUM:  E?

6     UNIDENTIFIED SPEAKER:  E-A-D-I-E.

7     MR. BAUM:  E-A-Z-I-E.

8     UNIDENTIFIED SPEAKER:  D.

9     MR. BAUM:  E-A-D-I-E.

10     THE COURT:  Okay.  Well, he has a -- I have a

11  declaration of his, don't I?

12     UNIDENTIFIED SPEAKER:  You do.

13     THE COURT:  I do.

14     UNIDENTIFIED SPEAKER:  Yes, sir.

15     MR. CELENTINO:  He's also listed on page nine of

16  our status report.

17     THE COURT:  Well, I have E-A-D-I-E.  Very good.

18  Okay.  So Scott Eadie.  Am I pronouncing that right?  Is

19  Scott Eadie here today?  He's an attorney.

20     MR. BAUM:  I believe so, yes.

21     THE COURT:  You don't know?

22     MR. BAUM:  I do not know.  I'm representing the

23  two individuals.

24     THE COURT:  I understand.  I understand.  What is

25  the interest of Trinh?  Are they Mr. and Ms. Trinh?

115

1        MR. BAUM:  No, they're --

2        THE COURT:  Mother and sister?  Brother and

3  brother?

4        MR. BAUM:  They're both women, your Honor, and my

5  understanding is that they have not taken advantage of --

6        THE COURT:  I understand.  I wasn't implying that.

7  I'm just trying to -- Han is a feminine name?

8        MR. BAUM:  Yes.

9        THE COURT:  Okay.

10       MR. BAUM:  And she attempted to say A few words to

11  you earlier, your Honor.

12       THE COURT:  Yeah.  I appreciate that, but -- so

13  now, what is their interest since they're just employees of

14  Greyson Law Center in this matter?

15       MR. BAUM:  It's their ability to do their -- the

16  job that they were hired to do.

17       THE COURT:  Well, would Mr. Eadie be more

18  interested in his company than Han and Jayde Trinh?

19       MR. BAUM:  I couldn't say.  That's a bit of

20  speculation.  Isn't it, your Honor?  I mean, you're --

21       THE COURT:  No, I'm asking you.  What is their

22  interest in this case?

23       MR. BAUM:  What is their interest in this --

24       THE COURT:  Have they been enjoined by the

25  temporary restraining order?

116

1        MR. BAUM:  My understanding is, yes, they have.

2        THE COURT:  Okay.  Why do you think they were

3  enjoined?

4        MR. BAUM:  Frankly, your Honor, I looked at the

5  papers as thoroughly as I could, and I couldn't find any

6  good reason.

7        THE COURT:  Okay.

8        MR. BAUM:  There was no credible -- there was no

9  evidence that actually tie them to anything.  Not to the

10  alter ego issues.  Not to the fraudulent transfer issues.

11  Nothing was there.

12        THE COURT:  Okay.

13        MR. BAUM:  The best I can come up with is that Han

14  was quoted as saying that she hates Mr. Diab.  That's a --

15        THE COURT:  Well, apparently, she's going to have

16  get in line

17        MR. BAUM:  I don't see much of an alternative,

18  your Honor.  But quite frankly, yes, they are in -- they

19  have been enjoined by the --

20        THE COURT:  Okay.  Enjoined from what?  What do

21  you think they've been enjoined from doing?  Better yet,

22  what are they enjoined from doing?

23        MR. BAUM:  As I read the order --

24        THE COURT:  I wrote the order.  Tell me, what do

25  you think they're enjoined from doing?

117

1          MR. BAUM:  Well, they can't go to their place of

2  business.  They can't access --

3          THE COURT:  Well, hold on.  Is that true?  They

4  can't go their place of business?  You mean they can't go

5  inside?

6          MR. BAUM:  Yes.

7          THE COURT:  Okay.  Keep going.

8          MR. BAUM:  As a result of that, they don't have

9  access to the papers and documents that they need, the --

10          THE COURT:  And are they -- and Jayde is an

11  attorney?

12          MR. BAUM:  Yes.

13          THE COURT:  And Han is not?

14          MR. BAUM:  Correct.

15          THE COURT:  Okay.  So Jayde represents a client.

16  Is that correct?

17          MR. BAUM:  I believe that is correct, your Honor.

18          THE COURT:  How many clients does Jayde represent?

19          MS. TRINH:  I mean, if -- can I answer?  Sorry.

20          THE COURT:  You don't know the answer, do you?

21          MR. BAUM:  From the top of my head, I do not.

22          THE COURT:  Would you like to go ask your client?

23          MR. BAUM:  Yes, your Honor.

24          THE COURT:  How many clients does she represent?

25          MR. BAUM:  Her role, more generally, is as general

118

 1  counsel.

 2          THE COURT:  So you're telling me she doesn't

 3  represent any clients?

 4          MR. BAUM:  I'm not saying that.

 5          THE COURT:  I'm asking you.

 6          MR. BAUM:  No, no.

 7          THE COURT:  Does she represent any client?

 8          MR. BAUM:  She does represent and has --

 9          THE COURT:  Well, name one client she represents.

10          MR. BAUM:  I couldn't do that without asking.

11          THE COURT:  Can she name one client that she

12  represents.  Go ask her.

13          MR. BAUM:  Greyson.

14          THE COURT:  So she doesn't represent any clients.

15  She represents Greyson?

16          MR. BAUM:  Correct.  As general counsel for a

17  business.

18          THE COURT:  Okay.  So you know your arguments over

19  the last 10 minutes have misled this Court into believing

20  that she can't do her job representing clients.  That's what

21  you said.  And now we know that that's not what you meant.

22  Mr. Baum, I don't expect that from you here.

23          MR. BAUM:  I'm sorry, your Honor.

24          THE COURT:  You have a very good reputation, but I

25  don't want to be misled again.

119

1          MR. BAUM:  I do not -- certainly do not intend to
2  mislead.
3          THE COURT:  But you -- yet you did.
4          MR. BAUM:  No, your Honor.  I --
5          THE COURT:  Let me tell you, until I made an
6  inquiry, everyone in this room believed that she needed to
7  get into her office to represent the clients, and, in fact,
8  she now -- we now know that she represents a -- she's
9  in-house counsel and does overall general counsel for
10 Greyson Law Center.  Is Greyson Law Center a law firm?
11         MR. BAUM:  My understanding is that, yes, it is.
12 It's headed by a lawyer.  It has a number of lawyers both as
13 employees and as 1099 employees.
14         THE COURT:  No, that isn't a law firm.
15         MR. BAUM:  Yes.
16         THE COURT:  Does it have a client trust account?
17         MR. BAUM:  Yes, it does.
18         THE COURT:  Okay.  So it makes -- it gives notices
19 to the State Bar of their client trust account every year?
20         MR. BAUM:  I assume that it does, your Honor, yes.
21 I don't know that -- from the fact that it's a new entity,
22 it may not have done so already.
23         THE COURT:  And then, when was it established?
24         MR. BAUM:  I believe the papers indicate sometime
25 in this year.

120

1              THE COURT:  And why was it established?

2              MR. BAUM:  Because the -- LPG had fallen apart.

3   It had -- there was dissension.  There were people who were

4   not getting paid, people who wanted to start out anew, and

5   it was the mismanagement of LPG.

6              THE COURT:  And who were the attorneys that

7   requested that the LPG clients went to Greyson?

8              MR. BAUM:  I don't know that.

9              THE COURT:  You were in the courtroom when that

10  was discussed.

11             MR. BAUM:  I was.

12             THE COURT:  Were you surprised?

13             MR. BAUM:  Not particularly.  I think there is --

14             THE COURT:  I guess maybe I should rephrase that.

15  Were you surprised that an attorney wanting to leave a law

16  firm can call a client of theirs at that law firm and say,

17  "I'm leaving.  I'm -- I want you to come -- do you want to

18  come with me?"

19             MR. BAUM:  Your Honor, I think as I look around

20  the legal universe over the last number of years I've been

21  practicing law, it's got to have been done virtually all the

22  time.

23             THE COURT:  Do you think that's a bar violation?

24             MR. BAUM:  You know I haven't really studied the

25  rules of ethics that closely to know that one way or the

121

1  other.  I've been a sole practitioner of my clients, so --

2          THE COURT:  You've never left Biglaw?

3          MR. BAUM:  I have not, your Honor.

4          THE COURT:  There you go.  Okay.  Well, what else

5  can I help you with today?

6          MR. BAUM:  That would be it, your Honor.  I think

7  that --

8          THE COURT:  All right.  I appreciate the help.

9  You've given me lots of things to look at here, and I admire

10  -- I've known you for a long time.  I know your reputation.

11  I appreciate your forthrightness and your reputation.

12          MR. BAUM:  Thank you, your Honor.  May I deviate

13  for one second?

14          THE COURT:  Well, I don't know.

15          MR. BAUM:  Just a little bit.  Just a little bit.

16          THE COURT:  You're going to deviate?  Okay.

17          MR. BAUM:  I absolutely love the presentation that

18  you gave on Rembrandt Ben Ryan (phonetic.)

19          THE COURT:  Well, now, you're just sucking up.

20  Move on.

21          MR. BAUM:  I loved it.  Thank you, your Honor.

22          THE COURT:  Okay.  Who else would like to discuss

23  this matter on Zoom.

24          Mr. Richards, are you there?  He's putting his tie

25  back on.

Case 8:23-ap-01046-SC Doc 276-2 Filed 06/26/23 Entered 06/26/23 13:13:21 Desc
Declaration of Kathleen P. March Page 127 of 288 Page 194 of 337

122

1          MR. RICHARDS:  No, your Honor.  I'm here.

2          THE COURT:  Would you like to add anything?  I

3  know you have an interest in this.

4          MR. RICHARDS:  No, your Honor.  Just there was a

5  couple arguments that just were not accurate, but I realized

6  counsel were just retained, and there's a lot a information.

7  So I don't want to get into -- it's not evidence, and I

8  don't think it's necessary for me to rebut everything.  I

9  just want the record to reflect there was a couple arguments

10  that just were innocently inaccurate.

11          THE COURT:  Well, I appreciate that, and what that

12  reflects from your point of view is you understand that none

13  of what I've heard yet is evidence unless it's been already

14  provided in testimony by declaration.  So I appreciate that.

15          MR. RICHARDS:  Thank you.

16          THE COURT:  Now, counsel -- special counsel for

17  the trustee, you want a preliminary injunction?

18          MR. CELENTINO:  We do.

19          THE COURT:  Would you like to call any witnesses

20  in support of your preliminary injunction?

21          MR. CELENTINO:  I would, your Honor.

22          THE COURT:  Would you please do so?

23          MR. CELENTINO:  Thank you.  May I have one second,

24  your Honor?

25          THE COURT:  Take your time.  I'm going to take two

123

 1  minutes as a break, or let's make it five minutes for --

 2          MR. CELENTINO:  Thank you, your Honor.

 3          THE COURT:  That's fine.  Restroom breaks.  Five

 4  minutes.

 5      (Proceedings recessed briefly.)

 6          THE CLERK:  Please come to order.  Court is back

 7  in session.

 8          THE COURT:  Please be seated.

 9  You don't need to do this every time, please.  Just once at

10  9:00 o'clock in the morning.

11          We're back in session.

12          Would you like to call a witness?

13          MR. CELENTINO:  I would, your Honor.

14          THE COURT:  And again, in favor of your request

15  for a preliminary injunction?

16          MR. CELENTINO:  Yes.

17          THE COURT:  Who would you like to call?

18          MR. CELENTINO:  I would like to call Dan March.

19          THE COURT:  Mr. March, come forward and be sworn

20  in by our recording officer.

21          THE CLERK:  Please raise your right hand.

22          DANIEL MARCH - PLAINTIFF'S WITNESS - SWORN

23          THE CLERK:  Please state and spell your name for

24  the record, please.

25          THE WITNESS:  Daniel S. March, M-A-R-C-H.

124

1    THE CLERK:  If you could speak into the mic.

2    THE WITNESS:  Sure.

3    THE CLERK:  Thank you.

4    THE COURT:  But the microphone is very sensitive,

5 so you don't need to get close to it.  They're so sensitive

6 that I can hear the people that are whispering in the last

7 row from these microphones here, and I pay attention to

8 everything.  Go ahead.

9                     DIRECT EXAMINATION

10 BY MR. CELENTINO:

11 Q    Mr. March, thank you.  I understand from earlier you

12 are the attorney of record for the Debtor out of possession,

13 Litigation Practice Group, correct?

14 A    Correct.

15 Q    We heard earlier that you have approximately 200

16 clients left that you continue to provide services for, that

17 were services of Litigation -- clients of Litigation

18 Practice Group, correct?

19 A    Yes, Litigation California (indiscernible).

20 Q    Thank you.  As to those clients, are you aware that any

21 of them still have financial obligations owing to Litigation

22 Practice Group on their contract with Litigation Practice

23 Group?

24 A    I believe that none of them owed any money to LPG, and

25 if they did, I believe it was probably waived anyway.  So

125

1  no, nobody owes anything.

2  Q    And you are the attorney of record for those clients in

3  pending cases now?

4  A    Yes, it's LPG, Litigation Practice Group P.C., my name

5  and then my bar number.

6  Q    And you've agreed to continue to finish out those cases

7  pursuant to the terms with those clients, correct?

8  A    I will, yes, and I have.

9  Q    Thank you.  Do you know who Wes Thomas is?

10 A    Not exactly.

11 Q    Do you remember that he was the chief financial officer

12 of LPG?

13 A    He was there -- he wasn't the CFO, but he was an -- he

14 was in charge, yeah.

15 Q    Okay.  You understand how -- let me start over.

16     The main source of revenue for LPG was through

17 contracts that allowed ACH draws from its clients, correct?

18 A    Yes.

19 Q    And those contracts were primarily monthly draws,

20 correct?

21 A    Yes.

22 Q    And there was a term period that was typically --

23     THE COURT:  Mr. Celentino.  Mr. Celentino, in

24 running this evidentiary hearing, I realized that there is

25 very few people here who are willing to or want to object to

126

1  the form of the question, but I would request that as much

2  as possible you not lead this witness, for purposes of

3  examination of the transcript later by appellate courts.

4  Let's hear what he has to say and not what you have to say.

5          MR. CELENTINO:  Fine.  Thank you.

6          THE COURT:  Thank you.

7  BY MR. CELENTINO:

8  Q    What is the average or typical duration of an LPG

9  client payment contract?

10  A    24 to 36 months.

11  Q    And you are aware that LPG relied upon those clients

12  ACH pulls for its livelihood, correct?

13  A    Yes.

14  Q    Did you ever direct anyone to make those ACH pulls from

15  a client?

16  A    I did not.

17  Q    Who at LPG directed those ACH pulls to take place?

18  A    I believe it's Tony Diab.

19  Q    Would anybody else have directed where the funds once

20  pulled were used -- were spent or directed?

21  A    No, I don't think so.

22          MR. CELENTINO:  Thank you.  I have nothing

23  further.

24          THE COURT:  Does anyone have questions for this

25  gentleman?

127

1          MR. MISKEN:  Just one question, your Honor.

2          THE COURT:  You can do two.

3          MR. MISKEN:  It might be two.

4                    CROSS EXAMINATION

5   BY MR. MISKEN:

6   Q    Ken Misken, assistant U.S. Trustee on the behalf of

7   United States Trustee.  Who is in charge at LPG?

8   A    I am.

9   Q    And you've been in charge since when?

10  A    About the end of 2019.

11  Q    Okay.

12         MR. MISKEN:  That's all the questions I have, your

13  Honor, two.

14         THE COURT:  Thank you.  Anyone else?

15         MR. CELENTINO:  I forgot one question, your Honor.

16  May I?

17         THE COURT:  Please.

18         MR. CELENTINO:  I forgot one.

19                   REDIRECT EXAMINATION

20  BY MR. CELENTINO:

21  Q    What was your compensation at LPG?

22  A    Ultimately, it was 1000,000 a month.

23         MR. CELENTINO:  Thank you.

24         THE COURT:  One hundred thousand a year or a

25  month?

128

1          THE WITNESS:  A month.  I didn't receive that

2    often, but that was my salary.

3          THE COURT:  Well, in the last year, how much have

4    you received?

5          THE WITNESS:  This year, about a 125,000.  I

6    haven't been paid since February 9th.  And then before that,

7    I was probably 250,000, $200,000 short of a $100,000 a

8    month.

9          THE COURT:  Do you have questions?

10         MS. PHAM:  I don't want to belabor this, your

11   Honor.  I was under the impression that we were going to

12   continue.  But if we're not continuing the hearing -- if

13   we're continuing the hearing, I would just simply submit

14   declarations, but if we're not, I'd like to have Mr. March

15   answer a few questions for the Court.

16         THE COURT:  Please.

17         MS. PHAM:  Okay.  Thank you.

18                     RECROSS EXAMINATION

19   BY MS. PHAM:

20   Q    Mr. March, can you explain to the Court what the

21   monthly payments were for?

22   A    We would agree with the client to pay a certain amount

23   of money.  It was a flat rate that would be divided over the

24   requisite period, whatever was negotiated, 24 months to 36

25   months, depending on the size of the debt.

129

1  Q    Is it a percentage of the debt or based on the size of

2  the debt?

3  A    It's based on the size of the debt and kind of

4  percentage of the debt as well.

5  Q    Was any of the -- were any of those payments intended

6  to service or pay the actual debt?

7  A    No, no.

8  Q    Okay.  That was just simply payment to the law firm?

9  A    Correct.

10 Q    Okay.  Earlier you were in the courtroom, you heard

11 some explanations, or, I guess, allegations made by the

12 trustee as to what the -- how the processing and payment

13 worked.  Did you hear all that?  Do you --

14 A    Yes.

15 Q    Can you explain to the Court exactly how the payment

16 processing worked, what functions the law firm did versus

17 the payment processors?

18 A    Well, once there was an agreement between ourselves and

19 the clients, it was in writing.  They had agreed to make the

20 monthly payment, but it would be through the ACH payment.

21 We didn't bill our invoice directly for that.  They had a

22 payment amount, a schedule that was set in the agreement,

23 and that was drawn every month, usually.  Sometimes those

24 payments weren't met.  Sometimes they were NSF.  sometimes

25 they were negotiated between myself and their staff to

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 13:33:21 Desc
Declaration of Kathleen Dunn March Page 135 of 202 Page 202 of 337

130

1    whether they would make the payments or not or they would be

2    put on a back end or not make things -- whatever we decided

3    to do with the clients and ourselves.

4           THE COURT:  I don't understand the "back end."  If

5    no money is being paid to service the debt of the customers,

6    then what's the back end?

7           THE WITNESS:  There are times when a client was

8    out of work, that was anticipated -- or they just didn't

9    have the money or they had an emergency, they would contact

10   us.  And if they owed money -- but that month -- for the

11   next month --

12          THE COURT:  So payments were deferred?

13          THE WITNESS:  Yes.  Yes, they were divided out

14   over a scheduled period of time.

15          THE COURT:  Okay.  That's what I needed to

16   understand.  But you're telling me that no money that came

17   into LPG ever went to one of those clients' creditors?

18          THE WITNESS:  We have a term and provision in the

19   contract that basically says, okay, we -- to negotiate with

20   a client on a particular debt, if it was a litigation debt,

21   I would get involved or staff would get involved, and we

22   would actually refund the money back to the client to permit

23   them to make payments -- monthly payments as agreed to the

24   creditor.

25          THE COURT:  Yes, but they were paying you, and

131

1  you're paying directly

2          THE WITNESS:  NO.

3          THE COURT:  -- to any of the customer's creditors?

4          THE WITNESS:  No.  No, we wouldn't pay the

5  creditors.  We would actually -- well, it was money that was

6  supposed to be -- they had a choice, and they could

7  actually --

8          THE COURT:  Who had a choice?

9          THE WITNESS:  The client.

10         THE COURT:  And a choice to do what?

11         THE WITNESS:  To either accept money -- we would

12 refund the money back to them directly and they could make

13 the payment or we would actually refund the money, and we

14 would make the payments, sometimes, to the creditor.

15         THE COURT:  So you would make direct payments to

16 the creditors?

17         THE WITNESS:  Yes, from time to time.  From time

18 to time --

19         THE COURT:  I feel like I'm being whipsawed.

20         THE WITNESS:  No.  Well, it was --

21         THE COURT:  Because you earlier testified that you

22 didn't.

23         THE WITNESS:  Well, no, I said not directly.  We

24 would -- once we entered into a settlement with a client,

25 some money was -- they -- the client directed us to make a

132

1  payment to the creditor.

2          THE COURT:  So you made payments to creditors?

3          THE WITNESS:  Yes.

4          THE COURT:  Okay.

5          THE WITNESS:  With the client's understanding.

6          THE COURT:  Thank you.

7  BY MS. PHAM:

8  Q    You may have made payments on behalf of the client, but

9  did it come from the monthly payment that the client was

10  making, or was that a separate payment?

11  A    The monthly.

12  Q    I think that's the confusion.

13  A    The monthly.

14  Q    Okay.  It would come from the monthly, but the initial

15  contract was not for the payments to be intended to be

16  servicing the debt or paying debt?

17  A    No, never.  We weren't a consolidation company or

18  anything like that.

19  Q    Okay.  So maybe perhaps explain a little bit for us.

20  What exactly were the services of LPG?  Earlier, you heard

21  some statements by the trustee's counsel about debt

22  invalidation.

23  A    Well, we started -- well, the first service we would

24  actually perform is before any money was -- change hands at

25  all.  we run the credit scores, you know, the information we

133

1 needed.  We would vet their accounts, make sure they weren't

2 any secured accounts.  We were unsecured accounts only.

3 Credit cards, those types of things.  We make sure that it

4 is was a type of debt that we could handle and that they

5 could handle, and then we would continue that ongoing

6 throughout the life of the contract to even after the life

7 of the contract if need be.  If there was a law suit or

8 something happened after the life of the contract, they

9 would contact us, and we would still represent that client

10 for as long as we would be in existence, I suppose.

11 Q    So some of the services that you heard from trustee's

12 counsel, one was debt invalidation.  So first, you got the

13 client, determine if they're an appropriate client for the

14 firm, someone the firm would assess, correct?

