FILED & ENTERED

JUL 22 2023

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY bolte        DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

In re:

The Litigation Practice Group P.C.,

Debtor(s).

Case No.: 8:23-bk-10571-SC

CHAPTER 11

**ORDER APPROVING MOTION OF TRUSTEE RICHARD A. MARSHACK FOR ENTRY OF AN ORDER (A) APPROVING SALE, SUBJECT TO OVERBID, OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS PURSUANT TO 11 U.S.C. §363(b) AND (B) APPROVING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND OTHER AGREEMENTS**

Hearing held
Date:        July 21, 2023
Time:        10:00 AM
Courtroom:  5C

On July 21, 2023, the Court held multiple hearings in this case, including on the Chapter 11 Trustee's (the "Trustee") motion for entry of an order approving the sale of assets of Debtor (the "Motion") [Dk. 191]. Appearances are as noted in the record.

Having fully considered the Motion, oppositions, replies, supplemental pleadings[1], the entire docket as a whole, the oral arguments and evidence presented at the hearing, and for the reasons set forth on the record and discussed below, the Court finds that there exists good cause to GRANT the Motion. On the terms set forth on the record, Morning Law Group is the winning bidder and the Bensamochan Law Group is the backup bidder.

## I.    Preliminary Statement

"The primary function of the Bankruptcy Code is to set out the rules for dividing up assets that are insufficient to pay a debtor's creditors in full. One such rule, contained in 11 U.S.C. § 363(f), authorizes a trustee in bankruptcy to sell—with some exceptions and limitations—a debtor's assets free and clear of third-party interests." *Pinnacle Rest. at Big Sky, LLC v. CH SP Acquisitions (In re Spanish Peaks Holdings II, LLC),* 872 F.3d 892, 894 (9th Cir. 2017).

As noted above, Trustee filed his Motion seeking entry of an order (the "Sale Order") approving the sale, subject to overbid, of certain assets of the Debtor and the assumption and assignment of certain executory contracts and unexpired leases and other agreements, including those consumer customer contracts, (collectively, "Contracts") to Consumer Legal Group, P.C. ("CLG") or a successful overbidder (the successful bidder shall be referred to as a "Good Faith Purchaser").

In response to the Motion, as well as responses to various ancillary motions associated with the proposed sale, including post-petition financing requests by Trustee pursuant to 11 U.S.C. § 364[2] and requests for approvals of compromises under FRBP

---

[1] In addition to setting a briefing schedule on the Motion itself, the Court specifically requested briefing on the authority and ability of the Court to permit a sale of this Debtor's assets in light of the allegations that such sale could permit the continuance of possible illegal operations by a successor organization [Dk. 206]. Multiple interested parties filed briefings in response this request, all of which were carefully reviewed and considered by the Court in reaching this decision.

[2] Throughout the pendency of this case, there have been multiple hearings on Trustee's motions related to post-petition financing requests. A hearing on Trustee's emergency motion for post-petition financing [Dk. 249] was heard on July 19, 2023, a mere two days prior to the hearing on Trustee's Motion.

9019 that reflect realities of ownership of estate property[3], the Court has now observed a significant shift of party-in-interest opinion on the soundness of the Motion. This, of course, is typical of fast-paced, sometimes lightning-fast, bankruptcy proceedings where there exists the so-called "melting ice-cube" situation.[4]  The Court, reviewing for instance the evolvement of the Official Committee of Unsecured Creditors' (the "Committee") positions in this case, recognizes that it takes time and much analysis to fully appreciate both the law and the facts of a particular case. The Committee, with well-articulated briefing, has played an important role in the development of a crafted solution brought to market by Trustee and his professionals. The United States Trustee, while opposing every aspect of the asset sale proposals and the ancillary motions, has opposed the sale in good faith. That opposition has provided added value to Trustee's efforts and proposed solutions to oppositions to the Motion. Further, the Court has heard from the appointed Consumer Privacy Ombudsman and has carefully considered her views on the issues upon which she is assigned responsibility, along with the views of other interested parties.

## II.    The Proposed Transaction

Together the Contracts and the identified assets (the "Assets") are set forth in the proposed Asset Purchase Agreement ("APA") which is attached as Exhibit 2 to Declaration of Richard Marshack [Dk. 191-1]. The APA, and this Court's Sale Order, would provide for the sale of the Assets to a purchaser free and clear of all liens, claims, encumbrances, and interests pursuant to the terms of a to be executed APA.

---

[3] Trustee's related compromise motions [Dks. 176 and 178] were originally heard on July 11, 2023, and continued to be heard on June 21, 2023, concurrently with the hearing on the Motion.

[4] The term "melting ice-cube" refers to a situation where the value of an asset or business is rapidly declining or eroding over time, making it difficult to recover or preserve value for creditors. The analogy of a melting ice cube is used to convey the idea that the asset's value is diminishing or melting away gradually. Typically, a melting ice-cube scenario arises when the assets in question are perishable, subject to obsolescence, or face significant ongoing costs that outweigh their value. In bankruptcy proceedings, the concept of a melting ice-cube is crucial for determining how to maximize value for creditors. It will influence decisions on whether to continue operating the business, liquidate the assets, or pursue alternative strategies to salvage some value. Understanding the diminishing nature of the asset is vital in evaluating the potential recovery for creditors and devising an effective bankruptcy strategy.

