1  CHRISTOPHER B. GHIO (259094)
   Christopher.Ghio@dinsmore.com
2  DINSMORE & SHOHL LLP
   655 W Broadway, Suite 800
3  San Diego, California 92101
   Tele: (619) 400-0468
4  Fax:  (619) 400-0501

5
6  Special Counsel to Plaintiff, Richard A. Marshack, Trustee of the LPG Liquidation Trust

7

8              **UNITED STATES BANKRUPTCY COURT**

9        **CENTRAL DISTRICT OF CALIFORNIA (SANTA ANA DIVISION)**

| | |
|---|---|
| 10  In re: | Case No.: 8:23-bk-10571-SC |
| 11  THE LITIGATION PRACTICE GROUP P.C., | Adv. Proc. No. 8:23-ap-01046-SC |
| 12               Debtor. | Chapter 11 |
| 13 ———————————————— | |
| 14  RICHARD A. MARSHACK, Chapter 11 Trustee, | **MOTION FOR ORDER APPROVING STIPULATION BETWEEN TRUSTEE OF THE LPG LIQUIDATION TRUST AND** |
| 15               Plaintiff, | **TONY DIAB; MEMORANDUM OF POINTS AND AUTHORITIES; AND** |
| 16  v. | **DECLARATION OF RICHARD A. MARSHACK IN SUPPORT THEREOF** |
| 17  TONY DIAB, an individual; DANIEL S. MARCH, an individual; ROSA BIANCA LOLI, | |
| 18  an individual; ENG TAING, an individual; HENG TAING, an individual; WES THOMAS, | Date:      May 7, 2025 |
| 19  an individual; SCOTT JAMES EADIE, an individual; JIMMY CHHOR, an individual; | Time:      11:00 a.m. |
| 20  DONGLIANG JIANG, an individual; MAX CHOU, an individual; OAKSTONE LAW | Judge:     Hon. Scott C. Clarkson |
| 21  GROUP PC; GREYSON LAW CENTER PC; MAVERICK MANAGEMENT GROUP, LLC; | Place:     Courtroom 5C |
| 22  LGS HOLDCO, LLC; CONSUMER LEGAL GROUP, P.C.; VULCAN CONSULTING | 411 West Fourth Street |
| 23  GROUP LLC; BAT INC. d/b/a COAST PROCESSING; PRIME LOGIX, LLC; | Santa Ana, California 92701 |
| 24  TERACEL BLOCKCHAIN FUND II LLC; EPPS; EQUIPAY; WORLD GLOBAL; | |
| 25  OPTIMUMBANK HOLDINGS, INC. d/b/a OPTIMUM BANK; REVOLV3, INC.; MERIT | |
| 26  FUND, LLC; GUARDIAN PROCESSING, LLC; PAYLIANCE, LLC; TOUZI CAPITAL, LLC; | |

27

28

1  | SEAMLESS CHEX INC; DWOLLA, INC.; and
2  | DOES 1 through 100, inclusive,
3  | Defendants.

4  **TO THE HONORABLE SCOTT CLARKSON, UNITED STATES BANKRUPTCY**

5  **JUDGE, AND ALL OTHER INTERESTED PARTIES:**

6      Plaintiff in the above referenced adversary, Richard A. Marshack ("Plaintiff"/"Trustee"),

7  solely in his capacity as Liquidating Trustee of the LPG Liquidation Trust, (the "Trust") arising

8  from/resulting from the bankruptcy estate of the Litigation Practice Group, PC (the "Debtor"/"LPG"),

9  hereby moves the Bankruptcy Court by this motion (the "Motion"), in the abundance of caution, for

10  an order pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and Local Bankruptcy

11  Rule 9013-1(f), or in the alternative, pursuant to the Court's powers under 11 U.S.C. § 105, for an

12  order approving the "Stipulation With Defendant Tony Diab For Entry Of Judgment" (the

13  "Stipulation") entered into between the Trustee and defendant, Tony Diab ("Diab"), individually, and

14  Defendant  BAT Inc. d/b/a Coast Processing ("Coast Processing"). (Trustee, Diab and Coast

15  Processing are collectively referred to as the "Parties").

16      The Stipulation resolves the bankruptcy estate's claims asserted against Diab and BAT for

17  avoidance, recovery, and preservation of fraudulent and constructive transfers, turnover, and

18  negligence. Specifically, Diab acknowledges and details, in the Stipulation, that he was the creator of

19  and one of the masterminds behind the illegal enterprise that interested parties around the country

20  have come to know as LPG. The Stipulation represents Diab's first steps towards making "amends"

21  for the extreme wrong doings he took in the years leading up to the Debtors' bankruptcy and after the

22  Petition Date. Specifically, the Trustee has identified hundreds of millions of dollars that Diab and

23  other co-conspirators have absconded with or wrongfully received from the Debtor, much of which

24  has or may still be located and recovered by the Trustee and his professionals based, partly, on

25  information and documents provided by Diab, which is described in the Stipulation. Unfortunately,

26  little remains in the hands of Diab at this time. Therefore, the Trustee believes that the Stipulation,

27  which includes an agreement for entry of judgment against Diab for a nondischargeable minimum

28  amount of $100,000,000.00, which is subject to increase upon further proof, is in the best interest of

1  the Trust for which he is entrusted to administer for the benefit of thousands of creditors presently

2  asserting in excess of $500,000,000.00 in claims.

3        The instant Motion is made on the grounds that the Trustee, in the exercise of his business

4  judgment, has determined that it is in the best interests of the Trust to enter into the Stipulation with

5  Diab and Coast Processing. Accordingly, the Trustee contends that the Stipulation is fair and

6  reasonable and should be approved by the Court. Significantly, the Trustee is not waiving any rights

7  pursuant to the Stipulation, including rights with respect to the final amount of the judgment to be

8  entered herein, and is not providing Diab or Coast Processing with a release. This Motion is based

9  upon the Notice of Motion filed concurrently herewith, this Motion, the Memorandum of Points and

10  Authorities and the Declaration of Richard A Marshack attached hereto, the entire record in this case,

11  and such further evidence as may be made.

12        **WHEREFORE**, the Trustee moves the Court for approval of the Stipulation between the

13  Parties pursuant to the terms set forth herein, and for such other and further relief that the Court deems

14  just and proper.

15                                            Respectfully submitted,

16  Dated:  April 16, 2025                    DINSMORE & SHOHL LLP

17

18                                  By:  */s/ Christopher B. Ghio*
                                         Christopher B. Ghio
19                                       Special Counsel to Plaintiff, Richard A.
                                         Marshack, Trustee of the LPG Liquidation
20                                       Trust

21

22

23

24

25

26

27

28

**<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>**

**I.     STATEMENT OF RELEVANT FACTS**

    **A.     Procedural Background**

On March 20, 2023 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, commencing the Bankruptcy Case.

After the Office of the United States Trustee (the "UST") filed the Motion by United States Trustee to Dismiss or Convert Case Pursuant to 11 U.S.C. § 1112(b) [Docket No. 21] and creditors Debt Validation Fund II, LLC; MC DVI Fund 1, LLC; and MC DVI Fund 2, LLC filed the Motion by DVF and MC DVI to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. §§ 105, 305, 349, & 1112, or in the Alternative Convert This Case to Chapter 7 or Appoint a Trustee [Docket No. 44], the Court entered the Order Directing United States Trustee to Appoint Chapter 11 Trustee [Docket No. 58] on May 4, 2021, thereby granting the UST's motion and directing the UST to appoint a Chapter 11 Trustee in the Bankruptcy Case.

Pursuant to the Acceptance of Appointment as Chapter 11 Trustee [Docket No. 63; the Order Approving Appointment is Docket No. 65], on May 8, 2023, the Plaintiff accepted his appointment as the Chapter 11 Trustee in the Bankruptcy Case. Pursuant to the Order Confirming Modified First Amended Joint Chapter 11 Plan of Liquidation entered September 9, 2024, and the Notice of Occurrence of Effective Date of Modified First Amended Joint Chapter 11 Plan of Liquidation filed September 24, 2024, Richard A. Marshack became the Liquidating Trustee of the LPG Liquidation Trust, effective September 24, 2024 [Docket Nos. 1646 & 1762].

The Trustee timely filed a complaint against Diab and others on May 25, 2023, in this case known as *In re Litigation Practice Group* (the "Bankruptcy Case") which created adversary case known as *Richard A Marshack, Chapter 7 Trustee v. Tony Diab, et al.* and assigned case number 8:23-ap-01046-SC (the "Adversary") (Adversary Docket No. 1). The Complaint was amended several times, most recently on November 15, 2024, and known as the "5th Amended Complaint."

Beginning in or about Fall 2024, the Trustee, through Special Counsel, engaged in communications with Diab to document the events leading up to the filing of the Debtor's bankruptcy and the actions of Diab and other co-conspirators after the Bankruptcy Case was filed. Those

communications led to the drafting and execution of the Stipulation that the Trustee seeks approval of by this Motion. The Stipulation will decrease further litigation costs to the Trust and the facts contained in the Diab Declaration will assist the Trustee in continuing to unravel the multiple fraudulent transfer actions and the likely collection of multiple other claims against additional third parties that will result in a greater recovery to the Trust and its beneficiaries.

### B.    Details of the Stipulation

The Trustee and Diab have reached an agreement which is memorialized in the Stipulation attached to this Motion, which resolves, for the most part, the claims alleged against Diab in the Adversary. A true and correct copy of the Stipulation between the Parties is attached hereto as **Exhibit 1** and incorporated herein by this reference.

The Stipulation allows for immediate entry of judgment against Diab for a minimum amount of $100,000,000.00 ("Judgment Amount") and can be increased through proof by the Trustee, such further proof to be provided in the form of a default judgment prove pursuant to applicable Federal Rules of Bankruptcy Procedure and Local Rules upon regular notice as provided therein. The Stipulation also attaches Diab's Declaration (the "Diab Declaration"). The Parties consent to the entry of a final order and judgment by the Bankruptcy Court, which shall result in entry of a non-dischargeable judgment against Diab supported by multiple admitted facts for the same. The Judgment Amount includes amounts that were fraudulently transferred to several of Diab's Alter Egos,[1] some of which are alleged to be defunct/nonoperational entities. The Stipulation includes a requirement that Diab shall cooperate in every extent possible, with the Trustee's efforts to obtain documents and information relating to the facts contained in the Diab Declaration, and any other matters which are subject to the Bankruptcy Case, the Trust and other related adversaries, of which Diab is able to obtain, as well as to appear as a witness at any and all hearings, trials, or other matters at which the Trustee requests Diab to appear, with notice given of not less than 15-days, and at his own expense. Finally, Diab is required by the Stipulation to remain bound by the Court's preliminary

---

[1] These non-debtor entities are alter egos of Diab and include Oakstone, Phoenix, Consumer Legal Group, Vulcan Consulting, Prime Logix, Maverick Management, Guardian Processing, LGS Holdco, Coast Processing, Strategic Consulting Solutions LLC, EZ Debt Relief, Inc., among other non-debtor entities (collectively, the "Alter Egos").

1    injunction [in Docket No. 70].

2         The Trustee believes that the terms of the Stipulation as set forth in **Exhibit 1**, is in the best

3    interest of the beneficiaries/creditors of the Trust and should be approved. The Stipulation, as

4    discussed below, will end further costs of litigation, only puts a floor on the amount owed to the Trust

5    by Diab, includes admissions and information that is assisting the Trustee in other matters, and the

6    terms of the Stipulation require an obligation that will require Diab to turn over every nonexempt

7    penny he earns until the Judgment Amount is paid in full and the victims of his and his co-

8    conspirators' fraudulent scheme are in some way made, as whole as possible, to the full extent of the

9    law without further delay.

10   **II.     THE STIPULATION SHOULD BE APPROVED**

11        **A.     The Creditors Have Received Sufficient Notice of the Stipulation**

12        Though not applicable to the Stipulation at issue here, Rule 9019 of the Federal Rules of

13   Bankruptcy Procedure and Local Bankruptcy Rule 9013-1(o)(1) authorize the Court to approve a

14   settlement agreement following notice and an opportunity for a hearing.

15        In the case at bar, notice of this Motion, which summarizes the relief sought by the Trustee,

16   was served upon the, all creditors of the bankruptcy estate, the Office of the United States Trustee, as

17   well as any parties who have requested special notice. Thus, the Motion may be determined upon

18   notice of opportunity to request a hearing under Rule 9019 of the Federal Rules of Bankruptcy

19   Procedure and Local Bankruptcy Rule 9013-1(o)(1). However, in addition to the notice being

20   provided in this Motion, the Trustee has also set the matter for hearing pursuant to Rule 9013-1(d)(1)

21   so that all parties affected by the relief sought in the Motion, may file a response to the Motion and

22   be heard at a hearing before this Court.

23        **B.     The Court is Authorized to Approve the Stipulation**

24        Bankruptcy Rule 9019 in relevant part states:

25        (a)  Compromise.  On motion by the trustee and after a hearing on notice to creditors,

26        the Debtor and indenture Trustees as provided in Rule 2002(a) and to such other

27        entities as the Court may designate, the Court may approve a compromise or

28        settlement.

1    The Court has the authority to decide whether to approve a settlement of claims held by a

2  bankruptcy estate. Notice must be given to all creditors, the United States Trustee, the debtor, and

3  indenture trustees as provided in FRBP 2002, and to any other entity as the court may direct. See

4  FRBP, Rule 9019(a).

5    It is well-established that a compromise should be approved if it is "in the best interest of the

6  estate. . . and is fair and equitable for the creditors." *Schmitt v. Ulrich (In re Schmitt)*, 215 B.R. 417,

7  424 (B.A.P. 9th Cir. 1997); *ATKN Company v. Guy F. Atkinson Company of California (In re Guy F.*

8  *Atkinson Company)*, 242 B.R 497, 502 (B.A.P. 9th Cir. 1999) ("At its base, the approval of a

9  settlement turns on the question of whether the compromise is in the best interest of the estate.") The

10  standards to be applied to the approval of a settlement include:

11    1)  the probability of success of the litigation on its merits;

12    2)  the difficulties in collection on a judgment;

13    3)  the complexity of the litigation involved; and

14    4)  the expense, inconvenience or delay occasioned by the litigation, and the interest of

15       creditors.

16  *In re A & C Properties*, 784 F.2d 1377, 1380-81 (9th Cir. 1986), cert. den., *Martin v. Robinson*, 479

17  U.S. 854, 107 S.Ct. 189 (1989).

18    Although the Court is to consider the range of results in the litigation, "the court's assessment

19  does not require resolution of the issues, but only their identification, so that the reasonableness of

20  the settlement may be evaluated" (emphasis added). *In re Hermitage Inn, Inc*., 66 Bankr. 71, 72

21  (Bankr. D. Colo. 1986). Moreover, it is not the bankruptcy court's responsibility to decide the

22  numerous questions of law and fact with respect to the merits of the litigation, but rather to "canvass

23  the issues and see whether the settlement falls below the lowest point of the range of reasonableness."

24  *In re Heissinger Resources Ltd*., 67 Bankr. 378, 383 (C.D. Ill. 1986).

25    Here, though the claims that are the subject of the Stipulation are not held by the bankruptcy

26  estate any longer, and the Court is not required to approve settlements which are reached by the

27  Trustee of the Trust pursuant to the Liquidating Trust, and although this Stipulation does not

28  constitute a settlement or compromise of any claims, the Trustee files this Motion and provides notice

to all of the creditors in the case and of the Trust, out of caution and respect, to all those harmed by the actions of Diab and his alter egos and co-coconspirators. Therefore, though the Stipulation does not require court approval, per se, the Trustee seeks this Court's approval through notice given, of the Stipulation and Motion. The Trustee believes the Stipulation provides an expedient and cost-effective resolution to a dispute that would require extensive and time-consuming litigation and only sets a floor to which Diab is liable to the Trust and his victims.

**C.      The Compromise is Fair and Equitable and in the Best Interest of the Creditors of the Estate.**

The Bankruptcy Court has great latitude in approving compromises. *Martin v. Kane* 784 F.2s 127 (9th Cir. 1986). It is well established that settlements are favored over continued litigation. *See In re Blaim*, 538 F.2d 849, 851 (9th Cir. 1976); *In re A & C Properties*, 784 F.2d 1377. 1382 (9th Cir. 1986).

A compromise should be approved if it is "in the best interests of the estate and … is fair and equitable for the creditors." *In re Schmitt*, 215 B.R. 417, 424 (9th Cir. BAP 1997). The court considers the following elements in determining whether a settlement is "fair and equitable" to creditors: (1) Probability of success of the litigation; (2) Difficulty in actual collection; (3) Complexity of the case involved, and the expense, inconvenience and delay necessarily attending it; and (4) the interest of creditors and their opinions. *In re Schmitt*, 215 B.R. 417, 421 (9th Cir. BAP 1997); *Martin v. Robinson*, 107 S. Ct. 89 93 L. Ed. 2d. 122 (1986).

The Trustee believes that the Stipulation, as set forth herein, is fair and equitable and in the best interest of the beneficiaries/creditors of the Trust and should be approved. This Stipulation allows a minimum money judgment against Diab (which he admits to be nondischargeable) of $100,000,000.00, includes requirements of cooperation in multiple other matters, includes admissions that have assisted in recovering millions of dollars to date, and is anticipated to lead to additional recoveries against Diab's coconspirators and other non-debtor parties, totaling millions of more dollars for the victims of the Debtor, Diab and his alter egos.

Finally, this Stipulation minimizes not just costs and the risk that comes with complex litigation, but delay to the beneficiaries of the Trust, that otherwise would result in further legal

1  expenses to the Trust in order to monetize the value of the Trust's claims against Diab and his alter

2  egos.

3      **1.    Probability of Success in Litigation and Complexity of Issues, expense,**

4      **inconvenience and delay of the litigation.**

5      The claims at issue in the Adversary involve complex and expensive issues to litigate as they

6  relate to years and layers of elaborate schemes, involving multiple parties, to fraudulently transfer

7  and abscond with hundreds of millions of dollars of the Debtor's funds which should have remained,

8  in most circumstances, in the Debtor for the benefit of its clients and creditors. However, the fraud

9  involved in the claims at issue in the Adversary are clearly documented by hundreds of thousands of

10  pages that make up the evidence against Diab and his co-conspirators; there is certainty that the

11  Trustee would succeed on his claims against Diab. However, the delay and expense that would come

12  with proceeding with litigation for a judgment of more than $100,000,000.00 would be an immense

13  expense and further delay to the beneficiaries of the Trust. Therefore, these factors weigh heavily in

14  favor of approving the Stipulation.

15      **2.    Difficulties in Collection**

16      Based on an extensive investigation by the Trustee's professionals, it is the belief of the

17  Trustee that Diab is uncollectible at this time for any amount of money. Diab is 42 years old, he is a

18  disbarred attorney, owing hundreds of millions of dollars on personal guarantees of debt he incurred

19  through the Debtor and by all accounts to date, owns nothing of value, exempt or nonexempt. Because

20  a judgment of any amount, let alone a $100,000,000.00 judgment as provided in the Stipulation, is

21  not likely collectible at this time, or even in Diab's remaining lifetime, this factor weighs heavily in

22  favor of approving the Stipulation. The Stipulation will serve as a "life sentence" similar to a

23  restitution order to pay the creditors, and especially to the victims, of Diab's elaborate scheme to steal

24  hundreds of millions of dollars from the people that trusted Diab and his entities to assist them in their

25  time of need. Finally, with an admission from Diab that the minimum $100,000,000.00 judgment

26  resulting from approval of the Stipulation, is nondischargeable, collection of the judgment will truly

27  remain for the life of Diab and only makes collection of the same more likely, decreasing costs to the

28  Trust if, at any point, Diab seeks relief of his own from a bankruptcy court somewhere in the country.

### 3.    Best Interest of Creditors

The Trustee believes that this Stipulation is in the best interest of the beneficiaries of the Trust. Administrative costs of the Trustee and professionals will be limited to what they are at this moment and very little would need to be spent to confirm the dischargeability of the judgment in any future bankruptcy. If the Stipulation is not approved, the attorney's fees incurred by the Trust, to pursue further litigation against Diab and his alter egos, could be hundreds of thousands of dollars, if not more than a million. If the Stipulation is approved, the Trust will receive an immediately enforceable judgment amount of no less than $100,000,000.00 which can be used to collect against Diab and any of his alter egos immediately, and to the extent that the Trustee determines that there are assets with which to satisfy the judgment, he may levy/collect immediately. If the Stipulation is not approved, as discussed above, expense of litigation of the claims the Trust holds against Diab will be substantial, requiring extensive discovery needed prior trial, and the litigation will take the usual time to go to trial, all while Diab remains free of the obligations in the Stipulation. Therefore, the Trustee contends that this factor weighs heavily in favor of approving the Stipulation.

## III.    CONCLUSION

In sum, upon notice to creditors, this Court is empowered pursuant by Bankruptcy Rule 9019 or in the alternative, pursuant to the Court's § 105 powers, to approve the Stipulation between the Trustee and Diab (as well as Coast Processing) and requests that the Court enter an order approving same and for any other relief necessary, as such relief is in the best interest of the Trust.

Respectfully submitted,

Dated:  April 16, 2025                    DINSMORE & SHOHL LLP


By: _/s/ Christopher B. Ghio_
_____
Christopher B. Ghio
Special Counsel to Plaintiff, Richard A.
Marshack, Trustee of the LPG Liquidation
Trust

## DECLARATION OF RICHARD A. MARSHACK

I, Richard A. Marshack, hereby declare as follows:

1.      I am the duly appointed, qualified and acting Liquidating Trustee ("Trustee") for the LPG Liquidation Trust (the "Trust").

2.      This declaration is made in support of my Motion for Order Approving Stipulation between myself, as Trustee of the Trust, and Defendants Tony Diab ("Diab") and BAT, Inc. dba Coast Processing ("Coast Processing").

3.      I have personal knowledge of the matters discussed below, and if called as a witness I could and would competently testify thereto.

4.      The facts stated herein are true and correct to the best of my knowledge, except as to such matters as may be stated upon information or belief, which I believe to be true.

5.      On March 20, 2023 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, commencing the Bankruptcy Case.

6.      After the Office of the United States Trustee (the "UST") filed the Motion by United States Trustee to Dismiss or Convert Case Pursuant to 11 U.S.C. § 1112(b) [Docket No. 21] and creditors Debt Validation Fund II, LLC; MC DVI Fund 1, LLC; and MC DVI Fund 2, LLC filed the Motion by DVF and MC DVI to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. §§ 105, 305, 349, & 1112, or in the Alternative Convert This Case to Chapter 7 or Appoint a Trustee [Docket No. 44], the Court entered the Order Directing Unites States Trustee to Appoint Chapter 11 Trustee [Docket No. 58] on May 4, 2021, thereby granting the UST's motion and directing the UST to appoint a Chapter 11 Trustee in the Bankruptcy Case.

7.      Pursuant to the Acceptance of Appointment as Chapter 11 Trustee [Docket No. 63; the Order Approving Appointment is Docket No. 65], on May 8, 2023, I accepted my appointment as the Chapter 11 Trustee in the Bankruptcy Case.

8.      Pursuant to the Order Confirming Modified First Amended Joint Chapter 11 Plan of Liquidation entered September 9, 2024, and the Notice of Occurrence of Effective Date of Modified First Amended Joint Chapter 11 Plan of Liquidation filed September 24, 2024, I became the Liquidating Trustee of the LPG Liquidation Trust, effective September 24, 2024.  [Docket Nos. 1646

1   & 1762].

2          9.      I, through Special Counsel, timely filed a complaint against Diab and others on May

3   25, 2023, in this case known as *In re Litigation Practice Group* (the "Bankruptcy Case") which

4   created adversary case known as *Richard A Marshack, Chapter 7 Trustee v. Tony Diab, et al.* and

5   assigned case number 8:23-ap-01046-SC (the "Adversary") (Adversary Docket No. 1).

6          10.     The Complaint was amended several times, most recently on November 15, 2024, and

7   known as the "5th Amended Complaint."

8          11.     Beginning in or about Fall 2024, I, through Special Counsel, engaged in

9   communications with Diab to document the events leading up to the filing of the Debtor's bankruptcy

10  and the actions of Diab and other co-conspirators after the Bankruptcy Case was filed.

11         12.     Those communications led to the drafting and execution of the Stipulation that I seek

12  approval of by this Motion.

13         13.     The Stipulation will decrease further litigation costs to the Trust and the information

14  contained in the Diab Declaration will assist my professionals and I in continuing to unravel the

15  multiple fraudulent transfer actions and the likely collection of multiple other claims against

16  additional third parties that will result in a greater recovery to the Trust and its beneficiaries.

17         14.     Diab and I have reached an agreement which is memorialized in the Stipulation

18  attached to this Declaration, which resolves, for the most part, the claims alleged against Diab in the

19  Adversary. A true and correct copy of the Stipulation between Diab and I is attached hereto as **Exhibit

20  1** and incorporated herein by this reference.

21         15.     The Stipulation allows for immediate entry of judgment against Diab for a minimum

22  amount of $100,000,000.00 ("Judgment Amount") and can be increased through proof I may submit;

23  such further proof to be provided in the form of a default judgment prove up pursuant to applicable

24  Federal Rules of Bankruptcy Procedure and Local Rules upon regular notice as provided therein.

25         16.     The Stipulation also includes the Diab Stipulation.

26         17.     Diab consents to the entry of a final order and judgment by the Bankruptcy Court,

27  which shall result in entry of a non-dischargeable judgment against Diab supported by multiple

28  admitted facts for the same.

18.     The Judgment Amount includes amounts that were fraudulently transferred to several of Diab's Alter Egos, some of which are alleged to be defunct/nonoperational entities.

19.     The Stipulation includes a requirement that Diab shall cooperate in every extent possible, with my efforts to obtain documents and information relating to facts set forth in the Diab Stipulation, and any other matters which are subject to the Bankruptcy Case, the Trust and other related adversaries, of which Diab is able to obtain, as well as to appear as a witness at any and all hearings, trials, or other matters at which I request Diab to appear, with notice given of not less than 15-days, and at his own expense.

20.     Finally, Diab is required by the Stipulation to remain bound by the Court's preliminary injunction [in Docket No. 70].

21.     I believe that the terms of the Stipulation as set forth in Exhibit 1, are in the best interest of the beneficiaries/creditors of the Trust and should be approved.

22.     The Stipulation, as discussed in the Motion, will end further costs of litigation, only put a floor on the amount owed to the Trust by Diab, includes admissions and information that is assisting my professionals and I in other matters, and the terms of the Stipulation require an obligation that will require Diab to turnover every nonexempt penny he earns until the Judgment Amount is paid in full and the victims of his and his co-conspirators' fraudulent scheme are in some way made, as whole as possible, to the full extent of the law without further delay.

23.     The Trustee believes the Stipulation provides an expedient and cost-effective resolution to a dispute that would require extensive and time-consuming litigation and only sets a floor to which Diab is liable to the Trust and his victims.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this ___15___ day of April 2025.

RICHARD A. MARSHACK

Exhibit 1

Christopher Celentino (State Bar No. 131688)
Christopher B. Ghio (State Bar No. 259094)
Yosina M. Lissebeck (State Bar No. 201654)
**DINSMORE & SHOHL LLP**
655 West Broadway, Ste 800
San Diego, California 92101
Tele: (619) 400-0500
Fax: (619) 400-0501
Christopher.Celentino@dinsmore.com
Christopher.Ghio@dinsmore.com
Yosina.Lissebeck@dinsmore.com

Attorneys for Richard A. Marshack,
Trustee of the LPG Liquidation Trust

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>THE LITIGATION PRACTICE GROUP P.C.<br><br><br>Debtor. | Case No.: 8:23-bk-10571-SC<br><br>Adv. Proc. No.: 8:23-ap-01046-SC<br><br>Chapter 11 |
| RICHARD A. MARSHACK,<br>Chapter 11 Trustee<br><br>        Plaintiff,<br><br>v.<br><br>TONY DIAB, an individual; DANIEL S. MARCH, an individual; ROSA BIANCA LOLI, an individual; ENG TAING, an individual; HENG TAING, an individual; WES THOMAS, an individual; SCOTT JAMES EADIE, an individual; JIMMY CHHOR, an individual; DONGLIANG JIANG, an individual; MAX CHOU, an individual; OAKSTONE LAW GROUP PC; GREYSON LAW CENTER PC; MAVERICK MANAGEMENT GROUP, LLC; LGS HOLDCO, LLC; CONSUMER LEGAL GROUP, P.C.; VULCAN CONSULTING GROUP LLC; BAT INC. d/b/a COAST PROCESSING; PRIME LOGIX, LLC; TERACEL BLOCKCHAIN FUND II LLC; EPPS; EQUIPAY; WORLD GLOBAL; OPTIMUMBANK HOLDINGS, INC. d/b/a OPTIMUM BANK; REVOLV3, INC.; MERIT | **STIPULATION WITH DEFENDANT TONY DIAB FOR ENTRY OF JUDGMENT**<br><br>Judge: Hon. Scott C. Clarkson |

FUND, LLC; GUARDIAN PROCESSING, LLC;
PAYLIANCE, LLC; TOUZI CAPITAL,
LLC; SEAMLESS CHEX INC; DWOLLA,
INC.; and DOES 1 through 100, inclusive,
             Defendants.

## I.     STIPULATION

IT IS STIPULATED AND AGREED:

1.     The Parties consent to the entry of a final order and judgment by the Bankruptcy Court.

2.     The facts set forth in the Declaration of Tony Diab, attached as **Exhibit "A"** are incorporated herein by reference.

3.     The Court shall enter a non-dischargeable judgment against Diab and Coast Processing, jointly and severally,  and in favor of the Trustee/Plaintiff in the minimum amount of $100,000,000.00 ("Judgment Amount"), which is subject to increase upon further proof, such further proof to be provided in the form of a default judgment prove up pursuant to the Federal Rules of Bankruptcy Procedure and/or Local Rules, upon regular notice as provided therein.