15 A    Yes, and then we would send out representation letters

16 to all the creditors that they wanted us to represent.  And

17 then that was done.  That was done in an ongoing basis.  The

18 client could request an update on what was going on.  We try

19 to do it every 30 days, and that's what a lot of our

20 employees were for.  So we would -- they would add service

21 -- they would add different clients.  At times, a client

22 would say, hey, you know what, I have a -- I mean, I have a

23 lease coming up on a car.  I want to buy a home.  I need to

24 -- can you resolve this debt?  So we would -- we go right

25 into that.  We would try to resolve a particular debt that

134

1  they had in mind that was a problem for them getting --

2  future creditor getting a lease or something like that.

3  And we would continue the process going down the list

4  with the hopes of -- you know, it was something only around

5  eight or nine-percent of the cases ever really got to any

6  litigation to the Court's point earlier.  Very few cases

7  would.  So it was about eight or nine-percent.  We would go

8  into litigation.  And at that point, they would send in all

9  the paperwork to us.  We would assign a counsel, if it was a

10  need, do you want three of four or five, six, I think, at

11  one time in California alone.

12  Q    Let me pause you there  just so we have a

13  question-and-answer here.  So do you explain -- so some of

14  it was debt negotiation?

15  A    At times when they requested specifically, yes.

16  Q    Okay.  Pre-litigation.  And then at some point,

17  sometimes, you said only eight to nine-percent would get to

18  litigation?

19  A    That's what was it was about, yes.

20  Q    Okay.  And then what would happen 0tigation, there was

21  a question earlier about some -- would you ever file an

22  action on behalf of a debtor?

23  A    Occasionally, we would file an action on behalf of a

24  debtor using an FDCPA, Fair Debt Collection Practices Act.

25  Q    Okay.

135

1 A     When through discovery, perhaps, we would take a look,

2 you'd see that they may be -- did something they weren't

3 supposed to do, or we would actually encourage clients to

4 tell us whether an inappropriate correspondence was made

5 through a debt collector or their agents or staff or anyone

6 to that effect, or anyone, and then we would try to, you

7 know, find out what was still going on with their accounts,

8 see what's going on.  If it seemed like a decent case, we

9 would go ahead and handle that particular case for them.

10 Q     Okay.  So you have a small percentage where you would

11 bring in action for on behalf of a debtor, a client?

12 A     Yes.

13 Q     Other litigation would be defending against an action

14 by a collector?

15 A     Ninety-eight percent we're defending against lawsuits,

16 right.

17 Q     And you're handling some of those cases presently?

18 A     Yes, I'm handling -- well, my -- yes, my office is

19 handling all of them.  I'm having some assistance from

20 former counsel that used to work for me, but they have --

21 the case is assigned to them before, and they're very

22 competent counsel.

23           THE COURT:  May I interrupt one second?

24           MS. PHAM:  Yes.

25           THE COURT:  Thank you.

136

1          THE WITNESS:  Sure.

2          THE COURT:  These were specifically collection

3   cases that were filed in the Superior Court of California

4   against the clients of LPG?

5          THE WITNESS:  Yes.

6          THE COURT:  Okay.

7          THE WITNESS:  In California, there were --

8          THE COURT:  In California?

9          THE WITNESS:  Yes.

10         THE COURT:  The ones you were working on?

11         THE WITNESS:  Yes.

12         THE COURT:  And so the question I have is what

13  were the defenses for these people?

14         THE WITNESS:  Well, if you don't allege any, then

15  it becomes a default, and you don't have the service.  So

16  that affords us -- there are several defenses or partial

17  defenses usually --

18         THE COURT:  Besides statute of limitations?

19         THE WITNESS:  Well, double billing.  We would

20  actually conduct discovery on our part.  But when we were

21  sent discovery -- in about 25-percent of the cases, we would

22  receive discovery.  So as part of the service we provided,

23  we did have to litigate that.  We did have to timely

24  respond.  We did have to discuss things with their clients,

25  prepare responses and get them back -- get the verifications

137

1  in writing, a lot going on there.  But occasionally, you

2  would find something that they did incorrectly, and there

3  were plenty of cases, plenty of cases where they simply just

4  dismissed the case.

5          THE COURT:  So in the last five years, how many

6  trials have you participated in?

7          THE WITNESS:  Well, I guess, about the end of

8  2019.  So it's about -- started in 2020.  So participated in

9  50 to 60.

10         THE COURT:  You actually went to court and had a

11 trial?

12         THE WITNESS:  Well, we were -- yes.

13         THE COURT:  I'm talking about bench trial or a

14 jury trial?

15         THE WITNESS:  Yes, it was always a bench trial.

16 It was done by -- this is during the pandemic, of course.

17 So it was all done that way.  They just now within the last

18 three, four months have an in-person --

19         THE COURT:  So you did approximately 50 trials in

20 defense of these clients?

21         THE WITNESS:  Yeah.  Yes, one we had later settled

22 at the date of the trial.  We resolved it --

23         THE COURT:  Well, that's different than during the

24 trial.

25         THE WITNESS:  Yes.

**Briggs Reporting Company, Inc.**

138

1          THE COURT:  I'm asking you how many trials did you
2   do?
3          THE WITNESS:  I think about nearly 50 or so, I
4   think, over three years.
5          THE COURT:  Okay.  And over three years.  And how
6   many clients went to trial over those three years?
7          THE WITNESS:  Just with me or the whole firm?
8          THE COURT:  With you.
9          THE WITNESS:  Well, how many went as opposed to
10  how --
11         THE COURT:  You said you did 50 trials.
12         THE WITNESS:  Well, I believe so.
13         THE COURT:  How many of your clients that you were
14  representing didn't go to trial in the three years?
15         THE WITNESS:  Didn't appear?
16         THE COURT:  Did not go to trial -- not default,
17  that you settled?
18         THE WITNESS:  The vast majority.
19         THE COURT:  And so 1,000?
20         THE WITNESS:  That seems like a large amount.
21  From my particular calendar, I was handling a lot of the
22  CMCs initial stuff, discovery.  So I think 1,000 is -- I
23  would say 400 or 500.
24         THE COURT:  Four hundred?  Okay.  Thank you.
25         MS. PHAM:  Sorry.  I apologize.  So actually

139

1 following on with the Court's --

2 THE COURT:  Well, I'm going to let you do some

3 discovery later if you desire, but I think that it is not

4 helpful for this preliminary injunction of what you're

5 doing.

6 MS. PHAM:  I just wanted the Court to have a

7 better picture of how the firm was actually operating.

8 THE COURT:  Yes.

9 MS. PHAM:  So I was going to have Mr. March

10 testify about how the firm (indiscernible).  You just asked

11 him about his --

12 THE COURT:  You seem to know a lot about the firm

13 itself.

14 MS. PHAM:  From the little I've learned as of this

15 morning, your Honor.

16 THE COURT:  No, I've learned the same as -- that

17 -- as you've learned?

18 MS. PHAM:  Meaning how the firm has operated,

19 because I the think misinformation --

20 THE COURT:  Some people can't read the room.  I'm

21 asking you to hurry up and finish.

22 MS. PHAM:  I appreciate it, your Honor.  May I ask

23 Mr. March to tell the Court approximately how many files and

24 cases or matters each attorney handled from one?

25 THE COURT:  Well, if he knows.  Do you know?

140

1          THE WITNESS:  I don't know.

2    BY MS. PHAM:

3    Q     For example, yourself.  Starting with yourself.

4    A     Probably have to figure that by -- handle -- just

5    handle cases?

6    Q     Yeah, the caseload assigned.

7    A     One to two every day was a court appearance, one way or

8    the other, whether it be a CMC, whether it be an MSC.  I

9    mean, that's how many -- we have appearance or had

10   appearances.  We still have appearances every day.  And I

11   suspect we will for -- assuming that we -- I get to handle

12   these cases or I am going to handle the cases, that's

13   probably two years where the case is still (indiscernible),

14   I believe.

15          THE COURT:  When you say, "two years," you mean

16   it'll take two years to complete these cases?

17          THE WITNESS:  Yes.

18          THE COURT:  Okay.

19          THE WITNESS:  Yeah, the ones we have.  We have

20   court dates.  We have trial dates.

21          THE COURT:  I understand what goes on in the state

22   court.

23          THE WITNESS:  Two years.

24          THE COURT:  Do you have any other questions?

25          MS. PHAM:  Very last.

141

BY MS. PHAM:

Q    If you can explain to the Court in terms of -- you heard some questioning about the trust account.  Why was no money put into a trust account?

A    Well, as I had read the rules, it wasn't required, unless it was a settlement case on the client's behalf.  We got the money in and it was distributed immediately.  It was a -- no money -- nothing was held on behalf of the client.

Q    You weren't billing hourly, were you?

A    No, we weren't billing hourly in the agreement.  The written agreement called for us to have a fee.  It was known upfront, and that's the way it was handled.

            MS. PHAM:  Okay.  Thank you, your Honor.

            THE COURT:  Thank you very much.  I think you're done.  Thank you very much.

            THE WITNESS:  Thank you, sir.

            MR. COUSINEAU:  I'm sorry, your Honor.  May I ask him a question?

            THE COURT:  Who do you represent?

            MR. COUSINEAU:  I represent Validation Fund and MC DVI 1 and 2.

            THE COURT:  Are you opposing the preliminary injunction?

            MR. COUSINEAU:  I am not opposing the preliminary injunction.

142

1          THE COURT:  Tell me what you want to ask questions

2 about.

3          MR. COUSINEAU:  I wanted to ask him a couple of

4 questions about the transfer of files and the authority to

5 transfer the clients.  It's come up a number of times.

6          THE COURT:  And is that necessary under oath?

7          MR. COUSINEAU:  I think it is, your Honor.

8          THE COURT:  Okay.  Sit down.

9          MR. COUSINEAU:  It's based on questions your Honor

10 have --

11          THE COURT:  Please come forward and state your

12 name for the record and ask your several questions.

13          MR. COUSINEAU:  Thank you, your Honor.  Your

14 Honor, my name is David Cousineau, and I represent Debt

15 Validation Fund and MC DVI 1 and MC DVI 2.

16          THE COURT:  And are you a creditor?

17          MR. COUSINEAU:  Yes, your Honor.

18          THE COURT:  And Debt Validation Funds II?

19          MR. COUSINEAU:  Yes.

20          THE COURT:  They claim that they owe you

21 $65,385,489.44.  Is that about right?

22          MR. COUSINEAU:  That is about right, your Honor,

23 yes.

24          THE COURT:  Now, how in the world did Debt

25 Validation Fund II come to be a creditor in this estate for

143

1  $65,385,489.44?

2          MR. COUSINEAU:  Your Honor, would you -- I can

3  answer that question --

4          THE COURT:  Thank you.

5          MR. COUSINEAU:  -- and I can tell you that it's

6  the same for Debt Validation Fund.

7          THE COURT:  Well, let's try it for Debt Validation

8  Fund II.

9          MR. COUSINEAU:  Okay.  So for Debt Validation Fund

10  II.  Debt Validation Fund II invested through Validation

11  Partners into the stream of income that your Honor has heard

12  about, the stream of income that comes from the clients.  So

13  the Debt Validation Fund would purchase the stream of income

14  -- which was going to come in over an extended period --

15  would purchase it at a discount and then would get the

16  payments.  So there would be a return on that investment.

17  That's not where we get to the 65 million.

18          THE COURT:  Well, I understand.  So you've already

19  said that there is a contract involved?

20          MR. COUSINEAU:  There is a contract --

21          THE COURT:  And I'm assuming that there's a

22  contract that you have with the Debtor, the Litigation

23  Practice Group P.C.

24          MR. COUSINEAU:  I haven't gotten to that where --

25  there is a contract, yes, and I --

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 13:31:21 Desc
Declaration of Kathleen Pnouhnuh March Page 149 of 290 Page 216 of 337

144

1          THE COURT:  Okay.  And what were there -- and what

2  was Debt Validation Fund II doing?  They were purchasing

3  streams of payments that have been generated by Litigation

4  Practice Group?

5          MR. COUSINEAU:  Correct, your Honor.

6          THE COURT:  How did it get to be 65 million plus?

7          MR. COUSINEAU:  So, your Honor, what happened was

8  in the summer of last year, spring, summer of last year,

9  payments were not getting made.  I had mentioned that we

10  invested --

11          THE COURT:  Spring or summer of 2022?

12          MR. COUSINEAU:  Correct.

13          THE COURT:  Okay.

14          MR. COUSINEAU:  And I had mentioned that we had

15  purchased these streams of income through Validation

16  Partners.

17          THE COURT:  And who is Validation -- Debt

18  Validation Fund II working with on the other side?  In other

19  words, I hate to use a word that no one understands.  But

20  who is the counterparty in that deal?

21          MR. COUSINEAU:  That was originally Validation

22  Partners.

23          THE COURT:  Okay.  So did you have a deal with

24  Litigation Practice Group?

25          MR. COUSINEAU:  That's exactly what I'm getting

145

1 to, your Honor.

2          THE COURT:  Please get to it.

3          MR. COUSINEAU:  So the Litigation Practice Group

4 would make payments to Validation Partners, who would make

5 payments to Debt Validation Fund.  Those payments stopped.

6 We tried to figure out what was going on.  My clients had

7 interactions with LPG where it was explained to them that if

8 they assigned that stream of income to LPG, as well as

9 rights to law suits against Validation Partners, LPG would

10 enter a secure promissory note with Debt Validation Fund

11 that would provide an additional -- a higher of money, but

12 paid out over a longer period of time.  So that's how we

13 entered into a contractual arrangement with the Debtor,

14 Litigation Practice Group.

15          THE COURT:  Okay.  And do you have a copy of that

16 agreement?

17          MR. COUSINEAU:  Your Honor, I --

18          THE COURT:  Not with you, but do you have your

19 copy of that agreement?

20          MR. COUSINEAU:  I do have a copy of that

21 agreement, yes.

22          THE COURT:  Would you provide that to the Chapter

23 11 Trustee?

24          MR. COUSINEAU:  I believe he has it, but I will

25 definitely -- I will -- sorry, I take that back.

146

1           THE COURT:  If he already has it, that's fine --

2           MR. COUSINEAU:  I think I've already given it to

3  him.

4           THE COURT:  -- but if not, please provide that

5  contract.  And now, what is MC DIV Fund 1?

6           MR. COUSINEAU:  DVI Fund II?

7           THE COURT:  Yes.

8           MR. COUSINEAU:  Yes.  That is another client of

9  mine.

10          THE COURT:  Yes.

11          MR. COUSINEAU:  Same issue happened.

12          THE COURT:  Well, that's 36,810,655.64.

13          MR. COUSINEAU:  Right.  Of lesser investment.

14          THE COURT:  Now, it's morbid curiosity.  How much

15 was the discount?

16          MR. COUSINEAU:  How much was the discount?

17          THE COURT:  Yeah.

18          MR. COUSINEAU:  I don't remember offhand, your

19 Honor.

20          THE COURT:  Okay.  And Validation Partners, LLC?

21          MR. COUSINEAU:  That is not --

22          THE COURT:  Not your client.

23          MR. COUSINEAU:  -- Validation Partners is not my

24 client.

25          THE COURT:  Whose clients -- does anyone represent

147

1   Validation Partners LLC?

2          UNIDENTIFIED SPEAKER:  Not in court.

3          MR. COUSINEAU:  Not in the --

4          THE COURT:  Okay.  But they're owed approximately,

5   according to the schedule, 25 million.  And then we get down

6   to Marich Bein, but that's only eight million.  But I assume

7   that all of these were facilities that are not unlike the

8   Debt Validation Fund II.  Am I right?  Do you have any idea?

9          MR. COUSINEAU:  Marich Bein, I believe, was one of

10  the payment processors.  I don't know what that -- I can't

11  answer on that claim.

12         THE COURT:  Okay.  All right.  All right.  Now,

13  you've established your bona fide.  Thank you very much.

14  You may ask a few questions.

15         MR. COUSINEAU:  Thank you, your Honor.

16                   FURTHER RECROSS EXAMINATION

17  BY MR. COUSINEAU:

18  Q    Good afternoon, Mr. March.

19  A    Hello.

20  Q    There were some discussions earlier and questions

21  earlier about clients that were transferred or that were

22  taken from LPG.  Do you remember that?

23  A    I do.

24  Q    Okay.  And there were discussions about some lawyers

25  and employees leaving to go to Greyson.  Do you remember

148

1  that?

2  A    I do.

3  Q    You as a person who's in charge of LPG, did you approve

4  the sending of the client files over to Greyson?

5  A    No, I did not.  Greyson, I think, was well after --

6  that they were with another law firm, either Phoenix or

7  Consumer Legal Group or Oakstone.  I wasn't part of any

8  decision with Greyson.

9        THE COURT:  Who would have made that decision?

10        THE WITNESS:  I was already -- we were already in

11  Chapter -- we already filed Chapter 11.  I wasn't doing

12  anything, really, with LPG other than managing my client

13  load.

14        THE COURT:  Let's try it again.  Who would have

15  made that decision?

16        THE WITNESS:  I don't know.

17        THE COURT:  Okay.

18  BY MR. COUSINEAU:

19  Q    So the lawyers that left and took clients, they did not

20  take clients from LPG.  They took the clients from one of

21  these other entities, Phoenix or Oakstone?

22  A    That is my understanding, yes.

23  Q    Okay.  Now, when clients were transferred to Phoenix

24  and Oakstone as well Consumer Law Group, did you authorize

25  the transfer of those files?

149

1  A    I did, after I -- yeah, we agreed that -- I thought it

2  was a -- in order to protect the clients and we were getting

3  no streaming money whatsoever, we were in dire straits.  Our

4  staff was leaving.  Counsel -- or local counsel all over the

5  United States was leaving.  I felt it incumbent on myself to

6  find a way somehow to get these clients representation,

7  whether it was litigation or whether it was just the files.

8  Q    And you negotiated agreements with Phoenix and Oakstone

9  and Consumer Law Group for them to pay a certain portion of

10 the fees they collected, correct?

11 A    I approved them.  I didn't negotiate them.

12 Q    Who negotiated them?

13 A    Mr. Diab.  Initially, when they first went, yes.

14 Q    Did you get client consent before you decided to send

15 the clients to Phoenix and Oakstone and Consumer Law Group?

16 A    We have provisions in the attorney-retainer agreement,

17 the services agreement, the initial (indiscernible) of

18 Litigation Practice Group.  That's how -- we didn't have

19 counsel throughout the United States.  So when we had a new

20 case or a litigation case, we did have to locate counsel,

21 and that's the only way we could do that.  So that's the

22 provision we used.

23         THE COURT:  And that's a unilateral decision by

24 Litigation Practice Group?

25         THE WITNESS:  Yes.

150

1          THE COURT:  The client would have no choice?

2          THE WITNESS:  They actually had a choice, and they

3    still have a choice, assuming there's any of them left, yes.

4          THE COURT:  How would they be told that they have

5    a choice other than read the initial contract?

6          THE WITNESS:  They were given a notice, I believe,

7    by e-mail, possibly mail, to each of the clients that we

8    had, and they were asked to say, here is where you can go.

9    And secondly, if you want out of it, if you want to

10   terminate it, we'll refund you your money as well.  There's

11   a 100-percent refund provision in all the agreements, and

12   some people have taken us up on it.  Some have not.  Some

13   just want the representation.  Some are like -- a lot of

14   people who want to stay with LPG.  But, yes, we were able to

15   provide a refund for any account that they were dissatisfied

16   with, or even if they were satisfied, they still had the

17   ability in the original agreements to go ahead and request a

18   refund, and some did.

19   BY MR. COUSINEAU:

20   Q    Mr. March, do you know what the provision is?  Is there

21   a specific provision number in the agreements?

22   A    I don't recall.  It's been a long time.

23   Q    Do you remember approximately what it says?

24   A    At this point, no, I don't recall.

25   Q    Did you get client authorization to transfer client

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 18:13:21 Desc
Declaration of Kathleen P. March Page 156 of 202 Page 223 of 337

151

1  files prior to transferring them?

2  A    No.

3  Q    And by client files, I mean the actual files related to

4  the clients, the information about the client?

5  A    No, no, other than the unilateral decision to go ahead

6  and do that to make sure the clients were protected.

7         MR. COUSINEAU:  Your Honor, thank you.  I have no

8  further questions.

9         THE COURT:  Well, thank you.  Would there be any

10 redirect?  I believe there is.  There's always another

11 question.

12                REDIRECT EXAMINATION

13 BY MR. CELENTINO:

14 Q    Mr. March, if I present to you a document that is the

15 Litigation Practice Group retainer you were talking to --

16 talking about, could you identify it for us?

17 A    There were many iterations of them, but, yes.

18        MR. CELENTINO:  May I, your Honor, approach him?

19        THE WITNESS:  Okay.

20 BY MR. CELENTINO:

21 Q    Does that document on the screen appear to you to be

22 one iteration as you've indicated of the agreement between

23 LPG and a client?

24 A    It appears, yes.

25 Q    Okay.  And does that document identify that you have

152

1 the right to move the file to another law firm?

2 A    I believe it does.

3 Q    Would you read the sentence for the Court and for the

4 parties, that you believe identifies that you can move the

5 client to another law firm.

6 A              "You further understand and agree

7              you sought a representation of LPG with

8              full knowledge of its location and

9              licensing.  LPG works with attorney's

10             license in all 50 states and the

11             District of Columbia as affiliated

12             counsel to allow LPG provide complete

13             representation in the state in which

14             you're sued, or to which a dispute shall

15             rise, you shall have the right to know

16             the licensed attorney with whom LPG has

17             affiliated in any state and any time,

18             but understand and agree that LPG may

19             choose to change the local attorney with

20             whom it is affiliated in any

21             jurisdiction."

22 Q    And it's your belief that that means that LPG is not

23 responsible but will allow for the transfer of the client to

24 a completely different law firm?  Is that what you

25 understand that sentence to mean?

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 08:33:21 Desc
Declaration of Kathleen P. March Page 158 of 293 Page 225 of 337

153

1 A    Yes.

2         MR. CELENTINO:  Okay.  Thank you.

3         THE COURT:  Thank you.  Get out while you can, Mr.

4 March.

5                          (The witness was excused.)

6         THE COURT:  Do you have any further witnesses?

7         MR. CELENTINO:  At the edge of the hour, your

8 Honor, I would like to call Tony Diab.

9         THE COURT:  Well, first of all, there is no edge

10 of the hour.  We are here.  This is important stuff, and

11 we're not going anywhere until we have resolution.  So if

12 you'd like to call Mr. Diab.  Is he under subpoena?

13         MR. CELENTINO:  He is under subpoena.  We

14 subpoenaed and served the summons on him with the complaint

15 and the order to show cause was served upon him.