1  Furthermore, the APA requires that the Contracts, upon assignment to a Good Faith

2  Purchaser will be reformed: (i) to comply with applicable law; (ii) to require performance

3  in accordance with applicable law; and (iii) to permit consumer consent to the transfer of

4  the contract to a Good Faith Purchaser and counsel in accordance with California Model

5  Rule 1.17 and/or comparable state ethics provision.[5] Trustee's Motion is made pursuant

6  to 11 U.S.C. §§ 105 and 363, and Federal Rules of Bankruptcy Procedure, Rule 6004.[6]

7  The statutory bases for the relief requested by Trustee are 11 U.S.C. §§ 105(a),

8  363, 365, 503 and 507 of title 11 of the United States Code (the "Bankruptcy Code"),

9  and Rules 2002, 6004, 6006, 9006, 9007 and 9014 of the Federal Rules of Bankruptcy

10  Procedure.

11  Debtor is a law firm that provided consumer debt resolution services.[7] One

12  aspect of the services sought by Debtor's consumer clients included being provided

13  attorney services to handle pending litigation, whether on the defense or offensive side

14  of the pleading, to address creditors threating litigation and or debt collection agencies

15  engaging in unfair debt collection practices pursuant to the Fair Debt Collection

16  Practices Act ("FDCPA") and California's Rosenthal Fair Debt Collection Practices Act

17  ("Rosenthal Act") among others. Declaration of R. Reed Pruyn ("Pruyn Decl.") Dk 191-3,

18

19  [5] The Court has also carefully reviewed the Declaration of Peter Bowie, Esq. [Dk. 309], a senior member
20  of Trustee's legal team, with respect to his views on the ethical considerations of the Chapter 11 Trustee,
   the attorneys currently representing Debtor's clients, and the ethical responsibilities of any prospective
21  buyer of the assets of this estate.  Mr. Bowie is a distinguished expert on legal ethics and has for years
   taught legal and judicial ethics to federal judges, including this Judge, across the nation. Mr. Bowie also
22  addressed various questions presented by this Court regarding ethical considerations concerning the
   transaction before the Court. That discussion has assisted the Court in its considerations and
23  determinations.

24  [6] The U.S. Trustee has provided argument that the contracts cannot be reformed by this Court. However,
   that assertion is incorrect. This is addressed in the main portion of this decision, however it is safe to say
25  that a court of equity may reform a contract or other instrument (deeds, wills, trusts. etc.) to make them
   "legal" and "enforceable. Few clients, if any, could or would complain of, or object to, this reformation. No
26  party has produced even one example of a client objecting to the reformations. The Court has reviewed
   the proposed reformations and protections to be put in place, and finds that Trustee has fulfilled his
27  obligations to reform the Contracts to insure their legality.

28  [7] Although the evidence before this Court indicates that Debtor should have been subjected to certain
   state or federal civil regulatory actions with respect to its former operations, the Court finds no evidence
   that any such regulatory actions have ever been taken against Debtor or its operations. Instead, various
   private causes of actions have been commenced and are pending (but stayed) against Debtor. Dk 191-3,

Exhibit 3, page 2-4, ¶¶ 12-22; Declaration of Jason Rebhun ("Rebhun Decl.") Dk. 191-4,

Exhibit 4, page 3-8, ¶ 6-22; Declaration of Peter Schneider ("Schneider Decl.") Dk. 191-

5, Exhibit 5, page 2, ¶ 5; Declaration of William "Ty" Carss ("Carss Decl.") Dk. 191-2,

Exhibit 2, page 2-3, ¶ 5-6. These are functions that can only be handled by an attorney

and whose services would otherwise not be affordable. Other services provided by

Debtor included settlement negotiations and debt invalidation strategies. Declaration of

Ty Carss ("Carss Decl.") Dk. 191-2, Exhibit 2, page 2-3, ¶ 5-6.

The United States Trustee ("UST") has opposed Trustee operating Debtor. The

Court and the UST have further opposed any use by Trustee of any funds derived from

payments received from clients since Trustee's appointment to fund post-petition

operations. Declaration of Richard Marshack, Dk. 191-1, Exhibit 1, page 2, ¶ 8.  Trustee

has indicated to the Court that he has faithfully obeyed the Court's Orders and has not

used any of the revenues received. This compliance has created issues in administering

Debtor's Estate, requiring emergency relief in order to fulfill Trustee's duties. In this

regard, Trustee sought, and this Court granted, emergency interim financing from third

parties that do not encumber client funds or files in order to prevent irreparable harm to

consumer clients and the Estate during the interim. For example, see Dk. Nos. 119,

131, 249, and 310.

At the time of the filing of the Sale Motion, the Court approved financing was

nearly depleted. Application for Order Shortening Time, Declaration of Richard

Marshack, Dk. 192, page 3, ¶ 6. Since that time, Trustee has requested approval of

further financing [Dk. 249], which this Court has approved as being legally proper and

further being within the confines of Trustee's good business judgment [Dk. 310].

Trustee believes that without the closing of the sale pursuant to the Motion, most,

if not all, employees and/or attorneys assisting the Estate will end their efforts and that

situation will domino into effectively leaving 22,000 clients without representation and

significantly impairing Trustee's ability to protect the interests of the consumer clients

and Debtor's Estate. Declaration of Richard Marshack, Dk. 191-1, Exhibit 1, page 4, ¶

14. As such, Trustee has demonstrated that exigent circumstances exist to approve Trustee's proposed Sale on a shortened period of time for the protection of the consumer clients, Debtor's Estate and all parties in interest.

Parties in interest have argued that this Court should not approve a transaction this large on such an expedited schedule. The Court has given consideration of the due process considerations, including the noticing of this Motion, that have been articulated in objections both orally and in writing. The Court has concluded that this is not a question of due process being denied. This is a question of due process being pursued in good faith by all parties to this transaction, even the objectors.

Suggestions by this Court pointed out that "pressure" on the Court to approve improvident agreements and actions might exist. But there has been no excess pressure placed upon the Court in this instance. Had this Motion been heard on four days' notice[8], without the benefit of sophisticated briefing or participation of a Creditors Committee, significantly more pressure would exist. In this particular case, however, the Court has now had the opportunity to review careful briefing from major parties in this proceeding and has observed the value of expanding the time of consideration, including the Committee's evolvement and appreciation of Trustee's actions.