4.     Diab acknowledges and agrees that the Judgment Amount is based upon fraud, breach of fiduciary duty, and willful and malicious injury to the Debtor including, but not limited to, Diab not requiring the Debtor to maintain client payments in trust, violating numerous federal and state consumer protection laws, and operating the Debtor as a Ponzi scheme as set forth in detail in the concurrently-filed stipulation.

5.     Diab shall cooperate in every extent possible, with the Trustee's efforts to obtain documents and information relating to the Recitals and any other matters which are subject to the Bankruptcy Case and other related adversaries, which Diab is able to obtain.

6.     Diab shall appear as a witness at any and all hearings, trials, or other matters at which the Trustee requests Diab to appear, with notice given of not less than 15-days, and at his own expense.

1       7.    The parties hereto have been represented by counsel or have had the opportunity to be

2 represented by counsel and have knowing waived such opportunity.

3       8.    Diab shall remain bound by the Court's preliminary injunction [in Dkt. 70].

5                     Respectfully submitted,

6 Dated:  April 9, 2025            DINSMORE & SHOHL LLP

8                    By: _____
                     Christopher Celentino

9                      Christopher B. Ghio
                     Yosina M. Lissebeck

10                     Attorneys for Richard A. Marshack,
                     Trustee of the LPG Liquidation Trust

13 Dated:                By: _____
                     Plaintiff Richard A. Marshack,
                     Trustee of the LPG Liquidation Trust

17 Dated: 4/8/2025            BAT, Inc. dba Coat Processing, dba LPG

19                    By: _____
                     Tony Diab
                     President and CEO

21 Dated: 4/8/2025

23                    By: _____
                     Tony Diab

7.   The parties hereto have been represented by counsel or have had the opportunity to be represented by counsel and have knowing waived such opportunity.

8.   Diab shall remain bound by the Court's preliminary injunction [in Dkt. 70].

Respectfully submitted,

Dated:  April 8, 2025

DINSMORE & SHOHL LLP

By: _____
Christopher Celentino
Christopher B. Ghio
Yosina M. Lissebeck
Attorneys for Richard A. Marshack,
Trustee of the LPG Liquidation Trust

Dated:                                          By: _____
Plaintiff Richard A. Marshack,
Trustee of the LPG Liquidation Trust

Dated:                                          BAT, Inc. dba Coat Processing, dba LPG

By: _____
Tony Diab
President and CEO

Dated:

By: _____
Tony Diab

Exhibit A

Christopher Celentino (State Bar No. 131688)
Christopher B. Ghio (State Bar No. 259094)
Yosina M. Lissebeck (State Bar No. 201654)
**DINSMORE & SHOHL LLP**
655 West Broadway, Ste 800
San Diego, California 92101
Tele: (619) 400-0500
Fax:  (619) 400-0501
Christopher.Celentino@dinsmore.com
Christopher.Ghio@dinsmore.com
Yosina.Lissebeck@dinsmore.com

Attorneys for Richard A. Marshack,
Trustee of the LPG Liquidation Trust

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>THE LITIGATION PRACTICE GROUP P.C.<br><br>Debtor. | Case No.: 8:23-bk-10571-SC<br><br>Adv. Proc. No.: 8:23-ap-01046-SC<br><br>Chapter 11 |
| RICHARD A. MARSHACK,<br>Chapter 11 Trustee<br><br>Plaintiff,<br><br>v.<br><br>TONY DIAB, an individual; DANIEL S. MARCH, an individual; ROSA BIANCA LOLI, an individual; ENG TAING, an individual; HENG TAING, an individual; WES THOMAS, an individual; SCOTT JAMES EADIE, an individual; JIMMY CHHOR, an individual; DONGLIANG JIANG, an individual; MAX CHOU, an individual; OAKSTONE LAW GROUP PC; GREYSON LAW CENTER PC; MAVERICK MANAGEMENT GROUP, LLC; LGS HOLDCO, LLC; CONSUMER LEGAL GROUP, P.C.; VULCAN CONSULTING GROUP LLC; BAT INC. d/b/a COAST PROCESSING; PRIME LOGIX, LLC; TERACEL BLOCKCHAIN FUND II LLC; EPPS; EQUIPAY; WORLD GLOBAL; OPTIMUMBANK HOLDINGS, INC. d/b/a OPTIMUM BANK; REVOLV3, INC.; MERIT | **DECLARATION OF TONY DIAB**<br><br>Judge: Hon. Scott C. Clarkson |

1

1  FUND, LLC; GUARDIAN PROCESSING, LLC;
   PAYLIANCE, LLC; TOUZI CAPITAL,
2  LLC; SEAMLESS CHEX INC; DWOLLA,
   INC.; and DOES 1 through 100, inclusive,
3                              Defendants.

4

5

6

7

8          I, Tony Diab, declare:

9          All the facts contained in this declaration are true and correct. I have personal knowledge of

10  the matters stated herein and if called as a witness, I could and would competently testify thereto.

11  **I.      RECITALS**

12          **A.      <u>THE FILING OF THIS ADVERSARY</u>**

13          1.      The Plaintiff timely filed a complaint ("Complaint" – Docket No 1 in the Adversary)

14  against Diab and others (discussed below) on May 25, 2023, in the Debtor's main case known as In

15  re Litigation Practice Group and assigned case number 8:23-bk-10571-SC (the "Bankruptcy Case")

16  which created adversary case known as Richard A Marshack, Chapter 7 Trustee v. Tony Diab, et al.

17  and assigned case number 8:23-ap-01046-SC (the "Adversary").

18          2.      The Complaint was amended several times, most recently on November 15, 2024 and

19  known as the "5th Amended Complaint."

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

2

**B.    STATEMENT OF JURISDICTION, NATURE OF PROCEEDING, AND VENUE**

3.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (H) and (O), 1334(b), and General Order No. 13-05 of the District Court for the Central District of California because this is a core proceeding arising in and/or related to the Bankruptcy Case, which is a case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), and which is pending in the United States Bankruptcy Court for the Central District of California, Santa Ana Division (the "Court"). Venue of this adversary proceeding properly lies in this judicial district pursuant to 28 U.S.C. § 1409(a) because this proceeding is related to the Debtor's pending Bankruptcy Case.

**C.    THE PARTIES RELATED TO THE ADVERSARY**

4.    Debtor/LPG is, and at all material times was, a professional corporation organized, existing, and in good standing under the laws of the State of California, with its principal place of business in Tustin, California.

5.    Defendant Diab is, and at all material times was, an individual residing in the State of California.

6.    The following are other co-defendants/related parties to the Adversary:

a.    Defendant Daniel S. March ("March") is, and at all material times was, an individual residing in the State of California.

b.    Defendant Eng Taing ("Eng") is, and at all material times was, an individual residing in the State of California.

c.    Defendant Heng Taing ("Heng") is, and at all material times was, an individual residing in the State of California.

d.    Defendant Wes Thomas ("Thomas") is, and at all material times was, an individual residing in the State of California.

e.    Defendant Scott James Eadie ("Eadie") is, and at all material times was, an individual residing in the State of California.

/ / /

3

1    f.    Defendant Jimmy Chhor ("Chhor") is, and at all material times was, an individual

2 residing in the State of California.

3    g.    Defendant Dongliang Jiang ("Jiang") is, and at all material times was, an individual

4 residing in the State of California.

5    h.    Defendant Max Chou ("Chou") is, and at all material times was, an individual residing

6 in the State of California.

7    i.    Defendant Rosa Loli a.k.a. Rosa Bianca Loli a.k.a. Bianca Loli ("Loli") is, and at all

8 material times was, an individual residing in the State of California.

9    j.    Defendant Oakstone Law Group, PC ("Oakstone") is, and at all material times was, a

10 professional corporation organized, existing, and in good standing under the laws of the State of

11 California, with its principal place of business in La Jolla, California.

12    k.    Defendant Greyson Law Center, PC ("Greyson") is, and at all material times was, a

13 professional corporation organized, existing, and in good standing under the laws of the State of

14 California, with its principal place of business in Costa Mesa, California.

15    l.    Defendant LGS Holdco, LLC ("LGS") is, and at all material times was, a limited

16 liability corporation organized, existing, and in good standing under the laws of the State of Delaware.

17    m.    Defendant Consumer Legal Group, PC ("CLG") is, and at all material times was, a

18 professional corporation organized, existing, and in good standing under the laws of the State of New

19 York.

20    n.    Defendant Maverick Management Group, LLC ("Maverick") is, and at all material

21 times was, a limited liability corporation in the State of Wyoming. On information and belief,

22 Maverick is owned, operated and run by Loli under the direction of Diab.

23    o.    Defendant Vulcan Consulting Group, LLC ("Vulcan") is, and at all material times was,

24 a limited liability corporation organized, existing, and in good standing under the laws of the State of

25 California, with its principal place of business in Newport Coast, California.

26    p.    Defendant BAT Inc. d/b/a Coast Processing ("Coast Processing") is, and at all material

27 times was, a corporation organized, existing, and in good standing under the laws of the State of

28 California, with its principal place of business in Riverside, California. Through Diab, Coast

4

1  Processing exercised authority, control and dominion over LPG pre-petition. Coast Processing

2  oftentimes used the name Coast Processing, LLC dba LPG to open financial accounts, including those

3  at Optimum Bank to effectuate the scheme alleged herein in concert with Diab, Eng, Touzi and PECC

4  among others.

5        q.      Defendant Prime Logix, LLC ("Prime Logix") is, and at all material times was, a

6  limited liability corporation organized, existing, and in good standing under the laws of the State of

7  Wyoming, with its principal place of business in Long Beach, California. On information and belief,

8  Prime Logix is owned operated and/or run by Loli under the direction of Diab.

9        r.      Defendant EPPS ("EPPS") is, and at all material times was, a corporation organized,

10  existing, and in good standing under the laws of the State of California.

11        s.      Defendant EquiPay, LLC ("EquiPay") is an ACH processor.

12        t.      Defendant World Global ("World Global") is an ACH processor.

13        u.      Defendant Merit Fund LLC ("Merit Fund") is, and at all material times was, a limited

14  liability corporation organized, existing, and in good standing under the laws of the State of

15  California, with its principal place of business in Torrance, California.

16        v.      Defendant OptimumBank Holdings, Inc. d/b/a Optimum Bank ("Optimum Bank") is,

17  and at all material times was, a bank holding company, with its principal place of business in Fort

18  Lauderdale, Florida.

19        w.      Defendant Revolv3, Inc. ("Revolv3") is, and at all material times was, a limited

20  liability corporation organized, existing, and in good standing under the laws of the State of Delaware,

21  with its principal place of business in Laguna Beach, California.

22        x.      Defendant Guardian Processing, LLC ("Guardian") is, and at all material times was, a

23  limited liability corporation organized, existing, and in good standing under the laws of the State of

24  Wyoming, with its principal place of business in Sheridan, Wyoming.

25        y.      Defendant Payliance, LLC ("Payliance") is and, at all material times was, a limited

26  liability company organized and existing under the laws of the State of Ohio, with its principal place

27  of business in Columbus, Ohio.

28  / / /

z.      Defendant Touzi Capital, LLC ("Touzi") is, and at all material times was, a limited liability company organized and existing under the laws of the State of California, with its principal place of business in Walnut, California. Touzi is owned, controlled and managed by Eng. Touzi and PECC, Corp. share the same office in Walnut, California, located at 340 South Lemon Avenue, Unit 8284 Walnut, California 91789.

aa.     PECC Corp. ("PECC") is, and all material times was, a Delaware Corporation registered and licensed to do business in the State of California, with its principal place of business listed in Walnut, California. PECC Corp. is owned, controlled and managed by Eng, who is also listed as PECC Corp.'s agent for service of process. PECC and Touzi share the same office in Walnut, California, located at 340 South Lemon Avenue, Unit 8284, Walnut, California 91789.

bb.     Defendant Teracel Blockchain Fund II, LLC ("Teracel") is, and at all material times was, a limited liability corporation organized, existing, and in good standing under the laws of the State of Delaware. On information and belief, Teracel is owned, managed and controlled by Eng, Touzi and/or PECC.

cc.     Defendant Seamless Chex, Inc. ("Seamless") is, and at all material times was, a corporation organized under the laws of the State of New York, with its principal place of business in New York, New York.

dd.     Defendant Dwolla, Inc. ("Dwolla") is, and at all material times was, a corporation organized under the laws of the State of Iowa, with its principal place of business in Des Moines, Iowa.

ee.     EZ Debt Relief, Inc. ("EZ") is, and at all material times was, a corporation organized under the laws of the State of Wyoming, with its principal place of business in Orange County, California.

ff.     A Solution Debt Relief Inc. ("ASDR") is, a Wyoming corporation with its principal place of business in Orange County, California.

**D.    LPG'S BANKRUPTCY CASE**

7.      On March 20, 2023 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, commencing the Bankruptcy Case.

8.      After the Office of the United States Trustee (the "UST") filed the Motion by United States Trustee to Dismiss or Convert Case Pursuant to 11 U.S.C. § 1112(b) [Bankr. Docket No. 21] and creditors Debt Validation Fund II, LLC; MC DVI Fund 1, LLC; and MC DVI Fund 2, LLC filed the Motion by DVF and MC DVI to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. §§ 105, 305, 349, & 1112, or in the Alternative Convert This Case to Chapter 7 or Appoint a Trustee [Bankr. Docket No. 44], the Court entered the Order Directing Unites States Trustee to Appoint Chapter 11 Trustee [Bankr. Docket No. 58] on May 4, 2021, thereby granting the UST's motion and directing the UST to appoint a Chapter 11 Trustee in the Bankruptcy Case. Pursuant to the Acceptance of Appointment as Chapter 11 Trustee [Bankr. Docket No. 63; the Order Approving Appointment is Docket No. 65], on May 8, 2023, the Plaintiff accepted his appointment as the Chapter 11 Trustee in the Bankruptcy Case. Pursuant to the Order Confirming Modified First Amended Joint Chapter 11 Plan of Liquidation entered September 9, 2024, and the Notice of Occurrence of Effective Date of Modified First Amended Joint Chapter 11 Plan of Liquidation filed September 24, 2024, Richard A. Marshack became the Liquidating Trustee of the LPG Liquidation Trust, effective September 24, 2024.  [Bankr. Docket Nos. 1646 & 1762].

**E.      LPG'S OWNERSHIP AND MANAGEMENT**

9.      In February 2019, after being disbarred in both California and Nevada for forging a judge's signature and misappropriating a large amount of client funds, Diab transferred his existing debt resolution practice to LPG.

10.      LPG was a law firm that provided consumer debt resolution.

11.      At its high point, LPG serviced more than 65,000 clients across the United States. Over its four year period of operation, LPG serviced more than 100,000 clients.

12.      The consumers that retained LPG to represent them would pay over a period of time via monthly ACH debits from their bank accounts. The monthly payments were meant to cover all legal services LPG provided to the consumers. However, LPG mismanaged the consumers' monthly payments.

/ / /

/ / /

7

13.     In certain instances, LPG would file a lawsuit in an effort to eliminate a disputed debt or to prosecute affirmative claims held by the consumers. In many instances, LPG would represent clients in defense of collection actions brought in courts across the country.

14.     LPG collected ACH debits in the range of $250,000,000. The ACH debits should have been deposited into an IOLTA account until earned.  Notwithstanding this requirement, substantially all of LPG's ACH debits were transferred out of LPG accounts, to non-debtor entities, insiders, affiliates, marketing companies and co-conspirators, including but not limited to: 1) $77 million to BAT through June of 2022; 2) substantial amounts were paid to marketing and affiliate companies, some which Diab controlled and/or was an insider; 3) substantial business expenses paid in cash including but not limited to over $100,000 to furnish Jane Dearwester's North Carolina office; 4) payments for unnecessary and unrelated personal luxury expenses, including but not limited to sports cars, private jets to Vegas, resorts, luxury hotels, a BMW i8, Mercedes Benz G-Wagon, Han Trinh's wedding, a luxury box suite at the Anaheim Ducks arena, and luxury watches costing more than $150,000 among other examples; and 5) other fraudulent transfers to Diab, his co-conspirators and other insiders and their affiliated entities for their role in the fraudulent scheme. All of which rendered LPG insolvent requiring Diab and LPG to continue to improperly sell or pledge LPG's accounts receivable, multiple times over, continually incurring new debt in a "Ponzi Scheme" to finance LPG's continued and extravagant existence.

15.     When Diab's scheme began to crumble in late 2022, and LPG's outstanding debt became insurmountable, Diab designed the fraudulent scheme alleged in the 5th Amended Complaint to protect LPG's most valuable assets and Diab's golden goose – LPG's ACH debits and nationwide attorney network.

16.     Despite having been disbarred, Diab formed LPG and controlled and operated LPG since its inception.

17.     Diab, however, endeavored to and did conceal his control of LPG. For example, Diab required LPG's employees to call him "Admin," would send and receive emails using generic usernames including Admin or Legal and had a name plate on his desk that read, "I don't work here," reinforcing the notion that he sought to be invisible while maintaining control over the entity.

18.    Diab used the law license of March who, at times, masqueraded as the managing shareholder of LPG but exercised no actual management or control. In fact, Diab sometimes impersonated March and regularly signed as March on various contracts.

19.    LPG's primary DocuSign account was tied to Diab's email address, admin@lpglaw.com, where Diab signed numerous contracts as March.

20.    For use of March's law license, March received an annual salary rising to $1,200,000, in addition to bonuses and other forms of benefits and compensation.

21.    March's predecessor at LPG was John Thompson ("Thompson").

22.    Thompson was the original sole shareholder of LPG from February 2019 to November 2019 and was put in place to hide Diab's control over LPG while Diab's license went inactive as he was in the process of being disbarred.

23.    Appreciating the wrongful conduct alleged in the 5th Amended Complaint, Thompson conveyed his interest in LPG to March in November 2019 over concerns about his and LPG's potential liability. Thompson received no compensation for the transfer of ownership.

24.    Similar to impersonating March, Diab also impersonated Thompson on certain matters, which continued after Thompson's exit as shareholder of LPG, and also signed various contracts as Thompson using the same mechanism he later used with March.

**F.    LPG'S BUSINESS STRUCTURE**

25.    Historically, LPG had a business partner called BAT Inc. d/b/a Coast Processing ("Coast Processing"), which was owned by Brian Reale ("Reale"), Arash Asante Bayrooti ("Bayrooti"), and Diab. Mario Azevedo later received a small ownership percentage in this entity.

26.    Coast Processing was one entity through which LPG ran its in-house marketing and client development operations, among other operational functions at LPG, such as backend processing.

27.    Coast Processing was formed on January 10, 2018, by Diab, Bayrooti and Reale.

28.    The purpose of starting Coast Processing was to use it as the ACH processing entity for LPG so that LPG could pay non-attorneys Bayrooti, Reale, marketing affiliates, and others with funds that were required to be deposited into a client trust account.

29.     From 2018 through the consummation of the share purchase described in Paragraph 30, below, Diab had a forty percent (40%) ownership stake in Coast Processing.

30.     In or around June 2021, Diab bought Bayrooti, Azevedo, and Reale's ownership in Coast Processing making him the sole owner of Coast Processing.

31.     On March 2, 2023, Diab listed Han Trinh as the Chief Executive Officer, Chief Financial Officer, President, Secretary and Board member of Coast Processing in order to give her control of $1,500,000 in LPG funds being transferred to Greyson Law Center PC, Guardian Processing LLC, Maverick Management Group LLC, Vulcan Consulting Group LLC, Prime Logix, LLC, and Phoenix Law PC among other entities and individuals.

32.     On April 2, 2024, Diab removed Han from her positions at Coast Processing.

33.     Presently, Diab is the 100% shareholder of Coast Processing and is the sole director and holds all of the positions of any and all officers of Coast Processing.

34.     Coast Processing received no less than $77,000,000.00 from the Debtor/LPG on or before the Petition Date. It received these monies by retaining amounts processed from LPG consumer client ACH debits which were fraudulently transferred to Coast Processing by Diab, working in concert with Bayrooti, a fellow insider.

Marking Affiliates and Affiliate Agreements

35.     LPG, however, also had a network of over 100 marketing affiliates from which LPG purchased new clients.

36.     In 2021, Diab bought out the other investors in Coast Processing and merged its operations with LPG, including Coast Processing's contracts with other marketing affiliates.

37.     Despite Coast Processing's operations being merged into LPG, Coast Processing exists as a California corporation in good standing. At all relevant times prior to the share purchase, through Diab, Coast Processing exercised authority, dominion and control over LPG and used the dba "LPG."

38.     "Marketing Affiliates"  Marketing affiliates referred clients to LPG. In order to generate these clients, most of the marketing affiliates placed web-ads seeking consumers who had debt problems or purchased lists of potential clients that they would feed through an automated dialer.

The marketing affiliates located clients who were seeking debt relief services. After capturing the consumers on behalf of LPG, LPG paid the marketing affiliates a percentage of the monthly payments made by the consumers.

39.    LPG consumers paid fees to LPG over a period of time, ranging from 12-36 months, through monthly debits from their bank accounts and, less frequently, debit card payments. The monthly debits were controlled by Diab, LPG, and at times, as alleged in the 5th Amended Complaint, other entities who fraudulently initiated ACH transactions on LPG clients and/or with whom Diab had control, influence and/or had conspired to effectuate the fraudulent transfers of client files and funds as alleged herein. Each set of payments received or due by a client is referred to as an "ACH debit" or "ACH receivable."

40.    Once a new client had signed up, executed the retainer and payment plan contract, and provided bank ACH information, LPG was responsible for servicing the client file. To this end, LPG utilized software such as DebtPayPro ("DPP") and, more recently, cobbled together a less efficient proprietary software known as LUNA to automate the dispute process, facilitate client communications, and track payment information. For instance, the correspondence sent on behalf of clients to creditors, collection agencies, and/or credit bureaus are automated and generic templates sent via U.S. Mail, facsimile, and/or email. Some cases resulted in the disputed debt being corrected on the client's credit report, some resulted in successful challenges based on consumer protection laws, and others resulted in debt settlement, which the client is responsible to pay in addition to the payment plan. In limited instances, LPG would file a lawsuit in an effort to eliminate a disputed debt. Creating proprietary systems such as LUNA also facilitated Diab's scheme and LPG's fraudulent transfers of client files, ACH information, and ACH debit processing to Phoenix; Prime Logix; Greyson; CLG; Oakstone; Touzi; Eng; Teracel; PECC; and Guardian among others as alleged in the 5th Amended Complaint.

41.    LPG mismanaged the consumers' monthly payments.

42.    Diab and other related parties devised a plan to fraudulently transfer funds, client files, client funds and assets in the form of ACH Receivables (the "ACH Receivables" or "Accounts Receivable") out of LPG.

43.     To obtain consumer clients, LPG contracted with marketing companies/Marketing Affiliates, who knowingly engaged in illegal capping and would advertise or call to solicit consumers to become clients of LPG in exchange for payment of a percentage of the ACH Receivables collected by LPG from the consumers.

44.     Diab and others at LPG had conversations with various Marketing Affiliates/their principal owners about the illegal nature of the agreements that LPG had with them, but the Marketing Affiliates knowingly proceeded with the illegal agreements. In some instances the Marketing Affiliates would generate fraudulent invoices to conceal the illegal nature of their fee-sharing agreements with LPG.

45.     The marketing companies would advertise to or call to solicit the consumers to become clients of LPG.

46.     Because LPG received payments from consumers over time, it often sought financing by borrowing against its future cash flows. This borrowing was not only used to finance operations at LPG, but also to pay the fees owed to the marketing companies for providing the client referrals.

47.     Many of the documents executed in connection with such financing described the transactions as accounts receivable purchase agreements.

48.     From its' inception and continuing through the Petition Date, LPG entered into agreements with the Marketing Affiliates ("Affiliate Agreement"). A true and accurate copy of an Affiliate Agreement is attached as Exhibit 1, and incorporated herein as an example of the same.

49.     The Affiliate Agreements stated that the Marketing Affiliate "owns and operates a system of generating leads consisting of consumers interested in the legal services offered by LPG." See Exhibit 1.

50.     Pursuant to the Affiliate Agreement, the Marketing Affiliates generated leads consisting of consumers interested in the legal services offered by LPG and referred those consumers to LPG. See Exhibit 1.

51.     The Marketing Affiliates often went so far as to assist with the execution of an engagement letter with the consumer. See Exhibit 1.

/ / /

52.    For example, pursuant to the Affiliate Agreements, LPG agreed to pay Marketing Affiliates as follows:

Affiliate shall be entitled to receive the following as full and complete compensation for its services to LPG: LPG shall pay $1500 plus an amount equal to the client's first payment per file for each file that Affiliate places with LPG. LPG shall be obligated to pay Affiliate $1,000 upon delivery of file and $500 plus an amount equal to the client's first payment when the client's first successful monthly payment clears. LPG shall remit Fees on a weekly basis via wire transfer. Fees shall be paid by LPG on Mondays (unless Monday is a bank holiday, and then payment shall be due and payable the next business day) for all billable files from the previous week. All files are subject to a chargeback policy. If an enrolled client's first monthly payment fails to clear, the disbursed portion ($1,000) for that enrolled client will be charged back to the Affiliate. (If that same enrolled client reschedules payment, and such payment clears, Affiliate will be credited back, same amount.) If any consumer cancels LPG's services, or demands a refund for payment for such services, or both, then LPG shall be solely responsive for such cost and Affiliate shall not have to share such expense. LPG has exclusive discretion to grant or deny a requested refund or cancellation. Finally, LPG may treat a consumer's failure to remit payment in a timely manner as a cancellation of the legal services agreement executed by consumer with LPG and has sole discretion to make such determination.

See Exhibit 1.

53.    The Marketing Affiliates all knew that the Affiliate Agreements violated Sections 6151 and 6155 of the California Business and Professional Code, which prohibited referrals of potential clients to attorneys unless registered with the State Bar of California.

Accounts Receivable Purchase Agreement with Marketing Affiliates.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

54.     Marketing Affiliates would purport to enter into, or negotiate to enter into, an Accounts Receivable Purchase Agreement for the purchase of account receivables procured for Debtor ("ARPA 1"). Debtor consented to and approved the assignment contemplated in the ARPA 1 despite knowing that the Marketing Affiliates' receivables were the product of illegal fee-sharing contracts. The ARPA 1 is also consistent with LPG's practices with other defendants with whom LPG had express capping agreements. A true and accurate copy of an ARPA 1 is attached as Exhibit 2, and incorporated here.

55.     LPG, through Diab and others, entered into many ARPA agreements and/or other agreements ("ARPA Agreements") supporting and evidencing the procurement of client files for Debtor and/or the sale of accounts receivable from Debtor's client files.

56.     Pursuant to the ARPA Agreements, the Marketing Affiliates purported to sell streams of monthly payments from consumers that were supposed to be held in trust until earned. See Exhibit 2.

57.     By entering into the ARPA Agreements, Debtor and the Marketing Affiliates violated federal and state laws by selling unearned legal fees or funds there were supposed to be held in trust or used for the benefit of consumers.

58.     Diab, the Marketing Affiliates, and the principles for the Marketing Affiliates, discussed the "illegality" of these agreements at length and devised various ways in which to mask this illegality. Among those efforts were fraudulent Marketing Affiliate invoices that suggested payment for services rendered and mechanisms for the flow of money that avoided direct transactions between the law firm (LPG) and the Marketing Affiliate by utilizing third parties.

59.     The effect of the ARPA Agreements was to accomplish an unlawful purpose. Thus, the agreements may be declared illegal regardless of the intention of the parties. Stockton Morris Plan Co. v. Cal. Tractor & Equip. Corp., 112 Cal. App. 2d 684, 690 (1952) (citing Fewel & Dawes, Inc. v. Pratt, 17 Cal. 2d 85, 91 (1941)). This remains true regardless of whether the contract has been performed. Stevens v. Boyes Hot Springs Co., 113 Cal. App. 479, 483 (1931) (A contract by a corporation to purchase its own stock has the effect of illegally withdrawing and paying to a stockholder a part of the capital stock of the corporation and is illegal and void, regardless of the fact

14

that the contract is fully performed by the sellers and partially performed by the corporation.); Mansfield v. Hyde, 112 Cal. App. 2d 133, 139 (1952), overruled, Fomco, Inc. v. Joe Maggio, Inc., 8 Cal. Rptr. 459 (1960) (Where object of statute requiring licenses is to prevent improper persons from engaging in particular activity, or is for purpose of regulating occupation or business for protection of public, imposition of penalty amounts to prohibition against engaging in occupation or business without license, and contract made by unlicensed person in violation of statute is invalid.); Firpo v. Murphy, 72 Cal. App. 249, 252 (1925) (A contract to pay commissions to a Reale estate broker is illegal and he is not entitled to recover thereon where he fails to secure the license required by law to carry on his business.).

60.    Because the ARPA Agreements violated federal and state laws, they were void, unenforceable, and subject to avoidance as fraudulent. Any alleged consideration provided to Debtor under the ARPA Agreements was unlawful.

61.    Unlawful consideration is that which is: "(1) contrary to an express provision of law; (2) contrary to the policy of express law, though not expressly prohibited; or (3) otherwise contrary to good morals." Cal. Civ. Code § 1667. "If any part of a single consideration for one or more objects, or of several considerations for a single object, is unlawful, the entire contract is void." Cal. Civ. Code § 1608.

62.    During the applicable reach-back period, LPG paid Marketing Affiliates millions of dollars, under the above scheme of illegal agreements, including but not limited to the following Marketing Affiliates and amounts, if known: See Exhibit 5 attached hereto.

Accounts Receivable Purchase Agreements with MCA Lenders

63.    Because LPG received only incremental payments over a period of time, LPG would enter borrow against its future cash flow from "MCA Lenders,"

64.    Under their agreements, the MCA Lenders would provide an amount to Debtor and obtain a promise to pay over an amount of time, a much higher amount, sometimes with an interest rate of 140% to 200%.