16         THE COURT:  Is Mr. Diab here?

17         MR. CELENTINO:  He is here.

18         THE COURT:  Mr. Diab, would you like to come

19 forward?

20         Good afternoon, Mr. Diab.

21         THE COURT:  Good afternoon, your Honor.

22         THE CLERK:  Please raise your right hand.

23          TONY DIAB - PLAINTIFF'S WITNESS - SWORN

24         THE CLERK:  Please state your name and spell your

25 last name for the record.

154

1          THE WITNESS:  Tony Diab, D-I-A-B.

2          THE CLERK:  Thank you.

3                    DIRECT EXAMINATION

4    BY MR. CELENTINO:

5    Q    Thank you, Mr. Diab.  At the 341(a) meeting of

6    creditors, you testified that you had no role in the

7    operations of LPG.  Is that correct?

8    A    That's not correct.

9    Q    What did you say your role was?

10   A    So my role was a combination of managing the vendors

11   and the administrative work of the firm, meaning there was

12   the practice of law at the law firm and there was everything

13   else.  And my job was the "everything else," meaning not the

14   practice of law, but the vendors and all the processes that

15   went into producing essentially the product that LPG

16   provided.

17   Q    Did you disclose to --

18          THE COURT:  Mr. Diab, Hold on.  Mr. Diab, he

19   didn't ask you the time frame of the services that you've

20   just described.  Can you help me understand when were you

21   doing this -- even -- or are you doing it now?

22          THE WITNESS:  So this would have been from

23   approximately February of 2019 until the date the petition

24   was filed.

25          THE COURT:  Thank you.  That helps me a great

155

1  deal.  Thank you.  I'm sorry for the interruption, but I

2  needed the date on this.

3          MR. CELENTINO:  I understand.

4  BY MR. CELENTINO:

5  Q    Who made the decision for the Litigation Practice Group

6  to file Chapter 11?

7  A    It was a conversation between Dan March and I.  We

8  discussed the pros and cons, and we opted to file the

9  Chapter 11 primarily to deal with the dispute that we had

10 with the payment processor.

11         THE COURT:  I'm sorry, you're speaking very fast.

12         THE WITNESS:  My apologies, your Honor.

13         THE COURT:  Dispute with?

14         THE WITNESS:  With a payment processor at the time

15 of the petition filing.

16         THE COURT:  Who was the payment processor?

17         THE WITNESS:  It was actually two, Marich Bein,

18 LLC and Equipay, which also went by the name of Profley

19 (phonetic).

20         THE COURT:  Thank you.

21 BY MR. CELENTINO:

22 Q    You heard the testimony earlier or the discussion

23 earlier about the way that the customer of the LPG has an

24 ACH pull from their account to a resolution account.  You

25 understand that process?

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 18:13:21 Desc
Declaration of Kathleen P. March Page 161 of 293 Page 228 of 337

156

1   A    I understand the process of ACH pulls very well, yes,

2   sir.

3   Q    Okay.  And when Litigation Practice Group enters into a

4   contract with a proposed client, it was to be able to pull

5   the ACH monthly payment, correct?

6   A    Correct.  It would pull it two ways.  One is the ACH

7   debit that you referenced, and the other is payment by debit

8   card.  We processed both methods, no credit cards, only

9   debit.

10  Q    Okay.  Who made the decision when to instruct through

11  the process that it was time to make a client pull?

12  A    That depends on the payment processor.  Each payment

13  processor has different procedures and different methods

14  that they use both for receiving instructions and for how

15  they handled the funds.

16  Q    Understand that.  Who made the decision at Litigation

17  Practice Group to reach out to the payment processor at a

18  time to engage them in their process?

19  A    That would depend on what point in time.  And I'll give

20  you the whole history if that's okay with the Court.  And so

21  this venture began with Diab Law as the law firm, not

22  Litigation Practice Group, working together with Coast

23  Processing.  That would have been from roughly November 2017

24  until February of 2019.  During that time period, it would

25  have been the CFO of Coast Processing, Asante Bayrooti, who

157

1  would have made the decision regarding ACH processing.  When

2  Diab Law -- when my license was involuntarily set to

3  inactive and Diab law essentially closed, Litigation

4  Practice Group was formed, and Asante continued to perform

5  that function as the acting CFO -- not the actual officer or

6  director, but acting CFO of Litigation Practice Group from

7  February of 2019 until June of 2021.

8  Q    Who hired him?

9  A    He was hired by Dan March, but -- sorry.  At Coast

10 Processing, he was a principal.  So he was one of the

11 members of B.A.T. LLC, which turned into B.A.T.

12 Incorporated.  And he formally held the role of CFO at

13 B.A.T. Incorporated.  At LPG, first, it was John Thompson

14 and then Dan March that selected him to perform that

15 function, and he performed it very well.  In June 2021, when

16 he ceased his connection to LPG and Coast Processing, I took

17 over that function.  So from June 2021 until the petition

18 date, it would have been me that had that role.

19 Q    Okay.  Thank you.  So you were the person, then, that

20 made the decision that LPG was going to take an ACH transfer

21 from a client?

22 A    Yes, but I'll explain the process.  The clients were

23 enrolled.  Their enrollment was confirmed, and then the CRM

24 would automatically transmit that data to the payment

25 processor, meaning nobody had to push a button, make a phone

158

1  call, send an e-mail.  It would automatically happen when

2  the enrollment was confirmed within the CRM.

3  Q    But that was at your instruction?

4  A    Correct.

5  Q    Okay.  And when the pull was pulled into the settlement

6  account, who made the decision where the money would be

7  sent?

8  A    So not all payment processors use a settlement account.

9  So we would have to go processor by processor.  Some like

10  Marich Bein, LLC had a settlement account, meaning the funds

11  would pull and sit in an account.  At the time, it was

12  BankUnited.  And then a decision was made to send the money

13  from BankUnited to whatever the destination would be.  That

14  was how Marich Bein performed their function.  World Global

15  performance --

16  Q    Let's stop with Marich Bein.  Who instructed Marich

17  Bein where to send that money?

18  A    So I would instruct Marich Bein where to send the money

19  -- sorry -- from the settlement account because they would

20  automatically put it there.  From the settlement account, I

21  would instruct where it would go after that.

22  Q    And when it was delivered after that, who made the

23  decision what it would be spent upon?

24  A    That was up to the accounting department.  So the

25  accounting department had certain automated payments that

159

1  they would regularly perform, and then there were certain

2  special requests.  And then the accounting department as a

3  whole would make decisions about which requests had which

4  priority.  We tracked that through an AP tracking chart to

5  show all of the payables, the due date, the aging, and then

6  decisions would be made.

7      For most decisions, it was low level, so the accounting

8  department would do it on their own.  For larger

9  transactions, they would usually consult Wes Thomas, while

10 he was the acting CFO, he was never an officer or director,

11 but he was the director of finance.  So Wes would be

12 involved.  I would always be involved.  And depending, there

13 may have been somebody else in the firm.  One of the

14 attorneys might have gotten involved if it's something that

15 they were demanding to be sent.  For instance, Jayde

16 sometimes would say this payment has to go out, and she

17 would intervene, or somebody else would make such a request.

18 So it was a group effort.

19 Q    Jayde, when she worked at LPG?

20 A    Correct.

21 Q    And you heard earlier that we discussed that Jayde is

22 now working for Greyson Law?

23 A    Correct.

24 Q    Yes.  Are you aware of her salary at Greyson Law?

25 A    I'm not aware of it and that I haven't seen it myself,

160

1  but I've heard rumors.

2  Q     What rumor have you heard?

3  A     I've heard --

4        MR. BAUM:  Your Honor, I'm going to object to that

5  as hearsay.

6        THE COURT:  Excuse me.  Well, it's not because

7  it's not for the truth of the matter asserted.  It's just

8  what a rumor is.  What I'll do -- excuse me --

9        MR. BAUM:  I'm sorry, your Honor.

10        THE COURT:  Okay.  I'll take it for what it's

11  worth.  And it's easier to get the answer and noting that

12  it's just a rumor, and it's not really relevant to arguing

13  about it.

14        MR. BAUM:  Thank you, your Honor.

15        THE WITNESS:  So this is semi speculation, but I

16  believe it's roughly 500,000 a year.

17  BY MR. CELENTINO:

18  Q     Do you know how many years she's been a practicing

19  attorney?

20  A     I believe she's practiced for a little over two years.

21  Q     Thank you.  I'm in the wrong business.

22        THE COURT:  No, you're not.

23  BY MR. CELENTINO:

24  Q     Fast forward for me to the date of the bankruptcy

25  petition.  The bankruptcy petition is filed.  I believe we

161

1  heard Mr. March say that by that time, you had negotiated,

2  and he had approved transfers of all but a few of Litigation

3  Practice Group clients.  Is that correct?

4  A    That's correct.  And the time frame would have -- it

5  would have began, I think late January, and it would have

6  stretched into the first week of March, those series of

7  transfers.

8  Q    Okay.  And series of transfers that were made to

9  Oakstone, when there was a falling out -- excuse me -- was

10 there a falling out between you and the parties at Oakstone?

11 A    I believe there was a falling out internal to Oakstone,

12 and then I became involved after that, and then there was a

13 falling out between me and Oakstone.

14 Q    Okay.  And when there was a falling out between you and

15 Oakstone -- and approximately when was that?

16 A    This would have been in, I would say, late April, early

17 May of this year, little over a month ago.

18 Q    And what happened at that time with the Oakstone files?

19 A    So Oakstone collapsed.  Essentially, it wasn't able to

20 service any files, and it ceased operations.  And at that

21 point, the files were transferred from Oakstone to Phoenix.

22 It was not a unilateral decision.  There were a lot of

23 people involved in that decision.

24 Q    Okay.  Did Oakstone request them to be transferred to

25 Phoenix?

162

1  A    They did.  So Scott Eadie was the principal of Oakstone

2  and was aware of the fact that they could not service the

3  clients, and he agreed that the clients had to be

4  transferred.

5  Q    And Scott Eadie is now the principal of Greyson Law,

6  correct?

7  A    Correct.  A lot of the former employees of Oakstone

8  after its collapse formed Greyson.

9  Q    When you were involved in the time frame that we've

10 talked about with Litigation Practice Group, you were aware

11 of the attorneys that Litigation Practice Group relied on to

12 assign clients to around the country, right?

13 A    Many of them, yes.  Not all.

14 Q    But that was a network you were generally aware of?

15 A    Yes.

16 Q    And so when the Litigation Practice Group clients were

17 transferred at your idea and Mr. March's approval to, take

18 an entity named Phoenix, for example.  Do you know whether

19 Phoenix contacted those same attorneys to work those same

20 files?

21 A    It was my understanding that Phoenix contacted every

22 client and then each attorney that was assigned to that

23 client after the point of transfer.

24 Q    Okay.  And were you involved at all with Phoenix?

25 A    I was involved in a consulting capacity but not related

163

1 to any client files.  So my communications with Phoenix

2 would have been limited to Ty Carss a handful of times per

3 month, Bianca and Stephanie regarding accounting matters, a

4 handful of times per week.  More frequent with Bianca and

5 Stephanie than with Ty, but it would have been consulting.

6 I was not typically consulted with any particular client

7 matter.  And when Ty would reach out to me, it was typically

8 to find local counsel, either somebody who could handle a

9 bankruptcy or in a state where he didn't already have a

10 relationship, trying to establish relationships so that

11 somebody could handle a client file, sort of the limit.

12 Q    Were you involved in the decision making to start

13 Phoenix Law Group?

14 A    I was.  And at the time, it was a successor to a prior

15 entity that I had more involvement with called Gallant Law

16 Group.

17 Q    And what happened with Gallant Law Group?

18 A    It was a joint venture that failed.  The joint venture

19 was with somebody named Nick Cole Schreiber (phonetic).  And

20 that joint venture failed in November of 2022, specifically

21 related to his objections over the Validation Partners

22 Litigation.  So he opted not to proceed with the JV, and we

23 formally dissolved it in November.

24 Q    Understood.  Okay.  Who hired Ty Carss to be the lead

25 lawyer at Phoenix Law?

164

1  A    He wasn't hired.  He is the principal of Phoenix, but

2  he was asked if he would serve as the managing attorney of a

3  new law firm that would take over the Gallant clients, and.

4  in fact, the Gallant client base.  So Gallant was the law

5  firm that was being serviced by an entity called Prime

6  Logix.  Prime continued, and it was under the direction of

7  Bianca Loli.  A new law firm was needed, and so we

8  approached Ty with that request.  He had done very well with

9  the clients.  He seemed interested.  So we asked if he would

10 be the managing attorney of this new entity called Phoenix,

11 and he accepted.

12 Q    So "we" implies you were part of that approach to Ty?

13 A    I was.

14 Q    Who was the other person or persons in the "we?"

15 A    The principal of Prime Logix, who was managing the

16 processing center, which is Rosa Bianca Loli.

17 Q    And the processing center was to process the client

18 pulls for the clients who were formerly clients of LPG that

19 had been transferred to other entities?

20 A    When we refer to processing, we mean mail processing,

21 customer service, phones, CRM.  It includes payment

22 processing, but that was a small part of what Prime Logix

23 would do.  And so it would do all of the customer service

24 and administrative function for the law firm.

25 Q    So it's like a third-party vendor to the law firm to

165

1  outsource the law firm services, right?

2  A    The services other than the practice of law, correct.

3  Q    Other than the practice of law.  Okay.  And Ms. Loli is

4  the owner of Prime Logix?

5  A    She was one of two.  It was owned by two individuals,

6  her and Nick Cole Schreiber.  Nick was no longer involved as

7  of November, and so she was the last remaining member of

8  that LLC.

9  Q    Prior to the outsourcing of those services to Ms. Loli,

10  weren't those services provided by staff at LPG itself?

11  A    No.  Prime Logix was in operation from May of 2022

12  until present, and it continued to provide that service for

13  the clients that they had onboarded through Gallant Law

14  Group.  And that servicing continued all the way until the

15  present day, actually, until the trustee's office obviously

16  took over the -- of the operation on June the 2nd.

17  Q    So there's a contract -- are you saying there's a

18  contract between Phoenix Law Group and Prime Logix to

19  provide all the staff support and other processing,

20  excluding legal services for Phoenix clients?

21  A    I believe the contract was with Phoenix and Maverick

22  Management Group, which was supposed to be a successor to

23  Prime Logix, but Prime is still operating alongside

24  Maverick, meaning they're both currently operating in that

25  identical capacity.

166

1  Q    And do you -- are you aware that Maverick and Prime

2  Logix provide those services also to Greyson Law?

3  A    I'm not aware of that, that that function is being

4  performed right now.  I think that Greyson is very distinct

5  from Phoenix and Prime and Maverick, and I don't think that

6  that's a good relationship.  I believe it's hostile.  Though

7  they have counsel who can address that issue.

8  Q    Is there any reason then -- let me backtrack.

9       Mr. Diab, you've testified that you've never been to

10 the Phoenix offices.  Is that right?

11 A    Not true.  Since it became Phoenix Law, I had not been.

12 But the same offices housed Gallant Law Group, and I visited

13 that multiple times.

14 Q    The same offices housed Gallant Law Group?

15 A    Correct.

16 Q    I see.  Okay.  Did the same offices house Phoenix Law

17 Group?

18 A    Yes.

19 Q    Okay.  And how about Oakstone when it was operating?

20 A    A different suite in the same space, but yes.

21 Q    Same space, okay.  Were you involved in the acquisition

22 of client files by LPG in the few weeks before the

23 bankruptcy petition was filed?

24 A    Acquisition of client files by LPG --

25 Q    Yes.

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 13:13:21 Desc
Declaration of Kathleen P. March Page 72 of 99    Page 239 of 337

167

A       -- pre-petition?  I believe that LPG was still

onboarding clients as of the beginning of March, so I would

have still been involved then.  I think it was around March

13th that it stopped onboarding new clients, somewhere

around there.

Q       And the onboarding of new clients, are those -- is that

onboarding from a marketer?

A       Typically, yes, a marketing affiliate is the typical

route through which a client would be connected with LPG to

become enrolled.

Q       And a marketing affiliate, why do you call it

affiliate?

A       Because they're more than a simple vendor.  They sort

of service the clients start to finish.  They have an

ongoing retention function, an ongoing customer service

function.  The clients will constantly call back to the

marketing affiliate with questions, with their anxieties,

with their complaints.  A lot of times, we find out what

clients don't like about the law firm from the marketing

affiliate that has a much closer relationship with the

client.

          THE COURT:  Who is the marketing affiliate?

          THE WITNESS:  We've worked with over 150 over the

last five years, but there are companies of various sizes.

Some are one individual.  Some are floors with 100 people.

168

1  But they sell various products, and we established

2  relationship so that we would be one of the products that

3  they would sell.

4          THE COURT:  You call them an affiliate or they

5  call themselves an affiliate.  Where is the affiliation?

6          THE WITNESS:  So there is an affiliation agreement

7  between the -- in our case, it was LPG.  And now, it would

8  be whichever law firm in that marketing company.  But it's

9  an affiliation agreement that outlines the roles that they

10  are going to perform and the rules and restrictions that

11  apply to them, because we have a lot of restrictions on what

12  they can do.

13          THE COURT:  Is it a -- more of a joint venture or

14  a contractual relationship.  I'm trying to get a handle on

15  "affiliate."  In the bankruptcy community, we know what an

16  affiliate is, but I'm not sure -- I'm -- I don't want to be

17  biased with my understanding of what affiliates are in

18  bankruptcy context versus what your understanding is, with

19  respect to what an affiliate is.

20          THE WITNESS:  Yeah.  In our context, it's simply a

21  contractual relationship.  But we try to differentiate an

22  affiliate from a regular vendor because of the ongoing

23  nature of that relationship.  But it's a vendor by contract

24  is the more accurate.

25          THE COURT:  Vendor by contract.  Thank you.

**Briggs Reporting Company, Inc.**

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 13:13:21 Desc
Declaration of Kathleen Dunn March Page 174 of 293 Page 241 of 337

169

BY MR. CELENTINO:

Q    Is there a fee that is paid to that affiliate for the
assignment of that client to you?

A    Yes.

Q    And what does that fee constitute?

A    The fee is for the services that they render, which
includes the onboarding, that ongoing retention function,
and the ongoing customer service function.  And it varies
affiliate by affiliate.  Our approach has changed over the
years.  So we've had different forms of the affiliate
agreement and the contract, but it's for the services
rendered.

        THE COURT:  Do you have any knowledge of any
connected ownership between the Debtor and any of these
affiliates?

        THE WITNESS:  It would not be the Debtor, but I
myself Tony Diab had a connection to one marketing affiliate
called Asolution (phonetic) Debt Relief.  It's an affiliate
that did not last very long.  And it ceased operations -- as
far as LPG is concerned, it would have been August of 2022.
But that was not an LPG connection.  That was a Tony Diab
connection.  Otherwise, the answer would be no.

        THE COURT:  Thank you.

BY MR. CELENTINO:

Q    Wasn't Coast Processing a marketing affiliate?

170

1   A      No.  Coast Processing did not do anything marketing.

2   It was like Prime Logix.  It was a company that would

3   provide processing service, which means customer service on

4   the phones, mail processing, inbound and outbound,

5   accounting, payment processing.

6   Q    So the marketing affiliate that refers a client to you

7   stays in contact with that client to make sure the client is

8   getting appropriate services?

9   A      Correct.  Sometimes they'll do payment reminders.

10  Sometimes they'll do regular outreach just to touch base

11  with the client and ensure that the --

12          THE COURT:  Is that a contractual requirement?

13          THE WITNESS:  It is.

14          THE COURT:  Thank you.

15  BY MR. CELENTINO:

16  Q    And the fee that the -- that LPG -- let's use LPG as an

17  example.  The fee that LPG pulls from the LPG client, is

18  some portion of that used to pay that marketing affiliate?

19  A      Yes.  The fees that LPG pulls from clients, that's

20  LPG's revenue, and LPG uses its revenue to compensate the

21  marketing companies for the services that they perform

22  pursuant to contract.

23  Q    I'm going to ask you to take a look at a document.  I'm

24  going to ask you some questions about that.

25          Do you see the document I have provided to you, Mr.

171

1  Diab?

2  A    Yes.

3  Q    Do you recognize that document?  Do you know what that

4  is?

5  A    I do.

6  Q    What is that?

7  A    This appears a screenshot of the Revolv/Worldpay

8  portal.  Revolv is the broker.  Worldpay is the actual

9  processor, but they use this portal to convey information

10 regarding process payments.

11 Q    Do you see in the upper left that it indicates

12 Litigation Practice Group P.C.?  Do you see that?

13 A    Yes.  The application for Revolv/Worldpay was initially

14 submitted by Litigation Practice Group.  It was approved

15 after the petition was filed when Phoenix Law had requested

16 payment processing through Revolv that the application

17 itself and the contract were submitted under Litigation

18 Practice Group, and at the time, I was the point of contact.

19 Q    Okay.  Thank you.  So on the upper right corner where

20 it says, "Hi, Tony Diab," do you recognize that as the login

21 that was probably assigned to you at some point?

22 A    Yes.  So when we first got approval from

23 Revolv/Worldpay, I was the user, and so they created a user

24 login for me, which I then transmitted to others to manage.

25 Q    So the number that's in the middle, the $9,333,000

172

1  number, what does that represent?

2  A    That's the amount that was attempted.  So from -- it

3  looks like the date ranges March the 28th to May the 19th.

4  So during that period of time, through this payment

5  processor, there was an attempt to collect 9.3 million.

6  Q    March the 28th through May 19th of this year.

7  A    Correct.  2023.

8  Q    Okay.  And you are saying that it was Revolv that later

9  approved other entities to use the Litigation Practice Group

10 portal?

11 A    So Litigation Practice Group never had a portal

12 pre-petition.  Post-petition when Phoenix Law was looking

13 for a way to process payments, the pending application with

14 Revolv was reignited, for lack of a better word.  So we had

15 a marketing affiliate called Bonus Financial.  And the

16 principal of Bonus Financial, his brother-in-law is Nathan

17 at Revolv and manages the Revolv payment processor.  So we

18 asked Jordan essentially for assistance in getting approval.

19 LPG could never get approved by Revolv.

20       And so Jordan got involved, communicated with Nathan,

21 and sometime at the end of March 2023, Nathan approved this

22 account for Phoenix Law to be able to pull payments.  But he

23 used the LPG application, specifically wanted to see the LPG

24 revenue stream and the LPG payment processing volume to get

25 approval to pull that level of ACH debit.  ACH is a credit

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 18:13:21 Desc
Declaration of Kathleen Denoumentc Page 173 of 293 Page 245 of 337

173

1  facility, so you have to get approved to be able to pull

2  this amount.