The issue of notice, or lack of notice to Debtor's clients/customers has been raised. However, the Creditors Committee is significantly populated by consumers or consumer representatives, and it is represented by quite capable counsels. Further, any due process issue is resolved since any client may terminate the contract pursuant to terms of the Motion, the APA and the Sale Order.[9] No client will be prejudiced by the sale of their contract.

---

[8] Trustee originally sought for the Motion to be heard on four days notice – a request which was rejected by this Court in light of the magnitude of the sale, parties involved, and complexities of the transactions.

[9] The UST asserts that the clients should be required to "opt in" instead of "opt-ing out" of the sale of their client file to the proposed purchaser. Dk. 259, Pg. 26. The Court disagrees and the arguments presented by Trustee's Counsel with respect to the inappropriateness and ethical problems of an opt-in process as it pertains to legal representation is accurate in this Court's view. As noted by the Committee, appropriately drafted "opt-out" provisions are sufficient and supported by case law. Dk. 264, Pg. 21 – 24.

"When as here the party asserting a violation of its due process rights was not prejudiced by the alleged due process violation, the alleged violation cannot constitute reversible error. See *Rosson v. Fitzgerald (In re Rosson),* 545 F.3d 764, 776 (9th Cir. 2008), partially abrogated on other grounds as recognized in *Nichols v. Marana Stockyard & Livestock Mkt., Inc. (In re Nichols),* 10 F.4th 956, 962 (9th Cir. 2021)." *Richards v. Marshack (In re Richards),* 2022 Bankr. LEXIS 3156, *16 (9th Cir. BAP 2022.)

Trustee and his attorneys have adequately demonstrated that they have spoken with numerous potential purchasers and have effectively marketed the assets. Declaration of Richard Marshack, Dk. 191-1, Exhibit 1, page 3, ¶ 7 and 11-12. He provides evidence of receiving several proposals from other parties. An asset purchase agreement has been negotiated and a second asset purchase agreement apparently exists between the Estate and Morning Law. *Id.* at ¶ 7. The Bensamochan Law Firm also submitted a bid. The foregoing is bolstered by Trustee's most recent declaration filed on July 21, 2023, and reviewed on the record by the Court, exhibiting and comparing the proposed overbids.

Trustee argues that Debtor's consumer clients are entitled to receive the legal services they sought, contracted for and in many instances require to combat lawsuits and unfair debt collection practices protected against under the FDCPA and, Rosenthal Act, among others.[10]

---

[10] Consumer protection activities by reliable and knowledgeable counsels are imperative to a sound consumer protection system. For instance, on July 14, 2023, the Ninth Circuit Court of Appeals, in *Brown vs. Transworld Systems, Inc.*, No 22-35244 (9th Cir. 2023), issued its published opinion, reversing a district court's dismissal of Brown's remaining FDCPA claim based on the theory that defendants knowingly brought a meritless post-discharge debt collection lawsuit because they knew they could not prove ownership of Brown's debts. **(This is the kind of work entities such as Debtor here should be engaged.)** The Ninth Circuit, agreeing with other circuits, held that certain litigation acts, including service and filing, can constitute distinct violations of the FDCPA that each trigger the statute of limitations. The 9th Cir. panel concluded that Brown sufficiently alleged one post-filing FDCPA violation in the filing of an affidavit that presented a new basis, not contained in the complaint, to show that defendants owned the debts. **Various consumer law centers and consumer attorneys** worked on behalf of Mr. Brown with this effort, and the law has now been clarified in the Ninth Circuit. Honest attorneys working on behalf of honest but unfortunate debtors for probably little or no compensation, or otherwise risking compensation recovery, undertook these efforts. This Court's decision to approve the sale, and at the same time requiring strict consumer controls and protections, will enhance access to justice. To this end, the Court

1    Trustee further argues that the contracts are a valuable asset that can be

2  assigned to a law firm for the benefit of consumer clients who choose not to opt out of

3  the Sale and assignment for the benefit of the Estate, and all creditors, including

4  consumer creditors. Trustee maintains that a sale of Debtor's assets and the

5  continuation of actual legal services provided to consumer clients including the

6  assignment of Debtor's consumer contracts is in the best interest of all interested

7  parties and those most impacted by it, the consumer. Declaration of Richard Marshack,

8  Dk. 191-1, Exhibit 1, page 3, ¶ 9-12. The supplemental declarations filed on July 21,

9  2023, also attest to the foregoing.

10    Trustee provides a similar situation, by way of example, in a similar pending

11  bankruptcy case, *In re PGX Holding, Inc. (In re PGX),* Case No. 23-10718-CTG (D. Del.

12  2023), where the Consumer Finance Protection Bureau (CFPB) obtained a pre-petition

13  judgment against PGX Holding, Inc. based on violations of the TSR, similar to the UST's

14  position in this matter as to Debtor's pre-petition operations and Legal Services

15  Agreement. Del. Dkt. 66. (The Delaware Court has permitted a claims servicing

16  company to establish a public website found at https://www.kccllc.net/PGX. A PACER

17  or ECF Account is not required to access the PGX case docket. References to these

18  Delaware case docket numbers are referred to as "Del. Dkt."  As this case proceeds,

19  this Court hopes that Trustee might provide the same service at no cost to the 22,000

20  customers and creditors of this Estate.)

21    In the pending PGX example, Debtor has brought a motion to sell its executory

22  contracts. Del. Dkt. No. 66. Trustee points out that in PGX, the UST only objected to

23  debtor's sale motion to the extent the sale motion sought to provide a break up

24  fee.  Del. Dkt. 101. The difference, it seems, between Debtor's case and the PGX case,

25  is that PGX changed its business model/practices pre-petition due to the CFPB litigation

26

27  _____

28  continues to rely on federal and state regulators, and the courts, to further advance the cause of
consumer protection.

brought against it, and removed and cured the offending conduct, and desires to sell a consumer protection compliant business pursuant to § 363. This Court expects the same reformation to proceed in this case.