/ / /

/ / /

15

65.    The Debtor borrowed against its future ACH Receivables by purporting to transfer them to MCA Lenders and others pursuant to "MCA Agreements" or similar transactions.  LPG transferred the same ACH Receivables multiple times.

66.    Given that a substantial portion of Debtor's ACH Receivables were transferred multiple times, there were more claims for payment from any one ACH Receivable in a given month than the receivable would generate in that month.  Thus Debtor engaged in a scheme to defraud its creditors by transferring client funds in the form of future Accounts Receivable to various fraudulent conveyance partners, including the lenders under the MCA Agreements, as alleged in the various adversary proceedings brought by the Trustee.

67.    Traditional merchant cash advances are a variation on "factoring" where a merchant sells a discounted portion of its accounts receivable, and the purchaser receives in return the actual income from the accounts receivable it purchased.  The amount paid to purchase the receivables is lower than the expected income thereby giving the seller a source of cash while losing the long-term benefit of the accounts receivable.

68.    The MCA Agreements, however, were loans, not purchases of accounts receivable. The reason for characterizing the transactions as a "purchase" rather than a loan was to avoid the application of usury laws.

69.    Under the MCA Agreements, LPG did not sell or transfer the Accounts Receivable to the MCA Lenders.  Instead, although LPG ostensibly promised to pay in future income to MCA Lenders, the obligation to collect the receivables and the risk of non-payment of the receivables remained with LPG at all times.  These transactions were loans, not sales, because under the MCA Agreements, MCA Lenders bore no risk of ownership of the subject receivables, among other reasons. Terms of MCA Lenders' MCA Agreements with LPG

70.    LPG would enter into various MCA Agreements, with the various MCA Lenders.  One example is the rue and complete copy of an MCA Agreement with MCA Capital, attached as Exhibit 3 ("6/14/21 MCA Agreement", and is incorporated herein).  The terms of the 6/14/21 MCA Agreement are typical of the MCA Agreements the Debtor would enter into:

/ / /

16

| | |
|---|---|
| Purchase Price: | $250,000 |
| Purchased Amount: | $374,750 |
| Net Funds Provided: | $225,000 |
| Specified Percentage: | 25% |
| Daily Remittance: | $12,491.66 |
| Term: | 30 business days ($374,750 / $12,491.66) |

71.    The stated effect of these terms is that in exchange for $250,000, MCA Capital would receive $374,750 in 30 business days, or a return of $124,750 on its $250,000 (49.9%) in just six weeks.  The 25% Specified Percentage is not an actual number of the Daily Remittance as a percent of LPG's receivables. Rather, the term is only included to help disguise this high interest loan as a purchase of receivables.

72.    The actual effect of the MCA Agreements is even more onerous because the agreements provide for "Additional Fees" that included, among others, a fee to cover underwriting and an ACH debit program.  Thus, the Net Funds Provided in the example above were only $225,000 for the $374,750 that MCA Capital would receive, giving MCA Capital a return of $149,750 (66.5%) on its investment in only six weeks.

73.    The transactions entered into pursuant to the MCA Agreements constituted loans with a usurious interest rate that was not made in the ordinary course of LPG's business.

74.    Under the terms of the MCA Agreements, MCA Lenders were receiving repayment for their loans through debits to Debtor's bank accounts as reflected by "Daily Remittances."  The MCA Lenders were not responsible for collecting the Accounts Receivable and thus had not purchased the specified receivables but, instead, had made a loan to the Debtor.

75.    The discrepancy between the interest rate determined pursuant to the terms of the MCA Agreements and the actual amount owed as a result of the Underwriting Fee being deducted from the Purchase Price is further indication of a loan.

/ / /

/ / /

/ / /

76.    MCA Lenders required personal guaranties from Debtor's principals and filed a UCC-1 Financing Statement in an attempt to perfect the security interest Debtor granted to it, again indicating that the MCA Lenders had not assumed the same risk of loss as the Debtor, and reflecting that the transaction was a loan.

77.    Because the MCA Agreements violated federal and state laws, they were void, unenforceable, and subject to avoidance as fraudulent.  Moreover, even if the MCA Agreements were not void for being unlawful, Debtor received less than reasonable equivalent value in exchange for incurring the purported obligations.  As such, Debtor's obligations under the MCA Agreements are avoidable as fraudulent transfers.

78.    During the applicable reach-back period, LPG paid MCA Lenders millions of dollars, under the above scheme of illegal agreements, including but not limited to the following MCA Lenders and amounts, if known, contained in Exhibit 6 attached hereto.

79.    To facilitate the transfer of ACH Receivables to Marketing Affiliates, Diab used entities he controlled including, without limitation, Vulcan, Coast Processing, Prime Logix, Maverick and/or Validation Partners LLC ("Validation Partners"). Diab would use numerous ACH processing companies to transfer millions of dollars from Debtor to entities he controlled, without oversight or detection, and to avoid payment disputes and complications.

80.    LPG transferred ACH receivables from client files in this fashion in order to defraud creditors in what amounted to a pyramid and/or "Ponzi" scheme. The same ACH receivable that had been transferred to one creditor was transferred to a subsequent creditor in order to satisfy the obligation to the prior creditor, thereby creating a "Ponzi" scheme of receivable sales.

81.    As alleged in the 5th Amended Complaint, Diab and LPG pledged or transferred ACH receivables in such a manner, often times pledging or transferring  the same ACH receivables to multiple entities including Touzi, PECC, Teracel and Eng, among others, in order to defraud creditors, pay prior creditors in a Ponzi scheme.

/ / /

/ / /

/ / /

### G.    **DIAB'S ADMITTED ACTIONS**

82.    Diab and his co-conspirators, including but not limited to Loli, Eng, Touzi, Teracel and PECC, caused thousands of LPG client files and/or their associated ACH receivables to be fraudulently transferred, sold, or both. In many instances, these ACH receivables were transferred and/or sold several times over to investors, MCA Lenders, Diab's non-debtor Alter Egos (defined below), and others.

83.    The largest purchaser of ACH receivables from Debtor was Validation Partners, LLC ("Validation"). Between August 30, 2021 and August 17, 2022, Validation Partners spent $66,000,000 to purchase accounts receivable from LPG and 58 of LPG's marketing affiliates. In total, Validation Partners purchased over 40,000 accounts from LPG and its affiliates with a notional value greater than $400,000,000 during this time period.

84.    Diab and others implemented and facilitated such a scheme in order to hide and hinder the discovery of LPG assets in order to continue receiving and using LPG client funds while shielding the same from the mounting number of creditors pursuing LPG.

85.    All of LPG's client files and ACH receivables were transferred to avoid and defraud its creditors and abscond with client files and ACH funds without any knowledge or consent by LPG creditors or clients.

### H.    **DIAB'S CONTROL OVER LPG'S PAYMENT PROCESSING**

86.    LPG's monthly revenue from client files was primarily received via ACH debit, a payment that automatically drafts from a client's bank account. In order to process ACH payments, LPG was required to enlist the services of ACH payment processing companies who handle high risk transactions. In this regard, Diab had enlisted numerous ACH processing companies in order to easily and quickly transfer millions of dollars of LPG funds to entities he controls, including but not limited to Vulcan, Prime Logix, and/or Coast Processing, generally in less than three days from an ACH pull, without oversight and detection and to avoid payment disputes and complications with the vendor itself. Notably, LPG does not have service contracts with EPPS or Marich Bein ("Bein"), among potential others who have processed the majority of LPG's ACH payments. The side deals between Diab and Bein, created to avoid a lawsuit against LPG, evidence Diab's continued influence and

1  control over the companies processing LPG and Diab's alter egos' ACH EFTs – property of the

2  Estate.

3        87.     LPG's monthly debit of client payments has, pre-petition, ranged between $8.4 million

4  to $11.2 million per month from May 2022 through September 2022. This amount was substantially

5  reduced in April 2022 due to the unauthorized debit of $12 million from LPG clients by Solomon

6  Feig and Shia Dembitzer on behalf of World Global, an MCA lender that was processing LPG client

7  payments from July 2021 to April 2022. In March 2022, LPG had debited more than $14 million in

8  client payments, a figure it would not reach again until November 2022 due to the impact of the

9  unauthorized payments in April 2022. It is estimated that, as of the Petition Date, the monthly debits

10  from LPG client accounts exceeded $15 million dollars. LPG was not accumulating any cash on hand

11  and only had $4,500 in its bank account on the Petition Date. The balance in Diab's alter ego bank

12  accounts holding LPG client funds as of the Petition Date is unknown.

13       **I.**     **LPG'S PREPETITION CREDITORS**

14        88.     In addition to the financing provided by the MCA Lenders, LPG, through Diab and

15  others, obtained financing directly from other sources. All these sources of financing are among the

16  creditors scheduled by the Debtor.

17        89.     On the Debtor's Schedule D [Bankr. Docket No. 33], the Debtor listed three secured

18  creditors – (a) Diverse Capital, LLC with a claim in the amount of $1,224,810, (b) City Capital NY

19  with a claim in the amount of $2,950,000, and (c) Fundura Capital Group with a claim in the amount

20  of $2,100,000 (together, the "Secured Creditors") – with secured claims totaling $6,274,810. As of

21  September 1, 2022, fourteen (14) separate UCC-1 statements were of record securing debts of the

22  Debtor. These statements remained unreleased as of the Petition Date. Further, these statements either

23  reflected secured liens against the Debtor's assets then owned, or thereafter acquired, or provided

24  evidence of the assignment or sale of substantial portions of the Debtor's future income. When the

25  fraudulent transfers were made, these prior UCC-1 statements secured the repayment of the following

26  claimed amounts that are currently known to Trustee and are allegedly owed by the Debtor: (i)

27  $2,374,004.82 owed to Fundura Capital Group as evidenced by Proof of Claim No. 335, filed in the

28  Bankruptcy Case, purportedly  secured by a UCC-1 statement filed on or about May 19, 2021; (ii)

1 approximately $15 million dollars owed to MNS Funding, LLC as evidenced by Proof of Claim No.

2 1060 purportedly secured by a UCC-1 statement filed on or about May 28, 2021; (iii) approximately

3 $5,000,000 owed to Azzure Capital, LLC as evidenced by Proof of Claim No. 127 secured by a UCC-

4 1 statement filed on or about May 28, 2021; and (iv) approximately $1.5 million dollars owed to

5 Diverse Capital, LLC purportedly secured by UCC statements filed on or about September 15, 2021,

6 and December 1, 2021.

7         90.     In addition, on the Debtor's Schedule E/F [Bankr. Docket No. 33], the Debtor

8 scheduled 11 unsecured creditors with priority unsecured claims totaling $374,060.04. These priority

9 unsecured creditors include Indiana Department of Revenue, Washington Department of Labor and

10 Industries, Arizona Department of Economic Security, Arkansas Department of Finance and

11 Administration, California Franchise Tax Board, Georgia Department of Labor, Internal Revenue

12 Service, Mississippi Department of Revenue, Nevada Department of Taxation, Utah State Tax

13 Commission, and Wisconsin Department of Revenue (collectively, the "Priority Unsecured

14 Creditors").

15         91.     By August of 2022, LPG's need for capital was so severe that it began borrowing funds

16 through a loan broker named Spot On Consulting, Inc. ("Spot On").  Upon information and belief,

17 Spot On would facilitate loans to LPG from individuals and corporations – sometimes for as little as

18 $5,000 – in exchange for a ten percent (10%) commission on the principal amount of the loan.  LPG

19 would then typically promise to pay each lender as much as eight percent (8%) interest per month on

20 the principal balance for twelve months and would then repay the original principal amount at

21 maturity.

22         92.     The claims bar date has now passed, in the Bankruptcy Case, and approximately

23 $500,000,000 in claims were filed against the Debtor.

24         93.     Another group of creditors that the Debtor listed on its Schedule E/F [Bankr. Docket

25 No. 33] are nonpriority unsecured creditors. Those 58 creditors have scheduled claims totaling

26 $141,439,158.05 and include Ajilon; Anthem Blue Cross; Azevedo Solutions Groups, Inc.; Carolina

27 Technologies & Consulting Invoice; Collaboration Advisors; Credit Reporting Service Inc.; CT

28 Corporation – Inv.; Debt Pay Pro; Document Fulfillment Services; EnergyCare, LLC; Exela

1  Enterprise Solutions; First Legal Network, LLC; GHA Technologies Inc.; Harrington Electric, Inc.;

2  Imagine Reporting; Juize, Inc.; Krisp Technologies, Inc.; Liberty Mutual; Marc Lemauviel – Allegra;

3  MarkSYS Holdings, LLC; Netsuite-Oracle; Pitney Bowes; Rapid Credit, Inc.; SBS Leasing A

4  Program of De Lage Landen; Security Solutions; Sharp Business Systems; Streamline Performance,

5  Inc.; Thomson Reuters; Twilio, Inc.; Nationwide Appearance Attorneys; Executive Center, LLC;

6  Outsource Accelerator, Ltd.; TaskUs Holdings, Inc.; Marich Bein, LLC; Validation Partners; MC

7  DVI Fund 1, LLC; MC DVI Fund 2, LLC; Debt Validation Fund II, LLC; Tustin Executive Center;

8  LexisNexus; JP Morgan Chase; Business Centers of America; Michael Schwartz; Anibal Colon Jr.;

9  Kathleen Lacey; David Ulery; Kimberly Birdsong; Kevin Carpenter; Karen Suell; Gloria Eaton;

10  Carolyn Beech; Debra Price; Kenneth Topp; Darcey Williamson, Trustee; James Hammett; Johnny

11  Rizo; Beverly Graham; Kathleen Scarlett; and Geneve and Myranda Sheffield (collectively, the

12  "Nonpriority Unsecured Creditors" and, together with the Secured Creditors and Priority Unsecured

13  Creditors, the "Prepetition Creditors").

14    **J.    LOLI & WOOD AIDED DIAB IN PERPETUATING HIS SCHEME**

15    94.    Prior to the fraudulent transfers discussed herein, Loli worked closely with Diab at

16  LPG.

17    95.    In or around August 2022, LPG started to receive threats of litigation and cease and

18  desist letters from LPG creditors, including but not limited to Validation Partners. In order to separate

19  LPG client files from ACH debits and protect Diab's stream of money, Loli and Diab began using

20  Prime Logix, formed in or around May 2022, to redirect LPG client payments. Prime Logix would

21  receive LPG client payments that had been processed by Bein and would use those funds to operate

22  without the knowledge or consent of LPG's clients or creditors.

23    96.    In or around October 2022, Loli was involved in making sure Diab remained hidden

24  behind the scenes and that his name was removed and kept off all files being transferred or intended

25  to be transferred to other entities, including but not limited to emails instructing attorneys not use the

26  name "Tony D" on any files, instructing employees not to use the name Tony in any file notes in DPP

27  or any email communications. Instead, employees were instructed to use "Atty" or "General

28  Counsel."

97.    In or around January 2023, after creditors had filed suit and were seeking the appointment of a receiver over LPG, Diab began to implement his scheme to fraudulently transfer LPG's client files and their associated ACH debits with the assistance of Loli, Matt Buchner, Keneth Hu, and Reid Wood ("Wood") (collectively referred to as the "Co-conspirators") among others. In addition, and in order to facilitate these transfers, Diab, Eng, Loli, Han Trinh  ("Han"), and Jayde Trinh ("Jayde"), among others, created entities including Phoenix, Oakstone, Greyson, Consumer Legal Group, Guardian Processing, and Maverick Management.

98.    During the fraudulent transfer period, the Co-Conspirators had knowledge of, aided, conspired, and were complicit with Diab in using and transferring LPG assets including client files, ACH debits, funds and other LPG assets and proprietary information to Phoenix, Oakstone, Guardian, Greyson, LGS Holdco, Consumer Legal Group and Bein, among other fraudulent transferee entities alleged in the 5th Amended Complaint.

99.    In or around January 2023, Diab and Loli formed Maverick to manage the funds, payments and transfer of funds between the fraudulent transferee entities and eventually be the successor to Prime Logix in controlling all ACH processing and funds for all or some of the newly created fraudulent transferee entities.

100.    In addition to running Prime Logix, which controlled the receipt of funds, Loli was also charged with running Maverick who controlled the distribution of LPG funds. In essence, Loli was Diab's gatekeeper for his golden goose, ACH debits. Per Diab's instructions in written communications, without Loli's approval, none of LPG's funds were to be sent out. In this regard, even when the accounting department at Maverick was required to make payments and send wires to cover liabilities that needed to be paid to avoid disruption at Greyson, Phoenix or other entities without Loli's authorization, Diab reprimanded the employee insisting that no payment be made under any circumstances until Loli approves.

101.    The purpose of Diab and Loli's work-flow was to ensure: 1) LPG funds were used to operate the fraudulent transferee entities; and 2) that sufficient LPG funds in these separated bank accounts would cover selective debt obligations, including payments to favored affiliates and MCA Lenders for the benefit of fraudulent transferees in which Diab had an indirect interest, including

Phoenix, Oakstone, Consumer Legal Group, Maverick Management, Prime Logix, Guardian Processing, and LGS Holdco.

102.     In her role at Prime Logix, Loli was in charge of and complicit with Diab in all fraudulent transfers of LPG client files and ACH debits, including post-petition ACH debits of LPG clients through Revolv3, among other ACH processing platforms and NACHA approved banks. Loli intentionally transferred LPG client files, ACH debits and funds to Prime Logix, among other entities. Loli negligently failed to ensure that all clients whose files and ACH receivables were transferred to and/or processed by Prime Logix provided written authorization for not only the transfer of their file but also written authorization for Prime Logix to initiate the ACH transactions on their bank account or debit cards.

103.     In her role at Maverick, Loli was the gatekeeper charged by Diab with approving all fraudulent transfers of LPG funds from Prime Logix and LGS Holdco, among other bank accounts, to the proper fraudulent transferees, affiliates and creditors.

104.     Loli's efforts to aid Diab, however, went beyond fraudulently transferring LPG and Estate funds. Loli was also involved in and assisting Diab in ensuring LPG's most valuable assets - its employees and network of attorneys - signed on with Diab's new entities including Greyson, Phoenix, Oakstone and Consumer Legal Group, among others. To this end, Loli recruited prior LPG employees in critical roles including attorneys and "settlement officers."

105.     Loli and Diab, , among others, had access to and were using copies of the ACH data, client file data and other LPG proprietary data, after the Petition Date, that the Preliminary Injunction prohibited them from accessing and using in order to accomplish Diab's scheme to defraud creditors and harm LPG's Estate and rebuild LPG under the rouse of competition.

106.     Loli was aiding, assisting and/or heading a new entity or entities, including but not limited to Legacy Law Partners, now known as Summit Law Partners, as part of Diab's scheme designed to and causing harm to LPG's Estate in an effort to recapture LPG's ACH debits through fraud, misappropriation of LPG assets, proprietary information and client data after the Petition Date.

107.     Loli has received substantial assets, compensation and other benefits belonging to LPG as a result of her involvement in Diab's fraudulent scheme to transfer LPG client files, funds, assets

and proprietary information. As a proximate cause of the wrongful conduct discussed above, LPG's Estate and creditors have suffered substantial damages to which Trustee is entitled to and seeks to recover, from Loli and others and through this Stipulation with Diab.

Post-Petition Date Actions by Jayde and Han

108.    Prior to the Petition Date, Jayde and Han had begun working with Eng and Oakstone, and continued to manage and interact with LPG's network of attorneys as part of their duties for Oakstone, which was paying substantial compensation for such work. This work that was not being done for LPG, but rather for Oakstone, which was servicing roughly 15,000 fraudulently-transferred LPG clients.

109.    This work was performed inside of Oakstone's systems, which included the LUNA CRM and other systems established and managed by Eng.  LPG's CRM - DebtPayPro – was no longer accessible as that CRM was shut down on March 17, 2023, three days prior to the filing of the Petition. Thus, the work performed by Han and Jayde was for Oakstone and was in the systems established by Oakstone.

110.    LPG was not the one responding to clients as of March 2023 and beyond.   The responding entities were Oakstone, Consumer Legal Group, and Phoenix.

111.    Diab asked Han and Jayde to continue their work for clients at Oakstone. No work was being performed at or for benefit of LPG, but rather for a fraudulent transferee and competitor of LPG.

Post-Petition Date Actions by EZ and Hinson

112.    Another Diab alter ego, EZ, was set up by Diab and one of his former LPG employees, James Hinson ("Hinson"), in September of 2022.

113.    Diab controlled everything EZ did, including EZ's bank accounts.

114.    Hinson was a day-to-day manager of EZ.

115.    EZ operated similarly to the other Diab alter egos.

116.    EZ had an affiliate agreement with CLG.

117.    EZ's operative lifespan was less than a year. It effectively shut down a couple months after the Petition Date.

118.    However, before shutting down, EZ received $104,000 in pre-Petition Date transfers from LPG, all inside the preference window.

119.    EZ also received $100,396.41 in pre-Petition Date transfers for payroll (of which $93,544.41 were during the preference period).

120.    EZ also received an additional $49,300 in post-Petition Date transfers.

121.    Total of all transfers to EZ were not less than $253,696.41.

122.    Hinson also directly received approximately $66,720.00 from the Debtor/EZ.

**K.    FRAUDULENT TRANSFERS AND DOUBLE PULLS BY DEFENDANTS TOUZI, ENG, AND TERACEL**

123.    Eng, along with Touzi, Teracel and PECC (all of which are controlled by Eng), were in business with and acting in concert with Diab as early as 2021, if not earlier, as evidenced in bank records produced by Optimum Bank showing hundreds of thousands of dollars being transferred from LPG to Touzi and PECC.

124.    After selling ACH receivables to Validation Partners and others, discussed above, Diab caused LPG to transfer receivables to a number of different entities at the direction of Eng, including Touzi, Teracel and PECC, entities Eng owned, controlled and dominated. To wit, at the first meeting of creditors, Diab testified under oath that Eng, who owned PECC, had been "pushing for these files to be moved to a different entity." Mr. Diab said that Eng was pushing for this action given the pending lawsuits against the Debtor and fear of a receiver being appointed for Debtor. As a result of these discussion, Diab testified "we essentially agreed in January that we would move them [the files] to the destination that we chose[.]" The result of this agreement was the execution of certain Finance Agreement and Statements, which resulted in the creation of Oakstone Law Group, PC, which was intended to house and service those files identified in the Finance Agreement and in the transfers to Teracel, PECC and others.

125.    Approximately 719 files were transferred to Teracel, an entity owned, controlled and operated by Touzi, which in turn is headed by Eng and his brother Heng, and for purposes of this Stipulation, alter egos of one another including PECC, Touzi and Teracel. Out of the 719 files transferred to Teracel, 643 of those files had already been purchased by Validation Partners. All of

these files were transferred without consideration and without Validation Partners nor the client's

knowledge or consent. Despite LPG never receiving a payment from Teracel for the purchase of these

client files, the ACH receivables associated with those files were paid out directly to Teracel, which

is controlled, dominated and managed by Eng, Touzi and/or PECC and each of them.

126.    Diab further caused client files to be sold for either no and/or little or inadequate

consideration, to PECC, Eng and/or Touzi. By and through Eng, Touzi and Guardian, Defendants

PECC, Eng, Touzi and/or Teracel have initiated and retained funds resulting from LPG client ACH

transactions processed by Payliance pre and post-petition, including but not limited to approximately

$551,893.42 in ACH transactions as listed in Invoice No. 230602030241-389051, Invoice Date June

15, 2023 for the Invoice Period, post-petition from May 1, 2023 to May 31, 2023 for which Payliance

charged approximately $13,140.40 to process. Notably, the Payliance account used to process these

fraudulent ACH transactions is in both Guardian and Eng's name and are identified in the client's

bank statements as Touzi.

127.    Between late April and May 2023 and at all relevant times alleged above, Phoenix

began receiving complaints from LPG clients indicating that their monthly ACH debits were being

taken out twice (double pulls) causing the client's bank account to go negative and incur overdraft

fees among other charges. These LPG clients indicated Touzi and Guardian had both taken monthly

payments from their bank account in identical amounts. One LPG client reported his account had

been debited four times in one month. Phoenix tracked these double pull complaints by Touzi, Eng,

Teracel and Guardian in the chart attached as Exhibit A-1 to the Declaration of Christine Le [Dkt No.

159-1 in the Main Case]. Phoenix tracked over 50 different complaints from LPG clients being double

pulled totaling approximately $35,805.76 in fraudulent double pulls that Phoenix was made aware of.

This does not include double pulls that were not reported. Phoenix, and therefore the Debtor's Estate,

reimbursed many of these clients using Estate assets, however, approximately $16,660.16 in double

pulls and overdraft fees Phoenix was made aware of have not been credited or reimbursed to the

clients harmed by such conduct. On information and belief, the conduct alleged above by Eng, Touzi,

Teracel and Guardian have and continue to result in double pulls that have not been reported to

Phoenix or otherwise. Further, on information and belief, the Guardian account initiating the double

1    pulls complained of by LPG clients to Phoenix, is and at all relevant times was, the same account

2    invoiced by Payliance above and therefore under Eng's control who, as an alter ego of his many

3    corporate forms, is responsible for the harm caused.

4    **L.      FURTHER FRAUDULENT TRANSFERS AND CONVEYANCES TO DIAB**

5    **ALTER EGOS AND OTHER ENTITIES**

6    128.    In addition to diverting millions of dollars to third parties as alleged herein, Diab has

7    transferred LPG's entire business and ACH debits to non-debtor entities free of LPG's obligations to

8    its creditors. These non-debtor entities are alter egos of Diab and include Oakstone, Phoenix,

9    Consumer Legal Group, Vulcan Consulting, Prime Logix, Maverick Management, Guardian

10   Processing, LGS Holdco, Coast Processing, Strategic Consulting Solutions LLC, EZ Debt Relief,

11   Inc., among other non-debtor entities (collectively, the "Diab Alter Egos").

12   129.    As he did with LPG, Diab controlled and operated the Diab Alter Egos, despite them

13   being nominally owned by licensed attorneys who were in fact renting their license for unsustainable

14   salaries. This included Aryeh Weber for Consumer Legal Group, Scott Eadie for Oakstone, and Ty

15   Carrs for Phoenix.

16   130.    In addition to fraudulent client file and ACH receivable transfers to the Diab Alter

17   Egos, described above, Diab sold with little or no consideration or fraudulently transferred additional

18   LPG client files to Greyson and Consumer Legal Group without client consent in exchange for a right

19   to receive a percentage of the ACH debit stream generated by those files (the "Fraudulent

20   Transferees").

21   131.    In January and February 2023, Diab purchased a shell corporation and the website

22   domain phoenixlaw.co and registered the business with the Better Business Bureau. Similarly, around

23   the same time, Diab set up Oakstone with his business partner Wes Thomas ("Thomas"), and Eng, to

24   run LPG's business through these new entities. The same had been done with Consumer Legal Group

25   in July 2022, which became another fraudulent transferee in January and February 2023.

26   132.    At or around the Petition Date, Diab admitted that LPG had transferred or sold

27   approximately 15,000 client files to Oakstone, 12,000 files to CLG, and the remaining files,

28   approximated at slightly less than 40,000, to Phoenix. Neither LPG nor Diab obtained consent prior

1    to fraudulently transferring the client files to these Diab Alter Egos and/or Fraudulent Transferees.

2    What Diab failed to admit, either at the 341(a) meeting of LPG or the June 12, 2023 evidentiary

3    hearing on the Trustee's motion for preliminary injunction, is that Diab had an indirect interest in

4    Oakstone, CLG, and Phoenix and stood to earn substantial sums from the operation of these law firms

5    in which Diab, a disbarred attorney, is unable to hold an ownership interest.

6         133.    LPG does not have an executed assignment contract for any of the transferred client

7    files to Diab Alter Egos and other entities. Client files and ACH receivables were transferred, pledged

8    and/or sold and resold to other Defendants, including but not limited to Teracel and PECC, among

9    others in furtherance of Diab's scheme to defraud creditors, hide and abscond with LPG assets,

10    namely the value of monthly ACH debits.

11         134.    Diab, Loli, and the same group of partners that ran LPG, post-petition, syphoned

12    money by using (1) LPG's ACH processing accounts at FIS Worldpay ("FIS") (access to which

13    processing platform was sold by Nathan Johnstone of Revolv3) that identify "Tony Diab" as the user

14    of the account (which was Diab) and LPG as the merchant account holder, and (2) Consumer Legal

15    Group's account at BCB Bank. LPG's FIS account indicates that, from March 28, 2023 through May

16    19, 2023, Diab netted between $6 million and $9.3 million dollars and transferred such funds to Diab's

17    Alter Egos or Fraudulent Transferees from this one ACH processing company alone. An additional

18    $3 million was processed by BCB Bank and transferred to Prime Logix, Maverick, Consumer Legal

19    Group, and Bein.

20         135.    Further, Diab, Loli, Wes, Eng, Heng, and/or Touzi have used other ACH processing

21    companies including Payliance (using a Guardian merchant account), among others, to process and

22    transfer property of the Estate through Diab's Alter Egos and Fraudulent Transferees, discussed

23    above. With this money, Diab issued payroll from an account held by Vulcan. Clients who requested

24    a refund after their file was transferred to Phoenix were refunded by and through accounts held by

25    Prime Logix and Vulcan, which Diab and Loli controlled. Diab and Loli among others have used

26    Diab's Alter Egos and the Fraudulent Transferees to re-direct LPG funds for his own personal gain

27    and avoid the protections afforded creditors and the Estate under the Bankruptcy Code.

28    / / /

29

136.    Collectively, the client files, ACH debits, ACH receivables and income received therefrom, and funds transferred to Defendants, the Diab Alter Egos and Fraudulent Transferees, are collectively referred to herein as the "Transfers."

137.    On or after the date that such Transfers were made, entities to which the Debtor was indebted include the Prepetition Creditors.