3  Q    The number of 6,308,000 and change, what does that

4  represent?

5  A    That's the amount that actually cleared.  So 9.3 was

6  the attempted debits.  The actual debits pulled would be 6.3

7  million.

8  Q    Revolv uses a settlement account, do they not?

9  A    To my knowledge, they do not.  The money is pulled from

10 the client and then deposited in the account that they're

11 directed to deposit to.  So when it was first formed, we

12 directed them to deposit to the Prime Logix account, and the

13 money would go from the client direct to that Prime Logix

14 account.  It would not stop in any intermediate account, to

15 my knowledge.

16 Q    Okay.  You were involved in the designation of that

17 money to go to Prime Logix?

18 A    Correct.  So the question arose at the time of the

19 approval which account would receive the funding from this

20 payment processor.  And we needed an account that was

21 seasoned, meaning an account that had been around long

22 enough to where the ACH and wire limits were high enough to

23 allow this business to function.  The business has a lot of

24 activity.  There are refunds that go out daily.  There are

25 payments that go out daily.  There's payments that come in

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 38:33:21 Desc
Declaration of Kathleen Depumpo March Page 179 of 292 Page 246 of 337

174

1  daily.  So you have to have a bank account that's seasoned

2  to be able to manage that volume, otherwise the bank will

3  shut you down, and then you end up having to switch bank

4  accounts.  You spend a lot of time in a branch, and the

5  business doesn't function.  So we chose the most seasoned

6  account we had access to.

7  Q    So you wouldn't have been able to maintain this volume

8  had you said Phoenix Law Group?

9  A    No, they would not have approved Phoenix.  As a

10  relatively new entity that had maybe 1.8 million in revenue

11  per month, they would have never been approved for this

12  amount of ACH.

13  Q    But they did approve Litigation Practice Group?

14  A    That's correct.

15  Q    So why did they accept Prime Logix as the account to

16  direct the Litigation Practice Group funds to?

17  A    So Revolv, again, is the broker that sits in between

18  Worldpay, the payment processor, and the merchant.  In this

19  case, the merchant became Phoenix Law, although the

20  application was submitted by LPG.  So the question was

21  presented to Revolv, "Can we choose which account we want

22  the money funded to?"  They said, "Yeah, we'll send it

23  wherever you want.  You just have to tell us which account

24  to direct it to."  So we had the conversation, and then

25  directed it to the Prime Logix account.

175

1  Q    And who had that conversation?  Who's the "we" in your

2  statement?

3  A    So that would have been me and the person who was

4  managing Prime Logix and the processing center, which was

5  Bianca Loli.

6  Q    Okay.  Who hired those employees at Prime Logix.  Do

7  you know?

8  A    So Bianca would have been in charge of hiring and

9  training the employees at Prime Logix.

10  Q    Did you have any role in that?

11  A    The initial batch of employees hired in June of 2022, I

12  think there were maybe three referrals that I made to

13  Bianca.  She subsequently terminated them all.  Apparently

14  my referrals weren't very good.  But I did hire about three

15  of the initial batch of trainees.  And then after that, I

16  was asked not to be involved.

17  Q    So why -- what happened in June of 2022 that it made

18  sense for the law firm to stop providing the incidental

19  services and contract with Bianca Loli's company?

20  A    So this was a new venture, meaning it was unrelated to

21  LPG.  So Valiant Law Group, which became Gallant Law Group

22  -- Gallant was formed.  The head attorney was Robert Tobia.

23  He practices out of Philadelphia, Pennsylvania.

24        And so Nick Cole Schreiber, who had run one of

25  these marketing affiliates I referenced, he wanted to do a

176

1 joint venture with me and specifically with Bianca and

2 establish a new law firm that would do the work of LPG, but

3 better, in his view. And he would do the marketing.

4 Instead of having multiple affiliates, there would be one

5 marketing affiliate, and it would be a joint venture.

6     And so we launched that in June of 2022, with Nick and

7 Bianca owning Prime Logix and performing the administrative

8 and processing function, and then Bob Tobia, at the time

9 Valiant Law Group, which became Gallant Law Group, working

10 with me to establish a new attorney network and a new legal

11 process to be able to process files.

12     They started in June 2022. The first clients were

13 enrolled in July of 2022, and then the joint venture fell

14 apart in November of 2022 when Nick wanted out.

15 Q    And so Gallant operated from about the time that Prime

16 Logix was started until about November of '22. Is that what

17 you just said?

18 A    Correct.

19 Q    And did Gallant onboard any of its own clients in that

20 period of time?

21 A    It did, somewhere between eight and 10,000 clients.

22 Q    Okay. And at that time, how many clients did LPG

23 transfer to Gallant?

24 A    Zero. There was never a transfer from LPG to Gallant.

25 Q    Okay. All right. And when Gallant fell apart, what

177

1  happened to its clients?

2  A    So Nick Cole Schreiber continued to manage the Gallant

3  clients using his own processing center, and a negotiation

4  took place between he and essentially Bianca, with me

5  involved, because I had been Nick's joint venture partner,

6  although the joint venture fell apart.  And so we negotiated

7  essentially a split.  He took half of the files and formed a

8  new law firm called Centerpoint Law Group, and Bianca took

9  the other half of the files and they looked for a name, and

10 they settled on Phoenix Law.

11       And so essentially the files were split sometime in

12 December.  And then in January, Phoenix took its side.  Nick

13 took his side as Centerpoint, and the two continued to

14 function separate apart from one another.

15            THE COURT:  Just for clarification, January of

16 what year?

17            THE WITNESS:  Of this year.  2023.

18            THE COURT:  Thank you.

19 BY MR. CELENTINO:

20 Q    So a portion of the clients that went to Phoenix Law

21 Group were from Gallant and did not have an arrangement with

22 LPG.  Is that your -- is that your testimony?

23 A    That's correct.

24 Q    And that's the portion that went to Phoenix Law Group

25 in January of '23?

**Briggs Reporting Company, Inc.**

178

1  A    Correct.

2  Q    Okay.  And what about the transfer of LPG clients to

3  Oakstone?  Tell me about that.

4  A    So the Oakstone -- yeah, that took place at the end of

5  January.  So Eng Tiang had an entity called PEC (phonetic)

6  Corporation, which was a large investor, I think the second

7  or third largest investor in Validation Partners.

8       And so like the other members of Validation Partners,

9  he opted to exchange the obligation from Validation Partners

10 for an obligation from LPG.  So he executed an exchange

11 agreement.  He assigned his right to a roughly $28 million

12 payment stream from Validation Partners.  He assigned that

13 to LPG and in exchange received a promissory note from LPG

14 for about 30 million to be paid over three years, I think

15 total.

16      And so PEC Corporation, which is Eng, started to demand

17 that it receive files and break away from LPG.  It felt that

18 Validation Partners was going to obtain a receiver, that LPG

19 was going to, in Eng's terms, go down in flames.  And he

20 wanted to take essentially $30 million worth of clients and

21 leave.

22      And so he negotiated the formation of Oakstone.  He was

23 going to take his 15,000 clients at a roughly $2,000 per

24 client value.  We were going to extinguish the promissory

25 notes.  LPG no longer owed PEC Corporation any money.  PEC

179

1  Corporation would operate Oakstone, which is a name that Eng

2  had settled on, and LPG would continue to receive a

3  20-percent residual from the files that went to Oakstone.

4       So we signed the agreement.  Eng received the 15,000 or

5  so files.  The promissory note was extinguished, and

6  Oakstone was formed.  We were then on the verge of

7  transferring the files at the end of January when the

8  Validation Partners' lawsuit really heated up, and we rushed

9  the transfer to complete it.  And then Eng started up and

10 running with Oakstone, and then he managed that entity.  He

11 was sort of the Tony Diab of that entity, meaning not

12 practicing law, but doing everything else.

13 Q    Okay.  And what happened to those files?

14 A    Those files went to Oakstone.  Oakstone began

15 processing them at the beginning of February, meaning they

16 were providing the client services, customer service,

17 handling the lawsuits, everything else.  That started at the

18 beginning of February and ran all the way until the end of

19 April when Oakstone essentially dissolved.

20      THE COURT:  Mr. Celentino, we could go on with

21 this for hours, but remember, our focus today is the

22 preliminary injunction.

23      MR. CELENTINO:  Yes.  I understand.  I just want

24 to get to the very essence then, your Honor.

25 //

180

BY MR. CELENTINO:

Q    The Oakstone files at that collapse point, which is a post-petition point, where did those files go?

A    So this would have been end of April, beginning of May. The files were transferred from Oakstone to Phoenix because Phoenix had the capacity to service the files.

Q    Okay.  Understand.  And so the revenue that was originally LPG's transferred to Oakstone.  And it didn't come back to LPG.  It came back to Phoenix.

A    So the revenue from the Oakstone files would have paid into to Phoenix.  And Phoenix would have then had an obligation to PEC Corporation for some amount of money that PEC Corporation is still owed on those files.

     Eng disappeared at the beginning of May.  So nobody has had any contact with him.  We've attempted to reach out to him, multiple people, and he hasn't responded.

Q    I understand.  You live on a -- you live in a property located on Cypress.  Is that correct?

A    I do currently reside at a property on Cypress Street. That's correct.

Q    Reside, yes.

A    In Newport Beach.

     THE COURT:  Cypress in Los Angeles County? Cypress in the Mediterranean?

     MR. CELENTINO:  Would you tell us the address

181

1  please?

2          THE COURT:  Where are you talking --

3          THE WITNESS:  So in Newport Beach, off of Birch

4  and Bristol.

5          THE COURT:  Thank you.

6  BY MR. CELENTINO:

7  Q    Off of Birch and Bristol.  What is the address at

8  Cypress?

9  A    20101 Southwest Cypress Street, Newport Beach,

10 California 92660.

11 Q    Thank you.  Do you own that property?

12 A    I do not.

13 Q    Do you rent that property?

14 A    I do.

15 Q    What is the monthly rent?

16 A    The monthly rent right now is at 43,500.

17 Q    Where do you get the money, that 43,500, to pay that

18 monthly rent?

19 A    I haven't since March, so I'm currently three months

20 behind and ready to move out by the end of this month.

21 Q    Okay.  Where did you get the money prior to that?  Was

22 it as you're consultant with these entities?

23 A    So income, both from the work that I did with LPG and

24 work that I did with other entities.

25 Q    I understand.  Okay.  Do you know if Phoenix has paid

182

1  any of the money it's supposed to be paying LPG for that

2  transfer?

3  A    No.  It has never paid any rent to my landlord, nor has

4  it paid me for that rent.

5  Q    Okay.  When the files were transferred from LPG to

6  Phoenix, Phoenix was supposed to pay something for those,

7  correct?

8  A    Phoenix was supposed to pay a residual on the revenue

9  that it collected from the files that came from LPG.  That's

10 correct.

11 Q    And has that happened?

12 A    There was a contract term that we had to finalize.  Mr.

13 Marshack asked that I send him the terms, because he's the

14 only one who could sign the agreement as the trustee once he

15 was appointed on May the 3rd.  I do not believe that

16 agreement was ever executed.  And so the terms were

17 established in principle prior to the transfer, but an

18 agreement was never executed.

19     And in the way of background, at the time of the

20 transfer, the payment processor (indiscernible) was

21 collecting money from all LPG clients regardless of their

22 location and holding the money.  So none of the firms could

23 operate, and all of them were sort of on the verge of

24 collapse.  So it was hard to finalize terms about exactly

25 how the 20-percent residual would be paid through.

183

1    The open question was what we do about the clients that
2  aren't making a payment but have to be serviced, because
3  Phoenix took on some 10,000 clients that don't have any
4  payments due.  But Phoenix had the capacity to service them,
5  and they were asked to service, and they agreed to do so,
6  even though they're doing it for free.  But we had to come
7  up with some method of compensating that batch of clients so
8  that Phoenix doesn't go under.
9  Q    Who made that decision for Phoenix to work for free?
10 A    I think that the decision -- it was a conversation
11 between me and the processing center, which was Prime
12 Logix/Maverick, and then it was conveyed to Ty.  I don't
13 believe Ty ever had a hand in that decision.  I think it was
14 only conveyed to him.
15 Q    Thank you.  My last question.  What vehicle is your
16 primary vehicle?
17 A    Right now, it's a Kia EV6 that a friend of mine gave me
18 yesterday to drive, because I don't currently have one.
19 Q    What happened to the Lamborghini?
20 A    I never owned a Lamborghini, and I'm not sure why
21 people think that I do.  I've had a friend who's -- who has
22 a Lamborghini that he's rented to me from time to time.  He
23 also lists it on Turo.  So when he's not able to rent it, he
24 stores it at my house.  I have a very big garage.
25 Q    Who is that friend?

184

1   A     His name is Keon (phonetic).

2   Q     Keon.  And his last name?

3   A     Fasafi (phonetic).

4   Q     Fasafi.  Was that the car that you were driving on the

5   morning of June 2nd?

6   A     I did drive that to Mr. Marshack's office to meet with

7   Ed Hays when they asked me to meet with them to discuss the

8   temporary restraining order and the -- and that's when they

9   served me with the order, and I did receive the order that

10  morning.

11  Q     And were you paying rent to your friend for the use of

12  the car that day?

13  A     I was not that day.

14  Q     Okay.  I have no further questions.

15          THE COURT:  I would like you to focus --

16          MR. CELENTINO:  Mr. Hays has a few, I think, your

17  Honor.

18          THE COURT:  I would like you to focus in on any

19  dots that you can connect with respect to Greyson Law

20  Center.

21          THE WITNESS:  I'm sorry, your Honor.  Was that for

22  me to respond to?

23          THE COURT:  For -- well, it's -- counsel.

24          MR. CELENTINO:  Your Honor --

25          THE COURT:  Let me put it bluntly, what's Greyson

185

1  Law Center doing in this case?

2      MR. CELENTINO:  I would move -- maybe -- I don't

3  know if you want me to get that from Mr. Diab, but I would

4  move in --

5      THE COURT:  Well, you -- now by me asking that

6  question, you know that I am interested in --

7      MR. CELENTINO:  I know.

8      THE COURT:  -- trying to understand what Greyson

9  Law Center is doing in this case.

10     MR. CELENTINO:  Right, so --

11     THE COURT:  So if you can solicit any information

12 that would help me, that would be great.

13     MR. CELENTINO:  My understanding with Greyson,

14 your Honor, is set forth in the declaration of Ty Carss,

15 which we submitted into evidence.  And I was going to call

16 Ty Carss next.

17     THE COURT:  Okay.  But not this count -- not this

18 witness.

19     MR. CELENTINO:  Not this person.

20     THE COURT:  Would someone like to cross examine or

21 direct examine, briefly, this witness that's related to the

22 preliminary injunction?

23     MS. PHAM:  Very briefly, your Honor.

24     THE COURT:  Please.

25     MS. PHAM:  Thank you.  Just in case you got lost,

186

 1  Mr. Diab --

 2          THE COURT:  For the record, your appearance.

 3          MS. PHAM:  I apologize.  Thank you.  Good

 4  afternoon again, your Honor.  Teri Pham, Enenstein Pham and

 5  Glass, on behalf of the witness Tony Diab and also Mr. March

 6  -- Daniel March.

 7          THE COURT:  Sure.

 8          MS. PHAM:  Thank you.

 9                      CROSS EXAMINATION

10  BY MS. PHAM:

11  Q    Very briefly, Mr. Diab.  Have you ever had any

12  ownership interest in the Debtor, Litigation Practice Group?

13  A    No.

14  Q    You've heard -- we've heard a bunch of different law

15  firms being discussed in terms of receiving client files.  I

16  don't know if the number is six or nine.  Have you ever had

17  any ownership interest in any of those law firms that have

18  mentioned that received any client files?

19  A    No, I have not.

20  Q    Okay.  Gallant was one of them.

21  A    Yes.

22  Q    Any ownership interest in Gallant?

23  A    No.

24  Q    Phoenix?

25  A    No.

Case 8:23-ap-01046-SC   Doc 296-2   Filed 06/27/23   Entered 06/27/23 18:13:21   Desc
Declaration of Kathleen P. March   Page 192 of 208   Page 259 of 337

187

1  Q     Greyson?

2  A     No.

3  Q     Oakstone?

4  A     No.

5  Q     Consumer Legal Group?

6  A     No.

7  Q     Okay.  And we've heard talk of some payment processors.

8  Have you ever had any ownership interest in any of the

9  payment processors that handled any payments on behalf of

10 Litigation Practice Group?

11 A     No.

12 Q     Have you ever had any ownership interest in any of the

13 payment processors for any of the law firms that we just

14 mentioned?

15 A     No.  None.

16        MS. PHAM:  That's all I have, your Honor.

17        THE COURT:  Well, stay there.

18        MS. PHAM:  Okay.

19        THE COURT:  You gave us a long list of different

20 firms.

21        MS. PHAM:  Yes.

22        THE COURT:  And you've now solicited -- elicited

23 information that he had no ownership interest.  So what was

24 the first -- the Debtor, I think, was the first firm, the

25 Litigation Practice Group, correct?

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 08:31:21 Desc
Declaration of Kathleen Pham March Page 193 of 292 Page 260 of 337

188

1          MS. PHAM:  Correct.

2          THE COURT:  What compensation, over the last four

3    years, have you received from the Litigation Practice group

4    of any form?  Barter, compensation, W-2, 1099, or anything

5    that wasn't 1099.

6          THE WITNESS:  So direct compensation from LPG

7    would have been by 1099.  But I also did receive indirect

8    compensation through Coast Processing, which was a DBA of

9    B.A.T, Inc.  That was also a 1099 compensation.

10          THE COURT:  And how much did you receive in the

11   last four years?

12          THE WITNESS:  In the last four years, in the

13   aggregate from LPG, direct or indirect, would be somewhere

14   between three and three-and-a-half million.

15          THE COURT:  I'm not asking you for your tax

16   returns.  I'm asking you, have you filed your tax returns

17   for those years?

18          THE WITNESS:  I have not.

19          THE COURT:  Okay.  What was the next firm?

20          MS. PHAM:  Gallant.

21          THE COURT:  Did you ever receive any compensation

22   in any form from that organization?

23          THE WITNESS:  No, neither direct nor indirect.

24          THE COURT:  Okay.

25          THE WITNESS:  If I may -- if I may clarify.

189

1          THE COURT:  Sure.

2          THE WITNESS:  I did stand to receive, in the

3   future, compensation for the referral of marketing

4   affiliates and clients, but it never reached that point.

5          THE COURT:  But why didn't it reach that point?

6          THE WITNESS:  The joint venture fell apart when

7   Nick, the other half of the joint venture, decided he did

8   not want to continue.  And that was November.

9          THE COURT:  Thank you.

10          What was the next company that you solicited

11   information that he didn't own?

12          MS. PHAM:  In fact, you can do it as a group, your

13   Honor, because the answer is going to be the same, but you

14   can go ahead and ask.  Phoenix.

15          THE COURT:  Phoenix.

16          THE WITNESS:  The same.  No compensation direct

17   from Phoenix.

18          MS. PHAM:  Okay.

19          THE COURT:  What about indirect?

20          THE WITNESS:  No compensation indirect.  Although,

21   in the future, again, the anticipation was through referral

22   of marketing companies, once it began onboarding, I did

23   stand to make commissions on that relationship.

24          THE COURT:  So it was your intention to receive

25   compensation for those --  from those entities?

190

1          THE WITNESS:  In the future, once those

2    relationships were established, yes, your Honor.

3          THE COURT:  And why would you have received

4    compensation from those?

5          THE WITNESS:  Brokering the relationship with

6    these marketing companies that were looking for a home.

7          THE COURT:  What's the next one?

8          MS. PHAM:  Greyson, Oakstone, Consumer Legal

9    Group.

10          THE WITNESS:  Same answer as Phoenix for all

11   three.

12          THE COURT:  Thank you.

13          MS. PHAM:  Just to be clear, you've not received a

14   single dime from any one of those other law firms?

15          THE WITNESS:  Correct, direct nor indirect.

16          THE COURT:  But were you planning to?

17          THE WITNESS:  Yes.  In the future, through the

18   same mechanism.

19          THE COURT:  Okay.

20          MS. PHAM:  Which would have been --

21          THE COURT:  So you would have had they not -- if

22   the -- I don't even know.  What caused you not to receive

23   the compensation that you would have hoped to receive.

24          THE WITNESS:  None of these entities are

25   onboarding clients in any real volume right now.  The

Case 8:23-ap-01046-SC   Doc 276-2   Filed 06/27/23   Entered 06/27/23 13:13:21   Desc
Declaration of Kathleen P. March   Page 196 of 289   Page 263 of 337

191

1 entities are all struggling and sort of teetering on the

2 brink of collapse.  So none of them are in a position to

3 onboard clients and pay the expensive marketing fees that

4 are associated with that onboarding.

5          THE COURT:  Exactly.  So the fact is that you

6 would have had they succeeded.

7          THE WITNESS:  Yes.  And they may still succeed in

8 the future.

9          THE COURT:  Would you -- are -- would -- are you

10 planning on receiving funds from those successful

11 operations?

12          THE WITNESS:  No, not unless I'm able to broker

13 relationships with them.  So that's a -- there's a step in

14 between that would have to take place.  But it's my hope and

15 my goal, but I don't know whether it's a reality.

16          THE COURT:  Thank you.  That helps a great deal.

17          MS. PHAM:  Just to be clear, would you be

18 receiving any compensation for the -- what we've been

19 calling the transfer of the LPG files to those groups?

20          THE WITNESS:  No, no compensation for that at all.

21          MS. PHAM:  Okay.  None whatsoever with respect to

22 the existing or pre-existing LPG clients, correct?

23          THE WITNESS:  Correct.  Neither direct nor

24 indirect.

25          MS. PHAM:  Okay.  This is for future compensation,

192

1 to the extent you help or assist in marketing for those

2 entities?

3        THE WITNESS:  In the future, correct, for new

4 clients only.

5        MS. PHAM:  Yeah.  Thank you, your Honor.

6        THE COURT:  Are there any other questions for this

7 witness?

8        MR. CELENTINO:  I have a couple on redirect, I'm

9 sorry.