In its Order issued July 10, 2023 [Dk. 206], this Court requested from any parties in interest briefing on the issue of the past bad acts of Debtor with respect to lack of legal or ethical behavior in its business practices, and how that could affect a sale under § 363. The Court has carefully reviewed all of these carefully presented and thought-out briefs and the Court is deeply appreciative of all points of view. Their efforts have assisted the Court enormously.

Through the continuing and persuasive insistence of this Court, Trustee and his professionals have engaged in an unrelenting and expensive process of converting Debtor's business into a consumer protection compliant business. This Court is satisfied that the herculean and frankly high-risk efforts of Trustee have resulted in an excellent start, and that the consumer protection aspects of the proposed sale cannot be discounted in any way. The continued efforts to re-direct the legal and ethical compass of the pre-petition company will likely, in the Court's opinion, succeed. The Court finds, in examining all the evidence before it (and appreciating the totality of the circumstances, including the alleged past bad acts of Debtor) that there is no fair reason to discount or refuse to approve the sale based on the prior bad acts of Debtor when considering the current and future reformation of business practices. Indeed, adding one more consumer protection compliant company in an industry of some bad actors cannot be a bad result.

### III.    Reformation, Illegality and Severability

As noted above in footnote 5: "[t]hat a bankruptcy court has the equitable powers to reform a trustee's deed is not in dispute. See *Matter of Cada Investments, Inc.,* 664 F.2d 1158, 1162 (9th Cir. 1981)." *In re Nicholson*, 779 F.2d 514, 517 (9th Cir. 1985). The Court's equitable powers are consistent with California law, which permit severability.

The Court may sever any unconscionable provisions. California Civil Code § 1670.5(a) provides that:

> [i]f the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

Further, comment 2 of the Legislative Committee comment on § 1670.5, incorporating the comments from the Uniform Commercial Code, states:

> Under this section the court, in its discretion, may refuse to enforce the contract as a whole if it is permeated by the unconscionability, or it may strike any single clause or group of clauses which are so tainted or which are contrary to the essential purpose of the agreement, or it may simply limit unconscionable clauses so as to avoid unconscionable results.

*Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 122 (2000) (citing (Legis. Com. com., at *9 West's Ann. Civ.Code* (1985 ed.) p. 494 (Legislative Committee comment)). Thus, the statute appears to give a trial court discretion as to whether to sever or restrict the unconscionable provision or whether to refuse to enforce the entire agreement. But it also appears to contemplate the latter course only when an agreement is "permeated" by unconscionability. See, *Armendariz*, 24 Cal. 4th at 122.

California Civil Code § 1598 provides "where a contract has but a single object, and *such object is unlawful*, whether in whole or in part, or wholly impossible of performance, or so vaguely expressed to be unascertainable, the entire contract is void." (emphasis added). California Civil Code § 1599 provides "where a contract has several distinct objects, of which one at least is lawful, and one at least is unlawful, in whole or in part, the contract is void as to the latter and valid as to the rest." Thus, the Court may sever portions of the contract.

> 'If the contract is divisible, the first part may stand, although the latter is illegal. [Citation.]' [citations.] It has long been the rule in this state that 'When the transaction is of such a nature that the good part of the consideration can be separated from that which is bad, the Courts will make the distinction, for the ... law ... [divides] according to common reason; and having made that void that is against law, lets the rest stand.'

1  *Armendariz*, 24 Cal. 4th at 122 (citing *Keene v. Harling*, 61 Cal. 2d 318, 392 (1964));

2  *see also Birbrower, Montalbano, Condon & Frank v. Superior Court* (*Birbrower*), 17

3  Cal.4th 119, 137–139 (1998) (holding severable legal from illegal portions of attorney

4  fee agreement). On the other hand, "[i]f the central purpose of the contract is tainted

5  with illegality, then the contract as a whole cannot be enforced. If the illegality is

6  collateral to the main purpose of the contract, and the illegal provision can be extirpated

7  from the contract by means of severance or restriction, then such severance and

8  restriction are appropriate." *Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.*, 341

9  F.3d 987, 1001 (9th Cir. 2003) (citing *Little v. Auto Stiegler, Inc.*, 29 Cal. 4th 1064, 1074

10  (2003)). "'In determining whether an illegal provision may be severed, the California

11  Supreme Court explained that we must also look to the overall 'interests of justice';

12  more specifically, courts should not allow a party to 'gain [ ] undeserved benefit or

13  suffer[ ] undeserved detriment as a result of voiding the entire agreement—particularly

14  when there has been full or partial performance of the contract.'" *Little*, 29 Cal. 4th at

15  1074.

16      Although certain parties in opposition assert that the agreements are void as a

17  result of alleged illegality, *Armendariz* provides guidance in determining whether certain

18  provisions can be severed rather than voiding the entire contract: (1) "prevention of

19  parties from gaining undeserved benefit or suffering undeserved detriment as a result of

20  voiding the entire agreement — particularly when there has been full or partial

21  performance of the contract" and (2) conservation of a contractual relationship if to do

22  so would not be condoning an illegal scheme. *Armendariz*, 24 Cal. 4th at 123-24.

23      In California, Courts "take a very liberal view of severability, enforcing valid

24  parts of an apparently indivisible contract where the interests of justice or the policy of

25  law would be furthered." *Addair v. Stockton Unified School Dist.,* 162 Cal.App.4th 1436,

26  150 (2008).

27      Further, section 3399 of the California Civil Code provides that "[w]hen, through

28  fraud or a mutual mistake of the parties, or a mistake of one party, which the other at

the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised on the application of a party aggrieved, so as to express that intention, so far as it can be done without prejudice to rights acquired by third persons, in good faith and for value." Cal. Civ. Code § 3399. *See also In re Yashouafar,* 2019 WL 342536, at *10 (Bankr. C.D. Cal. Jan. 25, 2019 (discussing reformation under the statute). Reformation is a remedy that "is equitable in nature and not restricted to the exact situations stated in section 3399." *Jones v. First American Title Ins. Co*., 107 Cal.App.4th 381, 388 (2003).