138.    The source of the client files, ACH debits, ACH receivables, and funds that are the subject of the Transfers are that of the Debtor.

139.    Diab among others, retained possession and control of the client files, ACH debits, ACH receivables, and funds transferred to the Diab Alter Egos and Fraudulent Transferees or elsewhere after the Transfers.

140.    By creating several entities including the Diab Alter Egos and transferring client files, ACH receivables, and funds to such entities, Diab endeavored to conceal the files, ACH receivables, funds, and Transfers, including those to the Fraudulent Transferees.

141.    Diab among others, made the Transfers, including those to PECC, Teracel, Touzi, Eng and/or Heng, among others as alleged herein, after LPG faced multiple lawsuits including those initiated by Validation Partners and MCA Lenders.

142.    Validation Partners initiated a lawsuit on September 20, 2022 (Case No. 30-2022-01281911-CU-BC-CXC) in the Superior Court of California, County of Orange. DVF II also filed a lawsuit on January 23, 2023 (Case No. 30-2023-01303355-CU-CO-CXC) in the Superior Court of California, County of Orange. Notably, the lawsuits sought the appointment of a receiver to perform many of the same duties of the Trustee and obtain information, an accounting of LPG funds, assets and ACH debits and maintain the status quo, among other relief, pending the outcome of the litigation.

143.    The client files, ACH receivables, and funds that were subject to the Transfers constitute substantially all of the Debtor's non-exempt property. In other words, the Transfers were of substantially all of the Debtor's assets.

144.    The Transfers were made by Diab and Loli, among others, to insiders, Diab Alter Egos that are and/or were at all relevant times under Diab's control and the Fraudulent Transferees.

/ / /

145.    In addition, a substantial portion of LPG's client files, ACH debits and/or ACH receivables were transferred to multiple Defendants in the Adversary in order to defraud creditors, and to hide, hinder and abscond with LPG assets. This resulted in double pulls on client files causing harm not only to Debtor's Estate but the individual clients themselves, which in turn diminished the Debtor's Estate through loss of clients.

146.    In addition, the Debtor received little to no consideration for the Transfers and/or double Transfers.

147.    At the time of these Transfers, Debtor was insolvent. The Debtor scheduled $141,813,219.09 in total debt to Prepetition Creditors. And although the Debtor's schedules state that it had $12,004,500 in assets; this amount cannot be correct, as LPG could not utilize ACH debits until earned.  Further, approximately $14,000,000 in LPG client payments were debited by Bein, which Bein is wrongfully withholding.

148.    Thus, the Transfers were made with actual intent to hinder, delay, or defraud creditors of the Debtor.

149.    The Transfers of the Debtor's client files, ACH debits, ACH receivables, and funds occurred within the two years prior to the Petition Date.

150.    Accordingly, the Transfers that Diab, among others, caused the Debtor to make should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(A), and such property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

151.    At the time of the Transfers, the Debtor received less than reasonably equivalent value in exchange for the Transfers.

152.    In many cases, the Debtor received no consideration for the Transfers.

153.    In addition, a substantial portion of LPG's client files and ACH receivables were transferred to multiple Defendants in the Adversary in order to defraud creditors, and to hide, hinder and abscond with LPG assets. This resulted in double pulls on client files causing harm not only to Debtor's Estate but the individual clients themselves, which in turn diminished the Debtor's Estate through loss of clients.

/ / /

154.    On or after the date the Transfers were made, the Debtor was not paying debts to the Prepetition Creditors as they came due.

155.    Thus, at the time of the Transfers, or as a result thereof, the Debtor either:

a.    was insolvent on the date the Transfers were made or became insolvent as a result thereof;

b.    was engaged or was about to engage in a transaction for which any property remaining with the Debtor was of unreasonably small capital;

c.    intended to incur or believed that it would incur debts beyond its ability to pay as such debts matured.

156.    Diab, Loli, and entities under the direct or indirect control of Diab and Loli, retained possession and control of the files, accounts receivable, and funds transferred to the Diab Alter Egos or elsewhere after the Transfers.

157.    By creating several entities including the Diab Alter Egos and transferring client files, ACH debits, ACH receivables, and funds to such entities, Diab had endeavored to conceal the client files, ACH debits, ACH receivables, funds, and Transfers.

158.    Diab and Loli, among others, made the Transfers after LPG faced multiple lawsuits including those initiated by Validation Partners and MCA Lenders.

159.    The client files, ACH debits, ACH receivables, and funds that were subject to the Transfers constitute substantially all of the Debtor's non-exempt property. In other words, the Transfers were of substantially all of the Debtor's assets.

160.    The Transfers were made by Diab, Loli, Han and Jayde, among others named herein, to insiders, Diab Alter Egos, and Fraudulent Transferees.

161.    The Debtor received little to no consideration for the Transfers.

162.    In addition, a substantial portion of LPG's client files and ACH receivables were transferred to multiple Defendants in order to defraud creditors and to hide, hinder, and abscond with LPG assets. This resulted in double pulls on client files by Touzi, Eng and Guardian among others causing harm not only to the Debtor's Estate but the individual clients themselves, which in turn diminished the Debtor's Estate through loss of clients.

163. As such, the Transfers left the Debtor with remaining assets that were unreasonably small in relation to the transaction.

164. Further, the Debtor was insolvent at the time of the Transfers or became insolvent as a result of the Transfers, the exact aim of Diab's scheme to bankrupt LPG in the event a receiver was appointed. On or after the date such Transfers were made, the Debtor was not paying debts to the Prepetition Creditors, all of which arose before the Transfers were made, as they became due.

165. Thus, the Transfers were made with actual intent to hinder, delay, or defraud creditors of the Debtor, as well as the duly appointed Receiver.

166. Thus, at the time of the Transfers, without receiving reasonably equivalent value in exchange for the Transfers, the Debtor either:

a. was engaged or was about to engage in a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction; or

b. intended to incur or believed or reasonably should have believed that the Debtor would incur debts beyond the Debtor's ability to pay as they became due.

167. The Transfers of the Debtor's client files, ACH receivables, and funds occurred within the four years prior to the Petition Date.

168. At all relevant times, the Transfers of the Debtor's client files, ACH receivables, and funds are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and California Civil Code sections 3439.04(a) and 3439.07 by one or more creditors who held and hold unsecured claims against the Debtor that were and are allowable against the Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the Prepetition Creditors.

169. Accordingly, the Transfers that Diab, among others, caused the Debtor to make should be avoided as fraudulent under 11 U.S.C. §§ 544(b) and California Civil Code sections 3439.04(a) and 3439.07, and such property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551 and California Civil Code section 3439.07.

170. Some or all of Diab's Alter Egos or Fraudulent Transferees had possession or control over property of the Estate, including but not limited to the files, accounts receivable, and funds, including LPG's Merchant Account at FIS where Diab has orchestrated the post-petition transfer of

33

in excess of $6,000,000 of Estate Property to entities owned and controlled by Diab and his associates/co-conspirators. None of those approximately $6,000,000 in post-petition payment assets have been turned over to the Trustee despite repeated requests for same, however, at this time Diab has cooperated with the Trustee in providing information and documents to trace/evidence some of the Transfers and Estate Property.

171.    The client files, ACH debits, ACH receivables, funds, funds refunded on account of Touzi, Guardian, Teracel, PECC and/or Eng's double pulls alleged herein and potentially other property are property of the Estate and are not of inconsequential value to the Estate.

172.    The client files, ACH debits, ACH receivables, and funds that are the subject of the Transfers were paramount to the operation of the Debtor and its ability to pay creditors.

173.    Accordingly, the Trustee is entitled to a judgment for turnover of the files, ACH debits, ACH receivable, and funds pursuant to 11 U.S.C. § 542.

174.    After the fraudulent transfer of LPG client files and nonpublic client information, Loli initiated electronic fund transfers ("EFT") from LPG client consumer accounts as the underlined terms are defined by 12 CFR 205.2(b) and (e) and 12 CFR 205.3. LPG's consumer client files and accounts that were transferred to Loli and Prime Logix were used to initiate unauthorized EFT / ACH transactions using nonpublic information as defined by 15 U.S.C. § 6809(4)(A). An ACH withdrawal transaction falls within the definition of an EFT as defined by 12 CFR 205.2 and 205.3.

175.    In Loli's role at LPG and Prime Logix, she owed Debtor, its clients and creditors a duty to follow all laws, rules and regulations regarding the transfer of consumer client files, consumer accounts, nonpublic client information and authorization requirements prior to initiating EFTs / ACH transactions on client accounts, including but not limited to:

a.    California Model Rules 1.17 and 1.17(b) requiring Loli to provide notice to each fraudulently transferred LPG client to opt out and/or provide written consent from each and every LPG client transferred prior to initiating the transfer at LPG, receiving the client file, ACH information and initiating ACH / EFT transactions on the fraudulently transferred client files at Prime Logix;

/ / /

b.      The Electronic Funds Transfer Act (15 U.S.C. § 1693 et seq.) and Regulation E requiring prior written authorization provided by the client and a copy of the authorization be provided to the client prior to initiating an EFT / ACH transaction that debit or credits a consumer's account. 12 CFR 1005.2, et seq; 12 CFR 1005.2(m); and 15 U.S.C. § 1693a(12).

c.      12 CFR 1005.10(b) that the entity initiating an ACH debit from a client account obtain written consent prior to initiating the withdrawal and provide a copy of the consent to the client;

d.      California Financial Code § 4050, et seq. (California Financial Privacy Act) prohibiting the dissemination or use of nonpublic client information without client consent by third party entities, including but not limited to Prime Logix, Maverick Management and Phoenix among others.  Cal. Fin. Code §§ 4051.5, 4052, and 4053;

e.      California Department of Consumer Affairs: Consumer Rights in Electronic Fund Transfers: Legal Guide CR-6 requiring written authorization by the client and a copy of which is provided to the client prior to the initiation of the EFT / ACH withdrawal; and

f.      NACHA (National Automated Clearing House Association) Operating Rules, Article II, Subsection 2.3, et seq. requires express written authorization prior to initiating a pre-arranged ACH payment and that such authorization be kept for two years after the date of the last ACH transaction. See also NACHA Operating Rules, Article II, Subsection 2.3.2.7.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

176.    On or between January 2023 and March 31, 2023, Diab, among others, caused over 40,000 client consumer files containing nonpublic client information to be transferred from LPG to Prime Logix and Phoenix, among other transfers to other entities without client consent. None of the clients transferred to Prime Logix and Phoenix were provided notice of the transfer of their client file or nonpublic client information until after it had already been completed by Diab and others in breach of the duties enumerated above. Further, none of the transferred clients provided consent to the transfer or for Prime Logix to initiate ACH transactions on their bank accounts and credit cards in breach of the duties enumerated above. In order to prevent clients from cancelling LPG's services and/or disputing charges initiated by Prime Logix, Diab and Loli continued to use LPG's ACH payment processor account at Revolv3 so that LPG continued to appear on client's bank statements in an attempt to disguise the unauthorized EFT transactions directly and proximately causing damages to the Debtor's Estate and consumer clients.

177.    As a direct and proximate cause of Diab and others conduct alleged herein, Debtor and its Estate have suffered substantial damages, loss of ACH debits, revenue and irreparable harm. Plaintiff is therefore entitled to seek damages for all fraudulent transfers and ACH transactions resulting from Diab and Loli's negligent conduct, jointly and severally, in an amount to be proven at trial.

**M.    ADDITIONAL    RELATED    ADMITTED    FACTS    REGARDING MISAPPROPRIATION/FRAUDULENT TRANSFERS OF DEBTOR'S FUNDS**

Fraudulent Transfers to Dovalina & Gilani

178.    Jason Dovalina ("Dovalina") and Sye Gilani ("Gilani") operated like partners of Diab at LPG.

179.    Gilani had a background in multiple debt entities that were shut down by enforcement actions by the Federal Trade Commission and Consumer Financial Protection Bureau.

180.    Dovalina ran sales floors for construction companies that would take advantage of government programs that were running out of steam.

181.    Dovalina and Gilani were involved in multiple transactions with Diab and LPG, many of which were in cash.

182.    In addition, Gilani had an American Express credit card registered to LPG on which he would make personal transactions that would be paid by LPG.

183.    In addition to investments, Dovalina and Gilani were receiving referral commissions on files onboarded to LPG through Validation LLC.

184.    For a period of several months, Dovalina and Gilani worked on LPG's customer service floor promoting retention of client files, but were eventually asked to leave the daily operations. Thereafter, they set up a separate sales floor with seed money from LPG called "A Solution Debt Relief."

185.    In addition to Dovalina and Gilani, the following entities are likely involved:

a.    JNR Service;

b.    PACE Construction;

c.    SideReale Entertainment Group

d.    Lifestar Products

e.    AZLS Enterprises

f.    A Solution Debt Relief.

186.    Dovalina, along with fraudulent transferee Trevor Young, have started a separate debt sales floor in Orange County at which they onboarded hundreds of clients to Consumer Legal Group among others.

N.    **DIAB'S POST-PETITION COOPERATION IN COLLECTING ASSETS OF THE ESTATE**

187.    Diab has begun cooperating with the Trustee and his professionals to provide documents and information that have assisted in and facilitated the Estate's ability to identify, trace, and in some situations, collect funds from various fraudulent transferees that has resulted in the return of Estate property to the Debtor/Estate.

/ / /

/ / /

/ / /

/ / /

37

188.    In connection with this cooperation, Diab has: (1) participated in several recorded interviews, each of which Diab consented to and which can be used as evidence in this action and other actions; (2) provided substantial documentary evidence in the form of emails, text messages and other documents/communications, all of which are true and correct copies of the said documents; and (3) provided information concerning the knowledge of certain individuals.

189.    Some of the funds recovered by the Estate, to date, are as follows:

a.    See Exhibit 4

I declare under penalty of perjury that the foregoing is true and correct and that this Declaration is executed at _Sunrise_, _Florida_ on April _8_ 2025.


_____
Tony Diab

# Exhibit 1

Exhibit 1
Page 1

DocuSign Envelope ID: 0096D9BE-5D6C-4BB5-A3CB-A4583DC17BD4

### The Litigation Practice Group PC - Affiliate Agreement

THIS AGREEMENT (the "Agreement") is made and effective as of the 3rd day of October, 2022 by and between The Litigation Practice Group PC ("LPG") and **Mpowering America, LLC.,** (hereinafter "Affiliate").

RECITALS:

LPG is in the business of providing a package debtor's rights services in the form of debt validation, consultation, and litigation defense through a network of attorneys licensed to practice law in all 50 states and the District of Columbia.  The legal services offered include:

-   Removal of invalid debts through correspondence directly with the three credit bureaus;
-   Validation of consumer debts through correspondence including disputes with original creditors, validation demands to third party debt collectors and assignees, and disputes with all three credit bureaus;
-   Defense of collection actions initiated by original creditors or third party assignees;
-   Negotiation of advantageous settlements of consumer debts both pre and post litigation;
-   Education of clients regarding federal laws applicable to consumer debt and credit reporting, and consultation regarding risk mitigation and litigation defense through its network of attorneys across the country.

Each of these services is offered without regard to the identity of the creditor or third-party debt collector or assignee.  LPG reviews all client files prior to the execution of the client's legal services agreement with the appropriate law firm, and maintains oversight through its administrative services over all file placements.

Affiliate owns and operates a system of generating leads consisting of consumers interested in the legal services offered by LPG.  Affiliate, acting in accordance with direction from LPG, shall obtain the names of Consumers and will market in a lawful manner, complying with the restrictions of the jurisdiction in which the consumer resides.  For consumers interested in utilizing LPG's services, Affiliate will assist LPG in having consumers execute an approved legal services agreement with a law firm to which LPG provides administrative support services, at which point consumers will become clients of that law firm, and that law firm will be exclusively responsible for and liable for the representation of consumers in the context of the provision of legal services.  Nothing in this Agreement nor in the eventual legal services agreement shall restrict Affiliate from offering any other service of any kind to consumer, including credit repair or debt relief programs.  Nor is Affiliate restricted from marketing on behalf of credit repair or debt relief entities, including but not limited to other law firms.  LPG and Affiliate hereby agree that any and all prior agreements entered into by LPG and Affiliate or any law firm to which LPG provides administrative support services and Affiliate are null and void and unenforceable, and this Agreement shall become the operative agreement for all files previously placed through the use of LPG's administrative support services.

Affiliate is being retained by LPG to provide marketing and customer service functions only.  All payments made to Affiliate are for services actually rendered, and do not constitute a revenue or fee sharing agreement.  The method used to determine the value of the services rendered by Affiliate to LPG were

Exhibit 1
Page 2

DocuSign Envelope ID: 009FD99E-5D5C-4B55-A3C4-...

selected by both parties based upon industry standard and effective valuation, and not for any other purpose.

LPG and Affiliate hereby agree to the following:

1.      Each Party shall be solely responsible for bearing its own costs and expenses incurred in performing its responsibilities under this Agreement, including all tariffs, filings, licensing and/or other fees.

2.      Affiliate shall comply with state and federal laws in communicating with consumers regarding LPG, any law firm utilized by LPG, or any of the programs of LPG or the assigned law firm.

3.      Both LPG and the law firm it utilizes shall comply with all state and federal laws in performing its obligations under the legal services agreement entered into between LPG and the consumers referred by Affiliate.

4.      If requested by LPG, Affiliate shall provide a copy of all marketing materials to LPG upon receiving a request from LPG. Affiliate shall endeavor to provide such materials within 10 business days of such request, but may provide such materials in any time frame that is commercially reasonable.

5.      Affiliate agrees to keep any and all documents or communications between itself and LPG confidential pursuant to the provisions set forth below, and shall not share of disclose such documents to any party with prior, express written consent.

6.      Affiliate shall be entitled to receive the following as full and complete compensation for its services to LPG: LPG shall pay 55% per files enrolled per month, not counting the monthly maintenance fee of $96.38, which LPG shall retain to cover administrative costs for each file. LPG shall calculate the amount of each file, apply the above-identified percentage fee, and remit the same to Affiliate pursuant to an agreed-upon schedule not to exceed one remittance per seven (7) calendar days. If any consumer cancels LPG's services, or demands a refund for payment for such services, or both, then LPG shall be solely responsive for such cost and Affiliate shall not have to share such expense. LPG has exclusive discretion to grant or deny a requested refund or cancellation. The one-time enrollment fee charged at the commencement of the representation shall not be included as a remittance to Affiliate, but shall remain with LPG and its agents. The enrollment fee is related to LPG's decision to onboard a file and not related to the actual legal services rendered, and as such the enrollment fee is retained by LPG. Finally, LPG may treat a consumer's failure to remit payment in a timely manner as a cancellation of the legal services agreement executed by consumer with LPG, and has sole discretion to make such determination.

7.      LPG shall bear all expenses related to the services it offers to consumers, and Affiliate shall bear all expenses related to its marketing of the same except as is set forth in this Paragraph. Neither LPG nor Affiliate shall be required to pay the expenses of the other.

8.      LPG reserves all rights with regard to rejection or cancellation of a consumer, but will do so only in accordance with the recommendation of the law firm utilized in providing such service, and only subject to the applicable state bar rules for such representation.

Exhibit 1
Page 3

9.      This agreement shall continue to operate and bind LPG and Affiliate for a period of twelve (12) months from the date of execution of this Agreement.  At that time, this Agreement will automatically renew until either party sends written notice of cancellation of this Agreement, which shall be effective 30 days after LPG or Affiliate postmarks or emails a cancellation letter stating the intent of that party to terminate this Agreement.  If such cancellation letter is sent by either party, it shall be effective 30 days from the date of postmark or email, and shall terminate this Agreement and release either party from the obligations contained herein.

10.      If either party shall default under this Agreement, defined as a failure to comply with any of the obligations set forth above, the Agreement shall terminate following notice of default and a cure period of 30 days from the date postmarked on the notice of default.  The notice of default must state with specificity the act of default alleged.

11.      Upon termination of this Agreement for any reason whatsoever, LPG and Affiliate will refrain from making any disparaging or negative comment, remark, statement, or implication, whether written or oral.

12.      The confidential information of LPG or Affiliate shall include information regarding contracts, customer or client lists or information, hardware, software, screens, specifications, designs, plans, drawings, data, prototypes, discoveries, research, developments, methods, processes, procedures, improvements, 'Know-how', compilations, market research, marketing techniques and plans, marketing materials, business plans and strategies, documents, scripts, guidelines, price lists, pricing policies and financial information or other business and/or technical information and materials, in oral, demonstrative, written, graphic or machine-readable form, which is unpublished, not available to the general public or trade, and which is maintained as confidential and proprietary information by the disclosing party for regulatory, customer relations, and/or competitive reasons.  Neither LPG nor Affiliate may disclose the confidential information of the other with the express written consent of the other.  A failure to abide by this confidentiality term shall entitle the party whose confidential information was compromised to a reasonable sum not less than $50,000.00, nor more than $200,000.00.  The disclosure of information in connection with a judicial proceeding shall not constitute a violation of this term.  The parties agree to notify the other if any inadvertent disclosure of information occurs within 48 hours of becoming aware of such disclosure.  The parties agree to work together in good faith to remediate any disclosure of confidential information.  A party whose confidential information is disclosed shall be entitled to injunctive relief in any court of competent jurisdiction.

13.      If, after the passage of six months of the date of this Agreement, Affiliate fails, in any one calendar month, to have at least fifty (50) active consumers, LPG shall withhold 20% of the fees due to Affiliate for said month in an escrow account.  Such fees shall be held in escrow until, in a single calendar month, Affiliate has fifty (50) or more active consumers, at which point, within five (5) business days of the end of such calendar month, LPG shall transfer the balance of such escrow account to Affiliate and retain nothing in such escrow account.  If Affiliate shall cease operations for any reason, or this Agreement shall terminate for any reason, Affiliate will continue to receive fees due to it under this Agreement until all active consumers have completed or withdrawn from the program, at which point any remaining amounts being held in escrow shall be released to Affiliate in full.

Exhibit 1
Page 4

14.     Affiliate agrees not to use the name LPG or any law firm in any advertising, publicity release, or sales presentation designed to promote Affiliate's service, unless LPG provides prior written consent to such specific use.

15.     Any fees incurred by LPG in connection with a customer's Non-Sufficient Funds ("NSF") fee shall be borne exclusively by LPG.

16.     This Agreement may not be assigned or transferred without the prior written consent of the other. This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and assigns.

17.     In the event of a breach, the prevailing party shall be entitled to reasonable attorneys' fees and collection costs, including all fees and costs on appeal.

18.     This Agreement contains the entire Agreement between the Parties, and shall not be modified, amended or supplemented, or any rights therein waived, unless specifically agreed upon in writing by LPG and Affiliate.

**The Litigation Practice Group PC**

_____

**By: Daniel S. March, Managing Shareholder**

**Mpowering America, LLC.**

By: Jeromy Slater

Title: **Principal**

4

Exhibit 1
Page 5

DocuSign Envelope ID: 328CF4EC-400A-4C79-83D2-22F0FC676855

### The Litigation Practice Group PC - Affiliate Agreement

THIS AGREEMENT (the "Agreement") is made and effective as of the 1st day of September, 2022 by and between The Litigation Practice Group PC ("LPG") and **Mpowering America, LLC.,** (hereinafter "Affiliate").

RECITALS:

LPG is in the business of providing a package debtor's rights services in the form of debt validation, consultation, and litigation defense through a network of attorneys licensed to practice law in all 50 states and the District of Columbia.  The legal services offered include:

- Removal of invalid debts through correspondence directly with the three credit bureaus;
- Validation of consumer debts through correspondence including disputes with original creditors, validation demands to third party debt collectors and assignees, and disputes with all three credit bureaus;
- Defense of collection actions initiated by original creditors or third party assignees;
- Negotiation of advantageous settlements of consumer debts both pre and post litigation;
- Education of clients regarding federal laws applicable to consumer debt and credit reporting, and consultation regarding risk mitigation and litigation defense through its network of attorneys across the country.

Each of these services is offered without regard to the identity of the creditor or third-party debt collector or assignee.  LPG reviews all client files prior to the execution of the client's legal services agreement with the appropriate law firm, and maintains oversight through its administrative services over all file placements.

Affiliate owns and operates a system of generating leads consisting of consumers interested in the legal services offered by LPG.  Affiliate, acting in accordance with direction from LPG, shall obtain the names of Consumers and will market in a lawful manner, complying with the restrictions of the jurisdiction in which the consumer resides.  For consumers interested in utilizing LPG's services, Affiliate will assist LPG in having consumers execute an approved legal services agreement with a law firm to which LPG provides administrative support services, at which point consumers will become clients of that law firm, and that law firm will be exclusively responsible for and liable for the representation of consumers in the context of the provision of legal services.  Nothing in this Agreement nor in the eventual legal services agreement shall restrict Affiliate from offering any other service of any kind to consumer, including credit repair or debt relief programs.  Nor is Affiliate restricted from marketing on behalf of credit repair or debt relief entities, including but not limited to other law firms.  LPG and Affiliate hereby agree that any and all prior agreements entered into by LPG and Affiliate or any law firm to which LPG provides administrative support services and Affiliate are null and void and unenforceable, and this Agreement shall become the operative agreement for all files previously placed through the use of LPG's administrative support services.

Affiliate is being retained by LPG to provide marketing and customer service functions only.  All payments made to Affiliate are for services actually rendered, and do not constitute a revenue or fee sharing agreement.  The method used to determine the value of the services rendered by Affiliate to LPG were

1

Exhibit 1
Page 6

DocuSign Envelope ID: 328CF4EC-400A-4C79-83D2-22F0FC676855

selected by both parties based upon industry standard and effective valuation, and not for any other purpose.

LPG and Affiliate hereby agree to the following:

1.      Each Party shall be solely responsible for bearing its own costs and expenses incurred in performing its responsibilities under this Agreement, including all tariffs, filings, licensing and/or other fees.

2.      Affiliate shall comply with state and federal laws in communicating with consumers regarding LPG, any law firm utilized by LPG, or any of the programs of LPG or the assigned law firm.

3.      Both LPG and the law firm it utilizes shall comply with all state and federal laws in performing its obligations under the legal services agreement entered into between LPG and the consumers referred by Affiliate.

4.      If requested by LPG, Affiliate shall provide a copy of all marketing materials to LPG upon receiving a request from LPG.  Affiliate shall endeavor to provide such materials within 10 business days of such request, but may provide such materials in any time frame that is commercially reasonable.

5.      Affiliate agrees to keep any and all documents or communications between itself and LPG confidential pursuant to the provisions set forth below, and shall not share of disclose such documents to any party with prior, express written consent.

6.      Affiliate shall be entitled to receive the following as full and complete compensation for its services to LPG: LPG shall pay 50% per file for 1-100 files enrolled per month, 55% per file for 101 or more files enrolled per month, not counting the monthly maintenance fee of $96.38, which LPG shall retain to cover administrative costs for each file.  LPG shall calculate the amount of each file, apply the above-identified percentage fee, and remit the same to Affiliate pursuant to an agreed-upon schedule not to exceed one remittance per seven (7) calendar days.  If any consumer cancels LPG's services, or demands a refund for payment for such services, or both, then LPG shall be solely responsive for such cost and Affiliate shall not have to share such expense.  LPG has exclusive discretion to grant or deny a requested refund or cancellation. The one-time enrollment fee charged at the commencement of the representation shall not be included as a remittance to Affiliate, but shall remain with LPG and its agents.  The enrollment fee is related to LPG's decision to onboard a file and not related to the actual legal services rendered, and as such the enrollment fee is retained by LPG.      LPG may treat a consumer's failure to remit payment in a timely manner as a cancellation of the legal services agreement executed by consumer with LPG, and has sole discretion to make such determination.

7.      LPG shall bear all expenses related to the services it offers to consumers, and Affiliate shall bear all expenses related to its marketing of the same except as is set forth in this Paragraph.  Neither LPG nor Affiliate shall be required to pay the expenses of the other.

8.      LPG reserves all rights with regard to rejection or cancellation of a consumer, but will do so only in accordance with the recommendation of the law firm utilized in providing such service, and only subject to the applicable state bar rules for such representation.

2

Exhibit 1
Page 7

DocuSign Envelope ID: 328CF4EC-400A-4C79-83D2-22F0FC676855

9.      This agreement shall continue to operate and bind LPG and Affiliate for a period of twelve (12) months from the date of execution of this Agreement.  At that time, this Agreement will automatically renew until either party sends written notice of cancellation of this Agreement, which shall be effective 30 days after LPG or Affiliate postmarks or emails a cancellation letter stating the intent of that party to terminate this Agreement.  If such cancellation letter is sent by either party, it shall be effective 30 days from the date of postmark or email, and shall terminate this Agreement and release either party from the obligations contained herein.

10.     If either party shall default under this Agreement, defined as a failure to comply with any of the obligations set forth above, the Agreement shall terminate following notice of default and a cure period of 30 days from the date postmarked on the notice of default.  The notice of default must state with specificity the act of default alleged.

11.     Upon termination of this Agreement for any reason whatsoever, LPG and Affiliate will refrain from making any disparaging or negative comment, remark, statement, or implication, whether written or oral.

12.     The confidential information of LPG or Affiliate shall include information regarding contracts, customer or client lists or information, hardware, software, screens, specifications, designs, plans, drawings, data, prototypes, discoveries, research, developments, methods, processes, procedures, improvements, 'Know-how', compilations, market research, marketing techniques and plans, marketing materials, business plans and strategies, documents, scripts, guidelines, price lists, pricing policies and financial information or other business and/or technical information and materials, in oral, demonstrative, written, graphic or machine-readable form, which is unpublished, not available to the general public or trade, and which is maintained as confidential and proprietary information by the disclosing party for regulatory, customer relations, and/or competitive reasons.  Neither LPG nor Affiliate may disclose the confidential information of the other with the express written consent of the other.  A failure to abide by this confidentiality term shall entitle the party whose confidential information was compromised to a reasonable sum not less than $50,000.00, nor more than $200,000.00.  The disclosure of information in connection with a judicial proceeding shall not constitute a violation of this term.  The parties agree to notify the other if any inadvertent disclosure of information occurs within 48 hours of becoming aware of such disclosure.  The parties agree to work together in good faith to remediate any disclosure of confidential information.  A party whose confidential information is disclosed shall be entitled to injunctive relief in any court of competent jurisdiction.