10        THE COURT:  Thank you.

11                    REDIRECT EXAMINATION

12 BY MR. CELENTINO:

13 Q    Are you the owner of Vulcan?

14 A    I am not, but I am the operator -- the primary operator

15 of Vulcan Consulting Group.

16 Q    Who is the owner of Vulcan Consulting Group?

17 A    The owner -- the sole member is Lisa Cohen.

18 Q    Lisa Cohen.  Okay.  A few weeks ago, Vulcan made the

19 payroll at Phoenix.  Do you know how Vulcan made the payroll

20 at Phoenix?

21 A    Prime had transferred money to Vulcan because Prime's

22 account could not release any further funds, and they didn't

23 have checks.  And so the money was transferred to Vulcan,

24 and Vulcan issued payment to both marketing companies and

25 employees who needed to be paid.  I believe it was on a

193

1  Friday.

2  Q    And do you know where that money came from to Prime?

3  A    The money that went into Prime would have come from

4  Revolv, the payment processor pulling the clients that

5  Phoenix is servicing.

6  Q    You testified to us -- for us earlier that contracts

7  that were at Oakstone post-petition were coming back.  The

8  contracts that were transferred to Oakstone by LPG

9  post-petition were coming back, and they got transferred to

10  Oakstone instead.  I mean, it transferred to Phoenix

11  instead.  Who was the counterparty to the contract that

12  delivered those files, not back to LPG but to Phoenix?

13  A    So at no point were the files coming back to LPG, but

14  there was no contract between Oakstone and Phoenix.  Eng,

15  who would speak on behalf of Oakstone as to his position as

16  a creditor, was unwilling to communicate with anybody.  So

17  no agreements were reached with regard to PEC's interest in

18  the Oakstone files?  To my knowledge, there was no agreement

19  between Scott Eadie or anyone else at Oakstone with Ty or

20  anyone else at Phoenix to transfer the files.  The decision

21  was made because the clients weren't being serviced and

22  Phoenix had the capacity to onboard the clients, and so the

23  clients were transferred.

24  Q    Who caused the clients to be notified that they were

25  now going to Phoenix?

194

1  A    On the Oakstone side -- I'm not sure I could speculate.

2  Han was the administrator in charge of Oakstone, so I

3  believe she would have initiated that process, but I don't

4  know that for a fact.  That's speculation.

5  Q    Okay.  Okay.

6         MR. CELENTINO:  Thank you.

7  BY MR. CELENTINO:

8  Q    I'm sorry, I had forgotten this one.  The assignment of

9  the LPG files to Consumer Law Group was for Consumer Law

10  Group to pay a referral fee for that assignment.  What

11  percentage was that referral fee?

12  A    The negotiated agreement with Consumer Legal Group was

13  40-percent.

14  Q    Okay.  And the negotiated agreement with Phoenix was

15  what?

16  A    Twenty-percent.

17  Q    Why?

18  A    Consumer Legal Group did a really poor job of

19  negotiating.  And so we went back and forth about the

20  pricing, and they agreed to 40-percent, which I thought was

21  generous, but I wasn't going to say no to it.  It's coming

22  to LPG.

23         MR. CELENTINO:  Okay.  Thank you.

24         THE COURT:  Mr. Diab, before you leave, earlier in

25  the day, someone made a crack about people liking you or not

195

1  liking you.  I unfortunately doubled down on that with my

2  own weird sense of humor when I said, "You'll have to get in

3  line."  I want to apologize for that.  That was uncalled

4  for, and I shouldn't have said it.  If I hurt your feelings

5  or if I irritated you, I'm very, very sorry.

6          THE WITNESS:  You did not, no need to apologize.

7  And it is a long list.  Your Honor is correct.

8          THE COURT:  Again, I shouldn't have said it, and I

9  regret it.

10          THE WITNESS:  Thank you, your Honor.

11          THE COURT:  Thank you.

12          Well, Mr. Celentino, would you like to call Mr.

13  Carss now?

14          MR. CELENTINO:  At this late honor -- late hour,

15  your Honor?

16          THE COURT:  I'm not in any rush.

17          MR. CELENTINO:  That's fine.  I was going to move

18  the submission of his declaration.

19          THE COURT:  It is already in the record.  It is

20  submitted.

21          MR. CELENTINO:  Then I call Mr. Carss.

22          THE CLERK:  Please raise your right hand.

23     WILLIAM TAYLOR CARSS - PLAINTIFF'S WITNESS - SWORN

24          THE CLERK:  Please you state your name and spell

25  your name for the record?

196

1          THE WITNESS:  William Taylor Carss.  That's

2    C-A-R-S-S.  I've gone by Ty my whole life.

3          THE CLERK:  Okay.  Thank you.

4                    DIRECT EXAMINATION

5    BY MR. CELENTINO:

6    Q    Mr. Carss, you are the lead attorney for the Phoenix

7    Law Group, correct?

8    A    That is correct.

9    Q    Who hired you?

10   A    Mr. Diab.

11   Q    Okay.  Did he do the interview for you also for the

12   position at Gallant before Phoenix?

13   A    Yes.

14   Q    Okay.  In your role as the lead attorney for Phoenix,

15   are you involved in deciding how Phoenix recovers its funds

16   from its customers?

17   A    No.  I don't have any involvement in the financials of

18   it.

19   Q    Who directs the pulls for Phoenix Law Group?

20   A    I don't know for sure.

21   Q    Who do you believe it is?

22   A    I believe it is a combination between Ms. Loli and Mr.

23   Diab.

24   Q    Who would make the decision how to spend the monies

25   that have been pulled from Phoenix Law Group clients?

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 13:13:21 Desc
Declaration of Kathleen March Page 202 of 289 Page 269 of 337

197

1 A    Well, I know that anytime that I need to make a

2 referral request or pay for a client's bankruptcy petition

3 or anything like that, while I'm allowed to authorize it, it

4 has to be submitted to HR, to accounting, and to Ms. Loli,

5 and to Mr. Diab.

6 Q    Okay.  And so some combination of those folks, with

7 input from Mr. Diab, decides if it's okay to pay that bill?

8 A    Well, if I continually go to the accounting department,

9 they just keep saying they haven't gotten authorization to

10 do so.

11 Q    Okay.  And you believe they're waiting for that

12 authorization from Mr. Diab?

13 A    I do believe that.

14 Q    Okay.  In your declaration, you discuss the network of

15 attorneys that were made available to you at Phoenix, right?

16 A    Yes.

17 Q    There was a network of attorneys.  Those network of

18 attorneys, to the best of your knowledge, are the same

19 network of attorneys that were utilized by Litigation

20 Practice Group, correct?

21 A    Yes.  (Indiscernible) I expand on that a little bit.

22 Q    Please.

23 A    When LPG came to a close, many of those attorneys that

24 were in the network obviously were not working for LPG

25 anymore.  A lot of them had outstanding cases, and they were

198

1 afraid they were not going to get paid.  We were in a need

2 for attorneys.  They were already very familiar with the

3 system and the way that LPG worked -- Phoenix worked.

4      So I reached out to many of them, and, surprisingly, a

5 lot of them reached out to me as well, saying, "Hey, do you

6 have any work?  We like this work.  We'll continue with this

7 work."  So I started establishing relationships with them.

8 And obviously we didn't have the funding to make them W-2

9 attorneys, so we were moving forward on a 1099 basis.  But

10 everything was coming at us very quickly, and that -- we

11 have verbal agreements and agreements in e-mails, but not

12 too many of them do we have an actual contract with them.

13 Q    But you'll utilize those same attorneys at Phoenix to

14 make appearances for Phoenix clients that were once LPG

15 clients?

16 A    Absolutely.

17 Q    Yes.  And that contract work for them was done for a

18 set fee.

19 A    There were a couple attorneys that wanted to work

20 hourly, and we did sign some retainers with that, and we

21 sent some money.  There were other attorneys that wanted a

22 -- just a percentage of what they -- basically what they

23 settled, and one of them was the 10-percent of whatever

24 amount he could settle.  That was a unique situation for

25 that attorney.  But the vast majority of them wanted just a

199

 1  per case.

 2       And I noticed that when they -- it seemed to me,

 3  because I had seen some invoicing, that when they were with

 4  LPG, they seemed to be making about $500 a case.  I had

 5  several of them come to me, and they wanted $900 per case.

 6  And I told them that we would pay them 750.

 7  Q    Okay.

 8  A    And most of them all agreed to that amount.

 9  Q    Okay.  When Greyson Law Group started, what developed

10  with your relationship with your list of attorneys that were

11  working for Phoenix?

12  A    Well, Phoenix was having a difficulty paying the

13  attorney invoices.  Again, we had to go through that whole

14  process of submitting them to just about everybody in the

15  company.  And then me daily asking, are these people going

16  to be paid?  Are these people going to be paid?

17            THE COURT:  May I interrupt for one second?

18            THE WITNESS:  Sure.

19            THE COURT:  You were involved in the questions of

20  these people going to be paid.  Who are these people you're

21  speaking of?

22            THE WITNESS:  The local counsel -- the attorneys

23  that are in the network throughout the United States.

24            THE COURT:  Because earlier in your testimony, and

25  I'm just trying to seek clarification, you gave me the

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 18:31:21 Desc
Declaration of Main Document March Page 206 of 293 Page 272 of 337

200

1 impression that you were an attorney practicing law and you

2 had nothing to do with the finances, but now I'm hearing you

3 trying to figure out who's going to pay these attorneys.  So

4 I just need an amplification.

5 　　　　THE WITNESS:  I'm -- the financing of it, where

6 the money went, where it came in -- the attorneys who were

7 out in the network, either myself or my paralegal, are the

8 point of contact.  And so the attorneys would copy me with

9 their invoices through e-mail.  Sometimes they would go

10 straight to accounting, but either my paralegal or myself

11 were always copied with them.  And so those attorneys that

12 wanted to be paid for these cases would contact me.  So the

13 only money issues that I tried to deal with are trying to

14 see that our local counsels get paid so that they'll

15 continue to help us represent clients out in the field.

16 　　　　THE COURT:  So this wasn't operational finance.

17 It was -- it was a client relationship financing and

18 attorney payments, but it wasn't operational.

19 　　　　THE WITNESS:  Absolutely.

20 　　　　THE COURT:  That's what I wanted to understand.

21 Thank you.

22 BY MR. CELENTINO:

23 Q    When Greyson Law Group was started in March, did you

24 start having difficulty getting the attorneys in that

25 network to work for Phoenix?

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 18:13:21 Desc
Declaration of Kathleen Pneuman March Page 206 of 293 Page 273 of 337

201

1  A    Yes.

2  Q    How so?

3  A    Well, again, the payment process through Phoenix was so

4  slow that a lot of these attorneys were wondering how they

5  were going to get paid.  And then they -- many of them, as I

6  noticed, their e-mails all started changing from LPG e-mails

7  to Greyson e-mails.  And many of them told me that they

8  would not take assignments unless it was through Greyson.

9  And this is sort of how I actually learned about Greyson.

10  And I would ask Mr. Diab, "Is this where the attorneys are

11  coming from?  Am I sending the assignments through that?"

12  And he was -- and the answer was, "Yes.  We're going to do

13  that for a while.  But I don't know that that model is

14  working.  And I think that Greyson is going to be

15  terminated.  It's going to be shut down."

16  Q    When he said "we're going to do that for a while," who

17  did you think he was talking about?

18  A    Phoenix Law.

19  Q    Okay.  So Phoenix is going to agree to pay Greyson --

20  to hire through Greyson the network of attorneys that LPG

21  and Phoenix were previously using on their own?

22  A    I assume so.

23  Q    Okay.  And since that time, have you had to hire

24  Greyson attorneys to assist the Phoenix clients formerly of

25  LPG?

202

1  A    I did.  It was a little bit difficult at first.  But

2  then there was a -- there was a short stretch where it

3  really was a good relationship.  Every time I asked for an

4  attorney to be assigned, I got response.  And I was hoping,

5  I think -- and we would follow up and -- that, you know,

6  these attorneys were being assigned to the task that we

7  needed in another state.  And then the relationship was

8  terminated.

9  Q    Who did you reach out to at Greyson to get the

10  assignment?

11  A    I would always send it to legal@greyson and

12  attorney@greyson, who I believe is Han and Jade.

13  Q    Okay.  Thank you.  What fee was Greyson charging

14  Phoenix for the Greyson attorneys that you had to engage?

15  A    Well, at first -- the first few assignments, there

16  weren't any.  But I do believe that between Maverick and

17  Greyson, they wanted to establish an invoicing system.  And

18  so suddenly after I started assigning these cases or asking

19  Greyson to assign these cases, I started immediately getting

20  invoices for $2,000 per case.

21  Q    Which was a large bit more than you had previously been

22  arranging to pay those same lawyers for the same work.

23  A    Well, it certainly opened my eye as to why when I asked

24  these attorneys if they wanted to go with Greyson or if they

25  wanted to stay 1099, they all said, "We'll stay with

Case 8:23-ap-01046-SC Doc 276-2 Filed 06/27/23 Entered 06/27/23 18:13:21 Desc
Declaration of Kathleen Marsh Page 208 of 289 Page 275 of 337

203

 1  Greyson."

 2  Q    I understand.  Okay.  There's a desk for Tony Diab at

 3  the Phoenix Law Firm, isn't there?

 4  A    No, not that I know of.

 5  Q    You've never seen the desk that has the sign, "I'm not

 6  here on it"?

 7  A    I have not.

 8  Q    Okay.  How about -- do you know what name Tony Diab was

 9  referred to by personnel?  He had an alias, didn't he?

10  A    At Phoenix?

11  Q    At Phoenix.  Was it --

12  A    I believe it was Paul.

13  Q    It was Paul.  And why would he have an alias?   Why

14  would people refer to him as Paul?

15  A    Well, I -- Mr. Diab, I think, has a -- is -- with his

16  disbarment, he doesn't want to have association with law

17  firms.

18  Q    I understand.  In your opinion, if Phoenix had control

19  of the client pulls, could Phoenix service the clients that

20  were purportedly transferred to Phoenix?

21  A    I absolutely believe so.

22  Q    Yes.  And could you do that legally?

23  A    I think so, yes.

24  Q    Okay.  And you can't do that now because you have no

25  control of the client pulls to Phoenix, right?

204

1  A    I have no control over the pulls at all.

2  Q    Right.  And so you have no control -- as the person in

3  charge, you have no control of the cash flow?

4  A    Correct.

5  Q    Okay.

6        MR. CELENTINO:  If I may consult with my team.

7  One second.

8  BY MR. CELENTINO:

9  Q    The converse question is also true.  If the files

10 resided at LPG, you were the attorney for LPG, and LPG was

11 in charge of its own pulls, could LPG survive?

12 A    Was that an if?

13 Q    If.

14        MS. PHAM:  Objection, your Honor.  Calls for

15 speculation.

16        THE WITNESS:  I don't --

17        THE COURT:  Excuse me, there was an objection.

18        MS. PHAM:  Speculation.

19        THE COURT:  Well, if -- you can ask him, "If you

20 know."

21 BY MR. CELENTINO:

22 Q    If you know.

23 A    I wouldn't know.  LPG's operating costs are probably --

24 were much different than Phoenix's, I would think.

25 Q    Okay.  But the premise is that the client work being

205

1    done for the clients could be financed by the client pulls

2    under your direction if you had control of the money, right?

3    A    I believe so.

4    Q    Yeah.

5              MR. CELENTINO:  Okay.  Thank you.

6              THE COURT:  Thank you.

7              MR. PLAZAK:  Good evening.  Doug --

8              THE COURT:  State your name for the record.

9              MR. PLAZAK:  Right.  Doug Plazek, Reid and

10   Hellyer, for Greyson.

11                    CROSS EXAMINATION

12   BY MR. PLAZAK:

13   Q    Mr. Carss, Phoenix required attorneys in many states

14   throughout the country to handle its clients, right?

15   A    Correct.  And so -- and it didn't have -- it didn't

16   always have attorneys readily available to --

17             THE COURT:  Excuse me for one second.  We have

18   people on the Zoom call who are not muted.  All right.  I

19   think that solved the problem.

20   BY MR. PLAZAK:

21   Q    And it didn't always have attorneys readily available

22   to take cases out of state, true.

23   A    That is correct.

24   Q    And sometimes these would be emergency cases.  In other

25   words, cases where a pleading or something was due within

206

1  24, 48 hours, 72 hours, something like that.

2  A    Oftentimes.

3  Q    Right.  So there was an exigency oftentimes to getting

4  counsel available, right?

5  A    Yes, I would agree.

6  Q    Okay.  And so -- and nobody forced Phoenix to use

7  Greyson, right, to get counsel out of state, right?

8  A    Well, I wish we could have sought out our own and

9  developed contracts and relationships.

10 Q    Right.

11 A    Right.  We could have.

12 Q    You could have picked up the phone to -- we -- talk

13 about Indiana.  You could have called counsel in Indiana and

14 say, "Hey, I need you to -- there's -- I got a -- I got a

15 pleading that's due in 48 hours.  Yeah.  I need you on this

16 case.  Will you take the case?"  You could have done that,

17 right?

18 A    I could have, and I did in a few states.

19 Q    Right.  Okay.  But it was -- that's something that's --

20 that takes time, right?

21 A    Correct.

22 Q    It takes work.

23 A    Correct.

24 Q    Takes sweat, right?

25 A    Absolutely.

207

1  Q    And oftentimes, you don't have time for that, right?

2  A    I do not.

3  Q    Right.  And so that's where you -- sometimes you have

4  to pay a premium for that -- to do that, right -- to get

5  those counsel, right?

6  A    Correct.

7  Q    Okay.  And so if they -- and, again, if Greyson was

8  charging exorbitant fees, you could have gone to somebody

9  else to do that work.  You could have -- in other words,

10  say, if you don't have the time to do it, you could have

11  hired somebody to do that, right?

12  A    Correct.

13  Q    Okay.  But you chose not to, right?

14  A    Well, I was informed that this was the way that we were

15  going to do it.

16  Q    Did Greyson inform you of that?  Did somebody from

17  Greyson tell you this is the way we're going to do it?

18  A    Not from Greyson.

19  Q    Right.  Okay.  And so the fact that Phoenix chooses to

20  use Greyson and to pay Greyson for whatever amount it's

21  agreed to pay, that's entirely Phoenix's decision, right?

22  A    Well, it's not, because Phoenix was paying Greyson's

23  salaries, and the attorneys that are in the Greyson network

24  are salaried attorneys.  So I guess the part that I'm

25  confused about is why are we then being invoiced for

208

1  attorneys who Phoenix is paying the salary of?

2  Q    Isn't that --

3  A    We're paying the salary of them so that they are

4  readily available, that when we need them in an emergency,

5  they're there.

6  Q    Isn't that between you and the counsel?  Isn't that --

7  and when I say "you," I mean Phoenix.  Isn't that between

8  Phoenix and the counsel?  In other words, if you're claiming

9  that the counsel are double billing you, isn't that really

10 an issue between Phoenix and the counsel who you claim or

11 double billing you?

12 A    I don't think it's the counsel.

13 Q    Well, okay.  If -- is it the issue that you feel that

14 Greyson is double dipping, or is it the fact -- or is the

15 issue that you feel you're paying Greyson too much?

16 A    Greyson is double dipping.

17 Q    All right.  But that's different than paying too much.

18 A    In some situations when it's an emergency and when

19 something needs to be done very quickly, yes, absolutely,

20 paying a premium is expected.  I completely understand that.

21 Q    Okay.  And if there are situations where you think

22 Greyson is double dipping, you can bring that to Greyson's

23 attention, right?

24 A    Sure.

25 Q    Okay.  Isn't that -- and so what -- is there something

209

1  that's -- that makes you unable to bring these issues to

2  Greyson's attention?

3  A    I guess not.

4  Q    All right.

5           MR. PLAZAK:  Nothing further.

6           THE COURT:  Is there anyone else?

7           Ms. Cohen, you came forward.

8           MS. COHEN:  I'm okay, your Honor.

9           THE COURT:  Okay.

10          Ms. Pham?

11          MS. PHAM:  A couple of questions, your Honor.

12                 FURTHER CROSS EXAMINATION

13 BY MS. PHAM:

14 Q    Mister -- I'm sorry.  You're the sole shareholder of

15 Phoenix Law Group, correct?

16 A    Correct.

17 Q    Okay.  I think I heard you -- you do the hiring of

18 attorneys, sir?

19 A    No, we are -- well, I have signed a retainer agreement

20 for a few of them so that they will continue to work for us.

21 Yes.

22 Q    And you make the decision whether or not to fire them

23 if you don't want the attorney anymore.

24 A    I have requested that we not work with an attorney

25 anymore, but I don't know that I have the power to do that.

**Briggs Reporting Company, Inc.**

210

1  Q    Who would have the power to fire an attorney in a firm

2  that you own?

3  A    Well, they don't work for my firm.  We either had them

4  on a 1099 or they're a Greyson attorney.

5  Q    Okay.  What about Phoenix Law Group?  Does Phoenix Law

6  Group have any contract directly with any attorneys not from

7  Greyson?

8  A    Yes, a few.

9  Q    Okay.  And who made the decision to retain those

10  attorneys?

11  A    I did.

12  Q    Okay.  And are -- is Phoenix Law Group currently

13  servicing any of the former LPG clients?

14  A    Nearly all of them.

15  Q    Nearly all of them.  Okay.  And which attorneys are

16  handling those?  How many attorneys, approximately?

17  A    We probably have 15 or 16 that we can sort of reach out

18  on a 1099.  Other than that, we go to Greyson.

19  Q    Okay.  So approximately 15, let's say, on retainer with

20  Phoenix Law Group, and then others from Greyson?

21  A    There's only a few on retainer.  The other would be

22  just 1099.

23  Q    Okay.  So contract attorneys you can pull from?

24  A    Yes.

25  Q    And the Greyson attorneys, approximately how many does

211

1 Phoenix Law Group use to service these clients?

2 A    For all the other states that we can't cover.

3 Q    We heard a lot of different numbers of numbers of

4 cases.  Can you give us an estimate, approximately how many

5 clients Phoenix Law Group is currently servicing?

6 A    I believe the number might be around 40,000.

7 Q    And they are -- and you are currently managing the law

8 group to service all 40,000.  Is that right?

9 A    Yes.

10 Q    Okay.

11        MS. PHAM:  That's all I have, your Honor.

12        THE COURT:  Thank you very much.  Anyone else?

13        MS. COHEN:  Your Honor, I have a separate

14 question.