As further noted by the Committee, Bankruptcy courts also generally recognize the ability to reform an agreement, including through the broad equitable authority under section 105(a) of the Bankruptcy Code. *See, e.g., In re Creger,* 403 B.R. 381, 386 (Bankr. W.D. Va. 2009) (observing that with respect of reforming agreement, a "bankruptcy court may grant such equitable relief pursuant to 11 U.S.C. § 105 if 'necessary or appropriate to carry out the provision[s] of this title.'"); *In re Gilmore*, 284 B.R. 801 (Bankr. E.D. Va. 2002) (noting the availability of reformation of an agreement as an equitable remedy).

Here, the central purpose of the contract is not tainted with illegality but is merely collateral to the main purpose, which is legal services. Moreover, the interests of justice and policy of law would be furthered by the severance and reformation of the contracts, rather than the mere voidance of the contracts as a whole. Finally, to the extent that the contracts contain illegal provisions, the Court has the authority to reform the contracts to avoid fraud or mistake, whichever the case may be.

In *In re Hacienda Company LLC,* 647 B.R. 748 (Bankr. C.D. Cal. 2023), the court found that a debtor's ties to cannabis did not require dismissal, or otherwise foreclose the court from exercising its equitable powers, simply due to the illegality of cannabis under federal law and noted:

> [The] Bankruptcy Court would be overstepping its role, and acting contrary to Congress' directives within the Bankruptcy Code, if it were to deny creditors, debtors, employees, equity investors, and other constituencies the benefits and protections of bankruptcy based on the facts and circumstances presented. In

general, this Bankruptcy Court should defer to prosecutors, and all of the types of persons mentioned above, to use their discretion about whether and how to address any violations of nonbankruptcy law.

*Id.* at 757-788.

This Court notes that even when a debtor has engaged in an illegal business, bankruptcy courts have recognized that a debtor can transform its business, stop violating applicable law, and remain in bankruptcy. *See Garvin v. Cook Invs. NW, SPNWY, LLC*, 922 F.3d 1031, 1034 (9th Cir. 2019) (affirming confirmation of a chapter 11 plan where debtor rejected its lease with a tenant involved in marijuana as part of its chapter 11 plan.) Under § 105(a), the court has the ability to take whatever action is necessary to aid in its administration of the case. See, *Gonzalez v. Gervaiz (In re Gonzalez),* 2007 Bankr. LEXIS 4837 (B.A.P. 9th Cir. Mar. 30, 2007).

Helpfully, David Goodrich, Esq., the Chapter 11 Trustee of an unrelated, but highly successful, reorganization case, *In re Cecilio and Irma Murrietta*, Case No. 8:17-bk-11743-SC ("Murrietta Case"), was present at the July 21, 2023, hearing and provided further example for the record of the positive impact that the bankruptcy process can have on a formerly law-breaking business. The key asset in the Murrietta Case is a small, casual Mexican restaurant that was, unfortunately, failing. When Mr. Goodrich was appointed, by this Court, the restaurant was operating in violation of a litany of laws and ordinances, including health and safety codes, federal employment laws, etc. Mr. Goodrich took over the operations of the restaurant and brought it into compliance. Now, the business is thriving, with a healthy balance sheet and the promise of longevity of operations.

The Court reasoned in the Murrietta Case, to the benefit of all involved, that the business was worth saving, despite the fact that the prior operators had engaged in improper and illegal behavior preceding the appointment of the Chapter 11 Trustee. Having become familiar with the record in the case before it now, the Court makes a similar determination. Debtor's business, while admittedly ill-managed pre-petition, is a

business endeavor worth saving, to the extent that it can be "brought to code" which will

aid the public with properly managed and fully compliant debt relief services.

For the reasons stated above, on the record, and herein, and as argued by

Trustee and others, the Court agrees that the Court may, in its sound discretion, sever

offensive provisions and cure the illegal terms of Debtor's existing agreements with a

comprehensive new Legal Services Agreement which will comport with applicable

California law.

## IV.    Legal Standards for the Sale and Assumption

As set forth on the record, this Court is first guided by considering the standards

of review in approving §§ 363 sales and 365 assumption and assignment of executory

contracts placed upon its decisions by the Ninth Circuit Court of Appeals. The decision

of a bankruptcy court approving a sale of estate property under § 363 is reviewed for

abuse of discretion. *Clear Channel Outdoor, Inc. v. Knupfer (In re PW, LLC)*, 391 B.R.

25, 32 (9th Cir. BAP 2008).[11] [12] With respect to determinations by bankruptcy court's §

365 assumption and assignment decisions, a reviewing court must accept the

bankruptcy court's findings of fact unless they are clearly erroneous. A finding is clearly

erroneous "'when although there is evidence to support it, the reviewing court on the

entire evidence is left with the definite and firm conviction that a mistake has been

committed.'" *In re Banks*, 263 F.3d 862, 869 (9th Cir. 2001) (quoting *Anderson v.*

---

[11] Also see *Baroni v. Seror (In re Baroni)*, 2021 Bankr. LEXIS 1896, *13 (9th Cir. BAP 2021), *Rosenberg Real Estate Equity Fund III v. Air Beds, Inc. (In re Air Beds, Inc.)*, 92 B.R. 419, 422 (9th Cir. BAP 1988) (citing *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) and *Big Shanty Land Corp. v. Comer Properties, Inc.*, 61 B.R. 272, 277 (N.D. Ga. 1985)). A bankruptcy court's finding of good faith is primarily a factual determination which is reviewed for clear error. E.g., *In re Taneja*, 743 F.3d 423, 429 (4th Cir. 2014); *Meeks v. Red River Entm't (In re Armstrong)*, 285 F.3d 1092, 1096 (8th Cir. 2002) (citations omitted). See *In re X-Treme Bullets*, 2020 U.S. Dist. LEXIS 137938, *18 (CACD 2020).