13.     If, after the passage of six months of the date of this Agreement, Affiliate fails, in any one calendar month, to have at least fifty (50) active consumers, LPG shall withhold 20% of the fees due to Affiliate for said month in an escrow account.  Such fees shall be held in escrow until, in a single calendar month, Affiliate has fifty (50) or more active consumers, at which point, within five (5) business days of the end of such calendar month, LPG shall transfer the balance of such escrow account to Affiliate and retain nothing in such escrow account.  If Affiliate shall cease operations for any reason, or this Agreement shall terminate for any reason, Affiliate will continue to receive fees due to it under this Agreement until all active consumers have completed or withdrawn from the program, at which point any remaining amounts being held in escrow shall be released to Affiliate in full.

3

Exhibit 1
Page 8

DocuSign Envelope ID: 328CF4EC-400A-4C79-83D2-22F0FC676855

14.      Affiliate agrees not to use the name LPG or any law firm in any advertising, publicity release, or sales presentation designed to promote Affiliate's service, unless LPG provides prior written consent to such specific use.

15.      Any fees incurred by LPG in connection with a customer's Non-Sufficient Funds ("NSF") fee shall be borne exclusively by LPG.

16.      This Agreement may not be assigned or transferred without the prior written consent of the other. This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and assigns.

17.      In the event of a breach, the prevailing party shall be entitled to reasonable attorneys' fees and collection costs, including all fees and costs on appeal.

18.      This Agreement contains the entire Agreement between the Parties, and shall not be modified, amended or supplemented, or any rights therein waived, unless specifically agreed upon in writing by LPG and Affiliate.


**The Litigation Practice Group PC**


_____

**By: Daniel S. March, Managing Shareholder**



**Mpowering America, LLC.**

_Jeromy Slater_
— 2E6411B060AE4D6...

By:  Jeromy Slater

Title:  **Principal**

4

Exhibit 1
Page 9

DocuSign Envelope ID: A635F2CF-DCF9-4D56-9640-7B5A9987400F

### Affiliate Agreement

THIS AGREEMENT (the "Agreement") is    made and effective as of this    10th  day of
March, 2021 by and between **The Litigation Practice Group PC**("LPG") and Mpowering
America, LLC (hereinafter "Affiliate").

RECITALS:

LPG  is in the business of providing    legal  services for  law firms providing a   package
debtor's rights services in the form of debt validation, consultation, litigation defense, and
bankruptcy.  Among the services offered by LPG are the following:

-   Removal  of in valid debts  through correspondence directly with the three credit
    bureaus;
-   Validation of consumer debts through correspondence     including  disputes with
    original creditors, validation demands to  third party debt collectors and assignees,
    and disputes with all three credit bureaus;
-   Defense of collection actions initiated by original creditors or third party assignees;
-   Negotiation of advantageous settlements of consumer debts      both pre and post
    litigation;
-   Protection from harassing collection practices, in    cluding but not limited to the
    initiation of actions under the Telephone Consumer Protection Act and Fair Debt
    Collection Practices Act;
-   Education of clients regarding federal laws applicable to consumer debt and credit
    reporting, and consultation regarding risk mitigation and litigation defense through
    its network of attorneys across the country
-   Filing bankruptcy petitions under Chapter 7 and Chapter 13 of the United States
    Bankruptcy Code when requested by clients as an alternative to disputing or settling
    debts.

Each of these services is offered without regard to the identity of the creditor or third party
debt collector or assignee.  LPG reviews all client files prior to the execution of the client's
legal services agreement  with LPG, and maintains overs ight through its administrative
services over all file placements.

Affiliate owns and operates a system of generating leads consisting of consumers interested
in the legal services offered by LPG.  Affiliate, acting in accordance with direction from
LPG, shall obtain the names of Consumers and will market in a lawful manner, complying
with the restrictions of the jurisdiction in which the consumer resides   .  For consumers
interested in utilizing  LPG's services, Affiliate will assist  LPG, directly or th rough any

1

Exhibit 1
Page 10

DocuSign Envelope ID: A635F2CF-DCF9-4D56-9640-7B5A9987400F

marketing firm or entity with whom Affiliate contracts, in having consumers execute an approved legal services agreement with LPG, at which point consumers will become clients of that law firm, and that law firm will be exclusively responsible fo r and liable for the representation of consumers in the context of the provision of legal services. Nothing in this Agreement nor in the eventual legal services agreement shall restrict Affiliate from offering any other service of any kind to consumer, in cluding credit repair or debt relief programs. Nor is Affiliate restricted from marketing on behalf of debt settlement, debt consolidation, credit repair, or debt relief entities, including but not limited to other law firms. LPG and Affiliate hereby agree that any and all prior agreements entered into by LPG are null and void and unenforceable.

LPG and Affiliate hereby agree to the following:

1.      Each Pa rty shall be solely    responsible for bearing its own costs and expenses incurred in performing its responsibilities under this      Agreement, including all tariffs, filings, licensing and/or other fees.

2.      Affiliate shall comply with state and federal laws in communicating with consumers regarding LPG or any of its programs.

3.      LPG shall comply with state and federal laws in performing its obligations under the legal services agreement entered into between    LPG and the consumers referred by Affiliate.    LPG sha ll follow all applicable Rules of Professional Conduct, and shall maintain sole discretion to reject or terminate any representation that conflicts with the applicable Rules of Professional Conduct.

4.      If requested by LPG, Affiliate shall provide a copy o f all marketing materials to LPG upon receiving a request from LPG. Affiliate shall endeavor to provide such materials within 10 business days of such request, but may provide such materials in any time frame that is commercially reasonable.

5.      Affiliate agrees to keep any and all documents or communications between itself and LPG confidential pursuant to the provisions set forth below.

6.      AFFILIATE  shall be entitled to receive the following as full and complete compensation for its services to LPG: Fifteen Percent (15%) of the total debt enrolled with LPG. The one -time enrollment fee charged at the commencement of the representation shall not be included as a remittance to Affiliate, but shall remain with LPG and its agents. The enrollment fe e is related to LPG's decision to onboard a file and not related to the actual legal services rendered, and as such the enrollment fee is retained by LPG.

2

Exhibit 1
Page 11

DocuSign Envelope ID: A635F2CF-DCF9-4D56-9640-7B5A9987400F

Payment shall be made by LPG direct to Affiliate within seven (7) calendar days of the receipt of payment from client. Affiliate and LPG agree and acknowledge that the risk of collection or non -collection of fees from an active client is the sole financial risk and burden of LPG, and the relationship contemplated herein is not a fee sharing arrangement. To that end, an y refund that LPG must issue to a client shall not be charged back to or otherwise assessed to or taken from Affiliate.

7.      Affiliate may procure any client provided the total of all fees charged to such client meet the following criteria: a client's fees, in aggregate, represent no less than 45% of the total of all debt the assistance with which client has sought from Affiliate; the monthly fee is in no event less than $250.00; the payment term is no more than 48 months; *and* client is enrolling only unsecured debt. No other restriction shall apply except to the extent mandated by Paragraph 3, above.

8.      LPG shall bear all expenses related to the services it offers to consumers, and Affiliate shall bear all expenses related to its operation.

9.      This Agreement shall continue in full force and effect until terminated or modified by the Parties in writing. Any client acquired during the operative term of this Agreement shall be governed by the terms of this Agreement The relationship with Affiliate and LPG shall be exclusive for a period of two (2) years from the date of execution of this Agreement absent a prior, existing relationship prior to the date of execution of this Agreement.

10.     If either party shall default under this Agreement,    defined as a failure to comply with any of the obligations set forth above, the Agreement shall terminate following notice of default and a cure period of 30 days from the date postmarked on the notice of default. The notice of default must state with specificity the act of default alleged.

11.     Upon termination of this Agreement for any reason whatsoever, LPG and Affiliate will refrain from making any    disparaging or negative comment, remark, statement, or implication, whether written or oral.

12.     The confidential information of      LPG or Affiliate shall include      information regarding contracts, customer or client lists or information,   hardware, software, screens, specifications, designs, plans, drawings, data,         prototypes, discoveries, research, developments, methods, processes, procedures,            improvements, 'Know -how', compilations, market research, marketing techniques and      plans, marketing materials, business plans and strategies, documents, scripts, guidelines, price lists, pricing policies and financial information or other business and/or technical information and materials, in oral, demonstrative, written, graphic or machine-readable form, which is unpublished, not available to the general    public or trade, and which is maintained a    s confidential and

3

Exhibit 1
Page 12

DocuSign Envelope ID: A635F2CF-DCF9-4D56-9640-7B5A9987400F

proprietary information by the  disclosing party for regulatory, customer relations, and/or competitive reasons.  Neither LPG nor Affiliate may disclose the confidential information of the other with the express written consent of the other.  A failure to abid        e by this confidentiality term shall entitle the party whose confidential information was compromised to a reasonable sum not less than $50,000.00, nor more than $200,000.00. The disclosure of information in connection with a judicial proceeding shall not constitute a violation of this term.   The parties agree to notify the other if any inadvertent disclosure of information occurs within 48 hours of becoming aware of such disclosure.  The parties agree to work together in good faith to remediate any disclo          sure of confidential information.  A party whose confidential information is disclosed shall be entitled to injunctive relief in any court of competent jurisdiction.

13.     The Parties hereby agree that their business involves, among other activities, introducing, participating, effectuating and consummating transactions between their respective contacts, including other Parties and marketing firms or affiliates (each, a "Transaction"). In consideration of the foregoing, each undersigned Party hereby irrevocably agrees and warrants that it and its Affiliates shall not, directly or indirectly, interfere with, circumvent, attempt to circumvent, avoid or bypass any Party from any Transactions between the Parties' contacts, or obviate or interfere with the relationship of any Party and its contacts for the purpose of gaining any benefit, whether such benefit is monetary or otherwise. The Parties also undertake not to make use of an    y third party to circumvent this paragraph.

14.     The Parties hereby legally and irrevocably bind themselves and guarantee to each other that they shall not directly or indirectly contact or communicate with, or submit a request for a product or service to any contact, entity, or institution introduced by Affiliate to LPG without the prior case -by-case written approval of the Affiliate authorizing such contact or communication.

15.     This Agreement shall be governed by the laws of the State of California, a    nd the Courts of the State of California, County of Orange, shall have exclusive subject matter jurisdiction over this Agreement .  All parties to this Agreement consent to the personal jurisdiction of the Superior Court of California, County of Orange, over such party.

16.     Affiliate agrees that any amount paid to Affiliate shall not be subject to withholding, and shall result in the issuance of a 1099 -MISC for services rendered by an independent contractor.  Affiliate agrees that it is not an agent for LP G authorized to bind LPG to any agreement or otherwise act on LPG's behalf.

4

Exhibit 1
Page 13

DocuSign Envelope ID: A635F2CF-DCF9-4D56-9640-7B5A9987400F

17.     Affiliate agrees that LPG may use the services of any related entity to assist with administrative services such as payment processing, mail processing (incoming and outgoing), general customer service, and accounting.  LPG shall not, however, allow any individual or entity to render legal advice or otherwise engage in the practice of law unless such individual is licensed to practice law in the jurisdiction in which the legal   advice or service is being rendered.

18.     This Agreement may not be assigned or transferred without the prior written consent of the other.  This Agreement  shall be binding upon and shall inure to the benefit of the Parties and their respective successors and assigns.

19.     In the event of a breach,      the prevailing party shall be entitled to reasonable attorneys' fees and collection costs, including all fees and costs on appeal.

20.     This Agreement contains the entire Agreement between the Parties, and shall not be modified, amended or supplemented, or     any rights therein waived, unless specifically agreed upon in writing by LPG and Affiliate.

**LPG**


_____
By: Daniel S. March
Title: **Managing Shareholder**


**Mpowering America, LLC.**


_____
By: Jeromy Slater
Its: Principal


5

Exhibit 1
Page 14

# Exhibit 2

Exhibit 2
Page 1

DocuSign Envelope ID: A541DAF0-7897-4463-86A6-07546A45E372

**ACCOUNTS RECEIVABLE PURCHASE AGREEMENT**

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of January 6, 2023 (the "**Agreement Date**"), by and between The Litigation Practice Group PC (collectively the "**Buyer**"), and Sabia Financial, Inc (the "**Seller**" **or "LPG"**, and together with the Buyer, the **"Parties"**), and The Litigation Practice Group PC ("LPG").

**RECITALS**

WHEREAS, in the regular course of business, the Seller originates account receivables from **LPG** in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

**ARTICLE 1.
DEFINITIONS**

Section 1.1    Certain Definitions.  Certain defined terms used in this Agreement are set forth on **Exhibit A**.

**ARTICLE 2.
ASSIGNMENT AND TRANSFER AND CONSIDERATION**

Section 2.1    Assignment of the Purchased Accounts to the Buyer.  Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens.  Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2    No Assumption of Liabilities.  The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3    Payment of Purchase Price.  Buyer shall pay $366,817.71 (total purchase price) for the Purchased Accounts (the "**Purchase Price**") by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in **Schedule 2.3** (the "**Wire Instructions**").  The Purchased Accounts are set forth on the attached spreadsheet.

Section 2.4    Guarantee of LPG.  If any file acquired by buyer shall fail to make a first payment, LPG will replace the file and bear any cost associated with such replacement.  The replacement file shall yield no less than the receivable of the failed file.  In addition, if any calendar month a total of less than 80% of files make a cleared payment, LPG shall replace any non-performing files in such month so that the performance of the file package as a whole equals 80%.  This guarantee shall continue until the completion of the 24th month following execution of this agreement.

Exhibit 2
Page 2

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1    <u>Organization; Good Standing</u>.  The Seller is a corporation duly organized, validly existing, and in good standing under the Laws of the State of Illinois and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2    <u>Power and Authority</u>.  The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3    <u>Title to, and Sufficiency of, the Purchased Accounts</u>.  The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.4    <u>Consents</u>.  The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5    <u>No Conflicts</u>. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

Section 3.6    <u>Compliance with Laws</u>.  The Seller has materially complied, and is now materially complying, with all Laws applicable to the Purchased Accounts.

Section 3.7    Legal Proceedings.  There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements.  No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8    Condition of Purchased Accounts.  Each Purchased Account shall have received no less than one processed payment.

Section 3.9    Confidentiality.  Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**").  Seller will at all times keep the  Confidential Information in confidence and trust.  Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer.  Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions.  The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

## ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1    Organization; Good Standing.  The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Florida.

Section 4.2    Power and Authority.  The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 4.3    No Conflicts.  The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any

DocuSign Envelope ID: A541DAF0-7697-4463-86A6-075A6A45E872

obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4    <u>Sufficient Funds</u>. The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

**ARTICLE 5.**
**COVENANTS**

Section 5.1    <u>Appropriate Actions</u>.

(a)    <u>General</u>. Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

**ARTICLE 6.**
**CLOSING**

Section 6.1    <u>Closing</u>. The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement at such other time, date, and place as the Parties may agree in writing. The date on which the Closing occurs is hereinafter referred to as the "**Closing Date**." The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2    <u>Closing Deliverables of the Seller</u>. At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer: (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **Exhibit B** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3    <u>Closing Deliverables of the Buyer</u>. At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to <u>Section 6.2</u>, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4    <u>Indemnification by the Seller</u>. Subject to the limitations set forth in this <u>Article 6</u>, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability.

Section 6.5    <u>Indemnification by the Buyer</u>.  Subject to the limitations set forth in this <u>Article 6</u>, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurance related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.6    <u>Indemnification Procedures</u>.

(a)    <u>No Restraints</u>.  Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, <u>provided</u>, <u>however</u>, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim.  The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; <u>provided</u>, <u>however</u>, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense.  The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)    No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim.  An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)    If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**").  Such Notice of Claim shall specify the basis for such Direct Claim.  The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c).  If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined.  In the event that the Indemnifying Party has timely disputed its Liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

### ARTICLE 7.
### MISCELLANEOUS

Section 7.1    Entire Agreement; Amendment.  This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof.  This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2    Waivers.  The rights and remedies of the Parties to this Agreement are cumulative and not alternative.  To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for what it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3    Notices.  All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission.  A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

Section 7.4    Successors and Assigns.  This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns.  Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties.  This Agreement will be binding upon any permitted

assignee of any Party.  No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5    <u>Public Disclosure</u>.  Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6    <u>Expenses and Fees</u>.  Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7    <u>Specific Performance</u>.  The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8    <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9    <u>Governing Law</u>.  This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10    <u>Severability</u>.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11    <u>Construction</u>.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

**The Litigation Practice Group P.C.**

By: _Daniel S March_
    Name: Daniel S March
    Title: Managing Shareholder

**SELLER:**

**Sabia Financial, Inc**

By: _Frank Dal Bello_
    Name: Frank Dal Bello
    Title: Owner

**APPROVAL OF ASSIGNMENT AND GUARANTEE**

The assignment of the Purchased Accounts set forth in this Agreement as well as the guarantee included therein is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.

**The Litigation Practice Group P.C.**

By: _Daniel S March_
    Name: Daniel S. March
    Title: Managing Shareholder

*[Signature Page to Accounts Receivable Purchase Agreement]*

Exhibit 2
Page 9

## EXHIBIT A

## DEFINITIONS

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a)    "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b)    "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c)    "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d)    "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)    "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in Section 6.2.

(f)    "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g)    "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h)    "**Buyer Indemnified Parties**" shall have the meaning set forth in Section 6.4.

(i)    "**Closing**" shall have the meaning set forth in Section 6.1.

(j)    "**Closing Date**" shall have the meaning set forth in Section 6.1.

(k)    "**Direct Claim**" shall have the meaning set forth in Section 6.6(c).

(l)    "**Excluded Assets**" shall have the meaning set forth in Section 2.1.

(m)    "**Excluded Liabilities**" shall have the meaning set forth in Section 2.2.

(n)    "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

Exhibit 2
Page 10

(o)    "**Indebtedness**" means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p)    "**Indemnified Party**" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q)    "**Indemnifying Party**" shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r)    "**Knowledge**" shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s)    "**Law**" shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(t)    "**Liabilities**" shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u)    "**Lien**" shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v)    "**Losses**" shall have the meaning set forth in Section 6.4.

(w)    "**Notice of Claim**" shall have the meaning set forth in Section 6.6(c).

(x)    "**Organizational Documents**" shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y)    "**Party**" or "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

(z)    "**Permitted Liens**" shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(aa)    "**Person**" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

Exhibit 2
Page 11

(bb)    "**Purchase Price**" shall have the meaning set forth in <u>Section 2.3</u>.

(cc)    "**Purchased Accounts**" shall have the meaning set forth in the Recitals.

(dd)    "**Seller**" shall have the meaning set forth in the preamble to this Agreement.

(ee)    "**Seller Indemnified Parties**" shall have the meaning set forth in <u>Section 6.5</u>.

(ff)    "**Tax**" or "**Taxes**" shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(gg)    "**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(hh)    "**Third Party**" or "**Third Parties**" shall mean any Person other than the Parties or their respective Affiliates.

(ii)    "**Third-party Claim**" shall have the meaning set forth in <u>Section 6.6(a)</u>.

(jj)    "**Transaction Agreements**" shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(kk)    "**Upfront Cash Payment**" shall have the meaning set forth in <u>Section 2.3</u>.

(ll)    "**Wire Instructions**" shall have the meaning set forth in <u>Section 2.3</u>.

Exhibit 2
Page 12

DocuSign Envelope ID: A541DAF0-7697-4463-86A6-075A6A45E372

## EXHIBIT B

## FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between **Buyer**, and **Seller**.  Each of the Seller and the Buyer are sometimes referred to herein, individually, as a **"Party"** and, collectively, as the **"Parties."**

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the **"Purchase Agreement"**), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.      <u>Defined Terms</u>.  Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2.      <u>Sale of Purchased Accounts; Assignment</u>.  The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3.      <u>Further Assurances</u>.  Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4.      <u>Terms of the Purchase Agreement</u>.  This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement.   The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference.  The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.      <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Remainder of page intentionally left blank.]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER: The Litigation Practice Group P.C.**

By: _Daniel S March_
Name: Daniel S. March
Title: Managing Shareholder

**SELLER:**

**Sabia Financial, Inc**

By: _Frank Dal Bello_
Name: Frank Dal Bello
Title: Owner

**Schedule 2.3**
**Wire Instructions**

<u>**$366,817.71**</u>

**Account Holder Name: Sabia Financial, Inc**

**Address: 444 N Michigan Ave, Suite 1200 Chicago, IL 60611**

**Routing Number: 021000021**

**Account Number:** ███████

# Exhibit 3

Exhibit 3
Page 1

Main Document    Page 227 of 132



Page **1** of **16**                                                 ver. 4/15/21

## MCA CAPITAL HOLDINGS LLC
802 Avenue U, PH7, Brooklyn, NY 11223
(646) 419-5325

# STANDARD MERCHANT CASH ADVANCE AGREEMENT

This is an Agreement dated 06/14/2021 _____ by and between MCA CAPITAL HOLDINGS LLC ("MCA") and each merchant listed below ("Merchant").

Merchant's Legal Name: THE LITIGATION PRACTICE GROUP PC / VULCAN CONSULTING GROUP LLC

D/B/A: THE LITIGATION PRACTICE GROUP / VULCAN CONSULTING GROUP          Fed ID #: ▮▮▮▮▮

Type of Entity:
_X_ Corporation ____ Limited Liability Company ____ Limited Partnership ____ Limited Liability Partnership ____ Sole Proprietor

Business Address: 17542 17TH ST STE 100     City: TUSTIN     State: CA     Zip: 92780
Contact Address: 17542 17TH ST STE 100      City: TUSTIN     State: CA     Zip: 92780
E-mail Address: admin@litigationpracticegroup.com     Phone Number: _____

| | |
|---|---|
| **Purchase Price** *This is the amount being paid to Merchant(s) for the Receivables Purchased Amount (defined below).* | $ 250,000.00 |
| **Receivables Purchased Amount** *This is the amount of Receivables (defined in Section 1 below) being sold.* | $ 374,750.00 |
| **Specified Percentage** *This is the percentage of Receivables (defined below) to be delivered until the Receivables Purchased Amount is paid in full.* | 25 % |
| **Net Funds Provided** *This is the net amount being paid to or on behalf of Merchant(s) after deduction of applicable fees listed in Section 2 below.* | $ 225,000.00 |
| **Initial Estimated Payment** *This is only applicable if an Addendum for Estimated Payments is being signed. This is the initial amount of periodic payments collected from Merchant(s) as an approximation of no more than the Specified Percentage of the Receivables and is subject to reconciliation as set forth in Section 4 below.* | $ 12,491.66 per DAY |

## TERMS AND CONDITIONS

**1. Sale of Future Receipts.** Merchant(s) hereby sell, assign, and transfer to MCA (making MCA the absolute owner) in consideration of the funds provided ("Purchase Price") specified above, all of each Merchant's future accounts, contract rights, and other obligations arising from or relating to the payment of monies from each Merchant's customers and/or other third party payors (the "Receivables", defined as all payments made by cash, check, credit or debit card,

I have read and agree to the terms and conditions set forth above:

DocuSigned by:

*DANIEL STEPHEN MARCH*
242CC5601A23474
Name: DANIEL STEPHEN MARCH     Title: OWNER     Date: 6/14/2021  06/14/2021

Exhibit 3
Page 2

FILED: Case 3:23-dv-00045-SCC Doc#59 Filed 02/05/25 Entered 02/05/25 12:34 Desc
NYSCEF DOC. NO. 1     Main Document      Page 89 of 135     RECEIVED NYSCEF: 08/17/202

Page **2** of **16**

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

electronic transfer, or other form of monetary payment in the ordinary course of each merchant's business), for the payment of each Merchant's sale of goods or services until the amount specified above (the "Receivables Purchased Amount") has been delivered by Merchant(s) to MCA. Each Merchant hereby acknowledges that until the Receivables Purchased Amount has been received in full by MCA, each Merchant's Receivables, up to the balance of the Receivables Purchased Amount, are the property of MCA and not the property of any Merchant. Each Merchant agrees that it is a fiduciary for MCA and that each Merchant will hold Receivables in trust for MCA in its capacity as a fiduciary for MCA.

The Receivables Purchased Amount shall be paid to MCA by each Merchant irrevocably authorizing only one depositing account acceptable to MCA (the "Account") to remit the percentage specified above (the "Specified Percentage") of each Merchant's settlement amounts due from each transaction, until such time as MCA receives payment in full of the Receivables Purchased Amount. Each Merchant hereby authorizes MCA to ACH debit the specified remittances from the Account on a daily basis as of the next business day after the date of this Agreement and will provide MCA with all required access codes and monthly bank statements. Each Merchant understands that it will be held responsible for any fees resulting from a rejected ACH attempt or an Event of Default (see Section 2). MCA is not responsible for any overdrafts or rejected transactions that may result from MCA's ACH debiting the Specified Percentage amounts under the terms of this Agreement.

**2. Additional Fees.** In addition to the Receivables Purchased Amount, each Merchant will be held responsible to MCA for the following fees, where applicable.
A. $ 25,000.00 - to cover underwriting and the ACH debit program, as well as related expenses. This will be deducted from payment of the Purchase Price.
B. Wire Fee - Merchant(s) shall receive funding electronically to the Account and will be charged $50.00 for a Fed Wire or $0.00 for a bank ACH. This will be deducted from payment of the Purchase Price.
C. Blocked Account/Default - $2,500.00 - If MCA considers an Event of Default to have taken place under Section 34.
D. UCC Fee - $195.00 — to cover MCA filing a UCC-1 financing statement to secure its interest in the Receivables Purchased Amount. A $195.00 UCC termination fee will be charged if a UCC filing is terminated.
E. Court costs, arbitration fees, collection agency fees, attorney fees, expert fees, and any other expenses incurred in litigation, arbitration, or the enforcement of any of MCA's legal or contractual rights against each Merchant and/or each Guarantor, if required, as explained in other Sections of this Agreement.

**3. Cap on Collection of the Receivables Purchased Amount.** The amount that MCA will collect from Merchant(s) towards the Receivables Purchased Amount during any specific DAY will be capped at $ 12,491.66 (the "Cap"). If the Specified Percentage of all Receivables for a specific _____ is less than the Cap, then in addition to the Specified Percentage of Receivables for that DAY , MCA will be permitted to collect any Receivables it did not previously collect due to the Cap such that the total amount collected during that DAY does not exceed the Cap. The Cap is not applicable to make up for a business day on which MCA is closed and does not ACH debit the Account, to subsequent attempts to collect a rejected or blocked ACH payment, or for the collection of any of the fees listed in Section 2 or if any Event of Default listed in Section 34 is considered by MCA to have taken place.

**4. Reconciliations.** Any Merchant may give written notice to MCA requesting that MCA conduct a reconciliation in order to ensure that the amount that MCA has collected equals the Specified Percentage of Merchant(s)'s Receivables under this Agreement. Any Merchant may give written notice requesting a reconciliation. A reconciliation may also be requested by e-mail to Michael@mcacapitalholdings.com and such notice will be deemed to have been received if and when MCA sends a reply e-mail (but not a read receipt). If such reconciliation determines that MCA collected more than it was entitled to, then MCA will credit to the Account all amounts to which MCA was not entitled within seven days thereafter. If such reconciliation determines that MCA collected less than it was entitled to, then MCA will debit from the Account all additional amounts to which MCA was entitled within seven days thereafter. In order to effectuate this reconciliation, any Merchant must produce with its request the login and password for the Account and any and all bank statements and merchant statements covering the period from the date of this Agreement through the date of the request for a reconciliation. MCA will complete each such reconciliation within two business days after receipt of a written request for one accompanied by the information and documents required for it. Nothing herein limits the amount of times that such a reconciliation may be requested.

I have read and agree to the terms and conditions set forth above:

DANIEL STEPHEN MARCH
242CC5601A23474
Name: DANIEL STEPHEN MARCH     Title: OWNER          Date: 06/14/2021

Exhibit 3
Page 3

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

**5. Prepayments.** Although there is no obligation to do so, any Merchant may prepay any amount towards the Receivables Purchased Amount. There will be no penalty for any prepayment made by any Merchant. Any Merchant may elect to terminate this Agreement by prepaying MCA the amount of the balance of the Receivables Purchased Amount at that time.

**6. Merchant Deposit Agreement.** Merchant(s) shall appoint a bank acceptable to MCA, to obtain electronic fund transfer services and/or "ACH" payments. Merchant(s) shall provide MCA and/or its authorized agent with all of the information, authorizations, and passwords necessary to verify each Merchant's Receivables. Merchant(s) shall authorize MCA and/or its agent(s) to deduct the amounts owed to MCA for the Receivables as specified herein from settlement amounts which would otherwise be due to each Merchant and to pay such amounts to MCA by permitting MCA to withdraw the Specified Percentage by ACH debiting of the account. The authorization shall be irrevocable absent MCA's written consent.

**7. Term of Agreement.** The term of this Agreement is indefinite and shall continue until MCA receives the full Receivables Purchased Amount, or earlier if terminated pursuant to any provision of this Agreement. The provisions of Sections 4, 6, 7, 8, 10, 11, 13, 14, 15, 17, 18, 19, 22, 23, 28, 31, 32, 33, 34, 35, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, and 58 shall survive any termination of this Agreement.

**8. Ordinary Course of Business.** Each Merchant acknowledges that it is entering into this Agreement in the ordinary course of its business and that the payments to be made from each Merchant to MCA under this Agreement are being made in the ordinary course of each Merchant's business.