15        THE COURT:  Ms. Cohen.

16        MS. COHEN:  It's not a cross-examination question.

17 Lisa Cohen has a little baby at home, and I've confirmed

18 with the trustee that they do not need to examine her today.

19 She's going to sit for a 2004 at some point.

20        THE COURT:  Well then she is excused.

21        MS. COHEN:  Thank you very much, your Honor.  I

22 appreciate that.

23        THE COURT:  You're welcome.

24        I think you're done, Mr. Carss.  Thank you very

25 much.

Case 8:23-ap-01046-SC   Doc 276-2   Filed 06/27/23   Entered 06/27/23 13:33:21   Desc
Declaration of Matthew Pena - March Pages 217 of 293   Page 284 of 337

212

1            MR. CARSS:  Thank you.

2            MR. CELENTINO:  Thank you, Mr. Carss.

3            I'm ready To summarize, your Honor, and I did want

4   to say we did indicate exactly what Ms. Cohen said, that her

5   client has agreed to sit for a 2004, and we would like to

6   let her go.

7            THE COURT:  That's fine.  That's fine.  Let me say

8   some preliminary things before we have closing discussions.

9            You're looking at me about something.  I don't

10  know what you're -- what are you seeking?

11           MR. MARSHACK:  Just trying to --

12           THE COURT:  You're trying to hear me?  Should I

13  speak up?  Okay.

14           Before we have any arguments further, I want to

15  get on the record a few things.

16           The Court has in front of it a complaint for

17  injunctive relief, avoidance, recovery, and preservation of

18  two-year actual fraudulent transfers, avoidance, recovery,

19  and preservation of two-year constructive fraudulent

20  transfers, avoidance, recovery, and preservation of

21  four-year actual fraudulent transfers, and avoidance,

22  recovery, and preservation of four-year constructive

23  fraudulent transfers and turnover.

24           There's no RICO charge in here, is there?

25           MR. CELENTINO:  No, your Honor.  Not yet.

Case 8:23-ap-01046-SC   Doc 296-2   Filed 06/27/23   Entered 06/27/23 13:13:21   Desc
Declaration of Kathleen P. March   Page 218 of 293   Page 285 of 337

213

1          THE COURT:  Okay.

2          The Court has also before it the following items,

3  docket number four, the trustee's omnibus emergency motion

4  for turnover, redirection of U.S. Parcel Service mail, order

5  to show cause re compliance with the court orders and other

6  relief necessary for the efficient administration of the

7  matter.  That's docket number four.

8          Docket number five, the Court has before it the

9  declaration of Ross Squires (phonetic) in support of Ross

10 Squires' omnibus emergency motion for a turnover and for a

11 preliminary injunction and lockout and redirection of U.S.

12 partial -- Parcel Service mail and an order to show cause re

13 compliance with court order and other relief necessary for

14 the effective of administration of the estate.

15         The Court also has the declaration of Darius

16 Newbold in support of Darius Newbold's omnibus emergency

17 motion for turnover of estate property and recorded

18 information pursuant to Section 542, preliminary injunction,

19 lockout, redirection of U.S. mail, order to show cause re

20 compliance with the court order and other relief necessary.

21 The Court also before it -- by the way, that was docket

22 number six.

23         The Court has before it docket number seven, the

24 declaration of Christopher Ghio, G-H-I-O, in support of the

25 trustee's omnibus emergency motion for all of the matters

214

1  that I've previously stated.  That's docket number seven.

2         The Court has before it docket number eight, which

3  is the declaration of trustee Richard Marshack in support of

4  the trustee's omnibus emergency motion for all of the

5  matters that we've previously stated.

6         Today, we also have the declaration of Chapter 11

7  trustee Richard Marshack in support of the status conference

8  report.  That is docket number 45-1.

9         The Court also has before it the order it entered

10  on June 7, 2023, docket number 88, which is the order

11  advancing the status conference to heard -- be heard

12  concurrently with this matter at this time.

13         We also have docket number 81, which is the actual

14  Chapter 11 trustee status report.  That is docket number 81.

15  I'm repeating myself.

16         And we have the proof of service on the order

17  advancing the status conference to be heard.  And that's

18  docket number 89.

19         We have docket number 45, which is the status

20  conference report filed today at 9:41 by special counsel to

21  Mr. Marshack.

22         We have the order approving the U.S. Trustee's

23  application for the appointment of the Chapter 11 trustee as

24  docket number 65.  That would be entered on May 8, 2023.

25         The Court takes judicial notice of docket number

Case 8:23-ap-01046-SC    Doc 296-2    Filed 06/27/23    Entered 06/27/23 13:13:21    Desc
Declaration of Kathleen P. March    Page 220 of 289    Page 287 of 337

215

1  33 in the main case, which is the schedules A and B, those

2  are the real and personal property assets of the Debtor, as

3  well as schedules E and F creditors who have unsecured

4  claims.  This docket number 33 was filed on April 4, 2023.

5           The Court has the list of equity security holders,

6  which is Daniel March, which is docket number 36.

7           The Court takes judicial notice of that, as well

8  as the summary of assets and liabilities, which is Official

9  Form 2006 S-U-M, which just stands for summary, docket

10  number 32.

11          Of course, the Court has before it and takes

12  judicial notice of docket number one, which is the voluntary

13  petition.

14          The Court also has docket number 54, the statement

15  of financial affairs.

16          The Court has schedule number two -- or Form 6 --

17  206G, docket number 53, the schedule of his executory

18  contracts and unexpired leases.  The Court takes judicial

19  notice of that.

20          The Court also has before it the opposition of the

21  Greyson Law Center P.C. to the motion for turnover,

22  preliminary injunction, lockout, redirection of U.S. mail,

23  and the declaration in support of the opposition to the

24  motion for turnover, et cetera.  Docket number 47 and docket

25  number 47.1.

Case 8:23-ap-01046-SC  Doc 296-2  Filed 06/27/23  Entered 06/27/23 13:31:21  Desc
Declaration of Kathleen P. March  Page 21 of 292    Page 288 of 337

216

1          The Court is not aware of any other oppositions

2    that have been filed, but the Court can be wrong on a lot of

3    time -- a lot of occasions.

4          Does anybody know of any oppositions to the

5    preliminary injunction other than from the Greyson Law

6    Center?

7          Hearing none, I think I've gone through most of

8    the matters that I've now reviewed very carefully.

9          Injunctive relief is available in bankruptcy

10   courts in two ways, pursuant to the Court's discretionary

11   inherent equitable powers under section 105(a) "to issue any

12   order, process, or judgment that is necessary or appropriate

13   to carry out the provisions of this title" or under the

14   auspices of Bankruptcy Rule 7065, which makes Federal Rule

15   of Civil Procedure 65 applicable in adversary proceedings.

16   And I've already cited to you the complaint that has been

17   filed in support.

18         With respect to preliminary injunction standards,

19   the use -- under Bankruptcy Rule 7065 and Federal Rule of

20   Civil Procedure 65, the traditional criteria for issuing a

21   preliminary injunction are, one, a strong likelihood of

22   success on the merits, two, the possibility of irreparable

23   injury to plaintiffs if the preliminary relief is not

24   granted, three, a balance of hardships favoring the

25   plaintiff, and, four, the advancement of the public

Case 8:23-ap-01046-SC   Doc 296-2   Filed 06/27/23   Entered 06/27/23 18:13:21   Desc
Declaration of Kathleen Dinunzio March Page 221 of 289   Page 289 of 337

217

1  interest, in certain cases.  I cite In re: Morgan-Busby 272

2  B.R., at 261.

3          Alternatively, movants must show either a

4  likelihood of success on the merits and the possibility of

5  irreparable harm or to the existence of serious questions

6  going to the merits and the balance of hardships tipping in

7  the movant's favor.  And I cite to you Nike, Inc. vs.

8  McCarthy, 379, F.3d 576, at 580, Ninth Circuit, 2004, which

9  cited Gilder vs. PGA Tour, Inc., 936 F.2d 417, at 420, Ninth

10  Circuit 1991.  "These two alternatives represent extremes in

11  a single continuum rather than two separate tests.  Thus,

12  the greater the relative hardship to the movant, the less

13  probable -- probability of success on the merits must be

14  shown," citing Walczak, W-A-L-C-Z-A-K, 180 -- 198 F.3d, at

15  731.

16          I tell you all of this because I am stating the

17  legal basis for granting a preliminary injunction.  And I do

18  that because the standard of reviews, of which I'm always

19  cognizant, are appellate courts review the grant of a

20  preliminary injunction for an abuse of discretion, Eisen vs.

21  Golden (In re Eisen), and you'll find that at 2006

22  Bankruptcy Lexus 470 -- 4790 at 12, from the Bankruptcy

23  Appellate Panel, Ninth Circuit, December 28, 2006, citing

24  Morgan-Busby vs. Gladstone.  That's In re: Morgan-Busby, 272

25  B.R. 257, at 260, Ninth Circuit Bankruptcy Appellate Panel

218

1  2002, "A bankruptcy court abuses its discretion if it bases

2  its rulings on an erroneous legal standard," which I think

3  I've now covered, "or on a clearly erroneous assessment of

4  the evidence."  Let me say that again, "On a clearly

5  erroneous assessment of the evidence," citing Alcove,

6  A-L-C-O-V (sic.), Investment, Inc. vs. Conceicao, and I'm

7  sorry, I butchered that.  That's C-O-N-C-E-I-C-A-O, 331 B.R.

8  885, at 889, Ninth Circuit Bankruptcy Appellate Panel, 2005.

9       When the bankruptcy court is alleged to have

10  relied on an erroneous legal premise, we review the

11  underlying issues de novo, but, again, it's the standard of

12  abuse with respect to the clearly erroneous assessment of

13  the evidence.  I say that because I would like to hear

14  arguments regarding the facts, with respect to the issuance

15  of a preliminary injunction at this time.

16       Would you like to go first?

17       MR. CELENTINO:  Thank you, your Honor.

18  Christopher Celentino, again.

19       The trustee has established that the Litigation

20  Practice Group has been decimated by transfers of its

21  valuable assets.  Mr. Diab took the stand and indicated it

22  was the problems with the creditors that led to the

23  dismantling of the Litigation Practice Group and the

24  transfer of the assets.

25       It's absolutely clear to us from the evidence that

Case 8:23-ap-01046-SC Doc 290-2 Filed 06/27/23 Entered 06/27/23 13:13:21 Desc
Declaration of Kathleen P. March Page 24 of 289 Page 291 of 337

219

1 to the extent that there are legal services being provided

2 to these consumers, the primary business of LPG has been to

3 recover funds for the benefit of the defendants.

4        The trustee is very concerned and remains

5 primarily concerned, as does the Court and the U.S. Trustee,

6 with trying to make a soft landing for these many consumer

7 creditors whose livelihood and futures were taken advantage

8 of in these contracts designed primarily to get the revenue

9 in and secondarily to protect the consumer and provide

10 services to the consumer.

11        The contracts themselves are executory contracts.

12 The notion that they could be assigned to a third party is

13 not set forth in the contract, and the language that Mr.

14 March read to us does not so authorize.  And even if it did,

15 the Rules of Professional Conduct don't so authorize.

16        And that's the main problem here.  Whenever there

17 is a transfer of a client file, the client has to have

18 consent.  That didn't happen here.  In fact, Mr. Diab just

19 took the stand and conceded that files that were transferred

20 to an entity, when that entity, Oakstone, couldn't fulfill

21 its obligation under that transfer agreement and Oakstone

22 abandoned those files, it was Mr. Diab, post-bankruptcy, who

23 made the decision that those files should go to Phoenix, not

24 the Debtor.

25        The trustee has submitted to you the evidence, and

220

1  Mr. Diab agreed to the documents, that pulls, through the

2  LPG portal, are being made to those LPG clients, and those

3  monies are being redirected, a decision he said he was in

4  on.

5          The elaborate scheme, as LPG started getting into

6  trouble with its creditors, was to take services that were

7  typically done and would be typically done in a law firm and

8  assign them out to his friends and colleagues who ran

9  Maverick and Prime Logix.  The assigning out of those

10 functions left LPG, in their perfect world, waiting for the

11 third parties to be able to collect from clients that those

12 third parties had no methodology to pull funds.

13          Now, Mr. Diab gave us the story, and I think

14 that's all it is is a story, that the payment processor

15 permitted LPG happy-go-lucky to decide wherever it wanted

16 the accounts to go once the monies were paid.  That's a

17 Ponzi scheme.  The way they ran it was a Ponzi scheme, and

18 the way they ran this operation was not appropriate.

19          The trustee is before you trying to make bad of a

20 good -- I mean good of a bad situation.  The trustee is

21 between a rock and a hard place, as your Honor has noted.

22 The revenue from these clients is property of the estate.

23 The revenue of the clients was dissipated, intentionally.

24 Fighting with creditors was the reason given.  The inability

25 to pay creditors was the reason given.

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 18:33:21 Desc
Declaration of Kathleen P. March Page 26 of 293 Page 293 of 337

221

1          THE COURT:  Mr. Celentino, would you agree that

2   under Section 541 of the Bankruptcy Code, any interest in

3   property that the trustee recovers under Sections 329(b),

4   363, and 543, 550, 553, or 723 are also property of the

5   bankruptcy estate?

6          MR. CELENTINO:  Yes, your Honor.

7          THE COURT:  Thank you.

8          MR. CELENTINO:  And it is our intention in the

9   litigation to pursue damages for all of that looting.

10          THE COURT:  Well, that's what your complaint says.

11          MR. CELENTINO:  Yes.  We're going to pursue it,

12   absolutely.

13          So the trustee is left between a rock and a hard

14   place at this very moment.  As the Court has noted and the

15   United States Trustee has noted, there is duty to legitimate

16   creditors.  As the Court has noted and the trustee is very

17   concerned about, there's a duty to these clients, and

18   there's a duty to help these clients make a soft landing.

19          I'm pleased to learn from Mr. Marsh -- March on

20   the stand what we learned from him before we came in today,

21   which is that he's going to substitute in and maintain the

22   200 clients to finish, and they are not going to be managed

23   -- the 200 clients of LPG -- and they're not going to be

24   managed by Mr. Marshack.  And he had agreed to that

25   previously, and we're comfortable with that.

222

1    So where we sit today is --

2    THE COURT:  That would be his business judgment.

3    MR. CELENTINO:  It's his business judgment.  And

4    the trustee in his business judgment is comfortable with

5    that.  And we will submit an appropriate resolution to the

6    Court for the Court to authorize so that that can happen.

7    But that wasn't the issue with today, and I'm sorry that we

8    got a little bit sidetracked, I'm thinking that --

9    THE COURT:  No, I wanted that clarified anyway,

10   and this gave us an opportunity.

11   MR. CELENTINO:  Yes.  Yes, I think so.  And I

12   appreciate that.

13   So we're anxious to come to a resolution to do the

14   right thing.  The preliminary injunction did the right

15   thing.  It required all of these people that have been

16   working in all of these successor companies -- you heard

17   that Han Trinh, Jayde Trinh, they were involved in not just

18   one or more of this -- of the transferees, they're involved

19   now in Greyson.  All of the same people have been involved,

20   and the order ordered them to turn over to us, the trustee,

21   the books and records of the LPG clients with whom LPG has

22   contracts.  We can debate someday, and it will not go very

23   long, that LPG somehow had the unilateral right to transfer

24   its clients to other entities.  That's not one that --

25   THE COURT:  Now, I think -- now, I think you

**Briggs Reporting Company, Inc.**

223

1  misspoke.  You said the preliminary injunction, but I think

2  you meant the temporary restraining order.

3           MR. CELENTINO:  Temporary restraining order.  I'm

4  sorry.

5           The temporary restraining order required the

6  turnover of the data.  And in the turnover of the data,

7  we've learned what we know now to be a wrongful operation of

8  what could have been a proper operation.  And we believe

9  that there are ways to operate properly, and Mr. Carss has

10 indicated in his testimony that we can operate properly, and

11 we understand the United States Trustee will have an open

12 discussion with us about the next steps.  And we do know

13 that counsel for the ad hoc committee representing the

14 consumers is here hopefully to be part of that discussion

15 and solution.

16          For today, it is absolutely clear that if -- the

17 former participants in LPG who are -- were part and parcel

18 of the other entities to which different parts of LPG were

19 assigned and different revenue streams of LPG were assigned

20 to remain enjoined from continued interference in the assets

21 of LPG.  That's important.

22          If they were to decide to do what somehow they

23 think they have the right to do and have a lawyer reach out

24 to a client of LPG or a client of Phoenix and say, "I'm

25 going to go with X.  I want you to come with me," that's an

Case 8:23-ap-01046-SC  Doc 296-2  Filed 06/27/23  Entered 06/27/23 13:13:21  Desc
Declaration of Kathleen P. March  Page 296 of 337

224

1  inappropriate thing to do without the overlay of the

2  bankruptcy.  That is ethically wrong.  But that is

3  inappropriate when the revenue stream you're attempting to

4  affect is the revenue stream of a bankruptcy case.  And it's

5  further inappropriate when it's on the back of a consumer

6  who needs legal services, not a 90-person operation of

7  non-lawyers running 48 clients.

8        So the circumstances that we've established, I

9  think, are clear.  The Court has the authority, for the

10  reasons cited by the Court and in our papers, to enter our

11  preliminary injunction.

12        The trustee -- from all we've heard, a rational

13  objective view of the evidence is that there were reasons,

14  economic reasons, that the Debtor's assets were transferred.

15  And it is to avoid the payment of those creditors that all

16  of this was done.  I think we may have almost had as close

17  as we're going to get to a consent to an actual intent to

18  defraud.  But we certainly have constructive defraud, and we

19  are certainly going to prevail, and certainly the Court can

20  find a reasonable likelihood of prevailing on the merits.

21        THE COURT:  Well, how about a reasonable

22  likelihood of irreparable injury to the plaintiff?

23        MR. CELENTINO:  The irreparable injury to the

24  plaintiff is what we've been talking about the most.  The

25  irreparable injury to the plaintiff, Mr. Marshack, is to the

225

1  system -- the bankruptcy system that would allow this type

2  of thing to happen in the first instance.

3       The other irreparable injury is to that consumer

4  to whom the trustee owns a duty.  And that consumer is the

5  one we're very much concerned about.  The Court is, the U.S.

6  Trustee is, the trustee is concerned.

7       THE COURT:  What about the irreparable harm to the

8  creditors of this bankruptcy estate?

9       MR. CELENTINO:  And the creditors of this

10  bankruptcy estate, to the extent they have legitimate

11  claims, have seen the revenue stream that they bet on, the

12  revenue stream that they contracted to receive, absolutely

13  scattered into the wind with no reasonable prospect of

14  payback.  You heard that the agreement is 20-percent

15  referral fee from Phoenix that hasn't been paid.

16       THE COURT:  What does the evidence show us would

17  happen if this preliminary injunction is not entered?

18       MR. CELENTINO:  Unfortunately, the evidence shows

19  that the parties that are the defendants will continue to

20  prey on the consumers and will continue to pretend that they

21  have the legal authority to pull the ACHs destined for this

22  estate and this Debtor for their benefit.  That is not going

23  to be available to the creditors of this estate.

24       Prime Logix is doing and providing services that

25  the Debtor had a contract to provide.  They just decided

226

1 another way to get that revenue -- that part of the revenue

2 stream out of the estate, and the creditors have a unlikely

3 attempt to collect if we can't get this picture together in

4 the right place and formulate a methodology by which the

5 consumer, creditors can be protected and revenue can begin

6 to come back into the estate legally.  And that is the thing

7 that we're most important -- we're most concerned about.

8          I want to add, in conclusion, I think that for the

9 most part, my observation has been, in the last week while

10 we've tried to figure this out, that the Court's temporary

11 restraining order gave a breath of fresh air to most of the

12 persons in the operation, because there does seem to now be

13 some practical decision making that could happen.  It does

14 seem that the attorney actually in charge should have an

15 opportunity to be in charge, not have to wait for the whims

16 of somebody behind the curtain making the decisions of where

17 the revenue goes.

18          The continued poaching of the clients of the

19 operation is a detrimental effect on the estate and its

20 ability to pay creditors.  The continued access to the LPG

21 database for LPG creditors continues to allow those parties,

22 if not enjoined, to use debtor information and debtor assets

23 to their benefit.

24          I did want repeat what I said in my opening

25 earlier, however.  Greyson appears to us to be slightly

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 18:31:21 Desc
Declaration of Kathleen P. March Page 232 of 293 Page 299 of 337

227

1 different than we anticipated when we filed the complaint.

2 As Mr. Diab indicated in his testimony, Greyson was

3 originally aligned with Mr. Diab in the thought that they

4 were going to be a party that was going to be able to siphon

5 off some of the Phoenix money for their benefit.

6        Today, Greyson has 48 clients.  That's what it is,

7 your Honor.  That's the list they've given us.  It's 48.

8 Those 48 clients, according to the declaration of Ty Carss

9 admitted into evidence today, 42 of them remain active in

10 the Phoenix database.  Notwithstanding that 42 of them are

11 active in the Phoenix database, I would like to recommend

12 that the Court allow us to modify our request on the

13 preliminary injunction as it affects Greyson.

14        We don't want to manage Greyson.  We don't want

15 any interaction with Greyson.  We will not pay the payroll

16 of Greyson.  And we want that to be clear because that's

17 what the TRO says, there is to be no movement of monies.

18        We are very comfortable to take a raw data CVS

19 (sic.) file of those 48 files.  We are very comfortable to

20 look at all 48 clients' retainer letters when Mr. Plazak

21 presents them to me.  And for everyone that he presents a

22 signed letter, we are thrilled to give the data file to

23 them, the raw data file of everything that's in our system.

24 And we're willing to send a notice to them that we've

25 accomplished that, they have the raw data file.

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 18:33:21 Desc
Declaration of Kathleen P. March Page 233 of 299    Page 300 of 337

228

1          I don't -- I have no interest in whether they
2    appear at the premises or they don't appear at the premises.
3    They're in a separate suite.  They have nothing to do with
4    the transferred operation of LPG that's in the hands of
5    Phoenix.  And they can do with those 48 clients, with the
6    Court's blessing -- it would be the trustee's request --
7    they can do with those 48 clients and the 90 employees and
8    the 28 attorneys whatever they wish.  But we can't -- we
9    cannot allow Greyson, through Prime Logix, through Vulcan,
10   through Maverick, through any of the other participants that
11   participated in the looting of the Debtor -- we can't allow
12   them to continue to loot the Debtor to pay their outrageous
13   overhead.