[12] To determine whether the bankruptcy court has abused its discretion, a reviewing court conducts a two-step inquiry: (1) the decision is reviewed de novo as to whether the bankruptcy court "identified the correct legal rule to apply to the relief requested," and (2) if it did, the reviewing court considers whether the bankruptcy court's application of the legal standard was illogical, implausible, or without support in inferences that may be drawn from the facts in the record. *United States v. Hinkson*, 585 F.3d 1247, 1262-63 & n.21 (9th Cir. 2009) (*en banc*).

*Bessemer City*, 470 U.S. 564, 573, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985)). The

bankruptcy court's conclusions of law are reviewed de novo. *In re Cohen*, 300 F.3d

1097, 1101 (9th Cir. 2002); *In re Anastas*, 94 F.3d 1280, 1283 (9th Cir. 1996). Also see

*Top Rank, Inc. v. Ortiz (In re Ortiz[13]),* 400 B.R. 755, 760-761 (CDCA, 2009),

> As the United States Supreme Court said in 2019,

> Section 365(a) of the Code provides that a "trustee [or debtor], subject to the
> court's approval, may assume or reject any executory contract."

> ***

> Section 365(a) enables the debtor (or its trustee), upon entering bankruptcy, to
> decide whether the contract is a good deal for the estate going forward. If so, the
> debtor will want to assume the contract, fulfilling its obligations while benefiting
> from the counterparty's performance. But if not, the debtor will want to reject the
> contract, repudiating any further performance of its duties. The bankruptcy court
> will generally approve that choice, under the deferential "business judgment" rule.
> *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523, n. 6 (1984).

*Mission Prod. Holdings v. Tempnology, LLC*, 139 S. Ct. 1652, 1658 (2019).

### a. The § 363 Sale

### i. § 363(b)(1)

The trustee or debtor in possession, after notice and a hearing, may use, sell, or

lease, other than in the ordinary course of business, property of the estate.  11 U.S.C. §

363(b)(1).  The requirements of § 363(b) were established to protect creditors' interest

in the assets of the Estate.  *In re 240 N. Brand Partners, Ltd.*, 200 B.R. 653, 659 (9th

Cir. B.A.P. 1996).  To this end, it is the court's obligation "to assure that optimal value is

realized by the estate under the circumstances." *Simantob v. Claims Prosecutor, LLC*

*(In re Lahijani),* 325 B.R. 282, 288 (9th Cir. B.A.P. 2005).

A bankruptcy court can authorize the sale of substantially all of the assets of the

---

[13] Victor Ortiz, 2011 WBC welterweight boxing champion, with a career record of 33 wins, 25 wins by KO, 7 losses, and 3 draws. Reaching the Olympic boxing trials at age 17 in 2004, he turned pro in 2005. In 2011 he relinquished his WBC title after only six months to Olympic bronze medal winner (1996) Floyd Mayweather, Jr. (50 wins, 27 by KO, 0 losses, 0 draws), and who retired undefeated after a career of winning 15 major world championships.

Estate under 11 U.S.C. §363(b) upon a proper showing that the sale is in the best

interest of the Estate, that there is a sound business purpose for the sale, and that it

was proposed in good faith.[14] *See In re 240 N. Brand Partners, Ltd.*, 200 B.R. at 659; *In*

*re Wilde Horse Enterprises, Inc.*, 136 B.R. 830, 841 (Bankr. C.D. Cal 1991); *In re Lionel*,

722 F.2d 1063, 1070 (2nd Cir. 1983).  In other words, the court must determine whether

the proposed sale: (1) is fair and reasonable; (2) was adequately marketed; (3) was

negotiated and proposed in good faith; (4) is being made to a purchaser proceeding in

good faith; and (5) is an "arms length" transaction. *See Id.* "Good faith encompasses fair

value, and further speaks to the integrity of the transaction.  Typical 'bad faith' or

misconduct, would include collusion between the seller and buyer, or any attempt to

take unfair advantage of other potential purchasers."  *In re 240 N. Brand Partners, Ltd.*,

200 B.R. at 659.  The proponent of section 363(m) good faith has the burden of proof. *In*

*re M Capital Corp.*, 290 B.R. 743, 747 (9th Cir. B.A.P.  2003).

After full and fair consideration of all evidence before the Court, the Court is

satisfied that the Motion complies with the requirements of § 363 and that Trustee has

met all required standards.

The Court finds that the purchase price is fair and reasonable. Trustee has

submitted evidence in the form of his declaration that "the bid from CLG was the highest

and best bid based not only on the consideration proposed, but also on CLG's history,

experience, and prior compliance with applicable law." Declaration of Richard

Marshack, Dk. 191-1, Exhibit 1, ¶ 13.  Moreover, the supplemental declarations filed

detailing the marketing and competitive bids support the Court's conclusion pertaining to

the foregoing. Given the circumstances of this particular case, including the financial

limitations faced by Trustee and the need to protect the consumer clients and creditors,

and Trustee and/or his counsel having spoken with multiple parties about purchasing

---

[14] A bankruptcy court's finding of good faith is primarily a factual determination which is reviewed for clear error. E.g., *In re Taneja*, 743 F.3d 423, 429 (4th Cir. 2014); *Meeks v. Red River Entm't (In re Armstrong)*, 285 F.3d 1092, 1096 (8th Cir. 2002) (citations omitted). See *In re X-Treme Bullets*, 2020 U.S. Dist. LEXIS 137938, *18 (CACD 2020).