**9. Financial Condition.** Each Merchant and each Guarantor (Guarantor being defined as each signatory to the Guarantee of this Agreement) authorizes MCA and its agent(s) to investigate each Merchant's financial responsibility and history, and will provide to MCA any bank or financial statements, tax returns, and other documents and records, as MCA deems necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of financial information. MCA is authorized to update such information and financial profiles from time to time as it deems appropriate.

**10. Monitoring, Recording, and Electronic Communications.** MCA may choose to monitor and/or record telephone calls with any Merchant and its owners, employees, and agents. By signing this Agreement, each Merchant agrees that any call between MCA and any Merchant or its representatives may be monitored and/or recorded. Each Merchant and each Guarantor grants access for MCA to enter any Merchant's premises and to observe any Merchant's premises without any prior notice to any Merchant at any time after execution of this Agreement.

MCA may use automated telephone dialing, text messaging systems, and e-mail to provide messages to Merchant(s), Owner(s) (Owner being defined as each person who signs this Agreement on behalf of a Merchant), and Guarantor(s) about Merchant(s)'s account. Telephone messages may be played by a machine automatically when the telephone is answered, whether answered by an Owner, a Guarantor, or someone else. These messages may also be recorded by the recipient's answering machine or voice mail. Each Merchant, each Owner, and each Guarantor gives MCA permission to call or send a text message to any telephone number given to MCA in connection with this Agreement and to play pre-recorded messages and/or send text messages with information about this Agreement and/or any Merchant's account over the phone. Each Merchant, each Owner, and each Guarantor also gives MCA permission to communicate such information to them by e-mail. Each Merchant, each Owner, and each Guarantor agree that MCA will not be liable to any of them for any such calls or electronic communications, even if information is communicated to an unintended recipient. Each Merchant, each Owner, and each Guarantor acknowledge that when they receive such calls or electronic communications, they may incur a charge from the company that provides them with telecommunications, wireless, and/or Internet services, and that MCA has no liability for any such charges.

**11. Accuracy of Information Furnished by Merchant and Investigation Thereof.** To the extent set forth herein, each of the parties is obligated upon his, her, or its execution of the Agreement to all terms of the Agreement. Each Merchant and each Owner signing this Agreement represent that he or she is authorized to sign this Agreement for each Merchant, legally binding said Merchant to its obligations under this Agreement and that the information provided herein and in all of MCA's documents, forms, and recorded interview(s) is true, accurate, and complete in all respects. MCA may produce a

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

DANIEL STEPHEN MARCH

242DC5601A23474...

Name: _____ Title: OWNER _____ Date: 06/14/2021

Exhibit 3
Page 4

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

monthly statement reflecting the delivery of the Specified Percentage of Receivables from Merchant(s) to MCA. An investigative report may be made in connection with the Agreement. Each Merchant and each Owner signing this Agreement authorize MCA, its agents and representatives, and any credit-reporting agency engaged by MCA, to (i) investigate any references given or any other statements obtained from or about each Merchant or any of its Owners for the purpose of this Agreement, and (ii) pull credit report at any time now or for so long as any Merchant and/or Owners(s) continue to have any obligation to MCA under this Agreement or for MCA's ability to determine any Merchant's eligibility to enter into any future agreement with MCA. Any misrepresentation made by any Merchant or Owner in connection with this Agreement may constitute a separate claim for fraud or intentional misrepresentation.

*Authorization for soft pulls:* Each Merchant and each Owner understands that by signing this Agreement, they are providing 'written instructions' to MCA under the Fair Credit Reporting Act, authorizing MCA to obtain information from their personal credit profile or other information from Experian, TransUnion, and Equifax. Each Merchant and each Guarantor authorizes MCA to obtain such information solely to conduct a pre-qualification for credit.

*Authorization for hard pulls:* Each Merchant and each Owner understands that by signing this Agreement, they are providing 'written instructions' to MCA under the Fair Credit Reporting Act, authorizing MCA to obtain information from their personal credit profile or other information from Experian, TransUnion, and Equifax. Each Merchant and each Guarantor authorizes MCA to obtain such information in accordance with a merchant cash advance application.

**12. Transactional History.** Each Merchant authorizes its bank to provide MCA with its banking and/or credit card processing history.

**13. Indemnification.** Each Merchant and each Guarantor jointly and severally indemnify and hold harmless each Merchant's credit card and check processors (collectively, "Processor") and Processor's officers, directors, and shareholders against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) incurred by Processor resulting from (a) claims asserted by MCA for monies owed to MCA from any Merchant and (b) actions taken by any Processor in reliance upon information or instructions provided by MCA.

**14. No Liability.** In no event will MCA be liable for any claims asserted by any Merchant under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect, or consequential damages, each of which is waived by each Merchant and each Guarantor.

**15. Sale of Receivables.** Each Merchant and MCA agree that the Purchase Price under this Agreement is in exchange for the Receivables Purchased Amount and that such Purchase Price is not intended to be, nor shall it be construed as a loan from MCA to any Merchant. MCA is entering into this Agreement knowing the risks that each Merchant's business may decline or fail, resulting in MCA not receiving the Receivables Purchased Amount. Each Merchant agrees that the Purchase Price in exchange for the Receivables pursuant to this Agreement equals the fair market value of such Receivables. MCA has purchased and shall own all the Receivables described in this Agreement up to the full Receivables Purchased Amount as the Receivables are created. Payments made to MCA in respect to the full amount of the Receivables shall be conditioned upon each Merchant's sale of products and services and the payment therefor by each Merchant's customers in the manner provided in this Agreement. Although certain jurisdictions require the disclosure of an Annual Percentage Rate or APR in connection with this Agreement, those disclosures do not change the fact that the transaction encompassed by this Agreement is not a loan and does not have an interest rate.

**16. Power of Attorney.** Each Merchant irrevocably appoints MCA as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to MCA, or, if MCA considers an Event of Default to have taken place under Section 34, to settle all obligations due to MCA from each Merchant, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral (which is defined in Section 33); (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents, or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign each Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to MCA; and (v) to file any claims or take any action or institute any proceeding which MCA may deem necessary for the collection of any of the unpaid Receivables Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Receivables Purchased Amount.

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

Name: DANIEL STEPHEN MARCH
242DC5601A23474...    Title: OWNER    Date: 06/14/2021

Exhibit 3
Page 5

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

**17. Protections Against Default.** The following Protections 1 through 7 may be invoked by MCA, immediately and without notice to any Merchant in the event:

(a) Any Merchant takes any action to discourage the use of methods of payment ordinarily and customarily used by its customers or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks and credit cards for the purchase of any Merchant's services and products;

(b) Any Merchant changes its arrangements with any Processor in any way that is adverse to MCA;

(c) Any Merchant changes any Processor through which the Receivables are settled to another electronic check and/or credit card processor or permits any event to occur that could cause diversion of any Merchant's check and/or credit card transactions to another such processor;

(d) Any Merchant interrupts the operation of its business (other than adverse weather, natural disasters, or acts of God) or transfers, moves, sells, disposes, or otherwise conveys its business or assets without (i) the express prior written consent of MCA and (ii) the written agreement of any purchaser or transferee to the assumption of all of any Merchant's obligations under this Agreement pursuant to documentation satisfactory to MCA; or

(e) Any Merchant takes any action, fails to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for any Merchant's goods or services with any means other than checks and/or credit cards that are settled through Processor. These protections are in addition to any other remedies available to MCA at law, in equity, or otherwise available pursuant to this Agreement.

(f) MCA considers any Event of Default listed in Section 34 to have taken place.

Protection 1: The full uncollected Receivables Purchased Amount plus all fees due under this Agreement may become due and payable in full immediately.

Protection 2. MCA may enforce the provisions of the Guarantee against Guarantor.

Protection 3. MCA may enforce its security interest in the Collateral identified in Section 33.

Protection 4. MCA may proceed to protect and enforce its rights and remedies by litigation or arbitration.

Protection 5. If requested by MCA, Merchant shall deliver to MCA an executed assignment of lease of each Merchant's premises in favor of MCA. Upon breach of any provision in this Section 17, MCA may exercise its rights under such assignment of lease.

Protection 6. MCA may debit any Merchant's depository accounts wherever situated by means of ACH debit or electronic or facsimile signature on a computer-generated check drawn on any Merchant's bank account or otherwise, in an amount consistent with the terms of this Agreement.

Protection 7. MCA will have the right, without waiving any of its rights and remedies and without notice to any Merchant and/or Guarantor, to notify each Merchant's credit card and/or check processor of the sale of Receivables hereunder and to direct such credit card processor to make payment to MCA of all or any portion of the amounts received by such credit card processor on behalf of each Merchant. Each Merchant hereby grants to MCA an irrevocable power-of-attorney, which power-of-attorney will be coupled with an interest, and hereby appoints MCA and its representatives as each Merchant's attorney-in-fact to take any and all action necessary to direct such new or additional credit card and/or check processor to make payment to MCA as contemplated by this Section.

**18. Protection of Information.** Each Merchant and each person signing this Agreement on behalf of each Merchant and/or as Owner, in respect of himself or herself personally, authorizes MCA to disclose information concerning each Merchant, Owner and/or Guarantor's credit standing and business conduct to agents, affiliates, subsidiaries, and credit reporting bureaus. Each Merchant, Guarantor, and Owner hereby waives to the maximum extent permitted by law any claim for damages against MCA or any of its affiliates relating to any (i) investigation undertaken by or on behalf of MCA as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**19. Confidentiality.** Each Merchant understands and agrees that the terms and conditions of the products and services offered by MCA, including this Agreement and any other MCA documents (collectively, "Confidential Information") are proprietary and confidential information of MCA. Accordingly, unless disclosure is required by law or court order, Merchant(s) shall not disclose Confidential Information of MCA to any person other than an attorney, accountant, financial advisor, or employee of any Merchant who needs to know such information for the purpose of advising any Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising any Merchant and first agrees in writing to be bound by the terms of this Section 19.

**20. D/B/As.** Each Merchant hereby acknowledges and agrees that MCA may be using "doing business as" or "d/b/a"

I have read and agree to the terms and conditions set forth above:

DocuSigned by:

DANIEL STEPHEN MARCH

Name: ___242CC5601A23474...___  Title: ___OWNER___  Date: ___06/14/2021___

Exhibit 3
Page 6

FILED: NASSAU COUNTY CLERK 08/17/2021 02:42 PM INDEX NO. 610577/202
NYSCEF DOC. NO. 1                    Main Document    Page 92 of 132      RECEIVED NYSCEF: 08/17/202

Page 6 of 16

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

names in connection with various matters relating to the transaction between MCA and each Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**21. Financial Condition and Financial Information.** Each Merchant represents, warrants, and covenants that its bank and financial statements, copies of which have been furnished to MCA, and future statements which will be furnished hereafter at the request of MCA, fairly represent the financial condition of each Merchant at such dates, and that since those dates there have been no material adverse changes, financial or otherwise, in such condition, operation, or ownership of any Merchant. Each Merchant has a continuing affirmative obligation to advise MCA of any material adverse change in its financial condition, operation, or ownership.

**22. Governmental Approvals.** Each Merchant represents, warrants, and covenants that it is in compliance and shall comply with all laws and has valid permits, authorizations, and licenses to own, operate, and lease its properties and to conduct the business in which it is presently engaged.

**23. Authorization.** Each Merchant represents, warrants, and covenants that it and each person signing this Agreement on behalf of each Merchant has full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**24. Insurance.** Each Merchant represents, warrants, and covenants that it will maintain business-interruption insurance naming MCA as loss payee and additional insured in amounts and against risks as are satisfactory to MCA and shall provide MCA proof of such insurance upon request.

**25. Electronic Check Processing Agreement.** Each Merchant represents, warrants, and covenants that it will not, without MCA's prior written consent, change its Processor, add terminals, change its financial institution or bank account, or take any other action that could have any adverse effect upon any Merchant's obligations under this Agreement.

**26. Change of Name or Location.** Each Merchant represents, warrants, and covenants that it will not conduct its business under any name other than as disclosed to MCA or change any place(s) of its business without prior written consent from MCA.

**27. Estoppel Certificate.** Each Merchant represents, warrants, and covenants that it will, at any time, and from time to time, upon at least two day's prior notice from MCA to that Merchant, execute, acknowledge, and deliver to MCA and/or to any other person or entity specified by MCA, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Receivables Purchased Amount or any portion thereof have been paid.

**28. No Bankruptcy.** Each Merchant represents, warrants, and covenants that as of the date of this Agreement, it does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against any Merchant. Each Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it. Each Merchant further warrants that there will be no statutory presumption that it would have been insolvent on the date of this Agreement.

**29. Unencumbered Receivables.** Each Merchant represents, warrants, and covenants that it has good, complete, and marketable title to all Receivables, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges, and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with this Agreement or adverse to the interests of MCA, other than any for which MCA has actual or constructive knowledge as of the date of this Agreement.

**30. Stacking.** Each Merchant represents, warrants, and covenants that it will not enter into with any party other than MCA any arrangement, agreement, or commitment that relates to or involves the Receivables, whether in the form of a purchase of, a loan against, collateral against, or the sale or purchase of credits against Receivables without the prior

I have read and agree to the terms and conditions set forth above:

Name: DANIEL STEPHEN MARCH  Title: OWNER  Date: 06/14/2021

Exhibit 3
Page 7

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

written consent of MCA.

**31. Business Purpose.** Each Merchant represents, warrants, and covenants that it is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and each Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family, or household purposes.

**32. Default Under Other Contracts.** Each Merchant represents, warrants, and covenants that its execution of and/or performance under this Agreement will not cause or create an event of default by any Merchant under any contract with another person or entity.

**33. Security Interest.** To secure each Merchant's payment and performance obligations to MCA under this Agreement and any future agreement with MCA, each Merchant hereby grants to MCA a security interest in collateral (the "Collateral"), that is defined as collectively: (a) all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by any Merchant; and (b) all proceeds, as that term is defined by Article 9 of the UCC. The parties acknowledge and agree that any security interest granted to MCA under any other agreement between any Merchant or Guarantor and MCA (the "Cross-Collateral") will secure the obligations hereunder and under this Agreement. Negative Pledge: Each Merchant agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Cross-Collateral, as applicable.

Each Merchant agrees to execute any document or take any action in connection with this Agreement as MCA deems necessary to perfect or maintain MCA's first priority security interest in the Collateral and the Cross-Collateral, including the execution of any account control agreements. Each Merchant hereby authorizes MCA to file any financing statements deemed necessary by MCA to perfect or maintain MCA's security interest, which financing statements may contain notification that each Merchant has granted a negative pledge to MCA with respect to the Collateral and the Cross-Collateral, and that any subsequent lienor may be tortiously interfering with MCA's rights. Each Merchant shall be liable for and MCA may charge and collect all costs and expenses, including but not limited to attorney fees, which may be incurred by MCA in protecting, preserving, and enforcing MCA's security interest and rights. Each Merchant further acknowledges that MCA may use another legal name and/or D/B/A or an agent when designating the Secured Party when MCA files the above-referenced financing statement(s).

**34. Events of Default.** An "Event of Default" may be considered to have taken place if any of the following occur:
(1) Any Merchant violates any term or covenant in this Agreement;
(2) Any representation or warranty by any Merchant in any Agreement with MCA that has not been terminated proves to have been incorrect, false, or misleading in any material respect when made;
(3) Any Merchant fails to provide MCA with written notice of any material change in its financial condition, operation, or ownership within seven days thereafter (unless a different notice period is specifically provided for elsewhere in this Agreement;
(4) the sending of notice of termination by any Merchant or Guarantor;
(5) Any Merchant transports, moves, interrupts, suspends, dissolves, or terminates its business without the prior written consent of MCA other than a bankruptcy filing;
(6) Any Merchant transfers or sells all or substantially all of its assets without the prior written consent of MCA;
(7) Any Merchant makes or sends notice of any intended bulk sale or transfer by any Merchant without the prior written consent of MCA;
(8) Any Merchant uses multiple depository accounts without the prior written consent of MCA;
(9) Any Merchant changes the Account without the prior written consent of MCA;
(10) MCA is not provided with updated login or password information for the Account within one business day after any such change is made by any Merchant;
(11) Any Merchant fails to send bank statements, merchant account statements, or bank login information for the Account within two business days after a written request for same is made by MCA;
(12) Any Merchant performs any act that reduces the value of any Collateral granted under this Agreement;
(13) Any Merchant fails to deposit its Receivables into the Account;

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

DANEL STEPHEN MARCH

242FC5601A23474...

Name: _____  Title: OWNER  Date: 08/44/2024

Exhibit 3
Page 8

FILED: Case 2:24-cv-00458-SC Document 690 Filed 02/08/25 Entered 02/08/25 02:42:24 Desc NYSCEF DOC. NO. 1 Main Document Page 95 of 132 RECEIVED NYSCEF: 08/17/202

Page 8 of 16

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

(14) Any Merchant causes any ACH debit to the Account by MCA to be blocked or stopped without providing any advance written notice to MCA, which notice may be given by e-mail to Michael@mcacapitalholdings.com; or

(15) Any Merchant prevents MCA from collecting any part of the Receivables Purchased Amount;

(16) Any Merchant causes any ACH debit to the Account to be stopped or otherwise returned that would result in an ACH Return Code of R08, R10, or R29 and that Merchant does not within two business days thereafter provide MCA with written notice thereof explaining why that Merchant caused the ACH debit to be stopped or otherwise returned, which notice may be given by e-mail to Michael@mcacapitalholdings.com; or

(17) Any Merchant defaults under any of the terms, covenants, and conditions of any other agreement with MCA.

**35. Remedies.** In case any Event of Default occurs and is not waived, MCA may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement, or other provision contained herein, or to enforce the discharge of each Merchant's obligations hereunder, or any other legal or equitable right or remedy. All rights, powers, and remedies of MCA in connection with this Agreement, including each Protection listed in Section 17, may be exercised at any time by MCA after the occurrence of an Event of Default, are cumulative and not exclusive, and will be in addition to any other rights, powers, or remedies provided by law or equity. In addition to the foregoing, in case any Event of Default occurs and is not waived, MCA will be entitled to the issuance of an injunction, restraining order, or other equitable relief in MCA's favor, subject to court or arbitrator approval, restraining each Merchant's accounts and/or receivables up to the amount due to MCA as a result of the Event of Default, and each Merchant will be deemed to have consented to the granting of an application for the same to any court or arbitral tribunal of competent jurisdiction without any prior notice to any Merchant or Guarantor and without MCA being required to furnish a bond or other undertaking in connection with the application.

**36. Required Notifications.** Each Merchant is required to give MCA written notice at least one day prior to any filing under Title 11 of the United States Code. Merchant(s) are required to give MCA at least seven days' written notice prior to the closing of any sale of all or substantially all of any Merchant's assets or stock.

**37. Assignment.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns, except that Merchant(s) shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of MCA, which consent may be withheld in MCA's sole discretion. MCA may assign, transfer, or sell its rights under this Agreement, including, without limitation, its rights to receive the Receivables Purchased Amount, and its rights under Section 33 of this Agreement, the Guarantee, and any other agreement, instrument, or document executed in connection with the transactions contemplated by this Agreement (a "Related Agreement"), or delegate its duties hereunder or thereunder, either in whole or in part. From and after the effective date of any such assignment or transfer by MCA, whether or not any Merchant has actual notice thereof, this Agreement and each Related Agreement shall be deemed amended and modified (without the need for any further action on the part of any Merchant or MCA) such that the assignee shall be deemed a party to this Agreement and any such Related Agreement and, to the extent provided in the assignment document between MCA and such assignee (the "Assignment Agreement"), have the rights and obligations of MCA under this Agreement and such Related Agreements with respect to the portion of the Receivables Purchased Amount set forth in such Assignment Agreement, including but not limited to rights in the Receivables, Collateral and Additional Collateral, the benefit of each Guarantor's guaranty regarding the full and prompt performance of every obligation that is a subject of the Guarantee, MCA's rights under Section 17 of this Agreement (Protections Against Default), and to receive damages from any Merchant following a breach of this Agreement by any Merchant. In connection with such assignment, MCA may disclose all information that MCA has relating to any Merchant or its business. Each Merchant agrees to acknowledge any such assignment in writing upon MCA's request.

**38. Notices.** All notices, requests, consents, demands, and other communications hereunder shall be delivered by certified mail, return receipt requested, or by overnight delivery with signature confirmation to the respective parties to this Agreement at their addresses set forth in this Agreement and shall become effective only upon receipt. Written notice may also be given to any Merchant or Guarantor by e-mail to the E-mail Address listed on the first page of this Agreement. Each Merchant must set its spam or junk mail filter to accept e-mails sent by Michael@mcacapitalholdings.com and its domain. This Section is not applicable to service of process or notices in any legal proceedings.

**39. Choice of Law.** Each Merchant acknowledges and agrees that this Agreement was made in the State of New

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

DANIEL STEPHEN MARCH

242CC5601A23474...

Name: _____ Title: OWNER _____ Date: 06/14/2021

Exhibit 3
Page 9

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

York, that the Purchase Price is being paid by MCA in the State of New York, that the Receivables Purchased Amount is being delivered to MCA in the State of New York, and that the State of New York has a reasonable relationship to the transactions encompassed by this Agreement. This Agreement and the relationship between MCA, each Merchant, and each Guarantor will be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable principles of conflict of laws.

**40. Forum and Venue Selection.** Any litigation relating to this Agreement or involving MCA on one side and any Merchant or any Guarantor on the other must be commenced and maintained in any court located in the Counties of Nassau, New York, or Sullivan in the State of New York (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient, submit to the jurisdiction of the Acceptable Forums, and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum. The parties agree that this Agreement encompasses the transaction of business within the City of New York and that the Civil Court of the City of New York ("Civil Court") will have jurisdiction over any litigation relating to this Agreement that is within the jurisdictional limit of the Civil Court. In addition to the Acceptable Forums, any action or proceeding to enforce a judgment or arbitration award against any Merchant or Guarantor or to restrain or collect any amount due to MCA may be commenced and maintained in any other court of competent jurisdiction.

**41. Jury Waiver.** The parties agree to waive trial by jury in any dispute between them.

**42. Counterclaim Waiver.** In any litigation or arbitration commenced by MCA, each Merchant and each Guarantor will not be permitted to interpose any counterclaim.

**43. Statutes of Limitations.** Each Merchant and each Guarantor agree that any claim that is not asserted against MCA within one year of its accrual will be time barred.

**44. Costs.** Each Merchant and each Guarantor must pay all of MCA's reasonable costs associated with a breach by any Merchant of the covenants in this Agreement and the enforcement thereof, including but not limited to collection agency fees, attorney fees, which may include a contingency fee of up to 40% of the amount claimed, expert witness fees, and costs of suit.

**45. Prejudgment and Postjudgment Interest.** If MCA becomes entitled to the entry of a judgment against any Merchant or any Guarantor, then MCA will be entitled to the recovery of prejudgment interest at a rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, and upon entry of any such judgment, it will accrue interest at a postjudgment rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, which rate will govern over the statutory rate of interest up until actual satisfaction of the judgment.

**46. Legal Fees.** If MCA prevails in any litigation or arbitration with any Merchant or any Guarantor, then that Merchant and/or Guarantor must pay MCA's reasonable attorney fees, which may include a contingency fee of up to 40% of the amount claimed.

**47. Class Action Waiver.** MCA, each Merchant, and each Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings.

**48. Arbitration.** Any action or dispute relating to this Agreement or involving MCA on one side and any Merchant or any Guarantor on the other, including, but not limited to issues of arbitrability, will, at the option of any party to such action or dispute, be determined by arbitration before a single arbitrator. The arbitration will be administered either by Arbitration Services, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.arbitrationservicesinc.com, or by Mediation & Commercial Arbitration, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.mcarbitration.org. Once an arbitration is initiated with one of these arbitral forums, it must be maintained exclusively before that arbitral forum and the other arbitral forum specified herein may

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

DANIEL STEPHEN MARCH

Name: _____  Title: _____ OWNER _____  Date: 06/14/2021

Exhibit 3
Page 10

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

not be used. Any arbitration relating to this Agreement must be conducted in the Counties of Nassau, New York, Queens, or Kings in the State of New York. Notwithstanding any provision of any applicable arbitration rules, any witness in an arbitration who does not reside in or have a place for the regular transaction of business located in New York City or the Counties of Nassau, Suffolk, or Westchester in the State of New York will be permitted to appear and testify remotely by telephone or video conferencing. In case any Event of Default occurs and is not waived, each Merchant and each Guarantor consents to MCA making an application to the arbitrator, without notice to any Merchant or any Guarantor, for the issuance of an injunction, restraining order, or other equitable relief in MCA's favor, subject to court or arbitrator approval, restraining each Merchant's accounts and/or receivables up to the amount due to MCA as a result of the Event of Default.

Each Merchant acknowledges and agrees that this Agreement is the product of communications conducted by telephone and the Internet, which are instrumentalities of interstate commerce, that the transactions contemplated under this Agreement will be made by wire transfer and ACH, which are also instrumentalities of interstate commerce, and that this Agreement therefore evidences a transaction affecting interstate commerce. Accordingly, notwithstanding any provision in this Agreement to the contrary, all matters of arbitration relating to this Agreement will be governed by and construed in accordance with the provisions of the Federal Arbitration Act, codified as Title 9 of the United States Code, however any application for injunctive relief in aid of arbitration or to confirm an arbitration award may be made under Article 75 of the New York Civil Practice Law and Rules. The arbitration agreement contained in this Section may also be enforced by any employee, agent, attorney, member, manager, officer, subsidiary, affiliate entity, successor, or assign of MCA.

**49. Service of Process.** Each Merchant and each Guarantor consent to service of process and legal notices made by First Class or Priority Mail delivered by the United States Postal Service and addressed to the Contact Address set forth on the first page of this Agreement or any other address(es) provided in writing to MCA by any Merchant or any Guarantor, and unless applicable law or rules provide otherwise, any such service will be deemed complete upon dispatch. Each Merchant and each Guarantor agrees that it will be precluded from asserting that it did not receive service of process or any other notice mailed to the Contact Address set forth on the first page of this Agreement if it does not furnish a certified mail return receipt signed by MCA demonstrating that MCA was provided with notice of a change in the Contact Address.

**50. Survival of Representation, etc.** All representations, warranties, and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

**51. Waiver.** No failure on the part of MCA to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**52. Independent Sales Organizations/Brokers.** Each Merchant and each Guarantor acknowledge that it may have been introduced to MCA by or received assistance in entering into this Agreement or its Guarantee from an independent sales organization or broker ("ISO"). Each Merchant and each Guarantor agree that any ISO is separate from and is not an agent or representative of MCA. Each Merchant and each Guarantor acknowledge that MCA is not bound by any promises or agreements made by any ISO that are not contained within this Agreement. Each Merchant and each Guarantor exculpate from liability and agree to hold harmless and indemnify MCA and its officers, directors, members, shareholders, employees, and agents from and against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) incurred by any Merchant or any Guarantor resulting from any act or omission by any ISO. Each Merchant and each Guarantor acknowledge that any fee that they paid to any ISO for its services is separate and apart from any payment under this Agreement. Each Merchant and each Guarantor acknowledge that MCA does not in any way require the use of an ISO and that any fees charged by any ISO are not required as a condition or incident to this Agreement.

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

DANIEL STEPHEN MARCH

242CC5601A23474...

Name: _____ Title: OWNER _____ Date: 06/14/2021 _____

Exhibit 3
Page 11

RECEIVED NYSCEF: 08/17/202

### STANDARD MERCHANT CASH ADVANCE AGREEMENT

**53. Modifications; Agreements.** No modification, amendment, waiver, or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by all parties.

**54. Severability.** If any provision of this Agreement is deemed invalid or unenforceable as written, it will be construed, to the greatest extent possible, in a manner which will render it valid and enforceable, and any limitation on the scope or duration of any such provision necessary to make it valid and enforceable will be deemed to be part thereof. If any provision of this Agreement is deemed void, all other provisions will remain in effect.

**55. Headings.** Headings of the various articles and/or sections of this Agreement are for convenience only and do not necessarily define, limit, describe, or construe the contents of such articles or sections.

**56. Attorney Review.** Each Merchant acknowledges that it has had an opportunity to review this Agreement and all addenda with counsel of its choosing before signing the documents or has chosen not to avail itself of the opportunity to do so.

**57. Entire Agreement.** This Agreement, inclusive of all addenda, if any, executed simultaneously herewith constitutes the full understanding of the parties to the transaction herein and may not be amended, modified, or canceled except in writing signed by all parties. Should there arise any conflict between this Agreement and any other document preceding it, this Agreement will govern. This Agreement does not affect any previous agreement between the parties unless such an agreement is specifically referenced herein. This Agreement will not be affected by any subsequent agreement between the parties unless this Agreement is specifically referenced therein. MCA will not be permitted to enforce any of its rights under this Agreement if so expressed by in writing by Gene Rosen's Law Firm.

**58. Counterparts; Fax and Electronic Signatures.** This Agreement may be executed electronically and in counterparts. Facsimile and electronic copies of this Agreement will have the full force and effect of an original.