14          The documents submitted and the evidence submitted
15   to your Honor shows an overhead of over $5.7 million in
16   employee salaries alone.  And the anticipated revenue of
17   those 48 clients isn't 15,000 a month, but hundreds of
18   thousands of dollars in the last two months have gone from
19   legacy LPG files -- not those 48 -- legacy LPG files to
20   Prime Logix for Prime Logix to pay hundreds of thousands of
21   dollars for the Greyson payroll.  That is what needs to stop
22   vis-a-vis Greyson.  We are not going to pursue them as an
23   alter ego.

24          THE COURT:  But the TRO already stops that.
25          MR. CELENTINO:  The TRO already stops it, and the

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 18:13:21 Desc
Declaration of Main Document March Page 234 of 293 Page 301 of 337

229

1  preliminary injunction needs to maintain that stoppage.

2  That is important.

3      THE COURT:  But do you think you're going to get

4  any opposition from Greyson for having one of these entities

5  pay their salaries?

6      MR. CELENTINO:  Well, I don't -- I think -- I

7  don't think -- I don't think with a straight face an

8  attorney will stand before you and suggest that it would be

9  appropriate for one of these entities that are pulling money

10 through the LPG portal for -- on LPG clients to front the

11 money to them to pay their enterprise, especially with the

12 testimony that we have from Mr. Diab and others that there's

13 nothing to come back to the Debtor for that.

14     THE COURT:  So if I enjoin another party from

15 paying anything to Greyson, parties that I have jurisdiction

16 over, that might be one of the largest solutions to this

17 issue.

18     MR. CELENTINO:  It's an easy solution to this

19 issue, your Honor, the trustee proposes and an appropriate

20 solution to this issue.

21     THE COURT:  Well, it might be.  Let me ask you

22 this, the 48 clients that they've said they've had, do I

23 have evidence of that, or was it a statement by an attorney?

24     MR. CELENTINO:  I believe we put evidence in a

25 declaration from one of our attorneys, your Honor, that

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 18:13:21 Desc
Declaration of Kathleen Dunn March Page 35 of 89 Page 302 of 337

230

1  pulled those files.  I will make a proffer of proof that the

2  director of HR sent me the list of 48 clients, the first one

3  of which was onboarded on the date of the petition March 20,

4  2023.  And I will work with Mr. Plazak to confirm that the

5  list provided to us by Greyson HR is the same list he's

6  talking about.

7        THE COURT:  Now, the interesting comment that you

8  made was that 42 of the 48 clients are also listed currently

9  as clients of Phoenix?

10        MR. CELENTINO:  You have the declaration of Ty

11  Carss before you, which says 42 of the 48 show up as active

12  in the Phoenix/LPG database.

13        THE COURT:  What am I to make of that?

14        MR. CELENTINO:  You're to make of that exactly

15  what counsel told you, is the lawyers that work for Greyson

16  reached out to try to get those clients to Greyson, and

17  we'll use that admission in the future in the litigation.

18        For today, I've consulted with the trustee, and

19  I've consulted with Mr. Carss, and we think the best thing

20  to do, if, in fact, the representation made by Mr. Plazak is

21  true that they have a signed authorization from all of those

22  clients -- if that is the case, we don't want to stand in

23  the way of that, even though they're active in our -- in the

24  LPG, Phoenix system.  We would be more than happy to have a

25  modification to this injunction to allow us to transfer

231

1  those clients because of that written authorization, but to

2  maintain the injunction against the continued dismantling of

3  the LPG clients.

4         THE COURT:  Well, be more specific.  Maintenance

5  of the injunction to exactly do what?

6         MR. CELENTINO:  Well, the injunction today says

7  that the named persons, of which Han Trinh, Jayde Trinh, and

8  I think Mr. Eadie are named -- it says any of them and

9  anybody working in concert with them are not to interfere

10 with the operations of LPG and LPG clients.

11        Now, we have that complication that was discussed

12 with Ty Carss.  It's a very -- it's a very interesting one

13 in that his referral base, most of it -- not all of it, but

14 most of it are now W-2 lawyers at Greyson.  That's the

15 payroll that we've produced the evidence for that's so

16 astronomical.  We're going to have a difficulty because of

17 that relationship, and we may have to explore that

18 relationship with some of those lawyers.  How is it that

19 they were persuaded to leave us and go to Greyson?  That may

20 have been some form of interference or not.  We'll decide,

21 and we'll bring that to the Court at a later time.

22        But today, the temporary restraining order enjoins

23 their continued interference with LPG and LPG legacy client

24 files.  And what that should mean to the lawyers that

25 they're working with is what we've already discussed today.

232

1   It's actionable for a former lawyer at an entity to say,

2   "Hey, I joined a new entity.  I want to solicit you to come

3   with me."  That's actionable today without the -- without a

4   temporary restraining order or a preliminary injunction

5   under the law.  I think the point is the preliminary

6   injunction should continue to say, those persons and anyone

7   acting in concert with them need to stop interfering with

8   the legacy clients of LPG, the consumers we need to protect

9   to get them to the right place and the right result.  And

10  that's in the current version, and that's what should

11  remain.

12          And the trustee believes that an objective view of

13  the conversations and evidence that's presented leads very

14  clearly to the estate being irreparably harmed, the trustee

15  being irreparably harmed, and the preponderance of the

16  evidence that we will more likely than not prevail on the

17  claims.

18          I will also say, your Honor, that it will actually

19  allow -- that order that I just requested specific to

20  Greyson will actually allow the trustee to function much

21  easier on dealing with the other operation.

22          In two days, somebody at Greyson let their

23  employees believe that it was Mr. Marshack who could pay

24  them but was not doing so.  And we received over 100 phone

25  calls from those employees blaming us for being inhuman,

233

1  notwithstanding that it's pretty clear what the preliminary

2  -- what the temporary restraining order said, the money

3  isn't going anywhere.

4         So we've done the best we can.  With that

5  situation carved out appropriately as I recommended and as I

6  will work out with the Court and the parties in the

7  appropriate language, we will be able to focus on fixing and

8  coming up with a solution with the U.S. Trustee's Office and

9  perhaps the ad hoc committee's counsel to fix the biggest

10 morass facing us, which is how do we repair the despair for

11 these consumers who -- your Honor has already said some of

12 the contracts were, on their face -- I don't remember

13 exactly the word --

14        THE COURT:  Unconscionable.

15        MR. CELENTINO:  -- but unconscionable, I think,

16 was your word.  We don't disagree with that, and we need to

17 get to the bottom of that, and we're going to need a few

18 weeks to get to the bottom of that.  It's 49,000 customers.

19 That isn't going to happen tomorrow.  As much as I think I'm

20 a superhuman, I'm not going to be able to do it.

21        THE COURT:  Are there any counsels that would like

22 to speak against the issuance of the preliminary injunction?

23        MS. PHAM:  I would, your Honor.

24        So I'm glad counsel just mentioned the -- I think

25 it's approximately 10,000 files that the Greyson firm is

Case 8:23-ap-01046-SC  Doc 296-2  Filed 06/27/23  Entered 06/27/23 13:13:21  Desc
Declaration of Kathleen P. March  Page 39 of 293  Page 306 of 337

234

1 handling on behalf of the Phoenix Law Group.  I'm going to

2 go back to your client's -- I'm sorry, your Honor's question

3 of what is the harm if the injunction is not entered?

4 Actually (indiscernible) flip, your Honor, what's the harm

5 if the injunction is entered?  And here's the problem, the

6 TRO and the preliminary injunction is supposed to maintain a

7 -- the status quo.

8          The status quo prior to the filing, pre-petition,

9 was clients were already with these various firms, already

10 being represented and managed and their cases being handled.

11 As you heard earlier, Mr. March is the only attorney right

12 now of record with the Debtor.  He cannot -- they cannot

13 possibly take back 40 to 50,000 --

14          THE COURT:  Well, he's handling 200 cases.

15          MS. PHAM:  Correct.  We cannot possibly send back

16 40 to 50,000 files and clients for Mr. March to handle by

17 himself.

18          THE COURT:  Well, sure you can.  Well, sure you

19 can.  But then the trustee has to have his own problem.

20 See, it's not your problem.  It's Mr. Marshack's problem.

21 If you say, "We're going to give these 10,000 back because

22 we're not getting paid," that's your cup of hemlock.  Please

23 feel free.

24          MS. PHAM:  Well, actually, your Honor, with all

25 due respect, it's actually Mr. March's problem as well,

235

1  because Mr. March is the attorney of record.

2          THE COURT:  Let me ask you, is Mr. March the

3  attorney of record on those cases?

4          MS. PHAM:  He is the managing partner.

5          THE COURT:  He's the attorney of record on those

6  cases?

7          MS. PHAM:  Not all of them are in litigation.  So

8  when you say "attorney of record," he is --

9          THE COURT:  Okay.  I'll try it this way, is he the

10  attorney of record of any of the litigation cases that your

11  firm is handling?

12          MS. PHAM:  For his firm?  For the 200 --

13          THE COURT:  You're representing Greyson.

14          MS. PHAM:  No.  I apologize, your Honor.  I

15  represent Mr. March and Mr. Diab.

16          THE COURT:  I apologize.

17          MS. PHAM:  Mr. March.  I should have said it

18  again.

19          THE COURT:  You see, when you get up and say --

20          MS. PHAM:  I apologize.

21          THE COURT:  This has been a nine -- a seven-hour

22  hearing now.  So I ask for your name, but I also like to

23  figure out who you're representing today.

24          MS. PHAM:  I apologize, your Honor.  I should have

25  done that again.  Yes.  I represent Mr. March.

236

1          THE COURT:  All right.  So you think that it's

2   burdensome on Mr. March.

3          MS. PHAM:  It is burdensome for Mr. March.

4          THE COURT:  Okay.  Because why?

5          MS. PHAM:  Because as the managing partner and the

6   sole attorney of record at this point for this one law firm,

7   if 50, 60,000 files come back --

8          THE COURT:  Is he the attorney of record on those

9   cases?

10         MS. PHAM:  I don't know.  I'm sure he was attorney

11  of record at one point in time on a number of them.

12         THE COURT:  Well then who replaced him as attorney

13  of record?

14         MS. PHAM:  There are all kinds of attorneys with

15  these various firms at this point who are attorneys of

16  record.

17         THE COURT:  Okay.  So you just can't send them

18  back to Mr. March, can -- they cannot be sent back to Mr.

19  March.

20         MS. PHAM:  It comes to the law firm, your Honor.

21  And the law firm, with Mr. March as the sole attorney, could

22  be on the hook and liable.  And this is where we get to,

23  "What is the harm?"

24         THE COURT:  How is that possible?

25         MS. PHAM:  Because with -- if there is a

237

1  malpractice claim, it is Mr. March who is the attorney who

2  will get sued if there is a problem.

3         THE COURT:  How interesting.  Mr. March, your

4  counsel has just thrown you under the bus for every

5  malpractice case that could arise.  Well done.

6         MS. PHAM:  I think, your Honor, that is the

7  reality here if your Honor sends back.  What Mr. March tried

8  to do was make sure these clients were taken care of by

9  making sure they get to attorneys and law firms that can

10 handle them.

11        THE COURT:  And I appreciate that.

12        MS. PHAM:  But if the Court is now taking them

13 back by preventing these law firms from handling it --

14        THE COURT:  Stop for a second.  Stop for a second.

15        MS. PHAM:  Yes.

16        THE COURT:  The Court is sending them back?

17        MS. PHAM:  If --

18        THE COURT:  When did that happen?

19        MS. PHAM:  That's what I'm asking, your Honor.  If

20 the Court is going to go -- start back with what I started

21 with is, what is the harm if an injunction is entered?  If

22 the injunction is entered with the current TRO language --

23        THE COURT:  Yes.

24        MS. PHAM:  -- that -- right now, those files --

25 client files are being taken back and are in the trustee's

238

1  possession.  These firms cannot handle the matters.  They're

2  technically, as I read the injunction, prevented from even

3  representing their clients at this point.

4          THE COURT:  And you represent Mr. March and Mr.

5  Diab --

6          MS. PHAM:  That's correct.

7          THE COURT:  -- not Greyson or anyone else.

8          MS. PHAM:  Correct.

9          THE COURT:  You don't have -- I'll take care of

10  that.

11          MR. CELENTINO:  Time to put that one off.

12          THE COURT:  One more down.

13          MS. PHAM:  Mr. March tried to do what was proper.

14  He clearly could not handle it himself when all of these

15  clients in --

16          THE COURT:  And so he transferred the --

17          MS. PHAM:  He made sure --

18          THE COURT:  -- he -- now, he -- now we know he

19  transferred the cases.

20          MS. PHAM:  He made sure that all of the clients

21  were taken care of.

22          THE COURT:  Did he transfer the cases?

23          MS. PHAM:  Correct, pre-petition.  So as of the

24  moment, the status quo, if we were to maintain it, would be

25  for each of those firms to handle the clients that they

239

1  received or are supposed to be handling.  They cannot -- if

2  they are ordered to transfer those clients and files back to

3  the trustee or to the Debtor, technically, the Debtor --

4  then Mr. March is the sole attorney with the Debtor at this

5  point.  It can't possibly happen.  Those clients will be

6  harmed.  That is the problem, your Honor.

7           THE COURT:  Well, it can't possibly happen?

8           MS. PHAM:  They can't possibly manage.

9           THE COURT:  Well, that's different.

10          MS. PHAM:  That's what I mean.  They're --

11          THE COURT:  How do you respond to that, counsel?

12  It sounds pretty compelling to me.

13          MR. CELENTINO:  Your Honor, we have a system in

14  place, and we have a system planned, and we know how to

15  operate legally.  We are going to work with Mr. Carss and

16  his team, and we're going to be coming back to you after we

17  finalize our discussion with the U.S. Trustee and perhaps

18  the ad hoc committee for a way to make that happen.

19          But let's remember, the testimony we had today was

20  there was an agreement that never got signed that

21  transferred those files.  They asked for Mr. Marshack's

22  permission.  They don't have an agreement from Mr. Marshack

23  to seek to have this court-authorized.  So the transfers

24  haven't happened.  It's a figment of the imagination.

25          THE COURT:  You see, I was having some cognitive

240

1  dissonance listening to the other counsel's argument knowing

2  what you've just said.

3          MR. CELENTINO:  So the point, of course, is, you

4  can't transfer the economics of a bankruptcy estate pre or

5  post-petition because you're trying to prevent creditors

6  from getting paid.  It really doesn't matter.  But we have a

7  system in place, and we have a plan in place, and that's

8  going be the risk that we take.

9          THE COURT:  I appreciate that.

10         Please continue.

11         MS. PHAM:  So that is the issue, your Honor.  And

12 I come back to the very beginning, which is we're a bit

13 disadvantaged, because we've heard all kinds of allegations

14 about improper unfair practices or allegations of improper

15 charges or allegations of ethical responsibilities or

16 violations.

17         THE COURT:  Yes, but the allegations aren't my

18 concern.  The evidence is.

19         MS. PHAM:  And the problem is, your Honor, we

20 haven't had an opportunity to address that.  All due respect

21 to counsel, we --

22         THE COURT:  Well, you'll have an opportunity --

23 believe me, you can bring a motion to vacate any aspect of

24 the preliminary injunction anytime you wish 24/7.

25         MS. PHAM:  What my concern is --

241

 1        THE COURT:  But why would I want to interfere with

 2  a mechanism now that could later cause irreparable harm to

 3  this estate?

 4        MS. PHAM:  And that is the -- what -- we share the

 5  same concerns, your Honor.  What I'm here to do is make sure

 6  that the clients are protected because that protects my

 7  client.  If the clients are protected, my client is

 8  protected.  As long as there is an immediate -- whatever it

 9  would be -- stepping in -- I don't know if it would be a

10  substitution for whomever the trustee has in place to handle

11  all of these matters so that it doesn't fall upon my client,

12  that is what I want to make sure, your Honor.

13        THE COURT:  But you understand your client was

14  deep into this whole morass.  Your client has been involved

15  in litigation practice -- I'm sorry, it's getting late --

16  the Litigation Practice Group for a very long time.

17        MS. PHAM:  Absolutely.

18        THE COURT:  You know, so you're -- now you're

19  saying, "This is a horrible situation," but it's your client

20  that did a lot of this.

21        MS. PHAM:  Well, when you say you did this --

22        THE COURT:  Clients, pardon me.

23        MS. PHAM:  I apologize, your Honor, but when you

24  say "did this," what my clients did was to make sure that

25  the clients were handled.

**Briggs Reporting Company, Inc.**

242

1      THE COURT:  No.  What your clients did was create

2  a systematic -- I really hesitate to come to the conclusion,

3  but you -- I want to say right now that what it looks like

4  is a systematic fraud.  And it sounds like it's a very

5  serious issue that I still am going to have to organize.

6  The trustee has only been in this job how many days?

7      MR. CELENTINO:  Three weeks.

8      THE COURT:  Three weeks.  I've got a lot to do to

9  listen to the arguments.  And so I appreciate your comments,

10  but I'm telling you that your concern for these clients --

11  no, pardon me.  Your client's concern for the consumers, and

12  understanding the evidence that I've heard now, doesn't ring

13  completely true with this Court.  And I'm saying it for the

14  record because I'm evaluating the evidence before me, and

15  I'm actually doing what the Ninth Circuit wants me to do.

16      Let me repeat, just so that you know.  I don't

17  want to abuse my discretion, and I want to base the rulings

18  on a good assessment and a legitimate assessment of the

19  evidence.  And from what I've heard, I don't think, at this

20  point, the preliminary injunction should be altered too much

21  from the original TRO, but I'm certainly hoping that an

22  accommodation can be made with respect to Mr. Plazak's

23  clients and the trustee, because that sounds like something

24  that could be very workable.

25      But in the interim, to hear counsel for Mr. Diab

243

1  and Mr. March worried now about the consumers, after what's

2  all happened, rings hollow to me.

3      MS. PHAM:  And I understand, your Honor.  You've

4  not -- again, you haven't heard our -- haven't had a chance

5  for us to brief it, so that you haven't received all of

6  that.  I know you've read a lot of what the trustee said and

7  maybe other counsel, which I understand.

8      THE COURT:  You can bring your motion to vacate

9  anything you would like.  I would be more than happy to

10  entertain it.

11      MS. PHAM:  Right.  And so I understand your

12  Honor's comments being based on that information thus far,

13  but, again, I can only speak for what I have -- what I have

14  from my clients.  We're more than willing to cooperate.

15  Again, we -- we're not opposing the injunction to the extent

16  it prevents funds from being dissipated or moved.  It is

17  simply --

18      THE COURT:  So you are just opposing it so that

19  Mr. March wouldn't have any more work.

20      MS. PHAM:  No.  We wanted to make sure that the

21  clients are being serviced.  And to the extent that I --

22  just hearing the counsel's representing that Mr. March has

23  agreed to substitute in, I'm not sure that's actually

24  correct, but I'm happy to discuss that with counsel.

25      THE COURT:  Well, he hasn't told me that, so I

*Briggs Reporting Company, Inc.*

244

1  don't know, and I don't particularly care.  You see, here's

2  the thing.  I don't deal with the administration directly of

3  a bankruptcy estate.  I recognize the business judgment if

4  it is sound business judgment of a Chapter 11 trustee.  And

5  I take into consideration all of the evidence plus the solid

6  sound advice and evidence -- advice of the United States

7  Trustee representing the United States of America through

8  the Department of Justice.  I take all of that very

9  seriously, and I appreciate your comments.

10         MS. PHAM:  Thank you, your Honor.  And I'm --

11  again, we're more than happy to cooperate with the U.S.

12  Trustee, the Court, the Chapter 11 trustee to make sure

13  everyone is protected.  Again, I just -- my comment was

14  simply because I have not had an opportunity to speak to

15  either the U.S. Trustee's counsel or the Chapter 11 counsel.

16  We did reach out, again, to know, "What exactly are we going

17  to do to protect all of these clients if this injunction

18  remains in place?"  That was the issue.

19         THE COURT:  You should work quickly.

20         MS. PHAM:  Yes.

21         THE COURT:  Thank you.

22         MS. PHAM:  Thank you, your Honor.

23         THE COURT:  Mr. Plazak.

24         MR. PLAZAK:  Thank you, your Honor.  Doug Plazak,

25  Reid and Hellyer, for Greyson.  And based upon Mr.

245

1  Celentino's comments and your Honor's comments, again, it

2  appears that, at a minimum, Greyson should be treated

3  differently and perhaps the language modified to allow

4  Greyson to do -- to operate.

5       Obviously, Mr. Celentino has said that and -- that

6  the Chapter 11 trustee is prepared to allow Greyson to

7  continue to work on the few LPG files that it has.  As also

8  is evidenced in the record, there are a number of files that

9  it's working on that are not LPG related at all.

10      In order for them to work on those files, they

11 have to operate like a normal business.  So amongst the

12 items in the TRO that should be modified, at least as to

13 Greyson, is, for example, the order to redirect mail, the --

14 you know, having the post -- the U.S. Postal Service direct

15 mail from Greyson to the trustee.  That would obviously

16 interfere with Greyson's abilities.

17      THE COURT:  Why don't we do this?  Why don't we

18 modify it to have the mail continue going to the trustee but

19 the trustee immediately review all mail that is going to

20 Greyson and immediately turn it over if they feel that it

21 would otherwise -- maintaining it would interfere with your

22 operations.

23      MR. PLAZAK:  Okay.

24      THE COURT:  Well, let's hear from Mr. Celentino or

25 Mr. Marshack.  He's here.

Case 8:23-ap-01046-SC   Doc 296-2   Filed 06/20/23   Entered 06/20/23 08:13:21   Desc
Declaration of Kathleen P. March   Page 251 of 290   Page 318 of 337

246

 1          MR. CELENTINO:  That would be fine with us, your

 2  Honor.

 3          THE COURT:  They could act as a gatekeeper but do

 4  it quickly.

 5          MR. CELENTINO:  Quickly, your Honor, is fine.

 6          MR. PLAZAK:  By "quickly," my assumption would be

 7  one to two business days?

 8          THE COURT:  That's what I think.

 9          MR. CELENTINO:  If we're allowed -- if we're

10  allowed, your Honor, to actually scan it to him, we can do

11  it pretty quick.  So it's not a problem.

12          THE COURT:  Well, how much mail do you get?

13          MR. CELENTINO:  Not very much.

14          THE COURT:  I didn't think so.

15          MR. PLAZAK:  Okay.  The next part that would

16  obviously interfere with their business operations is the

17  lockout order, locking out, you know, the owner and one of

18  the main attorneys.