1    the property, the property was adequately marketed. Declaration of Richard Marshack,

2    Dk. 191-1, Exhibit 1, ¶ 7-9, 12, 13, 15; Declaration of Richard Marshack, Dk. 311, ¶8-10.

3        Evidence that the sale was negotiated and proposed in good faith can similarly

4    be deduced from Trustee's declaration wherein he describes the consumer protections

5    he considered in connection with potential bidders and states that "the proposed sale is

6    not only proposed in good faith, but was structured to identify a good faith purchase who

7    was willing and able to comply with extraordinary consumer protections contained in the

8    proposed APA" and the activities which occurred at the sale hearing. See, Declaration

9    of Richard Marshack, Dk. 191-1, Exhibit 1, Dk. 191-1, ¶ 13. Evidence of good faith can

10    also be obtained from the supporting declarations. See, e.g., Declaration of Joshua

11    Armstrong, Dk. 318, ¶ 10-11; Declaration of Eric Bensamonchan, Dk. 312, ¶ 15;

12    Trustee's Declaration, Dk. 311, ¶11. Trustee's declaration detailing the receipt of the

13    overbids [Dk. 316], and the subsequent bidding at the hearing constitute further

14    significant and compelling evidence. Trustee also testifies that the offers were the

15    product of arms-length negotiations. Trustee's Declaration, Dk. 316, ¶ 5.

16        The evidence, and all of it, supports the Court's findings that the sale is fair and

17    reasonable, was adequately marketed, was negotiated, and proposed in good faith, is

18    being made to a purchaser proceeding in good faith; and is an "arms length"

19    transaction.

20           **ii.  § 363(f)**

21        The property may be sold free and clear of liens if any one of five conditions is

22    met. § 363(f).[15]  Here, it is undisputed that lienholders either consented to the sale or,

23    with respect to liens subject to bona fide dispute, those lienholders were given notice of

24

---

25    [15] (f)The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest
in such property of an entity other than the estate, only if—

26           (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
       (2) such entity consents;

27           (3) such interest is a lien and the price at which such property is to be sold is greater than the
aggregate value of all liens on such property;

28           (4) such interest is in bona fide dispute; or
       (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money
satisfaction of such interest.

the sale and did not object. Further, to the extent any lien is valid, the secured claim will be adequately protected by its attachment to the net proceeds of the proposed Sale albeit subject to any claims and defenses Trustee may possess with respect thereto, and/or any holder of the interest could be compelled in Debtor's bankruptcy proceeding to accept a monetary satisfaction of its interest.

### iii.   363(m)

Trustee seeks a good faith finding pursuant to 11 U.S.C. § 363(m).

The reversal or modification or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal. Though the Bankruptcy Code and Rules do not provide a definition of good faith, courts generally have followed traditional principles in holding that a good faith purchaser is one who buys "in good faith" and "for value." *In re M Capital Corporation*, 290 B.R. 743, 746 (9th Cir. BAP 2003).  *See, e.g.*, *In re Abbotts Dairies of Pennsylvania, Inc*., 788 F.2d 143, 147 (3d Cir.1986).

 Typically, lack of good faith is shown by "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re M Capital Corp.,* 290 B.R. at 746-47 (B.A.P. 9th Cir. 2003) ("Where good faith has been challenged, facts must be established to obtain the safety that section offers.").

Mr. Joshua Armstrong, the principal of Morning Law Group, submitted a declaration on July 21, 2023 [Dk. 318], evidencing his good faith. So too did Mr. Eric Bensamonchan, of the Bensamonchan Law Group, the backup bidder. Declaration of Eric Bensamonchan, Dk. 312. This evidence alone is sufficient for the Court to make a determination that no fraud, collusion, or unfair advantage was taken during the bidding and negotiation process.

At the hearing, the Court allowed the parties the opportunity to further question the representatives of the winning bidder, Morning Law Group, and the backup bidder, Bensamochan Law Group. Trustee presented Mr. Russell Squires, as the authorized representative for Morning Law Group. Mr. Squires testified that he was not a lawyer, nor an employee of Morning Law Group.  He submitted a declaration [Dk. 317], and also testified at the hearing as to his authority on behalf of Morning Law Group, his good faith, his familiarity with Mr. Armstrong, and the lack of fraud and lack of collusion between him and Tony Diab. Noting that Mr. Armstrong, himself, was unavailable to be questioned at the hearing, and upon the UST's request for further review of the declaratory evidence which had been submitted on the same day of the hearing, the Court permitted, with Trustee's consent, any interested parties to participate in a follow up deposition of Mr. Armstrong (or Mr. Bensamochan, the backup bidder) with the understanding that if the results of the follow up deposition revealed facts contradicting those in the record at the time of the entry of this order demonstrating any collusion, the Court would entertain reconsideration of its good faith finding.

Notwithstanding the foregoing, based upon the evidence before the Court, including the testimony received through declaration and on the stand by Russell Squires, the authorized representative of Morning Law Group, the Court finds that a good faith finding is warranted for both the winning bidder, Morning Law Group, and the backup bidder, Bensamochan Law Group.

### b.  The § 365 Assumption and Assignment of Contracts

Section 365(f)(1) authorizes the assumption and assignment of an executory contract "notwithstanding a provision in an executory contract … or in applicable law, that prohibits, restricts, or conditions the assignment of such contract …". *Dewey Ranch Hockey, LLC*, 406 B.R. 30, 36 (Bankr. D.AZ 2009). Section 365 generally requires three acts to assume an executory contract: (1) curing of enforceable default(s), (2) compensation for any actual pecuniary loss resulting from such default(s), and (3) providing adequate assurance of future performance.