### EACH UNDERSIGNED HEREBY ACCEPTS THE TERMS OF THIS AGREEMENT

**FOR THE MERCHANT/OWNER (#1)**

DANIEL STEPHEN MARCH

By: _____  _____  DocuSigned by: DANIEL STEPHEN MARCH
     (Print Name)          (Print Title)          242CC5601A23474 (Signature)

SS# ██████ _____  Driver License Number _____

**FOR THE MERCHANT/OWNER (#2)**

By: _____  _____  _____
     (Print Name)           (Print Title)           (Signature)

SS# _____  Driver License Number _____

Approved for MCA CAPITAL HOLDINGS LLC by: _____

Exhibit 3
Page 12

FILODoc ##34-400046850C DoD674690 FFiled 07208/265 Entered 07208/25 0258:254 Desc
NYSCEF DOC. NO. 1                    Main Document       Page 99 of 132        RECEIVED NYSCEF: 08/17/202

Page **12** of **16**

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

## GUARANTEE

**G1.   Personal   Guarantee   of   Performance.**   This   is   a   personal   guaranty   of   performance,   dated
06/14/2021_____, of the Standard Merchant Cash Advance Agreement, dated 06/14/2021_____ ("Agreement"),
inclusive of all addenda, if any, executed simultaneously therewith, by and between MCA CAPITAL HOLDINGS LLC
("MCA") and THE LITIGATION PRACTICE GROUP PC / VULCAN ("Merchant"). Each undersigned Guarantor hereby guarantees each
Merchant's performance of all of the representations, warranties, and covenants made by each Merchant to MCA in the
Agreement, inclusive of all addenda, if any, executed simultaneously herewith, as the Agreement may be renewed,
amended, extended, or otherwise modified (the "Guaranteed Obligations"). Each Guarantor's obligations are due at the time
of any breach by any Merchant of any representation, warranty, or covenant made by any Merchant in the Agreement.

**G2. Communications.** MCA may use automated telephone dialing, text messaging systems, and e-mail to provide
messages to Guarantor(s) about Merchant(s)'s account. Telephone messages may be played by a machine automatically
when the telephone is answered, whether answered by an Owner, a Guarantor, or someone else. These messages may
also be recorded by the recipient's answering machine or voice mail. Each Guarantor gives MCA permission to call or send
a text message to any telephone number given to MCA in connection with this Agreement and to play pre-recorded
messages and/or send text messages with information about this Agreement and/or any Merchant's account over the phone.
Each Guarantor also gives MCA permission to communicate such information to them by e-mail. Each Guarantor agrees
that MCA will not be liable to any of them for any such calls or electronic communications, even if information is
communicated to an unintended recipient. Each Guarantor acknowledges that when they receive such calls or electronic
communications, they may incur a charge from the company that provides them with telecommunications, wireless, and/or
Internet services, and that MCA has no liability for any such charges.

**G3. Guarantor Waivers.** If MCA considers any Event of Default to have taken place under the Agreement, then
MCA may enforce its rights under this Guarantee without first seeking to obtain payment from any Merchant, any other
guarantor, or any Collateral, Additional Collateral, or Cross-Collateral MCA may hold pursuant to this Guarantee or any
other agreement or guarantee. MCA does not have to notify any Guarantor of any of the following events and Guarantor(s)
will not be released from its obligations under this Guarantee even if it is not notified of: (i) any Merchant's failure to pay
timely any amount owed under the Agreement; (ii) any adverse change in any Merchant's financial condition or business;
(iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guarantee of the
Guaranteed Obligations; (iv) MCA's acceptance of the Agreement with any Merchant; and (v) any renewal, extension, or
other modification of the Agreement or any Merchant's other obligations to MCA. In addition, MCA may take any of the
following actions without releasing any Guarantor from any obligations under this Guarantee: (i) renew, extend, or otherwise
modify the Agreement or any Merchant's other obligations to MCA; (ii) if there is more than one Merchant, release a
Merchant from its obligations to MCA such that at least one Merchant remains obligated to MCA; (iii) sell, release, impair,
waive, or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guarantee of the
Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guarantee
of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for
payment under the Agreement. Until the Receivables Purchased Amount and each Merchant's other obligations to MCA
under the Agreement and this Guarantee are paid in full, each Guarantor shall not seek reimbursement from any Merchant
or any other guarantor for any amounts paid by it under the Agreement. Each Guarantor permanently waives and shall not
seek to exercise any of the following rights that it may have against any Merchant, any other guarantor, or any collateral
provided by any Merchant or any other guarantor, for any amounts paid by it or acts performed by it under this Guarantee:
(i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution.

**G4. Joint and Several Liability.** The obligations hereunder of the persons or entities constituting each Guarantor
under this Guarantee are joint and several.

**G5. Injunctive Relief.** In case any Event of Default occurs and is not waived, MCA will be entitled to the issuance
of an injunction, restraining order, or other equitable relief in MCA's favor, subject to court or arbitrator approval, restraining
each Guarantor's accounts and/or receivables up to the amount due to MCA as a result of the Event of Default, and each
Guarantor will be deemed to have consented to the granting of an application for the same to any court or arbitral tribunal

I have read and agree to the terms and conditions set forth above:

DocuSigned by:

DANIEL STEPHEN MARCH

242CC5601A23474...
Name: DANIEL STEPHEN MARCH      Title: OWNER_____   Date: 06/14/2021

Exhibit 3
Page 13

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

of competent jurisdiction without any prior notice to any Merchant or Guarantor and without MCA being required to furnish a bond or other undertaking in connection with the application.

**G6. Choice of Law.** Each Guarantor acknowledges and agrees that the Agreement and this Guarantee were made in the State of New York, that the Purchase Price is being paid by MCA in the State of New York, that the Receivables Purchased Amount is being delivered to MCA in the State of New York, and that the State of New York has a reasonable relationship to the transactions encompassed by the Agreement and this Guarantee. This Guarantee and the relationship between MCA, each Merchant, and each Guarantor will be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable principles of conflict of laws.

**G7. Forum and Venue Selection.** Any litigation relating to this Agreement or this Guarantee or involving MCA on one side and any Merchant or any Guarantor on the other must be commenced and maintained in any court located in the Counties of Nassau, New York, or Sullivan in the State of New York (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient, submit to the jurisdiction of the Acceptable Forums, and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum. The parties agree that this Guarantee encompasses the transaction of business within the City of New York and that the Civil Court of the City of New York ("Civil Court") will have jurisdiction over any litigation relating to this Guarantee that is within the jurisdictional limit of the Civil Court. In addition to the Acceptable Forums, any action or proceeding to enforce a judgment or arbitration award against any Merchant or Guarantor or to restrain or collect any amount due to MCA may be commenced and maintained in any other court of competent jurisdiction.

**G8. Jury Waiver.** Each Guarantor agrees to waive trial by jury in any dispute with MCA.

**G9. Counterclaim Waiver.** In any litigation or arbitration commenced by MCA, each Merchant and each Guarantor will not be permitted to interpose any counterclaim.

**G10. Statutes of Limitations.** Each Merchant and each Guarantor agree that any claim that is not asserted against MCA within one year of its accrual will be time barred.

**G11. Costs.** Each Merchant and each Guarantor must pay all of MCA's reasonable costs associated with a breach by any Merchant of the covenants in this Agreement or this Guarantee and the enforcement thereof, including but not limited to collection agency fees, expert witness fees, and costs of suit.

**G12. Prejudgment and Postjudgment Interest.** If MCA becomes entitled to the entry of a judgment against any Merchant or any Guarantor, then MCA will be entitled to the recovery of prejudgment interest at a rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, and upon entry of any such judgment, it will accrue interest at a postjudgment rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, which rate will govern over the statutory rate of interest up until actual satisfaction of the judgment.

**G13. Legal Fees.** If MCA prevails in any litigation or arbitration with any Merchant or any Guarantor, then that Merchant and/or Guarantor must pay MCA's reasonable attorney fees, which may include a contingency fee of up to 40% of the amount claimed.

**G14. Class Action Waiver.** MCA, each Merchant, and each Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings.

**G15. Arbitration.** Any action or dispute relating to this Agreement or this Guarantee or involving MCA on one side and any Merchant or any Guarantor on the other, including, but not limited to issues of arbitrability, will, at the option of any party to such action or dispute, be determined by arbitration before a single arbitrator. The arbitration will be administered either by Arbitration Services, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

DANIEL STEPHEN MARCH

—242CC5601A23474...

Name: _____  Title: OWNER  Date: 08/14/2024

Exhibit 3
Page 14

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

available at www.arbitrationservicesinc.com, or by Mediation & Commercial Arbitration, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.mcarbitration.org. Once an arbitration is initiated with one of these arbitral forums, it must be maintained exclusively before that arbitral forum and the other arbitral forum specified herein may not be used. Any arbitration relating to this Agreement or this Guarantee must be conducted in the Counties of Nassau, New York, Queens, or Kings in the State of New York. Notwithstanding any provision of any applicable arbitration rules, any witness in an arbitration who does not reside in or have a place for the regular transaction of business located in New York City or the Counties of Nassau, Suffolk, or Westchester in the State of New York will be permitted to appear and testify remotely by telephone or video conferencing. In case any Event of Default occurs and is not waived, each Guarantor consents to MCA making an application to the arbitrator, without notice to any Merchant or any Guarantor, for the issuance of an injunction, restraining order, or other equitable relief in MCA's favor, subject to court or arbitrator approval, restraining each Guarantor's accounts and/or receivables up to the amount due to MCA as a result of the Event of Default.

Each Guarantor acknowledges and agrees that the Agreement and this Guarantee are the product of communications conducted by telephone and the Internet, which are instrumentalities of interstate commerce, that the transactions contemplated under the Agreement and this Guarantee will be made by wire transfer and ACH, which are also instrumentalities of interstate commerce, and that the Agreement and this Guarantee therefore evidence a transaction affecting interstate commerce. Accordingly, notwithstanding any provision in the Agreement or this Guarantee to the contrary, all matters of arbitration relating to the Agreement or this Guarantee will be governed by and construed in accordance with the provisions of the Federal Arbitration Act, codified as Title 9 of the United States Code, however any application for injunctive relief in aid of arbitration or to confirm an arbitration award may be made under Article 75 of the New York Civil Practice Law and Rules. The arbitration agreement contained in this Section may also be enforced by any employee, agent, attorney, member, manager, officer, subsidiary, affiliate entity, successor, or assign of MCA.

**G16. Service of Process.** Each Merchant and each Guarantor consent to service of process and legal notices made by First Class or Priority Mail delivered by the United States Postal Service and addressed to the Contact Address set forth on the first page of the Agreement or any other address(es) provided in writing to MCA by any Merchant or any Guarantor, and unless applicable law or rules provide otherwise, any such service will be deemed complete upon dispatch. Each Merchant and each Guarantor agrees that it will be precluded from asserting that it did not receive service of process or any other notice mailed to the Contact Address set forth on the first page of the Agreement if it does not furnish a certified mail return receipt signed by MCA demonstrating that MCA was provided with notice of a change in the Contact Address.

**G17. Severability.** If any provision of this Guarantee is deemed invalid or unenforceable as written, it will be construed, to the greatest extent possible, in a manner which will render it valid and enforceable, and any limitation on the scope or duration of any such provision necessary to make it valid and enforceable will be deemed to be part thereof. If any provision of this Guarantee is deemed void, all other provisions will remain in effect.

**G18. Survival.** The provisions of Sections G2, G3, G4, G5, G6, G7, G8, G9, G10, G11, G12, G13, G14, G15, G16, G17, G18, G19, G20, G21, and G22 shall survive any termination of this Guarantee.

**G19. Headings.** Headings of the various articles and/or sections of this Guarantee are for convenience only and do not necessarily define, limit, describe, or construe the contents of such articles or sections.

**G20. Attorney Review.** Each Guarantor acknowledges that it has had an opportunity to review this Guarantee, the Agreement, and all addenda with counsel of its choosing before signing the documents or has chosen not to avail itself of the opportunity to do so.

I have read and agree to the terms and conditions set forth above:

DocuSigned by:

DANIEL STEPHEN MARCH

Name: 242CC5601A23474...    Title: OWNER    Date: 06/14/2021

Exhibit 3
Page 15

FILED: Case 2:24-cv-00469-SC Doc 69 Filed 04/08/25 Entered 04/08/25 05:38:52 Desc NYSCEF DOC. NO. 1 Main Document Page 102 of 135 RECEIVED NYSCEF: 08/17/202

Page 15 of 16

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

**G21. Entire Agreement.** This Guarantee, inclusive of all addenda, if any, executed simultaneously herewith may not be amended, modified, or canceled except in writing signed by all parties. Should there arise any conflict between this Guarantee and any other document preceding it, this Guarantee will govern. This Guarantee does not affect any previous agreement between the parties unless such an agreement is specifically referenced in the Agreement or herein. This Guarantee will not be affected by any subsequent agreement between the parties unless this Guarantee is specifically referenced therein.

**G22. Counterparts; Fax and Electronic Signatures.** This Guarantee may be executed electronically and in counterparts. Facsimile and electronic copies of this Guarantee will have the full force and effect of an original.

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "STANDARD MERCHANT CASH ADVANCE AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS GUARANTEE. CAPITALIZED TERMS NOT DEFINED IN THIS GUARANTEE SHALL HAVE THE MEANING SET FORTH IN THE STANDARD MERCHANT CASH ADVANCE AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

### EACH UNDERSIGNED HEREBY ACCEPTS THE TERMS OF THIS GUARANTEE

**GUARANTOR (#1)**

By: _DANIEL STEPHEN MARCH_____
(Print Name)

Signature: _DANIEL STEPHEN MARCH_____
DocuSigned by:
242CC5601A23474...
(Signature)

SS# _█████████_____

Driver License Number _____

**GUARANTOR (#2)**

By: _____
(Print Name)

_____
(Signature)

SS# _____

Driver License Number _____

Exhibit 3
Page 16

STANDARD MERCHANT CASH ADVANCE AGREEMENT

# BANK INFORMATION

Dear Merchant,

Thank you for accepting this offer from MCA CAPITAL HOLDINGS LLC. We look forward to being your funding partner.

You authorize MCA CAPITAL HOLDINGS LLC to collect the Receivables Purchased Amount under this Agreement by ACH debiting your bank account with the bank listed below.

MCA CAPITAL HOLDINGS LLC will require viewing access to your bank account each business day.

MCA CAPITAL HOLDINGS LLC will also require viewing access to your bank account, prior to funding, as part of our underwriting process.

Please fill out the form below with the information necessary to access your account.

**\* Be sure to indicate capital or lower case letters.**

Name of bank: BANK OF THE WEST / BANK OF AMERICA

Name of account: THE LITIGATION PRACTICE GROUP / VULCAN CONSULTING GROUP

Account number: ▓▓▓▓▓▓▓▓▓▓   Routing number: 122242843 / 121000358

Bank portal website: www.bankofamerica.com

Username: ▓▓▓▓

Password: ▓▓▓▓▓

Security Question/Answer 1:

Security Question/Answer 2:

Security Question/Answer 3:

Any other information necessary to access your account:

If you have any questions please feel free to contact us directly at (646) 419-5325.

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

*DANIEL STEPHEN MARCH*

Name: 242CC5601A23474...   Title: OWNER   Date: 08/14/2021

Exhibit 3
Page 17

## ADDENDUM TO STANDARD MERCHANT CASH ADVANCE AGREEMENT
## FOR ESTIMATED PAYMENTS

This is an Addendum, dated <u>06/14/2021</u>, to the Standard Merchant Cash Advance Agreement ("Agreement"), dated <u>06/14/2021</u>, between MCA Capital Holdings LLC ("MCA") and <u>THE LITIGATION PRACTICE GROUP PC / VULCAN CONSULTING GROUP LLC</u> ("Merchant"). This Addendum incorporates the Agreement by reference. The terms of this Addendum will control to the extent they conflict with any of the terms in the Agreement.

Instead of debiting the \_\_\_\_ % Specified Percentage of Merchant's Receivables, MCA may instead debit $ <u>12,491.66</u> ("Estimated Payment") from the Account every <u>DAY</u>. The Estimated Payment is intended to be an approximation of no more than the Specified Percentage.

Any Merchant may give written notice to MCA requesting that MCA conduct a reconciliation in order to ensure that the amount that MCA has collected equals the Specified Percentage of Merchant(s)'s Receivables under this Agreement. Any Merchant may give written notice requesting a reconciliation. A request for reconciliation may also be made by e-mail to Michael@mcacapitalholdings.com and such notice will be deemed to have been received if and when MCA sends a reply e-mail (but not a read receipt). If such reconciliation determines that MCA collected more than it was entitled to, then within seven days thereafter, MCA will credit to the Account all amounts to which MCA was not entitled and decrease the Estimated Payment so that it is consistent with the Specified Percentage of Merchant(s)'s Receivables from the date of the Agreement through the date of the reconciliation. If such reconciliation determines that MCA collected less than it was entitled to, then within seven days thereafter, MCA will debit from the Account all additional amounts to which MCA was entitled and increase the Estimated Payment so that it is consistent with the Specified Percentage of Merchant(s)'s Receivables from the date of the Agreement through the date of the reconciliation, with the increase being subject to any Cap in place on collections. In order to effectuate this reconciliation, any Merchant must produce with its request the login and password for the Account and any and all bank statements and merchant statements covering the period from the date of this Agreement through the date of the request for a reconciliation. MCA will complete each such reconciliation within two business days after receipt of a written request for one accompanied by the information and documents required for it. Nothing herein limits the amount of times that such a reconciliation may be requested.

### FOR THE MERCHANT/OWNER (#1)

By: <u>DANIEL STEPHEN MARCH</u>     <u>DANIEL STEPHEN MARCH</u>
      (Print Name and Title)       DocuSigned by:
                                        242CC5601A23474
                                         (Signature)

### FOR THE MERCHANT/OWNER (#2)

By: _____ _____
      (Print Name and Title)               (Signature)

Exhibit 3
Page 18



## ADDENDUM TO STANDARD MERCHANT CASH ADVANCE AGREEMENT
## FOR ADDITIONAL FEES

This is an Addendum, dated 06/14/2021 , to the Standard Merchant Cash Advance Agreement ("Agreement"), dated 06/14/2021 , between MCA Capital Holdings LLC ("MCA") and THE LITIGATION PRACTICE GROUP PC / VULCAN CONSULTING GROUP LLC ("Merchant"). This Addendum incorporates the Agreement by reference. The terms of this Addendum will control to the extent they conflict with any of the terms in the Agreement.

Each Merchant may be held responsible for an NSF/ Rejected ACH Fee of $50.00 for each time an ACH debit to the Account by MCA is returned or otherwise rejected. No Merchant will be held responsible for such a fee if any Merchant gives MCA advance notice of no more than one business day in advance that the Account has insufficient funds to be debited by MCA and no Merchant is otherwise in default of the terms of the Agreement. Each such fee may be deducted from any payment collected by MCA or may be collected in addition to any other payment collected by MCA under this Agreement.


### FOR THE MERCHANT/OWNER (#1)

By: DANIEL STEPHEN MARCH        OWNER
_____          DANIEL STEPHEN MARCH
        (Print Name and Title)              —242CC5601A23474...
                                          _____
                                                    (Signature)


### FOR THE MERCHANT/OWNER (#2)

By:_____          _____
        (Print Name and Title)                       (Signature)

Exhibit 3
Page 19



## ADDENDUM TO STANDARD MERCHANT CASH ADVANCE AGREEMENT

This is an Addendum, dated 06/14/2021 _____, to the Standard Merchant Cash Advance Agreement ("Agreement"), dated 06/14/2021 _____, between MCA CAPITAL HOLDINGS LLC ("MCA") and THE LITIGATION PRACTICE GROUP PC / VULCAN CONSULTING ("Merchant").

Merchant(s) instruct MCA to pay up to $_____ of the Purchase Price set forth in the Agreement to _____

instead of to Merchant(s). The balance of the Purchase Price will be paid to Merchant(s).

Additional comments: _____

_____

_____

_____

**FOR THE MERCHANT/OWNER (#1)**

By:_____
DANIEL STEPHEN MARCH          OWNER
(Print Name and Title)

_____
DANIEL STEPHEN MARCH
242CC5601A23474
(Signature)

**FOR THE MERCHANT/OWNER (#2)**

By:_____
(Print Name and Title)

_____
(Signature)

Exhibit 3
Page 20

## DECLARATION OF ORDINARY COURSE OF BUSINESS

Each undersigned hereby declares the following:

1.     I am duly authorized to sign the Standard Merchant Cash Advance Agreement ("Agreement"), dated 06/14/2021 _____, between MCA Capital Holdings LLC ("MCA") and  THE LITIGATION PRACTICE GROUP PC / VULCAN CONSULTING GROUP LLC _____ ("Merchant") on behalf of Merchant.

2.     This Declaration incorporates by reference the Agreement and every addendum to it.

3.     I acknowledge that I am authorized to sign the Agreement and every addendum to it on behalf of each Merchant.

4.     I acknowledge that I had sufficient time to review the Agreement and every addendum to it before signing it.

5.     I acknowledge that I had an opportunity to seek legal advice from counsel of my choosing before signing the Agreement and every addendum to it.

6.     I acknowledge that each Merchant is entering into the Agreement voluntarily and without any coercion.

7.     I acknowledge that each Merchant is entering into the Agreement in the ordinary course of its business.

8.     I acknowledge that the payments to be made from any Merchant to MCA under the Agreement are being made in the ordinary course of each Merchant's business.

9.     **I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on 06/14/2021 _____  6/14/2021
                               (Date)

### FOR THE MERCHANT/OWNER (#1)

By: DANIEL STEPHEN MARCH     OWNER _____          DANIEL STEPHEN MARCH
           (Print Name and Title)                                              —242CC5601A23474...
                                                 (Signature)

### FOR THE MERCHANT/OWNER (#2)

By:_____                              _____
           (Print Name and Title)                                              (Signature)

Exhibit 3
Page 21

# Exhibit 4

Exhibit 4
Page 1

| Date | Entity | Amount | Running Total |
|---|---|---|---|
| 10/8/2024 | New Horizon | $ 90,000.00 | $ 90,000.00 |
| 11/18/2024 | Payliance | $ 508,460.00 | $ 598,460.00 |
| 12/26/2024 | Bayrooti | $ 3,400,000.00 | $ 3,998,460.00 |
| Pre-Effective Date | Prime Logix, LLC | $ 1,223,687.59 | $ 5,222,147.59 |
| Pre-Effective Date | Maverick Bank Card, Inc. | $ 252,938.95 | $ 5,475,086.54 |
| Pre-Effective Date | Nelnet | $ 163,497.30 | $ 5,638,583.84 |
| Pre-Effective Date | Maverick Management Group, LLC | $ 239,197.01 | $ 5,877,780.85 |
| Pre-Effective Date | Revov3, Inc. | $ 5,024,678.89 | $ 10,902,459.74 |
| Pre-Effective Date | Vulcan Consulting Group, LLC | $ 11,308.15 | $ 10,913,767.89 |
| Pre-Effective Date | LPG Asset Sale Proceeds | $ 10,001,582.92 | $ 20,915,350.81 |

Exhibit 4
Page 2

Exhibit 5

Exhibit 5
Page 1

**EXHIBIT 5**

**MARKETING AFFILIATES ("Cappers")**

| MARKETING AFFILIATE | AMOUNT PAID |
| --- | --- |
| 1. United Global Research Group, Inc. | $689,137.59 |
| 2. MPowering America, LLC | $444,745.98 |
| 3. Strategic Consulting Solutions LLC | $1,650,053.21 |
| 4. Strategic Consulting Services LLC | $380,000.00 |
| 5. Sabia Financial Inc. | $125,965.60 |
|  | $79,978.71 |
| 6. Chad Rothrock  Frank Dal Bello |  |
| 7. BC Consulting Group, LLC  Brian Defelice | $69,438.45 |
| 8. EZ Debt Relief Inc. | $109,474.81 |
|  | $79,000.00 |
| 9. Summit Marketing Solutions Inc. | $695,575.69 |
| 10. Outsource LLC | $807,489.84 |
| 11. Bill.com LLC | $936,566.22 |
|  | $799.60 |
|  | $8.62 |
| 12. White Collar Group, Inc. | $570,891.54 |

Exhibit 5
Page 2

| | | | |
|---|---|---|---|
| 1 | 13. | ILM Corporation of | $278,256.06 |
| 2 | | Virginia | |
| 3 | 14. | Bold Cap LLC | $150,000.00 |
| 4 | 15. | Gotham Trading NYC | $150,000.00 |
| 5 | 16. | No Limit Media LLC | $129,175.00 |
| 6 | 17. | Venture Partners, LLC | $397,377.39 |
| 7 | | ProofPositive | |
| 8 | | Diana Hanson | |
| 9 | 18. | Clearfund Solution, | $189,136.75 |
| 10 | | LLC/Cloudfund, LLC | |
| 11 | 19. | Coast to Coast Marketing | $126.07 |
| 12 | | Services | |
| 13 | 20. | Everyday Funding Group | |
| 14 | 21. | Stratcap Management | |
| 15 | | LLC | |
| 16 | | Wes Thomas | |
| 17 | 22. | Herret Credit | $1,275,632.61 |
| 18 | | Consultants, Inc. | |
| 19 | 23. | Kyle Herret | $1,938.33 |
| 20 | 24. | Debt Resolution Direct | $12,945.146.97 |
| 21 | | LLC | |
| 22 | 25. | Matt Clegg | $139,885.00 |
| 23 | 26. | John Ilnicki | $84,000.00 |
| 24 | 27. | David John Ilnicki | $72,000.00 |
| 25 | 28. | United Debt Consultants | $1,564,012.97 |
| 26 | | LLC | |
| 27 | | April Parra | |
| 28 | | | |

Exhibit 5

Page 3

| 1 | 29. | Platinum Capital | $923,508.82 |
| 2 | | Consulting LLC | |
| 3 | 30. | Platinum Media | |
| 4 | | Marketing LLC | |
| 5 | 31. | Jim Murphy | |
| 6 | 32. | Paragon Financial Corp. | $934,778.67 |
| 7 | | Jenssen Varela | |
| 8 | 33. | July 5th LLC | $1,398,809.15 |
| 9 | 34. | Oha Management LLC | $1,400,745.86 |
| 10 | 35. | A Solution 2 | |
| 11 | 36. | A Solution Debt Relief | $290,567 |
| 12 | 37. | A Solution Debt Relief 3 | |
| 13 | 38. | All Service Financial | $866,462.06 |
| 14 | | (All Service Financial, | |
| 15 | | LLC) | |
| 16 | | Ryan McKenna | |
| 17 | 39. | Acufi LLC | $395,000 |
| 18 | | Acufi Finance | |
| 19 | | Nicholas Kohlschreiber | |
| 20 | 40. | Teracel Blockchain Fund | $103,500.20 |
| 21 | | II LLC | $774,180.17 |
| 22 | | Teracel LLC | |
| 23 | 41. | Freedom Enrollment | $586,615 |
| 24 | | Brian Reale | |
| 25 | 42. | Integrity Docs LLC | $481,279 |
| 26 | | Richard Nadelman | |
| 27 | 43. | Golden Financial | $434,552.23 |
| 28 | | Services | |

Exhibit 5
Page 4

| | | | |
|---|---|---|---|
| 1 | 44. | Liamia Group, Inc. | $373,496.28 |
| 2 | 45. | Joco Enterprises, LLC (2) | $365,241.16 |
| 3 | | fka CJB Enterprise | |
| 4 | 46. | Bonus Financial, LLC | $291,103.67 |
| 5 | 47. | Countdown Capital Inc. | $288,192.00 |
| 6 | 48. | ECE Financial LLC | $267,181.96 |
| 7 | 49. | NextStep Financial Debt | $257,582.90 |
| 8 | | Settlement LLC | |
| 9 | 50. | ACB Holdings, LP | $256,607.09 |
| 10 | 51. | Tux, LLC | $244,868.78 |
| 11 | 52. | AZLS Enterprises | $1,159,205 |
| 12 | 53. | VCG, LLC | $990,976 |
| 13 | 54. | Bit California LLC | $1,007,276.38 |
| 14 | 55. | Collaboration Advisors | $844,549.60 |
| 15 | 56. | YNS Funding LLC | $1,509.966 |
| 16 | 57. | DH Claims LLC | $1,365,800 |
| 17 | 58. | Finmkt Inc. | $1,359,472.91 |
| 18 | 59. | CFS | $899,000 |
| 19 | 60. | CCP Holdings LLC | $854,750.00 |
| 20 | 61. | Aston Technologies | |
| 21 | | Group LLC | |
| 22 | 62. | Point 69 LLC | $290,000.00 |
| 23 | 63. | Lorium Law PLLC | $300,000.00 |
| 24 | 64. | Make It Ring Marketing, | $226,750 |
| 25 | | LLC | |
| 26 | 65. | Validation LLC | $898,840.59 |
| 27 | 66. | Reliance Assistance | $275,870 |
| 28 | | Group Inc. | |

Exhibit 5
Page 5

| | | | |
|---|---|---|---|
| 1 | 67. | Debt Pay Inc. | $1,515,689.28 |
| 2 | | Debt Pay Financial | $194.09 |
| 3 | | Sarkis Manukyan | |
| 4 | 68. | DH Claims LLC | $1,365,800 |
| 5 | 69. | Achme Inc. | $398,596 |
| 6 | | Anthony DeRosa | |
| 7 | | Acme Inc dba Ace Tech | $142,440 |
| 8 | | Ops | |
| 9 | | Anthony DeRosa | |
| 10 | | | |
| 11 | 70. | Aten Consulting dba | $258,987 |
| 12 | | Upside Enroll | |
| 13 | 71. | CCCP Holdings LLC | $830,750 |
| 14 | 72. | Fidelity Pandemic | $587,577 |
| 15 | 73. | Ventura Consulting LLC | $576,678 |
| 16 | 74. | GCP Solutions Inc. | $560,000 |
| 17 | 75. | Lead Generation World | $225,645 |
| 18 | 76. | Emerging Media Partners | $482,689 |
| 19 | 77. | JNR Services Inc. | $507,476 |
| 20 | 78. | Key Capital | $895,750.00 |
| 21 | 79. | Delta Bridge Funding, | $191,250 |
| 22 | | LLC | |
| 23 | 80. | WCMD Services, Inc. | $265,381,06 |
| 24 | 81. | Countdown Capital Inc. | $288,192 |
| 25 | 82. | ECE Financial LLC | $267,181.96 |
| 26 | 83. | NextStep Financial Debt | $257,582.90 |
| 27 | | Settlement LLC | |
| 28 | 84. | Tux, LLC | $244,868.78 |