19          THE COURT:  Well, let's stop right there.

20          MR. PLAZAK:  Sure.

21          THE COURT:  Mr. Celentino, on the lockout order?

22          MR. CELENTINO:  I had indicated in my

23  presentation, your Honor, they're in a different suite.  We

24  have no interest in preventing them from being in their

25  suite.  We don't want to see them in the Phoenix Suite since

Case 8:23-ap-01046-SC  Doc 296-2  Filed 06/27/23  Entered 06/27/23 18:13:21  Desc
Declaration of Main Document  March Page 252 of 293  Page 319 of 337

247

1  we'll be working with Phoenix to fix it.  And in particular,

2  we don't want them to have access to our CRM.

3          THE COURT:  Does that sound okay with you?

4          MR. PLAZAK:  Just so I'm clear, so the -- and I'm

5  not sure what a CRM is, but the -- as far as we're talking

6  about the physical, we're talking about -- again, they may

7  -- being able to occupy, first of all, the physical suite

8  where they're in, my understanding is --

9          THE COURT:  What is the nature of the suite?  What

10 is the address?

11         MR. PLAZAK:  It is -- it's in the --

12         THE COURT:  Can someone --

13         MR. PLAZAK:  Yes.  334 -- I believe it's --

14         MR. CELENTINO:  3347 Michelson Drive.  There are

15 three different suites within Michelson -- within that

16 facility.

17         THE COURT:  And 3347 is Greyson's?

18         MR. CELENTINO:  3347, suite 410, I think.

19         MR. PLAZAK:  400B, I believe.

20         MR. CELENTINO:  400B is Greyson's.

21         MR. PLAZAK:  400B, correct.

22         THE COURT:  And today, who has the keys to 400B?

23 Someone has the keys.

24         MR. CELENTINO:  We believe it's a key fob, your

25 Honor.  And other than Greyson letting us into their

248

1  premises to help us transfer files, we don't access that

2  space or that key fob.

3          THE COURT:  So let's try it again.  Who has the

4  key fob?

5          MR. CELENTINO:  Somebody at Greyson does.  All --

6  your Honor, I believe all employees have their own.

7          THE COURT:  They have a key fob.  But they're

8  enjoined now from going in.  Has anyone violated my order?

9          MR. PLAZAK:  No, but I believe some -- it's not

10 that -- I don't believe that all of the employees are

11 enjoined, for example.  But I believe that there are some

12 employees enjoined, in particular, for example, the owner

13 and Ms. Trinh -- Jayde Trinh.

14         THE COURT:  So you're telling me that other people

15 besides the trustee's designees are entering today 400B?

16         MR. PLAZAK:  No, I don't -- actually, I don't

17 believe so.  No, I don't believe anybody is showing up, but

18 last week they were there.

19         THE COURT:  Okay.  And you would like someone to

20 be able to show up.

21         MR. PLAZAK:  Correct, in order to --

22         THE COURT:  Who would you like to have show up?

23         MR. PLAZAK:  Well, the -- all the employees, the

24 normal staff.

25         THE COURT:  Okay.  Mr. Celentino.

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 18:13:21 Desc
Declaration of Matthew Dunn March Page 254 of 289 Page 321 of 337

249

1          MR. CELENTINO:  Your Honor, I indicated I would

2   work it out with Mr. Plazak.  And I want to be clear.  We

3   don't want anything to do with Greyson.  They have their own

4   fobs.  They know how to get in and out.  We simply want them

5   out of the database that belongs to the Debtor.

6          THE COURT:  Right.  And Mr. Plazak is making a

7   good point that he wants to protect his clients from

8   violating a court order.

9          MR. CELENTINO:  Understood.

10         THE COURT:  And so let's refine the court order --

11         MR. CELENTINO:  We will.

12         THE COURT:  -- so that they are relieved of an

13  obligation that isn't necessary.  Tell me, what isn't

14  necessary?

15         MR. CELENTINO:  What is not necessary?

16         THE COURT:  That's right.  Can they -- can anyone

17  go into 400B tomorrow?

18         MR. CELENTINO:  It is not -- it is not necessary

19  to prevent them from access to 400B.  They need --

20         THE COURT:  Okay.  What is a CRM?

21         MR. CELENTINO:  It is the database where the

22  electronic files -- that's how we know they're active, LPG.

23  They're in the same database.  And we propose to give them a

24  data file and let them have their data file.  They can

25  convert that to however they wish to use it, and we want it

250

1  out of our database.

2          THE COURT:  And how long will that take you to

3  convert and transfer?

4          MR. CELENTINO:  We will have it to them tomorrow.

5  Whether we have a new order or not, we will provide it to

6  them tomorrow.

7          THE COURT:  Mr. Plazak, would you please identify

8  the gentleman?  He seems to know something at being

9  assertive.  I'm not asking him to talk.  I'm asking you to

10 identify him.  Mr. Plazak?  Mr. Plazak, would like to take

11 it outside?  Would you like to be held in contempt, Mr.

12 Plazak?

13         MR. PLAZAK:  I'm just trying to get his --

14         THE COURT:  Yes, I understand.  And he's causing

15 you to be held in contempt.

16         Now, would you identify that gentleman.

17         MR. PLAZAK:  Israel Orozco.

18         THE COURT:  And what is his relationship to your

19 client?

20         MR. PLAZAK:  He is a general counsel.

21         THE COURT:  He's general counsel.  He's a member

22 of the California Bar?

23         MR. PLAZAK:  He is -- I take that back.  I believe

24 he's -- what --

25         MR. OROZCO:  I'm an employee of Greyson.  An

251

 1    attorney at Greyson.

 2            MR. PLAZAK:  He's an attorney at Greyson.

 3            THE COURT:  Okay.  So now, what we've -- while we

 4    were -- while I was being interrupted by this gentleman, and

 5    if you want to take it outside, you can, but we're trying to

 6    do some business here, sir.

 7            How can we accommodate your client, Mr. Plazak?

 8    By getting access to the facility and getting a copy of the

 9    files you need.  And what we've heard -- I don't know if you

10    were able to hear it, but Mr. Celentino was saying he could

11    tomorrow provide you with your files.

12            MR. PLAZAK:  That is helpful.

13            THE COURT:  What else would you want?

14            MR. PLAZAK:  Well, I don't know that we need

15    anything else as it relates -- well, again, I'm just going

16    over the lockout order because I want to make sure that --

17    again, as it relates to --

18            THE COURT:  Well, the lockout order is an order

19    saying you can't go into the facility.

20            MR. PLAZAK:  Correct.

21            THE COURT:  Okay.  Now, I'm telling you that

22    there's a real good possibility that your people can go into

23    the -- suite 400B.

24            MR. PLAZAK:  Right.

25            THE COURT:  And work on files.  And now I'm seeing

Case 8:23-ap-01046-SC   Doc 296-2  Filed 06/27/23   Entered 06/27/23 18:33:21   Desc
Declaration of Kathleen P. March   Page 257 of 293   Page 324 of 337

252

 1 some major concern that there's something else that wants --

 2 them -- they want to do, and they want to talk to you about

 3 it, Mr. Plazak.

 4          MR. PLAZAK:  And I think --

 5          THE COURT:  Would you like to take a few minutes

 6 and talk to your clients?

 7          MR. PLAZAK:  I think -- thank you, your Honor.

 8          THE COURT:  Because they have some major concerns,

 9 I can tell.  Go ahead.

10          MR. PLAZAK:  Thank you.

11          THE COURT:  In the meantime, are there any other

12 parties --

13          Mr. Baum, would you like to talk about this

14 preliminary injunction?

15          MR. BAUM:  Very, very briefly, your Honor.  My

16 clients were the -- Han and Jayde were locked out of their

17 e-mail system.

18          THE COURT:  Yes.

19          MR. BAUM:  They want to get back into that.

20          THE COURT:  When you say "e-mail system," what

21 e-mail system were they locked out of?

22          MR. BAUM:  They cannot get their e-mails.  They

23 cannot send their e-mails.  They cannot --

24          THE COURT:  Is it a company e-mail?

25          MR. BAUM:  I believe it is, yes, your Honor.

253

 1          THE COURT:  And their company is?

 2          MR. BAUM:  Greyson.

 3          THE COURT:  Yes.

 4          MR. BAUM:  And that was one of the things that

 5  they were not allowed to do under the temporary restraining

 6  order.

 7          THE COURT:  Okay.  And what else besides the

 8  e-mail access?

 9          MR. BAUM:  As far as I know right now, your Honor,

10  that's it.

11          THE COURT:  Okay.

12          MR. BAUM:  But I actually --

13          THE COURT:  Mr. Celentino, what can you do about

14  getting e-mail access to these two individuals?

15          MR. CELENTINO:  It's the same, your Honor.  To the

16  extent it's hosted on a legacy LPG, Phoenix, other system,

17  we will -- we can, in one day, have a complete backup of the

18  entire e-mail address that they give to us, and we can

19  present that to them on a CVS (sic.) data disc.

20          And if they get their own e-mail program, whatever

21  the same one is, they get their own Microsoft Suite and get

22  Outlook, they'll plug that right into a computer that's

23  theirs, and they'll have access to their e-mail.  But they

24  will have to create their own account.

25          THE COURT:  Well, they can get a free trial on

254

1  Microsoft.  This is good.

2          MR. CELENTINO:  I'm sorry.  Yeah.  They will have

3  to -- they will have to create their own account, in other

4  words, but the data is all there.

5          THE COURT:  All right.  All right.  Now, with that

6  account, will they be using the e-mail address to solicit

7  clients or to try to interfere with any activity of the

8  Chapter 11 trustee?

9          MR. BAUM:  I think that the breadth of the

10 injunction against interference would take care of that.  So

11 I would say no.

12         THE COURT:  I appreciate that.  I think that

13 that's a magnificent solution to that particular question.

14         MR. BAUM:  I think so, too.

15         THE COURT:  Thank you, Mr. Baum.

16         MR. BAUM:  Thank you, your Honor.  And if I may --

17         THE COURT:  Be excused?

18         MR. BAUM:  No, I just want to go back and hear

19 what they're speaking of.

20         THE COURT:  Sure.  Sure.

21         MR. BAUM:  Thank you.

22         THE COURT:  All right.  Anyone else?

23         Ms. Cohen?

24         MS. COHEN:  Thank you, your Honor.  On behalf of

25 my two clients, Lisa Cohen and Bianca Loli, my clients want

255

1  to continue to cooperate with the trustee.  They've agreed

2  to sit for a 2004 exam.  And we do not oppose the issuance

3  of a preliminary injunction.  We're not asking for any

4  changes, bells and whistles.  If there's -- comes up a

5  problem, trustee and his counsel have been super cooperative

6  with us and us with them.  So I don't see an issue.

7          THE COURT:  And I am sensing that from most of the

8  community here.

9          MS. COHEN:  Thank you, your Honor.  The one thing

10 I want to say -- it's a little bit the litigator in me, but

11 -- sorry.  The -- most of this was done in secret, and then

12 a bunch of pleadings were handed to us today.

13         THE COURT:  Oh, yes.  It was.

14         MS. COHEN:  I was just engaged this morning.

15         THE COURT:  And I want to -- as a -- I'm saying

16 this as a judge.  I saw the immediacy and the need for

17 secrecy.

18         MS. COHEN:  Right.

19         THE COURT:  I saw evidence, and it's now on the

20 record.  It's been public now -- made public, of transfers

21 money that were in massive amounts.

22         MS. COHEN:  And we don't oppose --

23         THE COURT:  And so I think this worked out just

24 fine.

25         MS. COHEN:  Well, my only point is that some of

Case 8:23-ap-01046-SC Doc 296-2 Filed 06/27/23 Entered 06/27/23 18:13:21 Desc
Declaration of Kathleen P. March Page 261 of 289 Page 328 of 337

256

1  the declarations that came across today, some of them look

2  like there might be some hearsay and things like that.  And

3  so I just want to be careful that in consenting to the

4  injunction and cooperation, that we would reserve any rights

5  to bring our own evidence at a later date.

6          THE COURT:  And you can also file a motion to

7  vacate any portions of the preliminary injunction that you

8  wish to have vacated, and the Court will open everything up,

9  including the record.

10         MS. COHEN:  Thank you.  Thank you.  We're not

11 anticipating that at this time.  I just want to say we don't

12 necessarily agree with everything, but we're very much

13 cooperating with the trustee and support the injunction.

14         THE COURT:  No, it's a good policy that you do

15 this.

16         MS. COHEN:  Thank you, your Honor.  Thank you for

17 indulging my litigation personality.  Thank you.

18         THE COURT:  It's good -- no, it's good lawyering,

19 Ms. Cohen.

20         MS. COHEN:  Thank you, your Honor.  Appreciate

21 that.

22         THE COURT:  Thank you.

23         Anyone else?

24         Mr. Plazak.

25         MR. PLAZAK:  Thank you, your Honor.  Okay.  So, as

257

1  your Honor will recall, there was testimony regarding the

2  idea that LPG had transferred clients to Phoenix and that

3  Phoenix had then transferred files to Greyson or Greyson

4  affiliated attorneys.  I was just advised that in order to

5  service some of those clients, they need continued access to

6  Luna.  In order to service clients, I -- they -- I'm advised

7  that they -- it has the client's contact information,

8  e-mails, phone numbers, things like that -- that they

9  believe it would not be possible to service those clients

10 without access to Luna.

11         THE COURT:  Let me ask you this.  Would Luna --

12 would access to Luna cause any money to be -- or other files

13 to be sent away from this bankruptcy estate?

14         MR. CELENTINO:  Luna is a database, your Honor,

15 that contains all of the files.  Anybody with access to Luna

16 can access any file.

17         THE COURT:  Well then that's not going happen, Mr.

18 Plazak.

19         MR. CELENTINO:  And that's what should not happen.

20         THE COURT:  Yeah.  We have to -- we have to

21 segregate this.

22         MR. CELENTINO:  Right.  So -- what -- we will work

23 with Mr. Plazak and his client to the extent that any of the

24 Greyson attorneys are going to be maintained as the

25 attorneys for the wrongfully transferred files from LPG to

258

 1 Phoenix -- to the extent that the trustee is going to allow

 2 those folks to continue in that role as that hired counsel

 3 as opposed to replacing them or as opposed to coming up with

 4 an agreement with them like it used to be, because they were

 5 direct 1099s, not through Greyson, we'll deal with that.

 6 But for any that actually are going to maintain and remain

 7 on the Greyson payroll for which -- they are going to remain

 8 attorney of record because that is the client's wish.  So

 9 we're going to make sure we talk to clients.  There can't be

10 but a handful of those.

11         And so on top of the 48 clients of which they get

12 the entire file, we can deal with the handful of those and

13 making access for those specific attorneys to a data file

14 that they can have all that information, all the historical

15 information.  That's not an issue.  That data file is easy

16 to produce, and we'll produce it.

17         The issue for Greyson is it will need to get its

18 own software.  It will need to get its own Microsoft Suite,

19 not ours, and it will need to get its own software to

20 actually access or produce those data files into PDFs so

21 they can use them.

22         That's because allowing them that access to -- any

23 one of them to have access to Luna gives them access to all

24 49,000.  That's how the clients migrate in the first place.

25         MR. PLAZAK:  Okay.  Then turning to some of the

259

1  other aspects of the TRO, which is, for example, enjoined

2  conduct regarding bank accounts, the -- which is 1(c) -- I'm

3  sorry, strike that.  1(a)(2).  Obviously, if my clients are

4  unable to use or access bank accounts or draw funds from ACH

5  electronic fund transfers, it's going to impact their

6  ability to do business.

7          We're not talking about going into LPG, accessing

8  LPG funds, and, certainly, we can segregate that out of it.

9  But, obviously, the concept of them, just in the abstract,

10  using a bank account -- using their own bank accounts in

11  drawing monies from ACH that have nothing to do with LPG,

12  there's no reason to enjoin them from that.

13          MR. CELENTINO:  Specific to our ACH processing

14  from the LPG historical accounts that have been transferred

15  elsewhere that we're gaining control over.  So we can

16  certainly work with language with Mr. Plazak that makes it

17  clear that if they get their own ACH account, they can bill

18  their own clients through ACH if that's the method that they

19  want.

20          THE COURT:  I don't want this estate underwriting

21  any independent company.  They've come in and told me that

22  they're totally independent, they're not involved.  I'm not

23  going to have them underwriting anything, salaries or

24  anything else.

25          MR. CELENTINO:  That's the point, your Honor.  And

**Briggs Reporting Company, Inc.**

260

1 so we will separate it, and that will be the earliest

2 priority for tomorrow, so they can have all the data files

3 they need to operate on their own, separate and apart from

4 LPG and its legacy clients.

5          THE COURT:  Okay.

6          MR. MARSHACK:  Your Honor, hold on one second.  We

7 need a second.

8          MR. CELENTINO:  Mr. Marshack just reminded me,

9 your Honor, that obviously the implication is they claim the

10 clients are theirs and that they have fee agreements with

11 them.  So those clients can sign an ACH agreement with them

12 and they can pull that ACH.  It's not going to come through

13 us anymore.  I just want that to be clear.

14          Our request, and what you have indicated is likely

15 your answer, is we are separating that independent company.

16 They're responsible for their payroll.  They're responsible

17 for their 48 clients.  And to the extent there's a handful

18 of others that we decide we will continue to pay the service

19 for their lawyers to be the lawyers of record, that's a

20 decision that a Chapter 11 trustee makes in the ordinary

21 course.  He'll make that decision, and we'll work that out.

22          THE COURT:  Well, it's not in the ordinary course,

23 but it's in his business judgment.

24          MR. CELENTINO:  It's in his business judgment.

25 Yes, your Honor.

261

1          MR. MARSHACK:  We're not -- we're sending back the

2   ACH for their clients.  We're not forwarding the money.

3          MR. CELENTINO:  Right.  We're not pulling the

4   money for them.  We're not forwarding the money for them.

5   We're not doing any of that on their 48 clients, none of it.

6          THE COURT:  You shouldn't be doing any of that.

7          MR. PLAZAK:  I think -- if I understand it

8   right --

9          THE COURT:  What you're afraid of is they're going

10  to -- I'm going to kill the golden goose, and I'm not going

11  to -- I'm not going to do anything but that.

12          MR. PLAZAK:  Well -- and I think based on what

13  everybody is saying is -- I think what has to happen is Mr.

14  Celentino and I just need to work on specific language that

15  relates to this that's going to cover Greyson, which is in a

16  different situation with the others.  And I believe the idea

17  is that we're -- we just need to work together to figure out

18  language, as it relates to ACH, that's going to be different

19  for Greyson than perhaps all the others.  And the same thing

20  with, for example -- well, (indiscernible) -- you know,

21  again, with the lockout.  In other words, we're not --

22  things that would apply to Greyson may perhaps not apply to

23  the other entities.  And I think these are all things that

24  probably can be worked out by Mr. Celentino and I.

25          MR. CELENTINO:  So if I may suggest, your Honor,

262

1   the temporary restraining order says that it's in effect

2   until further order of the Court.

3           THE COURT:  That's right.

4           MR. CELENTINO:  I think the temporary restraining

5   order can remain in effect, with the understanding that a

6   minute order perhaps can accommodate for the physical

7   appearance at the premises, if that's what they want to do

8   tomorrow.  And we will work out both language, and you have

9   the trustee's promise that we will get the data files to

10  them on those 48 clients.  And we'll make sure on our end

11  that those 48 clients are no longer in the LPG ACH pull if

12  they ever were.

13          THE COURT:  Mr. Plazak?

14          MR. PLAZAK:  I think that's fine.  And I think

15  that'll work out fine.

16          THE COURT:  Excellent.  Anything else?

17          MR. PLAZAK:  No, your Honor.

18          THE COURT:  Thank you very much.

19          The U.S. Trustee has been incredibly patient.  Is

20  there anything you would like to add?  And let me -- before

21  you do it, let me say, I'm going to extend the TRO until the

22  language comes through on the -- as you call it, the minute

23  order.  But it won't be.  It will just be a preliminary

24  preliminary injunction and -- or a modification of the TRO

25  until we get to the final language.

263

And I think the -- I know now the evidence has --
supports my decision to impose a preliminary injunction with
the modifications that's been -- that have been raised, and
hearing also a tremendous amount of community support for
permitting the trustee to continue with the exercising of
his business judgment and getting a handle on this case.

Now, the U.S. Trustee.

MR. MARSHACK:  Nothing, your Honor.

THE COURT:  Well, I appreciate your patience and
cooperation.  I hope that you will work carefully and
continuously with the trustee and other constituents to seek
a resolution of the bigger picture that we've all discussed.

I want to thank all of the parties here today.

MR. MARSHACK:  We have one.

THE COURT:  Nothing else?

MR. MARSHACK:  We have one more comment.

THE COURT:  Somebody is not reading the room.

MR. CELENTINO:  It's not me, your Honor.  I'm the
mouthpiece.  I've been informed that it's important for the
record to state, since I haven't stated it, that Mr. Diab
and Mr. March were served 11 days ago.  The fact that they
didn't file an opposition is because of that.

THE COURT:  The first thing I asked for was a
proof of service to be filed approximately seven days ago.
And the Court noted that, but the Court knows how to pick

Case 8:23-ap-01046-SC Doc 276-2 Filed 06/27/23 Entered 06/27/23 13:13:21 Desc
Declaration of Kathleen P. March Page 269 of 293 Page 336 of 337

264

1 its fights and to not die on certain hills.

2        MR. CELENTINO:  Sorry for not reading the room,

3 but I wanted to make sure that the record was there.

4        UNIDENTIFIED SPEAKER:  I'm still learning how to

5 pick my fights.

6        THE COURT:  Well, I appreciate it.  With that,

7 court is in -- is adjourned for the evening.  Thank you for

8 all of your patience, and we'll see you soon.

9        UNIDENTIFIED SPEAKER: Thank you, your Honor.

10        UNIDENTIFIED SPEAKER: Thank you, your Honor.

11        UNIDENTIFIED SPEAKER: Thank you, your Honor.

12     (Proceedings concluded. )

13

14       I certify that the foregoing is a correct

15 transcript from the electronic sound recording of the

16 proceedings in the above-entitled matter.

17

18 /s/ Holly Steinhauer      6-27-23
   Transcriber          Date

19

20

21

22

23

24

25

*Briggs Reporting Company, Inc.*



**EXHIBIT H**