Moreover, a trustee must also show that he has exercised reasonable business judgment in deciding to assume or reject executory contracts. *Durkin v. Benedor Corp. (In re G.I. Indus., Inc.)*, 204 F.3d 1276, 1282 (9th Cir. 2000) (stating that "a bankruptcy court applies the business judgment rule to evaluate a trustee's rejection decision"); *In re Hertz*, 536 B.R. 434, 442 (Bankr. C.D. Cal. 2015) ("The propriety of a decision to assume or reject an unexpired lease . . . normally is determined under the deferential 'business judgment' test."). Also see *In re Minesen Co*., 635 B.R. 533, 542 (Bankr. D. Hawaii 2021.)

Further, whether a contract is in breach or in default for any reason is not a measure of assumption or assignability.  "A party seeking to assume a contract need not cure immaterial breaches. See *Vanderpark Properties, Inc. v. Buchbinder (In re Windmill Farms, Inc.),* 841 F.2d 1467, 1473 (9th Cir. 1988) (holding that alleged nonmonetary defaults were not of sufficient substance to preclude assumption of the lease); *In re Rachel Industries, Inc.,* 109 B.R. 797, 799-800 (Bankr. W.D Tenn. 1990) (describing that, if a default of the debtor's obligations existed, the Court must analyze each of those asserted defaults to determine whether any is material); *In re Empire Equities Capital Corp*., 405 B.R. 687, 691 (Bankr. S.D.N.Y. 2009) ("A default precludes assumption of an executory contract under § 365 if it is both incurable and material in the sense that it goes to the very essence of the contract, i.e., the bargained for exchange.") (internal quotations omitted)." *In re Minesen Co.,* 635 B.R. 533, 542 542 (Bankr. D. Hawaii 2021.)

In this case, Trustee has requested that all illegal terms of the contracts be reformed prior to assumption and assignment, and this Court will approve those reformations. The identified terms requiring reformation, the Court finds, are not material to the performance of the contract – they involved payment terms that were most likely illegal and improper. Indeed, the Court assumes that the clients, in the main, did not understand the various consumer protection statutes and regulations that required contracts such as these to be in place, or were in such dire need that they did not

concern themselves with such lack of provisions. The clients' goals were to secure

assistance with respect to financial difficulties, including offensive collection efforts and

litigation.[16]

The UST argues that reformation of the contracts is inappropriate because, *inter*

*alia*, the Court does not have authority to reform a fraudulently procured contract to

save the illegality of the contract. See Trustee's Pocket Brief, Dk. 259, pg. 16-17.

Rather, the UST argues that the Court has authority to reform only where parties have

made a mistake. *Id*. The Court disagrees. The Committee, who has also carefully

evaluated the legality of the contracts as a matter of law, including under the Creditor

Repair Organizations Act, 15 U.S.C. Section 1679 ("CROA") and the Telemarketing

Services Rule, 16 C.F.R. Section 310 ("TSR"), has come to the conclusion that the

contracts are not void under those provisions, such that they could not be reformed – or

that such reformation would revitalize an illegal contract. Dk. 264, Pg. 11-16. On the

contrary, the Committee has determined, like Trustee, that the contracts may be

reformed to comply with applicable law. Dk. 264, Pg. 16. The Court agrees, and herein

adopts the Committee's position.

The UST further notes that even if the contract is reformed, the funds obtained

from the consumer pursuant to an "illegal contract" must be returned to the consumers

immediately and cannot be included as part of the assets sold. Dk. 259, Pg. 26. As

---

[16] The opposition to debt-assistance firms on general principle, is appreciated; but it is a nuanced situation, almost exactly like legally operated "pay-day" or "title" loan operations, or even certain check-cashing services. There is a universe of people in our society that unfortunately need these unsavory businesses at times. For instance, a person who needs to get to work to make rent and food money and must immediately replace an unrepairable tire or be fired. Or an uninsured person with a child with a serious dental issue and they have no savings. They need assistance quickly and thus they require $400 or a thousand dollars now.  Without these unsavory but legal business operations, there are worse things parents could resort to, or face. There are also honest but struggling debtors who need assistance in stopping collections harassment, stopping threats at work by bill collectors, working out payment plans with legitimate creditors, preparing for bankruptcy. Debt assistance businesses can function honestly and effectively, and there are thousands of attorneys in the country who honestly do this work for little compensation. It is the hope and desire of this Court that the clients of Debtor will receive fair, honest and legitimate treatment, and that the buyer of these assets will continue to function honestly, fairly and legally with future customers. The Trustee has attempted to put into place such a system. One thing is for certain; terminating the operations of this Debtor without implementing a successor business honestly run will not result in any positive outcome for these current clients or the public in general.

confirmed on the record, the funds are not part of the assets sold. Further, as noted above, Trustee and Committee have taken a different position with regard to the purported "illegality" of the Contracts. Having reviewed the entire record before it, the Court agrees with Trustee and Committee, and finds the UST's argument regarding illegality is insufficient to cause the immediate return of funds to consumers or otherwise prevent the sale of assets which, as supported by competent evidence, is well-taken under the law.

### c.  FRBP 6004

Trustee has requested a waiver of Federal Rules of Bankruptcy Procedure 6004(d) and 6004(h), which provides that this order will be stayed until the expiration of fourteen days after entry of the order, unless otherwise ordered by the Court. Trustee has submitted evidence that such a waiver is required to minimize potential disruption. Trustee Declaration, Dk. 191-1, ¶ 8. This Court agrees and hereby waives the fourteen day stay period under FRBP Rules 6004(d) and (h).

### V.  Conclusion

Having considered all of the foregoing, and incorporating the evidence and arguments presented at the hearing, in conjunction with the unique considerations of this case, the Court finds that there exists good cause to GRANT the Motion. Morning Law Group is the winning bidder and the Bensamochan Law Group is the backup bidder on the terms set forth on the record. A further order on the sale is to be submitted forthwith by Trustee, including an order designating the monitor as stated on the record.

**IT IS SO ORDERED.**

Date: July 22, 2023

Scott C. Clarkson
United States Bankruptcy Judge