Exhibit 5
Page 6

| | | | |
|---|---|---|---|
| 1 | 85. | Lorium Law PLLC | $300,000.00 |
| 2 | | Tied to Point 69 | |
| 3 | 86. | ABR Enterprises LLC | $220,604.07 |
| 4 | 87. | M Merchant | $705,801.40 |
| 5 | 88. | Quantum One Holdings | $400,777.43 |
| 6 | | LLC | |
| 7 | 89. | 40One 10 | $121,909 |
| 8 | | ASFPartner | |
| 9 | 90. | VPF 2 – ASF Partner | $7,127.17 |
| 10 | 91. | Financial Debt Services – | $196,352.76 |
| 11 | | ASF Partner | |
| 12 | 92. | Afortus LLC – | |
| 13 | | Collaboration Advisors | |
| 14 | | Partner | |
| 15 | | Ryan Jacobs | |
| 16 | | Brett Olson | |
| 17 | 93. | Core Resource Group | $5,623.19 |
| 18 | | Collaboration Advisors | |
| 19 | | Partner | |
| 20 | | Brian Owens | |
| 21 | 94. | CP Insurance LLC | |
| 22 | | Collaboration Advisors | |
| 23 | | Partner | |
| 24 | | Carson Porter | |
| 25 | 95. | Debt Enrollment | |
| 26 | | Collaboration Advisors | |
| 27 | | Partner | |
| 28 | | | |

Exhibit 5
Page 7

| | | | |
|---|---|---|---|
| 1 | 96. | D.O.D. Debt Relief LLC | |
| 2 | | Collaboration Advisors | |
| 3 | | Partner | |
| 4 | | Norman Balassiano | |
| 5 | 97. | Fontaine Association | |
| 6 | | LLC | |
| 7 | | Collaboration Advisors | |
| 8 | | Partner Ken Fontaine | |
| 9 | 98. | Instinctive Edge LLC | $16,389.36 |
| 10 | | Collaboration Advisors | |
| 11 | | Partner | |
| 12 | | Greg Rispler | |
| 13 | 99. | Intermarketing Media, | $170,329.23 |
| 14 | | LLC | |
| 15 | | Collaboration Advisors | |
| 16 | | Partner | |
| 17 | | Jason Krieck | |
| 18 | 100. | Investake Houston LLC | |
| 19 | | Collaboration Advisors | |
| 20 | | Partner | |
| 21 | | Gustavo Cruz | |
| 22 | 101. | Manifest One Marketing, | $467.71 |
| 23 | | Inc. | |
| 24 | | Collaboration Advisors | |
| 25 | | Partner | |
| 26 | | Kathleen Luna | $228.86 |
| 27 | 102. | Master Contact Centre, | |
| 28 | | Ltd. | |

Exhibit 5

Page 8

| | | | |
|---|---|---|---|
| 1 | | Collaboration Advisors | |
| 2 | | Partner Kamran Rashid | |
| 3 | 103. | Merit Credit Group LLC | |
| 4 | | Collaboration Advisors | |
| 5 | | Partner Kelly Milner | |
| 6 | 104. | Miami Moves On | |
| 7 | | Collaboration Advisors | |
| 8 | | Partner | |
| 9 | | Sari Irons Giovanni | |
| 10 | 105. | Millenium Financial, | $201.81 |
| 11 | | LLC Collaboration | |
| 12 | | Advisors Partner dba 123 | |
| 13 | | Rapid Funding | |
| 14 | | (Millenium Financial) | |
| 15 | | Joshua Ballard | |
| 16 | 106. | Master Steward's | |
| 17 | | Collaboration Advisors | |
| 18 | | Partner Information | |
| 19 | | Technology Solutions, | |
| 20 | | Inc. | |
| 21 | 107. | Reliant One, LLC | |
| 22 | | Collaboration Advisors | |
| 23 | | Partner | |
| 24 | 108. | Reliant Solutions, Inc. | $13,641.18 |
| 25 | | Collaboration Advisors | |
| 26 | | Partner Matthew Deakins | |
| 27 | | | |
| 28 | | | |

Exhibit 5
Page 9

| | | | |
|---|---|---|---|
| 1 | 109. | Retail Is Us- 2 | $144,751.62 |
| 2 | | Collaboration Advisors | |
| 3 | | Partner | |
| 4 | 110. | Retail Is Us, LLC | $144,751.62 |
| 5 | | Collaboration Advisors | |
| 6 | | Nir Algazy | |
| 7 | 111. | Retirement Association, | $2,424.33 |
| 8 | | LLC Collaboration | |
| 9 | | Advisors Partner | |
| 10 | | Lance Burbank | |
| 11 | 112. | Safestone Financial | |
| 12 | | Collaboration Advisors | |
| 13 | | Partner | |
| 14 | | Nicole Villar | |
| 15 | 113. | Unified Consulting Firm, | $46,272.22 |
| 16 | | LLC | |
| 17 | | Collaboration Advisors | |
| 18 | | Partner | |
| 19 | | Howie Nguyen | |
| 20 | 114. | US Debt Assistance | |
| 21 | | Collaboration Advisors | |
| 22 | | Partner | |
| 23 | 115. | 1st Choice Financial, LLC | $1,352.21 |
| 24 | | First Choice Financial, | $112,101.79 |
| 25 | | LLC | |
| 26 | 116. | 1st Choice Solutions | $5,400.00 |
| 27 | | Jason Kashou | |
| 28 | 117. | Baryeh Investment Inc. | $149,106.27 |

Exhibit 5
Page 10

| | | | |
|---|---|---|---|
| 1 | 118. | Consumer Resource | $123,871.26 |
| 2 | | Service, Inc. dba Direct | |
| 3 | | Account Mgmt. | |
| 4 | 119. | Hood Marketing Inc. | $163,993.33 |
| 5 | 120. | AH Wentworth, LLC | $38,815.88 |
| 6 | 121. | Lexicon Consulting LLC | $208,493.45 |
| 7 | 122. | Modern Debt Solution | $32,787.70 |
| 8 | | LLC | |
| 9 | | Modern Debt Solution | |
| 10 | | LLC 2 | |
| 11 | | Michael Mitarotonda | |
| 12 | 123. | Unifi, LLC fba Fidelity | $93,945.81 |
| 13 | | Debt Relief | $52,569.73 |
| 14 | 124. | Debt Relief Consultants | $75,614.12 |
| 15 | | LLC | |
| 16 | 125. | Landmark Legal LLC | $121,161.83 |
| 17 | 126. | Morning Financial LLC | $70,425.98 |
| 18 | 127. | Prime LLC | $134,500.00 |
| 19 | 128. | Relief Center | $92,538.46 |
| 20 | 129. | Direct Account | $46,621.19 |
| 21 | | Management | |
| 22 | 130. | Vercy, LLC | $71,269.60 |
| 23 | 131. | Z.A.P. Marketing Corp. | $44,806.91 |
| 24 | 132. | AMW Holdings LLC | $41,938.46 |
| 25 | | Amar Wanly | $6,000.00 |
| 26 | 133. | American Debt Enders, | $28,631.82 |
| 27 | | LLC | |
| 28 | | | |

Exhibit 5
Page 11

| | | | |
|---|---|---|---|
| 1 | 134. | Attorney Referral Service | $108,731.67 |
| 2 | | Heather Griner | |
| 3 | 135. | First Financial LLC | $42,818.48 |
| 4 | 136. | BRDD, LLC | $149,883.67 |
| 5 | 137. | Debt Advisors | $64,576.74 |
| 6 | 138. | Debt Advisors US LLC | $64,576.74 |
| 7 | 139. | Four Pack Genesis LLC | $24,786.43 |
| 8 | 140. | Inprocesso, LLC | |
| 9 | 141. | NuLeaf Financial, LLC | |
| 10 | | dba JumpStart Financial, | |
| 11 | | LLC | |
| 12 | | Andrew Kennedy | |
| 13 | | Jack Seigler | |
| 14 | 142. | Lifeline Debt Relief | $30,932.62 |
| 15 | 143. | Motivating Concepts Inc. | $50,145.03 |
| 16 | 144. | MR Leads Group LLC | $42,005.81 |
| 17 | 145. | Multi Credit Solutions | $57,081.74 |
| 18 | | Gregory Edmond | $778.79 |
| 19 | 146. | Next Gen Financial | $79,760.73 |
| 20 | | Services | |
| 21 | 147. | Prime One Doc Prep | $86,883.54 |
| 22 | 148. | Privy Enterprises Inc. | $58,102.65 |
| 23 | 149. | Puridy Financial | $78,042.83 |
| 24 | 150. | Radius Financial/Radius | $93,390.24 |
| 25 | | Financial Solutions | |
| 26 | 151. | Painte Marketing LLC | $41,720.97 |
| 27 | | James Hayes | $451.01 |
| 28 | | | |

Exhibit 5
Page 12

| | | |
|---|---|---|
| 152. | Telecommunications International | $192,484.85 |
| 153. | Step by Step Capital | $43,631.51 |
| 154. | MPower | $470,796.09 |
| 155. | PeachTree Debt Relief | |
| 156. | Advantage 1st Financial | $80,000 |

Exhibit 5
Page 13

# Exhibit 6

Exhibit 6
Page 1

**EXHIBIT 6**

**MCA LENDERS**

| MCA LENDER (alleged) | AMOUNT PAID |
|---|---|
| 1.  PECC CORP | $2,798,814.58 |
| 2.  Azzure Capital LLC | |
| 3.  MCA Capital Holdings LLC | |
| 4.  MCA Servicing Co. | $114,949.96 |
| 5.  MCA Fund Adv. LLC | |
| 6.  MCA LLC | |
| 7.  MCA litigation | |
| 8.  BMF Advance LLC | $2,775,541.99 |
| 9.  Clearfund Solution, LLC/Clearfund LLC | $189,136.75 |
| 10. Cobalt Funding Solutions LLC | $4,552,150.00 |
| 11. Franklin Capital Management LLC | |
| 12. Green Fund NY | |
| 13. Kevlar Capital LLC | |
| 14. World Global Fund LLC | $175,000.00 |
| 15. Ace Funding Source LLC dba Thor | |
| 16. Point 69 LLC | $290,000.00 |
| 17. EIN CAP | $354,047.00 |
| 18. Old Hickory Partners | $163,048.75 |
| 19. Bridge Funding Cap, LLC | $1,210,000.00 |

Exhibit 6
Page 2

1    20. Bridge Consolidation aka

2        Hamilton Advance Inc.

Exhibit 6
Page 3

# Exhibit 7

Exhibit 7
Page 1

1

2

### EXHIBIT 7

#### DIAB ALTER EGO AMOUNTS INCLUDED IN JUDGMENT AMOUNT

3

4

| DIAB ALTER EGO | AMOUNT FRAUDULENTLY TRANSFERRED |
|---|---|
| 1. Strategic Consulting Solutions LLC | $1,783,498.86[7] |
| 2. EZ Debt Relief Inc. | $ 234,582.85[8] |
| 3. A Solution 2/A Solution Debt Relief/ A Solution Debt Relief 3 | $ 290,567.67[9] |

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[7] Includes $1,650,053.21 in over 51 pre-petition transfers, plus; $133,445.65 in 13 post-petition transfers.

[8] Includes $234,582.85 in 80 pre-petition transfers, plus; $70,408.04 in 11 post-petition transfers.

[9] Includes 32 pre-petition transfers.

Exhibit 7
Page 2

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

DINSMORE & SHOHL LLP
655 West Broadway, Suite 800
San Diego, California 92101

A true and correct copy of the foregoing document entitled (*specify*): **STIPULATION WITH DEFENDANT TONY DIAB FOR ENTRY OF JUDGMENT**

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On October 30, 2024, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

| | |
|---|---|
| Keith Barnett<br>on behalf of Defendant Payliance, LLC | keith.barnett@troutman.com<br>kelley.wade@troutman.com |

☒ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On October 30, 2024, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**JUDGE'S COPY**
Honorable Scott C. Clarkson
United States Bankruptcy Court. Central District of California
Ronald Reagan Federal Building and Courthouse
411 West Fourth Street, Suite 5130 / Courtroom 5C
Santa Ana, CA 92701-4593

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on October 30, 2024, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| March 3, 2025 | Angelica Urena | /s/ *Angelica Urena* |
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

| | |
|---|---|
| Bradford Barnhardt<br>on behalf of Plaintiff Richard A. Marshack | bbarnhardt@marshackhays.com<br>bbarnhardt@ecf.courtdrive.com<br>alinares@ecf.courtdrive.com |
| Bradford Barnhardt<br>on behalf of Trustee Richard A. Marshack (TR) | bbarnhardt@marshackhays.com<br>bbarnhardt@ecf.courtdrive.com<br>alinares@ecf.courtdrive.com |
| Eric Bensamochan<br>on behalf of Interested Party Courtesy NEF | eric@eblawfirm.us<br>G63723@notify.cincompass.com |
| Christopher Celentino<br>on behalf of Plaintiff Richard A. Marshack | christopher.celentino@dinsmore.com<br>caron.burke@dinsmore.com |
| Christopher Celentino<br>on behalf of Trustee Richard A Marshack (TR) | christopher.celentino@dinsmore.com<br>caron.burke@dinsmore.com |
| Leslie A Cohen<br>on behalf of Defendant Rosa Bianca Loli | leslie@lesliecohenlaw.com<br>jaime@lesliecohenlaw.com<br>clare@lesliecohenlaw.com |
| Leslie A Cohen<br>on behalf of Interested Party Courtesy NEF | leslie@lesliecohenlaw.com<br>jaime@lesliecohenlaw.com<br>clare@lesliecohenlaw.com |
| Michael T Delaney<br>on behalf of Defendant Fidelity National Information Services, Inc. dba FIS | mdelaney@bakerlaw.com<br>tbreeden@bakerlaw.com |
| Alan W Forsley<br>on behalf of Interested Party Courtesy NEF | alan.forsley@flpllp.com<br>awf@fkllawfirm.com<br>awf@fl-lawyers.net<br>addy@flpllp.com<br>andrea@flpllp.com |
| Jeremy Freedman<br>on behalf of Plaintiff Richard A. Marshack | jeremy.freedman@dinsmore.com<br>bonnie.connolly@dinsmore.com |
| Jeremy Freedman<br>on behalf of Trustee Richard A. Marshack (TR) | jeremy.freedman@dinsmore.com<br>bonnie.connolly@dinsmore.com |
| Christopher Ghio<br>on behalf of Plaintiff Richard A. Marshack | christopher.ghio@dinsmore.com<br>angelica.urena@dinsmore.com |
| Christopher Ghio<br>on behalf of Trustee Richard A. Marshack (TR) | christopher.ghio@dinsmore.com<br>angelica.urena@dinsmore.com |
| Eric D Goldberg<br>on behalf of Defendant Stripe, Inc. | eric.goldberg@dlapiper.com<br>eric-goldberg-1103@ecf.pacerpro.com |
| Richard H Golubow<br>on behalf of Creditor Debt Validation Fund II, LLC | rgolubow@wghlawyers.com<br>jmartinez@wghlawyers.com<br>svillegas@wghlawyers.com |
| Richard H Golubow<br>on behalf of Creditor MC DVI Fund 1, LLC | rgolubow@wghlawyers.com<br>jmartinez@wghlawyers.com<br>svillegas@wghlawyers.com |
| Richard H Golubow<br>on behalf of Creditor MC DVI Fund 2, LLC | rgolubow@wghlawyers.com<br>jmartinez@wghlawyers.com<br>svillegas@wghlawyers.com |
| Sweeney Kelly<br>on behalf of Defendant Fidelity National Information Services, Inc. | kelly@ksgklaw.com |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**

| | |
|---|---|
| Sweeney Kelly<br>on behalf of Defendant Fidelity National Information Services, Inc. dba FIS | kelly@ksgklaw.com |
| Sweeney Kelly<br>on behalf of Defendant Worldpay Group | kelly@ksgklaw.com |
| Sweeney Kelly<br>on behalf of Defendant Worldpay, LLC | kelly@ksgklaw.com |
| Ira David Kharasch<br>on behalf of Defendant Consumer Legal Group, PC | ikharasch@pszjlaw.com |
| Ira David Kharasch<br>on behalf of Defendant LGS Holdco, LLC | ikharasch@pszjlaw.com |
| Meredith King<br>on behalf of Defendant Gallant Law Group | mking@fsl.law<br>ssanchez@fsl.law<br>jwilson@fsl.law |
| Meredith King<br>on behalf of Interested Party Courtesy NEF | mking@fsl.law<br>ssanchez@fsl.law<br>jwilson@fsl.law |
| David S Kupetz<br>on behalf of Defendant Marich Bein, LLC | David.Kupetz@lockelord.com<br>mylene.ruiz@lockelord.com |
| Matthew A. Lesnick<br>on behalf of Defendant Optimumbank Holdings, Inc. d/b/a Optimum Bank | matt@lesnickprince.com<br>matt@ecf.inforuptcy.com<br>jmack@lesnickprince.com |
| Daniel A Lev<br>on behalf of Interested Party Courtesy NEF | daniel.lev@gmlaw.com<br>cheryl.caldwell@gmlaw.com<br>dlev@ecf.courtdrive.com |
| Yosina M Lissebeck<br>on behalf of Plaintiff Richard A. Marshack | yosina.lissebeck@dinsmore.com<br>caron.burke@dinsmore.com |
| Daniel S March<br>on behalf of Defendant Daniel S. March | marchlawoffice@gmail.com<br>marchdr94019@notify.bestcase.com |
| Kathleen P. March<br>on behalf of Defendant Greyson Law Center PC | kmarch@bkylawfirm.com<br>kmarch3@sbcglobal.net<br>kmarch@sbglobal.net |
| Kathleen P. March<br>on behalf of Defendant Han Trinh | kmarch@bkylawfirm.com<br>kmarch3@sbcglobal.net<br>kmarch@sbglobal.net |
| Kathleen P. March<br>on behalf of Defendant Jayde Trinh | kmarch@bkylawfirm.com<br>kmarch3@sbcglobal.net<br>kmarch@sbglobal.net |
| Richard A Marshack (TR) | pkraus@marshackhays.com<br>rmarshack@iq7technology.com<br>ecf.alert+Marshack@titlexi.com |
| Kenneth Misken<br>on behalf of U.S. Trustee United States Trustee (SA) | Kenneth.M.Misken@usdoj.gov |
| Victoria Newmark<br>on behalf of Defendant Consumer Legal Group, PC | vnewmark@pszjlaw.com |
| Victoria Newmark<br>on behalf of Defendant LGS Holdco, LLC | vnewmark@pszjlaw.com |
| Queenie K Ng<br>on behalf of U.S. Trustee United States Trustee (SA) | queenie.k.ng@usdoj.gov |
| Lisa Patel<br>on behalf of Defendant OptimumBank Holdings, Inc. | lpatel@lesnickprince.com<br>jmack@lesnickprince.com<br>jnavarro@lesnickprince.com |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**

| Daniel H Reiss<br>on behalf of Defendant Touzi Capital, LLC | dhr@lnbyg.com<br>dhr@ecf.inforuptcy.com |
|---|---|
| Daniel H Reiss<br>on behalf of Defendant Eng Taing | dhr@lnbyg.com<br>dhr@ecf.inforuptcy.com |
| Jonathan Serrano<br>on behalf of Plaintiff Richard A. Marshack | Jonathan@MarguliesFaithLaw.com<br>vicky@marguliesfaithlaw.com<br>angela@marguliesfaithlaw.com<br>amber@marguliesfaithlaw.com |
| Zev Shechtman<br>on behalf of Interested Party Morning Law Group, P.C. | Zev.Shechtman@saul.com<br>zshechtman@ecf.inforuptcy.com<br>hannah.richmond@saul.com |
| Howard Steinberg<br>on behalf of Defendant BankUnited, N.A | steinbergh@gtlaw.com<br>pearsallt@gtlaw.com<br>howard-steinberg-6096@ecf.pacerpro.com |
| Andrew Still<br>on behalf of Interested Party Courtesy NEF | astill@swlaw.com<br>kcollins@swlaw.com |
| United States Trustee (SA) | ustpregion16.sa.ecf@usdoj.gov |
| William J Wall<br>on behalf of Witness Bradford Lee | wwall@wall-law.com |
| Johnny White<br>on behalf of Interested Party Courtesy NEF | JWhite@wrslawyers.com<br>jlee@wrslawyers.com |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                    **F 9013-3.1.PROOF.SERVICE**

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

DINSMORE & SHOHL LLP
655 West Broadway, Suite 800
San Diego, California 92101

A true and correct copy of the foregoing document entitled (*specify*): **MOTION FOR ORDER APPROVING STIPULATION BETWEEN TRUSTEE OF THE LPG LIQUIDATION TRUST AND TONY DIAB; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF RICHARD A. MARSHACK IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On April 16, 2025, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

| | |
|---|---|
| Keith Barnett<br>on behalf of Defendant Payliance, LLC | keith.barnett@troutman.com<br>kelley.wade@troutman.com |

⊠ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On April 16, 2025, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**JUDGE'S COPY**
Honorable Scott C. Clarkson
United States Bankruptcy Court. Central District of California
Ronald Reagan Federal Building and Courthouse
411 West Fourth Street, Suite 5130 / Courtroom 5C
Santa Ana, CA 92701-4593

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on April 16, 2025, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| April 16, 2025 | Angelica Urena | /s/ *Angelica Urena* |
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                    Page 14                          **F 9013-3.1.PROOF.SERVICE**

**1.** **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

| | |
|---|---|
| Bradford Barnhardt<br>on behalf of Plaintiff Richard A. Marshack | bbarnhardt@marshackhays.com<br>bbarnhardt@ecf.courtdrive.com<br>alinares@ecf.courtdrive.com |
| Bradford Barnhardt<br>on behalf of Trustee Richard A. Marshack (TR) | bbarnhardt@marshackhays.com<br>bbarnhardt@ecf.courtdrive.com<br>alinares@ecf.courtdrive.com |
| Eric Bensamochan<br>on behalf of Interested Party Courtesy NEF | eric@eblawfirm.us<br>G63723@notify.cincompass.com |
| Christopher Celentino<br>on behalf of Plaintiff Richard A. Marshack | christopher.celentino@dinsmore.com<br>caron.burke@dinsmore.com |
| Christopher Celentino<br>on behalf of Trustee Richard A Marshack (TR) | christopher.celentino@dinsmore.com<br>caron.burke@dinsmore.com |
| Leslie A Cohen<br>on behalf of Defendant Rosa Bianca Loli | leslie@lesliecohenlaw.com<br>jaime@lesliecohenlaw.com<br>clare@lesliecohenlaw.com |
| Leslie A Cohen<br>on behalf of Interested Party Courtesy NEF | leslie@lesliecohenlaw.com<br>jaime@lesliecohenlaw.com<br>clare@lesliecohenlaw.com |
| Michael T Delaney<br>on behalf of Defendant Fidelity National Information Services, Inc. dba FIS | mdelaney@bakerlaw.com<br>tbreeden@bakerlaw.com |
| Jamie P Dreher<br>on behalf of Defendant EPPS | jdreher@downeybrand.com<br>amasson@downeybrand.com<br>courtfilings@downeybrand.com |
| Alan W Forsley<br>on behalf of Interested Party Courtesy NEF | alan.forsley@flpllp.com<br>awf@fkllawfirm.com<br>awf@fl-lawyers.net<br>addy@flpllp.com<br>andrea@flpllp.com |
| Jeremy Freedman<br>on behalf of Plaintiff Richard A. Marshack | jeremy.freedman@dinsmore.com<br>bonnie.connolly@dinsmore.com |
| Jeremy Freedman<br>on behalf of Trustee Richard A. Marshack (TR) | jeremy.freedman@dinsmore.com<br>bonnie.connolly@dinsmore.com |
| Christopher Ghio<br>on behalf of Plaintiff Richard A. Marshack | christopher.ghio@dinsmore.com<br>angelica.urena@dinsmore.com |
| Christopher Ghio<br>on behalf of Trustee Richard A. Marshack (TR) | christopher.ghio@dinsmore.com<br>angelica.urena@dinsmore.com |
| Eric D Goldberg<br>on behalf of Defendant Stripe, Inc. | eric.goldberg@dlapiper.com<br>eric-goldberg-1103@ecf.pacerpro.com |
| Richard H Golubow<br>on behalf of Creditor Debt Validation Fund II, LLC | rgolubow@wghlawyers.com<br>jmartinez@wghlawyers.com<br>svillegas@wghlawyers.com |
| Richard H Golubow<br>on behalf of Creditor MC DVI Fund 1, LLC | rgolubow@wghlawyers.com<br>jmartinez@wghlawyers.com<br>svillegas@wghlawyers.com |
| Richard H Golubow<br>on behalf of Creditor MC DVI Fund 2, LLC | rgolubow@wghlawyers.com<br>jmartinez@wghlawyers.com<br>svillegas@wghlawyers.com |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

| Veneeta Jaswal<br>on behalf of Plaintiff Richard A. Marshack | veneeta.jaswal@dinsmore.com<br>bonnie.connolly@dinsmore.com |
| Sweeney Kelly<br>on behalf of Defendant Fidelity National Information Services, Inc. | kelly@ksgklaw.com |
| Sweeney Kelly<br>on behalf of Defendant Fidelity National Information Services, Inc. dba FIS | kelly@ksgklaw.com |
| Sweeney Kelly<br>on behalf of Defendant Worldpay Group | kelly@ksgklaw.com |
| Sweeney Kelly<br>on behalf of Defendant Worldpay, LLC | kelly@ksgklaw.com |
| Ira David Kharasch<br>on behalf of Defendant Consumer Legal Group, PC | ikharasch@pszjlaw.com |
| Ira David Kharasch<br>on behalf of Defendant LGS Holdco, LLC | ikharasch@pszjlaw.com |
| Meredith King<br>on behalf of Defendant Gallant Law Group | mking@fsl.law<br>ssanchez@fsl.law<br>jwilson@fsl.law |
| Meredith King<br>on behalf of Interested Party Courtesy NEF | mking@fsl.law<br>ssanchez@fsl.law<br>jwilson@fsl.law |
| David S Kupetz<br>on behalf of Defendant Marich Bein, LLC | David.Kupetz@lockelord.com<br>mylene.ruiz@lockelord.com |
| Matthew A. Lesnick<br>on behalf of Defendant Optimumbank Holdings, Inc. d/b/a Optimum Bank | matt@lesnickprince.com<br>matt@ecf.inforuptcy.com<br>jmack@lesnickprince.com |
| Daniel A Lev<br>on behalf of Interested Party Courtesy NEF | daniel.lev@gmlaw.com<br>cheryl.caldwell@gmlaw.com<br>dlev@ecf.courtdrive.com |
| Yosina M Lissebeck<br>on behalf of Plaintiff Richard A. Marshack | yosina.lissebeck@dinsmore.com<br>caron.burke@dinsmore.com |
| Daniel S March<br>on behalf of Defendant Daniel S. March | marchlawoffice@gmail.com<br>marchdr94019@notify.bestcase.com |
| Kathleen P. March<br>on behalf of Defendant Greyson Law Center PC | kmarch@bkylawfirm.com<br>kmarch3@sbcglobal.net<br>kmarch@sbglobal.net |
| Kathleen P. March<br>on behalf of Defendant Han Trinh | kmarch@bkylawfirm.com<br>kmarch3@sbcglobal.net<br>kmarch@sbglobal.net |
| Kathleen P. March<br>on behalf of Defendant Jayde Trinh | kmarch@bkylawfirm.com<br>kmarch3@sbcglobal.net<br>kmarch@sbglobal.net |
| Richard A Marshack (TR) | pkraus@marshackhays.com<br>rmarshack@iq7technology.com<br>ecf.alert+Marshack@titlexi.com |
| Kenneth Misken<br>on behalf of U.S. Trustee United States Trustee (SA) | Kenneth.M.Misken@usdoj.gov |
| Victoria Newmark<br>on behalf of Defendant Consumer Legal Group, PC | vnewmark@pszjlaw.com |
| Victoria Newmark<br>on behalf of Defendant LGS Holdco, LLC | vnewmark@pszjlaw.com |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                   Page 16                          **F 9013-3.1.PROOF.SERVICE**

| Queenie K Ng<br>on behalf of U.S. Trustee United States Trustee (SA) | queenie.k.ng@usdoj.gov |
|---|---|
| Lisa Patel<br>on behalf of Defendant OptimumBank Holdings, Inc. | lpatel@lesnickprince.com<br>jmack@lesnickprince.com<br>jnavarro@lesnickprince.com |
| Daniel H Reiss<br>on behalf of Defendant Touzi Capital, LLC | dhr@lnbyg.com<br>dhr@ecf.inforuptcy.com |
| Daniel H Reiss<br>on behalf of Defendant Eng Taing | dhr@lnbyg.com<br>dhr@ecf.inforuptcy.com |
| Jonathan Serrano<br>on behalf of Plaintiff Richard A. Marshack | Jonathan@MarguliesFaithLaw.com<br><br>vicky@marguliesfaithlaw.com<br><br>angela@marguliesfaithlaw.com<br><br>amber@marguliesfaithlaw.com |
| Zev Shechtman<br>on behalf of Interested Party Morning Law Group, P.C. | Zev.Shechtman@saul.com<br>zshechtman@ecf.inforuptcy.com<br>hannah.richmond@saul.com |
| Howard Steinberg<br>on behalf of Defendant BankUnited, N.A | steinbergh@gtlaw.com<br>pearsallt@gtlaw.com<br>howard-steinberg-6096@ecf.pacerpro.com |
| Andrew Still<br>on behalf of Interested Party Courtesy NEF | astill@swlaw.com<br>kcollins@swlaw.com |
| United States Trustee (SA) | ustpregion16.sa.ecf@usdoj.gov |
| William J Wall<br>on behalf of Witness Bradford Lee | wwall@wall-law.com |
| Johnny White<br>on behalf of Interested Party Courtesy NEF | JWhite@wrslawyers.com<br>jlee@wrslawyers.com |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                      Page 17                  **F 9013-3.1.PROOF.SERVICE**